**ORIGINAL**

16 MAG 5473

Approved: _____
NOAH SOLOWIEJCZYK / ELIZABETH A. HANFT
Assistant United States Attorneys

Before:  DEBRA FREEMAN
         Chief United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :    **SEALED COMPLAINT**

         - v. -                    :    Violations of
                                        18 U.S.C.
IBRAHIM ISSA,                      :    §§ 201(b)(1)(A) and (B),
    a/k/a "Tony Issa,"                  641, and 2
                                   :
         Defendant.                     COUNTY OF OFFENSE:
                                   :    NEW YORK

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

       ANTHONY DUBAR, being duly sworn, deposes and says that he is a Special Agent with the United States Postal Service Office of the Inspector General ("USPS OIG"), and charges as follows:

COUNT ONE
(Bribing a Public Official)

       1.  From at least in or about 2014 up to and including at least in or about August 2016, in the Southern District of New York and elsewhere, IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, did directly and indirectly, corruptly give, offer and promise a thing of value to a public official, with intent to influence an official act, and to influence a public official to commit and aid in committing, and to collude in, and allow, and to make opportunity for the commission of a fraud, on the United States, to wit, ISSA paid and attempted to pay bribes to officials of the United States Postal Service ("USPS") in order to obtain fees relating to the maintenance and repair of USPS vehicles.

(Title 18, United States Code, Sections 201(b)(1)(A) and (B), and 2.)

## COUNT TWO
(Theft of Government Funds)

2. From at least in or about 2012, up to and including at least in or about August 2016, in the Southern District of New York and elsewhere, IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, did embezzle, steal, purloin, and knowingly convert to his own use, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, USPS, which exceeded the sum of $1,000, and did receive, conceal, and retain the same with intent to convert it to his use and gain, knowing it to have been embezzled, stolen, purloined and converted, to wit, ISSA fraudulently billed the USPS, and fraudulently caused the USPS to be billed, for vehicle maintenance work that was not, in actuality, performed, and also billed the USPS for vehicle maintenance work that was not necessary and had not been requested by the USPS.

(Title 18, United States Code, Sections 641 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I have been a Special Agent with the USPS OIG for approximately ten years. I have been personally involved in the investigation of this matter, and I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### BACKGROUND ON ISSA's VEHICLE MAINTENANCE COMPANIES AND THE CONTRACTS WITH THE USPS

4. Based on my review of USPS records and other publicly available records, I am aware that IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, owns and operates numerous vehicle maintenance and repair companies (the "Issa Companies") in the vicinity of New York City; Detroit, Michigan; Houston, Texas; and Miami, Florida, among other locations.

5. Based on my training and experience and my participation in this investigation, I am aware that the USPS maintains its own vehicles, and has its own internal vehicle maintenance departments, that are known as a Vehicle Maintenance Facilities ("VMFs"). The VMFs are responsible for the coordination of all maintenance and repair of USPS vehicles. In addition to having USPS employees directly perform maintenance work on USPS vehicles, the VMFs also contract with third-party vendors to perform maintenance, repair, and towing of USPS vehicles.

6. Based on my review of a vehicle maintenance and repair contract entered into in or about 2012 between IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, on behalf of one of the Issa Companies ("Issa Company-1"), and the USPS (the "Issa Company-1 Contract"), as well as federal regulations regarding the Standards of Ethical Conduct for Employees of the Executive Branch (the "Standards of Ethical Conduct"), I have learned, among other things, the following:

   a. The Issa Company-1 Contract specified that Issa Company-1 was required to abide by the USPS standard contract provision regarding gratuities or gifts, which states, in pertinent part, that the USPS "may terminate this contract for default if, after notice and a hearing, the Postal Service Board of Contract Appeals determines that the supplier or the supplier's agent or other representative: (1) [o]ffered or gave a gratuity or gift (as defined in 5 CFR 2635) to an officer or employee of the Postal Service; and (2) [i]ntended by the gratuity or gift to obtain a contract or favorable treatment under a contract."

   b. Section 2635 of Title 5 of the Code of Federal Regulations, which sets forth the Standards of Ethical Conduct, states, in pertinent part, that a federal government employee "shall not, directly or indirectly, solicit or accept a gift: (1) [f]rom a prohibited source; or (2) [g]iven because of the employee's official position." 5 C.F.R. § 2635.202(a). The Standards of Ethical Conduct define a "prohibited source" as "any person who . . . (1) [i]s seeking official action by the employee's agency; (2) [d]oes business or seeks to do business with the employee's agency; (3) [c]onducts activities regulated by the employee's agency; [or] (4) [h]as interests that may be substantially affected by performance or nonperformance of the employee's official duties." 5 C.F.R. § 2635.203.

3

c. Under the Standards of Ethical Conduct, a "gift" is defined as "any gratuity, favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value." A federal government employee is expressly prohibited from "accept[ing] a gift in return for being influenced in the performance of an official act." 5 C.F.R. § 2635.202(c)(1).

d. The Issa Company-1 Contract further states, in pertinent part, that although "[d]uring the course of performing authorized maintenance or repair work, the supplier may uncover additional work which is required," "[t]he supplier is NOT authorized to perform such additional work without the approval of an authorized Postal Service employee."

7. Based on my review of USPS records relating to billing of the USPS by vehicle maintenance contractors, I have learned that, between in or about 2012 and in or about July 2016, the Issa Companies have received fees associated with maintenance, repair, and towing of USPS vehicles nationally in the amount of approximately $30 million. In addition, I have learned that, in 2012, Issa Company-1 was the highest paid contractor in the New York City area by over one million dollars.

## THE ISSA COMPANIES' FRAUDULENT BILLING PRACTICES

8. Based on my participation in this investigation, including interviews of USPS employees, my review of reports prepared in connection with this investigation, and my discussions with another USPS OIG investigator ("Investigator-1"), I have learned that, beginning in or about 2013, USPS OIG began receiving complaints from various USPS employees, including VMF managers, about the quality of work performed by Issa Company-1, and various fraudulent billing practices in which the Issa Companies engaged.

a. For example, in or about July 2014, a USPS VMF manager ("VMF Manager-1") for a VMF facility located in the New York City area reported that IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, was attempting to solicit business from VMF Manager-1's facility. In response to ISSA's solicitations of VMF Manager-1, VMF Manager-1 contacted other VMF managers who had used the Issa Companies for vehicle maintenance work. Those managers reported being unsatisfied with the quality of work performed by the Issa Companies. In addition, those other VMF managers reported that they believed that ISSA and the Issa

4

Companies engaged in fraudulent billing practices, including billing for work that was not in fact performed, or performing work that was not requested by USPS or required.

    b. On numerous occasions, the Issa Companies billed USPS for work that was not performed on USPS vehicles, or billed the USPS more than once for the same work. For example:

      i. In or about June 2014, one of the Issa Companies was hired to perform maintenance work on a particular USPS vehicle. According to VMF Manager-1, when the vehicle was returned to the USPS, it was visually apparent that the requested work had not been completed despite the fact that the USPS was billed for the work. I have reviewed photographs of the relevant parts of that USPS vehicle after it was returned to USPS custody. Based on my review of those photographs, I believe that the requested repairs were not performed.

      ii. In or about October 2014, the USPS provided a USPS vehicle to Issa Company-1, along with a new engine for Issa Company-1 to install in that USPS vehicle. Issa Company-1 billed the USPS for a compression test to determine whether the vehicle required a new engine, despite the fact that no such test was requested by the USPS, and a new engine had already been provided to Issa Company-1 for installation. Based on my participation in this investigation, I have learned that Issa Company-1 frequently performed excess work on vehicles that had never been requested by an authorized USPS employee.

      iii. In or about April 2015, a USPS Vehicle was provided to Issa Company-1 for a preventive maintenance inspection ("PMI"), a comprehensive procedure that involves a flat charge for a certain number of hours, and a fixed list of maintenance work. Issa Company-1 billed the USPS for an itemized brake check and battery check on the USPS vehicle in the amount of approximately $500, despite the fact that a brake check and a battery check are both included in the standard PMI procedure. Based on my participation in this investigation, I have learned that, on this and other occasions, Issa Company-1 billed the USPS for additional charges that should have been included in the flat rate PMI charge.

    c. On numerous other occasions, the Issa Companies have also billed USPS for the towing of USPS vehicles that did not, in actuality, occur. For example, I have reviewed USPS records of towing purportedly performed by one of the Issa Companies. Based on my review of those records, as well as my

conversations with USPS employees, I have learned, among other things, that the Issa Companies have charged USPS for towing by a particular driver, although their records indicate that the driver was simultaneously towing a different vehicle. In addition, I have learned, among other things, that the Issa Companies have charged USPS for having a particular tow truck on "standby" at a given location, although its records indicate that the driver for the same vehicle purportedly on "standby" was simultaneously towing a different vehicle.

### ISSA'S ATTEMPTS TO BRIBE VMF MANAGER-1

9. Based on my participation in this investigation, including my review of reports prepared in connection with this investigation, and my discussions with Investigator-1 and VMF Manager-1, I have learned that, in or about September 2014, IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, met with VMF Manager-1 for lunch, at ISSA's invitation, at a restaurant. VMF Manager-1 attended and made an audio recording of the lunch with ISSA at the direction and under the supervision of the USPS OIG. During the course of the lunch, ISSA discussed with VMF Manager-1, in sum and substance, that VMF Manager-1 should provide more USPS vehicle maintenance work to the Issa Companies. ISSA paid for the entirety of the bill at lunch, despite VMF Manager-1's stating to ISSA that VMF Manager-1 was not permitted to accept the lunch from ISSA.

10. Based on my participation in this investigation, including my review of reports prepared by Investigator-1 and my review of audio recordings, I have learned that in or about November 2014, IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, invited VMF Manager-1 to attend a lunch at a high-end steakhouse located in New York, New York ("Restaurant-1"). VMF Manager-1 attended and made an audio recording of the lunch with ISSA at the direction and under the supervision of the USPS OIG. During the course of the lunch, which lasted approximately two hours and fifty minutes, the following, among other things, occurred:

   a. ISSA discussed with VMF Manager-1, among other things, that they were building a relationship. ISSA shortly thereafter invited VMF Manager-1 to join ISSA on an upcoming fishing trip to Florida.

   b. ISSA discussed with VMF Manager-1, among other things, that ISSA had a tablet computer bearing the name of one of the Issa Companies ("Issa Company-2") that ISSA wanted to provide to VMF Manager-1. VMF Manager-1 responded, in sum

6

and substance, that VMF Manager-1 needed to be careful because VMF Manager-1 should not be accepting such an item from ISSA. ISSA responded that he would have his employees remove the name of Issa Company-2 from the screen of the tablet computer. ISSA further stated to VMF Manager-1, in sum and substance, "If you don't know how to hide, then don't get in the game."

    c.  During the course of the meal, ISSA and VMF Manager-1 ordered the following items, among others: two New York cut sirloin steaks; colossal stone crab claws; Maryland crab cakes; and a bottle of wine that cost approximately $130. At the end of the meal, when the bill arrived, VMF Manager-1 requested to pay for his share of the meal, but ISSA refused. In addition, ISSA insisted on ordering a meal for VMF Manager-1 to bring home with him that included king salmon, two crab cakes, and four colossal stone crab claws. VMF Manager-1 again offered to pay for his portion of the meal, but ISSA declined the offer. Based on information provided by VMF Manager-1, Investigator-1 estimated that the total cost of the meal, including gratuity, amounted to approximately $650.

    d.  ISSA suggested to VMF Manager-1 that the Issa Companies could perform PMI[1] work on USPS vehicles managed by VMF Manager-1, and could also provide associated towing of the vehicles to and from Issa Company facilities for this purpose.

    e.  At the end of the lunch, ISSA stated to VMF Manager-1, in sum and substance, "Let's work together. That's all I want."

    11.  Based on my participation in this investigation, including my review of reports prepared by Investigator-1, I have learned that on or about December 24, 2014, the following gift-wrapped items were delivered to VMF Manager-1's office by an assistant to IBRAHIM ISSA, a/k/a "Tony Issa," the defendant: (i) two one-liter bottles of Johnnie Walker Black Label Scotch whiskey; and (ii) one bottle of Silver Patron Tequila. These items were accompanied by a business card for Issa Company-2, and a note that read "Happy Holidays!!"

---

[1] Based on my participation in this investigation and my conversations with VMF Manager-1, I have learned, among other things, that PMIs are among the most lucrative work available for third-party vehicle maintenance contractors.

12.     Based on my participation in this investigation, including my review of reports prepared by Investigator-1 and my review of audio recordings, I have learned that in or about January 2015, IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, invited VMF Manager-1 to attend a lunch at a high-end steakhouse located in New York, New York ("Restaurant-2"). VMF Manager-1 attended and made an audio recording of the lunch at the direction and under the supervision of the USPS OIG. During the course of the lunch, which lasted approximately two hours and forty-five minutes, the following, among other things, occurred:

   a.   Towards the beginning of the lunch, ISSA provided VMF Manager-1 with a tablet computer. VMF Manager-1 asked ISSA, in sum and substance, whether ISSA had removed the name of Issa Company-2 from the tablet computer, and ISSA stated that he had. VMF Manager-1 further stated that he was not supposed to accept such items from ISSA, and ISSA responded that that was why he had removed the name of Issa Company-2 from the tablet computer.

   b.   ISSA further stated to VMF Manager-1 that there was no problem with ISSA providing VMF Manager-1 with a gift, because he "kn[ew] this shit inside out." ISSA explained that "as long as there is what is called no quid pro quo," there would be no problem with what ISSA and VMF Manager-1 were doing.

   c.   During the lunch, ISSA and VMF Manager-1 discussed various USPS-related matters. ISSA explicitly and repeatedly requested that VMF Manager-1 provide the Issa Companies with additional PMI work, and complained that VMF Manager-1 was only providing ISSA with engine work.

   d.   ISSA further stated that what happened between him and VMF Manager-1 would stay between them. ISSA stated, in sum and substance, that his relationship with VMF Manager-1 was akin to a married man cheating with a married woman and cautioned that "a slip of the lip will sink a ship." ISSA also stated, in sum and substance: "Let's talk man to man . . . do you think I will benefit if anything god forbid comes out?".

   e.   During the lunch at Restaurant-2, ISSA and VMF Manager-1 ordered, among other items, crab cakes, sirloin steak for two, and an expensive bottle of wine. When the bill arrived, VMF Manager-1 offered to pay for his part of the bill, but ISSA refused and covered the entirety of the bill.

13.     Based on my review of a credit card statement in the name of IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, and Issa Company-1, I have learned that ISSA paid for the above-described January 2015 meal at Restaurant-2, and that the meal cost approximately $450.

14.     Based on my participation in this investigation, including my review of reports prepared by Investigator-1, I have learned that, following the above-described February 2015 lunch at Restaurant-2, IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, met with VMF Manager-1 again at VMF Manager-1's office in or about February 2015, during which meeting VMF Manager-1 informed ISSA, in sum and substance, that VMF Manager-1 would be providing PMI work to the Issa Companies as ISSA had previously requested.

15.     Based on my participation in this investigation, including my review of reports prepared by Investigator-1 and my review of audio recordings, I have learned that in or about April 2015, IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, invited VMF Manager-1 to attend a lunch at a high-end steakhouse located in Melville, New York ("Restaurant-3"). Prior to the lunch at Restaurant-3, ISSA provided VMF Manager-1 with a tour of one of the Issa Companies' facilities located in Long Island. ISSA provided VMF Manager-1 with a case of twelve bottles of wine before ISSA and VMF Manager-1 entered Restaurant-3. During the course of the lunch, which was recorded by VMF Manager-1 at the direction and under the supervision of the USPS OIG, the following, among other things, occurred:

    a.  ISSA and VMF Manager-1 ordered, among other items, colossal crab claws, lobster, shrimp, and ribeye steak. ISSA also ordered to-go items for VMF Manager-1 at the end of the meal. ISSA stated to VMF Manager-1, in sum and substance, that meals of this nature were just business expenses. ISSA paid for the entirety of the bill at the end of the meal.

    b.  ISSA again discussed with VMF Manager-1 that VMF Manager-1 should come fishing with ISSA in Florida.

    c.  ISSA stated to VMF Manager-1, in sum and substance, that ISSA could assist VMF Manager-1 with additional vehicle maintenance work. VMF Manager-1 responded that he had to "proceed cautiously" and that he had to be "under the radar."

16.     Based on my review of a credit card statement in the name of IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, his

wife, and another one of the Issa Companies ("Issa Company-3"), I have learned that ISSA paid for the above-described April 2015 meal at Restaurant-3 with VMF Manager-1, and that the meal cost approximately $600.

### ISSA'S ATTEMPTS TO BRIBE VMF MANAGER-2

17. In or about December 2015, the USPS OIG was contacted by a VMF manager for a USPS facility located in Michigan ("VMF Manager-2") regarding IBRAHIM ISSA, a/k/a "Tony Issa," the defendant. Based on my review of a report of an interview of VMF Manager-2, I have learned, among other things, the following:

   a. VMF Manager-2 had previously spoken with IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, because VMF Manager-2 had identified repairs that were charged by one of the Issa Companies based in Michigan ("Issa Company-4") without authorization by USPS. He further stated that Issa Company-4 was charging for work on vehicles that Issa Company-4 was not, in fact, performing.

18. Based on my participation in this investigation, including my discussions with VMF Manager-2 and my review of audio recordings, I have learned that, in or about May 2016, VMF Manager-2 met with IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, at a VMF facility located in Michigan and made an audio recording of the meeting at the direction and under the supervision of the USPS OIG. During the meeting, ISSA stated to VMF Manager-2, in sum and substance, that his goal was to work with VMF Manager-2. ISSA and VMF Manager-2 further discussed that VMF Manager-2 might be traveling to New York City in the coming months, because his daughter was considering attending a university there. ISSA responded, in sum and substance, that ISSA would show VMF Manager-2 around New York should VMF Manager-2 end up visiting New York.

19. Based on my discussions with VMF Manager-2, I have learned that IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, invited VMF Manager-2 for dinner at a restaurant located in Michigan ("Restaurant-4") in or about June 2016, which VMF Manager-2 attended at the direction and under the supervision of the USPS OIG. During the dinner, the following, among other things, occurred:

          a.    ISSA and VMF Manager-2 ordered multiple bottles of sake during the meal, as well as sushi, fried oysters, bourbon, steak, and scallops. ISSA paid for the entirety of the meal, although VMF Manager-2 offered to pay for his share.

          b.    VMF Manager-2 informed ISSA that VMF Manager-2 would have to put off his planned trip to New York City for the time being. ISSA encouraged VMF Manager-2 to come to New York for the weekend at some point and stated, in sum and substance, that ISSA would show VMF Manager-2 a good time.

        20.    Based on my review of a credit card statement in the name of IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, and Issa Company-1, I have learned that ISSA paid for the above-described June 2016 meal at Restaurant-4 with VMF Manager-2, and that the meal cost approximately $175.

        21.    On or about June 24, 2016, IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, and VMF Manager-2 exchanged text messages, in which VMF Manager-2 told ISSA, in sum and substance, that he planned to visit New York City in or about August 2016. ISSA responded, in sum and substance, that he was looking forward to seeing VMF Manager-2 and showing him around New York City. ISSA also informed VMF Manager-2 that he might be in Michigan prior to August 2016.

        22.    Based on my participation in this investigation, including my discussions with VMF Manager-2, I have learned that, on or about July 11, 2016, IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, invited VMF Manager-2 to a restaurant located in Michigan ("Restaurant-5"). VMF Manager-2 met with and recorded the meeting with ISSA at the direction and under the supervision of the USPS OIG. Based on my discussions with VMF Manager-2 and my review of the recording of the meeting, I have learned, among other things, the following:

          a.    ISSA and VMF Manager-2 discussed VMF Manager-2's upcoming trip to New York City in August 2016. In pertinent part, based on my review of a preliminary transcription of the recording of the meeting, I have learned that VMF Manager-2 and ISSA had the following discussion:

              ISSA:           Listen. I know you're not rich, okay? I don't want you to spend any money coming to New York. But, at the same

| | |
|---|---|
| | time, I don't want to get you in trouble, okay? |
| VMF Manager-2: | Right. |
| ISSA: | So, is there any way you can put it on your card, and I take care of it over there? I can do the ticket, whatever. I don't want you spending money over there. I want to show you a good time. You know what I'm saying? But I don't want you doing - I don't - I'm very careful and I'm very smart, and I have fun. |
| VMF Manager-2: | Absolutely. |
| ISSA: | I don't want - I'm very smart, trust me, okay? I don't want - so, why don't you just get the ticket, right? Like, I'll tell you where to get it from. |
| VMF Manager-2: | Okay. |
| ISSA: | Could you put it on your card? |
| VMF Manager-2: | Yeah. |
| ISSA: | Okay. Then I'll pay you back [unintelligible] over there. [unintelligible] one shot. [unintelligible] |
| VMF Manager-2: | Right. |

  b. Based on my review of the preliminary transcription of the recording of the July 11, 2016 meal, I have also learned that towards the conclusion of the meal, ISSA stated to VMF Manager-2, in sum and substance, "Look in my eyes. Okay, you could be a federal agent wired right now, okay?" ISSA thereafter stated, "All we ask for, if you guys need a service, you want a vendor that can provide you 24 hours, 7 days a week service . . . with mechanics who are certified, who can do the towing, the shuttling, the repairing, that stuff. All we ask, that's it."

12

        c. During the meal, ISSA and VMF Manager-2 ordered steaks, appetizers, and two drinks each, among other items. At the end of the meal, ISSA paid for the entirety of the bill.

        23. Based on my review of a credit card statement in the name of IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, and Issa Company-1, I have learned that ISSA paid for the above-described July 11, 2016 meal at Restaurant-5 with VMF Manager-2, and that the meal cost approximately $525.

        24. Based on my discussions with VMF Manager-2 and my review of a recorded telephone conversation between IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, and VMF Manager-2, I know that ISSA discussed with VMF Manager-2 his upcoming trip to New York City in or about August 2016. ISSA suggested, in sum and substance, that VMF Manager-2 should pay for the hotel and flight in VMF Manager-2's own name. At the direction of the USPS OIG, VMF Manager-2 thereafter purchased a flight and a room at a hotel in VMF Manager-2's own name.

### VMF MANAGER-2's TRIP TO NEW YORK CITY TO VISIT ISSA

        25. On or about August 8, 2016, VMF Manager-2 travelled to New York City at the request of IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, and met with ISSA at the direction of the USPS OIG. Between on or about August 8, 2016 and August 11, 2016, VMF Manager-2 was in New York City and spent an extended period of time with ISSA's assistant ("Assistant-1") and ISSA himself.

        26. Based on my participation in this investigation, including my discussions with VMF Manager-2, surveillance of meetings between VMF Manager-2 and IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, in New York City, my review of audio recordings that were made by VMF Manager-2 at the direction and under the supervision of the USPS OIG, and my review of financial records, I have learned, among other things, the following with respect to VMF Manager-2's trip to New York City:

        a. On or about August 9, 2016, VMF Manager-2 visited various tourist attractions in New York City with Assistant-1.

        b. During the evening of on or about August 9, 2016, ISSA, VMF Manager-2, and Assistant-1 went to dinner at a restaurant located in Manhattan ("Restaurant-6"). Based on my

review of a preliminary transcription of an audio recording of the meal at Restaurant-6, I have learned that, when Assistant-1 left the table to go to the bathroom, ISSA asked VMF Manager-2 how much VMF Manager-2's flight and airfare had cost, and subsequently told him to write the cost of the airfare and hotel on a piece of paper. VMF Manager-2 told Issa that the cost had been "almost 4 for the ticket, and a little over 6 for the . . . hotel."

    c. Based on my review of a credit card statement in the name of ISSA, his wife, Issa Company-1, and Issa Company-3, I have learned that ISSA paid for the above-described August 9, 2016 meal at Restaurant-6 with VMF Manager-2, and that the meal and bar tab collectively cost approximately $400.

    d. On or about August 10, 2016, VMF Manager-2 went to dinner at a restaurant located in Chinatown in Manhattan ("Restaurant-7") with ISSA and Assistant-1.

     i. During the meal, when Assistant-1 stepped away from the table, ISSA asked VMF Manager-2, in sum and substance, whether VMF Manager-2 had determined the cost of the flight to New York City and the hotel room.

     ii. VMF Manager-2 then handed ISSA a piece of paper with the cost of the hotel ($627.00), the flight ($456.00), and a total cost of $1,083. ISSA looked at the piece of paper, and then instructed VMF Manager-2 to put his hand under the table. Thereafter, ISSA placed a wad of United States currency that was wrapped in a napkin into VMF Manager-2's hand under the table. VMF Manager-2 then placed the wad of currency in the napkin into VMF Manager-2's pocket.

     iii. ISSA informed VMF Manager-2, in sum and substance, that there was $2,000 in the napkin. VMF Manager-2 responded that this was more than VMF Manager-2 had spent on the flight and the hotel. ISSA replied that everything was good and not to worry about it.

     iv. At the end of the meal, as ISSA and VMF Manager-2 were exiting Restaurant-7, VMF Manager-2 stated to ISSA, in sum and substance, that $2,000 was too much money, and ISSA again responded that VMF Manager-2 should not worry about it, and that it was all good. VMF Manager-2 thanked ISSA for his generosity.

14

     e. VMF Manager-2 provided me with the United States currency that he had been given by ISSA immediately following the meal at Restaurant-7, and I confirmed that the amount contained in the napkin was in fact $2,000.

    WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of IBRAHIM ISSA, a/k/a "Tony Issa," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

                _____
                 ANTHONY DUBAR
                 SPECIAL AGENT
                 UNITED STATES POSTAL SERVICE
                 OFFICE OF THE INSPECTOR GENERAL

Sworn to before me this
29th day of August, 2016

_____
HONORABLE DEBRA FREEMAN
CHIEF UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK