IC45iss1

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          17 Cr. 74 (CM)

 5   IBRAHIM ISSA,

 6                                          Trial
                   Defendant.
 7
     ------------------------------x

 8
                                           New York, N.Y.
 9                                         December 4, 2018
                                           9:55 a.m.
10

11   Before:

12                      HON. COLLEEN MCMAHON,

13                                          District Judge

14                           APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     NOAH SOLOWIEJCZYK
17   ELIZABETH HANFT
     KYLE WIRSHBA
18        Assistant United States Attorneys

19   BRAFMAN & ASSOCIATES, P.C.
          Attorneys for Defendant
20   BY:  BENJAMIN BRAFMAN
          JOSHUA D. KIRSHNER
21        STUART GOLD

22   ALSO PRESENT:   ANTHONY DUBAR, Special agent USPS-OIG
                     GRACE SOTO, Special agent IRS
23                   COLLEEN GEIER, Paralegal Specialist USAO
                     PRIYA KUARLALL PRASAD, Paralegal

24

25

IC45iss1

1                    (Trial resumed; jury present)

2                    THE COURT:  Who is opening for the government?

3                    MS. HANFT:  Good morning, your Honor.  Elizabeth

4        Hanft, opening for the government, here with my colleagues

5        Solowiejczyk, Kyle Wirshba, Colleen Geier, Anthony Dubar.

6                    MR. BRAFMAN:  Ben Brafman Josh Kirshner, Stuart Gold

7        who is present for Mr. Issa, and paralegal Priya Prasad.

8                    THE COURT:  Excellent.  All right.

9                    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IC45iss1

1              (Jury present)

2              THE COURT:  Good morning, everyone.

3              THE JURY:  Good morning.

4              THE COURT:  Have a seat.  So, let me give you a few

5    preliminary instructions and we will go right to opening

6    statements.

7              As I told you yesterday during the voir dire, you are

8    going to be the judges of the facts in this case and you are

9    going to decide the case on the basis of the evidence that you

10   hear and the law as I give it to you.

11             Now, nothing that I say to you is evidence in the

12   case.  I never met Mr. Issa before.  This event, this lawsuit

13   arose; I don't know anything about the facts of the case.  I'm

14   actually going to learn them along with you.  I'm not a

15   witness.

16             Nothing that the lawyers say to you is evidence, even

17   though they do a lot of the talking during the trial.  They are

18   not witnesses either.  Their questions aren't evidence.  It is

19   a question and the answer taken together, that is the evidence.

20   Objections that lawyers might make are not evidence.

21             Sometimes a witness will say something on the stand

22   and I will exclude that testimony and you have to erase it from

23   your memory as though it had never been said.  That's not

24   evidence.

25             The evidence consists of the sworn testimony of the

IC45iss1

1   witnesses, the exhibits, documents, objects, things that may be

2   received into evidence, and there may be some stipulations or

3   agreements between the lawyers either that a particular fact

4   can be deemed proved or that if a particular person got on the

5   stand, he or she would testify in a particular way and those

6   stipulations, those agreements are also evidence.

7         There are two types of evidence.  Direct evidence is

8   proof of a fact by virtue of the observation through the

9   witness' five senses.  I was walking down the street when I

10  heard the screech of brakes.  I looked up and I saw a green

11  Toyota go through a red light and crash into a truck that was

12  oncoming.  I could smell the smell of burning rubber.  I saw, I

13  heard I touched, I tasted.  That's direct evidence.  Okay?

14        Indirect evidence or circumstantial evidence is proof

15  of fact A by direct evidence from which we draw a conclusion

16  about fact B.  The classic example is always fun to give on a

17  sunny day.  Suppose we are in this courtroom, the weather is

18  beautiful this morning, and over the course of the day people

19  begin arriving and they're carrying umbrellas and their hair is

20  plastered down to their heads and they look like they've been

21  out in the rain.  That's the direct evidence.  It looks like

22  people have been out in the rain.

23        From that evidence you could draw the conclusion that

24  it had begun to rain outside.  You don't have the direct proof

25  of that fact because I'm going to pretend that you can't see

IC45iss1

1    out the window and you can't hear and in this room we don't

2    know what the weather is but you do have some evidence from

3    which you can draw the conclusion that the weather has changed

4    and it has begun to rain.  That's what we call circumstantial

5    evidence.

6             You can decide the case on the basis of direct

7    evidence, circumstantial evidence, or both kinds of evidence.

8    Whatever you, the jurors, find to be credible.

9             So, deciding credibility is one of your principal

10   functions and how do you do that?  You listen to the witnesses,

11   you watch them, and then you ask yourselves in a conscious way

12   questions that you don't really think about but you're asking

13   yourself every day when you encounter other people.  Does that

14   person seem to know what he is talking about?  Does she have

15   some kind of a motive to lie or to exaggerate or to distort

16   what she's saying to me?  Does that person strike me as being

17   candid and open?  You use your common sense.  You evaluate what

18   you hear and then you decide whether you believe it or you

19   don't believe it based on all the circumstances.

20            Now, it's very important, ladies and gentlemen, that

21   you keep an open mind throughout this case and that you not

22   form any judgments until all of the evidence has come in and

23   the lawyers have had an opportunity to talk to you about the

24   evidence and what it shows and I have explained the law to you.

25   Until you have all that information you are not in a position

IC45iss1

1   to start making up your mind about whether the government has

2   met its burden of overcoming the presumption of innocence and

3   proving that Mr. Issa, whom we are presuming to be innocent, is

4   in fact guilty of the crimes with which he has been charged.

5   And that's why we ask you to do this very unnatural thing.  We

6   ask you not to discuss the case.  Please don't discuss the

7   case.  Don't talk about the case, don't talk about what you

8   have heard in court, don't talk about the kind of case it is.

9   Don't engage in any kind of conversation whether it be in

10  person, over the phone, over the Internet.  I don't care what

11  and I don't care with whom.  Just don't talk about the case.

12  And the reason that we are going to ask you not to talk about

13  the case until you have all the information you need to decide

14  it, is because when you start talking about something, your

15  position will begin to harden.  You will actually start to make

16  up your mind and we don't want you to make up your mind until

17  you have all the information that you have.

18          Now, your friends, relatives, anybody is welcome to

19  come down and watch the trial.  I will say two things.  Let Jim

20  know if you know someone who is sitting in the benches in the

21  back so that we can caution that person about how important it

22  is for you not to talk to them about the case.  And then, don't

23  talk to them about the case.  All right?

24          I have already told you that because of the way this

25  building is designed you are likely to run into us in the

IC45iss1

hallways, in the elevators.  You might even run into somebody

who is associated with this case and you don't know the person

is associated with the case.  You know the folks at the front

table, you know the folks at the back table, you know me, you

know gym, you have met my law clerks, but you don't know who

the witnesses are.  You don't know who might be in the elevator

with you.  So, don't talk to strangers.  The advice that mom

gave you when you were little, don't talk to strangers.  You

have 15 new friends to with whom you can talk about anything

except the case.

          Do me a favor, especially if you meet the lawyers or

me:  Remember that we are going to turn away from you.  And I

know that the lawyers have instructed their staff, I know

Mr. Brafman has told Mr. Issa and the members of his family,

they are not to try to engage you in any kind of conversation.

Don't make it hard for us.  Please.  Help us to do our job.

          So, how are we going to proceed?  We start with

opening statements.  And I would like to say something about

the opening statement because it underscores the whole burden

of proof thing that we talked about yesterday.

          I will tell the government, open.  And the government

will give an opening statement.  The government has the burden

of proof so the government is required to open to you.  I will

then ask Mr. Brafman if he wants to open.  Why the difference?

Defense has no burden of proof, has no obligation to do

IC45iss1

anything at all.  Now, between you and me, I expect Mr. Brafman
to open but he doesn't have to because the defense does not
have to do anything, it is the government that shoulders the
entire burden in this case and it is the government's job to
try to overcome the presumption of innocence, which I remind
you it can only do by proving that the defendant is guilty
beyond a reasonable doubt.

So, the government will open.  I expect the defense
will open.  The government will then put on its witnesses.  The
government will examine the witnesses and someone from the
defense team will cross those witnesses and the government will
probably introduce some exhibits and the government will say
the government rests.  At that point I will excuse you because
I have to talk to the lawyers about some legal matters at that
moment.  And then you will come back in and I will look at
Mr. Brafman and I will say:  *Mr. Brafman, does the defense wish
to put on a case?*  The defense has no obligation to put on a
case, doesn't need to put on a case.  And if the defense
decides to call any witnesses, or to put in any exhibits, it's
not doing that in order to assume the burden of proof and
that's a very important thing for you to remember.  Perhaps the
defense wants you to have some additional information before it
argues that the government has failed to meet its burden of
proof but whatever the defense decides to do, it never assumes
the burden of proof.

IC45iss1                    Opening – Ms. Hanft

1          When all the evidence is in the lawyers will sum up.

2     They'll argue from the evidence that you have heard what

3     conclusions each of them believes you should reach.  And after

4     that is over I will talk to you about the law that governs the

5     charges in this case.  And when you have all of that

6     information, you will retire and you will reach your verdict.

7     Okay?  So that's our procedure.

8          Is the government ready?

9          MS. HANFT:  Yes, your Honor.

10          THE COURT:  Is the defendant ready?

11          MR. BRAFMAN:  Yes, your Honor.

12          THE COURT:  The government may open.

13          MS. HANFT:  Thank you, your Honor.

14          Steak dinners.  Lavish lunches.  All expenses paid

15     vacations to Florida and cold, hard cash, tens of thousands of

16     dollars, cash, wrapped in a napkin, passed under the table at a

17     Chinatown restaurant.  Cash delivered in white envelopes at a

18     gas station.  These are the bribes that that man, Ibrahim Issa,

19     paid to United States Postal Service employees in exchange for

20     millions of dollars worth of work.  These were the bribes that

21     the defendant used to enrich himself and his company.  In

22     return for these bribes, the defendant's companies

23     received millions of dollars in vehicle repair and maintenance

24     work from the post office.  But bribing U.S. Postal employees

25     to get work wasn't the only way that the defendant sought to

IC45iss1                         Opening - Ms. Hanft

1    get rich.  Far from it.  He also used his companies to

2    fraudulently bill the postal service for mechanic work that was

3    never even performed, sometimes that was never even asked for

4    by the postal service, and sometimes to bill the postal service

5    more than once for the same service.

6           In order to enrich himself even further, the defendant

7    cheated on his own taxes and on his companies' taxes.  He

8    conspired to tell lies to the IRS to avoid pay taxes that

9    rightfully belonged to the United States government that

10   taxpayers pay on a regular basis and that is why we are here

11   today, ladies and gentlemen.

12          Ibrahim Issa wanted to line his own pockets.  He

13   bribed people in return for getting work, he cheated the

14   government for billing it for work that was never done, and he

15   stiffed the government by not paying the taxes he owed on

16   behalf of his companies and himself.

17          This opening statement is the government's opportunity

18   to give you a road map of the evidence that you are going to

19   see and hear during this trial.  I am going to do that in two

20   parts.  First, I'm going to describe for you what the evidence

21   at trial will show; and second, I'm going to give you a sense

22   of just how we are going to show it.  So, let's talk first

23   about what the evidence will show.

24          In this case, the defendant is charged with three

25   types of crimes, as you will hear:  Bribing United States

IC45iss1                        Opening – Ms. Hanft

1    postal officials, theft of money belonging to the U.S.

2    government, and tax crimes.  So, let me start by talking about

3    the bribery.

4           The defendant, Ibrahim Issa, known as Tony Issa to his

5    friends, owned and ran several auto repair maintenance and

6    towing companies.  He learned that he could get massive amounts

7    of business, millions of dollars by repairing U.S. Postal

8    vehicles, those trucks that you see driving around and

9    delivering the mail.  And he decided that to do that, he would

10   bribe the individuals in charge of getting those vehicles

11   repaired for the postal service who are known as Vehicle

12   Maintenance Facility managers or VMF managers.  These VMF

13   managers were the guys who decided whether the postal trucks

14   would be repaired in-house at their own facilities or by

15   third-party contractors like the defendant's companies.  And if

16   they chose third-party contractors, they were the guys who

17   decided which ones.  They were very important to Tony Issa's

18   business because they decided whether he was going to get work

19   from the postal service or not.  And to ensure that he did,

20   Issa bribed them.  You will hear that Issa courted these VMF

21   managers aggressively.  He took them to fancy meals.  He took

22   one of them on vacation to Florida twice.  He paid for that

23   same VMF manager's dental work.  He even paid for a prostitute

24   for him.  He did whatever he could to get these U.S. Postal

25   service employees to give his companies work.  And ultimately,

IC45iss1                    Opening - Ms. Hanft

1    that meant paying certain of these VMF managers -- money --

2    cash.

3            Now, did Tony Issa do all of this stuff -- the meals,

4    the vacation, the cash -- just to be nice?  Is he just acting

5    like a good friend, a generous friend?  No.  What did he want

6    in return?  He wanted work.  He wanted these VMF managers to

7    send his companies lots of maintenance and repair work, as much

8    work as possible, and that is exactly what Tony Issa got in

9    return for these bribes.  You will come to learn during this

10   trial about Tony Issa's playbook.  You will hear the same

11   pattern over and over -- the meals, the gifts, and the cash to

12   get business for his companies in return.

13           You will hear about how two VMF managers, one who ran

14   the Brooklyn facility and another in Michigan, initially had

15   issues with the work being performed by Ibrahim Issa's

16   companies.  You will hear how they complained to Tony Issa

17   about certain items on the bill just didn't make any sense to

18   them.  What did Tony Issa do?  He started bribing one of them

19   with extravagant meals at expensive steak houses in Manhattan,

20   meals that cost upwards of $600.  He gave him a case of

21   expensive wine and a tablet computer for free.  He flew out to

22   Michigan personally to talk to the other VMF manager telling

23   him he could make him comfortable, taking him out to dinner,

24   and offering to do him favors.  And eventually, he even offered

25   to fly this Michigan VMF manager to New York City and show him

IC45iss1                    Opening – Ms. Hanft

1   around on his own dime.

2          Unbeknownst to Tony Issa, these two VMF managers

3   weren't on the take.  No.  Both of them quickly knew that

4   something was wrong when it came to Tony Issa.  So, each of

5   them separately went to law enforcement and when they agreed to

6   accept the gifts, the meals, the trip to New York City from

7   Issa, they were doing it at the direction of law enforcement.

8   They were recording their conversations and you will hear those

9   recordings during this trial.  You will hear what Tony Issa

10  said.  His own words.  And, you will hear that during these

11  lavish meals Issa made it very clear that he wanted work.

12  These were no lunches with a buddy, they were for the purpose

13  of getting work, greasing the hands of these VMF managers with

14  expensive food, drink, and gifts.  And you will hear Issa

15  reassure one of them that as long as there was no explicit

16  arrangement to accept these things in exchange for work, they

17  wouldn't get in trouble, that these were not bribes.  But, the

18  evidence at this trial will show that that was exactly what

19  these were and that Tony Issa did not lavish these gifts and

20  meals on these VMF managers for any reason other than to get

21  business from them in return, to bribe them.

22          That's why Tony Issa tried to cover his tracks, so

23  that he would never be caught, so that these payments and other

24  gifts that he was providing to these VMF managers could not be

25  traced back to him or his company.  You will hear Issa explain

IC45iss1                     Opening - Ms. Hanft

in his own words when he gives a tablet computer to a VMF

manager that he makes sure to wipe the name of his company from

the screen so that no one would ever know that it came from

Tony Issa.

You will hear Tony Issa telling the Michigan VMF

manager, *I want to pay for you to come to New York, but I don't

want to get you in trouble. Put the cost of the trip on your

card, I will pay you when you get back to New York.* Because if

Issa paid for the cost of the trip himself, it could be traced

back to him.

You will hear recordings and even see a video of parts

of that trip to New York. You will hear Tony Issa tell the

Michigan VMF manager to write down what his flight and hotel

cost. And you will see Tony Issa pass that VMF manager

straight cash, $2,000, almost double what the VMF manager paid

for his flight and hotel, wrapped in a napkin. Keep the rest,

Issa reassured that VMF manager.

It wasn't just these two VMF managers either. You

will hear at this trial from an insider, a VMF who wasn't

acting at law enforcement's action, who really was on the take.

Ismael Velez, a VMF manager in Westchester, will tell

you about the cash payments he regularly received from Issa.

You will hear how Tony Issa befriended Velez. He began by

visiting Velez at work and started taking him out for meals.

Then he started giving Velez access to his gas station, to fill

IC45iss1                          Opening - Ms. Hanft

1   up with free gas, get free cigarettes and coffee from the gas

2   station convenience store.  He even took Velez on vacation to

3   Florida twice.  And, eventually, Tony Issa started giving Velez

4   just plain cash.  It started out in smaller amounts, about

5   $200, but it went up and up and up.  Issa arranged for Velez to

6   go to his gas stations and pick up envelopes filled with cash

7   from one of Issa's trusted employees.  By the time of Issa's

8   arrest, Velez was getting about $1,600 per week from Issa

9   picking up the payments in installments every two or three

10  weeks.  And you will hear how Issa asked Velez early on, *Are*

11  *you depositing the cash in a bank account?  Don't do that.  You*

12  *don't want the money to be traced.*  Just another example of

13  Tony Issa trying to cover his tracks.

14          You will hear how Issa visited Velez even after his

15  arrest showing up at Velez's house in Pennsylvania unannounced

16  and reminding him not to tell anyone that he had been getting

17  money from him for years -- bribes -- in exchange for Velez

18  sending lots and lots of vehicle repair and maintenance work

19  Issa's way.

20          So, that is some of the bribery evidence that you will

21  hear at this trial.  You will also hear about how the defendant

22  used his companies to fraudulently bill the postal service.

23  And those three VMF managers I just told you about, we will

24  talk about that too, about the various ways that Issa engaged

25  in fraudulently billing the post office, ripping off the post

1    office, billing the post office for work that was never even

2    performed, billing the post office twice for the same work,

3    billing the post office for work that was totally unnecessary

4    and that had never been requested by the post office.

5             And finally, you will hear about all the ways in which

6    Tony Issa and the companies that he controlled avoided paying

7    taxes.  You will hear how the IRS sent his company a deficiency

8    notice telling him we know you owe more money in taxes because

9    we know how much work your company got from the postal service.

10   What did Tony Issa do when the IRS let him know that he owed

11   more in taxes, that they were on to him?  Did he pay up?  No.

12   Tony Issa, along with his wife, lied some more.  They lied to

13   their accountant in order to avoid owing any additional taxes,

14   lies about the companies finances that were sent right on to

15   the IRS.  But Tony Issa didn't just lie on the tax returns of

16   his companies, he also lied on his own personal tax returns, as

17   you will hear.

18            See, Issa was looting his own companies to pay for the

19   extravagant lifestyle he and his wife led.  In other words,

20   Issa used his companies as his own personal piggy bank.  He

21   claimed his and his wife's personal indulgences as business

22   expenses.  What sorts of things?  Things that obviously had

23   nothing to do with his business.  The costs for storing a boat

24   at a marina.  The cost for renting a house in South Hampton.

25   He even used his company's accounts to pay for dental work.

Issa wrote these items off as business expenses so that he wouldn't have to pay the taxes he owed even those these expenses had nothing whatsoever to do with Issa's business running a vehicle maintenance and towing company.

So, that's what you are going to learn during this trial.  How will we prove that Tony Issa cheated on his taxes, cheated the government out of money and paid bribes in exchange for work for his companies?  Well, let's talk a little bit about the evidence you can expect to see and hear in this case that will come in many different forms including the testimony of witnesses, physical evidence, and documents.

First you will hear from witnesses who will explain what happened to them; what they saw and heard and did.  You will hear from Ismael Velez, the Westchester VMF manager, who received cash payments from Issa.  You will hear from the two VMF managers I described a few moments ago, the one from Brooklyn and the one from Michigan.  They'll tell you about the gifts, the restaurants, the cash.  You will also hear from these same three witnesses about the fraudulent invoices that Issa submitted to them trying to double charge them, charge them for work that was never performed, or charge them for work they never even asked for.

You will also hear from accountants that worked with Issa about how Issa and others working at his direction, including his wife, provided them with information for tax

IC45iss1                          Opening - Ms. Hanft

1    returns that the evidence will show was false and how they used

2    that false information that Issa and his wife were feeding them

3    to prepare tax returns filled with lies that were submitted to

4    the IRS so Issa could avoid paying taxes he owed.

5          Before I move to the other types of evidence you will

6    see and hear, let me say a few words about Ismael Velez.

7          As I mentioned, you will hear testimony from Ismael

8    Velez himself who will tell you how he accepted bribes, cash

9    payments, and meals from Tony Issa in exchange for steering

10   postal service work to Issa's companies.  He will take the

11   stand and admit that he accepted bribes.  He will even admit

12   that at times he asked for more money from Tony Issa.  Make no

13   mistake about it, Velez committed a serious crime just like the

14   defendant.  But, you will also hear how Ismael Velez came

15   clean.  Months after Issa's arrest you will hear how law

16   enforcement agents approached Velez and Velez admitted that he

17   had been taking bribes from Issa for years.  He admitted his

18   crimes and he pled guilty for his participation in this bribery

19   scheme.  Velez is cooperating with the government.  He is

20   testifying here not out of the goodness of his heart but

21   because he hopes to receive leniency when he gets sentenced.

22   So you should listen carefully when Velez testifies.  Ask

23   yourselves is what he is saying consistent with what you are

24   hearing from other witnesses?  Does it fit with the rest of the

25   evidence in this case?

IC45iss1                    Opening – Ms. Hanft

1          Now, second, as I mentioned, you will hear recordings.

2     Issa's own words on tape.  You will hear Issa's conversation

3     with the Brooklyn VMF manager at high-end Manhattan

4     restaurants.  You will listen to conversations with the

5     Michigan VMF manager at his facility and at nearby Michigan

6     restaurants.  And you will see a video in which Tony Issa

7     passes the Michigan VMF manager $2,000 in cash under the table

8     at a restaurant right down the block from here in Chinatown.

9          Finally, you will see physical evidence including

10    documents, text messages, photographs, and even some of the

11    gifts Tony Issa gave to curry favor with the VMF managers.  You

12    will see the documents Tony Issa and his wife submitted to the

13    IRS and his bank records.  You will see e-mails in which Tony

14    Issa and his wife lied to their accountant so he could pass

15    those lies on to the IRS.  And when that accountant asked too

16    many questions, you will see e-mails showing that Tony Issa and

17    his wife went to a new accountant who they also lied to about

18    their company's income to further avoid their tax liabilities

19    who Issa even complained about when he told them they owed more

20    in taxes.

21         And you will see text message after text message after

22    text message between Velez and Issa and Velez and Issa's

23    employees showing Issa asking for work, setting up those trips

24    and dinners, and showing Velez complaining about the bills and

25    the work Issa's companies did.

IC45iss1                         Opening - Mr. Brafman

1         Finally, you will see pictures of Velez and Issa

2    enjoying themselves in the mutually beneficial arrangement they

3    made at lunches, at dinners, and on those Florida vacations

4    that Issa treated Velez to.

5         Each of these witnesses and types of evidence will

6    provide you with a different piece of the story.  Tony Issa's

7    bribes, theft of the government's money, and his tax fraud.

8    Soon you will begin to hear the evidence in this case and at

9    the close of this case we will have the chance to speak with

10   you again, but between now and then I am going to ask you to do

11   three things.  First, pay close attention to the evidence as it

12   comes in.  Second, follow Judge McMahon's instructions on the

13   law.  And third, use your common sense, the same common sense

14   you rely on in your everyday lives.  If you do those three

15   things, you will return the only verdict that is consistent

16   with the evidence in this case -- that the defendant, Tony

17   Issa, is guilty.

18              THE COURT:  Mr. Brafman, do you want to open?

19              MR. BRAFMAN:  Yes, ma'am.  Should I proceed?

20              THE COURT:  You may.

21              MR. BRAFMAN:  Good morning, ladies and gentlemen.

22   This is Ibrahim Issa, the man who is on trial in this case.  I

23   am his lawyer.  Mr. Kirshner, Mr. Gold equally share this

24   responsibility.  And, Ms. Kuarlall is our crack paralegal; is

25   probably the smartest person, certainly, on our team.

IC45iss1                        Opening - Mr. Brafman

1          So, I have the option of opening and I am going to

2    open and I am going to open if only to respond to what you

3    heard this morning from a very articulate, polite, bright,

4    carefully prepared Assistant United States Attorney who told

5    you what the government intends to prove and I would like to

6    briefly respond to her and I would also like to tell you all of

7    the proof that she conveniently left out that fills out the

8    picture.

9          My name is Ben Brafman.  It is a privilege to work

10   before you and that's what we are doing, we are working before

11   you.  And my job in this case, as the Court has explained, is

12   to do what I feel is necessary to rebut the government's case.

13   And I promise you that through the government's case, through

14   their witnesses, we will demonstrate to you why Mr. Issa is not

15   guilty of the specific crimes that he has been accused of and

16   the only thing I ask you to do is exactly what Ms. Hanft asked

17   to you do, with the exception of voting guilty.  I ask you to

18   wait, I ask you to listen to the Court, and I ask you for

19   patience.  I ask you to keep an open mind and use your common

20   sense.  And, I submit that if you wait until the end of the

21   trial and you hear the instructions from Judge McMahon, you

22   will find Mr. Issa not guilty.

23         Now, how is that possible if you just heard an

24   Assistant United States Attorney tell you what the evidence is?

25   So, let me tell you what is not in dispute.  We paid for a meal

IC45iss1                    Opening - Mr. Brafman

1    for Jim Nicholson that cost over $600.  We packed up salmon and

2    crab cakes for his wife to take home.  And, we put wine in the

3    trunk of his car.  There is no dispute, you don't have to fight

4    over that evidence.  We did it.  We will submit to you at the

5    end of the trial that it wasn't a bribe.

6         We paid for Jim Nicholson's trip to New York.  They

7    don't have to prove that.  We gave him $2,000 in a Chinese

8    restaurant.  We submit, at the end of the case, you will

9    conclude that is not a bribe.  So, that proof is not in

10   dispute.  We gave some money to Velez who, you will conclude,

11   is a fairly sympathetic character in this case.

12        And, Ms. Hanft suggested in her opening statement to

13   use your common sense; that these aren't acts of generosity,

14   these aren't gifts.  All I ask is that you wait until the end

15   of the case.  And, what Ms. Hanft conveniently left out is the

16   story.  What are we doing here and why is this a post office

17   case?  What is this case about?  Well, this case is about to

18   start.  It is about to start with the first witness.  Mr. Issa

19   only asks for his day in court.

20        As her Honor instructed you, he pled the not guilty,

21   the burden is on them, he has the presumption of innocence.

22   Let me tell you what the government's own evidence is going to

23   demonstrate.

24        Now, please keep that in mind with what I am saying.

25   Through the government's own witnesses we will prove that

IC45iss1                    Opening - Mr. Brafman

1    Mr. Issa is not guilty and that there is a reasonable doubt

2    again and again and again because the government looked at this

3    case with the narrow lens that they just used in their opening

4    statement.  What we want to do is broaden the lens, explain to

5    you what the proof is going to show, what the proof is actually

6    going to show.  And, please, keep in mind something that's very

7    important.  They get to speak on behalf of the government, it

8    is a privilege.  I get to speak on behalf of Mr. Issa.  It's a

9    privilege.

10           We are in an open courtroom, a public courtroom,

11   managed by a Judge who is the chief judge of this district and

12   we all work by certain rules.  They are not the government,

13   they get to speak for the government.  And the government's

14   proof in this case will demonstrate to you, ladies and

15   gentlemen, who are part of the government, that they did not --

16   they did not do what the government should do when bringing

17   serious charges and that is press -- press -- for the facts.

18   So, fasten your seat belts.  We are going on a battle here that

19   is not going to be easy.

20           The evidence that Ms. Hanft explained to you includes

21   tape recordings with Jim Nicholson and Jeffrey Blight.  And,

22   you know what?  We welcome those recordings.  We only wish that

23   Velez was recorded so we don't have to drag the truth out of

24   him.

25           We are not afraid of those tape recordings.  We

IC45iss1                      Opening - Mr. Brafman

1    welcome what is on those recordings because when you hear

2    what's on those recordings, you could begin to understand

3    something that Ms. Hanft left out completely -- lie after lie

4    after lie after lie -- by people wearing a tape recorder

5    talking to Tony Issa.

6         Jim Nicholson, lied.  Blight lied so many times that

7    by the end I promise you he is going to say I lied 50 to 100

8    times to Tony Issa before Mr. Issa gave him the money.  And

9    that's relevant.  Why the lies?  What was being said?  Because

10   this is a specific intent crime.  The Judge will explain

11   everything to you, I am not going there.  But, let me tell you

12   about Mr. Issa's excellent adventure in the post office world.

13   That's what I want to call it, because they left that part out

14   and that part is the key to why he should be acquitted.

15        What you will learn in this case is something I submit

16   none of you know yet so that is good.  So, let me give you a

17   preview of what the evidence will show and, unlike the

18   government who said they're going to paint you a road map, the

19   road map is only as good as who drew the map and some of the

20   people who drew the map are Jim Nicholson and Jeffrey Blight

21   and Ismael Velez who have an agenda in this case.  So, when

22   they testify, think to yourself what they're saying.  Listen

23   carefully.  Why are they saying it?  How are they saying it?

24   And, yes, there are going to be a number of invoices that are

25   going to be in dispute but what you didn't hear is that

IC45iss1                    Opening – Mr. Brafman

1    Mr. Issa submitted thousands of invoices to the post office;

2    9,000 to Velez alone.  So, are there a handful in dispute?

3    Ever dealt with a mechanic?  Yes.  At the end of the day there

4    are some mistakes, not proof of intentional crime when the case

5    is over.

6                Now let me explain the post office world that we don't

7    know about.

8                Mr. Issa, you will see from this trial, is an

9    entrepreneur.  And he tried so hard to do everything legal and

10   right.  So, what are we talking about?  We are not talking

11   about the men and women who carry mail to your home every day

12   through the rain and the snow and the sleet, people who do good

13   work and are honest citizens who get you the mail that you wait

14   for every day.  We are not talking about them and we are not

15   talking about Delores Waters who is going to testify as the

16   government's first witness who is in Philadelphia and she is,

17   like, the boss of bosses in the post office.  We are not

18   talking about her.  She is a lovely, educated, remarkable

19   career official who is a credit to the post office and she is

20   going to help me show you why Ton y Issa is not guilty of these

21   crimes.

22               The first government witness is going to testify

23   truthfully about a number of matters that are important to you.

24   So, what are we going to learn through her, through the vehicle

25   maintenance managers, and through the evidence in this case?

IC45iss1                    Opening – Mr. Brafman

1    There is a whole world in the post office that you don't think

2    about or that you know nothing about and you will learn that it

3    is run by vehicles that are old.  Most of the little mail

4    trucks that you see are coming to the end of their natural

5    lifespan; they're 25 years old, 23 years old.  They've been

6    repaired over and over and over again.  It is a crumbling

7    fleet.  That's not going to be in dispute.  Why is that

8    important?  Because in order for them to put them on the

9    street, the post office has Congressional oversight, you will

10   learn.  It is not just, *Here is the mail.  Thank you very much.*

11   It is a big business and it's crumbling because they can't

12   sustain itself on the earnings that they are making.

13            Now, why is that relevant in this case?  It is

14   relevant in this case because there is intense pressure to keep

15   the fleet working.  There is intense pressure on Jim Nicholson,

16   on Jeffrey Blight, on Ismael Velez to fix those trucks

17   overnight, 24 hours.  Get them back.  You know why?  Because if

18   they're not back, there is nobody to deliver the mail.  And we

19   are not talking about a Letter.  You are going to see trailer

20   trucks, 7-ton trailer trucks.  You are going to see LLVs which

21   are long-life vehicles that are coming to the end of their life

22   and what Delores Waters is going to tell you is that the post

23   office can't afford to buy new trucks.  Newt trucks would cost

24   $6 billion and they don't have it and they can't get it from

25   Congress, so they have decided to keep repairing these old

IC45iss1                     Opening - Mr. Brafman

1   vehicles, some of them 25 years old running six days a week

2   24/7 to get the mail, sort the mail, deliver the mail, get the

3   packages, sort the packages, deliver the packages.

4          This is an intensely pressurized business and who is

5   the pressure on?  The Vehicle Maintenance Facility.  What is

6   that?  It wasn't defined for you.  She just mentioned it, I am

7   going to explain what you need who hear.  You need to

8   understand this business before you can say, okay, you are

9   guilty because you sound guilty.

10         A Vehicle Maintenance Facility, the government's own

11  witness is going to explain, is a post office run facility that

12  is supposed to repair the trucks.  But, they have a problem.

13  There is a hiring freeze so good mechanics can't be hired.

14  Young mechanics who come out, were never trained to work on a

15  25-year-old car.  So, it is crazy land.  You are going to see

16  the right hand and the left hand not talk to go each other in

17  the post office and Mr. Issa is in the middle of this.  So,

18  were mistakes made?  Yes.  Was it an intent to defraud the post

19  office?  No.  Was he trying hard to do an impossible job under

20  impossible conditions?  Yes.

21         And then you know what happened?  The VMF manager said

22  wow, who is this Tony Issa?  He's got a place in Detroit, he

23  has got a place in Brooklyn, he has got a place in Queens.  He

24  is hiring mechanics because he is not on a hiring freeze.  He

25  is paying mechanics prevailing wages.  He spends months and

IC45iss1                    Opening – Mr. Brafman

1    months and months in Philadelphia, the proof will show, getting

2    a contract to do this legally.  They vet him, they examine him,

3    they put him through the ringer months and months and months.

4    Delores Waters, the government's own witness, will explain the

5    process to you and he gets the contract and he starts doing the

6    inspections.  And right away some people, like Jim Nicholson,

7    are told, use him.  And, Nicholson, he says no.  I don't want

8    to use him.  I want to use my own guys.  And what you are going

9    to hear is Nicholson is told use him, we need trucks fixed, we

10   need them on the road.  You can't do this alone.  Use him.  And

11   Nicholson resents it and Nicholson suspects everybody must be

12   bribed if people are telling me to use this guy I never heard

13   of and I don't like.

14          So, Nicholson goes to what is equivalent of the

15   Internal Affairs Bureau of the police department, he goes to

16   Office of the Inspector General and he agrees to wire himself

17   up and he begins to talk to Tony Issa.  And you will hear Tony

18   Issa on the tape.  They had a two-hour lunch at Smith &

19   Wollensky.  It is amazing either of them are still a live given

20   the amount of food they consumed, not just Mr. Issa but

21   Mr. Nicholson.  Steaks and oysters and crab cakes, over and

22   over again.  And wine and liquor.  And, yes, you will hear

23   Mr. Issa say some stupid things.  And you will also hear him

24   say some important things.  And then you will conclude at the

25   end that the government has failed to prove that it was his

IC45iss1                          Opening – Mr. Brafman

1    intent to bribe Nicholson.

2              Did we give him a computer tablet, a promotional item

3    as it is described on tape?  Yes.  And Ms. Hanft just told you

4    that Mr. Issa removed his name so that it wasn't traceable.

5    What she didn't tell is that you Nicholson told him to remove

6    the name.  Mr. Issa was going to give it to him as a

7    promotional item.  Yes, it was a tablet, but it is like a pen

8    at the bank or promotional item that he was giving out.  Not as

9    a bribe.  And the sinister quality of removing the name that

10   she just mentioned is wrong.  The proof will show that

11   Nicholson wearing a wire knowing that he is taping the person

12   who doesn't know he is being taped, asked him to remove the

13   name because Nicholson is telling Issa he doesn't want to get

14   in trouble.  And you will learn from the Judge at the end of

15   the case what the rules are.  I'm not going near there because

16   I don't want to be sat down.  I want to get through this

17   opening statement without violating the rules but unless you

18   wait, unless you have the patience I just showed for 20 minutes

19   listening to an opening statement that was bereft of 90 percent

20   of the facts that are important, you have to sit patiently.

21   And unless you sit patiently until the end of the trial and if

22   you jump to conclusions, I submit that you are going to be

23   wrong.  I submit that you might well convict someone who, if

24   you listened and waited, you will see did not commit the crime

25   charged.

IC45iss1                    Opening - Mr. Brafman

1          How is this possible?  How can she be right and how

2     can I be right?  How can there be so many things wrong with

3     what the government said if it's the government?  Well, at the

4     end of the day, they're advocates.  I'm an advocate.  We each

5     look at evidence and we determine, does this advance the theory

6     of this case?  Does it disrupt the theory of the case?  My job

7     is to disrupt the theory of the case with proof, not with

8     argument, with proof at the end of the case with argument that

9     points to the proof.  But without the proof my argument will

10    ring hollow.

11         So, keep in mind, ladies and gentlemen, what is and is

12    not in dispute.  We gave Nicholson lunch.  We gave Blight cash.

13    We had one of Mr. Issa's employees drive Blight around New

14    York, he has never been here and, yes, she showed him the

15    Statute of Liberty and, yes, she took him on a water taxi, and,

16    yes, she brought him to Chinatown and to Central Park, all of

17    the places someone from Michigan would want to see if they've

18    never been to New York.  But, wait until you hear the cross

19    examination of Blight.  I promise you -- and I you am making a

20    promise and if I am wrong and at the end of the case you say,

21    you know, Brafman promised me and he didn't deliver, therefore

22    he must be wrong, I promise you from the proof that you will

23    see, beyond question, that Blight played Tony Issa, that he

24    made up a story for Tony Issa, that he made up a story with the

25    government helping them draft it with a script that he followed

IC45iss1                          Opening - Mr. Brafman

1    and followed religiously as if he were in an off-Broadway play

2    but it is not a play, it is real.  This is as real as it gets,

3    ladies and gentlemen.  This is not a dispute over a contract

4    where the end result is you lose the contract.  This is a

5    charge of intentional criminal conduct and Mr. Issa has pled

6    not guilty.

7            So, ladies and gentlemen, Delores Waters is not the

8    problem with this case.  She's above it all but she will tell

9    you how it is supposed to work.  She will tell you the

10   difficulties that the United States Postal Service is facing.

11   It's not in dispute, it is in all of the publicly filed reports

12   that go by her desk, There is a Problem.  How do you address

13   it?  And the way they addressed it is by hiring private

14   contractors to supplement the work of the post office employee

15   because if you are a post office employee a couple of things

16   kick in:

17           One, you can retire, get a pension, it's expensive.

18           Two, the evidence will show the health plan is

19   expensive.

20           Three, when you try and hire people and there is a

21   hiring freeze, how do you replace the people who are retiring?

22   You don't.  If you have trucks that are crumbling, the evidence

23   will show, how do you replace the trucks that have crumbled?

24   You can't.  And you can't get loaners, it is too expensive.  So

25   they bring a truck to Mr. Issa's place of business at 5:00 in

IC45iss1                    Opening - Mr. Brafman

the evening and they want it back at 5:00 in the morning.  And
the truck is 25 years old and it's got stuff wrong with it and
it has to be inspected, according to Congress, twice a year.
Twice a year they have to have a thorough inspection and
anything wrong with it is has to be fixed and there is always
stuff wrong with the 25-year-old truck.  They ask you to use
your common sense.  Nobody in this jury is driving a
25-year-old truck that goes through storms and bad weather and
non-stop every single day so that people who run these
independent VMFs we will call them, our VMFs have to perform
immediately.  Mr. Issa is not in there under the truck fixing
the truck.  There are mechanics, there are engineers, there are
employees who are doing it.  He is relying on these people the
way the post office is relying on these people you will find
from the proof.  And you will see, Delores Waters will tell you
that with her own mechanics, her own post office people, there
are hundreds and thousands of disputed repair work.

        Nobody walks out of a mechanic's place completely
satisfied.  And in this case the evidence will show that it is
old trucks, big trucks, small trucks, 2-ton trucks, 7-ton
trucks.  They have 200,000 vehicles that have to be inspected
every year and if you add the personal cars, the smaller cars,
the administrative cars, it is 300,000.  And they have to have
two vehicle maintenance inspections every year so that's
600,000 inspections or 200,000 or 300,000 you will hear and you

IC45iss1                    Opening - Mr. Brafman

1   will hear that some of the VMFs have two mechanics in a place

2   that has 10 trucks.

3        So, Tony Issa -- Ibrahim Issa -- may sound like a jerk

4   on tape at some point but you are going to find out, you know

5   what?  This is what you are supposed to do in America.  You

6   find a need and you figure out a way to fill it.  And in this

7   case you are going to find something really fascinating that

8   was not mentioned -- not mentioned -- by Ms. Hanft.  He didn't

9   just go in the middle of the night and say to Mr. Velez I want

10  to do your work, here is some money.  He did 9,000 repair jobs

11  for that Vehicle Maintenance Facility and he got paid on all of

12  them.  And the ones in dispute, there is not going be proof

13  that they ever paid a bad bill.  And if they did and you

14  recognize there are 9,000, you are never going to have a

15  hundred percent excellence in any profession that deals in such

16  volume under such intense pressure in a short time frame.

17       And, don't forget what we are doing.  We are fixing

18  the truck in the middle of the night that has to be on the road

19  again at 5:00 in the morning.  You give in your car for an

20  inspection it can take a whole day and it is a car and it is

21  new.  You need to use your common sense.

22       There is no magic in this case.  The magic will be

23  when you end up saying not guilty; that even though you maybe

24  should not have done some of the things you did, it is not a

25  bribe.  Under the law it is not a bribe and you should not be

IC45iss1                    Opening – Mr. Brafman

1   found guilty of a bribe.

2          So, you know, we need to focus for a minute on the

3   three main players and the three main players in this case are

4   James Nicholson, Jeffrey Blight, and Ismael Velez.  And they're

5   all different.  They're all different.

6          Jim Nicholson, I submit, you are going to find is a

7   paranoid, mean-spirited post office employee who resents

8   Ibrahim Issa.

9          Jeffrey Blight, you are going to find him to be a

10  whining, annoying, patronizing liar who thought he was under

11  investigation so he ran to the Office of Inspector General to

12  cover his own backside because he thought Mr. Issa was

13  investigating him.  That's not in dispute.  And he is going to

14  say I got Anthony Issa here, he wants to open a place in

15  Detroit.  And, Ms. Hanft mentioned something that was quite

16  startling when you learned the facts.  He flew out to Detroit

17  as if he just got on a plane, landed, went to Detroit said,

18  hey, Jeff.  I'm here.  Here is money, come to New York.  What

19  she left out is that Mr. Issa went to Detroit because Detroit

20  has a real problem.

21         Detroit was, the proof will show, is one of the most

22  depressed economically depressed areas in the United States

23  with tens of thousands of able-bodied people out of work

24  because industry was leaving Detroit.  But, the post office

25  can't leave and the post office is in Detroit and they don't

IC45iss1                    Opening - Mr. Brafman

have adequate vehicle maintenance facilities.  So what did Tony

Issa do?  He just went out there and said to Blight, give me

your truck, I want to fix it.  Here is an envelope with money.

He built a facility and spent over a million dollars of his own

money building a massive garage with hydraulic lifts and hired

mechanics who were unemployed and trained them and gave people

in that neighborhood work that they could be proud of.  And

when you see a picture of what he built you are going to be

stunned.  It looks like a garage the size of a stadium filled

with post office trucks with people working on them that wasn't

there before Tony Issa came to Detroit.

You can't just say, as a government lawyer, well, he

flew to Detroit.  Yes over and over and over and over again.

It took months to build this place.  Why would he invest so

much money?  Because he had a contract with the post office

that was renewed and renewed and renewed.  And that allowed him

to bid on this work and do this work.  And you are going to see

his contract, Ms. Waters is going to put it the into evidence.

And, Ms. Water wasn't bribed.  And, Ms. Waters wasn't

approached.  She probably doesn't even know Mr. Issa.  But, all

of her colleagues are the ones who signed off on this contract.

So, yes, Tony Issa went to Detroit.  It went so far

that he had an employee live in Detroit, a young woman —— a

young woman —— single mother moved to Detroit to be able to

manage the building of this facility.  That's not going to be

IC45iss1                    Opening - Mr. Brafman

1   did in dispute.  It is the same woman Stephanie who drove

2   Blight around New York and you are going hear he taped her all

3   day, for hours, trying to get something incriminating.  You

4   won't hear that tape.

5        Now, the government doesn't have to play these tapes

6   and, yes, it was just chitchat with a young woman and a guy

7   from the midwest who had never been to New York but Mr. Issa

8   didn't just fly to Detroit so he could bribe Mr. Blight.  Wait

9   until you hear what Blight told him over and over and over

10  again.  And it was never mentioned in the government's opening.

11  That's not fair.  You can't just tell a jury, I submit, what

12  the evidence will show, and then leave out the evidence.

13       The evidence will show that Mr. Blight made up a

14  complete fabrication.  His daughter is going to Columbia, she

15  lost her scholarship.  It was a lie.  She never applied to

16  Columbia, she never had a scholarship.  Let Mr. Issa feel sorry

17  for him.  I'm poor, I can't pay for her room and board.  Listen

18  to Mr. Issa on the tape explain to him, he is telling Mr. Issa

19  I have to pay $20,000 for room and board.  Mr. Issa doesn't

20  give him $20,000.  He says to him, no, you don't.  I will get

21  her a time share, I will get her roommates.  I know the area.

22  I am from Manhattan.  I have uncles and cousins who are doctors

23  around Columbia.  You can get a room with four other girls or

24  four other students for $500.  Don't pay $20,000.

25       That's not a man who is trying to bribe you, that is

IC45iss1                        Opening – Mr. Brafman

1    someone who is trying to help you.

2              (Continued on next page)

1          MR. BRAFMAN:  (Continued) And when she says to you,

2     Mr. Issa's not doing this for generosity, wait till the trial

3     is over.  Wait till the trial is over.  Not everything that he

4     did was a bribe.  A lot of it was just being generous, and it

5     was nothing that was a bribe because he never intended to bribe

6     these people the evidence will show.  If that is how you find

7     at the end of this trial, then I submit that you will find him

8     not guilty.

9          So let's talk for a minute about Velez.  I told you

10    about Blight.  I don't think you're going to find him to be

11    particularly important in this case.  I think you're going to

12    be dismissive of Blight because he will have lied so many times

13    to Mr. Issa that he will admit to that I think you will

14    ultimately say, why should I believe anything that he says if

15    he just lied to Mr. Issa over and over and over and over again?

16    Bad lies.  Using your daughter in the lie to create sympathy or

17    need when it wasn't there.  Maybe that's legal, but you don't

18    have to accept it if you find him to be not worthy of belief.

19         Then you have Mr. Nicholson.  Wait till you hear about

20    the lunch.  Wait till you hear Nicholson's mindset when he

21    decided to start taping Mr. Issa.  So you have wait.

22         Mr. Velez, I think Mr. Velez will come across as a

23    somewhat sympathetic character.  I think you will see that he

24    ultimately, after more and more interviews by the government,

25    got frightened and pled guilty and is now facing the

IC4HIss2                    Opening - Mr. Brafman

1    possibility of a 15-year jail sentence for accepting bribes.

2    But Velez has his own problems in terms of his credibility

3    because what happened is Velez turned friendship into

4    extortion, and you're going to see that play out for you in

5    front of your eyes.

6         So at the end of the day, Mr. Issa did not bribe

7    anyone, I submit the evidence will show, and at the end of the

8    day, you will need to find him not guilty because of that.

9         Let's talk about the tax case in the time that I have

10   remaining, which is only about ten minutes.  So let me talk to

11   you about the tax case because that's quick.  There's no

12   evidence that the government lost a dime.  That's what the

13   evidence is not going to show.

14        Did Mr. Issa get a notice from the IRS?  Yes, Mr. Issa

15   got a notice that there was a tax deficiency in connection with

16   the corporate return.  What does he do?  Does he run away?  No.

17   He hires a tax lawyer, and the tax lawyer hires a tax

18   accountant.  Now, when you're finished hearing the testimony of

19   these tax accountants, you might ultimately conclude that they

20   must have had open enrollment for these people to become

21   certified public accountants, because now they blame the

22   client.  They didn't do their job, the evidence will show,

23   because Mr. Issa comes to them with a tax deficiency notice.

24   He gives it to them, and they say, we think you should file an

25   amended return, so they do.  And after the amended return, the

IC4HIss2                    Opening - Mr. Brafman

1    tax lawyers begins working on all of the other corporations.

2          Let me just straighten something out so it doesn't

3    bother you for the rest of the case.  If you have your own

4    corporation, the evidence will show, and you pay something of a

5    personal nature from the company, the proof will show, at the

6    end of the year, if you've put personal money into that

7    company, there is no tax liability, we will prove to you.

8          So, yes, they don't have to prove this.  Mr. Issa had

9    his company -- his company, no stockholders, no board of

10   directors, no partners -- had his company pay for a marina to

11   store a small boat.  He did.  They don't have to prove it, and

12   I'm not even going to tell you that sometimes maybe he

13   entertained business people and therefore it's a tax

14   deductible.  It was a personal boat.  He paid for it with

15   corporate money.  That doesn't make him guilty of tax fraud, I

16   submit, and that's what you're going to ultimately conclude.

17         He paid his rent.  And you'll know that he was running

18   ten companies or 15 companies, and he did not have an office,

19   and he worked out of his apartment.  And I'm not even going to

20   tell you that that was a completely OK deduction, but after the

21   tax deficiency notices from the government, there was no audit.

22   There was no IRS agents who showed up and said we think there's

23   a problem with these.  The tax deficiency notice says if you

24   don't do this right, you're going to continue to pay interest.

25   Nobody said people were going to come in handcuffs.  There was

IC4HIss2                          Opening – Mr. Brafman

1    no ordinary audit.  Nobody came to question these expenses.

2            And, yes, some of the accountants are going to come in

3    here and, to cover their own back side, they're going to say,

4    well, we got this information.  We didn't make this information

5    up, so we used the information.  Wait till the case is over and

6    wait till you see the net, net, net.  There's no intent to

7    commit tax fraud.  There's no tax fraud.  There's no corporate

8    tax fraud.  There's no personal tax fraud.

9            What they're going to do is they're going to show you

10   our own records and then put on a revenue agent who is, I'm

11   sure, a lovely young person who was brought into this case in

12   October to make interesting comments about what the records

13   show.  He didn't do the investigation for two years for the

14   IRS.  The government gave him charts and record and said:

15   Here, see if you can support the theory of this case, and he

16   will.  Wait till you see how that's done and how it was done

17   and what was neglected.

18           You know, at the end of the day, the judge talks to

19   you about the presumption of innocence, and she does it, quite

20   frankly, with great respect, better than any other judge I've

21   ever been before because it's so important.  I don't have the

22   burden of proof, but I welcome the opportunity to cross-examine

23   these witnesses.  And all I'm asking for you, all I'm asking

24   today is for you to wait.  It's very hard to do that because

25   for the rest of the trial until the end, I can't talk to you.

IC4HIss2                          Opening - Mr. Brafman

1    I can't stand up and say:  Did you get that point with that

2    witness?  Do you understand why that's a reasonable doubt?  I'm

3    not allowed to do that until the end of the trial.  And at the

4    end of the trial, I get to stand here again, and there I'm

5    allowed to argue, and I'm allowed to argue from the evidence.

6    The judge will then tell you what the law is, and I suspect,

7    knowing what I think the law is, that you will at the end of

8    the day apply the law.  I think if you apply the law and if you

9    discount any preconceived notions or prejudice or bias before

10   you come into the courtroom, if that's what you do, I suspect

11   and believe and anticipate and hope that the proof will

12   convince you that the government has failed to prove this case

13   beyond a reasonable doubt, because they must prove every

14   element of the crime beyond a reasonable doubt.

15          Does Tony Issa sound like a jerk on some of these

16   tapes?  Yes, and so does Nicholson and so does Blight.  There's

17   a difference.  Tony Issa doesn't know he's being taped; they

18   do.  To the extent that my client, who's had ten glasses of

19   wine probably by the time he says certain things, sounds like a

20   jerk, that's not a crime.  He's not charged with being a jerk

21   on tape.

22          So all of you need to just honor your oath to the

23   Court and to the parties and be patient.  Very hard to do that.

24   You're going to be without us for long periods of time.

25   Tomorrow, the day honoring the president, judge is going to

IC4HIss2                          Opening – Mr. Brafman

1   tell you not to discuss this case here or at home or on social

2   media.  It's so important.  It's so important.  All we ask is

3   that you as citizens who agree to serve honor your obligation

4   to the integrity of this process.  That's all.  And if you do

5   that, I believe that Mr. Issa will be found not guilty.

6            I'm going to ask you, ladies and gentlemen, something

7   else.  There is final argument at the end of the case, and it

8   may well be that it's not until the end of the case that you

9   understand some of the important proof.  That's normal.  This

10  is not your business.  This is not your life.  You're suddenly

11  being injected into a case where the parties have worked on

12  these facts for two years, and now in a couple of days, you're

13  asked to understand it, figure it out, and then make maybe the

14  most important decision in your life, not only in the life of

15  Mr. Issa.  The intensity of this moment that I hope you share

16  is you're sitting in judgment of someone else's life.  So wait

17  till the final argument and wait till the Court's instructions

18  and don't allow the presumption of innocence to be taken away

19  even for one second because if you do, we all lose until and

20  unless you've heard all of the proof and until and unless the

21  government has established the proof of the elements here

22  beyond a reasonable doubt.

23           And I submit with great respect for your willingness

24  to serve and thank you now for your willingness to serve.  It's

25  easy to thank someone after a trial, especially if you win.

IC4HIss2                        Opening – Mr. Brafman

1    I'm thanking you now for agreeing to be here every day because

2    without you, none of us get to do our jobs, not even Judge

3    McMahon who is in charge.  You are important to us, to

4    Mr. Issa, to this trial, and to the United States.

5            Thank you very much for your patience, and I look

6    forward to talking to you again in a couple of days after the

7    evidence.  Thank you very much.

8            THE COURT:  Call your first witness, please.

9            MS. HANFT:  The government calls Delores Waters.

10           THE COURT:  Folks, I'm going to pass out notebooks to

11   you, and you can use these notebooks to take notes during the

12   testimony.  The notes that you take are for your use only.

13           I see that one of the jurors had a notebook.  I didn't

14   notice that.  I'm going to ask you to tear those notes out of

15   your notebook and use this notebook, and the notebooks will be

16   kept back in the jury room.  They'll be locked at night.

17   Nobody will be able to get them.  They're for your use only.

18           The record in this case is not what you choose to

19   write down in your notebook any more than it's what I choose to

20   write down on my computer.  The record in this case, the record

21   in this case, is what the court reporter takes down.  So you

22   can make notes of anything that you want to jog your memory

23   about -- bring the witness up, please.  We're moving, moving,

24   moving quickly.

25           You can make notes about anything that you think is

IC4HIss2                              Opening - Mr. Brafman

 1  important, but if there's a dispute -- excuse me.  Could the

 2  witness please -- that's not how the witness comes up.  Just

 3  right through the middle, please.

 4          THE LAW CLERK:  This way.

 5          THE COURT:  Thank you.

 6          Your notes are for you.  Don't share them with the

 7  other jurors and don't use them in the witness room to resolve

 8  disputes that you may have about what the evidence shows.  If

 9  you have a dispute, ask me, and I'll have the court reporter

10  get the transcript for you.  OK.

11          Swear the witness, please.

12          MR. WIRSHBA:  Yes, your Honor.  May I approach to

13  place something on the witness box?  And there's a stipulation.

14          THE COURT:  Would you please swear the witness.

15          (Witness sworn)

16          THE COURT:  Now, do you want this stipulation read at

17  this point in time?

18          MR. WIRSHBA:  Yes, your Honor.

19          THE COURT:  Ladies and gentlemen, I told you that

20  sometimes the lawyers would come to an agreement that would

21  probably obviate the need for putting a lot of witnesses on the

22  stand, and they've done that.  I have this thing called a

23  stipulation, which is Government Exhibit 4004.  This is what it

24  says:

25          It is hereby stipulated and agreed by and between the

IC4HIss2                    Opening – Mr. Brafman

1    United States of America, by Geoffrey S. Berman, United States

2    Attorney, Elizabeth Hanft, Kyle Wirshba, and -- I can never

3    pronounce his name.  It's so embarrassing.

4         MR. SOLOWIEJCZYK:  It's Solowiejczyk.

5         THE COURT:  -- Mr. Solowiejczyk, Assistant United

6    States Attorneys, of counsel, and Ibrahim Issa, the defendant,

7    by and with the consent of his attorneys, Benjamin Brafman and

8    Joshua Kirshner that:

9         1.  If called as a witness, a custodian of records

10   from the United States Postal Service would testify that

11   Government Exhibits 103 through 104, 105A through 105J, 110,

12   113, 115 through 118, and 120, all parts and subdivisions

13   thereof, are true and correct copies of records of the USPS;

14   that the original records were all made at or near the time, by

15   or from information transmitted by a person with knowledge of

16   the matters set forth in the records; that they were kept in

17   the ordinary course of the USPS's regularly scheduled business

18   activity; and that it was the regular practice of that business

19   activity to make the records.

20        It is further stipulated and agreed that this

21   stipulation, Government Exhibit 4004, may be and it hereby is

22   received into evidence at trial.

23        What this means is that the parties have stipulated

24   that the exhibits in this stipulation are records of the United

25   States Postal Service, business records.

1              (Government's Exhibit 4004 received in evidence)

2              THE COURT:  You may examine your witness.

3              MR. WIRSHBA:  Thank you, your Honor.

4      DELORES WATERS,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7      DIRECT EXAMINATION

8      BY MR. WIRSHBA:

9      Q.  Good morning, Ms. Waters.

10     A.  Good morning, Kyle.  Can you hear me?

11     Q.  I can.

12              What's your current occupation, Ms. Waters?

13     A.  My current occupation at the postal service is I'm the

14     manager of vehicles and --

15              MR. BRAFMAN:  Excuse me.  It's difficult to hear.

16     Q.  Ms. Waters, I'd ask, to the extent you can, please keep

17     your voice up so that everyone in the courtroom can hear.

18     A.  I am the purchasing manager for vehicles and delivering

19     industrial equipment for the postal service.

20     Q.  Do people commonly refer to the United States Postal

21     Service as the USPS?

22     A.  Yes.

23     Q.  How long have you been with the postal service?

24     A.  I've been employed with the postal service for 33 years.

25     Q.  What other roles have you had with the postal service?

IC4HIss2                        Waters – Direct

1   A.  I started my career at the postal service as a letter

2   carrier and then advanced through various positions of

3   supervisory and management level in the postal service to

4   include a purchasing specialist.

5   Q.  How long have you been involved with postal service

6   purchasing?

7   A.  For 18 years.

8   Q.  How long have you been in your current role as the

9   purchasing manager of vehicles, delivery, and industrial

10  equipment?

11  A.  I've been in that position for two years.

12  Q.  How many individuals do you manage in that role?

13  A.  Fifteen employees.

14  Q.  What are your duties and responsibilities in that role?

15  A.  I oversee the acquisition, strategy, soliciting,

16  negotiating, and sourcing of postal service requirements for

17  three primary commodities: vehicles, deliveries, and industrial

18  equipment.

19  Q.  As part of that role, do you handle contracting for United

20  States Postal Service vehicle maintenance?

21  A.  Yes, we do.

22  Q.  Generally speaking, how many vehicles does the postal

23  service own?

24  A.  The postal service owns over 220,000 vehicles.

25  Q.  Which section of the postal service is responsible for

1    ensuring that its fleet of vehicles gets serviced and

2    maintained?

3    A.   A fleet management which consists of vehicle maintenance

4    facilities across the country.

5    Q.   What's the title of a person who's in charge of a vehicle

6    maintenance facility?

7    A.   A VMF manager, manager of vehicle maintenance facility.

8    Q.   Are vehicle maintenance facility sometimes called VMF's for

9    short?

10   A.   Yes.

11   Q.   And individuals immediately under the VMF manager, what's

12   their title?

13   A.   They would be supervisors.  They have various titles of

14   supervisor.  Some handle vehicle maintenance, some handle parts

15   supplies, but they are supervisors.

16   Q.   Do VMFs service all of the vehicles in the postal service

17   fleet?

18   A.   Not always.  It really depends, depending on staffing, the

19   volume of vehicles within their fleet.  They may also use

20   third-party sources to help with the maintenance.

21   Q.   In what circumstances would a VMF use a third-party vendor

22   to help with the maintenance?

23   A.   For overflow requirements.  Again, if there's not adequate

24   staffing within their facility, they may have a need to source

25   a third party to assist with maintenance of vehicles.

IC4HIss2                        Waters - Direct

1    Q.  Who's in charge of deciding whether a particular postal

2    service vehicle is serviced in house by the postal service or

3    sent out to a third party?

4    A.  I would say the manager of the vehicle maintenance

5    facility, a supervisor, someone in a management role within the

6    facility.

7    Q.  When a vehicle comes into a VMF requiring service that the

8    VMF cannot perform, who's in charge of deciding what vendor to

9    use?

10   A.  Again, I would say the vehicle maintenance manager or

11   supervisor of the facility.

12   Q.  You mentioned that you handle USPS contracting.  Who

13   initiates the contracting process for vehicle maintenance?

14   A.  We receive requirements from what would be a vehicle

15   maintenance facility, from a field office, for those services.

16   Q.  Are VMFs permitted to use vendors that do not have

17   contracts with the United States Postal Service?

18   A.  They do have local buying authority, so they can also

19   source those requirements locally.

20   Q.  When does your office recommend putting a contract in place

21   with a third-party vendor?

22   A.  We recommend if you have repetitive requirements that you

23   foresee for services, we would recommend that you would

24   establish a contract.

25   Q.  Is that a requirement?

IC4HIss2                        Waters - Direct

A.  It's not a requirement to have a contract, but it is

recommended.

Q.  Can a VMF manager choose a vendor without a contract over

one that has a contract?

A.  Yes, they can.

Q.  All right.  Now, in the circumstances where the postal

service does decide to enter into a contract, how does your

office determine with whom to contract?

A.  Well, there's a process that we go through.  When we talk

about the acquisition process, we would receive a requirement

from a facility, we would solicit those requirements, we would

send out a solicitation package to a source list of possible

sources, we would get their proposals in, we'd evaluate their

proposals, and in concert with the requesting office, we would

make a best value determination as to who should receive a

contract award.

Q.  So you mentioned a bunch of steps there.  I'd like to break

those down to go through each individually.

A.  Sure.

Q.  Let's start out with I think you mentioned the VMF needs.

        What would you do to evaluate the needs of the VMF in

part of this contracting process?

A.  Well, the VMF would start out by sending us what their

requirements are.  They would tell us the vehicles to be

serviced.  They would tell us the types of services that

IC4HIss2                              Waters - Direct

1    they're looking for.  And as a result of that, we would develop

2    a solicitation for that purpose.

3    Q.   What is that solicitation?

4    A.   A solicitation is -- contains terms and conditions.  It

5    will contain the scope of work.  We would request pricing, and

6    it would also contain other documents associated with the

7    services that we want performed.

8    Q.   What happens after you send out the solicitation?  What's

9    the next step?

10   A.   The next step in the process is suppliers will complete the

11   proposal, and they'll submit proposals back to our office for

12   consideration.

13   Q.   What happens after you receive these proposals?

14   A.   We receive the proposals, we evaluate the proposals, and

15   make a best value determination as to who should be awarded a

16   contract.

17   Q.   What's involved in making that best value determination?

18   A.   Well, we'll take into consideration both the pricing, we

19   take into consideration whatever valuation factors have been

20   defined within the solicitation.  And we also take those all

21   into consideration and, in concert with the requesting office,

22   make a decision as to who should be awarded a contract.

23   Q.   What's the next step in the process?

24   A.   The next step in the process is we would award a contract

25   to a supplier or suppliers for those services.

1    Q.  Are all contracts with third-party auto repair vendors the

2    same?

3    A.  No.

4    Q.  Is a VMRA one type of contract?

5    A.  That is a type of -- that is a type of contract, yes.  It's

6    an ordering agreement.

7    Q.  What does VMRA stand for?

8    A.  Stands for vehicle maintenance and repair agreement.

9    Q.  What are the basic high-level terms of a VMRA?

10   A.  A VMRA is itself not a contract.  It is an agreement

11   between the postal service and the supplier and contains terms

12   and conditions that may apply in a future issuance of an order

13   for service.

14   Q.  Apologies.  I'm the one that called it a contract.  So it's

15   an agreement, not a contract?

16   A.  That's correct.

17   Q.  What obligations does the postal service have under a VMRA?

18   A.  We have no minimum obligation under the terms of a VMRA to

19   request services.

20   Q.  All right.  Is an IDIQ fixed-price contract another type of

21   contract?

22   A.  That is another type of contract that the postal service

23   will award.  It's called an -- IDIQ stands for indefinite

24   delivery/indefinite quantity contract.  It is a contract with a

25   known period of performance typically, but we may not know when

IC4HIss2                              Waters - Direct

1   we want the services and we may not have defined totally the

2   amount of services.  So in those cases, we will put in a

3   minimum and maximum value.

4   Q.  What obligations does the postal service have under an IDIQ

5   contract?

6   A.  Under an IDIQ contract, the postal service is obligated to

7   the minimum value stated in the contract.

8   Q.  Do you see a binder in front of you?

9   A.  Yes, I do.

10  Q.  All right.  I ask you to take a look in that binder and

11  look at what's been premarked as Government Exhibit 103.

12          Do you see that?

13  A.  Yes, I do.

14  Q.  Do you recognize that document?

15  A.  Yes, I do.

16  Q.  What is it?

17  A.  This is PS Form 8203 order/offer/award.

18  Q.  Is it for any particular contract?

19  A.  It is for a contract that was awarded for -- it's a vehicle

20  maintenance and repair agreement.

21  Q.  For what company?

22  A.  Awarded to First Star Auto dba Daimner Fleet.

23          MR. WIRSHBA:  Your Honor, the government offers

24  Government Exhibit 103.

25          MR. BRAFMAN:  No objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

IC4HIss2                           Waters - Direct

1              THE COURT:  Admitted.

2              (Government's Exhibit 103 received in evidence)

3              MR. WIRSHBA:  Permission to publish it, your Honor?

4              THE COURT:  Blanket permission once it's admitted.

5              MR. WIRSHBA:  Thank you.  Understood, your Honor.

6              Ms. Geier, if we could put up Government Exhibit 103.

7      BY MR. WIRSHBA:

8      Q.  All right.  Ms. Waters, can you see Government Exhibit 103

9      up on the screen?

10             MR. BRAFMAN:  I'm sorry.  Our monitor is not working.

11     I don't know why.

12             THE LAW CLERK:  Turn it on.

13             MR. BRAFMAN:  It's on.

14             MR. WIRSHBA:  Your Honor, can I just check that the

15     jury --

16             THE COURT:  Is everybody's monitor on?  Anybody have a

17     problem?  You can all see the exhibit?

18             OK.  Hold on a second.  Technical difficulties.

19             (Pause)

20             MR. BRAFMAN:  Your Honor, I'll make do with the hard

21     copy until they figure it out so we don't delay.

22             THE COURT:  Thank you, Mr. Brafman.  I appreciate

23     that.

24             MR. WIRSHBA:  May I proceed, your Honor?

25             THE COURT:  Go ahead.

IC4HIss2                    Waters – Direct

1    BY MR. WIRSHBA:

2    Q.  Directing your attention to Government Exhibit 103 which is

3    up on the screen, is this contract signed?

4    A.  Yes, it is signed.

5    Q.  Who's this contract between?

6    A.  This contract is between the United States Postal Service

7    and First Star Auto.

8    Q.  Ms. Waters, would you speak into the microphone so everyone

9    can hear you.  You can move the interview over if that will be

10   helpful.

11   A.  This contract is between the United States Postal Service

12   and First Star Auto.

13   Q.  Is First Star Auto Repair a third-party vendor?

14   A.  Yes.

15   Q.  Is this contract with a particular VMF?

16   A.  This contract is for the vehicle maintenance facility --

17   this agreement is for the vehicle maintenance facility at

18   Manhattan, New York, VMF.

19   Q.  And who signed this agreement for the United States Postal

20   Service?

21   A.  Michael P. Gehrke.

22   Q.  Who signed this agreement for First Star Auto Repair?

23   A.  Ibrahim Issa.

24   Q.  Directing your attention to box No. 3 on the top portion of

25   this form, when did this agreement go into effect?

IC4HIss2                          Waters - Direct

1   A.  It was effective January 9, 2012.

2   Q.  Can you tell from this first page of the agreement, from

3   Government Exhibit 103, what type of agreement this is?

4   A.  This is a vehicle maintenance and repair agreement.

5   Q.  How do you know that?

6   A.  It's stated in block 19.

7            MR. WIRSHBA:  Ms. Geier, if we could show block 19.

8   Q.  Is that one of the types of contracts that we spoke about

9   earlier?

10  A.  Yes, it is.

11  Q.  All right.  Looking at box 17 on the left side -- I'm

12  sorry, on the right side in the middle, what time period does

13  this agreement cover?

14  A.  The period of performance for this agreement is from

15  January 9, 2012, to January 8, 2014.

16  Q.  All right.  I'd like to take a look at some of the terms of

17  this agreement.

18           Let's look at attachment 3, which, Ms. Geier, is on

19  page 23 of the PDF.

20           Can you see that on the screen, Ms. Waters?

21  A.  Yes, I can.

22  Q.  Can you read the terms and conditions at the top of the

23  page aloud for the jury where it says "items and prices."

24  A.  Sure.  "The postal service is not obligated to issue orders

25  under this agreement, nor does the postal service guarantee any

IC4HIss2                          Waters - Direct

minimum dollar amount during the term of the agreement.  No

individual order may exceed the dollar limitations established

in Part 1, authorized personnel, and in no event may the dollar

limit so established exceed $10,000 per order.  A binding

contract will come into effect only upon placement of an

order."

Q.  Is this a standard term in VMRAs, vehicle maintenance

repair agreements?

A.  Yes, it is.

Q.  Why would the postal service enter into an agreement that

it wasn't obligated to use?

A.  Well, again, the postal service wants the flexibility to

have services performed if needed, you know.  You may not have

a need to use a third-party source, but in the event that you

do, you have an agreement established, you have pricing

established, you have a period of performance established.

          MR. WIRSHBA:  Ms. Geier, if we could turn to page 16

of this PDF, which is page 15 of the agreement.

Q.  Ms. Waters, do you see there in the middle where it says

Clause 4-2?

A.  Yes, I do.

Q.  And it says there, "A." it says, "incorporation by

reference."  Am I reading that right?

A.  Yes.

Q.  What does it mean for something to be incorporated by

IC4HIss2                          Waters - Direct

1    reference?

2    A.   While the full text of the clauses that are listed here are

3    not provided within the contract document, they are a part of

4    the contract and are therefore incorporated by reference;

5    they're added in as part of the contract.

6    Q.   Do you see where it says "Clause 1-5.  Gratuities or

7    gifts"?

8    A.   Yes, I do.

9    Q.   Just in general terms, what does that clause say?

10   A.   The verbiage of the clause?

11   Q.   Do you know what that clause generally means?

12   A.   It means that we're prohibited from taking gratuities or

13   gifts from --

14   Q.   Where's the full text of Clause 1-5 published?

15   A.   The full text is published in -- you'll see the language

16   there says "the text of the incorporated terms may be found

17   at," and they are -- you can go to that particular link, which

18   is our purchasing/supplying principles and practices.

19   Q.   Ask you to look in your binder for Government Exhibit 120,

20   and when you've had a chance to find it, let me know if you

21   recognize it.

22   A.   OK.

23   Q.   Do you recognize that document?

24   A.   Yes, I do.

25   Q.   What is it?

IC4HIss2                          Waters - Direct

1    A.  Well, this document, this page itself?

2    Q.  Yes.

3    A.  This is from our purchasing guidelines.

4    Q.  And what does it cover?

5    A.  This particular document, it lists certain clauses, and

6    they're always listed in order.  And in this order, there's

7    Clause 1-4, -5, and -6 lists.

8                MR. WIRSHBA:  Your Honor, the government offers

9    Government Exhibit 120.

10               MR. BRAFMAN:  No objection.

11               THE COURT:  Admitted.

12               (Government's Exhibit 120 received in evidence)

13               MR. WIRSHBA:  Ms. Geier, if we could put 120 on the

14   screen and focus on 1-5.

15   Q.  Ms. Waters, could you read Clause 1-5 aloud for the jury.

16   A.  "Gratuities or gifts.  The postal service may terminate

17   this contract by defendant if, after notice and a hearing, the

18   Postal Service Board of Contract Appeals determines that the

19   supplier or the supplier's agent or other representative:  (1)

20   offered or gave a gratuity or gift (as defined in 5 CFR 2635)

21   to an officer or employee of the postal service and (2)

22   intended by the gratuity or gift to obtain a contract or

23   favorable treatment under a contract.

24               "The rights and remedies of the postal service

25   provided in this clause are in addition to any other rights and

1    remedies provided by law or under this contract."

2              MR. WIRSHBA:  Now, Ms. Geier, I'd like to go back to

3    government -- I apologize.

4    Q.  Ms. Waters, before we move on, how often is this clause

5    incorporated into postal service contracts?

6    A.  Every contract has this clause because Clause 4-2 is a

7    required clause in every solicitation and contract for the

8    postal service.

9    Q.  And Clause 4-2 incorporates Clause 1-5 which can be found

10   on that website?

11   A.  That's correct.

12             MR. WIRSHBA:  Ms. Geier, let's go back to Government

13   Exhibit 103, and we'll look at attachment 1, which is page 20

14   of the PDF for Government Exhibit 103.

15   Q.  Ms. Waters, do you see that on your screen, attachment 1?

16   A.  Yes, I do.

17   Q.  Do you see where it says, 1.3, "Additional work" on the

18   bottom of the page?

19   A.  Yes, I do.

20   Q.  Can you please read that term aloud for the jury.

21   A.  Sure.

22             "Additional Work:  During the course of performing

23   authorized maintenance or repair work, the supplier may uncover

24   additional work which is required.  The supplier is not

25   authorized to perform such additional work without the approval

IC4HIss2                              Waters - Direct

of an authorized postal service employee.  The supplier must

provide a written statement of additional work required when

requested by an authorized postal service employee."

Q.  Ms. Waters, is this a standard term in a vehicle

maintenance repair agreement, a VMRA?

A.  Yes, it is.

          MR. WIRSHBA:  OK.  Ms. Geier, if we could go to

page 17 of this PDF which is page 16 of the contract.

Q.  Can you read the provision entitled "Contracting Officer's

Representative."  It's towards the bottom of the page.

A.  Yes.

          "Clause 6-1.  Contracting Officer's Representative.

The contracting officer will appoint a contracting officer

representative responsible for the day-to-day administration of

the contract who will serve as the postal service's point of

contact with the supplier on all routine matters.  A copy of

the notice of appointment defining the COR's authority will be

furnished to the supplier upon award of the contract."

Q.  I'd like to explain this term a little bit, so let's start

with the contracting officer.  Who's the contracting officer?

A.  The contracting officer is the person who represents the

postal service and has bound the postal service through the

contract award to the terms and conditions of the contract.  In

this case, this particular contract, Michael Gehrke was the

contracting officer.

IC4HIss2                          Waters - Direct

1   Q.  Where does that contracting officer work?

2   A.  Contracting officer would work in my office.

3   Q.  And for whom does that contracting officer work?

4   A.  The postal service.

5   Q.  And for whom in particular?

6   A.  For me.  I'm sorry.

7   Q.  And there's also mention of a contracting officer's

8   representative.  Who is that?

9   A.  Contracting officer representative is the person for whom

10  which is identified -- is designated at the requiring office to

11  represent the contracting officer.

12  Q.  When we're talking about a repair services agreement, where

13  does that contracting officer's representative work?

14  A.  At the VMF in this case.

15  Q.  All right.  Is the contracting officer's representative

16  sometimes known by the shorthand COR?

17  A.  They are, yes.

18  Q.  It also mentions that the contracting officer

19  representative, or COR, is responsible for day-to-day

20  administration of the contract.  What does that mean?

21  A.  It means you'll be responsible for ensuring that --

22  number one, you would be responsible for obtaining the

23  services.  You would be responsible for ensuring that the

24  services that were to be performed were performed.  You'd make

25  sure that the invoicing is accurate for the services that were

IC4HIss2                        Waters - Direct

1    performed.  We issue a particular notice of appointment that

2    advises them of their duties and responsibilities.  There's a

3    couple things they can't do.  They cannot change pricing or the

4    term of a contract.  That's their limitations.

5    Q.  All right.  You mentioned that you issue something.  I'd

6    ask you to take a look in your binder at Government Exhibit 104

7    and tell me when you've had a chance to locate it and whether

8    you recognize that.

9    A.  Yes.

10   Q.  What is that?

11   A.  This is an appointment of a contracting officer

12   representative.  It's a notice of an appointment.

13   Q.  Can you tell from looking at that whether it's connected to

14   this contract that we've been looking at?

15   A.  Yes, it is.

16          MR. WIRSHBA:  Your Honor, I would like to offer

17   Government Exhibit 104 into evidence.

18          MR. BRAFMAN:  No objection.

19          THE COURT:  Admitted.

20          (Government's Exhibit 104 received in evidence)

21          MR. WIRSHBA:  Ms. Geier, if we could put 104 on the

22   screen.  In particular, if we could look at page 2 of this

23   agreement.

24   BY MR. WIRSHBA:

25   Q.  Ms. Waters, looking at page 2, do you see who signs this

IC4HIss2                        Waters – Direct

1   document for First Star Auto Repair?

2   A.   Ibrahim Issa.

3          MR. WIRSHBA:  Can we go back to page 1.  Thank you,

4   Ms. Geier.

5   Q.   I'd like to just walk through a couple of provisions.

6   Let's start with paragraph 2.  Can you read that aloud for the

7   jury.

8   A.   Sure.  "Ensure that contractor is not directed or

9   authorized to perform work outside the agreement's scope.

10  Requests outside the scope should be processed as separate

11  requirements."

12  Q.   I should have done this in advance.  The top line here

13  says, "The COR is delegated authority and responsibility as

14  shown below."

15         Did I read that right?

16  A.   That is correct.

17         THE COURT:  Let me know where there's a good spot for

18  us to take a morning break.

19         MR. WIRSHBA:  Of course, your Honor.  We're coming up

20  on one shortly.

21         THE COURT:  Good.

22         MR. WIRSHBA:  You know what --

23         THE COURT:  Call my attention -- ask another line of

24  questions, and then let's take a break.

25         MR. WIRSHBA:  Your Honor, actually, I think this would

IC4HIss2                          Waters - Direct

1    be a perfectly fine time to take a break.

2              THE COURT:  All right.  We're not going to argue about

3    it.  Let's take a short break.  Don't discuss the case.  Keep

4    an open mind.

5              (Recess)

6              (Jury present)

7              THE COURT:  Ma'am, you're still under oath.

8              You may continue.

9              MR. WIRSHBA:  Thank you, your Honor.

10   BY MR. WIRSHBA:

11   Q.  Ms. Waters, before we broke we were looking at Government

12   Exhibit 104.  Do you see it on your screen there?

13   A.  Yes, I do.

14   Q.  Can you remind the jury what the document is.

15   A.  This is notice of appointment of a contracting officer

16   representative.

17   Q.  Could you read the first line of this agreement, starting

18   with "the COR is."

19   A.  "The COR is delegated authority and responsibility as shown

20   below."

21   Q.  I'd like to concentrate first -- I think you had read

22   paragraph 2.  Let's look at paragraph 6 together.

23   A.  "Ensure that all work required has been performed and is of

24   acceptable quality and workmanship.  Designate individuals as

25   necessary to assist with inspection and acceptance.  Contact

1    local VMF if assistance is necessary."

2    Q.  Now, can we look at paragraph 8.  Can I ask you to read

3    that aloud.

4    A.  "Ensure that Forms 4541 reflect the actual work performed

5    by the contractor and are prepared as explained in payment

6    section of the agreement.  Verify that the information on Form

7    4541 is accurate, in accordance with the agreement.  Record the

8    Form 4541 amount, number, and date submitted for payment in the

9    vehicle maintenance service log.  The Form 4541 amount should

10   be compared with the approved estimate to confirm authorization

11   of the work."

12           MR. WIRSHBA:  Let's go back to Government Exhibit 103

13   if we could, Ms. Geier, on the first very page of that

14   document.

15   Q.  On the right side, Ms. Waters, do you see where it says,

16   "NTE $250,000"?

17   A.  Yes, I do.

18   Q.  What does NTE stand for there?

19   A.  Not to exceed $250,000.

20   Q.  Does that mean that the postal service must order from this

21   vendor $250,000 in services?

22   A.  No, it doesn't.

23   Q.  What does it mean?

24   A.  It means at the time that this award was made, possibly the

25   requisition that was sent to our office was for -- approved

IC4HIss2                          Waters - Direct

1    that $250,000.

2    Q.  When you say "requisition," what do you mean?  What's a

3    requisition?

4    A.  It's a funding document, and it has to have approvals

5    through your local approval chain to allow you to spend money,

6    in other words.

7    Q.  So $250,000 in funding was approved?

8    A.  Yes, that's correct.

9    Q.  Is there anything in this particular agreement that

10   obligates this particular VMF to use First Star instead of

11   another third-party vendor?

12   A.  No, it doesn't.

13   Q.  Is there anything in this particular agreement that

14   requires the VMF listed here to use First Star for any amount

15   of work?

16   A.  No, it doesn't.

17   Q.  Were there any modifications to this contract that you know

18   of?

19   A.  Without seeing the whole contract document, I can't tell.

20   This is the original contract, so typically there would be

21   modifications to a contract over the term of the contract.

22   Q.  Take a look in your binder at Government Exhibit 105A.  Let

23   me know when you've located that.

24   A.  OK.

25   Q.  Do you recognize that document?

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  This is a contract modification document.

4    Q.  What's the date of the modification?

5    A.  The date of the modification is June 25, 2012.

6    Q.  All right.  I'd also ask you to take a look in your book at

7    Government Exhibits 105B through 105J, if you would.

8              MR. BRAFMAN:  Your Honor, I don't have any objection

9    to any of those to speed it up.

10             THE COURT:  They're all admitted.

11             (Government's Exhibits 105A through 105J received in

12   evidence)

13   BY MR. WIRSHBA:

14   Q.  Let's start by taking a look at Government Exhibit 105A.

15   What was this particular modification of the contract?

16   A.  This modification was to increase funding in the amount of

17   $300,000.

18   Q.  What was the resulting total funding for this contract?

19   A.  So the new total value was $550,000.

20   Q.  Does this modification entitle the vendor to any additional

21   work under the agreement?

22   A.  No.

23   Q.  Let's take a look at Government Exhibit 105B.  What's the

24   date of this modification, if you could tell?

25   A.  September 10, 2012.

IC4HIss2                        Waters – Direct

1    Q.  Is this modification related to the contract that we were

2    looking at earlier?

3    A.  Yes, it is.

4    Q.  What is this modification?

5    A.  This modification was to increase funding by $400,000.

6            MR. BRAFMAN:  Excuse me, your Honor.  The date was

7    stated to be 2012.  It's 2014, the modification.

8            THE COURT:  Period of performance, 1/9/2012 to

9    1/8/2014.

10           MR. BRAFMAN:  I know, but it's stated --

11           THE COURT:  Look, if you want to argue with the

12   witness, fine.

13           MR. BRAFMAN:  No, I don't.  Thank you.

14           THE COURT:  Do it on your own time.

15   BY MR. WIRSHBA:

16   Q.  Ms. Waters, I'm sorry.  You were in the middle of telling

17   us what this modification did.

18   A.  This modification increased the funding by $400,000 from

19   550,000 to 950,000.

20   Q.  Does this modification entitle the vendor to any additional

21   work?

22   A.  No, this doesn't.

23   Q.  Let's take a look at Government Exhibit 105C in evidence.

24           What is the date that this modification was signed,

25   focusing on the bottom?

IC4HIss2                         Waters - Direct

1   A.  Effective -- it was effective -- it was signed on

2   10/16/2012.

3   Q.  When was it effective?

4   A.  It says the effective date was 10/15/2012.

5   Q.  What does this modification do?

6   A.  This modification increased funding by $375,000, increasing

7   the value from 950,000 to $1,325,000.

8   Q.  Does anything about this modification entitle the vendor to

9   any additional work?

10  A.  No, it doesn't.

11  Q.  All right.  Let's take a look at Government Exhibit 105D.

12  What's the date of this modification?

13  A.  This modification was effective February 11, 2013.

14  Q.  What does this modification do?

15  A.  This modification increased funding by $200,000, bringing a

16  new total value to $1,525,000.

17  Q.  Is there anything about this modification that entitles the

18  vendor to additional work?

19  A.  No, it doesn't.

20  Q.  All right.  Let's look at Government Exhibit 105E.  What's

21  the date of this modification?

22  A.  This modification was effective March 19, 2013.

23  Q.  What does this modification do?

24  A.  This modification increased funding by $12,800, increasing

25  the total to $1,537,800.

IC4HIss2                          Waters - Direct

1   Q.  Is there anything about this modification that entitles the

2   third-party vendor to additional work?

3   A.  No, it doesn't.

4   Q.  OK.  Let's move on to 105F.  What's the date of this

5   modification?

6   A.  This modification was effective, looks like, January 13,

7   2014.

8   Q.  And what does the modification do?

9   A.  This modification was issued to exercise the first renewal

10  option to increase funding by $100,000.

11  Q.  So what's the resulting funding available under this

12  agreement?

13  A.  The funding availability is now $1,637,800.

14  Q.  And let's look at Government Exhibit 105G.  What's the date

15  of this modification?

16  A.  This modification was effective February 10, 2014.

17  Q.  What does this modification do?

18  A.  This modification increased the funding in the amount of

19  $300,000, bringing the new total value to $1,937,800.

20  Q.  Is there anything about this modification that entitles the

21  vendor to additional work?

22  A.  No, it doesn't.

23  Q.  OK.  Let's look at 105H.  What's the date of this

24  modification?

25  A.  This modification was effective May 23, 2014.  This

IC4HIss2                          Waters - Direct

1    modification was to add three locations, three VMF locations to

2    the agreement and to increase funding by $948,000.

3    Q.  When you say "add three VMF locations," what do you mean?

4    A.  Well, what this did was allow for services to be performed

5    also for three additional vehicle maintenance facilities.

6    Q.  In addition to which?

7    A.  In addition to the one that the contract was established

8    for, which was the Manhattan VMF.

9    Q.  What are the three new vehicle maintenance facilities

10   covered by this contract as of May 23, 2014?

11   A.  Brooklyn, New York, VMF; the Flushing, Queens, Jamaica VMF;

12   and Staten Island VMF.

13   Q.  Did anyone sign this agreement on behalf of the vendor?

14   A.  This modification was signed by Ibrahim Issa.

15   Q.  What's his title, according to this document?

16   A.  President.

17   Q.  Of what?

18   A.  President of First Star Auto Repair.

19   Q.  Let's look at Government Exhibit 105I.  What does

20   Government Exhibit 105I do -- sorry, before we get there,

21   what's the date of 105I?

22   A.  Effective date August 7, 2014.

23   Q.  What does this modification do?

24   A.  This modification increased funding in the amount of

25   $200,000.  This funding was added for the Manhattan VMF.

IC4HIss2                    Waters - Direct

1   Q.  What, if anything, about this modification entitled the

2   vendor to additional work?

3   A.  There's nothing in the modification that entitled them to

4   additional work.

5   Q.  All right.  Let's look at 105J.  What's the date of this

6   modification?

7   A.  This modification was effective, based on the signature of

8   the contracting officer, February 25, 2016.

9   Q.  What does this modification do?

10  A.  This modification was the exercise of a renewal option.

11  Q.  From what to what?

12  A.  New period of performance changed from 2016 to 2018.

13  Q.  Did anyone sign this modification on behalf of First Star

14  Auto Repair?

15  A.  This was signed by Ibrahim Issa.

16  Q.  In what capacity?

17  A.  As president.

18  Q.  I'd like to take a look -- I'd like you to take a look in

19  your binder for Government Exhibit 110.

20          Do you see that?

21  A.  Yes, I do.

22  Q.  Do you recognize it?

23  A.  Yes, I do.

24  Q.  What is it?

25  A.  This is a solicitation for vehicle maintenance and repair

IC4HIss2                          Waters – Direct

1    services.

2              MR. WIRSHBA:  Your Honor, I would offer Government

3    Exhibit 110.

4              MR. BRAFMAN:  No objection.

5              THE COURT:  Admitted.

6              (Government's Exhibit 110 received in evidence)

7              MR. WIRSHBA:  Ms. Geier, if we could put Government

8    Exhibit 110 on the screen.

9    BY MR. WIRSHBA:

10   Q.  You mentioned solicitation.  Could you just remind us, what

11   is a solicitation?

12   A.  A solicitation is issued for services -- services or

13   supplies that the postal service is interested in establishing

14   a contract for.

15   Q.  What is this a solicitation for?

16   A.  This is a solicitation for vehicle maintenance and repair

17   services for various Northeast area vehicle maintenance

18   facilities.

19   Q.  Which vehicle maintenance facilities?

20   A.  The Manhattan VMF; Westchester VMF; New Hampshire VMF; and

21   Livingston, New Jersey, post office.

22              (Continued on next page)

23

24

25

IC45iss3                          Waters - direct

1    BY MR. WIRSHBA:

2    Q.   When was the solicitation sent out?

3    A.   Based on the date of the letter, September 1st, 2015.

4    Q.   And if a vendor wanted to bid for the solicitation, would a

5    vendor need to bid for a contract with all of these VMFs?

6    A.   No.

7    Q.   So, a vendor could bid for a contract with only some or one

8    of these VMFs; is that right?

9    A.   That is correct.

10   Q.   What else, if anything, gets sent out along with this cover

11   letter as part of a solicitation?

12   A.   As part of the solicitation, the cover letter would include

13   the solicitation document itself which would contain the postal

14   service terms and conditions.  It would also have scope of work

15   and other attachments associated with the work to be performed.

16   Q.   Let's take a look at page 2 of this pdf.  What is this?

17   A.   This is PS form 8203 which is

18   Order/Solicitation/Offer/Award document.

19   Q.   And why is it not filled out?

20   A.   Well, this is the solicitation phase so this is when we

21   would send it out to a supplier, request you to fill in certain

22   information, provide us with whatever documents we ask for, and

23   you would submit your proposal back to us.

24   Q.   Okay.  Let's take a look at page 5 of the solicitation

25   which is page 6 of the pdf, Ms. Geier.

IC45iss3                          Waters - direct

          So, focusing in on no. 3 at the top of the page, the
type of contract, what type of contract is being lited here?
A.  The resulting contract with the successful supplier will be
an indefinite delivery, indefinite quantity, fixed-price
contract, with economic price adjustments.
Q.  Now, is that an IDIQ contract?
A.  That is.  Yes.
Q.  And is the indefinite delivery, indefinite quantity, IDIQ
contract one of the ones we discussed earlier?
A.  Yes, it is.
Q.  How is an IDIQ contract different from the vehicle repair
maintenance we were discussing earlier?
A.  The difference between them is an IDIQ will express a
minimum and maximum value of what we anticipate spending, the
minimum is the obligated amount that the postal service is
obligated to spend under an IDIQ.  We are saying our minimum
spend will be $250,000, whereas a vehicle maintenance
agreement, it is just that, it is an agreement, it is not a
contract, until such time as an order is placed and there is no
minimum obligation of spend or services to be performed under a
VMRA agreement.
Q.  Let's take a look at no. 4 on this page, the term of
contract.  Can you read that, just that first paragraph for the
jury?
A.  Period of performance will be for a base period of two

1    years with two options to renew for two years, for a total of

2    six years, unless the supplier offers an incentive program in

3    the best interest of the postal service.  In this case,

4    alternate proposals will be considered.

5    Q.  Now, if you could, read the second paragraph there?

6    A.  The minimum and maximum will be expressed in dollars versus

7    units.  Minimum and maximum values will be $250,000 and

8    $100 million -- $1 million, excuse me, $1 million respectively

9    for the two-year base period of the contract.

10   Q.  Can you explain that term?

11   A.  So, in other words, the minimum value we expect to spend is

12   $250,000.  The maximum is $1 million.

13   Q.  And is the postal service guaranteeing that this contract

14   will be worth $250,000 to the third-party vendor?

15   A.  We are obligating that the postal service will spend the

16   minimum value.

17   Q.  And what would happen if the postal service awarded this

18   contract and then never asked the winner of the contract to do

19   any work?

20   A.  We could be obligated to pay them $250,000, based on the

21   terms of the contract.

22   Q.  What's the postal service's obligation to pay the

23   contractor once the minimum is reached?

24   A.  There is no obligation once the minimum is reached.

25   Q.  Let's take a look at page 43 of this pdf, Ms. Geier, which

IC45iss3                          Waters - direct

1    is attachment 1.  I would like to focus in on Section 1.3 where

2    it says Ancillary Services.

3             Can you read that term for the jury?

4    A.  During the course of performing authorized maintenance or

5    repair work, the supplier may uncover ancillary work.  The

6    supplier is not authorized to perform such ancillary work

7    without the approval of an authorized COR/postal service

8    employee.  The supplier must provide a written statement of

9    additional work required when requested by an authorized

10   COR/postal service employee.  Use of e-mail communication

11   including use of photos, as appropriate to document problem, is

12   recommended.

13   Q.  Now, here does COR have the same definition you were

14   talking about earlier?

15   A.  Yes, it is.

16   Q.  What is that again?  Remind the jury.

17   A.  Contracting officer representative.

18   Q.  Is this term similar to a term that was in the VMRA, the

19   vehicle maintenance repair agreement that we looked at earlier?

20   A.  Yes, it is.

21   Q.  Let's go to page 27 of this solicitation, which is page 28

22   of the pdf.

23            Now, in the very first agreement that we looked at you

24   mentioned that there were clauses that were incorporated by

25   reference.  Are there clauses incorporated by reference in this

IC45iss3                         Waters - direct

1    solicitation as well?

2    A.   Yes, there are.

3    Q.   Do you see the gift and gratuities clause here?

4    A.   Yes, clause 1-5 gratuities or gifts, yes.

5    Q.   Is this clause incorporated by reference?

6    A.   It is incorporated by reference.

7    Q.   And, is the content of that clause the same language that

8    we reviewed earlier?

9    A.   Yes, it is.

10   Q.   How do you know that?

11   A.   It's the standard clause:  Language, gratuities or gifts.

12   Q.   When was the last time the USPS changed their gratuities or

13   gifts terms?

14   A.   Changed the language of it?

15   Q.   The language of the term, yes.

16   A.   The last date that I'm aware the gratuities clause was

17   updated was March of 2006.

18   Q.   Did First Star Auto Repair bid for any contracts under this

19   solicitation?

20   A.   Yes, they did.

21   Q.   And was First Star Auto Repair awarded any contracts from

22   its bid?

23   A.   Yes, they were.

24   Q.   Take a look at Government Exhibit 117 in your book.  Do you

25   recognize that?

IC45iss3                         Waters – direct

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  PS form 8203, contract award document.

4    Q.  Who is this contract awarded to?

5    A.  This contract was awarded to First Star Auto Repair.

6           MR. WIRSHBA:  Your Honor, I would offer Government

7    Exhibit 117.

8           MR. BRAFMAN:  No objection, your Honor.

9           THE COURT:  Admitted.

10          (Government's Exhibit 117 received in evidence)

11   BY MR. WIRSHBA:

12   Q.  Ms. Geier, if we can put that up on the screen?

13          So, Ms. Waters, is this a signed contract?

14   A.  Yes, it is signed.

15   Q.  Is it related to the 2015 solicitation that we were just

16   looking at?

17   A.  Yes, it is.

18   Q.  Who are the parties to this contract?

19   A.  The parties are First Star Auto Repair and the United

20   States Postal Service.

21   Q.  And, can you tell what VMF this relates to?

22   A.  This is for the Westchester VMF.

23   Q.  And focusing on box 3 at the top, what is the effective

24   date of this contract?

25   A.  February 12, 2016.

IC45iss3                          Waters - direct

1   Q.  Can you see who signed for First Star?

2          I apologize, Ms. Geier.  I am bouncing around quite a

3   bit.

4   A.  Ibrahim Issa.

5   Q.  And, do you know whether a contracting officer's

6   representative, a COR, was appointed under this particular

7   contract?

8   A.  Yes, it was.

9   Q.  Can you take a look at Government Exhibit 118 in your book?

10  Do you recognize that?

11  A.  Yes, I do.

12  Q.  What is it?

13  A.  This is a notice of appointment of a contracting officer

14  representative.

15  Q.  And is it for this particular contract that we were just

16  looking at?

17  A.  Yes, it is.

18          MR. WIRSHBA:  Your Honor, the government would offer

19  Government Exhibit 118.

20          MR. BRAFMAN:  No objection, sir.

21          THE COURT:  Admitted.

22          (Government's Exhibit 118 received in evidence)

23  BY MR. WIRSHBA:

24  Q.  Is this the first page of that agreement that is up on the

25  screen, Government Exhibit 118?

IC45iss3                              Waters – direct

1    A.   Yes.

2    Q.   Is it similar to the appointment of a contracting office

3    representative that we looked at earlier?

4    A.   Yes, it is.

5    Q.   Let's take a look at the third page of this pdf.  Can you

6    tell from this page whether this appointment of a contracting

7    officer's representative is related to that contract that we

8    were just looking at, the 2016 First Star contract?

9    A.   Yes, I can.  Yes.

10   Q.   And, is it?

11   A.   Yes, it is.

12   Q.   And can you tell from this who the appointed contractor's

13   office representative is?

14   A.   Ismael Velez.

15   Q.   And for what VMF?

16   A.   Westchester VMT.

17   Q.   Let's go back to page 2 of this agreement.  Can you see who

18   is signing on behalf of the vendor in this case?

19   A.   Ibrahim Issa.

20   Q.   And from what business is he signing?

21   A.   First Star d/b/a Daimner.

22   Q.   Looking back at the first page of this agreement, are

23   paragraphs 2, 6, and 8 similar to the ones that we reviewed

24   earlier?

25   A.   Yes, they are.

IC45iss3                          Waters - direct

1    Q.  We can take that down, Ms. Geier.  Thank you.

2            Was a company called Healey awarded any contracts

3    under that 2015 solicitation that we were looking at?

4    A.  Yes, they were.

5    Q.  How many contracts were awarded to Healey?

6    A.  I think there was two.

7    Q.  Take a look at Government Exhibit 113 in your book.  Do you

8    recognize that?

9    A.  Yes, I do.

10   Q.  What is that?

11   A.  This is PS Form 8203 Contract Award Document.

12   Q.  It is a contract between whom?

13   A.  It is a contract between United States Postal Service and

14   Healey Motors Incorporated.

15           MR. WIRSHBA:  Your Honor, I would offer Government

16   Exhibit 113.

17           MR. BRAFMAN:  No objection.

18           THE COURT:  Admitted.

19           (Government's Exhibit 113 received in evidence)

20           MR. WIRSHBA:  Thank you, your Honor.

21   BY MR. WIRSHBA:

22   Q.  Ms. Waters, who are the parties to this contract?

23   A.  United States Postal Service and Healey Motors.

24   Q.  And to what VMF does this relate?

25   A.  This is for the Manhattan VMF.

IC45iss3                              Waters - direct

1    Q.  Is this also related to the 2015 solicitation that we

2    looked at?

3    A.  Yes, it is.

4    Q.  Who signed on behalf of Healey?

5    A.  Pamela Keil.

6    Q.  And, take a look at box 3 on the top.  What was the

7    effective date of this contract?

8    A.  It says effective 2/16/2016.

9    Q.  Take a look at Government Exhibit 115 in your book, if you

10   don't mind.  What is that?

11   A.  PS form 8203, Contract Award Document.

12   Q.  Who are the parties to that contract?

13   A.  The United States Postal Service and Healey Motors

14   Incorporated.

15             MR. WIRSHBA:  Your Honor, the government offers 115.

16             MR. BRAFMAN:  No objection.

17             THE COURT:  Admitted.

18             (Government's Exhibit 115 received in evidence)

19   BY MR. WIRSHBA:

20   Q.  Who are the parties to this contract?

21   A.  United States Postal Service and Healey Motors

22   Incorporated.

23   Q.  To what VMF does this particular contract relate to?

24   A.  This relates to the Westchester VMF.

25   Q.  Is this also on the same solicitation we looked at earlier?

IC45iss3                          Waters – direct

1    A.  Yes, it is.

2    Q.  Who signed for Healey on this particular contract?

3    A.  Pamela Keil.

4    Q.  Focusing in on box 3 at the top, what is the effective date

5    of this contract?

6    A.  February 12, 2016.

7    Q.  Was a contracting officer's representative –– a COR ––

8    appointed for this particular contract?

9    A.  Yes, it was.

10   Q.  Take a look in your book at Government Exhibit 116.  Do you

11   recognize that?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  This is a notice of appointment of COR, contracting officer

15   representative.

16   Q.  And for which contract does it relate?

17   A.  This is for the Westchester VMF.

18   Q.  Who are the parties to that agreement?

19   A.  And this is associated with the award made to Healey

20   Motors.  The parties are Healey Motors and U.S. Postal Service.

21           MR. WIRSHBA:  Your Honor, the government offers

22   Government Exhibit 116.

23           MR. BRAFMAN:  No objection, your Honor.

24           THE COURT:  Admitted.

25           (Government's Exhibit 116 received in evidence)

IC45iss3                        Waters – direct

1    BY MR. WIRSHBA:

2    Q.  If we can display that?  Is this the first page of that

3    appointment of a contracting officer's representative?

4           Can we go to page 3 of this agreement?  Can you tell

5    from page 3 who has appointed the contracting officer

6    representative for this contract?

7    A.  The contracting officer representative that was appointed

8    is Ismael Velez.

9    Q.  And where does Mr. Velez work?

10   A.  Westchester VMF.

11   Q.  Can we go to page 2 of this agreement?  Can you see who

12   signed on behalf of the vendor here?

13   A.  Pamela Keil.

14   Q.  For what company does Ms. Keil work?

15   A.  Healey Motors Incorporated.

16   Q.  Going back to page 1, are the provisions in this

17   appointment of a contracting officer representative similar to

18   those of the ones that we read earlier?

19   A.  Yes.

20          MR. WIRSHBA:  Your Honor, if I may have a brief

21   moment?

22          (Counsel conferring)

23          MR. WIRSHBA:  Your Honor, at this time we have a

24   stipulation we would ask your Honor to read, otherwise the

25   government is done with this witness.

IC45iss3                          Waters - direct

1                  THE COURT:  Okay.

2                  It is hereby stipulate and agreed by and between the

3        usual suspects that,

4                  1.  Ibrahim Issa owned, controlled, and operated the

5        following corporations from the time of formation to the time

6        of closing or at least in or about September 2016:

7                       A.  First Star Auto Repair, Inc.

8                       B.  Healey Motors, Inc.

9                       C.  Dee Jay Service Center, Inc.

10                      D.  Hybrid Specialist, Inc.

11                      E.  Optimum Grocery Store, Inc.

12                      F.  Value Grocery Store, Inc.

13                      G.  Daimner, Inc.

14                      H.  Safeway Tire and Auto, Inc.

15                 It is further stipulated and agreed that this

16       stipulation, which is Government Exhibit 4002, may be received

17       into evidence as a government exhibit at this trial.

18                 And, it is so received.

19                 (Government's Exhibit 4002 received in evidence)

20                 THE COURT:  You are done with this witness,

21       Mr. Wirshba?

22                 MR. WIRSHBA:  Yes, your Honor.  No further questions.

23                 MR. BRAFMAN:  Yes, your Honor.

24                 Would your Honor consider a very brief side bar before

25       I begin?

IC45iss3                          Waters – direct

1           THE COURT:  Very brief.

2           MR. BRAFMAN:  Very brief.  I promise.

3           (Continued next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IC45iss3                         Waters - direct

1            (At side bar)

2            MR. BRAFMAN:  Your Honor, I think you can tell from my

3    not objecting to anything that I'm trying not to waste time.  I

4    would ask, however, at this time, since it has gone over a

5    number of times, that the Court consider a very brief curative

6    instruction.  Several times they focused on the fact that the

7    contracts indicate that gifts are not permitted.  If you look

8    at that sheet it says, and if you give gifts, that the contract

9    can be terminated.

10            THE COURT:  There will be no curative instruction.

11    There is nothing to be cured.  You have an argument that you

12    can make at the end of the case.

13

14

15

16

17

18

19

20

21

22

23

24

25

IC45iss3                          Waters - cross

1                (In open court)

2                MR. BRAFMAN:  May I proceed, Judge?

3                THE COURT:  You may.

4                MR. BRAFMAN:  Thank you.

5     CROSS EXAMINATION

6     BY MR. BRAFMAN:

7     Q.  Good morning.

8     A.  Good morning.

9     Q.  Ms. Waters, my name is Ben Brafman.  I am one of the

10    lawyers representing Ibrahim Issa.  You and I have never met;

11    is that correct?

12    A.  That is correct.

13    Q.  Obviously I have never discussed any of the questions I'm

14    about to pose to you before because we have never met and we

15    have never spoke be by phone, correct?

16    A.  That is correct.

17    Q.  And, welcome to New York.

18    A.  Thank you.

19    Q.  You have spent a career in the United States Postal

20    Service; is that correct?

21    A.  That is correct.

22    Q.  And to your credit, you began as a letter carrier and now

23    you are one of the high-ranking people who almost run a big

24    part of the postal service?

25    A.  I'm a manager of vehicles and delivery/industrial

IC45iss3                    Waters - cross

1     equipment.  That's a category management center.

2     Q.  And the category management center is in Philadelphia; is

3     that correct?

4     A.  That's correct.

5     Q.  And it is referred to, in short, as CMC, correct?

6     A.  WELL there is Category Management Centers around country

7     because we're commodity driven, so that's why I referred to it

8     as the Category Management Center.  I happen to be the Vehicles

9     and Delivery Industrial Equipment Category Management Center

10    but there are Category Management Centers across the country.

11    Q.  And where this center is located in Philadelphia, have you

12    ever met with Ibrahim Issa at that location?

13    A.  No, I haven't.

14    Q.  And do you know whether or not any of your colleagues at

15    the CMC center in Philadelphia have met with Mr. Issa?

16    A.  No, I don't.

17    Q.  And some of the people whose names show up on some of the

18    contracts, I am just going to ask you if you know who they are,

19    for example, Marilou Carandang; is she a colleague of yours who

20    works there?

21    A.  She used to work there.

22    Q.  She retired?

23    A.  Yes, she is retired.

24    Q.  And Ira Feldman, what is his job?

25    A.  Ira Feldman was my manager and he is retired.

IC45iss3                        Waters - cross

1   Q.  So, he was your boss?

2   A.  Yes, he was.

3   Q.  And, do you know whether or not, by discussing with him,

4   whether he ever personally met with Mr. Issa?

5   A.  No, I don't know.

6   Q.  And Carolyn Taylor, she is retired as well?

7   A.  Yes, she is.

8   Q.  Just so the jury understands, how many years does a postal

9   service employee need to have in before they are eligible for

10  retirement?

11            MR. WIRSHBA:  Objection, your Honor.

12            THE COURT:  The objection is sustained.

13  BY MR. BRAFMAN:

14  Q.  Would it be a fair statement to save time that none of

15  these people's retirement had anything to do with this case, as

16  far as you know?

17  A.  Not to my knowledge.

18  Q.  So, at the end of the day one day, and hopefully when you

19  feel like it you will retire, right?

20            THE COURT:  The objection is sustained.

21            MR. BRAFMAN:  Thank you very much, Judge.

22  Q.  Now, one of the things you do is you understand the scope,

23  you have learned through your work, the scope of what the post

24  office must deal with in terms of vehicle management.

25            Would that be a fair statement?

IC45iss3                          Waters - cross

1    A.  I understand what their responsibilities are.

2    Q.  Yes.

3    A.  We manage the fleet.

4    Q.  Yes.

5    A.  That's what I understand them to do.

6    Q.  And you have dealt with that for years, correct, the fleet?

7    A.  I deal -- when you say "I dealt with the fleet," in what

8    way?

9    Q.  Well, let me ask you, for example, are you aware of

10   approximately how many vehicles are used by the post office to

11   deliver mail and packages?

12   A.  I have estimated approximately $220,000.

13   Q.  Among those are what we might refer to, correct me if I am

14   wrong, as LLVs?

15   A.  That is correct, the long-life vehicle.

16   Q.  And when you say long-life vehicle, when these vehicles

17   were purchased, it was projected that they would work for at

18   least 25 years, correct?

19   A.  That's correct.  24-year life.

20   Q.  Excuse me?

21   A.  A 24-year life was projected.

22   Q.  And a lot of these vehicles are approaching the end of that

23   period of time; would that be a fair statement?

24   A.  That is correct.

25   Q.  And, would it be a fair statement that the vast majority of

IC45iss3                        Waters - cross

1    the LLVs are north of 20 years of active work?

2    A.  They were first acquired in 1987, so they were acquired

3    between '87 and '94.

4    Q.  So, the ones that were acquired in '87 are already beyond

5    the 25-year period, correct?

6    A.  That's correct.

7    Q.  And many of them are still working, correct?

8    A.  That is correct.

9    Q.  Would it be a fair statement, and I'm not being critical at

10   all, would it be a fair statement that the post office is under

11   Congressional oversight for a number of different issues?

12           MR. WIRSHBA:  Objection, your Honor.

13           THE COURT:  I know where he is going with this.  I

14   will let him ask a couple of questions.

15           MR. BRAFMAN:  Thank you.

16   BY MR. BRAFMAN:

17   Q.  Does the post office answer to Congress for budgetary

18   issues?

19   A.  It's very hard for me to speak about that level of the

20   organization.  We --

21           THE COURT:  You are not it.

22           THE WITNESS:  Yes.

23           THE COURT:  That's not what you do.

24           THE WITNESS:  Yes.  I'm sorry.

25           THE COURT:  So, let's move on.

IC45iss3                        Waters – cross

1   BY MR. BRAFMAN:

2   Q.  Would it be a fair statement from your work that you know

3   that the post office simply does not have the money to buy all

4   new LLVs?  Would that be a correct statement?

5   A.  I can't say that either.  No, I wouldn't say that.

6   Q.  A vehicle that has a 25-year-old life, why are they still

7   being fixed, if you know?

8   A.  We need the vehicles to deliver mail so until such time as

9   we can replace the fleet, we have to keep them operating.  I

10  mean, that's the primary vehicle that is used in the fleet.

11  But, we also are replacing our fleet.  We just haven't replaced

12  the LLV fleet yet.  I am sure you have seen a lot of the newer

13  vehicles that are being procured by the postal service, larger

14  vehicles.  So, we are in the process of replacing our fleet, we

15  just have not replaced the LLV.

16        MR. WIRSHBA:  Your Honor, I would ask that Mr. Brafman

17  allow the witness to respond to the question.

18        THE COURT:  The objection is sustained.

19        Anything else, ma'am, that you have to say?

20        THE WITNESS:  No.  I'm just making note that,

21  obviously, the LLV is just the vehicle that we haven't replaced

22  yet in our fleet but if you have noticed on the streets today,

23  you have seen a lot of newer vehicles so we are replacing

24  different types of vehicles within our fleet.

25  BY MR. BRAFMAN:

IC45iss3                         Waters - cross

1   Q.  Would it be a fair statement that during the period of time

2   that we are talking about in this case, based on the contracts

3   you have reviewed, between 2012 and 2016, the vast majority of

4   LLVs had not yet been replaced?

5   A.  The LLV fleet has not been replaced.

6   Q.  As we speak?

7   A.  As we speak.

8   Q.  And, as we speak, vehicles that have exceeded, if you will,

9   their long life projections, are still continuing to be used on

10  a daily basis, right?

11  A.  That is correct.

12  Q.  And the vehicle maintenance facilities that we describe,

13  either from the post office or in a private contractor, a lot

14  of their work is to inspect and repair the vehicles including

15  the LLVs?

16  A.  Vehicle maintenance facilities, that's their

17  responsibility, to maintain the overall fleet whether it be an

18  LLV all the way up to our larger vehicles.

19  Q.  And, just in terms of the vehicle maintenance facilities

20  throughout the United States, would I be correct that you have

21  approximately 300 vehicle maintenance facilities in the United

22  States?

23  A.  That's approximately correct, yes.

24  Q.  And, would you tell me, if you can, approximately how many

25  vehicle inspections an LLV is required, by law, to undergo each

IC45iss3                        Waters – cross

1   year?

2   A.   Well, they have a preventive maintenance inspection

3   guidelines that they follow and I can't tell you what the

4   parameters of all the guidelines are.  I can say that depending

5   on the mileage used on vehicles makes the determination as to

6   how frequently it must be serviced.

7   Q.   Well, besides being serviced, and we will get to that in a

8   minute and we will go through the service agreement; besides

9   being serviced when needed, in terms of mandatory, required

10  preventive maintenance inspections, am I correct that each LLV

11  is required to have two inspections every year?

12  A.   Again, they have preventive maintenance inspection

13  guidelines that they follow.  I don't -- they don't necessarily

14  report to me but based on the use of the vehicles determines

15  how often it needs to be inspected.  They do -- you can say

16  generally they do get probably a couple inspections a year,

17  yes.

18  Q.   I will accept that.  Thank you.

19            Now, you said that the contracts is one of the ways

20  that a VMF can arrange to do work with an outside vendor.

21  Isn't it true that every post office, local post office has a

22  certain degree of buying power in the event they need service

23  on one of their vehicles?

24  A.   They have local buying authority, yes.

25  Q.   And how many post offices are we talking about?  Hundreds?

IC45iss3                    Waters - cross

1    Thousands?

2    A.   There are thousands of post offices.

3    Q.   And when a truck is required to be serviced by a local post

4    office and the requirement is to service it quickly, they have

5    the right to go to a local contractor and pay for it with some

6    system that the post office has set up, correct?

7    A.   The local post office?  They have local buying authority to

8    have, you know, work performed, but they do that, to my

9    knowledge -- and again, I'm not fleet management -- so, they

10   work with fleet management to make that determination as to

11   whether it's repaired locally or handled through a vehicle

12   maintenance facility.

13   Q.   So, would it be a fair statement there is a lot of

14   discretion involved in this process?

15   A.   They have local buying authority up to a certain dollar

16   amount.

17   Q.   How much is that?

18   A.   You can't spend more than -- local buying authority can't

19   exceed $10,000.

20   Q.   And whether you say $10,000, if a local post office has a

21   truck that they need fixed, even without a contract or a

22   solicitation, they have the right to go to the body shop down

23   the block, for example, and ask them to fix the truck and pay

24   them not to exceed $10,000?

25   A.   And, again, I'm not fleet management and that's a

IC45iss3                          Waters - cross

1   responsibility between fleet management and the post office.

2   If the vehicle maintenance facility has allowed them to get

3   those services performed locally and they have the local buying

4   authority to get the work done and they have the mechanism for

5   paying for it, then the service can be performed.

6   Q.  How do you vet the vendor in those circumstances?

7   A.  Well, it is up to them to vet the vendor.

8   Q.  When you say "them," the vehicle maintenance facility

9   manager or the local post office?

10  A.  Again, that's not my scope of work so it could be the local

11  post office, it could be the VMF.  What is important is that

12  you identify a qualified supplier who can perform the work that

13  you need done.  But, again, you know, all vehicles are assigned

14  under a vehicle maintenance facility even though they're used

15  at a local post office, and those determinations as to where

16  the service is performed, how the service is performed, whether

17  it's brought into a vehicle maintenance facility versus having

18  the work done locally.  I think there is even restrictions on

19  how much a local post office can proceed with having work done

20  without getting approval from a VMF.  So, their local authority

21  may be even less as it relates to vehicle maintenance.

22  Q.  And when you say post office authority or postal office

23  authority, we are talking about any of the thousands of post

24  offices that are around the country?

25  A.  That's correct, is the post office that has vehicles

1    assigned to it.  But, again, you know, the relationship between

2    the vehicle maintenance facility and the vehicle post office,

3    as it relates to getting work done, there is even a lower level

4    of authority that a local post office has as relates to just

5    moving ahead and getting work done.

6    Q.  Well, the job of delivering the mail is so extensive that

7    there are post offices -- and correct me if I am wrong -- in

8    places that have small populations, let's say, small towns,

9    they may have their own post office, right?

10   A.  Yes.

11   Q.  And there are only 300 VMFs in the entire country, correct?

12   A.  Yes.  That's correct.

13   Q.  So, there certainly is not a VMF next-door to every single

14   post office.  That's just mathematically impossible, correct?

15   A.  That is correct.

16   Q.  So, if a local post office person designates a vendor

17   across the street for an emergency repair, so long as it

18   doesn't exceed $10,000 he or she, the Postmaster in that town,

19   can pay for it, correct?

20   A.  I wouldn't say $10,000 in their case.  I think the

21   relationship between the post office and the VMF, their

22   authority to get work done is very much lower than that.

23   Q.  Okay.

24   A.  But, again, fleet management and the management of the

25   fleet is the responsibility of the vehicle maintenance

IC45iss3                          Waters - cross

1   facilities and if the post office locally needs work done,

2   their dollar value of authorization, I think, is very much

3   lower than that.  They have to get approval from a VMF to

4   proceed with getting that work done on a local basis.

5   Q.  And you understand how that gets done and how someone in

6   the Poughkeepsie post office, for example, contacts the VMF for

7   an emergency repair and you know what is required or is that

8   out of your --

9   A.  That's out of my scope, yes.

10  Q.  Fair enough.

11          You did speak, though, about VMRA as a Vehicle

12  Maintenance Repair Agreement; is that correct?

13  A.  That's correct.

14  Q.  I think what you explained to the jury is is that a VMRA is

15  not a binding contract until it becomes binding, correct?

16  A.  It is an ordering agreement in and of itself, it is not a

17  contract.  It is an agreement between a supplier and the postal

18  service and contains terms and conditions that may come into

19  effect if an order is placed for service.

20  Q.  Okay.  But, assuming good faith on the part of the supplier

21  and on the part of the post office, it is a fairly extensive

22  process to go through so there is some serious intent involved

23  in arranging for these VMRAs.  Am I correct?

24          MR. WIRSHBA:  Objection your Honor.

25          THE COURT:  Objection is sustained.

IC45iss3                        Waters - cross

1    BY MR. BRAFMAN:

2    Q.   What is the purpose of going through vetting solicitation

3    and then the VMRA agreement if there is no interest on the

4    part, perhaps, of the post office of ever using them?

5    A.   An agreement is set up just in cases where, again, your

6    operational needs may dictate that you have to outsource some

7    of this work.  It could be staffing, it could be the situation

8    where vehicles need to be repaired and you don't have the

9    staffing available to perform it and therefore you are setting

10   it up so that if -- and if -- you have requirements, you have

11   an agreement in place, you have already negotiated pricing for

12   the services to be performed, and you have that ability to, you

13   know, have the services performed by a supplier that you have

14   knowledge of.

15   Q.   And you have approval?

16   A.   You will have had a contract put in place.

17   Q.   Right, but it is not a contract --

18   A.   Until you place an order; then the terms and conditions of

19   the agreement are in effect but there is no obligation for the

20   postal service to issue an order under that agreement.

21   Q.   Fair enough.

22            But, when you make the decision that you need someone

23   to do the work and it can't be done by the VMF facility, what

24   you have in place is a VMRA that at least has a vetted supplier

25   and a signed understanding and then you can direct the repair

1    to that person, right?

2    A.  Yes.

3    Q.  Because the post office needs work done sometimes quickly.

4    Would that be a fair statement?

5    A.  We have an operational requirement to deliver the mail.

6    Q.  And the operational requirements to deliver the mail

7    relies, in large part, on these vehicles?

8    A.  That's correct.

9    Q.  And the vehicles need to be out of service a minimum period

10   of time from the post office's perspective, correct?

11   A.  That's correct.

12   Q.  So, if a vehicle goes down and you need that outside

13   vendor, what you have through the VMRA is a way to get it to an

14   approved vendor and then you assign the work, correct?

15   A.  That's correct.

16   Q.  I can't hear you.  I'm sorry?

17   A.  That's correct.

18   Q.  Thank you.

19          And that is instead of starting the process when the

20   emergency arises, right?

21   A.  That's correct.

22   Q.  Because when you apply for a VMRA to get that from the post

23   office, it takes at least several months to get all of the

24   paper work done and approved.  Would that be a fair statement?

25   A.  It really just depends.

IC45iss3                         Waters - cross

1   Q.  But it's not 24 hours, that's for sure.  Right?

2   A.  Well, no, because you have a solicitation process, you have

3   to take the requirements, generate the requirements, solicit,

4   evaluate proposals, and make a best value decision.

5   Q.  And that's something that can't really be done under the

6   gun when you have to fix a truck in 24 hours, right?

7   A.  That can't be done in 24 hours.

8   Q.  Right.  So, what you have done, wisely, is prepare for the

9   eventuality that you are not going to be able to get your

10  trucks fixed as quickly as you need them with the VMF so you

11  have these vendors out there are the to do the work, correct?

12  A.  That's correct.  If you can't perform it in-house.

13  Q.  I'm sorry?

14  A.  I said if you can't perform the services in-house.

15  Q.  Yes, ma'am.

16          I know it is uncomfortable, but when you lean back --

17  A.  I know.  I recognize that.  So, I will stay forward.

18  Q.  Thank you.

19          So then we go to the next, if you will, type of

20  contract you discussed on direct examination is an IDIQ

21  contract, correct?

22  A.  That's correct.

23  Q.  And that is a Indefinite Delivery Indefinite Quantity

24  contract, correct?

25  A.  That's correct.

1  Q.  And that is a binding agreement on the post office to a

2  certain extent, correct?

3  A.  That is a binding contract, yes.

4  Q.  And there is a minimum and a maximum?

5  A.  That's correct.

6  Q.  And the minimum is to be paid to the vendor even if they

7  don't do the work?

8  A.  We have an obligation.  It is considered an unconditional

9  purchasing obligation when we set up that type of contract.

10 Q.  And, obviously, you are not looked at to just give somebody

11 a quarter of a million dollars.  You are vetting the vendor and

12 you expect the vendor to do the work and the post office is

13 obligated to pay at least $250,000 in return, correct?

14 A.  Well, you anticipate that you are going to have a need for

15 services that are going to be valued at potentially that

16 $250,000 minimum.

17 Q.  Do you want to continue?

18 A.  What else do I want -- yes.

19         Based on your estimated requirements, you are

20 projecting that you will potentially spend, with a supplier,

21 that value, that minimum value of $250,000.

22 Q.  So, would it be a fair statement that before assigning

23 somebody an IDIQ there is some thought given to what the

24 prospective needs of the post office is going to be?

25 A.  That's correct.  That's part of acquisition strategy.  You

IC45iss3                          Waters - cross

1    are looking at what type of requirements the postal service may

2    need as it relates to these types of services and you make a

3    decision as to whether or not it is in your interest to

4    establish this type of contract.  You want to limit the risk on

5    a supplier when you set these types of values of, you know, a

6    minimum of $250,000.  And you are looking for fair and

7    reasonable pricing as part of offering this type of contract.

8    Q.  And the maximum in there, while you are not obligated to

9    pay it, the maximum isn't just a made up number, it is

10   something that you assume might be the maximum for the kind of

11   work you anticipate.  Would that be a fair statement?

12   A.  That's correct.

13   Q.  So, this is some careful analysis being made by either your

14   team or people working with you to figure out the needs that

15   the post office may have and the anticipated cost of those

16   needs, should that vendor need to be used, correct?

17   A.  That's correct.  That's the potential that we anticipate

18   possibly being spent.

19   Q.  Once, if I have my IDIQ letter -- by the way, it comes with

20   a very pleasant letter saying congratulations, you have just

21   been given an IDIQ, in words and substance, if you know.  Is

22   that correct?

23   A.  I didn't see the letter in this case.  We issue an award

24   letter for all types of contracts, so.

25   Q.  And, at the end of the day, once I get an IDIQ contract,

IC45iss3                        Waters - cross

1   when I say "I," I means once -- let me withdraw that and start

2   again.

3            To be accurate, once a vendor gets an IDIQ contract,

4   that vendor has been approved by the post office to do the

5   work.  Is that correct?

6   A.  Well, he was awarded a contract, so just as we do in every

7   requirement, we solicit, we evaluate proposals, and we make a

8   best value decision.

9   Q.  And when you say "best value," that means you analyze the

10  need for the work, the approximate cost of the work, and

11  whether or not, based on the information you have been

12  provided, whether or not the vendor is capable of doing the

13  work, is that correct?

14  A.  We have taken into consideration the requirements, we have

15  taken into consideration your past performance, your

16  capability, your pricing to make a determination of who offers

17  the best value to the postal service.

18  Q.  And when you say your past performance, some of these

19  contracts have gone on for years.  Would that be a fair

20  statement, based on the documents you have looked at?

21  A.  Some of them.  These contracts?

22  Q.  Yes, the ones Mr. Wirshba went through with you a little

23  while ago, the government exhibits.

24  A.  Well, they went off of the terms of the contract.  Whether

25  or not they were all renewed, they may not have been.

IC45iss3                        Waters - cross

1   Q.  All right.  We will go through them in a minute but when

2   you said best value, I think one of the things you said, and

3   correct me if I am wrong, that you evaluate the vendors' past

4   performance.  Would that be a fair statement?

5   A.  Within the solicitation it will tell you in the provision

6   as to what the evaluation factors would be, so these are things

7   that specialists and the contracting officer who awarded the

8   contracts would have taken into consideration as part of

9   evaluating the proposal so those factors were identified in the

10  evaluation provision.

11  Q.  Okay, but many of the people who signed these contracts,

12  and I will go through the contracts in a minute, are people you

13  have worked with 25 years or certainly for a long time.  Would

14  that be a fair statement?

15  A.  Well, I have been in purchasing since 2000, so 18 years.

16  Q.  Okay.

17  A.  And some of them were not there my whole tenure.

18  Q.  But they're not signatures or people who you don't

19  recognize, am I correct?

20  A.  That's correct.

21  Q.  Okay.  So, for example, if you went to Government Exhibit

22  103, could we have that up, please, Government Exhibit 103?

23  Can you pick up the size of the signatures, on the left-hand

24  side.

25           Do you see the signature of Ibrahim Issa?

IC45iss3                         Waters - cross

1    A.  Yes.

2    Q.  On right there is a name Michael Gehrke and a signature on

3    top of that.  Who is Mr. Gehrke?

4    A.  Mr. Gehrke is a contracting officer.  He works in my

5    office.

6    Q.  Excuse me?

7    A.  He is a contracting officer and he works in my office.

8    Q.  And at the time this contract is dated on the Lower

9    right-hand corner January 6, 2012, Mr. Gehrke was authorized to

10   sign this contract on behalf of the post office, correct?

11   A.  That's correct.

12   Q.  And can we just go up to the top so we can focus on the

13   dates for a minute?  The effective date was January 2012?

14   A.  That's correct.

15   Q.  And, do you know for how long a period this contract was to

16   run?

17   A.  Well it is stated in the contract.  So, this would have

18   been established for a two-year period with options to renew,

19   potentially.

20   Q.  Okay.  And during that two-year period, is there someone at

21   the VMF or at the contracting officer who is monitoring the

22   work done by this contractor?

23   A.  Well, we appointed a COR, contracting officer

24   representative for this contract.

25   Q.  And the vehicle maintenance field support, there is an

1    e-mail for Anna Maria Delillo, D-E-L-I-L-L-O.  Do you know who

2    that is?

3    A.  Anna Maria Delillo was a purchasing specialist in the

4    office of the vehicles CMC office, correct.

5    Q.  She is part of the team that authorized the contract?

6    A.  Only a contracting officer can authorize the contract.

7    Q.  She is one of the people --

8    A.  She was a purchasing specialist who would have worked on

9    this requirement.  In other words, she is the purchasing

10   specialist who developed a solicitation and issued it.

11   Q.  Can we turn to page 2 of that agreement?  We are still on

12   Government Exhibit 103, please.  On the bottom of the lower

13   part of the agreement, can we blow it up, please?

14            Do you see where it says offeror's place of business

15   and there is an address there?  Do you see that?

16   A.  Yes.

17   Q.  That's the address of the vendor who is going to be doing

18   the work on the post office vehicle, correct?

19   A.  Where the work is to be performed.  It asks to identify the

20   location where services will be performed and the offeror's

21   place of business, yes, and the addresses are listed.

22   Q.  And it also indicates a distance from vehicles location

23   less than one mile and multiple locations.

24            Do you see that?

25   A.  Yes.

1    Q.  Now, when that document gets to the contracting officer

2    before the contract is awarded, does anyone go out and actually

3    inspect the vendor's place of business to see if there is a

4    place and if they can do the work?

5             MR. WIRSHBA:  Objection.

6             THE COURT:  The objection is sustained.

7    BY MR. BRAFMAN:

8    Q.  Do you see where it says, the contractor is -- in this

9    case -- is not, required to pick up and return vehicles to

10   postal facility as part of the agreement?

11   A.  Yes.

12   Q.  Now, am I correct that sometimes the vehicles in question

13   are not operable and that's why they need help?

14   A.  That could be the case.

15   Q.  Do you know whether some of the vehicles have to be towed

16   to a repair facility?

17   A.  Do I know whether they have to be towed?

18   Q.  Is that included, if you know, in the work that may be have

19   to be done?

20   A.  The scope of the work is covered as part of attachment 1,

21   as well as we may have also requested just pricing for repair

22   services outside of getting inspections.  So, it could very

23   well require it.

24   Q.  Okay.  Turn to page 6 of this document, still in Government

25   Exhibit 103.  You can go down to the lower portion where it is

IC45iss3                         Waters - cross

1   paragraph subdivision small B, titled Business Disagreements.

2   A.   Okay.

3   Q.   Do you have that, ma'am?

4   A.   Yes, I do.

5   Q.   I am going to read this to you and then I'm going to ask

6   you some questions.

7        Business disagreements.  Business disagreements may be

8   lodged with the supplier ombudsman if the supplier and the

9   contracting officer have failed to resolve the disagreement as

10  described in 39 CFR Section 601 -- and then they give you a

11  link to it.  The supplier ombudsman will consider the

12  disagreement only if it is lodged in accordance with the time

13  limits and procedures described in 39 CFR Section 601.  The

14  supplier ombudsman's decisions are available for you.  And then

15  they give you a website.

16       Who is the ombudsman referred to in this case, if you

17  know?

18  A.   The ombudsman would be -- this comes into play typically

19  when we have made an award of a contract and for some reason if

20  you were not awarded a contract and you had, it could -- let me

21  just back up.

22       So, we award a contract and you weren't a successful

23  supplier and you don't agree with the decision that was made by

24  the postal service in making that contract award.  And so, the

25  first thing you would do is you would contact the contracting

1    officer when you got an unsuccessful letter that, notifying you

2    that someone was awarded a contract.  And we will provide you

3    with feedback, the contracting officer will provide you with

4    feedback on the proposal and the contract award that was made.

5    After that, if you don't agree with the decision, then you can

6    file a business disagreement with the ombudsman.  The ombudsman

7    would be someone designated within supply management to handle

8    the disagreement.

9         That is my understanding of how it is used.

10   Q.  Could you look at page 7 of the same exhibit, please?

11   Lower section, please, Evaluations.

12        Does the document which you placed into evidence

13   indicate that one of the factors being considered for the award

14   is supplier capability and another factor is past performance?

15   A.  That's correct.

16   Q.  And who does that, in your office or in the contracting

17   office, make the decision as to whether the person getting the

18   contract is capable of doing the work and whether or not they

19   have a track record of satisfactorily doing the work?

20   A.  Well, as part of the solicitation package we will collect

21   some of the that information from a supplier, we will ask you

22   for your -- one of the attachments, attachment 5, probably --

23   Q.  I will get to it in a minute.  It asks you for references,

24   right?

25   A.  It asks you for, you know, your capability, your facility

1  capabilities, qualifications, your he past performance.  We

2  take those things into consideration, we would potentially look

3  at -- we had prior contracts with your company within our own

4  contracting system, we would use that information.  We also get

5  information from the VMFs as to the evaluation of suppliers.

6  Q.  And then that all goes into the decision as to whether to

7  award the VMRA or the IDIQ, correct?

8  A.  Those are factors taken into consideration, yes.

9  Q.  And in this contract, if you go to the page that is labeled

10 attachment 1 but there is no number on the bottom of the page?

11 A.  Scope of work?

12 Q.  Attachment 1 in the same exhibit that we are in?

13 A.  Right, the scope of work.

14 Q.  I don't think that's it, I think it's -- might be page 19,

15 following page 18 but there is no no. 19 on it.  There it is.

16 Thank you.

17         Now, we are going to got to this in a minute but on

18 the top paragraph if you could highlight that, please?  There

19 is reference to PMI guideline checklist PS form 4546A through F

20 must be completed, as appropriate.

21         Do you see that?

22 A.  Yes.  Yes.

23 Q.  And that is in connection with the preventive maintenance

24 inspection which includes oil changes and lubrication, correct?

25 A.  That's correct.

IC45iss3                        Waters - cross

1   Q.  And if we could move down further on the page to the

2   bottom?  If you look at the bottom paragraph, 1.3, additional

3   work, if you could highlight that, please?

4        I am going to read it and then ask you a question:

5   During the course of performing authorized maintenance or

6   repair work, the supplier may uncover additional work, which is

7   required.  The supplier is not authorized to perform such

8   additional work without the approval of an authorized postal

9   service employee.  The supplier must provide a written

10  statement of additional work required when requested by an

11  authorized postal service employee.

12        Did I read that correctly?

13  A.  That's correct.

14  Q.  So, I want to ask you a question.  There is specific

15  requirements of a contract and then there is the practical

16  application.  Would you agree?

17        MR. WIRSHBA:  Objection.

18        THE COURT:  The objection is sustained.  We will stick

19  to things that are relevant to this case.

20        MR. BRAFMAN:  Yes, ma'am.

21  BY MR. BRAFMAN:

22  Q.  Ms. Waters, you told us a little while ago that many of

23  these vehicles need to be corrected and fixed and repaired

24  overnight, for example, correct?

25  A.  I don't think I stated that.  I said we need them for

IC45iss3                        Waters - cross

1   operational requirements.

2   Q.  Okay.  Whenever a vehicle is out of operation, the post

3   office has trouble delivering the mail in that location,

4   correct?

5   A.  Possibly.

6   Q.  And that can't happen because the mail has to arrive on

7   time, correct?

8   A.  We have to deliver the mail.

9   Q.  So, if a vehicle is brought there for al PMI and they need

10  extensive work but you need the truck back, who authorizes

11  this?

12  A.  We have appointed a contracting officer representative who

13  that work should be reported to and approved.

14  Q.  In writing?

15  A.  Does it state here that it should be provided in writing?

16  Yes.

17  Q.  It does?

18  A.  Uh-huh.

19  Q.  Okay.

20          Do you see in the contract, and I will go back to the

21  contract if you don't remember, that Mr. Issa was applying to

22  work seven days a week, 24 hours a day?  It is written in the

23  contract.

24  A.  I'm sorry.  It says what in the contract?

25  Q.  That Mr. Issa's company was prepared to handle the repair

IC45iss3                         Waters – cross

1   work 24-hours a day, seven days a week?

2   A.  I don't think that's in the contract.  Is it?

3           THE COURT:  Look.  Folks, it is time for lunch.  Okay?

4   I will see you at five after 2:00.  Don't discuss the case.

5   Keep an open mind.

6           Ma'am, you can step down and have lunch.  You can't

7   talk to the government lawyers because you are on

8   cross-examination.

9           THE WITNESS:  Okay.  Thank you.

10          THE COURT:  Just a second, come on.

11          (Continued next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IC45iss3                          Waters — cross

1                    (At side bar)

2                    THE COURT:  I feel like a complete idiot.  Everybody

3       else who is on trial is going tomorrow.  Can we go tomorrow?

4                    MR. BRAFMAN:  I am following your direction.

5                    THE COURT:  Fine.

6                    MR. BRAFMAN:  I think you told the jurors.

7                    THE COURT:  I did, but I'm going to untell them.

8       Okay?

9                    MR. BRAFMAN:  It is up to you.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IC45iss3                          Waters – cross

1          (In open court)

2          THE COURT:  Ladies and gentlemen, we can sit tomorrow.

3     Okay?  Is there anybody, if there is anyone, for whom that

4     would be a genuine hardship, tell Mr. O'Neill, but starting at

5     10:30 we actually can sit tomorrow.  All right?  Even though it

6     is a National Day of Mourning.  And I have just found that out.

7          So, Jim, do you want to talk to the jurors?  We are

8     all prepared to go tomorrow, if you are prepared to go.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  It is not up to me to tell the government

3   how to try the case, but I will not sit here and listen to

4   hours and hours of irrelevant testimony.  So, get on your feet.

5   We don't have time for this.

6          And, it is irrelevant, Mr. Brafman.

7          Ma'am, would you please leave?

8          MR. BRAFMAN:  Excuse me.  Can I be heard for a moment?

9   I will wait until the witness leaves.

10         (Witness steps down)

11         THE COURT:  Yes, Mr. Brafman?

12         MR. BRAFMAN:  Your Honor, the government opened on

13  this and they put this witness on, and this witness came out

14  and they used her to put all of this paperwork into evidence.

15  They went through provisions of the contract to make it look

16  like we did something wrong, including giving gifts to a postal

17  person.

18         THE COURT:  They're the only provisions of the

19  contract that are relevant.

20         MR. BRAFMAN:  No.  No.

21         THE COURT:  Mr. Brafman, there are pages and pages of

22  contracts that are not relevant to the charges in this case

23  and --

24         MR. BRAFMAN:  They are.

25         THE COURT:  I'm sorry, they're not.

1          MR. BRAFMAN:  Can I explain why they are?

2          THE COURT:  Sure.

3          MR. BRAFMAN:  Because one of the problems I have, and

4     say this with great respect, is I don't believe your Honor yet

5     has the full flavor of what's coming.

6          THE COURT:  I don't need the speechifying, I need why

7     is it relevant?  Why is it relevant?

8          MR. BRAFMAN:  I well tell you why.  Because it is

9     irrelevant for the jury to understand that Mr. Issa spent three

10    years trying to be approved as a vendor and they vetted him and

11    they checked him and they checked his facilities and they

12    approved him, and that all of the work that he did --

13         THE COURT:  That has nothing do with every --

14         MR. BRAFMAN:  It does.

15         THE COURT:  I disagree, so I am the one who gets to

16    make the ruling and you have your exception.

17         Object to irrelevant questions.

18         MR. SOLOWIEJCZYK:  We will, your Honor.

19         MR. BRAFMAN:  Your Honor, they can't.  They can't

20    bring in an irrelevant witness and then object when I am

21    crossing.

22         THE COURT:  Excuse me, Mr. Brafman.  Excuse me for

23    interrupting.

24         She is not an irrelevant witness.  She is introducing

25    the underlying contract, she is introducing them for the

IC45iss3                          Waters - cross

1   sole --

2          MR. BRAFMAN:  We did that by stipulation.

3          THE COURT:  -- for the sole purpose of showing that

4   there are contracts and that there are provisions that are

5   relevant to a bribery charge.  And, we are not going to go

6   through every provision in the contract.  I will not allow it.

7          And, I expect the government to do its job.

8          MR. WIRSHBA:  Yes, your Honor.

9          MR. SOLOWIEJCZYK:  We understand, your Honor.

10          THE COURT:  And you have your exception you can take

11   to the Court of Appeals, if you are ever unlucky enough to be

12   there.

13          MR. BRAFMAN:  I am not going to the Court of Appeals,

14   Judge.  I am going to this jury on facts that I think show that

15   Mr. Issa never intended to bribe anyone.

16          THE COURT:  I absolutely disagree with you if it is

17   what you have been examining this witness about for the last

18   half an hour.

19          MR. BRAFMAN:  Thank you, Judge.

20          THE COURT:  All right.  Go have lunch.

21          MR. WIRSHBA:  Your Honor, may we ask, has the jury

22   been instructed to stay away from the cafeteria?

23          THE COURT:  We have not instructed them, they're not

24   allowed in.

25          Go down to the cafeteria.

IC45iss3                        Waters – cross

1                MR. WIRSHBA:  Thank you, your Honor.

2                (Luncheon recess)
3                (Continued on next page)

IC4HIss4

AFTERNOON SESSION

2:12 p.m.

1
2
3          (In open court; jury not present)

4          THE COURT:  Yes.

5          MR. BRAFMAN:  Your Honor, there are two issues that

6     we'd like to address very quickly.

7          THE COURT:  Yes.

8          MR. BRAFMAN:  One is tomorrow --

9          THE COURT:  Yes.

10          MR. BRAFMAN:  -- in reliance on the Court telling us

11     we were not working, Mr. Kirshner and I have scheduled several

12     accounting professionals who were available and are not going

13     to be available on other days, and we've made arrangements to

14     meet with them.  It will shorten this case dramatically if we

15     can have those meetings.  And this was not our fault.  I

16     mean --

17          THE COURT:  It's not your fault.  I know it's not your

18     fault.  Not my fault either when I was told things that were

19     not true.

20          MR. BRAFMAN:  I'm not trying to blame you.  I'm trying

21     to explain that I think the case will move faster.

22          THE COURT:  The case will move faster if you will stop

23     asking irrelevant questions.

24          MR. BRAFMAN:  On that issue, just so the record is

25     clear, Judge, this is not just a bribery case.  The defendant

IC4HIss4

1    is charged with stealing from the government for shoddy

2    repairs.

3              THE COURT:  I understand.

4              MR. BRAFMAN:  Well, but, judge, the way you can defend

5    that case is to show the process for submitting repair

6    invoices, how they get vetted, how they get examined, and how

7    they get paid, and that requires me to go through the contract.

8              THE COURT:  It's really not what you're doing.  It's

9    really not what you're doing.

10             MR. BRAFMAN:  What is it that you think I'm doing?

11             THE COURT:  I think, Mr. Brafman, you're doing exactly

12   what a good criminal defense lawyer would do.  You're trying to

13   throw up so many smoke and mirrors and knowing that the

14   government doesn't want to object and look like it's objecting

15   in front of the jury.  All I'm doing is simply telling the

16   government to do its job.

17             MR. BRAFMAN:  Your Honor, I'll accept the part of the

18   statement about what a good criminal defense lawyer would do.

19             THE COURT:  Absolutely.

20             MR. BRAFMAN:  But I will --

21             THE COURT:  And you are a very good criminal defense

22   lawyer, Mr. Brafman.  Nobody has any doubt about that.

23             MR. BRAFMAN:  I accept it, and I'm going to order a

24   copy of this transcript.

25             THE COURT:  You should frame it; put it on your wall.

IC4HIss4

1          MR. BRAFMAN:  I'm going to do that.

2          But, your Honor, respectfully, there is a defense to

3    the charges in this case that the government may reject and the

4    jury may ultimately reject, but I have to be able to introduce

5    it into the record.  I didn't make the decision to call this

6    woman as a witness.  And, your Honor, I would have stipulated

7    to all of the contracts that she examined, and, in fact, I did

8    not object to any of these coming in.  When they walked her

9    through sections of the contract, Judge, I didn't object to any

10   of it.

11         THE COURT:  Mr. Brafman, you and I are on the same

12   page about one thing.  If there is ever a belt-and-suspenders

13   law office on this planet, it's the United States Attorney's

14   Office for the Southern District of New York.  Drives me

15   absolutely nuts.

16         MR. BRAFMAN:  But now that they've interjected the

17   belts and suspenders, you're asking me to let my pants fall

18   down, or Mr. Issa's.

19         THE COURT:  I don't think so.  I don't think so.

20         All right.  Let me tell them that we're not going to

21   be in session tomorrow.

22         MR. BRAFMAN:  Thank you.

23         THE COURT:  Talk to the people.  Make this trial

24   shorter.

25         MR. BRAFMAN:  I will do my best.  Thank you very much,

IC4HIss4

1    your Honor.

2              THE COURT:  What you don't want is a jury that goes

3    out on December 20, because you know what will happen then.

4              MR. BRAFMAN:  Judge, I will finish this trial well

5    before that even if I plod through the arguments to get me to

6    where I want to be, and I'm not looking for arguments.

7              Your Honor, on the subject of shortening the trial,

8    since I have conceded in my opening statements on the issue of

9    personal expenses, there are two or three witnesses who's

10   only --

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IC4HIss4                          Waters - Cross

1          (Jury present)

2          THE COURT:  Have a seat.  Get comfortable.  The first

3   news is, having rearranged everything for tomorrow, we can't

4   rearrange it again as it turns out, so we're not sitting

5   tomorrow, OK?

6          All right.  Where's the witness?

7          Ma'am, come on up, rejoin us.  I remind you that you

8   are still under oath.

9          MR. BRAFMAN:  May I proceed, your Honor?

10          THE COURT:  You may, sir.

11          MR. BRAFMAN:  Thank you.

12   Delores Waters, resumed.

13   CROSS-EXAMINATION CONTINUED

14   BY MR. BRAFMAN:

15   Q.  Ms. Waters, I'm going to try and move things along so that

16   you can leave and I don't get in trouble.

17          Can we put up attachment No. 3.

18          MR. WIRSHBA:  Your Honor, if I may have one moment?

19          THE COURT:  I don't have attachment 3.

20          MR. BRAFMAN:  I'm sorry.  It's attachment No. 3 from

21   exhibit -- I'm sorry, Exhibit 103.  Sorry.

22          THE COURT:  Exhibit 103.

23          MR. BRAFMAN:  There's no page -- there's no page

24   number.

25          THE COURT:  Stop when we get to what you want.

IC4HIss4                          Waters - Cross

1          MR. BRAFMAN:  Right.

2          THE COURT:  Thank you.

3          MR. BRAFMAN:  It's several pages after page 18, and

4    then -- that's it.  Couple more pages.  There it is.  OK.

5    Thank you very much.  Could you move to the top of the page,

6    please, that paragraph.  Yes, thank you.

7    Q.  Ms. Waters, can you see that?

8    A.  Yes.

9    Q.  The postal service -- it says the postal service is not

10   obligated to issue orders under this agreement.  Let me stop

11   there.

12          Does this agreement then -- this agreement turns into

13   an IDIQ?

14   A.  No.

15   Q.  Does it then have an obligation?

16   A.  This agreement can't turn into an IDIQ.

17   Q.  That's what I wanted to understand.  How do you get to be

18   an IDIQ?

19   A.  You solicit that type of requirement through the proposal

20   process.

21   Q.  Now, look at the last sentence on that paragraph:  "A

22   binding contract will come into effect only upon placement of

23   an order."

24          What does that mean?

25   A.  That means if I procure services under this agreement, if I

IC4HIss4                        Waters - Cross

1    advise you that I want you to perform, for example, a

2    preventive maintenance inspection, then at that time that

3    order, upon placement of that order, a binding contract will

4    come into effect.  That means the terms and conditions that

5    have already been incorporated into the contract come into

6    effect.

7    Q.   Who can make that decision, if you know?

8    A.   Who can make what decision?

9    Q.   That it becomes a binding contract.

10   A.   That's just the terms and conditions of the agreement.

11   Q.   I know, but it says "a binding contract will come into

12   effect upon the placement of an order."  An order from whom, to

13   whom?

14   A.   An order placed by the VMF for whom this contract is for.

15   Q.   So if the order is placed by a VMF manager to the vendor,

16   it's then binding on the post office?

17   A.   Under the terms and conditions of the agreement, yes.

18   Q.   Thank you very much.  I'm going to move ahead.

19           If we can just move a couple of pages ahead, please,

20   because these are not numbered, but I think go to the next

21   page, the following one.  I'm sorry.  It says, "Miscellaneous

22   services."  The next page.  There it is.  OK.  If you can go to

23   the bottom of the page -- sorry, the bottom of the page.

24           The vendor in this case indicates that the vendor is

25   going to be available seven days per week.  Did you see that?

IC4HIss4                              Waters - Cross

1    A.   Yes.

2    Q.   And the hours of operation, 24 hours per day and 24 hours

3    road service, is that correct?

4    A.   That's correct.

5    Q.   Then there's a question on the post office form, "Is

6    emergency service available after regular hours?"  And it says,

7    "Yes, 24 hours," correct?

8    A.   That's correct.

9    Q.   And it also is written "All repairs done 24 hours/7 days

10   per week."  Do you see that?

11   A.   Yes.

12   Q.   So the specific terms of this agreement, which is prepared

13   on your form, the vendor is explaining what they're capable of

14   doing, is that correct?

15   A.   They're telling us their availability of service, yes.

16   Q.   All right.  Now I want you to look at, it's the same

17   exhibit, and it's the PMI checklist.  If you could find that,

18   please.  It's about seven or eight or ten pages after the page

19   we just looked at.

20            Could you go back to the page before that, please,

21   just for a second.  Yes, that page.

22            Now, do you see this attachment 5?

23   A.   Yes.

24   Q.   We're still in the same exhibit.  Can you see that, ma'am?

25   A.   Yes, I can.

IC4HIss4                          Waters - Cross

1            MR. BRAFMAN:  All right.  If you could blow up the

2    first part, please.

3    Q.  This asks for a description of the physical facility where

4    the vendor is going to be performing the work, is that correct?

5    A.  Describe your facility capability -- your physical

6    facility, yes.

7    Q.  It also states the qualifications of personnel performing

8    work under the contract.  Do you see that?

9    A.  Yes.

10   Q.  Now, when this information is put into a contract, is the

11   contract officer who signs on behalf of the post office

12   responsible for verifying this information?

13   A.  We're relying on the supplier to give us information to be

14   accurate in accordance with what we've asked --

15           THE COURT:  The question was, do you go out and try to

16   verify it independently?  Do you do that?

17           THE WITNESS:  No, I don't do that.

18           THE COURT:  Thank you.

19   Q.  Does anyone on your staff do that, if you know?

20   A.  Not from where we're located, no.

21   Q.  Do you have any reason to believe, as you sit there today,

22   that this information was not accurate at the time it was put

23   on there?

24   A.  From where I sit today, do I know -- I'm sorry.

25   Q.  Do you know of any knowledge personally or from your work

IC4HIss4                          Waters - Cross

1   as to whether this information is accurate?

2   A.  No, I don't.

3   Q.  Now, obviously, we'll agree we're in 2018, and this

4   contract has essentially been prepared several years ago, is

5   that correct?

6   A.  That's correct.

7           MR. BRAFMAN:  Could we move up the page, please -- or

8   down the page.  I apologize.  Now.

9   Q.  This also has a listing under the category "Past

10  Performance."  Do you see that?

11  A.  Yes, I do.

12  Q.  What the post office wants is references on any maintenance

13  contracts performed within the last five years.  Any

14  information furnished by references will be held in strict

15  confidence by the postal service.  Is that correct?

16  A.  That's correct.

17  Q.  Then the vendor has filled this out and given the names of

18  at least three companies and phone numbers and people to

19  contact, is that correct?

20  A.  That's correct.

21          MR. WIRSHBA:  Objection, your Honor.

22          THE COURT:  Objection's sustained.

23          MR. BRAFMAN:  All right.  Now, can we go back to the

24  VMF -- the PMI checklist, I'm sorry, which is, I think, the

25  next page.  The page before that.  The page after, I'm sorry.

IC4HIss4                           Waters - Cross

1    It's the first page of the PMI checklist.  You had it a moment

2    ago.

3              THE COURT:  That page?

4              MR. BRAFMAN:  That's it.  OK.  Thank you very much.

5    Q.  Are you familiar with this form?

6    A.  These are preventive maintenance inspection guidelines from

7    the VMF.

8    Q.  Preventive maintenance inspection guidelines are prepared

9    by the post office, correct?

10   A.  These guidelines are, yes, they're published by the postal

11   service.

12   Q.  And this is what the vendor is required to follow in the

13   event they do a PMI for the post office, correct?

14   A.  That is correct.

15   Q.  Is there a fixed price, if you know, that the post office

16   pays for PMI?

17   A.  We send you a solicitation.  We give you the opportunity to

18   tell us where your items and prices will be based on the

19   services that we've requested.

20             MR. BRAFMAN:  Now, if we could just enlarge this page

21   just a little bit so some of the sections are clearer.  If we

22   could start with the top portion, please.  Thank you.

23   Q.  I'm not going to waste time or spend the time of going

24   through every one of these items, but there are a total, if we

25   can go down to the bottom of the page now, on this page alone,

IC4HIss4                          Waters - Cross

1  59 different items that are required to be performed in a PMI

2  inspection, correct, just on this first page?

3  A.  Yes.

4  Q.  Then you turn over to the second page of the PMI, there's a

5  second page, not the -- yeah, there's a second page -- there

6  are additional checklists.

7          And if you can enlarge it please.

8          Here we're talking about the 79 items in total that a

9  person doing a PMI is supposed to deal with, correct?

10 A.  That's correct.

11 Q.  Now, do you understand -- I'm sorry.

12         Do you know -- and if you don't, I'll move on -- but

13 do you know what the rules are with respect to how one performs

14 the PMI, if you know?

15         MR. WIRSHBA:  Objection.

16         THE COURT:  Objection's sustained.

17 Q.  Well, let me ask you a question.  You checked this off that

18 you've done it, right, and that's what you're supposed to do

19 before you submit the PMI for payment, right?

20         MR. WIRSHBA:  Objection.

21         THE COURT:  The objection's sustained.

22 Q.  Well, do you know what the purpose of this checklist is?

23 A.  It's described in the scope of work.

24 Q.  And it's described so that everyone who works for the post

25 office as a private vendor gets the same PMI checklist

IC4HIss4                          Waters - Cross

1   depending on the nature of the vehicle, correct?

2   A.   Depending on which vehicle is being serviced, there's a

3   defined guideline inspection checklist that's created for it.

4   For example, the one you're showing is relevant to

5   administrative vehicles.

6   Q.   So that would be like a normal sized car, correct?  Because

7   if you look on the page it actually shows --

8   A.   That's correct.

9   Q.   -- a picture of the car?

10          MR. WIRSHBA:  Objection, your Honor, to this line of

11   questioning.

12          THE COURT:  The objection's sustained.

13   Q.   Now could you move to the inspection guideline for the LLVs

14   that we've been talking about.

15          MR. WIRSHBA:  Objection, your Honor.

16          THE COURT:  Objection's sustained.

17          MR. BRAFMAN:  May I have a sidebar, Judge?

18          THE COURT:  No, you may not.

19          MR. BRAFMAN:  Can you show us a picture of just what

20   an LLV is looking like so we're talking about the same truck.

21   It's on the next page of the vehicle light delivery service

22   inspection.

23          It will take one minute, your Honor.

24          Can you move that to the light delivery vehicle

25   inspection certificate for the second page.  That's it.

1    Q.  Now you have in front of you -- do you recognize the

2    vehicle as being a light delivery vehicle, a light -- long life

3    vehicle, correct, the LLV?

4    A.  Light delivery vehicle, yes.

5    Q.  That's the long life vehicle you talked about on direct

6    examination and cross, correct?

7    A.  It could be the LLV, or we also have a version of it that's

8    called an FFE.

9    Q.  OK.  You also have trailer trucks and larger trucks,

10   correct?

11          MR. WIRSHBA:  Objection, your Honor.

12          THE COURT:  The objection's sustained.

13   Q.  Well, do you know what size trucks Mr. Issa's companies

14   contracted with the postal service to actually work on?

15   A.  According to the attachment 3 items and prices, this would

16   define which vehicles were covered under this particular

17   agreement.

18   Q.  And which vehicles were covered?

19   A.  They range from a Chevy P32 down to a Chevy Malibu.

20   There's other vehicles in between on the attachment 3.

21   Q.  Among the vehicles, is an LLV one of the vehicles?

22   A.  Yes, it is.

23   Q.  Now, does the contractor have to satisfy, if you know,

24   certain required federal regulations in order to be approved by

25   the post office?

1    A.  Well, it can't be on a debarred list.

2    Q.  OK.  They have to also be able to show that they pay

3    prevailing wage?

4    A.  Well, that's a requirement of the contract once you're

5    awarded a contract.

6    Q.  And also that you can maintain insurance coverage?

7    A.  That's correct.

8    Q.  And health insurance?

9    A.  It mentions in 7-4 -- 7-4 talks about insurance.  Health

10   insurance would come under -- if you had service contract and

11   you had to pay prevailing wages, and health and service

12   benefits are part of that.  That's required for any employees

13   that are performing work.

14   Q.  For the post office?

15   A.  For the contractor.

16   Q.  I'm sorry.  But for the contractor who's performing work

17   for the post office?

18   A.  Yes.

19   Q.  You want to maintain certain standards of employment even

20   if it's a private contractor, correct?

21   A.  That's correct.

22   Q.  Now, if you could look to Government Exhibit 105A.  I'll

23   try to move quickly through these exhibits.  If we could post

24   that.

25            Do you have it, ma'am?

IC4HIss4                          Waters - Cross

A.  Yes, I do.

Q.  If you could look, please, in the lower portion of this

where -- that's it.  Thank you.

        This is an increase in the amount of the proposal,

correct?

A.  This is increased funding.

Q.  How does that happen?

A.  Well, the site would have generated an internal funding

document.  They would have gotten it approved through channels,

and that allows them to spend moneys.

Q.  When you say "channels," could you just explain briefly

what you mean.  Are these levels of different post office

approval that are required?

A.  It's not necessarily levels of post office.  Anyone who has

authority to spend money on behalf of the postal service has to

have a funding document approved prior to spending.  Within

their approval chain, there could be different levels of

personnel who are responsible to approve their funding document

all the way through to whatever their approval chain is.

Q.  But the vendor can't just arbitrarily decide I want to have

a million dollars more.  Someone in the post office has to

approve that.  Would that be a fair statement?

A.  Any funding -- any moneys that are spent out of postal

service have to be approved.

Q.  OK.  Thank you.

1            Now, if we can move to 105B, as in boy, and if we

2      could look at the lower portion again, please.

3            Now, this is a contract that's signed on behalf of the

4      post office by Fred Neuhaus, correct?

5      A.   That is a modification to the contract signed by Fred

6      Neuhaus.

7      Q.   Do you know him personally?

8      A.   Yes, I do.

9      Q.   What is his title?

10     A.   He is a contracting officer.  His job title is purchasing

11     and supply management specialist.

12     Q.   Is he authorized to do this on behalf of the post office?

13     A.   As a contracting officer he is, yes.

14     Q.   Is he still employed by the post office?

15     A.   Yes, he is.

16     Q.   Now, if we could look up to the top of the document just

17     for the date.  The effective date of the contract is 9 --

18     September 10, 2012, correct, ma'am?

19     A.   Effective date of the modification is 9/10/2012, correct.

20     Q.   Now, if you can look down at the signature line again,

21     that's dated two years later, am I right?  That's dated the

22     same day in September 10, but it's 2014.  Do you see that?

23     A.   I do see it.

24     Q.   Now, is that a mistake, a typo, or was this an extension

25     for two more years?

IC4HIss4                              Waters - Cross

1    A.  I can't speak to it.  I mean, when I look at it, it appears

2    to me to be a mistake when you look at the order in which the

3    modifications were created, and there's no language in the

4    modification that references a renewal of the contract.  The

5    period of performance at that time says it was from January 9,

6    2012, to January 8 of 2014.

7    Q.  Will you look at 105C, please.  It's the next -- I think

8    it's the next exhibit.

9            If we can look at the middle or lower portion here.

10   Sorry.  Thank you.

11           Is that again an increase in funding?

12   A.  Yes.

13   Q.  It's a modification again, is that correct?

14   A.  Yes.

15   Q.  And it's signed by the same Fred Neuhaus?

16   A.  Yes.

17   Q.  This is dated October 16, 2012, is that correct?

18   A.  That's correct.

19   Q.  What does that tell you?  Is the 2014 date on the previous

20   exhibit just a mistake?

21   A.  From my view of it, I would think it's a mistake.

22   Q.  Can we move now to Exhibit 105D.

23           Now, if you look at, again, the portion where it's

24   described what's going on here, if you look at that, it says

25   under "Commodity," "vehicle maintenance," is that correct?

IC4HIss4                        Waters - Cross

1   A.  That's correct.

2   Q.  And the total amount for the modification is $200,000,

3   correct?

4   A.  That's correct.

5   Q.  The new total is 1,525,000?

6   A.  That's correct.

7   Q.  This is now signed by Carolyn, is that Taylor?

8   A.  Yes.

9   Q.  Is she also part of your division, if you will, in

10  Philadelphia?

11  A.  Carolyn Taylor has retired.

12  Q.  At the time she wasn't retired; she was working, correct?

13          MR. WIRSHBA:  Objection, your Honor.

14  Q.  Was she working at the time the document was signed?

15          THE COURT:  Hang on.

16          Objection ground?

17          MR. WIRSHBA:  Relevance, your Honor.

18          THE COURT:  Objection's sustained.

19  Q.  Do you know if she was employed by the post office when

20  this contract was signed?

21          MR. WIRSHBA:  Same objection, your Honor.

22          THE COURT:  The objection's sustained.

23  Q.  All right.  What is the date of this contract modification?

24  A.  Says it was effective February 11, 2013.

25  Q.  Now, you have no reason to believe that that date is a

1    mistake, do you?

2    A.  Well, it has the effective date, and she signed it the same

3    date.

4    Q.  So this is an increase again, correct?

5    A.  That's correct.

6    Q.  If you can look at 105F, in the middle of that page or

7    lower portion, sorry, this is a modification because of the

8    exercise of a first renewal option.  Do you see that?

9    A.  Yes.

10   Q.  This extends the contract for two years, from January 2014

11   to January 8, 2016, correct?

12   A.  It extends the agreement from January 9, 2014, to

13   January 8, 2016.

14   Q.  And it's signed by Mr. Neuhaus, and this one has

15   January 16, 2014, correct?

16   A.  That's correct.

17   Q.  All right.  Now, let me ask you a question and answer, if

18   you know.  If at any time during the period that this same

19   vendor has been doing work for the post office, if information

20   came to the attention of the contracting officer that he was

21   not performing the work satisfactorily, would his contract have

22   been renewed, if you mow?

23            MR. WIRSHBA:  Objection, your Honor.

24            THE COURT:  The objection's sustained.

25   Q.  How long has Mr. Neuhaus worked for the post office?

1         MR. WIRSHBA:  Objection, your Honor.

2         THE COURT:  Objection's sustained.

3         MR. BRAFMAN:  May we have a sidebar?

4         THE COURT:  No, you may not.

5         MR. BRAFMAN:  OK.  Thank you.

6         Exhibit 105G, please.

7    Q.  Do you have that?

8    A.  Yes, I do.

9         MR. BRAFMAN:  If we could enlarge the body where it

10   has the description of what's gone on.

11   Q.  This is another renewal option, is it not?

12   A.  This appears to be an increase in funding.

13   Q.  Right.  And it says the modification is issued to increase

14   funding in the amount of $300,000, is that correct?

15   A.  That's correct.

16   Q.  And the new total, if you look at the line towards -- the

17   new total is $1,937,800, see that?

18   A.  That's correct.

19   Q.  And it's signed by Mr. Neuhaus and dated February 2014,

20   correct?

21   A.  Correct.

22   Q.  Now, if you look at 105H, you testified on direct

23   examination that this document added locations, is that

24   correct?

25   A.  That's correct.

IC4HIss4                        Waters - Cross

1    Q.  And you testified, and correct me if I'm wrong, that it

2    added locations for the vendor to be able to perform repairs at

3    those locations, correct?

4    A.  That's correct.

5    Q.  And it added three locations, Brooklyn, Queens, and Staten

6    Island, in addition to the one that he already had in

7    Manhattan, correct?

8    A.  Correct.

9    Q.  Do you know how many repairs or PMIs or invoices have been

10   submitted by this vendor between the period of his contracts?

11   A.  No, I don't.

12   Q.  But it's been going on for years that these contracts have

13   been amended, would that be a correct conclusion just from what

14   you've seen in the documents?

15          MR. WIRSHBA:  Objection, your Honor.  Form.

16          THE COURT:  The objection is sustained to the form.

17   Q.  Now, the total now is $2,885,000, is that correct, if you

18   look at the box down there?

19   A.  Yes.

20   Q.  Now, if you look at the next page, the one right after

21   that, that actually lays out the locations for the vendor to do

22   his repair, correct?

23   A.  That's correct.

24   Q.  When you add locations by a vendor and you increase

25   funding, they have to identify where the work's going to be

1    performed, don't they?

2              MR. WIRSHBA:  Objection.  I'm just a little confused

3    as to the question.

4              THE COURT:  Do you understand that question, ma'am?

5              THE WITNESS:  I just understand it to be the actual

6    location of where it's going to be performed or --

7    Q.  Let me ask it again.

8              This is extended to three new locations which you

9    testified to on direct examination, correct?

10   A.  That's correct.

11   Q.  And we're adding Brooklyn, Queens, and Staten Island,

12   correct?

13   A.  That's correct.

14   Q.  To a contract that had previously only done VMF Manhattan,

15   correct?

16   A.  Correct.

17   Q.  And this second page of the continuation, the continuation

18   sheet as it's marked on top, lists the locations, correct?

19   A.  It lists the VMFs for whom the services will be performed.

20   Q.  Thank you.

21             105I, please.

22             If you look at the bottom of this document, this was

23   signed by Tisha Gandy, G-a-n-d-y?

24             MR. WIRSHBA:  Objection.

25   Q.  Who is that?

1              MR. WIRSHBA:  Objection.

2              MR. BRAFMAN:  Your Honor, they put the document into

3     evidence.  I'm just trying to identify the person who signed it

4     on behalf of the post office.

5              THE COURT:  Who's the person who signed it?

6              THE WITNESS:  The contracting officer.

7     Q.  And every time someone signs a document like this, they

8     have to be someone like a contracting officer who has authority

9     to bind the post office, correct?

10    A.  They have to be a contracting officer.

11    Q.  OK.  How many contracting officers worked in your

12    department at the time?

13    A.  I can only tell you who's there now.  I can't tell you who

14    may have been there during that time period.

15    Q.  But you recognize Tisha Gandy as a contracting officer who

16    was there at the time, correct?

17    A.  She was a contracting officer there.

18    Q.  Thank you.

19             And that's date 8/7/14, correct?

20    A.  Correct.

21    Q.  And this modification increases the funding $200,000,

22    correct?

23    A.  Correct.

24    Q.  Now, the total amount of this modification is $200,000.  It

25    shows it to you right there, correct?

IC4HIss4                          Waters - Cross

1   A.  Yes.

2   Q.  All right.  Now, if you can look at Government

3   Exhibit 105J.  Do you have it, ma'am?

4   A.  Yes, I do.

5   Q.  If we go to the place where it says, "Description of

6   amendment" --

7   A.  Yes.

8   Q.  -- I know it's faded words, but I think we can make them

9   out.  When it says, "COR Julie Lopez," do you know who that is?

10  A.  That was a VMF employee.

11  Q.  And she's listed as what on this document, the COR?

12  A.  As the contracting officer representative.

13  Q.  So she's the one who has to deal with the vendor?

14  A.  She would have been appointed the contracting officer

15  representative.

16  Q.  Of who?  The post office, the vendor, or the VMF?

17  A.  She would have been -- just as the contracting officer

18  assigns and appointments a contracting officer representative,

19  she is now being called out as the contracting officer

20  representative.  So she would have been given a notice of

21  appointment as well.

22  Q.  If we can now look at Government Exhibit 110.  You

23  testified about this on direct examination, correct?

24  A.  Correct.

25  Q.  You said that this was, in words or substance, a letter

1    that went out to people who wanted to solicit work from the

2    post office?

3    A.   The letter along with the solicitation makes up the

4    solicitation package.

5    Q.   But this is a solicitation package that is going out with

6    respect to -- if you look at the top paragraph, if we could

7    just blow that up a little bit -- this is for VMRA repair

8    services for the northeast area of Manhattan, Westchester, New

9    Hampshire, and Livingston, New Jersey, correct?

10   A.   That's correct.

11   Q.   And this is going out, and it's -- the email that I'm

12   pointing to at the bottom of this blowup is Marilou Carandang.

13   Do you see that?

14   A.   Yes.

15   Q.   She's a contract officer at the post office at that time,

16   correct?

17   A.   Yes, she was.

18          MR. BRAFMAN:  If we could lift the picture so we can

19   see the bottom of the sheet, please.

20   Q.   In fact, her name is at the bottom as having been signed as

21   a purchasing and supply management specialist.  Do you see

22   that?

23   A.   Yes.

24   Q.   Was that her title at the time?

25   A.   That is all the specialists' title, purchasing and supply

IC4HIss4                          Waters - Cross

1   management specialist.  However, some of the purchasing and

2   supply management specialists are also delegated authority as

3   contracting officers.  So every purchasing and supply

4   management specialist is not a contracting officer.

5   Q.  OK.  So they could wear different hats?

6   A.  That's correct.

7   Q.  OK.

8   A.  Well, it's not wearing a different hat.  They had the

9   authority to bind the postal service as a contracting officer.

10  Q.  And if we could then move to the following page, the

11  following page is entitled on top -- if we can show that,

12  please.  Thank you -- "Order/Solicitation/Offer/Award."

13          When that letter goes out from Marilou Carandang, it

14  goes to people with a packet of materials they have to fill out

15  if they want to be considered for the award, correct?

16  A.  That's correct.

17  Q.  If you look at the area below, I'm sorry, where it says

18  "Schedule of Supply Services."

19  A.  Yes.

20  Q.  On the bottom, I'm sorry.

21  A.  Yes, I see it.

22  Q.  You see it.  OK.  I'm just putting it on the screen for the

23  jury.

24          The schedule of supplies, it deals with, again,

25  vehicle maintenance and repair services, and then it gives you

IC4HIss4                          Waters - Cross

1    the area, correct?

2    A.  That's correct.

3    Q.  All right.  So if a vendor, whether it be Mr. Issa or

4    someone else, wants to apply for this work, they have to fill

5    out this contract, correct?

6    A.  They would have responded to the solicitation package, yes.

7    Q.  And if you look at page No. 5 that is part of this packet

8    that goes to the vendor, could you look at the paragraph No. 3

9    on the top, please.

10   A.  Yes.

11   Q.  I'm just trying to get it.  OK.

12           Type of contract, the resulting contract or contracts

13   with the successful supplier will be an indefinite delivery,

14   indefinite quantity (IDIQ) fixed-contract with economic price

15   adjustments.  So this is a packet going out for an IDIQ

16   contract, correct?

17   A.  That's correct.

18   Q.  Just so the jury understands, that has a mandatory minimum

19   and mandatory maximum if it gets filled out and accepted by the

20   post office, correct?

21   A.  It has an obligation for a minimum with an expectation of

22   possibly spending the maximum of a million.

23   Q.  This, when it goes out to a vendor, is really a vendor

24   applying to get one of these contracts, correct?

25   A.  We're soliciting prospective offers, yes.

IC4HIss4                          Waters - Cross

1   Q.  If you look at the next numbered term of contract -- if we

2   could blow up just that.  Thank you -- the period for the

3   contract is two years, correct?

4   A.  The base period of performance is for two years.

5   Q.  And with options to renew for two years?

6   A.  With options to renew up to two more two years.

7   Q.  For a total of six years?

8   A.  That's correct.

9   Q.  "Unless the supplier offers an incentive program in the

10  best interest of the postal service, in this case alternate

11  proposals will be considered."

12          Can you explain what that means, if you know.

13  A.  Well, we can accept alternate proposals based on our

14  contract type, but as to what they were -- incentive program,

15  I'm not -- I have no knowledge of what they were referring to.

16  Q.  If you then look down at the next paragraph -- I'm sorry,

17  still in paragraph 4, please -- there you have what you just

18  said:  "The minimum and maximum will be expressed in dollars

19  versus units.  Minimum and maximum will be $250,000 and a

20  million for the two-year base period of the contract."

21          That confirms what you've testified to, correct?

22  A.  Correct.

23          MR. BRAFMAN:  All right.  If we could turn to page 27

24  of, I believe it's, Government Exhibit 105J.

25          You'll be happy to note, Judge, I skipped 26 pages.

1          THE COURT:  I'm not having a conversation,

2     Mr. Brafman.

3          MR. BRAFMAN:  What?

4          THE COURT:  I'm not aware we're having a conversation.

5     Ask questions of the witness, relevant, material questions.

6          MR. BRAFMAN:  Yes.

7     Q.  Could you look at page 105J.

8          (Counsel confer)

9     Q.  I'm sorry.  I'm sorry, Exhibit 110, page 27.

10    A.  Yes, I'm there.

11    Q.  I think on two occasions in your direct examination the

12    government directed your attention to the clauses concerning

13    Clause 1 through 5, gifts of -- gratuities or gifts, correct?

14    A.  That's correct.

15    Q.  Do you see that in Clause No. 3 where it says "gratuities

16    or gifts"?

17    A.  Yes.

18    Q.  All right.  Then I think you took us to Government

19    Exhibit 120.

20          If we could have Government Exhibit 120 as soon as you

21    can, please.

22          Then you read from the portion where Clause 5,

23    gratuities or gifts.  If we could blow up that section, please.

24          Do you remember discussing this on direct examination?

25    A.  Yes.

IC4HIss4                              Waters - Cross

1   Q.  All right.  Now, I want to read it to you and then ask a

2   question.

3          Gratuities or gifts, subparagraph (a):  The postal

4   service may terminate this contract for default after notice

5   and a hearing the Postal Office Board of Contract Appeals

6   determines that the supplier or the supplier's agent or other

7   representative (1) offered or gave a gratuity or gift as

8   defined in 5 CFR 2635 to an officer or employee of the postal

9   service and intended by the gift or gift -- by the gratuity or

10  gift to obtain a contract or favorable treatment under a

11  contract.

12         Do you see that?

13  A.  Yes.

14  Q.  So those were the rules if you actually gave a gratuity or

15  gift, correct?  That's what you testified to on direct, am I

16  right?

17  A.  That's what is stated, yes.

18  Q.  And paragraph No. 2 indicates that the contract can be

19  terminated if a gift was intended by the gratuity or gift to

20  obtain a contract or favorable treatment under a contract.

21         Do you see that?

22  A.  Yes, I do.

23  Q.  Then go back to paragraph 1 -- I'm sorry, paragraph A.  I'm

24  reading backwards.

25         Do you know, of any of the contracts you've just

1    described, whether or not they were ever terminated?

2              MR. WIRSHBA:  Objection.

3              THE COURT:  Objection's sustained.

4    Q.  Do you know whether or not Mr. Issa or any of his companies

5    were given notice and a hearing that the Postal Board of

6    Contract Appeals --

7              MR. WIRSHBA:  Objection.

8              MR. BRAFMAN:  Can I finish the question?

9              MR. WIRSHBA:  Apologies.

10             THE COURT:  Finish the question.

11   Q.  -- the Board of Contract Appeals determines that the

12   supplier or supplier's agent or other representative, do you

13   know of any such -- any such hearings?

14             THE COURT:  The objection's sustained.

15             MR. BRAFMAN:  Your Honor, Ms. --

16             THE COURT:  The objection is sustained.  Move on,

17   Mr. Brafman.

18             MR. BRAFMAN:  I'd like to have a quick sidebar.

19             THE COURT:  No sidebar.  I know what you'd said.  I'd

20   say no, so let's just keep going.

21   BY MR. BRAFMAN:

22   Q.  You've met with the government on several occasions before

23   today, correct?

24   A.  Yes.

25   Q.  And they told you that they were going to ask you to read

IC4HIss4                          Waters - Cross

1    that particular section.  That didn't come as a surprise, did

2    it?

3    A.  I read the clause, yes.

4    Q.  But you read the clause to this jury, right?

5    A.  That's correct.

6    Q.  Why?

7             MR. WIRSHBA:  Objection.

8             THE COURT:  Oh, she can answer that.

9    Q.  OK.

10   A.  I was asked to read the clause.

11            MR. BRAFMAN:  Thank you very much.

12            I have no further questions, your Honor.

13            THE COURT:  Any redirect?

14            MR. WIRSHBA:  No, your Honor.

15            THE COURT:  Thank you very much, ma'am.  You may step

16   down.

17            (Witness excused)

18            THE COURT:  Call your next witness, please.

19            MS. HANFT:  The government calls Jeffrey Blight.

20            Your Honor, may I place a binder on the witness stand?

21            THE COURT:  The answer is yes for the rest of the

22   trial.

23   JEFFREY BLIGHT,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

1   DIRECT EXAMINATION

2   BY MS. HANFT:

3   Q.   Good afternoon, Mr. Blight.  How old are you?

4   A.   I am 47.

5   Q.   And where were you born?

6   A.   In Eloise, Michigan.

7   Q.   Where did you grow up?

8   A.   Detroit, Michigan.

9   Q.   What do you currently do for a living?

10  A.   I'm sorry.  I'm a USPS manager for vehicle maintenance.

11  Q.   Do you work at a vehicle maintenance facility?

12  A.   Yes.

13  Q.   What is a vehicle maintenance facility?

14  A.   The vehicle maintenance facility is a, more or less,

15  maintenance garage for postal vehicles.

16  Q.   I'm going to ask you a few more questions about that in a

17  moment.

18          How long have you worked at the United States Postal

19  Service?

20  A.   Twenty-three years.

21  Q.   Before you worked for the United States Postal Service,

22  where did you work?

23  A.   Prior to that I was a vehicle repair garage, and prior to

24  that it was with the United States Navy.

25  Q.   Mr. Blight, in the course of your work at USPS vehicle

IC4HIss4                          Blight - Direct

1   maintenance facilities, have you come across an individual

2   named Tony Issa?

3   A.  Yes.

4   Q.  How did you come across him?

5   A.  Mr. Issa came to the Detroit vehicle maintenance facility

6   where I was acting manager.

7   Q.  Do you see Tony Issa in the courtroom today?

8           MR. BRAFMAN:  I stipulate to the identification, your

9   Honor.

10          THE COURT:  Indicating Mr. Issa.

11  Q.  During the time that you interacted with Tony Issa, did he

12  ever provide anything to you?

13  A.  Yes.

14  Q.  What did he provide to you?

15  A.  Money, meals, a trip to New York, and it included airfare

16  and hotel.

17  Q.  At the time you received those items from Mr. Issa, were

18  you acting with the law enforcement?

19  A.  Yes.

20  Q.  I want to ask you a few questions about your current job

21  and the other positions you've held at the postal service.

22          What did you say your current position at the VMF is?

23  A.  My current position is vehicle maintenance manager.

24  Q.  And at what vehicle maintenance facility?

25  A.  Dearborn VMF.

IC4HIss4                              Blight - Direct

Q.   Before you were the VMF manager at the Dearborn VMF, what

was your position?

A.   Prior to that, was the manager of the Livonia vehicle

maintenance facility, acting manager of the Detroit vehicle

maintenance facility.  I also worked as a supervisor for

facility maintenance, as well as a mechanic for facility

maintenance and custodian.

Q.   Now, you mentioned that the VMFs handle the postal

service's vehicles.  What kinds of vehicles does the postal

service have?

A.   We have mail carrier vehicles.  They're pretty much

customized vehicles for mail carriers; off-the-shelf-type

vehicles that are -- we use for administrative vehicles, your

regular sedans and cars; as well as trucks, commercial-type

trucks for maintenance needs, trucks that would be straight

bodies with lifts on them, various types, as well as postal

inspection vehicles, all types.

Q.   What is the VMF manager's role?

A.   To ensure the repairs, the safety of the vehicles, to make

sure they're safe for employees to use, you know, all types of

repairs that involve -- that are involved with that.

Q.   Does the VMF manager report to anyone else within the VMF?

A.   Not my VMF, no.  I have a manager who is a manager over all

the VMFs in the state of Michigan.

Q.   So is it correct to say that you are the boss of the VMF?

IC4HIss4                          Blight - Direct

A.   Yes.

Q.   Now, generally speaking, how are postal vehicles repaired
and maintained?

A.   Well, generally, we bring them to our shop on periodic
schedules that are called preventive maintenance inspections or
scheduled maintenances.  They're brought in at various times a
year, usually twice a year, sometimes more for higher mile
vehicles or depending on their use.  We would bring them in, do
repairs ourselves, or if we had overflow, we would send them to
contractors.

Q.   So you just explained when a repair is scheduled.  Is there
ever an unscheduled repair?

A.   Yes.  That's for breakdowns on the road.  We call them road
calls.  If we have a vehicle that's maybe a no-start at a post
office, that would be what we'd call a tag.  It would be tagged
out, and we would arrange the repairs there at that facility.
For anything on the road, we would either respond ourselves or
send a contractor out to repair the vehicle on the road, if
possible.

Q.   Now, when a vehicle needs to be repaired or maintained,
what is the process for getting that done, generally speaking?

A.   Well, once we're aware of the problem, it's either -- well,
it will be inspected, wrote up for what the repair needs.  A
work order will be generated.  At that point we'll determine
whether or not it would be repaired in house in my facility or

1    if it will be sent out to a repair contractor for that repair.

2    Q.  Who decides whether the vehicle will be repaired in house,

3    as you say, versus outside of your VMF by a third contractor?

4    A.  That would be myself or my lead technician.

5    Q.  Approximately what percentage of repairs at your facility

6    are performed in house?

7    A.  Approximately 70 percent.

8    Q.  How about by third-party contractors?

9    A.  Third party, 30 percent.

10   Q.  Once the decision is made by you or your lead technician,

11   as you say, that a third party will do the repair, how do you

12   choose which third-party contractor?

13   A.  Well, usually logistically, depending on where the

14   repairs -- the vehicle is located, where the repair is needed,

15   I have offices that I would maintain vehicles that are about an

16   hour away from me, an hour's drive.  We would have a contractor

17   established in that area, and we also have contractors closer

18   to my facility within the inner city that will be dependent on

19   whether we can get it repaired efficiently in-house in my

20   facility or if it would be quicker and easier to send it to

21   that contractor.

22   Q.  Who makes the decision which third-party contractor to use?

23   A.  Usually myself or my lead technician.

24   Q.  Do you have contracts with certain third-party contractors?

25   A.  Yes.

IC4HIss4                          Blight - Direct

1    Q.   What are those contracts referred to as?

2    A.   I'm sorry.  Can you repeat that.

3    Q.   Do they have a name, those contracts?

4    A.   Oh, yes.  I have various contractors.  Midas, I had Safeway

5    Auto, Tire and Auto, Duploy.  I've used I-94 and Trumbull.

6    There's S & A.  They're all repair facilities.

7    Q.   And you mentioned Duploy and Safeway.  Who owns those

8    companies?

9    A.   Tony Issa.

10   Q.   How did you first meet the defendant, Tony Issa?

11   A.   Well, he came to my -- the facility I was acting manager

12   for in Detroit at the time.  He visited -- well, originally, he

13   came and I sent him away.  It was an unscheduled -- I didn't

14   know he was coming at all.  Apparently, he made an appointment

15   with another manager prior to me taking over.  After a couple

16   of calls, I realized that he was flying in from out of town

17   when he did come and everything, so I set up a date to see him.

18   And he was coming in to solicit work with me.

19   Q.   At the time you're talking about, where were you working?

20   A.   That was the Detroit vehicle maintenance facility.

21   Q.   What was your position there at that time?

22   A.   I was acting manager.

23   Q.   You mentioned that he came a few times, and eventually did

24   you say you met in person?

25   A.   Yes.

1   Q.   Approximately when was that meeting?

2   A.   That was in 2015.

3   Q.   Now, while you were the VMF manager at the Detroit VMF, at

4   any point was the Detroit VMF giving Tony Issa's companies

5   work?

6   A.   Yes.

7   Q.   During the time you were giving work to those companies,

8   what was your view as to the quality of the work they were

9   performing?

10  A.   Well, at first the work was good, and over time it was

11  subpar, it was not up to par.  We were getting a lot of repairs

12  that weren't -- well, they weren't repaired correctly.  Some

13  repairs weren't -- they were charged for, but they weren't

14  completed.  We had various problems with billing, either too

15  high of billing for estimated repair times, double billing on

16  some bills, as well as the -- and that was with both Safeway

17  with the repairs and Duploy with tows.

18  Q.   We'll talk about some of those specifics in a moment, but

19  did you tell Tony Issa about those issues?

20  A.   Yes.

21  Q.   At any point while you were in Detroit did you stop giving

22  work to Tony Issa?

23  A.   Well, that was my intentions.  I didn't totally stop all

24  work with Mr. Issa or his companies there.  I had a few scrap

25  vehicles there, or vehicles that we deemed that were beyond

IC4HIss4                        Blight - Direct

1   repair, but they had good parts on them.  So with those

2   vehicles, we do what we call a cannibalization.  We would take

3   parts off them and use the good parts on the same type of

4   vehicles.  I had a few vehicles left at his shop that we had to

5   arrange for pick up and, you know, gather all our parts and

6   bring them back, because I'm still accountable for those

7   vehicles as well until they're scrapped out properly.  I pulled

8   back pretty much all work except for tows, occasional road

9   calls or tags.

10  Q.  Does that mean you were no longer giving him PMIs or

11  scheduled maintenance?

12  A.  Right, I stopped that type of work, anything that went in

13  shop.

14  Q.  Why did you stop that work?

15  A.  Well, because there was never -- we never got anywhere with

16  the problems that I would state that were always occurring, the

17  bad repairs and the improper billing.

18  Q.  Approximately when did you say you left the Detroit VMF for

19  your current position?

20  A.  That was January of 2016.

21  Q.  Remind us where you went in January of 2016.

22  A.  I went to my actual, what I call, bid position.  It was the

23  Dearborn VMF.

24  Q.  After you became VMF manager at the Dearborn VMF, did you

25  contract out work to Tony Issa's companies right away?

1   A.  No.

2   Q.  Why not?

3   A.  I had no intention to.  I didn't want the same problems I

4   was having with Detroit.

5   Q.  Eventually, did you contract out work to Tony Issa's

6   companies?

7   A.  Eventually, I did.

8   Q.  Which companies?

9   A.  Safeway Tire and Auto and Duploy.

10  Q.  Did you have the issues you referred to previously at that

11  point?

12  A.  Yes.

13  Q.  Did you speak to Tony about those issues?

14  A.  I spoke to Tony as well.  Mainly his managers that worked

15  for him.

16  Q.  Did you speak to anyone else about those issues?

17  A.  Mainly it was Mustafa who was one of the people I talked to

18  who was running the facilities at the time, his repair

19  facilities.

20  Q.  Who is Mustafa?

21  A.  I was -- I know him as Tony's son.

22          MS. HANFT:  Your Honor, I would request that the Court

23  read stipulation 4006.  I apologize.  I thought your Honor had

24  it.

25          (Continued on next page)

IC45iss5                        Blight - direct

1                THE COURT:  Did you give it to me?

2                Again, it is hereby stipulated and agreed to, by and

3        between both parties in this case, that Government's Exhibits

4        250AA, 250BB, 250C, 250CC, 250EE, 250FF, 250GG, 250J, 250K,

5        250M, 250N, 250O, 250P, 250S, 250T, 250U, 250V, 250W, 250X,

6        250Y and 250Z, including all parts and subdivisions thereof,

7        are true and accurate copies of text messages and related

8        content, sent or received using a cellular phone belonging to

9        Ismael Velez.  The dates, times and identifying information of

10       senders and recipients of the text messages contained in all of

11       those exhibits are accurate.

12               2.  Government's Exhibits 251B through 251G, including

13       all parts and subdivisions thereof, are true and accurate

14       copies of text messages and related content, sent or received

15       using a cellular phone associated with the cell number with the

16       call number 917-418-4087, and belonging to Ibrahim Issa the

17       defendant.  The dates, times and identifying information of

18       senders and recipients of the text messages contained in those

19       exhibits are accurate.

20               3.  Government's Exhibits 252 and 254 through 260,

21       including all parts and subdivision thereof, are true and

22       accurate copies of text messages and related content sent or

23       received using a cellular telephone belonging to Jeffrey

24       Blight.  The dates, times, and identifying information of

25       sending and recipient of the text messages contained in those

IC45iss5                         Blight - direct

1    exhibits are accurate.

2              4.  Government Exhibit 418 is a copy of an image that

3    was contained on a cellular phone associated with the call

4    number 917-418-4087 and belonging to Ibrahim Issa, the

5    defendant.

6              It is further stipulated and agreed that this

7    stipulation may be, and it is, received into evidence as

8    Government Exhibit 4006.

9              MS. HANFT:  Thank you, your Honor.

10             (Government's Exhibits 4006, 252, 254, 255, 256, 257,

11   358, 359, 360, 418 received in evidence)

12   BY MS. HANFT:

13   Q.  Mr. Blight, you mentioned Mr. Mustafa and I believe you

14   said that you understood that to be Tony Issa's son, is that

15   correct?

16   A.  Correct.

17   Q.  I would like to show you what's been marked for

18   identification Government Exhibit 252A, it's also in the binder

19   up on your witness stand if you turn to 252A there is a tab.  I

20   will wait one moment.

21             Do you see that?

22   A.  I see it.

23   Q.  Do you recognize that?

24   A.  I do recognize it.  It is a text sent to me by Mustafa.

25   Q.  Did you receive that text?

IC45iss5                    Blight - direct

```
1    A.  Yes.

2              MS. HANFT:  The government would offer Government

3    Exhibit 252A.

4              MR. BRAFMAN:  Your Honor, I thought they were all in

5    by stipulation.

6              THE COURT:  Do you have any objection to any of the

7    documents that were listed in that stipulation coming into

8    evidence?

9              MR. BRAFMAN:  No.  That's why I stipulated to it.

10             THE COURT:  That's what I thought.  They're all in,

11   each and every one of them.  Okay?  That's the whole point.  I

12   know you didn't draft the stipulation that way.  Usually

13   assistants draft the stipulation so that the documents are

14   received in evidence.  They're in, apparently.

15             MR. BRAFMAN:  Thank you, your Honor.

16             THE COURT:  No objection.  They're all in.

17             (Government's Exhibits 250AA, 250BB, 250C, 250CC,

18   250EE, 250FF, 250GG, 250J, 250K, 250M, 250N, 250O, 250P, 250S,

19   250T, 250U, 250V, 250W, 250X, 250Y, 250Z, 251B, 251C, 251D,

20   251E, 251F 251G 252, 254, 255, 256, 257, 258, 259, 260, 418

21   received in evidence)

22   BY MS. HANFT:

23   Q.  We are looking at Exhibit 252, Mr. Blight?

24   A.  Yes.

25   Q.  Ms. Geier, could you publish Government Exhibit 252?
```

1          THE COURT:  Ms. Hanft, could I ask you to put that

2    microphone just a tiny bit closer to you?

3          MS. HANFT:  Yes, your Honor.  Certainly.

4          THE COURT:  Or you a tiny bit closer to the mic.  One

5    of the two.

6          MS. HANFT:  I will do both.

7    BY MS. HANFT:

8    Q.  Mr. Blight, could you explain the top of this text message?

9    At the very top it says "Mustfa Safeway."  What is that?

10   A.  Well, that's my contact name that I have put in my phone

11   for Mustafa who is managing Safeway.

12   Q.  Would you read this text message?

13   A.  It says:  *Hey Jeff.  My father wants to speak to you on a*

14   *personal note.  Can you give him a call when you get a chance.*

15   *Or he can call you.  When would be a good time.*

16   Q.  When you received this message, Mr. Blight, what did you

17   think it was referring to?

18          MR. BRAFMAN:  Objection.

19          THE COURT:  I'm so sorry.  Excuse me.

20          Grounds for the objection?

21          MR. BRAFMAN:  What he thought it was referring to is

22   not relevant, your Honor.

23          THE COURT:  The objection is overruled.

24          What did you understand was being said to you?

25          THE WITNESS:  Well, I understood that Mr. Issa wanted

IC45iss5                    Blight - direct

1    to speak to me.

2              THE COURT:  It does kind of speak for itself,

3    Ms. Hanft, don't you think, really?

4    BY MS. HANFT:

5    Q.  What did you do after you received this message,

6    Mr. Blight?

7    A.  Well, I actually blew it off.  I didn't respond to him, I

8    wasn't interested and it -- I figured it was --

9              MR. BRAFMAN:  Objection.

10             THE COURT:  You didn't respond to him.  That's fine.

11             Next question.

12   BY MS. HANFT:

13   Q.  Did there come a time when you met Mustafa in person?

14   A.  Yes.

15   Q.  And approximately when was that?

16   A.  It was a few weeks after.  Yes, a couple weeks after.

17   Q.  And when you met with him in person, what did he say?

18   A.  Well, he came to the VMF to talk to me.  He was interested

19   in doing work for the Dearborn VMF.  He mentioned that after I

20   left Detroit --

21             MR. BRAFMAN:  Your Honor, I'm going to --

22             MR. SOLOWIEJCZYK:  May we have one moment, your Honor?

23             THE COURT:  I would think so.

24             MR. BRAFMAN:  Your Honor, I am objecting to this

25   conversation.  He is not listed amongst --

1              THE COURT:  Hearsay.  Objection sustained.

2              MR. BRAFMAN:  Thank you.

3              MS. HANFT:  Your Honor, may I give a basis for

4     admission?

5              THE COURT:  Yes.

6              MS. HANFT:  This individual --

7              THE COURT:  No, no.  All you can do is indicate the

8     exception to the hearsay rule.

9              MS. HANFT:  801(d)(2)(C) and (D) I believe it is, your

10    Honor.

11             THE COURT:  Say it in words.  I don't deal well with

12    numbers.

13             MS. HANFT:  Agent or employee authorized to speak on

14    the subject within the scope.

15             THE COURT:  The objection is overruled.

16    BY MS. HANFT:

17    Q.  Mr. Blight, you can answer the question.  What did he say

18    at that meeting?

19    A.   He came to the VMF.  He said that he picked up more work

20    with Detroit after I had left, that he hired a few employees

21    and it is doing a lot better and the work that they were

22    performing and that he had mentioned that he, his father still

23    wanted to speak to me on a personal note and to make sure that

24    I called him on my cell phone and not on any type of postal

25    phone or communicated through postal devices.

IC45iss5                           Blight - direct

1   Q.  What did you do after that meeting?

2   A.  I contacted law enforcement.

3   Q.  And when you say law enforcement, who are you referring to?

4   A.  The Office of Inspector General for the Postal Service.

5   Q.  Why did you reach out to the Office of the Inspector

6   General?

7   A.  Because of the way I was asked to contact Mr. Issa.  That

8   he wanted me to do it, first of all, it was for a personal, you

9   know, that to talk to them or that he wanted to speak to me on

10  a personal note, as well as the fact that he didn't want me to

11  use a postal phone.

12  Q.  After you spoke with the Office of the Inspector General,

13  did there come a time when you agreed to begin working at the

14  direction of law enforcement?

15  A.  Yes.

16  Q.  What did you agree to do at the direction of law

17  enforcement?

18  A.  To meet with Tony and to record it.

19  Q.  When you say record, record what?

20  A.  The conversation.

21  Q.  Did you ultimately get back to Mr. Issa after you received

22  a text from Mustafa and after you met with him?

23  A.  Yes.

24  Q.  I'm going to show you what's now in evidence as Government

25  Exhibit 253, so if you could publish it?

IC45iss5                         Blight - direct

1              I apologize, your Honor.  Just one moment.

2              Mr. Blight, if you can turn in your binder to

3    Government Exhibit 253.  It is not in evidence.

4    A.  Yes.

5    Q.  Take a look at it and if you could read it and just let me

6    know when you are finished?

7    A.  It was sent Friday, March 18th, 2016.

8              MR. BRAFMAN:  Objection, it is not in evidence.

9    BY MS. HANFT:

10   Q.  Mr. Blight, please don't read it out loud.

11             THE COURT:  Do me a favor and don't read it.  Answer

12   her question.  She said read it and then let me know when you

13   are finished.  So, when you are done reading it to yourself,

14   say okay.

15             THE WITNESS:  Yes, your Honor.

16             MR. BRAFMAN:  It is not on the screen.

17             THE COURT:  It is not on my screen either.  My

18   computer doesn't work, it is not on my screen, but I am

19   listening.

20             MR. BRAFMAN:  It is not in the book, 253 or 254.

21             THE COURT:  There was no 253.  There was no 253 in the

22   stipulation.

23             MS. HANFT:  Correct, your Honor.  This is not within

24   the text message stipulation that the Court read.

25             THE COURT:  All right.

IC45iss5                          Blight - direct

1              MS. HANFT:  It should be an exhibit.  If it is

2      missing, we do not need to offer it.

3              THE COURT:  It is up now.

4              MS. HANFT:  I believe defense counsel is now able to

5      view it.

6      BY MS. HANFT:

7      Q.  Mr. Blight, what are you looking at?  Without describing

8      the content of what is in this?

9      A.  It is an e-mail.

10     Q.  And who sent the e-mail?

11     A.  I sent it.

12     Q.  Is your signature at the bottom?

13     A.  Yes.

14     Q.  Did you send this e-mail when you were manager of the

15     Dearborn VMF?

16     A.  Yes.

17             MS. HANFT:  Your Honor, the government would offer

18     Government Exhibit 253.

19             THE COURT:  Would offer it or does it does offer it?

20             MS. HANFT:  Does offer it, your Honor.

21             MR. BRAFMAN:  No objection.

22             THE COURT:  Admitted.

23             (Government's Exhibit 253 received in evidence)

24     BY MS. HANFT:

25     Q.  Ms. Geier, if we can publish Government Exhibit 253?

1              Mr. Blight, at the time you sent this e-mail, were you

2    acting at the direction of law enforcement?

3    A.   Yes.

4    Q.   After you sent this e-mail to Tony Issa, did he respond?

5    A.   Yes.

6    Q.   And did you speak to him further about meeting in person?

7    A.   Yes.

8    Q.   How did you speak to him?

9    A.   Telephone.

10   Q.   Ultimately, did there come a time when Mr. Issa visited the

11   Dearborn VMF?

12   A.   Yes.

13   Q.   Explain how that came out?

14   A.   Mr. Issa came, he was flying in to Detroit, I believe, to

15   talk to a real estate agent and that's what he told me, and at

16   that time we made an appointment to meet him at the Dearborn

17   VMF.

18   Q.   Now I'm going to show you what's in evidence as Government

19   Exhibit 254.  Do you recognize Government Exhibit 254,

20   Mr. Blight?

21   A.   Yes.

22   Q.   What are these?

23   A.   These are text messages.

24   Q.   In the first message up top, if we could zoom in,

25   Ms. Geier?

1          It says:  3800 Greenfield Road, Dearborn, Michigan.

2     What is that the address of?

3     A.   That is the address to the Dearborn VMF.

4     Q.   Where you worked?

5     A.   Where I worked, yes.

6     Q.   What information were you giving Tony Issa at this point?

7     A.   The address to the VMF where to come and where to park.

8     Q.   Did Mr. Issa show up at the Dearborn VMF that day?

9     A.   Yes.

10    Q.   Did you meet with him?

11    A.   Yes.

12    Q.   And did you have this meeting at the direction of law

13    enforcement?

14    A.   Yes.

15    Q.   During that meeting, were you wearing a recording device?

16    A.   Yes.

17         MS. HANFT:  Your Honor, we have another stipulation,

18    for the Court, it is Government Exhibit 4003.  And at this

19    point, your Honor, we only ask Court to admit from paragraphs

20    11 and on, with the exception of 309F.

21         THE COURT:  I'm sorry.  You want me to do what?  You

22    want me to start reading where?

23         MS. HANFT:  The introductory paragraph, and then

24    starting at paragraph 11, which is on page 4 of the

25    stipulation.

1            THE COURT:  Hereby stipulated and agreed, by and

2    between the usual suspects.

3            What paragraph do I go to?

4            MS. HANFT:  11, your Honor.

5            THE COURT:  Government exhibits 306A, 306B, 306C,

6    306D, 306E, 306F, 306G and 306H are true and accurate copies of

7    an audio recording of a meeting that took place on or about May

8    5, 2016 in Dearborn, Michigan between Ibrahim Issa, the

9    defendant, and Jeffrey Blight, and that was consensually

10   recorded by Jeffrey Blight at the direction of law enforcement.

11           Next paragraph you would like me to read?

12           MS. HANFT:  If your Honor prefers to read it now it

13   will come up later in this direct examination, so we can either

14   read it now or later.

15           THE COURT:  What is the next paragraph you want me to

16   read?

17           MS. HANFT:  Paragraph 12, your Honor.

18           THE COURT:  Government's Exhibits 306A-T through

19   306H-T, 306A-T, 306B-T down through 306H-T, are true and

20   accurate transcripts of the recorded conversations contained in

21   Government's Exhibits 306A through 306H, respectively.  The

22   identities of the participants, voice attributions, dates, and

23   times reflected on those transcripts are accurate.

24           Ladies and gentlemen, it is the recordings that are

25   the evidence in the case.  The transcripts have been prepared

IC45iss5                        Blight - direct

1    as an aid, which you may or may not need when you are listening

2    to the recordings.  Notwithstanding the stipulation, if you

3    perceive that there is a difference between what you hear on

4    the recordings and what you read in the transcripts, the

5    recordings win because they are the evidence in the case.

6              Now, you want the recordings admitted?

7              MS. HANFT:  Yes, your Honor.

8              THE COURT:  The recordings are admitted.

9              MS. HANFT:  Thank you.

10             THE COURT:  Transcripts are admitted as aids only.

11             (Government's Exhibits 306A, 306B, 306C, 306D, 306E,

12   306F, 306G, 306H, 306A-T, 306B-T, 306C-T, 306D-T, 306E-T,

13   306F-T, 306G-T, 306H-T received in evidence)

14   BY MS. HANFT:

15   Q.  Ms. Geier, can we play what is in evidence as 306A and can

16   we put up Government Exhibit 306A-T?

17             (Audiofile played)

18   BY MS. HANFT:

19   Q.  Mr. Blight, was that a portion of the May 5th meeting?

20   A.  Yes.

21   Q.  Where it says "TI", who was speaking?

22   A.  Tony Issa.

23   Q.  And what about where it says "JB"?

24   A.  Myself; Jeff Blight.

25   Q.  Now, generally speaking, what was spoken about during that

IC45iss5                      Blight - direct

1    May 5th meeting?

2             MR. BRAFMAN:  Objection, your Honor.  We just played

3    the tape.  That's what was said.

4             THE COURT:  Mr. Brafman, I won't tell the government

5    how to prove its case even though I might agree with you.

6             MR. BRAFMAN:   Thank you.

7             THE COURT:  Answer the question, please, Jim.

8    BY MS. HANFT:

9    Q.  The question was, generally speaking, what was discussed at

10   this meeting?

11   A.  Generally, it was Mr. Issa explaining to me that he

12   understood our processes and that he knew how to fly under the

13   radar or --

14            MR. BRAFMAN:  Objection.  Where does it say that?

15            THE COURT:  Excuse me.  That's called

16   cross-examination.  The objection is overruled.

17            Finish your answer, sir.

18            THE WITNESS:  Yes, your Honor.

19            That Tony understands our processes.

20   BY MS. HANFT:

21   Q.  Thank you.

22            And part of the recording that we just heard you

23   referred to a text from Mustafa, a personal matter.  What did

24   that refer to?  What were you referring to when you said that?

25   A.  I was referring to the, what I felt it meant, which was

IC45iss5                              Blight - direct

1    that it goes into what I was saying before with hiding things.

2              MR. BRAFMAN:  Objection, your Honor.  He didn't say

3    that to my client.  He can't just say it now.

4              THE COURT:  Excuse me, Mr. Brafman.  The objection is

5    overruled.  If you want to cross-examine this man you will have

6    your chance.

7    BY MS. HANFT:

8    Q.  When you referred to the text, was that the text that we

9    looked at a few moments ago?

10   A.  Yes.  That was the text.

11             THE COURT:  You try not to lead.  What text was that?

12   It is a much better way for the government to ask the question.

13             MS. HANFT:  Thank you, your Honor.

14   BY MS. HANFT:

15   Q.  What text were you referring to, Mr. Blight?

16   A.  The text that Mustafa sent me stating that his father

17   wanted to talk to me on a personal note.

18             MS. HANFT:  Can we play Government Exhibit 306H,

19   please, Ms. Geier?

20             (Audiofile played)

21   BY MS. HANFT:

22   Q.  Mr. Blight, do you have a daughter?

23   A.  Yes.

24   Q.  Is she in college or was she in college at the time?

25   A.  Yes.

IC45iss5                          Blight - direct

1    Q.  Was she looking at changing colleges?

2    A.  Yes.

3    Q.  Was she looking at coming to New York?

4    A.  No.

5    Q.  Why did you say that your daughter was looking to come to

6    New York?

7    A.  That was under the direction of law enforcement.

8    Q.  And in a part of the recording, Ms. Geier, if we could go

9    back to I believe the previous page?

10             You said, line 15 through 16:  As far as I have been

11   is Buffalo.

12             What did you mean by that?

13   A.  Oh, I meant I have never been to New York City or anywhere

14   near here.

15   Q.  Is that true?

16   A.  That's true.

17             MS. HANFT:  Can we please play Government Exhibit

18   306B, Ms. Geier?

19             (Audiofile played)

20   BY MS. HANFT:

21   Q.  Mr. Blight, did you understand what Mr. Issa was saying in

22   that recording?

23   A.  Yes.

24   Q.  And what did you understand him to be saying?

25   A.  That he was buying additional property close to the

IC45iss5                         Blight - direct

1    property he already bought to establish Safeway Auto and Duploy

2    to make it a one-stop shop to do everything that he didn't do

3    there, as well to store more parts for bigger trucks and to do

4    collision work, body repair type work.

5              MS. HANFT:  Ms. Geier, can we play Government Exhibit

6    306C?

7              (Audiofile played)

8    BY MS. HANFT:

9    Q.  Mr. Blight, when you referred to being out there the next

10   couple of weeks, where did you mean?

11   A.  New York.

12   Q.  How did that conversation come about?

13   A.  Well, it came about from us previously talking about me

14   coming out to New York to interview -- have my daughter

15   interview for college there.

16   Q.  Prior to you mentioning your daughter, had Mr. Issa ever

17   mentioned your coming to New York?

18   A.  Yes.

19   Q.  And when was that, approximately?

20   A.  In Detroit, when I was in Detroit as acting manager he

21   mentioned that New York was a great place to hang out, that I

22   should come there sometime and he could show me a good time.

23             MS. HANFT:  Ms. Geier, could you please --

24             THE COURT:  Is this a good place to take our afternoon

25   break?

IC45iss5                        Blight – direct

1           MS. HANFT:  Sure, your Honor.

2           THE COURT:  Great.  10 minutes.  Don't discuss the

3    case, keep an open mind.

4           (Continued on next page)

IC45iss5                        Blight – direct

1              (Jury not present)

2              THE COURT:  Okay, sir.  You can stand up and stretch.

3              MR. BRAFMAN:  May we step out, your Honor?

4              THE COURT:  Yes.

5              (recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IC45iss5                        Blight - direct

1              (Jury present)

2              THE COURT:  Sir, you are still under oath.

3              Continue.

4    BY MS. HANFT:

5    Q.  Mr. Blight, before the break you were speaking about what

6    you meant when you said you were going to be out there in a few

7    weeks.  Could you just remind the jury where "out there" meant?

8    A.  New York City.

9              MS. HANFT:  Ms. Geier, can we please play Government

10   Exhibit 306D, again another clip from the May 5 meeting?

11             (Audiofile played)

12             MS. HANFT:  Ms. Geier, can we play Government Exhibit

13   306E, also from the May 5 meeting?

14             (Audiofile played)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1  Q.  Mr. Blight, at the beginning of this conversation -- if we

2  could go a few pages back, Ms. Geier -- we see a reference to

3  the "got-you mode."  Did you understand what Mr. Issa was

4  referring to there?

5  A.  Well, that when they know you did something wrong and they

6  understand and got you for it.

7  Q.  Do you know who specifically?

8  A.  Talking about the postal service, contractors from what I

9  understand.

10  Q.  Now, turning to the end, I'm just asking, did you know what

11  Mr. Issa was referring to at the -- one page back, Ms. Geier,

12  page 97, paragraph starting with "right."

13          The question again is just did you know what Mr. Issa

14  was referring to?

15  A.  Well, to keep things under the radar.

16  Q.  Did you know, Mr. Blight, yes or no?

17          MR. BRAFMAN:  I have to object.  I know it will be

18  sustained, but I'm sorry, Judge.

19          THE COURT:  The objection I understand.  It's a

20  yes-or-no question.  Did you have an understanding of what he

21  was saying to you?

22          THE WITNESS:  Yes.

23          THE COURT:  What was your understanding?

24          THE WITNESS:  That he understands the processes of --

25  of our billing.

1              THE COURT:  He understood the process of your billing.

2              Next question.

3              MS. HANFT:  Thank you.

4              Ms. Geier, could we play Government Exhibit 306F from

5    the same May 5 meeting.

6              (Audio played)

7    BY MS. HANFT:

8    Q.  Mr. Blight, on page 103 of the transcript, line 22 to 23,

9    when you said, "I was right at the turning point," just

10   generally speaking, what were you referring to?

11   A.  That I was at the turning point to reach out to try to find

12   help with the contractor.

13   Q.  And was that true --

14   A.  Yes.

15   Q.  -- that you were reaching out to try to find help from a

16   contractor at that time?

17             THE COURT:  He said yes.  Ask your next question.

18   Q.  Turning to page 104, there's a reference of Jeff at line 6,

19   "I'm not understanding why they continue to allow Jeff to be

20   the one checking on invoices like that."

21             Can you explain to us what you meant when you referred

22   to Jeff checking on invoices like that?

23   A.  Well, that person, Jeff, he's an employee, a lead

24   technician at another -- at another vehicle maintenance garage,

25   and he came to Detroit to help out.  And at that time, he was

the main person checking on invoices for problems.  He

understood all processes, our ERT times for particular repairs,

and he was the person who went over the invoices and problems

with them.

Q.  I'm going to ask you a question about that in a moment.

        You just used the term "ERT times."  What does that

refer to?

A.  Estimated repair times.

Q.  Estimated repair times for what?

A.  For any and all repairs.  For example, an alternator may

have an hour estimated repair time to do the repair for that

particular vehicle.  It's preestablished.

Q.  You said that this individual named Jeff came to Detroit to

help out with the billing, is that correct?

A.  Yes.

Q.  Had Mr. Issa ever brought up Jeff to you before?

A.  Yes, Mr. Issa and his staff.

Q.  And what had they said?

A.  Well, that he was too hard; that he wasn't lenient at all.

Every once in a while they would challenge what he would mark

down as being improper, and usually that wasn't the case.  I

would back him because he was right on point with it and say,

no, that was too much for that charge or that job wasn't done

properly according to what we were charged on our invoices.

Q.  When you say you would back him up, who are you referring

1    to?

2    A.   Jeff Alwin.

3    Q.   And you're talking about the charges on which bills?

4    A.   On Safeway and Duploy's invoices.

5    Q.   Finally, this is the last clip of the May 5 meeting.

6              Ms. Geier, could you go to Government Exhibit 306G.

7              (Audio played)

8              MS. HANFT:  If we could turn back to page 117, I

9    believe it's on line 9.

10   Q.   Mr. Blight, when you said "do a little bit of strategy

11   talk" here, what exactly is going on?  What were you referring

12   to?

13   A.   Well, figuring out where, what stations, what post offices,

14   to start with.  Mainly logistically which offices were closer

15   to where Safeway Auto was located and to start work with that.

16   Q.   Was it your intention to give Safeway Auto work?

17   A.   At that point it was.  I was under law enforcement's idea.

18             MR. BRAFMAN:  Was that the answer, your Honor?

19             THE COURT:  I don't know.

20             MS. HANFT:  I'm sorry.  What's the question?

21             THE COURT:  Do you want to read back the answer,

22   please.

23             (Record read)

24             MR. BRAFMAN:  That's not an answer to the question.

25             THE COURT:  So the objection is you'd like it stricken

1   as nonresponsive?

2           MR. BRAFMAN:  Yes, your Honor.

3           THE COURT:  The objection is sustained.

4           That answer is stricken, ladies and gentlemen.  It was

5   not responsive to the last question.

6   BY MS. HANFT:

7   Q.  Mr. Blight, at this point did you intend to give Tony Issa

8   work?

9   A.  At that point, yes.

10  Q.  Why?

11  A.  Because I was advised by law enforcement to do that.

12  Q.  This meeting that we've just listened to parts of, where

13  did it take place?

14  A.  In my office at the Dearborn vehicle maintenance facility.

15  Q.  At any point did the meeting move?

16  A.  Yes.

17  Q.  Where did it move to?

18  A.  It moved out to the parking lot of my facility.

19  Q.  Why was that?

20  A.  Well, we were winding down, it seemed like, and Mr. Issa

21  asked me to come outside and speak to him a little more.  As we

22  were leaving, he says, "I don't want to be in here, in" –– I

23  guess within my office or the postal service walls.

24  Q.  So did you accompany him out to the parking lot?

25  A.  I did.

IC4HIss6                         Blight - Direct

1    Q.   What happened when you got to the parking lot?

2    A.   Well, we talked a little further.  He got into his truck;

3    he had a rental truck.  And he got in the driver's seat and I

4    stood next to the vehicle, and we talked a little more.

5    Q.   What did he say in that conversation?

6    A.   At that point he said he was looking forward to a good

7    relationship, a renewed relationship, and a purposeful and --

8    I'm trying to think of the word.  I can't really pronounce

9    it -- prosperous, you know, prosperous relationship.

10   Q.   Did he say anything else in that conversation?

11   A.   No.

12   Q.   When he referred to a prosperous relationship, is that a

13   term you had used previously?

14   A.   Yes, he --

15   Q.   Is that a term you had used previously?

16   A.   Not me, no, I hadn't.

17   Q.   At the time you had that conversation with Mr. Issa in the

18   parking lot of your VMF, did you have authority to decide

19   whether or not to give work to Mr. Issa's companies?

20   A.   Yes.

21   Q.   I'm going to move forward in time.  After this meeting, did

22   you give work to Tony Issa's companies?

23   A.   Yes.

24   Q.   How much work?

25   A.   Quite a bit of work.  Thousands of dollars' worth of work.

IC4HIss6                          Blight - Direct

1   Q.  Which companies?

2   A.  That would have been Safeway Tire and Auto, Duploy Tow.

3   Q.  At that time what was your view of the quality of the work

4   these companies performed?

5   A.  Well, it was the same thing.  The first couple repairs

6   turned out pretty good, and then things got -- got bad.

7   Repairs weren't being completed properly.  There was double

8   billing again, billing too much time for a particular repair.

9   Even repairs that repair time was doubled up on the same bill.

10  Q.  OK.  We're going to talk about that in a few moments.

11          When these problems arose, though, what would you do?

12          THE COURT:  Not what would you do, what did you do?

13  Q.  What did you do when those problems arose?

14  A.  I would talk to, well, Tony or any of his managers at his

15  facility.  There was a few different ones at different times.

16  Q.  After this point did you continue communicating with

17  Mr. Issa?

18  A.  Yes.

19  Q.  Did you communicate further about the trip to New York?

20  A.  Yes.

21  Q.  If you could take a look in your binder at Government

22  Exhibit 255.

23          This should be in evidence, so could we publish

24  Government Exhibit 255, please.

25          Mr. Blight, could you just read this top message.  You

1  could read it aloud, please.

2  A.  "Tony, I heard your message.  Sorry.  I'm in a loud banquet

3  hall.  Those dates sound good.  Probably that Thursday or

4  Friday through Sunday.  I will verify as soon as the

5  professor/director verifies their interview date.  Thank you,

6  Tony.  Talk to you soon."

7  Q.  So what was this conversation in relation to?

8  A.  The trip and dates.

9  Q.  Mr. Blight, which conversation is from you -- which of

10  these text messages are from you?  There's a blue on the left

11  hand and there's green on the right hand.  If you could tell us

12  which one.

13  A.  The blue.

14  Q.  The blue is from you.

15          And who is the green?

16  A.  That's Mr. Issa.

17  Q.  Now, these messages, when you sent them, did you send them

18  at the direction of law enforcement?

19  A.  Yes.

20  Q.  Directing your attention to June 1 of 2016, did there come

21  a time when you met Mr. Issa in person once again?

22  A.  Yes.

23  Q.  Could you look in your binder at Government Exhibit 256.

24          If we could publish Government Exhibit 256.

25          Mr. Blight, on the left-hand side, again, there's blue

1  and on the right-hand side there's green.  Is one of these you?

2  A.  Yes, I'm the blue.

3  Q.  And who is the green?

4  A.  That's Mr. Issa.

5  Q.  Could you read the top message, please.

6  A.  "Just reaching out to see if we're still on for today."

7  Q.  Why did you send that message?

8  A.  Because that's the day that Mr. Issa verified that he would

9  be in town.

10  Q.  Did you send these messages at the direction of law

11  enforcement?

12  A.  Yes.

13  Q.  Did you arrange to meet up with Mr. Issa that day?

14  A.  Yes.

15  Q.  Did you suggest a particular place?

16  A.  Yes.

17  Q.  Is that where you ultimately met Mr. Issa?

18  A.  No.

19  Q.  Where did you meet Mr. Issa?

20  A.  We changed the location to Kabuki.  It's a sushi

21  steakhouse.

22  Q.  What did you do at that sushi steakhouse?

23  A.  We met, ate and drank and talked.

24  Q.  About how long did that dinner last?

25  A.  It was a few hours.

IC4HIss6                    Blight - Direct

1   Q.  Did you have that dinner at the direction of law

2   enforcement?

3   A.  Yes.

4   Q.  Was that dinner recorded?

5   A.  No.

6   Q.  Do you know why it was not recorded?

7   A.  There wasn't enough time to have law enforcement get me a

8   recording device.

9   Q.  Would you describe generally what happened at that dinner.

10  A.  Generally, Tony talked about doing more work for us, doing

11  work.  He talked about my retirement and my pay.  Pretty much

12  saying that it wasn't a whole lot of money, especially with

13  everything that I had going on, and he made references into --

14  he kind of animated what he was doing with chopsticks and

15  saying I'm going in one direction, and if I continue in that

16  direction, I'm gonna fall off the -- well, he asked me what's

17  going to happen?  And I said, Well, I fall off the table.  And

18  he says if you take baby steps and turn that chopstick a little

19  bit, turn your direction, you know, what's going to happen

20  here?  And I wasn't gonna -- the chopstick wasn't gonna fall,

21  you know, he said in reference to that being baby steps that I

22  should take to gain more wealth and to be more prosperous.

23  That was used again.  He said that a lot.

24  Q.  Did you further discuss your trip to New York?

25  A.  Yes.

IC4HIss6                         Blight - Direct

1   Q.   Who paid for that dinner?

2   A.   Mr. Issa did.

3   Q.   Did you offer to pay for that dinner?

4   A.   I did.  I actually reached in my pocket to grab -- I got a

5   money clip, and Mr. Issa insisted, "No, no, don't worry about

6   that.  I got this."  I said, "Well, at least let me take care

7   of the tip."  At that point he was already dealing with the

8   bill.  He says, "No, I got this.  Don't worry about it.  We're

9   good," you know, and he paid for it.

10          MS. HANFT:  Your Honor, at this time I'd like to ask

11  the Court to read a stipulation into the record.  It's

12  Government Exhibit 4007.

13          THE COURT:  It's hereby stipulated and agreed that:

14          1.  If called as a witness at trial, a custodian of

15  records from Capital One Bank U.S.A., NA, would testify that

16  Government Exhibits 551A through 551C, 552 through 556, 3501

17  through 3502, 3504 through 3515, including all parts and

18  subdivisions thereof, are true and correct copies of records of

19  Capital One regarding an account opened and maintained at

20  Capital One; that the original records were at all times made

21  at or near the time, by or from information transmitted by a

22  person with knowledge of the matters set forth in the records;

23  that they were kept in the ordinary course of Capital One's

24  regularly conducted business activity; and that it was the

25  regular practice of that business activity to make the records.

1          2.  If called as a witness at trial, a custodian from

2     the United States Postal Service would testify that 1060, 2000

3     through 2072, including all parts and subdivisions thereof, are

4     true and correct copies of records of the USPS; that the

5     original records were all made at or near the time by or from

6     information transmitted by a person with knowledge of the

7     matters set forth in the records; that they were kept in the

8     ordinary course of the USPS's regularly conducted business

9     activity; and that it was the regular practice of that business

10    activity to make the records.

11         3.  If called as a witness at trial, a custodian of

12    records from Safeway Tire and Auto Inc. would testify that

13    Government Exhibits 1061 through 1067, including all parts and

14    subdivisions thereof, are true and correct copies of records of

15    Safeway; that the original records were all made at or near the

16    time by or from information transmitted by a person with

17    knowledge of the matters set forth in the records; that they

18    were kept in the ordinary course of Safeway's regularly

19    conducted business activity; and that it was the regular

20    practice of that business activity to make the records.

21         It is therefore stipulated and agreed that this

22    stipulation, which is Government Exhibit 4007, and Government

23    Exhibits 551A through C, 552 through 556, 1060, 1061 through

24    1067, 2000 through 2072, 3501 through 3502 and 3504 through

25    3515 may be and hereby are received into evidence as government

IC4HIss6                          Blight - Direct

1    exhibits at trial.

2              MS. HANFT:  Thank you, your Honor.

3              (Government's Exhibits 4007, 551A through 551C, 552

4    through 556, 1060, 1061 through 1067, 2000 through 2072, 3501

5    through 3502, and 3504 through 3515 received in evidence)

6              MS. HANFT:  Ms. Geier, could we publish Government

7    Exhibit 551A, and on the upper right-hand column, if you could

8    just zoom in on what I think is No. 45.  You could just get a

9    little bit closer to No. 45.

10             Thank you.  We could take that down now.

11   BY MS. HANFT:

12   Q.  Mr. Blight, you've mentioned certain billing issues you had

13   with Mr. Issa's companies.  Which companies, again, did you

14   state that you had billing issues with?

15   A.  That was Safeway Tire and Auto and Duploy Tow.

16   Q.  If you could take a look at Government Exhibit 1061, which

17   is now in evidence.

18             If we could publish Government Exhibit 1061.

19             What is this document, Mr. Blight?

20   A.  That is an invoice charged to the Dearborn vehicle

21   maintenance facility from Safeway Tire and Auto.

22   Q.  And in your capacity as VMF manager in Dearborn, did you

23   receive this invoice?

24   A.  Yes.

25   Q.  Now, what type of vehicle is this an invoice for?

1    A.   This is what the postal service calls an LLV, a long life

2    vehicle.   It's a pickup truck, rolling chassis with a

3    customized postal body on it, customized for delivery.

4    Q.   When was this vehicle brought in?

5    A.   This was brought in on June 30.

6    Q.   What kind of service was it brought in for?

7    A.   That would be a preventive maintenance inspection, PMI, or

8    what we call SEs as well, scheduled maintenance.

9    Q.   Where is that reflected on Government Exhibit 1061?

10   A.   That would be on the right-hand side of the document on the

11   first line item.

12   Q.   So that first line item where it says "PMI" indicates that

13   the vehicle was brought in for a PMI?

14   A.   Yes.

15   Q.   I'd like to turn your attention to Government Exhibit 1060.

16   What is Government Exhibit 1060?

17   A.   That's a form the postal service uses, VMFs in particular.

18   It's a checklist of the scheduled maintenance or the preventive

19   maintenance inspection for that type of vehicle.

20   Q.   And these items listed, what are they?   Why are these items

21   listed?

22   A.   Well, it's a checklist.   It's to help and document any

23   problems that the inspector or the technician, the mechanic,

24   would see on the vehicle.

25         MS. HANFT:   If we could highlight line 35.   Highlight

IC4HIss6                      Blight - Direct

1   line 35 specifically, please.

2   Q.  Mr. Blight, could you read line 35.

3   A.  35.  "Change oil, filter, and lubricate."

4   Q.  What does that process entail?

5   A.  That entails changing the oil in the engine, the filter for

6   the oil on the engine, and to lubricate the vehicle at

7   lubrication points.

8   Q.  I'm going to direct you back to Government Exhibit 1061.

9           Directing your attention to about the fourth line down

10  on the right-hand side where it says "Doors," could you read

11  that entry.

12  A.  "Doors.  Lubricate door tracks, rollers, hinges, and

13  locks."

14  Q.  What does that entail?

15  A.  That is part of the PMI.  That's included in the ERT time

16  of the oil, filter, and lubrication line.

17  Q.  So does this entry, lubricate door tracks, rollers, hinges,

18  and locks differ from the entry to the previous Government

19  Exhibit 1060 that we looked at?

20  A.  No.

21  Q.  Now, sticking with Government Exhibit 1061, but zoom back

22  out and look at the last item on the right-hand side of the

23  first page.  Highlight the very last item.

24  A.  That would be interior/exterior wash, wash/clean underneath

25  interior and exterior of vehicle.

1           MS. HANFT:  Now, if we could toggle back to Government

2    Exhibit 1060 and highlight line 12, please.

3    Q.  Would you read that, Mr. Blight.

4    A.  It's "clean inside and out."

5    Q.  Is there a difference between that process and what we

6    previously looked at, interior/exterior wash?

7    A.  No, that's part of the checklist for the PMI.  It's

8    something that should be included with the ERT time of the PMI

9    of the vehicle.

10   Q.  So turning back to Government Exhibit 1060 -- sorry, 1061,

11   is there a charge for the PMI?

12   A.  Yes.

13   Q.  And what is that charge?

14   A.  It's $213.30.

15   Q.  Is there a charge in addition for doors that includes

16   lubricate door tracks?

17   A.  There is on this invoice, yes.

18   Q.  And similarly at the bottom, interior/exterior wash, was

19   there a charge listed for that as well?

20   A.  There is.

21   Q.  Should those itemized charges be included if a PMI was

22   performed on this vehicle?

23   A.  They should be included in that 2.7 PMI hours.

24   Q.  I'm going to ask you to turn to Government Exhibit 1062,

25   which is also in evidence.

1            Is this an invoice that you reviewed in your capacity

2    as Dearborn VMF manager?

3    A.  Yes, it is.

4    Q.  When was this vehicle brought in?

5    A.  That was July 6 of 2016.

6    Q.  What type of vehicle is it?

7    A.  That is the same vehicle, LLV, long life vehicle.

8    Q.  And what type of service was this vehicle brought in for?

9    A.  That was brought in for a PMI, or preventive maintenance

10   inspection, as well.

11   Q.  So directing your attention to the fourth line down, doors.

12   Again, could you read that entry.

13   A.  "Doors.  Lubricate door tracks, rollers, hinges, and

14   locks."

15   Q.  So going back again to Government Exhibit 1060, which you

16   described as the PMI sheet line 35, lubricate in line 35, is

17   there a difference between that and the entry we just looked

18   at?

19   A.  No.

20   Q.  So if this vehicle in Government Exhibit 1062 was brought

21   in for a PMI, should there have been an additional charge

22   listed for lubricate?

23   A.  No.

24   Q.  And if we can also direct your attention to the very bottom

25   on the right-hand side of 1062.  Again under interior/exterior

IC4HIss6                    Blight - Direct

1    wash, could you read that.

2    A.   "Exterior/exterior wash.  Wash/clean underneath interior

3    and exterior of vehicle."

4    Q.   What does that process entail again?

5    A.   That process is washing the vehicle inside and out.  It's

6    part of the PMI.

7    Q.   Turning back again to line 12 of Government Exhibit 1060,

8    is there a difference between the wash we just read, you just

9    read aloud for us, and No. 12, clean inside and out?

10   A.   No difference.

11   Q.   So should that have been listed as an additional charge if

12   the vehicle was brought in for a PMI?

13   A.   No.

14        MS. HANFT:  I'm going to ask to turn to Government

15   Exhibit 1063, and we can keep 1060 up as well.

16   Q.   Is Government Exhibit 1063 a document that you received in

17   your capacity as Dearborn VMF manager?

18   A.   Yes.

19   Q.   What kind of vehicle is this?

20   A.   That is a flex fuel vehicle, FFE.  That is an Explorer type

21   of vehicle, rolling chassis with, again, a customized postal

22   body made for carriers.

23   Q.   When was this vehicle brought in?

24   A.   That was brought in July 21 of 2016.

25   Q.   What service was it brought in for?

IC4HIss6                         Blight - Direct

1    A.   Preventive maintenance inspection.

2    Q.   I'm going to again direct your attention to about the

3    fourth line down on the right-hand side.  Would you read the

4    entry under "Doors."

5    A.   "Lubricate door tracks, rollers, hinges, and locks."

6    Q.   If we could toggle back to Government Exhibit 1060,

7    line 35, could you read line 35.

8    A.   "Change oil, filter, and lubricate."

9    Q.   Is there a different between the lubricate listed in

10   line 35 and the lubricate listed in Government Exhibit 1063

11   under "Doors"?

12   A.   No.

13   Q.   If the vehicle was brought in for PMI, should that have

14   been listed as a separate charge?

15   A.   It should not have.

16   Q.   Let's go to the bottom of Government Exhibit 1063.  Would

17   you read interior/exterior wash.

18   A.   "Wash/clean interior and exterior of vehicle."

19   Q.   Flipping back to Government Exhibit 1060, line 12, again

20   line 12, could you read that.

21   A.   "Clean inside and out."

22   Q.   Is there a difference between that and the

23   interior/exterior wash that's on Government Exhibit 1063?

24   A.   No.

25   Q.   So if the vehicle was brought in for a PMI, should there

IC4HIss6                          Blight - Direct

1   have been an additional charge for interior/exterior wash?

2   A.  There should not have.

3          MS. HANFT:  Could we turn to Government Exhibit 1064

4   and keep up Government Exhibit 1060.

5   Q.  Mr. Blight, is this another invoice that you received in

6   your capacity as Dearborn VMF manager?

7   A.  Yes, it is.

8   Q.  What kind of vehicle does this relate to?

9   A.  That is a long life vehicle, LLV.

10  Q.  And when was this vehicle brought in?

11  A.  That was brought in August 19, 2016.

12  Q.  What service was it brought in for?

13  A.  That was a preventive maintenance inspection as well.

14  Q.  Turning to a few lines below where it says "PMI," can you

15  read that entry that says "Doors."

16  A.  "Lubricate door tracks, rollers, hinges, and locks."

17  Q.  If we could zoom back out and stick with this document and

18  just go to the very bottom where it says "interior/exterior

19  wash" to save some time.  If you could read that entry.

20  A.  "Wash/clean interior and exterior of vehicle."

21  Q.  So toggling back to Government Exhibit 1060, line 35,

22  "change oil, filter, and lubricate," is there any difference

23  between that lubricate and the lubricate under "Doors" in

24  Government Exhibit 1064?

25  A.  No.

IC4HIss6                        Blight - Direct

1   Q.  And on line 12 of Government Exhibit 1060, clean

2   inside/out, is there any difference between that and the

3   interior/exterior/wash entry we just looked at in Government

4   Exhibit 1064?

5   A.  No, no difference.

6   Q.  As to those charges, if the vehicle was brought in for a

7   PMI, should they have been listed in addition?

8   A.  No, they shouldn't have.

9   Q.  Should they have been charged?

10  A.  They should not have been charged.

11  Q.  Turning to Government Exhibit 1065, is this another invoice

12  you received as VMF manager?

13  A.  Yes, it is.

14  Q.  What kind of vehicle was this an invoice for?

15  A.  That is an LLV as well.

16  Q.  And when was the vehicle brought in?

17  A.  That was August 19 of 2016.

18  Q.  What type of service was it brought in for?

19  A.  Preventive maintenance inspection.

20  Q.  Let's just take a moment here to look at the fourth line

21  down, doors.  Can you read that.

22  A.  "Lubricate door tracks, rollers, hinges, and locks."

23  Q.  Zooming back out, the bottom right-hand corner, can you

24  read interior/exterior wash.

25  A.  "Wash/clean underneath interior and exterior of vehicle."

1   Q.  And these two charges that we just read in Government

2   Exhibit 1065, is there any difference between those entries and

3   the entry No. 35 in Government Exhibit 1060 and line 12 of

4   Government Exhibit 1060?  I'm combining both just to save time.

5   A.  No difference.

6   Q.  Should those charges have been charged separately if the

7   vehicle was brought in for a PMI and a PMI was performed?

8   A.  No, they shouldn't have.

9   Q.  Could we turn to Government Exhibit 1066.

10          Did you receive this invoice from Safeway in your

11  capacity as VMF manager in Dearborn?

12  A.  Yes.

13  Q.  What kind of vehicle was this an invoice for?

14  A.  That is a flex fuel vehicle, FFE.

15  Q.  Can you remind us what a flex fuel vehicle is.

16  A.  It is a -- an Explorer drivetrain or rolling chassis with a

17  customized mail carrier body on it.  It's for delivering mail.

18  Q.  What type of service was this vehicle brought in for?

19  A.  It's preventive maintenance inspection.

20  Q.  Do you see the charge under "Doors"?  Is there a charge

21  again for lubricate door tracks, rollers, hinges, and locks?

22  A.  Yes.

23  Q.  Do you also see a charge for interior/exterior/wash?

24  A.  Yes.

25  Q.  Are those charges reflected in the PMI checklist at

IC4HIss6                         Blight - Direct

1    Government Exhibit 1060?

2    A.   They are.

3    Q.   Is that a line 35 and line 12?

4    A.   And 12, yes.

5    Q.   So in Government Exhibit 1066, if the vehicle listed there

6    was brought in for a PMI, should those two charges have also

7    been charged if a PMI was performed?

8    A.   No, they shouldn't have.

9    Q.   Finally, I'm just going to ask you to take a look at

10   Government Exhibit 1067.

11            Did you receive this invoice in your capacity as VMF

12   manager in Dearborn?

13   A.   Yes.

14   Q.   What kind of vehicle is this?

15   A.   That is a flex fuel vehicle, FFE.

16   Q.   When did it come in?

17   A.   That came in -- let me see the date -- on August 17, 2016.

18   Q.   And what service was it brought in for?

19   A.   Preventive maintenance inspection.

20   Q.   Turning to the fourth line down, doors, do you see again

21   the lubricate door tracks, rollers, hinges, and locks entry?

22   A.   Yes.

23   Q.   And almost at the bottom, interior/exterior wash,

24   wash/clean interior/exterior of vehicle, do you see that entry?

25   A.   Yes.

1    Q.  Are both of those entries included in the PMI checklist at

2    Government 1060?

3    A.  Yes, they are.

4    Q.  So should the vehicle in Government Exhibit 1067, if it was

5    brought in for a PMI to be performed, should those additional

6    charges have been listed and charged?

7    A.  They should not have.

8    Q.  Mr. Blight, were these duplicate charges often on bills

9    your VMF received from Safeway?

10   A.  Can you state the question again.

11   Q.  Were these duplicate charges often in the invoices you

12   received from Safeway?

13             MR. BRAFMAN:  Objection as to form.

14             THE COURT:  The objection's sustained.

15   Q.  Mr. Blight, you mentioned before having duplicate billing

16   issues?

17   A.  Yes.

18   Q.  What were you referring to?

19   A.  Well, that's one of them.

20             THE COURT:  Well, no, no.  What does that mean,

21   duplicate billing issues?

22   Q.  When you referred to --

23             THE COURT:  What do you mean by that?  I'm asking the

24   question now.  What do you mean by that, duplicate billing

25   issues?

1              THE WITNESS:  Well, where there's a charge for a

2     certain repair or task that was done on a vehicle and then on

3     the same bill, further down in another charge, it may be the

4     labor was doubled because the labor was already performed in a

5     preventive maintenance inspection in the first place.  So then

6     there's another charge for it on the bill as well, pieces of

7     it, a part of that charge is recharged.

8              THE COURT:  Double billed?

9              THE WITNESS:  Double billed.

10             THE COURT:  Thank you.

11    BY MS. HANFT:

12    Q.  In the invoices that we just looked at, were those the only

13    examples of double billing or are there others?

14    A.  There were others.

15    Q.  Did you mention these problems to Mr. Issa?

16    A.  Yes.

17    Q.  We're going to move to a new topic now.

18             After the June 1st meal you described a few moments

19    ago, did you communicate with Mr. Issa?

20    A.  Yes.

21    Q.  I'm going to show you what's been marked as Government

22    Exhibit 257.

23             Actually, I believe this is in evidence.  So if we

24    could publish Government Exhibit 257.

25             What is this, Mr. Blight?

IC4HIss6                         Blight - Direct

1    A.   Those are -- it's an email -- or, I'm sorry, text messages.

2    Q.   And in this top message, first of all, what's the date on

3    that message?

4    A.   June 2 of 2016.

5    Q.   Is that a message you sent?

6    A.   I sent it, yes.

7    Q.   Would you read it, please.

8    A.   "Good morning Tony.  I was wondering if your new manager

9    can come by the Dearborn VMF to see where we're located and

10   talk about some services we need.  Car washes at some of our

11   offices as well."

12   Q.   Why did you send that text message?

13   A.   I sent it June 2.

14   Q.   Why did you send it?

15   A.   Oh, why?  To establish and get work going with Tony Issa's

16   shop.

17   Q.   If we could turn to the third text message, could you read

18   that one out loud.

19   A.   "I just talked to him.  He said he's going to email you.

20   He is stopping by this afternoon.  Looking to take some of

21   those baby steps."

22   Q.   When you said "looking to take some of those baby steps,"

23   what were you referring to?

24   A.   I was referring to what Mr. Issa explained to me the day

25   before at the dinner.

IC4HIss6                          Blight - Direct

1    Q.  And in this fourth message, could you read that aloud.

2    A.  "Great.  I'm glad to hear that.  Welcome to the world of

3    purposeful living."

4    Q.  Did you understand what that message meant when you

5    received it?

6    A.  Yes.

7    Q.  What did you believe it meant?

8    A.  That --

9            MR. BRAFMAN:  Objection, your Honor.

10           THE COURT:  The question is did you have an

11   understanding of that message?

12           THE WITNESS:  I did.

13           THE COURT:  What did you understand the message to

14   mean?

15           THE WITNESS:  That Tony was offering me money or --

16   that he was offering pretty much what I would call pay for

17   play.

18   BY MS. HANFT:

19   Q.  Mr. Blight, the word "purposeful living," had you heard

20   that before?

21   A.  Yes.

22   Q.  When had you heard that?

23   A.  Numerous different times.

24   Q.  If we could turn to Government Exhibit 258.

25           MR. BRAFMAN:  258?

1              MS. HANFT:  258.

2     Q.  Now, Mr. Blight, I'm not going to ask you to read the whole

3     message aloud, but did there come a time when you ultimately

4     told Mr. Issa that your daughter was not changing colleges?

5     A.  Yes.

6     Q.  Did you ultimately provide Mr. Issa with dates that you

7     would come to New York anyway?

8     A.  Yes.

9     Q.  If we could zoom in on the third message, would you read

10    that one aloud, please.

11    A.  It says, "Cool.  I am solid for August 9, 10, and 11.  Let

12    me know if you're good for those dates, and I'll look into

13    booking a hotel."

14    Q.  When you said "I'll look into booking a hotel," were you

15    expecting to book the hotel yourself?

16    A.  Yes.

17    Q.  Now I'm going to direct your attention to July of 2016.

18    Did there come a time when you met Mr. Issa in person once

19    again?

20    A.  Yes.

21    Q.  Can you describe how that came about.

22    A.  Well, Tony got ahold of me and said that he wanted to talk

23    again.  He was coming to Detroit, and he wanted to meet and

24    have dinner.

25    Q.  I'm going to show you what's in evidence as Government

1   Exhibit 259.  Just take a look at this, Mr. Blight.

2           Do you recognize these messages?

3   A.  Yes.

4   Q.  Were these messages that you exchanged with Mr. Issa?

5   A.  Yes, they are.

6   Q.  When Mr. Issa said, "I'm getting there Monday and will stay

7   a couple days," did you know what he was referring to when he

8   said "there"?

9   A.  In the Detroit area.

10          MS. HANFT:  If we could zoom back out.

11  Q.  In the third text message -- I'm sorry, the fourth text

12  message from the top, could you read that one aloud, please.

13  A.  "Monday after work looks good.  You are staying -- are you

14  staying closer to Detroit, Dearborn, Troy?  I'll look for a

15  good place to go."

16  Q.  Then can you read the response.

17  A.  "Yes.  Get a good place.  Does not matter where as long as

18  it's good."

19  Q.  Finally, the last response.

20  A.  "OK."

21          MS. HANFT:  Could we zoom back out, please.

22  Q.  I'd like to show you Government Exhibit 260.  Would you

23  read this top message aloud, please.

24  A.  "Good morning Tony.  I hope your travels are good.  Roast

25  Steakhouse is in the Westin Hotel, 1128 Washington Boulevard.

IC4HIss6                         Blight - Direct

1  Downtown Detroit is a great place for food and drink and easy

2  to get to and valet.  I hope to meet you there today around

3  5:30, 6:00.  Let me know."

4            MS. HANFT:  Your Honor, I think this may be a place

5  that makes sense to stop for the day if the Court is so

6  inclined.

7            THE COURT:  I'm not.  Keep going.

8  Q.  Did you ultimately meet Mr. Issa at that location?

9  A.  Yes.

10 Q.  Was this meeting with him at the direction of law

11 enforcement?

12 A.  Yes.

13 Q.  And were you recording the meal?

14 A.  Yes.

15           MS. HANFT:  Your Honor, I would ask that the Court

16 read the portion of the stipulation that was Government

17 Exhibit 4000 --

18           THE COURT:  What paragraphs do you want me to read?

19           MS. HANFT:  Your Honor, I believe it's 13.  I'm just

20 looking.

21           THE COURT:  Can I have that one back, please, or do I

22 have that one back?

23           THE LAW CLERK:  What is that one?

24           MS. HANFT:  It's Government Exhibit 4003.

25           THE COURT:  Paragraph 13?

IC4HIss6                        Blight - Direct

1          MS. HANFT:  I think so, your Honor.

2          THE COURT:  Well, you think so.

3          MS. HANFT:  I'm sorry.  I'm just getting a copy from

4     my colleague.  Looking at the paragraph that concerns

5     Government Exhibits 307.

6          THE COURT:  Yes, paragraph 13 --

7          MS. HANFT:  Thank you, your Honor.

8          THE COURT:  -- and 14.

9          Government Exhibits 307A, B, C, D, E, F are true and

10    accurate copies of an audio recording of a meeting that took

11    place on or about July 11, 2016, in Detroit, Michigan, between

12    Ibrahim Issa, the defendant, and Jeffrey Blight, and that was

13    consensually recorded by Jeffrey Blight at the direction of law

14    enforcement.

15         Paragraph 14 says that those exhibits with a "T" after

16    them are true and accurate transcripts of the recorded

17    conversation contained in the actual audio recordings.  The

18    identities of the participants' voice attributions, dates, and

19    times reflected on the transcripts are accurate.

20         MS. HANFT:  Thank you, your Honor.

21         Ms. Geier, could we play Government Exhibit 307A,

22    which is from this July 11 meeting.

23         (Audio played)

24         MS. HANFT:  If we could turn back to the beginning of

25    this transcript.

1   Q.  Mr. Blight, was that a portion of the conversation you had

2   with Mr. Issa on July 11?

3   A.  Yes.

4   Q.  On the very first line, "Listen quickly before he comes

5   back," did you know who he referred to?

6   A.  Yes.  There was a gentleman sitting next to Mr. Issa that

7   he was friendly with that he was talking to prior to me

8   arriving to the restaurant.

9   Q.  If we could take a look at line 3, starting with "OK,"

10  through line 4, says, "OK.  I don't want you to spend any money

11  coming to New York."

12          Had you ever asked Mr. Issa to spend any money for you

13  to come to New York?

14  A.  No.

15  Q.  Then at the next line, "But at the same time, I don't want

16  to get you in trouble."

17          Did you know what that referred to?

18  A.  Yes.

19  Q.  What did you understand it to refer to?

20  A.  That it's illegal.  It's --

21          MR. BRAFMAN:  Objection, your Honor.

22          THE COURT:  The objection's sustained.

23          Ladies and gentlemen, I'll talk to you about what's

24  legal and what's illegal.

25  Q.  In line 8 through line 9, "Is there any way you can put on

1   your card, and I can take care of it over there?"

2              Did you understand what "over there" meant?

3   A.  Yes.

4   Q.  And where was that?

5   A.  New York.

6              MS. HANFT:  If we could go to the next page.  I'm

7   sorry.  I think it's actually the bottom of the previous page,

8   Ms. Geier.

9   Q.  Where Mr. Issa said, "Don't go paying it in one shot," did

10  you know what that referred to, Mr. Blight?

11  A.  Yes.

12  Q.  What did you believe it referred to?

13  A.  To pay it in portions.  To not pay it all at one time.  To

14  make it -- make payments on that.

15             MS. HANFT:  Ms. Geier, could we please play Government

16  Exhibit 307B from the July 11 dinner.

17             (Audio played)

18             MS. HANFT:  If we could turn back to the beginning of

19  this clip.

20  Q.  Mr. Blight, there's a reference to a Jim and then to Paul

21  Filip, both on line 20 and 21.  Who are those people, just

22  generally speaking?

23  A.  Paul Filip is my manager.  He's the manager over all the

24  VMFs in Michigan, and Jim is currently the manager of the --

25  and at that time he was the manager of the Detroit vehicle

1    maintenance facility.

2              MS. HANFT:  If we could turn, Ms. Geier, to the next

3    page of the transcript.

4    Q.  When Mr. Issa talked about people leaving government,

5    line 5, did you understand what leaving government referred to?

6    A.  Yes.

7    Q.  What did you understand it to refer to?

8    A.  That people leave the government, government jobs such as

9    mine, to get set up, to get more money.

10             MS. HANFT:  If we could zoom back out, please, lines 8

11   through 10.

12   Q.  Did you understand what Mr. Issa was saying when he said,

13   "You're still new to the game"?

14   A.  I did, yes.

15   Q.  What did you understand it to refer to?

16   A.  That I was newer to that position, that job as a manager.

17   Q.  That's manager at the Dearborn VMF?

18   A.  Dearborn vehicle maintenance facility.

19             MS. HANFT:  And if we could just zoom back out,

20   please, and turn to line 13.

21   Q.  Where you said, "Oh, you got to protect your cash cow,"

22   what were you referring to there?

23   A.  Well, protecting the postal service, protecting the

24   fiduciary responsibility of the post office.

25             MS. HANFT:  Ms. Geier, could we play Government

IC4HIss6                          Blight - Direct

1    Exhibit 307C.

2              (Audio played)

3              MS. HANFT:  Ms. Geier, could we please play Government

4    Exhibit 307D.

5              (Audio played)

6              MS. HANFT:  And can we please play Government

7    Exhibit 307E.

8              (Audio played)

9    BY MS. HANFT:

10   Q.  Mr. Blight, at the beginning of this clip, we heard

11   Mr. Issa referring to being a federal agent wired right now.

12   What, if anything, did he do while he was making that

13   statement?

14   A.  Well, he asked me to look in his eyes, you know, look at

15   him, and he actually unbuttoned his shirt and opened it up to

16   show me he wasn't wearing a listening device.

17   Q.  Had you brought up federal agents prior to that in the

18   conversation?

19   A.  No.

20             MS. HANFT:  Ms. Geier if we could please play

21   Government Exhibit 307F.

22             (Audio played)

23   Q.  About how long did that July 11 dinner last, Mr. Blight?

24   A.  That was a few hours.

25             (Continued on next page)

IC45iss7                    Blight - direct

BY MS. HANFT:

Q.  Your Honor, Government Exhibit 551B is already in evidence.

        Ms. Geier, can we publish it?  At the very bottom of
the left-hand side, like 52.

        Mr. Blight, could you read line 52?

A.  The 12, it says July, Roast Detroit, Michigan, $527.32.

Q.  Can we zoom back out, please?  Did there come a time when
you finalized plans to come --

        THE COURT:  Are we done with the meeting?

        MS. HANFT:  We are, your Honor.

        THE COURT:  We are done with that meeting.  That's a
good time to break for the day and said, sadly, for tomorrow.

        I will see you on Thursday morning.  9:30.  Don't
discuss the case.  Keep an open mind.

        (Continued on next page)

IC45iss7                          Blight - direct

1              (Jury not present)

2              THE COURT:  Sir, you may step down.  Thank you.

3              (witness steps down)

4              THE COURT:  Leave the courtroom, actually.  No offense

5    but you can leave.

6              Okay.  Who is up after this guy?  Not that he will be

7    any time soon.

8              MS. HANFT:  Mr. Ismael Velez, your Honor, is the next

9    witness.

10             MR. BRAFMAN:  Could we have just -- I wanted to ask

11   her how much longer the direct is.

12             THE COURT:  Yes; how much longer is the direct?

13             MS. HANFT:  Your Honor, I think, I would estimate it

14   is probably only about 20 to 30 more minutes.

15             THE COURT:  Good.

16             I am looking forward to the cross.

17             MR. BRAFMAN:  Me too, Judge.

18             THE COURT:  Okay.

19             (Adjourned to Thursday, December 6, 2018 at 9:30 a.m.)

20

21

22

23

24

25

```
                        INDEX OF EXAMINATION

Examination of:                                 Page

Now

DELORES WATERS

Direct By Mr. Wirshba  . . . . . . . . . . . .51

Cross By Mr. Brafman . . . . . . . . . . . . .95

JEFFREY BLIGHT

Direct By Ms. Hanft  . . . . . . . . . . . . 162

                     GOVERNMENT EXHIBITS

Exhibit No.                                 Received

 4004    . . . . . . . . . . . . . . . . . . .51

 103    . . . . . . . . . . . . . . . . . . .59

 120    . . . . . . . . . . . . . . . . . . .64

 104    . . . . . . . . . . . . . . . . . . .68

 105A through 105J  . . . . . . . . . . . .73

 110    . . . . . . . . . . . . . . . . . . .79

 117    . . . . . . . . . . . . . . . . . . .85

 118    . . . . . . . . . . . . . . . . . . .86

 113    . . . . . . . . . . . . . . . . . . .88

 115    . . . . . . . . . . . . . . . . . . .89

 116    . . . . . . . . . . . . . . . . . . .90

 4002    . . . . . . . . . . . . . . . . . . .92

 4006, 252, 254, 255, 256, 257, 358, . . . . . 172

          359, 360, 418

 250AA, 250BB, 250C, 250CC, 250EE, . . . . . . 173
```

```
1                250FF, 250GG, 250J, 250K,

2                250M, 250N, 250O, 250P, 250S,

3                250T, 250U, 250V, 250W, 250X,

4                250Y, 250Z, 251B, 251C, 251D,

5                251E, 251F 251G 252, 254, 255,

6                256, 257, 258, 259, 260, 418

7      253   . . . . . . . . . . . . . . . . . 179

8      306A, 306B, 306C, 306D, 306E, 306F, . . . . . 183

9                306G, 306H, 306A-T, 306B-T,

10               306C-T, 306D-T, 306E-T,

11               306F-T, 306G-T, 306H-T

12     4007, 551A through 551C, 552 through  . . . . 203

13               556, 1060, 1061 through 1067,

14               2000 through 2072, 3501

15               through 3502, and 3504 through

16               3515
```