IC6HISS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                      17 Cr. 74 (CM)

IBRAHIM ISSA,

                                Trial
        Defendant.

------------------------------x

                               New York, N.Y.
                               December 6, 2018
                               10:00 a.m.

Before:

                HON. COLLEEN McMAHON,

                               Chief District Judge

                    APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
NOAH SOLOWIEJCZYK
ELIZABETH HANFT
KYLE WIRSHBA
     Assistant United States Attorneys

BRAFMAN & ASSOCIATES, P.C.
     Attorneys for Defendant
BY:  BENJAMIN BRAFMAN
     JOSHUA D. KIRSHNER
     STUART GOLD

ALSO PRESENT:   ANTHONY DUBAR, Special agent USPS-OIG
                 GRACE SOTO, Special agent IRS
                 COLLEEN GEIER, Paralegal Specialist USAO
                 PRIYA KUARLALL, Paralegal

IC6HISS1

1              (Trial resumed; jury not present)

2              THE COURT:  Please get the witness.

3              MS. HANFT:  He's on his way, your Honor.

4              MR. BRAFMAN:  Your Honor, would the Court prefer that

5    counsel stands for objections?  I apologize if I haven't up to

6    this point, but --

7              THE COURT:  What I really prefer is that I hear the

8    word "objection" when it's appropriate.

9              MR. BRAFMAN:  I understand.

10             THE COURT:  I don't care whether you do it on your

11   feet or on your derrière.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

IC6HISS1                        Blight - Direct

1           (Jury present)

2           THE COURT:  Good morning, everyone.

3           Come on back up, sir, and take the witness stand.  You

4    are still under oath.

5           MS. HANFT:  May I inquire?

6           THE COURT:  Yes, Ms. Hanft, go ahead.

7    JEFFREY BLIGHT, resumed

8    DIRECT EXAMINATION CONTINUED

9    BY MS. HANFT:

10   Q.  Good morning, Mr. Blight.

11   A.  Good morning.

12   Q.  When we broke on Tuesday, you were telling us about a

13   July 11 meal with Mr. Issa.  Do you recall that?

14   A.  Yes.

15   Q.  By the end of that meal, who did you expect would pay for

16   your trip to New York?

17   A.  Mr. Issa.

18   Q.  And how did you expect he would pay for it?

19   A.  Because he asked me if I could cover the expenses on my

20   credit card and that he would take care of me there, which I

21   assume was in New York.

22   Q.  Did there come a time when you finalized your plans to come

23   to New York?

24   A.  Yes.

25   Q.  Did you do that at the direction of law enforcement?

IC6HISS1                        Blight - Direct

A.  Yes.

            MS. HANFT:  Your Honor, would the Court please read

from the stipulation that's marked as Government Exhibit 4003,

paragraphs 15 and 16.

            THE COURT:  OK, folks.  This portion of the

stipulation states that Government Exhibits 308A through T, B

through T and C through T are true and correct transcripts of

the recorded conversation contained in Government

Exhibits 308A, B, and C respectively.

            I should have started with 15.

            Government Exhibits 308A, B, and C are true and

correct copies of an audio recording of a phone call on about

August 2, 2016, between Ibrahim Issa, the defendant, and

Jeffrey Blight, and it was consensually recorded by Jeffrey

Blight at the direction of law enforcement so that the T

exhibits are the transcripts.  You know that those are not the

real evidence in the case.  The identities of the parties,

voice attributions, dates and times reflected on Government

Exhibits 308A through T, B through T, and C through T are

accurate.  OK.

            MS. HANFT:  Thank you, your Honor.

            Ms. Geier, could you please play Government

Exhibit 308A.

            (Audio played)

BY MS. HANFT:

IC6HISS1                        Blight – Direct

 1   Q.  Mr. Blight, on this transcript where it says "JB," who was

 2   speaking?

 3   A.  Myself, Jeffrey Blight.

 4   Q.  When it says "TI," who was speaking?

 5   A.  Tony Issa.

 6          MS. HANFT:  Ms. Geier, could we play Government

 7   Exhibit 308B.

 8          Your Honor, in an abundance of caution, the government

 9   offers the government exhibits that the Court just read.

10          THE COURT:  They're in.

11          MS. HANFT:  Thank you.

12          (Government's Exhibits 308A, 308B, 308C, 308A-T,

13   308B-T, and 308C-T received in evidence)

14          MS. HANFT:  Ms. Geier, could we play Government

15   Exhibit 308C.

16          (Audio played)

17   BY MS. HANFT:

18   Q.  Mr. Blight, I'll ask you to turn in your binder to

19   Government Exhibit 261.  Tell me if you recognize this

20   document.

21   A.  Yes, I recognize it.

22   Q.  What is the document?

23   A.  That is the itinerary to show the flight information.

24   Q.  The flight information for what?

25   A.  To the trip to New York.

IC6HISS1                        Blight - Direct

1    Q.   Do you recall receiving this itinerary?

2    A.   Yes.

3            MS. HANFT:   The government offers Government

4    Exhibit 261.

5            MR. BRAFMAN:   No objection.

6            THE COURT:   Admitted.

7            (Government's Exhibit 261 received in evidence)

8            MS. HANFT:   Ms. Geier, could we publish Government

9    Exhibit 261.

10   BY MS. HANFT:

11   Q.   Mr. Blight, what does this document reflect?

12   A.   It reflects the time of arrival and departure for August 8

13   arriving and leaving on August 11 and the cost of the flight.

14   Q.   If we could turn to the next page, what was the cost of the

15   flight?

16   A.   The total cost of the flight was $456.18.

17   Q.   How did you pay for this flight?

18   A.   On my credit card.

19   Q.   Did you also book a hotel for your trip to New York?

20   A.   Yes, I did.

21   Q.   Do you recall what hotel?

22   A.   Four Points Sheraton in Queens.

23   Q.   How did you come to pick that hotel?

24   A.   An employee of Mr. Issa's got in contact with me and told

25   me that would be a good hotel to stay.

IC6HISS1                          Blight - Direct

1    Q.  If you could look at Government Exhibit 262 in your binder

2    and tell me if you recognize that.

3    A.  Yes, I do.

4    Q.  What is that document?

5    A.  That's the reservation document to show that I secured the

6    hotel.

7    Q.  Did you receive that document?

8    A.  Yes.

9              MS. HANFT:  The government offers Government

10   Exhibit 262.

11             MR. BRAFMAN:  No objection.

12             THE COURT:  Admitted.

13             (Government's Exhibit 262 received in evidence)

14             MS. HANFT:  Could we please publish Government

15   Exhibit 262.

16   BY MS. HANFT:

17   Q.  Mr. Blight, how did you pay for your hotel?

18   A.  I used my mother's credit card.  My mother paid for it.

19   Q.  Where it says "Customer Name," could you read what it says.

20   A.  Donna D. Blight.

21   Q.  Is that your mother's name?

22   A.  Yes, it is.

23   Q.  If we could turn to the next page.

24             What was the total cost of your hotel, Mr. Blight?

25   A.  The total cost with everything came up to $627.06.

IC6HISS1                          Blight - Direct

1              MS. HANFT:  Could we go to the next page, please.

2        Q.  Is that the total cost up on the screen?

3        A.  It flipped over.  Yes, the -- well, the total per room was

4        537.30, $537.30, and then there was tax and fees along with

5        that.

6        Q.  So is the total what is reflected here at the top of the

7        third page, $627.06?

8        A.  Yes, it is.

9        Q.  Did there come a time when you, in fact, traveled to New

10       York?

11       A.  Yes.

12       Q.  Did you do that at the direction of law enforcement?

13       A.  Yes.

14       Q.  Do you recall what airport you flew into?

15       A.  LaGuardia.

16       Q.  Before this trip, had you ever been to New York City?

17       A.  No.

18       Q.  What happened when you got to LaGuardia Airport?

19       A.  Stephanie, an employee of Mr. Issa's, picked me up, and we

20       went -- on the way to the hotel, we stopped and got something

21       to eat, and then I went to the hotel.

22       Q.  Had you ever met Stephanie before?

23       A.  Yes.

24       Q.  Where had you met her?

25       A.  I met her originally when she worked for Safeway Tire and

IC6HISS1                     Blight - Direct

1   Auto in Detroit.

2   Q.  Now, the next morning, August 9 of 2016, what did you do?

3   A.  The next morning, Stephanie came and picked me up, and we

4   went around New York to a couple tourist spots, sightseeing.

5   Q.  If you could take a look at Government Exhibit 401.  Do you

6   recognize this, Mr. Blight?

7   A.  Yes, I do.

8   Q.  What is this?

9   A.  Well, this is a picture that Stephanie took of me and her.

10  Q.  Does it fairly and accurately depict that scene as you

11  recall it?

12  A.  Yes.

13          MR. BRAFMAN:  I have no objection, your Honor.

14          MS. HANFT:  Government offers Government Exhibit 401.

15          THE COURT:  Admitted.

16          (Government's Exhibit 401 received in evidence)

17          MS. HANFT:  If we could publish Government

18  Exhibit 401.

19  Q.  Mr. Blight, who's the individual on the left of this

20  photograph?

21  A.  That is Stephanie.

22  Q.  And who's the individual on the right?

23  A.  That's me.

24  Q.  Where was this photograph taken?

25  A.  That was on a ferry near the Statue of Liberty.

1   Q.  Did you take a ferry ride with Stephanie that day?

2   A.  Yes.

3   Q.  Who paid for the ferry ride?

4   A.  Stephanie.

5   Q.  Did you offer to pay?

6   A.  Yes, I offered to pay.

7   Q.  What did Stephanie say when you offered to pay?

8   A.  I offered to pay for me and Stephanie.  I again pulled out

9   my money clip.  Stephanie said, "No, no, I got this covered.

10  Tony wanted me to make sure that I got everything covered."

11  Q.  Did you see Mr. Issa that day?

12  A.  Later that day, yes.

13  Q.  What happened later that day when you saw Mr. Issa?

14  A.  When we picked him up, me, Stephanie, and Tony, we went to

15  an Italian restaurant.  It was in Manhattan.

16  Q.  I'm going to ask you to take a look at Government

17  Exhibit 402.  Do you recognize that?

18  A.  Yes, I do.

19  Q.  What is that?

20  A.  That's a picture of me and Tony Issa at the dinner table

21  there at the restaurant.

22  Q.  Does it fairly and accurately depict your dinner at that

23  restaurant with Mr. Issa?

24  A.  Yes.

25          MR. BRAFMAN:  No objection.

IC6HISS1                    Blight - Direct

1          MS. HANFT:  Government offers Government Exhibit 402.

2          THE COURT:  Admitted.

3          (Government's Exhibit 402 received in evidence)

4   BY MS. HANFT:

5   Q.  Mr. Blight, again, who's the individual on the left in this

6   photograph?

7   A.  That's me.

8   Q.  And who's the individual on the right?

9   A.  That's Mr. Issa.

10  Q.  Do you recall who took that picture?

11  A.  Stephanie.

12  Q.  Again, when was this picture taken?

13  A.  That was on August 9.

14          MS. HANFT:  Your Honor, would the Court please read

15  from the stipulation marked as Government Exhibit 4003,

16  paragraph 17 and 18, with the exception, your Honor, I

17  apologize, of Exhibit 309F and 309F-T, which we're not seeking

18  to offer.

19          THE COURT:  I'm crossing them out of the stipulation.

20          MS. HANFT:  Thank you, your Honor.

21          THE COURT:  Government Exhibits 309A, B, C, D, and E

22  are true and correct copies of an audio recording of a meeting

23  that took place on or about August 10, 2016, in New York, New

24  York, between Ibrahim Issa, the defendant, and Jeffrey Blight,

25  and it was consensually recorded by Jeffrey Blight at the

IC6HISS1                         Blight - Direct

1    direction of law enforcement.

2            Government Exhibits 309A through E-T are true and

3    correct transcripts of the recorded conversations contained in

4    Government Exhibits 309A through E respectively, and the

5    identity of the participants, voice attributions, dates and

6    times reflected on Government Exhibits 309A-T through 309E-T

7    are accurate.

8            MS. HANFT:  Thank you, your Honor.

9            Ms. Geier, could we please play Government

10   Exhibit 309A.

11           (Audio played)

12           MS. HANFT:  Ms. Geier, could we please play Government

13   Exhibit 309B.

14           (Audio played)

15           MS. HANFT:  Could we play Government Exhibit 309C,

16   please.

17           (Audio played)

18           MS. HANFT:  Please play Government Exhibit 306D --

19   309D, I apologize.  Thank you.

20           (Audio played)

21   BY MS. HANFT:

22   Q.  Mr. Blight, was this information about your son receiving a

23   B in school true?

24   A.  Yes.

25           MS. HANFT:  Could we please play Government

IC6HISS1                          Blight - Direct

1    Exhibit 309E.

2              (Audio played)

3              MS. HANFT:  Your Honor, could I just clarify for the

4    record again Government Exhibits 309A through E and 309A-T

5    through E-T --

6              THE COURT:  They're in.

7              MS. HANFT:  -- admitted into evidence.

8              Thank you, your Honor.

9              (Government's Exhibits 309A, 309B, 309C, 309D, 309E,

10   309A-T through 309E-T received in evidence)

11   BY MS. HANFT:

12   Q.  Mr. Blight, who paid for that meal at the Italian

13   restaurant?

14   A.  Mr. Issa.

15   Q.  Did you return to your hotel at some point that night?

16   A.  Yes.

17   Q.  What, if anything, did you do when you were back at your

18   hotel?

19   A.  I wrote down the cost of the trip, the plane, and the hotel

20   fare, as Tony requested.

21   Q.  When you say that "Tony requested," what do you mean by

22   that?

23   A.  He asked me to write it down at that dinner.

24   Q.  Now I'm going to direct your attention to the next day,

25   August 10 of 2016.  What happened that day?

1    A.  Stephanie came and picked me up.  We went to various

2    buildings or places that Mr. Issa owned.  They were garages,

3    repair facility garages, and there was a gas station and there

4    was another office that Stephanie referred to as the

5    headquarters, or Tony's headquarters.

6    Q.  Did you see Mr. Issa that day?

7    A.  Later that day.

8    Q.  What happened when you saw him later that day?

9    A.  Well, me and Stephanie were driving.  We picked up

10   Mr. Issa, and then we went to a couple bars, a club, and then

11   later that evening we went to a restaurant in Chinatown.

12   Q.  Whose idea was it to go to those places?

13   A.  Mr. Issa.

14        MS. HANFT:  Your Honor, please read from the

15   stipulation marked Government Exhibit 4003, paragraphs 19 and

16   20.  And again, we'd ask that those exhibits be offered into

17   evidence.

18        THE COURT:  Government Exhibits 310A, B, C, and D are

19   true and correct copies of an audio recording of a meeting that

20   took place on or about August 11, 2016, in New York, New York,

21   between Ibrahim Issa, the defendant, and Jeffrey Blight, and

22   that was consensually recorded by Jeffrey Blight at the

23   direction of law enforcement.

24        Government Exhibits 310A, B, and C-T, and 310D-T are

25   true and accurate transcripts of the recorded conversation

IC6HISS1                        Blight - Direct

1    contained in Government Exhibits 310A through D, the identities

2    of participants, voice attributions, dates, and times reflected

3    on the transcripts are accurate.

4              (Government's Exhibits 310A, 310B, 310C, 310D, 310A-T,

5    310B-T, 310C-T, and 310D-T received in evidence)

6              MS. HANFT:  Thank you, your Honor.

7              Ms. Geier, could we please play Government

8    Exhibit 310D.

9              (Audio played)

10             MS. HANFT:  Would you please play Government

11   Exhibit 310C.

12             (Audio played)

13             MS. HANFT:  Would you please play Government

14   Exhibit 310A.

15             (Audio played)

16             MS. HANFT:  Finally, Government Exhibit 310B, as in

17   boy, please.

18             (Audio played)

19   BY MS. HANFT:

20   Q.  Mr. Blight, you were describing for us that evening going

21   to, I believe you said, a few bars and to a restaurant in

22   Chinatown, is that correct?

23   A.  Yes.

24   Q.  Who paid at those bars?

25   A.  Mr. Issa.

1    Q.   When you got to the restaurant in Chinatown, what did you

2    do?

3    A.   Well, we sat, ate and drank and talked.

4    Q.   At any point during the meal, were you and Mr. Issa alone?

5    A.   Yes.  Stephanie went to the restroom.

6    Q.   When she went to the restroom, what, if anything, did

7    Mr. Issa ask you?

8    A.   He asked if I had written down the cost of the hotel and

9    plane fare.

10   Q.   Had you written it down?

11   A.   Yes, I had.

12   Q.   Could you take a look at Government Exhibit 263.  Do you

13   recognize this?

14   A.   Yes.

15   Q.   What is it?

16   A.   That is a note, notepad piece of paper that was at the

17   hotel that I wrote the information down.

18   Q.   Is that your handwriting?

19   A.   That is my handwriting, yes.

20           MS. HANFT:  Your Honor, the government offers

21   Government Exhibit 263.

22           MR. BRAFMAN:  No objection.

23           THE COURT:  Admitted.

24           (Government's Exhibit 263 received in evidence)

25           MS. HANFT:  Can we publish Government Exhibit 263,

1  please.

2  BY MS. HANFT:

3  Q.  Mr. Blight, next to flight, could you read what it says.

4  A.  It says 456.

5  Q.  Next to hotel?

6  A.  627.

7  Q.  Would you please read the total at the bottom.

8  A.  $1,083.

9  Q.  What does that amount represent?

10 A.  The total cost of the flight and the hotel for that trip to

11 New York.

12 Q.  When you were sitting at this Chinese restaurant, did you

13 have this piece of paper with you?

14 A.  Yes.

15 Q.  Where was this piece of paper?

16 A.  It was in my shirt pocket.

17 Q.  At any point did you give this piece of paper to Mr. Issa?

18 A.  Yes, I did.

19 Q.  When did you do that?

20 A.  That's when Stephanie went to the restaurant, and Mr. Issa

21 asked me if I had written down the cost of the trip, and I told

22 him yes.

23 Q.  What did you do next?

24 A.  I handed him the note.

25 Q.  What happened after you handed him this piece of paper?

IC6HISS1                     Blight - Direct

1    A.  He looked at it and told me he had $2,000 to give me.  He

2    wrapped it in a napkin that was on the table there and reached

3    under the table to hand it to me, motioned down.  I reached

4    down to get it.  He told me to keep it in the napkin, and I put

5    it in my pocket.

6    Q.  What, if anything, did you say after he handed you the

7    $2,000 that you put in your pocket?

8    A.  I said, "That was way more than what the trip cost.  Are

9    you sure?"  And he interrupted me and said, "No, that's fine.

10   Everything's good.  Take it."

11           MS. HANFT:  Your Honor, please read the stipulation

12   marked as Government Exhibit 4008.

13           THE COURT:  It is hereby stipulated and agreed by and

14   between the usual suspects that:

15           1.  Government Exhibit 266 consists of $2,000 in cash

16   wrapped in a napkin provided by Ibrahim Issa to Jeffrey Blight

17   in New York, New York, on or about August 11, 2016.

18           MS. HANFT:  Thank you, your Honor.  We only need that

19   first paragraph.  I apologize.

20           The government offers Government Exhibit 266.

21           MR. BRAFMAN:  No objection.

22           THE COURT:  Admitted.

23           (Government's Exhibit 266 received in evidence)

24           MS. HANFT:  Your Honor, do I have permission to

25   publish to the jury by passing it out?

1          MR. BRAFMAN:  Your Honor.

2          THE COURT:  Can we wait on that?  They know what it

3    is.  Let's just move on, please.

4          MS. HANFT:  Certainly, your Honor.

5    Q.  Mr. Blight, could you take a look at Government

6    Exhibit 264.

7    A.  Yes.

8    Q.  What is that?

9    A.  That is the cash wrapped in the napkin that Mr. Issa handed

10   me.

11   Q.  Is that what it looked like when he handed it to you?

12   A.  Yes.

13         MS. HANFT:  Government offers Government Exhibit 264.

14         MR. BRAFMAN:  No objection.

15         THE COURT:  Admitted.

16         (Government's Exhibit 264 received in evidence)

17   BY MS. HANFT:

18   Q.  After Mr. Issa gave you that $2,000 of cash, what happened?

19   A.  Well, shortly after we left the restaurant, at that point

20   we were walking out, and there's a vestibule when you leave the

21   restaurant there, two doors.  I let Stephanie out first, and I

22   fell behind.  Tony was behind me, and I waited till Stephanie

23   was -- was outside of the door.  And I stepped back and I asked

24   Tony again, "This is way more than what the trip cost.  Are you

25   sure, you know?"  And he stopped me and said, "No, no worries.

IC6HISS1                        Blight - Direct

1   Everything's good."  And we're still in motion and left the

2   restaurant.

3           MS. HANFT:  Your Honor, please read the stipulation

4   marked Government Exhibit 4003, paragraph 21.

5           THE COURT:  If called as a witness, a custodian of

6   records from 69 Bayard Restaurant located at 69 Bayard Street,

7   New York, New York, would testify that Government Exhibit 311

8   is a true and correct copy of excerpts of a video recording

9   made by a security camera located inside of WK Restaurant

10  between on or about August 10, 2016, at approximately

11  11:03 p.m. and on or about August 11, 2016, at approximately

12  12:02 a.m.

13          MS. HANFT:  Thank you, your Honor.

14          Ms. Geier, could we please start playing Government

15  Exhibit 311.

16          (Video played)

17  BY MS. HANFT:

18  Q.  Mr. Blight, could you describe -- first of all, is this the

19  restaurant that you ate dinner at that night?

20  A.  Yes, it is.

21  Q.  Who is the individual in front here?

22  A.  That's Mr. Issa.

23  Q.  How about behind him?

24  A.  That's Stephanie.

25  Q.  And what about the individual behind that her?

IC6HISS1                    Blight - Direct

1   A.   That's me.

2   Q.   Thank you.  We can continue playing.

3             (Video played)

4   Q.   Mr. Blight, what's happening at that moment?

5   A.   That's Stephanie getting up to use the restroom.

6   Q.   Where is Mr. Issa seated?  Could you describe it on the

7   video.

8   A.   OK.  On the left-hand side of the video, he's sitting with

9   his back turned to the camera on the left of the table.

10  Q.   And where are you sitting?

11  A.   I'm sitting at the same table on the opposite side to the

12  right.

13  Q.   Thank you.  We can play again.

14            (Video played)

15  Q.   Mr. Blight, what are you doing with your hand?

16  A.   I'm reaching in my pocket to get the note I wrote the cost

17  of the trip on.

18  Q.   Why were you doing that at that point?

19  A.   Mr. Issa asked me if I did that for him, if I wrote down

20  the cost, and I was handing him the note.

21            MS. HANFT:  Again, play again, please.

22            (Video played)

23  Q.   What just happened there, Mr. Blight?

24  A.   I handed him the piece of paper I wrote the information

25  down on.

1    Q.  Thank you.

2              (Video played)

3    Q.  What's going on at this moment, Mr. Blight?

4    A.  At that moment I'm -- Mr. Issa's handing me the $2,000

5    wrapped in an envelope.

6    Q.  We can play.

7    A.  I'm sorry, not envelope.  It was a napkin, a napkin.

8              (Video played)

9              MS. HANFT:  Play just a bit further.

10   Q.  Mr. Blight, what was happening at this moment?

11   A.  Well, once I let Stephanie out of the door, I turned back

12   and reiterated and asked Tony, "Are you sure?  That's more than

13   what the trip cost."  He said, "No, everything's good, you

14   know.  Don't worry," and we continued to exit the door.

15             MS. HANFT:  Go to the end of that video.

16             (Video played)

17             MS. HANFT:  For the record again, your Honor, the

18   government offers Government Exhibit 311.

19             THE COURT:  It's in.

20             (Government's Exhibit 311 received in evidence)

21             MS. HANFT:  No further questions for this witness.

22             THE COURT:  Mr. Brafman.

23             MR. BRAFMAN:  Thank you, your Honor.

24             May I proceed?

25             THE COURT:  Please.

IC6HISS1                          Blight - Cross

1    CROSS-EXAMINATION

2    BY MR. BRAFMAN:

3    Q.   Good morning, Mr. Blight.

4    A.   Good morning.

5    Q.   You and I have never met other than seeing each other in

6    the courtroom, fair?

7    A.   That's right.

8    Q.   You and I have never spoken about this case, correct?

9    A.   I'm sorry?

10   Q.   You and I have never spoken about the case or seen each

11   other before you came into court the other day, correct, sir?

12   A.   Correct.

13   Q.   Now, let me just ask you, go back -- let's go backwards for

14   a minute.

15          When he gave you the $2,000, that was after you handed

16   him a note, correct?

17   A.   Yes.

18   Q.   And he didn't count the money.  He had it in a -- he

19   wrapped it in an envelope, and he handed it to you.  So would

20   you conclude that it was prepared by Mr. Issa --

21          MS. HANFT:  Objection.

22   Q.   -- the amount?

23          THE COURT:  The objection's overruled.

24          MR. BRAFMAN:  Sorry?

25          THE COURT:  I said the objection's overruled.  Ask the

IC6HISS1                          Blight – Cross

1    question.

2              MR. BRAFMAN:  Thank you.

3    Q.  You may answer, sir.

4    A.  He said he had $2,000.

5    Q.  Now, prior to that moment when you handed him the note, had

6    you ever told Mr. Issa how much your trip was going to cost?

7    A.  I did the day before when I -- when he asked me how much it

8    was, I gave him roundabout figure.

9    Q.  OK.

10   A.  I didn't know exactly to the dollar amount.

11   Q.  Right.  And the roundabout figure did not include any

12   incidental expenses that you might have incurred, correct?

13   A.  No.

14   Q.  Now, after he paid you the $2,000, did you ever do anything

15   for Mr. Issa?

16   A.  I continued to give him work --

17   Q.  You did?

18   A.  -- at the post office.

19   Q.  You did?

20   A.  Yes.

21   Q.  And none of those invoices that you showed the government,

22   is that correct?  I'm sorry.

23            None of the invoices that Ms. Hanft went through with

24   you were given to him after the payment, correct?

25            MS. HANFT:  Objection.

1              THE COURT:  The objection's overruled.

2    A.  I don't understand the question.

3    Q.  The invoices you discussed with Ms. Hanft that you claimed

4    showed double billing, do you remember those invoices?

5    A.  Yes.

6    Q.  All of them were before this payment, correct?

7    A.  I can't remember.

8    Q.  OK.  We'll go through them one by one.

9              I want to ask you, sir, just a couple of questions in

10   general about the work of a VMF manager.

11             Would it be fair to say that you as a VMF manager,

12   when you needed work done by a contractor, this was sort of a

13   routine activity on your behalf once you picked the contractor,

14   correct?

15   A.  Yes.

16   Q.  And you didn't go to any board for approval or go to any

17   agency to get permission to give that contract; you could make

18   that decision on your own, correct?

19   A.  Yes.

20   Q.  And it was fairly routine after a while because you'd been

21   doing this for a long time, correct?

22   A.  Yes.

23   Q.  And you used independent contractors both in Detroit and in

24   Dearborn besides Mr. Issa, correct?

25   A.  Correct.

IC6HISS1                         Blight - Cross

1    Q.  And you were following standard operating procedure of the

2    post office that gives you as the VMF manager the right to do

3    that, correct?

4    A.  Correct.

5    Q.  When you give an independent contractor work to do and you

6    assign it to that person as a VMF manager, so long as

7    everything's done OK, there's nothing particularly

8    controversial about that assignment of work; would that be a

9    fair statement?

10   A.  I'm not understanding the question.

11   Q.  So long as the contractor does the work properly, the

12   assignment or giving them the work is not particularly

13   controversial or something that you need anybody else to weigh

14   in on; would that be a fair statement?

15             MS. HANFT:  Objection.

16             THE COURT:  The objection's overruled.

17   Q.  You may answer, sir.

18             THE COURT:  Did you need anybody else to weigh in on a

19   decision that you make to give work to a particular contractor?

20

21             THE WITNESS:  No.

22   Q.  Thank you, sir.

23             Now, as part of your job as a VMF manager, in the

24   normal course of your workday, you make these decisions from

25   time to time that this job should go outside the VMF and go to

1    an independent contractor, correct?

2    A.  I would as well as my lead technician.

3    Q.  But it's fairly -- it's part of the workaday job of a VMF

4    manager to make these decisions, correct?

5    A.  Yes.

6    Q.  Nothing special about it, correct?

7    A.  Nothing special.  It's part of the job.

8    Q.  Thank you, sir.

9           Did you have this function both in, I think, Detroit

10   and in Dearborn to be able to do -- make those assignments?

11   A.  Yes.

12   Q.  Did you do that on a regular base when needed?

13   A.  I'm not understanding the question.

14   Q.  Did you give work to independent contractors on a regular

15   basis to do, for example, PMIs?

16   A.  Yes.

17   Q.  And you gave us some statistics, I think, and if you

18   recall, you said that the breakdown of doing it in-house or

19   doing it by contractor was 70 percent to 30 percent.  Do you

20   remember giving us those numbers?

21   A.  For the Dearborn VMF, yes.

22   Q.  At the Dearborn VMF, you were doing 70 percent of the PMIs

23   in-house and 30 percent went to independent contractors,

24   correct?

25   A.  Yes.

IC6HISS1                          Blight – Cross

1    Q.   Approximately?

2    A.   Approximately.

3    Q.   Could you tell me, in Detroit the numbers were not the

4    same, were they?

5    A.   I can't recall that.  I mean --

6    Q.   The percentages, I don't mean the actual numbers.

7             Would it be a fair statement that more PMIs -- excuse

8    me, more PMIs were given to independent contractors in Detroit

9    than when you were in Dearborn?

10   A.   I'm not sure of the percentage.  There was a whole

11   different -- a lot more vehicles there.

12   Q.   OK.  A lot more vehicles in Detroit because the Detroit VMF

13   covered a much greater area, would that be a fair statement,

14   more greater area than Dearborn VMF?

15   A.   No, actually, the Dearborn VMF reached out further.  It's

16   more suburban, some rural.  Detroit was concentrated in the

17   city.

18   Q.   When you say a whole lot more vehicles in Detroit, what are

19   you talking about?

20   A.   There were a few hundred more vehicles in the Detroit

21   vehicle maintenance facility's inventory.

22   Q.   Is that because the vehicles required more work or were in

23   worse shape?  What amounted to the increase in vehicles in

24   Detroit?

25   A.   Because of the amount of carrier routes and the need for

IC6HISS1                           Blight - Cross

1    the vehicles there.

2    Q.  Would it be a fair statement that when you give a repair

3    job to a VMF contractor, that often time is of the essence?

4    A.  Yes.

5    Q.  Would it be a fair statement that one of the

6    responsibilities of the VMF manager, whether you're doing it

7    in-house or giving it to a contractor, is to get that truck

8    back in service as quickly as possible?

9    A.  Yes.

10   Q.  Would it be a fair statement that one of the things that

11   Mr. Issa promoted about his ability was the ability to do work

12   24 hours a day, seven days a week, isn't that true?

13   A.  Can you repeat the question.

14   Q.  One of the things about Mr. Issa's operation was that it

15   was able to function 24 hours a day, seven days a week?

16   A.  Well, he promised that, but that wasn't the case.  It

17   wasn't open 24/7, no.

18   Q.  Was it a big facility, the one in Detroit?

19   A.  Whose facility?

20   Q.  Mr. Issa's facility, Safeway.

21   A.  It was pretty good size, yes.

22   Q.  How many trucks could it work on, if you recall, at the

23   same time, could fit in there?

24   A.  I can't recall.

25   Q.  More than ten, depending on size?

IC6HISS1                        Blight - Cross

1  A.  Ten could be stored there.  Worked on at one time?  I
2  assume it could be if he had the people to do it.
3  Q.  Did he have a facility that he was also looking to buy to
4  expand his operation in Detroit?
5  A.  He said he did, yes.
6  Q.  Well, you toured it with him, didn't you?  Across the
7  street that building that was for sale on the lot, didn't
8  Mr. Issa bring you there and show it to you?
9  A.  He showed it to me.  I'm not sure if I actually toured it.
10 Q.  When he showed it to you, you understood him to say that he
11 was expanding his operation in Detroit?
12 A.  Yes.
13 Q.  Now, when you were talking to Mr. Issa about expanding his
14 facility and working in Detroit, were you recording
15 conversations with him at that time?
16 A.  Not the first time he mentioned it.
17 Q.  When he mentioned that he was expanding his operation, were
18 you still the VMF manager in Detroit?
19 A.  Yes, acting manager.
20 Q.  I'm sorry?
21 A.  It's -- the title would be acting manager.
22 Q.  Did you welcome at that time the news that this was going
23 to give you more opportunity to send work there if, in fact,
24 this facility opened?
25 A.  I don't recall that.

IC6HISS1                        Blight – Cross

 1   Q.  Well, did you say:  Don't expand, don't buy, and don't

 2   build because there's not enough work to keep you busy?

 3   A.  I would not tell a contractor that.

 4           MR. BRAFMAN:  Your Honor, may I just have a moment?

 5           THE COURT:  Yes.

 6           MR. BRAFMAN:  Your Honor, may I approach the witness?

 7           THE COURT:  Please.

 8           MR. BRAFMAN:  Handing a set of photographs to the

 9   government.

10   Q.  Mr. Blight, I'm handing you a series of photographs.  Like

11   you to look at them.  I'm going to discuss them with you one at

12   a time before I offer them into evidence, sir.

13           Do you have them before you?

14           THE COURT:  Yes, of course he does.  You just handed

15   them to him.

16           MR. BRAFMAN:  I wanted the record to reflect that,

17   your Honor.

18   Q.  Can I ask you, sir, to look at Exhibit 1.  Do you recognize

19   the people in that photograph, or at least some of them?

20   A.  Yes, a couple of them.

21   Q.  Do you recognize the facility as Mr. Issa's VMF facility --

22   I'm sorry, Mr. Issa's independent contractor facility in

23   Detroit?

24   A.  Yes.

25   Q.  And you recognize Mr. Issa in the photograph?

IC6HISS1                          Blight - Cross

1   A.  Yes.

2   Q.  And you recognize on the right a gentleman named Lonnie who

3   used to work there?

4   A.  Well, he looks different.  I remember him having more hair,

5   but I believe it is.

6            MR. BRAFMAN:  Just going to offer it for the purposes

7   of the facility.  Your Honor, can I go through them all before

8   I make the offer?

9            THE COURT:  Please.

10  Q.  Exhibit 101, do you have that, sir?

11  A.  Yes.

12  Q.  Do you recognize that as the inside of Mr. Issa's facility

13  in Detroit?

14  A.  Yes.

15  Q.  Do you recognize the gentleman in the center of the

16  photograph who has got salt-and-pepper hair or brownish hair

17  and a beard and blue shirt?

18  A.  Yes.

19  Q.  That's James Hinman, is that correct?

20  A.  Yes.

21  Q.  He is a supervisor who became the VMF manager after you

22  left the Detroit office, is that correct?

23  A.  Yes.

24  Q.  Is one of the duties of an acting VMF manager or supervisor

25  to come to the location and discuss vehicle maintenance stuff

IC6HISS1                        Blight - Cross

1   with the people who do the actual repair?

2   A.  When necessary, yes.

3   Q.  OK.  If you look carefully in the picture, you can also see

4   one of the people on the right-hand side actually holding the

5   VMF checklist.  Do you see that?  You recognize it, lower

6   right-hand corner of the photograph?

7   A.  Yes.

8   Q.  If we could go to photograph 102.  You see it?  Do you

9   recognize the photos in that -- the cars in that photo as post

10  office vehicles?

11  A.  Yes.

12  Q.  Do you recognize that as part of the inside of Mr. Issa's

13  garage VMF in Detroit?

14  A.  Yes.

15  Q.  103, same questions, recognize it as his part of the garage

16  and post office vehicles?

17  A.  Yes.

18  Q.  And if you look at 104, same questions, inside the garage

19  with differing kinds of post office vehicles, 104?

20  A.  Yes.

21  Q.  And 105, same question?

22  A.  Yes.

23  Q.  And 106, same question, sir?

24  A.  Yes.

25  Q.  And 107, same questions?

IC6HISS1                          Blight - Cross

1   A.  Yes.

2   Q.  And 108, do you recognize those as hydraulic lifts that are

3   inside Mr. Issa's garage?

4   A.  Yes.

5   Q.  And 109, again, part of the lifts and trucks in the garage?

6   A.  Yes.

7   Q.  If you look at 110, just the picture of a building, do you

8   recognize that as the building that is across from Mr. Issa's

9   garage that he was telling you he wanted to buy to expand his

10  operation?

11  A.  At this angle it looks familiar.  I don't remember a

12  parking lot on the side, but I --

13  Q.  Do you recognize the building?

14  A.  I recognize the building, yes.

15  Q.  Do these photographs accurately reflect the condition of

16  Mr. Issa's property on or about the time that you were working

17  in the Detroit area and shortly thereafter?

18  A.  Well, in Exhibit 110 I don't believe he owned it at that

19  point.  The other pics I recall.  I mean, I could tell it's

20  inside of the garage there.  I don't remember a new hoist

21  sitting there at that area.

22          THE COURT:  It doesn't accurately reflect your

23  recollection of what the property looked like?

24          THE WITNESS:  Well, it does, yes.

25          THE COURT:  It does, OK.

IC6HISS1                          Blight - Cross

1          MR. BRAFMAN:  I offer them, your Honor, Exhibits 100

2     through 109, and I will withdraw 110 for now.

3          MS. HANFT:  Your Honor, we object.

4          THE COURT:  Ground?

5          MS. HANFT:  Authenticity, your Honor.  We haven't seen

6     these pictures, and we have no basis for knowing where or when

7     they were taken.

8          MR. BRAFMAN:  The witness just identified them.

9          THE COURT:  The objection is overruled.

10         (Defendant's Exhibits 100 through 109 received in

11    evidence)

12         MR. BRAFMAN:  Thank you, your Honor.

13    BY MR. BRAFMAN:

14    Q.  All right.  I want to briefly -- now that they're in

15    evidence, I want to publish them to the jury.

16         You able to do that, Ms. Kuarlall?  Can you do it?

17         May we just have one moment, your Honor?

18         THE COURT:  Please.  Let's move it along.

19         MR. BRAFMAN:  Can the jurors see the pictures?

20         Can you put it on the jurors' screen.

21         THE COURT:  I can see it now on mine.  Are you guys

22    up?

23         Jim, we're up, but the jurors are not up.  OK.

24         (Continued on next page)

25

IC65iss2                        Blight - cross

1  BY MR. BRAFMAN:

2  Q.  Okay.  Thank you.

3          So, looking at Exhibit 100, do you have it on your

4  screen, sir?

5  A.  Yes.

6  Q.  That's Mr. Issa in the garage facility in Detroit, correct?

7  A.  Yes.

8  Q.  Outside the garage facility?

9  A.  Yes.

10 Q.  And 101, that's the picture of Mr. Hinman who became the

11 VMF manager after you moved to Dearborn, correct?

12 A.  Yes.

13 Q.  And you have identified that as being him looking at a

14 truck and, if I put my finger on it, that's the PMI checklist

15 or part of it in the lower right-hand corner, correct?

16 A.  Yes.

17 Q.  And if we look at 102, this is a series of post office

18 vehicles inside, correct?

19 A.  Yes.

20 Q.  And what type of vehicles are they?  Can you just describe

21 them for the jury?

22 A.  Those are mail carrier delivery vehicles.

23 Q.  And they are among the vehicles that are serviced on a

24 regular basis by contractors like Mr. Issa, from time to time?

25 A.  From time to time, yes.

IC65iss2                        Blight - cross

1   Q.  And if you look at 103 -- if you look at 103 -- same, from

2   different angles, different trucks but also in the garage,

3   correct?

4   A.  Different angle, yes.

5   Q.  And if you look at 104, this shows a whole slew of

6   different size trucks besides the ones we were looking at

7   before.  In fact, I am going to point to them and you just

8   briefly, this -- I am pointing to -- that has the front sort of

9   leaning forward, that's a big truck, isn't it?  Everything is

10  relevant I know, but what size truck is that?

11  A.  Yes.  That is a 7-ton.

12  Q.  And the 7-ton trucks also come to service from time to

13  time?

14  A.  Yes.

15  Q.  And the one I am pointing to now, how would you describe

16  that truck?

17  A.  2-ton.

18  Q.  So you have, in addition to the LLVs which we will get to

19  it in a minute, you have 2-ton and 7-ton, correct?

20  A.  Correct.

21  Q.  And the smaller cars which are, we saw before, some of

22  those are letter carriers, some of those administrative

23  vehicles?

24          I will move forward, let's go forward.  This Exhibit

25  105, is that a 7-ton truck?

1   A.  Or -- that's an 11-ton truck.

2   Q.  So, how high did the tonnage go in terms of the amount of

3   size that the VMF, like Mr. Issa, has to service?

4   A.  The 11-ton would be the biggest for the box trucks.

5   Q.  And when they come in, the trucks routinely have to be

6   lifted at times to do the inspection, correct?

7   A.  Correct.

8   Q.  You have to look at not just the truck, the underpart of

9   the truck as well?

10  A.  Correct.

11  Q.  And this --

12          MS. HANFT:  Your Honor, objecting to this line of

13  questioning.

14          THE COURT:  Well, you can object to the question

15  that's on the table.  What is the ground?

16          MS. HANFT:  I apologize, your Honor.  Relevance.

17          THE COURT:  The objection is sustained.

18          MR. BRAFMAN:  May I move for side bar?

19          THE COURT:  No, you may not.

20          MR. BRAFMAN:  Can I do it from here?

21          THE COURT:  You may ask a question that is relevant.

22          MR. BRAFMAN:  I am.  I am.

23          THE COURT:  No, are you not.  That question is

24  stricken.  It is irrelevant.  Move on.

25  BY MR. BRAFMAN:

IC65iss2                              Blight - cross

1    Q.  Mr. Blight, on direct examination did you talk about what

2    has to be done in inspecting the truck?

3    A.  I don't --

4              THE COURT:  It is irrelevant.  I have ruled.  Move on.

5    BY MR. BRAFMAN:

6    Q.  When the independent contractor gets a job to do

7    inspections for the post office, did the post office pay for

8    their equipment?

9    A.  Can you repeat that, please?

10   Q.  When an independent contractor like Mr. Issa sets up a shop

11   like this he pays for that equipment, the post office does not.

12   Is that correct?

13   A.  The post office doesn't.

14   Q.  Doesn't.  Does not?

15   A.  Does not.

16   Q.  Okay.  Thank you.

17             Now, you told us that when you got the text from

18   Mr. Issa's son -- when you got the text from Mr. Issa's son,

19   Mustafa, that Mr. Issa wanted to talk to you about something of

20   a personal nature, you told us that that sort of raised your

21   guard because what could it possibly be, correct?

22   A.  Correct.

23   Q.  And you were concerned that maybe he was trying to

24   compromise you, correct?

25   A.  Correct.

IC65iss2                    Blight - cross

1    Q.  And one of the things you told the government is that when

2    Mr. Issa approached you, one of the things that you were

3    worried about was whether Mr. Issa was an undercover agent

4    looking to set you up.  Isn't that correct?

5    A.  At a certain point I did, yes.

6    Q.  And that's because in Detroit you knew, and without going

7    into the details, you knew at the very VMF that you were at you

8    knew there were people -- VMF people who were recently arrested

9    for bribery, correct?

10             THE COURT:  That's yes or no.

11             THE WITNESS:  Yes.

12   BY MR. BRAFMAN:

13   Q.  So, when Mr. Issa came to you with a plan about building

14   and fixing, you went and you called OIG and said he wants to

15   talk to me about something personal.  I want to investigate, or

16   I want to alert you.

17             Is that correct?

18             MS. HANFT:  Objection, your Honor.

19             THE COURT:  The objection is overruled.  Is that what

20   you said?  Is that what you did and said?

21             THE WITNESS:  Well, I said I didn't feel comfortable

22   on how he was putting it to talking on a personal matter.

23             THE COURT:  Did you call OIG?

24             THE WITNESS:  Yes, I did.

25             THE COURT:  And what did you say to them?

1          THE WITNESS:  I told them I didn't feel comfortable

2     about how his son approached me to speak on a personal matter,

3     to not use the postal phone, use my cell phone, and that drew

4     my suspicions and I did call.

5     BY MR. BRAFMAN:

6     Q.  And they said did you agree to record the conversations,

7     correct?

8     A.  At a certain point they did.

9     Q.  And you recorded the conversation with Mr. Issa, a number

10    of them, correct?

11    A.  Yes.

12    Q.  And, in fact, the first conversation you recorded he

13    discussed with you what the personal matter was, isn't that

14    correct?

15    A.  No.  He talked about business and wanting to do repair work

16    and that was one of the things he talked about.

17    Q.  Mr. Blight, the recording that the jury has heard, some of

18    them are pieces of much longer conversations; is that correct?

19    A.  That's correct.

20    Q.  And have you heard the longer conversations, in fact you

21    participated in those conversations.  Isn't that correct?

22    A.  Correct.

23    Q.  And at the very first time Mr. Issa came to talk to you,

24    the thing he didn't want to talk to you on the phone was that

25    Jeff was a racist and he was criticizing minority employees.

IC65iss2                        Blight - cross

1    Isn't that correct?

2              MS. HANFT:  Objection, your Honor.

3              THE COURT:  The objection is overruled.

4    BY MR. BRAFMAN:

5    Q.  Isn't that correct, sir?

6    A.  Jeff?

7    Q.  Jeff, yes?

8    A.  Jeff.  He mentioned that.

9    Q.  What do you mean he mentioned it?  He told you that you and

10   he were going to be sued because Jeff was making racial

11   comments to post office employees?  Isn't that what he told

12   you?

13   A.  I don't recall.

14   Q.  Oh, let me show you what I marked for identification as

15   Defendant's Exhibit 111.

16             THE COURT:  Before you show it to him, show it to me

17   and show it to the government.

18             MR. BRAFMAN:  Yes, ma'am.  It's a government

19   recording, Exhibit 11, and it is a May 5, 2016, first

20   recording, and I direct your Honor's attention and the

21   government's attention, because I'm not going to play it, I am

22   just going to use it to refresh his recollection, I direct your

23   attention to page 13.

24             THE COURT:  My guess is that I should have actually

25   sustained the government's original objection.

IC65iss2                          Blight - cross

1              MR. BRAFMAN:  I don't think so, Judge.

2              THE COURT:  Oh, I do think so.  Yes, I do.  I do.  I

3    should have.

4              MR. BRAFMAN:  Excuse me?

5              THE COURT:  I should have sustained the government's

6    original objection.

7    BY MR. BRAFMAN:

8    Q.  Isn't it a lie that the personal matter that he wanted to

9    talk to you about had anything to do with bribery and it had to

10   do with personnel issues that he wanted to bring to your

11   attention and he didn't want to use a post office --

12             THE COURT:  Don't ask compound questions.

13             MR. BRAFMAN:  Judge, we need a side bar.

14             THE COURT:  Don't ask compound questions.

15             MR. BRAFMAN:  I won't, but we need a side bar.  I need

16   to --

17             THE COURT:  Don't ask compound questions.

18             MR. BRAFMAN:  Your Honor, I can show anything to the

19   witness --

20             THE COURT:  Don't ask compound questions.  I have just

21   stricken the last question and answer before you showed him

22   this.  I have sustained the government's original objection.

23   BY MR. BRAFMAN:

24   Q.  On direct examination, when the government asked you what

25   you thought the personal matter was that Mr. Issa didn't want

IC65iss2                         Blight - cross

1    to talk to you about on a post office phone, you said that

2    that's what irked your suspicion to called OIG, correct?

3    A.   Correct.

4    Q.   And then, when you went on to testify, you said that the

5    personal matter that he wanted to talk to you about was in fact

6    just business related, correct?

7    A.   He never brought up personal matter --

8            THE COURT:  Excuse me.  That's a yes or no question.

9            THE WITNESS:  I don't know.

10           THE COURT:  Isn't that what you said on direct, that

11   the personal matter was really just a business matter?  Do you

12   recall saying that on your direct examination when Ms. Hanft

13   was asking you questions?

14           THE WITNESS:  I don't recall.

15           THE COURT:  Okay.  Fine.

16   BY MR. BRAFMAN:

17   Q.   Do you recall that he took you outside when he came to see

18   you and that you had a conversation in the parking lot?

19   A.   Yes.

20   Q.   And when you were testifying yesterday do you remember

21   being asked the following question and giving the following

22   answers at page 193:

23   "Q  Had Mr. Issa ever brought up Jeff to you before?

24   "A  Yes.  Mr. Issa and his staff.

25   "Q  And what had they said?

IC65iss2                         Blight - cross

1   "A  Well, that he was too hard, that he wasn't lenient at all,

2   and every once in a while they would challenge what he would

3   mark down as being improper, and usually that wasn't the case."

4           Continuing on top of page 194, do you remember being

5   asked this question and giving this answer:

6   "Q  And you are talking about the charges on which bills?

7   "A  On Safeway and Duploy invoices."

8           MS. HANFT:  Objection.

9   BY MR. BRAFMAN:

10  Q.  Do you remember being asked those questions and giving

11  those answers?  It is in the transcript?

12          THE COURT:  Do you remember that you gave that

13  testimony yesterday or two days ago when you were on the

14  witness stand?

15          MR. BRAFMAN:  I do remember.

16  BY MR. BRAFMAN:

17  Q.  Okay.  So, when you were asked that question by Ms. Hanft,

18  what you said about Jeff was that Mr. Issa was complaining that

19  Jeff was too hard and he was checking the invoices and it was

20  making it difficult for them.  Isn't that what you said?

21          THE COURT:  Sit down, Ms. Hanft.  There is nothing

22  objectionable about his question.

23          MS. HANFT:  There is as to form, your Honor.

24          THE WITNESS:  Okay.  Can you repeat the question?

25  BY MR. BRAFMAN:

IC65iss2                          Blight - cross

 1   Q.  When you testified on direct examination -- we just read

 2   your testimony, sir -- you said that Mr. Issa was complaining

 3   about Jeff as being too hard, that he wasn't lenient, and that

 4   every once in a while he would challenge and mark down as being

 5   improper and that usually it wasn't the case.

 6          Isn't that what you said under oath here two days ago

 7   to this jury?

 8   A.  Yes.

 9   Q.  And that that's what Mr. Issa was complaining about?

10   A.  Well, no, that's not the only thing that Mr. Issa talked

11   about.

12   Q.  Okay.  So let's understand what else Mr. Issa told you

13   about Jeff on that day right at the beginning of the recorded

14   conversation.

15   A.  I can't remember.  Refresh my memory.

16          MR. BRAFMAN:  Your Honor, may I use the transcript to

17   refresh his recollection?  It is a prior inconsistent

18   statement.

19          THE COURT:  Yes, you may.

20          MR. BRAFMAN:  Thank you.

21          THE COURT:  I'm sorry.  If it is his prior

22   inconsistent statement, yes.  If it is your client's, no.

23          MR. BRAFMAN:  I understand that, Judge.  I'm going to

24   just have him read it, I am not going to put it into evidence.

25          THE COURT:  I understand what you are doing.

IC65iss2                          Blight - cross

1   BY MR. BRAFMAN:

2   Q.  Giving you what's now marked for identification as

3   Defendant's Exhibit 111, cover page date May 5, 2016.  Look

4   through, see if it refreshes your recollection and in

5   particular, sir, once you have been able to get your bearings,

6   I want you to move to page 13.  When you are done, let me know.

7   A.  Okay.  I am at page 13.

8   Q.  Read it to yourself and then go on to page 14.

9           THE COURT:  The question is does that jog your memory

10  about what was said by Jeff.

11          THE WITNESS:  Yes.

12          THE COURT:  Okay.

13  BY MR. BRAFMAN:

14  Q.  Does it refresh your recollection that on that date

15  Mr. Issa complained to you about Jeff being a racist?

16  A.  He didn't complain to me about Jeff being a racist.

17          THE COURT:  Okay, then he didn't do that.  The answer

18  to the question is no.

19  BY MR. BRAFMAN:

20  Q.  Did he bring to your attention that Jeff was making racial

21  comments about employees?

22          MS. HANFT:  Objection.

23          THE COURT:  The objection is sustained.

24  BY MR. BRAFMAN:

25  Q.  Does it refresh your recollection that Mr. Issa was not

IC65iss2                              Blight – cross

1    complaining about Jeff being too hard, he was complaining about

2    him making racial comments to employees?

3              MS. HANFT:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  There was a lot talked about in that

6    conversation.  That was one of many things talked about.

7    BY MR. BRAFMAN:

8    Q.  But that's --

9    A.  I didn't consider that a complaint.  That was something he

10   mentioned, yes.

11   Q.  That wasn't important enough for you, as the VMF manager,

12   to know that one of your lead technicians was making racial

13   comments to the employees?

14             MS. HANFT:  Objection.

15             THE COURT:  The objection is sustained.

16   BY MR. BRAFMAN:

17   Q.  Did you do anything about it?

18             THE COURT:  The objection is sustained.

19   BY MR. BRAFMAN:

20   Q.  And, did Mr. Issa till you that you were going to be sued

21   if you don't fix this?

22   A.  No.

23   Q.  He didn't tell you that?  You want to look at the same

24   transcript and see if you're wrong?

25   A.  I'm telling you no.

IC65iss2                          Blight - cross

1   Q.   Look at page 14 and see if it refreshes your recollection

2   that he was concerned that you would be sued.

3          THE COURT:  Does that jog your memory that he said

4   anything about being sued?

5          THE WITNESS:  I don't see anything about being sued.

6          THE COURT:  We don't care what is on the page, we want

7   to know if it jogs your memory.  Does it cause you to recall,

8   change your mind?  Do you remember now that he said anything

9   about being sued?  Yes or no.

10          THE WITNESS:  No.

11          THE COURT:  No.  Right.  Okay, keep going.  We will

12   leave this topic and we will move on.

13          MR. BRAFMAN:  I just want to direct him to the bottom

14   of page 13.

15          THE COURT:  No.  Move on.

16          MR. BRAFMAN:  Your Honor, maybe he didn't read that

17   part.

18          THE COURT:  Excuse me.  You told him to look at page

19   14.  Move on.

20          MR. BRAFMAN:  It starts --

21          THE COURT:  Okay.  Side bar.

22          (Continued next page)

23

24

25

IC65iss2                    Blight - cross

1           (At side bar)

2           MR. BRAFMAN:  Your Honor, just for the record, on the

3    bottom of page 13 it says --

4           MS. HANFT:  Shhh.

5           THE COURT:  Shhh.

6           MR. BRAFMAN:  I think I am to the point of writing an

7    e-mail getting it ready and saying --

8           THE COURT:  You are talking very loudly, Mr. Brafman.

9           MR. BRAFMAN:  I'm sorry.

10          THE COURT:  I can read it.  The point is you can't get

11   your client's statements in through anybody else, including on

12   cross-examination.

13          MR. BRAFMAN:  Yes.

14          THE COURT:  I'm sorry.  You can't do it.

15          MR. BRAFMAN:  Yes, but your Honor, the man lied on

16   direct examination.  He testified that the thing that Mr. Issa

17   was complaining about, which he didn't want to talk to inside a

18   facility, related to --

19          MS. HANFT:  Your Honor --

20

21

22

23

24

25

IC65iss2                          Blight - cross

1               (In open court)

2               THE COURT:  Okay, guys out.  Don't discuss the case.

3    Keep an open mind.

4               You too, sir.  You have to go out.

5               (Witness steps down)

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IC65iss2                        Blight - cross

1              (Jury not present)

2              THE COURT:  Look, Mr. Brafman.  Here is how it works.

3    Not that I have to tell you this because you know it better

4    than I do.  The man said it was his understanding that that's

5    what the complaint was about.  You can set it up for other

6    evidence to come in that is admissible, including your client's

7    testimony should he decide to testify, that what he was really

8    complaining about was something else.  But, you cannot get this

9    witness to place your client's out-of-court statement before

10   the jury.

11             MR. BRAFMAN:  Your Honor --

12             THE COURT:  I appreciate that it is a fine line in

13   some instances.

14             MR. BRAFMAN:  Your Honor, under Rule 806, a prior

15   inconsistent statement I am permitted to confront a witness

16   about with both his prior inconsistent statement and my -- your

17   Honor, please, let me just make the record on this.

18             THE COURT:  Make your record.

19             MR. BRAFMAN:  It is so important, and I will be brief.

20             Your Honor, they opened this door and they went

21   through it with a plow truck and this is their tape.  They did

22   not -- they're not surprised by this.  This is the heading --

23             THE COURT:  No, but they get to pick what portions of

24   the tape they want to play and you can't play the rest of it.

25             MR. BRAFMAN:  That's not true, your Honor.

IC65iss2                        Blight - cross

1          THE COURT:  That may not be fair but that's the rule.

2          MR. BRAFMAN:  No, but that is also not an accurate

3     statement of the law because I'm not introducing it to play,

4     I'm using it to show that the witness lied or was mistaken when

5     he said that -- understand how they set this up.  You get a

6     text from Mustafa that says my father wants to talk to you

7     about a personal matter.  He immediately assumes Mr. Issa is

8     going to try and compromise him.  He calls OIG he is so

9     paranoid.  Okay?

10         THE COURT:  Right.

11         MR. BRAFMAN:  They start the investigation, they wire

12    him up.  He then says -- it makes it worse because then on

13    direct he says that Mr. Issa took him outside, didn't want to

14    talk to him in the post office, and talked to him in the

15    parking lot because he was going to talk to him about something

16    of a business nature suggesting to this jury, falsely, that my

17    client was concerned about having this conversation where there

18    would be prying ears.  When you look at the front of the

19    testimony, the front of the conversation, there is a clear back

20    and forth between Mr. Blight and my client because he answers

21    my client.  So, he is adopting his concern, and my client is

22    telling him the following -- without reading the transcript --

23    Jeff is making racial comments, you're the supervisor, you're

24    going to get sued.  That's why he doesn't want to talk on the

25    phone --

IC65iss2                              Blight - cross

1        THE COURT:  The only person who can say to this jury
2   that that's the personal matter I was -- that this man's
3   understanding was wrong and that that's the personal matter
4   that I wanted to talk to him about, unfortunately, is your
5   client.
6        MR. BRAFMAN:  Okay.  Under normal --
7        THE COURT:  You can't say it because you are not a
8   witness.
9        MR. BRAFMAN:  But under normal circumstances I might
10  agree with you on that because I have done this before.  Under
11  806 I can use anything to refresh his recollection --
12       THE COURT:  To refresh his recollection you can use
13  the phone book.
14       MR. BRAFMAN:  And then I have the right to press him
15  on it.  Your Honor, he had his memory refreshed.  He said he
16  didn't tell me I was being sued.  The same document --
17       THE COURT:  You told him to look at page 14 and the
18  word "sued" doesn't appear on page 14.  I read page 14 and
19  there was nothing on it about being sued.  What did you expect
20  him to say?
21       MR. BRAFMAN:  So now I say to him it is my mistake,
22  look at the bottom of page 13 which continues on 14, and there
23  is a clear statement by Mr. Issa that you are going to get
24  sued.
25       THE COURT:  What does the government have to say on

IC65iss2                    Blight - cross

1    this?  806 is the alleged rule of evidence pursuant to which

2    this testimony is supposed to be coming in.

3            MS. HANFT:  So, your Honor, a couple of things.

4            First of all, the declarant here that Mr. Brafman is

5    referring, is not this witness.

6            THE COURT:  Is not this witness.

7            The only prior -- my understanding of the prior

8    inconsistent statement rule, as it is enforced in this

9    courtroom -- possibly the Second Circuit will some day tell me

10   that I'm wrong -- but as it is enforced in this courtroom for

11   prior inconsistent statement, the only declarant whose prior

12   statement makes a difference is the one who is on the stand.

13   Nobody else.  Not somebody he is talking to.  Nobody else.

14   Now, that may be your understanding of the rule but it is not

15   mine.

16           So, if you have a prior inconsistent -- something that

17   this witness said on a previous occasion that is inconsistent

18   with what he said on the stand, you can confront him with it.

19   You cannot confront him with a statement of Mr. Issa's.

20           MR. BRAFMAN:  But it is a conversation, and he

21   testified about the conversation in a manner that is not

22   consistent with what he heard and said on the government's own

23   tape.

24           THE COURT:  That's not a prior --

25           MR. BRAFMAN:  It is, your Honor.

IC65iss2                         Blight - cross

1          THE COURT:  Show me the statement that this witness

2     made -- that this witness made -- that is inconsistent, on

3     pages 13 or 14 in the transcript.

4          MR. BRAFMAN:  No.  You have to go back to the trial

5     transcript.

6          THE COURT:  I heard the trial transcript.

7          MR. BRAFMAN:  No, but he --

8          THE COURT:  This is the prior statement.  You read the

9     trial transcript.

10          MR. BRAFMAN:  Yes.

11          THE COURT:  I heard it.  I have now heard it three

12     times.  Show me where in the prior statement there is something

13     that this guy said, not that your client said but that this

14     Mr. Blight said, that is inconsistent.  Show me that.  Show me

15     the words.

16          MR. BRAFMAN:  Judge, it is in page 193.  He said the

17     complaint about Jeff by Mr. Issa was that Jeff was being too

18     hard and that's not true.

19          THE COURT:  That's not the prior inconsistent

20     statement.

21          MR. BRAFMAN:  It is.  It is his statement.

22          THE COURT:  No, no, no.

23          MR. BRAFMAN:  The man on the stand is lying.

24          THE COURT:  Mr. Brafman -- Mr. Brafman -- you cannot

25     point me to a statement in the transcript of the conversation

IC65iss2                        Blight - cross

1   that happened two years ago, a statement that came out of the

2   mouth of this witness during that conversation that is

3   inconsistent.  What you want is for the jury to infer that your

4   client was really complaining about something else.

5           MR. BRAFMAN:  But he was.

6           THE COURT:  The only way you can do that is put your

7   client on the stand.

8           MR. BRAFMAN:  No.  On direct he adopted my client's

9   statements.

10          THE COURT:  He did not adopt your client's statements.

11  This is ridiculous.

12          MR. BRAFMAN:  On direct he adopted my client's

13  statement and they're using it as an admission.

14          THE COURT:  Mr. Brafman, guess what.  I am ruling

15  against you.  You have your exception.  Take it to the Circuit,

16  if you are unlucky enough to get there.  We will start again in

17  3 minutes.

18          MR. BRAFMAN:  Your Honor, if you look at the top of

19  page 14, Mr. Blight adopts my client's statement about this

20  being a racial problem.  Look at the bottom of 13 where my

21  client tells him that he is going to get sued because of these

22  employees and at the top he said "All right.  Yeah."

23          THE COURT:  I rule that "All right.  Yeah" is not the

24  adoption of a statement.  You can take it to the Circuit,

25  Mr. Brafman.  We are done with this.  We are through.  It is

IC65iss2                        Blight - cross

```
 1    over, finished, done.  You have your exception.
 2             (Recess)
 3             THE COURT:  Case on trial continued, parties are
 4    present, the jurors are not present.
 5             Mr. Brafman, I will give you one thing, which is that
 6    if you could get this witness to tell you, after he read the
 7    bottom of page 13, that the words at the top of page 14 meant
 8    that he was adopting and agreeing with what your client was
 9    saying, then he would be adopting your client's statements.
10    But just saying "All right.  Yeah" in the middle of a
11    conversation, that's not adopting anybody's statement.
12             MR. BRAFMAN:  I would need to ask him just a couple of
13    questions.
14             THE COURT:  And you would, wouldn't you.  Right.
15             MR. BRAFMAN:  It is almost impossible to just tell him
16    to look at that without referring him back to what Mr. Issa
17    said to him.  I will ask him to read it to himself.
18             THE COURT:  He would have to read it to himself.
19             MR. BRAFMAN:  Yes, ma'am.  I will do that.
20             MS. HANFT:  Your Honor?
21             THE COURT:  Yes.
22             MS. HANFT:  May we request some sort of curative
23    instruction?
24             THE COURT:  No, not right this minute you may not
25    request a curative instruction and you had better be writing
```

IC65iss2                          Blight – cross

1    gown stuff for your redirect.

2              MS. HANFT:  Thank you, your Honor.

3              (witness resumes the stand)

4              MR. BRAFMAN:  Your Honor, he has to read a little bit

5    longer than that to himself, but I will refer him to it.

6              THE DEPUTY CLERK:  Jury entering.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IC65iss2                         Blight - cross

1          (Jury present)

2          THE COURT:  Okay.  You are still under oath, sir.

3          You may continue, Mr. Brafman.

4          MR. BRAFMAN:  Thank you.

5     BY MR. BRAFMAN:

6     Q.  Mr. Blight, do you still have that transcript before you?

7     A.  Yes.

8     Q.  I would like you to again refer to page 13, line 7.  Do you

9     have that?

10    A.  Yes.

11    Q.  I would like you to read it to yourself -- not out loud,

12    read it to yourself from page 13, line 7, to the other page, to

13    line 7 on page 14.

14    A.  I have read it.

15    Q.  Now, I want you to look at the top of page 14 where you say

16    "all right.  Yeah."  Do you see that?

17    A.  I see it.

18    Q.  And without telling us what Mr. Issa said for a moment,

19    this is after he has made comments about Jeff, correct?

20    A.  Correct.

21    Q.  And then you say:  "All right.  Yeah."  Correct?

22    A.  I said that.

23    Q.  Are you indicating to Mr. Issa, in words or substance, that

24    you are accepting what he has said or that you understand it,

25    or you are just adopting the conversation?

IC65iss2                          Blight - cross

1           THE COURT:  That's three different things and only one

2    of them is relevant.  That's, Are you adopting Mr. Issa's

3    statements as your own by saying "all right.  Yeah."

4           THE WITNESS:  That I heard him, yes.

5           THE COURT:  That you heard him.  Are you adopting the

6    statements as your own statements?

7           THE WITNESS:  As my own statements?

8           THE COURT:  Correct.

9           THE WITNESS:  The "all right, yeah."

10          THE COURT:  The question is by saying that are you

11   adopting what Mr. Issa said as something you would say?

12          THE WITNESS:  No.  I wouldn't say what he said.

13          THE COURT:  Fine.  Okay.  Then you don't adopt his

14   statement.

15          Let's move on.

16          MR. BRAFMAN:  Your Honor, that's not the rule.

17          THE COURT:  Let's -- excuse me.  We are done talking.

18   Let's move on.

19   BY MR. BRAFMAN:

20   Q.  What did you mean when you said "All right.  Yeah"?

21   A.  That I heard him.

22   Q.  But you said "all right.  Yeah."  You heard him, right?

23   A.  Yes, I heard him.

24          THE COURT:  He told you what he meant.

25   Q.  And you understood what he said?

1           THE COURT:  Move on.  Please.  You have your

2     exception.  No more of these questions.  I have ruled.  It's

3     over.

4           MR. BRAFMAN:  For just this part, your Honor.  I will

5     move on.

6     BY MR. BRAFMAN:

7     Q.  Now, you told this jury that the first time you met

8     Mr. Issa he showed up at your VMF facility in Detroit with an

9     unscheduled appointment and you didn't really meet him that

10    day, correct?

11    A.  Correct.

12    Q.  And that the first time you really sat and talked to

13    Mr. Issa was after you notified OIG and he came to meet with

14    you on that date when you recorded him; is that correct?

15          MS. HANFT:  Objection.

16          THE COURT:  Ground?

17          MS. HANFT:  It mischaracterizes the prior testimony.

18          THE COURT:  Okay.  Now I'm going to talk to you for a

19    minute.

20          Who is the Judge of what a witness says?  Is it the

21    government?  No.  Is it the defense?  No.  Is it me?  No.  It's

22    you, the jury, informed, if you need your recollection

23    refreshed, by the transcript.  So, when a lawyer jumps up and

24    says, *that question mischaracterizes what the witness*

25    *previously said,* I overrule that objection because if I were to

IC65iss2                          Blight - cross

1   sustain it, I would be agreeing that it mischaracterized the

2   testimony and then I would be making myself the judge of what

3   the witness said.  It is not a proper objection.  Okay?

4   Lawyers do it all the time, they're not doing anything wrong

5   when they do it, they're just wrong to do it, and I am

6   overruling that objection.  The witness will tell us if that's

7   not what he said.

8          Okay?

9   BY MR. BRAFMAN:

10  Q.  Do you remember the question?

11         THE COURT:  No.  Read it back.

12         MR. BRAFMAN:  Can I rephrase it, make it easier?

13         THE COURT:  That would be great, Mr. Brafman.

14  BY MR. BRAFMAN:

15  Q.  Do you remember, sir, when the first time I asked you that

16  you actually sat down and talked to Mr. Issa?

17  A.  Yes.

18  Q.  When was that?

19  A.  It was sometime in 2015.

20  Q.  And where was it?

21  A.  The Detroit Vehicle Maintenance Facility.

22  Q.  And you didn't meet with him before that?

23  A.  No.

24  Q.  Didn't you and he go to a Lebanese restaurant for lunch

25  before the meeting at the VMF facility?

IC65iss2                          Blight - cross

1   A.  At the VMF facility?  The Detroit VMF?  No.

2   Q.  You didn't go to a restaurant in Dearborn, a Lebanese

3   restaurant with Mr. Issa before the recorded conversation with

4   him at the Detroit facility?  Yes or no.

5   A.  I don't recall that.

6   Q.  You don't recall him going to your favorite restaurant in

7   Dearborn with Mr. Issa?

8               MS. HANFT:  Objection.

9               THE COURT:  The objection is overruled.

10  BY MR. BRAFMAN:

11  Q.  Do you have a favorite restaurant, a Lebanese, like, lunch

12  place in Dearborn?

13  A.  No, I -- a grocery store I go to.

14  Q.  And did you take Mr. Issa there?

15  A.  No.

16  Q.  Never had lunch with him there?

17  A.  No.

18  Q.  You're a hundred percent sure?

19  A.  I don't recall.

20  Q.  Okay.

21              So now you come to the VMF and you have a recorded

22  conversation with him; is that correct?  In 2015?

23  A.  No.

24  Q.  When do you have the first recorded conversation?

25  A.  2016.

IC65iss2                           Blight - cross

1   Q.  Okay.  In the summer?

2   A.  In May at the VMF -- Dearborn VMF.

3   Q.  That conversation is after you went to OIG?

4   A.  Yes.

5   Q.  And prior to going to OIG did Mr. Issa offer you anything

6   of value for anything in return?

7   A.  Can you ask the question again?

8   Q.  Did he give you any money before you went to OIG?

9   A.  No.

10  Q.  The first time he gave you any money was months and months

11  later in New York at the Chinese restaurant, correct?

12  A.  Correct.

13  Q.  And prior to that, the only thing that you got from

14  Mr. Issa was you had lunch with him, correct?  Or dinner?

15  A.  That was --

16              THE COURT:  It is a yes or no question, sir.

17              THE WITNESS:  Prior to when?  Can you ask the question

18  again?

19  BY MR. BRAFMAN:

20  Q.  Prior to coming to New York before you meet Mr. Issa in

21  Chinatown and he gives you money for the plane and the hotel

22  and a little bit extra, did you ever get any money from

23  Mr. Issa before you went to OIG?  That's the first question.

24  A.  No.

25  Q.  Okay.

1              And then you went to OIG because of the phone message

2      from Mustafa that you say put you on maybe a suspicion of

3      Mr. Issa, correct?

4      A.   Correct.

5      Q.   And then OIG asked if you would cooperate and work as an

6      undercover witness wearing tape recorders, correct?

7      A.   Correct.

8      Q.   And you agreed?

9      A.   Correct.

10     Q.   But there was a -- you were then, from that day on, you

11     were always scripted -- I will use that word -- scripted, for

12     what you should say to Mr. Issa?  Would that be a fair

13     statement?

14     A.   No.

15     Q.   Wasn't there, like, a game plan established early on?

16     A.   Yes.

17     Q.   And part of the game plan was that you were going to talk

18     to Mr. Issa over and over again about financial hardships that

19     you and your family were facing.

20     A.   No.

21     Q.   You just made that up?

22     A.   Well, it's partial true, partial not true.

23     Q.   Okay.  So, when you talked to Mr. Issa sometimes you lied,

24     sometimes you told the truth?

25     A.   Correct.

IC65iss2                          Blight - cross

1   Q.  And you became fairly good at it, would you agree, because

2   Mr. Issa never stopped you and asked if you were wired,

3   correct?

4   A.  I don't know what to answer.  It was a couple different

5   questions in there.  Can you rephrase it?

6   Q.  Okay.  So, you talked to him how many times with a recorded

7   conversation?

8   A.  Many times.

9   Q.  And you knew it was being recorded but you never told

10  Mr. Issa it was being recorded, right?

11  A.  Right.

12  Q.  And you were talking sometimes true, sometimes a lie, and

13  when it was a lie it was a game plan that had been developed

14  with you and OIG and some of the people at the front table with

15  the government, correct?

16  A.  No.

17  Q.  Never spoke to Mr. Solowiejczyk or Mr. Dubar, the gentleman

18  that has been sitting there, there sitting in the back with the

19  red shirt about how to proceed, what to say, what not to say?

20  A.  No.  I talked to Mr. Dubar, yes, but not with the --

21  Q.  And did he give guidance?

22  A.  Guidance, yes.

23  Q.  So, when you say sometimes it was true, sometimes it was a

24  lie, how do we know when we are listening to you without asking

25  you specifically what is true and what's a lie?

IC65iss2                      Blight - cross

1   A.  I'm not sure how to answer that.  I am going to explain

2   why, if I can.

3          THE COURT:  If you answer the question --

4   BY MR. BRAFMAN:

5   Q.  I will move on.  Let's break this down so that we can make

6   it easy.  You testified on direct that you do have a daughter

7   in college, correct?

8   A.  Correct, yes.

9   Q.  But she never applied to Columbia, correct?

10  A.  Right, not Columbia.

11  Q.  And every time you told Mr. Issa that she applied to

12  Columbia, that was a lie?

13  A.  That was, yes.

14  Q.  And part of the lie was scripted so that maybe one day you

15  would be able to come to New York and meet Mr. Issa, right?

16  A.  Yes.

17  Q.  Because otherwise you could pick Southern Cal or Harvard or

18  any other wonderful university besides Columbia, right?

19  A.  Well, yes, that's -- I'm not sure what you are asking me.

20  Q.  Columbia was a complete fabrication, yes?

21  A.  Yes.

22  Q.  And it was a complete fabrication to be a university in New

23  York City, correct?

24  A.  Correct.

25  Q.  Because the game plan was that hopefully you would get him

IC65iss2                         Blight - cross

```
1    here and arrest him in New York, or have enough to arrest him
2    in New York, correct?
3              MS. HANFT:  Objection.
4              THE COURT:  The objection is sustained.
5    BY MR. BRAFMAN:
6    Q.  Well, why was it important to pick a college in New York,
7    if you know?  Did they ever tell you?
8    A.  I was under advisement of law enforcement.
9    Q.  Okay.  So, they said pick a college in New York and you
10   did?
11   A.  Correct.
12   Q.  So, instead of just saying my daughter is going to go to
13   Columbia, the story got a lot better in that she was in danger
14   of losing her scholarship.  Was that law enforcement telling
15   you to put that in the story?
16   A.  No.
17   Q.  That was your idea?
18   A.  Yes.
19   Q.  And was it so that Mr. Issa should feel sorry for you?
20   A.  No.
21   Q.  What did you say it for?  It is a complete fabrication.
22             THE COURT:  What did you say it for?  Why did you say
23   that?
24             THE WITNESS:  That she was going to lose her
25   scholarship?  Is that what you are asking?
```

IC65iss2                          Blight - cross

1              MR. BRAFMAN:  Yes.

2              THE COURT:  Yes.  Why did you say she was in danger of

3    losing her scholarship.

4              THE WITNESS:  For going to Columbia.

5              THE COURT:  Why did you say that?

6              THE WITNESS:  That, yeah, I'm -- I said that, I made

7    that up.  I don't know exactly why I said that.

8    BY MR. BRAFMAN:

9    Q.  Let me see if I can help you.  Now, from time to time in

10   these conversations with Mr. Issa, not only did you talk about

11   losing her scholarship but you talked about how expensive her

12   dormitory in New York was going to be, correct?

13   A.  Correct.

14   Q.  And you talked about all of your financial debt that you

15   and your wife were under, correct, from time to time?

16   A.  That there could be debt if she went there.

17   Q.  And that was all a lie, she wasn't going there, right?

18   A.  Correct.

19   Q.  We will go into the conversations but you went back and

20   forth with Mr. Issa over and over again that she is going to

21   have to come to New York to be interviewed by the director of

22   the program, right?

23   A.  Correct.

24   Q.  That's a lie.  There was no director of program interview,

25   correct?

IC65iss2                        Blight - cross

1   A.  Correct.

2   Q.  So this lie got better and better as time progressed?

3   A.  What do you mean by better?

4   Q.  Well, more and more sympathetic components thrown into the

5   lie.  Why?

6              MS. HANFT:  Objection.

7              THE COURT:  The objection is overruled.

8   BY MR. BRAFMAN:

9   Q.  Do you understand the question?

10  A.  I'm trying to.

11  Q.  Okay, so let me make it easy for you.  The lie was Columbia

12  initially, right?

13  A.  Correct.

14  Q.  Fabrication, law enforcement's idea.  Correct?

15  A.  Correct.

16  Q.  Then you added, you said on your own, that she was in

17  danger of losing her scholarship, correct?

18  A.  Correct.

19  Q.  Then you told Mr. Issa that her room and board was going to

20  cost $ 20,000.  It was a complete fabrication, correct?

21  A.  If she would have went there it would have cost that much.

22  Q.  But she wasn't going there?

23  A.  Correct.  Correct.

24  Q.  And you knew that you weren't going to have to pay $20,000

25  for her room and board in Manhattan, right?

IC65iss2                         Blight - cross

1    A.  Correct.

2    Q.  So you added that to the mix also, correct?

3    A.  Correct.

4    Q.  And did you, from time to time, talk to the government

5    about this Columbia story and what you were saying and what

6    they should -- what you should say, and were they helping you,

7    Mr. Dubar and his agents?

8    A.  I was under advisement of law enforcement.

9    Q.  But you suddenly, when you were under advisement of law

10   enforcement you have told us that you injected some things on

11   your own, correct?

12   A.  Correct.

13   Q.  I am just going to ask you this one more time before I move

14   on.  Isn't it true that the reason to inject all of the

15   financial hardships into the conversations were so that

16   Mr. Issa would begin to feel sorry for you?

17          MS. HANFT:  Objection.

18          THE COURT:  The objection is overruled.

19   BY MR. BRAFMAN:

20   Q.  You may answer.

21   A.  No.

22   Q.  Why, then, do you put all of this junk that's a lie into

23   him and tell him about all of your financial woes?  Why are you

24   telling him that?

25   A.  That's part of the story of what I was telling him.

IC65iss2                    Blight - cross

1   Q.  Part of the lie?

2   A.  Yes.

3   Q.  But why the financial components in the story?

4           THE COURT:  Mr. Brafman, I think we can move on.

5           MR. BRAFMAN:  Okay.

6   BY MR. BRAFMAN:

7   Q.  Mr. Blight, did you listen to all the conversations you had

8   with Mr. Issa, not just the parts that were played?

9   A.  Yes.

10  Q.  Okay.  Did you take notes from time to time when you were

11  listening?

12  A.  No.

13  Q.  But you listened carefully, right?

14  A.  I tried.

15  Q.  And how many times do you think you met with the government

16  or the lawyers, the government lawyers in this case before

17  testifying today?  Just a guess.

18  A.  Three times.

19  Q.  And, how many times did you talk to Agent Dubar about your

20  testimony before coming today?  10 times, approximately?

21  A.  About the testimony, maybe the three times.

22  Q.  Okay.  And did you, were they essentially telling you every

23  question they were going to ask you when you got in front of

24  the jury?  Yes?

25  A.  I'm not sure if they were.  They asked questions and I

IC65iss2                          Blight - cross

1    answered.

2    Q.  And pretty much the questions that Ms. Hanft asked you on

3    direct examination you heard on several occasions in their

4    office before, correct?

5    A.  A few of them.

6    Q.  I'm sorry?

7    A.  A few of them.

8    Q.  So, what did you talk about when you sat down with them?

9    The Yankees?

10   A.  They asked me questions and I answered.

11   Q.  About this case?

12   A.  Yes.

13   Q.  Now, did you ever sit down and actually count the number of

14   outright lies you told to Mr. Issa that are recorded on tape

15   before he ever gave you a dime?

16   A.  No, I didn't count.

17   Q.  If you had to guess, would you agree that it is more than a

18   hundred?

19   A.  I cannot say.  I don't know.

20   Q.  Because you were lying to him constantly, right?

21   A.  No.

22   Q.  And in just about every conversation there was some truth

23   and some lie, correct?

24   A.  Correct.

25   Q.  Every conversation; some truth and some lie?

IC65iss2                         Blight - cross

1    A.  Not every conversation.

2    Q.  But that was the balance, the vast majority of

3    conversations, some truth and some lie?

4    A.  Correct.

5    Q.  Now, the lie got a little bit more complicated because you

6    involved other members of your family in the lie, didn't you?

7    A.  Complicated?

8    Q.  Did you tell Mr. Issa that you were going to bring your

9    wife and daughter to New York and hoped that they could go

10   shopping at the expensive stores in New York City?

11   A.  I didn't say anything about expensive stores but to go

12   shopping and that could be expensive in New York.

13   Q.  Okay, so let's rephrase it.  Did you tell Mr. Issa that you

14   were going to bring your wife and daughter to New York to go

15   shopping and you mentioned how expensive the stores are going

16   to be in New York?

17   A.  Correct.

18   Q.  Was that chitchat or was that by design?

19   A.  That was chitchat.

20   Q.  So you were just telling them that your wife and daughter

21   are coming to New York, they were never coming with you --

22   A.  They weren't going to New York, no.

23   Q.  So that was a completely lie?

24   A.  That was.

25   Q.  When you talk about chitchat, chitchat is generally not a

IC65iss2                        Blight - cross

1   lie, is it?

2   A.  I don't know what chitchat is.

3   Q.  But this conversation was scripted and designed and

4   approved by law enforcement for to you say these things,

5   correct?

6   A.  No.

7   Q.  You just moved at your own free will?

8   A.  When I said that, yes.

9   Q.  Okay, so you injected scholarship, you injected rent, and

10  you injected expensive stores.  Why?

11  A.  Because that is how I perceive New York.  I perceive New

12  York as being an expensive place.  Mr. Issa knew that I was

13  coming to New York and from what I said, yes, that my daughter

14  was going to check out Columbia.

15  Q.  Okay.

16  A.  But as far as the shopping and the hanging out and it being

17  expensive, that's something I know of from what I heard about

18  New York.

19  Q.  Okay.  I will accept that.

20  A.  Right?  So it seemed to be, you know, something that you

21  would normally say about New York and that's why I said it;

22  yes.

23  Q.  You would normally say to someone who are you trying

24  eventually to hopefully get a bribe from?

25  A.  I wasn't hopefully and trying to get a bribe from Mr. Issa.

IC65iss2                          Blight - cross

1   Q.  You weren't?

2   A.  No.

3   Q.  Okay.  So, why did you then talk to him constantly about

4   all of the money woes that you and your family had?  Were you

5   his friend?

6   A.  I did not talk to Mr. Issa constantly about that.

7   Q.  But it is repeatedly in the transcripts, even the little

8   portions we heard here; my daughter, the scholarship, the

9   stores.  Everything is in there, isn't it?

10  A.  That's in there.  It is not constant.  There was a lot of

11  things talked about in these transcripts.

12  Q.  Right.  So some of these conversations were three hours

13  long, right?

14  A.  Yes.

15  Q.  And then some of them we heard, like, 15 minutes, right?

16  A.  Right.

17  Q.  And you didn't pick those spots, the government did; right?

18  A.  Right.

19  Q.  And in some of the conversations you are lying about your

20  daughter, correct?

21  A.  Correct.

22  Q.  Lying about coming to New York with your wife, right?

23  A.  Correct.

24  Q.  And lying about rent for your daughter?

25  A.  Correct.

IC65iss2                          Blight - cross

1    Q.  And you told Mr. Issa it was going to be approximately

2    $20,000 for her room and board, correct?

3    A.  Correct.

4    Q.  And does Mr. Issa offer you $20,000 to pay for it?

5    A.  No.

6    Q.  Do you remember what he says to you?

7    A.  Yes.

8    Q.  He says to you that that's crazy.  You can get three or

9    four girls who are going to school and you could work as

10   roommates and they would all share the expense, correct?

11              MS. HANFT:  Objection.

12              THE COURT:  I believe we heard this.

13              MR. BRAFMAN:  It is on the tape.

14              THE COURT:  Correct; that portion that was played.

15              MR. BRAFMAN:  Yes.

16              THE COURT:  Yes.

17              MR. BRAFMAN:  Okay.

18              THE COURT:  The objection is overruled.

19              MR. BRAFMAN:  Thank you.

20   BY MR. BRAFMAN:

21   Q.  Didn't you say that?

22   A.  Yes.

23   Q.  Did you think when he said that he was being sinister or

24   was he being nice, in your mind?

25   A.  I don't know.

IC65iss2                        Blight - cross

1   Q.  Well, he told you his family, he had doctors up in Columbia

2   where she would be living and he would help you find a place,

3   correct?

4   A.  Correct.

5   Q.  You think he was bribing -- getting a bribe or bribing you

6   with that information or trying to help you with your daughter?

7   The truth, as you sit here now.

8   A.  I don't know how to answer that.  I don't know if he was

9   trying to bribe me or not.  I don't know.

10  Q.  So, telling you that you told him your daughter was going

11  to medical school, right?

12  A.  Right.

13  Q.  Was that true?

14  A.  Yes.

15  Q.  In New York?

16  A.  No.

17  Q.  And Mr. Issa said that his cousin was like the head of

18  research at Mount Sinai, correct?

19  A.  I think so.

20  Q.  And do you think he was trying to help you for

21  ill-motivated reasons or you were just having the discussion

22  and he was trying to assist your daughter?

23  A.  I think Mr. Issa was offering to help with the intent to

24  get business from me, yes.

25  Q.  To get your daughter an apartment for the intent of getting

1    business; is that right?

2    A.  That's why I think he would help me, yes.

3    Q.  That's the only reason why you think a person might help

4    you, for a corrupt reason?

5    A.  In this instance.

6    Q.  In this instance.

7           Did you have three-, four-, six-hour conversations

8    with Mr. Issa about so many topics unrelated to this case, am I

9    right?

10   A.  Yes.

11   Q.  Topics, in general, about the world, right?

12   A.  Yes.

13   Q.  And those conversations that you participated in had

14   nothing do with business from time to time, correct?

15   A.  Correct.

16   Q.  And Mr. Issa didn't ever, never, ever brought up a

17   conversation concerning the difficulties of your family, it was

18   always you who injected it into the equation, correct?

19   A.  Not always.

20   Q.  Mr. Issa didn't know your daughter, correct?

21   A.  No.  He didn't know her.

22   Q.  Okay.  You knew that she wasn't going to Columbia.  We have

23   established that, right?

24   A.  Right.

25   Q.  How many times did you bring up your daughter's problems

IC65iss2                         Blight - cross

1   with tuition at Columbia and the loss of her scholarship?   How

2   many separate times did you raise that subject with Mr. Issa?

3   A.   I'm not sure.

4   Q.   50?

5   A.   Once, maybe twice.

6   Q.   You sure?  You're under oath.

7         I'm going to ask you again.  How many times was

8   Columbia University and your daughter's scholarship referenced

9   by you in conversations with Mr. Issa?  More than 10?

10  A.   I would have to count.  I mean, yes, there was times -- it

11  was more than a couple times we talked about that, absolutely.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And after each and every juncture when you talked about it,

2    it was the same sob story, as I can characterize it.  She's

3    losing her scholarship, you can't afford her tuition, you can't

4    afford her rent, over and over and over again?

5    A.  No.

6    Q.  Isn't that true?

7    A.  No.

8    Q.  It's not?

9    A.  No.

10   Q.  You want me to go through the recordings with you?

11   A.  Sir, you can.  Every time that I talked to him about

12   Columbia or coming to New York wasn't about hardship or

13   anything.  It was about going to New York.  It wasn't me

14   dwelling on me not being able to afford it or anything like

15   that, no.

16   Q.  You could go to New York without injecting Columbia and a

17   scholarship.  Just get on a plane or take a train or a bus and

18   get here, right?

19   A.  Right.

20   Q.  Why do you need all these money bells and whistles for?

21   You thought it would help the conversation, right?  Isn't that

22   the honest truth?

23   A.  When I mentioned that about the hardships, yes, I

24   interjected that.

25   Q.  Because you thought it would help get Mr. Issa to help you

1    or discuss helping you, right?

2    A.  I would say yes.

3    Q.  And you're recording that, right?

4    A.  Yes.

5    Q.  For law enforcement?

6    A.  Yes.

7    Q.  Hoping to make evidence of a crime, right?

8    A.  I don't know what the outcome would be.

9    Q.  OK.  But you are doing it at their direction, right?

10   A.  Yes.

11   Q.  All right.  Now, then there were issues concerning the

12   scheduling of your trip to New York, correct, sir?

13   A.  Correct.

14   Q.  And Mr. Issa had scheduling issues sometimes, right?

15   A.  Correct.

16   Q.  And you had scheduling issues, yes?

17   A.  Correct.

18   Q.  Your scheduling issues were sort of like discussed with the

19   government as to when it would be convenient to do this trip,

20   right?

21   A.  Correct.

22   Q.  From the first time the trip to New York was mentioned

23   until the time you actually landed in New York, how many months

24   passed?

25   A.  A couple.

IC6HIss3                         Blight - Cross

1    Q.   Six?  Five?  Four?

2    A.   I don't know.

3    Q.   Would you accept several months as a practical answer?

4    Yes?

5    A.   I guess yes.

6    Q.   How many conversations from the time the trip to New York

7    was mentioned until the time you hit LaGuardia Airport, landed?

8    A.   I don't know how many.

9    Q.   And the scheduling issues that you essentially talked to

10   Mr. Issa about at times, were they created?

11   A.   Yes.

12   Q.   Was some of the scheduling issues that you created dealing

13   with your daughter's efforts to get an interview with a certain

14   professor in the hope of salvaging her scholarship?

15   A.   Yes.

16   Q.   And what you said to Mr. Issa as a total lie was that you

17   needed to schedule this around the interview that you were

18   hoping she would get in Columbia, correct?

19   A.   Correct.

20   Q.   And that was all a lie, right?

21   A.   Correct.

22   Q.   There was not ever going to be an interview?

23   A.   Correct.

24   Q.   So why did you do that?

25   A.   I thought I answered that already.

IC6HIss3                         Blight - Cross

1    Q.  You were told by law enforcement to do it, right?

2    A.  Correct.

3    Q.  And the game plan became a little bit more tricky.  So to

4    add to the equation, suddenly there was an injection of a

5    possibility of her getting an interview to salvage a

6    scholarship that she never really had, right?

7    A.  I do believe I answered that.

8    Q.  But you're going --

9            THE COURT:  You have, sir.  He's allowed.  You have.

10   He's allowed to ask again.  He's coming perilously close to the

11   point where I will tell him to move on, but as long as I'm

12   allowing the question, don't fight with him, just answer.

13           THE WITNESS:  Yes, your Honor.

14   Q.  Who injected the interview with the director of the

15   scholarship --

16           THE COURT:  You've reached the point.  We've heard

17   that testimony ten times.  We don't need to hear it again.

18           MR. BRAFMAN:  Yes, ma'am.

19   Q.  Was there a discussion with Mr. Issa that when you got to

20   New York, you would hang out and have a good time?

21   A.  Yes.

22   Q.  Did you hang out when you came to New York?

23   A.  Yes.

24   Q.  Did you hang out first with a young lady who worked for

25   him, Stephanie?

IC6HIss3                              Blight - Cross

1    A.  Yes.

2    Q.  And Stephanie picked you up from the airport, is that

3    correct?

4    A.  Yes.

5    Q.  And Stephanie -- at first you came in late at night, and

6    you were hungry and you stopped at a place to eat?

7    A.  Yes.

8    Q.  Did you pay or she pay?

9    A.  She paid.

10   Q.  When she paid, what was it, like a hamburger place or diner

11   or something like that?

12   A.  Yes.

13   Q.  Approximately how much the check was, do you know?  Twelve

14   dollars?

15   A.  I don't recall.

16   Q.  What did you have?  Do you recall that?

17   A.  I don't.

18   Q.  Now, then Stephanie took you to your hotel, right?

19   A.  Yes.

20   Q.  And she left you off at the hotel, and the hotel was right

21   across from the airport, the Sheraton, right?

22   A.  I'm not sure how close it was.

23   Q.  But who picked that hotel?

24   A.  One of Tony Issa's employees.

25   Q.  And you put it on your mother's credit card?

Blight – Cross

1    A.  Yes.

2    Q.  Now, the hotel that you stayed at, was it a nice place?

3    A.  It was nice.

4    Q.  OK.  Modest or extraordinarily expensive?

5    A.  I'm not sure what extraordinary would be.

6    Q.  It wasn't in Midtown Manhattan; it was at LaGuardia

7    Airport, right?

8    A.  I don't remember it being by an airport.

9    Q.  It was right on the highway, the Van Wyck or Grand Central,

10   and it's right sitting on the highway, right?

11   A.  I don't remember it being on a highway.  It was on a street

12   in a neighborhood-type setting.

13   Q.  But it wasn't in Manhattan?

14   A.  I've never been to New York.  I'm not sure how close the

15   highway was to that.

16   Q.  How many months after the text from Mustafa did this

17   meeting in New York take place?

18   A.  Three.

19         MR. BRAFMAN:  May I just talk to the government

20   paralegal for a second to make sure she has the exhibits I

21   need?

22         THE COURT:  Of course.

23         MR. BRAFMAN:  Thank you.

24         (Discussion off the record)

25         MR. BRAFMAN:  Can I just have a minute, your Honor?

1  Q.  Now, Ms. Hanft asked you to discuss some of the problems

2  that you were having in Detroit with Mr. Issa's invoices, and

3  then you went through a couple.  Do you remember that?

4  A.  Yes.

5  Q.  You said to the Court and the jury, and correct me if I'm

6  wrong, that there was some billing for things that either

7  shouldn't have been on there or that they should have been

8  covered by the preventive maintenance inspection, correct?

9  A.  Correct.

10 Q.  Just so the jury understands, because it's been a couple of

11 days and I just want to go back for a minute, there's a vehicle

12 maintenance inspection form that is a checklist, is that

13 correct?

14 A.  Correct.

15         MR. BRAFMAN:  And if we could put up, I think it's 360

16 or 260, the form, 1060.  It's the inspection for LLVs.

17 Q.  Do you see that, sir?

18 A.  Yes.

19         MR. BRAFMAN:  Could we put the second half of that

20 sheet side by side, if we can.

21 Q.  For the record, Government Exhibit 1060.  It's in evidence,

22 and it's a two-page form.  The second page is actually the back

23 of the form, is that correct?

24 A.  Correct.

25 Q.  And it's Form 4546-B, correct?

IC6HIss3                          Blight - Cross

1   A.  Correct.

2   Q.  This one is dated March 1998.  The form's basically been

3   the same for 20 years, correct?

4   A.  Correct.

5   Q.  All right.  So this is the form that you use when you

6   talked with Ms. Hanft about billing issues that you had with

7   Mr. Issa, correct?

8   A.  Correct.

9   Q.  So the jury understands, this form -- if we could go to the

10  top of the first page, enlarged please -- this form is entitled

11  "United States Postal Service Preventive Maintenance Inspection

12  Guidelines for Light Delivery Vehicles," and the light delivery

13  vehicle is pictured on the right.

14          You're familiar with the form and the vehicle?

15  A.  Correct.

16  Q.  Many of those vehicles are almost 25 years old, correct?

17  A.  Correct.

18  Q.  And they come to you for mandatory inspections or when they

19  need inspections, even though it's not mandatory, because

20  something's wrong with the truck, right?

21  A.  Right.

22  Q.  And you do literally hundreds, if not thousands, of these a

23  year?

24  A.  Hundreds, yes.

25  Q.  And most VMFs around the country do numerous PMIs, to your

IC6HIss3                        Blight - Cross

1   knowledge, correct?

2   A.  Correct.

3   Q.  And these are mandatory inspections at least twice a year

4   for light delivery vehicles, correct?

5   A.  Correct.

6   Q.  And when I say "twice a year," every six months, whether

7   there's anything wrong with the truck or not, it's got to be

8   brought in and inspected to ensure that the driver is operating

9   a safe vehicle, correct?

10  A.  Correct.

11  Q.  And sometimes the vehicles come in when they break down in

12  between inspections or something breaks and they need it fixed,

13  right?

14  A.  Correct.

15  Q.  So you can see the same truck twice a year or ten times a

16  year depending on the condition of the truck, correct?

17  A.  Correct.

18  Q.  It's not uncommon during the period we're talking about for

19  vehicles needing to be repaired again and again through no

20  fault of anyone because they're old and broken down in some

21  respects, right?

22  A.  In some respects, yes.

23         MR. BRAFMAN:  All right.  So now if we could go up and

24  show the entire page, just the first page.  You can show him

25  both.  That's fine.

IC6HIss3                         Blight - Cross

1   Q.  There are a total -- if we go to the right-hand side of the

2   second half and you enlarge there, where my finger -- I'm

3   sorry.  You can't see my finger -- where the No. 79 is.

4           You see that, sir?

5   A.  Yes.

6   Q.  All right.  So every one of these items, the ones that

7   certainly have information, are supposed to be checked by a

8   trained mechanic for a PMI, right?

9   A.  Not every single thing on this inspection is.

10  Q.  OK.  So the things that have to be inspected, a mechanic

11  would know, correct?

12  A.  Yes.

13  Q.  But it's more than two dozen items would have to be checked

14  on a PMI, would you agree with that estimate?

15  A.  Yes.

16          MR. BRAFMAN:  All right.  Could we put them both side

17  by side.  Now I want to take down the first -- I'm sorry.  Take

18  down the right side of the screen and put up Exhibit 1061 next

19  to it.  Thank you.

20  Q.  When Ms. Hanft questioned you, you identified 1061 as an

21  invoice that you characterized as having a billing issue,

22  correct, or double billing issue, correct?

23  A.  Correct.

24  Q.  Do you know whether this invoice was prepared to defraud or

25  whether it was just an error in how it was prepared?

IC6HIss3                          Blight - Cross

1              MS. HANFT:  Objection.

2    Q.  Do you know?

3              THE COURT:  I'm sorry.  The ground for the objection?

4              MS. HANFT:  Calls for a legal conclusion.

5              MR. BRAFMAN:  Sorry?

6              THE COURT:  Calls for a legal conclusion?

7              MR. BRAFMAN:  No, that's not what I'm asking.

8              THE COURT:  Certainly does not call for a legal

9    conclusion.  Have a seat.

10   BY MR. BRAFMAN:

11   Q.  Let me make it easy.  Did you see this after it had been

12   already prepared or the time it was submitted?

13   A.  I saw it after it was submitted.

14             MR. BRAFMAN:  If you pull up the right-hand side and

15   enlarge the legend on top, Dearborn Heights, we can see that,

16   please, Colleen.

17   Q.  Can you see it, sir?

18   A.  I see it.

19   Q.  That's your VMF where you were working at the time,

20   correct?

21   A.  Incorrect.

22   Q.  Were you working there at the time?

23   A.  No.

24   Q.  So you never saw this invoice until after it was submitted

25   and it was shown to you by the government?

IC6HIss3                          Blight - Cross

1    A.  Yes, this was submitted to the Dearborn VMF.

2    Q.  Did you see it when it was submitted or did you see it the

3    first time when they showed it to you at the government?

4    A.  No, this is -- I saw this when I received it back in

5    somewhere around July of 2016.

6    Q.  This was at a time when you were already taping Mr. Issa,

7    correct?

8    A.  Correct.

9    Q.  Is there any reference whatsoever in any tape or any text

10   to this invoice and you saying:  By the way, Tony, I'm taking

11   off $23 because you can't charge me for this?  You ever say

12   that to him?

13   A.  Not -- not in this text, no.

14   Q.  Did you ever say it to him when this invoice was submitted,

15   or did you just send it on for approval?

16   A.  I told Tony that we were having billing problems.

17   Q.  On this specific invoice, did you ever tell Mr. Issa that

18   there was a mistake?

19   A.  I cannot recall for this specific invoice.  I did talk to

20   his managers at Safeway.

21   Q.  So let's talk about the managers.

22           This invoice, do you know if Mr. Issa ever personally

23   saw it before it was introduced into evidence today?

24   A.  I don't know.

25   Q.  And the work was done in Detroit, correct?

1   A.  At Mr. Issa's shop, yes, I believe it was.

2   Q.  It's his shop, but do you know if he was there when the

3   work was done?

4   A.  I don't know.

5   Q.  Do you know if he ever approved this invoice when it was

6   sent to Detroit for payment?

7   A.  I don't know.

8   Q.  So now we have an invoice that's prepared in Detroit by

9   someone working at the shop.

10          If we could bring it up again so we could see the

11  whole document, please.

12          It's a two-page document, is that correct, sir?

13          If we could now take down the PMI checklist and put

14  this side by side with the second page of the invoice.  Thank

15  you.  If we could enlarge the bottom of the second page for

16  your Honor and the jury.

17          All right.  The total submitted was $1,200.67.  Do you

18  see that?

19  A.  I do.

20  Q.  All right.  And there's a reference there to there being a

21  revision from the previous estimate, correct?

22  A.  I see it.

23  Q.  All right.  Now, if you look down at this -- I'm sorry.  If

24  you look down at the invoice, you see 28.78 for labor was

25  revised, and the total bill was 1,200.67.  You see that?

1   A.  I see it.

2   Q.  Now, we can go back now to the whole bill so we can see the

3   work done.

4           I think what you said to the jury when you were

5   talking about this invoice with Ms. Hanft -- if you can

6   increase the size, please of the bill, of the breakdown, the

7   part that itemizes the work done.  OK.

8           Do you see over on the left where it says "oil

9   filter"?

10  A.  Yes.

11  Q.  And even though there is one oil filter supplied, there's

12  no charge, correct?

13  A.  Correct.

14  Q.  And that's because it's covered by the PMI; you're supposed

15  to replace the oil filter?

16  A.  No.

17  Q.  So why didn't he charge you for it?

18  A.  Because that is -- it's a one for one.  Mr. Issa

19  established a parts consignment with the same company we use,

20  the postal service uses.

21  Q.  OK.

22  A.  And when you see a no sale price or an extended price on

23  the right, that is a part that we resupply --

24  Q.  OK.

25  A.  -- him with, his company, or that is a part that they pick

IC6HIss3                         Blight - Cross

1   up from our post office stockroom and install.  It's itemized

2   on the left to show it was used.

3   Q.  So they can't charge you for it, right?

4   A.  Only if we purchase it from them --

5   Q.  And you --

6   A.  -- rather than exchange.

7   Q.  And you weren't charged for it?

8   A.  I wasn't, no.

9   Q.  Now, the two items that you indicated were false on this

10  was an item on the right-hand side where it says, "Lubricate

11  doors, tracks, rollers, hinges, and locks," and you were

12  charged $23.70.  That's the problem with this $1,200 bill, one

13  of the problems, correct?

14  A.  Correct.

15  Q.  And your position is -- if we can have the PMI inspection

16  sheet picked up and moved it side by side with this, the

17  checklist -- that's because what you said was, under the PMI,

18  he should have lubricated the entire truck because it says that

19  on the PMI guideline checklist, and he didn't and shouldn't

20  have billed you for it, is that right?

21  A.  Correct.

22  Q.  Can you show me where it says that on the PMI checklist.

23  Is it item 12?

24  A.  Thirty-five, change oil filter and lubricate.

25  Q.  Where does it say that?  What item is that?

IC6HIss3                          Blight - Cross

1    A.   Item 35.

2    Q.   OK.  It's up there, right, "change oil filter and

3    lubricate"?  So when you change the oil filter and lubricate,

4    you're telling this jury that you're supposed to lubricate the

5    entire truck?

6    A.   Yes, all lubrication points.

7    Q.   All lubrication points with the oil filter like a Jiffy

8    Lube or the entire truck?

9    A.   The entire truck doesn't need to be lubricated; the

10   lubrication points do.

11   Q.   All right.  Let's look at the bill.  The $23.70 for

12   lubrication.  Talks about door tracks, rollers, hinges, and

13   locks.  That's what you were charged 23.70 for, not for the oil

14   filter and not for lubricating the oil filter.  Where does it

15   say you have to lubricate the tracks, the locks, whole

16   pull-down door to do it for free?  Where does it say that on

17   your PMI checklist?

18   A.   OK.  I'm confused on what you just said --

19   Q.   You are?

20   A.   -- because it don't make sense.  At the beginning of it

21   where you said lube, a filter, but this is preestablished.  We

22   talked about this numerous times.

23   Q.   With who?

24   A.   With Tony, Mustafa, Amir, Mike, and all the other managers

25   that he used.

IC6HIss3                          Blight - Cross

1    Q.  OK.

2    A.  OK.  Now, the lubrication points need to be lubed.  The

3    suspension parts where there's dirt fittings, the door slides,

4    locks, and those items are all included in the lubricating of

5    the vehicle, and that's something that we talked about before

6    he even worked with Dearborn.  It was in Detroit as well.  We

7    talked about what's the right way to do it and --

8    Q.  Let's talk about --

9    A.  -- and they were shown.

10   Q.  Let's talk about next item that you thought was false

11   billing, which is the wash.  You see that on the bill?

12   A.  Yes.

13   Q.  All right.  You said that the wash should be covered by the

14   PMI checklist because the wash is covered on line 12 where it

15   says, "Clean inside and out."  Do you see that?

16   A.  Yes.

17   Q.  Are you wrong, Mr. Blight, about this?

18   A.  About what, sir?

19   Q.  About whether or not when you clean inside and out, that

20   you have to eat the wash as well?

21   A.  No, I'm not wrong.

22   Q.  It's supposed to be covered when you clean inside and out,

23   right?

24   A.  What's supposed to be covered?  I don't understand what

25   you're saying.

1  Q.  When you wash the vehicle -- I'm sorry.  When you clean

2  inside and out, you're telling this jury that it's supposed to

3  cover washing the vehicle as well, is that correct?

4  A.  The time for it, yes.

5  Q.  Do you know how big the truck is that we're talking about

6  under this bill?

7  A.  Yes.

8  Q.  All right.  Do you wash it by hand?

9  A.  I don't wash them.  I'm not sure what you're asking me,

10  sir.

11  Q.  Are you telling us that there's no exception in the code

12  that you follow for when you wash the vehicle that it's

13  separate and apart from cleaning the vehicle inside and out?

14  A.  If there's anything like that, it'd have to be

15  preestablished.

16  Q.  When you say "preestablished," I'm going to show you what's

17  marked for identification as the rule book that you guys

18  follow, Exhibit 112.

19          Do you recognize this book?

20  A.  Yes.

21          MR. BRAFMAN:  Can I give one to the Court?

22          THE COURT:  You may.

23  Q.  Do you recognize this book?  If you could look at me until

24  I'm referring to a specific place.

25          Do you recognize this book as the guidebook that

IC6HIss3                          Blight - Cross

1   you're supposed to use when conducting a PMI inspection?

2   A.  Well, there's addendums to this book.  This -- there's a

3   lot of addendums.  They're called maintenance --

4   Q.  Let's look at this book, and then you'll tell me what's

5   been addended.  If you tell me it's been changed, I'm going to

6   show you every other book, OK?  So let's just look at a

7   specific reference.

8           Is there a specific reference for LLVs at page 24 and

9   a discussion, if you will, guidelines for PMI light delivery

10  vehicles?  Look at page 21.

11  A.  21?  I see it.

12  Q.  All right.  Now, do you recognize this as the guideline for

13  conducting a PMI inspection?

14  A.  Yes.

15  Q.  Could you look at page 24.  And page 24, including among

16  other things, has a reference to item 12 which there is just

17  described -- I'm not going to read it -- "Clean inside and

18  out," Sections A and B referring to the PMI inspection sheet.

19  Do you see that?

20  A.  I see it.

21  Q.  Do you recognize that as the guideline for conducting a

22  cleaning inside and out?

23  A.  Yes.

24          MR. BRAFMAN:  Your Honor, I offer that page into

25  evidence as Defendant's Exhibit 112 with the cover page, or

IC6HIss3                          Blight - Cross

1    I'll offer the whole book.

2              MS. HANFT:  Your Honor, we don't object to the page

3    coming in.

4              THE COURT:  The page can come in with the cover page,

5    112.

6              MR. BRAFMAN:  We'll just identify it for the record as

7    Exhibit 112, page 24, OK.

8              (Defendant's Exhibit 112, page 24 received in

9    evidence)

10   BY MR. BRAFMAN:

11   Q.  I want to read to you now that it's in evidence on the top

12   of the page where it says "Clean inside and out."

13             If we could have that page so I can show to the jury

14   as I'm reading.  You can put it up here.

15             Can you see it, sir?

16   A.  Yes.

17   Q.  I'm going to see if I can focus this or make it bigger,

18   just the top.

19             Thank you.  That's good.

20             The top of the page gives you the instructions for

21   clean inside and out, A and B.  Do you see that?

22   A.  Yes.

23   Q.  Let me read it:  "During each PMI, pressure clean the

24   engine and chassis, wash the vehicle before performing repairs.

25   Take extreme precautions when washing inside of vehicles.

IC6HIss3                          Blight - Cross

1   Note:  The estimated repair time shown on the back of Form

2   4546-B was calculated assuming the use of an automatic truck

3   washer.  Add 0.3 hours if the vehicle is hand-washed and 0.2

4   hours for cleaning windows and inside of vehicle."

5          Do you see that?

6   A.  Yes.

7   Q.  And that gives the VMF contractor the right to charge for

8   additional labor if he's using hand-wash, correct?

9   A.  Yes.

10  Q.  It doesn't mean that you just get coverage for the PMI;

11  you're allowed to charge for that if you're actually washing a

12  truck that size, correct?

13  A.  Correct.

14  Q.  You ever personally try and hand-wash an LLV?  It's a big

15  truck to do by hand, isn't it?

16  A.  They're not that big.

17  Q.  We've all seen them.  Everybody knows the size.  They're

18  running up and down the streets delivering mail, right?

19          It's a truck.  You wash it by hand, does it take at

20  least a half-hour?

21  A.  By hand I would imagine it would.  I'm not sure.

22  Q.  OK.  So look at the bill, 1061, for the wash that you

23  claimed was double billing.

24          Would you put up 1060.  Let's put up an invoice.

25  Let's put up 1067, if we can.

1          You look at the wash, there is a standard charge on

2     all of the invoices you identified, if you'll accept my

3     representation.  We can enlarge the part on the lower

4     right-hand side where it says "wash."

5          Wash, clean interior, and exterior of the vehicle,

6     $70, is that correct?

7     A.  Correct.

8     Q.  Now, as you sit here today, do you know how long it took to

9     do that?

10    A.  No.

11    Q.  Do you know what the labor costs for a trained person to do

12    this is in that time in Detroit?  Is it $79 or more an hour?

13    A.  To do a vehicle wash by hand?  I'm not sure what you're

14    asking me.

15    Q.  I'm asking you how do you know that that line item is false

16    billing as you sit here today?

17    A.  Because the vehicle was not hand-washed, and I don't

18    consider the inside of the vehicle just being blown out with an

19    air hose of the dust a clean of the inside of the vehicle.

20    Q.  But it was washed, wasn't it?

21    A.  The outside was.

22    Q.  Was the outside washed by hand or by a power washer?

23    A.  I was told a power washer and that vehicles were taken to a

24    local drive-through.

25    Q.  And who takes them?  One of Mr. Issa's contractors?

1   A.   Correct.

2   Q.   And the time of the labor going and coming back, he's not

3   allowed to charge you for that?

4   A.   Well, when you're referring to hand-washing, that's one

5   thing.  When you're referring to doing with a power washer at

6   your shop or driving it through a car wash up the street, it's

7   different, and that should have been preestablished.  I found

8   out about that being done early on with Mr. Issa, and that's

9   when I talked to them about that.

10  Q.   OK.  Look at the invoice.  If that's what you're saying is

11  truthful, look at the invoices.

12          If we can put up 1067, the lower part of the invoice.

13  You can move it fuller on the page, please.  Now the lower part

14  that has the pricing, right.  Thank you.

15          How many revised estimates do you have?  You have a

16  revision 846.  You have current estimate, 846.  How much is the

17  amount that's approved for payment?

18  A.   The balance was 781.60.

19  Q.   So it's about $70 less than what Mr. Issa wanted to be

20  paid, correct?  Do the math.

21  A.   Well, from the current estimate, costs can be dropped for

22  numerous different issues.  In particular, where it says, "Oil

23  seepage at where oil pan.  Possible residue oil.  Engine looks

24  new," the original quote could have had on there the cost of

25  the oil pan replacement or gasket replacement, and I'm not --

IC6HIss3                         Blight - Cross

1   Q.  Did you review this before it was submitted for payment?

2   A.  This invoice, yes.

3   Q.  So you made these revisions, right?

4   A.  Not me in particular.

5   Q.  But your office?

6   A.  Let me read this and see here.

7           The office or Mr. Issa's mechanic or tech who went

8   further to do the repair and realized that the repair wasn't

9   needed.

10  Q.  So they revised the invoice the way they should, right?

11  A.  Yes.

12  Q.  But before it was submitted for payment, you looked at it,

13  or someone on your staff looked at it, who would have never

14  gotten it for payment, correct?

15  A.  I'm sorry.  Can you --

16  Q.  Before it was submitted to whoever pays these things,

17  either you or someone under your supervision approved this

18  invoice?

19  A.  Yes.

20  Q.  And no one took off the $70 for the wash, correct?

21  A.  We wouldn't have known.  We're not the ones working on it

22  at the time.  The wash, I don't see a reversion for a wash on

23  this.

24  Q.  Interior/exterior wash $70, you don't see that, the last

25  item on the bottom?  That's what you said was false about this

1    invoice.

2    A.  Right.

3    Q.  OK.  Did you take it off before the invoice was submitted?

4    A.  No.

5    Q.  Now look down at the $23 for the lubrication.  Did you take

6    off the -- if we could move up the invoice, please -- did you

7    take off the 23.70 that was charged for lubricating the door

8    tracks, the rollers, the hinges, and the locks?

9    A.  No.

10   Q.  But you're telling us it's a false billing item; it should

11   have never been on there to begin with?

12   A.  Correct.

13   Q.  So when I am a contractor, whether it's Mr. Issa or someone

14   else, and I do mechanical work on your behalf and I submit an

15   invoice, you have a right to reject it, don't you?

16   A.  Yes.

17   Q.  You have a right to correct it, don't you?

18   A.  Yes.

19   Q.  Sort of like every one of us who's put a car into a

20   mechanic, when it comes back, we look at the bill and sometimes

21   we say, Hey, wait a minute.  I didn't authorize you to do that,

22   and there's some back-and-forth, and either you take it off or

23   we convince you that it should be on, right?

24   A.  Right.

25   Q.  Did you ever discuss these invoices with Mr. Issa or his

IC6HIss3                        Blight - Cross

1    company before Ms. Hanft showed it to you as a false billing

2    invoice?

3    A.  Yes, I have, numerous times.

4    Q.  With Mr. Issa personally, this invoice?

5    A.  This -- I'm sorry.  I didn't hear.

6    Q.  Did you ever discuss this item with Mr. Issa on this

7    invoice before you submitted it for approval?

8    A.  Not him.  I talked to his people numerous times.

9    Q.  All right.  But these invoices, you approved them?

10   A.  Yes.

11           MR. BRAFMAN:  OK.  Could we take it down for a minute,

12   and if we could put back up the PMI report.  If we could turn

13   it over, show the back, or put it side by side.

14   Q.  I want you to look again on the back of the PMI checklist.

15   If you look to the bottom, you see in small print -- if we

16   could have it enlarged, lower part of the second page -- the

17   guidelines, and let me just ask you.

18           The guidelines are guidelines as opposed to absolutes.

19   There's some discretion, correct, would you agree?

20   A.  There can be, yes.

21   Q.  From time to time you exercise the discretion, correct?

22   A.  Correct.

23   Q.  And sometimes you fight over it with the vendor, correct,

24   or discuss it?

25   A.  Discuss it, yes.

IC6HIss3                        Blight - Cross

1   Q.  Now, if you see "ERT" where it's in bold caps, you see that

2   word, three letters, ERT?

3   A.  Yes.

4   Q.  I'm going to read it with you.  ERT is estimated repair

5   time, correct?

6   A.  Correct.

7   Q.  Now let's just stop for a minute and explain to the jury.

8   When we use estimated repair time, until you actually do the

9   repair, you could be lower than the estimate or more than the

10  estimate, correct?  There's a lot of factors involved, correct?

11  A.  Correct.

12  Q.  The condition of the vehicle that has to be repaired could

13  be a factor, right?

14  A.  Correct.

15  Q.  The training and skill of the mechanic doing the repairs is

16  a factor, correct, can be a factor?

17  A.  It shouldn't be, no.

18  Q.  But you have different people work at different speeds?

19  Don't you have good mechanics --

20  A.  Yes.

21  Q.  -- reasonably good mechanics, and some poor mechanics?

22  A.  Correct.

23  Q.  And there was a hiring freeze at this time so that getting

24  a really new mechanic was hard, correct?

25  A.  Hiring freeze?  There wasn't a hiring freeze.

1  Q.  So you had all the staff you needed?

2  A.  No.

3  Q.  You needed more trained mechanics, right?

4  A.  We were short mechanics.

5  Q.  Which is one of the reasons you used independent

6  contractors, because you didn't have enough mechanics, correct?

7  A.  It's one of the reasons.

8  Q.  And the mechanics, in fairness to them, they're working

9  pretty much under the gun.  They got to get the truck back and

10  operating, right?

11  A.  Correct.

12  Q.  All right.  So the ERT, estimated repair time, to perform a

13  Section A, which is the capital letter A, PMI on a light

14  delivery vehicle is 1.5 hours.  Let me stop there.

15        They estimate that to do all the stuff on this

16  checklist under category A should take one and a half hours,

17  correct?

18  A.  Correct.

19  Q.  And that means really a visual inspection of the vehicle or

20  actually doing all of the work?

21  A.  Doing the work that's considered to be the inspection.

22  Q.  Well, the "A" inspection, if you look to the sheet again,

23  the PMI reads, "Inspection," if you look at the list -- if we

24  can take this part down, please.  Sorry -- the "A" inspection

25  has at least 19 separate items for the cab area alone, correct?

IC6HIss3                        Blight - Cross

1    A.  Correct.

2    Q.  And then there is circle inspection.  It wants you to do

3    another inspection, and that gives you approximately ten items.

4    Up to the number 31, correct?

5    A.  Correct.

6    Q.  They also want you to do an underneath inspect, lube, and

7    all those things during that one and a half hours, correct,

8    correct?

9    A.  Correct.

10   Q.  Without wasting the whole morning, it's a lot of work to do

11   in an hour and a half on a truck this size, isn't it?

12   A.  It's what's expected.

13   Q.  OK.  But part of it is like doing a road test on the car,

14   right, to see if it makes noise, if it starts, if it stops,

15   right?

16   A.  Right.

17   Q.  How long is the road test supposed to take?  Are there

18   rules for that?

19   A.  That's one of the variables.

20   Q.  OK.

21   A.  I --

22   Q.  If the road test takes ten minutes or if a road test takes

23   20 minutes, that's really up to the person doing the road test

24   to satisfy herself or himself that the vehicle is OK?

25   A.  Correct.

1   Q.   There's no set -- you don't do 90-second road tests.

2   You've got to drive the car?

3   A.   Correct.

4   Q.   Because what you're listening for is sometimes even

5   non-mechanics hear in a car rattles or noises or knocking to

6   suggest there's something wrong with the car, right?

7   A.   Correct.

8   Q.   And part of what you're doing is trying to straighten that

9   out, if you can?

10  A.   To document it.

11  Q.   Now let's go back to the second page at the bottom.

12          A PMI on a light delivery vehicle equipped with CNG is

13  a 2.0 hours.  That's a special emission standard engine,

14  correct?

15  A.   Correct.

16  Q.   It's a little bit more complicated than the average LLV,

17  correct?

18  A.   Correct.

19  Q.   All right.  Now, estimated time to perform a "B" PMI on a

20  light delivery vehicle is three hours; ERT to perform a "B" PMI

21  on a light delivery vehicle with CNG is 3.5 hours, correct?

22  A.   Correct.

23  Q.   All right.  Now let's go back to 112, page 24, that's in

24  evidence.  That's that one sheet, sir.  Do you have it in front

25  of you?

1          You can take that down, please.  Turn on the ELMO,

2     please.

3          It's the one-sheet document I gave you earlier this

4     morning from the rule book, 112.  I'm going to put it on the

5     screen.  Do you see it?

6     A.  Oh, yes, I see it.

7     Q.  So the book indicates, if you're reading the book when

8     you're doing this work, that the estimated repair time on the

9     back form of 4546-B, which is what we just looked at, was

10    calculated assuming the use of an automatic truck washer, and

11    they tell you you can add .3 hours if the vehicle is

12    hand-washed and 0.2 hours for cleaning windows and inside of

13    the vehicle.

14         The only point I'm trying to make, sir, is you have to

15    read the PMI guideline list in conjunction with this book in

16    order to really understand what the rules are, right?

17    A.  That would absolutely help, yes.

18    Q.  OK.  Thank you.

19         If we could take that down, please.

20         Now, the PMI checklist also references that you can

21    bill for waxing the vehicle.  Do you see that?

22         Can we put on the PMI checklist, please.

23         See item 19?  We can blow that up.  You see it?

24    A.  Yes.

25    Q.  That's covered under the PMI, right?

1    A.  Correct.

2    Q.  Can you charge for it separately?

3    A.  That, yes, when you wax the vehicle.

4    Q.  And you can charge how much extra?

5    A.  An hour.

6    Q.  OK.  Good.

7         Where does it say that on the PMI form?

8    A.  It doesn't.

9    Q.  So if you are doing the wax, you're doing the PMI form, you

10   would need to know the rule book like you know the rule book,

11   correct?

12   A.  Correct.

13   Q.  And then you could charge an hour for waxing the car even

14   though it's listed under the PMI, correct?

15   A.  Correct.

16         MR. BRAFMAN:  Your Honor, could we take an earlier

17   break and work longer?

18         THE COURT:  No, I can't do that.  We go to 1 o'clock,

19   we're going to be back at 2:00, and we'll work a very long

20   afternoon.

21         MR. BRAFMAN:  OK.

22         THE COURT:  I have a meeting between 1:00 and 2:00.

23         MR. BRAFMAN:  I was trying to get you there early,

24   Judge.  I'll work --

25         THE COURT:  Doesn't do any good to get me there early.

1    It doesn't happen until 1:00.

2            MR. BRAFMAN:  You're the chief judge.  You can make it

3    happen.  I'll continue.  I'm sorry, your Honor.

4    Q.  Now, I'm trying to make this user-friendly because you're

5    the expert and we're just ordinary people in the mechanic land.

6            When I bring my car into a mechanic for an inspection,

7    it doesn't include the repairs that the mechanic then suggests

8    the car needs, right?  He charges for the inspection, which

9    could be $50 or $30, and then I might get, you need new tires,

10   right?

11   A.  You're asking me about a normal garage?

12   Q.  A normal garage, and then I'm going to translate it to an

13   abnormal VMF garage.

14           A normal garage, you go in to get your car inspected

15   every year.  They charge you whatever it is, $25, to inspect

16   the car.  When it comes back, you're not expecting to pay the

17   inspection fee to cover repairs that you then might need after

18   the inspection; would that be a fair statement?

19           MS. HANFT:  Objection, your Honor.

20           THE COURT:  What's the ground, Ms. Hanft?

21           MS. HANFT:  Relevance and form.

22           THE COURT:  Sit down, Ms. Hanft.

23           Answer the question, sir.

24   A.  OK.  Can you repeat.  I'm trying to understand what you're

25   asking.

1   Q.  When I bring my car in to have it inspected and I pay the,

2   let's say, $25 inspection fee, I should not expect that $25 fee

3   to also cover repairs that the inspection demonstrates are

4   needed for the vehicle, correct?

5   A.  Not in that situation.

6   Q.  OK.  So now let's talk about your situation with the PMI.

7   The PMI has a set price, the inspection, correct?

8   A.  Correct.

9   Q.  All right.  And the PMI on the lower -- when you have

10  circle inspection -- if you could show the rest of that box,

11  please.  And if we could enlarge just the left-hand side of the

12  first page -- I'm paying a set price of approximately

13  300-and-some dollars.  What's the exact price for PMI?  391?

14  A.  It depends on the hourly rate of the garage or the

15  contractor.

16  Q.  If you look at the sheets submitted, the invoices that you

17  use, there's a regular fee that shows up on every invoice,

18  correct?

19  A.  It's the estimated repair time, yes.

20  Q.  And it's in the $390 area, correct?  That's to inspect the

21  whole truck?  You want me to show you one invoice so we do not

22  spend too much time on this?

23          Give me back the invoices.  Forget it.

24          All right.  If we could look at 1061 -- I'm sorry.  I

25  was wrong.  1061, if we could put that up.

1              Do you see it, sir?

2    A.  Yes.

3              MR. BRAFMAN:  Pick up the side on the right-hand side

4    where it says charge for the PMI.

5    Q.  That shows approximately two hours and 70 -- 2.70 hours,

6    and the charge is 213.30, correct?

7    A.  That's correct.

8    Q.  And that's to do the entire PMI, correct?

9    A.  The parts that you're able to do, absolutely.

10   Q.  Now go back to the lower left-hand side of this PMI

11   schedule, PMI checklist, if we could, No. 1060, and look to the

12   lower left-hand side.  We'll enlarge it.

13             A lot of these deal with tires, correct?  Item No. 21,

14   tire inflation, correct?

15   A.  Correct.

16   Q.  You're supposed to check the tire inflation under the PMI,

17   correct?

18   A.  Correct.

19   Q.  You put one of those gadgets on to try to see what the

20   pounds per square inch is, and if it's too low, you just add

21   air?

22   A.  Right.

23   Q.  And you don't get paid extra for that?

24   A.  No.

25   Q.  And the lug nuts, wheels, hubs, and alignment, you're

1  supposed to check that, and that's all covered under the PMI,

2  correct?

3  A.  Correct.

4  Q.  It's covered under the PMI fee, is that correct?

5  A.  Correct.

6  Q.  Then there's tire probe condition and tread depths,

7  correct?

8  A.  Correct.

9  Q.  And you're supposed to put that in.  When you say "tread

10  depths," to those, perhaps, who don't work on cars, it is the

11  amount of tread that's left on the tire to make it safe, too

12  bald, or not safe?

13  A.  Correct.

14  Q.  A tire has treads, and you could put an instrument in and

15  actually check to see how much tread is left?

16  A.  Correct.

17  Q.  And when a tire has very little treads, left it could be a

18  safety hazard, correct?

19  A.  Correct.

20  Q.  Now, if I'm doing this inspection and I find out that the

21  tires need to be replaced, if the vendor does that, the vendor

22  gets paid for replacing the tires, right?

23  A.  Correct.

24  Q.  And the cost of the tires and the labor of taking them off

25  and putting them back on?

IC6HIss3                          Blight - Cross

1   A.  Correct.

2   Q.  That's not covered by the PMI fee?

3   A.  No.

4   Q.  You would need to approve that in case that was being

5   billed, right?

6   A.  Correct.

7   Q.  So just this example, then I'll move on.

8           The PMI checklist is a guide as to what the mechanic

9   is supposed to do, but it's not the be-all and end-all of what

10  the bill turns out to be, right?

11  A.  Correct.

12  Q.  It has to depend on what the condition of the vehicle is

13  after the inspection, right?

14  A.  Necessary repairs, correct.

15  Q.  Some of that is left to the trust and discretion of the

16  mechanics who are working on it, right?

17  A.  Correct.

18  Q.  You never saw Mr. Issa get under the hood of a car and

19  actually do the repair work, did you?

20  A.  I never saw him do that.

21  Q.  And the people who worked for him, do you know the level of

22  certification they have?

23  A.  No.

24  Q.  But when a VMF approves a vendor, there has to be some type

25  of a vetting to at least determine that the people who are

1    doing the work are capable of doing it; is that true?

2    A.  Correct.

3    Q.  Physically capable, not whether they do it honestly, but

4    that they can actually fix a car, right?

5    A.  Correct.

6    Q.  Whether they bill you properly or not is a separate issue,

7    but they need to know what to do under the hood, correct?

8    A.  Correct.

9    Q.  And you're relying on their expertise, correct?

10   A.  Correct.

11   Q.  When you have a VMF facility that you control, you hire the

12   mechanics, right?

13   A.  The postal service does, yes.

14   Q.  But you have to eventually interview them and hire them?

15   A.  Correct.

16   Q.  And you are the one who supervises their work?

17   A.  Correct.

18   Q.  And their quality of the -- the quality of their work

19   sometimes varies from mechanic to mechanic, would that be a

20   fair statement?  It's like any other job.

21   A.  Correct.

22   Q.  Now, when you delegate that out to the contractor, you're

23   delegating the responsibility of getting trained mechanics,

24   correct?

25   A.  I'm delegating -- I'm not sure of the question.

IC6HIss3                          Blight - Cross

1    Q.  You're hoping that they hire people who are capable of

2    doing work?

3    A.  Correct.

4    Q.  All right.  You have to take some responsibility for who's

5    doing the work if you approve the vendor, right?

6    A.  At a certain point I do, yes.

7    Q.  When this case first started -- and if you want, I'll show

8    you the report -- without getting into an argument of what

9    someone said, when Mr. Issa first arrived in Detroit, you

10   called someone who had worked with him previously from the post

11   office, and without telling what they said, what they said gave

12   you confidence to use him, right?

13   A.  On the parts.

14   Q.  Yes?

15   A.  Yes.

16   Q.  You checked him out to some degree?

17   A.  To some degree about the parts and how he handled the

18   parts, yes.

19   Q.  And the information that you got caused you to agree to use

20   him, in part?

21   A.  In part, yes.

22   Q.  Now, when the facility in Detroit, not the new building

23   that he was going to buy, the facility in the pictures that we

24   have shown you, that facility actually physically arose while

25   you were still the VMF manager nearby, didn't it?

1    A.  Yes, it was established when I was in the Detroit VMF.

2    Q.  Mr. Issa took you to that facility numerous times while it

3    was being built, isn't that true?

4    A.  Well, we met there, yes.

5    Q.  When you say you met there, you didn't go there just to

6    hang out; you went there to check out what you knew was going

7    to be this contractor's VMF facility, correct?

8    A.  Correct.

9    Q.  And you saw it actually take shape, is that a fair

10   statement?

11   A.  Yes.

12   Q.  Because when Mr. Issa started, it was an overgrown, decayed

13   part of Detroit that hadn't been used in years, correct?

14   A.  Correct, it was -- it was being used.  Actually, somebody

15   was using it.

16   Q.  But it wasn't in good shape, and Mr. Issa cleared the

17   property of all of the brush and dirt?  You were there when

18   this happened, Mr. Blight.

19   A.  Right.  I'm trying to understand what you're saying.

20   Q.  He put a lot of money into that facility before it was

21   operational.  You saw it happen.

22            THE COURT:  The objection is sustained.

23            We're going to break for lunch now, ladies and

24   gentlemen.  Don't discuss the case, and keep an open mind.

25   I'll see you all at 2:00.  (Lunch recess)

1                    A F T E R N O O N   S E S S I O N

2                              2:10 p.m.

3            THE DEPUTY CLERK:  Case on trial continued.

4    Government and defense present; jurors are not present.  The

5    witness is on the way back in.

6            THE COURT:  Good.  I hope so.

7            MR. SOLOWIEJCZYK:  Judge, can we take care of one

8    brief housekeeping matter?

9            Yesterday there was a couple of exhibits that came in

10   that the court reporters weren't able to catch.  I just wanted

11   to read for the record certain exhibits that we offered and

12   make sure they were admitted, pursuant to stipulation.

13           THE COURT:  I don't recall having turned down the

14   admission of any exhibit.

15           MR. SOLOWIEJCZYK:  I don't think you did either, your

16   Honor.

17           Just for the record, 252, 254 through 260, 418, 307A

18   through 307F, 307A-T through 307F-T were all offered and

19   admitted.

20           THE COURT:  If they were identified in a stipulation,

21   then I consider them to be in evidence.

22           MR. SOLOWIEJCZYK:  Thank you, your Honor.

23           (Government's Exhibits 252, 254 through 260, 418, 307A

24   through 307F, 307A-T through 307F-T received in evidence)

25           THE COURT:  How much more cross do we have of this

IC65iss4                         Blight - cross

1    guy?

2            MR. BRAFMAN:  Your Honor, it is hard for me to gauge.

3    I think at least another hour.

4            THE COURT:  Okay.  Get them in here.

5            MR. BRAFMAN:  But don't hold me to that, please.

6            THE COURT:  Good.  That means you will do less.  I

7    think that's wonderful.

8            MR. BRAFMAN:  I think an hour and a half I should say.

9    After the fact.

10           THE COURT:  I think you have made your point.  At

11   least with me you have made your point.

12           MR. BRAFMAN:  Making a point to the jury not always

13   the same, your Honor.

14           (Witness resumes the stand)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Okay, you are still under oath, sir.

3              Mr. Brafman?

4              MR. BRAFMAN:  Thank you, your Honor.

5    BY MR. BRAFMAN:

6    Q.  Mr. Blight, do you remember on direct examination the

7    government showed you one or two texts in addition to the

8    recordings that occasionally you texted Mr. Issa or he texted

9    you?

10   A.  Yes.

11   Q.  And, do you remember when I asked you before lunch, I asked

12   you whether or not you ever told Mr. Issa that when you were

13   coming to New York you were going to use your daughter and your

14   wife were going to go to some fancy stores, expensive stores.

15   Do you remember I asked you that?

16   A.  Yes.

17   Q.  And I don't think you remembered having the conversation.

18   Is that correct?  What do you remember?

19   A.  Well, I remember-yes, I remember that conversation.

20   Q.  And, do you remember saying to Mr. Issa, by text, that this

21   was about, you know, around Father's Day in June where you said

22   that you were going to try and go to the city with your wife

23   and that she was going to go shopping with your daughter at

24   some kind of fancy stores out there $$$.  And she deserves it

25   and is worth every expensive penny that you were going to

IC65iss4                          Blight - cross

1    spend.

2              Do you remember testifying to that?

3              MS. HANFT:  Objection.

4              THE COURT:  I'm sorry?  What is the objection?

5              MS. HANFT:  He is reading from something that is not

6    in evidence.

7              MR. BRAFMAN:  Okay.  I will put it in evidence.  Thank

8    you.

9              Do you have 3509-46 and 47?

10             Can we use the 3500 number as an exhibit or should I

11   tag it, your Honor?

12             THE COURT:  You should tag it with a Defendant's

13   Exhibit number.

14             MR. BRAFMAN:  Okay.  I am doing that as we speak.

15             Showing you what is now in evidence --

16             THE COURT:  Nothing is in evidence yet.

17             MR. BRAFMAN:  I'm sorry.

18             THE COURT:  What's been marked as.

19             MR. BRAFMAN:  Showing you what's been marked for

20   identification Exhibit 113, also Exhibit 3509-46 and will ask

21   the Judge to take a look at it first.

22             THE COURT:  Okay.

23             MR. BRAFMAN:  May I show it to the witness?

24             THE COURT:  You may.  And, actually, the government

25   doesn't have any objection to that, does it, really?

1              MS. HANFT:  No, your Honor.

2              THE COURT:  Thank you.  It is admitted.

3              (Defendant's Exhibit 113 received in evidence)

4    BY MR. BRAFMAN:

5    Q.  It is now in evidence, I am going to put it on the screen.

6    Can you see it, sir?

7    A.  Yes.

8    Q.  I am going to read parts of it and I am going to start

9    with:  I will have Thursday and Friday free.  The girls --

10             I am going to stop there.  You are referring to your

11   wife and daughter?

12   A.  Yes.

13   Q.  That is a lie, right?  They didn't come in with you?

14   A.  Right.

15   Q.  Girls planning on hanging out with my wife's friend --

16             That's a lie.  There was no such hanging out plan,

17   right?

18   A.  Right.

19   Q.  -- Thursday and shopping Friday.  She scheduled dress

20   fittings for my daughter at some kind of fancy stores out

21   there.  $$$?

22   A.  Yes.

23   Q.  Did you write that?

24   A.  Yes.

25   Q.  Why?

IC65iss4                           Blight - cross

1    A.   The part about the girls planning on hanging out and with a

2    friend, that was so Tony wouldn't expect my wife or daughter to

3    hang out with us.

4    Q.   Why did he have to know that you're spending a lot of money

5    at an expensive store for your daughter?  Why was that relevant

6    to your conversation?

7    A.   Because of the New York thing being so expensive here.

8    Q.   But why did that -- why was that pertinent to put into the

9    conversation with Mr. Issa?  He is from New York?

10   A.   And he always talked about how things were expensive in New

11   York --

12   Q.   Okay.

13   A.   -- and it was a party town, all that good stuff, but that

14   was in the past and in my mind.  I put that in there to make it

15   pretty much believable that we are going out there and that it

16   is going to be expensive.

17   Q.   Expensive for you, right?

18   A.   Yes.

19   Q.   But none of this is true, right?

20   A.   True, right.

21   Q.   Other than you coming to New York, right?  Am I right?

22   A.   Yes.

23            THE COURT:  We have done this.  We have done this.  We

24   have been over this.  We have been over it *ad nauseam*.  Move on

25   to an entirely different topic.

IC65iss4                    Blight - cross

1   BY MR. BRAFMAN:

2   Q.  I just want to go back for a minute to something to avoid

3   the confusion.  Before you met Mr. Issa on the day shortly

4   after Mustafa said he wanted to meet you, before that time

5   period you had already known Mr. Issa for almost a year, at

6   least from him coming to Detroit and starting to open a

7   facility, correct?

8   A.  Correct.

9   Q.  Before there was any conversation about Mustafa you had met

10  Tony Issa out there and you knew that he was opening a

11  facility?

12  A.  Correct.

13  Q.  And you saw the facility essentially take shape, correct?

14  A.  Correct.

15  Q.  And would it be a fair statement that you went there on at

16  least a couple of occasions with Mr. Issa or saw him on the

17  location?

18  A.  Correct.

19  Q.  And you went there to look at the facility?

20  A.  To check on vehicles, to check on parts, yes.  To see the

21  facility as well.

22  Q.  And what you saw, if you can tell the jury, is that the

23  facility went from being empty, to having lifts and hydraulic

24  lifts and windows and doors that weren't in it when Mr. Issa

25  first bought it, correct?

IC65iss4                        Blight - cross

1    A.  Correct.

2    Q.  And when you first saw it it was, without, you know, trying

3    to be too graphic, it was somewhat covered with brush and dirt,

4    correct?

5    A.  Correct.  It was not -- it was being used but it didn't

6    seem to be well maintained for an open business.  It seemed to

7    be like storage.

8    Q.  And then, ultimately, when he took it over it began to take

9    shape as a working business?

10   A.  Yes.  Yes.

11   Q.  And not only did you go there but you were there when

12   officials from Detroit came and they put in new lighting in the

13   area, correct?

14          MS. HANFT:  Objection.

15          THE COURT:  The objection is sustained.

16   BY MR. BRAFMAN:

17   Q.  Well, do you know whether or not Mr. Issa was hiring people

18   for this new facility before it opened?  Do you know?

19          THE COURT:  The objection is sustained.  It is

20   irrelevant.

21          MR. BRAFMAN:  I think not, but I will accept your

22   Honor's ruling.

23          THE COURT:  Unfortunately you have little choice.

24          MR. BRAFMAN:  Yes, I know that.

25   BY MR. BRAFMAN:

IC65iss4                         Blight - cross

1    Q.  Now, I think you testified yesterday on direct examination,

2    and if you need me to go to the testimony, tell me, that when

3    Mr. Issa came to see you before you began recording his

4    conversation, you said that he was looking forward to a

5    prosperous relationship or a purposeful relationship?  Which

6    one was it?

7    A.  Well, overall, he said that after we were talking a little

8    bit about more bringing work into the Dearborn VMF or him

9    working for the Dearborn VMF; that he was looking forward to a

10   lucrative partnership.  It may have been "purposeful" that he

11   said.  I don't recall totally, but there was a lot talked about

12   there, a few minutes worth of talking.

13   Q.  But, was purposeful and prosperous, in your mind in this

14   context, the same?

15   A.  In my mind, yes.

16   Q.  Purposeful and prosperous to you is the same in your mind?

17   A.  Well, as I'm trying to say it, yes.  I mean, I'm not sure

18   exactly the pronunciation or how it was said.  I know I tried

19   to get it out what I remember him saying and at that time

20   that's what I remembered.

21   Q.  What about the pronunciation of purposeful don't you

22   understand?

23   A.  Purposeful.  I understand what it means, yes.

24   Q.  Does it have to mean money?

25   A.  No.  No.

1   Q.  It could mean a genuine relationship, right?

2   A.  It could, yes.

3   Q.  And depending on the purpose, it could be very good and

4   legal and honest, right?

5   A.  Yeah, it could mean anything.

6          MS. HANFT:  Objection.

7   Q.  And the word "prosperous" could mean the same thing,

8   doesn't it.  It doesn't have to be a negative connotation

9   correct?

10  A.  Correct.

11  Q.  So, when you were asked yesterday by Ms. Hanft about the

12  word "purposely," you were asked whether or not Mr. Issa used

13  that word a lot.  Do you remember what you said?

14  A.  Yes.

15  Q.  That's the way he talked, wasn't it?

16  A.  Yes.

17  Q.  And he used the word "purposeful living" a number of times

18  in your conversations?

19  A.  He had, yes.

20  Q.  Both record and unrecorded?

21  A.  Yes.

22  Q.  And when he said "purposeful," you told the jury that you

23  meant it was pay-for-play; is that correct?

24  A.  I did say that, yes.

25  Q.  In your own mind you meant that, right?

1    A.  Yes.

2    Q.  You understood that, right?

3    A.  Yes.

4    Q.  But there is nowhere on any of the tapes does he use that

5    expression ever, does he?

6    A.  I don't recall.

7    Q.  Well, you would recall if he used the word pay-for-play,

8    wouldn't you?

9    A.  If he used that word, yes, I would.

10   Q.  He never did, did he?

11   A.  No.

12   Q.  In addition to all of the other things that you told

13   Mr. Issa about that, the Judge has ruled that I have gone over

14   it enough, besides the lies about money and your daughter, you

15   have also lied to him about the stress her scholarship was

16   causing to your family.  Isn't that true?

17   A.  No.

18           MR. BRAFMAN:  Can I have Exhibit 258, please, that's

19   in evidence?  It is a text.  Will you put it up on the screen?

20   258?

21           MR. WIRSHBA:  Do you want us to do it?

22           MR. BRAFMAN:  Yeah.  Please.

23   BY MR. BRAFMAN:

24   Q.  You can have the top part blown up.

25           Do you see it, sir, the top paragraph?  Let me ask you

IC65iss4                         Blight - cross

1   some questions before you read it.  Yesterday on direct

2   examination Ms. Hanft showed you this text.  Do you recall?

3   A.  Yes.

4   Q.  And she didn't -- she told you -- I'm not going to read the

5   whole thing.  She read a portion of it, correct?

6   A.  I can't remember.

7   Q.  Okay, so let's look at the top paragraph.  That's you

8   talking to Tony by text, your phone to his phone, correct?

9   A.  Correct.

10  Q.  And you say: *What's up, Tony?  I hope all is well with*

11  *you.  Busy as hell around here.  The scholarship will not*

12  *transfer and after weighing out the pros and cons, my daughter*

13  *decided not to do it.  That is actually a huge weight off me*

14  *and my wife's shoulders and check book.  It was unnecessary*

15  *stress and my daughter is well.  I was waiting for actual*

16  *dates,* and then you go into trying to talk about when you are

17  coming, right?

18  A.  Correct.

19  Q.  Did you have stress from your daughter's scholarship to

20  Columbia?

21  A.  At this time I had stress with my daughter's scholarship.

22  That's what you asked me.  Yes, I did.

23  Q.  Not involving Columbia?

24  A.  You didn't mention Columbia.  You --

25  Q.  I just did.

IC65iss4                        Blight - cross

 1              THE COURT:  Excuse me.  You are talking over each

 2      other.

 3              MR. BRAFMAN:  I will --

 4              THE COURT:  Let him finish.

 5              THE WITNESS:  Yes.

 6              At the time my daughter was thinking of going to an

 7      advanced class or it was a program to get into the medical

 8      field to get her Ph.D.  At that time she actually changed her

 9      mind to go into another field.  So the stress was there

10      depending on where she would go, yes.  It was not Columbia.

11      Not for the purposes of this task but, yes, I had stress with

12      my daughter's scholarship.

13      BY MR. BRAFMAN:

14      Q.  Why were you telling Mr. Issa that?  Were you his friend

15      now?

16      A.  Well, part of this is true and part of it is lie, yes.

17      Q.  We've passed that point.  Part of it is true and part of it

18      is lying?

19      A.  Yes.

20      Q.  But Mr. Issa is being told a lie about Columbia and you're

21      suggesting that it was Columbia that gave you the stress, am I

22      right?

23      A.  In this text, yes.

24      Q.  Okay.  And this text is written to Mr. Issa before you come

25      to New York, right?

IC65iss4                    Blight - cross

1  A.  Right.  Yes.

2  Q.  And then you relate, if you move on you said that's the

3  stress, I have to help the audit schedule for July; is that

4  true?

5  A.  Yes.

6  Q.  And you have to help with other VMFs too, is that true?

7  A.  That's true.

8  Q.  And then you said:  *That screwed up my July plans and I*

9  *will be taking a break for all of this shit* -- I apologize, but

10  that's what the text says, your Honor -- *we will be taking a*

11  *break from all this blank.  I want to get away and hang out in*

12  *New York and we will be available the second week of that.  I*

13  *don't care what the post office pops up with, I'm taking off*

14  *and without my wife.*

15         Is that what you tell him?

16  A.  Yes.

17  Q.  So now you are coming to New York to get away from the

18  stress involving the scholarship and Columbia and you are

19  telling him that your wife's not coming, right?

20  A.  Correct.

21  Q.  Your wife was never coming, correct?

22  A.  Correct.

23  Q.  Now, part of your -- isn't there conversation between you

24  and Mr. Issa where Mr. Issa suggests that when you come to New

25  York, he would like to have dinner with his wife and you and

IC65iss4                          Blight - cross

1   your wife?  Isn't there a conversation like that?

2   A.  Where he suggested that, yes.

3   Q.  And that wasn't part of the script in your mind, the game

4   plan?  There was no point in having your wife in the middle of

5   this, right?

6   A.  Correct.

7   Q.  So you told him now your wife's not coming, right?

8   A.  Eventually, yes.

9   Q.  Mr. Issa was recommending a friendly dinner with your

10  respective wives, right?

11  A.  That's correct.

12  Q.  And you changed the terms and left your wife home because

13  she was never supposed to come, right?

14  A.  Correct.

15          MR. BRAFMAN:  Excuse me one moment, your Honor.

16          (pause)

17  BY MR. BRAFMAN:

18  Q.  Now, I asked you before lunch whether or not the

19  government, meaning the OIG, was helping you script your

20  contact with Mr. Issa.  Do you recall that?

21  A.  Yes.

22  Q.  And from time to time you would exchange extensive e-mails

23  with Mr. Dubar of the OIG in which you gave him almost a blow

24  by blow wrap-up or update on the things you were doing, right?

25  A.  Correct.

1  Q.  And you gave him up-to-dates and he sometimes helped you

2  decide what the next part of the lie would be, right?

3  A.  Correct.

4  Q.  And at some point you were concerned that by pushing the

5  Columbia story it was like getting a little bit absurd already,

6  right?

7  A.  Well, absurd -- it wasn't working.

8  Q.  What do you mean it wasn't working?  You got him all

9  excited about helping your daughter.  What wasn't working about

10  the Columbia story that caused you to stop?

11  A.  The whole thing for me was the fact that Mr. Issa wanted to

12  meet with my wife and daughter, you know, and that situation.

13  Q.  So he had a friendly dinner in mind and you had an

14  undercover investigation in mind and you stopped it, correct?

15  A.  Correct.

16  Q.  Now, on May 24th you let Mr. Dubar know -- and if you don't

17  remember, please tell me -- by e-mail, that Mr. Issa had called

18  you, you didn't return the call because you were awaiting

19  instructions, right?

20  A.  Correct.

21  Q.  And almost every time Mr. Issa called you, before you would

22  respond you would call Mr. Dubar and sort of go over what

23  should I say if he says this, what should I say if he says

24  that?  Am I right?  In words or substance?

25  A.  Incorrect.

IC65iss4                         Blight - cross

1    Q.  But when he called you and you needed instructions before

2    you returned the call, what were you saying?

3    A.  I'm not understanding your question.

4    Q.  Mr. Issa calls you on, if you recall, on May 24th at 1:29

5    p.m.  You say to Agent Dubar you missed the call.  You didn't

6    respond because you were awaiting instructions from him, from

7    Mr. Dubar?

8    A.  That was for verification of dates and I wanted to wait to

9    find out if those dates were going to work.

10   Q.  And you wanted them to tell you what to say?

11   A.  Yes.

12   Q.  Because they were making plans for Mr. Issa, right?

13   A.  For that, yes.

14   Q.  Now, we talked a little bit earlier, and I'm not going to

15   belabor this, I just want to show you one text.  Do you

16   remember the discussion about house-sharing at NYU you had

17   before lunch?

18   A.  Say that again?

19   Q.  We had a brief discussion about the fact that Mr. Issa was

20   going to help your daughter by trying to find her some

21   house-sharing possibilities?

22   A.  Yes.

23   Q.  Because you had suggested that to live up at Columbia would

24   cost you $20,000 a year and his response was not to give you

25   the money, his response was let me help her find a place to

IC65iss4                          Blight - cross

1    live that's much cheaper, right?

2    A.   I believe that's what he was saying, yes.

3    Q.   I want to show you Exhibit 114 that is also marked 3509-47

4    for identification.

5             May I show it to your Honor, first, before I show it

6    to the witness?

7             THE COURT:   Why are you showing me this?

8             MR. BRAFMAN:   Because I want to put it into evidence

9    because it is the same --

10            THE COURT:   You can't put it into evidence.

11            MR. BRAFMAN:   Yes, your Honor.   They put the text in

12   around this.

13            THE COURT:   Excuse me, Mr. Brafman.   I don't intend to

14   have a conversation on whether it comes in evidence.

15            MR. BRAFMAN:   The exhibit that I just put in is part

16   of this, it is the same chain.

17            THE COURT:   Please move on.

18            MR. BRAFMAN:   Pardon me?

19            THE COURT:   Please move on.

20            MR. BRAFMAN:   There is no objection by the government.

21   Is there an objection?

22            MR. SOLOWIEJCZYK:   I don't even know what document it

23   is.

24            THE COURT:   If you don't object I will let it in.

25            MS. HANFT:   We don't object, your Honor.

IC65iss4                        Blight - cross

1           THE COURT:  Fine.  In that case I will let it in.

2           (Defendant's Exhibit 114 received in evidence)

3   BY MR. BRAFMAN:

4   Q.  It is now up on the screen, it is a text for Mr. Issa to

5   you responding to the previous text and it says:  Okay, great.

6   I found a possible house-sharing where two other girls that are

7   from NYU.  Will discuss when you are here, and she could see

8   it.

9           Do you see that?

10  A.  I see it, yes.

11  Q.  Did you ask Mr. Issa to do any of this stuff?

12  A.  No.

13  Q.  Was he, in your mind, trying to help your daughter?

14  A.  In my mind?

15  Q.  Yes.

16  A.  I believe he was doing these things to ensure me to keep

17  giving him work at the Dearborn.

18  Q.  Not a nice man in getting your daughter a roommate?

19  A.  In your mind you asked me and I said yes.

20  Q.  So, anything that Mr. Issa did that was nice and good and

21  decent in your mind, would be part of a corrupt plan that you

22  invented?

23          MS. HANFT:  Objection.

24          THE COURT:  Your objection is sustained.

25  BY MR. BRAFMAN:

IC65iss4                         Blight - cross

1   Q.  Who put the concept of your daughter needing a place to

2   live into Mr. Issa's mind; him or you?

3   A.  Me.

4   Q.  So you started the conversation because you wanted him to

5   what?  Bribe you by finding your daughter a place to live?

6   A.  No.

7   Q.  But he went out of his way to help your daughter and you

8   are sitting here telling this jury that that's part of a

9   corrupt plan by Mr. Issa, right?

10          MS. HANFT:  Objection.

11          THE COURT:  The objection is sustained.  Your problem

12  is the adjective, Mr. Brafman.  That's the problem.

13          MR. BRAFMAN:  I will move on.

14          THE COURT:  Remember, ladies and gentlemen, a lawyer's

15  questions, without more, is not evidence.

16  BY MR. BRAFMAN:

17  Q.  Now, there came a time yesterday -- let me just ask you one

18  question, I'm not sure I covered this.

19          The texting that we are referring to around Father's

20  Day is around June and July of the summer of 2016, correct?

21  A.  I believe so, yes.

22  Q.  And that's the same date and the seven or eight invoice --

23  the same dates that the seven or eight invoices that the

24  government showed the jury that I am not allowed to go back to

25  but that's around the same dates, right?

1    A.  Around?

2    Q.  They're from June to July and August.  Will you accept my

3    representation?

4    A.  Yes.

5    Q.  So, during this very same period when you were texting

6    Mr. Issa, you know, whenever you want and he is responding,

7    there isn't a single text in which you suggest that there is

8    anything wrong with any of his bills, is there?

9    A.  Not on text.  We spoke.

10   Q.  I am asking you about texts.  Is there a single text in

11   which you can confirm to this jury that you told Mr. Issa there

12   is anything wrong with the invoices that were dated at the same

13   dates?

14   A.  Not a text.

15   Q.  Now, the texts were pretty much sent to you by direction of

16   the government, correct?

17   A.  Mr. Issa didn't send me texts on direction of the

18   government.

19   Q.  No, you did.  You sent texts to Mr. Issa on direction of

20   the government, right?

21   A.  Yes.

22   Q.  And they helped you craft those texts sometimes?

23   A.  Yes.

24   Q.  And Mr. Issa, you weren't helping Mr. Issa respond, were

25   you?

IC65iss4                    Blight - cross

1    A.  No.

2    Q.  So you could have said anything you wanted in a text and

3    see what Mr. Issa said in response, correct?

4    A.  That's possible, yes.

5    Q.  Well, it is not possible.  You were doing it every day

6    trying to elicit responses from Mr. Issa, am I correct?

7    A.  Not every day, but when I text, yes.

8    Q.  And whenever you texted he responded, right?

9    A.  Yes.

10   Q.  He wasn't hiding from you, right?

11   A.  Right.

12   Q.  This has gone on for months, this Columbia story before you

13   even get to New York, right?

14   A.  You're right.

15   Q.  And for the months that this is going on, you are also

16   approving invoices from Mr. Issa's shop in Detroit or Dearborn?

17   A.  Dearborn.

18   Q.  Dearborn, I'm sorry.

19   A.  And, at a certain point, after talking to his managers --

20   him -- it didn't stop.

21   Q.  So, I am telling you you are now trying to investigate

22   Mr. Issa with the help of the government agents and you have

23   the opportunity to confirm that what you are telling this jury

24   is true beyond just your word and you don't send a single text

25   about the subject, do you?

1             MS. HANFT:  Objection.

2             THE COURT:  The objection is sustained.

3             MR. BRAFMAN:  Your Honor, I'm going to save a lot of

4    time by not asking to play the tapes, I'm going to use the

5    transcripts to guide the witness.

6             THE COURT:  That's fine.

7             MR. BRAFMAN:  Is that okay?

8             THE COURT:  Just fine.

9    BY MR. BRAFMAN:

10   Q.  I am going to ask if we can put up on the screen Government

11   Exhibit 306A-T.

12            Do you see this transcript, the portion that is up

13   there?

14   A.  Yes.

15   Q.  If we can go to the next page and if you can put it up side

16   by side, please?

17            I am going to read with you, this was one of the tapes

18   that Ms. Hanft played and she asked you some questions and I'm

19   going to point you to page 19, line 12 where you say:

20            *Yeah, oh, I got that, the text from Mustafa, you know,*

21   *personal matter and everything, it was at that time I was new*

22   *here so when I came here to Dearborn, you know, it was --*

23            Mr. Issa:  *Right.*

24            You say:  *All new to me.  I had to get a feel for my*

25   *guys, make sure work, folks.  I have to supervise --*

IC65iss4                         Blight - cross

 1 | *unintelligible -- but now I have to fill these, I have four*
 2 | *slots, a lot more chill.*
 3 |         Do you see that?
 4 |         Mr. Issa says:  Okay?
 5 | A.  Yes, I see it.
 6 | Q.  Do you know what you said when Ms. Hanft asked you what you
 7 | thought Mr. Issa was telling you at the time of this
 8 | conversation?
 9 | A.  That he understood our processes.
10 | Q.  And?
11 | A.  And I don't recall.
12 | Q.  Well, you said Mr. Issa was flying under the radar.  Do you
13 | remember saying that?
14 | A.  Yes.  Yes, I did say that.
15 | Q.  Where in this conversation does it say that?  It doesn't,
16 | does it?
17 | A.  I was asked what I thought it meant.
18 | Q.  But it doesn't say under the radar, right?
19 | A.  It doesn't say it, no.
20 | Q.  And in none of the conversations with Mr. Issa that you
21 | taped for months and months does he ever use the term "under
22 | the radar," does he?
23 | A.  He doesn't, no.
24 | Q.  You do.  Do you?
25 | A.  I did, yes.

IC65iss4                          Blight - cross

1   Q.  And when you use it you are telling us that because you

2   used it that's what Mr. Issa must mean when he says this?

3   A.  No.

4   Q.  You just are interpreting what you think he means by this,

5   right?

6   A.  Yes.

7   Q.  But you're the one who is talking here.  You're the one who

8   says: *I'm a lot more chill*, and all he says is:  *Okay.*  And

9   from that you told this jury that that means he is flying under

10  the radar?

11  A.  My answer involved both these sheets of paper that has all

12  the text on it.

13  Q.  Okay.  And there is nothing in there that says under the

14  radar, does it?

15  A.  No.

16  Q.  That's your interpretation oar what you thought you meant,

17  right?

18  A.  Yes.

19  Q.  Let's move to Government Exhibit 306B as in boy, the

20  transcript.  Do you remember I asked you about Mr. Issa buying

21  an additional piece of property across the road from where he

22  was working and you said you don't specifically recall or you

23  do recall?

24          Do you recall?  Without looking at the transcript?

25  A.  I recall that he was buying a piece of property.

IC65iss4                    Blight - cross

1   Q.   Right.

2   A.   Yes, I recall that.

3   Q.   He discussed that with you on the tapes that the government

4   made, isn't that true?

5   A.   Yes.

6   Q.   And he discussed it on the tape that was played yesterday,

7   correct?

8   A.   Correct.

9   Q.   Look at Government Exhibit 306B-T and I'm going to read it

10  to you:  *About the corner shop, there is a repair shop on the*

11  *corner, I bought that.  There are two buildings between that*

12  *and the collision shop, I bought that.  And there is an empty*

13  *property next to it.  I bought that.  And now the two*

14  *properties that we signed with the city with it, I guess my*

15  *real tore is working on it so, you know, and then I have across*

16  *the street that big lot.*

17           Do you see that?

18  A.   I see it.

19  Q.   And the big lot that he was talking about was that brick

20  building I showed you earlier this morning, correct?

21  A.   I seen a lot, I don't know --

22  Q.   It is Exhibit 110 in evidence.  Do you see that?

23  A.   I see it, yes.

24  Q.   That's what he is talking about, isn't it?

25  A.   Yes.

IC65iss4                    Blight - cross

1    Q.   And he was going to be expanding his VMF business, right?

2    A.   That's what he said.

3    Q.   And at the time you knew that -- your area, Detroit, we

4    discussed it earlier, needed additional VMF contractors, right?

5    A.   Detroit, no.

6    Q.   You were behind PMIs, the whole state?

7    A.   I worked for the Dearborn VMF not the Detroit VMF.  There

8    is two.

9    Q.   But the Detroit VMF were behind doing PMIs on the scheduled

10   basis, weren't they?

11   A.   I don't know at that time.  I wasn't in charge of the VMF

12   at that time.

13   Q.   Look across, let's go back to the transcript and go to the

14   second page, page 31 of the 306B-T -- sorry to make it so

15   complicated.  This is Mr. Issa explaining to you what he is

16   doing.  Okay?

17            Now, if we could put page 30 and 31 side by side,

18   let's go to the bottom of page 30 to start where he finishes

19   telling you about the property and he says:  *So, you know, and*

20   *then I have across the street that big lot.*

21            You say:  *Yeah.*

22            He says:  *Right.*

23            You say:  *Wow.*

24            He says:  *Okay.*

25            And you say, on the top of page 31:  *I'm on it now.*

1          What are you talking about?

2    A.   I can't remember what I meant by that; *I'm on it now.*

3    Q.   But he is telling you about the business he is building in

4    Detroit and you are recording the conversation so you know

5    everything you say is being taken down, right?

6    A.   Yes.

7    Q.   And you don't say I don't know what you are talking about.

8    Your words are "I'm on it now."  What does it mean when you say

9    that to him or what did you intend by that?  Just to make

10   conversation?

11   A.   I can't answer exactly what I meant about that unless I was

12   thinking, okay, I'm on it, I know what you are saying, yeah,

13   right.  You know, I'm on it, I understand, you are buying the

14   property.

15   Q.   Why didn't you just say I understand?

16   A.   I said before, I, right now, that's what I'm interpreting.

17   I don't know at the time what I was referring to.  *I'm on it*

18   *now*, I'm assuming that's what I meant when --

19   Q.   You were interpreting what you think Mr. Issa meant all day

20   and yesterday and now you can't interpret what you meant?

21   A.   I cannot remember everything that I said in the past or

22   what I meant by it.  I am seeing it here and that's what I'm

23   trying to explain to you.

24   Q.   Okay.

25   A.   I don't know how else to put it.

IC65iss4                        Blight - cross

1   Q.  So, when you sort of guess at what you meant because you

2   can't remember, do you sometimes guess at what you think

3   Mr. Issa must have meant?

4   A.  Yes.

5   Q.  Thank you.

6          Now look at the top of page 31 where Mr. Issa then

7   says to you:  *So, now I'm going to make a one-stop shop for*

8   *everything.  We are going to have heavy duty parts, we are*

9   *going to have body work.  You give me your vehicle I can fix*

10  *the fender, change the glass, roll the chassis, do the PMI, get*

11  *it out.  Rick and I, I ordered $50,000 to upgrade the site.  We*

12  *the got a spray booth overshoot.  I am putting in pipes because*

13  *you have got a fire sprinkler system it isn't even required*

14  *here because I am putting a fire sprinkler system in, all that.*

15         does he tell you that?

16  A.  Yes.

17  Q.  And he is describing to you the business that he is going

18  to be investing in and creating to help do PMI, right?

19  A.  That's what he is saying.

20  Q.  But you didn't have any reason to doubt him at the time he

21  says that, do you?  You have seen the property, you have seen

22  what he did to the other property, right?

23  A.  At that time I really didn't know if he was going to buy

24  that property or not across the street.

25  Q.  Okay.

1    A.  That's an honest answer, I didn't know.

2    Q.  Okay, but then you saw the property and he bought it,

3    right?

4    A.  I don't know.

5    Q.  As you sit here today you don't know?

6    A.  I don't know if he bought that property.  I don't know if

7    he owned that.

8    Q.  You have never been back to that property to see whether it

9    was ever cleaned up and was functioning?

10   A.  Mr. Issa showed me that property and I remember seeing that

11   building.  I don't know if the lot came with it for Nick's

12   store or not.  He showed me buildings down the street that he

13   said he cleaned up that were abandoned, an abandoned store and

14   a few others that he said he cleaned up because he was pretty

15   much trying to help the neighborhood out.

16   Q.  Okay.  And could you tell the jury that before Mr. Issa

17   came to that neighborhood was it one of the depressed areas of

18   Detroit?

19              MS. HANFT:  Objection.

20              THE COURT:  The objection is sustained.

21              MR. BRAFMAN:  Thank you, your Honor.

22   BY MR. BRAFMAN:

23   Q.  Did you tell Mr. Issa a lot of personal stuff in these

24   conversations that were recorded?

25   A.  Some was personal stuff.

IC65iss4                         Blight - cross

1   Q.  Some was personal about your family, correct?

2   A.  Some of it.

3   Q.  And it's the kind of stuff you might tell to someone you

4   are befriending?

5   A.  Yes.

6   Q.  Your instructions were to try and make these conversations

7   natural, right?  To appear natural?

8   A.  You know, I was never really instructed or that was said to

9   me.  I assumed that.

10  Q.  You were doing this on your own?

11  A.  Yes.

12  Q.  Okay, and what you were trying to do is basically, without

13  putting words in your mouth, getting Mr. Issa to like you?

14  A.  I actually think and thought that Mr. Issa liked me before

15  any of that.

16  Q.  Before you said it.

17      Did you make believe that you liked Mr. Issa?

18  A.  In the beginning when he first started working with

19  Detroit, yes, I did.

20  Q.  And did you also, on these tapes, make it appear like you

21  liked him when you had these jovial three-hour meals where a

22  lot of personal stuff was exchanged about your families, right?

23  A.  Yes.

24  Q.  If someone were just listening to these conversations there

25  is a lot in there that has nothing to do with this case, it has

1   to do with your life and his life, correct?

2   A.   Correct.

3   Q.   And some of it was true and some of it wasn't true,

4   correct?

5   A.   Correct.

6   Q.   For example, at the time when you were still talking to him

7   about who was coming to New York with you, you discussed your

8   wife's schedule, whether she had leave or not, what your wife

9   did for a living.  Subjects like that?

10  A.   Correct.

11  Q.   Nothing to do with business, right?

12  A.   Correct.

13  Q.   And when you mentioned that you had to stay in Detroit

14  because of swap meets, that was something your kids were

15  involved in?

16  A.   Swap meets.  I don't remember that.  I don't remember swap

17  meets.

18  Q.   Let me help you.  At one point, in one form or another

19  injected into the these conversations we have covered your wife

20  and daughter, correct?

21  A.   Yes.

22  Q.   And at one point you injected into the discussion about

23  your son, correct?

24  A.   Yes.

25  Q.   And at some point you entered into this discussion,

IC65iss4                        Blight - cross

1    discussions about your mother, correct?

2    A.  Yes.

3    Q.  And you even told him about potential surgery that she

4    needed which required you to get back to Michigan, correct?

5    A.  Yes.

6    Q.  Was it true?

7    A.  No.

8    Q.  You made up your mother's surgery to talk to Mr. Issa about

9    as an excuse why you had to get back to Detroit?

10   A.  I did, because I needed something to stop me from staying

11   the whole weekend or having an excuse to stay the whole weekend

12   and get back when I needed to get back.

13   Q.  Why didn't you say I have to get back to work rather than

14   your mother having a heart operation?

15   A.  For the same reason I didn't.  That worked for me, I said

16   that.

17   Q.  I know you said it but did you say it to get sympathy from

18   Mr. Issa as to why you are going back to Michigan?

19   A.  Not sympathy.  To make an excuse to come back to Michigan

20   when I needed to come back.

21   Q.  All the excuses that an intelligent, middle-aged person to

22   make up in his mind all that you came up with was your mother

23   needed surgery?

24   A.  Because it was partial truth.

25   Q.  Was it true or was it not true?  Did she or did she not

1    need -- I am not trying to pry into your mother's life but you

2    brought it up in the conversation.  You told us a minute ago

3    that it wasn't true.  Now you are telling us it was partially

4    true.  Which is it?

5    A.  My mother had a stint and that was partially true.  She had

6    complications from it.  It wasn't anything that needed to be

7    repaired, thank goodness, but I used that, yes.

8    Q.  And you used it because you wanted Mr. Issa to understand

9    you as a person, not as an official, correct?

10   A.  I used that to get back to Detroit to have an excuse to get

11   back when I needed to get back.

12   Q.  Can we move to Government Exhibit 306E, as in Edward?

13         Did Mr. Issa and you discuss something that he

14   referred to as a "got you mode?"  It is on the bottom of page

15   95.  Do you see that?

16   A.  I see it.  I see it.

17   Q.  And Mr. Issa says to you -- if we could have that

18   transcript put, up, please?  It is up already.  Does the jury

19   have it.

20         On the bottom you have Mr. Issa saying:  You say:  *I'm*

21   *sorry, yeah, but there is, you know, something good if you go*

22   *up to him and you know* -- and then it is unintelligible.

23         And he says:  *Got you.  They're in that "got you"*

24   *mode.  So, nobody wants to help you when you are in the got you*

25   *mode.*

IC65iss4                        Blight - cross

1             And you say:  *No.*

2             And he says:  *Got it?  It has nothing to do with*

3   *relationship.  If you get a vehicle --* and we turn over to the

4   next page, please *-- going to go over a thousand dollars.  This*

5   *vehicle needs 1,150 to do it.  I'll say, you know what?  Eat --*

6   blank *-- the 150.  Get it done.  They need the vehicle back*

7   *here, here back on the road, and we bend over backwards to get*

8   *it done but I know you've got my back.*

9             Let's stop there.

10            You know with some vehicles there is going to be a

11  $1,000 maximum if the vehicle is going to be repaired

12  immediately, right?

13  A.  There is different maximums, yes.

14  Q.  And for the $1,000, nobody needs to get approval, you can

15  do it on a card; right?

16  A.  Correct.

17  Q.  And he is telling you that if the repairs are going to be

18  $1,150, he doesn't want to get into an argument, he will eat

19  the $150 so that you can get it done because you need the

20  vehicle back on the road.  Do you see that?

21  A.  I see it.

22  Q.  And then he goes on and he says:  *So, for example,*

23  *something happens with --* And you go:  Tony, why did you do

24  that?  And I go:  I wanted to save your vehicle.  No problem,

25  thank you.  But if you are going to go to I gotcha, then I'm

IC65iss4                    Blight - cross

1    going to say blank you, eff you.  Next I'm not going to fix it,

2    I'm going to say no.  You, $1,500, then you are either going to

3    bring it here and Tony doesn't, do it, or yourself or whatever.

4    And you say, all right.

5            Do you understand this discussion?

6    A.  Yes, I do.

7    Q.  Mr. Issa is essentially explaining to you that he has sort

8    of been in this position where if he wants to fix something and

9    eat the money so the post office gets the truck back someone

10   will say, hey, you didn't fix it right because you didn't do

11   this work.

12           Isn't that correct?

13   A.  That can be said, especially by doing an inspection on it

14   and looking at it after, making sure that the work was done.  I

15   talked to Mr. Issa a few different times --

16   Q.  I'm talking about this conversation, please.  If they want

17   to go into this on redirect and the judge allows them, God

18   bless you.

19           On this conversation --

20           THE COURT:  I wish that the two of you would not talk

21   over each other.  And, Mr. Brafman, it really is incumbent on

22   you to let the witness finish his answer.

23           MR. BRAFMAN:  Yes, your Honor.

24   BY MR. BRAFMAN:

25   Q.  When you have this conversation and you are interpreting

IC65iss4                    Blight - cross

1   Mr. Issa's concern about "gotcha," that's what I want you to

2   focus on, correct?  Okay?

3                THE COURT:  Focus on that, sir.

4                THE WITNESS:  Okay.

5   BY MR. BRAFMAN:

6   Q.  Then I'm going to ask the question.  Okay?  He is

7   explaining what a gotcha mode is, right?  He is explaining it?

8   A.  Yes.

9   Q.  And he is telling you that I have a vehicle, you need it

10  back, it is supposed to cost $1,150 to fix it but I can only go

11  up $1,000, right?  That's what he is saying?

12  A.  Yes, that's what he was saying.

13  Q.  So he would fix it for the $1,000, give it to you back, but

14  what he doesn't want when he bends over backwards to help you,

15  he doesn't want someone to look at the PMI and say gotcha, you

16  didn't do this and you didn't do that.  Right?  Isn't that what

17  he is saying?

18  A.  That's what he is saying.

19  Q.  And what you say in response is, "all right."  Right?

20  A.  That's what I said.

21  Q.  Yeah, and that's when you were wired, he doesn't know it.

22  You were wired, you can say whatever you want, right?

23  A.  Yes.

24  Q.  And what you say is "all right," correct?

25  A.  Correct.

IC65iss4                         Blight - cross

1   Q.  Do you know, sir, what the basic -- do you have a basic

2   understanding of what the rules are if you deposit money in the

3   bank in excess of $10,000 cash?

4   A.  Mr. Issa explained it to me.

5   Q.  And when he was talking to you on this same conversation in

6   Exhibit 306E, we can put up -- do you have that?  Is that it?

7   Page 96?  Thank you.

8          If you look at Mr. Issa, starting on line 14, he says

9   to you:  So if there is a way to get it done, listen.  There is

10  no need to create work.  This blanking is all effed up as shit.

11  There is no need to play games.  There is no need for that, you

12  know?  And this is what I have to tell you.  In fact I said

13  this to you before, I am an effing businessman, am I right?

14  I'm going to survive, right.  I'm not like some effing weasel.

15  I mean, I never net the guy or anything like that.  He says you

16  know how to steal.

17         And now, if you go over to the next page on page 97,

18  he says to you, in the middle of the page:  Yeah, so there oh

19  yeah, I remember now, everybody so paranoid, right?  You have

20  to relax.  But, guess what?  Paranoia is a reflex and you say

21  yes.

22         Do you see that?

23  A.  Yes.

24         (Continued on next page)

25

IC6HIss5                          Blight - Cross

BY MR. BRAFMAN:

Q.  What you were discussing in this conversation, not

necessarily the part that's been played and in some of the

conversations is the case we referred to about years ago in

Detroit where VMF managers were arrested for bribery, correct?

A.  Correct.

Q.  And he was telling you that everybody's paranoid because of

that, right?

A.  I believe that's what he meant.

Q.  Then you say, "Yes," and then he says, "Right."  So he's

giving you an example here.  So if I -- if they say:  "This

ain't right.  They sent me a thousand dollars -- they sent a

thousand dollars to the bank cash, you have to report it

because it could be money laundering, right?"

        And you go:  "Well, I own a gas station, and they say:

Well, $15,000, but I'm not going to deposit it because they're

going to red flag it.  So what do I do?  I take 9,800 to the

bank.  That's called structuring, right?

        "Yes.

        "Then you're just circumventing whatever, but yes."

        So he says:  "Now, what do you think they have?"

        And you say:  "That's more of a red flag."

        "Right," he says, "exactly."

        "So you think to have -- so, shit, everybody's walking

around like this.  What do you want to be like that for,

1    right?"

2              Do you understand what he's saying to you?

3    A.  He's --

4    Q.  Let me help.

5    A.  Yes.

6    Q.  OK.  What he's saying, and correct me if I'm wrong, is he's

7    trying to explain that everybody's paranoid, and they're

8    paranoid and -- and their paranoia is making things worse.

9    Isn't that what he's saying?

10   A.  I don't think he's saying that.

11   Q.  But when he gives you the example, he's saying if you send

12   more than $10,000 to the bank, the bank has to file a report,

13   that's a red flag, correct?  You know that?

14   A.  Yes.

15   Q.  So if you try to avoid that red flag and you send him

16   9,800, that's worse.  That's structuring, that's what he's

17   saying to you, right?

18   A.  Yes.

19   Q.  And the import of what he is saying is I got a gas station.

20   It's a cash business.  I don't have to be afraid of depositing

21   money.  It's a cash business, correct, that's the import of the

22   conversation?

23   A.  No, the point of the conversation was, from what I

24   understood, that paranoia was a good trait.

25   Q.  It's what?

IC6HIss5                          Blight - Cross

1   A.  He said paranoia was a good trait.  That's how I understood

2   it, being paranoid is a good trait.  You're on your toes.

3           THE COURT:  Let's move on.  Let's move on, please.

4   Q.  Look at the way this ends, because you have to imagine what

5   he's doing at the time he is doing it, and correct me if I'm

6   wrong, last sentence:  "Everybody's walking around like this,

7   and look at me."  What he does is he puts -- correct me if I'm

8   wrong?

9           MS. HANFT:  Objection.

10           THE COURT:  I'm sorry.  The objection?

11           MS. HANFT:  Objection to form, your Honor.

12           THE COURT:  Let's start with form.  That's right,

13   that's a very good objection.  Stop making speeches and just

14   ask the man a question.

15   Q.  When Mr. Issa says, "Everybody's walking around like this,"

16   what, if anything, does he do with his hands or his face or his

17   head or hoodie?  What does he do?

18   A.  I don't recall him doing anything.

19   Q.  But when he says, "Everybody's walking around like this,"

20   what does that mean if you don't recall what he's doing?  Isn't

21   it true --

22   A.  Paranoid.

23   Q.  What?

24   A.  Paranoid.

25   Q.  But when he says "like this," isn't he demonstrating to you

IC6HIss5                         Blight - Cross

1  by putting his hands over his face to suggest that's how people

2  are acting, like they've done something wrong?

3  A.  I don't recall that.

4          MR. BRAFMAN:  OK.  Now can you please look at

5  Exhibit -- put up, please, Exhibit 306F, as in Frank, T.

6  Q.  Remember I asked you whether or not you were behind in the

7  work, PMIs or in the work you needed to do?

8  A.  Yes.

9  Q.  And you said you weren't?

10 A.  There's a difference in what you were asking me.

11 Q.  OK.

12 A.  Detroit versus Dearborn.

13 Q.  What?

14 A.  Detroit vehicle maintenance facility versus the Dearborn.

15 Q.  When you were having this conversation, are you already in

16 Detroit -- are you already in Dearborn?

17 A.  Dearborn, yes.

18 Q.  Look at the bottom of page 306F, as in frank, T, and the

19 bottom of page 103.  I'm going to read it to you and please

20 follow it, last attribution to you:

21         "I'm glad you reached out, you know, because I was

22 right at the turning point.  I was still learning what was

23 going on here, and where I needed to get things in gear, you

24 know, and where, which, and what employees do" -- and could you

25 change next page.  I'm sorry, yes.

1          "So where -- why are we behind or what?  But I

2    understand a lot of the hardships we -- you know, I got, I

3    understand where you coming from to man.  That Detroit thing is

4    bad.  I'm not understanding that, why they continue to let Jeff

5    be the one checking on invoices like that.  He is a good guy, a

6    good watchdog, and that -- but, you know, you got -- but you

7    got to be reasonable, and he's been a lead long enough to

8    understand the problems that you guys are running into."

9          And Mr. Issa says:  "Yeah, yeah."

10         Do you see that?

11   A.  Yes.

12   Q.  This is the same Jeff that we talked about before lunch,

13   correct?

14   A.  Correct.

15   Q.  What's his name?

16   A.  Jeff Hinman.

17   Q.  That's the man we discussed briefly before lunch, correct?

18   A.  Yes.

19   Q.  Now, what you're saying, if I'm wrong tell me, now you're

20   in Dearborn, and you're telling Mr. Issa that you are behind,

21   on the top of page 104, and you don't understand why.  Do you

22   see that?

23   A.  Yes.

24   Q.  What are you behind on?  PMIs?

25   A.  Yes.

IC6HIss5                       Blight – Cross

1   Q.  You need to look at the place, get used to it because

2   you're new there, right?

3   A.  Yes.

4   Q.  And when you came there, you knew it was behind and needed

5   help, and that's what you're saying, "I'm glad you reached out

6   to me"?

7   A.  Yes.

8   Q.  You wanted Mr. Issa to believe, did you not, that there was

9   a valuable service that he could offer, correct?

10  A.  Yes.

11  Q.  And, in fact, you also confirm what we discussed earlier

12  that the Detroit thing -- reading down 104, line 5 -- that

13  Detroit thing is bad.  I'm not understanding that, and why they

14  continue to let Jeff -- Jeff be the one checking on the

15  invoices.  Do you see that?

16  A.  Yes.

17  Q.  And then you characterize him as a good guy.  Did you mean

18  that?

19  A.  Yes.

20  Q.  Jeff's a good guy?

21  A.  Yes.

22  Q.  And then you say:  "He's almost like -- I don't know what

23  it is" -- line 13 -- "He's almost like -- I don't know what it

24  is.  He's almost every time instigating a problem."

25          MS. HANFT:  Objection.

1          MR. BRAFMAN:  Mr. Issa says that, I'm sorry.

2          THE COURT:  I'm sorry.  Objection ground?

3          MS. HANFT:  Relevance.

4          THE COURT:  Objection's sustained.

5   Q.  What are you talking about?

6          THE COURT:  The objection's sustained.

7          MR. BRAFMAN:  Can I have sidebar?

8          THE COURT:  No.

9   Q.  And you then say that he likes to keep things stirred up.

10  Do you know what you're talking about?

11         MS. HANFT:  Objection.

12         THE COURT:  The objection's sustained.

13         MR. BRAFMAN:  If we could go to 306G, as in George, T,

14  like in Thomas.  Do you have that up there?

15         All right.  You could read it, sir.  It's the bottom

16  of page 116, line 22:

17         "OK.  They got rid of the mechanic.  They're not happy

18  with their vendors because you got it -- because, you got it,

19  it's a lot of things, but I want to work with postal service

20  because I have a national picture in mind."

21         And you say:  "I got you, yeah."

22  Q.  Let me ask you, sir, during your time with Mr. Issa, did

23  you learn that he operated VMFs in different states?

24  A.  Yes.

25  Q.  Did you learn that he operated VMFs in a number of

different states?

A.  You're saying "operated VMFs."  I understand that he worked

with the VMFs as a contractor in different states, yes.

Q.  That's what I mean.  That's what I mean, an independent

contractor with VMFs in different states, correct, sir?

A.  Correct.

Q.  When he talks to you about a national vision that he is

looking to make, that's sort of the description of the

one-shop -- one-stop shop that he was trying to set up in

Detroit that he described for you that we discussed earlier in

the afternoon, correct?

A.  Correct.

Q.  He had a plan, right?

A.  That's what he said.

Q.  And he was trying to explain it to you, right?

A.  Yes.

Q.  And your response on the top of page 117 is, "I got you,

yeah," meaning you understood.  Is that what you meant?

A.  Yes.

Q.  And you understood what he was saying?

A.  Yes.

Q.  All right.  Now, at the end of the conversation, we revert

back to New York, and on page 118, there's a reference to the

trip on the bottom, and you say, line 22:  "I'm excited.  I'm

so excited.  OK, yeah."  And he asks you, "Who's coming?"  You

IC6HIss5                          Blight – Cross

1    say, "Wife and daughter."

2              Were you excited about this?

3    A.   No.

4    Q.   Was this an act that you were putting on?

5    A.   Yes.

6    Q.   At the top of 119, you say:  "She needs to see the campus

7    and everything, and there will be an interview for her with the

8    person who's the director out there for that."

9              That's reference to your daughter, correct?

10   A.   Correct.

11   Q.   And all of that's a lie?

12   A.   Correct.

13             MR. BRAFMAN:  If we could move to 306H.

14   Q.   These are sort of out of order, out of the order played by

15   the government.  But here, here now actually beginning to talk

16   about Columbia on page 48.  Do you see that?

17   A.   Yes.

18   Q.   And Mr. Issa says:  "That's my neighborhood, man, oh, wow."

19   And you said, "It is, that's your neighborhood?" And he goes on

20   to explain that he knows the area, right?

21   A.   Yes.

22   Q.   And you indicate that she wants to go -- on page 49,

23   line 15, you indicate that your daughter wants to go to medical

24   school, and you say, "She's pretty much on a full ride."

25             Do you see that?

IC6HIss5                        Blight - Cross

1   A.  Yes.

2   Q.  Did she have a scholarship, by the way?

3   A.  Yes.

4   Q.  Not to Columbia?

5   A.  No.

6   Q.  You then go on at the bottom of 22 and you say:  "It's

7   almost 20 grand just for the -- unintelligible -- in New York

8   for her to stay at the dormitory," and then it's

9   unintelligible.  And you then go on to explain on the top of

10  page 50:  "For one semester of college.  She's going to house

11  into the school."

12          OK.  You see that?

13  A.  Yes.

14          THE COURT:  Yes.  What's the question?

15  Q.  On the bottom of page 20 --

16          THE COURT:  No, you're just reading, reading, reading.

17  Ask a question.

18          MR. BRAFMAN:  Yes, sir -- yes, ma'am.

19          THE COURT:  Read a discrete section, ask a question,

20  and make sure it's not a question that you've asked previously.

21          MR. BRAFMAN:  But, your Honor, these are the

22  conversations --

23          THE COURT:  Excuse me, Mr. Brafman.  I'm not having a

24  conversation with you.  I'm telling you what to do.

25  BY MR. BRAFMAN:

IC6HIss5                        Blight - Cross

1    Q.  Look at the bottom of page 50.  Mr. Issa says to you:

2    "That's my oyster.  And also another thing, you know, I got

3    some of the biggest doctors there in the hospitals are my

4    family."  You say, "Really?"  He says, "Oh yeah.  I'll call

5    them."  And you say, "Yeah."

6            Did you understand when he said "my oyster," that he's

7    referring to New York City?

8    A.  Yes.

9    Q.  Then when you talked about Mount Sinai Medical School, it

10   was Mr. Issa who was volunteering to call doctors for you,

11   correct, to help her?

12   A.  Yes.

13   Q.  Then you volunteer on the top of page 51 that she's really

14   into the research part of medicine, correct?

15           MS. HANFT:  Objection.

16           THE COURT:  The objection's sustained.

17   Q.  Mr. Issa -- I'm sorry, Mr. Blight, if we could look at

18   307A-T, this conversation was played.  I'm going to read and

19   then ask you a question, paragraph 3:

20           "I know you're not rich, OK?  I don't want you to

21   spend any money coming to New York, but at the same time, I

22   don't want to get you in trouble, OK?"  And you say right,

23   "OK."

24           Do you see that?

25   A.  Yes.

IC6HIss5                          Blight - Cross

1    Q.  And at that point, why didn't you just end the

2    conversation?

3    A.  Can you rephrase the question.

4    Q.  You had the --

5    A.  I'm not understanding.

6    Q.  You had the opportunity to get up and say to the people,

7    you know, he's not looking to get me in trouble.  I don't want

8    this to continue?

9                MS. HANFT:  Objection.

10               THE COURT:  The objection is sustained.

11   Q.  Now, look at what goes on in the conversation.  You say:

12   "Right."  And Mr. Issa said:  "So is there any way you can put

13   on your card and I can take care of it over there?  I can do

14   the ticket, whatever."

15               That's referring to your plane tickets to New York,

16   correct?

17   A.  Correct.

18   Q.  "I don't want you spending money coming over there,"

19   correct?

20   A.  Correct.

21   Q.  "I want to show you a good time, you know what I'm saying?"

22               MS. HANFT:  Objection.

23               THE COURT:  The objection's sustained.

24   Q.  Turn over to the back of page 26.  This conversation is

25   during the long dinner, is that correct?

1    A.  Correct.

2    Q.  How many hours was this call?

3    A.  Few hours.

4    Q.  Three hours?

5    A.  I think a little more.

6    Q.  OK.  Eating and drinking for three hours?

7    A.  Yes.

8    Q.  Food and alcohol consumed by both of you?

9    A.  Yes.

10   Q.  At some point Mr. Issa says to you:  "You know what I'm

11   saying?"  And he asks you:  "I'm having a great time.  Are you

12   having a great time?"  And you say:  "I'm having a great time."

13              Were you having a great time, sir?

14   A.  I said I was having a good time.

15   Q.  Were you having a good time?

16   A.  Yes.

17   Q.  You liked Tony, didn't you?  As a person you liked him?

18   A.  No.

19   Q.  You're having a three-and-a-half-hour conversation with

20   him, and it's at this point he's expressing friendship to you,

21   and you don't say, no, you say, I'm having a good time too, is

22   that correct?

23              MS. HANFT:  Objection.

24              THE COURT:  The objection's sustained.

25              MR. BRAFMAN:  Can I have a sidebar, your Honor?

IC6HIss5                        Blight - Cross

1           THE COURT:  No.

2   Q.  Did you say that?

3           THE COURT:  I just sustained the objection.

4           MR. BRAFMAN:  That wasn't the question you sustained.

5           THE COURT:  That doesn't give you --

6           MR. BRAFMAN:  That wasn't the question you sustained.

7   Q.  Can did you tell him you were having a good time?

8           THE COURT:  He's answered that question.  Asked and

9   answered.

10  Q.  Were you telling the truth when you said that or were you

11  lying?  You looking for help?

12          THE WITNESS:  Should I answer?

13          THE COURT:  Yes, you should answer that question.

14  Were you lying when you said you were having a good time?

15  A.  Yes.

16  Q.  Now look at Government Exhibit 307B, as in boy.  Do you

17  have that before you, sir?

18  A.  Yes.

19  Q.  Mr. Issa says, continues in conversation at line 3:

20  "Listen to me.  I don't call you every F-ing day.  I don't

21  bother you every F-ing day.  I like you and I respect you, OK?"

22  And you say, "I know you do."

23          Why did you say that?

24  A.  Because I knew he liked me.

25  Q.  And did he respect you?

IC6HIss5                          Blight - Cross

1   A.  I didn't get that from him, no.

2   Q.  Why did you say, "I know you do," when he said, "I like you

3   and I respect you"?  Why'd you say it?  You're taping it.  You

4   know it's being taped.  Why'd you say, "I know you do"?

5   A.  Because that's what I felt.

6   Q.  That he respected you?  You can answer yes.

7   A.  Not on the respect part.  I don't think he respected me.

8   Q.  OK.  Now, you then say, and he says:  "I really do."  And

9   you say again, "I know you do.  I do."  You say that "I've

10  gotten it."

11          MS. HANFT:  Objection.

12          THE COURT:  I don't have a question yet.

13  Q.  What is he referring to when you -- what are you referring

14  to when you say, "I know you do.  I do.  I've gotten it"?  What

15  are you saying?  He's saying the respect?

16          MS. HANFT:  Objection.

17          THE COURT:  To the form, yes.

18  Q.  Is it respect that you're referring to when you say, "I've

19  gotten it"?

20  A.  No, him liking me, yes.  The respect, in my heart of

21  hearts, no, I don't feel he respected me.

22  Q.  OK.  Well, let's not talk about your heart of hearts.

23  Let's talk about what you said, OK?

24  A.  What I said was a lie, sir.

25  Q.  What you said was a lie, that you like him, but you don't

IC6HIss5                          Blight - Cross

1   respect him, right?

2           I'm sorry.  That he liked you.  That you believe, but

3   that he didn't respect you, is that correct?

4   A.  That's correct.

5   Q.  All right.  Now, when you say that -- let's move on to

6   page 57.  There's a discussion of what people do after they

7   leave government.  Do you recall that conversation?

8   A.  Yes.

9   Q.  And you're aware that many people after they leave

10  government and especially the post office, they can go on and

11  be lobbyists or work in private industry with the skills you've

12  acquired, correct?

13  A.  Can you ask that again.  I didn't understand.

14  Q.  You know that some of your colleagues at the post office

15  after they retire go on and get jobs either as mechanics or as

16  lobbyists or as workers in businesses that are similar to the

17  post office, right?

18  A.  Correct.

19  Q.  There's nothing illegal about that, correct?

20  A.  Correct.

21  Q.  In fact, you can keep getting your pension from the post

22  office and work in the private industry, correct?

23          MS. HANFT:  Objection.

24          THE COURT:  Overruled.

25  Q.  Correct?

IC6HIss5                          Blight - Cross

1   A.  Correct.

2   Q.  And isn't that what you're discussing here, that at some

3   point life in the post office comes to an end, and you'll be

4   able to go on into private industry?

5   A.  Correct.

6   Q.  He didn't offer you a job then; he said when you retire,

7   right?

8   A.  I'm not understanding the question.

9   Q.  He wasn't talking about coming in as his partner now; he

10  was talking to you about options you might have when you

11  retire?

12          THE COURT:  Did he offer you a job that day?

13          THE WITNESS:  No.

14          THE COURT:  Did he offer you a partnership that day?

15          THE WITNESS:  No, he didn't.

16          THE COURT:  Was he talking about the possibility that

17  in the future it might happen?

18          THE WITNESS:  Well, if I interpreted it, yes.

19          THE COURT:  That's how you interpreted it.

20          Next question.

21  BY MR. BRAFMAN:

22  Q.  Where the reference is to at line 13 on that page when you

23  say, "OK.  You got to protect your cash cow," when Ms. Hanft

24  asked you what you meant by that, you said you got to protect

25  the United States Postal Service, correct?

IC6HIss5                          Blight - Cross

1    A.  Correct.

2    Q.  And the postal service was where you were drawing your

3    salary from, correct?

4    A.  Correct.

5    Q.  And you have told the jury that you had a fiduciary

6    obligation to the post office, right?

7    A.  Correct.

8    Q.  So protecting the cash cow was not talking to him about

9    anything sinister; it was protecting the post office, correct?

10   A.  Correct.

11   Q.  Now, do you remember, if you look at 307C -- before you get

12   to it, let's just have a brief conversation before.

13           At various times in these conversations where you knew

14   it was being recorded, Mr. Issa, in words or substance, said he

15   would never do anything illegal to get you in trouble, correct?

16   A.  That was said, yes.

17   Q.  And this was one of the places where -- starting at

18   line 17:  "So I'm telling you right now, take this to your

19   grave.  I would never ask you to complete anything that's

20   illegal, that would be against your job, nothing, never, never.

21   You know why?  Because if I do, it's not good for me."  And you

22   say, "Right, right."

23           Do you see that?

24   A.  Yes.

25   Q.  You had the opportunity right there to say to Mr. Issa,

1   what we're talking about is illegal, and you didn't, did you?

2            MS. HANFT:  Objection.

3   A.  No, I didn't.

4   Q.  All right.  Now, on the top of page 118, Mr. Issa -- and I

5   don't want to paraphrase this, so I'm going to actually read

6   it, but he's essentially telling you what he has in mind at the

7   post office, and he says:  "All I ask is that you got work to

8   do, we'll do it for you.  So that there's -- we can do it

9   because I don't believe in that.  That's the MF -- that's the

10  MF'ers that got caught because they get greedy.  I don't do

11  that with this F-ing problem, and I don't want to F your -- I

12  want to do work, clean the parts, check -- always check the

13  parts, always check the labor, always check the time, always

14  check every F-ing thing.  I think you'll find out, hey, charge

15  you one hour, supposed to be half-hour, F you, it should be a

16  half-hour.  That's what I want.  I don't want to take" -- and

17  then it stops and the conversation ends and then he says

18  something and then --

19           THE COURT:  What's the question?

20  Q.  He has told you that he doesn't want to do any work -- do

21  work and get paid for work that he didn't do.  Isn't that the

22  import of what he's saying?

23           THE COURT:  Is that what he's telling you, sir, that

24  he doesn't want to do work for which he's not being paid?

25           MR. BRAFMAN:  No, I'm sorry.

1    Q.  He wants to do work and get paid for the work he does,

2    correct?

3    A.  That's what he said.

4         THE COURT:  That's what he said.  Fine.

5    Q.  And that's what you understood him to mean, right?

6    A.  That's not what I believed he was --

7    Q.  I didn't ask you what you believed.  That's the

8    conversation?

9    A.  Can you rephrase the question.

10   Q.  Did you understand what he said was that he wants to work

11   and get paid for the work he does?

12   A.  That's what he said.

13   Q.  Did he say that?

14        So anything that Mr. Issa says that you say -- that

15   sounds good for him, you can twist it to something bad in your

16   mind, can't you?

17        MS. HANFT:  Objection.

18        THE COURT:  The objection is sustained.

19   Q.  Then there comes a time in the conversation where you told

20   this jury yesterday that Mr. Issa actually opened his shirt to

21   show you that he wasn't a federal agent taping you, right?

22   A.  Correct.

23   Q.  Did you laugh?

24   A.  Yes.

25   Q.  Here you are, you're taping him, and he wants to make you

understand that he's not taping you.  It's kind of bizarre,

right?

        MS. HANFT:  Objection.

        THE COURT:  Overruled.

Q.  Is it bizarre?

A.  I haven't thought about that.  I'm not sure what to call

it.

Q.  But you laughed when it happened, right?

A.  Yes.

Q.  OK.  Because you knew that he -- I'm sorry.  He had

discussed with you previously that the people in Detroit think

they're all being investigated, right?

A.  I'm sorry.  Can you repeat that.

Q.  When you started the correspondence -- when you started the

relationship with Mr. Issa, you told us yesterday that you went

to OIG first, in part, because you suspected that Mr. Issa was

trying to set you up, right?

A.  Correct.

Q.  And you reported him because you had concerns which were

heightened by the fact that other VMF people in Detroit had

recently been arrested?

A.  That was one of the reasons why I called OIG.

Q.  Because you were concerned that he's a federal agent or

undercover agent, right, or cooperating witness, yes?

A.  I'm trying to understand the question.

1    Q.  I'm going --

2    A.  Repeat it.

3    Q.  I'm trying to explain -- I'm trying to get you to focus on

4    your state of mind for a minute of when this relationship with

5    you and Issa began, OK, just for a minute.

6            I think you told us that when he first came out to

7    meet with you, you had already notified OIG and that you were

8    concerned that Mr. Issa was coming to set you up and get you in

9    trouble, correct?

10   A.  That was one of the reasons why I called OIG.

11   Q.  And it was heightened, I think we've established, because

12   of the prior recent arrests of people in Detroit for bribery,

13   correct?

14   A.  That was one of the heightened things that happened, yes.

15   Q.  Then they asked you if you would cooperate, you said yes,

16   and from then on you tried as much as you could to tape your

17   conversations with Mr. Issa by consenting to the recording and

18   conversations with him, correct?

19   A.  Correct.

20   Q.  And in total, despite what we've heard in the courtroom,

21   there's dozens of hours of conversations between you and

22   Mr. Issa, correct?

23   A.  Correct.

24   Q.  There's even conversations with you and Stephanie all day

25   long as she's driving you around Manhattan to the Statue of

1    Liberty, on the ferry, Central Park.  You're taping her

2    throughout the whole period, right?

3    A.   Correct.

4    Q.   Now, you're now in a conversation with Mr. Issa, and he

5    tells you, on the bottom of page 122, Exhibit 307E:  "Yeah, I

6    could be a federal agent wired right now and say to you, OK.

7    Let me tell you this:  Listen, I would never ask you to do

8    anything that is negative for the post office."  On the top of

9    page 123.

10           I'm sorry.  If we could get to Exhibit 307E, which is

11   page 122.  It's the same conversation, a different section.

12   And you could go back to the -- OK.  Thank you.

13           On the bottom of page 22 he says:  "Yeah, I could be a

14   federal agent wired right now, OK.  Let me tell you this:

15   Listen, I would" -- then the top of page 123 -- "I would never

16   ask you to do anything that is negative for the post office,

17   never.  We don't need that, right?  We don't need that, OK?

18   All we ask for is that if you guys need a service, you want a

19   vendor that could provide you 24-hour service seven-days-a-week

20   service, certified and stocked with mechanics who are

21   certified, who is an authority in the shuttling, the repairing?

22   Yes, that's it.  Isn't that it?  I'm going to have you -- if we

23   make a mistake," then it's unintelligible, and he says to you,

24   "You got that," correct?

25   A.   That's what he said.

1  Q.  Right.  And there's no response, if you will, that the

2  government played on your behalf and -- let's assume if there

3  was a probative response, it would be played, correct?

4          MS. HANFT:  Objection.

5          THE COURT:  Ground?  Do you me a favor and articulate

6  a ground when you stand up, Ms. Hanft, so I don't have to keep

7  asking.

8          MS. HANFT:  Your Honor, in the first case, objection

9  as to form of the question.

10          THE COURT:  The objection's overruled.

11          MR. BRAFMAN:  Thank you.

12  Q.  Would you agree that if there was a response to that, that

13  would be important to the case, it would be in the government's

14  exhibit?  Would you agree with that?

15  A.  If it was recorded, I would.

16  Q.  But this conversation's recorded, isn't it?

17  A.  Yes.

18  Q.  After Mr. Issa says this entire thing, you don't rip off

19  the recording or stick your hand in your shirt and turn it off,

20  do you?

21  A.  No.

22  Q.  There's a lot more to this conversation, isn't there?

23  A.  Yes.

24  Q.  What do you say?  Did you tell him anything in response to

25  that?  Do you remember what you said without looking at a

1    transcript?

2    A.   I don't remember.

3    Q.   But he's telling you that we don't need that.  We don't

4    need to hurt the post office.  That's what he's saying, right?

5    A.   That's what he's saying.

6    Q.   Then he's describing the nature of the work that he can do

7    and the kind of work that he wants to do, and he says that,

8    right?

9    A.   Correct.

10   Q.   And then if we go to the same exhibit -- I'm sorry,

11   Government Exhibit 307F, there is a statement by him to you on

12   the top of page 126, and he says:  We're not -- not that we're

13   doing anything wrong, he's telling you, because you don't

14   want -- you don't want to act suspicious for a reason, because

15   then you have to defend yourself.

16            What do you have to defend yourself?

17            And an unidentified male says:  Got it, got it.

18            Do you know who that person is?  Is it you?

19   A.   What person?

20   Q.   Look at the transcript.  Doesn't say "JB."  It says "U/M,"

21   which is code for unidentified male.  Who is that person?  Is

22   there someone else at this conversation?

23   A.   No.

24   Q.   So is that you and it's a mistake, or is it someone else?

25   A.   I didn't know what part you were referring to.  Yes, that

IC6HIss5                          Blight - Cross

1    was me.

2    Q.  So that's you?

3    A.  That said, "Got it, got it."

4    Q.  Right.  Thank you.

5          Now, if you look at page 308A, this is a trip that's

6    been planned for months, correct, New York?

7    A.  Correct.

8    Q.  And for months you've tried to schedule something that's

9    good for you, good for your daughter's scholarship, and good

10   for Mr. Issa and, obviously, good for the government because

11   they're telling you what dates work, right?

12   A.  Good for Mr. Issa and good for the government, yes.

13   Q.  OK.  But this has gone on for months, and now you're

14   finally coming to New York, right?

15   A.  Correct.

16   Q.  And in this conversation, Government 308A, page 3 on the

17   bottom, you're giving him your flight information -- I'm sorry,

18   line 9, correct, telling him when you're leaving, when you're

19   coming, when you're leaving in this transcript, right?

20   A.  When I'm coming back.

21   Q.  Right.  When you're going back, yes.

22   A.  Yes.

23   Q.  And he then says to you:  "OK.  You're going to be landing

24   Monday afternoon, and you're leaving Thursday morning.  So

25   you're going to be here Monday night, Tuesday night, Wednesday

IC6HIss5                        Blight - Cross

1    night," and he -- and you say, "Yes."  He says, "OK.  Perfect,"

2    right?

3    A.  Yes.

4    Q.  Now, he knows you're coming in finally to New York.  This

5    is the event that people have been sort of looking forward to

6    for a long time, right?

7              MS. HANFT:  Objection.  Relevance.

8              THE COURT:  The objection's sustained.

9    Q.  Does he even bother to pick you up at the airport?

10   A.  No.

11   Q.  Stephanie picks you up, right?

12   A.  Yes.

13   Q.  This young woman Stephanie, she's like a kid, right?  She's

14   a young Hispanic lady.  She works for Mr. Issa.  Do you know

15   anything about her?

16   A.  I'm not sure what you mean by "kid."  She's an adult.

17   Q.  OK.  I'm an old man.  I'm talking someone in their 20s or

18   early 30s.

19   A.  I know her to be around 30, yes.

20   Q.  She picks you up, not Mr. Issa?

21   A.  Correct.

22   Q.  She doesn't try to bribe you or do anything, right?

23   A.  No.

24   Q.  And you go to eat because you're hungry.  It's a late

25   flight, you're coming into New York, and she goes with you for

IC6HIss5                          Blight - Cross

1    a quick bite, right?

2    A.  Correct.

3    Q.  And then she drops you at a hotel?

4    A.  Correct.

5    Q.  And she leaves and makes arrangements to pick you up the

6    next morning, correct, sir?

7    A.  Correct.

8    Q.  And she does, she picks you up the next morning without

9    Mr. Issa, correct?

10   A.  OK.

11   Q.  And you and Stephanie spend the entire day going around New

12   York City like you are a tourist in New York, correct?

13   A.  For a few hours, yes.

14   Q.  But she's taking you to most of -- mostly tourist spots

15   that either you want to see or you've heard about, correct?

16   A.  Well, not a bunch of tourist spots.  We drove around and we

17   ended up by the Statue of Liberty.

18   Q.  OK.

19   A.  Yes.

20   Q.  And the Statue of Liberty, you needed reservations, so you

21   couldn't get in, but you went on a water taxi, right?

22   A.  Yes.

23   Q.  And all the while you're taping, right?

24   A.  Yes.

25   Q.  What are you talking to her about for the five hours that

1    you're with her?  Life?

2    A.  I don't really recall.  I don't recall.  It's a lot of

3    different things.

4    Q.  Well, you knew Stephanie from Detroit, didn't you?

5    A.  Yes.

6    Q.  Stephanie, the same woman who picks you up, was Mr. Issa's

7    point person on the ground in Detroit for various times when

8    the business was being built, right?

9    A.  Correct.

10   Q.  You would go there and you would see Stephanie actually

11   working in the facility, correct?

12   A.  Correct.

13   Q.  So when Stephanie picked you up at the airport, it wasn't

14   the first time you had met her, correct?

15   A.  Correct.

16   Q.  Did you have any relevant conversation -- I'm sorry.  Wrong

17   form.

18          Did you have any conversation with Stephanie relating

19   to the business of the VMF?

20   A.  I don't recall any.

21   Q.  As you sit here today, you don't have any recollection of

22   any part of the conversation, correct?

23   A.  I do have recollection.  Yes, I recall some of the

24   conversations we had.  She talked about an adopted brother,

25   talked about her working at different --

1  Q.  Being a single mother?

2  A.  I'm sorry?

3  Q.  Being a single mother?

4  A.  I don't recall.

5  Q.  Did you go anyplace besides the Statue of Liberty?

6  A.  I believe in the Bronx area we stopped and I got a hot dog

7  from a vendor, a vending --

8  Q.  Did you pay for it yourself?

9  A.  That I did.

10  Q.  OK.  Now you were staying someplace not in Manhattan,

11  someplace in Queens, correct?

12  A.  Correct.

13  Q.  Now, that day, when's the first time you saw Mr. Issa?

14  Approximately at night sometime?

15  A.  Yes.

16  Q.  And then it was you, Stephanie, and Mr. Issa who went to a

17  couple of bars, had a drink, right?

18  A.  Correct.

19  Q.  Then you went to a club, had another drink, correct?

20  A.  No.

21  Q.  Went to a restaurant?

22  A.  That was the first -- the first day, no.  We went to an

23  Italian restaurant.

24  Q.  At the Italian restaurant, it was you, Mr. Issa, and

25  Ms. Stephanie, correct?

1    A.  Correct.

2    Q.  Now I want to turn to page -- I'm sorry, Government

3    Exhibit 309B.  The bottom of page 309B, conversation at

4    line 20, Mr. Issa says:  "There's another thing and then

5    another thing.  Regardless of how you or anybody benefits, I'm

6    never going to ask anything from anyone that is illegal or --

7    so then there's nothing to worry about.  You got it?  It's not

8    like I'm saying to you, 'Yo, here's a hundred bucks.  Bring me

9    a six pack of cocaine through the mail,' right?"

10          And he's telling you that he's not going to ask you to

11   do anything illegal, correct?

12          MS. HANFT:  Objection.

13          THE COURT:  The objection's sustained.

14   Q.  Now, on Exhibit 309C, does there come a time in that

15   conversation on line 7 when you start talking to Mr. Issa about

16   your future on line 7?

17   A.  Yes.

18   Q.  And you say:  "I mean, you know, I do a lot of thinking,

19   pondering, soul-searching, especially when I'm looking at my

20   future and when I'll get out of the postal service.  Like you

21   said, man, you know, just retiring in Florida."  And he says,

22   "Yeah."  And you say, "Anything I want to do."

23          Why'd you tell that to Mr. Issa?  Was that true?  Were

24   you thinking about retiring?

25   A.  Yes, I have thought about retirement.  Mr. Issa brought up

IC6HIss5                          Blight - Cross

1    my retirement or the postal service's retirement --

2    Q.  Right.

3    A.  -- and our wages numerous times in the past.

4    Q.  And you in this conversation, it's you who talk about

5    pondering the future, correct?

6    A.  Correct.

7    Q.  Do you ponder the future as a post office employee?

8    A.  Yes.

9    Q.  Do you sometimes feel that a man with your talents is

10   underappreciated and underpaid by the post office?  It's OK to

11   answer truthfully.

12   A.  Well, I mean, yes, I believe for any job.

13   Q.  No, not for any job, your job.  When's the last raise you

14   got from the post office, and was it 1 percent?

15            MS. HANFT:  Objection.

16            THE COURT:  The objection is sustained.  It's

17   irrelevant.  We'll stop talking about the defendant's -- or the

18   witness' compensation.  It's not relevant to the case.

19            MR. BRAFMAN:  I can explain why it is, Judge.

20            THE COURT:  Mr. Brafman, I can imagine what you'll

21   say.  I've ruled.  Move on.

22            MR. BRAFMAN:  Yes, ma'am.  Yes, ma'am.

23   Q.  Look at page 18 of the same transcript, and on page 18,

24   line 15, you say to Mr. Issa:  "The more I see it, I'm saying

25   two, three, years past retirement age, I got to put in at least

1  another three years, get my kids through college, do this and

2  do that.  I got to finish paying off the house.  I got a new

3  mortgage about ten years ago.  I got two more years left on it.

4  I mean, F, man, are you serious you're going to stay out here

5  like that?  At a certain point, it costs you more in gas money

6  and lunches than just to collect your damn retirement."

7           Did you say that to Mr. Issa?

8           MS. HANFT:  Objection.

9           THE COURT:  Objection's sustained.

10 Q.  Why were you telling Mr. Issa all of your financial

11 problems?

12 A.  That wasn't my financial problems.

13 Q.  No.  Whose was it?

14 A.  I was referring to what people have said, and I said it

15 here.  Man, why would you stay working?  I've told that to many

16 people.  At a certain point, you kind of plateau on what you're

17 going to make.  When you come to work, you end up losing money

18 because you're buying lunches, spending gas to get there.  You

19 would make the same amount sitting home on retirement.  That's

20 what I was saying.

21 Q.  And you've said it before to other people, right?

22 A.  People have said -- yes, yes.

23 Q.  Now you're saying it to Mr. Issa who you're recording.  Why

24 are you saying that?  That's all I'm asking.  Is that how you

25 feel?

1   A.  Yes.

2   Q.  Were you being truthful?

3   A.  Not about me at that time, no.

4   Q.  But were you being truthful about these concerns, what you

5   were worried about?

6   A.  No.

7   Q.  So when you said a minute ago that you were, what did you

8   mean?

9   A.  When you asked me about the other question and I was

10  pondering, this is a different conversation, later in the

11  conversation.

12  Q.  You know, Mr. Blight, I'm almost done, but I just want to

13  ask you, were you talking to Mr. Issa sometimes in these

14  conversations like a friend who you are unburdening yourself

15  to?

16  A.  Yes.

17  Q.  So how does Mr. Issa know, if you can tell us, when you're

18  the friend or you're the undercover agent when he responds to

19  you?

20          MS. HANFT:  Objection.

21          THE COURT:  Objection's sustained.

22  Q.  Well, when you say you were talking to him as a friend

23  unburdening yourself, let's look at page 21.  Page 21, next

24  page -- I'm sorry, Exhibit 309D, like David, you say:

25          "And now I'm looking at my 15-year-old trying to, you

1    know, stress to him he's got an F-ing B," like a grade B, "out

2    of all these years of school, he's going in 5th grade, he got a

3    B last year and on a final grade.  Me and my wife are

4    heartbroken.  We're on his ass.  F-ing B.  That's like when I

5    was a kid, if I got an F, my mom'd be up my ass, you know, a B,

6    oh, he's smart" --

7              THE COURT:  What's the question?

8              MR. BRAFMAN:  I can't ask the question until I read

9    it, your Honor.

10             THE COURT:  Well, I'm sorry.

11   Q.  Why are you telling Mr. Issa all of these things that are

12   of a personal nature that have nothing to do with this case?

13   Why?

14             THE COURT:  You've asked that question 150 times, and

15   I will not allow you to ask it again.  It is asked and

16   answered.  Move on.  You can argue at the end of the case about

17   the believability of the witness' answer.  Move on.

18   Q.  On the bottom of the page -- just one last question -- when

19   you say, "I'm going to be paying out the ass when college

20   comes," is that true?

21   A.  No.

22   Q.  You wanted Mr. Issa to believe that you had a financial

23   hardship?

24             MS. HANFT:  Objection.  Asked and answered.

25             THE COURT:  The objection's sustained.

IC6HIss5                    Blight - Cross

1    Q.  How often would you complain to Mr. Issa about the

2    stress --

3              MS. HANFT:  Objection.

4    Q.  -- in your life?

5              THE COURT:  The objection's sustained.

6    Q.  You and Mr. Issa discuss another visit to New York at some

7    time in the future, right?

8    A.  He mentioned that, yes, and there --

9    Q.  You said words to the effect that you would love to come

10   back at another time and party and hang out in New York City,

11   correct?

12   A.  Correct.

13   Q.  And that never happened, right?

14   A.  Correct.

15   Q.  Shortly after the meal in Chinatown, Mr. Issa was arrested,

16   and you never spoke to him again; would that be a fair

17   statement?

18   A.  I don't recall if I spoke to him after that.

19             MR. BRAFMAN:  I don't have anything further, your

20   Honor, but I need just a minute to get my books out of here

21   before they start, if they're starting.

22             THE COURT:  Fine.

23             Is there any redirect?

24             MS. HANFT:  Very briefly, your Honor.

25             MR. BRAFMAN:  Are we going to be able to take a break,

1   afternoon break?

2          THE COURT:  We will not take a break until this

3   witness is off the stand.

4          MR. BRAFMAN:  Yes, ma'am.  I'm getting out of here.

5   Sorry.

6   REDIRECT EXAMINATION

7   BY MS. HANFT:

8   Q.  Mr. Blight, do you remember being asked questions a few

9   moments ago about Mr. Issa telling you he didn't want to get

10  you into trouble?

11  A.  Yes.

12  Q.  When you went out to dinner with Mr. Issa in June of 2016

13  and Mr. Issa paid for the entire meal, could you have gotten in

14  trouble for that?

15          MR. BRAFMAN:  Objection.

16          THE COURT:  The objection's overruled.

17  A.  Yes.

18  Q.  When you went out with him in July of 2016 and he paid for

19  dinner, could you have gotten in trouble for that?

20  A.  Yes.

21  Q.  Is that because you're not allowed to accept payments,

22  accept meals from contractors?

23          MR. BRAFMAN:  Objection.

24          THE COURT:  Why is that?  The objection is

25  well-founded.  It is an objection to form.  You are the

1    government.  You are on direct.  Please do not ask leading

2    questions.

3              MS. HANFT:  I apologize, your Honor.

4    Q.  Why could you have gotten in trouble, Mr. Blight?

5              MR. BRAFMAN:  Objection.

6              THE COURT:  Overruled.

7    A.  Because that is considered gratuity.  It's against our

8    ethical and legal rules with the postal service.

9    Q.  So when Mr. Issa said, "I don't want to get you in

10   trouble," did you believe him?

11             MR. BRAFMAN:  Objection.

12             THE COURT:  Objection is overruled.

13   A.  No, I didn't.

14   Q.  Do you remember a few moments ago on cross-examination

15   Mr. Brafman asked you, pointed you to a portion of a

16   conversation where Mr. Issa said, "I only want to get paid for

17   the work I do"?  Do you recall that?

18   A.  Yes.

19   Q.  Based on your experience with Mr. Issa's companies and the

20   billing, do you believe that statement?

21   A.  No, I don't.

22   Q.  Do you remember --

23             MR. BRAFMAN:  Excuse me, your Honor.  This witness'

24   belief is not relevant.

25             THE COURT:  The objection is -- I told you the

1    objection's overruled.  Please.

2    Q.  Do you remember being asked earlier this morning about

3    whether you gave Mr. Issa work after your trip to New York City

4    when he passed you $2,000 in cash?

5    A.  Yes.

6    Q.  And you recall that you said that you did give work to him,

7    right?

8    A.  Yes.

9    Q.  And then Mr. Brafman said, How come there aren't invoices

10   that we looked at after that time period?  Do you recall that?

11   A.  Yes.

12   Q.  You returned to Michigan from New York on August 11, is

13   that right?

14   A.  Yes.

15           THE COURT:  Can you stop asking leading questions.

16           MS. HANFT:  Apologize, your Honor.

17   Q.  When did you return, Mr. Blight, from your trip to New

18   York?

19   A.  It was early August 11.

20           MS. HANFT:  Can we put up Government Exhibit 1063,

21   please.

22   Q.  Do you recall looking at this document on direct

23   examination, Mr. Blight?

24   A.  Yes.

25   Q.  What is the date on this document?

1    A.  That's August 19 of 2016.

2    Q.  Did you receive this invoice before or after your trip to

3    New York?

4    A.  After.

5              MS. HANFT:  Can we see Government Exhibit 1064.

6    Q.  Do you recall looking at this document on direct

7    examination, Mr. Blight?

8    A.  Yes.

9    Q.  What's the date on this document?

10   A.  August 19, 2016.

11   Q.  Did you receive this document before or after your trip to

12   New York?

13   A.  After.

14             MS. HANFT:  Finally, let's look at Government

15   Exhibit 1065.

16   Q.  Do you recall looking at this document on your direct

17   examination?

18   A.  Yes.

19   Q.  What's the date on this document?

20   A.  August 19 of 2016.

21   Q.  Did you receive this document before or after your trip to

22   New York?

23   A.  That was after.

24             MS. HANFT:  Thank you.  One moment.

25             No further questions, your Honor.

IC6HIss5                              Blight - Recross

1         THE COURT:  Thank you.

2         MR. BRAFMAN:  Can I just go back, your Honor, just on

3    these documents?

4         THE COURT:  Only.  That's all you can do.  Recross.

5         MR. BRAFMAN:  Can you put up -- if you could bring

6    this up a little bit.  This is 1065.

7    RECROSS EXAMINATION

8    BY MR. BRAFMAN:

9    Q.  Do you see that, sir?

10   A.  Yes.

11   Q.  When's the first time you actually can testify -- you can

12   testify under oath that you actually saw this invoice?

13   A.  It would have been after, the date of or after 8/16/2016 or

14   8/19.

15   Q.  But you don't remember the date you saw it, do you?

16   A.  Not the exact date, no.

17   Q.  Now, look if you can -- can we pick up and enlarge the

18   bottom part?

19         The invoice that was submitted -- I'm sorry, the bill

20   that was submitted was $742, is that correct?

21   A.  Yes.

22   Q.  What was the revised estimate that you approved?

23   A.  It says 705.

24   Q.  So it's $37 less than Mr. Issa had billed the post office

25   for, correct?

IC6HIss5                          Blight - Recross

1    A.  The reversion, the quote was.

2    Q.  I'm sorry?

3    A.  The quote was, yes.

4           MR. BRAFMAN:  Now can we go back to the previous

5    exhibit that the government put up, 1064.  Can we enlarge the

6    bottom part?

7    Q.  The revised estimate was $3,658.59, correct?

8    A.  Correct.

9    Q.  How much were you billed for?

10   A.  $883.52.

11   Q.  And this is $2,300 less, and it was after you already

12   received the $2,000, correct?

13   A.  Correct.

14   Q.  You were cutting Mr. Issa's bill by almost $2,000, isn't

15   that true?

16   A.  Can you highlight or bring the whole page up so I can see

17   what the work was?

18   Q.  Sure.  Yes.

19   A.  The frame, Mr. Issa was not set up to do frames.

20   Q.  OK.

21   A.  And that was part of the quote, so I would not have gave

22   him that job.

23   Q.  And even though he gave you money, you would not have given

24   him that job, and you didn't?

25   A.  Correct.

1    Q.  All right.

2            Next, the last one that they used, if we could look at

3    it, please.  I'm sorry.  I don't remember the number.  What was

4    the first number you used?  1063, I think 1063.

5            Now, you asked Ms. Hanft asked -- if we could see the

6    top, please -- Ms. Hanft asked you what the date of the invoice

7    was, and you said it was August 18, 2016.  And that was after

8    you came back from New York, correct?

9    A.  Correct.

10   Q.  But the vehicle came in to be serviced on July 22, 2016,

11   which was before the meeting in New York, correct?

12   A.  Correct.

13           MR. BRAFMAN:  And could we enlarge this bill, please,

14   or just put up the whole bill.  And the next page, please.  If

15   we can enlarge the bottom, please.

16   Q.  This was revised on several occasions, correct?

17   A.  Correct.

18   Q.  The bill was submitted at $1,547, correct?

19   A.  Correct.

20   Q.  Then after you came back on August 18, after you got money,

21   it was revised down to $858, is that correct?

22   A.  I'm sorry.  Can you ask the question again.

23   Q.  Revised estimate was $858, correct?

24   A.  Says 996.77.

25   Q.  I'm sorry.  I don't know if you have the same exhibit as I

1   do.

2          Yes, current estimate is $996, is that correct?

3   A.  Correct.

4   Q.  And the bill was $1,547, correct?

5   A.  Correct.

6   Q.  The revised estimate, after you came back, was $858.12,

7   correct?  Here, right --

8   A.  I'm not understanding.

9   Q.  Under the original estimate there's a revision one.

10  Previous estimate, zero.  Additional cost, $858.  Revised

11  estimate $858.12.  Do you see that?

12  A.  Yes.

13  Q.  And then you break it down by labor and taxes and fees,

14  correct?

15  A.  Correct.

16  Q.  All right.  And that's on August 18, 2016.  The estimate is

17  revised down from 996.77, correct?

18  A.  Correct.

19  Q.  Then it is a second revision on 818, and the revised

20  estimate is 996, correct?

21  A.  Correct.

22  Q.  Because they add in the labor -- the parts for $135,

23  correct?

24  A.  Correct.

25  Q.  But the revised, the current estimate of almost a thousand

1   dollars is still $500 less than the bill that Mr. Issa

2   submitted for approval, correct?

3   A.  The bill is more than.

4   Q.  I'm saying the bill is more, but it wasn't approved, was

5   it?

6   A.  It was approved.  He did the work.

7   Q.  He did the work.

8           Thank you.  I have nothing further.

9           MS. HANFT:  May I briefly re-redirect, your Honor?

10          THE COURT:  Very brief.  There's not much there.

11          MS. HANFT:  Two questions.

12   REDIRECT EXAMINATION

13   BY MS. HANFT:

14   Q.  Mr. Blight, could you explain what an estimate is for us.

15   A.  It is a quote or a price of what the repairs and parts may

16   cost.

17   Q.  What does the bill itself represent?

18   A.  What was charged after the repairs were done.

19          MS. HANFT:  Thank you.

20          Nothing further.

21          MR. BRAFMAN:  One question.

22   RECROSS EXAMINATION

23   BY MR. BRAFMAN:

24   Q.  In this case, sir, the work was done, correct?

25   A.  Can I see the full --

IC6HIss5                              Blight - Recross

1          MS. HANFT:  Objection.  Asked and answered, your

2     Honor.

3          THE COURT:  That's correct.  It was asked and

4     answered.

5          MR. BRAFMAN:  Yes, ma'am.  I will sit down.

6          THE COURT:  Are we done?

7          Thank you, sir.  It's been nice knowing you.  You may

8     leave.

9          Let's take a break.  Don't discuss the case.  Keep an

10     open mind.

11          Have your next witness ready.

12          (Witness excused)

13          (Jury excused)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

IC6HIss5                          Blight - Recross

1          (Jury not present)

2          MR. SOLOWIEJCZYK:  Judge, could we be very briefly

3    heard on something?  We didn't want to do it in the presence of

4    the jury.

5          THE COURT:  What?  I don't have a court reporter -- I

6    do.

7          MR. SOLOWIEJCZYK:  We don't want to do a long speaking

8    objection, but just basically reading the transcripts aloud ad

9    nauseam is not proper cross-examination.

10         THE COURT:  So stand up and object.  Every single time

11   you did, you were sustained.

12         MR. SOLOWIEJCZYK:  We're going to continue to do that.

13         THE COURT:  So let's continue to do that because --

14         MR. BRAFMAN:  Excuse me, your Honor.  Excuse me just

15   one second, please.  For them to be able to read that -- listen

16   to that tape and then not allow me to press him on the --

17         THE COURT:  You can't read a page and a half of

18   transcript.  You could read discrete statements.

19         MR. BRAFMAN:  How do I ask a question that the jury

20   understands without putting the context in?

21         THE COURT:  Let me assure you, they were falling

22   asleep in their chairs.

23         MR. BRAFMAN:  No, I don't think so, Judge.

24         THE COURT:  They were not understanding your

25   questions.

1              MR. BRAFMAN:  I don't think so.  I don't think so,

2     Judge, but thank you.

3              (Recess)

IC65iss6                          Velez – direct

1              THE DEPUTY CLERK:  Jury entering.

2              (Jury present)

3              THE COURT:  Okay.  Call your next witness.

4              MS. HANFT:  The government calls Ismael Velez.

5              THE DEPUTY CLERK:  Raise your right hand.

6    ISMAEL VELEZ,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9              MS. HANFT:  Good afternoon, sir.

10             THE COURT:  Wait a minute.  State your full name for

11   the record, sir, and spell it for the court reporter.

12             THE DEPUTY CLERK:  Tell us your name.

13             THE WITNESS:  My name is Ismael Velez.  I-S-M-A-E-L,

14   V-E-L-E-Z.

15             THE COURT:  Now you may inquire.

16             MS. HANFT:  Thank you, your Honor.

17   DIRECT EXAMINATION

18   BY MS. HANFT:

19   Q.  How old are you, Mr. Velez?

20   A.  I'm 58 years old.

21   Q.  Where were you born?

22   A.  Brooklyn, New York.

23   Q.  Where did you grow up?

24   A.  I grew up in the Bronx, New York.

25   Q.  How far did you go in school?

IC65iss6                          Velez - direct

1    A.   Some college.

2    Q.   What do you currently do for a living?

3    A.   Right now I work for Lyft and a private contractor.

4    Q.   Where did you work before that?

5    A.   I used to work for the United States Postal Service.

6    Q.   For how long did you work for the United States Postal

7    Service?

8    A.   For 22 years.

9    Q.   Why did you stop working at the United States Postal

10   Service?

11   A.   I was visited by the OIG's office because I committed a

12   crime.

13   Q.   And what was that crime?

14   A.   Bribery.  I received bribes.

15   Q.   Who did you receive bribes from?

16   A.   From Tony Issa.

17   Q.   Do you see Tony Issa in the courtroom today?  Would you

18   please point him out --

19             MR. BRAFMAN:  We will stipulate to the identification.

20             THE COURT:  Please point him out and describe

21   something he is wearing.

22             THE WITNESS:  Second gentlemen at the back, second

23   table.

24             THE COURT:  Indicating, Mr. Issa.

25   BY MS. HANFT:

IC65iss6                    Velez - direct

1    Q.  When did you first start working at the postal service,

2    Mr. Velez?

3    A.  June 17 of 1995.

4    Q.  What was your first job there?

5    A.  My first job was auto mechanic.

6    Q.  And at the time that you left your job at the postal

7    service, what was your job?

8    A.  Manager of vehicle maintenance.

9    Q.  Where were you the manager of vehicle maintenance?

10   A.  In White Plains, New York.  White Plains VMF.

11   Q.  What is a VMF?

12   A.  It is a Vehicle Maintenance Facility.

13   Q.  You said you were the manager of one of those.  What is the

14   manager of a VMF's role?

15   A.  We are in charge of making sure that the vehicles are

16   maintained across the district.  So, I had 1,644 vehicles.

17   Q.  When a postal service vehicle needs to be repaired or

18   maintained, how do those repairs get done?

19   A.  Vehicles are brought into the shop, to our garage, which is

20   the White Plains VMF, and we repair them there.  When we are

21   overwhelmed we send them out to contractors.

22   Q.  And who decides whether the vehicle gets repaired within

23   the VMF or sent to a third-party contractor?

24   A.  Myself and my supervisors.

25   Q.  When you say your supervisors, are those people you report

1   to or people who report to you?

2   A.  I believe two supervisors that I had that reported to me.

3   Q.  And who decides which third-party contractor gets to repair

4   a vehicle if the decision is made that the vehicle will be sent

5   out to a third-party contractor?

6   A.  They would be sent out to contractors with contracts.

7   Q.  And who decides which contractors they're sent out to?

8   A.  Myself or the supervisors.

9   Q.  What were some third-party contractors that you used during

10  your time as VMF manager?

11  A.  I had over a hundred contractors up in the Westchester

12  district.  Do you want some of the names?

13  Q.  Yes, please.

14  A.  The most recent ones are Healey, Dee Jay, Delorean, First

15  Star.  There were a bunch of others that I had, that were there

16  in place prior to me before I started there.

17  Q.  I will ask you a bit more about that in a moment.

18          Could you tell us how you first met the defendant Tony

19  Issa?

20  A.  I met Tony Issa while I was acting manager of the Bronx

21  VMF.  I went up there to do an acting manager position while

22  the manager had just retired and I had -- Tony Issa's company

23  was doing work for the Bronx VMF and they had exceeded a

24  $10,000 window that we had to give work to contractors without

25  a contract.  I stopped all work going to his shop and then he

IC65iss6                         Velez – direct

1    showed up to my shop to talk to me.

2    Q.  I will ask you about that in one moment but when did you go

3    to the Bronx as acting VMF manager?

4    A.  I believe it was 2012.  2012, I believe it was.

5    Q.  And you mentioned that work was being given to Tony Issa's

6    companies.  What are the names of his companies?

7    A.  The names of his companies are First Star, Delorean, Dee

8    Jay, Duploy, Healey.  Then there was a bunch of gas stations as

9    well.

10   Q.  And you mentioned a few moments ago that you stopped giving

11   work to these companies without a contract when you were at the

12   Bronx VMF.  Could you describe, what is the procedure for

13   getting a contract with the third-party contractor?

14   A.  You give them work to -- you have a leeway of about $10,000

15   to try them out.  We were -- we tried them out.  At the

16   beginning everything was fine, we put them in for a contract.

17   We also have to have two other vendors so it is a competitive

18   process so it doesn't automatically mean that he is going to

19   get it.  If somebody else underbids him, they could get the

20   contract.  That paperwork is -- you collect a bunch of data

21   from the three different contractors and you send it to

22   Philadelphia CMC, which is a contract management center down in

23   Philadelphia, and they decide.

24   Q.  And you just testified a moment ago about this but what did

25   you do -- I apologize.

1          What did Tony Issa do when you stopped using his

2     companies, as you just said?

3     A.  He would visit the Bronx VMF almost on a daily basis.  He

4     wanted to talk to me about getting work.

5     Q.  And would you talk to him on a daily basis?

6     A.  Not all the time.  I was, you know, busy trying to

7     straighten out my work.  There was times that I would meet with

8     him and we would talk about him wanting to get on the postal

9     service under a contract.

10    Q.  About how long were you acting VMF manager in the Bronx?

11    A.  About three to six months, in that neighborhood.  I don't

12    remember the exact date.

13    Q.  During that time period, did you give any vehicle

14    maintenance or repair work to Mr. Issa or any of his companies?

15    A.  No.  I don't believe so.  No.

16    Q.  At any point during that time period did Mr. Issa give you

17    anything?

18    A.  Well, one time we went out for lunch.  It just so happened

19    that I was going out to lunch.  He told me oh, I'm going out to

20    lunch too.  We wound up going together to a place on Willis

21    Avenue by the name of Jimbo's and I bought a hamburger and

22    fries.  I don't remember what he had.  At the end of the lunch

23    I went to go pay for my lunch, and he stuck his hand out and

24    said no, no, no.  I'll pay for it.  I got it.  So, he paid for

25    my lunch.

IC65iss6                         Velez - direct

1   Q.  Now, after you left the Bronx VMF in your position as

2   acting manager there, where did you work?

3   A.  He went back down to Manhattan -- Manhattan VMF.  That was

4   my home station.  I was a supervisor there so I went back to

5   Manhattan VMF, yes.

6   Q.  And when, approximately, was that?

7   A.  2012.

8   Q.  In your capacity as supervisor, did you get to decide which

9   third-party contractors to use?

10  A.  Only if they had a contract.

11  Q.  Did any of Mr. Issa's companies have contracts with the

12  Manhattan VMF at that time, to your knowledge?

13  A.  No.

14  Q.  Who was the VMF manager of that facility?

15  A.  David Conover.

16  Q.  Do Tony Issa and David Conover know each other?

17  A.  No, but they came to know each other after I introduced

18  them.

19  Q.  How did it come to be that you introduced them?

20  A.  Mr. Issa had asked me if he could meet the manager down

21  there so he wanted to get, do work for Manhattan VMF and I gave

22  him his number and information.

23  Q.  And about how long were you back at the Manhattan VMF?

24  A.  When that happened?

25  Q.  Generally speaking, between the time when you were acting

IC65iss6                          Velez - direct

1    manager at the Bronx VMF and the manager of the White Plains

2    VMF that you testified earlier was your final position.

3    A.   About a year.  A little over a year.

4    Q.   And during that time period, that year between those jobs,

5    did Mr. Issa still come to visit you every day?

6    A.   Not myself, but I did see him up in Mr. Conover's office

7    every once in a while.

8    Q.   During that time period was Mr. Issa giving you anything?

9    A.   I started to get gas only after I had initiated a contract,

10   paperwork to submit to Philadelphia.  So, he had called me down

11   to his gas station because he wanted to talk to me about that

12   process.  At the end of the conversation he says, oh, you need

13   gas?  I said yeah.  Well, he said, pull up at that pump.  And

14   he instructed his manager to give me gas.  So, I pulled into

15   the pump and I got gas.

16   Q.   Just to break that down for a moment, you said that you

17   were in the process of drawing up contract papers; is that

18   right?

19   A.   Yes.

20   Q.   And so, where did you meet Mr. Issa on that occasion?

21   A.   Where did I meet him?  In the gas station at White Plains

22   and Bronxdale in the Bronx.  It is a Mobil gas station.

23   Q.   Who owns that Mobil gas station?

24   A.   Mr. Issa does.

25   Q.   And do you know anyone who worked at that station?

IC65iss6                        Velez - direct

1   A.  He has a manager there by the name of Sohail.

2   Q.  How did you first meet Sohail?

3   A.  When I first went to that gas station to meet Tony Issa, he

4   had introduced me to his manager.

5   Q.  And what did he say when he introduced you to that manager?

6   A.  After our conversation at the gas station he told Sohail,

7   after I got gas, he told him he is going to come here to get

8   gas once a week, just give him gas.

9            That's how I met Sohail.

10  Q.  How did Mr. Issa refer to you when he introduced you to

11  Sohail?

12  A.  My nickname Izzy.  He used to call me by my nickname.

13  Q.  After that time, did you start going to that Mobil station

14  for free gas?  Did you go more than once?

15  A.  Once a week.

16  Q.  And why did you believe that Mr. Issa was allowing you to

17  fill up your car with gas for free?

18            MR. BRAFMAN:  Objection.

19            THE COURT:  Overruled.

20  BY MS. HANFT:

21  Q.  You can answer, sir.

22  A.  Because he wanted -- you know, he wanted to get in with the

23  company.  He wanted to get in with the postal service with the

24  contracting.  He knew I was drawing it up and sending it to

25  Philadelphia.

IC65iss6                        Velez - direct

1    Q.  Now, did there come a time that you were promoted to acting

2    manager of the White Plains VMF?

3    A.  Yes.  That was in September of 2013.

4    Q.  And after you were acting manager, did there come a time

5    when you were just manager?

6    A.  I was promoted to manager on June 28 of 2014.

7    Q.  After you found out you had been named acting manager of

8    the White Plains VMF, do you recall when the next time you

9    spoke to Mr. Issa was?

10   A.  He actually called me on my cell to congratulate me about

11   getting the acting manager's position.

12   Q.  Did he say anything else on that phone call?

13   A.  He says now you can start giving me work from up there.

14   Q.  After you became acting VMF manager in White Plains, did

15   Mr. Issa come to the White Plains VMF?

16   A.  No, he didn't.  He never came to the White Plains VMF but

17   he did send his employees up there to speak with me.

18   Q.  Which employees did he send?

19   A.  Some of the girls.  Do you want their names?

20   Q.  Yes, please.

21   A.  I know -- one of them I know first and last name, Stephanie

22   Rivera.  The other ones I only know their first names --

23   Jasmine, Karen, Sheryl.  That's about it.

24   Q.  Did there come a time when Mr. Issa established a company

25   not far from the White Plains VMF?

IC65iss6                        Velez - direct

1   A.  Yes.

2   Q.  And what was the name of that company?

3   A.  Healey Motors.

4   Q.  Where was Healey Motors?

5   A.  It was up in Poughkeepsie, New York.

6   Q.  Mr. Velez, did you ever receive cash from Mr. Issa?

7   A.  Yes.

8   Q.  When was the first time you recall receiving cash from

9   Mr. Issa?

10  A.  On my way back down from -- I went up there to go, to take

11  a look at the shop prior to it opening up and just to check it

12  out to make sure that it was safe for us to have our vehicles

13  repaired there.  On the way back we were driving down the

14  Taconic Parkway and I was following him, and at one point he

15  pulled over to the side of the highway.  I pulled in behind him

16  thinking that there was something wrong.  He got out of the

17  car, came up towards my car so I rolled down the window, and he

18  threw something inside the car.  I didn't know what it was so I

19  looked over to reach for it.  As I was opening up -- there was

20  a little ball -- and he was already starting to walk back

21  towards his car.  When I unbundled the ball, it was two $100

22  bills.

23  Q.  And what, if anything, did he say when he threw those two

24  $100 bills into the window of your car?

25  A.  He didn't say anything.  When I saw it was two $100 bills,

1    I tried to tell him I don't want this, but he was already

2    walking into his car, put it in drive, and he took off.  I

3    didn't get to talk to him or give him back that money.

4    Q.  Were you surprised that Mr. Issa had thrown $200 into your

5    car?

6    A.  Yeah, I was surprised, because I thought he had broken down

7    or something was wrong and then had I found it was $200.  Yeah,

8    I was surprised.

9    Q.  Had you asked Mr. Issa for money prior to that?

10   A.  No.

11   Q.  When was the next time you received cash from Mr. Issa?

12   A.  The next time was, you know, he wanted to talk to me down

13   in the gas station on White Plains and Bronxdale, it is a Mobil

14   gas station.  He wanted to find out how he is going to get

15   work, how can start doing work for us because now he has the

16   place open up in Healey and he has mechanics, he is opening up

17   and he has no work.  So, I said, well, you know, as soon as we

18   can because right now it is kind of hard.  I have got a hundred

19   other vendors out there right now so it is hard to do something

20   to you, to get work.  And we were having the conversation in --

21   sort of in the back hallway.

22   Q.  In the back hallway of where?

23   A.  In the back way from the customers.  There is, like, a

24   little hallway in the back behind the machines, like coffee

25   machines and stuff.  You can't see the outside, they can't see

IC65iss6                          Velez - direct

1    the inside, you know, the customers can't see the inside of the

2    hallway.  And Sohail's office is right there as soon as you

3    walk into that hallway, Sohail's office is on the left.

4            So, we were to the right to the back of that hallway

5    talking.  And after our conversation, he spoke to Sohail and

6    told him to give me $200.  And after that, it was once a week I

7    was getting $200.

8    Q.  You just said he spoke to Sohail and told him to give you

9    $200?

10   A.  Tony Issa spoke to Sohail.

11   Q.  And this conversation, did it take place at that same Mobil

12   gas station?

13   A.  Yes.

14   Q.  Before that time had you ever asked Mr. Issa for money?

15   A.  No.

16   Q.  And when you said that he said you would start coming

17   regularly to receive cash payments, did he say how you should

18   go about doing that?

19   A.  He had told me to call Sohail.  So, I wound up getting

20   Sohail's phone number so I would call Sohail on the phone and I

21   would give him a code name: *I'm going down to pick up coffee.*

22   That's how he knew that I was coming to pick up money.

23   Q.  So who came up with the code name "coffee?"

24   A.  Tony.  Tony Issa.

25   Q.  So, after that time did you start receiving cash on a

1   regular basis?

2   A.  Yes.

3   Q.  And just describe for us how that worked.

4   A.  I would call Sohail, like, on a Friday.  It had to be after

5   3:00 because Sohail used to go to a mosque to pray.  So, on my

6   way out of work I used to go to that gas station once a week on

7   a Friday but then that schedule also changed as well.  Instead

8   of being Friday, it would be he would say come on Wednesdays.

9   Break it up.  Come on Wednesdays, come on Thursday, come every

10  two weeks.  So, it would change.

11  Q.  We will get back to that in a moment.

12          When you arrived at the Mobil station, what would you

13  do?  What did you do?

14  A.  I would pull up to a pump, walk inside to tell him to open

15  up the pump.  I would go outside, get gas.  Come back inside,

16  get an envelope from Sohail, a white envelope with $200 in it

17  and cigarettes.  I used to get cigarettes as well.

18  Q.  Did you see where Sohail took the envelopes from?

19  A.  From his office.  He had a file cabinet with five drawers;

20  he would take it out from the third drawer from the top.

21  Q.  Did he ever take it from anywhere else?

22  A.  Sometimes from the safe.  There was a safe under his desk,

23  a real short safe; he would open it up and get the money out of

24  there.

25  Q.  What color were the envelopes?

IC65iss6                         Velez - direct

1    A.   White.

2    Q.   Did they say anything on them?

3    A.   Just my nickname, "Izzy."

4    Q.   And you mentioned a moment ago that you would also receive

5    cigarettes from time to time.  Could you explain how that

6    happened?

7    A.   One time I was out in front of the Mobil mart talking to

8    Mr. Issa and I was smoking, he grabbed the cigarette, I was low

9    on cigarettes, and I said, hey, I'm low on cigarettes.  He went

10   inside, grabbed a pack, and said here.  He was smoking a

11   cigarette with me.  And that's how it started.  Every time I

12   went there I would get cigarettes along with the money and the

13   gas.

14   Q.   And what did they look like when you got the cigarettes?

15   How were they packaged, if at all?

16   A.   Sohail would put them in a black plastic bag.  You know

17   those black plastic bags that you get at the grocery stores?

18   One of those type of bags.

19   Q.   I am going to show you what's in evidence as Government

20   Exhibit 251B.  You also have it in your binder there,

21   Mr. Velez.  Take a moment to look at this.  Do you recognize

22   these?

23   A.   Yes.  These are text messages.

24   Q.   Who are they text messages between?

25   A.   These are text messages from my phone to Tony -- Tony Issa.

IC65iss6                        Velez – direct

1    Q.  If we go to the fourth row down, could you read the message

2    aloud, please?

3    A.  *No, it's okay.  Ask for Sohail.  He is expecting you.*

4    Q.  And who was that message sent from?

5    A.  From, I believe that's Mr. Issa's cell phone.

6    Q.  And then below that, what does that message say?

7    A.  That's from me saying: *Okay, thanks.  I'll go to Mobil in*

8    *the morning.*

9    Q.  So, when Mr. Issa said ask for Sohail, he is expecting you;

10   what was he referring to, if you know?

11   A.  For me to see Sohail at the gas station at the Mobil mart

12   to go pick up either money or gas, cigarettes.

13   Q.  I am going to show you what's in evidence as Government

14   Exhibit 250C.  Can you read this message, please, Mr. Velez?

15   A.  Read the message?

16   Q.  Yes, please.

17   A.  *Tony, I know you're busy today so I took the liberty of*

18   *calling your office to get a good number to the shop in Bay*

19   *Shore.  If you could follow up and make sure they e-mail me the*

20   *info because I'm visiting that place first in the morning on my*

21   *way to get gas.*

22   Q.  So, who sent this text message?

23   A.  I believe I sent it to Tony Issa.

24   Q.  And first part of the message when you speak about getting

25   a number to a shop in Bay Shore, what were you referring to?

IC65iss6                         Velez - direct

1    A.   There was a shop that he was dealing with out in Bay Shore

2    for repairs, they were repairing trucks, so I was going out

3    there to take a look at the shop and make sure it can handle

4    the work.

5    Q.   And when you say "he," who are you referring to?

6    A.   Tony Issa.

7    Q.   And then the last part of this message, "on my way to get

8    gas," why were you telling Mr. Issa that you were on your way

9    to get gas?

10   A.   I just put it in there.  I was going to go to his gas

11   station to get gas.

12   Q.   When you first started getting cash payments from Mr. Issa

13   in envelopes in the gas station, how much was in those

14   envelopes?

15   A.   It started out at $200, yeah.

16   Q.   Did that amount later increase?

17   A.   Yes; in increments of $50.

18   Q.   How did it come to increase?

19   A.   I asked him for more money.

20   Q.   Will you explain how much the money went up to, what

21   amount?

22   A.   It went up to in $50 increments.  Every time I asked him

23   for money he would raise it $50.  It went all the way up to, at

24   the end prior to his arrest, was $1,600 a week.

25   Q.   Did you continue going to get the money every single week

1    for the entire time you received cash from Mr. Issa?

2    A.  No.  The time frame changed from every week to every two

3    weeks to sometimes every three weeks, and the venue also

4    changed.

5    Q.  When you say the time frame changed, whose idea was it for

6    you to come less frequently?

7    A.  Mr. Issa.

8    Q.  And you also said that the venue changed.  What do you mean

9    by that?

10   A.  He wanted me to go to another gas station to go get the gas

11   and money.

12   Q.  When you say "he," who are you referring to?

13   A.  Mr. Tony Issa.

14   Q.  So, where did you go?  Where was the other gas station?

15   A.  Down on Metcalf Avenue and Watson Avenue in the Bronx.

16   Q.  And when you were getting cash every two or three weeks

17   instead of every week, how much -- were you getting the amount

18   that you specified per week in duplicate, or three times that?

19   A.  Yes.  It went up to, you know -- so, if I went in a

20   three-week increment it would be like $4,800.

21   Q.  What did you do with the money you received from Mr. Issa?

22   A.  I paid bills.

23   Q.  What kinds of bills?

24   A.  My electric, light bills, gas bills, cell phone bills.

25   Food.  Other things, you know.

IC65iss6                          Velez - direct

1    Q.  Where did you put the money that you received from

2    Mr. Issa?

3    A.  I used to hide it in the electrical box downstairs in the

4    basement.

5    Q.  Did you ever deposit it into a bank account?

6    A.  In the very beginning I think I did five or six times but

7    that's -- after that, I was told not to do it.

8    Q.  Who told you not to do it?

9    A.  Mr. Issa said it could be traced so he told me don't

10   deposit money into the bank.

11   Q.  Did Mr. Issa ever threaten to stop giving you the money?

12   A.  Yeah.  When work slowed down he was -- he would get upset

13   and say you know what, you're not getting any money.  I would

14   go down to see Sohail and he would say I have nothing for you.

15   Then I would call him and text him and he would say, well, we

16   need to talk.  So, he did threaten me a few times not to give

17   me money.

18   Q.  Directing your attention to late April of 2014, what, if

19   anything, did you do with Mr. Issa during that time?

20   A.  I went to -- I invited him to go to Florida.

21   Q.  How did that come about?

22   A.  He teased me.  He used to tease me a lot.  He told me, oh,

23   your wife won't let you go, you can't go to Florida.  And I

24   would say, I don't know what are you talking about, I can go to

25   Florida.  He said, nah, you can't go.  Your wife is not going

1   to let you go.  Wound up that I wound up going to Florida.

2   Q.   Where in Florida did you go, generally?

3   A.   The first time was down to -- we landed, I believe, in

4   Miami, and then I stayed in his cousin's house, Junior.

5   Q.   How did you get to Florida?

6   A.   By plane.

7   Q.   Did you fly with Mr. Issa or separately?

8   A.   The first time, separately.

9   Q.   Who paid for the flight to Florida?

10  A.   I paid with my card, with my bank card.  I gave the card

11  information to his employee and they ordered the ticket for me,

12  but then I was reimbursed by Mr. Issa.

13  Q.   How were you reimbursed by Mr. Issa?

14  A.   He gave me cash back for the amount.

15  Q.   When you got to the airport in Miami, did anyone meet you?

16  A.   His cousin Junior came to pick me up in his car -- personal

17  car.

18  Q.   Had you ever met Junior before?

19  A.   I don't recall now whether I met him before or not but I

20  met him at the airport that day.

21  Q.   Was anyone else with Junior when he met you at the airport

22  that day?

23  A.   Mr. Issa.

24  Q.   And where did Junior take you?

25  A.   Back to his condominium.

IC65iss6                          Velez – direct

1   Q.  Do you recall where his condominium was?

2   A.  I believe it is Seaside, Florida.

3   Q.  Where did you stay during that trip to Florida?

4   A.  In Junior's condominium.

5   Q.  Who, if anyone else, stayed with you there?

6   A.  Junior, and Mr. Issa, and myself.

7   Q.  What kinds of things did you do during that trip to the

8   Miami area?

9   A.  We took rides down to Homestead.  We went to a flea market.

10  We drove to the marina.  We walked around South Beach Miami on

11  the sand.  And then we also went to a strip club.

12  Q.  I'm going to take those one at a time.  You said you went

13  to the marina?

14  A.  Yes.

15  Q.  And did you also go out to meals during that trip?

16  A.  Yes.

17  Q.  Do you recall any restaurants in particular that you went

18  to during that trip?

19  A.  I believe one of the restaurants was an Arabic restaurant

20  or something like that.  It was pretty good.

21  Q.  I'm going to show you what's in evidence as Government

22  Exhibit 409.  I am going to show you, Mr. Velez, what is marked

23  for identification Government Exhibit 409.  If you could take a

24  look, do you recognize this?

25  A.  Yes.

IC65iss6                          Velez - direct

1    Q.  What is this?

2    A.  That's a picture of myself and Junior, Tony Issa, Tony

3    Issa's brother, and Tony Issa's friend.

4    Q.  Does that picture fairly and accurately depict the meal

5    that you had?

6                MR. BRAFMAN:  No objection, your Honor.

7                THE COURT:  I'm sorry?  No objection to what?

8                MS. HANFT:  Thank you; anticipating that the

9    government offers Government Exhibit 409.

10               THE COURT:  Do you?

11               MS. HANFT:  I do.

12               THE COURT:  Admitted.

13               (Government's Exhibit 409 received in evidence)

14   BY MS. HANFT:

15   Q.  Can we publish Government Exhibit 409, please?

16               Mr. Velez, can you tell us again where this picture

17   was taken?

18   A.  In Florida.  I believe that was in the flea market.

19   Q.  Who are the individuals depicted here?

20   A.  Myself, Junior, Mr. Issa, Mr. Issa's brother at the end,

21   Mohammed; and I'm not sure the name of the other fellow that

22   was with us as well but that's Mohammed's friend.

23   Q.  Now I would like to show you Government Exhibit 410.  What

24   is that?

25   A.  That's a picture of Junior, Mr. Issa, myself, having a

IC65iss6                        Velez – direct

1    drink in Junior's condo.

2            MS. HANFT:  The government offers Government Exhibit

3    410.

4            MR. BRAFMAN:  No objection.

5            THE COURT:  Admitted.

6            (Government's Exhibit 410 received in evidence)

7    BY MS. HANFT:

8    Q.  Again, Mr. Velez, who are the individuals in this

9    photograph?

10   A.  Junior, Mr. Issa, and myself.

11   Q.  Now I would like to show you what's been marked for

12   identification as Government Exhibit 414.  Do you recognize

13   this?

14   A.  Yes.

15   Q.  And what is this?

16   A.  A picture of me and Tony on the balcony.

17   Q.  Where was that balcony?

18   A.  From Junior's condo.

19           MS. HANFT:  Government offers Government Exhibit 414.

20           MR. BRAFMAN:  No objection.

21           THE COURT:  Admitted.

22           (Government's Exhibit 414 received in evidence)

23   BY MS. HANFT:

24   Q.  Mr. Velez, you also mentioned going to a strip club during

25   that trip.  What was the name of the strip club you went to?

IC65iss6                              Velez - direct

1    A.   Tootsie's.

2    Q.   And what happened when you went there?

3    A.   We drank.  We drank hard liquor and I had -- had performed

4    sex with a girl.

5    Q.   And who paid for that?

6    A.   Mr. Issa gave me the money.

7    Q.   Can you describe how that happened?

8            MR. BRAFMAN:  Objection.  Do we need more than this,

9    your Honor?

10   BY MS. HANFT:

11   Q.   Just the payment, sir.  How did Mr. Issa pay for it.

12   A.   Mr. Issa gave me cash.  $320.

13   Q.   Approximately how much?

14   A.   $320.

15   Q.   Did you frequently go to meals with Mr. Issa?

16   A.   Yes.

17   Q.   Where were some of the restaurants that Mr. Issa took you

18   to?

19   A.   In New York in the Bronx.  We went to Frankie and Johnny's,

20   which is in the Bronx on Bronxdale Avenue.  We went to New

21   Jersey to The Palm restaurant in Edgewater, New Jersey.  We

22   went to two other places in Manhattan, one was Jimmy's Barbecue

23   on Second Avenue, and there was another restaurant on First

24   Avenue but I couldn't tell you the name of it.

25   Q.   When Mr. Issa took you to those restaurants, who paid for

IC65iss6                        Velez – direct

1    the meals?

2    A.  Mr. Issa did.

3    Q.  Were you alone with Mr. Issa during those meals or did

4    other people come too?

5    A.  He had sometimes his employees would join us.  They would

6    also have meals, too, or appetizers and drinks and stuff.

7    Q.  About how frequently did you go out to meals with Mr. Issa?

8    A.  Once every two weeks, once every three weeks.  It depends.

9    If he wanted to talk to me or if I wanted to talk to him about

10   work and things that were going on we would meet up and talk

11   about it.

12   Q.  During those meals did he ask you for work?

13   A.  Yeah.  He would ask me frequently for work, yes.

14   Q.  Now directing your attention to October of 2014.  Did you

15   do anything with Mr. Issa during that time period?

16   A.  Excuse me?  What was the date again?

17   Q.  In October of 2014, did you do anything with Mr. Issa

18   during that time period?

19   A.  I flew to Florida again with him.

20   Q.  Where in Florida?

21   A.  Fort Lauderdale.

22   Q.  Who booked your flight?

23   A.  Again, Stephanie booked my flight with my card -- my credit

24   card and then, you know, he sent me a text with all the

25   information.

IC65iss6                    Velez - direct

1    Q.   Do you recall Stephanie's last name?

2    A.   Stephanie Rivera.

3    Q.   I'm going to show you what's in evidence as Government

4    Exhibit 250J.  What are those top two messages, Mr. Velez?

5    A.   That's the information that Stephanie sent me about the

6    flight to Florida.

7    Q.   Did you receive that information?

8    A.   Yes.  By text, yes.

9    Q.   And approximately when?

10   A.   It was October 15th.

11   Q.   When were you scheduled to leave?

12   A.   October 16th, 2014.

13   Q.   How about the return?

14   A.   October 19th, 2014.

15   Q.   If you could turn to about the seventh row down in this

16   exchange, what were these messages?

17   A.   These messages between myself and Stephanie Rivera and Tony

18   Issa.

19   Q.   Did you make this flight alone or did someone travel with

20   you?

21   A.   Mr. Issa flew with me on that flight.  We went down there

22   together.

23   Q.   I am going to show you what's been marked for

24   identification as Government Exhibit 604.  Mr. Velez, if you

25   could look through this page and the following three pages?  Do

IC65iss6                         Velez – direct

1    you recognize this document?

2    A.  Yes.

3    Q.  What is this document?

4    A.  That's the itinerary for the flight to go to Florida.

5    Q.  The flight that you took?

6    A.  Yes.

7         MS. HANFT:  The government offers Government Exhibit

8    604.

9         MR. BRAFMAN:  No objection.

10        THE COURT:  Admitted.

11        (Government's Exhibit 604 received in evidence)

12   BY MS. HANFT:

13   Q.  So, in the middle of the first page, Mr. Velez, is that

14   your name?

15   A.  Yes.

16   Q.  And if we could turn to the next page, was that your flight

17   information?

18   A.  Yes.  To go to Florida, yes.

19   Q.  The next page, please?  And there is an address here where

20   it says Ismael Velez.  What is that address?

21   A.  That's my home address.

22   Q.  And below that there is an electronic address information

23   section.  Could you read what that says?

24   A.  That's Stephanie Rivera's e-mail address.  It says

25   srivera@Daimner.com.

IC65iss6                         Velez - direct

1   Q.   What is Daimner?

2   A.   Daimner is Tony Issa's corporation.

3   Q.   Who paid for this flight to Florida?

4   A.   I paid for it with my card and then I was reimbursed later.

5   Q.   If you would go to the next page of this exhibit?  One more

6   page in the center of the page at the top, what is the name

7   written there?

8   A.   That's Ibrahim Issa.

9   Q.   Who is that?

10  A.   That's Tony's first name.

11  Q.   And if we can turn to the next page?  The page after?

12          Do you recognize the address 813 Morris Park Avenue?

13  A.   That's the office -- Tony's office in the Bronx, 813 Morris

14  Park Avenue.

15  Q.   And the electronic address information at the bottom, do

16  you recognize that e-mail address?

17  A.   I recognize the address, I just don't know who that first

18  letter, who is that.  It is Aissa@Daimner.com.

19  Q.   Remind me what Daimner is?

20  A.   Daimner is Tony's corporation.

21  Q.   I would like to show you what's been marked for

22  identification as Government Exhibit 415.  What is this?

23  A.   That's a picture of me and Tony I took on the plane.

24          MS. HANFT:   The government offers Government Exhibit

25  415.

IC65iss6                          Velez - direct

| | |
|---|---|
| 1 | MR. BRAFMAN:  No objection. |
| 2 | THE COURT:  Admitted. |
| 3 | (Government's Exhibit 415 received in evidence) |

BY MS. HANFT:

Q.  Mr. Velez, who took this picture?

A.  I took the selfie with my cell phone.

Q.  Where were you when you took it?

A.  On the plane on the trip to Florida.

Q.  Now, on that trip to Florida in October 2014, where did you stay?

A.  I stayed in the Renaissance Inn Hotel.

Q.  Who paid for that hotel room?

A.  That was Mr. Issa.

Q.  I would like to show you what's in evidence as Government Exhibit 250K.  What is this?

A.  That's a text message.

Q.  Who is it from?

A.  From Daniela Issa.

Q.  Who is Daniela Issa?

A.  Mr. Issa's spouse.

Q.  And what does the message say?

A.  That's the address to the Renaissance Hotel in Plantation, Florida.

Q.  Is that the Renaissance Hotel where you stayed?

A.  Yes.

IC65iss6                          Velez - direct

1   Q.  What sorts of things did you do during that visit to

2   Florida in October 2014?

3   A.  Mr. Issa had a meeting down there so I kind of drove around

4   during the daytime, I got a hair cut.  Stuff like that.

5   Q.  Let me show you what's been marked for identification as

6   Government Exhibit 404.  Do you recognize that?

7   A.  That's the hotel that we stayed in, the Renaissance Hotel.

8               MS. HANFT:  The government offers Government Exhibit

9   404.

10              MR. BRAFMAN:  No objection.

11              THE COURT:  Admitted.

12              (Government's Exhibit 404 received in evidence)

13  BY MS. HANFT:

14  Q.  You mentioned you got a hair cut during that trip,

15  Mr. Velez.  What other things did you do during that trip?

16  A.  After he was done with his meeting we went out to dinner to

17  a place called Chima's.

18  Q.  What is Chima?

19  A.  It is a Brazilian steakhouse.

20  Q.  Now I'm going to show you what's been marked for

21  identification Government Exhibit 406 and 407.  Do you

22  recognize these?

23  A.  Yes.

24  Q.  What are they?

25  A.  Pictures of myself and Mr. Issa inside Chima's.

IC65iss6                         Velez – direct

1          MS. HANFT:  Government offers Government's Exhibits

2     406 and 407.

3          MR. BRAFMAN:  Your Honor, I'm not objecting but we are

4     not disputing that the trips took place.  Why do we need photo

5     albums?  I don't understand.

6          THE COURT:  I don't know.  Why did we need all of that

7     cross-examination earlier today?  Because the government gets

8     to prove its case, because you get to cross-examine, both of

9     you within reason.  That's why.

10         The objection is overruled.

11         MS. HANFT:  Government's Exhibits and 406 and 407 are

12    in evidence?

13         THE COURT:  Yes, they are.

14         (Government's Exhibits 406 and 407 received in

15    evidence)

16    BY MS. HANFT:

17    Q.  Mr. Velez, can you tell us what is happening in the picture

18    on the left?

19    A.  That's a picture of myself and Mr. Issa sitting at a table.

20    Q.  How about on the right?

21    A.  On the right is the waiter bringing food over to the table,

22    meat that they cut off.

23    Q.  Who paid for this dinner?

24    A.  Mr. Issa.

25    Q.  Now, about how long was this second trip to Florida?

IC65iss6                          Velez - direct

1   A.   About three days.

2   Q.   Do you recall approximately when you returned?

3   A.   The 19th.

4   Q.   Is there any reason you remember that so specifically?

5   A.   That was a few days prior to my birthday.

6   Q.   When is your birthday?

7   A.   October 21.

8   Q.   Mr. Velez, have any of your family members ever met

9   Mr. Issa?

10   A.   My wife and my daughter, yes.

11   Q.   When was that?

12   A.   On one occasion Mr. Issa was going down to Philadelphia for

13   a meeting, and on his way down he stopped by my house and we

14   went out.

15   Q.   And where did you go?

16   A.   We went out to a restaurant by the name of Plumsteadville

17   Inn.

18   Q.   Who paid for that dinner?

19   A.   Mr. Issa.

20   Q.   I would like to show you Government Exhibit 408.  Do you

21   recognize this?

22   A.   Yes.

23   Q.   What is that?

24   A.   That's a picture of the place, Plumsteadville Inn.

25          MS. HANFT:  The government offers Government Exhibit

IC65iss6                              Velez - direct

1    408.

2                 MR. BRAFMAN:  No objection.

3                 THE COURT:  Admitted.

4                 (Government's Exhibit 408 received in evidence)

5    BY MS. HANFT:

6    Q.  I would also like to show you what's in evidence as

7    Government Exhibit 250N.  Do you recognize these, Mr. Velez?

8    A.  Yes.

9    Q.  What are these?

10   A.  That's a text message from my daughter with the address for

11   the Plumsteadville Inn, and then I forwarded it to Mr. Issa.

12   Q.  Why was that?

13   A.  So he didn't get lost.  I had my daughter look it up and

14   look up the address.  She is pretty good on the phone so she

15   did it for me, she sent it to me, and then I forwarded it to

16   Mr. Issa so he didn't get lost.

17   Q.  Did there come a time in February 2015 when you had dinner

18   with Mr. Issa and his employees in New Jersey?

19   A.  Yes.

20   Q.  Can you explain the circumstances?

21   A.  I received a text from one of his employees -- Sheryl --

22   and she gave me the address.  We went out there to meet and

23   talk.

24   Q.  I am going to show you what's in evidence as Government

25   Exhibit 250O.  What are these, Mr. Velez?

IC65iss6                              Velez - direct

1    A.  That's Princeton, New Jersey.

2    Q.  Is that where you met Mr. Issa and his employees?

3    A.  Yes.  Yes.

4    Q.  What is the date on these messages?

5    A.  February 26, 2015.

6    Q.  Who is Sheryl Daimner?

7    A.  Her name is Sheryl.  I just put the name "Daimner" on the

8    back of it so I would know where she was from.  I didn't

9    recognize names all that well, so I just put the name "Daimner"

10   right after her name.

11   Q.  And did you meet them for dinner that night?

12   A.  Yes.  Kind of late but, yes, I did.

13   Q.  What was the name of the restaurant?

14   A.  It's the name of the restaurant is an Italian restaurant by

15   the name of Tre Piani Restaurant.

16   Q.  Who paid for dinner?

17   A.  Mr. Issa.

18   Q.  You previously mentioned a restaurant named The Palm.

19   Where was The Palm?

20   A.  That's in Edgewater, New Jersey.

21   Q.  About how many times did you go there with Mr. Issa?

22   A.  About six, seven times.

23   Q.  I am going to show you what's in evidence as Government

24   Exhibit 250P.  What is this?

25   A.  That's the address to The Palm restaurant in New Jersey.

IC65iss6                          Velez – direct

```
 1   Q.   Did there come a time, Mr. Velez, when you met Mr. Issa in
 2   Washington, D.C.?
 3   A.   Yes.
 4   Q.   Describe what happened.
 5   A.   I was invited to go down there to go hang out with them.
 6   They were -- Mr. Issa had a meeting down there and I went down
 7   there and I drove down to Washington and I stayed with him in
 8   his room.
 9   Q.   Did you pay for the hotel?
10   A.   No.  Mr. Issa already had booked the hotel, that was his
11   room.
12   Q.   Did Mr. Issa ever pay for any of your expenses?
13   A.   I remember one time he paid for my teeth.  My teeth were
14   failing, he bought the bottom denture for my mouth.
15   Q.   How did that come about that he paid for that?
16   A.   I paid for it at first and then I showed him the receipt
17   and then he paid me.  He had -- he used to make, you know, made
18   fun of me and he says, oh, get your teeth fixed.  And, you
19   know, I said, you know, I went and got it done and then he
20   reimbursed me for it.
21   Q.   Do you recall approximately how much it cost?
22   A.   It was $880.
23   Q.   Do you know approximately when that was?
24   A.   All I remember it was in the summertime because I had a
25   short sleeve shirt when I went in there.  It was hot.
```

IC65iss6                          Velez - direct

1   Q.   During the time you were getting cash from Mr. Issa, were

2   you giving Mr. Issa work?

3   A.   Yes.

4   Q.   During your time as White Plains VMF manager, which of

5   Mr. Issa's companies did you give work to?

6   A.   I used to give work to Healey Motors and First Star.

7   Q.   Were you satisfied with the quality of the work that these

8   companies performed?

9   A.   Not all the time, no.

10  Q.   When you weren't satisfied, why weren't you satisfied?

11  A.   There was always issues with the invoicing.  Trucks would

12  go back to the stations without the invoice so you couldn't

13  verify the work.  Sometimes the invoices had mistakes on them.

14  It was a host of -- a bunch of issues that I used to have

15  issues with.

16  Q.   You are referring to trucks coming in without the invoices.

17  Could you explain what you mean by that?

18  A.   After they repaired a vehicle they would return the truck

19  back to the station that it was assigned to but without the

20  invoice.  So, it's like when you go to a dealer and you go

21  bring your car in, when you go pick up your vehicle they give

22  you the invoice so you could pay for it.  That didn't happen

23  here.  I used to have a lot of issues with that.

24  Q.   What is the problem with not receiving the invoice then?

25  A.   Well, there were a few issues.

1          One, that the truck would go back, the invoice would

2     be a week later, sometimes two weeks later, sometimes three

3     weeks later.  The post office people would switch the managers

4     and post masters would switch places, so the next person would

5     come, would receive an invoice, and they didn't know what the

6     hell that was all about.  So, there was always issues about

7     getting them paid.  So, that person would not pay them and then

8     they would cry and complain to me.

9          So, it was a whole bunch of issues.  On top of that,

10    we couldn't verify the work against the truck with the invoice

11    because the truck was already back in service for a week or

12    two, so.

13    Q.  So what is the usual process when you receive a vehicle

14    back?

15    A.  You are supposed to get the vehicle and the invoice at the

16    same time so that way you can verify it, you look at the

17    vehicle and say, okay, well, it says here change the spring.

18    You can take a look at the truck and verify that it got a

19    spring change or -- stuff like that, you know, just for

20    example.

21    Q.  You mentioned other issues with the companies.  What were

22    some of those issues?

23    A.  Sometimes, like on a preventive maintenance inspection, it

24    includes checking the whole vehicle.  There is a list, front to

25    back, for each vehicle.  On that list it includes getting an

IC65iss6                           Velez - direct

1   oil change and stuff and that price.  Sometimes it would say

2   PMI and there was three hours, $237, and then a few lines below

3   it would say oil change and then it would charge you separate

4   $79 to do the oil change when it should have been included.

5   Q.  Was it always oil change or are you using that as an

6   example?

7   A.  I am using that as an example.  There is a whole bunch of

8   different items that would happen without having the invoices

9   in front of me.  I could show you a whole bunch.

10  Q.  When you say, when you had these problems, the late

11  invoices and the billing where items were included in the PMI,

12  did you complain to Mr. Issa about these things?

13  A.  I would send him texts, complain.  He wouldn't respond

14  because he would know I was pissed off.

15          MR. BRAFMAN:  Objection.

16          THE COURT:  I'm sorry?

17          MR. BRAFMAN:  I objected to the answer.

18          THE COURT:  On the ground that?

19          MR. BRAFMAN:  Your Honor, what he knew about

20  Mr. Issa's state of mind.

21          THE COURT:  That's correct.  You can't get yourself

22  into Mr. Issa's head, sir.  You can't say what Mr. Issa knew or

23  didn't know in his head.

24          THE WITNESS:  Okay.  Thank you.

25          THE COURT:  Don't do that.

1          THE WITNESS:  Thank you, your Honor.

2          MR. BRAFMAN:  Stricken, your Honor.

3          THE COURT:  It is.

4  BY MS. HANFT:

5  Q.  What did Mr. Issa say when you complained about these

6  issues?

7  A.  He would have his employees text me back and then meet up

8  with him so we could talk about it.

9  Q.  When you're a VMF manager, are you in charge of any other

10  facilities aside from the VMF?

11  A.  The VMF is the only facility that I was in charge of, you

12  know.  I had to support post offices.

13  Q.  And can post offices use third-party contractors?

14  A.  They could use their contractors.  They have a credit card

15  by the name of Voyager so they were allowed to use that credit

16  card to pay anybody out there to repair their vehicles,

17  especially on emergencies.

18  Q.  And during the time that you were receiving cash from

19  Mr. Issa and that you were VMF manager, did you ever direct any

20  of these stations to use Mr. Issa's companies?

21  A.  I sent out an e-mail to all of the post offices out in that

22  district, it was 167 stations that they could use Healey Motors

23  for repairs since they worked overnight because a lot of times

24  the drivers would come back and the trucks were having issues,

25  so they could utilize their services at night.

IC65iss6                         Velez - direct

1    Q.  Was there any other reason that you suggested that they use

2    Healey Motors?

3    A.  Yes.

4    Q.  What was that?

5    A.  I was receiving money from his company so it behooved me to

6    give him work.

7    Q.  I am going to he show you what is in evidence as Government

8    Exhibit 250S.  Take a look at this, Mr. Velez, and tell me if

9    you recognize it.

10   A.  Yes.

11   Q.  What are these?

12   A.  This is text messages with pictures attached that I sent to

13   Mr. Issa with issues on a vehicle.

14   Q.  Taking it one at a time, this first message up top, could

15   you read that, please?

16   A.  *This is a major no-no.  The electrical line to fuel tank*

17   *hanging on the rear end.  No bushings installed.*

18            And then I attached pictures to the e-mail.

19   Q.  Why did you send this message to Mr. Issa?

20   A.  Because his company had performed all this work on this

21   truck and they changed the chassis and they didn't perform all

22   the work correctly and it was a danger.

23   Q.  Turning to the second row, would you read that message

24   aloud, please?

25   A.  I sent a text to Mr. Issa and it reads:  *Call me right now.*

IC65iss6                        Velez - direct

1   Q.  I am going to ask you about them one at a time.  Why did

2   you send that message?

3   A.  Because I wanted to talk to him about this particular

4   truck.

5   Q.  Moving on to the particular message here, could you read

6   that aloud?

7   A.  The last one?  The second one or the Lars one?

8   Q.  The second one of the three that are now zoomed in.

9   A.  I'm sorry.  *Wrong bolts on lower control arms.  Compression*

10  *fitting used on brake lines.  Brakes were not bleed.  Catalytic*

11  *converter was loose.*

12  Q.  What does "wrong bolts on lower control arms" mean?

13  A.  Lower control arm is a -- it's a piece that attaches

14  basically, the wheel to the chassis on the vehicle, and the

15  bolts were the wrong bolts.  That arm can come loose or break

16  the -- snap the bolt.  It can cause an accident.

17  Q.  What about "compression fitting used on brake lines."  What

18  does that mean?

19  A.  There is a general rule that you never use compression

20  fittings on brake lines.  Never, ever.  If there is a break on

21  a brake line, you take that whole brake line out and replace it

22  because a compression fitting can start leaking and leave the

23  driver without brakes.  It doesn't matter what car it is.

24  Q.  How about "brakes were not bled."  What does that refer to?

25  A.  Brakes not bled that means that there is air in the system

IC65iss6                    Velez – direct

1    so it didn't have hydraulic fluid throughout the whole brake

2    line.  There was air in the system so when you press on the

3    brake the fluid, if there is an air pocket inside there, the

4    fluid would meet the air pocket, the air pocket would compress

5    but it wouldn't push the brake to stop.  So, the vehicle having

6    a brake issue meant that this vehicle here, the brakes were not

7    bled.

8    Q.  Finally, you wrote "catalytic converter was loose."  Can

9    you tell us what that means?

10   A.  That has to do with the exhaust system.  Certain of the

11   gases.  The catalytic converter receives gases from the engine

12   and it sort of cleans it inside the catalytic converter so when

13   it comes out the other end of the exhaust, it is cleaner to the

14   environment.  On this particular vehicle the catalytic

15   converter was loose and it wasn't working properly.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

1    BY MS. HANFT:

2    Q.  What were the dates on these messages?

3    A.  October 20, 2014.

4    Q.  Was this around the time that you went to Florida with

5    Mr. Issa?

6    A.  I found out about it when I got back from Florida, yes.

7    Q.  At the time that you sent these messages, what was your

8    view as to the quality of the work, Tony's, Mr. Issa's,

9    companies were performing?

10   A.  Subpar.

11   Q.  Now I'd like to show you what's in evidence as Government

12   Exhibit 250T.

13           What are these?

14   A.  These are text messages between Stephanie Rivera to me and

15   my return to her.

16   Q.  Would you read the top message, please.

17   A.  "Tony would like to use you as a reference for Miami VMF.

18   Is that OK?"

19   Q.  And then the next one.

20   A.  Approximately two hours later, the same message:  "Tony

21   would like to use you as a reference for Miami VMF.  Is that

22   OK?"

23   Q.  What did you understand that message to refer to?

24   A.  That they wanted to use me as a reference for another

25   vehicle maintenance facility in Miami.

IC6HIss7                          Velez - Direct

1   Q.   Going to turn your attention to what's in evidence as

2   Government Exhibit 250U.

3        What are these?

4   A.   Text messages between Mr. Issa and myself.

5   Q.   This first message, can you please read it.

6   A.   Says, "There are four trailers needing repairs.  Can you

7   handle this?"

8   Q.   What are the four trailers?

9   A.   Trailers are these boxes that are attached to tractors and

10  they haul mail.  We had four that were -- that weren't working

11  in the yard that needed repair, so I contacted him.

12  Q.   And what was Mr. Issa's response?

13  A.   He said, "Of course."

14  Q.   And what did you say?

15  A.   I said, "Transportation department is" -- "Transportation

16  is going to contact Daimner right now."

17  Q.   What is transportation refer to there?

18  A.   It's the department that deals with tractors and trailers.

19  My particular VMF didn't deal with the trailers because they

20  didn't fit inside the shop, so we always had to contract them

21  out when there were major issues there.

22  Q.   Can you remind us what Daimner refers to.

23  A.   Daimner is Tony's company.

24  Q.   Then the second to last message, can you read that out

25  loud.

1    A.   "They will call you.  I told them you have a 24-hour

2    service.  Don't screw this up."

3    Q.   Why did you say, "Don't screw this up"?

4    A.   I already had experience with his company having issues.

5    Q.   Mr. Velez, did you speak to Mr. Issa on the phone?

6    A.   Yeah, several occasions I've spoken to him on the phone.

7    Q.   When you spoke to him on the phone, did you use your office

8    phone or your cell phone?

9    A.   My cell phone basically.

10   Q.   Why was that?

11   A.   Just more convenient.  And sometimes I was walking around

12   the shop; sometimes I'd be in my car.

13   Q.   Were there ever times when Mr. Issa told you not to use

14   your cell phone?

15   A.   There were times that I received text messages to use a

16   landline.

17   Q.   Let me show you what's been marked -- what's in evidence as

18   Government Exhibit 250W.

19   A.   Yeah.

20   Q.   What is this?

21   A.   That's a text message from Tony Issa to me:  "Call me from

22   a landline later."

23   Q.   I'd like to show you what's in evidence as Government

24   Exhibit 250V.  Would you read this first message aloud, please.

25   A.   "Do you have some time to talk today?"

1  Q.  Who is this message from?

2  A.  From Tony Issa.

3  Q.  Is this one from Tony Issa?

4  A.  I'm sorry, from me to Tony Issa.  I'm sorry.

5  Q.  Then the second message?

6  A.  Again from me to Tony:  "Not about issues but upcoming

7  decision for me."

8  Q.  Do you recall what this referred to, "not about issues"?

9  First of all, what did "issues" refer to?

10  A.  I don't know if it had to do with a decision as far as

11  because I would ask him for money, for more money, and he would

12  say no, and sometimes he would change his mind.  And so I

13  was -- I think I -- I don't recall exactly what that was all

14  about.

15  Q.  Could you read the third-row message.

16  A.  "Call me from landline at 6."  That's from Mr. Issa.

17  Q.  Like to show you what's in evidence as Government

18  Exhibit 250X.

19          Do you recognize these?

20  A.  These are text messages from myself to Mr. Issa and from

21  Mr. Issa to me.

22  Q.  Can you read the first message, please.

23  A.  "Truck never made it here again.  Really?"

24  Q.  And the next one.

25  A.  "What do I say to my boss today?  Another excuse?"

1    Q.  How about after that?

2    A.  "I can't keep stalling."

3    Q.  Then what's the last message?

4    A.  From Tony Issa:  "It's coming today."

5    Q.  Why did you say, "Another excuse"?  Why did you use the

6    word "another"?

7    A.  Because I already had told my boss that the truck was

8    coming once before and it didn't show, and now he's expecting

9    the truck, and it wasn't there.  That was my immediate boss.

10   Q.  Like to show you what's in evidence as Government

11   Exhibit 250Y.

12          Taking this one half at a time, Mr. Velez, can you

13   read these first four messages.

14   A.  "What happened with my brother?"

15          "We need to talk."

16          "Again?"

17          "Not about your brother, about techs sitting with no

18   work.  We have been ready to start but nothing happens.  We

19   need to start working."

20   Q.  This top message -- if we could go back to where we were --

21   this top message, "What happened to my brother?" who does "my

22   brother" refer to?

23   A.  That was the name that I had for Sohail.

24   Q.  And the fourth message here, "Not about your brother, about

25   techs sitting with no work," what did you understand that to

IC6HIss7                          Velez – Direct

1    refer to?

2    A.  He was asking for work.  His technicians were sitting down

3    doing nothing.

4    Q.  When you said, "What happened with my brother?" what were

5    you referring to?  What had happened?

6    A.  I had an issue either getting money or gas or something

7    from Sohail.  I just don't recall right now what it was.

8    Q.  If we could look at the second half of this exhibit,

9    please.

10          Please read the top message, Mr. Velez.

11   A.  "Can you complete what you have already in your place?  And

12   more will go out.  I am feeling these vibes.  First your shop

13   takes it upon itself to perform PMIs that were done.  I still

14   am awaiting the work that is there now.  So you really want to

15   talk, make sure you have answers to my questions.  I will not

16   play games with these trucks."

17   Q.  Now, what did you mean when you said, "First your job takes

18   it upon itself to perform PMIs"?

19   A.  They would do PMIs without authorizations sometimes.  So if

20   the vehicle -- if a PMI, preventive maintenance inspection, was

21   already performed on the vehicle and if they did it again,

22   there was no way for me to put it in the system under a PMI

23   because my system would not accept a PMI.  So I had to revert

24   to -- put it as an unscheduled repair, which was not good for

25   me.

IC6HIss7                          Velez - Direct

1    Q.   Is a third-party contractor entitled to do a PMI without

2    authorization?

3    A.   No.

4    Q.   I'm going to show you Government Exhibit 250Z, which is

5    also in evidence.

6              Do you recognize these?

7    A.   Text messages between me and Tony Issa.

8    Q.   Could you read these three messages, please.

9    A.   "We need to talk issues again."

10             "OK.  But I'm not in New York.  You want me to call

11   you?"

12             "We will talk tomorrow.  I need you to see the

13   invoices."

14   Q.   Why did you need Mr. Issa to see the invoices?

15   A.   I was needing him to take a look at some invoices because

16   there would be ridiculous charges, something wrong with it,

17   something that shouldn't be charged was charged.  It was always

18   issues.

19   Q.   Now I'd like to show you what's in evidence as Government

20   Exhibit 250BB.

21             Would you read these messages, please.

22   A.   "We are having no luck with your plans.  Vendor upstate

23   having same issues.  Technicians hired and working but can't

24   get PMIs.  Danny's still calling stations."

25             Continue on?

1    Q.   Yes, please keep going.

2    A.   "Telling them they should go to local vendor, Poughkeepsie,

3    Fishkill, and all others up there and not letting vehicles

4    come.  We're just spending money."

5    Q.   We'll stop right there since that sentence isn't complete.

6              Who does "vendor upstate" refer to?

7    A.   That was Healey Motors up in Poughkeepsie.

8    Q.   What about Danny still calling stations telling them they

9    should go to local vendor?

10   A.   That was my supervisor telling the stations up there to

11   call their local vendors up there.

12   Q.   When you say your supervisor, do you mean the person who

13   supervised you or somebody else?

14   A.   I was his manager, but he worked under me, Danny Hill,

15   yeah.

16   Q.   So if we could keep going to the second half of this

17   exhibit.

18   A.   "We're just spending money with workers not getting trucks.

19   Nothing changed."

20   Q.   Then if you could read this last message, please.

21   A.   I sent this text message to Tony:  "Not true.  Your people

22   are trying to get vehicles from stations that we are working

23   with.  Did you look at some of your invoices?  Ridiculous

24   charges being added.  They are pushing everyone away.

25   Remember, we have to see the vehicles in my shop once a year.

1    So during the next inspection, obviously, you will not see

2    them.  I gave your son the correct dates for some PMIs, and I

3    hope he updated the due dates.  I tell you the issues, and you

4    tell me this.  You don't have a clue to the BS that is going on

5    up there.  Keep it up, and they will push themselves right

6    out."

7    Q.  I'm going to show you now what's -- actually, Mr. Velez,

8    this part that says, "Did you look at some of your invoices?

9    Ridiculous charges being added," what did that refer to?

10   A.  There were items that were on the invoice that should not

11   have been there, were not authorized to be on there.

12   Q.  What kinds of items?

13   A.  Winterizing the vehicles, cleaning the in and out every

14   time the vehicle would go in.  Only on a PMI those vehicles are

15   supposed to be cleaned inside and out.  They were doing it on

16   every -- every time a vehicle came in, there was an extra $40

17   added to the bill.  There was always different items that were

18   being added on.

19   Q.  What's the problem with winterize being added on?

20   A.  That's only -- something like that, those vehicles were in

21   the shops most of the time.  So antifreeze and stuff like that

22   was always being added to these vehicles.  It did not need to

23   be flushed out.  So what they were performing was flushing out

24   the vehicle, taking out all the antifreeze and replacing it

25   with new antifreeze when that wasn't authorized by my shop or

1   myself.

2            MS. HANFT:  If we could zoom out, please.

3            THE COURT:  OK.  Find a good place to stop.

4            MS. HANFT:  Let's put up Government Exhibit 250DD, and

5   then we could stop after this one.

6   Q.  Mr. Velez, could you just read the top three lines of this

7   message.

8   A.  Yeah.  These are text messages from myself to Jasmine and

9   from Jasmine to me.  Said:  "What the hell is going on with

10  these invoices three months later?"

11           Jasmine sent:  "Terrible, I'm telling you.  I came

12  here to clean this place up too.  Everything was behind."

13  Q.  If you could just tell us when you say, "What the hell is

14  going on with these invoices three months later?" what did that

15  refer to?

16  A.  The vehicles were repaired, sent back to the stations, and

17  the invoices -- three months later they're sending us invoices

18  for those trucks.

19  Q.  Can you just remind us what the problem with getting the

20  invoices three months later is.

21  A.  Number one, vehicles would be done more than once for the

22  same -- same things.  So if you do a PMI and it's a month

23  later, I had 1,644 vehicles, you're not going to remember --

24  you're going to say that truck is due inspection; it will be

25  done again.  So redundancy in the work.  It doesn't have to

1    necessarily be Daimner.  It could be someone else.  They'll

2    call the shop, they'll see in the system that the vehicle

3    wasn't done, say, "Oh, yeah, go ahead and do the PMI."  They'll

4    be paying again.

5            It's just a lot of issues.  I wasn't getting the

6    invoices on time.  Postmaster's going from one shop to another.

7    Then when they finally get an invoice three months later, they

8    say, "I don't know nothing about this," and they don't want to

9    pay it.  It was just issue on top of issue.

10           MS. HANFT:  Your Honor, I think that makes sense as a

11   stopping point for today.

12           THE COURT:  OK.  Thanks for working an extra long day.

13   I really appreciate it.  I will see you on Monday morning,

14   bright and early, 9:30.  Don't discuss the case.  Keep an open

15   mind.  Have a great weekend.

16           When they've left, sir, you can step down.

17           (Witness temporarily excused)

18           (Jury excused)

19           (Continued on next page)

20

21

22

23

24

25

IC6HIss7                          Velez – Direct

1              (Jury not present)

2              THE COURT:  OK.  We'll see you on Monday, Mr. Velez.

3              MR. WIRSHBA:  Mr. Velez.

4              THE COURT:  Out.  See you Monday.

5              How much more direct do you have?

6              MS. HANFT:  Your Honor, I think it's probably just

7     about half an hour.

8              THE COURT:  OK.  Mr. Brafman, you should rest assured

9     that when you close, I won't stop you from reading all the

10    texts that you want and contrasting it with the witness'

11    testimony, subject to whatever deadline I give you for the

12    closing argument.

13             MR. BRAFMAN:  I'm not certain that that solves the

14    problem, but I hear you.

15             THE COURT:  Oh, there's no problem to be solved.  Some

16    things are argument and some things are cross-examination.

17             (Adjourned to December 10, 2018, at 9:30 a.m.)

18

19

20

21

22

23

24

25

1                       INDEX OF EXAMINATION

2     Examination of:                         Page

3     Direct By Ms. Hanft  . . . . . . . . . . . 232

4     Cross By Mr. Brafman . . . . . . . . . . . 252

5     Redirect By Ms. Hanft  . . . . . . . . . . 426

6     Recross By Mr. Brafman . . . . . . . . . . 430

7     Redirect By Ms. Hanft  . . . . . . . . . . 434

8     Recross By Mr. Brafman . . . . . . . . . . 434

9     ISMAEL VELEZ

10    Direct By Ms. Hanft  . . . . . . . . . . . 438

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     GOVERNMENT EXHIBITS

 2    Exhibit No.                              Received

 3    308A, 308B, 308C, 308A-T, 308B-T, and 308C-T  234

 4    261  . . . . . . . . . . . . . . . . . . 235

 5    262  . . . . . . . . . . . . . . . . . . 236

 6    401  . . . . . . . . . . . . . . . . . . 238

 7    402  . . . . . . . . . . . . . . . . . . 240

 8    309A, 309B, 309C, 309D, 309E, 309A-T through 309E-T  242

 9    310A, 310B, 310C, 310D, 310A-T, 310B-T, . . . 244

10              310C-T, and 310D-T

11    263  . . . . . . . . . . . . . . . . . . 245

12    266  . . . . . . . . . . . . . . . . . . 247

13    264  . . . . . . . . . . . . . . . . . . 248

14    311  . . . . . . . . . . . . . . . . . . 251

15    252, 254 through 260, 418, 307A through . . . 352

16              307F, 307A-T through 307F-T

17    409  . . . . . . . . . . . . . . . . . . 459

18    410  . . . . . . . . . . . . . . . . . . 460

19    414  . . . . . . . . . . . . . . . . . . 460

20    604  . . . . . . . . . . . . . . . . . . 464

21    415  . . . . . . . . . . . . . . . . . . 466

22    404  . . . . . . . . . . . . . . . . . . 467

23    406 and 407  . . . . . . . . . . . . . . 468

24    408  . . . . . . . . . . . . . . . . . . 470

25
```

494

1                      DEFENDANT EXHIBITS

2    Exhibit No.                              Received

3     100 through 109   . . . . . . . . . . . . . 264

4     112, page 24    . . . . . . . . . . . . . 330

5     113   . . . . . . . . . . . . . . . . . 356

6     114   . . . . . . . . . . . . . . . . . 370

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25