ICA5iss1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                          17 Cr. 74 (CM)

5   IBRAHIM ISSA,

6                                           Trial
                    Defendant.
7   ------------------------------x

8                                           New York, N.Y.
9                                           December 10, 2018
                                            9:53 a.m.
10

11  Before:

12                      HON. COLLEEN MCMAHON,

13                                          District Judge

14                          APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    NOAH SOLOWIEJCZYK
17  ELIZABETH HANFT
    KYLE WIRSHBA
18       Assistant United States Attorneys

19  BRAFMAN & ASSOCIATES, P.C.
         Attorneys for Defendant
20  BY:  BENJAMIN BRAFMAN
         JOSHUA D. KIRSHNER
21       STUART GOLD

22  ALSO PRESENT:   ANTHONY DUBAR, Special agent USPS-OIG
                    GRACE SOTO, Special agent IRS
23                  COLLEEN GEIER, Paralegal Specialist USAO
                    PRIYA KUARLALL PRASAD, Paralegal
24

25
```

ICA5iss1

```
 1              (Trial resumed; jury not present)

 2              THE DEPUTY CLERK:  Case on trial continuing;

 3    government and defense attorneys present.  Jurors are not

 4    present.

 5              THE COURT:  Good morning.  Hope you had a good

 6    weekend.  Here is the deal with today.  I have already begged

 7    out of the first part of the Judges' lunch so we will break for

 8    lunch at 12:45, but at 4:00 this afternoon the new learning

 9    center, which is Chief Judge Katzman's big project, is being

10    dedicated and Chief Judge McMahon has to put in an appearance

11    at that event.

12              So, can we get the witness on the stand, please?

13              MR. BRAFMAN:  So, we will be stopping at 4:00 today,

14    your Honor?

15              THE COURT:  I think that's what I just intimated, yes.

16              MR. BRAFMAN:  Thank you.

17              THE COURT:  How much more do you have?

18              Come on up, sir.  Get in the witness box.

19              How much more do have you with the witness?

20              MR. SOLOWIEJCZYK:  Approximately a half hour.

21              THE COURT:  Okay.  Great.

22              (Continued on next page)

23

24

25
```

ICA5iss1                         Velez – direct

```
 1              (Jury present)
 2              (Witness resumes stand)
 3              THE COURT:  Good morning, everybody.
 4              THE JURY:  Good morning.
 5              THE COURT:  Good to see you.
 6              Our witness is still on the stand.  We will pick up
 7     where we left off on Thursday.
 8              Sir, you are still under oath.
 9      ISMAEL VELEZ, resumed.
10              THE COURT:  You may continue.
11              MR. SOLOWIEJCZYK:  Thank you, your Honor.
12     DIRECT EXAMINATION
13     BY MS. HANFT:
14     Q.  Good morning, Mr. Velez.
15     A.  Good morning.
16     Q.  When we broke for the weekend you were discussing some of
17     the problems you had with Mr. Issa's companies.  Do you recall
18     that?
19     A.  Yes.
20     Q.  Can you remind us what some of those problems were?
21     A.  Invoices were coming late, we couldn't match the invoice to
22     the vehicle because the vehicle would go back to the station,
23     we wouldn't get the invoices on time so we couldn't verify.
24     There were items that should have been on the PMI -- preventive
25     maintenance inspection -- that were added on the bottom of, you
```

ICA5iss1                     Velez - direct

1   know, separately which shouldn't have been.

2              MR. BRAFMAN:  Your Honor, this has been asked and

3   answered.

4              THE COURT:  It is a little review to catch up.  It's

5   one question.  There will not be two.

6              Remind the folks again.  Finish your answer, sir.

7              THE WITNESS:  And, we were getting bills late so it

8   was causing souse to have more confusion with the vehicles

9   getting PMI because the vehicles would be PMI'd but the

10  invoices weren't coming in so we couldn't take them off of our

11  system and seeing, showing that they were done.  So, since they

12  didn't show in our system, vehicles were constantly being done

13  again with no prior knowledge that the vehicle was done.  We

14  had a lot of vehicles, 1,640 vehicles so we had a lot of

15  redundancy in work.

16  BY MS. HANFT:

17  Q.  Despite those problems, did you continue to use Mr. Issa's

18  companies?

19  A.  Yes.

20  Q.  Why was that?

21  A.  When I spoke to Mr. Issa, he would constantly tell me that

22  he was going to take care of the problem, he was going to fix

23  it, don't worry about it, I'm going to take care of it, and at

24  the same time I didn't want to lose the money that I was

25  getting at the time.

ICA5iss1                        Velez - direct

1   Q.  You also told us that there were other third-party

2   contractors you used.  Do you recall that?

3   A.  Yes.

4   Q.  As compared with other third-party contractors, did you use

5   Mr. Issa's companies more or less frequently?

6   A.  More.

7   Q.  Approximately how much work did you give Mr. Issa's

8   companies while you were Westchester VMF manager?

9   A.  It was a lot more.  He would get work with Healey, Dee Jay,

10  First Star, Delorean, Duploy.  All those companies were getting

11  a lot of work.

12  Q.  And when you say a lot of work, can you estimate a monetary

13  amount, if you know?

14  A.  As far as money is concerned, it was in the millions.

15  Q.  Now, I would like you to take a look at Government Exhibit

16  250DD.

17          We don't need to discuss this again but I think I

18  neglected to formally offer it in evidence.  The government

19  offers Government Exhibit 250DD?

20          MR. BRAFMAN:  Do you have it on the screen?

21          THE COURT:  What is it?

22          MS. HANFT:  A text message.

23          THE COURT:  Can they see it so they know whether we

24  want to object or not?

25          MR. BRAFMAN:  We have no objection.

ICA5iss1                        Velez - direct

1              THE COURT:  Admitted.

2              MS. HANFT:  Thank you.

3              (Government's Exhibit 250DD received in evidence)

4    BY MS. HANFT:

5    Q.  Let's turn to Government Exhibit 250EE.  This exhibit is in

6    evidence.

7              Mr. Velez, could you read the first message aloud,

8    please?

9    A.  "You, yourself, better be in my office on Tuesday, June

10   13th, at 9:00 a.m."

11   Q.  Did you send him this message, sir?

12   A.  Yes.

13   Q.  Who did you send it to?

14   A.  To Mr. Issa.

15   Q.  Could you read the next message, please?

16   A.  "Since you haven't responded to my text, it means to me

17   that as of Monday, June 13th, we will shut down operations with

18   Healey, Duploy and First Star.  Documentation will be sent,

19   forwarded to Philadelphia CMC."

20   Q.  Did you send this message?

21   A.  Yes.

22   Q.  Why did you send this message?

23   A.  Still was having a lot of issues with this company.

24   Q.  And when you say, "documentation will be forwarded to

25   Philadelphia CMC," what are you referring to?

ICA5iss1                    Velez - direct

1    A.  To make them aware that I was going to stop doing work with

2    them in case they were going to use him for other places to cut

3    him off, don't recommend him anywhere else.

4    Q.  Did you shut down operations with Healey, Duploy and First

5    Star?

6    A.  No, I didn't get to.  No.

7    Q.  Did you shut down operations with any of Mr. Issa's

8    companies?

9    A.  No.

10   Q.  Why not?

11   A.  We spoke about the issues that we were having -- that I was

12   having with his companies, and again he told me he was going to

13   take care of it and repair it so I didn't send anything to

14   Philadelphia CMC.  And on top of that, you know, again, I

15   needed the money.

16   Q.  If I can show you one last text message, Government Exhibit

17   250GG, I believe it is also in evidence.  Could you read this

18   set of messages aloud please, Mr. Velez?

19   A.  From top to bottom?

20   Q.  Yes, please.

21   A.  "Give me invoices, please.  Does me no good just talking

22   about it.  Get four or five a night.  I want them done as soon

23   as possible.  You guys need work and nothing is being done.

24   Send me whatever invoices you have."

25            "Tell your boy not to screw this up or he's dead."

ICA5iss1                    Velez - direct

1          "Got it, boss."

2          "Will do."

3          "Tell him he complained and I'm coming through for

4     your uncle.  No more crying."

5     Q.  Mr. Velez, who did you send these messages to?

6     A.  Sent them to Jasmine, an employee of Tony Issa's.

7     Q.  And could you explain the entry in your phone, why does it

8     say Love Jasmine My?

9     A.  That was just, I used to give everybody a name, put it on

10    my phone.

11    Q.  And in this first message, what were you referring to when

12    you said give me invoices, please?

13    A.  Well, again, the invoices weren't coming on time so they

14    were just sitting in their office, vehicles were done, they

15    were back in the stations already driving, delivering mail, but

16    I didn't have the invoices to enter into SEAM to show that they

17    were done.  So, I didn't want them to be done again, have

18    redundancy with the invoices.

19    Q.  When you say tell your boy not to screw this up or he's

20    dead, were you being serious or were you angry?

21    A.  I was upset because it was taking too long with these

22    invoices.  I mean, we are talking about a month later, two

23    weeks later, three weeks later.  It wasn't being done right.

24    There was no efficiency to the invoices.

25    Q.  Finally, this last message:  "Tell him he complained and

ICA5iss1                    Velez - direct

1   I'm coming through for your uncle, no more crying."

2           First of all, who is "your uncle?"

3   A.  That's Jasmine's name for Mr. Issa, she used to call him

4   her uncle.

5   Q.  What did you mean when you said, "I'm coming through for

6   him?"

7   A.  He was getting work.  He was complaining to me that he

8   wasn't getting work so he was getting work.  Even though he had

9   work he was getting more work and he was getting work, but he

10  just wasn't coming through for us with the invoices.  So, I

11  told him don't cry no more, because he used to tell me all the

12  time I'm not getting any work.

13  Q.  And, Mr. Velez, if I could refer your attention back to

14  Thursday again, do you recall telling us about a trip -- two

15  trips to Florida with Mr. Issa?

16  A.  Yes.

17  Q.  Those trips to Florida, who invited who?

18  A.  Mr. Issa invited me.

19          MS. HANFT:  Your Honor, if I could request that the

20  Court read stipulation 4009, paragraph 11?

21          THE COURT:  If called as a witness at trial, the

22  custodian of records of Miami Gardens Square 1, Inc., doing

23  business as Tootsie's Cabaret, would testify that Government

24  Exhibit 603, including all parts and subdivisions thereof, are

25  true and correct copies of records of Tootsie's, that the

ICA5iss1                          Velez - direct

1    originals records were all made or near the time by or from

2    information transmitted by a person with knowledge of the

3    matters set forth in the records, that they were kept in the

4    ordinary course of Tootsie's regularly conducted business

5    activity, and that it was the regular practice of that business

6    activity to make the records.

7            You have heard those words frequently enough by now to

8    know that that's the magic formula for authenticating something

9    as a business record.

10           MS. HANFT:  The government offers Government Exhibit

11   603.

12           MR. BRAFMAN:  No objection.

13           THE COURT:  Admitted.

14           (Government's Exhibit 603 and 4009 received in

15   evidence)

16   BY MS. HANFT:

17   Q.  May we publish Government Exhibit 603?

18           Mr. Velez, I'm going to turn your attention forward in

19   time.  Do you recall learning at some point that Mr. Issa had

20   been arrested?

21   A.  Yes.

22           MS. HANFT:  And, your Honor, with the Court's

23   indulgence, would you please read the stipulation marked

24   Government Exhibit 4001?

25           THE COURT:  Can I have 4001, please?  It is hereby

1    stipulated and agreed, by and between the usual suspects that:

2              1.  Ibrahim Issa was arrested in connection with this

3    case on or about September 2, 2016, in New York, New York.

4              It is further stipulated and agreed that this

5    stipulation may be received into evidence and it is hereby

6    received as Government Exhibit 4001.

7              (Government's Exhibit 4001 received in evidence)

8    BY MS. HANFT:

9    Q.  Mr. Velez, how did you hear that Mr. Issa had been

10   arrested?

11   A.  I actually saw a sheet of paper with his picture showing on

12   the bottom, a statement showing that he was arrested, inside

13   the swing room in my shop.

14   Q.  Did there come a time after Mr. Issa's arrest when you

15   spoke to Sohail?

16   A.  Yes.  About a week after I found out that he was arrested I

17   called Sohail.

18   Q.  Why did you call Sohail?

19   A.  Because I was going to go on the regular day to go pick up

20   money.

21   Q.  Could you remind us who Sohail is, Mr. Velez?

22   A.  Sohail is an employee that runs the gas station for

23   Mr. Issa.

24   Q.  So, why did you want to go pick up money at that point?

25   A.  It was a scheduled day to go.  I just called, called him on

1   his cell phone.

2   Q.   Would you describe the conversation you had with Sohail?

3   A.   When I called Sohail I told him, oh, I'm coming down to

4   pick up coffee and he told me oh, no more, they took the

5   computers.  No more.  It's done.  No more.

6   Q.   When you say "pick up coffee," would you remind us what

7   that referred to?

8   A.   "Coffee" was the code word for money.

9   Q.   When, approximately, was the last time you received a cash

10  payment from Mr. Issa?

11  A.   Two weeks prior to Mr. Issa being arrested.

12  Q.   How much money did you receive at that time?

13  A.   It was $4,800.

14  Q.   By the way, Mr. Velez, when you went to pick up money from

15  the gas station, did you drive or were you on foot?

16  A.   I used to drive there.

17  Q.   And which car or cars did you use?

18  A.   I used -- at the time I owned a C300 Mercedes Benz.

19  Q.   Did there come a time when you had a different car?

20  A.   Yes.  I traded that in for a jeep.  It was getting too

21  expensive, the monthly payments.

22  Q.   Did you drive that car to the gas station at times as well?

23  A.   Yes, the jeep.

24  Q.   What color was the jeep?

25  A.   It was an orangey-red color.

ICA5iss1                         Velez - direct

1    Q.  After Mr. Issa's arrest, did you continue to work at the

2    White Plains VMF?

3    A.  Yes.

4    Q.  Until when?

5    A.  Until January of 2017.

6    Q.  What happened in January of 2017?

7    A.  I was visited by the OIG's office and the agent presented

8    me with some paperwork saying pretty much that I was accepting

9    bribes, I was putting money into an account, my checking

10   account, and I couldn't recall.

11   Q.  I am going to ask you some more detailed questions about

12   that in a moment but, generally speaking what, if anything, did

13   OIG ask you that day?

14           MR. BRAFMAN:  Objection.

15           THE COURT:  Overruled.

16   BY MS. HANFT:

17   Q.  You can answer, sir.

18   A.  They asked me why was I depositing large amounts of money,

19   is this money that I was getting from the outside, from the

20   company.  He told me, you know, they're going to ask me

21   questions that they already know the answers to.  And I was

22   answering.  I was nervous, I was scared at that time so I

23   just --

24   Q.  Generally speaking -- I'm sorry.

25   A.  No.  I just don't know what else to say about that.

ICA5iss1                      Velez - direct

1  Q.  Generally speaking, by the end of that meeting, what had

2  you told OIG that you had done?

3  A.  That I was receiving a bribe in return for money.

4  Q.  When you say in return for money, what do you mean by that?

5  A.  I mean -- I'm sorry.  I was receiving a bribe in return for

6  work that I was giving him.

7  Q.  And when you say in return for work, could you be more

8  specific what you are referring to?

9  A.  Giving Mr. Issa's company work, you know, vehicles for

10 repair.

11 Q.  And you referred a moment ago to being nervous.  Were you

12 completely truthful at that time?

13 A.  No.

14 Q.  In what way were you not truthful?

15 A.  I didn't recall all the information either, so at that time

16 being nervous and all I wrote on a statement some things that

17 weren't true, like as far as the amount of money that I was

18 getting, the date I wasn't sure of and I put down a year that I

19 wasn't clear on.  Based upon the documents that they showed me,

20 I just assumed that it was correct and I just wrote that number

21 on the paperwork.

22 Q.  Can you explain what you are referring to when you say the

23 document that they showed you?

24 A.  They showed me a spreadsheet, the OIG agents showed me a

25 spreadsheet of deposits going into my bank account back in, you

ICA5iss1                        Velez - direct

1    know, 2013, '14.  I didn't know what those deposits were.  It

2    was a joint account between myself and my wife and so I -- I

3    assumed they were correct only to find out later that it wasn't

4    correct.

5    Q.  When you say you assumed they were correct, what do you

6    mean by that?  What did you say those deposits were?

7    A.  I said to the OIG agent that those were deposits on the

8    statement that I wrote that they were deposits that I was

9    putting money in, but that wasn't accurate.

10   Q.  Which money did you say that was?  What kind of deposits,

11   what was the money from?

12   A.  From -- well, I thought it was deposits from money that I

13   was getting from Mr. Issa but it wasn't.

14   Q.  Were you getting money from Mr. Issa?

15   A.  Yes.

16   Q.  What, if anything, did you say at that time with respect to

17   the work that Tony Issa's company performed?

18   A.  I told them that I didn't accept shoddy work, that they

19   were doing the work, that I was giving them the work and

20   everything was fine.

21   Q.  Was that true?

22   A.  No.

23   Q.  Did there come a time when you realized that those deposits

24   were not in fact the very money you had received from Mr. Issa?

25   A.  Yes.

1              When I got home I looked at the documents online for

2      that account and my wife reminded me that was money that she

3      was depositing from her account to pay the rent, mortgage, and

4      stuff like that.  She used to work in a hospital and the money

5      wasn't going direct deposit into our account, she was having

6      trouble getting that done so she had to take it out from her

7      personal account, withdraw it, and then deposit it into our

8      joint account.  And that's what that money was, those deposits.

9      Q.  So, would it be correct to say that you got some of the

10     details wrong that day that you were approached by the OIG?

11     A.  Yes.

12     Q.  Remind us, what were you doing with the money that you

13     received from Mr. Issa?

14     A.  I was actually keeping it in the house inside of an

15     electrical box.  As I needed to get groceries or pay a bill, I

16     would buy a money order and pay the bills.

17     Q.  Did you ever deposit it in any bank account?

18     A.  I believe in the very beginning I deposited, like, four or

19     five times $200 a week.

20     Q.  Now, did there come a time when you began to cooperate with

21     law enforcement?

22     A.  Yes.

23     Q.  Around when was that?

24     A.  February of 2017.

25     Q.  What did you do to cooperate?

ICA5iss1                         Velez - direct

1    A.  I told them everything, all my interactions with Mr. Issa

2    and his companies between the post office and Mr. Issa's

3    companies, the monies that I was receiving from beginning to

4    end.

5    Q.  Did you also tell them everything about the crime you had

6    committed?

7    A.  Yes.

8    Q.  Who did you meet with of the government as part of your

9    cooperation?

10   A.  With the OIG, the IRS, assistant district attorney, my

11   lawyer, and myself.

12   Q.  And, what sorts of things did you have to tell the

13   government at those meetings as part of the process of meeting

14   with them?

15   A.  I had to tell them the truth about everything.

16   Q.  Did you do that?

17   A.  Yes.

18   Q.  Ultimately, were you charged with accepting bribes based on

19   your having received bribes from Mr. Issa?

20   A.  Yes.

21   Q.  Did that require turning yourself in to the authorities?

22   A.  Yes.  I turned myself in to the marshal's office.

23   Q.  Did you ultimately plead guilty in a court of law to that

24   crime?

25   A.  Yes, I did.

ICA5iss1                          Velez - direct

1   Q.  Can you tell us, in your own words, what you did that made

2   you guilty of the crime?

3   A.  Well, I accepted money, bribes for the work that I was

4   giving Mr. Issa.

5   Q.  What is your understanding about the maximum sentence you

6   face as a result of that crime?

7   A.  15 years in jail.

8   Q.  Are you testifying here today as a result of what's called

9   a cooperation agreement with the government?

10  A.  Yes.

11  Q.  I am going to show you what's been marked for

12  identification as Government Exhibit 3549-16.  Let me know when

13  it is up on your screen, Mr. Velez.

14  A.  There it is.

15  Q.  Do you recognize this document?

16  A.  Yes.

17  Q.  Could we turn to the last page of this document, please?

18  Do you see your signature here, sir?

19  A.  Yes.

20  Q.  What is this document?

21  A.  This is the cooperation agreement between myself and the

22  government.

23        MS. HANFT:  The government offers Government Exhibit

24  3549-16?

25        MR. BRAFMAN:  No objection.

1              THE COURT:  Admitted.

2              (Government's Exhibit 3549-16 received in evidence)

3    BY MS. HANFT:

4    Q.  Can we publish the first page of this document, please?

5              Mr. Velez, what are your responsibilities under this

6    cooperation agreement?

7    A.  To meet with the government, tell the truth, cooperate and

8    assist the government, don't commit any more crimes, and to

9    come here and testify.

10   Q.  Would you please blow up the third paragraph, here?

11             Take a look at these things, Mr. Velez.  Are these the

12   responsibilities you just told us about?

13   A.  Yes.

14   Q.  If we could just page forward one more and finish the

15   paragraph?

16             Mr. Velez, if you meet your responsibilities and do

17   those things, what is your understanding of what the government

18   will do?

19   A.  That they would submit a 5K1 letter to the Judge in my

20   case.

21   Q.  What is your understanding of what a 5K1 letter is?

22   A.  That it would tell all the good and all the bad in my life,

23   the cooperation that I gave -- that I helped the government in

24   this case.  You know, I don't recall anything else right now.

25   Q.  And who is that letter sent to?

ICA5iss1                        Velez - direct

1   A.  The letter is sent to the judge in my case.

2   Q.  What does it allow the judge to do?

3   A.  To use it in consideration for my sentence.

4   Q.  Has the government promised you a reduced sentence?

5   A.  No.

6   Q.  Has anyone promised you a reduced sentence?

7   A.  No.

8   Q.  Who decides what your sentence will be?

9   A.  The Judge in my case.

10  Q.  Will the government recommend any particular sentence for

11  you?

12  A.  No.

13  Q.  Do you hope to get a lower sentence because you cooperated?

14  A.  Yes.  Yes, I do.

15  Q.  If the government writes the 5K1 letter you described, what

16  is the least amount of jail time the Judge can give you?

17  A.  Zero.

18  Q.  And even if you get the 5K1 letter, what is the most amount

19  of time the Judge can give you?

20  A.  15 -- 15 years.

21  Q.  If you tell the truth at this trial and the defendant is

22  found not guilty, do you believe you will get the 5K1 letter?

23  A.  Yes.

24  Q.  And if you lie at this trial and the defendant is

25  convicted, do you believe you will get the 5K1 letter?

ICA5iss1                    Velez - direct

1    A.  No.

2    Q.  As you understand it, does the outcome of this trial affect

3    whether you will get the 5K1 letter?

4    A.  No.

5    Q.  Mr. Velez, when was the last time you spoke with Mr. Issa?

6    A.  The last time I spoke with Mr. Issa is when he showed up in

7    the back of my house in his car.

8    Q.  Was this before or after Mr. Issa had been arrested?

9    A.  After.

10   Q.  Was it before or after you had been approached by law

11   enforcement?

12   A.  Before.

13   Q.  We can take down the exhibit on the screen, please.

14           Where were you when you saw Mr. Issa that day?

15   A.  I was getting home from work, it was late, it was dark, and

16   I had pulled into the driveway.  Then I turned around because I

17   heard something and it was Mr. Issa's car, and Mr. Issa was in

18   the passenger side.

19   Q.  You said you were getting home.  Where were you living at

20   the time?

21   A.  I lived in Pennsylvania, in Doylestown.

22   Q.  And you said you saw a car.  What kind of car was it?

23   A.  It was a white Mercedes Benz.

24   Q.  Could you see who was inside the white Mercedes Benz?

25   A.  Mr. Issa and a driver, but I didn't get to see the driver.

ICA5iss1                        Velez - direct

1    I didn't know who it was.

2    Q.  What, if anything, did Mr. Issa say?

3    A.  That we needed to talk.

4    Q.  Did you speak to him right there?

5    A.  No.  I was a little nervous so I didn't know what -- what

6    he was doing there at that time.

7    Q.  Where, if anywhere, did you go?

8    A.  We went to the Giant Super Market.  It is like a Stop and

9    Shop here, it is the same sort of company but it is, over there

10   in Pennsylvania, Giant.

11   Q.  Did you go there alone or with Mr. Issa?

12   A.  With Mr. Issa in my car.

13   Q.  What did you do when you got there?

14   A.  We went in and went to the freezer aisle, I believe he

15   suggested to go to the freezer aisle.

16   Q.  And what happened when you got to the freezer aisle of the

17   Giant?

18   A.  He turned around, put his hands on me to check had me if I

19   had a wire, and I got annoyed so I turned around and did the

20   same thing to him, put my hands on him and said do you have a

21   wire.

22   Q.  What, if anything, did Mr. Issa say?

23   A.  He said you gotta help me, I need money.

24   Q.  Did he say anything else during that conversation?

25   A.  Yeah.  It was -- it was about not saying that I was

ICA5iss1                              Velez - cross

1   receiving money from him, what he was doing was just doing work

2   for the post office, he didn't do anything wrong -- which

3   wasn't true.

4   Q.  Did he tell you what, if anything to say, if you were

5   approached?

6   A.  Yeah, to just -- that I didn't receive any money from him,

7   everything was legit and he was doing the work.  That's

8   basically it.

9           MS. HANFT:  One moment, please?

10          (Counsel conferring)

11   BY MS. HANFT:

12   Q.  Mr. Velez, why did you believe that Mr. Issa was giving you

13   cash payments?

14          MR. BRAFMAN:  Objection.

15          THE COURT:  Objection is sustained.

16          MS. HANFT:  No further questions of this witness, your

17   Honor.

18          MR. BRAFMAN:  Should I proceed now, your Honor?

19          THE COURT:  You may, Mr. Brafman.

20          MR. BRAFMAN:  Thank you.

21   CROSS EXAMINATION

22   BY MR. BRAFMAN:

23   Q.  Mr. Velez, good morning.

24   A.  Good morning.

25   Q.  You and I have never met, is that correct?

ICA5iss1                              Velez - cross

1    A.   Correct.

2    Q.   And you and I have never discussed this case?

3    A.   No.

4    Q.   Can you estimate for me how many times you think you have

5    been interviewed by either Agent Dubar from OIG or members of

6    the U.S. Attorney's office?   Approximately.

7    A.   15 times, 12 times.   Somewhere around there.

8    Q.   15 times, approximately?

9    A.   Yeah.

10   Q.   And when you are interviewed by them is there always

11   someone taking notes?

12   A.   Yes.

13   Q.   And you understand -- I just want to make sure you

14   understand that now that you're testifying, they have to turn

15   these notes over to us.   Do you understand?

16   A.   Yes.

17   Q.   So I can show you these notes, if necessary, to refresh

18   your recollection.   Okay?

19   A.   Yes.   Okay.

20   Q.   So, you testified that you -- I want to start backwards and

21   I have got a lot of stuff to cover.

22         You testified that you went to see -- that Mr. Issa

23   went to see you after his arrest and you went to the

24   supermarket, correct?

25   A.   Correct.

ICA5iss1                          Velez - cross

1   Q.  And you went to the freezer aisle?

2   A.  Yes.

3   Q.  Now, in any of the 15 interviews that you ever had with the

4   government, did you ever once tell them that you checked him

5   for a wire and he checked you for a wire?

6   A.  The opposite way around.  He checked me first and then I

7   checked him.

8   Q.  Did you ever tell them that?  You told them you went to the

9   freezer in the market, but did you ever tell them that he put

10  his hands on you and you put your hands on him, or vice versa?

11  A.  Yes.

12  Q.  You did.  Okay.

13          Now, let's talk backwards from where you just left

14  off.  You said that you gave Mr. Issa tons of work up in

15  Westchester, correct?

16  A.  Yes.

17  Q.  Now, let's just be clear about one thing.  Mr. Issa was the

18  only vendor up there who could work at night at that time,

19  correct?

20  A.  That's correct.

21  Q.  So you needed people to do work overnight and return the

22  trucks in the morning, correct?

23  A.  Yes, that's correct.

24  Q.  And you knew that Healey Motors was capable of doing that?

25  A.  Yes.

ICA5iss1                              Velez - cross

1    Q.   And in terms of the millions of dollars that you claim

2    Mr. Issa earned from the post office, there were thousands of

3    trucks repaired by him, correct?

4    A.   Yes.

5    Q.   And thousands and thousands of invoices submitted by him,

6    correct?

7    A.   Yes.

8    Q.   And some late and some not late, correct?

9    A.   What do you mean?

10   Q.   Some invoices were submitted late; you have talked about

11   that, correct?

12   A.   A lot of the invoices.  More than most.

13   Q.   Okay, but we are talking about thousands of invoices,

14   correct?

15   A.   Yes.

16   Q.   Now, I want to give the jury an understanding of what's

17   involved in him working for you and him working up at Healey

18   for the post office.  If he were to get a truck at 5:00 or 6:00

19   at night and the truck needed PMI it was, in most cases,

20   supposed to be returned in the morning, correct?

21   A.   Correct.

22   Q.   So you have to pick up the truck, do the PMI and deliver

23   the truck, correct?

24   A.   Correct.

25   Q.   And do the invoice and deliver it with the truck overnight?

ICA5iss1                          Velez - cross

1    A.  Correct.

2    Q.  And you know that Mr. Issa didn't do the mechanical work

3    himself, correct?

4              MS. HANFT:  Objection.

5              THE WITNESS:  Correct.

6              THE COURT:  The objection is overruled.

7    BY MR. BRAFMAN:

8    Q.  You know that, right?

9    A.  Yes.

10   Q.  He had about 25 mechanics working for him up at Healey

11   Motors, right?

12   A.  I don't know the amount.

13   Q.  But he had a lot of people to do thousands of PMIs.

14   A.  I didn't get to see the operation inside while they were

15   working on them.  No, I don't.

16   Q.  But you know there were many times when you were getting

17   trucks from Healey Motors when you knew that Mr. Issa was out

18   of town?

19   A.  Yes.

20   Q.  And the days when he also had to do emergency breakdowns,

21   tell the jury what that is?

22   A.  An emergency breakdown would be called in.  If a vehicle

23   was broken down they would call them, they would go with a tow

24   truck, go pick up the vehicle, bring it to the post office,

25   drop off the mail with the driver, then bring the truck over to

ICA5iss1                         Velez - cross

1    Healey Motors via the tow truck, offload it, bring it into the

2    shop, and then work on it, fix it, bring it back to the station

3    before morning.

4    Q.  So you had to get the truck, which could involve a drive of

5    over an hour on some occasions, correct?

6    A.  Correct.

7    Q.  Because this was Westchester County and it covers about an

8    8,000 square mile area your VMF, correct?

9    A.  Correct.  11 counties, yes.

10   Q.  Excuse me?

11   A.  11 counties.

12   Q.  So, if you went from Poughkeepsie to go get a truck that

13   broke down 50 miles away, the time to get the truck could be an

14   hour or two, correct?

15   A.  Correct.

16   Q.  And then you have to hook up the truck, bring it back to

17   the post office so they could take the mail, correct?

18   A.  Correct.

19   Q.  And then you have to take the truck back to Healey Motors,

20   correct?

21   A.  Correct.

22   Q.  And then you have to unload it, put it up on lift, if

23   necessary, and do the work, right?

24   A.  Correct.

25   Q.  And you never knew in advance so he never knew in advance

1    whether he was getting a truck with a bad tire or a truck that

2    had to have a whole chassis replaced, correct?

3    A.   Correct.

4    Q.   These trucks were in terrible shape as a practical matter,

5    is that true?

6    A.   Yes.

7    Q.   You had an aging fleet of thousands of trucks that were

8    almost 25 years old?

9    A.   I only had 1,644 vehicles.

10   Q.   I'm not talking about you, forget the post office in

11   general.  You, alone, had 1,600 trucks, right?

12   A.   Yes.

13   Q.   And for the most part the trucks were -- some were as much

14   as 25 years old?

15   A.   Little more than that.

16   Q.   Okay.  So now they had surpassed what you call the life

17   expectancy of these trucks when they were first put on the

18   road, correct?

19   A.   Correct.  They're 31, 30, and going down as far as --

20   Q.   You had trucks as much as 30, 31 years old?

21   A.   Yes.

22   Q.   And would it be a fair statement that if the truck broke

23   down and they had to tow it and they had to bring it back, they

24   still needed to get it back to the post office at 5:00 or 6:00

25   in the morning so it wouldn't be taken out of service, correct?

ICA5iss1                        Velez - cross

1   A.  Correct.

2   Q.  Was there any other vendor up in your area at the time that

3   could do that?  Get the truck, bring it back, unload it, and

4   fix it, and give it to the post office?

5   A.  No.

6   Q.  So you were using Mr. Issa because, at least at the

7   beginning, you were trying to clean up the Westchester VMF when

8   you got there, correct?

9   A.  Correct.

10  Q.  And you had 1,600 trucks; most of them were way behind in

11  terms of maintenance, correct?

12  A.  Correct.

13  Q.  And it wasn't your fault, the people before you just were

14  either lax or inefficient or they didn't do the work, correct?

15  A.  That is correct.

16  Q.  And you were determined to make this work, correct?

17  A.  Correct.

18  Q.  And you knew, did you not, from going up to Healey Motors,

19  that Mr. Issa was investing a great deal of money in building

20  Healey Motors?

21  A.  Correct.

22  Q.  And you knew, did you not, that he was investing this money

23  because he had gotten a contract to do the work?

24  A.  Yes.

25  Q.  You know what an IDIQ contract is?

ICA5iss1                          Velez – cross

1   A.   Excuse me?

2   Q.   IDIQ.

3   A.   No, sir.

4   Q.   You know that Mr. Issa got contracts through Philadelphia?

5   A.   Yes.

6   Q.   And do you know that an IDIQ contract or the contracts that

7   Mr. Issa got had a mandatory minimum, we have heard testimony

8   about, that means the post office had to pay him at least

9   $250,000 if he didn't do any work?

10              MS. HANFT:  Objection.

11              THE COURT:  The objection is overruled.

12              MR. BRAFMAN:  Thank you.

13   BY MR. BRAFMAN:

14   Q.   You may answer.

15   A.   I'm not aware of that part of it.

16   Q.   You helped him get the contracts?

17   A.   But the minimum amount of money is not -- that is not

18   accurate.  If he does no work and gets $250,000, that's not

19   true.

20   Q.   So, if somebody testified to that they don't know what

21   they're talking about, right?

22              MS. HANFT:  Objection.

23              THE COURT:  The objection is overruled.

24   BY MR. BRAFMAN:

25   Q.   You can answer.

ICA5iss1                    Velez - cross

1   A.  I -- I'm not going to put words in somebody else's mouth,

2   no.

3   Q.  Now, when you were helping him with the paperwork to submit

4   the paper work to Philadelphia you needed the help up there,

5   did you not?

6   A.  Yes.

7   Q.  And you submitted the paperwork to get the help not because

8   anybody was paying you at the time.  You really needed the

9   work, is that correct?

10  A.  I needed the help but he gave me the incentive to help him

11  get the contract.

12  Q.  You had the incentive to get it cleaned up.  You got credit

13  for the clean-up in that VMF in Westchester, correct?

14  A.  No.

15  Q.  You didn't get credit.

16           Were you unhappy with the post office?

17  A.  I didn't get any raises from them, no.

18  Q.  You used to complain about that to Mr. Issa all the time,

19  right?

20  A.  Yeah.

21  Q.  And you worked hard, did you not?

22  A.  A lot of hours.

23  Q.  And you worked hard to make it a good VMF, right?

24  A.  Yes.

25  Q.  And you know, do you not, that you would never have caught

1   up in the backlog of PMIs up in Westchester without Mr. Issa's

2   assistance?

3   A.  That is true.

4   Q.  Now, would it be a fair statement that in these periodic

5   interviews with the government, from time to time you either

6   changed what you said to them or corrected what you said to

7   them if you thought you had said something wrong?

8   A.  To?

9   Q.  To the government when you were being interviewed.

10  A.  Yes.  As I remembered stuff I would correct the --

11  Q.  And they would help you remember stuff, right?

12  A.  No, I had to answer it.

13  Q.  I know you had to answer it but would they show you things

14  and tell you this must be right so you are wrong in what you

15  said?  That kind of dialogue went on?

16  A.  I don't recall that.

17  Q.  Didn't you tell them in November of 2018, just a few weeks

18  before this trial started, that when you started taking money

19  from Mr. Issa you didn't even he think you were taking a bribe?

20  A.  That is true.

21  Q.  Now, let's go through a timeline and we will do it quickly

22  so that we understand where you were working and when you were

23  working.

24          In 2010, we will start there, you were a mechanic,

25  correct, working in the Bronx VMF?

ICA5iss1                         Velez - cross

1    A.   When I first started the post office?

2    Q.   Yes.

3    A.   Back in 1995.

4    Q.   No, I am starting with 2010 so we speed it up.

5            In 2010, were you working in the Bronx for Tom

6    Skopack?  You were working as a mechanic?

7    A.   No.

8    Q.   What were you working as?

9    A.   I was actually a supervisor for Manhattan VMF.

10   Q.   And then there was a period of time when you were the

11   acting manager in the Bronx, correct?

12   A.   Yes.

13   Q.   And then there was a period of time when you moved back to

14   Manhattan as a supervisor, correct?

15   A.   Correct.

16   Q.   And then there was a period of time when the Bronx closed,

17   correct, end of 2011?

18   A.   Yes.  I went back up there to close it, yes.

19   Q.   And it was shut down, correct?

20   A.   Yes, sir.

21   Q.   So all of the post office trucks that needed service in the

22   Bronx now had to come to Manhattan, correct?

23   A.   Correct.

24   Q.   And then you went to Manhattan, correct?

25   A.   Yes.  I went to Manhattan.

ICA5iss1                        Velez - cross

1   Q.  And you felt overwhelmed?  Is that a correct word you used

2   sometimes?

3   A.  We all did, because it was far up to get the vehicles in

4   the traffic from Manhattan to the Bronx.

5   Q.  And it was a very complicated process to get the trucks,

6   bring them back, do the work, and get them back again, correct?

7   A.  Yes.

8   Q.  And the VMF that you were managing, despite your best

9   effort, simply couldn't handle it; is that correct?

10  A.  I wasn't managing the Manhattan VMF.

11  Q.  Were you working then?

12  A.  I was a supervisor, I wasn't managing.

13  Q.  As a supervisor did you have the opportunity to see that

14  you were not able to meet the demands on a regular, timely

15  basis?

16  A.  There were several supervisors there so I was only one.

17  Q.  I'm not blaming you, I'm asking you.  As a supervisor, did

18  you notice that once the Bronx closed you were overwhelmed with

19  work down there to try and get everything done on a timely

20  basis?

21  A.  Yeah, I was -- it was difficult.

22  Q.  It was chaotic at times I think you said, right?

23  A.  Difficult, yeah.

24  Q.  And did you use outside vendors at the time?

25  A.  There was a few.  Down in Manhattan we had few vendors, we

ICA5iss1                          Velez – cross

1    didn't have that many.

2    Q.  Now, in 2012 there was an incident where you left the post

3    office for six months, correct?

4    A.  Yes.

5    Q.  Joe Glenn, a post office employee, hit you in the face with

6    a phone?

7    A.  Yes.

8           MS. HANFT:  Objection.

9           MR. BRAFMAN:  Your Honor, this is relevant.

10          THE COURT:  Excuse me.  Ground?

11          MS. HANFT:  Relevance.

12          THE COURT:  Overruled until I see where we are going.

13          MR. BRAFMAN:  Thank you.

14   BY MR. BRAFMAN:

15   Q.  You were out of the post office during that period of time

16   for six months, correct?

17   A.  Correct.

18   Q.  Were you being paid from the post office during that

19   period?

20   A.  My sick leave, yeah.  I was using my sick leave.

21   Q.  I'm sorry?

22   A.  I was using my sick leave.

23   Q.  And you went to a -- you were treated by a therapist or

24   psychiatrist who gave you an antianxiety medication, correct?

25   A.  Correct.

ICA5iss1                    Velez - cross

1          THE COURT:  The objection is sustained.

2     BY MR. BRAFMAN:

3     Q.  Well, did you ultimately go back to the post office?

4     A.  Yes.

5     Q.  You went back and ultimately, in June 2013, you went back

6     to where?

7     A.  It was actually February or March.

8     Q.  And when you went back to the post office, did you go back

9     to Manhattan?

10    A.  Manhattan VMF, yes.

11    Q.  And your assignment was to go all over the town to find

12    post offices and help them get the Voyager system working,

13    right?

14    A.  To get the Voyager system up and running, yeah, because it

15    was a lot of issues.

16    Q.  And then, in September 2013, you ultimately go to

17    Westchester and you become the acting manager in about

18    mid-2014, correct?

19    A.  No.

20    Q.  When did you become acting manager?

21    A.  September -- September 17th of 2013.

22    Q.  And you were replacing James Fulton?

23    A.  I should have replaced him but he was sort of about -- he

24    was under investigation.

25    Q.  But he stayed there for a while, right?

ICA5iss1                        Velez - cross

1    A.  He stayed there and didn't want to leave the post but he

2    was removed from the post so I was there until he came back.  I

3    requested to come back down to Manhattan.

4    Q.  To take over.

5    A.  Yeah, but he wound up taking a job at another facility so

6    he transferred out and then they left me there.

7    Q.  You knew, did you not, that part of the reason that the

8    Westchester VMF was in such a state of disrepair is because

9    Mr. Fulton was holding down two jobs and he was sleeping in the

10   VMF office?

11               MS. HANFT:  Objection.

12               THE COURT:  The objection is sustained.

13               MR. BRAFMAN:  May we have a side bar so I can explain?

14               THE COURT:  The objection is sustained.

15               MR. BRAFMAN:  Can I explain the relevance?

16               THE COURT:  Move on.  The objection is sustained.

17   BY MR. BRAFMAN:

18   Q.  So, when you got to the VMF you found that they were 2,100

19   vehicles behind in PMI inspections, correct?

20   A.  Correct.

21   Q.  That's over 2,000 PMI inspections that had not been done,

22   right?

23   A.  Correct.

24   Q.  And the PMI inspections are supposed to be done to ensure

25   the safety and working condition of the trucks?

ICA5iss1                        Velez - cross

1    A.  Correct.

2    Q.  So, by the time you got there, as a result of things having

3    nothing to do with Mr. Issa, the office was in utter chaos

4    because you needed to get 2,100 trucks inspected, fixed, and

5    back on the road?

6    A.  Correct.

7    Q.  And you enlisted Mr. Issa's help because it was the only

8    place in White Plains, in Westchester, that could fit the

9    trucks into their garages, correct?

10   A.  He was not in Westchester yet.

11   Q.  I'm sorry.  But he was going to be up in Healey, he was

12   opening the place, correct?

13   A.  He was First Star down in the Bronx.  He was trying to

14   solicit me to get the work from Westchester down to the Bronx

15   to get them fixed.

16   Q.  And then he opened Healey?

17   A.  Yes.

18   Q.  And he opened Healey and invested all the money in Healey

19   that you have testified to because you told him about the

20   condition of the Westchester VMF and you assured him that you

21   would be able to give him work, correct?  That's the truth,

22   isn't it?

23   A.  There is a little more to that.

24           THE COURT:  Well, is that part of it true?

25           THE WITNESS:  Yes.

ICA5iss1                         Velez - cross

1          THE COURT:  Fine.  If there is more to tell the
2   prosecutor will ask you to say more.
3          THE WITNESS:  Okay.
4          THE COURT:  But, please, just answer Mr. Brafman's
5   question.
6          THE WITNESS:  Yes.  Yes, your Honor.
7   BY MR. BRAFMAN:
8   Q.  Now, you talked about there were dinners that you talked
9   about going out to dinner with Mr. Issa and we saw pictures of
10  different places and you told us of different places.  Isn't it
11  true that on virtually all of those dinners it was you,
12  Mr. Issa, and several of his employees?
13  A.  Not all the time.
14  Q.  A lot of them?
15  A.  Yes.
16  Q.  And that the employees were Stephanie and Jasmine and
17  Claudia and a number of people who worked for him that you got
18  to know fairly well, correct?
19  A.  Correct.
20  Q.  And at the time you were separated and you hung out with
21  these people as friends, did you not?
22  A.  Yes.
23  Q.  And you went to dinner and everybody got drunk sometimes
24  and you got drunk, Mr. Issa had to carry you home.  Remember
25  that night?

ICA5iss1                         Velez - cross

1  A.  Yes.

2  Q.  So you were sitting out there, you saw this dinner with his

3  employees as a bribe or as a friendly dinner?

4  A.  I saw it as a friendly dinner, but.

5  Q.  And you said that Mr. Issa paid for these dinners.  It

6  wasn't just you there, he was paying for all of his employees

7  too, right?

8  A.  Yes.

9  Q.  So it is not like he took you out that night with all of

10 these people, everybody got drunk, and then he decided to let

11 everybody chip in at the dinner.  That wasn't his style, was

12 it?

13 A.  No.

14 Q.  Let's talk about the relationship that you had with

15 Mr. Issa as it began.

16        Would it be a fair statement that despite the money,

17 which you have talked about, we will get to that in a minute,

18 would it be a fair statement that you ended up as Tony Issa's

19 friend at the beginning and during the relationship for a

20 period of time?

21 A.  Yes.

22 Q.  And you confided in him about personal matters?

23 A.  Yes.

24 Q.  And you sought his advice on personal matters?

25 A.  I don't know about advice.  I can't recall.

ICA5iss1                      Velez - cross

1   Q.  Well, let's just go through a list of things that you will,

2   I think agree, were personal matters that you spoke to Mr. Issa

3   about.

4             Did you tell him about your wife's physical condition?

5             MS. HANFT:  Objection.

6             THE COURT:  The objection is sustained.

7             MR. BRAFMAN:  Your Honor, we must have a side bar.

8             THE COURT:  No, we must not, Mr. Brafman.  You may ask

9   your next question.

10            MR. BRAFMAN:  Your Honor, this goes to the --

11            THE COURT:  Mr. Brafman, I said no and that's the end

12  of it.  When I say no I mean no.

13            MR. BRAFMAN:  I would like to explain why.  Sometimes

14  you say no, I explain why, and then you say yes.

15            THE COURT:  Mr. Brafman, ask your next question.

16  BY MR. BRAFMAN:

17  Q.  Didn't you tell him you needed money to help your wife

18  because she was disabled?

19            MS. HANFT:  Objection.

20            THE COURT:  The objection is sustained.

21  BY MR. BRAFMAN:

22  Q.  You testified, on direct examination, that when you were

23  down in Florida there was a time when you engaged with a

24  prostitute.  Do you remember that question on direct

25  examination?

ICA5iss1                         Velez - cross

1    A.  Yes.

2    Q.  Hadn't you told Mr. Issa that, as a result of your wife's

3    condition, you hadn't had sex in a long time?

4              MS. HANFT:  Objection.

5              MR. BRAFMAN:  Your Honor, they opened this.

6              THE COURT:  The objection is sustained.

7              MR. BRAFMAN:  Your Honor, I need to stop.

8              THE COURT:  Then fine, sit down.  You're done.

9              MR. BRAFMAN:  No, I need to continue but I need to

10   stop for a minute.

11             THE COURT:  Take a deep breath.

12   BY MR. BRAFMAN:

13   Q.  When you were at that strip club in Florida with Junior and

14   about five or six other people, did you pay for any of the lap

15   dances down there?

16   A.  No, sir.

17   Q.  They all paid for you, right?  Not just Mr. Issa?

18   A.  I don't know who paid but it wasn't me.  When I got cash it

19   was Mr. Issa would hand me cash.

20   Q.  And you went in the back and you had sex with a woman?

21   A.  Yes, I did.

22   Q.  And that just happened out of the blue or did you and

23   Mr. Issa have a discussion about this before?

24   A.  About?

25   Q.  Didn't you tell the government that you had sex with the

ICA5iss1                         Velez - cross

1   woman down there because you hadn't had sex in a long time?

2                MS. HANFT:  Objection.

3                THE COURT:  The objection is sustained.  I am ruling

4   that the reason why is irrelevant.  Okay?

5                MR. BRAFMAN:  It's not.

6                THE COURT:  I made that ruling.  Move on.  You have

7   your exception.

8   BY MR. BRAFMAN:

9   Q.  Did you complain about the post office only giving you a 1

10  percent raise despite your hard work?

11  A.  Yes.

12  Q.  Why did you tell him that?

13  A.  I was frustrated.

14  Q.  And did you try and have Mr. Issa share your frustration?

15  A.  No.  I just brought it up in conversation because I was

16  frustrated.

17  Q.  Something you would say to a friend?

18  A.  Yeah.

19  Q.  Now, you told us on direct examination that Mr. Issa had

20  you fix your teeth and he treated you to dentures?

21  A.  Yes.

22  Q.  It didn't just happen one day, there was a constant

23  discussion about this that went on for months.  Isn't that

24  true?

25  A.  No.

ICA5iss1                         Velez - cross

1   Q.  Didn't you get a ribbing from everybody about the fact that

2   you had no lower teeth?

3   A.  They used to rib me but I had no choice.

4   Q.  You had no teeth, right?

5   A.  I had failing teeth.

6   Q.  And Mr. Issa said to you just get new teeth, correct?

7   A.  Yes.

8   Q.  And you said I can't afford it?

9   A.  Yeah.

10  Q.  And Mr. Issa said do it, I'll take care of it.  Right?

11  A.  Yes.

12  Q.  And you saw that as a bribe?

13  A.  Well, I paid for it -- he said pay for it and I will give

14  you the money.

15  Q.  Okay, but it was to get teeth, right?

16  A.  Correct.

17  Q.  And you saw that as a bribe or as an act of compassion?

18  A.  I thought he was doing it being nice to me.

19  Q.  Thank you.

20          Now, in October of 2014 you testified that you flew to

21  Florida again with Mr. Issa, right?

22  A.  Yes.

23  Q.  And this time it was just him and you and it was none of

24  the other pals, right?

25  A.  Nobody else, no.

ICA5iss1                     Velez - cross

1    Q.  Not Junior or anybody else?

2    A.  Right.

3    Q.  And that's when you took the photo on the plane, the selfie

4    of you and Mr. Issa on the plane, right?

5    A.  Correct.

6    Q.  And when you got to Florida you knew that Mr. Issa was

7    attending a post office conference, right?

8    A.  Yes.

9    Q.  Tell us what you understand that to mean.

10   A.  It was a postal conference, they call it a PCC, Postal

11   Service CCC.  He went there to meet, interact with other

12   vendors and post office officials in Florida.

13   Q.  And you knew that these conferences were held from time to

14   time, correct?

15   A.  Yeah.  And I stood back in the hotel, yes.

16   Q.  You didn't go to the conference, it was just Mr. Issa?

17   A.  No, because you had to pay to get in and it is boring.  I

18   have been to them.

19   Q.  He didn't pay for you to go to the conference, right?

20   A.  No.

21   Q.  And you stayed in Florida and I think you told us you

22   basically drove around, right?

23   A.  Yeah, drove around.

24   Q.  And you had a hair cut?

25   A.  Yes, sir.

ICA5iss1                       Velez - cross

1    Q.  Did he pay for the hair cut?

2    A.  No.

3    Q.  You paid for that yourself?

4    A.  Yes.

5    Q.  Now, when you went out to dinner in Florida, did Mr. Issa

6    pay for the dinner?

7    A.  Yes.

8    Q.  Now, when you went to another postal conference -- sorry

9    with you went to another trip with Mr. Issa, that was in

10   Washington, D.C., correct?

11   A.  I drove there on my own.

12   Q.  But you met him there?

13   A.  Yes.

14   Q.  He had already made the arrangements for himself to go and

15   again it was a post office conference, correct?

16   A.  Yes.

17   Q.  So he didn't treat you to the trip, did he?

18   A.  No.

19   Q.  In fact, when you got there you stayed in his room with him

20   that he had already paid for, correct?

21   A.  That is correct.

22   Q.  So there is nothing about that trip that had Mr. Issa

23   giving you anything to influence you, was there?

24   A.  No.  We just went out to dinner with all the employees of

25   his.

ICA5iss1                    Velez - cross

1   Q.  And all the employees were at the same dinner, correct?

2   A.  Yes.

3   Q.  And Mr. Issa picked up the check for all of his employees,

4   correct?

5   A.  Correct.

6   Q.  He didn't ask you to kick in your one-seventh share, right?

7   A.  Correct.

8   Q.  But when you went there he didn't pay for your trip there,

9   he didn't hang out with you at the conference, and he didn't

10  get you your separate hotel room, correct?

11  A.  Correct.

12  Q.  Now, would it be a fair statement that you took your job

13  very seriously at the VMF?

14  A.  Yes.

15  Q.  And that you would not do anything to compromise the post

16  office in terms of danger or work, correct?

17  A.  Correct.

18  Q.  And you told that to the government on a number of

19  occasions, correct?

20  A.  Yes.

21  Q.  And you were being truthful, correct?

22  A.  Yes, sir.

23  Q.  Did you tell the government that the Westchester VMF was

24  sort of like a revolving door before you got there?

25  A.  Yes, it was.

ICA5iss1                    Velez - cross

1    Q.  And when you use that expression, explain to the jury what

2    you mean in terms of the VMF being a revolving door?

3    A.  There was a lot of people going in as managers and then

4    would leave because it was a mess, the place was a mess.  So,

5    when I got there, I, you know, rolled up my sleeves and started

6    to work to get it fixed.

7          MR. BRAFMAN:  Now, if I may ask for identification for

8    us to be able to use either the ELMO, your Honor to show --

9          THE COURT:  Whatever works for you, Mr. Brafman.

10          MR. BRAFMAN:  This is going to be for the witness,

11   lawyers and the Judge, correct?

12          MR. GOLD:  Yes.

13          THE COURT:  It is a little blurry.

14          MR. BRAFMAN:  I know.

15   BY MR. BRAFMAN:

16   Q.  This is Defendant's Exhibit 271.  Do you recognize this

17   photograph?

18   A.  Yes.

19   Q.  Is that the place you saw in Poughkeepsie which was Healey

20   Motors?

21   A.  Yes.

22   Q.  And that was the place Mr. Issa built?

23   A.  Yes.

24   Q.  I want to show you --

25          MR. BRAFMAN:  Your Honor, I offer no. 271.

ICA5iss1                           Velez - cross

1              THE COURT:  Any objection?

2              MS. HANFT:  No objection.

3              THE COURT:  Admitted.

4              (Defendant's Exhibit 271 received in evidence)

5    BY MR. BRAFMAN:

6    Q.  And you went up there and you toured this facility,

7    correct?

8    A.  Yes.

9    Q.  I want to show you Exhibit 274 for identification -- just

10   show it to him first -- this is the inside of Healey Motors,

11   correct?

12   A.  Yes.

13   Q.  And do you know who built all of these lifts and hydraulic

14   lifts and posts?

15   A.  That warehouse was empty and he was in the process of

16   getting all of that installed.

17   Q.  And is that the common equipment that you need in A VMF

18   repair facility or independent contractor to repair postal

19   trucks?

20   A.  Yes.

21              MR. BRAFMAN:  I offer 274.

22              THE COURT:  Any objection?

23              MS. HANFT:  Your Honor, we don't know where the

24   picture is from.  Again, we have --

25              THE COURT:  He has just identified it.

ICA5iss1                    Velez - cross

1           MS. HANFT:  I apologize, your Honor.  I mean when it

2      was from.

3           THE COURT:  Oh, that's quite all right.  I'll admit

4      it.

5           MS. HANFT:  Thank you.

6           MR. BRAFMAN:  Thank you, your Honor.

7           (Defendant's Exhibit 274 received in evidence)

8      BY MR. BRAFMAN:

9      Q.  This is the inside of Healey Motors under construction,

10     correct?

11     A.  Yes.

12     Q.  Now, you know, do you not, do you recognize post office

13     trucks when you see them?  Would that be a fair statement?

14     A.  Yes.

15     Q.  And I'm going to show you -- and only for the witness --

16     Exhibit 264.  That's a post office truck?

17     A.  Yes.

18     Q.  The kind that gets repaired by Mr. Issa and other

19     contractors?

20     A.  Yes.

21     Q.  And you recognize it to be inside what you have identified

22     as Healey Motors?

23     A.  Yes.  That's an FFV.

24     Q.  Bigger truck than --

25           THE COURT:  The question is can you identify the place

ICA5iss1                        Velez - cross

1   where it is.

2               THE WITNESS:  Yes.

3   BY MR. BRAFMAN:

4   Q.  Healey Motors?

5   A.  That's inside their shop, yes.

6   Q.  That's an official U.S. Postal truck, right?

7   A.  Yes.

8               MR. BRAFMAN:  I offer into evidence 264.

9               MS. HANFT:  No objection.

10              THE COURT:  Admitted.

11              (Defendant's Exhibit 264 received in evidence)

12  BY MR. BRAFMAN:

13  Q.  Does the jury have it?

14              MR. GOLD:  Yes.

15  Q.  Now I'm going to show just the jury please, first, Exhibit

16  266 for identification, first.  Do you recognize this as a

17  truck on a lift on the inside of Healey Motors?

18  A.  Yes.

19              MR. BRAFMAN:  I offer 266.

20              MS. HANFT:  No objection.

21              THE COURT:  Admitted.

22              (Defendant's Exhibit 266 received in evidence)

23  BY MR. BRAFMAN:

24  Q.  I want to ask you a question about this photograph in

25  particular.  Can you identify the kind of truck that's up

ICA5iss1                          Velez - cross

1   there?

2   A.   Yes.

3   Q.   What is it?

4   A.   That's an FFV.   Flex --

5   Q.   F-like-in-Frank, F-like-in-Frank, V?

6   A.   It is called a flex fuel vehicle.

7   Q.   How many of the 1,600 trucks that you have are this type of

8   truck?

9   A.   The box truck like that there is two different types.

10  Q.   Okay.

11  A.   There is an LLV, a long life vehicle that looks like this

12  which is a General Motors built, and this is an FFV which is a

13  flex fuel vehicle which looks similar but this type of vehicle,

14  we had 1,200 of them.

15  Q.   And 1,200 that would need PMIs twice a year?

16  A.   Yes.

17  Q.   And any other types of repairs in the interim that might

18  come up, yes?

19  A.   Yes.

20       MR. BRAFMAN:   I am offering this into evidence, your

21  Honor.   It is already in evidence.

22       THE COURT:   It is admitted, yes.

23  BY MR. BRAFMAN:

24  Q.   Now I am going to show the witness 268 for identification.

25  Do you see that?

ICA5iss1                         Velez - cross

1    A.   Yes.

2    Q.   And this is also a series of post office trucks inside the

3    Healey Motors Center, correct?

4    A.   Yes.

5              MR. BRAFMAN:   I offer this into evidence.

6              MS. HANFT:   No objection.

7              THE COURT:   Admitted.

8              (Defendant's Exhibit 268 received in evidence)

9              MR. BRAFMAN:   Can I show this to the jury, your Honor?

10             THE COURT:   You may.

11   BY MR. BRAFMAN:

12   Q.   Looking at this picture, sir, can you tell me how many post

13   office trucks you see in there at the same time?

14   A.   Right now in this picture there is probably about seven.

15   Q.   And would that be customary, or low or high, for Healey

16   Motors to have that many trucks in there at the same day?

17   A.   That's normal.

18   Q.   That's normal, right?

19   A.   Yes.

20   Q.   So at the very least we have, in this day, at least seven

21   trucks being worked on that need to be out the same day?

22   A.   Yes.

23   Q.   And you have no idea, by looking at these pictures, the

24   kind of repair or work that has to be done perhaps in addition

25   to the PMI, correct?

ICA5iss1                    Velez - cross

1    A.  Correct.

2    Q.  All of those trucks, after they're repaired, they need to

3    be invoiced, correct?

4    A.  They need what?

5    Q.  To be invoiced, repaired.

6    A.  Yes, the invoices needed to be made.

7    Q.  And if they weren't invoiced Mr. Issa would not get paid?

8    A.  Correct.

9    Q.  So it was in his interest to at least prepare invoices,

10   correct?

11   A.  Correct.

12   Q.  Now, do you have an understanding as to who the person was

13   who is responsible for the invoicing up in Westchester VMF --

14   I'm sorry, Healey Motors?

15   A.  For Healey Motors, two people.

16   Q.  Who are they?

17   A.  Pam Keil, who is the manager up there; and Mr. Issa's son,

18   Tarik Issa.

19   Q.  And when you had issues concerning the invoices that's who

20   you would talk to, correct?

21   A.  Constantly.

22   Q.  From time to time?

23   A.  Constantly.

24   Q.  And you would tell them get your invoices in, correct?

25   A.  And -- yes.  There is more to that, yes.

ICA5iss1                    Velez - cross

1   Q.  Okay, but you could tell them get your invoices in and some

2   of them are not correct, right?

3   A.  Right.

4   Q.  Now, of the thousands of invoices and car/trucks that

5   Mr. Issa worked on, there was back and forth with respect to at

6   least some of them, correct?

7   A.  Yes.

8   Q.  Now, do you remember how far back, in the post office in

9   connection with Mr. Issa trying to get work, that you learned

10  that he was soliciting work from the post office long before he

11  met you?

12          MS. HANFT:  Objection.

13          MR. BRAFMAN:  I will rephrase the question.

14          THE COURT:  Thank you.

15  BY MR. BRAFMAN:

16  Q.  Can you tell me sir, do you know who Anna Maria Delillo is?

17  A.  Delillo, yes.

18  Q.  Who is she?

19  A.  She was a contracting agent down in Philadelphia CMC.

20  Q.  Did she tell you -- did she and you ever discuss First Star

21  Auto?

22  A.  Yes.

23  Q.  And did you ever see a memo sheet prepared which you saw a

24  copy of?

25  A.  Yes.

ICA5iss1                         Velez - cross

```
 1   Q.  And in the memo, if you recall -- I am going to get the
 2   memo-can I have 3549-02?
 3            Sorry, your Honor.  We are pulling it up on computer
 4   screen, your Honor, for the witness.
 5            THE COURT:  Okay.
 6            MR. BRAFMAN:  Your Honor, I'm going to show it to the
 7   witness, the government, and your Honor.
 8   Q.  I am going to ask you to look at this and then you can tell
 9   me if you need to refresh your recollection, you can refer to
10   it.  All right?  It is 3549-02, only look at it if you need to
11   refresh your recollection.  I will ask you questions and then
12   you tell me whether you need to refresh your recollection.
13            MS. HANFT:  Your Honor, I would ask the first question
14   whether he has seen this before.
15            MR. BRAFMAN:  I'm sorry.
16            MS. HANFT:  Can you ask whether you have seen this
17   before.
18   BY MR. BRAFMAN:
19   Q.  Have you seen this document before?
20   A.  Yes.
21   Q.  Okay.
22            Ms. Delillo, is she a superior person in the post
23   office to where you are?
24   A.  I don't know what her level was at Philadelphia CMC so I
25   couldn't tell you.
```

ICA5iss1                          Velez - cross

1    Q.   Philadelphia CMC is where --

2    A.   Philadelphia, Pennsylvania.

3    Q.   Right.

4    A.   It is a contracting management center.

5    Q.   And every person who wants to do contracting for the post

6    office, these are like contracting officers who sign off on the

7    contract, right?

8    A.   For vehicle maintenance, yes, was down there.

9    Q.   Do you remember being told at or about December of 2011

10   that First Star should be used in the Bronx?

11   A.   Yes.  I put down --

12   Q.   Does it refresh your recollection that you were told that?

13   A.   Yes.

14   Q.   And does it -- and do you need to refresh your

15   recollection, were you told, also, that they charged a lot less

16   for A inspections?

17   A.   Yes.

18   Q.   What is an A inspection?  Part of the PMI?

19   A.   Yes.

20   Q.   And the Philadelphia office was telling you that First Star

21   also charges less for fluids; isn't that correct?

22              MS. HANFT:  Objection.

23              THE COURT:  Ground?

24              MS. HANFT:  He is reading from a document not in

25   evidence and it is hearsay.

ICA5iss1                         Velez - cross

1              MR. BRAFMAN:  I will ask the question rather than --

2              THE COURT:  That's fine, Mr. Brafman.  Go ahead.  Ask

3    the question.

4    BY MR. BRAFMAN:

5    Q.  Were you told that First Star charges less for their

6    fluids, correct?

7    A.  I don't recall at the moment.

8    Q.  Look at the document and see if it refreshes your

9    recollection?

10             THE COURT:  Does reading that document jog your memory

11   that you were told that so that you remember as you sit here

12   today?

13             MR. BRAFMAN:  Do you see where I'm pointing?

14             THE COURT:  Don't do that.

15             Look at the document and see if it jogs your memory

16   about what First Star charged for --

17             THE WITNESS:  Yes.

18   BY MR. BRAFMAN:

19   Q.  It does?  Thank you.

20             First Star was Mr. Issa's company, correct, in 2011?

21   A.  Yes.

22   Q.  And you knew that, right?

23   A.  In December, yes.

24   Q.  And did Ms. Delillo, do you recall being told also that

25   First Star has 16 locations?

ICA5iss1                          Velez – cross

1              MS. HANFT:  Objection.

2              THE COURT:  The objection is sustained.

3              MR. BRAFMAN:  I don't understand.

4              THE COURT:  Don't say "do you recall being told."

5     That's an out-of-court statement.  You can ask him a question,

6     was First Star blah, blah, blah.

7              MR. BRAFMAN:  Okay.

8     BY MR. BRAFMAN:

9     Q.  Did you know that First Star had 16 service locations

10    around the Bronx?

11    A.  I was told that there was but I --

12             THE COURT:  Did you know?  Did you know?

13             THE WITNESS:  I, no.

14             THE COURT:  Okay.

15             THE WITNESS:  No, ma'am.

16    BY MR. BRAFMAN:

17    Q.  Did you understand, in 2011, whether First Star had handled

18    all types of post office vehicles?

19             THE COURT:  Did you have an understanding back then?

20             THE WITNESS:  Yes.

21    BY MR. BRAFMAN:

22    Q.  And we are talking some are LLVs are and some are 7-ton

23    trucks, correct?

24    A.  Yes.

25    Q.  And one of the problems you and the post office had is the

ICA5iss1                        Velez - cross

1    truck couldn't even get into the garage, correct?

2    A.  Correct.

3    Q.  And Mr. Issa had the facility to have that truck back in

4    and be worked on, correct?

5    A.  Yes.

6    Q.  And that was a big draw for Mr. Issa as a contractor,

7    correct?

8    A.  Yes.

9    Q.  Now, did you know also whether or not First Star had the

10   capacity to handle 50 trucks at a time?

11   A.  I wasn't sure if he could do that.

12   Q.  25?

13   A.  Probably about 20, 25.  Yeah.

14   Q.  What other vendor at that time, that you were aware of, had

15   that capacity?

16   A.  There was a place out in Long Island but they were kind of

17   far out.

18   Q.  You would have to drive all the way out to Long Island to

19   get the truck repaired, right?

20   A.  Exit 64, yes.

21   Q.  And if you were trying do that in traffic you could be on

22   there for two or three hours with the truck, right?

23   A.  Yes.

24              (Continued on next page)

25

1    Q.  If you were towing the truck, it would be driving slow?

2    A.  Yes.

3    Q.  And then after it was fixed, you'd have to bring the truck

4    all the way back into Manhattan, correct?

5    A.  We tried that, yes.

6    Q.  It didn't work, right?

7    A.  No.

8    Q.  It was impossible to do it in the same day?

9    A.  I would lose personnel for just about, two people going and

10   two people coming back, probably about six hours.

11   Q.  Just a waste of time?

12   A.  Yes, sir.

13   Q.  Then it was almost impossible, if you had the work done, to

14   fight the traffic in the morning to get it back on time?

15   A.  Correct.

16   Q.  When the truck wasn't back on time, it cost the post office

17   not just money, sometimes mail wasn't delivered, correct?

18   A.  Correct.

19   Q.  All right.  Now, you ever tell the government while you

20   were being debriefed that you're going to go to jail whether

21   you're telling the truth or not?

22   A.  Yes.

23   Q.  So you were frustrated by the knowledge that even if you

24   told the truth, you might go to jail?

25   A.  Yes.

ICAHIss2                          Velez - Cross

1    Q.  And even if you didn't tell the truth, you might go to

2    jail?

3    A.  Yes.

4    Q.  At times you didn't know what to do, correct?

5    A.  I just told the truth.

6    Q.  You told them that you were going to go to jail whether or

7    not you told the truth, correct?

8    A.  I don't remember saying that.

9          MR. BRAFMAN:  Can we show the witness 3500 -- I'm

10   sorry, we marked it.  It's 3549-18, but we're making it as

11   Defense Exhibit 206.

12   Q.  Now, you remember you said before when you were interviewed

13   by the government someone was always taking notes?

14   A.  Yes, sir.

15   Q.  Ultimately, do you know whether those notes were then

16   turned into typed reports?

17   A.  I never saw it, so I don't know.

18   Q.  But to the extent that I'm going to show you something to

19   refresh your recollection, I'm representing to you that we got

20   this from the government, OK?

21   A.  OK, sir.

22   Q.  Now, I want to -- this is just for the witness and the

23   Court.

24          This is marked Defendant's Exhibit 206, which is also

25   3549-18.  Do you remember being interviewed by the government

ICAHIss2                     Velez - Cross

1   in or about January 19, 2017?

2   A.  Yes.

3   Q.  And the interview location was the White Plains maintenance

4   facility, correct?

5           MS. HANFT:  Objection.

6           THE COURT:  I'm sorry.  Ground?

7           MS. HANFT:  He's pointing at the document.  He's

8   essentially reading from a document.

9           THE COURT:  Take the document off the screen.

10          MR. BRAFMAN:  Let me just ask the question.

11          THE COURT:  Yes, that would be really nice if you

12  would just do that.

13  Q.  Mr. Velez, do you recall being interviewed on January 19,

14  2017 --

15  A.  Yes.

16  Q.  -- at White Plains maintenance facility by government

17  agents?

18  A.  Yes.

19  Q.  Do you remember talking to them for quite some time?

20  A.  Yes.

21  Q.  And I'm going to ask you, sir, on that date, did you tell

22  the government that you didn't feel that Healey, meaning Healey

23  Motors, was doing anything wrong?

24  A.  Yes.

25  Q.  Did you tell them that they were fixing the vehicles?

ICAHIss2                       Velez - Cross

1    A.  Yes.

2    Q.  Did you tell them that you feel that you were going to jail

3    whether you tell the truth or not, correct?

4    A.  Yes, I recall now, yes.

5    Q.  Now, did you tell the agents that you confronted Mr. Issa

6    from time to time, and he would correct the work if there was a

7    problem, correct?

8    A.  Yes.

9    Q.  Wasn't that also the familiar procedure with vendors in

10   general if they brought something back and it wasn't fixed

11   properly, that you would talk to them and give them a chance to

12   correct it?

13   A.  Yes.

14   Q.  And from time to time, you talked to Mr. Issa about an

15   invoice or work and you asked him to fix it, and you told the

16   agents he did?

17   A.  Yes.

18   Q.  You also told the agents that when Mr. Issa got his

19   contract from Philadelphia he was the lowest bid?

20   A.  At that time, yes.

21   Q.  There were two other bids submitted for competitive

22   bidding?

23   A.  Yes.

24   Q.  And you helped him through the paperwork, right?

25   A.  I submitted it to Philadelphia.  They choose.  I don't get

ICAHIss2                         Velez - Cross

1    to choose.

2    Q.  So they chose Issa, not you?

3    A.  Right.

4    Q.  Once they had the contract, Philadelphia decided he should

5    get the work if it was available --

6    A.  Yes.

7    Q.  -- and it was needed, correct?

8    A.  Correct.

9    Q.  One of the reasons you wanted him to get a contract was

10   because you wanted him to be able to do the work because no one

11   was helping you do the work?

12   A.  It was difficult up in the Bronx, yes.

13   Q.  Now --

14   A.  But that contract from Manhattan wasn't me.

15            MR. BRAFMAN:  May I have just a minute, your Honor?

16            THE COURT:  Yes.

17   Q.  When you were confronted by the government, did you tell

18   them that you would not accept any shoddy work from Mr. Issa

19   and that he did not do shoddy work?

20   A.  I remember putting that on a statement, yes.

21   Q.  When you said that to them, this was you not yet having

22   your cooperation agreement, correct?

23   A.  Yes.

24   Q.  It was before you had your cooperation agreement, correct?

25   A.  Correct.

ICAHIss2                          Velez - Cross

1    Q.  And it was you being confronted by agents who said, Tell us

2    the truth, correct?

3    A.  Yes.

4    Q.  And at that time you said to them, "I did not accept shoddy

5    work from Mr. Issa, and he didn't give me shoddy work,"

6    correct?

7    A.  Correct.

8    Q.  And you went further.  You said, "I would never accept

9    shoddy work on behalf of the post office; that's not me,"

10   right?

11   A.  That's correct, put on the statement.

12   Q.  But what you put on the statement, it was a statement you

13   signed under oath?

14   A.  No, I didn't -- I didn't swear to anybody.

15   Q.  Did they tell you it might be a crime to talk to a

16   government agent even when you're not under oath, and if you

17   intentionally lie, that that could be a five-year penalty?

18   A.  I don't recall that being told to me, but that's what I

19   wrote down.

20   Q.  They gave you a bunch of rights before they talked to you,

21   right?

22   A.  No.  What I was told was something different.

23   Q.  As a post office employee, you're basically told you had to

24   talk to them?

25   A.  Yes, I spoke to them.

ICAHIss2                        Velez - Cross

1   Q.   Now, did you also tell them that when Mr. Issa worked for

2   you in the Bronx, he was a good fit -- a good fit to keep the

3   vehicles repaired?

4   A.   Up in the Bronx, yes.

5   Q.   Did you tell them that you were not wanting to give him any

6   work until he had a really certified contract from

7   Philadelphia?

8   A.   Yes, I stopped him from work, yes.

9   Q.   And Mr. Issa, instead of bribing you to get work, he went

10  to Philadelphia to get the contract, correct?

11  A.   I don't know what Mr. Issa did.

12  Q.   You know that he went to Philadelphia to get the contract?

13  A.   He --

14  Q.   You walked him through the process, didn't you?

15  A.   No, he can't go to Philadelphia and walk in and get a

16  contract.

17  Q.   I didn't mean it that way it sounded.

18          You know that he submitted paperwork to get a

19  contract?

20  A.   Yes.

21  Q.   And you told him that unless he got the contract, you were

22  not going to give him work?

23  A.   Correct.

24  Q.   And you know that he submitted the contract and he worked

25  on getting the contract for months and months, correct?

ICAHIss2                          Velez - Cross

1    A.  Yes.

2    Q.  And the contract has a packet of information about him that

3    he has to fill out and submit.  You went through it with him,

4    didn't you?

5    A.  I -- once he got the paperwork back from Philadelphia, I

6    didn't go through it with him, no.

7    Q.  OK.  But once he got -- you told him how to get the

8    paperwork from Philadelphia, right?

9    A.  I submitted his name along with two others to Philadelphia.

10   They submitted paperwork to him.  He received it, filled it

11   out, sent it back to them.  I had nothing else to do with it at

12   that time.

13   Q.  How did you know that he was doing this?

14   A.  Because he told me.

15   Q.  Ultimately, you know he was approved, correct?

16   A.  Yes.  I was contacted by the people at Philadelphia CMC,

17   and they sent me a copy through the email showing an -- an

18   attachment showing that he was the vendor at that point that

19   they chose.  At that point, all he needed was my signature for

20   approval.

21   Q.  And you did it?

22   A.  Up in the Bronx, we didn't get that far because we closed

23   the Bronx.

24   Q.  Right.  But eventually when you got to Westchester, he had

25   a contract?

ICAHIss2                    Velez - Cross

1   A.   In Westchester, I had to submit other people as well too,

2   so we had to do the process all over again.

3   Q.   And Mr. Issa went through the process all over again.  He

4   didn't try and shortcut the process, correct?

5   A.   Correct.

6   Q.   And when you say "the process," would it be a fair

7   statement that when you're dealing with the post office or the

8   administrative office, there's a lot of paperwork involved?

9   A.   Yes.

10   Q.   And a lot of people who have to sign off on the paperwork?

11   A.   Yes.

12   Q.   And a lot of different levels of approval before you get

13   your contract?

14   A.   Correct.

15   Q.   You don't have anything to do with that, do you?

16   A.   No.

17   Q.   The people in Philadelphia might call you and ask you about

18   the vendor, but that's about it, correct?

19   A.   Correct.

20   Q.   And when they asked you about Mr. Issa, if they did, you

21   told them you needed Mr. Issa because you had work piled up in

22   the VMF, did you not?

23   A.   I didn't say Mr. Issa.  I needed an approved vendor for the

24   process.

25   Q.   And of the three vendors who were submitted, the other two

ICAHIss2                          Velez - Cross

1    vendors for the bid, the independent three people, they

2    couldn't handle what Mr. Issa could handle, right?

3    A.  I can't say that.

4    Q.  You knew who they were?

5    A.  I knew who they were, but doesn't say that they can't

6    handle the work.

7           MR. SOLOWIEJCZYK:  Your Honor, can we have a moment

8    with defense counsel with something really briefly?  It's going

9    to take two seconds.

10          (Counsel confer)

11   Q.  You told us on direct examination that the first time you

12   got money from Mr. Issa was when you were driving back from the

13   Taconic Parkway after visiting the Healey Motors place,

14   correct?

15   A.  Correct.

16   Q.  Is that true?

17   A.  Yes.

18   Q.  That's the first time you got money from Mr. Issa?

19   A.  Yes.

20   Q.  And when you said that on direct examination, you have a

21   clear recollection of him throwing two $100 bills into your car

22   and then walking back to his car, correct?

23   A.  Correct.

24   Q.  And there's no real conversation with him.  He walks to

25   your car, you think there's something wrong with his car, you

ICAHIss2                        Velez - Cross

1   pull over on the Taconic, he throws two $100 bills into the

2   window, and he leaves, correct?

3   A.  Correct.

4   Q.  And there's no discussion at all as to what the money's

5   for?

6   A.  No.

7   Q.  You had driven up to visit the Healey Motors place and saw

8   the place, correct?

9   A.  That was prior to the money, yes.

10  Q.  But then on the way back, you saw -- he stopped and gave

11  you the money?

12  A.  Yes.

13  Q.  Now, is that the truth as to when was the first time?

14  A.  That's what I recall, yes.

15  Q.  Well, that's what you recall specifically?

16  A.  Yes.

17         MR. BRAFMAN:  All right.  I'm going to ask you to give

18  me, please, Exhibit 201, which is 3549-09.

19  Q.  Remember being -- I'm going to put this up just for the

20  witness and the government.  This is Defense Exhibit 201, and

21  it's also 3549-09.

22         You remember being interviewed, sir, on February 3,

23  2017?

24  A.  Yes.

25  Q.  And this was just one of the many interviews that you had

ICAHIss2                          Velez - Cross

1  with government lawyers, correct?

2  A.  Yes.

3  Q.  Do you remember being told -- and if not, I'll ask to

4  refresh your recollection -- do you remember telling the

5  government that the first time you received money was when you

6  were visiting Manhattan on the mezzanine level.  It was $500

7  and a card when --

8             MS. HANFT:  Objection.

9             THE COURT:  Excuse me.  There's an objection.  What is

10  the objection?

11             MR. BRAFMAN:  I'm not even finished with the question.

12             THE COURT:  Do you remember being told, it's the wrong

13  form.  Object to the form.  Objection sustained.

14  Q.  Do you remember telling the government that the first time

15  you got money from Mr. Issa, it was after you complained about

16  your wife's health, it was $500, and it was in Manhattan?  Do

17  you remember telling them that?

18  A.  I remember telling them that, but that was incorrect.

19  Q.  When you told them that, did you believe it to be true?

20  A.  At that time, yes.

21  Q.  So how did you figure out that it wasn't correct?

22  A.  Because of the amount.

23  Q.  They made you look at your bank statement?

24  A.  They showed me the bank statement, but that had nothing to

25  do about my recollection.

1    Q.  Your recollection now is that the first time was $200?

2    A.  Yes, sir.

3    Q.  And when you told them that you had told him about your

4    wife's health and he gave you $500, did Mr. Issa tell you not

5    to worry about it?

6    A.  Yes.

7    Q.  What was the "it" that he was telling you not to worry

8    about?  Your wife's condition?

9    A.  She'll be fine is what he -- what I recall him telling me,

10   but I don't -- I don't recall if that was before or after.

11   Q.  Why don't you look at page 4 of the document 201 and see if

12   it refreshes your recollection -- on the top paragraph -- if it

13   refreshes your recollection that the first time -- sorry, that

14   Velez told Issa about his wife's health, do you remember

15   telling them that?

16   A.  Yes.

17   Q.  Do you remember telling them that Issa said --

18               MS. HANFT:  Objection.

19               THE COURT:  Objection's sustained.

20               MR. BRAFMAN:  It's in payment of the money.

21               THE COURT:  The objection is sustained.

22   Q.  Was it in the same sentence that you then told them --

23               THE COURT:  The objection is sustained.  Mr. Brafman,

24   move on.

25   Q.  And is that when you got $500 the first time in Manhattan?

ICAHIss2                           Velez - Cross

1    Is that what you told them?

2    A.   That's what I told them, but I don't recall if that was --

3    Q.   Ultimately, they showed you something to refresh your

4    recollection, to make you change your testimony?

5    A.   No, I recall -- all I recalled was when I was coming back

6    from Healey Motors, I didn't recall that again, that $500.

7    Q.   But when you were asked the first time, you said something

8    about a drive from Healey Motors down the Taconic Parkway,

9    money thrown through your window, you never said that to them?

10   A.   Because I didn't remember it.

11   Q.   So you only remembered it here?

12   A.   I remembered it later, afterwards.

13   Q.   Whenever you told the government something and later

14   changed your mind or remembered it differently, they let you

15   change it, right?

16              MS. HANFT:   Objection.

17              THE COURT:   The objections are sustained.   The

18   objection's sustained.

19   Q.   Did you tell the government that Issa was begging you for

20   work?

21   A.   Yes.

22   Q.   And was Issa begging you for work because of expenses he

23   went through in putting mechanics in place up at Healey Motors

24   who were not working?

25              THE COURT:   The objection's sustained.

ICAHIss2                          Velez - Cross

1    Q.  He wasn't begging you for work -- when he was begging you

2    for work, that's when you claim he was paying you?

3    A.  Yes.

4    Q.  So he was paying you to give him work.  Why did he have to

5    beg.  That was supposed to be the deal, money for work?

6               MS. HANFT:  Objection.

7               THE COURT:  The objection's sustained.

8               MR. BRAFMAN:  Your Honor, we need to talk.

9               THE COURT:  The objection's sustained.  Move on.

10              MR. BRAFMAN:  I can't.

11              THE COURT:  Well, then you're done.  Then sit down.

12              MR. BRAFMAN:  I'm not done.

13   Q.  How many hours did these -- on a regular basis did these

14   proffer sessions take with the government from time to time?

15   A.  Can you repeat that again.

16   Q.  These interviews that you had with the government

17   approximately 15 times, you said, how many hours did each of

18   them take?

19   A.  Sometimes two hours; sometimes three hours.

20   Q.  And so in total, if it's two or three hours, you've been

21   debriefed by them for 30 hours, would that be a fair -- at

22   least 30 hours?

23   A.  Maybe.

24   Q.  Maybe more?

25   A.  Maybe somewhere in that neighborhood.

ICAHIss2                    Velez - Cross

1    Q.  In those 30 hours or 35 hours, you're talking about the

2    same stuff you testified to in this courtroom for about a total

3    of two hours, correct?

4    A.  Maybe, yeah.

5    Q.  And were they making you -- excuse me.  Were they giving

6    you suggestions about your testimony at any time?

7    A.  No, they just showed me just whatever -- whatever -- they

8    asked the questions, and I would answer the questions.

9    Q.  And if the answer was something that either they didn't

10   expect or didn't like, they would show you something to remind

11   you that you were wrong, right?

12   A.  I don't recall that.  I don't recall them showing me

13   documentation to --

14   Q.  Then how would it work?

15   A.  They would ask me questions.  I give them the answers.

16   They would write down my responses.

17   Q.  You told us on direct examination that when you were in

18   Florida, Mr. Issa paid for you to have prostitute services, is

19   that correct?

20   A.  It was one of the dancers in the place, yes.

21   Q.  OK.  And you are telling this jury that that was, in your

22   mind, part of the bribe?

23   A.  To keep me happy, yeah.

24   Q.  But it was a bunch of guys out drinking.  You were a heavy

25   drinker at the time, and you were at a strip club, right?

ICAHIss2                        Velez – Cross

```
 1   A.   Yes.

 2   Q.   And stuff happens at strip clubs, right?

 3   A.   Yes.

 4   Q.   And when they took you there, you didn't say, "Hey, I'm not

 5   going to a strip club."  You went willingly, right?

 6   A.   Yes.

 7   Q.   In fact, whether you didn't go with Mr. Issa, in the Bronx

 8   you visited strip clubs and hookers regularly, didn't you?

 9             MS. HANFT:  Objection.

10             THE COURT:  Objection's sustained.

11   Q.   Didn't you tell the government that in the Bronx you had

12   gone to strip clubs and used prostitutes on a regular basis?

13             MS. HANFT:  Objection.

14             THE COURT:  The objection's sustained.

15             OK.  Let's take a morning break.  Don't discuss the

16   case.  Keep an open mind.

17             Sir, you can go out into the hall.

18             (Jury excused)

19             (Continued on next page)

20

21

22

23

24

25
```

ICAHIss2                          Velez - Cross

1           (Jury not present)

2           MR. BRAFMAN:  Your Honor, can I be briefly heard?

3           THE COURT:  As soon as the witness leaves, I was

4   expecting you to speak.  You can be briefly heard, the

5   government can be briefly heard, and I will be briefly heard.

6           MR. BRAFMAN:  Your Honor, most respectfully, in my

7   judgment, you are preventing me from putting in evidence that

8   goes to the heart of Mr. Issa's defense.

9           THE COURT:  His defense is intent, and this witness

10  cannot say what's in Mr. Issa's head, and I will not allow this

11  witness to do that.

12          MR. BRAFMAN:  I'm not asking this witness to do that.

13          THE COURT:  Yes, you are.

14          MR. BRAFMAN:  I think you ultimately will charge --

15          THE COURT:  Yes, you are.

16          MR. BRAFMAN:  I think you ultimately will charge,

17  respectfully, that if they believe that the money was paid to

18  generate goodwill, it may not be bribery.

19          THE COURT:  I don't have that in my draft charge.

20          MR. BRAFMAN:  Well, I think you should, and I'll give

21  it to you again because it's in the *Silver* reversal by the

22  Second Circuit, and that's the rule right now.

23          Second, I will ask your Honor to understand that if I

24  give a public official a present because I'm a nice guy and

25  we're friends, because he tells me that his wife needs an

ICAHIss2                          Velez – Cross

 1  operation, and that's why I give him the money, the jury has a

 2  right to take that into consideration to determine whether my

 3  client gave this money with a specific intent to corrupt or was

 4  he being a nice person?

 5          THE COURT:  The problem is he can't testify that your

 6  client was just being a nice person.

 7          MR. BRAFMAN:  But he --

 8          THE COURT:  Your client might be able to so testify,

 9  but he can't.

10          MR. BRAFMAN:  But your Honor --

11          THE COURT:  And that's the question where I drew the

12  line.

13          MR. BRAFMAN:  But he can testify to acts of kindness

14  unrelated to the job that my client performed so that I can ask

15  the jury to in- --

16          THE COURT:  He has testified to those acts, and you

17  want him to testify that your client was doing it because your

18  client felt sorry for him and he was a nice guy, and he can't

19  give that testimony.

20          MR. BRAFMAN:  I won't give that question to him.

21          THE COURT:  Well, that was the question you asked,

22  Mr. Brafman.

23          MR. BRAFMAN:  Yes.  But, Judge, you are stopping me

24  from asking him whether or not he told Mr. Issa about his

25  wife's problems, his daughter's problems, his house problems,

ICAHIss2                          Velez - Cross

1    and this is very similar, your Honor, to the testimony that you

2    admitted, after some struggle --

3              THE COURT:  Because --

4              MR. BRAFMAN:  -- with Mr. Blight.

5              THE COURT:  Because the government wasn't objecting.

6              MR. BRAFMAN:  But, your Honor, it's the right -- it's

7    testimony the jury has a right to hear.  My client doesn't fix

8    his teeth because he's a stranger and he wants to fix the teeth

9    so he'll give him a PMI.

10             THE COURT:  The only person who can testify to that,

11   unfortunately, is your client.

12             MR. BRAFMAN:  No, but I may argue.

13             THE COURT:  You can argue it.

14             MR. BRAFMAN:  But how can I argue it if it's not in

15   the record?

16             THE COURT:  You want him to say he was --

17             MR. BRAFMAN:  No.

18             THE COURT:  I listened to your question.

19             MR. BRAFMAN:  You cut me off when I asked whether or

20   not he told my client that his wife had a back condition.  You

21   stopped me.  He never answered that question.

22             THE COURT:  You've now told the jury at least twice.

23             MR. BRAFMAN:  No, I haven't told them.

24             THE COURT:  Excuse me.  It is in evidence that he was

25   told about the back condition.

1            MR. BRAFMAN:  It was objection sustained.

2            THE COURT:  And you go on -- it was not objection

3    sustained in every instance, but you go on and you -- the way

4    you ask the question isn't just, "Didn't he tell you his wife

5    had a bad back?"  It's "And he told you his wife had a bad back

6    because he was a really nice guy and you were his friend,

7    right?"  That's the question you asked, and that question is

8    improper.  And I am sorry.  I will make the same ruling if you

9    ask the question in that way every single time.

10           MR. BRAFMAN:  But there are a litany of sad facts that

11   he told Mr. Issa.

12           THE COURT:  Fine.  Then you elicit them by saying:

13   And did you tell Mr. Issa X, and did you tell Mr. Issa Y?  Did

14   you tell Mr. Issa Z?  And say nothing more.

15           MR. BRAFMAN:  Fine.

16           THE COURT:  Because the minute you try to put him into

17   Mr. Issa's head, I'm going to pick him up and take him right

18   back out, OK?

19           MR. BRAFMAN:  Well, it's not OK, but I accept your

20   ruling.

21           THE COURT:  It all has to do, Mr. Brafman, with the

22   form of the question, because the questions you asked in the

23   form you asked them were irrelevant.  But if you want to elicit

24   that he told your client X, that he told your client Y, and he

25   told your client Z, and then you want to argue to the jury that

ICAHIss2                          Velez - Cross

1    that must have been the reason that Mr. Issa gave him the

2    money, you go right ahead.

3              MR. BRAFMAN:  May I take --

4              THE COURT:  But just don't make a big argumentative

5    to-do about how Mr. -- I've heard you say 15 times this morning

6    what a nice guy Mr. Issa must be.  No, save it for the end.

7    That's not a proper question.  Save it for the end.

8              MR. BRAFMAN:  May we have five minutes, Judge?

9              THE COURT:  I need five minutes.

10             (Recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICAHIss2                              Velez - Cross

1           (Jury present)

2                THE COURT:  OK.  Where's the witness?

3                MR. SOLOWIEJCZYK:  Sorry, Judge.

4                THE COURT:  He kind of is a necessary person.

5                THE LAW CLERK:  Takes seats, please.

6                THE COURT:  Come on up, sir.  You're still under oath.

7      BY MR. BRAFMAN:

8      Q.  Mr. Velez, please listen carefully to these questions and

9      just answer yes or no, OK, if you can.

10     A.  OK.

11     Q.  When you were having dinner or talking to Mr. Issa, did you

12     tell him that your wife had back surgery?

13     A.  Yes.

14     Q.  Was that true?

15     A.  Yes.

16     Q.  Did you tell him that your wife was in constant pain

17     despite the surgery?

18     A.  Yes.

19     Q.  Was that true?

20     A.  Yes.

21     Q.  Did you tell him that your wife had to leave work because

22     of her back pain?

23     A.  Yes.

24     Q.  Did you tell him that your wife needed more surgery?

25     A.  Yes.

ICAHIss2                          Velez - Cross

1   Q.  Did you tell him that you were having marital troubles,

2   leave it at that, at that time?

3   A.  Somewhat.

4   Q.  Did you tell him even that your daughter had financial

5   needs for school?

6   A.  Yes.

7   Q.  Did you tell him that your daughter was very depressed

8   because her pet died?

9   A.  Yes.

10  Q.  Did you tell him that your wife was on disability?

11  A.  Yes.

12  Q.  Did you tell him that you were in the process of buying a

13  house because you had to move out of the apartment?

14  A.  Yes.

15  Q.  Now I want you to listen carefully to the question.  In

16  your own mind, when you were saying these things, in your own

17  mind -- can I finish the question before you stand?

18          THE COURT:  You may, and then I'll sustain the

19  objection on relevance grounds.  So if you want to waste your

20  time asking the question, go right ahead.

21  Q.  In your own mind, were you telling Mr. Issa these things as

22  a friend?

23          MS. HANFT:  Objection.

24          THE COURT:  The objection's sustained.  It's

25  irrelevant.  Move on, please.

ICAHIss2                          Velez - Cross

1   Q.   Would it be a fair statement that from time to time you,

2   Mr. Velez, demanded more money from Mr. Issa?

3   A.   Yes.

4   Q.   That it went up and up and up, and these were always your

5   demands, correct?

6   A.   Yes.

7   Q.   Did you tell him when you were demanding more work that if

8   he didn't comply with your demands, you would shut him down?

9   A.   Yes.

10  Q.   And you had the capacity to shut him down, correct?

11  A.   Yes, I could, yeah.

12  Q.   Put him out of business?

13  A.   I don't know about putting him out of business, but --

14  Q.   Cost him a lot of money?

15  A.   You need to do the work.

16  Q.   Well, when you said I'm going to shut you down unless you

17  pay me, what did you mean by "shut him down"?

18  A.   Not unless you pay me, that's not accurate.

19  Q.   OK.  So you asked him for more money, right?

20  A.   I asked him for more money because I needed it for my home.

21  Q.   There were times when you and he had arguments, correct?

22  A.   Yes.

23  Q.   And in those arguments, you threatened to shut him down?

24  A.   He also threatened to shut me down.

25            THE COURT:  But that wasn't the question.  Did you

ICAHIss2                              Velez - Cross

1   threaten to shut him down, yes or no?

2           THE WITNESS:  Yes.

3   Q.  When you meant that, you meant that as a business shut it

4   down, right?

5   A.  As a business, no.

6   Q.  Shut down his business?

7   A.  No.

8   Q.  Shut him down?

9   A.  Meant cut him off from the post office.

10  Q.  So if he doesn't pay you, in those arguments, shut him

11  down?

12  A.  No, not if he doesn't pay me, no.

13  Q.  Wasn't that the argument you had?  I want more money.  I

14  want more money, right, you would say that?

15  A.  Incorrect, no.

16  Q.  You would say that over and over again?

17  A.  No.

18  Q.  Didn't you demand more money again and again?

19  A.  I demanded more money because I needed more money for my

20  home, but not because of that.  I wasn't demanding money in

21  order to shut him down.  I never said that.

22  Q.  You never said it in the same sentence, right?

23  A.  Not for that, no.  Shut him down because he wasn't

24  performing the work, right.

25  Q.  Is that what you said?

ICAHIss2                          Velez - Cross

1    A.   Yeah.

2    Q.   And then you would demand more money?

3    A.   No, only when I needed it.

4    Q.   When you needed it?

5    A.   Only when I needed to take care of home, my home issues,

6    yeah.

7    Q.   So you went to Mr. Issa when you needed more money?

8    A.   Yes.

9    Q.   And you would ask him and sometimes demand it, let's move

10   on, but that's true, correct?

11   A.   I would ask him for more money, yes.

12   Q.   But you would sometimes demand?

13   A.   I'd ask him for money.  I didn't demand anything.  It's up

14   to him to give me the money or not.

15   Q.   Now, in 2015 were you trying -- were you in contact with

16   the Philadelphia office to try and get Mr. Issa a contract?

17   A.   Yeah, I believe so.

18   Q.   And what is USAC?

19   A.   USAC, United States Auto Club.

20            MR. BRAFMAN:  Now can we put 228 on the screen,

21   please.

22   Q.   This is Exhibit 228.  Look at it and tell me if you -- read

23   it to yourself and tell me if you recognize this as a series of

24   emails that was sent on or about February 20, 2015, between

25   you, Mr. Issa, and Michael Hayden.

ICAHIss2                          Velez - Cross

1  A.  Can you bring it down a little bit.  No, down.  There you

2  go.

3  Q.  May I bring it up now?

4  A.  Yes.

5  Q.  Do you recognize them as emails you received or sent during

6  that time?

7  A.  Yes.

8          MR. BRAFMAN:  Your Honor, I offer them into evidence.

9          MS. HANFT:  Your Honor, we object.

10          THE COURT:  Ground?

11          MS. HANFT:  On hearsay grounds.

12          THE COURT:  I'm sorry?

13          MS. HANFT:  On hearsay grounds.

14          THE COURT:  Objection's sustained.

15  BY MR. BRAFMAN:

16  Q.  Was Michael Hayden a post office employee?

17  A.  Yes.

18  Q.  What was his job?

19  A.  He worked in Philadelphia CMC.

20  Q.  Were there times when Philadelphia CMC and you and vendors,

21  did they communicate by email?

22  A.  Yes.

23  Q.  Was this in the ordinary course of business for CMC to

24  communicate with people who worked for the post office and with

25  vendors who worked for the post office on a regular basis?

ICAHIss2                          Velez - Cross

1   A.  Yes.

2   Q.  And were these emails prepared by people who were

3   authorized to prepare them on behalf of the post office?

4   A.  Yes.

5   Q.  And they're supposed to be prepared in an accurate fashion?

6   A.  Yes.

7           MR. BRAFMAN:  Your Honor, I offer this in as a

8   business record.

9           MS. HANFT:  We still object, your Honor.  This is not

10  a business record.  It's an email.

11          THE COURT:  The objection's sustained.

12  Q.  Mr. Velez, did you know whether Mr. Issa had prepared a bid

13  package for Westchester?

14  A.  For vehicle repairs, yes.

15  Q.  Who is San Mateo?

16  A.  San Mateo is the -- is an office that does the payment

17  for -- payment for the USAC system.  So when a vehicle is

18  towed, there's an invoice created.  It's submitted from Duploy

19  to USAC, to United States Auto Club.  They would then submit it

20  for verification to -- back to the VMF.  From the VMF, it's

21  verified then sent forth to San Mateo who's an office for

22  payment in the post office.

23  Q.  Before Mr. Issa made a dime on that invoice, it would go

24  through this process?

25  A.  Yes.

ICAHIss2                      Velez - Cross

1  Q.  Were you being told -- in February 2015 did you understand

2  that the way invoices were going to be supplied for payment or

3  submitted for payment was going to change?

4  A.  Yes.

5  Q.  And how was it going to change?

6  A.  There was a confusion on the payment arrangement with USAC

7  and San Mateo.  They couldn't verify information between the

8  two offices, so they were going to come up with a new idea to

9  make it easier for payment to be made.

10  Q.  Until that new idea was implemented, it was sent out to all

11  the VMFs, no invoices were going to be paid, correct?

12  A.  Correct.

13  Q.  So there was delay in the processing of invoices on

14  occasion by the post office that had nothing to do with

15  Mr. Issa, correct?

16  A.  Correct.

17  Q.  Do you know how many months went by at times before

18  Mr. Issa's companies got paid at all?

19  A.  Sometimes three months.

20  Q.  Would he constantly tell you that this is wrong.  I'm doing

21  the work.  I got to make payroll, and I'm not getting paid?

22  A.  Yes.

23  Q.  And then would you share those complaints if they were made

24  with Philadelphia or with the payment people?

25  A.  Yes.

ICAHIss2                        Velez - Cross

1    Q.  And they were behind, would that be a fair statement?

2    A.  They were still working on the process.

3    Q.  Until the process was resolved and the kinks out of the

4    system, no one was getting paid?

5    A.  Correct.

6    Q.  Were you getting your salary every week?

7    A.  From the post office, yes.

8    Q.  Now, from time to time did Mr. Issa email you for help

9    because he was not getting enough work?

10   A.  Can you repeat that again.  Sorry.

11   Q.  Were there some times -- you know, this difficulty that

12   Mr. Issa had when he opened Healey and then he was not getting

13   enough work, he would not only bring it to your attention but

14   to Philadelphia as well, correct?

15            MS. HANFT:  Objection as to form.

16            THE COURT:  The objection's sustained.

17   Q.  Did you have email correspondence with Mr. Issa during this

18   period when he was begging you for work in writing?

19            MS. HANFT:  Objection.

20            THE COURT:  The objection's sustained.

21   Q.  I want to show you what's been marked for identification as

22   Defendant's Exhibit 208.  This is an email exchange just

23   between you and Mr. Issa on May 18.  Please look at it and tell

24   me if you remember getting this email.

25            Have you read it, sir?

ICAHIss2                           Velez - Cross

1   A.  Not yet.

2           Yes, I remember this.

3   Q.  This is in May 18, 2016, correct?

4   A.  Yes.

5   Q.  During a period when you claimed to be getting money from

6   Mr. Issa?

7   A.  Yes.

8   Q.  Money for work, correct?

9   A.  Uh-huh, yes.

10  Q.  This is correspondence between just you and Mr. Issa,

11  correct?

12  A.  Correct.

13          MR. BRAFMAN:  Your Honor, I offer this into evidence

14  under 806.  I offer it into evidence as nonhearsay.

15          MS. HANFT:  We object, your Honor.

16          THE COURT:  Can somebody hand me a copy of the

17  document, please.

18          MR. BRAFMAN:  Yes, ma'am, I'll bring it up.

19          THE COURT:  Sorry, folks.

20          The objection's sustained.

21  BY MR. BRAFMAN:

22  Q.  Mr. Issa, did you tell this jury under oath that you were

23  getting money from Mr. Issa for sending him work?

24  A.  Yes.

25  Q.  Did you tell them that this continued on until -- in

ICAHIss2                          Velez – Cross

1    May 2016?

2    A.  Till May of 2016?

3    Q.  During the period May of 2016, is it your testimony that

4    you were still getting money from Mr. Issa for giving him work?

5    A.  Yes.

6    Q.  And you were getting a lot of money during that period.  It

7    had gone up to $1,500 a week you testified to, correct?

8    A.  Yes.

9    Q.  During this period, I am asking you, did Mr. Issa ever

10   complain to you that he was not getting any work?

11   A.  Yes.

12   Q.  Was there correspondence between you and Mr. Issa's company

13   where you were trying to explain why sometimes they were not

14   getting paid?

15   A.  Probably, yes.

16   Q.  Were you telling them often that they were not getting paid

17   having nothing to do with the quality of the work, but that

18   they were not getting paid because of problems with the post

19   office?

20           MS. HANFT:  Objection.  Hearsay and form, your Honor.

21           THE COURT:  Form, yes.

22           MR. BRAFMAN:  I'll withdraw as to form.

23   Q.  Did you say to Mr. Issa or people who are working at his

24   company that the payments were being delayed because of issues

25   with the post office?

ICAHIss2                        Velez - Cross

1   A.  There's more than one answer, but yes.

2   Q.  Did you say that on occasion?  We'll get to the other

3   reasons.

4   A.  Yes.

5   Q.  Did you say that?

6   A.  Yes.

7   Q.  Was it true when you said it?

8   A.  Yes.

9   Q.  Were there difficulties in terms of the contract date with

10  the SEAM system?

11  A.  Not the SEAM system.  It was more -- it was something else.

12  Q.  Tell us what it was.

13  A.  The post offices a lot of times were -- postmasters were

14  being switched around in offices.  I had 167 offices up there,

15  and postmasters would either retire, someone new would come in.

16  If the invoices weren't coming in with the trucks at the time

17  that they were repaired, the new postmaster would come in and

18  say, "I don't know anything about this," and they wouldn't pay

19  the bill.  They had the opportunity of paying their own bills

20  with a system called Voyager card, and there was a lot of

21  issues with that because, again, the invoices weren't going

22  with the trucks.  They were sometimes two, three weeks late.

23          And when they were switching people around, remember,

24  there's 167 post offices, and there's constant movement between

25  the postmasters up there.  The new person coming into an office

1    would not pay the bill because they didn't know anything about

2    it.  So there was a lot of issues there.

3    Q.  Was part of the delay occasioned because of the staffing

4    changes in the post office?

5    A.  Yes, a lot of it.

6    Q.  A lot of it.  Thank you.

7          So with 167 people moving in and out, there was room

8    for confusion?

9    A.  Yes.

10   Q.  And sometimes did you ever use the expression when talking

11   about the post office that sometimes the right hand and the

12   left hand didn't talk to each other?

13   A.  Correct.

14   Q.  And is that true?

15   A.  That's true.

16   Q.  And it became part of your frustration, forget about

17   Mr. Issa's position.  Your own frustration was sometimes the

18   right hand in the post office wasn't really listening or

19   talking to the left hand, right?

20   A.  Correct.

21   Q.  Now, you know who Mr. Radakovitz is, Steve Radakovitz?

22   A.  Radakovitz.

23   Q.  I'm sorry, Radakovitz.

24   A.  Steve Radakovitz, yes.

25   Q.  Who is he?

ICAHIss2                        Velez - Cross

1   A.  He's the manager of operations up in Westchester.

2   Q.  Is he above you in terms of level?

3   A.  He was my boss.  He was the one that hired me up in

4   Westchester in the very beginning.

5   Q.  Were you part of a meeting with Mr. Issa going to meet with

6   Mr. Radakovitz?

7   A.  Mr. Radakovitz and the district manager as well.

8   Q.  Who is the district manager?

9   A.  I don't recall his name.

10  Q.  Mr. Conti?

11  A.  Mr. Conti, yes.

12  Q.  And Mr. Conti was who?

13  A.  He was the district manager.  He was in charge of the whole

14  district.  He was the top boss up there.

15  Q.  So it was Conti, Radakovitz, and then somewhere on the next

16  line you fit in, right?

17  A.  Yes.

18  Q.  And the purpose of the meeting, if you recall, was for

19  Mr. Issa to introduce himself and explain his capabilities in

20  getting work done, correct?

21  A.  Correct.

22  Q.  And they met with him and you were there, correct?

23  A.  Yes.

24  Q.  And without telling us what was said by these people, was

25  it a favorable meeting?

ICAHIss2                         Velez - Cross

1    A.  Yes.

2    Q.  Favorable to Mr. Issa?

3    A.  To both sides.

4    Q.  And he was providing the post office with a service that

5    they desperately needed, correct?

6    A.  That I needed, yes.

7    Q.  That you needed.

8           And you needed their approval to use him, correct?

9    A.  I didn't set up the meeting, but I was there.

10   Q.  And you were happy that they approved him, correct?

11   A.  Yes.

12   Q.  Because they needed the work?

13   A.  Yes.

14   Q.  And you needed the work?

15   A.  I needed the vendor to do the work.

16   Q.  Mr. Issa was telling them how capable he is and he

17   described the nature of his operation and the size, correct?

18   A.  Correct.

19   Q.  Thank you.

20          Did Mr. Issa maintain a low profile during the period

21   he was with you, if you know what I mean, or was he an out and

22   about guy?

23          MS. HANFT:  Objection.

24          THE COURT:  The objection's sustained.

25   Q.  Well, did Mr. Issa, like, lobby the post office on a

ICAHIss2                         Velez - Cross

1    regular basis to give him work?

2             MS. HANFT:  Objection.

3             THE COURT:  The objection's sustained.

4    Q.  Were you aware of Mr. Issa inviting the whole post office

5    hierarchy on a boat ride that he underwrote?

6             MS. HANFT:  Objection.

7             THE COURT:  Ground.

8             MS. HANFT:  Relevance.

9             MR. BRAFMAN:  It's very relevant, your Honor.  Is it

10   overruled?

11            THE COURT:  It's overruled.  Just go ahead.

12   Q.  Were you aware of the boat ride?

13   A.  The what ride?

14   Q.  Boat ride that Mr. Issa organized for --

15            THE COURT:  Well, no.  Are you aware whether, because

16   there's no evidence that he did.

17   Q.  Are you aware of the boat ride that Mr. Issa organized

18   for --

19            THE COURT:  No, the objection to the form is -- do you

20   know anything about a boat ride with postal officials?

21            THE WITNESS:  I heard about a boat ride.

22            THE COURT:  You heard about it.

23   Q.  Did you also see documentation?

24   A.  I don't recall.

25   Q.  I'm going to show you a copy of an email marked 231 for

ICAHIss2                          Velez - Cross

1    identification.  It's an email flyer addressed to you.

2              You see your name up on top?  That's copied.

3    A.  Yes.

4    Q.  Does this refresh your recollection that there was a boat

5    ride in June of 2014 for the post office that you became aware

6    of?

7              MS. HANFT:  Objection.

8              THE COURT:  The objection's overruled.

9    Q.  Does it refresh your recollection?

10             THE COURT:  Does it jog your memory, sir?

11   A.  So many documents, I don't remember.

12   Q.  Didn't you tell the government about this?

13   A.  No.

14   Q.  Never?

15   A.  I don't remember telling them anything.

16   Q.  You sure?

17   A.  I don't remember, no.

18   Q.  Well --

19   A.  I don't remember this.

20   Q.  What is the NY PCC?

21   A.  That's the gathering of the managers and hierarchy in New

22   York with the vendors from New York where they get together and

23   meet and try to -- vendors try to sell their services, and post

24   office also -- the personnel try to, you know, see what's

25   available for their post offices.  So it's a meet-and-greet and

ICAHIss2                          Velez - Cross

1   stuff like that.

2   Q.  Were you invited on this?

3   A.  I was told about it, but I didn't go.

4   Q.  OK.  But you know people who went?

5   A.  I don't recall.

6   Q.  Who is it available to?  Not people who deliver the mail;

7   managers, right?

8           MS. HANFT:  Objection.

9           THE COURT:  The objection's sustained.  Move on,

10  please.

11  Q.  Now, you testified on direct examination about certain

12  charges that Mr. Issa made on the invoices that, in your

13  judgment, were not appropriate?

14  A.  Correct.

15  Q.  Were you telling this jury that this was a manner of which

16  he was stealing from the post office?

17          MS. HANFT:  Objection.

18          THE COURT:  The objection's sustained.  It's

19  argumentative.

20  Q.  What was your understanding of, when you testified about

21  that, what was going on?  That he was trying to get something

22  for nothing?

23          MS. HANFT:  Objection.

24          THE COURT:  The objection's sustained.  It's

25  argumentative.

ICAHIss2                          Velez - Cross

1    Q.  Mr. Velez, isn't it true that on a regular basis Mr. Issa's

2    office sent you emails telling you that they had been paid

3    twice for the same invoice and crediting the post office?

4    A.  I don't recall that.  We had to bring it up to him.

5    Q.  Who was Mike Barton?

6    A.  Who?

7    Q.  Mike Barton?

8    A.  Don't know.

9    Q.  Well, let me show you what's marked for identification --

10   A.  He wasn't in my office.  I don't know.

11   Q.  Let me show you what's marked for identification as

12   Defendant's Exhibit 213.  If you could look at it, sir.

13            THE COURT:  I'd appreciate it if you give me a copy of

14   these.  I'm having a hard time with my screen.

15            MR. BRAFMAN:  Yes.  May I give the witness a copy?

16            THE COURT:  That would be great.  It's easier to read.

17            (Continued on next page)

18

19

20

21

22

23

24

25

ICA5iss3                         Velez – cross

BY MR. BRAFMAN:

Q.  It refers to an e-mail below which I --

            MS. HANFT:  Objection, your Honor.

            THE COURT:  I think I have a portion of an exhibit,
one page.

            MR. BRAFMAN:  Yes, your Honor.  I'm sorry.

            THE COURT:  It is, like, the back page.  Oh, a lot
more pages.  Well, the objection sustained as to this exhibit
of multiple e-mails.  No.

            MR. BRAFMAN:  Your Honor, one of the charges in the
indictment --

            THE COURT:  I'm aware of what all the charges in the
indictment are.  I'm well aware of what the charges in the
indictment are.  This is a bulk of e-mails, handwriting all
over one of the pages.  Sorry.

            MR. BRAFMAN:  I will give you one that is not marked,
Judge.

            THE COURT:  This is an exhibit.  One exhibit, right?
213?  The objection to introducing the Exhibit 213 is
sustained.

            MR. BRAFMAN:  I would like to separate it and just
give him the first part that has a statement by Mr. Velez.

            MS. HANFT:  Objection, your Honor.

            THE COURT:  Hang on.

            MR. BRAFMAN:  The first page.

ICA5iss3                          Velez - cross

1            THE COURT:  What page are you looking at?

2            MR. BRAFMAN:  The one that has the no. 213 on it, the

3  exhibit number, it is a statement by Mr. Velez in the middle.

4            THE COURT:  Fine, yes.  You want to show that to him,

5  you don't want to introduce it because he is on the stand.  You

6  want to show it to him to see if it jogs his memory because he

7  says he didn't remember any of that, right?

8  BY MR. BRAFMAN:

9  Q.  Yes.

10           I show you Exhibit 213, read it to yourself and then

11  let me ask you a question.  Did you read it?

12  A.  Yes.

13  Q.  Does it refresh your recollection that from time to time

14  Mr. Issa's company --

15           MS. HANFT:  Objection.

16           THE COURT:  The objection is overruled.

17           MS. HANFT:  Your Honor.

18           THE COURT:  To intent.  Goes to intent.

19           MS. HANFT:  But my issue, your Honor, is just if

20  Mr. Brafman could first ask whether it refreshes his

21  recollection before he says he believes what it says.

22           THE COURT:  That is a ridiculous objection, Ms. Hanft.

23  Please.  The objection is overruled.

24           Go ahead, Mr. Brafman.

25           MR. BRAFMAN:  Thank you.

ICA5iss3                    Velez - cross

1   BY MR. BRAFMAN:

2   Q.   Does it refresh your recollection that from time to time

3   Mr. Issa or people in his company sent you e-mails to notify

4   you that they had received double payment for the same invoice

5   from the post office?

6   A.   This refreshes my recollection of Daniella Silva.

7   Q.   That's his wife, right?

8   A.   Correct.

9   Q.   She's running the office, right?

10  A.   I recall her telling me about receiving double payment.  I

11  don't recall anybody else telling me that.

12  Q.   Okay.

13          THE COURT:  Okay.

14  Q.   On behalf of Healey, right?

15  A.   This is not Healey, this is Duploy.

16  Q.   Okay, but it is not Daniella getting the money, it is

17  Duploy, Mr. Issa's company, correct?

18  A.   Correct.

19  Q.   And she is telling you they got double payment for

20  invoices?

21  A.   Yes.

22  Q.   And your response is "thank you for your honesty," correct?

23  A.   Yes.

24  Q.   Now, that's not the only time this happened; is that

25  correct?

ICA5iss3                    Velez - cross

1   A.   It's happened a bunch of times.   Daniella would make the --

2   she would send e-mails and let me know that we got double paid.

3   She would deal with my clerk Celine Martin and they would fix

4   it.

5   Q.   By fixing it the post office would get the money back,

6   right?

7   A.   Would get credit, yes.

8   Q.   So it was Issa's company who brought these mistakes in

9   favor of the post office to your attention, correct?

10  A.   One department, yes.

11  Q.   Excuse me?

12  A.   One department.

13  Q.   That's the department that handles this kind of stuff,

14  right?

15  A.   No.

16  Q.   Who did they send it to?

17  A.   This was from Duploy.

18  Q.   Okay.

19  A.   Duploy is a towing service.

20  Q.   Now, Duploy was doing a lot of work for the post office,

21  right.

22  A.   Towing vehicles for us, back and forth, yes.

23  Q.   So, any time a post office vehicle broke down, whether it

24  was a small car or a truck, they would go out and pull it to

25  the repair shop?

ICA5iss3                      Velez - cross

A.   Not accurate, because Healey had their own tow truck.

Q.   So somebody would go out and get the truck on behalf of

Mr. Issa.  You testified to that already, right?

A.   Yes.

Q.   And one of his companies would then bill the post office,

right?

A.   Two different operations here.  We can't confuse them both.

Q.   Don't confuse them.

        When the truck was towed he had a right to get paid,

correct?  Yes or no.

A.   From the post office that they towed it from, yes.

Q.   Okay.

A.   They would pay them with Voyager.

Q.   So some post office was supposed to pay them, right?

A.   You are confusing the whole process here.

Q.   Do you know why they were telling you that they were paid

twice?

A.   This is a different department.  This has nothing to do

with vehicles breaking down.  This is Duploy.  This is -- we

are going to USAC that went to San Mateo.  They also verified

there was double payments.  This is that.

Q.   Okay.  And then when Mr. Issa's company told you there was

double payments, the post office took a credit for that,

correct?

A.   That was Duploy, yes.

ICA5iss3                        Velez - cross

1   Q.  Now, I want to show you 215 for identification, which is

2   another set of invoices; 215, 216, 217 and 218.  I'm going to

3   put it on the screen so the government, Court, and witness can

4   see it, your Honor.

5            Who is Julie Lopez?

6   A.  She was an employee down at Manhattan VMF.

7   Q.  What was she involved with?  Payment?

8   A.  She was a supervisor down there.  I don't know what she was

9   involved with.

10  Q.  You know who she is, right?

11  A.  I know who she is but I don't know what she was involved

12  in.

13  Q.  I want you to look at 215, look at it for yourself, 216 --

14  I'm sorry -- 217, and 218.

15           MS. HANFT:  Your Honor, we object.  This witness has

16  not established a failure of recollection.  It is not clear

17  what Mr. Brafman --

18           MR. BRAFMAN:  I'm about to ask him a question.

19           THE COURT:  Can you please wait until there is a

20  question on the floor before you object?

21           MS. HANFT:  Yes, your Honor.

22  BY MR. BRAFMAN:

23  Q.  Do you remember whether or not the fact that the Issa

24  company was submitting double-billing areas to the post office

25  was something that recurred where they were telling the post

ICA5iss3                          Velez - cross

1    office that they were getting double payments?

2              MS. HANFT:  Objection.  Also asked and answered.

3              MR. BRAFMAN:  It is a separate --

4              THE COURT:  The question, I believe, if it were asked

5    in a simple manner, would be did the Issa company tell you, on

6    more than one occasion, that they were double-billing?

7              MR. BRAFMAN:  That they were paid twice.

8              THE COURT:  The Duploy company, did they tell you, on

9    more than one occasion, that it was double-billed and that it

10   was paid twice?

11             THE WITNESS:  Yes.  Duploy.

12   BY MR. BRAFMAN:

13   Q.  Only Duploy?

14   A.  Yes.

15   Q.  Did they tell you that with respect to First Star as well?

16   A.  I don't recall First Star or Healey or Dee Jay.

17   Q.  Then you know someone named Tisha Gandy.

18   A.  She is in Philadelphia CMC.  She is in the contracting

19   department.

20   Q.  Did you get, from time to time, memos from her that went

21   out to all managers?

22   A.  Sometimes, yes.

23   Q.  And do you remember specifically in March of 2016 an e-mail

24   telling you about the problems or the corrections and the

25   manner in which the Voyager cards were to be used?

ICA5iss3                        Velez - cross

1   A.  Oh, yes.  Yes, I recall, but I don't have a hundred percent

2   recollection, but I remember her sending me an e-mail that went

3   out to managers, yes.

4   Q.  And, do you remember a letter that went from Ms. Gandy to

5   Mr. Issa directly in connection with this issue and -- do you

6   remember that?

7   A.  I don't know that she sent him a letter.  I don't know.

8   Q.  So, let me show you what's marked for identification as

9   237.  Do you remember this memo from Tisha Gandy?

10  A.  Vaguely.  I -- she used to send a lot of stuff sometimes so

11  I don't recall.

12  Q.  Flip over to the second page.  Sorry, flip over to the page

13  and look at 238.  Do you remember that e-mail exchange between

14  you and her?

15  A.  I sent it to him, yes.

16  Q.  You sent it to him?

17  A.  Yes.

18  Q.  And he responded?  I'm sorry.  You sent it to him, right?

19  A.  I sent it to him.

20          MR. BRAFMAN:  I offer this into evidence.

21          MS. HANFT:  Government objects, your Honor.

22          THE COURT:  Could I have a copy that I can actually

23  see?  Is there a ground for your objection?

24          MS. HANFT:  Yes, your Honor.  Hearsay.

25          MR. BRAFMAN:  It is statement by Mr. Velez.

1            THE COURT:  Well, that's hearsay.  Mr. Velez is here

2    on the witness stand.  Is it a prior inconsistent statement?

3    No, it is not, so the government is correct.  The objection is

4    sustained.

5    BY MR. BRAFMAN:

6    Q.  Did you read the e-mail?

7    A.  Some of it.

8    Q.  Exhibit 238, read it to yourself.

9            THE COURT:  There is no reason for him to read the

10   e-mail.  Ask him a question.

11   BY MR. BRAFMAN:

12   Q.  Were you telling Mr. Issa, in April of 2016, that you had

13   been asked to keep your budget down, in words or substance, or

14   your expenditures down?

15           MS. HANFT:  Objection.

16           THE COURT:  Ground?

17           MS. HANFT:  Calls for hearsay.

18           THE COURT:  Overruled.

19           THE WITNESS:  Can I respond?

20           THE COURT:  Yes, you can.

21           THE WITNESS:  I'm sorry.

22           Yes.

23   BY MR. BRAFMAN:

24   Q.  And you were thanking him for his patience and

25   understanding, correct?

ICA5iss3                          Velez - cross

1   A.   Basically I was telling him that we needed to keep costs

2   down because we were losing a lot of money.

3   Q.   Okay, and you were telling him that --

4            THE COURT:  We, the postal service was losing a lot of

5   money?

6            THE WITNESS:  Yes.  Yes, I'm sorry.

7            The postal service was losing a lot of money and

8   the -- my bosses above wanted me to keep costs down and this is

9   the idea that they came up with, not only myself but all the

10  VMF managers.

11  BY MR. BRAFMAN:

12  Q.   And it essentially changed the way these things would be

13  processed, right?

14  A.   Change the process?

15  Q.   It changed the manner in which payments would be approved?

16  A.   It would change the amount of repairs that were included on

17  an invoice that we could receive on an invoice.

18  Q.   And this was in 2016, right?

19  A.   Yes, sir.

20  Q.   So it is essentially changing the rules in the middle of

21  the contract?

22  A.   No, not changing the rules.  You still could repair

23  vehicles, just we had to cut down on the cost.

24  Q.   How did you tell the contractors what they could and could

25  not do?

ICA5iss3                          Velez - cross

1   A.  We would only take care of all the emergency and safety

2   issues on the vehicles.

3   Q.  So PMIs were not done?

4   A.  PMIs were not done but it didn't cost $2,000 for a PMI, it

5   didn't go up that high.

6   Q.  Right, but --

7   A.  Change the oil filter and tires, maybe two tires.  The

8   bills didn't have to go up to $2,000 but that was the max limit

9   that I could spend.

10   Q.  If the truck needed more repair it couldn't be done?

11   A.  No, not there.  I would have it bring it into my shop and

12   complete the rest of the repairs.  In order for us to spend

13   $2,000 on a vendor, if there was any more work, it had to come

14   back to the VMF that we had to complete that work.

15   Q.  And that was changed in May of 2016?

16   A.  Yes.

17   Q.  And for the years before that -- '12, '13, '14, '15, and up

18   to May of 2016 -- if the PMI suggested that there had to be

19   additional work the work could be done by the vendor, correct?

20   If approved by you?

21   A.  Back then there was no immediate policy change because

22   there was a new regime that took over, so when they took over

23   this is what they wanted.

24   Q.  But my question was before the new regime, as you called

25   it, came into power, the contractors had a lot more leeway,

ICA5iss3                           Velez - cross

1    correct?

2    A.  Back then they had to get approval from the VMF if anything

3    cost $250 or more, which hardly ever happened.

4    Q.  The approval?

5    A.  It had to meet the VMF approval.  They can call a

6    supervisor and tell them I have got a bill here for $500, it is

7    over the $250 limit.  At that point we would have to approve

8    it.

9    Q.  How do you do that in the middle of the night when no VMF

10   worker is in their station?

11   A.  We have supervisors there until midnight.

12   Q.  And then what about 2:00 in the morning?

13   A.  They would have to wait until the next day to get approval.

14   Q.  And to get approval before they fix it?

15   A.  For PMI, yes.

16   Q.  What if they needed the truck back?

17   A.  They would bring it back.

18   Q.  They don't bring it back.

19   A.  They would have to bring it back.

20   Q.  In an unrepaired fashion?

21   A.  Unrepaired, and then pick it up the next night.  Get

22   approval on your estimate -- get your approval on your estimate

23   and then bring the vehicle back to the station and fix it the

24   next day.

25   Q.  And what if the vehicle wasn't drivable?

ICA5iss3                        Velez - cross

1    A.  If it's not drivable then leave it at your shop, call the

2    VMF anyway.

3    Q.  So you couldn't get the truck back until the next day?

4    A.  Not all the time.

5    Q.  Not all the time?

6    A.  Not all the time, no.

7    Q.  Did you give any instructions to Mr. Issa's company or his

8    employees at these companies about washing trucks?

9    A.  The trucks had to be washed on PMI.  That's part of the

10   PMI.

11   Q.  And did you tell them to wash it every time that it had a

12   PMI or to use their judgment?

13   A.  Every time the vehicle comes in for a PMI, remember, it's

14   twice a year they had to be washed, yes.

15   Q.  How does it get washed?  By hand?

16   A.  Use brushes, whatever soap.  It had to be washed.

17   Q.  Regardless of the size of the truck?

18   A.  Regardless of the size of the truck.  It is on the PMI

19   sheet.

20   Q.  Okay.  And regardless of the size of the truck is the

21   charge for the wash the same?

22   A.  It doesn't matter, it is part of the PMI.  They give you --

23   no.  Each vehicle has an amount of allotted time to perform a

24   PMI so if it's a small vehicle, it is an hour and a half.  The

25   bigger the vehicles go, there is more hours, more time added to

ICA5iss3                          Velez - cross

1    it.  So, up to a big truck, sometimes it would be hours for

2    PMI, yes.

3    Q.  And then if the truck has to be taken out to be washed,

4    that additional time you are allowed to bill for, can't you?

5    A.  That's -- no.

6    Q.  Can't do that?

7    A.  No.

8    Q.  How do you get the truck to the car wash, truck wash?

9    A.  That's not my problem.  That's part of the contract.  You

10   agreed to wash the vehicle.  That's something you have to do.

11   Q.  Doesn't the rules provide for extra time in the estimated

12   time if you are using a car wash?

13   A.  No, sir.

14   Q.  Are you sure?

15   A.  Yes.

16   Q.  Have you looked at the manual in the last 10 years?

17   A.  In the last five years, yes.

18            MR. BRAFMAN:  May we have a moment, your Honor?  We

19   have to get an exhibit that is in evidence, but.

20            THE COURT:  Well, get it.

21            MR. BRAFMAN:  I'm trying.  I will move on and come

22   back to this, your Honor.

23            THE COURT:  That would be great.  Thank you.

24   BY MR. BRAFMAN:

25   Q.  Michael Hayden, are you familiar with that name?

ICA5iss3                          Velez - cross

1    A.  Yes.  He was an acquaintance but he is also a supervisor in

2    Newark, and then he went down to Philadelphia.

3    Q.  And he was one of the people in charge of purchasing and

4    supply management, correct?

5    A.  He was one of the employees there, yes.

6    Q.  Well, when you say employees, in Philadelphia these were

7    people who had super management positions, right?

8    A.  They were -- they had different assignments.  I don't know

9    what his assignment was.

10   Q.  Do you remember getting an e-mail from him in February of

11   2014 telling you that Issa's company was the only one that

12   could handle 7, 9, and 11-ton tractors?

13           MS. HANFT:  Objection.

14           THE COURT:  Objection is sustained.

15   BY MR. BRAFMAN:

16   Q.  Was Mr. Hayden your supervisor, or over you?

17   A.  No.

18   Q.  Did you ever write to him about Mr. Issa's companies?

19   A.  Sometimes, yes.

20   Q.  And what was the subject matter that you wrote to him

21   about?

22   A.  I don't recall now.

23           MS. HANFT:  Objection.

24           THE COURT:  I can't hear three voices at once.  I just

25   can't do it.

ICA5iss3                         Velez - cross

1           Ground for the objection?

2                MS. HANFT:  Hearsay.

3                THE COURT:  The objection is sustained.  I rather

4      imagine it won't be the next time it is asked.

5      BY MR. BRAFMAN:

6      Q.  Do you know what a form 4546 is?

7      A.  Yes.

8      Q.  That's the PMI checklist, right?

9      A.  Yes.

10     Q.  And the PMI checklist lists washing as one of the items

11     that's supposed to be under the PMI, correct?

12     A.  Correct.

13     Q.  I just want to ask you, when you go to the guidelines for

14     your trucks, does the estimated repair time increase if, in

15     fact, depending on how the wash is being done?

16     A.  No.

17     Q.  I want to show you what's already in evidence as 112 and

18     specifically point you to page 112A which is in evidence.  I am

19     going to put it up on the screen because I don't have enough

20     copies.  112, sir, described as the preventive maintenance

21     inspection program.  Do you see that?

22     A.  Yes.

23     Q.  You are there are with this document, correct?

24     A.  That's an old document, yes.

25     Q.  But that's the book that covers this stuff, isn't it?

ICA5iss3                    Velez – cross

1    A.  That's an old document.  That's not the revised version.

2    Q.  You have a revised one that changes the wash estimated

3    time?

4    A.  No, it doesn't change.

5    Q.  Okay.  So let's look at page 112A which is the page for the

6    washing explanation, and 112A on the top where it says clean

7    inside and out, I am going to point to you the second where it

8    says note:  The estimated repair time -- ERT -- shown on the

9    back of form 4546B, was calculated assuming the use of an

10   automatic truck washer.  Add 0.3 hours if the vehicle is

11   hand-washed, and 0.2 hours for cleaning windows and inside of

12   vehicle.

13           Do you see that?

14   A.  Yes, I see that.

15   Q.  Does that allow the vendor to add time and expense to the

16   wash?

17   A.  That depends on where they wash it.

18   Q.  Okay, but if they wash it consistent with this rule they're

19   allowed to increase the time that is estimated to take,

20   correct?

21   A.  Yes.  Maybe about a quarter of an hour.

22   Q.  Well .3 and .2 is closer to half an hour, correct?

23   A.  No.

24   Q.  No?

25   A.  Quarter of an hour.  15, 20 minutes.  In that neighborhood.

ICA5iss3                        Velez - cross

1   10 minutes.

2   Q.   That depends on where you have to go to wash it?

3   A.   It doesn't say anything about travel time on there.

4   Q.   So, if you have to go 20 miles to get this 7-ton truck into

5   a machine, you eat that time you are telling us?

6   A.   That's not my rule, so yeah.

7   Q.   I get it.  Thank you?

8   A.   It is what it is.

9   Q.   It is what it is.  Thank you.

10          Did the government confront you -- when you were on

11   your first confrontation by agents from OIG, did they confront

12   you with a printout or a spreadsheet of cash deposits into your

13   bank?

14   A.   Yes.

15   Q.   And did they tell you that you have a real problem, in

16   words or substance, because you have at least $96,500 in cash

17   going into your account?

18   A.   Yes.

19   Q.   And did they tell you that that money is all money that you

20   got as bribes?

21   A.   Yes.

22   Q.   And you told them that's not true?

23   A.   Yes.

24   Q.   Now, tell us, who was making these cash deposits into your

25   account for several years?

ICA5iss3                           Velez - cross

1   A.   My wife.

2   Q.   And why is your wife making cash deposits its into your

3   account all of those years?

4   A.   The account that the money was going into for the joint

5   account between myself and my wife, her job where she used to

6   work at they couldn't -- there was some issue they were having

7   with getting a direct deposit into our joint account with her

8   check so she had a separate checking account without my name on

9   it.  The check was automatically going there so she would go to

10  the bank, withdraw the money from an ATM machine, then go to

11  our joint account bank and then deposit the money in bits and

12  pieces on the machine.

13  Q.   Why couldn't she just give you a check?

14  A.   She could have deposited a check back then.  I -- that was

15  her choice.  I --

16  Q.   You had nothing to do with this?

17  A.   No, sir.

18  Q.   So, the deposits that go in $500, $500, $500 into your

19  account on a weekly basis, that's not bribes?

20  A.   No.  That's my wife.

21  Q.   That's your wife?

22  A.   Yeah.

23  Q.   And it has nothing do with Mr. Issa?

24  A.   Correct.

25  Q.   So the $100,000 approximately that they showed you in

ICA5iss3                          Velez - cross

1  deposits into your bank account was all not Issa's money,

2  correct?

3  A.  Correct.

4  Q.  So, all of the money you claimed got from Mr. Issa went

5  into your electric box or you just spent it, correct?

6  A.  Right.

7  Q.  So there was no way we can confirm with any document that

8  Mr. Issa actually paid you money, correct?

9  A.  Correct.

10  Q.  Excuse me?

11  A.  Correct.

12  Q.  And did you ask Mr. Issa for money when you were buying a

13  house?

14  A.  I might have, yeah.  I might have.

15  Q.  Did you ask him for $5,000 or $10,000 when you were buying

16  a house because you couldn't close without the money?

17  A.  I might have.

18  Q.  You did, didn't you?

19  A.  I don't recall right now.  I might have.

20  Q.  Let me see if I can help you.  Okay?

21  A.  I believe -- I am trying to think back because that was a

22  while back.

23        THE COURT:  No.  There is no question pending, sir.

24  BY MR. BRAFMAN:

25  Q.  Did the government ever ask you whether or not Mr. Issa

ICA5iss3                         Velez - cross

1    gave you money to help you buy a house?

2    A.   No.

3    Q.   You know that as a result of your plea you are going to be

4    required to forfeit all of the money you got as a bribe plus

5    any investment you made with that money, correct?

6    A.   Correct.

7    Q.   And whether you want to or not, they can take it all away

8    from you, right?

9    A.   Correct.

10   Q.   And you did not want to include the house as a recipient of

11   any of this corrupt money you claim you got, right?

12   A.   I -- no, I didn't say that.

13   Q.   Well, but that's the truth, isn't it?

14   A.   No.

15   Q.   If the money went into the house the house could be

16   forfeitable?

17   A.   I don't recall any money going into the house.

18   Q.   But it did, didn't it?

19   A.   No.  I don't recall that.

20   Q.   You asked him for a favor?

21   A.   I might have paid him back.

22   Q.   You asked him for a $5,000 loan for your house.  Isn't that

23   true?

24   A.   Yes, to put on a -- I think it was some deposit that they

25   needed but I believe I gave it back to him.

ICA5iss3                          Velez - cross

1    Q.  You have a record of giving it back to him?

2    A.  It was all cash money, so he didn't have any record of

3    giving it to me.

4    Q.  Well, it wasn't cash money.  You gave it to your sister and

5    your sister give you a check which you used as the deposit.

6    Isn't that true?

7    A.  My sister-in-law, yes.

8    Q.  Your sister-in-law, right?

9    A.  Yes.

10   Q.  And you told Mr. Issa that, right?

11   A.  Gave her the check, right.

12   Q.  You told him that's what you were going to do?

13   A.  Yes.

14   Q.  Because, otherwise, how would he know about your

15   sister-in-law?

16   A.  Actually, he didn't want to give me a check so I -- the way

17   I did it, I had my sister-in-law write me a check as a loan,

18   yes.

19   Q.  As a loan?

20   A.  Yes.

21   Q.  This is a copy of the transaction marked as 256, a series

22   of four documents.  I want to show it to the witness first.

23   256, do you recognize that as part of your bank statement for,

24   from between July 2014 and August 2014?  Is that your bank

25   statement?

ICA5iss3                        Velez - cross

1    A.   Yes.  That's the check deposited, yes.

2    Q.   You see where says check deposited?

3    A.   Yes.

4    Q.   And then the next page is a copy of a deposit slip?

5    A.   Yes.

6    Q.   And then the next page is the check that you got back from

7    your sister-in-law, correct?

8    A.   I can't see it.  Can you bring it down?

9              Yes.

10             MR. BRAFMAN:  Your Honor, I offer this document into

11   evidence, three pages.

12             MS. HANFT:  No objection, your Honor.

13             THE COURT:  Admitted.

14             (Defendant's Exhibit 256 received in evidence)

15   BY MR. BRAFMAN:

16   Q.   You said it was a loan from your sister-in-law?

17   A.   No.  It was a loan from Mr. Issa.

18   Q.   Why did your sister-in-law get involved in this?

19   A.   That's the way Mr. Issa wanted me to do it.

20   Q.   He wanted you to do it through your sister-in-law?

21   A.   She was loaning me the money.

22   Q.   She was loaning it to you?

23   A.   You are not listening to me.

24   Q.   I'm listening?

25   A.   Mr. Issa told me to have somebody else give me the money as

ICA5iss3                          Velez - cross

1    a loan, like if I was getting it from someone else.

2    Q.  So it was going to be a wash, right?

3    A.  So I gave her the $5,000, she deposited it, and then she

4    gave me the check.  He didn't want to be involved in it.

5    Q.  Right.  Was it a loan?

6    A.  From him, yes.

7    Q.  And from your sister-in-law?

8    A.  No.  It was just a wash for her.

9    Q.  Wash?  Look at the check, what does it say at the bottom?

10   A.  It says "gift," yes.

11   Q.  What?

12   A.  It says a gift, but.

13   Q.  Was it a gift?

14   A.  No.

15   Q.  Was it being disguised as a gift?

16   A.  Mr. Issa gave me the money, I gave it to her --

17   Q.  That's not the question.  The question is your

18   sister-in-law wrote down "gift."  It was not a gift, was it?

19   A.  No.  It was -- it wasn't a gift, no.

20   Q.  And it wasn't a bribe either, was it?

21   A.  I would say yes.

22   Q.  You asked him to help you with the house, right?

23   A.  I needed it, yeah.  I asked him to.

24   Q.  You pleaded with him?

25   A.  No.  I asked him if he could.

ICA5iss3                          Velez - cross

1   Q.  And he gave it to you?

2   A.  And he, yes, he turned around and gave it to me.

3   Q.  And then you tell me you paid him back?

4   A.  Yes.

5   Q.  So who pays a bribe back?

6   A.  It had to be me.

7   Q.  What?

8   A.  It had to be me.

9           MR. BRAFMAN:  Your Honor, can we stop here?

10           THE COURT:  No.

11           MR. BRAFMAN:  Okay.

12           THE COURT:  We can't.  We are going to go on for

13   another 10 minutes.

14   BY MR. BRAFMAN:

15   Q.  Now, the government asked you on a number of occasions

16   whether you got any money for the house and you flat out denied

17   it to them, didn't you?

18   A.  No, I didn't deny it.  I told them that I took money out of

19   my account, which I did.

20   Q.  That's not the question.  Specifically for the house the

21   government asked you whether you used any of the money from

22   Mr. Issa for the house and you said no.

23   A.  Correct.

24   Q.  And when you said no you knew you were lying to them?

25   A.  That's not true.

ICA5iss3                         Velez - cross

1   Q.  Were you faking?

2   A.  That's not true.  It got repaid, so.

3   Q.  Well, why didn't you tell the government that?

4   A.  Because I -- in other words, I didn't use any of his money.

5   I used it to put the money in and then I gave it back to him.

6   Q.  You were asked again and again and again on several

7   debriefings --

8   A.  Because I used my money.  I used my money and my wife's

9   money from the retirement fund for the house.

10  Q.  Yes, but they asked you whether Mr. Issa ever gave you any

11  money for the house and you said no.

12  A.  Yeah, and I didn't recall the $5,000 until you brought it

13  up just now, put it up on the screen.  Really.

14  Q.  You didn't recall until I put it up on the screen?

15  A.  Yes.

16          MR. BRAFMAN:  Can you give me a minute, your Honor?

17          THE COURT:  Yes.

18  BY MR. BRAFMAN:

19  Q.  Now I want to show you, so the jury has an understanding of

20  what you were talking about, go back to an area to show you

21  Exhibit 247, which is a multi-page exhibit.  Do you see that?

22  A.  Yes.

23  Q.  It's an e-mail from Mr. Issa to you, right?

24  A.  Yes.

25          MS. HANFT:  Objection.

ICA5iss3                         Velez - cross

1          THE COURT:  He hasn't asked a question, just show him

2     the document.

3     BY MR. BRAFMAN:

4     Q.  Is that what it is?

5     A.  Can you bring it down?  Because I can't see the top.

6     Q.  It is from Tony Issa?

7     A.  A little more?  There you go.  Yes, now I see it is from

8     Mr. Issa.

9          THE COURT:  Please don't ask a question that

10    articulates anything that was said by your client in that

11    e-mail because you can't introduce your client's hearsay

12    statement.  So, please don't do that.

13    BY MR. BRAFMAN:

14    Q.  The e-mail comes with a series of documents, Exhibit 248 --

15         MS. HANFT:  Objection.

16         THE COURT:  The objection is sustained.  You may not

17    do this.  The objection is sustained.  Move on to another --

18         MR. BRAFMAN:  Did you see Exhibit 248?

19         THE COURT:  Move on to another exhibit.

20         MR. BRAFMAN:  It is not the e-mail, it is the

21    attachment.

22         THE COURT:  The attachment is part of the statement.

23    Move on.

24         MR. BRAFMAN:  No, it is not, your Honor.

25         THE COURT:  Well, Mr. Brafman, you are going to have

ICA5iss3                              Velez - cross

1    to move on right now.

2    BY MR. BRAFMAN:

3    Q.   Did Mr. Issa ever send you or did you send him a list of

4    the PMIs that had to be done?

5    A.   Yes.

6    Q.   In fact, you sent it to him on a number of occasions and in

7    fact it got annoying to you to keep sending him the list,

8    right?

9    A.   I sent him the list.

10          THE COURT:  The question is did you have to do it over

11   and over again?

12          MR. BRAFMAN:  A number of times.

13          THE WITNESS:  Yes.  As the numbers were coming off of

14   here?  Yes.

15          THE COURT:  Did it become annoying to you to have do

16   it over and over again?

17          THE WITNESS:  It is part of the job.

18   BY MR. BRAFMAN:

19   Q.   248 for identification, is this the list that you sent to

20   Mr. Issa?

21          MS. HANFT:  Objection.

22          MR. BRAFMAN:  Again and again?

23          THE COURT:  Not yet.

24   A.   I don't recall.  I don't recall.  It doesn't have anything

25   from me on there.

1              MR. BRAFMAN:  Your Honor, this is not right.  It is

2     attached to the e-mail from him.

3              THE COURT:  The ground for the objection is?

4              MS. HANFT:  Your Honor, this is not in evidence.

5     Mr. Brafman keeps --

6              MR. BRAFMAN:  I'm trying to.

7              THE COURT:  He is trying to introduce it.  Why do you

8     want to keep it out?

9              MS. HANFT:  It is hearsay, your Honor.

10             THE COURT:  It is hearsay, it stays out.

11             MR. BRAFMAN:  It is not hearsay, it is a business

12    record.

13             THE COURT:  We will discuss it later.  And if it is a

14    business record you haven't established it is a business

15    record.  All right?

16    BY MR. BRAFMAN:

17    Q.  Was it the normal course of business for the post office to

18    maintain lists of PMIs scheduled --

19             THE COURT:  He can't testify -- oh, well, the post

20    Office, yeah, he can.  All right.  Ask him the question.

21    BY MR. BRAFMAN:

22    Q.  Was it the normal course of business for the post office to

23    maintain lists of PMIs that had to be conducted and completed

24    on trucks?

25    A.  In our system SEAM, yes.

ICA5iss3                          Velez - cross

1   Q.  Was it in the normal course of business that these lists

2   were distributed to vendors like Mr. Issa --

3           THE COURT:  That doesn't make it a business record.

4           MR. BRAFMAN:  I'm not finished.

5           THE COURT:  I know, but distribution to Mr. Issa has

6   nothing to do with authenticating it as a business record.

7   BY MR. BRAFMAN:

8   Q.  Was this list prepared by post office people?

9   A.  Yes.

10  Q.  Was the list of PMI that prepared by post office people

11  prepared by people who, at the time, were under a duty to do it

12  accurately?

13  A.  This comes out of a system.

14  Q.  I know it does.

15          THE COURT:  Sir, were the people who put the

16  information into the system under a duty to input that

17  information accurately?

18          THE WITNESS:  Yes.

19          THE COURT:  And did they do it at or about the time

20  they got the information that they input into the system?

21          THE WITNESS:  Yes.

22          THE COURT:  And it was part of their job to do that,

23  right?

24          THE WITNESS:  Yes, ma'am.

25          MR. BRAFMAN:  Thank you, Judge.  I offer Exhibit 248

ICA5iss3                          Velez - cross

1    as a business record of the post office.

2              MS. HANFT:  Your Honor, as long as it's just this

3    attachment, the government does not object.

4              THE COURT:  There is no objection.  248 has been

5    authenticated as a business record of the United States.

6              I feel like I am in the middle of Miracle on 34th

7    Street.  It is a business record of the post office.

8              MR. BRAFMAN:  That movie ends well, doesn't it?

9              THE COURT:  Very well.  Good evidence ruling.  It is

10   in.  248 is in.  It is a list of, I think, PMIs.  That's what

11   it is.  That's all it is.

12             MR. BRAFMAN:  It is.

13             THE COURT:  That's all it is.

14             MS. HANFT:  And we were clarifying, your Honor, that

15   the prior document is not --

16             THE COURT:  Not the e-mail, just the list.

17             MS. HANFT:  Thank you.

18             THE COURT:  Okay.

19             (Defendant's Exhibit 248 received in evidence).

20   BY MR. BRAFMAN:

21   Q.  Now that this is in evidence I am going to ask you -- I

22   will turn to some of the pages and you will have to accept my

23   representation in terms of the amount unless you count them,

24   this is a series of pages, each page, we will take one as an

25   example, lists, on the top it has the Westchester VMF, correct?

ICA5iss3                       Velez – cross

1   A.   Those are the are our maintenance reserve vehicles.

2   Q.   And go to the front page, on the top they give you the

3   legend of what these columns are supposed to mean.  Do you see

4   that, sir?

5   A.   Hmm?

6   Q.   So, the first column is "schedule count," yes?

7   A.   Yes; one.

8   Q.   And two is "parent VMF name" meaning where it originates

9   from?  Do you see that?

10  A.   Those are all assigned to the VMF.

11  Q.   In Westchester?

12  A.   Every vehicle on those lists that you have, they're

13  assigned to the Westchester VMF.

14  Q.   That's what I'm trying to establish.

15  A.   Individual offices are on the right side.

16  Q.   I'm getting to that, sir, but this is all under your

17  jurisdiction?

18  A.   Yes.

19  Q.   You said you had 1,600 trucks; this is the list, correct?

20  A.   Yes.

21  Q.   Now, then it has a vehicle number so we know what truck we

22  are talking about, correct?

23  A.   Yes, sir.

24  Q.   And then we have a "EAM/last PMI schedule start date."  Do

25  you see that?

ICA5iss3                          Velez - cross

1   A.  That's when it is due.

2   Q.  That's when it is due?

3   A.  Yes.

4   Q.  Now, this list was sent to you on April 2015?

5   A.  Excuse me?

6   Q.  Do you know whether this list was sent to you in April of

7   2015?  Were you aware the list was prepared in April of 2015?

8   A.  I don't know.

9   Q.  So, each one --

10  A.  Every day the list is updated.  Every day.  So, I don't

11  know when this sheet was from.

12  Q.  And if you look at the column that says "last PMI scheduled

13  start date," they have all different scheduled start dates,

14  correct?

15  A.  Yes.

16  Q.  And on the first page they're all in 2014 until you get to

17  the bottom where it's 2013, correct?

18  A.  Yes.  Those are vehicles that are past due.

19  Q.  That are what?

20  A.  That would be past due.

21  Q.  If you look at this list, would it be a fair statement that

22  all of these vehicles are past due?

23  A.  I don't know what date this was printed out so I couldn't

24  tell you.

25  Q.  Let me just show you the e-mail that's not in evidence

ICA5iss3                          Velez - cross

1   identified as 247 and see if it refreshes your recollection

2   that this --

3            THE COURT:  See if it refreshes your recollection as

4   to when the list was printed.  All right?  Just take a look.

5   BY MR. BRAFMAN:

6   Q.  If you look at the bottom, also, of the e-mail, 247?

7            THE COURT:  See if it jogs your memory about when this

8   particular list was printed.

9   A.  April 7th, yes.

10  Q.  I'm sorry?

11  A.  April 7th of 2015.

12  Q.  Thank you.

13           So, all of these VMIs were long overdue.  Would that

14  be a fair statement?

15  A.  Yes.

16  Q.  Because they would have to be within the last six months as

17  the latest, correct?

18  A.  These were all past due.

19  Q.  Okay.  That's what you inherited when you took over the VMF

20  in Westchester, correct?

21  A.  Yes.

22           THE COURT:  Okay.  Now we can stop.

23           MR. BRAFMAN:  Thank you.

24           THE COURT:  All right.  So, folks, I will see you at

25  2:00 on the dot.  This is one of those days when I have Chief

ICA5iss3                          Velez – cross

1    Judge McMahon stuff at the end of the day.  They're dedicating

2    the new Center for Civic Education next-door in the other court

3    house and I have to go so we will go until 4:00 today.

4              Don't discuss the case, keep an open mind.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICA5iss3                        Velez - cross

1              (Jury not present)

2              (Witness steps down)

3              THE COURT:  Sir, don't discuss anything with the

4     government lawyers over the lunch break.

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  I will see you at 2:00.

7              (Luncheon recess)

8              (Continued next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                             2:08 p.m.

3            (In open court; jury present)

4            THE COURT:  Hi everybody.

5            Sir, you're still under oath.  Have a seat.

6            Mr. Brafman.

7            MR. BRAFMAN:  Yes, ma'am.

8    ISMAEL VELEZ, resumed.

9    CROSS-EXAMINATION CONTINUED

10   BY MR. BRAFMAN:

11   Q.  Mr. Velez, before lunch we showed you certain documents,

12   and you testified briefly about your awareness that from time

13   to time Duploy, one of Mr. Issa's companies, would notify you

14   of double billing and return the money to the post office?

15   A.  Correct.

16   Q.  And on one occasion, you thanked him for their honesty?

17   A.  Yes.

18   Q.  Did you know whether or not Duploy sometimes sent out bills

19   for First Star or whether First Star sometimes sent out bills

20   for Duploy?  Did you know that?

21           THE COURT:  Did you know if that happened, sir?  Do

22   you know if that happened?

23   A.  I don't recall right now.

24   Q.  But you knew that Duploy was a towing company, correct?

25   A.  Yes.

ICAHIss4                         Velez – Cross

1    Q.   Whereas First Star was repairs and PMIs, correct?

2    A.   Correct.

3    Q.   When you look at amounts, can you tell if it's for a PMI or

4    for repair or for towing?

5    A.   Unless it's in the description, depends on the description.

6    Q.   Let me show you what's been marked for identification as

7    Exhibit 215, just for identification, and ask if you -- if

8    these materials look familiar to you during the period that you

9    were in charge of Westchester.

10   A.   That -- that document has nothing to do with me.

11   Q.   Nothing to do with you?

12   A.   No.

13              THE COURT:   OK.  Let's move on, please.

14              MR. BRAFMAN:   OK.

15   Q.   Did there come a time when Allan Balicki became your new

16   boss?

17   A.   Yes.

18   Q.   And what was your relationship with Mr. Balicki?  What was

19   your job?  What was his job?

20   A.   My job was manager of vehicle maintenance.  He was regional

21   manager.

22   Q.   And he was someone you had to answer to?

23   A.   Yes.

24   Q.   And without going into details or getting yelled at, would

25   it be fair to say that you and he had a contentious

ICAHIss4                          Velez – Cross

1    relationship?

2    A.   Yes.

3    Q.   Do you know what that word means, sir?

4    A.   Yes.

5    Q.   It was a difficult relationship, correct?

6    A.   Yes.

7    Q.   All right.  Now, he came over from Boston, correct?

8    A.   No, Springfield, Massachusetts.

9    Q.   I'm sorry.  From Massachusetts, correct?

10   A.   Yes.

11   Q.   And now he was transferred to Westchester to be the VMF

12   regional manager that included Westchester?

13   A.   That included Westchester.  There were eight VMFs that he

14   was in charge of.

15   Q.   Including your VMF in Westchester?

16   A.   Yes.

17   Q.   Would it be a fair statement that depending on the area and

18   the region, the VMFs had to deal with different issues

19   concerning geography and condition of vehicles, and so on?

20   A.   Yes.

21   Q.   And were you trying to explain that to Balicki from time to

22   time?

23   A.   Yes.

24   Q.   Was it fair, essentially, his way or the highway?

25   A.   Correct.

ICAHIss4                          Velez - Cross

1    Q.  All right.  Now, I think you told the jury that whenever

2    Mr. Issa wanted more money, wanted more work, you gave him more

3    money?

4    A.  Can you say that again.

5    Q.  Did you tell the jury that as a practical matter, when

6    Mr. Issa wanted more work, you would ask for more money?

7    A.  No, that's not true.

8    Q.  Does your amount that you were allegedly receiving have

9    anything to do with the amount of work that you were giving

10   Mr. Issa?

11   A.  No.

12   Q.  So there was no "I give you this, you give me that"?

13   A.  No.

14   Q.  OK.  Thank you.

15            Now, there came a time when you agreed to plead guilty

16   to a crime, correct?

17   A.  Yes.

18   Q.  And this was sometime in October of 2017?

19   A.  Yes.

20   Q.  Before you agreed to plead guilty, how many times had you

21   met with the government by that time?

22   A.  About three or four times.

23   Q.  And in each of those meetings, they lasted several hours?

24   A.  Yes.

25   Q.  And you told them things and they told you things?

1  A.  Yes.

2  Q.  And they showed you documents and let you review them?

3  A.  Yes.

4  Q.  All right.  Now, ultimately, you prepared -- I'm sorry.

5       You agreed to sign a cooperation agreement, correct?

6  A.  Yes.

7  Q.  And that cooperation agreement is in evidence as Government

8  Exhibit -- is it in evidence?

9            THE COURT:  It is.

10           MR. BRAFMAN:  What is the exhibit number, please?

11           THE COURT:  I don't remember.

12           MS. HANFT:  3549.

13           MR. BRAFMAN:  It's the 3500 number?

14           MS. HANFT:  Yes.

15  BY MR. BRAFMAN:

16  Q.  So your cooperation agreement, you read it carefully before

17  you signed it?

18  A.  Yes.

19  Q.  And you had a lawyer who helped you along with that?

20  A.  Yes.

21  Q.  And you discussed it with her before you signed it?

22  A.  Yes.

23  Q.  And you understood what you were signing?

24  A.  Yes.

25           MR. BRAFMAN:  All right.  Could we have the first page

ICAHIss4                          Velez - Cross

```
1    of that agreement on the screen that was used on direct?  It's
2    3549-16.  I can use the ELMO if you want me to.
3              MR. WIRSHBA:  We don't have it loaded on.
4              MR. BRAFMAN:  I'll use the machine here.  This is in
5    evidence.  Can we show it to the jury, please.
6    Q.  Do you see it, Mr. Velez?
7    A.  Yes, sir.
8    Q.  That's a copy of your cooperation agreement with the U.S.
9    Attorney's Office, correct.
10   A.  Correct.
11             MR. BRAFMAN:  All right.  Now, does the jury have it?
12   Q.  Now I'm going to point you to the second paragraph,
13   beginning with the word "the defendant," that's you, and I'm
14   going to read it with you and ask you some questions:
15             "The defendant furthermore admits the forfeiture
16   allegations with respect to Count One of the information, and
17   agrees to forfeit to the United States pursuant to Title 18" --
18   I'll skip the sections of the code -- "a sum of money
19   representing all property, real and personal, which constitutes
20   or is derived from proceeds traceable to the commission of the
21   offense charged in Count One of the information (the money
22   judgment).  It is understood that any forfeiture of the
23   defendant's assets shall not be treated as satisfaction of any
24   fine, restitution, cost of imprisonment, or any other penalty
25   the Court may impose upon him in addition to the forfeiture."
```

1              Did you read it with me?

2    A.   Yes.

3    Q.   Do you understand it?

4    A.   Yes.

5    Q.   Do you understand that, as part of your agreement, you have

6    to give the government any money that you claim was given to

7    you as a bribe?

8    A.   Yes.

9    Q.   And it's your testimony that you didn't put any of that in

10   the bank, correct?

11   A.   Correct.

12   Q.   And you didn't put any of it in your house?

13   A.   No.

14   Q.   The $5,000 that Mr. Issa gave you for the house you gave

15   back to him, is that correct?

16   A.   Correct.

17   Q.   And so what you've essentially done by testifying in this

18   manner is you've insulated yourself from this forfeiture

19   agreement, is that correct?

20              MS. HANFT:   Objection.

21              THE COURT:   The objection's overruled.   You're free go

22   into it on redirect.

23   Q.   When you put the money in the basement like you say you

24   did, you spent it, right?

25   A.   Yes.

1    Q.  It's gone?

2    A.  Yes.

3    Q.  Are you in a position to give the government back this

4    money or $100,000 they claim you took as bribes?

5    A.  I'm broke.

6    Q.  So what is the point of this, agreeing to this?  It's

7    meaningless, isn't it?

8              MS. HANFT:  Objection.

9              THE COURT:  The objection's sustained.

10             MR. BRAFMAN:  Thank you.

11   Q.  Now let's go down to the third paragraph on the page.  I'm

12   going to move this up a little bit.

13             Do you have it where it starts, "It is understood"?

14   Do you have it, sir?

15   A.  Yes.

16   Q.  I'm going to read it out loud and then ask you some

17   questions:

18             It is understood that defendant (a) shall truthfully

19   and completely disclose all information with respect to the

20   activities of himself and others concerning all matters about

21   which the office inquiries of him, which information can be

22   used for any purpose; shall cooperate fully with the office,

23   the United States Postal Service of the Inspector General,

24   Internal Revenue Service, and any other law enforcement agency

25   designated by this office.  He shall attend all meetings at

1   which this office requests his presence, your presence; shall

2   provide to the office upon request any document, record, or

3   tangible evidence relating to matters about which this office

4   or any designated law enforcement agency inquires of him; shall

5   truthfully testify before the grand jury at any trial and other

6   court proceeding with respect to any of the matters about which

7   this court may request his testimony; shall bring to the

8   attention -- bring to the attention to this office crimes which

9   he has committed and all other administrative, civil, or

10  criminal proceedings, investigation, or prosecutions he has

11  been a subject, party, or witness, and shall commit no further

12  crimes.  Moreover, any assistance the defendant may provide the

13  federal criminal investigation shall be pursuant to the

14  specific instructions and control of his office and designated

15  investigators.

16          Do you understand the paragraph I just read?

17  A.  Sort of, yes.

18  Q.  I'm sorry?

19  A.  Sort of, yes.

20  Q.  Sort of?

21  A.  Yes.

22  Q.  Let me break it down for you.  You can't commit any more

23  crimes since the date of the agreement, correct?

24  A.  Correct.

25  Q.  And if you did that, you would violate the terms of the

ICAHIss4                          Velez – Cross

1    agreement?

2    A.   That's correct.

3    Q.   And you would have no agreement and your plea would be

4    guilty and you couldn't pull it back, right?

5    A.   Correct.

6    Q.   And the government would not give you any credit for your

7    cooperation?

8    A.   Correct.

9    Q.   Your objective by signing this agreement is to hopefully

10   get what you call a 5K letter?

11   A.   Correct.

12   Q.   Correct?

13   A.   Yes.

14   Q.   And the government has the decision whether or not to write

15   that letter to the judge who's going to sentence you, right?

16   A.   Yes.

17   Q.   And then the judge can decide what, if any, weight to give

18   to that letter?

19   A.   Yes, sir.

20   Q.   And you understand that the letter is a form of asking for

21   leniency for you in consideration of your cooperation, right?

22   A.   Correct, sir.

23   Q.   And that's something you want?

24   A.   Hope to get.

25   Q.   You want that, right?  You want that letter?

ICAHIss4                    Velez - Cross

1   A.  Yes, sir.

2   Q.  All right.  Who has the decision as to whether or not you

3   get the letter?

4   A.  The prosecution, I guess.

5   Q.  The people at the front table?

6   A.  Yes, sir.

7   Q.  The judge cannot order them to do that if they don't want

8   to, right?

9   A.  Right.

10  Q.  And in order to get the letter from the government, you

11  must testify in a manner that they believe to be truthful,

12  correct?

13  A.  Correct, sir.

14  Q.  What?

15  A.  Correct, sir.

16  Q.  Now, if you testify and you lie but they believe you, do

17  you get the letter?

18  A.  If I lie in the --

19  Q.  If you lie and they believe you, do you get the letter?

20  A.  If I lie, that's not good.

21  Q.  I understand it's not good to lie, but my question is they

22  get the decision as to whether or not you're telling the truth,

23  right?

24  A.  They have the decision, yes.

25  Q.  If you tell the truth but they don't believe you, do you

ICAHIss4                          Velez - Cross

```
 1    get the letter?
 2    A.  I don't know.  That's up to them.
 3    Q.  If you tell the truth but they do not believe you, they
 4    think you are lying, you don't get the letter, do you?
 5    A.  Correct.
 6    Q.  Now, one of the obligations to them for you is to give them
 7    information concerning everything you've done of a criminal
 8    nature, correct?
 9    A.  Correct.
10    Q.  And you also have to -- you want to get coverage for the
11    crimes you've committed, correct?  You know what that means?
12    A.  Coverage?  What do you mean?
13    Q.  If you tell them about a crime you committed during the
14    period of the agreement, you get covered for it; meaning,
15    they're not going to prosecute you separately for it, correct?
16    A.  I don't know that.
17    Q.  Well, it requires you -- your paragraph No. 3 on page 1
18    requires you, on the top of -- bottom of page 1, going onto the
19    top of page 2, "Shall bring to this office's attention all
20    crimes which he has committed."  I'll stop there.
21            Do you see that?  I'm sorry?
22    A.  I can't see.  You've got to pull it down.
23    Q.  You see it?
24    A.  While I'm here, you're saying?
25    Q.  No.  When you are under this agreement, this agreement
```

ICAHIss4                      Velez - Cross

1    covers a certain period of time, right?

2    A.  Yes, sir.

3    Q.  And from the date you signed this agreement, which is

4    September 29, 2017, what you were doing is you are essentially

5    pleading guilty to crimes that you committed in the first

6    paragraph while you were a post office employee and taking

7    money, correct?

8    A.  Correct.

9    Q.  And you need to tell them about all of the crimes you

10   committed in order to get coverage for those crimes, correct?

11   A.  Yes, sir.

12   Q.  So if you had a bribe from somebody else and you tell them

13   about it, they're not going to prosecute you for it; you'll get

14   coverage, correct?

15   A.  I don't know.

16   Q.  But if you withheld information about a crime you

17   committed, all deals are off, correct?

18   A.  Yes, sir.

19   Q.  OK.  I just want to make sure we're clear on that.  If you

20   had not told them about a crime you committed, all deals are

21   off.  That's what you just said, correct?

22   A.  Yes, sir.

23   Q.  So let's talk a minute about what happened after Mr. Issa

24   was arrested and after he was no longer doing business with the

25   post office.

ICAHIss4                          Velez - Cross

1          You still needed money, right?  Your financial

2     condition didn't improve; got worse?

3     A.  Yes.

4     Q.  And that's why you started taking things from another

5     vendor, Garrison, Mr. Arafat, correct?

6     A.  He started doing business with the post office after that,

7     yeah.

8     Q.  And you started taking things of value from him?

9     A.  No.

10    Q.  No.

11         You told the government about tickets, right?  He

12    offered you tickets to a show, but you paid for them, right?

13    A.  What tickets?

14    Q.  You didn't tell the government about tickets that Arafat

15    offered you and you paid for them?

16    A.  No.

17    Q.  You sure?

18    A.  Well, yeah, I paid him a dollar for it.  That's what he

19    wanted.

20    Q.  So he gave you tickets to a Broadway show?

21    A.  Yeah, he sold them to me.

22    Q.  For a dollar?

23    A.  Yes, sir.

24    Q.  And he at the time --

25    A.  He wasn't going to go.

ICAHIss4                          Velez - Cross

1    Q.   At the time he was working on stuff for the post office?

2    A.   He sold me the tickets because he wasn't gonna go.

3    Q.   That's not the point.  The point is the tickets had much

4    more value than a dollar, correct?

5    A.   Probably a little more, yeah.

6    Q.   What show was it?

7    A.   It was -- it was a football game, but I didn't -- I didn't

8    get to go.

9    Q.   But you bought them intending to go?

10   A.   Yeah, I didn't get to go.

11   Q.   And you told the government that you paid for the tickets?

12   A.   Yeah, but I didn't go.

13   Q.   You didn't pay for the tickets?

14   A.   I paid him what he wanted, a dollar.

15   Q.   And now this Arafat person, you took him to your home and

16   taught him how to do invoices on several occasions, isn't that

17   correct?

18   A.   To my home, no.

19   Q.   To his home?

20   A.   No.

21   Q.   Did you meet him and teach him how to do invoices?

22   A.   No, sir.

23   Q.   Never?

24   A.   Nope.

25   Q.   Did you help him get his work processed?

ICAHIss4                    Velez - Cross

1  A.  No.  All he had to do was fix -- fix vehicles and invoice

2  the company.

3  Q.  And this is Garrison, right?

4  A.  Garrison, yeah.

5  Q.  How much money did you start giving Garrison?

6  A.  How much money?

7  Q.  How much work did you start giving Garrison?

8  A.  We gave them vehicles that were going out for Christmas, to

9  get them prepped to use them for Christmas.

10  Q.  I don't understand.

11  A.  For Christmas delivery.  These were vehicles that were

12  replaced and that were going to be sent out to auctions, but my

13  boss wanted me to put them back into service and to get

14  somebody to repair them.  And the amount -- allotted time that

15  we had, we couldn't do them all at the VMF, so we used Garrison

16  to do the repairs.

17  Q.  And Garrison out of all of the vendors that were available

18  to you?

19  A.  Garrison was recommended by one of the postmasters.

20  Q.  And you accepted him, right?

21  A.  Yeah, we -- we used him.  We were already using him through

22  one of the post offices.

23  Q.  And was that before or after the tickets?

24  A.  Excuse me?

25  Q.  Was that before or after he gave you the tickets?

ICAHIss4                        Velez - Cross

1    A.   That was -- I don't know.

2    Q.   And the tickets weren't used to influence you in any way?

3    A.   That was -- no.

4    Q.   Now, when the government asked you about the tickets, do

5    you remember what you said?

6    A.   When the government asked me for the -- about the tickets?

7    I bought them.

8    Q.   What did you say to the government about the tickets?

9    A.   I bought them.  I don't recall what you're talking about.

10   Q.   You told the government that you declined the tickets for

11   free, but you purchased them from Arafat, correct?

12   A.   Yes.

13   Q.   You didn't tell them you purchased them for a dollar, did

14   you?

15   A.   He offered them for free, and I told him I can't accept

16   them for free.

17   Q.   And in your mind, paying a dollar for the tickets was not

18   getting them for free?

19   A.   He said -- he offered them to me for a dollar.

20   Q.   You're not allowed to do that when you're working for the

21   post office, take tickets for a football game from someone

22   you're giving business to?

23   A.   Less than 20 bucks.

24   Q.   And these tickets to a football game were less than 20

25   bucks?  What football game?

ICAHIss4                        Velez - Cross

1   A.  I don't know what they were worth at the time.  I didn't

2   get to use them anyway.

3   Q.  Did you tell the government about the car he gave you?

4   A.  No, I don't have a car.

5   Q.  You didn't get a car from Mr. Arafat, a Mercedes?

6   A.  He let me borrow it, and then he wanted it back.

7   Q.  Excuse me.  It's a Mercedes, right?

8   A.  Yeah.

9   Q.  He let you borrow it?

10  A.  Yes.

11  Q.  And then he wanted it back?

12  A.  Yeah.

13  Q.  And you gave it back to him?

14  A.  Had to.

15  Q.  Didn't you register it in your wife's name?

16  A.  Yes.

17  Q.  So that's how you give it back.  It's still in your wife's

18  name?

19  A.  I registered it under my wife's name, and it's not there no

20  more.  I don't have it.

21  Q.  That's not the point.  He gave you a car?

22  A.  I don't have it anymore.

23  Q.  Will you answer the question.  Did he give you a car?

24  A.  He --

25          THE COURT:  Yes or no, sir?

ICAHIss4                         Velez - Cross

1    A.  No.

2    Q.  Now, you're under oath.  I just want to remind you.

3    A.  Yes.

4    Q.  And you have to tell the truth whether it's good for us or

5    bad for us.  You understand?

6    A.  Yes, sir.

7    Q.  And whether it's good for the government or bad for the

8    government, correct?

9    A.  Yes, sir.

10   Q.  Did you tell the government that after Mr. Issa was

11   arrested, you got a Mercedes from Mr. Arafat which you

12   registered in your wife's name in Duploy, Pennsylvania?

13            THE COURT:  Did you tell that to the government, yes

14   or no?

15   A.  No.

16   Q.  Did you do it and keep it from the government because you

17   knew that would violate the terms of your agreement?

18   A.  No, because I was -- that was actually prior to getting --

19   getting arrested by them, I think.

20   Q.  But you're supposed to tell them about the stuff that you

21   did that was illegal in connection with your work as a post

22   office vehicle maintenance manager, isn't that true?

23   A.  Yes, sir.

24   Q.  And you did not tell them about this car?

25   A.  No, I did not.

ICAHIss4                          Velez - Cross

1   Q.   And you got the car from Arafat who was soliciting work

2   from you to his company Garrison?

3              THE COURT:   Is that correct, sir?

4   A.   Yes.

5   Q.   And he did get work for Garrison, correct?

6   A.   He who?  Who's "he"?

7   Q.   Garrison got work from the post office?

8   A.   Yes.

9   Q.   And how much was the value of this car at the time you got

10  it from him?

11  A.   I think about 4,000, $5,000.

12  Q.   How about 25,000?

13  A.   No, it was not worth --

14  Q.   It was a Mercedes.  You want to take back the 4,000?

15  A.   It was a 2008 car, old car.

16  Q.   Did you register the car?

17  A.   We registered it, yeah.

18  Q.   And you registered it in your wife's name, right?

19  A.   Yeah.  He gave it to her so she could use it, but it had a

20  lot of problems, so we got rid of it.

21  Q.   But when you gave it to her, it was a Mercedes that you got

22  from a vendor, correct?

23  A.   Yes.

24  Q.   And when you got the car, you were sending texts back and

25  forth to Mr. Arafat thanking him, correct?

ICAHIss4                          Velez – Cross

1    A.  Yes.

2    Q.  In fact, you said, "Wow, thank you," isn't that correct?

3          MS. HANFT:  Objection.

4          THE COURT:  Objection's overruled.

5    Q.  Isn't that what you said?  You want me to show you the

6    text?

7    A.  Probably said that.

8    Q.  In fact, you kept texting him because you didn't know how

9    to work the car, right?

10   A.  It had issues.

11   Q.  No.  It had issues?  You didn't know how to turn on the

12   lights.  That's not an issue.  That's you were asking a former

13   owner how to turn on the light of a Mercedes that he gave you,

14   correct?

15   A.  It had issues.

16   Q.  I'm asking you --

17         THE COURT:  Sir, could you please just answer his

18   question.  You know, Mr. Brafman is being very careful at this

19   point to ask questions that can only be answered yes or no.

20         THE WITNESS:  OK.

21         THE COURT:  So I would appreciate it if you would

22   answer the questions yes or no.

23         THE WITNESS:  OK.

24         Can you repeat the question?

25   Q.  Why don't I do it this way:  I'm going to show you

ICAHIss4                        Velez - Cross

1   Defendant's Exhibit 254, put it on the screen, just for

2   identification.

3           Mr. Velez, the government showed you certain texts

4   between yourself and Mr. Issa that are in evidence, correct?

5   A.  Yes, sir.

6   Q.  He didn't show you any texts between you and Mr. Arafat,

7   correct, sir?

8   A.  No, sir.

9   Q.  But you know you had text messages with Mr. Arafat,

10  correct?

11  A.  I didn't recall at the time.  I was too --

12  Q.  Your phone number at the time was (914) 573-3602?  I'm

13  sorry, 36002?

14  A.  I don't recall that number.

15  Q.  All right.  Let's put this on the screen.  It's identified

16  as Exhibit 254, and then I'm going to go to the next page.  I'm

17  sorry.  Let me use the one that's highlighted.

18          I'm going to go to the next page where it's

19  highlighted and ask you to look at the next page and tell me,

20  sir, whether these are, in fact, a series of texts between you

21  and Mr. Arafat concerning the car, correct?

22  A.  No, that's not my number, no.

23  Q.  (914) 346-7674 is not your number?

24  A.  No, sir.

25  Q.  That's not you talking to Mr. Arafat about the car?

ICAHIss4                    Velez - Cross

1    A.  No, sir.

2    Q.  Did you talk to Mr. -- did you use somebody else's number?

3    A.  No.

4    Q.  Didn't you tell the government that you used a burner phone

5    during this period?

6    A.  That's not my phone.

7    Q.  It's not your phone?

8    A.  No.

9    Q.  So who's talking to -- look at it and ask if it refreshes

10   your recollection.

11          Did you ask him about the lifetime warranty?

12   A.  That's not my phone.  That's --

13   Q.  Did you ask him about the lifetime warranty?

14   A.  That's not me.  That's somebody else.

15   Q.  But you had the car, right?

16   A.  Not -- not at that time, no.

17   Q.  Did your wife take it in for servicing or did you take it

18   in for servicing?

19   A.  I might have.  I don't --

20   Q.  Is your wife Arlyn?

21   A.  I might have.

22   Q.  Is your wife's name Arlyn?

23   A.  Yes.

24   Q.  I want to show you what's marked for identification as

25   Defendant's Exhibit 255, and you remember Keenan Motors?

ICAHIss4                        Velez - Cross

1    A.  Yes.

2    Q.  And is that where the service was done?

3    A.  Yes, sir.

4    Q.  Could you look at this and tell me whether this is a record

5    that shows your wife servicing that car in Keenan Motors?

6    A.  Yeah, that's her car, yeah.

7            MR. BRAFMAN:  I'm going to offer it into evidence,

8    your Honor.

9            MS. HANFT:  Objection.  Hearsay.

10           THE COURT:  The objection's sustained.

11   Q.  Now let's look at some documents, if we can.

12           Give me 252.

13           I'm showing you 252 for identification.  Just starting

14   with the registration information, ignore the top because

15   that's how the report was obtained, but this is registration

16   information for your wife?

17           MS. HANFT:  Objection, your Honor.

18   Q.  Do you recognize this document as the registration of the

19   vehicle by your wife?  Do you?

20           MS. HANFT:  Objection.

21   A.  Yes.

22           MR. BRAFMAN:  I offer it into evidence.

23           THE COURT:  The objection's overruled.

24           MR. BRAFMAN:  Thank you.

25           (Defendant's Exhibit 252 received in evidence)

ICAHIss4                        Velez - Cross

BY MR. BRAFMAN:

Q.  Now that it's in evidence, let's go over the pertinent
information.

         First of all, you know from being a car person that
every car has a VIN number?

A.  Yes, sir.

Q.  And every car, in the United States at least, has only one
VIN number?

A.  Yes, sir.

Q.  That's how the police can track a vehicle through that,
correct?

A.  Yes, sir.

Q.  All right.  And when you register a new car, the VIN number
stays the same, correct?

A.  Yes, sir.

Q.  Even if you change the plates, the VIN number stays the
same?

A.  Yes, sir.

Q.  And the VIN number here, so that it's in the record is
4JGBBBG6E88A434706.  Did I read it correctly?

         I'm going to do it one more time.  I'm told I missed a
number.  4JGBB86E88A434706, correct?

A.  Yes.

Q.  And it's registered to Arlyn Serrano Velez in Doylestown,
Pennsylvania.  That's your wife, sir, isn't it?

ICAHIss4                    Velez - Cross

```
 1    A.  Yes, sir.
 2    Q.  This is in or about the date -- this is a 2008 Mercedes,
 3    correct?
 4    A.  Yes.
 5    Q.  And that's the car we're talking about, correct?
 6    A.  Yes, sir.
 7    Q.  Just so we're clear, the car that you were given by
 8    Mr. Arafat was registered in your wife's name.  Did you
 9    consider that car, however much it was worth, a bribe from
10    Mr. Arafat?
11    A.  Looking at it, I would say yes.
12    Q.  Did you tell the government about it?
13    A.  No, we never spoke about it.
14    Q.  I'm sorry?
15    A.  We never spoke about it.
16    Q.  You forgot about a Mercedes that you got from a vendor?
17    A.  We never spoke about it.
18    Q.  So if they didn't ask you, you didn't have to tell them?
19    A.  I didn't even remember because we were doing Mr. Issa's
20    stuff.
21    Q.  So you completely forgot about a gift of a Mercedes and you
22    remember the $5 sandwich at Jimbo's?
23    A.  That was the first time I went out to lunch with him.
24         MR. BRAFMAN:  Now, if I may have a minute, your Honor?
25    Q.  I want to go back to the agreement you signed with the
```

1    government for a moment, if I may.

2          Now, the first page of your agreement which is in

3    evidence says, beginning on the third paragraph:  It is

4    understood that the defendant (a) shall truthfully and

5    completely disclose all information with respect to the

6    activities of himself and others concerning all matters about

7    which the office inquires, which information can be used for

8    any purpose.

9          Do you read that correctly?

10   A.  Yes.

11   Q.  Do you understand that to mean so long as the government

12   doesn't ask you, you don't have to tell them?

13   A.  Anything that they want is what I have to give them.

14   Q.  How would they even know to ask you about a car that you're

15   not telling them about that's clearly a bribe that you even

16   admit to?

17   A.  I didn't think of it, sir.  At the time I didn't think of

18   it.

19   Q.  And now it says:  Shall cooperate fully with the office --

20   and I'll skip a little bit.  Shall attend all meetings; shall

21   provide this office upon a request any document, record, or

22   tangible evidence relating to matters about which this office

23   or any designated law enforcement agency inquiries; shall

24   truthfully testify; shall bring to this office's attention all

25   crimes he has committed -- sorry -- and all crimes he has

ICAHIss4                          Velez - Cross

1    committed, period.

2             OK.  You got to tell them about crimes you have

3    committed, correct?

4    A.  Yes, sir.

5    Q.  And you didn't tell them about the Arafat bribe of a

6    Mercedes-Benz, correct?

7    A.  Correct.

8    Q.  You believe, as you sit here today, that you have violated

9    the terms of your agreement or do you get a pass?

10   A.  I didn't think of it at the time, so I didn't -- I admitted

11   it, and I would say that it's a crime.

12   Q.  That's what?

13   A.  That it's a crime.

14   Q.  Do you believe that you could be prosecuted for that or you

15   get a pass for that crime?

16   A.  No, I could be prosecuted for it.

17   Q.  And as you sit here today, do you believe that they have

18   the right to tear up your cooperation agreement?

19   A.  Yes, sir.

20   Q.  Do you honestly believe that that's going to happen?

21   A.  Could be.

22             MR. BRAFMAN:  Nothing further.

23             THE COURT:  Thank you.

24             Is there any redirect from the government?

25             MS. HANFT:  Briefly, your Honor.

1          MR. BRAFMAN:  Your Honor.

2          THE COURT:  Did you forget one?

3          MR. BRAFMAN:  No, it's OK.  I'll do it in summation.

4          THE COURT:  OK.

5    REDIRECT EXAMINATION

6    BY MS. HANFT:

7    Q.  Mr. Velez, do you recall being asked on cross-examination

8    about the various items that Mr. Issa gave you?  Do you recall

9    being asked about, for example, cash payments that Mr. Issa

10   gave you?

11   A.  Yes.

12   Q.  Do you recall Mr. Brafman asking you whether you always

13   thought of that as a bribe?

14   A.  Yes.

15   Q.  As you began to get money from Mr. Issa, did you come to

16   think of that money as a bribe?

17   A.  Yes, later on.

18   Q.  Did you come to think of it as a bribe while you were

19   getting the money?

20   A.  In the very beginning, no, I just thought -- I thought of

21   it as a friend giving me money, but then, you know, when he

22   started to request more and more work and then told me that he

23   was gonna cut me off, I didn't have a choice but to give him

24   work, and I knew at that point that it was a bribe.

25   Q.  When you first started giving work to Mr. Issa's companies,

ICAHIss4                     Velez - Redirect

1   is it fair to say that at the beginning you were somewhat

2   satisfied?

3   A.   In the beginning, yes.

4   Q.   And then as time went on, were there more problems or fewer

5   problems?

6   A.   There were more problems with the company, and they just

7   was not up to par, no.

8   Q.   As time went on, what, if anything, happened to the amount

9   of money that you were getting from Mr. Issa?

10  A.   It increased.

11  Q.   You recall Mr. Brafman asking you about that first day when

12  OIG agents approached you?

13  A.   Yes.

14  Q.   Do you recall him asking whether you told them that you did

15  not accept shoddy work?

16  A.   Correct.

17  Q.   Is that true, did you accept shoddy work?

18  A.   Work you mean -- there was times that there was a lot of

19  issues with the vehicles, and I had to contact the company to

20  let them know that they brought me back a vehicle that was

21  limping.  It wasn't working right.

22  Q.   That first time, had you met with the government yet?  When

23  the OIG agents came to see you in your office, had you met with

24  the government at all?

25  A.   No.

ICAHIss4                    Velez - Redirect

1   Q.  Had you talked about this crime at all before with any law

2   enforcement agents?

3   A.  About the bribe?

4   Q.  About that time, yes.

5   A.  No.

6   Q.  So why did you say that you did not accept shoddy work that

7   day?

8   A.  I was nervous.  I was scared, and I just --

9           THE COURT:  All right.  Go ahead.

10  A.  I just -- you know, I wanted to tell them, you know, how I

11  felt about the work that I was getting from -- you know, the

12  work performance that I was getting from them, you know, at

13  that time wasn't as bad, but it really started to get bad.

14  Q.  Now, you a moment ago mentioned Mr. Issa threatening to

15  stop giving you work.  What would he say when he -- sorry, to

16  stop giving you money.  What would he say when he threatened to

17  stop giving you money?

18  A.  At first I would call to go pick up money from Sohail, and

19  when I'd call him, he says, "Oh, there's nothing here for you."

20  So I would send a text to Mr. Issa to tell him, you know, "What

21  happened with my brother?" that's how I used to refer to

22  Sohail.  He says, "Oh, we have to talk."  And when we would

23  talk, he says, "Well, I'm not getting any work, and Danny's

24  giving work out to everybody else.  I'm not getting any work at

25  the shop.  My mechanics are sitting down doing nothing while

1    everybody else is working, and I'm not doing anything."  And I

2    said, "Everybody -- you know, there's a lot of work, and once

3    we catch up to where we have to be at, the work is going to

4    slow down substantially."

5    Q.  Did you think Mr. Issa was giving you the cash because he

6    was your friend or because he wanted work from you?

7              MR. BRAFMAN:  Objection.

8              THE COURT:  The objection's sustained.

9              MS. HANFT:  One moment.

10             No further questions, your Honor.

11             THE COURT:  Thank you.

12             Anything else?

13             MR. BRAFMAN:  No your Honor.

14             THE COURT:  Thank you, sir.  You may step down.

15             Call your next witness, please.

16             (Witness excused)

17             MR. WIRSHBA:  Government calls Marina Gorboul.

18   MARINA GORBOUL,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21             THE COURT:  You may inquire.

22             MR. WIRSHBA:  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MR. WIRSHBA:

25   Q.  Good afternoon, Ms. Gorboul.

1    A.   Good afternoon.

2    Q.   Where do you currently work?

3    A.   Global Partners.

4    Q.   What's Global Partners?

5    A.   It's a company that owns hundreds of gas stations and

6    operates them between Pennsylvania and Maine.

7    Q.   What's your title at Global Partners?

8    A.   Assistant director of accounting.

9    Q.   How long have you been there at Global Partners?

10   A.   Four and a half years.

11   Q.   What are the roles that you have had there?

12   A.   I started as a senior accountant.  A year later I was

13   promoted to general ledger supervisor.  Ten months later I was

14   promoted to general ledger manager.  And about a year and a

15   half later, I was promoted to my current role.

16   Q.   For those of us who are not accountants, what's the general

17   ledger?

18   A.   It's a main accounting department that combines

19   transactional data from subledgers, such as accounts

20   receivable, accounts payable, retail.

21   Q.   What are your duties and responsibilities in your current

22   role as assistant director of accounting?

23   A.   I oversee functions of accounts receivable and accounts

24   payable departments.

25   Q.   What's Global Montello?

ICAHIss4                        Gorboul - Direct

1    A.   Global Montello is subsidiary of Global Partners.

2    Q.   Does Global Montello has a gasoline distribution business?

3    A.   Yes, they do.

4    Q.   Does Global Montello run all of its gas stations in the

5    same way?

6    A.   No.

7    Q.   What are the different types of gas stations with which

8    Global Montello has relationships?

9    A.   Retail is one type.  We either lease or own the location.

10   We own few inventory.  We own C-store inventory, and we have

11   our employees that operate the station.

12   Q.   So Ms. Gorboul, you mentioned C-store what's a C-store?

13   A.   C-store is convenience store inventory.  It's your Snickers

14   bars, anything you can buy at a gas station.

15   Q.   So that was retail locations.  Are there other types of gas

16   stations with which Global Montello has relationships with?

17   A.   Second type is dealer.  We do not own the site or lease it.

18   We do not own any of the inventory.  The only connection, only

19   relationship we have with the dealer is we sell them fuel.

20   Q.   And what's the other type of relationship that Global

21   Montello has?

22   A.   Last and third type is agent.  We lease or own the site.

23   We own fuel inventory.  The agent, which is a third party, they

24   own C-store inventory and they operate the site on our behalf.

25   Q.   So does the agent receive any income from the sale of gas

ICAHIss4                         Gorboul - Direct

1  in the agency relationship?

2  A.  They receive commission on monthly basis based on the

3  number of gallons that they sell.

4  Q.  In 2012 did Global Montello have a relationship with a

5  company called First Star Auto Repair?

6  A.  Yes, they did.

7  Q.  Was that a gas station?

8  A.  Yes.

9  Q.  What type -- among these three types, what type of

10  relationship did Global Montello have with First Star Auto

11  Repair?

12  A.  They were the agent at the location.

13  Q.  Was this agency relationship memorialized in an agreement?

14  A.  Yes.

15  Q.  All right.  When did First Star Auto's relationship with

16  Global Montello begin?

17  A.  May 2012.

18  Q.  Who was the contact person for First Star Auto Repair in

19  2012?

20  A.  Ibrahim Issa.

21  Q.  Do you know where First Star Auto was located?

22  A.  1982 Bronxdale Avenue, Bronx, New York.

23  Q.  For First Star Auto, did First Star Auto Repair own the gas

24  sold at that gas station?

25  A.  No.

ICAHIss4                          Gorboul - Direct

1    Q.   Who owned that gas?

2    A.   Global Montello Group.

3    Q.   And when a customer came to First Star to get gas, what are

4    the methods of payment that they might use to get gasoline?

5    A.   They could pay via credit card or cash.

6    Q.   When a customer pays with a credit card at First Star Auto

7    Repair, how would Global Montello be paid?

8    A.   We receive all the credit cards, so in the end of the day,

9    the money hits our bank account.

10   Q.   Would First Star Auto Repair receive any money directly

11   from credit card sales into its bank account?

12   A.   No.

13   Q.   What about when a customer paid cash?  Was Global Montello

14   paid directly for every cash sale?

15   A.   No.

16   Q.   How did Global Montello get paid for cash sales?

17   A.   We know total fuel sales for the day.  We also know the

18   credit cards that we receive for the day.  If there's a

19   difference, which is essentially your cash sales, we would

20   draft the agent, we would draft their bank account for the

21   difference.

22   Q.   You said "draft."  What do you mean by "draft"?

23   A.   Take money directly out of their bank account.

24   Q.   How is Global Montello able to take money directly out of

25   the bank account of First Star Auto Repair?

ICAHIss4                        Gorboul - Direct

1    A.  It's part of the agreement.  There's some sort of

2    authorization signed at the time when the contract is signed.

3    Q.  So fair to say that Global Montello had permission to do

4    that, is that right?

5    A.  Yes, yes.

6    Q.  Now, as long as First Star Auto Repair had money in its

7    account, how would Global Montello know if it was withdrawing

8    money from cash sales or other sources?

9    A.  I'm sorry.  Could you repeat the question.

10   Q.  Of course.  As long as First Star Auto Repair had money in

11   its bank account, would Global Montello know if it was

12   withdrawing money from cash sales or from other sources?

13   A.  No, they wouldn't know.

14   Q.  So can Global see the balances or the detail in First Star

15   Auto Repair's bank account?

16   A.  No.

17   Q.  You mentioned that agents like First Star Auto Repair, they

18   get a commission.  Am I right about that?

19   A.  Yes.

20   Q.  How did First Star Auto Repair receive its commission?

21   A.  It was deposited directly into his bank account.

22            MR. WIRSHBA:  Your Honor, at this time the government

23   would request that your Honor read a stip, specifically 4009,

24   paragraph 9.

25            THE COURT:  Which one is that?

ICAHIss4                        Gorboul - Direct

1           MR. WIRSHBA:  4009, the one from this morning,

2   paragraph 9.  I have a copy of that if it would be easier.

3           THE COURT:  If called as a witness at trial, a

4   custodian of records from Global Montello Group Corp. would

5   testify that Government Exhibits 651 through 654, including all

6   parts and subdivisions thereof, are true and correct copies of

7   records of Global Montello; that the original records were all

8   made at or near the time, by or from information transmitted by

9   a person with knowledge of the matters set forth in the

10   records; that they were kept in the ordinary course of Global

11   Montello's regularly conducted business activity; and that it

12   was the regular practice of that business activity to make the

13   records.

14           MR. WIRSHBA:  Thank you, your Honor.

15           At this time the government would offer Government

16   Exhibits 651 through 654.

17           MR. BRAFMAN:  No objection.

18           MR. KIRSHNER:  No objection.

19           THE COURT:  Admitted.

20           (Government's Exhibits 651 through 654 received in

21   evidence)

22           MR. WIRSHBA:  Thank you, your Honor.

23           If we could have Government Exhibit 654 put up on the

24   screen, Ms. Geier.

25   Q.  Ms. Gorboul, can you see that on your screen?

1    A.   Yes.

2    Q.   What is this?

3    A.   This is a summary of agent's activity, account activity,

4    from 2012 to 2014.

5    Q.   And behind this summary, is there an actual report?

6    A.   Yes.  The data behind the summary is generated out of our

7    accounting software, PDI.

8    Q.   What kind of information does your accounting software,

9    PDI, have in it?

10   A.   It has amount of total drafts from the agent's account, it

11   has commission expense, amount of commission earned, rent,

12   utility expenses.

13   Q.   Can you tell from this first page what agent this report

14   relates to?

15   A.   Yes.  First Star Auto Inc.

16   Q.   And who's the contact person for First Star Auto?

17   A.   Ibrahim Issa.

18           MR. WIRSHBA:  Ms. Geier, if we could put up Government

19   Exhibit 651.

20   Q.   Taking a look at this document, what is this, Ms. Gorboul?

21   A.   This is a fuel inventory report.  It reports on a daily

22   basis the amount of inventory/fuel there was in the tanks at

23   the location, amount of sales that were made in gallons and in

24   dollars.

25   Q.   Where do you get this information?

1   A.  It's generated out of our accounting system, PDI.

2            MR. WIRSHBA:  Let's take a look at page 23 of this

3   report, if we could, Ms. Geier.

4   Q.  Is this the last page of this report, Ms. Gorboul?

5   A.  Yes.

6   Q.  Taking a look at page 23, can you tell how much gas First

7   Star Auto Repair sold from May 2012 to the end of the year?

8   A.  470,651 gallons, which is equivalent of $1,883,120.

9            MR. WIRSHBA:  Let's take a look at Government

10  Exhibit 652, if we could, Ms. Geier.

11  Q.  What is this?

12  A.  This is a report showing on daily basis number of diesel

13  gallons sold at the location as well as dollars for the diesel

14  product.

15           MR. WIRSHBA:  If we could jump to the fourth page of

16  this report.

17  Q.  Where did you get the information contained on this report?

18  A.  Information is pulled out of our accounting system, and

19  it's generated through our reporting tool called Focal Point.

20  Q.  And why do these figures, why do they start in May of 2012?

21  A.  That's when the relationship with First Star Auto started.

22  Q.  OK.  Did you add anything to this chart?

23  A.  I added a third column which takes second column, divides

24  it by the first column.

25  Q.  And what is the result when you take the first column and

ICAHIss4                           Gorboul - Direct

1   divide it by the second column -- or the second column and

2   divide it by the first column, I apologize?

3   A.   It shows dollar price per gallon for the diesel fuel for a

4   specific day.

5   Q.   What does it mean where it says, Div, divide by, zero

6   exclamation mark?

7   A.   It means there was no diesel sales for that day.

8            MR. WIRSHBA:   Ms. Geier, if we could take a look at

9   Government Exhibit 653, and specifically on the second page of

10  that PDF.

11  Q.   What's this?

12  A.   This is a report generated by software DTN.   It outlines

13  credit cards processed at this location for a specific day.

14  Q.   Where does Global get the information that's contained in

15  this report?

16  A.   It is pulled from credit card processor.

17  Q.   Let's go back to the first page of this document.   Who made

18  this particular summary chart here?

19  A.   I put together a summary.

20  Q.   Where'd you get this information?

21  A.   Underlying data which we just looked at which is generated

22  from the credit card processor.

23  Q.   You said that total gas sales for 2012 from May until the

24  end of the year was $1,883,120 for First Star Auto Repair, is

25  that right?

ICAHIss4                         Gorboul – Direct

1    A.   Correct.

2    Q.   And what does it say here is the total amount of credit

3    card sales?

4    A.   $714,118.31.

5    Q.   The difference between those numbers, that's the non-credit

6    card sales for 2012 for First Star Auto Repair, right?

7    A.   Correct.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICA5iss5                         Gorboul - cross

1    BY MR. WIRSHBA:

2    Q.  And the amount that Global Montello automatically withdrew

3    from First Star auto repair from their account is equivalent to

4    these noncredit card gas sales.  Is that right?

5    A.  Yes.

6              MR. WIRSHBA:  Nothing further, your Honor.

7              THE COURT:  Yes.

8    CROSS EXAMINATION

9    BY MR. KIRSHNER:

10   Q.  Good afternoon, Ms. Gorboul.

11   A.  Hello.

12   Q.  Global Montello had a business relationship with First Star

13   Auto since 2012; is that correct?

14   A.  Correct.

15             THE COURT:  Sir, could you just move the microphone a

16   little closer to you, or you a little closer to the microphone?

17   One of the two.

18             MR. KIRSHNER:  Your Honor, may I approach?

19             THE COURT:  Yes.

20   Q.  Showing you what's been marked for identification as

21   Defendant's Exhibit 600, do you recognize that?

22   A.  Yes.

23   Q.  Is that a --

24             THE COURT:  What is it?

25   Q.  What is it?

ICA5iss5                         Gorboul - cross

1    A.  It's an agreement between Global Montello Group and the

2    agent.

3            MR. KIRSHNER:  I ask that Defendant's Exhibit 600 be

4    moved into evidence.

5            THE COURT:  Offered.  It is offered.

6            Objection?

7            MR. WIRSHBA:  Government has no objection.

8            THE COURT:  Thank you.  It is admitted.

9            (Defendant's Exhibit 600 received in evidence)

10   BY MR. KIRSHNER:

11   Q.  Is that an agreement that sets out the term of the business

12   relationship between First Star Auto and Global Montello?

13   A.  Yes.

14   Q.  And as you described on direct examination, that business

15   relationship is an agency relationship, correct?

16   A.  Yes.

17   Q.  And in an agency relationship it is fair to say that the

18   contract here, Defendant's Exhibit 600, spells out a business

19   relationship whereby First Star sells Global's gas for Global,

20   right?

21   A.  Yes.

22   Q.  And in exchange for the service of selling Global's gas, at

23   the end of the month Global pays First Star a commission?

24   A.  Yes.

25   Q.  And then you testified on direct about credit card payments

ICA5iss5                    Gorboul - cross

1   that are processed at First Star's location, that goes directly

2   to Global, right?

3   A.  Yes.

4   Q.  That money never hits any account of First Star's?

5   A.  Correct.

6   Q.  In fact, you have your own machines at the location which,

7   once a credit card gets swiped, it is credited to Global, not

8   First Star?

9   A.  Yes.

10  Q.  Now, customers that buy Global's gas from a First Star

11  location using cash, their money is collected by First Star but

12  the funds, at all time, belong to Global, correct?

13  A.  Yes.

14  Q.  We see that on page 6 of Defendant's Exhibit 600, I am

15  going to show you highlighted, it says deposit by agent of any

16  daily deposits to a bank account -- and agent there is First

17  Star, correct?

18  A.  Yes.

19  Q.  -- in its own name shall not be interpreted as, nor

20  constitute, any agreement or acknowledgment that daily deposits

21  shall ever be deemed the property of the agent it being

22  expressly understood and agreed that said funds remain, at all

23  times, the sole and exclusive property of Global.

24       That's consistent with the terms of the agency

25  relationship, correct?

1    A.  Yes.

2    Q.  Now, once the cash that First Star collects on behalf of

3    Global gets deposited into this account, at some point Global

4    has a right to withdraw the amount of the gas sales minus the

5    credit card, correct?

6    A.  Yes.

7    Q.  And in between the time that First Star collects the cash

8    and Global withdraws it from the account, it makes no

9    difference to Global if the cash is actually deposited in there

10   or other funds are used to meet the amount that's being

11   withdrawn by Global, correct?

12           MR. WIRSHBA:  Objection.  Form.

13           THE COURT:  I don't see the problem.  Answer the

14   question.

15           THE WITNESS:  It makes no difference to Global.

16   BY MR. KIRSHNER:

17   Q.  And, at the end of the month when Global pays First Star,

18   the commission based on the amount of gas sales, they actually

19   deduct something from that commission, correct?

20   A.  There could be some charges that the agent is responsible

21   for potentially, yes.

22   Q.  And in this case is Global responsible for collecting the

23   rent for another entity that First Star owes that entity?

24   A.  Could you rephrase the question, please?

25   Q.  Does Global collect rent from First Star for the pumps, the

ICA5iss5                      Gorboul - cross

1   machines, and some of the facilities at First Star?

2   A.  Yes.

3   Q.  And so, often times would it be that the commission is

4   actually less than the money owed for rent?

5   A.  Yes.

6   Q.  So, First Star would receive no money they would owe less

7   than the rent they're owed -- that they're required to pay to

8   the third-party?

9   A.  Potentially.

10  Q.  I am being a little confusing.  I'm sorry.

11  A.  That's okay.

12  Q.  I am going to show you what's in evidence as Government

13  Exhibit 654.  This is the first page which is a summary page,

14  correct?

15  A.  Yes.

16  Q.  We see here that the commission expense, that number right

17  there, that's the number that's paid to First Star for the

18  commission over a three-year period, correct?

19  A.  Yes.

20  Q.  And then when we look down here, rent premises, across

21  there we see a number, that's the number that, and it says it

22  right here that Global collects from First Star for rent?

23  A.  Correct.

24  Q.  We see that the number here, $195,204.48, is greater than

25  the total number of commission which is $136,841.34, correct?

ICA5iss5                         Gorboul - redirect

1    A.   Yes.

2    Q.   So, we can't break it down month by month; overall, Global

3    didn't actually pay the actual commission, they just collected

4    less for rent.  It's a net negative for First Star?

5    A.   Net, yes.

6              MR. KIRSHNER:  No further questions.

7              THE COURT:  Thank you.

8              Any redirect?

9              MR. WIRSHBA:  Very briefly, your Honor.

10   REDIRECT EXAMINATION

11   BY MR. WIRSHBA:

12   Q.   Ms. Gorboul, taking a look at that defendant's exhibit that

13   is in front of you, the contract; do you see that?

14   A.   Yes.

15   Q.   Can you take a look at the last page of that contract and

16   just let me know, I guess it is not the last page of that

17   entire thing, it is the last page of the contract which is on

18   page 15.  Do you see that?

19             THE COURT:  Page 15 of 23.

20   A.   Yes.

21   Q.   Who signed this contract on behalf of the Agent?

22   A.   Ibrahim Issa.

23   Q.   And take a look at the first page of Defendant's Exhibit

24   600.  What does it say is the effective date of this agreement?

25   Can you tell from the top?

ICA5iss5                              Gorboul - recross

1    A.   November 2014.

2    Q.   So, would this agreement have governed the parties in 2012?

3    A.   No.

4             MR. WIRSHBA:  Nothing further, your Honor.

5             MR. KIRSHNER:  Briefly, your Honor, two questions?

6             THE COURT:  Yes.

7    RECROSS EXAMINATION

8    BY MR. KIRSHNER:

9    Q.   Is there anything in this agreement that was different

10   about the business relationship that Global had with First Star

11   in 2012?

12   A.   I'm not aware.

13            MR. KIRSHNER:  Thank you.

14            THE COURT:  Okay.  Thank you.  I think you are done.

15   Thank you very much.

16            (Witness excused)

17            THE COURT:  Call your next witness.

18            MS. HANFT:  Your Honor, there is one item with the

19   next witness that should be taken up outside the presence of

20   the jury.

21            THE COURT:  Good.  They can sit here because we are

22   not taking a break.  So, come on over here.

23            (Continued next page)

24

25

ICA5iss5                        Gorboul — recross

1              (At side bar)

2              MS. HANFT:  We apologize, your Honor.  It is an

3    immunity witness.

4              THE COURT:  That's unfortunate, isn't it?  I could

5    have been alerted to this earlier in the day possibly.

6              MS. HANFT:  I apologize, your Honor.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICA5iss5                              Gorboul – recross

1              (In open court)

2              THE COURT:  I'm sorry.  I actually do have to send you

3     out of the courtroom.  Do not discuss the case, keep an open

4     mind.  I tried.

5              Don't go far.  Because I have to leave at 4:00, I want

6     to really get you back in here as fast as possible.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICA5iss5                          Butt - direct

1                    (Jury not present)

2                    THE COURT:  Call your next witness, please.

3                    MS. HANFT:  Government calls Sohail Butt.

4           SOHAIL I. BUTT,

5                called as a witness by the Government,

6                having been duly sworn, testified as follows:

7           DIRECT EXAMINATION

8           BY MS. HANFT:

9           Q.  Good afternoon, Mr. Butt.

10          A.  Good afternoon.

11          Q.  Where do you live?

12          A.  I invoke my Fifth Amendment rights.

13          Q.  Where do you work?

14          A.  I invoke my Fifth Amendment rights and I'm not answering

15          any questions.

16          Q.  Do you know an individual named Ibrahim Issa?

17          A.  I invoke my Fifth Amendment rights.

18          Q.  Do you work for him?

19          A.  I invoke my Fifth Amendment rights.  I'm not answering any

20          questions.

21          Q.  Have you received cash payment off-the-books?

22          A.  I invoke my Fifth Amendment rights.  I'm not answering any

23          questions.

24          Q.  Have you paid the full amount owed in taxes?

25          A.  I invoke my Fifth Amendment rights.

ICA5iss5                          Butt - direct

1   Q.  Did you participate in giving large cash payments to an

2   individual designated by Ibrahim Issa?

3   A.  I invoke my Fifth Amendment rights and I am not answering

4   any questions.

5          MS. HANFT:  Judge, I ask that the immunity order that

6   your Honor previously conditionally entered become effective

7   and be marked as a Court exhibit.

8          THE COURT:  I don't have a copy of it up here.

9          Sir, is it your intention to answer any and all

10  questions that are put to you with respect to this matter in

11  the same manner that you have answered the questions that have

12  been put to you already?

13         THE WITNESS:  Yes.

14         THE COURT:  Okay.

15         On November 16, the Court conditionally ordered,

16  entered an order of immunity.  It was conditioned on having the

17  witness assert his Fifth Amendment privilege in open court.  He

18  has done so.  Accordingly, the order of November 16 has become

19  effective.

20         Get the jury back in here.

21         MS. HANFT:  Thank you, your Honor.

22         (Continued on next page)

23

24

25

ICA5iss5                        Butt - direct

1                (Jury present)

2                THE COURT:  Call your next witness please.

3                MS. HANFT:  The government calls Sohail Butt.

4      SOHAIL I. BUTT,

5           called as a witness by the Government,

6           having been duly sworn, testified as follows:

7                THE COURT:  You may inquire.

8      DIRECT EXAMINATION

9      BY MS. HANFT:

10     Q.  Good afternoon, sir.  How old are you?

11     A.  I'm 54.

12     Q.  Where do you live?

13     A.  I live in the Bronx.

14     Q.  Do you have a job?

15     A.  Yes.

16     Q.  What do you do?

17     A.  I work in a Mobil gas station as a manager right now.

18     Q.  Who owns that gas station?

19     A.  Mr. Issa.

20     Q.  Do you see Mr. Issa in the courtroom today?

21     A.  Yes.

22                MR. BRAFMAN:  Stipulate identification.

23                THE COURT:  Where is Mr. Issa, sir?

24                THE WITNESS:  In the middle, in that row.

25                THE COURT:  Which row?

ICA5iss5                        Butt - direct

1              THE WITNESS:  Behind this gentleman.

2              THE COURT:  Behind this gentleman.

3              THE WITNESS:  He doesn't have no ties.

4              THE COURT:  Indicating Mr. Issa.

5              THE WITNESS:  Right there.

6    BY MS. HANFT:

7    Q.  You mentioned that you worked at a gas station owned by

8    Mr. Issa.  What did you say the name of that station was, sir?

9    A.  What?

10   Q.  What is the name of that gas station?

11   A.  It is a Mobil gas station, 2090 Bronxdale.

12   Q.  Where is it located?

13   A.  Bronx, New York.

14   Q.  Have you worked at any other gas stations?

15   A.  Right now?

16   Q.  Have you, in the past, worked at any other gas stations?

17   A.  Yes; in another location, 1106 Metcalf, Bronx, New York.

18   That's in the Bronx as well.

19   Q.  Who owned that gas station?

20   A.  Mr. Issa.

21   Q.  How long have you worked for Mr. Issa?

22   A.  I works 2005 until today.

23   Q.  During what years were you working at the gas station at

24   2090 Bronxdale?

25   A.  From 2005 until 2016 and I think a little bit more.

ICA5iss5                        Butt - direct

1    Q.  And the gas station on Metcalf, how long did you work there

2    for?

3    A.  Metcalf, I think I went to -- 2015 I just go there to take

4    care and help the other manager, she was there.  So, finally I

5    took over, 2017 until today.

6    Q.  At the gas station located at 2090 Bronxdale, did you have

7    an office?

8    A.  Yes.

9    Q.  Where in the gas station was that office?

10   A.  Just behind, like for example, the counter and behind there

11   on a wall, next to the wall.

12   Q.  Indicating that the office was a few feet behind the

13   counter?

14   A.  Yes.

15   Q.  About how many employees did you manage as manager of that

16   gas station?

17   A.  We have roughly five to six, and sometime on a summer we

18   have seventh guy who comes in who do from 2:00 to 8:00s in

19   summer only.  So, normally we have six peoples.

20   Q.  During the course of your work as a manager at the gas

21   stations owned by Mr. Issa, what were your duties?

22   A.  Basically, my duty was to maintain the store, order gas,

23   anything the store need to order, check the paperworks for the

24   cashier reports, separate the money, and we have three accounts

25   only to put it in on each account.  And, basically, if I need

ICA5iss5                          Butt - direct

1    to hire somebody I hire it and that's -- anything to do with

2    the store I was managing.

3              MS. HANFT:  Your Honor, I ask that the Court read

4    paragraph 15 of the stipulation marked Government Exhibit 4009.

5              THE DEPUTY CLERK:  Do you have 9 still up there?

6              THE COURT:  I should, but I have a lot of paper up

7    here.

8              If called at a witness at trial, a custodian of

9    records of Optimum Grocery Store, Inc., would testify that

10   Government's Exhibits 772, 774, 776, including all parts and

11   2001 divisions thereof are true and correct copies of records

12   of Optimum; that the original records were all made at or near

13   the time by or from information transmitted by a person with

14   knowledge of the matters set forth in the records; that they

15   were kept in the ordinary course of Optimum's regularly

16   conducted business activity, and it was the regular practice of

17   that business activity to make the records.

18             MS. HANFT:  Thank you, your Honor.  The government

19   offers Government's Exhibits 772, 774, and 776.

20             MR. BRAFMAN:  No objection.

21             THE COURT:  They're admitted.

22             (Government's Exhibits 772, 774, and 776 received in

23   evidence)

24   BY MS. HANFT:

25   Q.  Can we publish Government Exhibit 772?

ICA5iss5                        Butt - direct

1           Mr. Butt, do you recognize this?

2    A.   Yes.

3    Q.   What is this?

4    A.   That's a shift paper.  Normally the cashier, when he finish

5    his shift, at the end of the day they have to print the report

6    from the computer and then write on it if they have any payroll

7    towards any vendors or anybody.  Whatever they paid out they

8    write it on that sheet, on that paper.

9    Q.   What, if anything, is the sheet supposed to keep track of?

10   A.   How we do keep the track of these papers?

11   Q.   What is the intention of the sheet?  What is the sheet

12   supposed to keep track of?

13   A.   This is basically he approve because we paid cash to the

14   vendors.  So, it keep us tracks on these paper and then, plus,

15   we do as well on a computer DSR and we put it up there as well.

16   So, for example, for the office, when they have these invoices,

17   they could compare with this paper to the DSR we have do on a

18   computer to make sure, I mean, that money belongs to or goes to

19   that person or vendor.

20   Q.   Looking about a quarter of the way down the page on the

21   left-hand side where it says paid out, what is that?  What is

22   paid out?

23   A.   Yes.  That's what I'm talking about.  For example, this is

24   Global -- okay, that's Mr. Tony $750 and Entenmann, that's a

25   cake company, they have $88.85 paid out.

1    Q.  So, my question is just what does paid out mean?

2    A.  Paid out, like for example if somebody brings some stuff or

3    we buy something or we order and then they bring the delivery

4    after we check out the deliveries, whatever they bring it in,

5    so we have to pay them.

6    Q.  There is a third entry that says "Mr. Tony."  What does

7    that refer to?

8    A.  Mr. Tony, that 750, maybe he took some money because Tony

9    comes in and we give him the money.

10   Q.  And what do you give him when he comes in?

11   A.  Excuse me?

12   Q.  What do you give Mr. Issa when he comes in?

13   A.  Yes, if he comes in and asks for money we give him; yes.

14   Q.  How often are these sheets completed?

15   A.  How often?

16   Q.  Yes.  How often are these sheets completed?

17   A.  These sheets, it depends on how many cashiers working.  So

18   if there are four or five, so they have to complete their shift

19   and after 24 hours we have to print the report for 24 hours and

20   those all cashier report, we put it together and then, you

21   know, we keep it for the office.

22   Q.  Can we turn to the sixth page of this document, please?

23         So, Mr. Butt, if you could look again halfway down the

24   page, these entries that say Mr. Tony, who does that refer to,

25   first of all?

ICA5iss5                    Butt - direct

1    A.   That's for Mr. Tony, $1,500.

2    Q.   Who is Mr. Tony?

3    A.   Mr. Issa.

4    Q.   And what does it mean if you wrote $1,500?

5    A.   Maybe he came in and he took the $1,500 money.

6    Q.   Now, when Mr. Issa came in to the station and asked for

7    cash, did it come out of the cash register?

8    A.   If it is like, for example, regular money like $500, $600,

9    if we have it in the cash that come out from the cash.  And if

10   someone had put it up there so that means that come out from

11   the cash.  Nothing come from the office, back office or from

12   the safe, it come out from the cash registers.

13   Q.   Were there times when it did not come out of the cash

14   registers?

15   A.   The time, if not come out from the cash register?

16   Q.   Yes.  You just mentioned a safe.

17   A.   That we don't pay because only thing, for example, I mean

18   if there is no money outside and nobody comes in, we don't pay

19   it.

20   Q.   Mr. Butt, do you recall giving cash regularly to a

21   particular person over the course of several years?

22   A.   Yes.

23   Q.   What was his name?

24   A.   I mean, sometimes Tony father came, his sisters, and a lot

25   of his friends, and Mr. Izzy, he cames.  Plus, we have some,

1    the people, mechanics that works in the other gas station which

2    is very close by to us that used to be a Sunoco so like 10, 12

3    people 15 people's mechanics and they comes in and they take

4    coffees, and they take butter rolls, Red Bulls.  So, that's

5    when we talked to Mr. Issa, I said look, they comes in in the

6    morning time, they come in in the afternoon so --

7    Q.  Mr. Butt, I think you are getting a little ahead of my

8    question.

9    A.  Oh, okay.

10   Q.  You mentioned someone named Izzy?

11   A.  Yes.

12   Q.  Who is that individual?

13   A.  Izzy, that person used to -- he comes in and Tony

14   introduced me to and he told me to give him $200.

15   Q.  What did Izzy look like?

16   A.  Izzy, he was a little bit dark-skinned, little bit chubby,

17   have a, you know, a big belly.

18   Q.  Do you know where Izzy worked?

19   A.  No.

20   Q.  Why would you give cash to Izzy?

21   A.  Because he cames in with the Tony and Tony introduced me,

22   he is my manager, and I thought he is working with him from --

23   for his, any work shops, maybe a supervisor so that's why he

24   first time he asked me $200 to give to him.

25   Q.  So you said that Mr. Issa asked to you give him $200?

ICA5iss5                    Butt - direct

```
1    A.   Dollars, yes.

2    Q.   What did he say, if anything, about Mr. Izzy coming?

3    A.   He told me he is away all the time so if he comes in a

4    week, just, you know, give him $200.

5    Q.   Around when was the first time you met Izzy?

6    A.   I think that was after when I became a manager, I think

7    2012, 2013, and middle of I think '13, maybe April, May.  That

8    times.

9    Q.   After that first time that you just told us about, did Izzy

10   come to the gas station regularly to pick up cash?

11   A.   Yes.

12   Q.   Approximately --

13   A.   Yes.

14   Q.   Approximately when did he start coming?

15   A.   Normally he come every weeks.

16   Q.   In what year did he start coming?

17   A.   I think May.  May, June, I'm not sure, but I think May,

18   June 2013.

19   Q.   When did he stop coming to pick up cash?

20   A.   He stopped coming the last time I see him on July 31st or

21   30th on 2016.

22   Q.   Did Izzy ever come to the gas station to get other things

23   aside from cash?

24   A.   When he started, afterwards for later on he will ask for

25   the cigarettes and sometimes he got gas on his car.
```

ICA5iss5                         Butt - direct

1   Q.   And what did his car look like?

2   A.   Used to have, I think a Mercedes, then he have a black --

3   I'm sorry, red jeep.  He used to come into.

4   Q.   What color did you say?

5   A.   Red.  Red jeep.

6   Q.   How would you know when Izzy was coming to pick up his

7   cash?

8   A.   I mean, sometimes he just comes in, he knows I'm there, and

9   sometimes even if I'm not there he comes in and the cashier,

10  they call me and tell me, listen, Tony friend came with the red

11  jeep guy.  So, that's what we gave him the names for.  I said

12  okay, give him because I'm not there.  So, sometimes he called

13  and I think he have number and he called me and said, listen,

14  I'm going to come so if I am there.  I say, yes, I'm going to

15  be there.  And that's how he will come.

16  Q.   How much cash did he pick up when he came?

17  A.   When?  I mean most of --

18  Q.   Did the amount of cash he picked up change over time?

19  A.   Yes, it did change, like from two to five.  And then it

20  goes up to 15 and that is the maximum I remember.

21  Q.   When you say goes up to 15, what do you mean?  How much

22  money?

23  A.   Yeah, because when he started getting five, when he come up

24  to, one day he came in and he asked me, you know, he needed

25  $500 because I have been told to give him $200.  So, I called

1    Tony, I say, Tony, the guy you sent me, he said give me $500.

2    So he said, Sohail, I'm sorry, I forgot to tell you, that poor

3    guy he -- his wife I think, she have back surgery and I'm

4    trying to help him out so, yes, give him $500.

5    Q.  And what was the most amount of money he ever picked up?

6    A.  $1,500.

7    Q.  $1,500.  Did he pick up $1,500 on more than one occasion?

8    A.  On more than one occasion means every week.

9    Q.  More than one time.  Did he do it more than one time?

10   A.  Yes.

11   Q.  Where did the cash come from that you gave to Izzy?

12   A.  The $1,500, because we can't afford it in the store because

13   the business wasn't that good, so sometime I go in the office

14   and they have the money and I pick up and when he come so I

15   give it to him.

16   Q.  Approximately how often did he come?

17   A.  Before he used to he comes every week, then he start coming

18   in the month basis.

19   Q.  When you say in the month you mean once every month?

20   A.  Once every month, yes.

21   Q.  And what did the cash look like when you gave it to Izzy?

22   A.  Okay.  When I pick up the cash, if it is on a, not in an

23   envelope, like a cash, regular bills, and then I put it, bring

24   it in and put it in an envelope.  Sometimes they have in the

25   office already in an envelope.  So, I pick up the envelope, I

ICA5iss5                        Butt - direct

1   bring it in, and I put it in my drawers or in a safe for him.

2   Q.   And what color were the envelopes?

3   A.   Just normal regular envelopes.  White.

4   Q.   And you mentioned putting it in a drawer or a safe.  Is

5   that where you would then take the envelopes out of?

6   A.   That is what?

7   Q.   Would you then take the envelopes out of that drawer or the

8   safe that you just mentioned?

9   A.   When he comes?

10  Q.   Yes.

11  A.   Yes.

12  Q.   Mr. Butt, are you testifying here today because of what is

13  called a compulsion order issued by this Court?

14  A.   Yes.

15  Q.   Does that mean that you have been ordered to testify?

16  A.   Yes.

17  Q.   Do you have an attorney to help you understand that order?

18  A.   Yes.

19  Q.   What is your understanding of what the order requires to

20  you do?

21  A.   The order force me to testify and it is also protect me by

22  forbidding government from using my testimony against me in any

23  way.  And I have to tell the truth while I'm on the stand and

24  any evidence government find from any other sources or any

25  other way they could -- and which they couldn't obtain from my

ICA5iss5                         Butt - direct

1    testimony, they could use it against me.

2    Q.  Does this order protect you from prosecution for

3    anything --

4    A.  If I lie.  If I lie, yes.  I mean, I can be prosecuted for

5    lying on the trial, yes.

6    Q.  Can you be prosecuted for other things that don't relate to

7    your testimony today?

8    A.  Other things like?

9    Q.  Does the order protect you from prosecution for anything or

10   just from the use of your words today?

11   A.  Use of my word I think.

12   Q.  Do you have any agreement with the government beyond that

13   order?

14   A.  No.

15   Q.  Does this order protect you from prosecution if you lie

16   today?

17   A.  Yes.

18   Q.  Does it protect from you prosecution?  Can you be

19   prosecuted if you lie today?

20   A.  I can be prosecuted if I lie on the stand during my

21   testimony.  I can be prosecuted.

22   Q.  Mr. Butt, when was the last time you saw Izzy?

23   A.  I saw before August -- sorry, July 30 or 31st, 2016.

24   Q.  What happened?  How do you remember that it was July, the

25   end of July 2016?

ICA5iss5                          Butt - direct

1    A.   Because August 30th or 31st I think Mr. Issa got arrested.

2    That's why I remember.

3    Q.   Did you speak to Izzy at all after Mr. Issa was arrested?

4    A.   He called me that day, the 31st, and he asked for Mr. Issa.

5    So, I told him we have a problems and the cops comes in, they

6    took all computers so that's why maybe you are not getting in

7    touch with him.  So, that's the last time I spoke with him.

8    Q.   After that time did Izzy come to pick up cash anymore?

9    A.   No.  No.  I never seen him.

10              MS. HANFT:   One moment.

11              (Counsel conferring)

12   BY MS. HANFT:

13   Q.   Mr. Butt, you explained that you would store the envelopes

14   in two places; isn't that right?

15   A.   Basically if I -- if he comes in every week then I don't

16   have to store any envelope for him, but once when he decided to

17   come in a month so then I have it in my drawers inside the

18   folder, I put it up there inside the drawers.

19   Q.   And you also mentioned having a safe in your office; is

20   that right?

21   A.   Safe, yes, we do.

22   Q.   Did you ever give, take money out of that safe?

23   A.   For him?

24   Q.   For anyone.

25   A.   I mean, one time I took $5,000 for his father, Tony's

ICA5iss5                          Butt -cross

1    father, he cames in and I give it to him because that was

2    Saturday and we have that cash.  And I call him and he say,

3    okay, give it to him.  So that's the most cash I give from the

4    safe because normally during the days we don't have no cash in

5    the safe.  Why?  Because every day we deposit in accounts, that

6    goes to in accounts.  So, only way I could have cash in the

7    safe is if it is Friday, for example.  So, Friday cash, because

8    Saturday we don't do banking so Saturday cash plus -- sorry

9    Friday cash, Saturday cash, and then Sunday and Monday we go to

10   the bank for three days' cash.

11   Q.  Did you ever give Mr. Issa money from that safe?

12   A.  No.  Mr. Issa, when we give him the money, we always make

13   his pay out -- his payout comes from the outside.  So, outside

14   for example, weekly basis for example, if you make $600 payout

15   they make that outside, they put it inside the safe.  I leave

16   it in the safe or leave it on my drawers.  But that come from

17   outside, not from inside.  Mr. Issa never took money from

18   inside.

19          MS. HANFT:  No further questions for this witness.

20          THE COURT:  Cross.

21   CROSS EXAMINATION

22   BY MR. KIRSHNER:

23   Q.  Good afternoon, Mr. Butt.

24   A.  Good afternoon.

25   Q.  You have worked for Mr. Issa since 2015, you said?

ICA5iss5                        Butt -cross

1    A.  Yes.

2    Q.  And you are still work for him today?

3    A.  Until today, yes.

4    Q.  And for many of the years you worked for him your salary

5    was paid in cash, correct?

6    A.  Yes.  We was getting before cash.

7    Q.  And you were aware that a lot of Mr. Issa's employees were

8    paid in cash, correct?

9    A.  Yeah.  From 2015 to 2013 everybody was getting paid only

10   cash.

11   Q.  And in 2013 that changed?

12   A.  '13, end of '13, maybe beginning of '14 we go half and

13   half; half check and half cash.

14   Q.  And so, it's fair to say that a lot of cash coming in and

15   out of Mr. Issa's various locations, correct?

16   A.  I mean very short, for example.  When we have a load coming

17   out, a vendor is there, for example, we have to pay for the

18   lotto or the loads so we always are short of money so we go for

19   the other location and get cash from there.  So, if it is in a

20   range of $10,000, $11,000, because normally we have over store

21   cash $5,000 to $6,000, but if it is but above, like $18,000,

22   $19,000 so even if we go to the different locations we can't

23   get it.  So then, you know, I think Claudia, she called Tony

24   and have him arrange some cash.

25   Q.  We will go through this step by step.

ICA5iss5                          Butt -cross

1          All of the cash that came into and out of the business

2     was recorded on or -- I'm sorry.  All of the cash that came out

3     of the business was recorded on the daily sheets that the

4     government showed you, correct?

5     A.  Yes.

6     Q.  And then they were put into something called a DSR, a daily

7     sales report?

8     A.  Yes.

9     Q.  And the numbers were taken from those cash sheets and put

10    into the DSR, correct?

11    A.  DSR, yes.

12    Q.  You did that, to the best of your ability, accurately,

13    correct?

14    A.  Yes.

15    Q.  And no one ever told you to leave a number out or add a

16    number, you did it accurately the whole time?

17    A.  No.  I -- actually, I can't do it because every -- whatever

18    the cash we have we called in to the office and let them know

19    how much cash we have for the fuel, for the store, for the

20    lotto for that day, and then plus on a report.  So, we have to

21    take those reports and even send them in 10 days to the office

22    and or end of the month.  So, they will compare those reports

23    to the DSR we do on the system to tally it to make sure

24    everything is correct.

25    Q.  And, in fact, the cash payroll was recorded on those

ICA5iss5                          Butt -cross

1    sheets, correct?

2    A.  Yes, yes, yes.

3    Q.  And that was also put on the DSR?

4    A.  DSR, yes.

5    Q.  And if a vendor came in and needed to be paid in cash, that

6    was reported on the sheet?

7    A.  Correct.

8    Q.  All the expenses of the business that was paid in cash were

9    recorded on those sheets, correct?

10   A.  Yes.

11   Q.  And they were accurately transferred onto the DSR?

12   A.  DSR, yes.

13   Q.  And, we saw on the cash sheets that the government showed

14   you earlier and said "Tony" or "Mr. Tony," correct?

15   A.  Uh-huh.

16   Q.  And you said that may have been when Tony came to pick up

17   the cash, correct?

18   A.  Yes.

19   Q.  It could also be that Tony just authorized the cash to go

20   out to someone, correct?

21   A.  No, but sometime if Tony comes in we write down Tony's

22   name.  But, if he is authorizing somebody, then we put it up

23   there "Tony friends."  So most of the time it goes to "Tony

24   friends."

25   Q.  But that's how you did it but other people who worked in

ICA5iss5                          Butt -cross

1   the business, you're not aware of if they were --

2                MS. HANFT:  Objection.

3                THE COURT:  Can he finish the question?

4                MR. KIRSHNER:  They were accurate in putting "Tony" or

5   "Tony's friends," they may have just put Tony, correct?

6                THE COURT:  Okay.  The objection is sustained.

7   BY MR. KIRSHNER:

8   Q.  You reviewed the cash sheets of other employees of

9   Mr. Issa's businesses, correct?

10  A.  You mean other locations?

11  Q.  Or other employees in your location.

12  A.  Yes.

13  Q.  And sometimes it said "Tony" and sometimes it said "Tony's

14  friend," correct?

15  A.  Yes.

16  Q.  And, as you sit here today, you don't know if the other

17  people were as accurate as you are in saying, when they said

18  "Tony" meant "Tony" for the cash and "Tony's friend" meant Tony

19  authorized it, correct?

20  A.  When Tony comes in personally and they know if Tony comes

21  in and picks up the cash, that's everybody put it in Tony.  But

22  even before me, even when I started work in 2005 until 2012 or

23  2013 when I become a manager.  So, anybody comes in to, if they

24  pay any cash here, who paid, not Tony, they put Tony friends.

25  Q.  The government, on direct, also asked you about payments to

ICA5iss5                        Butt -cross

1    Tony's father?

2    A.   Uh-huh.

3    Q.   And, at various points other family members were paid cash,

4    correct?

5    A.   Sometime his sisters, she comes in.  I think she have a

6    store somewhere and she needed help so she -- I think that

7    happened only once or twice, two times, about $1,800 or

8    something like that.

9    Q.   And you are aware that Mr. Issa also owed these people a

10   lot of money and that's why he was paying them the cash,

11   correct?

12           MS. HANFT:  Objection.

13   Q.   Are you aware?

14           THE COURT:  The objection is sustained.

15   A.   No --

16           THE COURT:  The objection is sustained, sir.  You

17   don't answer the question.

18   BY MR. KIRSHNER:

19   Q.   The gas station in which you worked at, it was often short

20   of cash, correct?

21   A.   Every day.  Almost every next days.

22   Q.   And often times you would borrow cash from another

23   location?

24   A.   Yes.

25   Q.   And there came times when the other locations didn't have

ICA5iss5                              Butt -cross

1    enough money, correct?

2    A.  Yes.

3    Q.  And in those situations Mr. Issa would bring his own money

4    to these locations, correct?

5    A.  Yeah.  One time he did bring me around $50,000 cash which I

6    took it to the office and I gave it to Claudia, my office

7    manager, and then she put it up wherever she need to be put it

8    in.  So, you know, yes, he did bring me one time cash $50,000.

9    Q.  That $50,000 that Mr. Issa brought, that was in 2012,

10   correct?

11   A.  I don't remember the year but that surely when I become a

12   manager so that could be in 2000 -- after 2013, '14, during

13   that period of times.

14   Q.  And you testified on direct examination about this person

15   you know as Izzy, right?

16   A.  Yes.

17   Q.  And you made payments to him of cash at various points?

18   A.  Yes.

19   Q.  And when those payments started, you testified on direct,

20   that you understood that he was being given that money because

21   Mr. Izzy, his wife was sick?

22   A.  Yes.

23   Q.  And at various times the payments to Mr. Izzy increased,

24   correct?

25   A.  Yes.

ICA5iss5                          Butt -cross

1   Q.   And you would notify Mr. Issa --

2   A.   When it increase --

3   Q.   -- when the payments increased, correct?

4   A.   Yes.  Because, I mean, one time when he came in and he was

5   getting $1,500 so we was short of cash and we have to pay for

6   the loads, too.  So, I called Tony and I think he was away in

7   Texas somewhere so I told him this and that guy want $1,500

8   now, we don't have no cash.  And then he got very angry with me

9   and mad and he told me, Sohail, I'm too far away and try to get

10  the money for him.  And if I don't pay this guy, he shut all my

11  shops.  So, that's what he mentioned that time.  And, he was

12  very angry.

13  Q.   And the government asked you about when Mr. Velez would

14  call ahead before he was -- I'm sorry, Izzy, when he would call

15  ahead before he showed up, he would often say I'm coming to get

16  coffee, correct?

17  A.   Coffee.  He likes to drink coffee and sometimes when he

18  comes in and if we don't have fresh coffee so we have to dump

19  the other coffee and make it fresh for him.  So, basically he

20  just want to make sure I'm there and so that means he is coming

21  to pick up the cash.

22  Q.   Well, he also liked coffee, right?

23  A.   He also liked coffee, yes.

24  Q.   Mr. Issa had no idea that he would call ahead and say I'm

25  coming for coffee?

ICA5iss5                         Butt - redirect

1                MS. HANFT:  Objection.

2                THE COURT:  I'm sorry?

3    BY MR. KIRSHNER:

4    Q.  Was Mr. Issa aware that the term meant -- the term

5    "coffee"meant anything other than coffee?

6                THE COURT:  The objection is sustained.  He can't put

7    himself into Mr. Issa's head.

8    BY MR. KIRSHNER:

9    Q.  Had you ever told Mr. Issa that "coffee" means anything

10   else besides coffee?

11   A.  I never talked to him about these things because there was

12   like a --

13   Q.  Thank you.

14               THE COURT:  Okay.  The answer is no.  Next question.

15               MR. KIRSHNER:  No further question -- well, one

16   moment, your Honor?

17               (Counsel conferring)

18               MR. KIRSHNER:  No further questions.

19               MS. HANFT:  May I briefly redirect, your Honor?

20               THE COURT:  Yes.

21   REDIRECT EXAMINATION

22   BY MS. HANFT:

23   Q.  Mr. Butt --

24   A.  Yes, ma'am.

25   Q.  -- do you remember being asked about a time when Mr. Issa

ICA5iss5

1    brought $50,000 to the station?

2    A.   Uh-huh.

3    Q.   Do you know where he got that money?

4    A.   I mean, I don't know really from where he got the money,

5    you know, but there is -- there was a second time he came in

6    and he asked me where is Claudia.  So, you know, Claudia wasn't

7    there and then I think he called and he spoke -- to I don't

8    know if he spoke to Claudia or somebody else and I think she

9    told him we need, I think, $36,000.  So only words I mentioned

10   front me, oh, I have to go and borrow again $36,000.  That was

11   the one time.  But he didn't mention me that time where he get

12   that $50,000.

13           MS. HANFT:  Thank you.  No further questions.

14           MR. KIRSHNER:  Nothing further.

15           THE COURT:  Okay.  You may step down.  Thank you.

16   That's pretty convenient.

17           Please, leave, good-bye.

18           THE WITNESS:  Oh, me?

19           THE COURT:  Yes.

20           THE WITNESS:  Thank you.

21           (Witness excused)

22           THE COURT:  Usually they can't wait to get out.

23           So, since it is now 9 nine minutes to 4:00 and I have

24   to go to this event at 4:00 we will break for the day.  So, Jim

25   asked me to brief you on whether there would be a similar day

ICA5iss5

1    later in the week and the answer to the question is yes, and it

2    is Thursday, and I would actually like you all to brief me

3    because, on Thursday, we would get started around 10:00.  I

4    have Chief Judge meetings, including an emergency meeting at

5    noon and 1:00, and one of our Judges from our court, my

6    long-time colleague Judge Sullivan is being sworn in as a Judge

7    of the Court of Appeals at 4:00 and I'm supposed to be there.

8    So, we would go from like 10:00 to 12:00 and 2:00 to 4:00 on

9    Thursday.  So, you tell me.  I don't know where we are exactly

10   with the lawyers but you tell me whether you want to come in

11   that day.  We are going to work on Friday.  You tell me whether

12   you want to come in that day.  I would like you to come in that

13   day but I realize that I'm interrupting the day a lot and there

14   is just nothing I can do about it.  So, Jim, do you want to

15   take the jurors back?

16           Don't discuss the case, keep an open mind.

17           THE DEPUTY CLERK:  Tell you tomorrow?

18           THE COURT:  They will tell me tonight.  I'm not

19   leaving until you come back.  How is that?

20           (Continued on next page)

21

22

23

24

25

ICA5iss5

1          (Jury not present)

2          THE COURT:  So, stick around for a minute.

3          THE DEPUTY CLERK:  So, they want to sit Thursday.

4          THE COURT:  Good.  Then we work on Thursday.  Great.

5     Okay.  Gotta go.  But do tell me, who is left?

6          MR. SOLOWIEJCZYK:  Your Honor, the next witness is a

7     pretty lengthy one, there is a lot of long recordings coming in

8     through him so he is probably a half a day of direct at a

9     minimum.

10         THE COURT:  And his name is?

11         MR. SOLOWIEJCZYK:  Jim Nicholson, another United

12    States Postal Service employee.

13         THE COURT:  Good.  Does he have a Mercedes registered

14    in his wife's name?

15         MR. BRAFMAN:  We are working on it, Judge.

16         MR. SOLOWIEJCZYK:  And then there is, I would say from

17    that point the list of the witnesses are on shorter side.  We

18    are going to get more into the tax part of the case which I

19    know your Honor is eager to hear about.  And then there is one

20    longer witness right at the end which is the revenue agent.

21    But, I would say after Nicholson it is more of hopefully a

22    sprint to the finish might be an exaggeration but we are

23    getting there.

24         THE COURT:  Okay.  See you in the morning.

25         (Adjourned to Tuesday, December 11, 2018 at 9:30 a.m.)

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    ISMAEL VELEZ

 4    Direct By Ms. Hanft  . . . . . . . . . . . . 497

 5    Cross By Mr. Brafman . . . . . . . . . . . . 517

 6    Cross By Mr. Brafman . . . . . . . . . . . . 633

 7    Redirect By Ms. Hanft  . . . . . . . . . . . 661

 8    MARINA GORBOUL

 9    Direct By Mr. Wirshba  . . . . . . . . . . . 664

10    Cross By Mr. Kirshner  . . . . . . . . . . . 675

11    Redirect By Mr. Wirshba  . . . . . . . . . . 680

12    Recross By Mr. Kirshner  . . . . . . . . . . 681

13    SOHAIL I. BUTT

14    Direct By Ms. Hanft  . . . . . . . . . . . . 684

15    SOHAIL I. BUTT

16    Direct By Ms. Hanft  . . . . . . . . . . . . 686

17    Cross By Mr. Kirshner  . . . . . . . . . . . 700

18    Redirect By Ms. Hanft  . . . . . . . . . . . 708

19

20

21

22

23

24

25
```

```
 1                        GOVERNMENT EXHIBITS

 2   Exhibit No.                                        Received

 3    250DD   . . . . . . . . . . . . . . . . . 500

 4    603 and 4009    . . . . . . . . . . . . . 504

 5    4001    . . . . . . . . . . . . . . . . . 505

 6    3549-16   . . . . . . . . . . . . . . . . 513

 7    651 through 654   . . . . . . . . . . . . 670

 8    772, 774, and 776    . . . . . . . . . . . 689

 9                         DEFENDANT EXHIBITS

10   Exhibit No.                                        Received

11    271   . . . . . . . . . . . . . . . . . . 544

12    274   . . . . . . . . . . . . . . . . . . 545

13    264   . . . . . . . . . . . . . . . . . . 546

14    266   . . . . . . . . . . . . . . . . . . 546

15    268   . . . . . . . . . . . . . . . . . . 548

16    256   . . . . . . . . . . . . . . . . . . 619

17    248   . . . . . . . . . . . . . . . . . . 627

18    252   . . . . . . . . . . . . . . . . . . 656

19    600   . . . . . . . . . . . . . . . . . . 676

20

21

22

23

24

25
```