ICBHIss1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           17 Cr. 74 (CM)

 5   IBRAHIM ISSA,

 6                                           Trial
                  Defendant.
 7   ------------------------------x

 8                                           New York, N.Y.
 9                                           December 11, 2018
                                             9:55 a.m.
10

11   Before:

12                    HON. COLLEEN McMAHON,

13                                         Chief District Judge

14                         APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     NOAH SOLOWIEJCZYK
17   ELIZABETH HANFT
     KYLE WIRSHBA
18        Assistant United States Attorneys

19   BRAFMAN & ASSOCIATES, P.C.
          Attorneys for Defendant
20   BY:  BENJAMIN BRAFMAN
          JOSHUA D. KIRSHNER
21        STUART GOLD

22   ALSO PRESENT:   ANTHONY DUBAR, Special agent USPS-OIG
                     GRACE SOTO, Special agent IRS
23                   COLLEEN GEIER, Paralegal Specialist USAO
                     PRIYA KUARLALL, Paralegal
24

25
```

ICBHIss1

1                    (Trial resumed; jury not present)

2                    MR. SOLOWIEJCZYK:  Your Honor, one thing we just

3      wanted to make you aware of because we didn't give you advance

4      notice yesterday.  Probably not today, we think most likely

5      tomorrow, there will be another immunity witness.

6                    MR. WIRSHBA:  I mentioned it to Jimmy.

7                    MR. SOLOWIEJCZYK:  Just putting it on the record.

8                    THE COURT:  Good.  What we'd like to do is do the

9      immunity part at a natural break so that we don't -- thank you.

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICBHIss1

1            (Jury present)

2            THE COURT:  Good morning, everybody.

3            Where's the witness?

4            MR. SOLOWIEJCZYK:  We're getting him, your Honor.  If

5     we could actually start by reading a stipulation, asking your

6     Honor to read two specific paragraphs.

7            THE COURT:  Sure.  Which stipulation?

8            MR. SOLOWIEJCZYK:  Government Exhibit 4009.

9            THE COURT:  Yes.

10           MR. SOLOWIEJCZYK:  If you could read paragraph 1, your

11    Honor.

12           THE COURT:  OK, folks.  This is a snazzy way to start

13    the morning.

14           If called as a witness at trial, a custodian of

15    records from Capital One Bank U.S.A., NA., would testify that

16    Government Exhibits 3501A through Q, 3502A through E, 3504A

17    through P, 3505A through D, 3506A through D, 3507A through Z,

18    3507AA through ZZ, 3508A through D, 3509A through H, 3510A,

19    3511A, 3512A, 3513A, 3514A, 3515A, and 3517 through 3520, and

20    you could probably recite the rest of it with me, including all

21    parts and subdivisions thereof are true and correct copies of

22    records of Capital One regarding an account opened and

23    maintained at Capital One; that the original records were all

24    made at or near the time, by or from information transmitted by

25    a person with knowledge of the matters set forth in the

ICBHIss1

records; that they were kept in the ordinary course of Capital

One's regularly conducted business activity; and that it was

the regular practice of that business activity to make the

records.

          MR. SOLOWIEJCZYK:  Your Honor, we would offer at this

time all the exhibits you just listed.

          THE COURT:  Mr. Brafman?

          MR. BRAFMAN:  No objection.

          THE COURT:  Thank you.

          (Government's Exhibits 3501A through 3501Q, 3502A

through 3502E, 3504A through 3504P, 3505A through 3505D, 3506A

through 3506D, 3507A through 3507Z, 3507AA through 3507ZZ,

3508A through 3508D, 3509A through 3509H, 3510A, 3511A, 3512A,

3513A, 3514A, 3515A, and 3517 through 3520 received in

evidence)

          MR. SOLOWIEJCZYK:  Your Honor, if you could just

indulge us and also read paragraph 4.  Thank you.

          THE COURT:  Can we get the witness in here, please.

I'd like to literally be ready to go.

          MR. SOLOWIEJCZYK:  He's here.

          THE COURT:  Good.  Put him on the stand.

          All right.  This one is even longer, just full of

numbers.  OK.  If called as a witness at trial, a custodian of

records from the United States Postal Service would testify

that all of the following exhibits meet all the conditions for

ICBHIss1

being a business record.  All right.  I've just short-circuited

the reading.  Here are the exhibits:

          Government Exhibits 2000 through 2040, 2041A through

2041B, 2042A through 2042E, 2043A through 2043B, 2044A through

2044B, 2045A through 2045D, 2046A through 2046B, 2047A through

2047C, 2048A, 2049A through 2049B, 2050A through 2050B, 2051A,

2052A through D, 2053A through B, 2054A through E, 2055A

through B, 2056A through D, 2057A through B, 2058A through C,

2059A through C, 2060A through B, 2061A through C, 2062A

through B, 2063A through B, 2064A through D, 2065A, 2066A

through E, 2067A through E, 2068A through D, 2069A through C,

2070A, 2071A, 2072A through B.

          All of those meet all of the conditions for being

business records of the United States Postal Service.

          MR. SOLOWIEJCZYK:  Your Honor, we would offer those

exhibits at this time.

          MR. BRAFMAN:  No objection.

          THE COURT:  Thank you, Mr. Brafman.  They're admitted.

          (Government's Exhibits 2000 through 2040, 2041A

through 2041B, 2042A through 2042E, 2043A through 2043B, 2044A

through 2044B, 2045A through 2045D, 2046A through 2046B, 2047A

through 2047C, 2048A, 2049A through 2049B, 2050A through 2050B,

2051A, 2052A through 2052D, 2053A through 2053B, 2054A through

2054E, 2055A through 2055B, 2056A through 2056D, 2057A through

2057B, 2058A through 2058C, 2059A through 2059C, 2060A through

ICBHIss1                    Nicholson - Direct

1   2060B, 2061A through 2061C, 2062A through 2062B, 2063A through

2   2063B, 2064A through 2064D, 2065A, 2066A through 2066E, 2067A

3   through 2067E, 2068A through 2068D, 2069A through 2069C, 2070A,

4   2071A, 2072A through 2072B received in evidence)

5            THE COURT:  OK.  Good morning.

6            MR. SOLOWIEJCZYK:  I think the witness needs to be

7   sworn.

8            THE COURT:  That is true.  Could you call him so we

9   know his name.

10            MR. SOLOWIEJCZYK:  That's a good point, your Honor.

11   The government calls James Nicholson.

12            THE COURT:  Thank you.

13   JAMES NICHOLSON,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. SOLOWIEJCZYK:

18   Q.  Good morning, Mr. Nicholson.

19   A.  Good morning.

20   Q.  Where are you employed?

21   A.  I'm employed at the United States Postal Service.

22   Q.  What's your position at the United States Postal Service?

23   A.  Manager of the vehicle maintenance facility.

24   Q.  Is that often referred to a VMF manager?

25   A.  Yes, it is.

ICBHIss1                         Nicholson - Direct

1    Q.   What's a vehicle maintenance facility?

2    A.   It's a government-owned repair shop where all aspects of

3    vehicle maintenance are performed.

4    Q.   What kind of vehicles does your shop repair?

5    A.   Postal vehicles.

6    Q.   In the course of your work with the postal service, did

7    there come a time when you met an individual named Ibrahim

8    Issa?

9    A.   Yes.

10   Q.   Can you come a little closer to the mic, sir.  My

11   apologies.

12            Did he go by any other names?

13   A.   Yes, Tony Issa.

14   Q.   And what did you understand Mr. Issa did for a living?

15   A.   I understood that he owned and operated a repair facility.

16   Q.   Do you see Tony Issa in the courtroom today?

17   A.   Yes, I do.

18   Q.   Can you please point him out and describe where he's seated

19   and an article of clothing that he's wearing.

20   A.   Mr. Issa's seated over in the back to my right, and he's

21   wearing a gray sport jacket or suit next to Mr. Brafman.

22            THE COURT:  What is Mr. Issa not wearing?

23            THE WITNESS:  Oh, he's not wearing a tie.

24            THE COURT:  Right.  That's become the easy way to

25   identify Mr. Issa.

ICBHIss1                         Nicholson – Direct

1          MR. BRAFMAN:  I can stipulate.

2          THE COURT:  Thank you for doing that, Mr. Issa.  It

3     makes it easier.

4          Indicating Mr. Issa.

5     BY MR. SOLOWIEJCZYK:

6     Q.  Mr. Nicholson, did Mr. Issa ever provide anything to you

7     during the course of your relationship with him?

8     A.  Yes, he did.

9     Q.  What sorts of things did he provide?

10    A.  He provided expensive lunches, tablet computer, bottles of

11    alcohol for Christmas, case of wine, tablet computer.

12    Q.  At the time you received these things from Mr. Issa, were

13    you acting at the direction of law enforcement?

14    A.  Yes, I was.

15    Q.  Specifically, the USPS Office of Inspector General?

16    A.  That's correct.

17    Q.  All right.  Mr. Nicholson, I want to ask you a few more

18    questions about your background.

19          How far did you go in school?

20    A.  I graduated high school.

21    Q.  Have you previously obtained any certifications or degrees

22    relating to vehicle maintenance?

23    A.  Yes, I have.

24    Q.  What kind of certification?

25    A.  I have a New York State Department of Motor Vehicles

1    inspector certificate and an ASE certification in engine

2    repair.

3    Q.  What does ASE stand for?

4    A.  Automotive service excellence.  It's short for National

5    Institute of Automotive Service Excellence.

6    Q.  To obtain that certification, did you have to go through

7    certain testing?

8    A.  Yes, I did.

9    Q.  You mentioned a New York State inspection certificate, what

10   does that allow you to do?

11   A.  That allows me to perform vehicle inspections in New York

12   State.

13   Q.  Before you worked for the USPS, where did you work?

14   A.  I worked for Kaplan Service Station in Bensonhurst.

15   Q.  What did you do there?

16   A.  I started out pumping gas.

17   Q.  Did you eventually move up the ranks?

18   A.  Yes, I did.  I went to after school programs.  I learned

19   the trade.  I was allowed to do light repairs in the shop, and

20   then when I got my certifications, the shop owner felt

21   confident enough to have me work on cars and perform general --

22   you know, the general maintenance that would be -- that any

23   shop would do.

24   Q.  When did you start working for the USPS?

25   A.  In 1983, October 15.

ICBHIss1                        Nicholson - Direct

1    Q.   What position did you initially hold?

2    A.   I was an automotive mechanic.

3    Q.   Where were you located at the time?

4    A.   I was located at 34th Street in Manhattan.

5    Q.   How long were you a mechanic for the USPS?

6    A.   I was a mechanic for approximately five years.

7    Q.   Did you eventually get promoted to supervisor?

8    A.   Yes, I did.

9    Q.   When you made supervisor, where were you based?

10   A.   I was based in Manhattan VMF.

11   Q.   Did there come a time when you were promoted to manager?

12   A.   Yes, there was.

13   Q.   When was that, approximately?

14   A.   That was in 2007.

15   Q.   When you became manager, did you have to relocate to a new

16   facility?

17   A.   Yes, I did.

18   Q.   Which one?

19   A.   Brooklyn vehicle maintenance facility, 1054 Bell Street in

20   Brooklyn.

21   Q.   Is that the position you still hold today?

22   A.   Yes, it is.

23   Q.   As a manager of the VMF facility, are you the head of the

24   facility?

25   A.   Yes I am.

ICBHIss1                         Nicholson - Direct

1    Q.  Approximately how many USPS employees do you supervise?

2    A.  I supervise 17 vehicle maintenance employees.

3    Q.  Does that include mechanics?

4    A.  That includes mechanics, yes.

5    Q.  Mr. Nicholson, can you describe for the jury generally what

6    your responsibilities are as the VMF manager.

7    A.  My responsibilities include overseeing the entire operation

8    of vehicle maintenance, from ordering fuel to directing the

9    repairs if we contract work out, to billing, everything.  I'm

10   the guy that does it all.

11   Q.  Are certain of the vehicles that the USPS owns and operates

12   older vehicles?

13   A.  Yes.

14   Q.  Are some of them newer?

15   A.  Yes, they are.

16   Q.  What does it depend on?

17   A.  It depends on what type of vehicle it is.

18   Q.  Are you familiar with a model called an LLV?

19   A.  Yes, I am.

20   Q.  What does that stand for?

21   A.  Long life vehicle.

22   Q.  Are those older vehicles?

23   A.  They're the oldest vehicles we have in our fleet.

24   Q.  What's the majority of the Brooklyn VMF fleet?

25   A.  The majority is the heavy fleet, the intermediate-size

ICBHIss1                    Nicholson - Direct

1   vehicles.

2   Q.  Are LLVs the majority?

3   A.  No.

4   Q.  Are they the minority?

5   A.  Yes.

6   Q.  Was that true in 2014?

7   A.  Yes, it was.

8   Q.  Was that true in 2015?

9   A.  Yes, it was.

10  Q.  In maintaining the USPS fleet under your supervision, is

11  work performed by mechanics at the USPS in-house?

12  A.  Yes, it is.

13  Q.  Are there times where you have to send the work out to

14  contractors?

15  A.  Yes.

16  Q.  Where do you send work out when you send it to contractors?

17  A.  We send it to a number of local, you know, vendors, glass

18  work, and the like.

19  Q.  What sorts of jobs would you typically send out to an

20  outside contractor?

21  A.  The heavy work that would tie up my base or tie up my -- or

22  take a long time to do.

23  Q.  When it comes to the Brooklyn VMF facility, who decides

24  whether a vehicle's going to be serviced in-house or sent out

25  to a vendor?

1   A.  I do.

2   Q.  Are you required to use a particular outside vendor?

3   A.  No, I'm not.

4   Q.  You have discretion in deciding which vendor to use?

5   A.  Yes.

6   Q.  Does the USPS have contracts with certain of its vendors?

7   A.  Yes, they do.

8   Q.  What are those called?

9   A.  VMRAs.

10  Q.  What does that stand for?

11  A.  Vehicle maintenance repair agreements.

12  Q.  Now, Mr. Nicholson, if you're considering working with a

13  new outside vendor, do you do any due diligence before you work

14  with them?

15  A.  Yes, I do.

16  Q.  What sorts of things do you typically do?

17  A.  I would ask for references.  I would visit the shop.  I

18  would see what kind of, you know, equipment that the shop has,

19  whether they can handle, you know, the fleet that I operate.

20  Q.  Would you ask around to other VMF managers what they knew

21  about the shop?

22  A.  Absolutely.

23  Q.  In 2014 and 2015, was the majority of the work for your

24  facility being done in-house or sent out to vendors?

25  A.  It was being done in-house for the most part.

ICBHIss1                           Nicholson - Direct

1   Q.   Now, Mr. Nicholson, did there come a time when you became

2   familiar with a company called First Star Auto Repair?

3   A.   Yes.

4   Q.   Did you know it by any other names?

5   A.   Yes, many.

6   Q.   Are you familiar with the name Daimner?

7   A.   Yes, I am.

8   Q.   Was that another name that First Star?

9   A.   That's another name for First Star.  It was Altamari.

10  There was Hybrid.

11  Q.   Did you know who owned all these companies?

12  A.   Yes.

13  Q.   Who?

14  A.   Ibrahim "Tony" Issa.

15  Q.   Did there come a time when you were contacted by Mr. Issa?

16  A.   Yes.

17  Q.   And how did that contact initially happen?

18  A.   It happened by telephone.

19  Q.   Do you recall approximately when this was?

20  A.   This was -- initially, it was around 2013, I would say.

21  Q.   When Mr. Issa first contacted you, what did he say?

22  A.   He told me that he had these local repair shops, and he

23  could handle every aspect of vehicle repair, and whatever it

24  was, he could do it.  Towing, major repairs, he could handle

25  all that.

ICBHIss1                        Nicholson - Direct

1    Q.  After you heard from Mr. Issa, did you eventually call

2    other VMF managers about his company?

3    A.  Yes, I did.

4    Q.  Why were you calling those people?

5    A.  I was calling them to ask them, you know, their experience

6    with the company.

7    Q.  Without getting into the substance of the conversations,

8    based on those conversations, were you more inclined to use

9    Issa's shops or less inclined?

10   A.  Less inclined.

11   Q.  Besides talking to other VMF managers, did you take any

12   other steps to look into Issa's companies in considering

13   whether to hire them?

14   A.  Yes, I did.

15   Q.  What did you do?

16   A.  I went to his website.  I saw the website, and I visited

17   the Kingsland Avenue location.

18   Q.  How'd you know about the Kingsland Avenue location?

19   A.  He had told me where it was.

20   Q.  Mr. Issa, that is?

21   A.  Yes.

22   Q.  The website you visited, were there photos on it?

23   A.  Yes, there were.

24   Q.  What'd those look like?

25   A.  It looked like a state-of-the-art facility.  The

1    technicians were, you know, wearing nice, crisp, clean

2    uniforms.  They had ASE-certification patches on their

3    uniforms.  They had a narrative on the bottom that they had all

4    this high-tech equipment that they could use; that they were

5    certified technicians; that they were skilled in all aspects of

6    automotive repair.

7    Q.  Now, you said you went to the Kingsland facility

8    eventually?

9    A.  Yes, I did.

10   Q.  When you went there, can you just describe what you saw.

11   A.  When I went there, I saw a signpost that had the name of at

12   least two different companies with the same address.  The gate

13   was peeled over like it was hit by a truck.  It was a long

14   driveway.  There was tanker trucks parked on the side.  There

15   was no security whatsoever.  I was allowed to proceed through

16   the facility and also take pictures.

17   Q.  When you say you were "allowed to," what do you mean by

18   that?

19   A.  I mean there was no one there to challenge me.  The place

20   was unoccupied.

21   Q.  Did you see any USPS vehicles that day?

22   A.  Yes, I did.

23   Q.  What time of day was this?

24   A.  It was around 12:00, 1 o'clock in the afternoon.

25   Q.  Was it a weekday or weekend?

ICBHIss1                          Nicholson - Direct

1    A.  It was a weekday.

2    Q.  Now, Mr. Nicholson, at the time you visited, what was the

3    significance, if any, to you about the fact that you were able

4    to access the vehicles without having to present

5    identification?

6    A.  I was concerned because I'm responsible for the security of

7    my vehicles.

8    Q.  What concerns did you have specifically?

9    A.  Specifically, I was concerned that the vehicles might be

10   stolen or vandalized or stripped.

11   Q.  Had you visited other contractors' facilities before this

12   time?

13   A.  Yes, I have.

14   Q.  When you went to those facilities, were you able to access

15   the vehicles without showing ID?

16   A.  No.

17   Q.  Based on what you saw at the Kingsland Avenue facility,

18   were you more inclined or less inclined to use Issa's business?

19   A.  Less inclined.

20   Q.  Approximately when did you go look at the facility?

21   A.  This was -- this was early -- I would say it was very early

22   in the summer.  Springtime, early summer.

23   Q.  Of what year?

24   A.  Oh, 2014.

25   Q.  When you went to visit the Kingsland facility, had anyone

1    instructed you to do that?

2    A.  No, they did not.

3    Q.  At that time were you yet working on the direction of the

4    USPS OIG?

5    A.  At that time, no.

6    Q.  Now, Mr. Nicholson, did there come a time when you were

7    told by another USPS manager that you should use Mr. Issa's

8    company?

9    A.  Yes, I was.

10   Q.  Who told you that?

11   A.  The manager of operation program support.

12   Q.  What was his name?

13   A.  Fred DeMaso.

14   Q.  And you mentioned manager of operations program support.

15   Can you just very briefly explain sort of where that fits into

16   the hierarchy.

17   A.  Well, he would be the boss over my boss.

18   Q.  Was he your direct supervisor?

19   A.  No.

20   Q.  Who was your direct supervisor?

21   A.  Donald Andreoli.

22   Q.  Approximately when did you speak with Mr. DeMaso about

23   Mr. Issa's company?

24   A.  We had spoken many times.  Mr. DeMaso had heard about the

25   Issa companies and had wanted us to use them.

1    Q.  Now, were you inclined to use First Star at this time?

2    A.  No, I was not.

3    Q.  But did you eventually send a few jobs to First Star

4    nonetheless?

5    A.  Yes, I did.

6    Q.  Why did you do that?

7    A.  Well, in the event that, you know -- I was trying to give

8    him, you know, the benefit of the doubt, you know.  Maybe there

9    was other shops that were working on the vehicles that those

10   managers and people that I spoke to, you know, maybe it was

11   different people.  Maybe they provided better service.

12   Q.  And did you send a lot of jobs to Issa at the beginning or

13   just a few?

14   A.  No, just a few.

15   Q.  At this time were you also sending work out to other

16   vendors?

17   A.  Yes, I was.

18   Q.  Can you just, Mr. Nicholson, briefly walk us through the

19   process of how it works at your facility when you're going to

20   send a vehicle out to a vendor.

21   A.  OK.  Depending upon the work, we would make out a

22   commercial vehicle repair order, and my supervisors would write

23   on this commercial work order what specific items they wanted

24   the vendor to complete, and then the vendor would on the

25   right-hand side of the column write down, you know, what he

ICBHIss1                          Nicholson - Direct

1    did.  Up on the upper left-hand side of the form would show the

2    parts that were used.  It would have the date, it would have

3    the name of the company that we sent it to, things of that

4    nature.

5    Q.  You mentioned a commercial work order.  What's the purpose

6    of that form?

7    A.  That's so we can track and review what work was done --

8    what work we sent out to the contractor.

9    Q.  You say "sent out," do you mean authorized?

10   A.  Yes.

11   Q.  Now, if a vendor while performing work that you've

12   requested comes across an additional issue with the vehicle,

13   are they permitted to go ahead and do that repair, or do they

14   have to first consult with your shop?

15   A.  They're not permitted to go ahead with the repair.  They

16   have to notify the supervisor that generated the repair -- the

17   vehicle maintenance commercial work order.

18   Q.  Why do they have to do that?

19   A.  To ensure that we're getting what we asked for and not

20   additional work was added on.

21   Q.  If the supervisor authorized additional work, would that be

22   reflected anywhere in your paperwork?

23   A.  Yes, on the left-hand side, they would write the work that

24   was -- that was authorized to go there.

25   Q.  Left-hand side of what?

1    A.  The left-hand side of the commercial work order.

2    Q.  And that's the practice at your VMF facility?

3    A.  Yes, it is.

4    Q.  Do you pay vendors before they do the work or after?

5    A.  After.

6    Q.  Mr. Nicholson, you mentioned you sent a few work orders to

7    Issa's company in June -- summer 2014, is that right?

8    A.  Yeah, it was in June, yes.

9    Q.  Mr. Nicholson, were you satisfied with the work that was

10   performed by First Star on those vehicles?

11   A.  No, I was not.

12   Q.  Why were you not satisfied?

13   A.  Because we specifically asked for work to be completed and

14   it was not completed, although we were charged for it.

15            MR. SOLOWIEJCZYK:  If we could put up, just for the

16   witness, Government Exhibit 2042A.  Actually, it's in evidence,

17   you can put it up for everybody.  My apologies.

18   Q.  Mr. Nicholson, can you just tell us, what is this form,

19   first of all?

20   A.  OK.  This is a Form 4541.  It's a postal service form.

21   It's a commercial work order.  And basically, on this form

22   you'd write the date -- my supervisor would write the date,

23   write the vehicle number.  The supervisor would put down, you

24   know, his name where -- who ordered the work.  Right next to

25   that would be the company that performed the work, and on the

1    lower left-hand side where you see items one through ten, those

2    were the items specifically that were requested by the

3    supervisor at my facility.

4    Q.   You mentioned supervisors.  Do those folks work for you?

5    A.   Yes, they do.

6    Q.   You're the manager?

7    A.   Yes, I am.

8    Q.   You mentioned the left-hand bottom side.  Can we just zoom

9    in on that.  Thank you.

10   A.   Sure.  That's that right there, uh-huh.

11   Q.   Who fills out this part of the form?

12   A.   The supervisor does.

13   Q.   From the postal service?

14   A.   Yes.

15   Q.   So what work was requested here?

16   A.   We requested the parking brake be adjusted.  That was

17   number one.  Repair the ABS system, which is a brake issue.

18   Replace both rear shock absorbers.  Replace the drag link,

19   which is front end work.  Replace right-side king pin, front

20   end work.  Repair steering box mounting bracket to chassis,

21   replace exhaust clamps, repair heater blower motor, replace

22   wiper blades, and replace fuel filter assembly.

23   Q.   That's all work that the USPS was asking to be performed,

24   right?

25   A.   That's correct.

ICBHIss1                        Nicholson - Direct

1          MR. SOLOWIEJCZYK:  If we could look at 2042B now, B as

2     in boy.  If we could just zoom in on the top half.  Thank you.

3     Q.  So, Mr. Nicholson, what are we looking at?

4     A.  We're looking at an invoice, 6392, from First Star Auto.

5     The work was on vehicle No. 1520833, and on the right-hand side

6     of the page, it states here the work that the Issa companies

7     had performed.

8     Q.  Now, is this prepared by the contractor?

9     A.  Yes, it is.

10    Q.  Does this correspond with the work order we were just

11    looking at?

12    A.  Yes, it does.

13    Q.  If we could focus on the right side of the page where

14    there's an entry that says "parking brake," can you just read

15    that for us, Mr. Nicholson.

16    A.  Parking brake.  Repair parking and drums behind tranny.

17    Repair parking brake arm and adjust brakes for $110.60.

18    Q.  Now, Mr. Nicholson, when this vehicle was returned to your

19    shop, did you take any steps to examine it?

20    A.  Yes, I did.

21    Q.  What'd do you?

22    A.  The minute the vehicle was dropped off, my employees under

23    my supervision bring the vehicle up on a lift, and I inspected

24    the work that came back.

25    Q.  Did you take any photographs of what you saw?

1    A.  Yes, I did.

2            MR. SOLOWIEJCZYK:  If we could put up 2042E, which is

3    in evidence -- actually, you know what?  I'm going to use the

4    ELMO.  My apologies.

5    Q.  Mr. Nicholson, let me just ask you, the photographs that

6    are 2042E, they're in your binder, if you could just look at

7    them really briefly.  My apologies.  They're towards the back.

8            May I approach, your Honor?

9            THE COURT:  Yes.

10   A.  I got it.  I got it.

11   Q.  Did you take those photographs?

12   A.  Yes, I did.

13   Q.  Do they fairly and accurately depict what you saw when you

14   examined the vehicle?

15   A.  Yes.

16           MR. SOLOWIEJCZYK:  I think they're in evidence, your

17   Honor, but in an abundance of caution, we offer them.

18           MR. BRAFMAN:  No objection.

19           THE COURT:  Admitted.

20           (Government's Exhibit 2042E received in evidence)

21   BY MR. SOLOWIEJCZYK:

22   Q.  Mr. Nicholson, I'm just going to put up on the screen, you

23   should be able to see it, a photo.  Can you see that?

24   A.  Uh-huh, yes.

25   Q.  What's this a photo of?

ICBHIss1                      Nicholson - Direct

1   A.   It's a photo of the vehicle that I sent out to one of

2   Mr. Issa's repair facilities.  The vehicle is 1520833.

3   Q.   Does that match the work order in the invoice we just

4   looked at?

5   A.   Yes, it does.

6   Q.   So I'm going to show you this photo.  What's this a photo

7   of?  What area of the vehicle?

8   A.   This is the underside of the vehicle where the drive shaft

9   meets the drum for the emergency brakes.

10  Q.   And the invoice we looked at, did it have -- did it list

11  any work that was supposed to be performed in this area?

12  A.   Yes, it did.

13  Q.   Which work?

14  A.   The work to replace the, if I could go back -- if I can go

15  back to the original invoice.

16  Q.   Sure.  It's 2042B.  It's right behind those photos.  I'll

17  just hand it to you.

18  A.   OK.

19  Q.   Here you go.

20  A.   Oh, here we go.  Thank you.  Yes, OK.

21  Q.   What work was supposed to be performed in this area?

22  A.   Excuse me.  Repair parking and drum behind transmission,

23  tranny.  Repair parking brake arm and adjust brakes.

24  Q.   Now, when you examined this portion of the vehicle, what,

25  if anything, did you notice?

ICBHIss1                          Nicholson - Direct

1   A.   I noticed that it didn't appear to have been even removed.

2   Q.   When you say it didn't appear to be removed, what?

3   A.   Specifically, when you remove the bolts from the drive

4   shaft and the drum, if you notice in the picture, you'd see

5   that everything is grimy and dirty.

6   Q.   Let me just, what are these that I'm circling here?

7   A.   OK.  The first one that you circled is for the drive shaft

8   U-joint.  You would have to remove those four bolts.  There's

9   two on each side there, uh-huh.  And then the larger bolts, the

10  ones that are further away from there, are the bolts that you

11  would need to remove the drum for the emergency brake.

12  Q.   What did you observe specifically with respect to the

13  bolts?

14  A.   Specifically, the dirt and grime that had been on there was

15  not even disturbed.

16  Q.   And --

17  A.   If you had removed the bolts, some disturbance would have

18  occurred where the dirt would have come off of those areas.

19  Q.   To do the work on the parking brake, would you have had to

20  remove the bolts?

21  A.   Specifically for what was stated on the work -- on the

22  invoice, yes.

23  Q.   Based on what you observed, did it appear that that work

24  had been performed?

25  A.   No.

ICBHIss1                           Nicholson - Direct

1              MR. SOLOWIEJCZYK:  Ms. Geier, if we could put back up

2     2042B, and I think the lower right portion.

3     Q.  Mr. Nicholson, do you see the entry that says "exhaust"

4     towards the bottom right?

5     A.  Yes, I do.

6     Q.  Could you just read that for us.

7     A.  Sure.  Exhaust.  Repair exhaust and align exhaust system

8     and remove and replace exhaust clamps and realign hanger for

9     charge of $102.70.

10    Q.  Mr. Nicholson, I'm now going to show you a photo on the

11    ELMO.  What area of the vehicle is this a photo of?

12    A.  That's the exhaust system on a vehicle, on a 2 ton truck.

13    Q.  What work was supposed to be performed with respect to this

14    portion of the vehicle?

15    A.  The exhaust clamps were supposed to have been replaced.

16    Q.  And are we looking at exhaust clamps right now?

17    A.  Yes, we are.  The exhaust system, the pipe, and the exhaust

18    clamp is that corroded area with the nuts on it, the nuts and

19    bolts.

20    Q.  What observations did you have, if any, regarding the

21    clamps in particular?

22    A.  It had been rotted out.  It was the -- it was the reason

23    why we sent it out to Mr. Issa's repair shop.  We wanted those

24    replaced.

25    Q.  Based on what you saw, did it appear like it had been

1   replaced?

2   A.  No, it did not.

3   Q.  What would you expect to see if they had been replaced?

4   A.  If it had been replaced, it would be shiny, bright metal.

5   There would be no corrosion on the part whatsoever.

6   Q.  Now, Mr. Nicholson, this was one of the first jobs you sent

7   to Mr. Issa's job, correct?

8   A.  Yes.

9   Q.  Based on the work performed, were you inclined to continue

10  sending work to Issa's shop?

11  A.  No, I was not.

12  Q.  This job we just looked at, were there other jobs that you

13  sent to him at that time?

14  A.  Yes, there were.

15  Q.  Were there any issues with those other jobs?

16  A.  Yes, there was.

17  Q.  What, if anything, did you tell Issa about the issues that

18  you had identified in the work performed?

19  A.  When I brought it up to Mr. Issa, he says:  "Don't worry

20  about it.  If you find a problem, just tell me, and we'll take

21  care of it."

22  Q.  Did you tell him about this issue with the exhaust clamp?

23  A.  Yes, I did.

24  Q.  Did you tell him about the issue with the parking brake?

25  A.  Yes, I did.

1           MR. SOLOWIEJCZYK:  Sorry, your Honor, I'm just trying

2      to figure out how to close this ELMO.  Not very tech savvy.

3           THE COURT:  That's what you have Mr. Wirshba for.

4      Q.  All right.  Now, Mr. Nicholson, after this work was

5      performed, it came back to your shop, did you tell Mr. DeMaso

6      anything about the problems?

7      A.  Yes, I did.  I told him basically that I was not satisfied

8      with the quality of the work.

9      Q.  Did you receive instructions after that to keep using

10     Issa's shop?

11     A.  Yes, I did.

12     Q.  Now, Mr. Nicholson, after you had brought the problems to

13     the attention of DeMaso, were told to keep using the shop, what

14     concerns did you have, if any, at that point?

15          MR. BRAFMAN:  Objection.

16          THE COURT:  I'm sorry.  Could you read that back.  I

17     haven't linked up.

18          (Record read)

19          THE COURT:  Objection's overruled.

20     A.  I was concerned because -- I was concerned because there

21     were issues with the billing, and we were being charged for

22     work that was not, in fact, being done.

23     Q.  Now, Mr. Nicholson, as a USPS employee, what obligations do

24     you have, if any, to spot and report issues?

25     A.  It's my obligation to report fraud, waste, and abuse when I

ICBHIss1                          Nicholson - Direct

1    observe it.

2    Q.  At that point did you reach out to the USPS OIG?

3    A.  Yes, I did.

4    Q.  That's the United States Postal Service Office of Inspector

5    General?

6    A.  That's correct.

7    Q.  Did you tell them about your concerns?

8    A.  Yes, I did.

9    Q.  Now, after this point in the summer of 2014, did you

10   continue to send some work to Issa's shop?

11   A.  Yes, I did.

12   Q.  At that point was that your own decision or had you

13   received direction from the OIG?

14   A.  That was under direction of the OIG's office.

15   Q.  What kinds of jobs were you sending to Issa's shop at that

16   time?

17   A.  At that time we were sending him specific jobs to work on.

18   Q.  When you say "specific jobs," can you just explain what you

19   mean.

20   A.  Well, we sent one vehicle out for a transmission repair.

21   Q.  Were you sending out inspections at that point, or was it

22   just sort of discrete jobs?

23   A.  Discrete jobs.  Just basically single or, you know -- it

24   wasn't a full inspection.  It was just a couple items, if that.

25   Q.  And as those jobs were being performed, were you taking any

ICBHIss1                        Nicholson - Direct

1    steps to examine the invoices?

2    A.  Yes, I was.

3    Q.  The work being performed?

4    A.  Yes, absolutely.

5    Q.  Were there issues?

6    A.  Yes, there were.  On one specific vehicle that I sent out,

7    the vehicle came back, and there was issues with it.

8    Q.  If I could direct your attention to 2043A, which is in

9    evidence.  You don't need to use the binder, Mr. Nicholson.

10   A.  OK.  Very good.  Can you just expand, yeah, make it a

11   little bigger.  Thank you.

12   Q.  Now, Mr. Nicholson, what are we looking at?

13   A.  We're looking at invoice No. 6432 from First Star Auto.  It

14   is for vehicle 3511422, and it was initiated by Willie Wallace,

15   which is one of my supervisors.

16   Q.  What's the date on the invoice?

17   A.  The date is 8/8/2014.

18   Q.  Do you recall this particular vehicle, Mr. Nicholson?

19   A.  I certainly do.

20   Q.  Do you recall why this vehicle was sent to First Star?

21   A.  It was sent there for a transmission issue.  Specifically,

22   the vehicle wouldn't shift.

23   Q.  Can you just explain what that means.

24   A.  Well, when you drive your car along and you'd notice that

25   the engine kind of sounds a little differently as it switches

ICBHIss1                          Nicholson - Direct

1   gears, the speed will increase, the RPMs will come down, and

2   you'll continue to -- to, you know, accelerate.

3   Q.  At the time you sent the vehicle out, were there any issues

4   with the engine?

5   A.  None whatsoever.

6   Q.  Did you personally look at the vehicle before it was sent

7   out to Issa's shop?

8   A.  Yes, I did.  I listened to that engine.  I observed that

9   vehicle driving around.  It had been -- some aspects of the

10  vehicle repair were performed at my shop before we sent it out

11  for the transmission.

12  Q.  All right.  If we could look on the invoice at the entry

13  that says "electrical short, electrical repair."  Do you see

14  that?

15  A.  Yes.

16  Q.  It's in the amount of $1,264.  Do you see that?

17  A.  Yes.

18  Q.  Could you just read that.

19  A.  Uh-huh.  That's electrical short:  Repair all electrical

20  shorts in vehicle, includes the removal of transmission and

21  engine electrical harnesses and surrounding components,

22  repairing harness, repairing all electrical problems, and

23  reinstalling harness parts and components.

24  Q.  What area of the vehicle does that work relate to?

25  A.  That related to the electrical system.  Basically where all

ICBHIss1                        Nicholson - Direct

1   the power goes through the wires.

2   Q.   There's a reference to harnesses there.  Do you see that?

3   A.   Yes, I do.

4   Q.   Did the USPS request for harnesses to be replaced in this

5   vehicle?

6   A.   No, not at all.  In fact, we had done that in my shop.  We

7   replaced all the harnesses with original equipment harnesses.

8   They were brand new.

9   Q.   The harnesses were brand new, is that what you said?

10  A.   Yes.

11  Q.   So if the work hadn't been authorized or requested by USPS,

12  was First Star allowed to perform it?

13  A.   No, they were not.

14  Q.   Mr. Nicholson, when the truck was returned to your shop,

15  did you take any steps to examine it?

16  A.   Yes, I did.

17  Q.   Did you personally examine it?

18  A.   I personally examined it.

19  Q.   What did you observe when you examined the vehicle?

20  A.   When I got in the vehicle, the vehicle wouldn't even crank

21  over.

22  Q.   What does "crank over" mean?

23  A.   It means that there was no power going to any circuit in

24  that vehicle.

25  Q.   What about with respect to the engine?

1   A.   When we determined that -- which harnesses were

2   disconnected and left out, we plugged everything in, we got the

3   vehicle to start.  At that point I heard an engine noise.  It

4   was popping through the intake of the engine.

5   Q.   Did the vehicle have any of those issues when it was sent

6   to First Star?

7   A.   No, it did not.

8   Q.   To identify a transmission issue, would the engine have to

9   be running?

10   A.   Yes, it would.

11   Q.   Please explain that.

12   A.   Well, in order to see how the vehicle is shifting, you have

13   to start the engine and you have to run it.  And at that point

14   while it's running and you're driving, the transmission should

15   be shifting at normal intervals.

16   Q.   Did you make Mr. Issa aware of these issues?

17   A.   Yes, I did.

18   Q.   With respect to this specific vehicle?

19   A.   Yes.

20   Q.   Now, once the vehicle was returned from Issa's company and

21   it had the issues just mentioned, did you have to take any

22   additional steps to repair those issues?

23   A.   Yes, I did.

24   Q.   What'd you have to do?

25   A.   I had to send the vehicle out to motor engine rebuilders on

1   Long Island to rebuild the 4-cylinder Mercedes engine.

2   Q.  Did that cost the USPS extra money?

3   A.  Yes, it did.

4   Q.  Approximately how much?

5   A.  About $19,000.

6   Q.  If we could turn to Government Exhibit 2046A, which is in

7   evidence.  What is this document, Mr. Nicholson?

8   A.  This is a commercial work order, otherwise known as a 4541.

9   It's for vehicle 3511369.  The date on there is 7/17/2014.  It

10  was initiated by my supervisor, Andre Noel.  The vehicle went

11  to Daimner, which is on the left-hand side there, uh-huh.

12  Q.  And focusing on the bottom left quadrant of the document --

13  A.  Right, uh-huh.

14  Q.  -- who fills out this portion again?

15  A.  The supervisor does.

16  Q.  From USPS?

17  A.  Yes.

18  Q.  So what work was requested here?

19  A.  We requested to replace both front springs, replace both

20  king pins, replace turn signal switch, and adjust the parking

21  brake.

22  Q.  If we could turn to Government Exhibit 2046B, as in boy.

23  What are we looking at, Mr. Nicholson?

24  A.  We're looking at invoice 6770 from First Star Automotive.

25  It is for vehicle 3521369.  It's dated 8/8/2014.

ICBHIss1                       Nicholson - Direct

1   Q.  Now, was this invoice submitted to your shop for payment?

2   A.  Yes, it was.

3   Q.  If we could focus in on the entry that says "wheel

4   alignment" towards the bottom there.

5          Mr. Nicholson, on the work order we just looked at,

6   did the USPS ask for this work to be performed?

7   A.  No, it did not.

8   Q.  Was this work authorized?

9   A.  No, it's not.

10  Q.  How much was this charge for?

11  A.  This charge was for $165.

12  Q.  At the time of this invoice, the summer of 2014, would your

13  facility typically have asked a vendor to perform a wheel

14  alignment?

15  A.  No, we would not have.

16  Q.  Why not?

17  A.  I have a complete wheel alignment system in my shop and

18  certified techs that can use it.

19  Q.  Was First Star permitted to do work that the USPS hadn't

20  specifically authorized?

21  A.  No.

22  Q.  Now, Mr. Nicholson -- we can take that down, thank you,

23  Ms. Geier -- did there come a time when you were present at a

24  meeting with Mr. Issa and other USPS officials?

25  A.  Yes, it was.

ICBHIss1                    Nicholson - Direct

1    Q.  Do you recall some of the people who were present?

2    A.  Yes.

3    Q.  Who was there?

4    A.  Aside from myself, there was Phil Castellano; he's the

5    vehicle maintenance manager from Staten Island.  There was Don

6    Andreoli, who at the time was the Queens VMF district manager.

7    There is Fred DeMaso.  There was Frank Calabrese.  I believe

8    Mike Chester was there, and Tony Issa was there.

9    Q.  So it was Tony Issa and a bunch of USPS officials, fair to

10   say?

11   A.  Yes.

12   Q.  Approximately when was this?

13   A.  This was early -- it was probably late springtime -- maybe

14   around the summer.  Around the summertime.

15   Q.  Of what year?

16   A.  2014.

17   Q.  Who called the meeting?

18   A.  It was called by Fred DeMaso, the manager of operation

19   program support.

20   Q.  Did you record that meeting?

21   A.  Yes, I did.

22   Q.  Was that done at the direction of law enforcement?

23   A.  Yes, it was.

24   Q.  Generally speaking, what occurred at the meeting?

25   A.  At the meeting the vehicle maintenance managers, the three

1    of us, presented Mr. DeMaso and Mr. Issa at this meeting the

2    items that we believed there was an issue with.  If I remember

3    correctly, Mr. Andreoli came in with a bottle of transmission

4    fluid that they supposedly replaced the fluid, and it was as

5    black as the dirtiest oil I've ever seen.  Phil Castellano came

6    in with a video recording of a vehicle that I believe was an

7    LLV that when it was dropped off at his shop, he had his guys

8    lift the vehicle up and look it over, and they were looking at

9    the various things that Mr. Issa's company --

10         MR. BRAFMAN:  Your Honor, I'm going to have a

11   continuing objection.  He's essentially testifying to what was

12   said by these people, and they have this recorded if they want

13   to play it, but he can't just testify to what these people

14   said.

15         THE COURT:  The objection's overruled.

16   A.  I looked at the video that Mr. Castellano, Phil Castellano,

17   the manager of Staten Island VMF, presented, and it was a

18   vehicle that just came back from one of Mr. Issa's companies.

19   And there was an issue with the brakes, and it had been sent

20   out for work that should have been -- that should have been

21   corrected.

22         And as for myself, I brought my own issues forward

23   with the vehicle with the engine.  That on this particular

24   vehicle, it went in for the transmission work.  Mr. Issa

25   proceeded to have his company replace the injectors, which

ICBHIss1                          Nicholson - Direct

1   ultimately damaged the engine, and that was not requested under

2   authority of the USPS.  We didn't request that work at all.

3   Q.  Now, after this meeting that you just described, did there

4   come a time soon after when Issa reached out to you?

5   A.  Yes, he did.

6   Q.  What was suggested at that time?

7   A.  That we have a meeting and discuss things.

8   Q.  Did you end up having lunch together?

9   A.  Yes, we did.

10  Q.  When you went to that lunch, were you acting at the

11  direction of the USPS OIG?

12  A.  Yes, I was.

13  Q.  Did you record that meeting?

14  A.  Yes, I did.

15  Q.  Is that also at the direction of OIG?

16  A.  Yes, I did.

17  Q.  Where did you meet Mr. Issa?

18  A.  I met Mr. Issa at the Olive Garden restaurant.  The initial

19  place that I picked had been closed, so -- it was Boulder

20  Creek, another family-style restaurant nearby, and we wound up

21  at Olive Garden.

22          MR. SOLOWIEJCZYK:  Your Honor, at this time we'd ask

23  the Court to read a portion of a stipulation.

24          THE COURT:  Which one?

25          MR. SOLOWIEJCZYK:  4003, and it's paragraphs 1 and 2.

ICBHIss1                    Nicholson – Direct

1           THE COURT:  It is hereby stipulated and agreed, by and

2      between the usual suspects, that:

3           Government Exhibits 301A, B, C, D, E, and F are true

4      and accurate copies of a video recording of a meeting that took

5      place on or about September 24, 2014, in Brooklyn, New York,

6      between Ibrahim Issa, the defendant, and James Nicholson, and

7      that was consensually recorded by James Nicholson at the

8      direction of law enforcement.

9           Government Exhibits 301AT through 301FT are true and

10     accurate transcripts of the recorded conversations contained in

11     Government Exhibits 30A through F respectively.  The identities

12     of the participants' voice attributions, dates and times

13     reflected in the transcripts are accurate.

14          Remember, ladies and gentlemen, it's the recordings,

15     not the transcripts, that are the evidence in the case.

16          MR. SOLOWIEJCZYK:  Your Honor, we're actually only

17     going to offer Government Exhibits 301B, C, and D, and the

18     associated transcripts at this time.

19          THE COURT:  They're admitted.

20          MR. BRAFMAN:  No objection.

21          (Government's Exhibits 301B, 301C, 301D, and 301BT,

22     301CT, 301DT received in evidence)

23          MR. SOLOWIEJCZYK:  Ms. Geier, if we could play 301B

24     and put up the associated transcript.

25          MR. BRAFMAN:  Could we just have one minute, your

ICBHIss1                        Nicholson - Direct

Honor?

MR. SOLOWIEJCZYK:  Just one moment.

MR. BRAFMAN:  Just need to get the transcript real quick.  We're good.

MR. SOLOWIEJCZYK:  This is an excerpt of a September 24, 2014, meeting between Mr. Issa and James Nicholson.

(Video played)

MR. SOLOWIEJCZYK:  If we could, Ms. Geier, if we could go back to page 13, line 24, and then 14, line 2 through there. Yes, exactly.

Q.  Mr. Nicholson, directing you to page 13, line 24, through page 14, line 2, do you see that?

A.  Uh-huh.

Q.  When you stated, "I mean, I don't care who does it as long as it's done right.  Thing is I'm protected.  I mean, I can't be ending work out and having stuff, you know, coming back, and then it looks bad on -- unintelligible -- you know," what were you telling Mr. Issa when you said that?

A.  I was telling Mr. Issa that I wasn't particularly impressed with the level of service that I was getting and the repair I was getting on the vehicles I was sending him, and basically that I don't care who does the work as long as it's done correctly.  You know, I had other vendors.

MR. SOLOWIEJCZYK:  Ms. Geier, if we could go back to

ICBHIss1                    Nicholson – Direct

1    page 16, and we're going to pick up, continue playing.

2              (Video played)

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICB5iss2                    Nicholson - direct

1   BY MR. SOLOWIEJCZYK:

2   Q.  Ms. Geier, if we could go back to page 18, lines 13 through

3   18?

4           Mr. Nicholson, when you said, "I would like to keep an

5   open mind, I just want to point some things out to you, I mean,

6   there is a lot of stuff that they're saying that you guys can

7   do or that your shop can do," then you went on to say at line

8   18, "and when I go there, I'm not seeing it."

9           What were you referring to when you said this,

10  Mr. Nicholson?

11  A.  I was referring to, I was referencing his website, and when

12  I viewed the website and I viewed the Kingsland Avenue location

13  it was like night and day.  In actuality, there was no security

14  whatsoever there, the gate was torn off, practically bent over.

15  It looked like an abandoned building.

16  Q.  So, during this part of the conversation, were you telling

17  Mr. Issa about the visit you had paid to Kingsland?

18  A.  Yes, I did.

19  Q.  And what you saw there?

20  A.  Yes.

21  Q.  Mr. Issa provided, during that portion of the conversation,

22  some responses to that.  Do you remember those?

23  A.  Yes, he did.

24  Q.  What, if anything, did you think of those responses?  Did

25  they make sense to you?

ICB5iss2                     Nicholson - direct

1    A.  They were ridiculous.

2              MR. SOLOWIEJCZYK:  If we can go to the next clip,

3    301C?  Go ahead and play it.

4              (Audiofile played)

5    BY MR. SOLOWIEJCZYK:

6    Q.  Ms. Geier, if we can turn back to page 22, line 16 through

7    20?

8              Mr. Nicholson, when you said:  "You know, and I'm told

9    and, and I look at your website and your website is very

10   impressive and you guys look all decked out, you know, ASC

11   certifications and everything, but here I've got a guy that

12   doesn't even have a regular CDL license to drive the truck."

13             Mr. Nicholson, what is an ASC certification?

14   A.  Automotive Service Excellence -- it should be an E,

15   Automotive Service Excellence -- this is an independent

16   non-profit group that promotes automotive service excellence

17   and competency to repair shop -- that is available to

18   technicians in the private sector to take these tests to show

19   that they're competent in various areas of automotive repair.

20   Q.  And then at lines 19 to 20 you say:  "But here I've got a

21   guy that doesn't even have a regular CDL license to drive the

22   truck."

23             Can you explain what you meant when you said that?

24   A.  A CDL license is a commercial driver's license and it is a

25   New York State requirement that everyone that drive a vehicle

ICB5iss2                        Nicholson - direct

1   over a certain weight with air brakes has to have that.  It's

2   federal law for -- it is a New York State law.

3   Q.  And what were you referring to when you said this specific

4   statement, Mr. Nicholson?

5   A.  Because out of the blue I just asked his employees that

6   were there to pick up the vehicle if they had the CDL license

7   and they responded to me that:  *What's a CDL?  I don't know*

8   *what that is.*

9            *What kind of license do you have?*

10           *I have a regular license.*

11  Q.  What was your reaction to that?

12  A.  I -- I was mortified.  I was surprised.

13           MR. SOLOWIEJCZYK:  If we could go to 301D, Ms. Geier?

14           (Audiofile played)

15  BY MR. SOLOWIEJCZYK:

16  Q.  Mr. Nicholson, looking at page 6, line 13 when you said:

17  "I see you're pushing, you know, you're pushing your services."

18           What did you mean?

19  A.  He was promoting his companies that he could do all this

20  work for us.

21  Q.  Then, right after that on line 13 through 16 you said:

22  "I'm concerned about some things that came back because I'm on

23  hunt for an engine now and I don't know what the hell to do

24  with that."

25           What were you referring to specifically when you said

ICB5iss2                          Nicholson - direct

1    that?

2    A.  I was referring to the vehicle that we sent for the

3    transmission problem in which the Issa companies damaged the

4    engine by replacing injectors that we never requested.

5    Q.  Is that the engine you were talking about a few minutes

6    ago?

7    A.  Yes, it was.

8           MR. SOLOWIEJCZYK:  We can keep playing this,

9    Ms. Geier.  Thank you.

10          (Audiofile played)

11   BY MR. SOLOWIEJCZYK:

12   Q.  Mr. Nicholson, just directing you to the page we are on,

13   line 10 -- sorry, line 9 through 10 where you said:  "My guys

14   are looking at the invoices saying, what is this?"

15          What did you mean by that?

16   A.  What I meant was we had replaced the harnesses in our

17   vehicle via Mr. Issa's company were charging us for harnesses

18   that were already brand-new.  They didn't need any replacement

19   or repairing.

20   Q.  Is that the invoice we looked at a few minutes ago?

21   A.  Yes, it is.

22   Q.  Going back to page 8, lines 16 to 22.  When you said:

23   "They see that, you know, hey, I've got an invoice here and it

24   says that you know, you guys did the harness work and stuff and

25   then let's face it the truck -- went in there for a

ICB5iss2                          Nicholson - direct

1   transmission problem.  It was running.  We had it running all

2   over the dam are damn place, the result is you guys broke it."

3           What were you referring to specific?

4   A.  I was referring to damaging the engine.  We did our work on

5   it and I was farming it out and contracting out just for the

6   transmission issue.

7   Q.  Now, so during this meal overall, did you raise various

8   issues with Mr. Issa with the work performed?

9   A.  Yes.

10  Q.  Did he seem to be aware of the issues that you were raising

11  with him?

12  A.  He kept saying don't worry about it, we'll take care of it,

13  just keep sending me the work.

14  Q.  During this meal, did Mr. Issa seek to pitch his business

15  to you?

16  A.  Yes, he did.

17  Q.  Did it seem like he was trying to get work from you?

18  A.  Yes.  He was looking for PMI work.

19  Q.  What's a PMI?

20  A.  Preventive Maintenance Inspection work.

21  Q.  I will ask you more questions about that later.

22          If we can go to 301E, please?

23          I'm sorry.  We didn't finish.  My mistake, Ms. Geier.

24  I am too late, aren't I?

25          (Audiofile played)

1           MR. SOLOWIEJCZYK:  Ms. Geier, if we could turn to

2    Government Exhibit 301E?

3           (Audiofile played)

4    BY MR. SOLOWIEJCZYK:

5    Q.  Mr. Nicholson, on that page, line 17 through 20 you stated:

6    "Yeah, I'm just worried about, you know, getting this thing in,

7    getting the thing out.  I don't give a shit what it costs me,

8    you know?  Just do the right thing and get it out you, you

9    know?"

10          What were you referring to?

11   A.  I was referring to that when I gave Mr. Issa's company a

12   vehicle, I expect it to be repaired correctly so there is no

13   issue with it.

14          MR. SOLOWIEJCZYK:  If you can go to the next clip,

15   Ms. Geier?  301F.

16          (Audiofile played)

17   BY MR. SOLOWIEJCZYK:

18   Q.  Mr. Nicholson, on this page Mr. Issa -- by the way, when it

19   says "TI," who is speaking?

20   A.  Sorry.  Can you repeat?

21   Q.  When it says "TI" on the transcript, who is speaking?

22   A.  "TI" is Tony Issa.

23   Q.  When it says "JN," who is speaking?

24   A.  That's me.

25   Q.  So, Mr. Issa mentioned here PMIs.  What are those?

ICB5iss2                    Nicholson – direct

A.   Those are Preventive Maintenance Inspections.

Q.   What is a preventive maintenance inspection, generally?

A.   It's a comprehensive diagnostic -- it's a comprehensive
check of the vehicle.  It's an A or a B service, the B service
being more in detail.

Q.   And, directing you to page 22, line 5, there is a reference
to a 4546 there.  Do you see that?

A.   Yes.

Q.   What is 4546?

A.   The 4546 is the commercial work order that's written out by
my supervisor when he sends the work out to the contractors.

Q.   And then, looking at line 9 and 10 when Issa said:  And you
know, I could get your PMIs up.  Did you understand what he
meant?

A.   Yes, he did.

Q.   What did you understand him to mean?

A.   He wanted me to give the work to him and he would, in turn,
make me lessen -- his company would do the scheduled services
and then my numbers would be better, you know, because they
rate us on how much work we perform and if we are within the
guidelines of when they're due, the scheduled services.

Q.   When you say scheduled services, is that another word
for --

A.   Yes, PMI.  Sorry.

Q.   Is there any reason that contractors seek out PMI work in

ICB5iss2                              Nicholson – direct

1   particular?

2           MR. BRAFMAN:  Objection.

3           THE COURT:  Excuse me?  What is the question?

4           MR. BRAFMAN:  Objection.

5           THE COURT:  The objection sustained.

6           MR. BRAFMAN:  Thank you.

7   BY MR. SOLOWIEJCZYK:

8   Q.  You sent work out to multiple vendors in your career,

9   correct?

10  A.  Yes, I have.

11  Q.  You have sent out specific jobs for specific pieces of

12  equipment, right?

13  A.  That's correct.

14  Q.  You have also sent out inspection jobs for PMIs, right?

15  A.  At that time, no.

16  Q.  Have you, since then, sent some stuff out for PMIs?

17  A.  Yes.

18  Q.  What, typically, results in more money going to the vendor?

19  The individual jobs or the PMIs?

20  A.  The PMIs.  They're the most lucrative part of the business

21  that we contract out.

22  Q.  And why are they the most lucrative?  Can you explain?

23  A.  Well, based on the guidelines for the preventive

24  maintenance, if the contractor finds any items there that were

25  not specifically authorized, the vendor is supposed to call up

1    my supervisor and tell him the additional items that he found

2    and that were generating additional revenue for the contractor.

3    Q.  So, if during the PMI the contractor finds additional

4    issues, they call the USPS?

5    A.  Yes.  My supervisor.

6    Q.  To seek authorization?

7    A.  Yes.

8    Q.  And if the work is authorized, that could result in more

9    billing; is that right?

10   A.  Yes.  More charges.  Sure.

11          MR. SOLOWIEJCZYK:  You can keep playing, Ms. Geier.

12          (Audiofile played)

13   BY MR. SOLOWIEJCZYK:

14   Q.  Mr. Nicholson, at the end of this meal, who paid for the

15   bill?

16   A.  Mr. Issa did.

17   Q.  Did you offer to pay?

18   A.  Yes, I did.

19   Q.  Did he let you?  Did he let you pay?

20   A.  No.

21   Q.  When you let Mr. Issa pay for you, were you acting at the

22   direction of the OIG?

23   A.  Yes, I was.

24   Q.  We can take that down, Ms. Geier, and if we can put up

25   Government Exhibit 767 just for the witness, actually?

ICB5iss2                          Nicholson - direct

1              Mr. Nicholson, directing you -- it should be on your

2      screen, 767.  Do you see that?

3      A.  Yes, I did.

4      Q.  Do you recognize that document?

5      A.  Yes, it is.

6      Q.  What is it?

7      A.  It is an e-mail from Tony Issa sent 9/24/2014, to myself.

8      Q.  Don't tell us anything else about it.

9              MR. SOLOWIEJCZYK:  The government offers Government

10     Exhibit 767, your Honor.

11             MR. BRAFMAN:  Your Honor, may we have a brief

12     discussion with the Court -- maybe if we have time for the

13     break now -- on this document?

14             THE COURT:  Do you want to take a break now?

15             THE JURY:  Yes.

16             THE COURT:  Take a break now, don't discuss the case,

17     keep an open mind.

18             Sir, could I ask you, when the jury leaves, to just go

19     out in the hall?

20             THE WITNESS:  Sure.

21             THE COURT:  Thank you very much.

22             (Continued on next page)

23

24

25

ICB5iss2                          Nicholson - direct

```
 1              (Jury not present; witness not present)
 2              THE COURT:  Okay.  So, what's the problem?
 3              MR. BRAFMAN:  No, there is no problem.  I want to
 4    alert the Court to an argument that I don't want to make in the
 5    presence of the jury, obviously, and I don't want to interrupt
 6    the cross, assuming I get to it at some point today or
 7    tomorrow.
 8              THE COURT:  What is it?
 9              MR. BRAFMAN:  This is an e-mail that Mr. Issa sends to
10    Mr. Nicholson, it's really chitchat, it's thanking him for the
11    meeting.  There are a number of e-mails --
12              THE COURT:  I see what it says.
13              MR. BRAFMAN:  But there are a number of e-mails that I
14    intend to offer because they go to 803(3) which is they show
15    the state of mind of Mr. Issa, they go to the issue of intent.
16              THE COURT:  Unfortunately, you can't do that.
17              MR. BRAFMAN:  Yes, I can.
18              THE COURT:  No, you can't, because I just ruled.
19              MR. BRAFMAN:  No, no.  You didn't hear the argument.
20              THE COURT:  You cannot offer your client's
21    out-of-court statements.  You can't do it.  In this court you
22    can't do it.  You cannot offer the e-mails.  You can put him on
23    the stand.  I appreciate the risk of that, but you can't
24    circumvent that.  But, you can't by offering the out-of-court
25    statement.
```

1              MR. BRAFMAN:  May I just finish the record?

2              THE COURT:  The government can, you can't.  We have

3    been over this 16 times.

4              MR. BRAFMAN:  But you have never let me make a record

5    on this so give me 90 seconds and I will be quiet.

6              Your Honor, these e-mails, many of them, evince the

7    state of mind of Mr. Issa at the time he is having these

8    conversations with Mr. Nicholson.  The government claims every

9    time there is a conversation, even if it's chitchat, it is a

10   form of an admission because he is talking to someone who is an

11   undercover operative.  If I have e-mails that fill out the

12   narrative on the issue of either completeness or to show the

13   context, it is an exception to the hearsay rule if, under

14   803(3) the e-mail is used to show the state of mind of Mr. Issa

15   at the time.

16             THE COURT:  Fine.  You have made your record.  This is

17   not a rule of completeness issue and this is an effort to

18   introduce your client's out-of-court statements.  It is an

19   unfortunate effect of the rules of evidence that the government

20   can do it and you can't.

21             MR. BRAFMAN:  But it is certainly appropriate to have

22   this witness' response to my client's statement because it is

23   either going to be an inconsistent statement or it shows his

24   bias.

25             THE COURT:  No, it's going to be -- you have to

ICB5iss2                        Nicholson - direct

1   prove -- let me say what the rule is in this courtroom and you

2   have a standing exception.

3           The prior inconsistent statement rule applies only to

4   the witness' prior inconsistent statements.

5           MR. BRAFMAN:  Correct.

6           THE COURT:  Not anybody else's prior inconsistent

7   statement.  And, therefore, the witness can be confronted with

8   his, and only his, prior inconsistent statements.  Nobody

9   else's.

10          MR. BRAFMAN:  Let me just explain that example so that

11  your Honor understands it because I know you are right, but let

12  me just explain it.

13          THE COURT:  Thank you.

14          MR. BRAFMAN:  I will go to OIG and he will say

15  Mr. Issa said this or Mr. Issa didn't do this.  I have an

16  e-mail that shows that that is a flat out lie.  I can certainly

17  use the e-mail to cross-examine him.  It doesn't have to be a

18  prior inconsistent statement in its entirety, it can show that

19  he is lying.

20          THE COURT:  But you can't admit your client's

21  statement.  You can't admit your client's statement.

22          MR. BRAFMAN:  But my client's statement to him is what

23  he is lying about?

24          THE COURT:  You can set it up by saying didn't

25  Mr. Issa say to you on a prior occasion this?  And he says no.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   And then, under the prior inconsistent statement rule, you can

2   put somebody on the stand who can contradict his statement if

3   that's how do you it.  If they say something to the FBI agent

4   and the witness says no, I didn't say that, you can't introduce

5   the prior inconsistent statement in writing, you have to put

6   the FBI agent on the stand in order to apprise the jury of the

7   inconsistency.  Unfortunately, for your client, the fair

8   implication of that is that your client would have to get on

9   the stand and rebut the inconsistency.

10          I'm sorry, that's the rule.  You have a standing

11  exception to my interpretation of the prior inconsistent

12  statement rule.

13          MR. BRAFMAN:  Your Honor, if I could just ask you,

14  when you have an opportunity, that tonight or tomorrow to

15  review the case of *United States v. Lea*, L-E-A, it is a Second

16  Circuit opinion, it is 131 Federal -- I will give you the copy

17  of the case.

18          THE COURT:  That's great.

19          MR. SOLOWIEJCZYK:  Can you read the cite for the

20  government, though?

21          MR. BRAFMAN:  131 F. App'x 320 (2005).  It is a short

22  opinion but I am referring you to page 2 of the opinion.

23          Your Honor, just so the record is clear on this, I

24  believe that your Honor's ruling is a burden shifting ruling.

25  You are requiring me --

ICB5iss2                          Nicholson – direct

1          THE COURT:  Sadly, it is not a burden shifting ruling

2     because your client's out-of-court statements cannot be

3     introduced by you.  That does not shift the burden.

4          MR. BRAFMAN:  Look at the e-mail they're trying to get

5     in and tell me how this is an admission.  It is just thanking

6     him for the meeting.

7          THE COURT:  Mr. Brafman, I agree that you have an

8     excellent argument that the government is trying to read too

9     much into that e-mail.

10          (Recess)

11          THE DEPUTY CLERK:  Case on trial continued.

12     Government and defense present.  Jury is not present.

13               (Witness resumes the stand)

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Sir, you are still under oath.

3            THE WITNESS:  Yes, ma'am.  Yes, your Honor.

4            MR. SOLOWIEJCZYK:  Your Honor, we were offering

5    Government Exhibit 767, the e-mail.

6            MR. BRAFMAN:  No objection.

7            THE COURT:  Admitted.

8            (Government's Exhibit 767 received in evidence)

9    BY MR. SOLOWIEJCZYK:

10   Q.  If we can put that on the screen, Ms. Geier?

11           Mr. Nicholson, was this e-mail sent right after the

12   lunch we reviewed?

13   A.  Yes, it was.

14   Q.  If you can just read the last three lines of the e-mail?

15   A.  "Let me know what day you would like to continue our

16   discussion and get things started.  I am available Monday

17   through Wednesday next week.  Let's get some trucks fixed.

18   Tony Issa, Daimner Fleet."

19   Q.  Now, Mr. Nicholson, after this lunch, did you send

20   additional work to Issa's company First Star Auto?

21   A.  Yes, I did.

22   Q.  When you did that, had you been instructed by the OIG to do

23   so?

24   A.  Yes, I was.

25   Q.  I want to review some more invoices with you.

1        If you could put up Government Exhibit 2064A, which is

2    in evidence?

3        What is this document, Mr. Nicholson?

4    A.   This is a 4541 commercial work order which is initiated by

5    my supervisor for work that was directed to Daimner Corporation

6    for vehicle 4870542, on October 17, 2014.

7    Q.   And Daimner Corporation, what is that?

8    A.   That's one of Mr. Issa's companies for repair.

9    Q.   Based on -- if we can zoom in on the left-hand quadrant,

10   bottom quadrant?  Thanks.

11       What work was being requested here?

12   A.   To replace the engine in that vehicle.

13   Q.   Can you read the entry?

14   A.   Yes.  "Replace engine supplied by USPS through Jasper."

15   That's one of our parts suppliers.

16   Q.   What does that mean?

17   A.   That means that we requested for the engine to be

18   drop-shipped to Mr. Issa's company to replace the engine.

19   Q.   So, this is 2064A.  So, how does that work, exactly?  What

20   is drop-shipping?

21   A.   Drop shipping means that we have a vehicle that we are

22   sending to a contractor and the USPS has its own suppliers for

23   parts, and we would notify our supplier to authorize the

24   shipment of an engine to Mr. Issa's company and this way we

25   didn't have to take ownership of it and get it over to his

ICB5iss2                          Nicholson – direct

1   company, it went directly to the company.

2   Q.  So, the engine was sent directly to Issa's company?

3   A.  Yes.  That's correct.

4   Q.  Now, can you tell from this work order whether your USPS

5   facility had already determined if an engine replacement was

6   necessary?

7   A.  Can I see the entire work order?

8   Q.  Let me withdraw that.

9   A.  Okay.

10  Q.  Given that you were sending an engine to Issa's shop, what

11  does that tell you?

12  A.  It tells me that we already knew that the vehicle needed an

13  engine.

14  Q.  If we could put up 2064B, and just zoom in on the top half,

15  please?

16          What is this?

17  A.  This is the invoice 7628 from First Star Automotive dated

18  10/22/2014, for vehicle 4870542.

19  Q.  Do you see where it says, on repair tag replace engine

20  supplied by Jasper by post office?

21  A.  That's correct.

22  Q.  Is that consistent with the other order?

23  A.  I'm sorry?

24  Q.  Is that consistent with the work order?

25  A.  Yes.

1    Q.  Now, below that, do you see the charge that states

2    "diagnostic?"

3    A.  Yes, I see that.

4    Q.  Would you read that?

5    A.  It says diagnostic, check engine, and compression test.

6    Q.  So, what does that entry mean, Mr. Nicholson?

7    A.  It means that we were being charged $316 for an engine that

8    we already knew was bad and we had already had drop-shipped it

9    to Mr. Issa's company.

10   Q.  What is the purpose of diagnostics?

11   A.  Well, a diagnostic is to tell you that there is something

12   wrong with the engine.

13   Q.  Is diagnostics called for in this situation?

14   A.  No, it was not.  We knew the engine was bad.

15   Q.  Was diagnostic work authorized by the USPS with respect to

16   this vehicle?

17   A.  No, it was not.

18   Q.  Mr. Nicholson, do you recall if you ever spoke to Mr. Issa

19   about the issues with this invoice?

20   A.  Yes, I did.

21   Q.  Did you make him aware of this diagnostic charge?

22   A.  Yes, I did.

23   Q.  Were there other instances of other invoices that had a

24   diagnostic charge?

25   A.  Yes, there were.

ICB5iss2                        Nicholson – direct

1    Q.  That weren't necessary?

2    A.  Yes.

3    Q.  Mr. Nicholson, did there come a point in time when you went

4    to another meal with Mr. Issa?

5    A.  Yes, there was.

6    Q.  Whose idea was it to get a meal?

7    A.  That was Mr. Issa's idea.

8    Q.  Did you meet at a restaurant?

9    A.  Yes, we did.

10   Q.  Who chose the restaurant?

11   A.  Mr. Issa did.

12   Q.  Do you recall where you ate?

13   A.  Yes, I do.

14   Q.  Where did you eat?

15   A.  We ate at Smith & Wollensky's on Second Avenue in

16   Manhattan, on the east side of Manhattan.

17            MR. BRAFMAN:  Third Ave.

18   BY MR. SOLOWIEJCZYK:

19   Q.  Can you describe the setting?

20   A.  It was a very, very high-end restaurant where people in

21   suits were seated around me.  It was not a family restaurant,

22   it was people in suits doing business.

23   Q.  Approximately how many hours was the meal?

24   A.  Approximately two and a half, two and three quarter hours.

25   Q.  And, can you generally describe what sorts of items were

1    ordered during the meal?

2    A.  We had colossal, colossal sea food.  Shrimp, crab cakes, a

3    number of sea food items, and steak, high-end steak.

4    Q.  Who chose what items to order off the menu?

5    A.  Mr. Issa did.

6    Q.  When you attended this lunch, were you acting at the

7    direction of the OIG?

8    A.  Yes, I was.

9    Q.  And did you record the meeting?

10   A.  Yes, I did.

11   Q.  Is that also at the direction of OIG?

12   A.  Yes, it was.

13             MR. SOLOWIEJCZYK:  Your Honor, at this time we request

14   that the Court read a portion of Government Exhibit 4003, which

15   is a stipulation.

16             THE COURT:  Which portion?

17             MR. SOLOWIEJCZYK:  Paragraphs 3 and 4, your Honor.

18             THE COURT:  Government's Exhibits 302A through 302R

19   are true and accurate copies of an audio recording of a meeting

20   that took place on or about November 5, 2014, in New York, New

21   York, between Ibrahim Issa, the defendant, and James Nicholson,

22   and that was consensually recorded by James Nicholson at the

23   direction of law enforcement.

24             Government's Exhibits 302A-T through 302R-T are true

25   and accurate transcripts of the recorded conversations

ICB5iss2                          Nicholson - direct

<table>
<tbody>
<tr><td>1</td><td>contained in 302A through 302R, respectively.  The identities</td></tr>
<tr><td>2</td><td>of the participants, voice attributions, dates, and times</td></tr>
<tr><td>3</td><td>reflected in the transcripts are accurate.</td></tr>
<tr><td>4</td><td>MR. SOLOWIEJCZYK:  Your Honor, at this time we would</td></tr>
<tr><td>5</td><td>offer 302A, B, E as in Edward, F, G, J, K, L, M, N, O, P, Q, R,</td></tr>
<tr><td>6</td><td>and the same exhibits with the T designation.</td></tr>
<tr><td>7</td><td>THE COURT:  Okay.  Any objection?</td></tr>
<tr><td>8</td><td>MR. BRAFMAN:  No.  No, your Honor.</td></tr>
<tr><td>9</td><td>THE COURT:  Thank you.  Admitted.</td></tr>
<tr><td>10</td><td>(Government's Exhibits 302A, 302B, 302E, 302F, 302G,</td></tr>
<tr><td>11</td><td>302J, 302K, 302L, 302M, 302N, 302O, 302P, 302Q, 302R, 302A-T,</td></tr>
<tr><td>12</td><td>302B-T, 302E-T, 302F-T, 302G-T, 302J-T, 302K-T, 302L-T, 302M-T,</td></tr>
<tr><td>13</td><td>302N-T, 302O-T, 302P-T, 302Q-T, 302R-T received in evidence)</td></tr>
<tr><td>14</td><td>MR. SOLOWIEJCZYK:  Ms. Geier, if we can play 302A,</td></tr>
<tr><td>15</td><td>please?</td></tr>
<tr><td>16</td><td>(Audiofile played)</td></tr>
<tr><td>17</td><td>BY MR. SOLOWIEJCZYK:</td></tr>
<tr><td>18</td><td>Q.  Mr. Nicholson, going back to page 8, line 16 through 17,</td></tr>
<tr><td>19</td><td>when you said, "I like the way they do the menus, it's a far</td></tr>
<tr><td>20</td><td>cry from the other place;" what were you referring to?</td></tr>
<tr><td>21</td><td>A.  I was referring to that we had gone to the Olive Garden,</td></tr>
<tr><td>22</td><td>which is basically a family restaurant and Mr. Issa invited me</td></tr>
<tr><td>23</td><td>to this place on the east side and it was, you know, top shelf.</td></tr>
<tr><td>24</td><td>It was out of my league.</td></tr>
<tr><td>25</td><td>MR. SOLOWIEJCZYK:  If we can go on to Government</td></tr>
</tbody>
</table>

ICB5iss2                          Nicholson – direct

1    Exhibit 302B, Ms. Geier?

2                  (Audiofile played)

3                  (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICBHIss3                    Nicholson - Direct

1    Q.  Mr. Nicholson, during this portion of the conversation,

2    Mr. Issa referenced a fishing trip?

3    A.  Yes, he did.

4    Q.  What, if anything, did you understand Issa to be saying

5    about the fishing trip?

6             MR. BRAFMAN:  Objection, your Honor.

7             THE COURT:  I'm sorry.  Ground?

8             MR. BRAFMAN:  He's --

9             THE COURT:  The objection's sustained.

10             MR. BRAFMAN:  Thank you.

11             THE COURT:  I'm sorry.  The objection's overruled.  I

12    didn't mean --

13             MR. BRAFMAN:  He was asking him to discuss Mr. Issa's

14    state of mind.

15             THE COURT:  The objection's overruled.

16    Q.  Do you want the question repeated?

17    A.  I'm sorry?

18    Q.  Do you need the question repeated?

19    A.  Yes, please.

20    Q.  What, if anything, did you understand Mr. Issa to be saying

21    with respect to the fishing trip?

22    A.  Oh, that he had a fishing trip that was available as long

23    as I provided work to Mr. Issa's shop.

24             MR. BRAFMAN:  Objection.

25             THE COURT:  Is that what he said?

1        THE WITNESS:  He said that -- he asked me about a

2    fishing trip, if I was available to go on a fishing trip in

3    Florida, in Miami.

4        THE COURT:  OK.

5    Q.  Next question.  Mr. Nicholson, are there any rules or

6    regulations that govern what a USPS employee can accept?

7    A.  Yes, there are.

8    Q.  Have you been trained on those rules?

9    A.  Yes, I have.

10   Q.  How often are you trained?

11   A.  Yearly.

12   Q.  Under those rules would you be permitted to go on such a

13   fishing trip?

14   A.  Absolutely not.

15   Q.  Would that be true even if you paid your own way?

16   A.  That's true.

17   Q.  Is there a dollar threshold with respect to a value of item

18   that you can receive from a vendor?

19   A.  Yes, that's correct.

20   Q.  Approximately what is it?

21   A.  It's approximately -- I believe it's $20 -- $20, and it

22   should be intrinsic -- basically just hats and maybe a coffee

23   mug or something like that.  But we're capped at $20.  It

24   should never be cash.  It should never be trips.  It should

25   never be stocks or anything like that of monetary value,

ICBHIss3                          Nicholson - Direct

1   significant monetary value.

2            MR. SOLOWIEJCZYK:  You can continue playing,

3   Ms. Geier.  Thank you.

4            (Audio played)

5   Q.  During the portion we just listened to, there was a

6   reference to colossal stone crab?

7   A.  Yes.

8   Q.  How much were those apiece?

9   A.  $30 apiece.

10           MR. SOLOWIEJCZYK:  You can continue, Ms. Geier.

11           (Audio played)

12           MR. SOLOWIEJCZYK:  And if we could now turn to 302E

13   now, Ms. Geier.  Thank you.

14           MR. BRAFMAN:  E?

15           MR. SOLOWIEJCZYK:  E, as in Edward.

16           (Audio played)

17   Q.  Mr. Nicholson, just directing you back to page 37, lines 1

18   through 2.

19   A.  Yes.

20   Q.  Mr. Issa stated, "I would never ask or do anything to get

21   you in trouble."  Did you understand what he was saying?

22   A.  Yes.

23   Q.  What did you understand him to be saying?

24   A.  I understood that to mean that Mr. Issa would basically

25   keep his mouth shut as long as I kept my mouth shut.

1        MR. BRAFMAN:  Objection.

2   Q.  Mr. Nicholson --

3            THE COURT:  I'm sorry.  Ground?

4            MR. BRAFMAN:  Your Honor, that's not what's being

5   said.

6            THE COURT:  The objection's overruled.

7            Ladies and gentlemen, you'll decide what was being

8   said.

9   Q.  Mr. Nicholson, under USPS rules, could you have gotten in

10  trouble for the very lunch you were sitting at with Mr. Issa?

11  A.  I could have been fired.

12  Q.  Did you believe the statement that he made to you was true?

13  A.  No, I do not.

14           MR. BRAFMAN:  Objection.

15           THE COURT:  The objection's overruled.

16           MR. BRAFMAN:  Your Honor, the rules are not disclosed

17  to Mr. Issa.  They're post office rules.

18           MR. SOLOWIEJCZYK:  Defense counsel's testifying.

19           THE COURT:  Excuse me, Mr. Brafman.

20           Strike that statement.  Disregard it, ladies and

21  gentlemen.

22           Please continue.

23  BY MR. SOLOWIEJCZYK:

24  Q.  By the way, Mr. Nicholson, are you generally familiar with

25  the sort of information that's conveyed to contractors who have

ICBHIss3                          Nicholson - Direct

1    contracts with the USPS?

2    A.   Absolutely.

3    Q.   Are you aware if USPS contractors are informed about the

4    rules that apply regarding gifts and gratuities?

5    A.   Yes.  They are on the vehicle maintenance repair agreement.

6              MR. SOLOWIEJCZYK:  If you could continue playing,

7    Ms. Geier.

8              (Audio played)

9              MR. SOLOWIEJCZYK:  Ms. Geier, if we could go to

10   Government Exhibit 302F.

11             (Audio played)

12             MR. SOLOWIEJCZYK:  If we could go to 302G, please.

13             (Audio played)

14   BY MR. SOLOWIEJCZYK:

15   Q.   Mr. Nicholson, what were you and Mr. Issa discussing during

16   this portion of the conversation?

17   A.   We were discussing the gifts that Mr. Issa was going to

18   give me if I proceeded to give his companies work.

19             MR. BRAFMAN:  Objection, your Honor.  Doesn't say

20   that.

21             THE COURT:  Mr. Brafman, that's an argument for you to

22   make at the close of the case.

23   Q.   Mr. Nicholson, was a tablet computer mentioned?

24   A.   Yes, it was.

25   Q.   If we could go back to page 48, lines 16 to 18.

ICBHIss3                     Nicholson - Direct

1    A.  Yes.

2    Q.  You stated, "You know, I got to be careful with that,

3    though.  I'm not supposed to take these things, you know."

4            What were you referring to?

5    A.  I was referring to that on the government code of ethics,

6    that anything over $20 I'm prohibited from accepting.

7    Q.  And what, if anything, did Mr. Issa propose to you during

8    this part of the conversation regarding your concern?

9    A.  He proposed that his people would remove the Daimner logo

10   from the computer, the tablet, and that it would actually look

11   like any other tablet computer.

12   Q.  And if we could turn to page 49, lines 16 through 20.

13           When Mr. Issa stated, "Yeah.  No one's going to know I

14   gave it to you," did you understand what he meant?

15   A.  Yes.

16   Q.  What did you understand him to mean?

17   A.  That he wasn't going to say anything about giving it to me,

18   and he knew that I wasn't supposed to accept it.

19   Q.  When Mr. Issa said, "Listen, if you don't know how to hide,

20   don't get in the game," did you understand what he meant?

21   A.  Yes.

22   Q.  What did you understand him to be saying?

23   A.  He wanted me to keep everything quiet.

24           MR. SOLOWIEJCZYK:  If we could pick up at page 49,

25   Ms. Geier, and continue with the audio.  Thank you.

ICBHIss3                          Nicholson - Direct

1          (Audio played)

2          MR. SOLOWIEJCZYK:  And if we could continue to 302J.

3          (Audio played)

4    BY MR. SOLOWIEJCZYK:

5    Q.  Mr. Nicholson, just taking a look at lines 12 to 13, when

6    Mr. Issa stated, "Someday somebody like you is very valuable to

7    companies like ours," did you understand what he was saying?

8    A.  Yes, I did.

9    Q.  What did you understand him to mean?

10   A.  He wanted me to use my influence.

11   Q.  Did you have any understanding about -- what, if anything,

12   did you understand regarding whether Mr. Issa was interested in

13   giving you a job in the private sector?

14   A.  Mr. Issa had mentioned that he wanted to give me a job and

15   that the information, the knowledge that I had, was valuable.

16   That knowledge could be used to drum him up extra business.

17          MR. SOLOWIEJCZYK:  Keep playing.  Thank you.

18          (Audio played)

19          MR. SOLOWIEJCZYK:  Sorry, your Honor.  One moment.

20          If we could go on to 302K.

21          (Audio played)

22          MR. SOLOWIEJCZYK:  If we could play 302L, Ms. Geier.

23          (Audio played)

24          MR. SOLOWIEJCZYK:  Thank you.  If we could just turn

25   back to page 98, lines 12 through 16.

ICBHIss3                        Nicholson - Direct

1   Q.  Mr. Nicholson, when Mr. Issa said, "That's the other thing
2   that we can help you with, by the way.  I don't know how -- I
3   don't know how your numbers, but we can -- we could -- because
4   they're not PMI, do all the work and get them back before they
5   open up in the morning," did you understand what he was
6   referring to?
7   A.  Yes, I did.
8   Q.  What did you understand him to be saying?
9   A.  He was referring to my numbers, which were the maintenance
10  PMIs in arrears, and he basically was telling me that he could
11  do the work by going directly to the station and pick up the
12  vehicle and perform the PMI on it and then return it back in
13  the morning.
14         MR. SOLOWIEJCZYK:  If we could go back to page 99 and
15  continue playing.  Thank you.
16         (Audio played)
17         MR. SOLOWIEJCZYK:  If we could continue to 302M,
18  Ms. Geier.  Thank you.
19         (Audio played)
20         MR. SOLOWIEJCZYK:  If we could just turn back to
21  page 107, Ms. Geier, and line 17 to 18.
22  Q.  Mr. Nicholson, when you said, "Tony, what do I owe you?" he
23  said, "Nothing.  Don't worry about it," and you said, "Please,
24  no," what did you mean?
25  A.  I meant that I was not supposed to accept those gratuities

ICBHIss3                     Nicholson - Direct

1    under the guidelines of code of ethics.

2    Q.  Were you offering to pay for your part of the meal?

3    A.  Yes, I was.

4    Q.  Had you been instructed by anyone to do that?

5    A.  Yes, I was.

6    Q.  By who?

7    A.  The Office of Inspector General.

8    Q.  Did Mr. Issa let you pay for your portion of the meal?

9    A.  No, he did not.

10   Q.  Then at page 107, lines 20 to 25, Mr. Issa said, "Are you

11   crazy?  Order more still.  You want to take a steak or

12   something home to your wife?"

13           Did Mr. Issa in fact order items to go for your wife?

14   A.  Yes, he did.

15           MR. SOLOWIEJCZYK:  You can take that down, Ms. Geier.

16   If we could publish what's in evidence already as Government

17   Exhibit 3520.

18           MR. BRAFMAN:  What's the number?  3520.  We don't have

19   a copy.

20           MR. SOLOWIEJCZYK:  This is a bank statement for LMX

21   Auto Repair Inc, and I'm just showing charges at 11/7, Smith &

22   Wollensky, for 244.48 and the second for 405.74 dated

23   November 7.

24           If we could go to 302N, Ms. Geier.

25           (Audio played)

1          MR. SOLOWIEJCZYK:  Pause for a second, Ms. Geier.

2          There's a technical difficulty, your Honor.

3          THE COURT:  I gathered that.  Can we get around the

4     technical difficulty by doing it the old-fashioned way?  We

5     actually did look at documents prior to the invention of these

6     machines.

7          MR. SOLOWIEJCZYK:  I believe the jury can see it.

8     It's just defense counsel table.  We do have a binder.

9          MR. BRAFMAN:  I'll get around it, Judge.

10         THE COURT:  Thank you, Mr. Brafman.

11         MR. SOLOWIEJCZYK:  We can continue, Ms. Geier.  Thank

12    you.

13         (Audio played)

14         MR. SOLOWIEJCZYK:  Ms. Geier, if we could turn back to

15    page 115, lines 8 through 10.

16    Q.  When Mr. Issa said to you, "Listen, I like you, we hit it

17    off.  Anything you need, you let me know.  Let me tell you

18    right now, I'm a very generous person," did you understand what

19    he was saying?

20    A.  Yes.

21    Q.  What did you understand him to mean?

22    A.  I understood Mr. Issa saying that he wanted -- he wanted to

23    shower me in gifts basically, in lunches.

24    Q.  Mr. Nicholson, during this meal did Mr. Issa ever raise the

25    topic of doing more work for your VMF?

ICBHIss3                          Nicholson - Direct

1    A.  Yes.

2    Q.  Did he discuss a specific type of work that he was

3    interested in obtaining?

4    A.  Yes, the PMI work, the preventive maintenance inspections.

5            MR. SOLOWIEJCZYK:  If we could turn to 302O, please.

6            (Audio played)

7    BY MR. SOLOWIEJCZYK:

8    Q.  Mr. Nicholson, right at the end there when you said, "But

9    you see I'm sending you more," what were you referring to?

10   A.  I was referring to the vehicles that I was sending out

11   under the direction of the OIG's office.

12           MR. SOLOWIEJCZYK:  If we could turn to 302P,

13   Ms. Geier.

14           MR. BRAFMAN:  P?

15           MR. SOLOWIEJCZYK:  Yes, P as in Paul.

16           (Audio played)

17           MR. SOLOWIEJCZYK:  You can go back to page 132,

18   Ms. Geier.  Actually, the bottom of that page into the top of

19   the next page.  Great.

20   Q.  When Mr. Issa stated, "How can we get some work from the --

21   from the non-transportation side, like, you know, 2 tons,

22   LLVs?" did you understand what he was saying?

23   A.  Yes, I did.

24   Q.  What did you understand him to be saying?

25   A.  He wanted the delivery fleet from the stations.  These are

ICBHIss3                         Nicholson - Direct

1    the -- I believe in Brooklyn there's 42 stations that their

2    vehicles are assigned to me.

3    Q.   When you say he wanted them, wanted them for what?

4    A.   He wanted them for PMI, preventive maintenance inspections.

5              THE COURT:   Tell me when it's a good time to break for

6    lunch.

7              MR. SOLOWIEJCZYK:   This would be a good time, your

8    Honor.

9              THE COURT:   OK.   See you after lunch.   See you in an

10   hour.   Don't discuss the case.   Keep an open mind.   I don't

11   have to do anything weird today.   We can just have a normal

12   trial day.

13             (Jury excused)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  OK.  I'll see you after lunch.

3           Oh, Mr. Brafman, would you mind giving me all those

4    emails that you want to introduce.  I'd like to have them,

5    please, if I might.

6           MR. SOLOWIEJCZYK:  The government would like a copy

7    too.

8           THE COURT:  That's fine.

9           MR. BRAFMAN:  I don't have to give them my cross while

10   still on direct.

11          THE COURT:  If you want me to make evidentiary

12   rulings, I'd like to have a copy of the emails that you claim

13   fall within 803(3), OK, that you claim are present statements

14   of your client's intent.  I'd like to have the emails so I can

15   consider your request.

16          MR. BRAFMAN:  Yes, but I would like to give them to

17   you after lunch but not give them to the government because

18   they're in the middle of direct.

19          MR. SOLOWIEJCZYK:  Your Honor, we believe we're

20   entitled to these.  We had this come up in a recent trial in

21   front of Judge Kaplan, and he required the defense to give us

22   all state of mind statements they were trying to get in so that

23   we would have an opportunity to argue that they weren't state

24   of mind.

25          MR. BRAFMAN:  You can argue that they're not state

ICBHIss3                    Nicholson - Direct

1    of -- I'm not going to get to cross this witness until

2    tonight -- until tomorrow at this rate.

3              THE COURT:  I don't know why it's taking so long.

4    It's taking a lot longer than you said it would.

5              MR. BRAFMAN:  I'm sorry.

6              THE COURT:  Not you.

7              MR. SOLOWIEJCZYK:  I'm sorry, your Honor.  It's hard

8    to estimate with the tapes.  It is going to take longer than I

9    said.

10             THE COURT:  OK.  It's going to take longer than you

11   said.  We'll talk about this when I get back from lunch.

12             (Lunch recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

ICB5iss4                        Nicholson - direct

```
 1                    A F T E R N O O N   S E S S I O N

 2                              2:15 p.m.

 3            THE DEPUTY CLERK:  Case on trial continuing.  Parties

 4    are present, jurors are not present.

 5            THE COURT:  I want the e-mails now.

 6            MR. BRAFMAN:  Yes.  I have them collated for your

 7    Honor.

 8            THE COURT:  Thank you.

 9            MR. BRAFMAN:  Can I read the numbers into the record?

10    There aren't that many.

11            THE COURT:  You certainly may.

12            MR. BRAFMAN:  I just want the record to reflect that

13    some of the e-mails are from Mr. Issa's agents and some of them

14    are from Mr. Nicholson's agents back to Mr. Issa's agents but

15    it is clear who they are.  So, it is Exhibit 303, Exhibit

16    312 -- these are all defendant's exhibits -- 313, 314, 315,

17    316, 318, 320, 321, 322, 323, 324, and 325.  I am going to hand

18    them up, your Honor.

19            THE COURT:  Thank you.  And yes, of course, the

20    government will have an opportunity to argue that they are not

21    803(3) statements.

22            MR. SOLOWIEJCZYK:  We still haven't seen them, your

23    Honor.

24            MR. BRAFMAN:  I am happy to give them to the

25    government after the direct and I am happy to, you know, avoid
```

ICB5iss4                          Nicholson – direct

1    the argument on this until tomorrow morning because I doubt

2    that I will get to them on my cross today.

3              THE COURT:  Let's put the witness on the stand right

4    now.  Can we, please?

5              (Witness resumes the stand)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Hi, everybody.

3          Sir, you are still under oath.

4          THE WITNESS:  Yes, your Honor.

5          MR. SOLOWIEJCZYK:  I believe when we left off we were

6   listening to recordings from the November 25th, 2014 lunch

7   between Mr. Nicholson and Mr. Issa, and if we could now play

8   Government Exhibit 302P?  Thank you.

9          MR. BRAFMAN:  We still don't have a monitor, Judge.

10          THE COURT:  You still don't?

11          MR. BRAFMAN:  No, ma'am.

12          (pause)

13          MR. BRAFMAN:  We have got it now, Judge.

14          THE COURT:  Great.

15          MR. BRAFMAN:  What are you playing?

16          MR. SOLOWIEJCZYK:  302P, as in Peter.

17          (Audiofile played)

18          MR. SOLOWIEJCZYK:  I'm sorry.  We were up to 302Q.  My

19   mistake.

20          (Audiofile played)

21   BY MR. SOLOWIEJCZYK:

22   Q.  Mr. Nicholson, at line 6 to 7 when Mr. Issa said:  "What

23   matters is for you to be up-to-date with the PMIs;" did you

24   understand what he was saying?

25   A.  Yes, I do.

1  Q.  What did you understand him to be saying?

2  A.  He was saying that it was up-to-date on my PMIs, that no

3  one -- that's the way it should be, I should be current with my

4  PMIs.

5  Q.  What, if anything, did you believe he was proposing to you?

6  A.  That by using his services I would be current in my PMIs.

7           MR. SOLOWIEJCZYK:  If we could play 302R?

8           (Audiofile played)

9  BY MR. SOLOWIEJCZYK:

10  Q.  Mr. Nicholson, just looking at that last page, 151; when

11  Mr. Issa said at lines 16 and 17:  "I'm not going to hurt you,

12  you're not going to hurt me.  Let's work together."

13           Do you see that?

14  A.  Yes.

15  Q.  Mr. Nicholson, if you disclosed the fact that Mr. Issa paid

16  for the lunch what, if anything, could have happened?

17  A.  If I disclosed the fact that he paid the lunch he would

18  lose his VMRA.

19  Q.  Is that the vehicle maintenance repair agreement?

20  A.  Repair agreement, right.

21  Q.  What could have happened to you if the fact he paid for

22  lunch had been disclosed?

23  A.  I could lose my position, I would be fired.

24  Q.  We can take this down.

25           Mr. Nicholson, just very briefly switching gears, in

ICB5iss4                          Nicholson - direct

1   the situation where your VMF is overcharged by a vendor, have

2   you had such a situation?

3   A.  On occasion, yes.

4   Q.  And you, your VMF, would be entitled to a credit under such

5   a situation?

6   A.  Yes.

7   Q.  How would the USPS typically get paid back in such a

8   situation?

9   A.  Well, it is on a U.S. Bank card, it is a vehicle repair

10  card and the charges, to start, yes, the charges would go on

11  the credit card and then if there was any discrepancies or

12  whatever, it would be reflected as a credit on the credit card

13  and it would come back to the -- it would come back to the

14  finance number.

15  Q.  Would it be permissible for a vendor to pay a USPS employee

16  back directly?

17  A.  Absolutely not.

18  Q.  Would it be permissible for a USPS employee to be paid in

19  cash?

20  A.  Absolutely not.

21  Q.  If we could put up, just for the witness only, Government

22  Exhibit 762?  Do you recognize this?

23  A.  Yes.

24  Q.  What is it?

25  A.  It is an e-mail from Tony Issa dated December 4, 2014.

1    Q.   Is it an e-mail to you?

2    A.   Yes, it is.

3              MR. SOLOWIEJCZYK:   Your Honor, the government offers

4    Government Exhibit 762.

5              MR. BRAFMAN:   No objection.

6              THE COURT:   Admitted.

7              (Government's Exhibit 762 received in evidence)

8    BY MR. SOLOWIEJCZYK:

9    Q.   Mr. Nicholson, if you could read the bottom e-mail that is

10   from Mr. Issa to you dated December 3rd, 2014?

11   A.   Yes.

12             Subject was meeting.   It says:   Hey Jim.   Hope all is

13   good.   When can we have lunch and catch up and discuss our

14   services?   Hope you and your family had a wonderful

15   Thanksgiving.   Tony Issa.   Daimner Fleet.

16   Q.   You can take that down, Ms. Geier.

17             Mr. Nicholson, did there come a time soon after this

18   e-mail exchange when you received certain items at your office

19   at the VMF?

20   A.   Yes, I did.

21   Q.   Around what time of year was that?

22   A.   That was around Christmastime.

23   Q.   And, can you generally describe what happened?

24   A.   Yes.

25             Mr. Issa sent an office worker, one of the ladies that

1    works in his office and came to the shop around -- I would say

2    it was in the afternoon, and dropped off some gifts for me and

3    left them with my supervisor.

4    Q.  After you received these gifts, did you take photos of

5    them?

6    A.  Yes, I did.

7            MR. SOLOWIEJCZYK:  And if we could just put on the

8    screen, just for the witness, Government Exhibit 419?

9            MR. BRAFMAN:  I have no objection, if you want to

10   offer it.

11           MR. SOLOWIEJCZYK:  Your Honor, then we would offer

12   Government's Exhibits 419, 420, 421, 422 and 423.

13           THE COURT:  Admitted.

14           (Government's Exhibits 419, 420, 421, 422, and 423

15   received in evidence)

16   BY MR. SOLOWIEJCZYK:

17   Q.  If we could put up Government Exhibit 419, please?

18           What is this a photograph of, Mr. Nicholson?

19   A.  This is a photograph of the Christmas card that came along

20   with the alcohol that were gifts.

21   Q.  And if we could put up 420?

22   A.  That's the envelope and the Christmas card that came from

23   Daimner Corporation.

24   Q.  And 421?

25   A.  That's a bottle of Black Label alcohol.  I believe there is

1  two that were given to me.

2  Q.  422?

3  A.  That's the gift wrapped gifts that were delivered to my

4  supervisor for me from Daimner.

5  Q.  That's Mr. Issa's company?

6  A.  Yes, it is.

7  Q.  And 423?

8  A.  That's the third gift in the set of gifts that was dropped

9  off from Mr. Issa's company.

10          MR. SOLOWIEJCZYK:  Your Honor, at this time we would

11  ask the Court to read a brief portion of stipulation which is

12  Government Exhibit 4008.

13          THE COURT:  I have it.  What?

14          MR. SOLOWIEJCZYK:  If the Court could just read

15  paragraphs 3, 4, and 5?

16          THE COURT:  It is hereby stipulated and agreed that:

17  Government Exhibit 268A consists of one bottle of Silver Patron

18  Tequila, 750 milliliters, sent by Ibrahim Issa to James

19  Nicholson in or about December 2014.

20          4.  Government Exhibit 268B consists of two bottles of

21  Johnnie Walker Black Label scotch whiskey, one liter, sent by

22  Ibrahim Issa to James Nicholson, in or about December 2014.

23          5.  Government Exhibit 268C consists of a greeting

24  card sent by Ibrahim Issa to James Nicholson in or about

25  December 2014.

1          MR. SOLOWIEJCZYK:  Your Honor, at this time the

2     government would offer 268A, 268B, and 268C.

3          THE COURT:  Any objection?

4          MR. BRAFMAN:  No, your Honor.

5          THE COURT:  Admitted.

6          (Government's Exhibits 268A, 268B and 268C received in

7     evidence)

8          MR. SOLOWIEJCZYK:  May I approach?

9          THE COURT:  Oh, sure.

10    BY MR. SOLOWIEJCZYK:

11    Q.  Mr. Nicholson, when you received these items from Mr. Issa,

12    what did you do with them?

13    A.  I kept them in my office and I notified the OIG's office.

14    Q.  Did you eventually provide them to the OIG?

15    A.  Yes, I did.

16    Q.  And if you could just take a look at the -- are those the

17    two bottles of Johnnie Walker you were talking about?

18    A.  Yes, they are.

19    Q.  Is that the bottle of Patron tequila you were talking

20    about?

21    A.  Yes, it is.

22    Q.  Is that the greeting card you were talking about?

23    A.  Yes, it certainly is.

24          MR. SOLOWIEJCZYK:  Your Honor, would we have

25    permission to publish these to the jury?

1          MR. BRAFMAN:  Your Honor, they're bottles of liquor.

2          THE COURT:  Oh, come on.

3          Guys, you will have them in the jury room with you

4     when you deliberate but you may not open them.

5     BY MR. SOLOWIEJCZYK:

6     Q.  Now, Mr. Nicholson, if you could take a look at --

7     actually, if we could put up just for the witness Government

8     Exhibit 763?

9          Do you recognize that?

10    A.  Yes, I do.

11    Q.  What is it?

12    A.  It is an e-mail from Tony Issa dated January 8, 2015, to

13    myself.  It is in regards to the meeting.

14         MR. SOLOWIEJCZYK:  Government offers Government

15    Exhibit 763.

16         MR. BRAFMAN:  There is no objection.

17         THE COURT:  Admitted.

18         (Government's Exhibit 763 received in evidence)

19    BY MR. SOLOWIEJCZYK:

20    Q.  If we can publish that, Ms. Geier?

21         If you could just look at the bottom of page 1, who is

22    that e-mail from?

23    A.  It's from Tony Issa and Daimner Fleet.

24    Q.  Can you just read the e-mail?

25    A.  *Jim, Happy New Year.  I hope you and your family had a safe*

ICB5iss4                          Nicholson - direct

1    *and happy one.  I would love to get together with you, grab a*

2    *bite and catch up.  Please let me know when we can get*

3    *together.  Let's have a great new year.*

4              And then I responded.  Hi Tony --

5    Q.  You don't need to read the response.

6    A.  Okay.

7    Q.  What was the date of that e-mail?

8    A.  That was January 7, 2015.

9    Q.  And soon thereafter, did there come a time when you got a

10   meal with Mr. Issa?

11   A.  Yes, I did.

12   Q.  Do you recall where you went?

13   A.  Yes, I do.

14   Q.  Where did you go?

15   A.  We went to Wolfgang's.

16   Q.  What's Wolfgang's?

17   A.  Wolfgang's is a really high-end restaurant and it was

18   located actually right across from where I used to work.

19   Q.  Who suggested that location for the meal?

20   A.  Mr. Issa did.

21   Q.  Approximately how long was the meal?

22   A.  Around two and a half hours or so.

23   Q.  Do you recall some of the items that were ordered?

24   A.  Yes.

25   Q.  What sorts of things were ordered?

ICB5iss4                          Nicholson - direct

1   A.  We ordered shrimp, crab cake, and lobster, and steaks

2   and -- you name it.

3   Q.  When you attended this meal, were you under the direction

4   of the OIG?

5   A.  Yes, I was.

6   Q.  Did you record the meeting?

7   A.  Yes, I did.

8   Q.  Was that at the direction of the OIG?

9   A.  Yes.

10          MR. SOLOWIEJCZYK:  Your Honor, we would ask the Court

11  to read a portion of GX- 4003, which is a stipulation;

12  paragraph 5 and 6, specifically.

13          THE COURT:  Government's Exhibits 303A through 303K

14  are true and accurate copies of an audio recording of a meeting

15  that took place on or about January 15, 2015, in New York, New

16  York, between Ibrahim Issa, the defendant, and James Nicholson,

17  and that was consensually recorded by James Nicholson at the

18  direction of law enforcement.

19          Government's Exhibits 303A-T through 303K-T are true

20  and accurate transcripts of the recorded conversations

21  contained in Government's Exhibits 303A through 303K

22  respectively.  The identities of the participants, voice

23  attributions, dates, and times reflected on the transcripts are

24  accurate.

25          MR. SOLOWIEJCZYK:  The government offers 303A through

ICB5iss4                          Nicholson - direct

303K and 303A-T through 303K-T.

MR. BRAFMAN:  No objection.

THE COURT:  Admitted.

(Government's Exhibits 303A through 303K received in evidence)

(Government's Exhibits 303A-T through 303K-T received in evidence)

MR. SOLOWIEJCZYK:  Can we please play Government Exhibit 303A, please?

THE COURT:  Yes.

(Audiofile played)

MR. SOLOWIEJCZYK:  Pause there, Ms. Geier?

BY MR. SOLOWIEJCZYK:

Q.  Mr. Nicholson, during this portion of the conversation what, if anything, did Mr. Issa provide to you?

A.  He provided a tablet computer from the Issa companies that had "Daimner" across the screen, but he had erased it.

Q.  Looking back at page 16, lines 19 through 25, when you stated:  "You wiped off everything from Daimner, though, right?"  What were you referring to?

A.  I was referring to the advertisement that referred to his company because it was a gift, it was advertising his company.

Q.  And during the prior lunch with Issa in November 2014, had you discussed the tablet?

A.  Yes, he did.

ICB5iss4                         Nicholson - direct

1   Q.  Whose idea was it to wipe the Daimner logo off the tablet?

2   A.  Mr. Issa's.

3           MR. SOLOWIEJCZYK:  If your Honor could read from

4   stipulation 4008, paragraph 2?

5           THE COURT:  Government Exhibit 267 consists of a

6   portable computer tablet provided by Ibrahim Issa to James

7   Nicholson on or about January 15, 2015, in New York, New York.

8           MR. SOLOWIEJCZYK:  And your Honor, the government

9   offers Government Exhibit 267.

10           MR. BRAFMAN:  No objection.

11           THE COURT:  Admitted.

12           (Government's Exhibit 267 received in evidence)

13           MR. SOLOWIEJCZYK:  May I approach?

14           THE COURT:  You may.

15   BY MR. SOLOWIEJCZYK:

16   Q.  Mr. Nicholson, the computer I just handed to you, is that

17   the what you received from Mr. Issa?

18   A.  Yes, it is.

19   Q.  When you received this tablet computer, what did you do

20   with it?

21   A.  I turned it over to the OIG's office.

22           MR. SOLOWIEJCZYK:  We can continue playing.  Thank

23   you.

24           (Audiofile played)

25   BY MR. SOLOWIEJCZYK:

ICB5iss4                    Nicholson - direct

1    Q.  Mr. Nicholson, during that portion of the conversation

2    there was a third voice that we heard briefly, a UM-1 on the

3    transcript.  Do you recall that?

4    A.  Can we go back to the transcript?

5    Q.  Never mind.  Were there waiters talking to you?

6    A.  There was waiter, it was a -- it was a crowded, high-end

7    restaurant.

8    Q.  So, if we can go to page 20, line 7 through 8?

9            When you stated:  "Thank you so much for the bottles,"

10   what were you referring to?

11   A.  I was referring to the Christmas gifts, the alcohol that

12   was dropped at my office.

13   Q.  Directing you to page 20, lines 14 through 23, you

14   referenced somebody named Phil and somebody named Andreoli?

15   A.  Yes.

16   Q.  Who were they?

17   A.  Don Andreoli was the vehicle maintenance manager in Queens,

18   he was the lead manager, he was my boss; and Phil Andreoli was

19   the Staten Island VMF manager.

20   Q.  Is it Phil Andreoli?

21   A.  I'm sorry.  Phil Castellano.

22   Q.  Who was he?  Castellano?

23   A.  Castellano, yes.

24   Q.  What was his position?

25   A.  He was vehicle maintenance manager in Staten Island.

ICB5iss4                          Nicholson - direct

1   Q.  What were you and Issa discussing with respect to Phil

2   Andreoli during this portion of the conversation?

3   A.  That they weren't receptive to the gifts that were dropped

4   off at their offices.

5   Q.  By Issa?

6   A.  It was by Issa's company.  I don't know who specifically

7   dropped them off.

8          MR. SOLOWIEJCZYK:  You can keep playing this,

9   Ms. Geier.

10          (Audiofile played)

11  BY MR. SOLOWIEJCZYK:

12  Q.  Mr. Nicholson, you mentioned somebody named Nicole during

13  this portion of the conversation.

14  A.  Yes.

15  Q.  Who is Nicole?

16  A.  Nicole is one of the office help in Daimner's company.

17          MR. SOLOWIEJCZYK:  And then at the top of page 21 or

18  bottom of 20, line 25 through the top of 21, line 2 -- bottom

19  of 20 to the top of 21.  Sorry.

20          (Audiofile played).

21          MR. SOLOWIEJCZYK:  Please, pause.  Sorry.

22          If we can go to the bottom of page 20 -- thank you so

23  much -- when you said:  "If she comes over with anything,

24  please, there are so many eyes looking at me, you know I'm not

25  supposed to do that," what were you referring to when you said

ICB5iss4                        Nicholson - direct

1    that?

2    A.  I was referring that to when Nicole came over to my VMF,

3    she walked through the shop when I wasn't there and my

4    employees and my supervisors saw her with gifts that she was

5    bringing to me.

6              MR. SOLOWIEJCZYK:  If we can pick up, we are at the

7    bottom of page 21?  Thank you.

8              (Audiofile played)

9    BY MR. SOLOWIEJCZYK:

10   Q.  Mr. Nicholson, if we can look at page 22, lines 2 through

11   5?  When Mr. Issa said:  "As long as -- I know this shit inside

12   out.  As long as there is what's called no *quid pro quo*."

13             Were you familiar with the words *"quid pro quo*?"

14   A.  Yes.

15   Q.  What did you understand them to mean?

16   A.  *Quid pro quo* is when you get something -- you give

17   something and you expect to get something back.

18   Q.  Mr. Nicholson, during this lunch what, if anything, did you

19   get from Mr. Issa?

20   A.  I received the tablet computer.

21   Q.  Did he end up paying for the meal?

22   A.  Yes, he did.

23   Q.  And, Mr. Nicholson, during this meal what, if anything, did

24   Mr. Issa say to you about getting work from your VMF?

25   A.  He wanted the PMI work.

ICB5iss4                          Nicholson - direct

1    Q.  And looking at page 22, lines 20 to 24 -- sorry, it is

2    further up.  My apologies.

3           When Mr. Issa said it is a Christmas thing, it is

4    good, every company gives out gifts at Christmastime,

5    Mr. Nicholson, had you ever received gifts of alcohol from any

6    other vendors?

7    A.  No.

8           MR. SOLOWIEJCZYK:  If we can turn to Government

9    Exhibit 303B?

10          (Audiofile played)

11   BY MR. SOLOWIEJCZYK:

12   Q.  If we can turn back to page 31, line 6 through 11?

13          When Mr. Issa said to you:  "That's what I'm saying.

14   When you retire, we got businesses all over the place.  If you

15   want to be in New Jersey, you want to be -- wherever you're

16   going to wind up."

17          Did you understand what he was saying?

18   A.  Yes, I did.

19   Q.  What did you understand him to be referring to?

20   A.  Mr. Issa was offering me a job at his company.

21   Q.  When you retired?

22   A.  Yes.

23          MR. SOLOWIEJCZYK:  If we can turn to 303C?

24          (Audiofile played)

25          (Continued on next page)

1  Q.  So going back to page 44, line 8, you stated, "You know,

2  I'm not supposed to be doing this.  You know that, right?"

3           What were you referring to?

4  A.  I was referring to that Mr. Issa shouldn't be offering me

5  gifts.

6  Q.  Had you been instructed to say that by anyone prior to the

7  lunch?

8  A.  Yes, the OIG inspector.

9  Q.  And after you said that, did Issa seem concerned to you?

10 A.  No, not at all.

11           MR. SOLOWIEJCZYK:  You could continue playing,

12 Ms. Geier.

13           (Audio played)

14           MR. SOLOWIEJCZYK:  If we can turn to 303D.

15           (Audio played)

16           MR. SOLOWIEJCZYK:  Pause here for a minute.

17 Q.  Can you just describe, Mr. Nicholson, what was happening

18 during this particular portion of the recording.

19 A.  During this portion of the recording, Mr. Issa was ordering

20 high-end wine for us, and he was discussing that he wanted to

21 get additional work from me and that he would continue to

22 provide me with gifts.

23 Q.  Can you just describe what -- he's describing things to

24 you.  What's he doing with his hands?  You know, what's

25 happening at the table?

1    A.  He's swirling around the wine.

2    Q.  Are you holding a glass of wine as well?

3    A.  Yes, I was.

4              MR. SOLOWIEJCZYK:  You can keep playing, Ms. Geier.

5              (Audio played)

6              MR. SOLOWIEJCZYK:  Pause here, Ms. Geier.

7              All right.  If we could look up at the top of the

8    page, page 66, lines 1 through 2.

9    Q.  When Issa said to you, "It's a two-way street, we help each

10   other, understand?" did you understand what he was saying?

11   A.  Yes.

12   Q.  What did you understand him to mean when he said that?

13   A.  Mr. Issa wanted me to provide him more work.

14   Q.  What, if anything, would you receive in return?

15   A.  More gifts.

16   Q.  And then at line 3 to 8, do you see where Mr. Issa says,

17   "All I ask you is to do your job but try to get me in there

18   with you"; do you see that?

19   A.  Yes.

20   Q.  Did you understand what Mr. Issa was saying?

21   A.  Yes.

22   Q.  What did you understand Mr. Issa to be saying when he said

23   "get me in there with you"?

24   A.  He wanted more work.

25             MR. SOLOWIEJCZYK:  OK.  You can keep playing,

ICBHIss5                        Nicholson – Direct

1   Ms. Geier.  Thank you.

2              (Audio played)

3   BY MR. SOLOWIEJCZYK:

4   Q.  Mr. Nicholson, just directing your attention to line 17

5   through 19, when Mr. Issa stated to you, "Right, it would be

6   OK.  I mean, if the shit hit the fan and they investigated you,

7   it would be OK because there's no quid pro quo," did you

8   understand what he was saying?

9   A.  Yes.

10  Q.  When he referred to you being investigated, what did you

11  understand him to mean?

12  A.  I understood that to be if the OIGs were called in and

13  investigated me for taking gifts.

14             MR. SOLOWIEJCZYK:  If you could keep playing,

15  Ms. Geier.

16             (Audio played)

17             MR. SOLOWIEJCZYK:  Ms. Geier, if we could play 303E.

18             (Audio played)

19             MR. SOLOWIEJCZYK:  Pause there, Ms. Geier.

20  Q.  Just looking at lines 9 through 13, when Mr. Issa stated to

21  you, Listen, whatever we do together, me and you, you know what

22  I'm saying, no Phil, no Andreoli, no -- God forbid don't trust

23  nobody because, you know how it is, did you understand what

24  Mr. Issa was saying?

25  A.  Yes, I did.

1    Q.  What did you understand him to be telling you?

2    A.  Mr. Issa was telling me that -- to keep -- I should keep my

3    mouth shut about this arrangement.

4    Q.  Then going to line 15, when Issa said to you, "If you want

5    to live a good life, you got to know how to keep your mouth

6    shut," did you understand what he meant?

7    A.  Absolutely.

8    Q.  What did you understand Issa to be telling you?

9    A.  He was telling me that if I continued to keep my mouth

10   shut, the dinners and expensive gifts would continue.

11          MR. SOLOWIEJCZYK:  You can keep playing, Ms. Geier.

12   Thank you.

13          (Audio played)

14          MR. SOLOWIEJCZYK:  Pause here.

15   Q.  Mr. Nicholson, turning to that page, lines 14 to 15, when

16   you said, "Now, do you have DeMaso and Calabrese on board like

17   this, or what?" who were DeMaso and Calabrese?

18   A.  Mr. DeMaso was the MOPS, manager operations support, and

19   Mr. Calabrese, Frank Calabrese, was a higher level than he was

20   postal officials.

21   Q.  What were you asking Mr. Issa when you said this?

22   A.  If they were accepting gratuities from his company.

23   Q.  What did you understand him to say in response?

24   A.  That he was not going to tell me one way or another because

25   he wanted to ensure that we both had an agreement that we'd

1    keep our mouth shut and then the gifts would continue.

2              MR. SOLOWIEJCZYK:  You can continue playing,

3    Ms. Geier.

4              (Audio played)

5              MR. SOLOWIEJCZYK:  Ms. Geier, if we could turn to

6    Government Exhibit 303F.

7              (Audio played)

8              MR. SOLOWIEJCZYK:  If we could just go back to

9    page 90, Ms. Geier, and line 16 and 17.

10   Q.  When Mr. Issa said to you, "Later on maybe you'll help me a

11   little with Phil," did you understand what he was saying?

12   A.  Yes, I did.

13   Q.  Who was Phil again?

14   A.  Phil was the manager of Staten Island VMF.

15   Q.  What did you understand Issa to be requesting, if anything,

16   when he said this?

17   A.  He wanted me to speak to Phil and get him to use Issa's

18   companies and to talk up Mr. Issa's business.

19             MR. SOLOWIEJCZYK:  All right.  If we could turn to

20   303G.

21             MR. BRAFMAN:  Excuse me, your Honor.  Are we going to

22   take an afternoon break?

23             THE COURT:  I certainly hope so.  Is this a good time?

24             MR. SOLOWIEJCZYK:  This would be fine, your Honor.

25   Thank you.

ICBHIss5                        Nicholson – Direct

1              THE COURT:  Let's take a break.  Don't discuss the

2     case.  Keep an open mind.

3                   (Jury excused)

4                   (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  How much longer is this going to go on?

3    This is really -- has Mr. Brafman disappeared?

4          MR. BRAFMAN:  I'm here.  I'm sorry.

5          THE COURT:  This has gotten so redundant.

6          MR. SOLOWIEJCZYK:  I'm going to try to cut --

7          THE COURT:  The jurors are --

8          MR. SOLOWIEJCZYK:  I agree.

9          THE COURT:  It's driving them crazy.  It's driving me

10   crazy.

11         MR. SOLOWIEJCZYK:  I understand.  I'm going to try to

12   cut a few.

13         THE COURT:  I know you're a very belt-and-suspenders

14   operation at the United States Attorney's Office for the

15   Southern District of New York, but really, you've made your

16   point.

17         MR. SOLOWIEJCZYK:  I understand, your Honor.

18         MR. BRAFMAN:  Your Honor, may you permit me to start

19   cross in the morning fresh?

20         THE COURT:  If they would stop in five minutes, I

21   would tell you to start cross now.

22         MR. SOLOWIEJCZYK:  I don't think we're going to be

23   starting cross today, Mr. Brafman.

24         THE COURT:  You better start cutting it down, because

25   I may cut you off tomorrow.

1          MR. SOLOWIEJCZYK:  I will, your Honor.

2          THE COURT:  The jury's really -- you know, this is a

3     substantial underestimate at holiday season of how long this is

4     going to take.

5          MR. SOLOWIEJCZYK:  We still believe it will be a

6     two-week trial, your Honor.

7          (Recess)

8          THE COURT:  Let's get the witness back.

9          MR. SOLOWIEJCZYK:  Your Honor, we're going to for now

10    not play three of the excerpts we planned to.  We'll talk to

11    the defense overnight about it.  I think they may come to you

12    with something, but we're not going to play them now.  We're

13    playing two more clips from this meal, and then I will move on

14    to something else.  And I will look at all the other clips

15    overnight and try to cut as much as possible.

16         THE COURT:  Yes, because it's ridiculous.

17         MR. SOLOWIEJCZYK:  I agree with you, your Honor.

18         THE COURT:  If something happened 20 times, in order

19    to make out the elements of your alleged crime, you don't have

20    to put on evidence of all 20 times.  You just don't.

21         OK.  Bring in everybody, witness.

22         (Continued on next page)

23

24

25

ICBHIss5                         Nicholson – Direct

1              (Jury present)

2              THE COURT:  Sir, you're still under oath.

3              MR. SOLOWIEJCZYK:  Ms. Geier, if we could play 303G at

4    this time.

5              THE COURT:  Is it closed, Jim?

6              THE LAW CLERK:  Yes.

7              (Audio played)

8              MR. SOLOWIEJCZYK:  If we could just go back to

9    page 95, Ms. Geier.

10   Q.  Mr. Nicholson, you're looking at the screen?

11   A.  Yes.

12   Q.  What, if anything, is Mr. Issa requesting during this

13   portion of the conversation?

14   A.  Mr. Issa was requesting more work, specifically PMIs.

15             MR. SOLOWIEJCZYK:  If we could play 303H, Ms. Geier.

16             (Audio played)

17             (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MR. SOLOWIEJCZYK:

2   Q.  Mr. Nicholson, during that portion of the recording what,

3   if anything, is Mr. Issa offering you?

4   A.  Can you put it back up so I can see, please?

5   Q.  Yes, page 102 at the bottom.  When Mr. Issa said to you,

6   "by the way, does your wife use a laptop," at line 15 to 16,

7   and, "I have another one of those," what was he referring to?

8   A.  He was referring to a tablet that he had given me.

9   Q.  What was he offering you?

10  A.  He was offering me a tablet for additional work for PMIs.

11          MR. SOLOWIEJCZYK:  You can keep going.

12          (Audiofile played)

13  BY MR. SOLOWIEJCZYK:

14  Q.  If you can take a look, Mr. Nicholson, at lines 11 through

15  14 of this page, when Mr. Issa stated to you, "Yeah.  Listen,

16  it's like -- I joke around with the -- well, you know, my two

17  little kids go.  *This is our legal secret, right?*  Listen.  I

18  have just as much to lose as you do."

19          Did you understand what Mr. Issa was saying?

20  A.  Yes, I do.

21  Q.  What was Mr. Issa saying?

22  A.  Mr. Issa was saying that if I open my mouth, I would lose

23  my job, and -- if he opened his mouth I would lose my job, and

24  if I opened my mouth, he would lose the VMF contract for the

25  PMIs.

1    Q.   Opened your mouth about what?

2    A.   About what was going on with the quality of work, billing,

3    and issues like that, and the gratuities, the gifts.

4            MR. SOLOWIEJCZYK:   And then, looking at -- actually,

5    we can keep playing.   Sorry.

6            (Audiofile played)

7    BY MR. SOLOWIEJCZYK:

8    Q.   If we can go back to page 106, and line 7 to 8?

9            When Mr. Issa said to you:   "Because slip of a -- slip

10   of a lip can sink a ship."   Did you understand what he meant?

11   A.   Yes, I did.

12   Q.   What did you understand him to mean?

13   A.   Mr. Issa was saying that if it ever got out, that I would

14   lose my job and Mr. Issa would lose his business -- lose

15   business and his contract with the postal service.

16           MR. SOLOWIEJCZYK:   We can go back to page 107,

17   Ms. Geier, and keep playing.   Thank you.

18           (Audiofile played)

19   BY MR. SOLOWIEJCZYK:

20   Q.   Ms. Geier, if we can go back to page 110 towards the

21   bottom, if you could zoom in on lines 18 through 21?

22           When Mr. Issa said to you:   "You and I, we have a

23   mutual relationship that we can both benefit from."

24           Did you understand what he meant?

25   A.   Yes, I did.

ICB5iss6                          Nicholson - direct

1    Q.   What benefit, if any, could you provide to Issa?

2    A.   More work.

3    Q.   And what benefit, if any, could he provide to you?

4    A.   More gifts and more business lunches and all this other

5    stuff.

6    Q.   During the portion of the recording we just listened to,

7    did Mr. Issa order some additional items?

8    A.   Yes, he did.

9    Q.   Who were those for?

10   A.   Those were for my wife.

11   Q.   Who paid for this lunch, Mr. Nicholson?

12   A.   Mr. Issa did.

13   Q.   Did you offer to pay?

14   A.   Yes, I did.

15   Q.   If you could take this down, Ms. Geier and put up

16   Government Exhibit 556, and specifically page 7?  If you could

17   highlight the heading, and if you could highlight the two

18   Wolfgang's entries and the amounts?  (pause)  Thank you.  You

19   can take those down.

20        Now, Mr. Nicholson, after this lunch, did you begin to

21   send more work to Mr. Issa's shop?

22   A.   Yes, I did.

23   Q.   And was that your own decision or was that the at direction

24   of the OIG?

25   A.   That was at the direction of the OIG.

1  Q.  When you were sending this work to Mr. Issa's company, were

2  you taking any steps to examine the invoices?

3  A.  Yes, I was.

4  Q.  As you examined those invoices, did you identify certain

5  issues with them?

6  A.  Yes, I did.

7  Q.  What sorts of issues, generally?

8  A.  We would be basically be double-billed or charged for items

9  that weren't authorized, repair work that wasn't authorized.

10  There was things on there that should have been included in the

11  preventive maintenance inspection and there were separate line

12  items that we were paying for that.

13  Q.  If we could put up Government Exhibit 2049A, which is in

14  evidence?

15       What is this, Mr. Nicholson?

16  A.  This is a commercial work order.  It's the form that's

17  filled out by my supervisor, it is for vehicle 4810643 dated

18  February 25, 2015.  It was written out by my supervisor, Randy

19  Cox, it was to Hybrid Daimner Corporation and it was for, on

20  the left-hand lower column, perform B service as per form 4546,

21  which is the inspection sheet that the vendors are given to

22  perform either an A or a B inspection.

23       2, lubricators as per form 4546D.

24       3, repair engine stalling.

25  Q.  You mentioned a B service.  What is that specifically?

1    A.   The B service is the more in-depth service than the A.

2    They give three and a half hours to do that type of work.

3    Q.   Is that a type of PMI?

4    A.   Yes, it is.

5    Q.   If we can take a look at 2049B which is also in evidence?

6    What is this?

7    A.   This is an invoice from First Star Auto and it's for

8    vehicle 4810643 with the date 3/10/2015 on it.

9    Q.   We can zoom out?

10           Looking at the middle right portion of the page, do

11   you see the charge -- lower down, Ms. Geier -- do you see in

12   the middle there there is a charge for wheel alignment?  Do you

13   see that?

14   A.   Yes, I see that.

15   Q.   How much was this for?

16   A.   $195.

17   Q.   Based on the work order that we just reviewed, was that

18   work authorized by the USPS?

19   A.   No, it was not.

20   Q.   If additional issues were spotted by the vendor while they

21   were looking at the vehicle during a PMI, could they just

22   repair those issues themselves or did they have to take other

23   steps?

24   A.   No.  They had to take other steps.  They had to notify a

25   supervisor.

ICB5iss6                          Nicholson - direct

1   Q.   Supervisor where?

2   A.   In the VMF.  In my VMF.

3   Q.   What did the supervisor have to say at that point?

4   A.   He would either approve or disapprove the repair.

5   Q.   Was wheel alignment authorized according to the work order?

6   A.   No, it was not.

7   Q.   How much was the charge for it?

8   A.   That was for $195.

9   Q.   Is wheel alignment work the type of work you would have

10  sent out to a vendor?

11  A.   No.  Not at all.

12  Q.   Why not?

13  A.   I have a state of the art wheel alignment machine in my

14  facility and I have technicians that know how to use it.

15  Q.   Looking towards the bottom where it says "airborne, repair

16  airborne;" was that work authorized according to the work

17  order?

18  A.   No, it was not.

19  Q.   And, looking at the charge that says "column loose," in the

20  middle.  Do you see that?

21  A.   Yes, I see that.

22  Q.   How much was that for?

23  A.   $276.50.

24  Q.   According to the work order, was that authorized?

25  A.   No, it was not.

1    Q.  If your shop sent work to a vendor, they identified an

2    issue and you authorized additional work, would it be reflected

3    on the work order?

4    A.  Yes, it would be.

5    Q.  You can take that down, Ms. Geier.  If we can take a look

6    at Government Exhibit 2052C, which is in evidence?

7           Mr. Nicholson, can you just walk us through this work

8    order briefly?

9    A.  Sure.  It's a commercial work order that was made out for

10   vehicle 4870509.  It was made out on 3/10/2015.  The work that

11   we -- it was to Daimner Corporation, it was made out by Anolfo

12   Williams, and it was to perform an A inspection, repair coolant

13   leak at shut off valve, perform the A inspection, check

14   charging system, and repair stalling.

15   Q.  The A inspection, is that a type of PMI?

16   A.  It is the PMI, two-hour preventive maintenance scheduled.

17   Q.  If we could look at 2052D, Ms. Geier?

18          What is this?

19   A.  It's an invoice, 9558 for First Star Automotive.  It was

20   for vehicle no. 4870509 dated 3/13/2015.

21   Q.  Can you tell from the invoice, does it mention that a PMI

22   was performed?

23   A.  Yes.  It's on the right-hand column, the item there where

24   it says two hours at $158.

25   Q.  And directing you to the charge that states just under

1    there "severe brake chatter."  Do you see that?

2    A.  Yes, I see that.

3    Q.  How much was that charge for?

4    A.  That was for $395.

5    Q.  Was that work authorized by the work order?

6    A.  No, it was not.

7    Q.  Directing you to the line item in the middle of the page

8    that states "lube lines, remove all auto lube lines and lube

9    manually."  Do you see that?

10   A.  Yes, I see that.  That was a charge for $158.

11   Q.  Did you expect to see such a charge on the invoice?

12   A.  No.  Not at all.

13   Q.  Why not?

14   A.  It wasn't authorized and it is an illegal modification.

15   Q.  When you say it is an illegal modification, what do you

16   mean?

17   A.  We are not allowed to remove anything from the vehicle that

18   it came with.  From the factory.

19   Q.  Did this vehicle come with --

20   A.  It came with -- yes.  It came with an auto lube system.

21   Q.  If we can turn to 2050B?  If you can zoom in on the top

22   portion?

23         What is this?

24   A.  This is an invoice from invoice no. 3989 from First Star

25   Auto Repair for vehicle 4810645 dated 4/20/2015.

ICB5iss6                          Nicholson - direct

1    Q.  Directing you to the bottom right of what we are looking

2    at, can you tell whether a PMI was requested with respect to

3    this service?

4    A.  Yes.  The B service, the more involved service at three and

5    a half hours.

6    Q.  Now, looking at the top of this portion that is zoomed in

7    where it states:  Check batteries, labor to check batteries,

8    clean terminals, check charging rate, 1.6 V, check voltage,

9    11.5 V.

10            Did you expect to see this charge itemized on the

11   invoice?

12   A.  No.  Not at all.

13   Q.  Why not?

14   A.  Because it is included in the PMI.

15   Q.  And you mentioned that there are guidelines for what work

16   needs to be performed in a PMI?

17   A.  Yes.

18   Q.  Ms. Geier, if you could put up Government Exhibit 2033?

19   First of all, looking at the first page, are these the

20   guidelines you are referring to?

21   A.  Yes.  For that vehicle, they are.

22   Q.  What's the type of vehicle?

23   A.  Intermediate cargo van.

24   Q.  Looking at the second page, if we can zoom in on the top

25   half, what line items of the PMI guidelines cover the item that

1    was itemized on the invoice for the batteries?

2    A.   That would be line items 64, clean battery post and cables;

3    67, battery load test, they're supposed to include the amount

4    of -- the reading from the voltage; the alternator output test

5    on 69, again with the voltage and amperage; and no. 70, the

6    regulator voltage, and it is supposed to record the voltage on

7    there also.

8    Q.   Just going back to the invoice which is 2050B, how much was

9    the charge -- the itemized charge for the batteries?

10   A.   That was $118.50.

11   Q.   Ms. Geier, if we can put up Government Exhibit 2063A?

12            Is this a commercial work order?

13   A.   Yes, it is.

14   Q.   Was it completed by your VMF?

15   A.    Yes, it was; our supervisor Randy Cox.

16   Q.   Can you walk us through the information on it?

17   A.   Sure.

18            The top states the vehicle no. 4870541.  The date,

19   4/8/15.  It went to Daimner Corporation hybrid.  The vehicle

20   was sent for a B service, as per the 4546, check and record

21   brakes, replace left and right lower shock brackets, replace

22   rear spring bracket bolts, repair air leak under hood while key

23   is on, replace rear shocks.

24   Q.   These are all the items that were requested by USPS?

25   A.   Yes, they were.

ICB5iss6                      Nicholson - direct

1    Q.   There is a reference on the first line to perform B service

2    as per 4546.  What's a 4546?

3    A.   That's the maintenance schedule for the A and B

4    inspections.  This one was a B inspection, the more in depth

5    one.

6    Q.   Is the 4546 the checklist we were just looking at?

7    A.   The checklist, yes.

8    Q.   If we can turn to 2063B?  Now, can we zoom in on the top

9    half?  When is this invoice from?

10   A.   This invoice is 9961 from April 22, 2015, for vehicle

11   4870541, and it was from First Star Auto.  It was a B service.

12   Q.   A PMI B service?

13   A.   Yes, it was.

14   Q.   And just looking at the charge it says "diagnosis."  Do you

15   see that?

16   A.   Yes.  Yes.

17   Q.   Was any diagnosis called for by the work order we just

18   reviewed?

19   A.   No, it was not.

20   Q.   For your Brooklyn VMF facility, who typically does

21   diagnosis on a vehicle?

22   A.   That's the lead tech.

23   Q.   At your shop?

24   A.   Yes.

25   Q.   What do you typically use vendors for?

ICB5iss6                         Nicholson - direct

1   A.   For the overflow work.

2   Q.   Looking at the entry that says "overheat," it is right

3   under there -- how much was the diagnostic charge, by the way?

4   A.   That was $158.

5   Q.   Looking at the overheat charge, can you read that to us?

6   A.   Overheat.  Vehicle overheating, flush out radiator and

7   hoses, remove and replace band clutch, replace thermostat, top

8   off coolant.  And that was for $237.

9   Q.   Was that work authorized by the USPS under the work order?

10  A.   No, it was not.

11  Q.   And then, under that, do you see where it says ABS?  What

12  does that mean?

13  A.   That's the anti-lock braking system and they wrote on there

14  to raise vehicle, remove wheels, remove sensors, clean off

15  sensors, clean and adjust brakes, clean and sand brake shoes,

16  reset computer, test drive, light remains off, and they charged

17  us $221.20 for that.

18  Q.   Was that work authorized by the USPS pursuant to the work

19  order?

20  A.   No, it was not.

21  Q.   If we can go down, further down the page, Ms. Geier, to the

22  bottom half?  Do you see the charge that says headlights?

23  A.   Yes, I see that.  Headlights.  Repair head lights, repair

24  connections to headlight driver's side for a charge of $39.50.

25  Q.   Was this work authorized by USPS work order?

ICB5iss6                        Nicholson - direct

1    A.   No, it was not.

2    Q.   If we can go to the entry that says computer malfunction,

3    how much was that charge for?

4    A.   That charge was for $316 for four hours labor.

5    Q.   Was that charge authorized by the USPS pursuant to the work

6    order?

7    A.   No, it was not.

8    Q.   And, Mr. Nicholson, at your facility, what do you use the

9    work orders for?  Can you just explain that, briefly?

10   A.   The work order is a written document that provides us with

11   the information of what shop we sent it to, what vehicle we

12   sent, when we sent it to them, and what specifically we

13   requested on the work.

14   Q.   Actually, if we can go back to the work order for a second

15   which I believe was 2063A?

16            Ultimately, for this invoice to get paid, what do you

17   do with the work order?

18   A.   With this work order, my supervisor would get the

19   original -- the original copy of this and if there was any

20   work, that additional work that you authorized, he would write

21   on the left-hand and add it to the line items that he sent it

22   out initially for.  From that point, the vehicle, the 4541,

23   would go to my clerk --

24   Q.   What's a 4541?

25   A.   That's the repair invoice, the commercial work order.

ICB5iss6                          Nicholson - direct

1    Q.   Is that what we are looking at right now?

2    A.   Yes.  The commercial work order, yes.

3    Q.   Continue, sir.

4    A.   Okay.  He would take that and he would match that up with

5    the invoice that was provided by the vendor and then my clerk

6    would input it and then my clerk would put it in the computer,

7    the SEAM system, I would review it, and authorize the charges.

8    Q.   So, ultimately, do you authorize the charges?

9    A.   Yes, I do.

10   Q.   Is it important to you that the work order, if additional

11   work has been authorized, that it reflects that?

12   A.   Yes.  Absolutely.

13   Q.   Why is it important to you?

14   A.   Because we know what we sent it out for, what was

15   authorized to be worked on, and how much we paid for the work.

16   Q.   You can take that down, Ms. Geier.  If we could go to 2054D

17   which is in evidence?

18            Is this a commercial work order?

19   A.   Yes, it is.

20   Q.   Can you walk us through this one?

21   A.   Sure.  This is for vehicle 4870518, it is dated 4/25/15, it

22   was written by Randy Cox, my supervisor, and it was going to

23   Daimner Corporation and it was for a B service, which is the

24   more involved service, check all brakes, etc.  Make sure auto

25   lube operates.  Lube drive line new joints.

1    Q.  What we are looking at here, that was the work that was

2    authorized; is that correct?

3    A.  Yes, that's correct.

4    Q.  If you can look at 2054D?  Is this the invoice that

5    corresponds with the work order, Mr. Nicholson?

6    A.  Yes, it is.  That is invoice 4042 for vehicle no. 4870518,

7    dated 5/5/2015.

8    Q.  Looking at the bottom there it says PMI B service.  How

9    many hours was it for?

10   A.  That was for three and a half hours, that's the more

11   in-depth PMI service.

12   Q.  What did it cost?

13   A.  I'm sorry?

14   Q.  What did it cost?

15   A.  That cost $276.50.

16   Q.  Now, looking one line item above that, do you see where it

17   says "road test?"

18   A.  Yes.  I see that.  That was for $118.50.

19   Q.  Did you expect to see an itemized entry for a road test?

20   A.  No.  Not at all.

21   Q.  Why not?

22   A.  It is included in the PMI service.

23   Q.  If we could go to 2033, is this the PMI guidelines?

24   A.  Yes, it is.

25   Q.  If you could zoom in on the top left quadrant, Ms. Geier?

1           Which line item does this duplicate?

2   A.  No.  2, the road test.  And that's required for both the A

3   and B inspection.

4   Q.  If we could go back to the invoice which is 2054E, if you

5   can zoom in on the right-hand side?

6           Mr. Nicholson, directing your attention to the entry

7   ABS lights.  Do you see that?

8   A.  Yes, I do.

9   Q.  What does that mean?

10  A.  That's the ABS is the -- I'm having a --

11  Q.  That's all right.  How much was the charge for?

12  A.  That was a charge for $118?

13  Q.  Can you read the description underneath?

14  A.  Scan brake system, reset front and right rear brake

15  sensors.

16  Q.  Then if we can go to the where it says hydraulic

17  transmission flood leak; how much was that charge for?

18  A.  That charge was for $237.

19  Q.  And just going back very briefly to the work order, 2054D,

20  if we can zoom in on the left-hand quadrant there?

21          Is this a list of the work that was authorized?

22  A.  Yes, it is.

23  Q.  And, were the charges that we just went through authorized

24  by the work order?

25  A.  Flip back again, please?  Talking about the ABS service and

ICB5iss6                    Nicholson - direct

1   that other?

2   Q.  ABS and hydraulic transmission fluid?

3   A.  No.  That was not reflected on 4541.

4   Q.  If we can take a look at Government Exhibit 2071A?  What is

5   this?  If we can blow up the top half?  Thanks?

6   A.  This is invoice 9836 for First Star Automotive for vehicle

7   of 6617101.  The date on here was 4/8/2015.

8   Q.  And, from the invoice, the top portion there, top right,

9   can you tell if this vehicle was sent out for PMI?

10  A.  Yes, it was.

11  Q.  What type of service?

12  A.  It was a B service.

13  Q.  How do you know that?

14  A.  Because the charge was for three and a half hours and the

15  vehicle was a tractor.

16  Q.  If we can zoom in on the top portion, top half?  You said

17  the vehicle was a tractor?

18  A.  Yes.

19  Q.  How do you know that?

20  A.  The 661 designation indicates to me that it's a tractor.

21  Q.  Does the USPS have different numbering systems for the

22  different types of vehicles?

23  A.  Yes, it does.

24  Q.  In focusing your attention on the charge it says -- we can

25  zoom out, Ms. Geier.

1              If we can zoom in on the bottom right portion?  Do you

2      see there is a charge there that says rear door?

3      A.  Yes.  That's correct.

4      Q.  How much was that charge for?

5      A.  $118.50.

6      Q.  Did you expect to see this charge on this invoice?

7      A.  No.  Not at all.

8      Q.  Why not?

9      A.  There is no rear door on a tractor trailer.

10             MR. SOLOWIEJCZYK:  You can take that down, Ms. Geier.

11             Your Honor, I am about to start another meeting.  I

12     can begin.

13             THE COURT:  You better.

14             MR. SOLOWIEJCZYK:  Okay.  I will, then.

15     BY MR. SOLOWIEJCZYK:

16     Q.  Mr. Nicholson, did there come a time when Mr. Issa invited

17     you to see one of his facilities?

18     A.  Yes, he did.

19     Q.  And where was that facility?

20     A.  That was in Brentwood, Long Island.

21     Q.  Did you, in fact, visit that facility?

22     A.  Yes, I did.

23     Q.  At the time you did that, were you acting at the direction

24     of the OIG?

25     A.  Yes, I was.

1  Q.  Did you record the conversation?

2  A.  Yes, I did.

3  Q.  After the visit, did you go anywhere with Issa?

4  A.  Yes.  We went to a very high-end restaurant.  Blackstone's

5  was the name of it.

6  Q.  Do you recall where it was?

7  A.  That was in Long Island somewhere.

8  Q.  So you went to the facility first in Brentwood?

9  A.  Yes.

10  Q.  Can you describe what you saw when you first went to the

11  facility?

12  A.  It was a state of the art facility.  It had vehicles in

13  there that were supposedly being worked on.  There was a

14  well-stocked stock room.  There was shop equipment there which

15  was under -- it was not the right type of equipment, it was

16  underpowered for the type of work that they would be performing

17  there.

18  Q.  Can you explain that?

19  A.  Well, there was presses there, like you would press a

20  bearing and, you know, heavy work like that requires a certain

21  tonnage press.  That press was for, like, a regular car, it was

22  not for heavy trucks.  There was a lift there that was a

23  drive-over lift where the technician had to go down into a hole

24  and perform the work.  The postal service used to have lifts

25  like that, bays where you climb down into but OSHA said that

ICB5iss6                         Nicholson - direct

1   was not acceptable so we covered them over and we had lifts put

2   in.

3   Q.  Was there anything else you saw that struck you as at all

4   unusual?

5   A.  It was too clean, it looked like a movie set.  There was no

6   dirt or dust.  There was no indication that anything was

7   actually being worked on.  The vehicle was there but it was --

8   it wasn't dirty, it wasn't greasy.  It was like a stage set.

9   Q.  So, you mentioned after the visit you went to a restaurant

10  with Mr. Issa?

11  A.  Yes.

12  Q.  I think you said it was Blackstone Steak House?

13  A.  Yes.

14  Q.  Who chose the restaurant?

15  A.  Mr. Issa did.

16       MR. SOLOWIEJCZYK:  Your Honor, we would ask that the

17  Court read from a stipulation which is Government Exhibit 4003,

18  and in particular paragraphs 9 and 10.

19       THE COURT:  Government's Exhibits 305A through 305H

20  are true and accurate copies of a recording of a meeting that

21  took place on April 16, 2015, in Melville, New York, between

22  Ibrahim Issa, defendant, and James Nicholson, and that was

23  consensually recorded by James Nicholson at the direction of

24  law enforcement.

25       10.  Government's Exhibits 305A-T through 305H-T are

1    true and accurate transcripts of the recorded conversations

2    contained in Government's Exhibits 305A through 305H,

3    respectively.  The identities of the participants, voice

4    attributions, dates, and times reflected on the transcripts are

5    accurate.

6              MR. SOLOWIEJCZYK:  Your Honor, at this time we are

7    only going to offer 305A, B, D E and H and the associated

8    transcript exhibits.

9              THE COURT:  Fine.

10             I take it you don't have an objection, Mr. Brafman?

11             MR. BRAFMAN:  No, your Honor.

12             (Government's Exhibits 305A, 305B, 305D, 305E, 305H,

13   305A-T, 305B-T, 305D-T, 305E-T, 305H-T received in evidence)

14   BY MR. SOLOWIEJCZYK:

15   Q.  Mr. Nicholson, can you just describe the setting of the

16   restaurant, briefly?

17   A.  It was a very high-end restaurant.  It was business people

18   there and it was very, very high-end, classy place.  There was

19   a wine -- it was like a wine display there where you can pick

20   high-end wines.

21             MR. SOLOWIEJCZYK:  And, Ms. Geier, if we can play

22   Government Exhibit 305A at this time?

23             (Audiofile played)

24   BY MR. SOLOWIEJCZYK:

25   Q.  Mr. Nicholson, at this point were you driving to the

ICB5iss6                           Nicholson - direct

1   restaurant?

2   A.  Yes, I was.

3   Q.  When you arrived outside the restaurant what, if anything,

4   did Mr. Issa provide to you?

5   A.  He provided a case of wine, it was 12 bottles of wine that

6   he had promised me at a previous luncheon.

7            MR. SOLOWIEJCZYK:  And, your Honor, if you could just

8   read briefly from stipulation, Government Exhibit 4008,

9   paragraph 6?

10           THE COURT:  Government Exhibit 269 consists of one

11  case of wine provided by Ibrahim Issa to James Nicholson on or

12  about April 16, 2015.

13           MR. SOLOWIEJCZYK:  Your Honor, the government would

14  offer Government Exhibit 269.

15           MR. BRAFMAN:  No objection.

16           THE COURT:  Sure.

17           (Government's Exhibit 269 received in evidence)

18  BY MR. SOLOWIEJCZYK:

19  Q.  Ms. Geier, if you could publish Government Exhibit 424?

20           Mr. Nicholson, what is this a photo of?

21  A.  This is a photo of some of the wine that I received from

22  Mr. Issa.

23           MR. SOLOWIEJCZYK:  I'm actually not sure if I have

24  offered these, your Honor.  I would offer them at this time;

25  424 through 427.

ICB5iss6                        Nicholson - direct

1          MR. BRAFMAN:  No objection.

2          THE COURT:  Admitted.

3          (Government's Exhibits 424 through 427 received in

4    evidence)

5    BY MR. SOLOWIEJCZYK:

6    Q.  Is this some of wine you received Mr. Nicholson?

7    A.  Yes, it is.

8    Q.  And looking at Government Exhibit 425 --

9    A.  Oh, yes.

10   Q.  -- additional bottles of wine you received?

11   A.  Yes.

12   Q.  426?

13   A.  Yes.

14   Q.  427?

15   A.  Ah, the good stuff.

16   Q.  What kind of wine is this?

17   A.  That's La Fenice Barolo.

18   Q.  Had Mr. Issa said anything to you about Barolo wine at the

19   last meeting?

20   A.  He said it was the best wine, that I would love it.  It's

21   the wine that we sampled in one of the restaurants.

22          MR. SOLOWIEJCZYK:  If we could go ahead to 305B?

23          (Audiofile played)

24          MR. SOLOWIEJCZYK:  If we could skip ahead to 305E,

25   Ms. Geier?

ICB5iss6                         Nicholson - direct

1           (Audiofile played)

2                MR. SOLOWIEJCZYK:  And if we could go to 305H,

3     Ms. Geier?

4           (Audiofile played)

5     BY MR. SOLOWIEJCZYK:

6     Q.  What's a VMRA again, Mr. Nicholson?

7     A.  It is a vehicle maintenance repair order.

8                MR. BRAFMAN:  Agreement.

9     Q.  Agreement?

10    A.  Agreement.  I'm sorry.

11               MR. SOLOWIEJCZYK:  Please continue playing, Ms. Geier?

12          (Audiofile played)

13    BY MR. SOLOWIEJCZYK:

14    Q.  If we can go back to page 44 and focus on line 16 through

15    21?

16          Mr. Nicholson, when Mr. Issa said:  "I will never

17    mention your name, but that's what it is.  Listen, I'm a

18    businessman, you know, being below the radar is good for me."

19          Did you understand what he was saying?

20    A.  Yes.

21    Q.  What did you understand him to be saying?

22    A.  He was saying that as long as I kept my mouth shut, things

23    would be fine.  As long as he -- he would keep his mouth shut

24    also.

25    Q.  You can take this down, Ms. Geier.

1          Mr. Nicholson, who paid for this meal?

2     A.  Mr. Issa did.

3     Q.  And Ms. Geier, if we can put up Government Exhibit 553?

4     And go to page 61 of the PDF?  And the right-hand side, top

5     portion.  We can zoom in even more than that.  Sorry, the top

6     row.  If you can highlight the transactions for Ibrahim Issa

7     heading?  (pause)  Thank you.  You can take that down.

8          Mr. Nicholson, around this time were you continuing to

9     give PMI work to Mr. Issa's shop?

10    A.  Yes, I was.

11    Q.  I am going to ask, Ms. Geier, it you can put up 2055A,

12    please?

13         Is this a commercial work order?

14    A.  Yes, it is.  It is for vehicle 4870519, dated 5/21/15.  It

15    was written out by Randy Cox, the supervisor, and it was for

16    Daimner Corporation, and on the left-hand lower it was a B

17    service, as per 4546, this is the more intense inspection, and

18    that was the first item, the second item was lube drive line,

19    U-joints, check all brakes, repair air conditioning, and

20    replace rear body light.

21    Q.  If you could turn to the invoice which is 2055B?

22    Mr. Nicholson, what is the date on the invoice?

23    A.  This date is for 5/27/2015, the invoice number 4095, it is

24    for vehicle no. 4870519, and it was to -- this invoice was USPS

25    First Star.

1    Q.  And, Mr. Nicholson, does this correspond with the work

2    order we just looked at?

3    A.  Yes, it does.

4              THE COURT:  Okay, so find a place that's a good place

5    to stop.

6              MR. SOLOWIEJCZYK:  I will just finish this one

7    invoice, your Honor?

8              THE COURT:  That would be a good thing to do.

9    BY MR. SOLOWIEJCZYK:

10   Q.  If you can take a look where it says, "performed battery

11   service, check voltage."  Do you see that in the middle of the

12   page?

13   A.  Yes, I do.

14   Q.  How much is that charge for?

15   A.  $79.

16   Q.  Can you just read the charge?

17   A.  Perform battery service; check voltage, 12.3 volts; check

18   charging rate, 13.3 volts; check all terminals.

19   Q.  Did you expect to see the charge itemized on the invoice

20   for this?

21   A.  No.

22   Q.  Why not?

23   A.  That item is included in the service.

24   Q.  PMI service?

25   A.  Yes, it is.

1    Q.  If you can just turn to 2033, the guidelines, second page?

2    A.  Can you expand it a little bit so I can see it?  Thank you.

3    Q.  Which line items does it duplicate?

4    A.  That would be line item 64, clean battery post and cables,

5    battery; 67, battery load test and voltage; 69, alternator

6    output test and they have to write the voltage and amps there;

7    and 70, regulator voltage and, again, they would have to write

8    the voltage.

9    Q.  If we can go back to the invoice, Ms. Geier?

10          Do you see at the bottom of the charges,

11   Mr. Nicholson, it says -- bottom right, Ms. Geier?

12          "Road test."  Do you see that?

13   A.  Can you make it bigger, please?

14   Q.  2055B.

15          Do you see how it says "road test?"

16   A.  Yes.

17   Q.  Is that a charge you expected to see itemized?

18   A.  No.

19   Q.  Why not?

20   A.  It is included in the PMI service.

21          MR. SOLOWIEJCZYK:  This would be a good time to stop,

22   your Honor.

23          THE COURT:  Okay.

24          Folks, so tomorrow the schedule calls for us to have

25   an early lunch for an hour and a half from 12:00 to 1:30, but

ICB5iss6                         Nicholson - direct

1    otherwise we are on focus, so let's be here at 9:30, let's get

2    started.

3               Don't discuss the case.  Keep an open mind.

4               (Continued on next page)

ICB5iss6                         Nicholson - direct

1          (Jury not present)

2          THE COURT:  Okay.  You can step down.

3          MR. SOLOWIEJCZYK:  We are almost done, your Honor.  I

4     apologize for my estimation of time.

5          THE COURT:  Okay.

6          Mr. Brafman, you need to get these documents to the

7     government.

8          MR. BRAFMAN:  I know.

9          THE COURT:  Let me just say this.  The last one is --

10    several are not Mr. Issa's statements but the last one is so

11    clearly not an 803(3) document that it doesn't even bear a lot

12    of discussion.

13          I can see that arguments could be made for portions,

14    not the entirety, but portions of some of these documents to be

15    deemed admissible as 803(3).  If I were the government, I'm not

16    sure I would make too big a fuss about it.  But, you can take a

17    look at them and be ready to argue your point tomorrow or file

18    your inevitable letter.

19          MR. SOLOWIEJCZYK:  Understood, your Honor.

20          MR. BRAFMAN:  Your Honor, I have what I believe to be

21    a full set.

22          THE COURT:  Great.

23          MR. BRAFMAN:  I will give it to Mr.  --

24          THE COURT:  Thank you, Mr. Brafman, and I appreciate

25    your giving them to me so I could lake a look at this this

ICB5iss6                        Nicholson – direct

1      afternoon.

2                   MR. BRAFMAN:  Thank you, and I take it from

3      Mr. Solowiejczyk that he will not discuss them with the witness

4      who is still on direct.

5                   THE COURT:  No.

6                   MR. BRAFMAN:  With that representation, I will give

7      them to him.

8                   THE COURT:  Thank you very much.  I appreciate it,

9      everybody.

10                  I will see you in the morning.

11                  (Adjourned to Wednesday, December 12, 2018 at 9:30

12     p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   JAMES NICHOLSON

 4   Direct By Mr. Solowiejczyk . . . . . . . . . . 719

 5                     GOVERNMENT EXHIBITS

 6   Exhibit No.                              Received

 7    3501A through 3501Q, 3502A through  . . . . . 717

 8            3502E, 3504A through 3504P,

 9            3505A through 3505D, 3506A

10            through 3506D, 3507A through

11            3507Z, 3507AA through 3507ZZ,

12            3508A through 3508D, 3509A

13            through 3509H, 3510A, 3511A,

14            3512A, 3513A, 3514A, 3515A,

15            and 3517 through 3520

16    2000 through 2040, 2041A through 2041B, . . . 718

17            2042A through 2042E, 2043A

18            through 2043B, 2044A through

19            2044B, 2045A through 2045D,

20            2046A through 2046B, 2047A

21            through 2047C, 2048A, 2049A

22            through 2049B, 2050A through

23            2050B, 2051A, 2052A through

24            2052D, 2053A through 2053B,

25            2054A through 2054E, 2055A
```

```
 1              through 2055B, 2056A through

 2              2056D, 2057A through 2057B,

 3              2058A through 2058C, 2059A

 4              through 2059C, 2060A through

 5              2060B, 2061A through 2061C,

 6              2062A through 2062B, 2063A

 7              through 2063B, 2064A through

 8              2064D, 2065A, 2066A through

 9              2066E, 2067A through 2067E,

10              2068A through 2068D, 2069A

11              through 2069C, 2070A, 2071A,

12              2072A through 2072B

13    2042E  . . . . . . . . . . . . . . . . . . 737

14    301B, 301C, 301D, and 301BT, 301CT, 301DT  . 753

15    767  . . . . . . . . . . . . . . . . . . . 771

16    302A, 302B, 302E, 302F, 302G, 302J, . . . . . 777

17              302K, 302L, 302M, 302N, 302O,

18              302P, 302Q, 302R, 302A-T,

19              302B-T, 302E-T, 302F-T,

20              302G-T, 302J-T, 302K-T,

21              302L-T, 302M-T, 302N-T,

22              302O-T, 302P-T, 302Q-T, 302R-T

23    762  . . . . . . . . . . . . . . . . . . . 798

24    419, 420, 421, 422, and 423  . . . . . . . 799

25    268A, 268B and 268C  . . . . . . . . . . . 801
```

763 . . . . . . . . . . . . . . . . . . 802

303A through 303K . . . . . . . . . . . . 805

303A-T through 303K-T . . . . . . . . . . 805

267 . . . . . . . . . . . . . . . . . . 806

305A, 305B, 305D, 305E, 305H, 305A-T, . . . . 840

        305B-T, 305D-T, 305E-T, 305H-T

269 . . . . . . . . . . . . . . . . . . 841

424 through 427 . . . . . . . . . . . . 842