ICC5iss1

1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                  17 Cr. 74 (CM)

5   IBRAHIM ISSA,

6                                 Trial
              Defendant.
7
     ------------------------------x
8
                              New York, N.Y.
9                             December 12, 2018
                             9:53 a.m.
10

11  Before:

12                  HON. COLLEEN MCMAHON,

13                               District Judge

14                     APPEARANCES

15  GEOFFREY S. BERMAN
        United States Attorney for the
16       Southern District of New York
    NOAH SOLOWIEJCZYK
17  ELIZABETH HANFT
    KYLE WIRSHBA
18        Assistant United States Attorneys

19  BRAFMAN & ASSOCIATES, P.C.
        Attorneys for Defendant
20  BY:  BENJAMIN BRAFMAN
        JOSHUA D. KIRSHNER
21       STUART GOLD

22  ALSO PRESENT:   ANTHONY DUBAR, Special agent USPS-OIG
                GRACE SOTO, Special agent IRS
23             COLLEEN GEIER, Paralegal Specialist USAO
              PRIYA KUARLALL PRASAD, Paralegal
24

25

ICC5iss1

1             (Trial resumed; jury present)

2             THE COURT:  Good morning.

3             THE JURY:  Good morning.

4             THE COURT:  I hope that none of you was on my subway

5     line this morning, otherwise you had the same miserable and

6     wretched experience that I did.  And, we obviously have a lot

7     of whoop dee doo today because of the Michael Cohen sentencing,

8     what's going on.  So, we are just going to stay in our little

9     quiet place and do our job.

10            Sir, you are still under oath?

11            THE WITNESS:  Yes.

12     JAMES NICHOLSON, resumed.

13            THE COURT:  Please, finish direct.

14            MR. SOLOWIEJCZYK:  Yes, your Honor.

15            One housekeeping matter.  The government offers 301E,

16     301F, 301E-T and 301F-T.  I believe I offered them yesterday

17     but they didn't make it into the transcript.

18            MR. BRAFMAN:  No objection.

19            THE COURT:  They're admitted.  We have heard enough

20     about them.

21            (Government's Exhibits 301E, 301F, 301E-T and 301F-T

22     received in evidence)

23            MR. SOLOWIEJCZYK:  We are going play more tapes.

24            THE COURT:  As long as it has nothing to do with the

25     relative merits of string beans and spinach.

ICC5iss1                          Nicholson – direct

1        MR. SOLOWIEJCZYK:  We will try.

2     DIRECT EXAMINATION

3     BY MR. SOLOWIEJCZYK:

4     Q.  Mr. Nicholson, do you recall that you attended a lunch at

5     Wolfgang's Steak House with Mr. Issa in January of 2015?

6     A.  Yes, I do.

7        MR. SOLOWIEJCZYK:  Ms. Geier, if we could put up 303K

8     and play an excerpt of that?

9        MR. BRAFMAN:  One second, please?

10       MR. SOLOWIEJCZYK:  Yes; K.

11       MR. BRAFMAN:  Your Honor, if we can have just one

12    second?

13       THE COURT:  Sure, Mr. Brafman.

14       MR. BRAFMAN:  That's fine.  Thank you.

15       (Audiofile played)

16       MR. SOLOWIEJCZYK:  Can you pause here for a second?

17    BY MR. SOLOWIEJCZYK:

18    Q.  There is a reference here, it says "Jamaica Rep" on the

19    page at the very top line, sir.

20    A.  No.  That's Jamaica Rack, actually.

21    Q.  What's Jamaica Rack?

22    A.  Jamaica Rack and Axle was a contractor that we had used.

23    Q.  Thank you.

24       (Audiofile played)

25    BY MR. SOLOWIEJCZYK:

ICC5iss1                    Nicholson - direct

1    Q.  Pause there, please?

2           Mr. Nicholson, right at the end there you were asked

3    by Mr. Issa:  "I did the work for you.  Are you happy with it?"

4    And you said:  "Yeah.  So far, yeah."

5           Do you see that?

6    A.  Yes, I do.

7    Q.  Were you in fact satisfied with the work at that time?

8    A.  No, I was not.

9    Q.  When you gave that answer, were you acting at the direction

10   of the OIG?

11   A.  Yes, I was.

12   Q.  Earlier in that portion of the recording there was a

13   reference to something called SEAM?

14   A.  Yes.

15   Q.  What is that?

16   A.  Solution for Enterprise Management.  It's a computer

17   program that we use.

18   Q.  For what?

19   A.  We use that for documenting work.  Each work order that we

20   have, my clerk inputs it with the work that was done and the

21   amounts and then it comes to me, and then I reference that in

22   SEAM, I make sure that the amounts are correct, and then I

23   approve it.

24   Q.  Would it be fair to say it's an internal billing system for

25   the post office?

ICC5iss1                    Nicholson – direct

1    A.  Yes.  That's exactly what it is.

2              MR. SOLOWIEJCZYK:  If we could turn to 303J,

3    Ms. Geier, and we will pick up at page 4, line 15, of the

4    transcript of 303J?  Thank you.

5              (Audiofile played)

6    BY MR. SOLOWIEJCZYK:

7    Q.  Mr. Nicholson, at the end there there is a reference to a

8    Voyager card?

9    A.  Yes.

10   Q.  What is that?

11   A.  It is a U.S. Bank credit card.  They call it the Voyager

12   card.

13   Q.  Is that one of the methods that you can use to pay a

14   contractor?

15   A.  Yes, it is.

16   Q.  Are there other methods as well?

17   A.  Yes, there are.

18             We use the Voyager card.  We also make up a request,

19   an authorization request for bulk funding and, you know, we

20   charge the work to the bulk funding accounts.

21   Q.  There is a reference in that recording to "Nicole."  Who

22   was she again?

23   A.  Nicole is one of the Mr. Issa's people that works for him.

24   Q.  And you talked about bottles.  What was that a reference

25   to?

ICC5iss1                    Nicholson - direct

1   A.  This was a reference to the Christmas gifts that she

2   brought in on 12/3 after I had left.

3            MR. SOLOWIEJCZYK:  If we could turn to 303I, the last

4   clip, Ms. Geier?

5            (Audiofile played)

6   BY MR. SOLOWIEJCZYK:

7   Q.  Thank you, Ms. Geier.  You can take that down.

8            Mr. Nicholson, changing gears for a second, do you

9   know an individual named Jeffrey Blight?

10  A.  No, I don't.

11  Q.  Have you ever heard of him?

12  A.  No, I haven't.

13  Q.  We are just going to talk about a few more invoices,

14  Mr. Nicholson, if we could go to Government Exhibit 2069B?

15  Actually, sorry, if we could go to 2069A, first?  Is this a

16  commercial work order, Mr. Nicholson?

17  A.  Yes, it is.  This is postal form 4541.

18  Q.  Who is the work order actually sent to?  Which contractor?

19  A.  This is sent to Daimner Corporation.

20  Q.  And what work was requested by the post office on this

21  vehicle?

22  A.  On the left-hand side it is:  Perform B service as per

23  4546.  The second item is lube as per 4546, also fill jockey --

24  which is the lube jockey.  Check all brakes, etc.; repair

25  differential axle leak at spring.

ICC5iss1                    Nicholson – direct

1    Q.  And B service, is that the more comprehensive PMI that you

2    are talking about?

3    A.  Can you just flip to the other side so I can verify that,

4    please?  Okay, I'm sorry, it was on there, yeah, B service,

5    line 1.

6    Q.  That's a type of PMI, right?

7    A.  Yes, it is.

8    Q.  So, if we can go to 2069B, the invoice?  And just looking

9    at the very top, Mr. Nicholson, who is this invoice actually

10   from?

11   A.  This is from Hybrid Specialist, the invoice is 4035, and it

12   is for vehicle 4870552, generated 4/28/2015.

13   Q.  Mr. Nicholson, you sent the work order to Daimner

14   Corporation, right?

15   A.  Yes, I did.

16   Q.  You got the invoice back from Hybrid Specialists; is that

17   correct?

18   A.  That's correct.

19   Q.  Looking at the invoice, the work that was actually

20   performed, if we could just focus in on the top where it says

21   check batteries?

22   A.  Yes.

23   Q.  Did you expect to see that charge itemized on this invoice?

24   A.  No.  Not at all.

25   Q.  Why not?

ICC5iss1                          Nicholson - direct

1    A.   That's part of the PMI service on the A and B inspection.

2    Q.   If we could put up 2062A?  Was the PMI requested here as

3    well, Mr. Nicholson?

4    A.   Yes, it was.  It is line item no. 1 on the left-hand side,

5    perform inspection as per 4546.

6    Q.   If we could turn to 2062B, Ms. Geier, and if we could zoom

7    in on the right-hand side?

8            Mr. Nicholson, directing you to the entry that says

9    "charging system."  Do you see that?

10   A.   Yes, I do.

11   Q.   Did you expect to see that charge itemized on this invoice?

12   A.   Not at all.

13   Q.   Why not?

14   A.   Because that's included in the PMI.

15   Q.   Then it says road test at the bottom?

16   A.   Yes.

17   Q.   Did you expect to see that charge itemized?

18   A.   No, I did not.  That's also included in the PMI.

19   Q.   If we can put up 2068D, as in David?

20           Is this another invoice from First Star Auto Repair?

21   A.   Yes, it is.

22   Q.   And looking at the right-hand side, can you tell if a PMI

23   was requested?

24   A.   Yes, it was.  It is complete services, three and a half

25   hours; yes.

1    Q.  And, looking towards the bottom, do you see the charge for

2    "check all batteries, clean terminals, check voltage."  That

3    charge?

4    A.  Yes, I see that.

5    Q.  Did you expect to see that charge itemized?

6    A.  No, not at all.  That's included in the PMI.

7    Q.  How about the road test?

8    A.  That's also included in the PMI.

9    Q.  We can take that down.

10           Mr. Nicholson, some of the invoices that we reviewed

11   during your testimony, did your shop end up paying those

12   invoices?

13   A.  Yes.

14   Q.  Was that your decision or was that at the direction of the

15   OIG?

16   A.  That was at the direction of the OIG's office.

17   Q.  Would you have otherwise paid these invoices in full?

18   A.  No, sir.

19   Q.  Ms. Geier, if we can put back up 303K for a minute?  Just

20   the transcript, actually, 303K-T?  And if we could go to page

21   12, line 13 through 18?

22           Do you recall when you were at Wolfgang's with

23   Mr. Issa he said to you:  "You know what?  Listen.  If you

24   think that -- if you think I'm taking you from lunch and I

25   expect anything from you but don't give me anything, I don't

ICC5iss1                          Nicholson - direct

1    want to put any pressure on you.  All I'm saying to you is

2    this, if I can help you with something, let me help you."

3              Do you recall him saying that to you?

4    A.  Yes, I do.

5    Q.  At the time he said that, do you believe that to be true?

6              MR. BRAFMAN:  Objection.

7              THE COURT:  The objection is sustained.

8    BY MR. SOLOWIEJCZYK:

9    Q.  Going to page 12, lines 21 through 23, do you recall

10   Mr. Issa saying to you:  "If you don't need me, you don't need

11   me.  Don't worry about it, it's okay, we're still friends.  I

12   want to continue to go out with you."

13             Do you recall him saying that to you that day?

14   A.  Yes, I do.

15   Q.  You can take that down, Ms. Geier.

16             Now, Mr. Nicholson, did there come a time when you

17   essentially stopped sending pretty much any work to Issa's

18   companies?

19   A.  Yes.  That's correct.

20   Q.  Approximately when was that?

21   A.  That was in 2015.

22   Q.  Why did you stop sending work to Issa's shop?

23   A.  It was under the direction of one of the Northeast Vehicle

24   Maintenance managers, the high-ups in the chain.

25   Q.  Mr. Nicholson, after you stopped sending work to Issa's

ICC5iss1                      Nicholson - cross

1    companies, did he continue to take you out to lunch?

2    A.  What was the time frame?

3    Q.  After you stopped sending work to his companies, did he

4    continue to take you out to lunch?

5    A.  No, he did not.

6    Q.  Did he continue to give you gifts?

7    A.  No, he did not.

8    Q.  Did he ever give you anything again?

9    A.  Never gave me anything.

10            MR. SOLOWIEJCZYK:  Nothing further.

11            THE COURT:  Mr. Brafman?

12            MR. BRAFMAN:  May I have just one moment, your Honor?

13            THE COURT:  Of course.

14   CROSS EXAMINATION

15   BY MR. BRAFMAN:

16   Q.  Good morning, Mr. Nicholson.

17   A.  Good morning, Mr. Brafman.

18   Q.  You and I have never met other than seeing you in the

19   courtroom or in the hall?

20   A.  That's correct.

21   Q.  And I have never asked you any questions?

22   A.  No, you have not.

23   Q.  Can you tell me how many times have you met with Mr. Noah

24   Solowiejczyk or agents to go over your testimony before today?

25   A.  I'm sorry.  Could you repeat that?

ICC5iss1                         Nicholson – cross

 1   Q.  Yes.

 2           How many times do you think you have met with agents

 3   of the government or Mr. Solowiejczyk to go over your direct

 4   exam before giving it yesterday and today?

 5   A.  A number of times.

 6   Q.  Five, 10, 13?

 7   A.  I didn't keep track, actually.

 8   Q.  More than five?

 9   A.  Like I said, I didn't keep track, sir.

10   Q.  Well, you would know if it was more than one, right?

11   A.  Yes, it was.

12   Q.  And it was more than two, right?

13   A.  Yes.

14   Q.  And it was more than three?

15   A.  Yes.

16   Q.  And it was more than four, right?

17   A.  Perhaps.

18   Q.  Was it more than five?

19   A.  I don't know the exact amount of time, sir.

20           THE COURT:  Okay.  So let's move on, please.

21   BY MR. BRAFMAN:

22   Q.  So, you went over the questions that Mr. Solowiejczyk was

23   going to ask you, he asked you prior to coming in to court for

24   the most part?

25   A.  He asked me what?

ICC5iss1                    Nicholson - cross

1    Q.  The questions that you were asked yesterday and today, you

2    were asked by Mr. Solowiejczyk before you came in here, pretty

3    much the same questions, right?

4    A.  Pretty much, yes.

5    Q.  And you went through pretty much the same invoices?

6    A.  Pretty much.

7    Q.  And you and he discussed them, right?

8    A.  Yes, we did.

9    Q.  And with respect to the tapes, you listened to them,

10   correct?

11   A.  I was there when we had the conversations.

12   Q.  And then you listened to the tapes to prepare for your

13   trial testimony?

14   A.  Yes, I did.

15   Q.  And you went through the transcripts?

16   A.  Yes, I did.

17          MR. BRAFMAN:  Your Honor, with the Court's indulgence,

18   and I won't do this again throughout my cross, I just want to,

19   if we could briefly play again --

20          THE COURT:  You can do anything you want, Mr. Brafman.

21          MR. BRAFMAN:  Oh, you don't mean that.

22          THE COURT:  Okay.  Pretty much anything you want.

23          MR. BRAFMAN:  Could you play, please, Colleen -- I

24   want to get it right so we don't waste time -- Government

25   Exhibit 303J, and if you could put up when you are ready,

ICC5iss1                    Nicholson - cross

1  please, 303J-T?  It is a conversation played yesterday and a

2  part today as well.  Do you have it?  And, the Jurors have a

3  transcript?  Would you play it, please?

4              (Audiofile played)

5              THE WITNESS:  Can I see the transcript, please?

6              THE COURT:  The witness has asked for the transcript.

7  Is that okay with you?

8              MR. BRAFMAN:  Yes, that's fine.  I think it is on his

9  screen.

10              THE WITNESS:  Well, it is not.

11              MR. BRAFMAN:  I'm sorry.  I'm not the computer person

12  but we will certainly deliver him the transcript.

13              THE COURT:  And we can start it over again?

14              MR. BRAFMAN:  Yes, ma'am.  Do you have it now, sir?

15              THE WITNESS:  Yes.

16              (Audiofile played)

17              MR. BRAFMAN:  Could you stop and move ahead to page 4,

18  line 12, so we can save some time?  Just play it, it is another

19  minute.

20              (Audiofile played)

21  BY MR. BRAFMAN:

22  Q.  Can we stop here?  I want to refer you to page 7 where on

23  line 11 the word "kickbacks" appears.  Do you see it?

24  A.  Yes, I do.

25  Q.  That's not on the tape, is it?

ICC5iss1                          Nicholson - cross

1    A.   I'm sorry?

2    Q.   That's not on the tape, is it?

3    A.   Kickbacks?

4    Q.   Yes.  It's not.

5    A.   Yes, kickbacks.  That's whatever comes back into the shop

6    after it's been repaired.

7    Q.   That's not talking about an illegal kickback where you pay

8    somebody and they give you back money.  You are talking about a

9    truck that was kicked back because the repairs weren't right or

10   something like, right?

11   A.   That's correct, sir.

12   Q.   Okay.

13          Now, I want to talk to you a little bit about this

14   transcript -- and I won't play the tapes again, your Honor --

15   but let's focus on what you said and what Mr. Issa said in this

16   transcript that I am referring to.

17          If we could take it down, please?

18          When you said that there were 1,300 PMIs behind, is

19   that true?

20   A.   That was not true for my facility, sir.

21   Q.   Who were you talking about?

22   A.   I believe Mr. Issa was talking about the collective number

23   from Brooklyn and Staten Island and Queens VMF.

24   Q.   That's a lot of VMFs, is that correct?

25   A.   It is.

ICC5iss1                          Nicholson - cross

1    Q.   And PMIs are supposed to be done on a current basis?

2    A.   Within two weeks of the date that they're due.

3    Q.   And any of the PMIs that he is talking about were months

4    overdue, correct?

5    A.   That's correct.

6    Q.   And that's the pressure that was coming down from on high

7    because trucks that are not inspected could be dangerous?

8    A.   The pressure -- the pressure, sir, that was coming down on

9    me was from the higher ups that wanted me to use Mr. Issa's

10   company.

11   Q.   We will get to that in a minute, but you were told to fix

12   this backlog of PMIs; you and Castellano and all of the vehicle

13   men were getting e-mails from Mr. Neuhaus talking about keeping

14   these current, correct?

15   A.   We were getting e-mails and direction to send the work to

16   Mr. Issa's company.

17   Q.   How many trucks did you send to Mr. Issa's company, in

18   total?  30?

19   A.   From 2014 on?

20   Q.   Yes.  30?

21   A.   I couldn't possibly answer that, sir.

22   Q.   You didn't send them 1,300?

23   A.   No.  Of course not.

24   Q.   So, the conversation about the 1,300 PMIs was collectively

25   the post office in your region -- maybe not your fault -- was

ICC5iss1                    Nicholson - cross

1   1,300 PMIs behind, correct?

2   A.  Sir, I'm only responsible for --

3   Q.  I'm not berating you.  I'm asking you the question.

4            THE COURT:  Wait, sir.

5            MR. BRAFMAN:  I'm asking you the question.

6            THE COURT:  Shhh, Mr. Brafman.

7            Sir?

8            THE WITNESS:  Mr. Brafman --

9            THE COURT:  I want you to listen to Mr. Brafman's

10   questions.

11            THE WITNESS:  Will he repeat it?

12            THE COURT:  He will, but I'm going to tell you

13   something.

14            THE WITNESS:  Yes, ma'am.

15            THE COURT:  He is going to phrase it in a way that it

16   should be answered either yes or no.

17            THE WITNESS:  Okay.

18            THE COURT:  This whole process will go faster, and

19   therefore you can leave, if you will answer his question yes or

20   no when that's what it calls for.  And if the government

21   lawyers want you to clarifying something, they have another

22   chance to ask you questions.  Okay?

23            THE WITNESS:  Thank you, your Honor.

24            THE COURT:  So, don't get into a fight with

25   Mr. Brafman.

ICC5iss1                          Nicholson - cross

 1              THE WITNESS:  No, no.  Of course not.

 2              THE COURT:  Okay.

 3      BY MR. BRAFMAN:

 4      Q.  If we could put up page 5 of 301-T?  I'm sorry, 303I-T?  Do

 5      you have that, sir?

 6      A.  Which one, sir?

 7      Q.  Page 5 of 3031, page 5, Colleen.

 8              THE COURT:  Mr. Brafman, it is a beautiful name.  It

 9      is driving me nuts because every time you call her Colleen as

10      opposed to "Ms. Something," I think you are talking to me.

11              MR. BRAFMAN:  You think I'm talking to you.

12              THE COURT:  Which I know you are not and it is okay,

13      but would you mind using her last name so I don't jump every

14      single time?  It is an unusual enough name that every time I

15      hear it, I look up.

16              MR. BRAFMAN:  I have either addressed you as either

17      your Honor --

18              THE COURT:  You have never dressed me in any

19      inappropriate way, Mr. Brafman; I don't mean to suggest it.  It

20      is my problem.  I am like Pavlov's dog when I hear that.  Okay?

21      I go up.  So.

22      BY MR. BRAFMAN:

23      Q.  Let me see if I can do it without the transcript.

24              In this conversation, did you -- are you permitted by

25      OIG to lie to Mr. Issa if the conversation warranted it?

ICC5iss1                    Nicholson - cross

1    A.  Yes.

2    Q.  And were you permitted to tell him the truth, obviously?

3    A.  Yes.

4    Q.  So you mixed the truth with lies when appropriate, right?

5    A.  Yes.

6    Q.  Now, you're wearing a wire, you are not telling this to

7    Issa, that it's being recorded; correct?

8    A.  That's correct.

9    Q.  The whole purpose is to have a conversation when he doesn't

10   know he is being recorded, right?

11   A.  That's correct.

12   Q.  You know the expression "feeding the tape?"  Have you ever

13   heard that?

14   A.  No, I haven't heard that.

15   Q.  Before you went on these meals or these adventures as I

16   will call them, did you have conversations with an OIG

17   investigator to turn sort of what you might say during this

18   conversation?

19   A.  I informed the OIGs at every step.

20   Q.  I understand that, but did they give you any instructions?

21   Yes or no.

22   A.  Yes.

23   Q.  Before every meeting there was at least some instruction,

24   correct?

25   A.  Yes, there was.

ICC5iss1                         Nicholson - cross

1  Q.  Now, so did you tell Mr. Issa, in this conversation that we

2  just heard played, that if you give over the VMFs -- sorry, if

3  you give over the PMIs to the stations, they will eventually

4  phase you out?

5  A.  That's correct.  I made that statement.

6  Q.  And when you made that statement were you telling the truth

7  or was that a lie?

8  A.  In -- yes.  It was my belief that eventually that they

9  would probably phase out the VMFs.

10  Q.  Because contractors were getting a fair share of the work

11  and they were competing with the costs, correct?

12  A.  Yes.  That's correct.

13  Q.  And one of the problems you faced at the post office VMF

14  was the fact that you were understaffed.  You told him that on

15  a number of occasions, correct?

16  A.  Is that correct.

17  Q.  Was that true?

18  A.  That was true.

19  Q.  And sometimes these PMIs have to be done quickly, correct,

20  sir?

21  A.  They have to be done within the guidelines; that's correct.

22  Q.  And some of the guidelines suggest that they be done

23  overnight or in 24 hours?

24  A.  That's not correct, sir.

25  Q.  The VMFs are trying to get these trucks back on the road as

ICC5iss1                    Nicholson - cross

1    quickly as possible, correct?

2    A.  That part is true.

3    Q.  And if they're not on the road they obviously can't deliver

4    the mail, correct?

5    A.  That's correct.

6    Q.  And you were understaffed, correct?

7    A.  That's correct.

8    Q.  And that's why you were giving out stuff to independent

9    contractors long before you met Mr. Issa, correct?

10   A.  That is correct.

11   Q.  And it goes on and continues today, correct?

12   A.  That is true.

13   Q.  Because in order for the post office to continue to be

14   viable and function on a timely basis, you need to send trucks

15   to be inspected and repaired to outside vendors, correct?

16   A.  That is correct.

17   Q.  And long before you met Mr. Issa, you had other vendors

18   that you were using on a regular basis, correct?

19   A.  Yes.  That is correct.

20   Q.  Now, in this transcript, in this conversation in which we

21   just heard there is a statement by you that you don't want to

22   make no trouble for yourself.  Is that correct?

23   A.  That's correct.

24   Q.  And you said:  "I'm enjoying this."  But then Mr. Issa then

25   jumped in and said:  "This has nothing to do with that, by the

ICC5iss1                         Nicholson - cross

1   way."

2               Did you understand what he said?

3   A.  Yes, I understood that.

4   Q.  And what he was saying was him having lunch with you has

5   nothing to do with you giving him work.  Isn't that what he was

6   saying?

7   A.  That's what he said.

8   Q.  Okay, and that's what he said not knowing he was being

9   recorded, correct?

10  A.  That's correct.

11  Q.  And then you say:  "Uh-huh," and he says:  "Don't mix one

12  with the other.  No quid pro quo."  And you say:  "All right."

13              Correct?

14  A.  That's correct.

15  Q.  You didn't say: *What are you talking about?  This is*

16  *exactly what we are doing, you are buying me lunch so I can*

17  *give you work.*

18              You didn't say that, did you?

19              MR. SOLOWIEJCZYK:  Objection.  Argumentative, your

20  Honor.

21              MR. BRAFMAN:  It is not argumentative, Judge.

22              THE COURT:  Actually, it is, but answer the question.

23              MR. BRAFMAN:  Thank you.

24              THE WITNESS:  Could you repeat the question, sir?

25  BY MR. BRAFMAN:

ICC5iss1                    Nicholson - cross

1   Q.  When he said this has nothing do with that and you told us

2   what you understood him to mean, and he said, don't mix one

3   with the other, and you said, all right.

4        Correct?

5   A.  Yes, that is correct.

6   Q.  You didn't say "you're wrong," right?

7   A.  No, I did not.

8   Q.  Now, when you talked about the fact that you wanted to stay

9   below the radar and you were not happy with the fact that

10  Nicole brought these bottles right into the post office, you

11  told Mr. Issa that; right?

12  A.  Yes, I did.

13  Q.  And you know Nicole was one of the managers for one or more

14  of Mr. Issa's companies, correct?

15  A.  Yes, I did.

16  Q.  And she marched into the station, middle of the day with

17  all the employees working there, and put bottles of liquor on

18  the table around Christmas, right?

19  A.  That's correct.

20  Q.  She wasn't handing it to you under the table or in a

21  parking lot, right?  In the broad daylight in your office,

22  correct?

23  A.  It was no in my office; no, sir.

24  Q.  She left it at the VMF?

25  A.  Yes, she did.

ICC5iss1                    Nicholson - cross

1    Q.  And she left you a card.

2    A.  Yes, she did.

3    Q.  And the card said "Happy Holidays," right?

4    A.  That's correct.

5    Q.  And it had a business card for a woman who was a business

6    manager for one of Mr. Issa's companies so that you would know

7    who it came from, correct?

8    A.  That's correct.

9    Q.  Now, you said to this jury on direct examination that you

10   went out to Mr. Issa's shop in Brooklyn and you said a lot of

11   not nice things about it; it was small, it was dinky, it wasn't

12   secured, right?  Words to that effect?

13            MR. SOLOWIEJCZYK:  Objection.  Mischaracterizes the

14   witness' testimony.

15            THE COURT:  Excuse me.  That's not a valid objection.

16            MR. SOLOWIEJCZYK:  My apologies, your Honor.  I forgot

17   which courtroom I was in.

18            THE COURT:  The objection is overruled.

19            THE WITNESS:  Mr. Brafman, can you repeat?

20   BY MR. BRAFMAN:

21   Q.  Yes, sir.  I'm going to repeat anything you need me to

22   repeat.

23   A.  Okay.  Thank you.

24   Q.  Did you tell this jury, when you first started to consider

25   using Mr. Issa, you wanted to see what his facility or

ICC5iss1                          Nicholson - cross

1   facilities looked like, correct?

2   A.   That's correct.

3   Q.   And you told the jury that you went out to the facility in

4   Brooklyn and there were things about the facility that you did

5   not like, correct?

6   A.   That's correct.

7   Q.   And one of the things you said you did not like is that it

8   was unsecured, correct?

9   A.   That's correct.

10  Q.   And there was no guard, correct?

11  A.   That's correct.

12  Q.   And it didn't look like a facility that could really do the

13  work that you wanted to use him for, correct?

14  A.   That is correct.

15  Q.   And what you did, you said to the government people and to

16  the U.S. Attorney and to this jury, that you didn't think it

17  was a real facility, correct?

18  A.   That's correct.

19  Q.   Now, let's just talk for a minute about the contractors

20  that you used.

21         You used Jamaica Rack?

22  A.   Jamaica Rack, yes.

23  Q.   I'm going to show you a photo I am marking for

24  identification as 327, I am going to hand one to the Court --

25  will just -- you know what?  I can put it on the ELMO and we

ICC5iss1                     Nicholson - cross

1   can mark it for identification that way.  Just for the witness,

2   government, and the Court.

3           This is 327?  Can you see it, sir?  I'm going to make

4   it clearer.  Do you see it?

5   A.  Yes, I see it.

6   Q.  That's the entrance to Jamaica Rack, correct?

7   A.  Sir, I'm not sure.  I don't see any indication it's Jamaica

8   Rack.  I don't believe that's the facility I looked at.

9   Q.  How many times have you given work to Jamaica Rack?

10  A.  Many times.

11  Q.  Hundreds?

12  A.  Perhaps.

13  Q.  Over 10 years, five years?

14  A.  Over 10.  As long as I've been at the Brooklyn VMF as a

15  manager.

16  Q.  So, that's a Long time?

17  A.  Yes, it is.

18  Q.  And you went to -- you said you met Mr. Issa and you went

19  immediately to check out his facility, right?

20  A.  Yes.

21  Q.  And you didn't ever visit this facility?

22  A.  Yes.  Yes, I did, early on.

23  Q.  And do you recognize this as the Jamaica Rack facility?

24  A.  It's on -- it's on Liberty Ave, yes, it could very well be.

25          MR. BRAFMAN:  Your Honor, I offer this into evidence.

ICC5iss1                          Nicholson - cross

1          MR. SOLOWIEJCZYK:  No objection.

2          THE COURT:  Admitted.

3          (Defendant's Exhibit 327 received in evidence)

4    BY MR. BRAFMAN:

5    Q.  Now, this facility, do you see a security guard there?

6    A.  No, I do not.

7    Q.  Do you see a gate there during the day?

8    A.  It's a roll-down gate, sir.

9    Q.  But you don't see it down, do you?

10   A.  Down?  No.

11   Q.  It's open?

12   A.  Yes, it is.

13   Q.  Without a security guard?

14   A.  That's correct.

15   Q.  And that's what you criticized Mr. Issa's place for, having

16   no gate and people could just go in; right?

17   A.  That's not correct, sir.

18   Q.  Did you criticize him for not having it secured?

19   A.  Yes, I did.

20   Q.  But it didn't stop from you giving Jamaica Rack work for 10

21   years, did it?

22   A.  I was satisfied with their work, sir.

23   Q.  Did you see their security?

24   A.  Yes.

25   Q.  Did they have a guard?

ICC5iss1                    Nicholson - cross

1   A.  No, sir.

2   Q.  Thank you.  Can we take that down?

3        Do you give work to a company called Unico?

4   U-N-I-C-O?

5   A.  Yes.

6   Q.  That's one of your contractors, right?

7   A.  Yes, it is.

8   Q.  I am going to put this on the ELMO for the witness to see,

9   this is 328.

10       Do you see it?

11  A.  Yes, I do.

12  Q.  And off to the left, that's the facility of Unico, right?

13  A.  Yes, it is.

14  Q.  Do you see the garage where the truck is coming out or

15  seems to be on the sidewalk?  That's the Unico facility,

16  correct?

17  A.  Yes, it is.

18  Q.  The one you have been sending work to for how many years?

19  A.  Quite a few years, sir.

20       MR. BRAFMAN:  I'm going to offer this into evidence.

21  328.

22       MR. SOLOWIEJCZYK:  No objection.

23       THE COURT:  Admitted.

24       (Defendant's Exhibit 328 received in evidence)

25  BY MR. BRAFMAN:

ICC5iss1                         Nicholson - cross

1   Q.   That's a one-truck-width entrance way, right?

2   A.   Yes, it is.

3   Q.   And, in order to get another truck in there you would

4   either have to back this all the way in or put it out on the

5   street, right?

6   A.   That facility goes all the way back, sir.

7   Q.   I understand, but in order to get in you need to either get

8   that truck out of the drive way or back it all the way in,

9   right?

10  A.   I would say so.

11  Q.   Do you see any security guard there?

12  A.   No, I don't.

13  Q.   Do you see any gate there during the day?

14  A.   During the day?  No.

15  Q.   Okay.  Now, do you know if it is open 24 hours -- I offer

16  it into evidence.  It is in.

17  A.   I'm sorry, sir?

18            THE COURT:  It is in evidence.

19  Q.   Now, did you think that Mr. Issa really didn't do this kind

20  of work when you met him?

21  A.   Could you be more specific, sir?

22  Q.   When you met Mr. Issa, you told the agents the minute after

23  they interviewed you that you went to a facility, you didn't

24  think he was really able to do this, you thought he was a

25  salesman.  Didn't you say that?

ICC5iss1                         Nicholson – cross

1    A.  Are you referring to Kingsland Avenue, sir?

2    Q.  Yes, sir.

3    A.  Yes.

4    Q.  But have you gone to other facilities that Mr. Issa

5    operates?

6    A.  Yes, I have.

7    Q.  Did you go to Brentwood?

8    A.  Brentwood?  Yes.

9    Q.  And you said Brentwood was a state of the art facility,

10   right?

11   A.  Yes.

12   Q.  Now I'm going to put on the ELMO 326 for the witness and

13   the government.  Do you recognize that as the Brentwood

14   facility?

15   A.  Yes, I do.

16   Q.  Fairly large?

17   A.  Yes.

18             MR. BRAFMAN:  I offer this into evidence, your Honor.

19             MR. SOLOWIEJCZYK:  No objection.

20             THE COURT:  Admitted.

21             (Defendant's Exhibit 326 received in evidence)

22   BY MR. BRAFMAN:

23   Q.  Do you see the gates all down?

24   A.  Yes, I do.

25   Q.  Do you know if Brentwood does work on post office trucks?

ICC5iss1                         Nicholson - cross

1    A.  Yes, it does.

2    Q.  I'm going to show you Defendant's Exhibit 326B for

3    identification.  Do you see that?

4    A.  Yes, I do.

5    Q.  That's the other side of the Brentwood facility, correct?

6    A.  Brentwood facility?  No, I don't believe it is, sir.

7    Q.  You went there -- withdrawn.

8              326B, this is the Kingsland facility that you went to

9    when you visited the place in Brooklyn, isn't it?

10   A.  That was Kingsland, yes.

11             MR. BRAFMAN:  Okay, so this is Kingsland.  I'm going

12   to offer this into evidence.

13             MR. SOLOWIEJCZYK:  No objection.

14             THE COURT:  Admitted.

15             (Defendant's Exhibit 326B received in evidence)

16   BY MR. BRAFMAN:

17   Q.  This is the facility you described to the jury as to you

18   looking like just not a real place, right?

19   A.  That's true.

20   Q.  Look at it now, it is in evidence.  Do you see how many

21   bays there are for fixing trucks?

22   A.  Yes, I do.

23   Q.  And, do you see where my finger is pointing, that's a

24   United States Postal Service truck, correct?

25   A.  Yes.  That's correct.

ICC5iss1                        Nicholson - cross

1    Q.  And, when you said to the jury that you came to Brentwood

2    you had to drive -- I'm sorry, when you came to Kingsland you

3    had to drive a long drive way before you got to the facility?

4    A.  Yes.  That's correct.

5    Q.  And I am showing you 326C.

6    A.  Uh-huh.

7    Q.  Is that the drive way?

8    A.  Yes, it is.

9              MR. BRAFMAN:  Offer this into evidence.

10             MR. SOLOWIEJCZYK:  No objection.

11             THE COURT:  Admitted.

12             (Defendant's Exhibit 326C received in evidence)

13   BY MR. BRAFMAN:

14   Q.  It is in evidence, now I can show it to the jury.

15             This is the long road that you traveled, you said,

16   passing tanker trucks, correct?

17   A.  Yes, just past the broken gate.

18   Q.  Right.  And you went through all -- do you see the gates on

19   the right, all the gates on the right?

20   A.  Yes.

21   Q.  The chain link; they're not broken are they?

22   A.  The entrance gate is.

23   Q.  But I'm asking you about the gates on the side.  They're

24   not broken, are they?

25   A.  I can't see all the gates there.  From what I see from what

ICC5iss1                          Nicholson - cross

1   you are pointing at, yeah, they look to be in tact.

2   Q.  And you knew, did you not, that the road was being

3   blacktopped.  Did you not?  He told you that?

4   A.  I had no way of knowing that, sir.  That's what Mr. Issa

5   said.

6   Q.  Look at the road.  Look at the road.  Doesn't it look like

7   it has fresh tar on it?

8   A.  No, it does not, sir.

9   Q.  Now, that road leads to what I am offering for

10  identification 326A.  Do you see that?

11  A.  Yes, I see that.

12  Q.  That's where that long road leads out, correct?

13  A.  That's correct.

14          MR. BRAFMAN:  I offer it into evidence?

15          MR. SOLOWIEJCZYK:  No objection.

16          THE COURT:  Admitted.

17          (Defendant's Exhibit 326A received in evidence)

18  BY MR. BRAFMAN:

19  Q.  Now, this is an enormous piece of land, isn't it, by

20  standards compared to what Jamaica Rack has?

21  A.  That's true.

22  Q.  What Unico has?

23  A.  That's true.

24  Q.  And one of the things you need if you are operating a VMF

25  is room to maneuver these large trucks, right?

ICC5iss1                          Nicholson - cross

1    A.   That's true.

2    Q.   Your trucks are not the little ones, you have the 710

3    trucks, too?

4    A.   710?

5    Q.   I'm sorry.   7-ton trucks?

6    A.   The 7-ton, yes.

7    Q.   Those are big trucks?

8    A.   Yes, they are.

9    Q.   You said that one of the things you didn't like about the

10   facility besides the fact that the gate was broken is you

11   didn't think it could handle your work?

12   A.   That's true.

13   Q.   Now, did the government ever show you or tell you about the

14   facilities Mr. Issa is operating all around the United States?

15   A.   Did the government -- could you repeat that, please?

16   Q.   When you were telling the OIG people that Mr. Issa is just

17   a salesman, he really doesn't do this; did any one of them tell

18   you that he operates huge facilities in other states and in

19   this state?

20           MR. SOLOWIEJCZYK:   Objection, your Honor.

21           THE COURT:   Objection is sustained.

22   BY MR. BRAFMAN:

23   Q.   I'm going to show you what's in evidence as Defendant's

24   Exhibit 100.   Did you ever see this photo?

25   A.   Did I ever see that photo?

ICC5iss1                        Nicholson - cross

1    Q.   Yes.

2    A.   No.

3    Q.   Did OIG ever show you 101?

4              MR. SOLOWIEJCZYK:  Objection, your Honor.  Relevance.

5              MR. BRAFMAN:  I think it is relevant and subject to

6    connection.

7              THE COURT:  I will let it in.

8              MR. BRAFMAN:  It is already in evidence.

9              MR. SOLOWIEJCZYK:  I am objecting to the line of

10   questioning, whether he saw the photos or not.

11             THE COURT:  The objection is overruled.

12             MR. BRAFMAN:  Thank you.

13   BY MR. BRAFMAN:

14   Q.   Never saw it, right?

15   A.   I never saw that, no.

16   Q.   Look down into the corner of that photo.  Do you recognize

17   that as a PMI inspection form being held in that gentleman's

18   hand?

19   A.   Yes, I do.

20   Q.   I show you Defendant's Exhibit 103.  Do you see that photo?

21   It is in evidence.

22   A.   I see the photo.

23   Q.   Those are post office vehicles, aren't they?

24   A.   Yes; they're Winstars.

25   Q.   And in this photo, 104 which is in evidence, would you

ICC5iss1                    Nicholson - cross

1   identify the different kind of trucks that are here in that

2   photograph?

3   A.   Certainly.

4           The one in the foreground there, the large one, is a

5   7-ton truck; the one next to it is a light delivery vehicle,

6   the one that looks like a bread truck; and the one next to it

7   is probably a Ford Windstar or Caravan.  Ford Caravan,

8   something like that.

9   Q.   All post office vehicles?

10  A.   Yes, they are.

11  Q.   All required to have regular maintenance?

12  A.   Yes, they are.

13  Q.   This picture, 105 in evidence those, those are post office

14  trucks, right?

15  A.   Yes, they are.

16  Q.   Large trucks?

17  A.   Yes.

18  Q.   The kind of trucks that you send out for service, right?

19  A.   On that order but not that type; yes.

20  Q.   And 106, which is in evidence, are the lifts that I think

21  you testified to that you need to do work under the truck,

22  right?

23  A.   That lift would accommodate those smaller vehicles, yes.

24  Q.   And these are lists that you would expect someone who does

25  this kind of work to have in their garage?

ICC5iss1                         Nicholson - cross

1   A.   In their garage?

2   Q.   In their vehicle maintenance center?

3   A.   If they're working on light vehicles, yes.

4   Q.   Now are you aware whether or not Mr. Issa serviced

5   thousands of vehicles in upstate New York?

6   A.   I was not aware of that.

7   Q.   Did they show you or anybody show you Exhibit 266?

8            MR. SOLOWIEJCZYK:  Is it in evidence?

9            MR. BRAFMAN:  It is in evidence.  All of these are in

10  evidence.

11  Q.   Did you ever see that photo?

12  A.   No, I never did.

13  Q.   That's a post office vehicle, right?

14  A.   Yes, it is.

15  Q.   And it is up on a lift, correct?

16  A.   Yes.

17  Q.   And there is no pit below it because you said OSHA doesn't

18  allow it, right?

19  A.   That's correct.  That's not what I observed.

20  Q.   I'm saying this photograph.

21  A.   Yes.

22  Q.   Do you see that?

23  A.   Yes.  This was upstate New York you're saying?

24  Q.   Poughkeepsie, Healey Motors.  They never told you about

25  Healey Motors?

ICC5iss1                          Nicholson - cross

1    A.   No.  I would have no business with Healey Motors or --

2    Q.   But you told OIG that you investigated Mr. Issa.  You told

3    them that, right?

4    A.   I didn't -- I investigated -- what I did was under the

5    direction of the OIG's office, I looked at the facilities where

6    he told me the facility was.

7    Q.   Okay.  Now, you also told OIG that you went on the Internet

8    to look at Mr. Issa, correct?

9    A.   To look up Daimner Corporation.

10   Q.   And you found out in that discussion, you told the

11   government or the agents, that Mr. Issa, Tony Issa, his real

12   name is Ibrahim Issa, right?

13   A.   Yes.  When I looked up -- when I looked up one of his other

14   company names.

15   Q.   Which company?

16   A.   That was the one, First Star.

17   Q.   And you didn't look up and see a link to Healey Motors?

18   A.   No, I did not.

19   Q.   Well, look at 268 in evidence.  Do you see it?

20   A.   Yes, I see it.

21   Q.   That's the inside of what looks like a repair facility?

22   A.   Yes.

23   Q.   And while you can't really see the truck on top where I am

24   pointing to, the truck behind the gentleman with the beard is

25   an LLV, correct?

ICC5iss1                         Nicholson - cross

1   A.  That's correct.

2   Q.  Long-life vehicle?

3   A.  That's correct.

4   Q.  And just for the record, so that we have your

5   understanding, these vehicles were supposed to last 25 years,

6   correct?

7   A.  That's correct, sir.

8   Q.  And most of them are older than that now, right?

9   A.  Yes, they are.

10  Q.  And part of the disrepair and the breakdown, regardless of

11  who fixes it, is because we are dealing with trucks that are 25

12  years old?

13  A.  That is correct, sir.

14  Q.  Beyond its life expectancy?

15  A.  That is true.

16  Q.  Have you ever driven a car that's 25 years old, personal

17  car?

18  A.  No, sir.

19  Q.  Now, look at this.  This is an LLV, right?  I'm pointing to

20  it.

21  A.  Yes, it is.

22  Q.  Can you tell in the back whether those are also LLVs or

23  larger trucks?

24  A.  By the shape of them, they appear to be all LLVs, the

25  smaller vehicles.

ICC5iss1                    Nicholson - cross

1    Q.  And this blue contraption that the truck is leaning on,

2    that's the kind of lift you would expect to mount an LLV on,

3    right?

4    A.  Specifically an LLV or a smaller car, yeah.

5    Q.  And when you do an inspection of an LLV for its PMI, you

6    need to get under the truck, right?

7    A.  Yes, you do.

8    Q.  And this is in evidence, 266; that shows a person under an

9    LLV that is off the ground.  Would that be a fair statement?

10   A.  Yes, it is.

11   Q.  How long did you cooperate with the government in helping

12   them develop this evidence that we talked about for the last

13   couple of days?

14   A.  From approximately -- it was around 2014.  Sometime in

15   2014.

16   Q.  Until?

17   A.  Until 2015.

18   Q.  And now you are continuing to cooperate by coming here,

19   right?

20   A.  Yes, I am.

21   Q.  In all of that time you were under the impression that

22   Mr. Issa is or is not capable of doing this work?

23   A.  From what I observed and the work orders that I saw, there

24   was problems.

25   Q.  Did you ever have a problem with Jamaica Rack?

ICC5iss1                          Nicholson - cross

1   A.  On occasion, yes.

2   Q.  Did you have a problem with Unico?

3   A.  On occasion, yes.

4   Q.  Would it be a fair statement that there is no mechanic that

5   has ever worked as an outside vendor, to your knowledge, who

6   didn't, on occasion, have a truck sent back or a dispute over

7   an invoice, correct?

8   A.  No one is perfect, sir.

9   Q.  No one is perfect.  Thank you.

10          Now, in this case one of the things you testified to

11  was that you were concerned because you didn't know where your

12  vehicles were, right?

13  A.  That's correct.

14  Q.  And that was a concern that the main hierarchy is concerned

15  with as well, it's called vehicle security, right?

16  A.  Vehicle security is a main concern, yes.

17  Q.  And you told this jury that one of the problems with

18  Mr. Issa's company was that trucks would go out and you would

19  have no idea where they are, correct?

20  A.  That's absolutely true.

21  Q.  Isn't it true that he sent you an exact markup list of

22  where the trucks were, what the truck was, and where it was

23  going to be?

24  A.  That didn't always occur, sir.

25  Q.  So I want to show you what I have marked for identification

ICC5iss1                    Nicholson - cross

1    as Defendant's Exhibit 329.  I will give a copy to the

2    government.

3              MR. SOLOWIEJCZYK:  Thank you.

4              MR. BRAFMAN:  And I will give one to the witness

5    because it is small.

6              THE COURT:  Okay.

7    BY MR. BRAFMAN:

8    Q.  This is an e-mail that you got addressed to you and it also

9    has an attachment, correct?

10   A.  Can I just have a few moments to review it?

11   Q.  You can have all weekend, if the Judge allows.

12   A.  Thank you, sir.  I appreciate that.

13   Q.  Do you recognize that as an e-mail that you got June 11,

14   2014 from Mr. Issa's assistant Nicole Mangone?  Your e-mail is

15   right on the top besides Willie Wallace.

16   A.  Yes, I see that.

17   Q.  Do you see this, do you recognize it as something that you

18   got from Mr. Issa in June of 2014?

19   A.  Yes, June 11.

20             MR. BRAFMAN:  I offer it into evidence.

21             MR. SOLOWIEJCZYK:  Objection, your Honor.  Hearsay,

22   and it is not from Mr. Issa.

23             MR. BRAFMAN:  There is nothing written on the e-mail,

24   Judge.

25             MR. SOLOWIEJCZYK:  The attachment is written for its

ICC5iss1                          Nicholson - cross

1    truth.

2               THE COURT:  Where is the e-mail?

3               MR. BRAFMAN:  Here it is, your Honor.  I wrote on that

4    copy.

5               THE COURT:  I understand.  I understand.

6               The objection is sustained.

7               MR. BRAFMAN:  Can I have a side bar?

8               THE COURT:  No.

9    BY MR. BRAFMAN:

10   Q.  Forget the e-mail; do you recognize the log sheet that is

11   underneath it?

12   A.  I see the log sheet.  I don't know who it belongs to.

13   Q.  You do know who it belongs to because it came to your

14   attention.  Whether the e-mail is in evidence or not, you're

15   allowed it to use it to see if you recognize the log sheet.  Do

16   you?

17   A.  I don't know if this was an attachment from this e-mail,

18   sir.

19              MR. BRAFMAN:  Your Honor --

20              THE COURT:  Sir, he just asked you to look at the

21   e-mail.

22              THE WITNESS:  Yes.

23              THE COURT:  Don't ask questions about the e-mail.

24   Okay?  Listen to his question.

25              THE WITNESS:  Okay.

ICC5iss1                    Nicholson - cross

1    BY MR. BRAFMAN:

2    Q.  Is the e-mail addressed to you and other people?

3    A.  This one is, yes.

4    Q.  And Willie Wallace, does he work for you?

5    A.  He did at the time.  He was a supervisor.

6    Q.  At the VMF that you worked at, right?

7    A.  Yes.  That's correct.

8    Q.  And this e-mail came to your attention in or about June 11,

9    2014?  Don't tell us what it says.

10   A.  That's correct.

11   Q.  And it came with an attachment referring to vehicle log

12   sheet, correct?

13   A.  Oh, okay.  Down at the bottom, yes.  I see that.

14   Q.  Is that the vehicle log sheet that came with the e-mail?

15   A.  There is no -- I couldn't say, sir.

16   Q.  Let me show you what's been marked for identification as

17   329.  You have it on yours.  Look at the attachment, it says

18   Brooklyn VMF log, doesn't it?

19            MR. SOLOWIEJCZYK:  Your Honor, this isn't in evidence.

20   He is reading from it.

21            THE COURT:  Objection sustained.

22   BY MR. BRAFMAN:

23   Q.  You are telling me you don't recognize this?  You are

24   telling me, under oath, that you don't recognize this log

25   sheet?

ICC5iss1                    Nicholson - cross

1   A.  No, sir.  I don't recognize it.

2   Q.  You don't remember getting this in June 2014, addressed to

3   you and Willie Wallace and Fred DiMasso and John Tortorice and

4   Mr. Issa, and Frank Calabrese.  That doesn't jog your memory?

5   A.  No, sir.

6   Q.  Mr. --

7           THE COURT:  He said no.  Stop it.  Get back behind the

8   podium and move on.

9   BY MR. BRAFMAN:

10  Q.  Look at the vehicle numbers in the log.  Do you recognize

11  the vehicle numbers?

12  A.  I don't memorize vehicle numbers, sir.

13  Q.  Do you recognize them?  These are the vehicles you talked

14  about with Mr. Solowiejczyk for a day and a half.

15          THE COURT:  Do you recognize the numbers, sir?  Yes or

16  no.

17          THE WITNESS:  I don't recognize them.

18          THE COURT:  Fine.  The answer, then, is no.  Okay?

19  Say no.  If you don't recognize them, say no.

20          THE WITNESS:  Okay.

21          THE COURT:  If you do recognize them, say yes.  All

22  right?  Please.

23  BY MR. BRAFMAN:

24  Q.  Do you want to change your answer?

25          THE COURT:  Do you recognize them, sir?  Yes or no.

ICC5iss1                         Nicholson – cross

1              THE WITNESS:  Let me go over each and every one of

2     these vehicles numbers --

3              THE COURT:  Sir, you are not listening to me and you

4     are not listening to Mr. Brafman and I wish you would listen to

5     us both.  Either say yes or no.  Do you, as you sit here right

6     this minute, without going over anything else, recognize those

7     vehicle numbers?  Yes or no.

8              THE WITNESS:  Yes.  Here is one that stands out.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICCHIss2                         Nicholson - Cross

1    Q.  Now, do you recognize Willie Wallace?  Is he a person who

2    worked for you?

3    A.  Yes, he does.

4    Q.  Could he be someone to either dispatch or pick up a truck

5    from if you're doing a VMF, for a contractor?

6    A.  Personally, no.

7    Q.  No, he can't give out a truck to work?

8    A.  He gives out the work, yes.

9    Q.  So under the column of station, is it all Brooklyn VMF?

10            MR. SOLOWIEJCZYK:  It's not in evidence, your Honor.

11            THE COURT:  The objection's sustained.

12   Q.  You don't recognize this sheet as something you got -- I'm

13   going to ask you one last time.

14            MR. SOLOWIEJCZYK:  Asked and answered.

15            THE COURT:  It's asked and answered.  Please.  Enough.

16   Q.  You want to change your answer?

17            MR. SOLOWIEJCZYK:  Asked and answered.

18            MR. BRAFMAN:  I'm asking him if he wants to change his

19   answer because you're under oath.

20   Q.  Do you or do you not?

21            THE COURT:  Move on, Mr. Brafman.  Move on.

22   Q.  Which vehicle number do you recognize?

23   A.  3511.

24   Q.  It's one of the trucks you talked about with

25   Mr. Solowiejczyk, correct?

1     A.  Yes, it is.

2     Q.  Look at the other numbers.  You don't recognize any of the

3     others that you talked about with Mr. Solowiejczyk?

4                MR. SOLOWIEJCZYK:  Objection.  He can't get this

5     document in through this witness.

6                THE COURT:  That's correct, it's not going to come in.

7     I'm not going to let it in, so let's move on.

8     Q.  Now, we heard of a meeting, about you having lunch with

9     Mr. Issa in Long Island.  Do you remember that, on January 15,

10    2015?

11    A.  Is that the one in Brentwood, sir?

12    Q.  Yes, sir.

13    A.  Yes.

14    Q.  And you went out there for two reasons: one, to have lunch,

15    and also to tour his facility, correct?

16    A.  That's correct.

17    Q.  And you were wired.  You had your wire on while you were

18    touring the facility, correct?

19    A.  That's correct.

20    Q.  Now, we didn't hear your conversation about the facility,

21    but would it be a fair statement that virtually everything you

22    said to Mr. Issa about Brentwood was complimentary about the

23    facility?

24    A.  No, it was not.

25    Q.  It was not.

ICCHIss2                          Nicholson - Cross

1              Did you say it was very impressive?

2    A.   It was impressive.

3    Q.   Did you say to him that you have 70-foot trucks that could

4    fit in there?

5    A.   I don't recall.

6    Q.   Did you say to him that this was a good looking,

7    state-of-the-art place?

8    A.   It was clean and state of the art, yes.

9    Q.   As opposed to, what, some of the unclean places that you

10   went to?

11   A.   Opposed to Kingsland Avenue, sir.

12   Q.   And this was brand new, and it wasn't yet in operation,

13   correct?

14   A.   There was vehicles in there.

15   Q.   But no one was -- you said no one was working yet, right?

16   You had people in crisp uniforms, correct?

17   A.   In crisp uniforms, I believe --

18   Q.   Crisp clean uniforms, right?

19   A.   I believe I was speaking about the website, and I don't

20   recall if I noticed mechanics there.

21   Q.   How long were you walking around this facility?

22   A.   I'd have to make a guesstimation, sir.

23   Q.   Yes.

24   A.   Guess?

25   Q.   Yes.

ICCHIss2                           Nicholson - Cross

1    A.   Maybe half an hour or so.

2    Q.   Half an hour walking around a garage is a long time, isn't

3    it?

4    A.   I was just there to observe.

5    Q.   And you spent one half-hour observing, and you saw postal

6    trucks among others?

7    A.   No, I did not.

8    Q.   You saw trucks?

9    A.   I saw trucks.

10   Q.   Now, when you went to Kingsland -- and we have the photos

11   of Kingsland -- Kingsland was up and running and in operation,

12   and the trucks in there were being serviced, right, were in the

13   process of being serviced?

14   A.   I saw them sitting in the base.  I did not see any

15   employees there whatsoever.

16   Q.   You went there during the lunch hour, didn't you?

17   A.   I went there around 12.  I'd say around 12:00, 1 o'clock,

18   somewhere around there.

19   Q.   And sometimes at 12, 1 o'clock even mechanics go to lunch,

20   right?

21   A.   I don't know what time they go to lunch, sir.

22   Q.   But you were there during the lunch hour?

23   A.   Depends what your lunch hour is.

24   Q.   You went to Brentwood to have lunch, you said, with

25   Mr. Issa.  What time is lunch in your mind?  At the VMF, what

ICCHIss2                          Nicholson - Cross

1    do you do with your people who work there?

2    A.   My people?

3    Q.   Yeah.

4    A.   My people will take lunch anywhere between 10:30 and 11:00

5    and possibly 11:00, 11:30.

6    Q.   Because you close at 3 o'clock or 2:30?

7    A.   That's not correct, sir.

8    Q.   Don't you close your shift -- doesn't the shift change at

9    2:30 or 3 o'clock?

10   A.   I have three shifts of work in my shop.

11   Q.   And you have three shifts of workers too, right?

12   A.   Yes, I do.

13   Q.   So the people who come in at 6 o'clock in the morning may

14   have lunch at 10:30 right?

15   A.   That's correct.

16   Q.   And if they came in at 9 o'clock like most people, they

17   could have lunch at 1 o'clock?

18   A.   I don't have people coming in at 9 o'clock, sir.

19   Q.   At the end of the day, when you are in this facility, one

20   of the things you say to him is that this is quite impressive,

21   in Brentwood, correct?

22   A.   Yes, sir.

23   Q.   Now, when you went back to the car -- I'm sorry, when you

24   went on the drive back, you get debriefed when you come back

25   from these lunches, right?

ICCHIss2                      Nicholson - Cross

1   A.  I don't understand that question, sir.

2   Q.  As soon as your lunch is finished or one of these

3   adventures are finished, you report to OIG, correct?

4   A.  Yes, I do.  They take the wire off.

5   Q.  I'm sorry?

6   A.  They take the wire off, sir.

7   Q.  They take the wire off and then discuss the meeting with

8   you?

9   A.  No, they do not.

10  Q.  Later they do?

11  A.  No, they do not.

12  Q.  You don't sit down with an OIG person and tell them exactly

13  what happened?

14  A.  No, I do not.

15  Q.  You've never seen any of their reports?

16  A.  No, I have never.

17  Q.  And when you -- I'm sorry.  When they talk to you, do they

18  take notes?

19  A.  Do they take notes?  No, sir.

20  Q.  You've never talked to an OIG person in this investigation

21  where the person was taking notes while you were telling them

22  what you did?

23  A.  Initially, when I notified the OIG's office, I sat down

24  with several agents and I spoke with them about my concerns,

25  and they took a written statement at that time.

ICCHIss2                          Nicholson – Cross

1    Q.  From you?

2    A.  Yes, they did.

3    Q.  Now, when you first talked to OIG, the first meeting that

4    was recorded was not any of these lunches or meetings, correct?

5    A.  The first meeting that I had with Mr. Issa?

6    Q.  That was recorded.

7    A.  That was recorded?

8    Q.  It was in September of 2014, correct?

9    A.  No, that's not correct.

10   Q.  Did you have a big meeting in September 2014, all hands on

11   deck, where Mr. Issa was there, Mr. DeMaso was there,

12   Mr. Andreoli was there, Mr. Castellano was there?

13   A.  Oh, yes.

14   Q.  And you were there?

15   A.  Yes, that's correct.

16   Q.  And you told OIG that this meeting was going to take place?

17   A.  Yes, I did.

18   Q.  And OIG set you up -- or set the office up with a video and

19   a tape recorder, correct?

20   A.  I was wearing the wire, sir.

21   Q.  And it was taped from start to finish, correct?

22   A.  That's correct.

23   Q.  None of the people in that room, all of these post office

24   officials, knew that it was being recorded except you?

25   A.  That's correct.  That's correct, no one knew.

ICCHIss2                     Nicholson - Cross

1    Q.  And the purpose of that meeting was to have Mr. Issa come

2    in and address some of the concerns that you and Mr. Castellano

3    and others had about the quality of his work, correct?

4    A.  Yes, it was.

5    Q.  And in that meeting with all of these post office people --

6    you tell me if I'm right.  Did you or you were the VMF manager

7    in September 2014 in Brooklyn?

8    A.  I'm sorry.  Repeat that, please.

9    Q.  You were the VMF manager in Brooklyn at the time of this

10   meeting?

11   A.  Yes, sir, I was.

12   Q.  And Fred DeMaso was the tri-borough district manager?

13   A.  Manager of operations support.

14   Q.  And that is your boss, correct?

15   A.  No, sir.

16   Q.  That's your boss' boss?

17   A.  Yes.

18   Q.  All right.  And John Tortorice was there?

19   A.  Yes.

20   Q.  And he's your boss, he was?

21   A.  No, he's an assistant to Mr. DeMaso.

22   Q.  Phil Castellano runs the Staten Island VMF at the time?

23   A.  That's correct.

24   Q.  And Don Andreoli was the Queens VMF manager, correct?

25   A.  He's my boss.

ICCHIss2                      Nicholson - Cross

1    Q.  And Don Andreoli wasn't told that he was being recorded,

2    was he?

3    A.  No, he was not.

4    Q.  And none of the other people I listed were being told they

5    were being recorded, correct?

6    A.  No, they weren't.

7    Q.  Have you ever listened to this transcript, this tape?

8    A.  This tape from the office when we had the meeting?

9    Q.  Yeah.

10   A.  No.

11   Q.  You've never listened to it.  That was the whole purpose of

12   recording it.

13   A.  I have not listened to it, sir.

14   Q.  In four years you haven't listened to that record, that's

15   your testimony?

16          MR. SOLOWIEJCZYK:  Objection.  Asked and answered.

17          THE COURT:  The objection is sustained.

18   Q.  Did you go over it with Mr. Solowiejczyk at all?

19   A.  I mentioned that we had a meeting and it was at the

20   direction of Mr. DeMaso.

21   Q.  The meeting was at the direction of Mr. DeMaso, correct?

22   A.  Yes.

23   Q.  Not the recording?

24   A.  The recording was under the direction of the OIG's office.

25   Q.  The same OIG people who set you up to record your other

ICCHIss2                        Nicholson - Cross

1   conversations with Mr. Issa, correct?

2   A.  Yes, that is correct, sir.

3   Q.  That was the, I'll call it, all hands on deck, but there

4   were a lot of people in these recordings, correct?

5   A.  Yes, they were.

6   Q.  And Mr. Issa appeared, correct?

7   A.  Yes, he did.

8   Q.  And the purpose of the meeting with to address some of the

9   concerns that you, Mr. Castellano, and others had about his

10  work, correct?

11  A.  That's correct, sir.

12  Q.  This was sort of like, who is Tony Issa, and let's talk to

13  him about the work he's doing, correct?

14  A.  That's correct.

15          But at this point, could I have a drink of water,

16  please?

17          THE COURT:  Mr. O'Neill, please.

18          MR. SOLOWIEJCZYK:  We have a bottle of water, your

19  Honor.

20          THE COURT:  Thank you.

21          THE WITNESS:  Thank you, your Honor.

22          Thank you.  I'm good.  Thank you.

23  BY MR. BRAFMAN:

24  Q.  And some of the very same repair issues that you discussed

25  in front of this jury were discussed at that meeting, correct?

ICCHIss2                      Nicholson - Cross

1    A.  Yes, they were.

2    Q.  And Mr. Issa addressed them?  Whether you were satisfied or

3    not is not the question.  He did discuss them, correct?

4    A.  He did discuss them, yes.

5    Q.  And he defended his work, did he not?

6    A.  Yes, he did.

7    Q.  And you criticized him at this meeting at different points,

8    right?

9    A.  Yes, I did.

10   Q.  And you criticized his work with respect to these items,

11   correct?

12   A.  Yes, I did.

13   Q.  And Mr. Issa did his best to answer you at this meeting

14   where he didn't know he was being recorded, without telling us

15   what he said?

16            MR. SOLOWIEJCZYK:  Objection.

17            THE COURT:  The objection is sustained.  He can't

18   possibly say whether Mr. Issa did his best.

19   Q.  Did Mr. Issa address the issues, whether he did his best or

20   not?

21   A.  He gave answers, yes.

22   Q.  Now, one of the trucks you discussed with this jury as

23   being not repaired properly by Mr. Issa was a truck that had

24   been damaged in the Sandy flood, is that correct?

25   A.  Yes, sir.

ICCHIss2                        Nicholson - Cross

1   Q.  During the meeting with Mr. Issa, that issue was addressed,

2   correct?

3   A.  He made a statement on it, yes.

4   Q.  Well, but you responded to the statement, right?

5   A.  Yes, I did.

6   Q.  And you acknowledged the fact that some of the trucks had

7   damage from the salt water, but you still were critical of some

8   of the work, correct?

9   A.  That's true, sir.

10  Q.  Now, as a result of that storm, if you know, were post

11  office vehicles permanently damaged?

12  A.  Yes, some of them were.

13  Q.  And neither you or any mechanic could put them back

14  together again and operational, correct?

15  A.  Sir, we put repaired many of them.

16  Q.  I didn't ask you that.

17          Some were permanently damaged, correct?

18  A.  Yes, some were.

19  Q.  And despite the best efforts of even you or your mechanics,

20  they could not be properly repaired, correct?

21  A.  Yes.

22  Q.  And you know as a master mechanic who's dealt with trucks

23  and cars for most of your adult life that salt water can

24  permanently damage an engine beyond repair, correct?

25  A.  It could, yes.

ICCHIss2                    Nicholson - Cross

1    Q.  All right.  Now, did Mr. Issa -- did you address the costs

2    of the repairs with Mr. Issa?

3    A.  The cost for what, sir?

4    Q.  The costs of some of the repairs that you were complaining

5    about.

6    A.  I was discussing that one was for exhaust clamps.

7    Q.  Let me stop you.

8    A.  OK.  I don't understand where we're going.

9    Q.  Was the subject of the cost of the repairs raised at this

10   meeting?

11   A.  I don't know, sir.  I don't remember.

12   Q.  You don't remember?

13   A.  No.

14   Q.  And was the subject of Mr. Issa's company giving the post

15   office a credit raised at this meeting?

16   A.  No, sir, not at all.

17   Q.  Didn't Mr. Issa offer to do the repairs free of charge at

18   this meeting if you showed him that you were right and he was

19   wrong?

20   A.  I believe Mr. Issa said that whatever issue I had, he would

21   take care of.

22   Q.  OK.

23   A.  I don't know what that meant.

24   Q.  You don't know what that meant?

25   A.  No, sir.

ICCHIss2                          Nicholson - Cross

1    Q.  If you tell me I'm not doing a good job and I tell you,

2    tell me what's wrong and I'll fix it, you don't understand that

3    dialogue?

4    A.  No, sir.

5    Q.  Was the subject of lunch -- did the subject of lunch come

6    up in this all-hands-on-deck meeting?

7    A.  No, sir, it did not.

8    Q.  You sure?

9    A.  Not to my knowledge, no.

10   Q.  This was about noon this meeting, right?

11   A.  Yes, it was.

12   Q.  In Brooklyn?

13   A.  Yes, it was.

14   Q.  And everybody's sitting around the table and somebody says,

15   What about lunch?  Isn't that true?

16   A.  Not to my knowledge, sir.

17   Q.  Let me show you what -- I'm not going to even.  It's all

18   marked up.  Let me move on.

19           You don't remember that at all?

20   A.  No, I don't, sir.

21   Q.  How long did the meeting last?

22   A.  I couldn't tell you, sir.  I don't remember.

23   Q.  Approximately?  Ten minutes?

24   A.  Sir, I don't remember.

25   Q.  You know it was at least over an hour.  You know that as

ICCHIss2                          Nicholson - Cross

1   you sit here today, isn't that true?

2   A.  We're talking about a meeting that was four years ago,

3   three, four years ago.  I don't honestly remember how long the

4   meeting -- the duration of the meeting.

5   Q.  All of the stuff that you testified to on direct happened

6   shortly after this first meeting four years ago, and you had no

7   problem remembering anything Mr. Solowiejczyk asked you, did

8   you?

9   A.  That's true.

10   Q.  That's true.

11          So this meeting, the one they didn't play for you, you

12   don't remember anything, right?

13          MR. SOLOWIEJCZYK:  Objection.

14          THE COURT:  The objection's overruled.

15   Q.  You may answer.

16   A.  I remember who was there.  I remember the substance of the

17   meeting.  I remember the issues that each one of the VMF

18   managers brought up and the -- some brought examples of what

19   they felt was not correct when the vehicles were being

20   repaired.  Mr. Andreoli from the Queens VMF came in with a

21   bottle of transmission --

22   Q.  I didn't ask you that.  I asked you how long the meeting

23   was.

24          THE COURT:  No, no, the question was, you didn't

25   remember anything, did you?  And now he's telling you what he

ICCHIss2                         Nicholson – Cross

1    remembered.

2              MR. BRAFMAN:  OK.

3              THE COURT:  So he's answering your question.

4    A.  Can I continue to answer that question?

5              THE COURT:  You may, sir.  You may continue to answer

6    the question.

7              MR. BRAFMAN:  Can I play the recording?

8              THE COURT:  No.  You may finish answering the question

9    by telling him what you remember, and then you may do anything

10   you want.

11             MR. BRAFMAN:  Does that include playing the recording?

12             THE COURT:  Excuse me.  Yes, you may, but right now.

13             MR. BRAFMAN:  The government's going to object.

14             THE COURT:  Let the witness finish answering the

15   question.

16             MR. BRAFMAN:  The government is objecting to me

17   playing this recording.  We've had this issue.

18             MR. SOLOWIEJCZYK:  Your Honor, this is not in

19   evidence.

20             THE COURT:  Oh, if this is the record that's not in

21   evidence, no, you can't play it.  Sorry, very sorry.  I'm not

22   even there yet.  I'm at let the witness finish his answer.

23   That's where I am, OK.

24   BY MR. BRAFMAN:

25   Q.  Finish your answer, sir.

1    A.   Thank you, sir.

2            The three vehicle maintenance managers that were at

3    that meeting, there was two including myself, had issues with

4    Mr. Issa's companies.  Mr. Andreoli came in with a

5    transmission -- a bottle of transmission fluid for a vehicle

6    that the transmission fluid was supposedly changed.  The

7    transmission fluid was jet black.  It appeared that it had not,

8    in fact, been changed.  For myself, I viewed vehicles that came

9    back from Mr. Issa's company right after they were dropped off

10   at my facility.  I noticed that things that we specifically

11   asked for to be worked on and gave him the parts were not done.

12   Q.   OK.

13   A.   For Mr. Castellano in Staten Island -- and thank you for

14   letting me continue -- Mr. Castellano, when the vehicle was

15   dropped off at his facility, he had his lead technician bring

16   the vehicle up in the air --

17           MR. BRAFMAN:  Why isn't this hearsay?  When I do it, I

18   can't get it in.  Why isn't it hearsay what people said?

19           THE COURT:  Sir.

20           THE WITNESS:  Gotcha.

21           THE COURT:  You can tell what you remember.  You can't

22   say what other people said to you.

23           THE WITNESS:  OK.

24           THE COURT:  We're just trying to get a laundry list of

25   what you remember, that's all.

ICCHIss2                        Nicholson - Cross

1              THE WITNESS:  OK.  Mr. Castellano from Staten Island

2     brought in a computer screen with a video of a vehicle that

3     came back from Mr. Issa.

4              THE COURT:  And that was shown at the meeting?

5              THE WITNESS:  Yes, it was.

6              THE COURT:  Don't tell us what was on the video.

7     BY MR. BRAFMAN:

8     Q.  So Mr. Issa then addressed all of these issues, correct?

9     A.  He made statements about them, yes.

10    Q.  But he said that his vehicles were being sabotaged by your

11    employees, didn't he?

12    A.  He said that for the Staten Island VMF, sir.

13    Q.  And that's Castellano's VMF, right?

14    A.  Yes, it is.

15    Q.  And you were joking at this meeting, if you recall, that

16    Castellano was a hothead.  Did you say that?

17             MR. SOLOWIEJCZYK:  Objection, your Honor.  It's

18    hearsay.  He's just getting into what this person said.

19             THE COURT:  It's his statement.

20             MR. BRAFMAN:  It's his statement.

21    Q.  Did you say that Mr. Castellano from Staten Island was a

22    hothead?

23    A.  I said --

24             THE COURT:  Did you say it, yes or no?

25    A.  I don't recall.

ICCHIss2                          Nicholson - Cross

1    Q.  That, you don't recall.  You don't recall a heated exchange

2    between Mr. Castellano and Mr. Issa, that you had to calm them

3    down?

4    A.  I recall an exchange.

5    Q.  It wasn't heated exchange, angry, screaming?

6    A.  Yes, he was screaming at Mr. Issa.

7    Q.  Mr. Issa was screaming back, wasn't he?

8    A.  Yes, he was.

9    Q.  And all of this is captured on the recording?

10   A.  Yes, it is.

11   Q.  Then at the end of the meeting, at the end of the meeting,

12   after all of this, you were told to use Mr. Issa to help with

13   the backlog of PMIs, correct?

14   A.  I was at the direction of the OIGs, yes.

15   Q.  And you were also, at the direction of the postal service,

16   to use Mr. Issa to clear up the backlog of PMIs, yes or no?

17   A.  No, that was on my discretion, sir.

18   Q.  And you helped clean up the VMIs, right?

19   A.  I don't understand the question, sir.

20   Q.  The PMIs?

21   A.  Yes.

22   Q.  You were directed, were you not, both by the OIG to

23   continue doing this, correct?

24   A.  Yes.

25   Q.  But you were also directed by your bosses and their bosses

ICCHIss2                        Nicholson - Cross

1   to have Mr. Issa work to help clear up the backlog of the PMIs,

2   yes or no?

3   A.  Yes.

4   Q.  Just based on the amount of things you've ticked off that

5   were discussed by you and others, would it be fair to say that

6   this meeting lasted approximately one hour?

7   A.  I said before, sir, I honestly don't remember how long the

8   meeting took or how long it was for.

9   Q.  Was it more than ten minutes?

10  A.  Yes, it was.

11          MR. SOLOWIEJCZYK:  Objection, your Honor.

12          THE COURT:  The objection's sustained.  Asked and

13  answered.

14  Q.  Was there laughter at the end of the meeting?

15  A.  I don't remember, sir.

16  Q.  Well, there was no fight thanks to you, right?

17  A.  We're gentlemen.  We're not boxers.

18  Q.  A lot of screaming by Mr. Castellano, though, right?

19  A.  He was not happy, yes.

20  Q.  OK.  And you calmed it down, didn't you?

21  A.  Yes, I did.

22  Q.  You knew you were wired and you were trying, if you will,

23  not to have that tape deteriorate into something that would

24  embarrass you and the OIG, isn't that true?

25  A.  Whatever happened, happened.

ICCHIss2                         Nicholson - Cross

1    Q.  But you didn't let it happen.  You stopped the fight?

2    A.  That's not true.

3    Q.  You stopped the argument?

4    A.  It ran its course, and that was the end of it.

5    Q.  But it was you who spoke up and said, let's everybody calm

6    down, correct?

7    A.  Perhaps, yes.

8    Q.  Perhaps.  You remember saying that, yes or no?

9    A.  I'm not into being argumentative, sir.

10   Q.  You're not?

11   A.  No, I'm not, sir.

12   Q.  OK.  I am.  Didn't you say that?

13   A.  I don't know for sure, sir.

14   Q.  Well, you know there was an argument.  That you remember

15   for sure?

16   A.  Yes.

17   Q.  And you knew you interceded.  That you remember for sure?

18   A.  I tried to calm everyone down.

19   Q.  OK.  Because you were wearing a wire and nobody knew that.

20   You weren't telling anyone?

21          MR. SOLOWIEJCZYK:  Objection at this point, your

22   Honor.

23          THE COURT:  The objection's sustained.

24   Q.  Then at the end everybody shook hands, right?

25   A.  I don't know if we did or not.  I don't recall shaking

ICCHIss2                        Nicholson - Cross

1    hands with anyone.

2             MR. BRAFMAN:  Your Honor, are we going to take a

3    morning break?

4             THE COURT:  No, we're not, because I have to leave at

5    five of 12:00, so we're going to keep going.

6             MR. BRAFMAN:  I forgot.  I'm sorry, Judge.  Never

7    mind.  I want to go back one last time, and I don't have -- do

8    I have a copy of this?  I'll just show it.  I want to show the

9    witness -- I don't have a copy.  I'll show him to identify it

10   as an email dated July 3, 2014, a Southern District discovery

11   number 049230.  I just have one copy.  I'm going to show it to

12   the witness, again, to refresh his recollection, if it does, as

13   to certain vehicles that he testified about.

14            MR. SOLOWIEJCZYK:  He hasn't been asked a question yet

15   that would warrant any recollection being refreshed.

16            MR. BRAFMAN:  Your Honor, it goes back to the document

17   which he refuses to acknowledge.  This email has all the

18   vehicle numbers in it.  I want to show it to the Court, if I

19   can.

20            THE COURT:  What Mr. Brafman says isn't evidence.  You

21   don't know what's in a document that's not in evidence, and

22   he's trying to plant it in your mind, but you're going to just

23   erase it, OK.  Thank you.

24            You may show the witness the document.

25   BY MR. BRAFMAN:

ICCHIss2                     Nicholson - Cross

1   Q.  I'm going to show you a document dated Thursday, July 3,

2   2014, addressed to you -- I'm sorry, it's from you.  Read that

3   to yourself, sir.

4            THE COURT:  There's absolutely no need for you to tell

5   him anything about the document.  You just show it to him and

6   ask him if it jogs his memory about something.

7            MR. BRAFMAN:  Yes, ma'am.

8   A.  OK.  I remember the document, sir.

9   Q.  Is that an email you sent?

10  A.  Yes, it is.

11           MR. BRAFMAN:  I offer it into evidence.

12           MR. SOLOWIEJCZYK:  Objection.

13           THE COURT:  The objection's sustained.

14           MR. BRAFMAN:  Can you look at it, Judge?  Let me just

15  ask him to look at one other document before I do that.

16  Q.  Ask you to look at the chart I showed you before, 329A for

17  identification.  Do you have it?  Right there.  It's in your

18  hand.  This.

19  A.  OK.

20  Q.  OK.

21  A.  Yeah.

22  Q.  Look at that chart.  Look at the vehicle numbers in your

23  email and answer me if it refreshes your recollection about

24  anything.

25           THE COURT:  OK.  Strike that comment from the record.

ICCHIss2                    Nicholson - Cross

1   Q.  Does it refresh your recollection?

2           THE COURT:  Does it jog your memory as you sit here,

3   sir?

4           About what?  About what?

5   Q.  The document that you saw before that you didn't recognize,

6   do you now recognize it when comparing to your email?

7   A.  Let me review this, please.

8   Q.  OK.

9           THE COURT:  Would you mind going back to the podium,

10  please.

11          THE WITNESS:  Thank you.

12  A.  Some of the vehicles are on this document, sir.

13          THE COURT:  We don't care what's on the document.  The

14  question is does it jog your memory about those numbers,

15  whatever they may be?  Does it jog your memory about what those

16  numbers are?

17  A.  I don't -- I don't remember vehicle numbers.

18          THE COURT:  Fine.  You don't remember vehicle numbers,

19  so let's move on.

20  Q.  I'm not asking if you remember.  Did you get that email?

21          MR. SOLOWIEJCZYK:  Objection.

22          MR. BRAFMAN:  Your Honor, could you please look at

23  this.

24          THE COURT:  The question was, did you get the email,

25  yes or no?

ICCHIss2                     Nicholson - Cross

1    Q.  You got the email -- you wrote the email?

2    A.  I got an email, yes.

3    Q.  You wrote it?

4              THE COURT:  Give me these.

5              MR. SOLOWIEJCZYK:  Your Honor, could we have a very

6    brief sidebar?

7              THE COURT:  No, we can't have a very brief sidebar.  I

8    can make a ruling.

9              This doesn't come in.

10             MR. BRAFMAN:  Well, it comes together, Judge.

11             THE WITNESS:  Is this part of it?

12             THE COURT:  OK.  You can ask him questions about the

13   email that he wrote, but you can't get it into evidence.  I'm

14   sorry.

15             MR. BRAFMAN:  Well, Judge --

16             THE COURT:  I just made a ruling, and that's the end

17   of it.  You have your exception.

18             MR. BRAFMAN:  Yes, ma'am.

19             THE COURT:  Do not make a speech in front of this

20   jury.

21             MR. BRAFMAN:  I'm not.  Can I have the email back?

22             THE COURT:  That would be a first, Mr. Brafman.

23   BY MR. BRAFMAN:

24   Q.  When you sent this email, did you include vehicle numbers?

25   A.  When I sent that email?

ICCHIss2                          Nicholson - Cross

1   Q.  Did you include vehicle numbers?

2   A.  Yes, I did.

3   Q.  And are some of those -- all of those vehicle numbers,

4   numbers that were addressed on direct examination?

5   A.  I'm sorry.  I don't understand the question.

6        THE COURT:  Did the prosecutor ask you questions about

7   all of the vehicles that had those numbers when he was asking

8   you questions yesterday and this morning?

9   A.  I recognize some of the numbers, sir.  I don't remember all

10  of them.

11  Q.  Where do you recognize them from?

12  A.  What do I -- some of the vehicles went through my shop.  I

13  remember some of the vehicles, but not all of them.

14  Q.  I'll move on.

15        Do you have any bias against Mr. Issa?

16  A.  No, sir, I do not.

17  Q.  You want to see this end badly for him?

18  A.  Do you want my opinion?

19  Q.  No.  Did you say you have no bias?  Do you have a bias?

20  A.  No, I have no bias, sir.

21  Q.  Did you express a bias to the U.S. Attorney's Office?

22  A.  Did I express a bias?

23  Q.  Yes.

24  A.  I felt that there was some issues with his billing and

25  his --

ICCHIss2                          Nicholson - Cross

1    Q.   I didn't say that.

2             Did you write to the U.S. Attorney's Office just a

3    couple of weeks before this trial and ask them, why isn't this

4    guy in prison yet?

5    A.   Oh, yes.

6    Q.   Did you say that?

7    A.   Yes, I did.

8    Q.   When you said that, do you understand that in America,

9    first you have a trial?

10            MR. SOLOWIEJCZYK:   Objection, your Honor.

11            THE COURT:   The objection is sustained.

12   Q.   Now, you testified on direct examination to a number of

13   invoices, correct?

14   A.   Yes, I did.

15   Q.   They were put on the screen and they were shown to the

16   jury, and once they were admitted into evidence or they were in

17   evidence, you walked us through them, correct?

18   A.   That's correct.

19   Q.   For example, what's in evidence as 2049A -- I'll put it on

20   the ELMO to save time -- do you see that email -- that work

21   order?

22   A.   Yes, I do.

23   Q.   This is one of the work orders that you said was part of a

24   fraudulent billing, correct?

25   A.   That's correct.

ICCHIss2                        Nicholson - Cross

1    Q.   Because the stuff that he's supposed to do is on the

2    left-hand side, correct?

3    A.   The stuff that he's supposed to do is on the left-hand

4    side, that's correct.

5    Q.   And he did more than that, correct?

6    A.   Yes, he did.

7    Q.   And you're not supposed to do it without authorization from

8    the VMF, correct?

9    A.   That's correct, sir.

10   Q.   Now, you know that there was a policy in place to try and

11   get people to give written authorization, correct?

12   A.   Written authorization?

13   Q.   Isn't there supposed to be written authorization to do the

14   extra work?

15   A.   Do you want me to go through the procedure?

16   Q.   No.   When I have your vehicle --

17   A.   Right.

18   Q.   -- and I decide it needs more work --

19   A.   Right.

20   Q.   -- am I supposed to write it down, send it to you and get

21   it approved, yes or no?

22   A.   You're supposed to notify the supervisor and inform the

23   supervisor so that the supervisor can make a note and record

24   the additional work.

25   Q.   One of the things you didn't do when you went through these

ICCHIss2                    Nicholson - Cross

1    invoices is point out to the jury that there is a supervisor's

2    name on every single invoice, isn't there?

3    A.  Can I see the invoice again?

4    Q.  Yes.  Here's an invoice, Government Exhibit 2049 in

5    evidence.  I'm pointing to something I've circled.  That's

6    Noel, isn't it?

7    A.  Yes, it is.

8    Q.  That's Andre Noel?

9    A.  Andre Noel.

10   Q.  He worked for you?

11   A.  He still does.

12   Q.  He's a supervisor?

13   A.  Yes, he is.

14   Q.  He may be at work right across the bridge here, right?

15   A.  Yes.

16   Q.  And Mr. Noel is on there because he gave verbal

17   authorization to do the work, isn't that true?

18   A.  To do some of the work on the left-hand side of the

19   commercial work order, sir.

20   Q.  But he's on the invoice?

21   A.  I didn't create that work order --

22   Q.  I didn't ask you that.

23   A.  -- that invoice.

24   Q.  The invoice is submitted, and his name is on it, isn't that

25   correct?

ICCHIss2                        Nicholson - Cross

1    A.   That's true.

2    Q.   And that's supposed to be on there to show who authorized

3    all of this work, correct?

4    A.   No.

5    Q.   No.  Look at the left side.  You're supplying parts for

6    Mr. Issa to work on, correct?

7    A.   Yes.

8    Q.   And when you supply a part, there's no charge.  That means

9    the post office supplied the parts, right?

10   A.   That's correct.

11   Q.   And there are parts that are being supplied at no charge

12   that have nothing to do with the work order?

13   A.   That's correct.

14   Q.   Why are they giving them parts to do work that's not

15   authorized?

16   A.   Because I was under the direction of the OIGs office, sir.

17   Q.   That invoice wasn't created by you.

18   A.   The initial work and the commercial work order was by my

19   supervisors.

20   Q.   So you were trying to fool him into believing that he was

21   getting parts for free to do work, and then you're telling us

22   that it wasn't authorized?

23            MR. SOLOWIEJCZYK:  Objection, your Honor.

24            THE COURT:  Objection's overruled.

25   Q.   This was a setup by OIG.

ICCHIss2                      Nicholson - Cross

1    THE COURT:  Excuse me.  Wait a minute.  There's a

2    question pending.  Let him answer.

3    A.  Sir, could you repeat the question.

4    THE COURT:  Read back his last question.

5    (Record read)

6    A.  I wasn't fooling anyone, sir.

7    Q.  Why were you giving them parts to do something if it wasn't

8    authorized?

9    A.  I was acting under the direction of the OIG's office, sir.

10   Q.  Let me understand that, what that means.

11   OIG said to you:  We've got a great idea.  Have a work

12   order, but give him parts that have nothing to do with the work

13   order, and see if he uses the parts to fix the truck, correct?

14   A.  That's not correct, sir.

15   Q.  Well, that's what happened?

16   A.  I don't know what happened.

17   Q.  Did you tell Mr. Noel, was he involved in this with OIG?

18   A.  With the OIGs office?

19   Q.  Yes.

20   A.  Mr. Noel brought it to my attention that there was

21   discrepancies.

22   Q.  I'm not asking you that.

23   Did he know that you were working in connection with

24   the OIG, wearing a wire?

25   A.  He was not aware that I was wearing a wire.

ICCHIss2                        Nicholson - Cross

1      THE COURT:  Did he know you were working with --

2    wait -- did he know you were working with OIG?

3      THE WITNESS:  Yes, he did.

4    Q.  Did he know that this invoice was set up to essentially be

5    used against Mr. Issa if he fixed the truck?

6      MR. SOLOWIEJCZYK:  Objection, your Honor.

7    Argumentative.

8      THE COURT:  Objection's overruled.

9    Q.  Did he know that?

10   A.  Could you repeat the question again.

11   Q.  Did he know that this was going to be an invoice that was

12   going to be used to prosecute Mr. Issa if he used the parts

13   that you supplied him?

14      MR. SOLOWIEJCZYK:  Objection to the form of the

15   question.

16      THE COURT:  The objection's overruled.

17   Q.  Did he know that?

18   A.  You're confusing me, sir.

19   Q.  How am I confusing you?  I'm speaking English.

20      Did he know?  Did Mr. Noel know that the OIG told you

21   to give Mr. Issa parts for stuff that wasn't on the work order,

22   yes or no?

23      THE COURT:  Did the OIG people tell you to give

24   Mr. Issa parts that would have been used for things that were

25   not on the authorized work order?  Did OIG tell you to do that?

ICCHIss2                        Nicholson - Cross

1   A.  They told me to provide Mr. Issa with work.

2   Q.  That's not the question.

3          THE COURT:  No, no, I didn't say "work," sir.  Listen

4   to me.  I said "parts."

5          Did OIG tell you to give Mr. Issa parts that could not

6   be used for the things that were on your authorized work order,

7   but that could be used to do other stuff?

8          THE WITNESS:  No, ma'am, they didn't authorize.

9          THE COURT:  They did not tell you to do that.

10  BY MR. BRAFMAN:

11  Q.  They didn't?

12  A.  No, they did not.

13  Q.  None of the parts that Mr. Issa gets have anything to do

14  with the work he ultimately performed?

15  A.  If he requested parts or his people came to my shop, they

16  were given the parts.

17  Q.  Even if it wasn't for repair of the work order?

18  A.  That's true.

19  Q.  You knew, then, that he was getting parts to be used for

20  stuff that wasn't specifically authorized on the work order,

21  correct?

22  A.  True.

23  Q.  And one of your supervisors gave him the parts or gave one

24  of his people the parts, correct?

25  A.  That's correct.

ICCHIss2                          Nicholson - Cross

1    Q.  Without charge?

2    A.  Without charge, no.

3    Q.  Well, if it was given to him and supposed to be used, by

4    the post office, sometimes there's no charge if you supply the

5    parts.  He doesn't have to pay for the parts, correct?

6    A.  That's an incorrect statement, sir.

7    Q.  OK.  You gave him the parts whoever paid for them, right?

8    You gave him parts, correct?

9    A.  If the postal service supplied him the parts, they would be

10   recorded.  It's inventory, sir.  It's accountable items.

11   Q.  And it would be given to Mr. Issa whether or not it

12   complied with parts needed for the specific work order,

13   correct?

14   A.  That is correct.

15   Q.  So, implicitly, the supervisor who's giving him this stuff

16   is authorizing these repairs, isn't he?

17   A.  He's giving him the parts.

18   Q.  I'm asking you, what he is supposed to do with the parts?

19   Sell them?

20   A.  No, sir.

21   Q.  Supposed to use them to repair the truck, correct?

22   A.  That's correct.

23   Q.  To work on the truck, right?

24   A.  That's true.

25   Q.  Even if it's not in connection with the specific authorized

ICCHIss2                          Nicholson - Cross

1    work on the work order, correct?

2    A.   Anything --

3    Q.   Correct?

4    A.   No.

5    Q.   Any additional work has to be authorized, right?

6    A.   Yes.

7    Q.   And can it be authorized verbally?

8    A.   It can.

9    Q.   Can it be authorized by Mr. Noel?

10   A.   Yes, it can.

11   Q.   Did you have a chance to look at this invoice and say to

12   Mr. Noel:  Hey, did you authorize this?

13   A.   Mr. Noel --

14   Q.   Yes or no?

15   A.   Yes.

16   Q.   When he got the invoice, did you ever pay this invoice?

17   A.   Yes, I did.

18   Q.   And did you remove the questionable items?

19   A.   Did I remove them?  No.

20   Q.   Yes.

21   A.   No.

22   Q.   You didn't remove them so that Mr. Issa could be charged

23   with fraud?

24   A.   Wait a minute.  Could you repeat that, sir.

25   Q.   Yes.  When you have a questioned item from a mechanic and

ICCHIss2                          Nicholson - Cross

1    you say, I didn't authorize this, you take it off the invoice,

2    right?  That's one of the options, right?

3    A.   That could be, yes.

4    Q.   Then he wouldn't pay for it and he wouldn't be sitting here

5    charged with defrauding the post office?

6           MR. SOLOWIEJCZYK:  Objection, your Honor.

7           THE COURT:  The objection's sustained.

8    Q.   Did you give him an opportunity to take this questioned

9    item off the invoice before you signed off on it for payment?

10   No, right?

11          MR. SOLOWIEJCZYK:  Your Honor.

12          THE COURT:  The objection's --

13   Q.   Did you submit this invoice for payment?

14   A.   Yes, I did.  I certified it.

15   Q.   With the questioned items, correct?

16   A.   Yes, I did.

17   Q.   And you never removed them so that they would be used as a

18   credit against the balance of the invoice?

19   A.   I don't believe I understand that question.  Could you say

20   it again, please.

21          MR. BRAFMAN:  Can we put up Government Exhibit 2049B.

22   Mine is all marked up.  2049B.  Yes, do you have it?  Please.

23   Q.   Do you see the document?

24   A.   Yes, I do.

25   Q.   That's one of the invoices you went over with

ICCHIss2                        Nicholson - Cross

1    Mr. Solowiejczyk, correct?

2    A.   Could you expand it a little bit so I could look at the --

3    Q.   Sure.

4              Would you do that, please, so the witness can see it.

5              That's one of the invoices you went over with

6    Mr. Solowiejczyk on direct examination, correct?

7    A.   681064, it could be, yes.

8    Q.   Could be?  It is.  It's the one you identified, and it's in

9    evidence.

10   A.   OK.

11   Q.   So that's the invoice, right?

12   A.   OK.

13             MR. BRAFMAN:  All right.  Could we bring it up now,

14   please.  I'm sorry.  Give me the whole invoice.  Now, if you

15   could zoom in on the top third of the invoice.

16   Q.   Do you see that?

17   A.   Yes, I see that.

18   Q.   And you see Mr. Noel's name under Brooklyn VMF?

19   A.   Yes, I see that.

20   Q.   His name on there is to indicate that he's the person who

21   authorized this work, isn't that correct?

22   A.   What is correct, sir, is that he sent it to Mr. Issa's

23   company for a "B" service.

24   Q.   I'm asking you a different question.

25             Why is Mr. Noel's name on there?  Aren't they supposed

ICCHIss2                          Nicholson - Cross

1    to --

2             THE COURT:  Why is his name on there?  Stop.  Why is

3    his name on there?

4    A.   Because Mr. Issa's company put Mr. Noel's name on there.

5    Q.   Is it supposed to be on -- is the invoice supposed to have

6    the name of the supervisor who authorized the work, yes or no?

7    A.   Is it supposed to?  It could.

8    Q.   No, isn't that the policy, you're supposed to know who

9    supervised the work, either in writing or verbally, yes?

10   A.   It's part of a procedure that we follow.

11   Q.   OK.  The procedure is to list the name of the supervisor on

12   the invoice.  This is not a procedure made up by Mr. Issa.

13   It's the post office who wants that, right?

14   A.   The post office requires --

15            THE COURT:  Yes or no, is it a post office

16   requirement, yes or no?

17            THE WITNESS:  To have his name on this form?

18            THE COURT:  To have the supervisor's name on the form,

19   is it a requirement of the post office?

20            THE WITNESS:  Not to my knowledge.

21   Q.   Is it procedure at the VMF in Brooklyn that a vendor

22   submits a bill for payment and gives you the name of the

23   supervisor who authorized the work?

24   A.   The names sometimes do appear on the invoices.

25   Q.   On Mr. Issa's invoice, at least this one, and we'll get to

ICCHIss2                          Nicholson - Cross

1    others, the name Noel appears, correct?

2    A.  He's my supervisor, yes.

3    Q.  Now, did you ever, ever --

4            I'm sorry.  Let's move up.  I just want to go to one

5    charge.  If we could move up higher, I'm sorry.  Expand the

6    screen.  Apologize.  And if we could go down to air horn, blow

7    that up, please.

8    A.  I see it.

9    Q.  I want the jury to see it.

10   A.  Sure.

11   Q.  You see that item -- sorry.  Move it up -- air horn,

12   $55.30?  You see that?

13   A.  Yes, I do.

14   Q.  That's one of the items you said wasn't authorized,

15   correct?

16   A.  That's true.

17   Q.  Now, do you know if the work was done?  You don't know, do

18   you?

19   A.  No, I don't know if it was done.

20   Q.  So if it was authorized by Noel and it was fixed, that

21   would be an appropriate $55 charge, correct?

22   A.  No, that's not correct.

23   Q.  Well, because it was not on the work order, right?

24   A.  On the -- are you referring to the 4541 commercial --

25   Q.  Yes.

ICCHIss2                          Nicholson - Cross

1    A.   -- work order?

2    Q.   It's not on there, right?

3    A.   It's not on there.

4    Q.   Now, if Mr. Noel had authorized them to fix the air horn,

5    then it would be an appropriate charge, correct?

6    A.   If he had.

7    Q.   Do you know if he did?

8    A.   I only see -- I don't know.

9    Q.   OK.  Now you have his name on there and the charge of

10   $55.30, and you're telling us that you submitted this charge to

11   the post office, and Mr. Issa got paid the $55, right?

12   A.   That's correct.

13   Q.   And that's an item that you said to the government that's

14   not a fair charge, right?

15   A.   That's correct.

16   Q.   All right.  Let's look at the last page of the invoice, if

17   we can, for the total of the invoice.  If we could blow up the

18   amount.  Total is $3,600.24, correct?

19   A.   That's correct.

20   Q.   And the air horn that you're complaining about is 55 bucks,

21   right?

22   A.   That's true.

23   Q.   Why didn't you just take it off the invoice before you

24   submitted it for payment if it's a questioned item?  Because

25   OIG told you not to, right?

ICCHIss2                        Nicholson - Cross

1          MR. SOLOWIEJCZYK:  Objection, your Honor.  He keeps

2     providing the answers to his own questions.

3          THE COURT:  I know that.

4     Q.  Why didn't you just take it off the invoice before you

5     charged it to -- paid Mr. Issa for it?

6     A.  Mr. Brafman, I don't know how to answer that.

7     Q.  Let me ask you another question then.

8          OIG told you:  Don't give a credit to anything that's

9     questioned.  Submit it.  We'll pay it, and then we can use it

10    against Mr. Issa, isn't that correct?

11    A.  That's not correct, sir.

12    Q.  So why didn't you just take it off the invoice, if this is

13    a good faith challenge, because the work wasn't authorized?

14         MR. SOLOWIEJCZYK:  Objection to "good faith

15    challenge."

16         THE COURT:  The objection is sustained.  Let's move on

17    please.

18    Q.  You ever ask Mr. Issa about the air horn?

19    A.  No, I don't believe I did.

20    Q.  Do you think Mr. Issa actually does the repairs?

21         MR. SOLOWIEJCZYK:  Objection -- actually --

22         THE COURT:  Overruled.

23         MR. SOLOWIEJCZYK:  -- withdrawn.  Sorry.

24    Q.  Do you know whether Mr. Issa goes into the thing, puts on

25    overalls, and actually does the repairs?

ICCHIss2                        Nicholson - Cross

1    A.  I would imagine he wouldn't, sir.

2    Q.  He has people who do these repairs, correct?

3    A.  That's correct.

4    Q.  Some of the repairs on this invoice, whether you agree it

5    was authorized or not, are fairly sophisticated repair work,

6    correct?

7    A.  That's correct.

8    Q.  You need to be a mechanic to be able to even understand

9    what to do, right?

10   A.  I would hope so, yes.

11   Q.  And then you're giving them parts that are costing the post

12   office a lot of money, and they're using your parts, correct?

13   A.  They're supposed to be using my parts, yes.

14   Q.  Do you know whether or not the parts you gave them were

15   used to repair this vehicle?

16   A.  Can we go back to the work order, please, so I could see it

17   and the invoice, if you don't mind.

18   Q.  Let's move on, and I'll do it at the end with all of them,

19   OK.  Save a lot of time.

20          Who are the supervisors who work for you at the

21   vehicle maintenance facility in that period on March of 2015?

22   Who are they?

23   A.  I believe it was Andre Noel, and I don't know if Randy Cox

24   had made supervisor at that time.  He took the place of Willie

25   Wallace, who was the supervisor on tour three.

ICCHIss2                    Nicholson - Cross

1   Q.  Now, looking at 2052C that's in evidence -- I'm sorry.

2   I'll put it on the ELMO.

3           2052C, do you see it?

4   A.  Yes, I see that.

5   Q.  That's one of the invoices you discussed with

6   Mr. Solowiejczyk, is that correct?

7   A.  Yes.  Could you just -- I want to see the very top of that,

8   if you don't mind.  OK.

9   Q.  Is that one of them that's in evidence that you discussed

10  with Mr. Solowiejczyk?

11  A.  Yes, it is.

12  Q.  Now, who is --

13  A.  Arnulfo Williams.

14  Q.  Excuse me?

15  A.  Arnulfo Williams.

16  Q.  Who is that?

17  A.  He is my lead tech AG.

18  Q.  Is he allowed to authorize work?

19  A.  He was acting as a --

20          THE COURT:  Question is, is he allowed to authorize

21  work?

22  A.  Yes, yes.

23  Q.  So it's someone who works for you, not Mr. Issa, correct?

24  A.  That's correct.

25  Q.  And Noel was still working there at the time?

ICCHIss2                       Nicholson - Cross

1    A.  He was still working there, yes.

2            MR. BRAFMAN:  All right.  If we could have put up,

3    please, 2052D.  Mine is all marked up.  2052D, it's the invoice

4    for this work order.

5    Q.  This is the invoice for the work order we just looked at,

6    correct?

7    A.  That was for 4870509.  I didn't -- could you flip to the

8    other one so I can double-check.

9            MR. BRAFMAN:  I'll just put the other one on my

10   machine, and you take that one down, please.

11   Q.  Do you see it?

12   A.  509, yes, that's the same vehicle.

13   Q.  So that's the invoice for that vehicle, correct?

14   A.  Yes, it is.

15   Q.  For that work order, correct?

16   A.  Yes, it is.

17           MR. BRAFMAN:  If we could have it put up again, 2052D.

18   We could show the top part again, please.  The jury needs to

19   see it.  This is in evidence.

20   Q.  Once again, under Brooklyn VMF you have Andre Noel,

21   correct?

22   A.  That's correct.

23   Q.  So the work order was authorized by your lead tech who was

24   authorized to do that, but the invoice is approved by -- I'm

25   sorry.  The invoice has Noel's name on it, correct?

ICCHIss2                      Nicholson - Cross

1   A.  Yes, it does.

2   Q.  And again, you never spoke to Mr. Noel about this

3   particular invoice, correct?

4   A.  I don't know for sure we discussed this invoice.

5   Q.  None of the questioned items that you went through with

6   Mr. Solowiejczyk were removed from this invoice before it was

7   submitted for payment, correct?

8   A.  They were not removed, no.

9           MR. BRAFMAN:  Your Honor, if you have to leave, this

10  is a good place to stop.  I have a whole different area, and

11  you said a quarter to 12:00.

12          THE COURT:  Well, actually, I said five of 12:00.

13  It's ten of 12, so folks, I will see you at about 1:35, OK.

14  Try to be back by 1:30.  It's probably a mob scene out there,

15  lots of reporters and people like that.

16          Is it possible that we could let them go out Pearl

17  Street, which would be a lot easier?

18          THE LAW CLERK:  They can go anywhere they want.

19          THE COURT:  Easier to go out the Pearl Street door

20  because on Worth Street there are 250 reporters and camera

21  people and stuff.

22          Don't discuss the case.  Keep an open mind.  OK.

23          (Jury excused)

24          (Continued on next page)

25

1                 (Jury not present)

2                 THE COURT:  OK.  Sir, you're on cross-examination, so

3    you can't talk to the government lawyers, OK.

4                 Fine.  All right.  Thank you.

5                 THE WITNESS:  Can I leave?

6                 THE COURT:  You may leave, yes.

7                 THE WITNESS:  Thank you, your Honor.

8                 (Lunch recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICC5iss3

1                    A F T E R N O O N   S E S S I O N

2                              1:45 p.m.

3              THE DEPUTY CLERK:  Case on trial continues.

4    Government present, defense present, jurors are not.

5              MR. SOLOWIEJCZYK:  Your Honor, we have a new paralegal

6    for the afternoon.

7              THE COURT:  His name is not Colleen?

8              MR. SOLOWIEJCZYK:  We figured that was creating too

9    much confusion.  So, we thought it might make sense when the

10   jury comes out to confirm that nobody knows him in any, way,

11   shape or form.

12             THE COURT:  What's your name, sir?

13             MR. CONCEPCION:  Jonathan.

14             MR. SOLOWIEJCZYK:  Jonathan Concepcion.

15             THE COURT:  Jonathan Concepcion, we will ask the

16   jurors.

17             MR. BRAFMAN:  I won't call him Colleen.  There was

18   never any disrespect intended.

19             THE COURT:  No, no, no.  You don't understand.  It

20   really is every time I hear it, it just -- if my name were Mary

21   I would not do that.

22             (Continued on next page)

23

24

25

1              (Jury present)

2              THE COURT:  Okay.  We are back, sir.  You are still

3     under oath.

4      JAMES NICHOLSON, resumed.

5              MR. SOLOWIEJCZYK:  Your Honor, did you just want to

6     confirm?

7              THE COURT:  This is Mr. Jonathan Concepcion, his name

8     is not Colleen, he is a paralegal with the U.S. Attorney's

9     office.  They've substituted him in for the afternoon.

10             Does anybody know him?  Okay.  Great.

11             MR. BRAFMAN:  May I proceed, your Honor?

12             THE COURT:  You may.

13    CROSS EXAMINATION (Cont'd)

14    BY MR. BRAFMAN:

15    Q.  Mr. Nicholson, you said on direct examination or on cross,

16    I don't remember anymore, that at the point when you went on

17    the Internet to try and -- or on the website to try and

18    research Mr. Issa, that you found out that his full name was

19    Ibrahim; is that correct?

20    A.  That is correct, sir.

21    Q.  And prior to that you knew him as Tony Issa?

22    A.  Yes.  That's correct.

23    Q.  Now, isn't it true that Mr. Issa was appointed by the post

24    office as an official vehicle maintenance contractor over your

25    very VMF in 2014?

ICC5iss3                          Nicholson - cross

1    A.  That's not true, sir.

2    Q.  You didn't know that?

3    A.  No, I didn't know that.

4    Q.  I'm going to show you what's in evidence as a Government

5    Exhibit.  Okay?

6    A.  Okay.

7    Q.  It is Government Exhibit 105H, if we could put it up for

8    everyone since it is in evidence, and if we could bring that up

9    a little bit more, zoom in on the top part?  Thank you.

10          You recognize this as an amendment of a solicitation

11   modification of contract that's used by the post office?

12   A.  This is a -- I have never seen this contract before.

13   Q.  It is in evidence, I'm going to show it to you now; made

14   out to vehicle maintenance field support in Philadelphia.

15   That's where they have their offices, right?

16   A.  Yes.  We know that as CMC.  Philadelphia CMC.

17   Q.  And if the name and address of the contractor in part 8,

18   would you highlight that, please -- is first start and it has

19   Ibrahim Issa and his address, work address, correct?

20   A.  That's correct.

21   Q.  And if we could go up this document or go further down the

22   document, if we could point to the middle of the document,

23   please?

24          It says that there is a net increase of $948,000 to

25   this contract, correct?

ICC5iss3                           Nicholson - cross

1    A.  Yes.  That's the funding for it.

2    Q.  And you don't know what that contract is for, do you?

3    A.  I know what a VMRA is and I am assuming that this is the --

4    something in addition to a VMRA.

5    Q.  Let's turn, if we can, to the bottom lower portion of the

6    page and if we could highlight this far?  I am going to read

7    the paragraph starting with "this modification."  Thank you,

8    sir.  This modification is to add three locations in the

9    tri-borough district to existing agreement with First Star Auto

10   Repair, doing business as Daimner Fleet, doing business

11   effectively, and it follows going on to the second page and if

12   we could go to the top one, please, and highlight that, the top

13   location, lower, thank you, highlight that -- that's you, isn't

14   it?  Brooklyn, New York, VMF, 1050 Fourbell Street?

15   A.  That's correct.  That's my finance number.

16   Q.  And it is adding you, your finance number, your VMF, to

17   Mr. Issa's contract.  Do you see that?

18   A.  I see that.

19   Q.  And this is the first time you know of this?

20   A.  Yes, it is.

21   Q.  The post office doesn't notify you who they appoint to do

22   your work?

23   A.  It is not my discretion who I use.

24   Q.  I didn't ask you that.  You didn't get notified that this

25   contract covers your VMF so if someone shows up you know that

ICC5iss3                          Nicholson - cross

1   he is an authorized contractor?  Yes or no.  They don't notify

2   you?

3   A.  No.

4   Q.  So, let's go back to the front page, if we can, and amount

5   down here.  The total amount of the modification is $948,000.

6   The new total for this award is $2,885,800.  You were not aware

7   that Mr. Issa's company First Star had an almost $3 million

8   contract with the post office?

9   A.  No, sir.  I was not.

10  Q.  Let's go back to the second page and let's highlight the

11  three names, please, who are added.  That's good.  Thank you.

12  If you would highlight that?  The first one is you, right?

13  Your VMF, right?

14  A.  My location, yes.  That's correct.

15  Q.  That's the one you manage?

16  A.  Yes, it is.

17  Q.  And the second one is Flushing, Queens, Jamaica?

18  A.  Yes, it is.

19  Q.  And who manages that?

20  A.  Don Andreoli.

21  Q.  And who managed Staten Island?  Phil Castellano?

22  A.  Castellano, yes.

23  Q.  So, all of the three people who were at this meeting that

24  you taped in 2014 were officially added as locations to his

25  contract; is that correct?

ICC5iss3                          Nicholson - cross

1    A.   That's correct.

2    Q.   And you didn't know anything about that?

3    A.   No, sir.

4    Q.   So, when Mr. Issa shows up at this meeting and he is

5    fighting with you and the others, you don't know that he is

6    authorized by the post office to be doing this kind of work?

7    A.   I don't know that he is authorized.

8    Q.   Now, that's my question.

9    A.   Okay.

10   Q.   Now I have another question.  You have talked to OIG since

11   you started taping Mr. Issa several years ago, correct?

12   A.   That's correct.

13   Q.   And you went out on several lunches that were taped,

14   correct?

15   A.   That's correct.

16   Q.   And a car ride out to Brentwood to see the facility?

17   A.   That's correct.

18   Q.   And that was taped?

19   A.   Yes, it was.

20   Q.   And in all of your conversations with OIG, none of the

21   officers told you about this contract?

22   A.   No, sir.

23   Q.   And you never found out about this contract until this very

24   minute when I showed it to you?

25   A.   No.  Until Don Andreoli had mentioned that there was a

ICC5iss3                         Nicholson - cross

1    VMRA.

2    Q.  But the VMRA being amended to cover you, you had no idea

3    until this plea agreement?

4    A.  I had no idea, no.

5    Q.  Can you put it down for a minute, please?  I'm sorry, leave

6    this page up.  If you could go further down a little bit,

7    please, and if we can do the first one?  Funding is added to

8    the amount.

9            "Funding is added in the amount of $316,000 for

10   ship-to location 182326."  That's your identification number in

11   Brooklyn, isn't it?

12   A.  It's my finance number.

13   Q.  That's right; it's your finance number, right?

14   A.  Yes, it is.

15   Q.  What does it mean when they add this money to your finance

16   number?  That you can use it and spend it?

17   A.  That it is there for the funding, yes.  That's correct.

18   Q.  And you didn't know anything about it until just now?

19   A.  That's correct.  That's correct.

20   Q.  I would like to move on, if we can.

21            You testified on direct examination that you had, one

22   of the difficulties you had with Mr. Issa's maintenance

23   facility was that they never sent you invoices, correct?

24   A.  They sent the invoices late.

25   Q.  Okay.  And one of the things you testified to is that you

ICC5iss3                         Nicholson - cross

1   never knew who authorized the extra work, correct?

2   A.   That's correct.

3   Q.   Isn't it true that they were e-mailing you constantly with

4   the information telling you that they wanted to clear this up

5   and you ignored them?

6   A.   I didn't see any e-mails, sir.

7   Q.   Let me show you what I have marked for identification as

8   316A with attachments and ask if you would look at this e-mail

9   and tell me if you recognize it -- handing one to the

10  government, your Honor.  May I hand one up to the Court?

11           THE COURT:  Please.

12  Q.   Look at it, read it to yourself, note that you are copied

13  on it.  Did you read the e-mail?

14  A.   I am reading it, sir.  Just the e-mail or the rest with the

15  attachment?

16  Q.   Read the e-mail first?

17  A.   Yes.  Okay.

18  Q.   Have you read that?

19  A.   Yes, I did.

20  Q.   You recognize that as an e-mail that you got on or about

21  June 11, to 14, from Nicole Mangone who is Mr. Issa's office

22  manager?

23  A.   Yes.

24  Q.   You remember getting it?

25  A.   I must have gotten it, my name is on the e-mail chain at

ICC5iss3                        Nicholson - cross

1    that time.

2    Q.  Do you recognize it?

3    A.  I recognize it, sure.

4             MR. BRAFMAN:  Your Honor, I offer it into evidence.

5             MR. SOLOWIEJCZYK:  Objection, your Honor.  Hearsay.

6             THE COURT:  I'm going to let it in.

7             MR. BRAFMAN:  Thank you, your Honor.  Thank you very

8    much.

9             (Defendant's Exhibit 316A received in evidence)

10   BY MR. BRAFMAN:

11   Q.  This document here, you can read it on your screen, sir?

12   Can you see it?

13   A.  Yes.

14   Q.  Do you see it now?

15   A.  Yes, I see it.

16   Q.  Do you know who Ms. Mangone was?

17   A.  Who, sir?

18   Q.  Ms. Mangone, the one sending the e-mail from Daimner, she

19   is one of the Mr. Issa's assistants?

20   A.  I believe she was, yes.

21   Q.  And the subject matter is invoices from Daimner, right?

22   A.  That's correct.

23   Q.  And it's the date of June 11, 2014, which is the date

24   around the approximate time you were discussing on direct

25   examination, correct?

ICC5iss3                         Nicholson - cross

1    A.   That's correct.

2    Q.   And it's addressed to also Willie Wallace who is one of

3    your supervisors at the time, correct?

4    A.   That's correct.

5    Q.   And a copy to James Nicholson, correct?

6    A.   That is correct.

7    Q.   And there is a copy to Mr. Issa and the other people at the

8    post office, correct?

9    A.   That's correct.

10   Q.   And let me read it first sentence.  Mr.  Willie Wallace,

11   now, he was your supervisor at the time, right?

12   A.   Yes.

13   Q.   One of them at the time, right?

14   A.   Yes.

15   Q.   Authorized to send out trucks and authorized to add

16   additional work, correct?

17   A.   That's correct.

18   Q.   First sentence:  Please find included invoices for vehicles

19   repaired together with the scanned copies of the 4541s for the

20   U.S. Postal Service to match our invoices to the work

21   requested.

22        Did I read that correctly?

23   A.   Yes, you did.

24   Q.   And 4541 is a form that you fill out that has the work you

25   did and the amount you are charging, right?

ICC5iss3                          Nicholson - cross

1    A.  Yes.  That's correct.

2    Q.  And the next paragraph:  We make notes on the invoice such

3    as who authorized the work, was vehicle shuttled or towed, what

4    was requested, what parts were provided to us, together with

5    any other relevant information.

6            Do you see that?

7    A.  Yes, I see that.

8    Q.  And some of the invoices I showed you right before lunch,

9    and I will show you again, it had a name of somebody on there

10   which was the name of one of your supervisors, correct?

11   A.  That's correct.

12   Q.  For example, we saw Noel on one of the invoices, correct?

13   A.  That is correct.

14   Q.  And the e-mail says we make notes on the invoices such as

15   who authorized the work.  Do you see that?  That's what it

16   says, right?

17   A.  Where is that, sir?

18   Q.  Yes, and the next sentence is --

19            THE COURT:  Wait a minute, wait a minute, wait a

20   minute.  He asked you a question.  He said where is that, sir.

21   BY MR. BRAFMAN:

22   Q.  I'm sorry.

23            Here, second paragraph, second sentence?

24   A.  I see.

25   Q.  We make notes on the invoices such as who authorized the

ICC5iss3                          Nicholson - cross

1    work, correct?

2    A.  Yes.

3    Q.  And then here we go down to the next sentence:  We are

4    committed to provide USPS with best in class service 24 hours a

5    day, seven days a week, 365 days a year.  All parts given to us

6    by the VMF show as supplied.  All our work is guaranteed, one

7    year, unlimited mileage, towing and shuttling is billed

8    separately.  Please let us know how we could do things better.

9    We are here to serve you.

10            She signed it her name and telephone number.  Did you

11   ever respond to that e-mail?

12   A.  Did I respond to it?

13   Q.  Yes, did you respond?  Writing to that e-mail?

14   A.  I don't know in fact if I did.  I probably didn't.

15   Q.  You didn't, because you were under the direction of the

16   OIG, right?

17            MR. SOLOWIEJCZYK:  Objection, your Honor.

18            THE COURT:  The objection is sustained.

19   BY MR. BRAFMAN:

20   Q.  You didn't respond, did you?

21   A.  I don't know if I did or I didn't, sir.

22   Q.  So, as you sit here today, you have no recollection of ever

23   responding, right?

24            THE COURT:  I think he said one way or the other,

25   Mr. Brafman.

ICC5iss3                    Nicholson - cross

1   BY MR. BRAFMAN:

2   Q.   Thank you.

3        Now, this is documentation of the work they performed

4   and they tell you who authorized it, correct?  Yes or no?

5   A.   Yes.

6   Q.   And you ignored this, right?

7   A.   It is more involved than that, sir.

8   Q.   Okay, because at the time OIG was telling you what to do;

9   isn't that correct?

10       MR. SOLOWIEJCZYK:  Objection, your Honor.

11       THE COURT:  Objection is sustained.

12  BY MR. BRAFMAN:

13  Q.   Were you following the direction of OIG in the manner in

14  which you handled the invoices from First Star during this

15  period?

16  A.   In the manner I handled the invoices?  No.

17  Q.   In the manner in which you handled the correspondence and

18  the invoices during that period in which you were cooperating

19  as an undercover operative?

20  A.   No.

21       MR. SOLOWIEJCZYK:  Objection?

22       THE COURT:  He said as to invoices and you can't --

23  you have to stop asking multiple questions.  As to invoices he

24  said no.  Then you added something else.

25  BY MR. BRAFMAN:

ICC5iss3                          Nicholson - cross

1    Q.  The fact is, you never responded, right?

2    A.  That's correct.  That could be possible, yes.

3    Q.  Now, let's talk about lunch.

4    A.  Lunch?

5    Q.  Yes.

6    A.  Okay.

7    Q.  Not what you had for lunch today but let's talk about lunch

8    that you had with Mr. Issa.  Okay?

9    A.  Okay.

10   Q.  You told us yesterday, under oath, that Mr. Issa was the

11   one who suggested that you have lunch and the meeting should be

12   at lunch.  Isn't that right?

13   A.  That's correct, sir.

14   Q.  You told us that under oath, right?

15   A.  Yes, I certainly did.

16   Q.  Now, I want you to look at Government Exhibit --

17   Defendant's Exhibit 302.  I am not putting it into evidence, I

18   am just asking him to refresh his recollection.

19          MR. SOLOWIEJCZYK:  There is no time frame on the

20   question.

21   BY MR. BRAFMAN:

22   Q.  In connection with the very first lunch -- thank you

23   Mr. Solowiejczyk -- in connection with the very first lunch you

24   told this jury that it was Mr. Issa who suggested you meet at

25   lunch, correct?

ICC5iss3                        Nicholson - cross

1    A.  Yes.

2    Q.  And you still believe that to be true, correct?

3    A.  That is true, sir.

4    Q.  That is true?

5    A.  Yes, it is, sir.

6    Q.  Now I want you to look at Exhibit 302, I am going to give

7    it to you in a minute.

8              THE COURT:  This is Defendant's Exhibit 302?

9              MR. BRAFMAN:  Defendant's Exhibit 302.

10             THE COURT:  For identification.  Thank you.

11             MR. BRAFMAN:  Giving a copy to the government.  I will

12   show a copy to the witness, your Honor, and if I give you a

13   copy I won't have one to work with.  Can you wait just a

14   moment?

15             THE COURT:  I will wait.

16             MR. BRAFMAN:  Thank you.

17   BY MR. BRAFMAN:

18   Q.  I want you to look at Government Exhibit 302, read it going

19   backward as the e-mail chain where it starts.

20   A.  Where are we starting from, sir?

21   Q.  It is an e-mail, you can start from the first e-mail which

22   usually works backwards.

23   A.  So that would be the last page, you say?

24   Q.  Next to last page, the last is disclaimer.

25             Actually, you start from the bottom of the first page.

ICC5iss3                         Nicholson - cross

1    A.   This is from Tony Issa to me.

2    Q.   Right.

3    A.   Okay.

4    Q.   Read it to yourself.

5    A.   I'm sorry?

6    Q.   Read it to yourself.

7    A.   Okay.

8    Q.   Did you read it?

9    A.   Yes, I did.

10   Q.   It is an email you got on September 22nd, 2014 from

11   Mr. Issa and then it's an e-mail from you to OIG, correct?

12   A.   That's correct.

13           MR. BRAFMAN:   Your Honor, I offer this into evidence.

14           MR. SOLOWIEJCZYK:   Objection, your Honor.   Hearsay.

15           THE COURT:   The objection is sustained.

16   BY MR. BRAFMAN:

17   Q.   Well, let me ask you a question.   Read it to yourself and

18   tell me whether or not it refreshes your recollection that

19   Mr. Issa offered to meet you any time -- at any time -- that is

20   good for you between Monday and Wednesday or Thursday; isn't

21   that true?

22           MR. SOLOWIEJCZYK:   He is reading from the document.

23           THE COURT:   The objection is sustained.   Strike that.

24   BY MR. BRAFMAN:

25   Q.   Does it refresh your recollection --

ICC5iss3                         Nicholson - cross

1          THE COURT:  Does it refresh your recollection about

2     who suggested that the two of you meet?

3          MR. BRAFMAN:  No, for lunch.  It moves on to another

4     exhibit, your Honor.

5     BY MR. BRAFMAN:

6     Q.  Does it refresh your recollection that, during this

7     conversation, Mr. Issa wants to meet and then you reach out to

8     OIG?  Just that.

9     A.  It's more complicated, sir.

10    Q.  Just answer that.  I will get to the complication.

11         THE COURT:  He hasn't said that he needs his

12    recollection refreshed about that.

13    Q.  Do you need your recollection refreshed?

14         THE COURT:  No, no, he doesn't.  Mr. Brafman, you are

15    trying to impeach with a prior inconsistent statement, not to

16    refresh his recollection.  There is no prior inconsistent

17    statement in here.  Can we please move on?

18         MR. BRAFMAN:  Yes.

19         THE COURT:  If you have a prior statement of this

20    witness --

21         MR. BRAFMAN:  Yes, ma'am.

22         THE COURT:  -- not your client --

23         MR. BRAFMAN:  Yes, ma'am.

24         THE COURT:  -- that you would like to confront him

25    with --

ICC5iss3                        Nicholson – cross

 1           MR. BRAFMAN:  Yes, ma'am.

 2           THE COURT:  -- show it to him.

 3   BY MR. BRAFMAN:

 4   Q.  Showing you Exhibit 303.

 5   A.  It is inside out, sir.

 6   Q.  I'm not showing it to you.

 7   A.  Oh.

 8   Q.  I'm showing you 303, for identification only, and ask you

 9   to read the chain of e-mails from you and Mr. Issa and then to

10   OIG.

11   A.  Okay.

12   Q.  If you read it out loud I might as well put it unto

13   evidence.  Read it to yourself.

14   A.  Okay.  Fine.

15           (pause)

16   A.  Okay.

17   Q.  Did you suggest lunch?

18   A.  Mr. –

19           THE COURT:  The question is --

20   Q.  Did you suggest lunch?

21           THE COURT:  No.  The question is does this refresh

22   your recollection that it was your idea to have lunch.

23   A.  It was not my idea to have lunch, sir.

24   Q.  Let me come back and we will figure this out together.

25           There was a discussion that you would take a number of

ICC5iss3                          Nicholson - cross

1    people, including Mr. Issa, with Mr. Issa with Phil Castellano

2    that we talked about, correct?

3    A.  Yes.

4    Q.  That tape that went on where you taped them and we don't

5    have the tape in evidence, correct?

6             MR. SOLOWIEJCZYK:  Objection, your Honor.

7             THE COURT:  The objection is it sustained.

8             Ladies and gentlemen, there is a perfectly good reason

9    why it is not in evidence:  It's inadmissible.  Okay?  Thank

10   you.

11            MR. SOLOWIEJCZYK:  Your Honor --

12            THE COURT:  You know, Mr. Brafman --

13            MR. BRAFMAN:  I am moving on.

14            THE COURT:  Mr. Brafman, I would move on if I were

15   you.

16   BY MR. BRAFMAN:

17   Q.  You know the conversation I'm talking about, right?  That

18   taping, the conversation I am talking about, you remember it,

19   right?

20   A.  There is many conversations, sir.

21   Q.  The one where Mr. DiMasso and Mr. Issa, Mr. Castellano,

22   those people were only taped once by you, right?

23   A.  That's correct, sir.

24   Q.  That's the one I'm talking about.

25   A.  Okay.

ICC5iss3                          Nicholson - cross

1    Q.  That meeting, okay?

2    A.  Yes.

3    Q.  And that meeting broke up, there was some chitchat, and you

4    will tell me I'm wrong, about, maybe we could have lunch,

5    right?

6    A.  At that point in time?  No, sir.

7    Q.  Okay.  So, tell me when Mr. Issa reached out to you to have

8    lunch.

9    A.  If I recall correctly, it was someone in Mr. Issa's office,

10   maybe Nicole or someone in there, some female that was in his

11   office that suggested or reached out to me that Mr. Issa would

12   like to have lunch with me.

13   Q.  And then a lunch was set up, correct?

14   A.  And I notified the OIG's office and spoke to them about

15   having a contact with Mr. Issa and I was at the direction and

16   supervision of the OIG's office.

17   Q.  And when you told them that you and Mr. Issa was having

18   lunch, do you remember what you said to them?

19   A.  I don't recall what I said, sir.

20   Q.  You said "fish on."

21   A.  Okay, sir.

22   Q.  You did that, right?

23   A.  Yes, I did.

24   Q.  So Mr. Issa was the fish, right, that you were referring

25   to?  Yes?  He was.

ICC5iss3                     Nicholson - cross

1   A.  My statement was --

2   Q.  Fish on.  That's all you said?

3   A.  I said that.  I said that and what I meant by that -- are

4   you asking me what I meant by that?

5          THE COURT:  No, he is not, actually.

6   Q.  I am asking you if Mr. Issa was the fish in the sentence

7   "fish on."

8   A.  I didn't assign a person to "fish on," sir.

9   Q.  Were you notifying OIG that you are going to have a lunch

10  with Mr. Issa, correct?

11  A.  That's correct.

12  Q.  That's the e-mail chain, correct?

13  A.  Yes.

14  Q.  And whether it was his suggestion or your suggestion, you

15  are letting them know that you are going to lunch, right?

16  A.  Yes.

17  Q.  And that was the first time you were going to have lunch

18  with Mr. Issa?

19  A.  That's correct.

20  Q.  And there was OIG people directing your undercover

21  activities, right?

22  A.  Yes.

23  Q.  And the only thing you said to them after confirming the

24  meeting was "fish on," correct?

25  A.  Yes.

ICC5iss3                        Nicholson - cross

1   Q.   And it had to be Mr. Issa who was the fish that was on the

2   hook, nothing else makes sense --

3            MR. SOLOWIEJCZYK:   Objection, your Honor.

4   Q.   -- does it?

5            THE COURT:   The objection is overruled.

6   BY MR. BRAFMAN:

7   Q.   You may answer.

8   A.   If you allow me --

9   Q.   Was it Mr. Issa who you were referring to as the fish who

10  you had hooked?

11  A.   No, sir.

12  Q.   So what does "fish on," mean?

13  A.   Here we go.

14  Q.   Here we go?   Why don't you just say "here we go."

15  A.   I'm a fisherman, sir.

16  Q.   And when a fish is on it means a fish is on the hook,

17  right?

18  A.   You don't always catch the fish, sir.

19  Q.   I know that.   That's what the trial is about.

20           When you say "fish on," it is on a hook, right?

21  A.   It could be.   It might not be.

22  Q.   Mr. Nicholson --

23  A.   Yes, sir.

24  Q.   -- this is really simple.

25  A.   Okay.

1   Q.  The only words you say to OIG, after you know you are

2   having lunch with this man who is the subject of your

3   investigation, is "fish on."  They're the only words.  Nothing

4   hello, not good-bye.  "Fish on," with an exclamation point.

5   A.  Perhaps I should have just responded "here we go."

6   Q.  But you didn't?

7   A.  No, sir, I did not.

8   Q.  Okay.

9           MR. BRAFMAN:  If I may have just a moment, your Honor?

10          (Pause)

11  Q.  Were you getting more than one letter or a series of

12  letters from people who worked from Mr. Issa trying to

13  straighten out the invoice issues?

14  A.  I don't recall, sir.

15  Q.  Let me show you what I have marked for identification as

16  Exhibit 316, not offering it into evidence, just using it to

17  see if it refresh his recollection.  I have given a copy to the

18  Court before, and the government.

19  A.  Thank you.

20  Q.  Do you recognize the document?

21  A.  I am reading it, sir.  Okay.

22  Q.  Is that another document from Mr. Issa's staff concerning

23  invoices?

24  A.  Yes, it's from --

25  Q.  Do you remember getting this?

ICC5iss3                        Nicholson - cross

1    A.   Yes.

2    Q.   And the attachment in the back shows the invoice numbers,

3    PDFs?

4              MR. SOLOWIEJCZYK:  Objection, your Honor.

5              MR. BRAFMAN:  Your Honor, I am offering it into

6    evidence.

7              MR. SOLOWIEJCZYK:  Is he offering it?

8              MR. BRAFMAN:  I am going to offer it, yes.

9              MR. SOLOWIEJCZYK:  Objection, your Honor.  This is

10   hearsay.

11             THE COURT:  It is not coming in.

12             MR. BRAFMAN:  Okay.

13             THE COURT:  The objection is sustained.  This document

14   is not coming in.

15             MR. BRAFMAN:  Okay.  Okay.  I get it.

16             THE COURT:  Fine.

17   BY MR. BRAFMAN:

18   Q.   Did you get this document?

19             THE COURT:  Doesn't matter if he got it or not.  It is

20   not coming in.

21   Q.   And that was addressed to you, right?  Personally.

22             MR. SOLOWIEJCZYK:  Objection, your Honor.

23             THE COURT:  The objection is it sustained.  You can't

24   tell the jury anything about the contents of the document.

25             MR. BRAFMAN:  Okay.

ICC5iss3                          Nicholson - cross

1          THE COURT:  It is not in evidence.

2          MR. BRAFMAN:  Okay.  Yes, ma'am.

3          THE COURT:  Thank you.

4    BY MR. BRAFMAN:

5    Q.  So Mr. Nicholson, you told us on direct examination that

6    they weren't giving you invoices, they weren't telling you

7    about the invoices in words or substance, right?

8    A.  They were not giving me the invoices in a timely fashion,

9    sir.

10   Q.  But they were giving you the invoices over and over and

11   over again; isn't that true?

12   A.  At times they would give me 20 invoices at a time.

13   Q.  Okay, but they were giving you invoices?

14   A.  Yes.  When I brought the issue up, yes.

15   Q.  And then they also, if you can recall -- look at this

16   Exhibit 318 for identification, I'm not going to offer it --

17   Mr. Noel is one of your supervisors?

18   A.  Yes, he is.

19   Q.  Do you remember getting this document?

20   A.  Sir, how would I remember this if it wasn't addressed to

21   me.

22   Q.  You are copied on it?

23   A.  I see CC Tony Issa.

24          THE COURT:  I think you have got the wrong document,

25   Mr. Brafman, because he is not copied on this.

ICC5iss3                    Nicholson - cross

1              MR. BRAFMAN:  I will move on.

2    BY MR. BRAFMAN:

3    Q.  One of the trucks you talked about on direct examination

4    was truck 4870522?

5    A.  You are telling me a vehicle number, sir?  Can you put it

6    up on the screen, please?

7    Q.  I will move on to something that is a little easier,

8    Mr. Nicholson.

9    A.  Thank you.

10   Q.  Did you get communications, ever, as the manager of one of

11   the tri-borough district offices from Fred Neuhaus from

12   Philadelphia?

13   A.  Fred Neuhaus is --

14   Q.  Did you get it?

15   A.  Yes.

16   Q.  And during the period in the summer of 2014 in particular,

17   do you remember getting instructions from Mr. Neuhaus about

18   additional instructions on invoicing and parts?

19   A.  No, sir.  What I remember is --

20   Q.  Do you remember that?  Yes or no.

21   A.  No, sir.

22   Q.  I'm going to show you what is marked 312 and just ask if

23   that refreshes your recollection that you personally got this

24   from Mr. Neuhaus in the summer of 2014.

25              MR. SOLOWIEJCZYK:  Your Honor, if he could hand him

1    the document instead of describing it?

2            MR. BRAFMAN:  I didn't describe it.

3            THE COURT:  Well, actually, you did.

4            MR. BRAFMAN:  Okay.

5    BY MR. BRAFMAN:

6    Q.  Did you get that document?

7    A.  Let me read it, sir?

8            MR. SOLOWIEJCZYK:  Your Honor, the question is does it

9    refresh his recollection, not if he got it.

10           MR. BRAFMAN:  Well, that's the first question, if he

11   got it.

12           THE COURT:  Well, then you are not using it to refresh

13   his recollection.

14           MR. BRAFMAN:  I have to know if he got it before I can

15   use it to refresh his recollection.

16           THE COURT:  You can use the phone book to refresh his

17   recollection and he doesn't ever have to have read it.

18           MR. BRAFMAN:  You're right, but I'm not using it as a

19   phone book, I'm using it as correspondence.

20   BY MR. BRAFMAN:

21   Q.  Did you get it?

22   A.  My name is on the e-mail chain, sir.  I must have received

23   it.

24   Q.  Does it refresh your recollection as to what the subject

25   matter was that you were getting instructions from Mr. Neuhaus

ICC5iss3                     Nicholson - cross

1   in the summer of 2014?

2   A.   This --

3   Q.   Does this refresh your recollection as to what this e-mail

4   was about?

5           MR. SOLOWIEJCZYK:  Objection.  Your Honor.

6           THE COURT:  The objection is sustained.

7   Q.   Do you remember getting this?

8           MR. SOLOWIEJCZYK:  Objection.

9           THE COURT:  Sir.  All right.  He said he was on the

10  e-mail chain, therefore he must have gotten it.

11          It doesn't matter whether or not you remember, sir.

12  Does this e-mail refresh your recollection about the subject

13  that is discussed in the e-mail?

14          THE WITNESS:  No, sir.  No, ma'am.

15          THE COURT:  Jog your memory.

16          THE WITNESS:  Okay.

17          THE COURT:  Yes or no.

18          MR. BRAFMAN:  Not at all?

19          THE WITNESS:  No, sir.

20          THE COURT:  Okay.  Let's move on then.

21  BY MR. BRAFMAN:

22  Q.   Who was Mr. Neuhaus in the pecking order?

23  A.   Fred Neuhaus; he is in Philadelphia CMC from -- I don't

24  deal with him that often but normally if something exceeds my

25  spending limit or if I need additional bulk funding or

1   something that would cost over a certain amount of money, I

2   would have to notify Fred Neuhaus and get the bulk funding

3   authorized for the work before I could perform the work.

4   Q.  So you have had contact with him before?

5   A.  Yes, on occasion.

6   Q.  Of a limited nature?

7   A.  Yes.

8   Q.  So, getting an e-mail from Mr. Neuhaus, if you got one in

9   the summer of 2014, it would be somewhat unusual, would you

10  agree?

11  A.  Depending upon the content, sir.

12  Q.  And this content was a hot subject, was it not?

13  A.  I wouldn't know about that.  Something that exceeds my pay

14  grade.

15  Q.  What is your -- Never mind.  I don't want to go there.

16          Was there a procedure for getting additional work done

17  on vehicles and getting it approved for after hours?

18  A.  There is a procedure in place for approving additional

19  work, yes.

20  Q.  And, was this a policy established or presented to you by

21  the same Mr. Neuhaus?

22  A.  No, sir.

23  Q.  Did, in the summer of 2014, did he write to you about that?

24  A.  About a policy at my VMF?

25  Q.  No, about the policy for tri-borough.

1    A.  I don't recall, sir.

2    Q.  Let me show you the Exhibit 315 and see if it refreshes

3    your recollection about whether you received this e-mail in the

4    summer of 2014.

5    A.  Mr. Brafman -- can I respond?

6          THE COURT:  You should respond to his question.

7          THE WITNESS:  Okay.

8    BY MR. BRAFMAN:

9    Q.  Did you get that e-mail?

10   A.  No, I did not, sir.

11   Q.  Okay.  We will move on.

12         In July of 2014, do you remember if you were being

13   interviewed by Patrick Casey of OIG?

14   A.  Mr. Casey was the OIG agent that I reached out to.

15   Q.  And he was assigned to you, right?

16   A.  Yes, he was.

17   Q.  Did you have a conversation with him, if you recall, on

18   July 17, 2014?

19   A.  I had many conversations --

20   Q.  I'm asking you if you had a conversation with him on July

21   17th, 2014, if you recall.

22   A.  I don't -- I could have.

23   Q.  And, did you know whether Mr. Casey took notes when you

24   spoke to him?

25   A.  Yes, he did.

ICC5iss3                    Nicholson - cross

1    Q.  I am going to be referring to 3531-01 Mr. Solowiejczyk,

2    and -- I'm not offering it into evidence and I'm only going to

3    ask you to use it to refresh your recollection, if you need to.

4    Okay?

5              MR. SOLOWIEJCZYK:  Your Honor, he hasn't said anything

6    that he hasn't remembered.

7              THE COURT:  That's correct, so don't show him the

8    document.

9              MR. BRAFMAN:  I am just leaving it up there so I don't

10   have to walk back and forth.

11             THE COURT:  I don't want you leaving it up there,

12   Mr. Brafman.  If there comes a moment when he needs his

13   recollection refreshed, you are welcome to show it to him.  The

14   temptation for him to look at it instead of answering your

15   questions will simply be too great.

16             MR. BRAFMAN:  How about if I put it face down?

17             THE COURT:  Nope.

18   BY MR. BRAFMAN:

19   Q.  Okay.

20             Did you, on July 17, 2014, did you tell Mr. Casey that

21   your VMF is understaffed?

22   A.  I could have.

23   Q.  And, did you tell him that Mr. Issa has a 24-hour facility?

24   A.  I don't know if I mentioned that, sir.

25   Q.  Did you tell him that you were ordered to use Mr. Issa?

ICC5iss3                         Nicholson - cross

1   A.  Yes, I did.

2   Q.  And did you tell him that Mr. Issa had been given the

3   entire Brooklyn fleet?

4           MR. SOLOWIEJCZYK:  Your Honor, objection.  He is just

5   reading from the document.

6           MR. BRAFMAN:  I'm not.  I'm asking him if he said it.

7   Q.  Did you tell Mr. Casey that Mr. Issa had been given the

8   entire Brooklyn fleet to service?

9   A.  No, I don't believe I told him that.

10  Q.  Okay.  I would like to ask you to look at 3531-01 for

11  identification and look at the second page, the fourth full

12  paragraph, the first sentence.  Just read it to yourself.

13  A.  I'm sorry.  Where are we starting from, sir?

14  Q.  Page 3.

15  A.  Page 3?

16  Q.  Page 3.

17  A.  Okay.

18  Q.  The fourth full paragraph on that page, just read it to

19  yourself.

20  A.  Okay.

21  Q.  Did you read it to yourself?

22  A.  Yes, I did.

23  Q.  Does it refresh your recollection that you said to

24  Mr. Casey that Daimner had been awarded the entire Brooklyn

25  fleet on around May 19th, 2014?

1    A.   I don't believe I use the word "awarded," sir.

2    Q.   Okay.  So, it doesn't refresh your recollection, right?

3            THE COURT:  That would be correct.

4    Q.   Now, the contract I showed you before, Government Exhibit

5    105H, it is in evidence so I can put it up there if we can

6    light the screen, please?  We can zoom in on the date up on

7    top, the effective date is May 23rd, 2014, correct?

8    A.   For that document, yes.

9    Q.   But that's the contract that awarded your VMF to Mr. Issa,

10   correct?  We just went through this.

11   A.   Can I just see where it says that, sir?

12   Q.   Yes; on the second page.

13   A.   Okay.  Yes.

14   Q.   Do you see it?

15   A.   Yes, I see it, sir.

16   Q.   That's up on top, right?

17   A.   Yes, it is.

18            (Continued on next page)

19

20

21

22

23

24

25

ICCHIss4                        Nicholson - Cross

1    Q.  All right.  Now, you are telling Mr. Casey that you

2    understand that Mr. Daimner was awarded or got the Brooklyn

3    fleet around May 14, 2014, correct?

4    A.  I was telling Pat Casey that Mr. DeMaso was ordering us to

5    use Mr. Issa's company.

6    Q.  And the date you attached was May 19 of 2014, correct,

7    approximately, in your -- what you're reading to refresh your

8    recollection?

9    A.  That was July 17, 2014.

10   Q.  No, no, no, no, look at the paragraph we just read, what

11   you said, what you refreshed your recollection, that you've

12   been awarded the fleet May 19, 2014.  Do you see that?

13   A.  I see that, sir.

14   Q.  You remember saying that?

15   A.  Not awarded, no, sir.

16   Q.  What?

17   A.  Not awarded.

18   Q.  How about the date?

19   A.  I don't remember the date, sir.

20   Q.  Well, it's pretty close to the date of the contract, isn't

21   it?  If it's May 19, it's five days from the date of the

22   contract.

23   A.  What I remember --

24   Q.  Right, five days?

25   A.  OK.  Five days, yes.

ICCHIss4                          Nicholson - Cross

1   Q.  You never saw this contract until I showed it to you 15

2   minutes ago, right?

3   A.  That's correct.

4   Q.  Do you remember telling Mr. Casey on that date -- and if

5   you need to refresh your recollection, we'll let you use it,

6   but not until then -- do you remember telling him that you were

7   working at less than half staff to handle repairs?

8   A.  I had vacancies.

9   Q.  Did you tell that to Mr. Casey -- Mr. Casey that you had

10  been operating on a less than half staff?

11  A.  I could have, yes.

12  Q.  All right.  Was the post office undergoing a hiring freeze

13  at that time?

14  A.  We were trying to get additional staffing.  I don't know if

15  it was under the hiring -- hiring freeze at that time.

16  Q.  Did you tell -- withdrawn.

17       Did you tell Mr. Casey on that date that Mr. Issa was

18  complaining about people sabotaging his cars, his vehicles?

19  A.  From my facility, sir?

20  Q.  Did you tell Casey on that date that Mr. Issa was

21  complaining about people sabotaging his repair work?

22  A.  I don't recall, sir.

23  Q.  Look at the last page of the document and read it to

24  yourself on the first paragraph and see if it refreshes your

25  recollection as to whether you told Mr. Casey that.

ICCHIss4                         Nicholson - Cross

1    A.  I'm sorry.  The pages aren't numbered, sir.

2    Q.  I know.  It's the last page, so it's kind of easy.  It's

3    the top -- there are numbers on the bottom.  It says page 5 of

4    5.

5    A.  Oh, here we go.

6    Q.  Do you have the page?

7    A.  Yes, I have the page.

8    Q.  All right.  Read the first paragraph to yourself and tell

9    me whether or not it refreshes your recollection that among the

10   things you told Mr. Casey on that day was that USPS mechanics

11   were sabotaging work done by Mr. Issa.  Did you tell that to

12   Mr. Casey, that's the only question?

13          THE COURT:  No, the question is does it refresh your

14   recollection?

15   A.  No, it does not.

16   Q.  Does not.

17          Did Mr. Issa ever tell you that they were sabotaging

18   his cars, his trucks?

19   A.  Yes.

20          MR. SOLOWIEJCZYK:  Objection.

21          THE COURT:  Wait a minute.  The objection is

22   sustained.

23          MR. BRAFMAN:  Your Honor, this is --

24          THE COURT:  You know, I'm not prepared to have a

25   debate.  You asked what Mr. Issa told him.  The government

ICCHIss4                        Nicholson - Cross

1   objected.  The objection is sustained.

2   BY MR. BRAFMAN:

3   Q.  But you told -- this doesn't refresh your recollection that

4   you said it to Mr. Casey?

5           MR. SOLOWIEJCZYK:  Asked and answered, your Honor.

6           THE COURT:  The objection's sustained.  He said it

7   doesn't refresh his recollection.

8   Q.  Do you know, without telling us who told you, whether there

9   was concern expressed by anyone that Mr. Issa's trucks were

10  being sabotaged?

11          MR. SOLOWIEJCZYK:  Objection.  Hearsay.

12          THE COURT:  Objection's sustained.

13  Q.  Do you remember being directed by Philadelphia to have

14  approvals for additional work beyond the work order approved in

15  written emails?

16  A.  I don't recall, sir.

17  Q.  Never?

18  A.  No.

19          MR. BRAFMAN:  Well, let's see a particular invoice, if

20  we can.  If you could put up Government Exhibit 2063, please,

21  Mr. Concepcion, 2063A, and then we'll be using 2063B.  Thank

22  you.

23  Q.  Is this one of the invoices that you went through with

24  Mr. Solowiejczyk?

25  A.  It could be, sir.

ICCHIss4                        Nicholson - Cross

1    Q.  Well, would you accept the representation that this is the

2    one he put into evidence with you on the stand?

3    A.  It's -- it's a vehicle repair record, yes.

4    Q.  That you discussed with Mr. Solowiejczyk just yesterday?

5    A.  Yes, that's correct.

6    Q.  This one has a certain work order on the left-hand side,

7    correct?

8    A.  A certain work order, sir?

9    Q.  It has a work order on the left-hand side, correct?

10   A.  The complete document is a work order, sir.

11   Q.  But the work that was -- the truck that was given out, if

12   you look at the left-hand side, description of work to be

13   performed, correct?

14   A.  Yes, that's the work that my supervisor directed Daimner

15   Corporation, Hybrid, to perform on the vehicle.

16   Q.  And the supervisor is listed here in the top hand -- the

17   top segment as David Cox.

18           If you could focus in on the top quarter of the

19   document.

20   A.  That's Randy Cox.

21   Q.  Sorry, Randy Cox.

22           He's one of your supervisors, correct?

23   A.  That's correct.

24   Q.  He's authorized to do this, right?

25   A.  Yes, he is.

1          MR. BRAFMAN:  Now, could we put up the invoice 2063B,

2    and if we could go to the first quarter of the document.

3    Q.  Do you see Mr. Cox's name on the invoice?

4    A.  Yes, I do.

5    Q.  Does he still work for you?

6    A.  Mr. Cox, yes, he does.

7    Q.  Did you ever ask him whether he authorized this additional

8    work?

9    A.  He authorized a "B" inspection, sir.

10   Q.  Did you ever ask him why his name is listed on this side of

11   the document?

12         MR. SOLOWIEJCZYK:  Objection, your Honor.

13         THE COURT:  Objection's sustained.

14   Q.  Do you know whether he authorized the rest of this work,

15   yes or no?

16   A.  No.

17   Q.  Thank you.

18         Now, if we could show the balance on the invoice.  I'm

19   sorry, the whole invoice.

20         The item marked for $39.50, the headlights, do you see

21   that?

22         If we could focus in on that, that lower half of the

23   document.

24   A.  Towards the middle, sir?

25         MR. BRAFMAN:  I'm asking the technician to blow up the

1    lower half of this.  That's it.  And if we could blow up the

2    headlight entry, which is 39.90.

3    Q.  Now, do you see that are?

4    A.  39.50, sir.

5    Q.  39.50, yes, sir.

6    A.  Yes, I see that.

7    Q.  That's one of the items you said to Mr. Solowiejczyk was

8    not authorized, correct?

9    A.  That's correct.

10   Q.  And you shouldn't have been charged the 39.50, correct?

11   A.  That's correct.

12   Q.  And look at the balance of this invoice, correct?

13   A.  The balance?

14   Q.  Yeah, let's see the whole total.

15   A.  What do you mean by "balance"?

16   Q.  The whole total of the invoice.

17   A.  The dollar amount?

18   Q.  Yeah, the dollar amount.

19            If we go to the second page, the bottom, $2,919.82,

20   correct?

21   A.  That's correct, sir.

22   Q.  Do you know if the work was done?

23   A.  If the work was -- it was not authorized.

24   Q.  Do you know if they replaced the headlights and charged you

25   39.50 for real headlights?  Do you know, yes or no?

ICCHIss4                    Nicholson - Cross

1   A.  I don't know, sir.

2   Q.  So when the truck came back, no one went and turned on the

3   headlight to see if they worked?

4   A.  No, sir.

5   Q.  So this 39.50 that was charged against a $2,919 invoice was

6   never taken off the invoice when it was submitted to the post

7   office, right?

8   A.  No, it was never taken off.

9   Q.  Even though, according to you, it's not authorized

10  document -- not an authorized charge, correct?

11  A.  That's correct.

12  Q.  Because you were acting under the direction of OIG, right?

13  A.  I was under the direction and supervision of the OIG, but

14  it's more complicated than that, sir.

15  Q.  But you were under the direction of OIG as to how these

16  invoices would be handled, yes or no?

17  A.  I would give Mr. Issa work.

18  Q.  You were under the direction of OIG as to how these

19  invoices should be handled, yes or no?

20  A.  We would pay them, yes.

21  Q.  What?

22  A.  We would pay them, yes.

23  Q.  You were under the direction of OIG not to cancel any

24  charges?

25  A.  That's --

ICCHIss4                        Nicholson - Cross

1    Q.   Yes or no?

2    A.   No, that's incorrect, sir.

3    Q.   So you just paid them?

4    A.   We paid them, yes.

5    Q.   At the time you paid them, you, sir, you personally did not

6    believe it should be authorized, right?

7    A.   That is correct, sir.

8    Q.   All right.  Now, let's do one more.

9            If we could have Government Exhibit 2054D, as in

10   David.

11           Do you remember this document?

12   A.   Yes, I do, sir.

13   Q.   This is another invoice that you went through with

14   Mr. Solowiejczyk, correct?

15   A.   Yes, that's correct.

16   Q.   And it's the same supervisor, Randy Cox, who drew up this

17   work order, right?

18   A.   That's correct.

19   Q.   If we look at the invoice, it's 2054E, as in Edward -- can

20   we pull down where the invoice -- could it be made lower,

21   the -- I'm sorry, the higher portion first right under here.

22           Now, under brake service there you would normally

23   expect to see the name of a supervisor if it had been

24   authorized, correct?

25   A.   That's true.

ICCHIss4                        Nicholson - Cross

1    Q.   And there's no name there, right?

2    A.   Well --

3    Q.   Yes or no, there's no name there?

4    A.   There is no name there.

5    Q.   But if you look at the bottom of the invoice, please, the

6    last entry on the right-hand side, authorized by A. Cox,

7    Brooklyn VMF, and the date of when the vehicle came in,

8    correct, says it?

9    A.   That's what that document says, yes.

10   Q.   That document was submitted to you and the post office,

11   right?

12   A.   It's more complicated than that.

13   Q.   Was it submitted --

14          THE COURT:  Just answer.

15   Q.   -- as part of your investigation?

16   A.   Please, sir.

17          THE COURT:  Please, sir, just answer the question.  If

18   it's more complicated than that, some lawyer at the front table

19   will ask you about it.  Don't fight with Mr. Brafman.  Answer

20   his question.

21          THE WITNESS:  I don't mean to, your Honor.  I'm sorry.

22          THE COURT:  I know.  I realize you're tired and we're

23   all getting a little testy, but if you would just answer his

24   questions --

25          THE WITNESS:  OK.

ICCHIss4                        Nicholson - Cross

1              THE COURT:  -- it will go faster, I promise you.

2              THE WITNESS:  What was the question, sir?

3     BY MR. BRAFMAN:

4     Q.  It says "Authorized by A. Cox" on the face of the invoice?

5     A.  Yes, that's correct.

6     Q.  All right.  And as you sit here today, you can't tell us,

7     yes or no, whether Mr. Cox authorized this vehicle to be

8     repaired, correct?

9     A.  Could you rephrase that?

10    Q.  No, I'm not going to do that.  I'll move on.

11             Now, Mr. Issa first approached you in or about 2013 to

12    try and get some work, is that correct, if you know?

13    A.  When was this, sir?

14    Q.  Around 2013.

15             Are you OK do you want to take a brief --

16             MR. SOLOWIEJCZYK:  Brief break, your Honor.

17             THE COURT:  I think we should take a break.  OK.

18    Don't discuss the case.  Keep an open mind.

19             (Jury excused)

20             (Continued on next page)

21

22

23

24

25

1                   (Jury not present)

2                   THE COURT:  Mr. Nicholson, Mr. O'Neill is going to

3       take you back to a room, OK.  If you want a cup of coffee, a

4       cup of tea, whatever you want, I know you're exhausted.  I know

5       I understand this is an ordeal, OK.  I would like to get it

6       over with as soon as possible.  So let's get him whatever he

7       needs to help him calm down.

8                   THE LAW CLERK:  All right.

9                   (Witness temporarily excused)

10                  THE COURT:  Take a break.

11                  (Recess)

12                  MR. BRAFMAN:  Your Honor, I have not had this

13      experience in a while, but the witness, who is an adult male

14      who has been testifying for two days, I think the record should

15      reflect, started to sob.  And I don't want to cause this

16      witness health issues, and I don't want to proceed if the

17      witness can't go on.

18                  THE COURT:  Mr. O'Neill is an expert at dealing with

19      these kinds of situations.

20                  THE LAW CLERK:  I said nothing to him but give him

21      water and pretzels.

22                  THE COURT:  Mr. O'Neill is a task master at dealing

23      with these situations.  If Mr. Nicholson has a health situation

24      that we should be aware of, he will find out.

25                  MR. BRAFMAN:  Yes, ma'am.  Can we take five minutes?

ICCHIss4                          Nicholson - Cross

1           THE COURT:  You have to.  Don't have any choice.

2           (Recess)

3           THE COURT:  Case on trial continued.

4           MR. BRAFMAN:  Your Honor, under the circumstances,

5   after conferring with my client, I made the decision and he

6   agrees that when the jury comes back, I am going to say, I have

7   no further questions of Mr. Nicholson.  I don't want to ask

8   repetitive --

9           THE COURT:  I do want -- before Mr. Nicholson gets

10  back on the stand, I would like to say something to the jurors,

11  because I want to be absolutely sure that nobody holds this

12  against your client.  You were doing your job.

13          MR. BRAFMAN:  How would they hold it against my

14  client?

15          THE COURT:  If you don't want me to, I won't.

16          MR. BRAFMAN:  I don't want you to say that.  Don't

17  hold it against any of the parties, not me.

18          THE COURT:  OK.

19          MR. BRAFMAN:  But, your Honor, in terms of scheduling,

20  I was going to go to the end of the day with him.  I have that

21  much to do, and I'm not.  We have, I think -- I've offered to

22  stop now if they don't do a redirect.  They're insisting on

23  doing a redirect.

24          MR. SOLOWIEJCZYK:  We're going to do a short redirect.

25          THE COURT:  It will be short, I'm sure.

1      MR. BRAFMAN:  I am -- depending on their redirect, I

2 don't believe I'm going to be asking any questions.  We will

3 then be at about 3:15, 3:20.  There are two additional

4 witnesses who will be brief.  I don't say short because they're

5 not, but they'll be brief.

6      MR. SOLOWIEJCZYK:  One of them isn't as brief as you

7 think maybe.

8      MR. BRAFMAN:  Claudia?

9      MR. SOLOWIEJCZYK:  How long --

10      THE COURT:  Then you're going to put somebody else on

11 the stand, OK.

12      MR. BRAFMAN:  Yes, I know, but I just want you to

13 know --

14      THE COURT:  We'll go until about 4:45, OK.

15      MR. BRAFMAN:  But after the next witness and one after

16 that, the next one on the list is an accountant, and we did not

17 bring any of the materials for him.

18      THE COURT:  We're not going to get to that witness.

19      MR. BRAFMAN:  Thank you.

20      THE COURT:  I promise you that.  Don't worry.

21      MS. HANFT:  Your Honor, one of those two witnesses is

22 an immunity witness.

23      THE COURT:  Can we do that right now --

24      MR. WIRSHBA:  Sure.

25      THE COURT:  -- before we bring the jury back?

1          MR. WIRSHBA:  Yes.

2          THE COURT:  Let's do that right now.

3          MR. WIRSHBA:  She's on her way up, but if your Honor

4     wants to proceed, whatever your Honor prefers.

5          THE COURT:  All right.

6          (Pause)

7          THE LAW CLERK:  Come on up.

8     CLAUDIA BETANCOURT,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MR. WIRSHBA:

13    Q.  Ms. Betancourt, where did you last work?

14    A.  I invoke my Fifth Amendment privilege and refuse to answer

15    the question.

16    Q.  Did you work for Ibrahim Issa?

17    A.  I invoke my Fifth Amendment privilege and refuse to answer

18    the question.

19    Q.  Did you work for First Star Auto Repair?

20    A.  I invoke my Fifth Amendment privilege and invoke to --

21    refuse to answer the question.

22    Q.  Did you prepare the books and records for First Star Auto

23    Repair?

24    A.  I invoke my Fifth Amendment privilege and refuse to answer

25    the question.

ICCHIss4                           Betancourt - Direct

1   Q.  Did you prepare the books and records for other businesses

2   owned by Ibrahim Issa?

3   A.  I invoke my Fifth Amendment privilege and refuse to answer

4   the question.

5   Q.  Were you paid in cash during your time working for

6   Mr. Ibrahim Issa?

7   A.  I invoke my Fifth Amendment privilege and refuse to answer

8   the question.

9   Q.  Did you report that cash payment to the IRS?

10  A.  I invoke my Fifth Amendment privilege and refuse to answer

11  the question.

12          MR. WIRSHBA:  Your Honor, on November 14 of 2018, you

13  conditionally ordered immunity for this witness.  I would ask

14  that your Honor order that immunity at this time.

15          THE COURT:  OK.  The November 14 conditional order now

16  becomes operative.  Having ascertained that the witness does

17  not intend to answer any questions relating to the matters

18  herein, I confer immunity.

19          And, ma'am, you will be required to testify.

20          OK.  So we have to finish up with the witness.

21          MR. WIRSHBA:  Yes.

22          THE COURT:  All right.

23          MR. WIRSHBA:  Does your Honor require the original

24  order?

25          THE COURT:  Well, it should be part of the record.

ICCHIss4                        Betancourt - Direct

1              THE LAW CLERK:  Signed.

2              MR. WIRSHBA:  Yes.

3              THE COURT:  So we'll see you in a few minutes,

4    Ms. Betancourt.  Thank you.

5              If you could bring in the jury and the witness.  Bring

6    in the witness, then bring in the jury, OK.

7              (Witness temporarily excused)

8              (Witness resumed)

9              THE COURT:  Feel better?

10             THE WITNESS:  Thank you, your Honor.  I'm sorry.

11             THE COURT:  Don't worry.  I've been in that chair.

12   It's a very stressful experience.  I don't want to go back

13   there.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Sir, you're still under oath.

3          MR. BRAFMAN:  Your Honor, under the circumstances, I'm

4     going to dispense with any further cross-examination.

5          THE COURT:  Thank you, Mr. Brafman.

6          Does the government have any redirect?

7          MR. SOLOWIEJCZYK:  Briefly, your Honor.

8     JAMES NICHOLSON, resumed,

9     REDIRECT EXAMINATION

10    BY MR. SOLOWIEJCZYK:

11    Q.  Mr. Nicholson, I know it's been a long day, so I just have

12    a few more questions for you.

13    A.  Yes.

14    Q.  You were asked a few questions about your visit to the

15    Kingsland Avenue facility.  Do you recall that you went there?

16    A.  Yes, that's correct.

17    Q.  And you took photographs when you went there, is that

18    right?

19    A.  Yes, I did.

20    Q.  Actually, I have to use the ELMO, sorry.

21          Is this one of the photographs you took that day,

22    Mr. Nicholson?

23    A.  Yes, it is.

24    Q.  When you went to that facility, did you see any mechanics

25    or staff present?

ICCHIss4                         Nicholson - Redirect

1    A.  No, I did not.

2    Q.  Were you able to access the various vehicles that were

3    present at the facility?

4    A.  I didn't enter into the vehicles, but I did see them there.

5    Q.  Did anybody ask you to identify yourself?

6    A.  No, not at all.

7    Q.  You had visited other facilities, Mr. Nicholson?

8    A.  Yes, I had.

9    Q.  Unico, Jamaica Rack?

10   A.  Yes.

11   Q.  At those facilities, had you been able to just freely

12   access those vehicles without anybody asking you who you were?

13   A.  When I went into the other vendors, there was always

14   someone there to say, "Can I help you?"  They wanted to know

15   who I was and what I was doing there.

16   Q.  Mr. Nicholson, you were shown a number of invoices on

17   cross-examination.  I just want to show you one or two of

18   those.

19   A.  Sure.

20        MR. SOLOWIEJCZYK:  If we could pull up 2049B, as in

21   boy.

22   Q.  Do you recall being asked about this on cross-examination

23   by Mr. Brafman?

24   A.  Yes.

25   Q.  Now, Mr. Nicholson, I just have a few questions for you

ICCHIss4                      Nicholson - Redirect

1    about this invoice.  First of all, if we could focus on the

2    wheel alignment entry that's in the middle of the right side.

3    A.  Yes, I see it.

4           MR. BRAFMAN:  Your Honor, I asked no questions about

5    wheel alignment.

6           MR. SOLOWIEJCZYK:  He asked about this document.

7           THE COURT:  The objection's overruled.

8    Q.  Do you recall on direct testimony discussing this specific

9    charge?

10   A.  Yes, I do.

11   Q.  Do you recall whether this specific charge was authorized

12   by the USPS work order?

13   A.  This work order -- this charge was not, no, sir.

14   Q.  To do a wheel alignment -- actually, if we could zoom out.

15          On the left-hand side of this document, there's a

16   bunch of parts listed, right?

17   A.  Yes, there are.

18   Q.  To do a wheel alignment, would the USPS have had to supply

19   any parts?

20   A.  No, not at all, sir.

21   Q.  I think you were also asked about the top right-hand

22   portion of this document, the very top right where it says:

23   "Vehicle came in 02/28/15, PMI "B" service, Brooklyn VMF,

24   Noel"?

25   A.  Yes.

ICCHIss4                        Nicholson - Redirect

1    Q.  Does the vendor write that or the USPS write that on the

2    document?

3    A.  The vendor writes that on the document.

4    Q.  The fact that this document says that, does that tell you

5    whether or not all the work on the invoice was authorized?

6    A.  No, it does not.  I go by the vehicle commercial repair

7    order.

8    Q.  And the commercial repair order, is that a USPS document?

9    A.  Yes, sir, it is.

10   Q.  This document is a document provided by the vendor?

11   A.  That's correct.

12   Q.  Now, I think you mentioned situations where the vendor

13   would identify additional work that might need to be performed?

14   A.  That's correct.

15   Q.  That's supposed to be on the work order as well?

16   A.  On the original document, the commercial repair order.  See

17   that, that document along with this document comes back to my

18   facility.  The supervisor -- this is the additional steps that

19   happen.  This document and the commercial repair order come

20   back to the supervisor that initiated it, and my supervisor

21   would review it.  And if it was correct, it would go up to my

22   clerk.  He would also notify me if there was any issues with

23   the invoice.  My clerk would then put it into SEAM, affix a

24   number to it, and he would normally sign it.

25   Q.  And SEAM, is that the billing system?

ICCHIss4                      Nicholson – Redirect

1   A.  Yes, it's solution for enterprise management system.

2             MR. SOLOWIEJCZYK:  If we could put up Government

3   Exhibit 1019.

4   Q.  Is this an invoice from First Star Auto Repair?

5   A.  Yes, it is.

6   Q.  Is it to your VMF?

7   A.  No, this is --

8   Q.  See top left where it says "Brooklyn VMF"?

9   A.  That's for Morris Park Avenue -- Brooklyn, yes.

10  Q.  If we could look at -- there's an entry towards the bottom

11  right, and we could zoom out and zoom back in on the bottom

12  right, do you see there's an entry that says, "Power steering

13  line"?  Do you see that?

14  A.  Oh, yes, I see that.

15  Q.  And then next to that it says, "OK by VMF Noel"?

16  A.  I see that.

17  Q.  What does that tell you, if anything?

18  A.  That tells me that Daimner wrote a line item on there and

19  put Mr. Noel's name on that as being OK'd, but --

20  Q.  Mr. Noel's name is only next to that one line item, is that

21  right?

22  A.  That is correct, sir.

23            MR. SOLOWIEJCZYK:  You can take that down.  If we

24  could put up 2063A.

25  Q.  Do you recall being shown this by Mr. Brafman on

ICCHIss4                          Nicholson - Redirect

1  cross-examination?

2  A.  Yes, I do.

3          MR. SOLOWIEJCZYK:  And then 2063B, the invoice --

4  actually, 2063A, if we could keep it up for a second.

5  Q.  Mr. Nicholson, do you use a document like this one in

6  deciding whether or not to approve an invoice and pay it?

7  A.  Yes.

8  Q.  And there's a stamp on here that says "VMAS" put on the

9  center of the screen.  What does that mean?

10  A.  VMAS was the old system.  In order to have my clerk record

11  the -- record the amounts of the charges and the invoice,

12  the -- there's a number on the top there that they input in.

13  It was signed by GR, George Richardson.  He's one of my

14  employees.

15  Q.  Are you responsible for taking these invoices, taking these

16  work orders, and deciding whether they get paid or not?

17  A.  Yes, I am.

18  Q.  Do you just look at what the invoice says or do you look at

19  the work order?

20  A.  You have to look at them together, because it's not

21  complete without both documents.

22          MR. SOLOWIEJCZYK:  If we could put up 2063B.

23  Q.  Do you recall being asked about this invoice as well,

24  Mr. Nicholson?

25  A.  Yes, sir.

ICCHIss4                        Nicholson – Redirect

1   Q.  In particular, I think you were asked -- the right-hand

2   side middle there's a headlights charge.  Do you remember being

3   asked about that?

4   A.  Yes, I do.

5           MR. SOLOWIEJCZYK:  If you could zoom in on that,

6   Mr. Concepcion.  You can take that down.

7   Q.  Typically, when headlights are repaired, would a new

8   headlight have to be provided, or does it depend?

9   A.  It depends on a lot of things.

10  Q.  Mr. Nicholson, you were asked some questions about a VMRA

11  agreement, and you were shown some documents by Mr. Brafman.

12  Do you recall that?

13  A.  Yes.

14  Q.  If a vendor has a VMRA agreement with the United States

15  Postal Service, does that mean you're required to use them over

16  another vendor?

17  A.  No, sir, not at all.

18  Q.  Were you ever under that impression at any time?

19  A.  No, sir, not at all.

20          MR. SOLOWIEJCZYK:  One moment, your Honor.

21  Q.  There was a document shown to you that showed funding

22  amounts that had been allocated.

23  A.  Yes.

24  Q.  Do you recall that?

25  A.  Yes.

ICCHIss4                          Melchner - Direct

1   Q.  If funding is allocated, are you required to spend it?

2   A.  No, I'm not.

3            MR. SOLOWIEJCZYK:  No further questions.

4            THE COURT:  Mr. Brafman?

5            MR. BRAFMAN:  No, your Honor.  Thank you.

6            THE COURT:  Sir, you may step down.  Thank you.

7            THE WITNESS:  Thank you, your Honor.  I can leave?

8            THE COURT:  Yes.

9            (Witness excused)

10           THE COURT:  Call your next witness, please.

11           MS. HANFT:  The government calls Charles Melchner.

12  CHARLIE MELCHNER,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15  DIRECT EXAMINATION

16  BY MS. HANFT:

17  Q.  Good afternoon, Mr. Melchner.  How old are you?

18  A.  Fifty.

19  Q.  And where do you live?

20  A.  Carmel, New York.

21  Q.  Where do you work?

22  A.  Mahopac Marina.

23  Q.  What is Mahopac Marina?

24  A.  Boat sales, service, and storage facility, marina on the

25  water.

ICCHIss4                       Melchner - Direct

1    Q.  What do you do there?

2    A.  I run it.

3    Q.  How long have you worked at Mahopac Marina?

4    A.  My whole life, forever.

5    Q.  Who owns the Mahopac Marina?

6    A.  I do.

7    Q.  In the course of your work at the Mahopac Marina, have you

8    come across an individual named Ibrahim Issa?

9    A.  Yes.

10   Q.  Do you know him by any other name?

11   A.  Tony, Tony Issa.

12   Q.  Do you see that individual in the courtroom today?

13   A.  Yes.

14   Q.  Would you please identify him by describing an article of

15   clothing he's wearing and pointing to where he's sitting.

16   A.  I -- the gray suit.

17              THE COURT:  There's a lot of people wearing a gray

18   suit.  Is there anything that distinguishes him from the

19   others?

20              THE WITNESS:  White shirt.

21              THE COURT:  Mr. Issa.

22              THE WITNESS:  I'm sorry.

23   BY MS. HANFT:

24   Q.  In what capacity did you come across Mr. Issa?

25   A.  He had bought a boat from us and had it serviced at the

ICCHIss4                         Melchner - Direct

1   Marina and kept it at a spot with us.

2   Q.  Approximately when did he buy his boat from the Marina?

3   A.  I don't know the exact year.  I'd say probably ten years

4   ago maybe.

5   Q.  For how long has he been storing his boat at Mahopac

6   Marina?

7   A.  The whole time.

8   Q.  What kind of boat is it?

9   A.  Pontoon boat.

10  Q.  Would you describe what it looks like.

11  A.  A flat deck with lots of, like, couch chairs around on it.

12  Big, round pontoons that are in the water.  Kind of looks like

13  a floating living room.

14  Q.  I'm going to show you what's in evidence as Government

15  Exhibit 418.  Just take a look at your screen and it should

16  show up.

17  A.  Yep.

18  Q.  Do you recognize this photograph, sir?

19  A.  That -- yes, I can see the Marina in the background, and

20  that's his boat right there, yes.

21  Q.  When you say "his boat," who are you referring to?

22  A.  Mr. Issa.

23  Q.  Do you recognize any of the individuals in this photograph?

24  A.  I believe -- only person I think I know on there is I

25  believe that's his son on the left-hand side, I think.

ICCHIss4                          Melchner - Direct

1    Q.  I'm sorry.  You may have said this.  I know you told us you

2    recognize this marina.  Do you recognize this boat?

3    A.  Yes, yeah.

4    Q.  Whose boat is it?

5    A.  Mr. Issa's boat.

6    Q.  About how often does Mr. Issa come to the marina?

7    A.  Honestly, I don't know.  We don't have to be there for him

8    to be there, so I wouldn't know how often.  I mean, I'd see him

9    occasionally.  Depends on the season, you know.  This summer,

10   not a lot of people on their boats.  It rained a lot.  It

11   varies by weather.  And because we don't have to be there, he

12   could come at any time.  He could be there after hours, before,

13   during.

14   Q.  Have you ever met any of his family members?

15   A.  I'm not aware of who they are.  I don't know.  I could have

16   met them, but I wouldn't know if I did or did not.

17   Q.  Have you ever seen him come to the marina with other

18   individuals?

19   A.  Sure.

20   Q.  Do you know who those individuals are?

21   A.  No.

22   Q.  Do you know if he ever held a work event on his boat?

23   A.  I wouldn't know.  He comes with people all the time.  I

24   don't know who they are, so I wouldn't know.

25   Q.  Do you know what Mr. Issa does for a living?

ICCHIss4                          Melchner - Direct

1  A.  I'm sorry.  One more time.

2  Q.  Do you know what he does for a living?

3  A.  Not for -- I believe he owned a gas station is what I had

4  thought, but I don't know any more than that.  And that's what

5  I believed through -- maybe through conversation at one time.

6  Q.  What kinds of things does Mr. Issa do when he comes to the

7  marina?

8          Just a few more questions, your Honor.

9          THE COURT:  I would hope it would be very few.

10 A.  Just go on -- going on the boat.

11 Q.  Does he store his boat there year-round?

12 A.  Yes.

13 Q.  Thank you.

14         I'm just going to show you -- if your Honor could read

15 Government Exhibit 4009 which is a stipulation, paragraph 5.

16         THE COURT:  If called as a witness at trial, a

17 custodian of records from the Mahopac Marina would testify that

18 Government Exhibit 601, including all parts and subdivisions

19 thereof, are true and correct copies of records of the Mahopac

20 Marina; that the original records were made at or near the

21 time, by or from information transmitted by a person with

22 knowledge of the matters set forth in the records; that they

23 were kept in the ordinary course of the Mahopac Marina's

24 regularly conducted business activity; and that it was the

25 regular practice of that business activity to make the records.

ICCHIss4                      Melchner - Cross

1              MS. HANFT:  The government offers Government

2     Exhibit 601.

3              MR. BRAFMAN:  No objection, Judge.

4              THE COURT:  Admitted.

5              (Government's Exhibit 601 received in evidence)

6              MS. HANFT:  Could we just publish Government

7     Exhibit 601 briefly.

8     Q.  Mr. Melchner, could you just explain what this document is.

9     A.  A receipt for payment he had made to the marina.

10    Q.  And is this the address of your marina at the top?

11    A.  Yes.

12             MS. HANFT:  If we could please publish what's already

13    in evidence as Government Exhibit 251C, which is from a cell

14    phone belonging to Ibrahim Issa.

15             No further questions for this witness, your Honor.

16             MR. BRAFMAN:  Can I ask one question from here.

17             THE COURT:  Of course.

18             MR. BRAFMAN:  Thank you, ma'am.

19    CROSS-EXAMINATION

20    BY MR. BRAFMAN:

21    Q.  Do you know whether or not Mr. Issa ever uses the boat to

22    entertain people who are in his business?

23    A.  I wouldn't have any way to know that.

24             MR. BRAFMAN:  Thank you very much.

25             THE WITNESS:  You're welcome.

ICCHIss4                          Betancourt - Direct

1          THE COURT:  Thank you for coming down.

2          THE WITNESS:  OK.  Thank you so much.

3          (Witness excused)

4          THE COURT:  Call your next witness, please.

5          MR. WIRSHBA:  Your Honor, the government calls

6    Ms. Claudia Betancourt.

7    CLAUDIA BETANCOURT,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. WIRSHBA:

12   Q.  How old are you, Ms. Betancourt?

13   A.  Thirty-six.

14   Q.  Are you currently working?

15   A.  No.

16   Q.  When you last worked, what company did you work for?

17   A.  Delorean Inc.

18   Q.  And who owned Delorean?

19   A.  Mr. Issa.

20   Q.  Who hired you for that position?

21   A.  Mr. Issa.

22   Q.  For how long did you work for Mr. Issa?

23   A.  For about six years.

24          (Continued on next page)

25

ICC5iss5                        Betancourt - direct

1    BY MR. WIRSHBA:

2    Q.  When did you stop working?

3    A.  On March 2018.

4    Q.  While you were working for Mr. Issa, at what location did

5    you spend most of your time?

6    A.  I used to work at 813 Morris Park Avenue, then at 3424

7    Eastern Avenue.

8    Q.  Fair to say most of your time was spent at 813 Morris Park?

9    A.  Yes.

10   Q.  When you first started working there, what year was it?

11   A.  2012.

12   Q.  And at that time when you first started, who else was

13   working at 813 Morris Park?

14   A.  No one.

15   Q.  Well, who was your boss?

16   A.  Mr. Issa and Daniela.

17   Q.  Who is Daniela?

18   A.  Mr. Issa's wife.

19   Q.  Do you know her full name?

20   A.  Yes.

21   Q.  What is it?

22   A.  Daniela Silva.

23   Q.  And who would you get direction from, on a daily basis,

24   while working at 813 Morris Park?

25   A.  Daniela.

ICC5iss5                          Betancourt - direct

1    Q.  Did Mr. Issa and Daniela work at 813 Morris Park?

2    A.  No.

3    Q.  So how did you get direction from them?

4    A.  Over the phone and e-mails.

5    Q.  What types of businesses did you understand Mr. Issa had at

6    that time?

7    A.  Convenience store gas stations and repair shop and gas

8    stations.

9    Q.  Ms. Betancourt, did you receive a subpoena to be in court

10   today?

11   A.  Yes.

12   Q.  Are you testifying under an immunity order?

13   A.  Yes.

14   Q.  From the Court?

15   A.  Yes.

16   Q.  What do you understand that immunity order to do?

17   A.  The order forces me to testify because it forces me to

18   testify, also protect me by forbidding the government from

19   using my testimony against me in any way.

20   Q.  Is it your understanding that the immunity order protects

21   you from prosecution using evidence other than your testimony

22   here?

23   A.  Yes.

24   Q.  Is it your understanding that the immunity protection

25   happens from things outside of this courtroom or only from

ICC5iss5                          Betancourt - direct

1   things that happen inside this courtroom?

2   A.   Only inside here.

3   Q.   And what happens if you were to lie inside this courtroom?

4   A.   If I lie during my testimony, I can be prosecuted for lying

5   on the stand.

6   Q.   Are you reading from something when you say that,

7   Ms. Betancourt?

8   A.   Yes.

9   Q.   Okay.  Did anyone help you to prepare that?

10  A.   My lawyer.

11  Q.   But do you believe it to be true, that if you lie you could

12  be prosecuted?  Is that right?

13  A.   Yes.

14  Q.   Okay.

15          Now, what type of work were you doing when you first

16  started at 813 Morris Park?

17  A.   Bookkeeping, office manager.

18  Q.   And when you say bookkeeping and office manager, tell me

19  the types of tasks that you would do while you were at 813.

20  A.   A lot of office work, doing bank control, checking all the

21  banks on a daily basis making sure the banks were not negative,

22  that everything was covered, going through a lot of mails,

23  making payments, doing payroll.  Everything that has to do with

24  office work.

25  Q.   And while you were working at 813 Morris Park, did you ever

ICC5iss5                           Betancourt - direct

1    meet Ibrahim Issa in person?

2    A.  Yes.

3    Q.  Do you recognize him in court today?

4    A.  Yes.

5    Q.  Can you point him out and identify an article of clothing

6    that he is wearing?

7    A.  He is --

8              MR. BRAFMAN:  Can we stipulate to the identification,

9    Judge?  She worked for him for six years.

10             THE COURT:  Mr. Issa is identified.  Let's move on.

11             MR. WIRSHBA:  Yes, your Honor.

12   BY MR. WIRSHBA:

13   Q.  Are you familiar with Optimum Grocery Store,

14   Ms. Betancourt?

15   A.  Yes.

16   Q.  What is Optimum Grocery Store?

17   A.  It is a gas station convenience store.

18   Q.  And who owns Optimum Grocery Store?

19   A.  Mr. Issa.

20   Q.  Where is optimum located?

21   A.  1990 Bronxdale Avenue, Bronx, New York.

22   Q.  What brand of gas station is Optimum?

23   A.  It's a Mobil gas station.

24   Q.  Have you been there?

25   A.  Yes.

ICC5iss5                          Betancourt - direct

1    Q.  Is there a convenience store there?

2    A.  Yes.

3    Q.  So, how are the different ways that Optimum Grocery Store

4    made money?

5    A.  From the gas sales and the sales of the store.

6    Q.  Did the employees at Optimum keep records of the daily

7    sales?

8    A.  Yes.

9    Q.  What do you recall those records of the daily sales?

10   A.  The sales report.

11   Q.  I would like to take a look at Government Exhibit 772,

12   which is already in evidence.  Do you see that on your screen,

13   Ms. Betancourt?

14   A.  Yes.

15   Q.  How do you know -- what is this document?

16   A.  This is the Mobil sales report.

17   Q.  And when you say Mobil, what do you mean by that?

18   A.  The Optimum Grocery Store.

19   Q.  How can you tell that this particular sales report is from

20   Optimum Grocery Store?

21   A.  It says Bronxdale Avenue, Mobil on top.

22   Q.  And, do you see that there is a date on the top right

23   corner of this document?

24   A.  Yes.  8/11/2012.

25   Q.  And whenever there would be a sales report like this, would

ICC5iss5                          Betancourt - direct

1   there always be a date at the top?

2   A.   Yes.

3   Q.   And were employees at Optimum required to fill out sales

4   reports every day?

5   A.   Yes.

6   Q.   And is it your understanding that the Optimum employees

7   would fill these out during the day as they went about

8   Optimum's business?

9   A.   Yes.

10  Q.   And where were these sales reports sent after they were

11  filled out?

12  A.   To the office.  813 Morris Park Avenue.

13  Q.   And that's where you worked, right?

14  A.   Yes.

15  Q.   And you relied on them in keeping the records of Optimum;

16  is that right?

17  A.   Yes.

18  Q.   Why were Optimum employees required to fill out reports

19  like this every day?

20  A.   To keep a record of everything, all the purchases and

21  everything, you know, that was purchased and paid out of the

22  store, the store sales.

23  Q.   Why is it important to keep records of the purchases and

24  the things that are paid out of the store?

25  A.   To make sure that everything is accurate and everything is

ICC5iss5                              Betancourt - direct

1   where it is supposed to be and nobody is stealing or nothing is

2   being done incorrectly.

3   Q.  Mr. Concepcion, if we could go to page 4 of this PDF?

4           Do you recognize this, Ms. Betancourt?

5   A.  Yes.

6   Q.  Is this another one of those sales reports?

7   A.  Yes.

8   Q.  Where is this one from, is it also from Optimum?

9   A.  Yes.

10  Q.  What's the date on this particular sales report?

11  A.  9/4/2012.

12  Q.  Do you see where it says "Mr. Abrahim" at the top?

13  A.  Yes.

14  Q.  Who is that?

15  A.  One of the employees at the station.

16  Q.  I see a section called Paid Outs on the left-hand side.  Do

17  you see that?

18  A.  Yes.

19  Q.  And what are the things that are listed there under Paid

20  Outs?

21  A.  Mr. Tony, N.L. Foods.

22  Q.  What does it mean if there is something under the heading

23  Paid Outs?

24  A.  That is being Paid Out.  That is being paid out.

25  Q.  What do you mean by it is being paid out?

ICC5iss5                           Betancourt - direct

1    A.  Money is being taken out to pay out to someone.

2    Q.  And where does that money come from when it is being paid

3    out?

4    A.  From the daily sales.

5    Q.  Is it coming from the cash register?

6    A.  Yes.

7    Q.  Or from somewhere else in the business?

8    A.  From the cash register.

9    Q.  Okay, you mentioned that one of the things here, it says

10   paid out is Mr. Tony; is that right?

11   A.  Yes.

12   Q.  What does that mean, that Mr. Tony is listed on the Paid

13   Outs?

14           MR. KIRSHNER:  Objection.

15           THE COURT:  Overruled.

16   BY MR. WIRSHBA:

17   Q.  You can answer the question, Ms. Betancourt.

18   A.  It means it was set apart for either payment -- it was an

19   authorization for payment.

20   Q.  Who authorized the payment?

21   A.  Mr. Tony.

22   Q.  And if it says Mr. Tony, does that mean that he was

23   involved in actually paying it out?

24           MR. KIRSHNER:  Objection.

25           THE COURT:  I'm sorry.  Ground?

ICC5iss5                         Betancourt - direct

1          MR. KIRSHNER:  She didn't write it.

2          THE COURT:  Objection is overruled.

3    BY MR. WIRSHBA:

4    Q.  If it says "Mr. Tony," does that mean he was involved in

5    the decision of whether to pay that out?

6    A.  Of he paying it himself to someone?  I don't know if he

7    took the money and paid himself but he authorized someone to do

8    it and that's the way they explained it there.

9    Q.  Okay.  So, who else could have actually done the paying out

10   if it was authorized by Tony?

11   A.  Any of the employees at the location.

12   Q.  Okay.  Let's zoom out.  Mr. Concepcion, if you could zoom

13   in on cash drops?  What are cash drops, Ms. Betancourt?

14   A.  Cash drop means that's the money going inside the safe.

15   Q.  Do the cash drops, does that include the money that's been

16   paid out?

17   A.  No.

18   Q.  So, if money is paid out, that means it's not included in

19   cash drops?  Am I right about that?

20   A.  Yes.

21   Q.  So, after the money went into the safe, what would the

22   managers do with it?

23   A.  Money was supposed to be taken to the bank.

24   Q.  And these sheets, you testified earlier that they would

25   eventually reach your office at 813 Morris Park, right?

ICC5iss5                        Betancourt - direct

1    A.   Yes.

2    Q.   When these sheets got to the office, what would you do with

3    them?

4    A.   Review them and make sure that everything is accurate.

5    Q.   Would you check the Paid Outs column -- if we could zoom

6    out, Mr. Concepcion?

7    A.   Yes.

8    Q.   How would you check the Paid Outs column?

9    A.   Go through the receipts, make sure that everything has a

10   receipt and everything was dated for that day, same amount.

11   Q.   If it says Mr. Tony, how would you check that entry?

12   A.   I will call and make sure that he authorized that.

13           MR. WIRSHBA:  Your Honor, at this time the government

14   would like to read a portion of a stip, if your Honor would

15   indulge us?  It is stipulation 4009, particular paragraph 15.

16           THE COURT:  If called as a witness at trial, a

17   custodian of records from First Star Auto Repair, Inc., doing

18   business as Daimner Corporation, would testify that Government

19   Exhibit 614, 615, 702, 704A, 705A, 7 15(a), 715B, 716A, 717A,

20   718A, 719A, 7 23(a), 724A, 728A, 752A, 753A, 754A, 771, 773,

21   775, 801A through C, and 1001 through 1053, including all parts

22   and subdivision thereof, as well as Defendant's Exhibit 500

23   through 530, are true and correct copies of records of First

24   Star, that the original records were all made at or near the

25   time by or with information transmitted by a person with

ICC5iss5                        Betancourt - direct

1    knowledge of the matters set forth in the records, that they

2    were kept in the ordinary course of First Star's regularly

3    conducted business activity, and that it was the regular

4    practice of that business activity to make the records.

5              MR. WIRSHBA:  Your Honor, at this time the government

6    would offer, and excuse me for repeating what you just said,

7    Government's Exhibits 614, 615, 702, 704A --

8              MR. KIRSHNER:  No objection to all of them.

9              THE COURT:  We need it in the record.  Everything that

10   I just read -- does that include the 30 defense exhibits as

11   well?

12             MR. WIRSHBA:  No, your Honor.

13             THE COURT:  So, the government is offering the

14   government's exhibits from paragraph 15 of the stipulation.

15             MR. WIRSHBA:  Yes, your Honor.

16             THE COURT:  Defendant's Exhibit 500 through 530 are

17   established as business records of First Star.  Okay, so the

18   government has offered its group of exhibits from that

19   stipulation.  They're admitted.

20             MR. WIRSHBA:  Thank you, your Honor.

21             (Government's Exhibits 614, 615, 702, 704A, 705A, 7

22   15(a), 715B, 716A, 717A, 718A, 719A, 7 23(a), 724A, 728A, 752A,

23   753A, 754A, 771, 773, 775, 801A, 801B, 801C, and 1001 through

24   1053,  received in evidence)

25   BY MR. WIRSHBA:

ICC5iss5                            Betancourt - direct

1    Q.   Are you familiar with First Star Auto Repair,

2    Ms. Betancourt?

3    A.   Yes.

4    Q.   What is First Star Auto Repair?

5    A.   It is a gas station and repair shop.

6    Q.   Where is First Star Auto Repair located in?

7    A.   1982 Bronxdale Avenue, Bronx, New York.

8    Q.   What brand of gas station is it?

9    A.   It is a Getty gas station -- Citgo gas station.

10   Q.   Is it a Getty or a Citgo?

11   A.   It is a Citgo gas station.

12   Q.   Did people have a name for that location that they called

13   First Star Auto Repair on Bronxdale?

14   A.   Getty.

15   Q.   They called it the Getty?

16   A.   Yes.

17   Q.   Are you sure when you said earlier that it was a Citgo?  Is

18   it a Citgo?

19   A.   They just changed the brand, the name.

20   Q.   Okay.  So people still called it the Getty; is that right?

21   A.   Yes.

22   Q.   And have you been there?

23   A.   Yes.

24   Q.   How many times have you been there, approximately?

25   A.   Many times possible in six years.

ICC5iss5                      Betancourt - direct

1   Q.  Who owns First Star Auto Repair, as best you know?

2   A.  Mr. Issa.

3   Q.  Was there a convenience store at First Star Auto Repair?

4   A.  No.

5   Q.  How did First Star Auto make money?

6   A.  Out of the repair work, jobs, and the gas commissions.

7   Q.  Did the employees of First Star keep records of the daily

8   sales of the gas?

9   A.  Yes.

10  Q.  I would like to take a look at Government Exhibit 771 in

11  evidence, if you don't mind, Mr. Concepcion.

12          Do you recognize this document?

13  A.  Yes.

14  Q.  What is it?

15  A.  It's the gas -- the sales -- daily sales report for the

16  Getty.

17  Q.  And how do you know that this is for the Getty?

18  A.  It says Bronxdale.

19  Q.  And is the Getty also First Star Auto Repair?

20  A.  Yes.

21  Q.  Were employees at First Star Auto Repair required to fill

22  out forms just like this one?

23  A.  Yes.

24  Q.  And did they fill it out at or near the date that's at the

25  top right of the form?

ICC5iss5                           Betancourt - direct

1    A.  Yes.

2    Q.  Did they fill it out -- how often did the employees of

3    First Star Auto Repair fill out these sheets?

4    A.  Daily.

5    Q.  Where were the First Star sales reports sent after they

6    were made?

7    A.  To the office on 813 Morris Park Avenue.

8    Q.  Did you rely on these reports in order to keep track of the

9    books and records of the company?

10   A.  Yes.

11   Q.  Does it seem like a fair and accurate copy of this report?

12   A.  Yes.

13   Q.  Let's take a look at page 23 of this particular pdf which

14   is Government Exhibit 771.

15          Can you tell from this particular document when

16   Government Exhibit 771 was filled out?

17   A.  10/22/2012.

18   Q.  I see a name to the left, I see "Samir."  Do you see that,

19   Ms. Betancourt?

20   A.  Yes.

21   Q.  Who is Samir?

22   A.  He is the gas attendant.

23   Q.  Does this sales report have a Paid Out section like the

24   Optimum one we looked at earlier?

25   A.  Yes.

ICC5iss5                         Betancourt - direct

1   Q.   Can you read out the first four items in the Paid Out

2   section?

3   A.   Gas, towing, Tony, Tony gas.

4   Q.   So, what does it mean that there is an entry for gas here?

5   A.   Gas, they put gas on anyone that was doing something for

6   them, for the shop.  Any -- they put gas to probably anyone

7   that was doing something for the repair shop.

8   Q.   So, if an employee of First Star Auto Repair put gas in a

9   truck for the shop, how would that be recorded on these daily

10  gas sheets?

11  A.   I'm sorry.  Can you ask that again?

12  Q.   Of course.

13          If a First Star Auto Repair employee put gas into a

14  struck for First Star, how would that be reported on these

15  daily gas sheets?

16  A.   Gas.

17  Q.   And what's the next item on the daily sales report here?

18  A.   Towing.

19  Q.   The one after that?

20  A.   Tony.  Tony gas.

21  Q.   If it said Tony, is that the same sort of situation we are

22  dealing with in Optimum when it said "Mr. Tony?"

23  A.   Yes.

24  Q.   So what does it mean that Tony is listed here for $300 on

25  the sales report?

ICC5iss5                          Betancourt - direct

1   A.   That he authorized something for $300.

2   Q.   And what does Tony's gas mean for $56?

3   A.   Gas was either put on his card -- gas was put on his card

4   for $56.

5   Q.   And would these forms, just like the ones from Optimum,

6   would they eventually make their way back to the office?

7   A.   Yes.

8   Q.   Would you check to verify the accuracy of these forms?

9   A.   Yes.

10  Q.   If it said Tony, how would you verify these forms?

11  A.   I would call Mr. Issa and ask if it's okay.

12  Q.   What about Tony gas?

13  A.   I wouldn't -- I didn't verify that.

14  Q.   You wouldn't have verified any entry for gas?

15  A.   I mean, if it said "Tony gas" I knew he was probably around

16  and he would probably go and put gas.  It didn't happen, like,

17  on a daily basis so I didn't call and verify that.

18  Q.   Can we publish, Mr. Concepcion, but only to the Court and

19  the parties, Government Exhibit 710, which is an e-mail from

20  Ms. Silva, 2012?

21       The government offers Government Exhibit 710 at this

22  time.

23       MR. KIRSHNER:  One moment, your Honor?  (pause)  No

24  objection.

25       THE COURT:  Admitted.

ICC5iss5                        Betancourt - direct

1          (Government's Exhibit 710 received in evidence)

2     BY MR. WIRSHBA:

3     Q.  Mr. Concepcion, can we go to the pdf on page 3?  Actually,

4     going back to page 1, I apologize, and can we publish this to

5     the jury?  It is published.  Could we go to pdf page 3 and

6     could you zoom in on the section that says monies that you are

7     taking from stations.  Okay.  Let's return to the first page

8     for a second.  Mr. Concepcion, if you could focus in on it the

9     top portion that shows the e-mails?  You can take that down.

10    Thank you.

11         Ms. Betancourt, when you first started in 2012, did

12    you have any daily duties having to do with First Star's bank

13    accounts?

14    A.  Yes.

15    Q.  What did you do?

16    A.  I checked the bank -- go online, check the bank accounts

17    daily, do like a bank control knowing that the checks that went

18    out, checks that had been paid, checks that are outstanding

19    that still need to be paid, how much is needed in the bank.

20    Q.  And did the bank controllers, did they include the cash

21    deposits from First Star Auto Repair?

22    A.  Yes.

23    Q.  Did the bank controllers reflect the payouts from the First

24    Star cash register that you discussed earlier?

25    A.  No.

ICC5iss5                        Betancourt - direct

1   Q.  At some point, would you ever combine the bank controllers

2   into another document?

3   A.  Yes.

4   Q.  What were those combined documents?

5   A.  They were different spreadsheets so that whatever payouts

6   was on the sheet they would go into another spreadsheet on the

7   same DSR, on the same form.

8   Q.  Take a look in your book if you don't mind, it is sitting

9   right next to you, at Government Exhibit 715?

10  A.  715?

11  Q.  715; yes, ma'am.

12  A.  Okay.

13  Q.  What is Government Exhibit 715?

14  A.  It is an e-mail.

15  Q.  Who is it from?

16  A.  From me.

17  Q.  And who is it to?

18  A.  To Tony Issa.

19  Q.  Can you just look at 715A, very briefly?  Is that the

20  attachment to this e-mail?

21  A.  Yes.

22          MR. WIRSHBA:  Your Honor, at this time the government

23  offers Government Exhibit 715.  715A is already in evidence.

24          MR. KIRSHNER:  No objection.

25          THE COURT:  Admitted.

ICC5iss5                        Betancourt - direct

1              (Government's Exhibit 715 received in evidence)

2    BY MR. WIRSHBA:

3    Q.  Can we put Government Exhibit 715 on the screen, please?

4              Who is this e-mail from now that we are looking at it?

5    A.  From me, from Claudia.

6    Q.  Who is it to?

7    A.  To Tony.

8    Q.  Is anyone cc'd on this e-mail?

9    A.  Daniela.

10   Q.  And can you read the content of this e-mail?

11   A.  "Tony, is this form okay?"

12   Q.  Do you see an attachment to this e-mail?

13   A.  Yes.

14   Q.  Let's take a look at Government Exhibit 715A, in evidence.

15             Is this the attachment to the e-mail?

16   A.  Yes.

17   Q.  What is this document?

18   A.  This is the First Star expenses, 2012.

19   Q.  And, are these expenses organized in any particular way?

20   A.  Expenses.  They're listed -- they are --

21   Q.  Let me withdraw the question.

22             Is this first page, is this related to any particular

23   period of time for First Star Auto Repair?

24   A.  The January 2012.

25   Q.  Let's look at the next page, Ms. Concepcion, if we could.

1    What time period is this page for?

2    A.   February.

3    Q.   So, what does each individual page represent?

4    A.   An expense.

5    Q.   Each page represents one expense?

6    A.   Oh, no.  No.  You mean each page?  Each month.

7    Q.   All right.  Who filled out this particular document?

8    A.   I did.

9    Q.   And, did you create the form on which you filled out?

10   A.   No.

11   Q.   Do you know who created that form?

12   A.   No.

13   Q.   Do you know who created these categories under expenses?

14   A.   No, I didn't -- well, it was there when I got there.  The

15   format was there, I just figured it out.

16   Q.   When you say you filled it out, what portion of this did

17   you fill out?

18   A.   The amounts.

19   Q.   The dollar figures?

20   A.   The dollar figure, yeah.

21   Q.   Where did you get this information from, the dollar

22   figures?

23   A.   From the bank.

24   Q.   When you say from the bank, what do you mean by you got

25   them from the bank?

ICC5iss5                         Betancourt - direct

1   A.  From our bank controller, which is the same information on

2   the banks on the bank statements.

3   Q.  So, how did you view the bank statements?

4   A.  How I did the bank statements?

5   Q.  How would you view the bank statements?

6   A.  On a daily basis.

7   Q.  You looked them up where?  On the computer?

8   A.  Online.

9   Q.  On the computer.  Okay.

10            And who decided where to put the individual entries

11  for each expense?

12  A.  I don't --

13  Q.  I will ask it a different way.  When you saw an expense on

14  the bank records, whose decision was it to put it in a

15  particular category for this particular document?  Did you do

16  that?

17  A.  Yeah, I did that.  I filled it out.

18  Q.  And you decided which category to put it in; is that right?

19  A.  Yeah.  If it's rent, rent.  Yes.

20  Q.  What are the things that are listed on the bottom here?  Do

21  you see the bottom?  Can you focus in on that, underneath the

22  total?

23  A.  Yes.

24  Q.  What are those things?

25  A.  Marnic Group, parking, circle lubricants, total

ICC5iss5                          Betancourt - direct

1    withdrawals, payroll withdrawals.

2    Q.  Why are those payments separated from the payments at the

3    top?

4    A.  Because there was not a category for that.

5    Q.  And the payouts information that we looked at on the sales

6    sheets earlier for First Star Auto Repair, was that reflected

7    anywhere in these monthly reports?

8    A.  No.

9    Q.  Let's take a look at a couple of months, let's start with

10   April, which I believe is page 4 of this pdf.

11            Is this the monthly expense report for April?

12   A.  Yes.

13   Q.  Let's focus in on the bottom of that other section below

14   the total.  Do you see where it says Tony's taxes for 1628?

15   A.  Yes.

16   Q.  What does that mean?

17   A.  Tony's taxes.

18   Q.  Were those the business' taxes?

19   A.  I'm not sure.

20   Q.  Well, if it says Tony's taxes, who would have wrote that?

21   Is that you?

22   A.  Probably I did.

23   Q.  Do you see where it says William Wolfson/dentist?

24   A.  Yes.

25   Q.  Whose dentist was that?

1   A.  Mr. Issa.

2   Q.  Let's take a look, quickly, at Government Exhibit 3507A

3   which is already in evidence, at page 19 of that.

4          Is it a bank statement for the First Star Auto Repair?

5   A.  Yes.

6   Q.  Is this for April of 2012?

7   A.  Yes.

8   Q.  And would you frequently review bank statements in the

9   course of your duties?

10  A.  Physical bank statements?  No.

11  Q.  You would look at the same information online?

12  A.  Online.

13  Q.  Let's look at page 20 of this pdf.  Do you see where it

14  says April 5th, a purchase for William Wolfson, DMD, PC?

15  A.  Yes.

16  Q.  Do you see another charge on April 6 for William Wolfson

17  just slightly further down?  Do you see another charge there on

18  April 6?

19  A.  Yes.

20  Q.  How much were these two charges for?

21  A.  $1, 550.

22  Q.  And if we could look at page 2 of the document looking at

23  the whole document?  Do you see another charge there towards

24  the bottom on April 30th, for William Wolfson?

25  A.  Yes.  Yes.

ICC5iss5                          Betancourt - direct

1    Q.  Let's go back to Government Exhibit 715A, if we could, pdf

2    page 4.  Zooming in again on the bottom, what does it say is

3    the total amount for William Wolfson?

4    A.  $3,050.

5    Q.  Also down here on the bottom it says here Tony's parking

6    $460.  Do you see that?

7    A.  Yes.

8    Q.  What is that?

9    A.  Tony's parking spot for his car.

10   Q.  And where was that parking spot?

11   A.  On his building.

12   Q.  What do you mean his building?

13   A.  Where he lives.

14   Q.  Where he lived.

15            Do you know where that was?

16   A.  Yes.

17   Q.  Where was that?

18   A.  On 72nd Street.

19   Q.  Can we publish Government Exhibit 3507Q in evidence?  Can

20   we zoom in on the check?  Who is this check to?

21   A.  Quik Park.

22   Q.  Who is it from?  What business?

23   A.  First Star Auto Repair, Inc.

24   Q.  For how much?

25   A.  $460.

ICC5iss5                              Betancourt - direct

1    Q.   How often was this amount paid out of First Star Auto

2    Repair's bank accounts?

3    A.   Monthly.

4    Q.   Let's go back to Government Exhibit 715A if we could,

5    Mr. Concepcion, and now let's look at page 7.

6             Ms. Betancourt, what month is this?

7    A.   July.

8    Q.   Let's go back to the bottom of the page again and zoom in.

9    Do you see where it says Tony's parking?

10   A.   Yes.

11   Q.   Is that the same amount that we just discussed?

12   A.   Yes.

13   Q.   What about dentist, which is a little higher up?  What's

14   that?

15   A.   The same amount for the dentist.

16   Q.   What about Tony's rent, what's that?

17   A.   His rent.

18   Q.   His rent for where?

19   A.   Where he lives.

20   Q.   Let's take a look at Government Exhibit 3507Y, that is in

21   evidence.  Zooming in on the check, who is this a check to?

22   A.   Solow.

23   Q.   Do you know what that is?

24   A.   That's the management for the building.

25   Q.   And for how much is it?

ICC5iss5                        Betancourt - direct

1    A.  $3,999.

2    Q.  What does it say in the memo line?  For what?

3    A.  Rent, Issa A, 20A.

4    Q.  Who signed this check?

5    A.  Aliya.

6    Q.  Who is that?

7    A.  Tony's mom.

8    Q.  And for what bank account did this come out of?

9    A.  First Star Auto Repair, Inc.

10   Q.  Let's go back to Government Exhibit 715A in July, so that

11   is page 7, thank you, Mr. Concepcion, focusing on the bottom

12   again.

13           Do you see the entry where it says marina and Canopus

14   Island?

15   A.  Yes.

16   Q.  Do you know what that is?

17   A.  It is a marina.

18   Q.  Do you know what was at the marina?

19   A.  I'm sorry?

20   Q.  Do you know what was at the marina?

21   A.  A boat.

22   Q.  Whose boat?

23   A.  Mr. Issa.

24   Q.  Let's take a look at Government Exhibit 3507J in evidence.

25   Who is this check made out to?

ICC5iss5                          Betancourt - direct

1    A.  Mahopac Marina.

2    Q.  For how much?

3    A.  $1,800.

4    Q.  From which account?

5    A.  First Star Auto Repair, Inc.

6    Q.  What does it say it's for?

7    A.  Boat.

8    Q.  What's the name of the person who signed the check?

9    A.  Aliya.

10   Q.  Did Aliya sign this check?

11   A.  No.

12   Q.  Who signed this check?

13   A.  I did.

14   Q.  Why did you sign in Aliya's name?

15   A.  Because she was the signer at the bank.

16   Q.  Who told you to do that?

17   A.  Mr. Issa.

18   Q.  Let's go back to Government Exhibit 715A and let's go to

19   pdf, page 8.  What month is this?

20   A.  August.

21   Q.  Let's focus in on the bottom again.  Is Tony's rent the

22   same?

23   A.  Yes.

24   Q.  Is Tony's parking the same?

25   A.  Yes.

ICC5iss5                          Betancourt - direct

1   Q.  Do you see where it says "Ray Chung" and then question

2   parks?

3   A.  Yes.

4   Q.  Do you know who Ray Chung is?

5   A.  No.

6   Q.  Who wrote those question marks?

7   A.  I did.

8   Q.  Let's take a look at Government Exhibit 3507X which is

9   already in evidence.  Can we focus in on the check?  Thank you,

10  Mr. Concepcion.

11          So, who was this check made out to?

12  A.  Ray Chung.

13  Q.  And for how much?

14  A.  $4,250.

15  Q.  From what account did this come out of?

16  A.  First Star Auto Repair, Inc.

17  Q.  Focusing on the bottom left of the check, can you see what

18  this check was for?

19  A.  50 percent payment for exhaust system, and plus hood

20  installation for commercial kitchen.

21  Q.  You have been to First Star Auto Repair, haven't you?

22  A.  Yes.

23  Q.  On numerous occasions?

24  A.  Sorry?

25  Q.  On many occasions?

1   A.  Yes.

2   Q.  Did you visit in 2013?

3   A.  Yes.

4   Q.  What about in 2012 when this check is from?  I apologize.

5   A.  Yes.

6   Q.  Did you ever see a commercial kitchen at First Star Auto

7   Repair?

8   A.  No.

9   Q.  Was there a kitchen of any kind at First Star Auto Repair?

10  A.  No.

11  Q.  Let's go back to Government Exhibit 715A and we will get

12  page 9 of the pdf.  What month is this?

13  A.  September.

14  Q.  Do you see where it says "legal" in the green expenses at

15  the left side?

16  A.  Yes.

17  Q.  How much is listed there for legal?

18  A.  $594.66.

19  Q.  Ms. Betancourt, are you familiar with a Gun Hill Road

20  service station?

21  A.  Yes.

22  Q.  What was the Gun Hill Road service station?

23  A.  I believe it was a gas station.  I never worked at that

24  time.

25  Q.  Who owned the service station?

ICC5iss5                          Betancourt - direct

1    A.  Mr. Issa.

2    Q.  And, in 2012 did Mr. Issa still own the Gun Hill Road

3    service station?

4    A.  I'm not sure.  I don't know.  I don't think it exists at

5    that time.

6    Q.  I'm sorry, you don't think --

7    A.  I don't think the station was open at that time.

8    Q.  Was there anything that you did related to the Gun Hill

9    Road service station?

10   A.  Yes.

11   Q.  Let's take a look in your book at what's been marked as

12   Government Exhibit 728.  Do you see that?

13   A.  728?

14   Q.  728; yes, ma'am.

15          Do you see that?

16   A.  Yes.

17   Q.  What is that?

18   A.  This is an e-mail.

19   Q.  And who is it from and who is it to?

20   A.  From me, to Daniela.

21          MR. WIRSHBA:  At this time the government offers

22   Government Exhibit 728.

23          MR. KIRSHNER:  No objection.

24          (Government's Exhibit 728 received in evidence)

25   BY MR. WIRSHBA:

ICC5iss5                        Betancourt - direct

1    Q.  If we can put Government Exhibit 728 on the screen,

2    focusing on the bottom e-mail, if we can focus on that?  Who is

3    this e-mail from?

4    A.  From Daniela.

5    Q.  Who is it to?

6    A.  To me.

7    Q.  Can you read the e-mail?

8    A.  Claudia, I told you I need the summary of monies paid for

9    Gun Hill case only for 2013 but it's wrong.  I need for all

10   expenses paid for this case, since the beginning.

11   Q.  When she says "this case," do you know what she was talking

12   about?

13   A.  There was a lawsuit.

14   Q.  And is that lawsuit related to Gun Hill Road service

15   station?

16   A.  Yes.

17   Q.  Remind me again, who is Daniela Silva at the top?

18   A.  Tony's wife.

19   Q.  Is she also your boss?

20   A.  Yes.

21   Q.  And it says mail to Zagnolli.  Do you know what Zagnolli

22   is?

23   A.  No.

24   Q.  Was that Ms. Silva's e-mail, though, Zagnolli@me.com?

25   A.  Yes.

1    Q.  What date is this from?

2    A.  October 20th, 2014.

3    Q.  Okay, let's look at the top e-mail.  Focusing on the top

4    e-mail, who is this from?

5    A.  From me to Daniela.

6    Q.  And again, Daniela is Mr. Issa's wife?

7    A.  Yes.

8    Q.  And what does this e-mail say?

9    A.  As per your request, please find attached summary of

10   expenses paid for Gun Hill lawsuit.  Call me to discuss if you

11   have any questions.

12   Q.  Is there an attachment to this e-mail?

13   A.  Yes.

14   Q.  Let's take a look at Government Exhibit 728A, which is in

15   evidence.

16           Is this the attachment to this e-mail?

17   A.  Yes.

18   Q.  Focusing in on the left side, that table, if we could, what

19   is this?

20   A.  This is the checks and breakdown, the breakdowns of who it

21   was paid to.

22   Q.  Who it was paid to for what?

23   A.  This is in relationship to the Gun Hill lawsuit.

24   Q.  Who prepared this document?

25   A.  I did.

ICC5iss5                          Betancourt - direct

1    Q.  And where did you get the information?

2    A.  From files in the office.

3    Q.  I want to focus your attention where it says 2 September,

4    let's see if we can zoom in on just that entry, 2 September, it

5    is in the middle of the page.  Can we zoom out and kind of zoom

6    in so we can get it bigger for Ms. Betancourt?

7           What does it say for 2 September?

8    A.  Veritext transcripts.

9    Q.  And what's the amount?

10   A.  $594.66.

11   Q.  And what is the check number?

12   A.  Check 2794.

13   Q.  Let's take a look at Government Exhibit 3507B in evidence,

14   can we look at the check and zoom in?

15          Who is this check to?

16   A.  Veritext New York reporting.

17   Q.  I'm sorry.  I didn't mean to cut you off, Ms. Betancourt.

18   Did you finish reading that?

19   A.  Yes.

20   Q.  And from what account is it drawn?

21   A.  First Star Auto Repair, Inc.

22   Q.  How much is it for?

23   A.  $594.66.

24   Q.  Let's go back to Government Exhibit 715A and pdf page 9.

25   Is this September again?

ICC5iss5                         Betancourt - direct

1    A.  Yes.

2    Q.  Let's focus in on that legal expense that we were just

3    looking at earlier.  What is the amount for that legal expense?

4    A.  $594.66.

5    Q.  How is the Gun Hill Road service station lawsuit related to

6    First Star Auto Repair?

7              MR. KIRSHNER:  Objection.

8              THE COURT:  The objection is overruled.

9    BY MR. WIRSHBA:

10   Q.  You can answer the question, Ms. Betancourt.

11   A.  He -- the same owner.

12   Q.  But First Star Auto Repair, it didn't own Gun Hill Road

13   service station, right?

14   A.  No.

15   Q.  Mr. Issa did?

16   A.  Yes.

17   Q.  Take a look in your book at Government Exhibit 716.  What

18   is Government Exhibit 716?

19   A.  This is an e-mail.

20   Q.  From whom to whom?

21   A.  From me, Claudia, to Daniela.

22             MR. WIRSHBA:  Your Honor, at this time the government

23   offers Government Exhibit 716.

24             MR. KIRSHNER:  Can I have it up on the screen?  No

25   objection.

ICC5iss5                          Betancourt - direct

1          THE COURT:  Admitted.

2          (Government's Exhibit 716 received in evidence)

3   BY MR. WIRSHBA:

4   Q.  Can we publish it to the jury, please?  Who sent this

5   e-mail, Ms. Betancourt?

6   A.  I did.

7   Q.  Who did you send it to?

8   A.  To Daniela.

9   Q.  It says there Daniela Zagnolli; is that the same Daniela we

10  have been talking about?

11  A.  Yes.

12  Q.  What's the date that this e-mail was sent?

13  A.  February 22, 2013.

14  Q.  And what's the subject of this e-mail?

15  A.  2012, First Star expenses.

16  Q.  Is there an attachment to this e-mail?

17  A.  Yes.

18  Q.  Let's take a look at Government Exhibit 716A, which is in

19  evidence.  Is that a similar report to the one we were just

20  looking at?

21  A.  Yes.

22  Q.  Was this report sent on the date of the e-mail we just

23  looked at, Government Exhibit 716?

24  A.  Yes.

25  Q.  And this was sent at a later date than on the earlier

ICC5iss5                         Betancourt - direct

1    reports we were looking at earlier, right?

2    A.   Yes.

3    Q.   This one is from February 2013?

4    A.   Yes.

5    Q.   Do you remember when the last one was from?  Let's put up

6    Government Exhibit 715, briefly.

7            Was the last monthly expense report we were looking at

8    attached to this e-mail?

9    A.   January 2013.

10   Q.   Okay, so going back to Government Exhibit 716A, this was

11   the one that was prepared in February, right?

12   A.   Yes.

13   Q.   Let's jump to page 7 in the pdf, Government Exhibit 716A.

14   What month is this?

15   A.   July.

16   Q.   And I see that there is expenses written at the bottom

17   here.  Are those expenses similar to the ones that we saw on

18   the last expense report?

19   A.   Yes.

20   Q.   I would like to put this page of Government Exhibit 716A

21   next to Government Exhibit 715A so we have Government Exhibit

22   716A on the left and we are going to put Government Exhibit

23   715A on the right.

24            So, there is one on the left side, this is from

25   February 2013, right?

ICC5iss5                        Betancourt - direct

1   A.   Which one is this?

2   Q.   The one on the left side, is that --

3             THE COURT:   The left one is the one that's longer?

4   One of them is shorter than the other one, right?   The left and

5   right thing is, you know --

6             MR. WIRSHBA:   I understand it is difficult, your

7   Honor.   That's why I am just trying to --

8             THE COURT:   But, I mean, I am looking at two things

9   and one of them is longer, physically longer than the other

10  one.   That's a real easy way.

11            MR. WIRSHBA:   Absolutely.

12  BY MR. WIRSHBA:

13  Q.   So the longer one on the left, that's from February of

14  2013, right?

15  A.   February.

16  Q.   Government Exhibit 715A, if we can turn to the same month

17  which is July, which is page 7 and the one on the right, that

18  one is from January of 2013, right?

19  A.   Okay.   Yes.

20  Q.   So, let's look at, on the right side, we are going to look

21  at Tony's rent expense?

22            THE COURT:   Do you guys get this.

23            THE JURY:   Uh-huh.

24            THE COURT:   You do?   Fine.   Oh, I'm not following so I

25  am obviously having issues with my sanity or something.

ICC5iss5                          Betancourt - direct

1           MR. KIRSHNER:  It says July, your Honor.

2           MR. WIRSHBA:  Your Honor, if I may have a moment?

3           THE COURT:  Sure, Mr. Wirshba.  Offered January, July,

4   left, right.  It is always easiest to put a number at the

5   bottom of each page, thereby identifying each page really

6   clearly.

7           MR. WIRSHBA:  We will be sure to do that the next

8   time, your Honor?

9           THE COURT:  Oh good.  You could even do it now.

10          MR. WIRSHBA:  I'm not sure we can do it now and be

11  able to publish it everyone so we swill have to struggle along

12  with what we have.

13  BY MR. WIRSHBA:

14  Q.  On the left let's put exhibit 716 and on the right put

15  Government Exhibit 715.

16          THE COURT:  This is the left as we are looking at the

17  screen?

18          MR. WIRSHBA:  The left as we are looking at the

19  screen, correct.

20  Q.  On the left, Ms. Betancourt, that's from February of 2013,

21  right?

22  A.  Yes.

23  Q.  And on the right, that's from January of 2013.  Am I right

24  about that?

25  A.  Yes.

ICC5iss5                          Betancourt - direct

1    Q.  So, the one on the left was sent a month later; is that

2    right?

3    A.  Yes.

4    Q.  Now let's go to Government Exhibit, let's put on the left,

5    let's put Government Exhibit 716A at page 7, and on the right

6    let's go Government Exhibit 715A at page 7.

7              So, I am right, Ms. Betancourt, these are both for

8    July, right?

9    A.  Yes.

10   Q.  The one on the left, it was sent out in January of 2013,

11   right?

12   A.  Yes.

13   Q.  And the one on the right, that was sent out in February of

14   2013.  Am I right about that?

15   A.  Yes.

16   Q.  Nope.  I screwed that up.  I apologize?

17             THE COURT:  AAAGH.

18             MR. WIRSHBA:  I apologize, your Honor.

19   Q.  The one on the --

20             THE COURT:  Do me a favor.

21             MR. WIRSHBA:  Yes, your Honor.  Of course.

22             THE COURT:  Ma'am, look at the one on the left.  Can

23   you see a date on this document?

24             MR. WIRSHBA:  Your Honor, I don't believe there is a

25   date identifying the date that it was sent.

ICC5iss5                         Betancourt - direct

1          THE COURT:  But is there a month?  Is there something

2    on the document -- see, this is also not a leading question.

3    Is there something on the document that identifies --

4          MR. WIRSHBA:  There is not, your Honor.

5          THE COURT:  A date or a time?  Then I've got the wrong

6    documents on my screen.

7          MR. WIRSHBA:  They both say July.

8          THE COURT:  They do, that's correct.  They say July.

9    No wonder we are confused.

10          MR. WIRSHBA:  Fair enough.

11    BY MR. WIRSHBA:

12    Q.  All right.  We are back to Government Exhibit 716 and 715.

13    Okay?  The one on the left is from February, right,

14    Ms. Betancourt?

15    A.  February, yes.

16    Q.  The one on the right, that's from January?

17    A.  January.

18    Q.  Okay.  Now let's go to page 7 of 716 and page 7 of 715A.

19    The one on the left, that was sent around later than the one on

20    the right, right?

21    A.  Yes.

22          THE COURT:  How can you tell that?

23          THE WITNESS:  Because he just presented the first

24    pages first when the e-mail was sent out.

25          THE COURT:  Okay.  So you can tell that one of these

ICC5iss5                         Betancourt - direct

1    was sent in January and one of these was sent in February?

2               THE WITNESS:  Yes.

3               THE COURT:  Which one was sent in January?

4               We are all getting a lull punchy here, Ms. Betancourt.

5               THE WITNESS:  The one that was in January was the

6    right one.

7               THE COURT:  It the one on the right side of the screen

8    and the one sent in February is on the left side of the screen?

9               THE WITNESS:  On the left side, yes.

10              THE COURT:  Thank you.

11              MR. WIRSHBA:  I think we have it, your Honor.  May I

12   proceed?

13              THE COURT:  I hope so.

14   BY MR. WIRSHBA:

15   Q.  Ladies and gentlemen, focusing in on the one on the right

16   side from January, the things at the bottom there, who put

17   those things down at the bottom?

18   A.  I did.

19   Q.  For Tony's rent, how much does it say?

20   A.  $3,999.

21   Q.  Now let's look at the one on the left side there, February

22   of 2013.  Do you see that same expense down at the bottom?

23   A.  No.

24   Q.  Take a look at the entire page.  Do you see that expense

25   anywhere in the top section?

ICC5iss5                        Betancourt - direct

1   A.  City office rent.

2   Q.  On the bottom of the right do you see where it says Tony's

3   parking for $460?

4   A.  Yes.

5   Q.  Take a look at the one on the left.  Do you see that

6   expense for Tony's parking on the left-hand side?

7   A.  No.

8   Q.  What about in the top section?

9   A.  It is included in the truck parking rent.

10  Q.  Truck parking rent.

11          One more, let's go to the bottom of the one on the

12  right.  Do you see where it says dentist?

13  A.  Yes.

14  Q.  What was that again?

15  A.  Tony's dentist.

16  Q.  Let's look at the one on the left side.  Do you see that

17  expense on the one on the left side on the bottom?

18  A.  No.

19  Q.  Do you see it in the section at the top?

20  A.  The amount, yes.

21  Q.  And where is that?

22  A.  Health insurance.

23  Q.  Who worked on these spread sheets in early 2013?

24  A.  Myself and Daniela.

25  Q.  Do you remember moving these expenses from the bottom into

ICC5iss5                        Betancourt - direct

1    the categories?

2    A.   I don't recall exactly moving them.

3    Q.   Is that something that you would have done on your own?

4    A.   No.

5    Q.   Why would you have done that?

6    A.   I'm sorry?

7    Q.   Why would you have done that?

8    A.   Because I put it on the bottom because it didn't fit in

9    there, it didn't fit the categories, it didn't --

10   Q.   So, if it got into categories, who could have done that?

11   A.   Probably myself or Daniela.

12   Q.   Let's look at just Government Exhibit 716A and stop with

13   the comparing and let's look at pdf page 13.  What is this

14   page, Ms. Betancourt?

15   A.   January to December total expenses, 2012.

16   Q.   And what were the total expenses for 2012 for First Star

17   Auto Repair?

18   A.   I'm sorry?

19   Q.   What were the total expenses?

20   A.   $438,444.47.

21   Q.   Let's take a look at in your binder Government Exhibit 718.

22   A.   I'm sorry?  7?

23   Q.   718.  Do you see that in your binder?

24   A.   Yes.

25   Q.   What is that?

ICC5iss5                              Betancourt - direct

1     A.  An e-mail.

2     Q.  Who is this from and who is it to?

3     A.  From Daniela to Joe Sanchez.

4           MR. WIRSHBA:  The government offers Government Exhibit

5     718.

6           MR. KIRSHNER:  No objection.

7           THE COURT:  Admitted.

8           (Government's Exhibit 718 received in evidence)

9     BY MR. WIRSHBA:

10    Q.  Let's publish that to the jury focusing on the top, the

11    to/from section.

12          Who is this from?

13    A.  From Daniela.

14    Q.  Again that's Daniela Silva, the same person?

15    A.  Yes.

16    Q.  Who is it to?

17    A.  To Joel Sanchez.

18    Q.  Who is Joe Sanchez?

19    A.  The accountant.

20    Q.  Can you read the first -- sorry, whose accountant?

21    A.  Mr. Issa.

22    Q.  Can you read first paragraph there, "Hi Joe," and then the

23    first paragraph?

24    A.  Hi Joe.  Attached is the 2012 expenses and bank accounts'

25    summaries for First Star Auto Repair.  I am resending it to you

1   as per your request.

2   Q.  Let's take a look at Government Exhibit 718A, which is in

3   evidence.  Is this the attachment to that e-mail?

4   A.  Yes.

5   Q.  What is this page?

6   A.  This is First Star Auto Repair 2012 expenses.

7   Q.  For the entire year?

8   A.  Yes.  Looks like it.

9   Q.  Where does this information come from?

10  A.  From the monthly expenses.

11  Q.  Let's look at the next page of 718A, if we could.  If you

12  will zoom in on that a little bit so we can see it?

13          What is this document?

14  A.  This is the bank -- the bank monthly -- monthly bank

15  accounts money that went in, into the bank.  First Star Auto

16  Repair.

17          (Continued on next page)

18

19

20

21

22

23

24

25

ICCHIss6                              Betancourt - Direct

1    Q.   From what company?

2    A.   From First Star gas account.

3    Q.   Who created this document?

4    A.   Daniela.

5    Q.   All right.  Let's take that down.

6             Did First Star Auto Repair own trucks while you were

7    working there?

8    A.   Yes.

9    Q.   What about in 2012?  Did First Star Auto Repair own any

10   trucks?

11   A.   I -- I think, yeah.

12   Q.   How many trucks do you think First Star Auto Repair may

13   have owned in 2012?

14   A.   2012?

15   Q.   When you first started working there in 2012.

16   A.   Oh, when I first started, they didn't own no trucks.

17   Q.   All right.  And the vehicles that First Star Auto Repair

18   repaired, how would First Star get them to the shop?

19   A.   Towing, towing the vehicles or getting to -- repair service

20   the vehicle where the vehicle was stuck.

21   Q.   So if they were towed in 2012, would one of Mr. Issa's

22   companies have done the towing when you first got there?

23   A.   When I first, no.

24   Q.   Let's look at Government Exhibit 771 in evidence, page 33.

25   I'm sorry, not page 33.  I apologize.  Let's look at page 23.

ICCHIss6                          Betancourt - Direct

1    Apologies.

2              All right.  Is this the same daily sales report we

3    looked at earlier?

4    A.  Yes.

5    Q.  And this is from 10/22/12?

6    A.  Yes.

7    Q.  All right.  Let's focus in on the paid out section at the

8    top.

9    A.  Yes.

10   Q.  First of all, for which gas station does this particular

11   document relate?

12   A.  First Star.

13   Q.  All right.  What's the second payout from the top there?

14   A.  Towing.

15   Q.  What does it mean if there was a payout for towing?

16   A.  That there was a vehicle that was towed.

17   Q.  And --

18   A.  We have to pay a towing company to tow the vehicle.

19   Q.  For vehicles that did not need to be towed, how did First

20   Star get those vehicles in 2012?  Were there any other ways?

21   A.  Vehicles that didn't need to be towed?

22   Q.  Yes, ma'am.

23   A.  They were drove to the location.

24   Q.  All right.  Now, when First Star would purchase vehicles,

25   who would keep track of the vehicles that were purchased?

1   A.  I did.  Me and Daniela.

2   Q.  I'd like you to take a look at Government Exhibit 754 in

3   your book.  It's actually on your screen also if you want to

4   look there.

5   A.  OK.

6   Q.  What is this?

7   A.  This is an email.

8   Q.  Who's it from and who's it to?

9   A.  From me to Daniela.

10          MR. WIRSHBA:  Your Honor, the government offers

11  Government Exhibit 754.

12          MR. KIRSHNER:  No objection.

13          THE COURT:  Admitted.

14          (Government's Exhibit 754 received in evidence)

15          MR. WIRSHBA:  All right.  Let's published.

16  Q.  Focusing on the top, who is this from?

17  A.  From myself to Daniela.

18  Q.  When you say "Daniela," who do we mean?

19  A.  Daniela Silva.

20  Q.  Is this an attachment to this email?

21  A.  Yes.

22  Q.  Let's take a look at Government Exhibit 754A in evidence.

23          Was this the attachment to the email?

24  A.  Yes.

25  Q.  All right.  What is shown here?

ICCHIss6                        Betancourt - Direct

1    A.  This is the list of the vehicles.

2    Q.  Looking at the second page of this document --

3    A.  It's that follows the same list.

4    Q.  -- how many vehicles are on this list?

5    A.  Sixteen.

6    Q.  All right.  Going back to the first page and focusing in on

7    the left side where it says "Date," let's just focus on the

8    first entry.

9         What does it mean where it says "Date" here?

10   A.  That's the date that we wrote the check.

11   Q.  So if there is a check written for a vehicle, the date

12   would be reflected here, is that right?

13   A.  Yes.

14   Q.  All right.  Going back to the whole document, focusing in

15   on the registered on, do you see that?

16   A.  Yes.

17   Q.  Does this document have vehicles registered to different

18   companies?

19        I think you need to zoom out, Mr. Concepcion.

20   A.  Registered on First Star?

21   Q.  Looking down from there, are there other companies that are

22   listed on registration on?

23   A.  Healey.

24   Q.  Take a look at all the dates and just look and see if you

25   can identify any dates from 2012.

1   A.   No.

2   Q.   All right.  The one that says 11, can you read what year

3   that car, that make and model, please.  Do you see that,

4   No. 11?

5   A.   2015 F750 flatbed.

6   Q.   All right.  Let's take a look at the next page.  Again,

7   looking at the left side, for 12, can you read the make and

8   model of that vehicle.

9   A.   For which one?

10  Q.   For the first one, for vehicle No. 12.

11  A.   2015 F750 wrecker.

12  Q.   For 13.

13  A.   2015 Peterbilt 16-ton wrecker.

14  Q.   Are 14 and 15 also from 2015?

15  A.   Yes.

16  Q.   OK.  For truck No. 16, can you tell what company owned that

17  truck?

18  A.   For which number?

19  Q.   No. 16, the last one on the list.

20  A.   Healey Motors.

21  Q.   All right.  Take a look in your book, if you don't mind,

22  behind what's been marked as -- it's A.  It should be at the

23  very front of your book, tab A.

24  A.   Tab A?

25  Q.   Yes.

ICCHIss6                        Betancourt - Direct

1    A.  OK.

2    Q.  You see that?

3    A.  Yes.

4    Q.  Does that have Government Exhibits 2073 through 2075 in it?

5    A.  2073, yes.

6    Q.  Are those repair invoices from Delorean?

7    A.  Yes.

8    Q.  Where were those repair invoices prepared?

9    A.  At the location.

10   Q.  Who prepared those invoices?

11   A.  The people that work at the locations.

12   Q.  And after they were prepared, did they eventually reach you

13   in the office at 813 Morris Park?

14   A.  Yes.

15   Q.  Did you and the other office employees rely on them in

16   completing your work?

17   A.  Yes.

18   Q.  How did you rely on them?

19   A.  We needed the invoices to charge.

20           MR. WIRSHBA:  Your Honor, the government -- I'm sorry.

21   Q.  Take a look at Government Exhibit C in your book.

22           If I may have one moment, your Honor?

23           THE COURT:  You may.

24           (Counsel confer)

25           MR. WIRSHBA:  Your Honor, the government would seek to

ICCHIss6                          Betancourt - Direct

1    admit Government Exhibits 2073 through 2075, 2080 and 2102 and

2    2090 through 2101 and 2103 through 2105 and 2076 through 2079.

3              THE COURT:  Is there a difference between offering

4    them and seeking to admit them?

5              MR. WIRSHBA:  No, your Honor.  The government offers

6    them.  I apologize.

7              THE COURT:  Thank you.

8              MR. KIRSHNER:  No objection.

9              THE COURT:  Admitted.

10             (Government's Exhibits 2073 through 2075, 2080 and

11   2102 and 2090 through 2101 and 2103 through 2105 and 2076

12   through 2079 received in evidence)

13   BY MR. WIRSHBA:

14   Q.  Take a look in your binder at Government Exhibit 723.

15             We're not publishing that to the jury, right?

16             What is this?

17   A.  This is an email.

18   Q.  It is an email.

19             Who's it from and who's it to?

20   A.  It's from Claudia to Daniela.

21             MR. WIRSHBA:  Your Honor, the government offers

22   Government Exhibit 723.

23             MR. KIRSHNER:  No objection.

24             THE COURT:  Admitted.

25             (Government's Exhibit 723 received in evidence)

ICCHIss6                          Betancourt - Direct

 1    BY MR. WIRSHBA:

 2    Q.  All right.  So this is from Claudia to Daniela, you said,

 3    right?

 4    A.  Yes.

 5    Q.  What's the date?

 6    A.  March 11, 2014.

 7    Q.  What's the subject?

 8    A.  First Star yearly expenses 2013.

 9    Q.  Is there an attachment listed on this email?

10    A.  Yes.

11    Q.  All right.  Let's go to Government Exhibit 723A.

12             Is this the attachment to the email we were just

13    looking at?

14    A.  Yes.

15    Q.  What is this attachment?

16    A.  Monthly expenses January 2013.

17    Q.  And in 2013 who was filling out this form?

18    A.  I did.

19    Q.  All right.  Let's jump to page 4 of this PDF, which is

20    April.  Focusing in on the bottom section, do you see where it

21    says, "Other Expenses and Loans"?

22    A.  Yes.

23    Q.  Can you read those categories under "Other Expenses and

24    Loans."

25    A.  Oh.  Main office expenses, Tony's expenses, loan to value,

ICCHIss6                          Betancourt - Direct

1    loan to High Powered, loan to Hybrid, expenses for Gunhill law

2    suit.

3    Q.  How much does it say for Tony expenses in April of 2013?

4    A.  19,534.33.

5    Q.  Do you see the box next to it?

6    A.  Yes.

7    Q.  What's included in that box?

8    A.  3,099; 1,577; 3,330.

9    Q.  Ms. Betancourt, you don't need to read them all.  I mean

10   more in general what gets put in the box next to where the

11   amount is?

12   A.  His expenses.

13   Q.  Do you see where it says "3,999."  Do you know what it is,

14   3,999?

15   A.  The rent.

16   Q.  Whose rent?

17   A.  Mr. Issa.

18   Q.  For what?

19   A.  For his apartment.

20   Q.  And where it says "460," do you know what that is?

21   A.  Which one?

22   Q.  460, it's kind of in the middle there.  Oh, we lost it.

23          See where it says "460," do you know what that would

24   be for?

25   A.  For the parking lot.

ICCHIss6                              Betancourt - Direct

1    Q.   Where was that parking?

2    A.   On 72nd.

3    Q.   It says, "1,250 Mercedes-Benz lease."  Do you see that?

4    A.   Yes.

5    Q.   What name is next to Mercedes-Benz lease?

6    A.   Mike.

7    Q.   Who is Mike?

8    A.   Tony's friend.

9    Q.   You know Mike's name?

10   A.   Michael Randazzo.

11   Q.   Why was First Star paying Mike?

12   A.   The vehicle was under Mike's name.

13   Q.   But who drove that vehicle?

14   A.   Mr. Issa.

15   Q.   Did you see Tony driving the vehicle?

16   A.   Yes.

17   Q.   All right.  Take a look in your book at Government

18   Exhibit 777.

19           What is that?  It's also on the screen.

20   A.   This is an email.

21   Q.   And taking a look -- your Honor -- I'm sorry.

22           Who's it from and who's it to, Ms. Betancourt?

23   A.   This is from Daniela to Claudia, to me.

24           MR. WIRSHBA:  All right.  The government offers

25   Government Exhibit 777.

ICCHIss6                          Betancourt - Direct

1          MR. KIRSHNER:  No objection.

2          THE COURT:  Admitted.

3          (Government's Exhibit 777 received in evidence)

4    BY MR. WIRSHBA:

5    Q.  If we could focus on the bottom email there.

6    A.  Yes.

7    Q.  Who's that email from?

8    A.  It's from me.

9    Q.  What does it say?

10   A.  "I received today the attached letter from Michael

11   Randazzo.  Please advise."

12   Q.  I apologize.  Let's focus in on the top email, if we could.

13        Who's this email from?

14   A.  From Daniela.

15   Q.  Who's it to?

16   A.  To me.

17   Q.  Anyone else on this email?

18   A.  Mr. Issa.

19   Q.  Was this Mr. Issa's email, aissa@daimner.com?

20   A.  Yes.

21   Q.  What's the subject of this email?

22   A.  Michael Randazzo invoice.

23   Q.  Can you read the email.

24   A.  "Give Mike a check for First Star to pay Mercedes.  This

25   owed for the old car."

1           MR. WIRSHBA:  Can we put up Government Exhibit 3501K.

2    Q.  What is this?

3    A.  A check.

4    Q.  For how much?

5    A.  1,250.

6    Q.  Who's it made out to?

7    A.  To Michael Randazzo.

8    Q.  From what account?

9    A.  First Star Auto Repair.

10   Q.  What does it say it's for?

11   A.  July 2013 Mercedes-Benz lease and insurance.

12   Q.  Who signed this check?

13   A.  I did.

14          MR. WIRSHBA:  All right.  Let's put back up Government

15   Exhibit 723A at page 13 of the PDF, please.

16   Q.  What is this page?

17          If we could zoom in so it would be little easier to

18   see all entries.

19   A.  January to December 2013 expenses.

20   Q.  Focusing down at the bottom, do you see where it says

21   "Tony's expenses" on the very bottom section?

22   A.  Yes.

23   Q.  What does it say for the total of Tony's expenses in 2013?

24   A.  238,121.94.

25          MR. WIRSHBA:  May I have a moment, your Honor?

ICCHIss6                          Betancourt - Cross

1              (Counsel confer)

2              MR. WIRSHBA:  Your Honor, we have no further

3    questions.

4              THE COURT:  How much do you have?

5              MR. KIRSHNER:  Ten, 15 minutes.

6              THE COURT:  OK.  That's more or less what I have.

7    CROSS-EXAMINATION

8    BY MR. KIRSHNER:

9    Q.  Good afternoon, Ms. Betancourt.

10   A.  Good afternoon.

11   Q.  When you first met Mr. Issa, where were you working?

12   A.  I was working at Capital One Bank.

13   Q.  Did there come a time when you were laid off from Capital

14   One Bank?

15   A.  Yes.

16   Q.  Did you tell that to Mr. Issa?

17   A.  Yes.

18   Q.  Did he offer you a job?

19   A.  Yes.

20   Q.  Did you tell Mr. Issa that you needed to be paid in cash

21   because you needed to collect unemployment?

22   A.  Yes.

23   Q.  And he agreed to do that for you?

24   A.  Yes.

25   Q.  And that was because you had some young children at home

ICCHIss6                      Betancourt - Cross

1   and needed both the unemployment and a salary at the same time,

2   is that right?

3   A.  Yes.

4   Q.  Then you were asked to start immediately at Mr. Issa's

5   companies, correct?

6   A.  Yes.

7   Q.  When you started working there, there was no one else in

8   the office, right?

9   A.  No.

10  Q.  You were hired to be both an office manager and a

11  bookkeeper, correct?

12  A.  Yes.

13  Q.  And you were hired to manage all of Mr. Issa's companies,

14  correct?

15  A.  Yes.

16  Q.  Those companies included First Star Auto, Hybrid, Optimum

17  Value, High Power, eventually Healey and DJ, correct?

18  A.  Yes.

19  Q.  When you first started, did it become very apparent to you

20  that the bookkeeping at the various companies was unorganized?

21  A.  Yes.

22  Q.  The records were in a little bit of disarray?

23  A.  Yes.

24  Q.  And when you got there, it was actually -- when you first

25  started, it was actually his sons Mustafa and Tariq who were

1  running the companies, correct?

2  A.  Yes.

3  Q.  And you learned that Mr. Issa was coming out of a lengthy

4  and protracted divorce, right?

5  A.  Yes.

6  Q.  He was just getting back into running the business in 2012,

7  correct?

8  A.  Yes.

9  Q.  Is it fair to say when you started in 2012, Mr. Issa's

10  businesses were short a lot of cash, right?

11  A.  Yes.

12  Q.  At the same time you found out that Mr. Issa owed,

13  Mr. Issa's companies owed, a lot of money to people, correct?

14  A.  Yes.

15  Q.  And people were calling, wanting to have these companies,

16  including First Star, pay them back, correct?

17  A.  Yes.

18  Q.  And that included debt to family and friends, correct?

19  A.  Yes.

20  Q.  For example, Mike Randazzo, we saw his name on direct

21  testimony, Mr. Issa owed him -- I'm sorry, Mr. Issa's companies

22  owed him money, correct?

23  A.  Yes.

24  Q.  Do you recall how much money First Star owed him?

25  A.  60,000.

ICCHIss6                          Betancourt - Cross

1    Q.  Some of these debts were paid back in cash, correct?

2    A.  Cash, checks, yeah.

3    Q.  You testified earlier that you managed several of

4    Mr. Issa's companies, correct?

5    A.  Yes.

6    Q.  Each business name was a different name because they were

7    tied to a different location, correct?

8    A.  I'm sorry?

9    Q.  The various names of Mr. Issa's businesses, they were done

10   that way because each one was a different location, correct?

11   A.  Yes.

12   Q.  And different locations had different businesses.  Some had

13   just gas stations, some had repair, and some had a whole mix,

14   right?

15   A.  Yes.

16   Q.  First Star Auto was unique, correct?

17   A.  What do you mean unique?

18   Q.  Well, it was both a gas station and an auto repair shop?

19   A.  Yes.

20   Q.  And the repair shop, it serviced USPS vehicles?

21   A.  Yes.

22   Q.  It also serviced other vehicles, right?

23   A.  Street vehicles.

24   Q.  Street vehicles, other commercial vehicles?

25   A.  Yes.

1  Q.  And the gas station part of First Star, that was on a

2  commission basis, correct?

3  A.  Yes.

4  Q.  Which means that First Star didn't own the gas, right?

5  A.  No, it was on commission base.

6  Q.  So it sold the gas of another company?

7  A.  Sold the gas, yeah, and earned a commission.

8  Q.  And earned a monthly commission based on the sales,

9  correct?

10 A.  Based on the sales, yes.

11 Q.  And you were aware that the credit card gas sales at First

12 Star, that went straight to the gas company, correct?

13 A.  Yes.

14 Q.  There was also a significant amount of cash that was

15 collected for the other company at First Star, correct?  When

16 customers would pay in cash rather than credit card, First Star

17 collected the cash, correct?

18 A.  I don't -- I don't understand.

19 Q.  For the gas, when a customer came in and paid --

20 A.  Oh, for the gas.

21 Q.  Yeah, I'm sorry.

22 A.  Yes.

23 Q.  And then the amount that was received in cash for the gas,

24 that would be due to the gas company in a day or two, right?

25 A.  Yes.

ICCHIss6                          Betancourt - Cross

1    Q.  The gas company would just automatically debit it out of --

2    A.  Draft the money out of the bank accounts, yeah.

3    Q.  Now, turning to the auto repair side of the business, that

4    was a 24/7 operation, correct?

5    A.  24/7, yes.

6    Q.  And a lot of the repairs, especially for the USPS, the

7    postal service vehicles, that had to be done overnight, right?

8    A.  Yes.

9    Q.  And oftentimes mechanics needed to be paid to work

10   overnight, is that correct?

11   A.  Yes.

12   Q.  A lot of them would insist on being paid in cash, correct?

13   A.  Yes.

14   Q.  And they were actually paid in cash?

15   A.  They were paid cash, yes.

16   Q.  And often it was the cash that was received from the gas

17   sales that was used to pay expenses like the payroll for the

18   mechanics, right?

19   A.  Yes.

20   Q.  And also for the parts to complete the repairs, you had to

21   pay cash sometimes, right?

22   A.  To buy parts?

23   Q.  Yeah.

24   A.  Yes.

25   Q.  Especially if it's in the middle of the night and you need

ICCHIss6                          Betancourt - Cross

1   a part quickly?

2   A.  Yes.

3   Q.  And they would use the cash from the gas sales for the

4   parts as well?

5   A.  Yes.

6   Q.  Now, First Star had several employees, right?

7   A.  Yes.

8   Q.  Not in the office?

9   A.  I'm sorry?

10  Q.  Not in the office, but they had employees working at the

11  gas station and repair shop?

12  A.  At the gas station, yes.

13  Q.  Eventually, they had tow truck drivers, correct?

14  A.  Yes.

15  Q.  They had mechanics?

16  A.  Yes.

17  Q.  As time went on, they added additional office personnel,

18  right?

19  A.  Yes.

20  Q.  And they had salespeople?

21  A.  Salespeople, yes.

22          MR. KIRSHNER:  Give me a moment.

23  Q.  Now, turning back to the gas sales, after First Star used

24  the cash for the gas sales for these auto repair expenses, it

25  needed to replace the money in the bank account before the gas

1  company drafted it out of the account, is that correct?

2  A.  Can you repeat it, please.

3  Q.  When First Star used the cash it received from gas sales to

4  pay a mechanic or to buy a part, they were short of cash,

5  correct?

6  A.  Yes.

7  Q.  And they had to replace that cash with funds from somewhere

8  else into the account before the gas company took it out?

9  A.  Yes.

10            MR. WIRSHBA:  Objection.  Who's "they"?

11            MR. KIRSHNER:  First Star.

12            THE COURT:  OK.  Got that.

13  Q.  Then there was -- sometimes there wasn't enough money from

14  the repair side of the business, right, to cover the gas, the

15  gas draft or the gas debit that was about to occur, correct?

16  A.  Yes.

17  Q.  And that happened frequently, right?

18  A.  Uh-huh.

19  Q.  At that point First Star would generally try and borrow

20  from one of the other companies, correct?

21  A.  Yes.

22  Q.  And the same thing happened in reverse, the other

23  companies, if they were short of money?

24  A.  Would borrow from First Star.

25  Q.  And it went back and forth frequently?

ICCHIss6                          Betancourt - Cross

1    A.  Back and forth, yes.

2    Q.  Then there were also times when all the companies were just

3    short of cash or short of funds to cover their expenses,

4    correct?

5    A.  Yes.

6    Q.  And in those situations, often Mr. Issa would bring his own

7    cash to the business to cover those expenses, correct?

8    A.  Yes.

9    Q.  And that happened several times, right?

10   A.  Yes.

11   Q.  For thousands and thousands of dollars?

12   A.  Yes.

13          MR. KIRSHNER:  Your Honor, at this time I'm going to

14   show the witness Defense Exhibits 500 through 530.

15          THE COURT:  OK.

16          MR. KIRSHNER:  Do it all at once.

17          THE COURT:  Those are the ones that were authenticated

18   as business records a little earlier in the afternoon.

19          MR. KIRSHNER:  Right.  Pass it to the Court.  Sorry.

20   Long reach.

21   Q.  Do you recognize these?

22   A.  Yes.

23   Q.  What do you recognize them to be?

24   A.  This is First Star gas sales report.

25          MR. KIRSHNER:  Your Honor, I offer exhibits -- Defense

ICCHIss6                          Betancourt - Cross

1    Exhibit 500 through 530 into evidence.

2              MR. WIRSHBA:  No objection.

3              THE COURT:  Admitted.

4              (Defendant's Exhibits 500 through 530 received in

5    evidence)

6    BY MR. KIRSHNER:

7    Q.  If you just flip through the document, it's more of the

8    sheets that you were shown before, correct?

9    A.  Yes.

10   Q.  It's the cash sheets from First Star, right?

11   A.  Yes.

12   Q.  And you see Samir's name up there?

13   A.  Yes.

14   Q.  If you look at the dates, it's basically the entire month

15   of October, correct?

16   A.  Yes, the month of October.

17   Q.  There's a cash sheet for -- starts on October 1, and

18   there's a cash sheet for every day of the month, correct?

19   A.  Yes.

20   Q.  It's your understanding that this was kind of a

21   reconciliation or -- that these cash sheets were a

22   reconciliation of all the cash going in and out for the day for

23   the First Star location, right?

24   A.  Yes.

25   Q.  And part of your job was to review these daily cash sheets,

1   correct?

2   A.  Yes.

3   Q.  And show you again -- I'm going to show you Defense

4   Exhibit 501.  See where it says, "Taxi, parts, Tariq," and then

5   you see here it says "Aymen," correct?

6   A.  Yes.

7   Q.  Says $400?

8   A.  Yes.

9   Q.  Was that payroll?

10  A.  Yes.

11  Q.  Cash payroll?

12  A.  Yes.

13          MR. WIRSHBA:  Can you zoom out?

14          MR. KIRSHNER:  I took it off.

15  Q.  It was your understanding that whoever was the person

16  working there, in this case it was Samir, that when it said

17  "taxi," that person would pay the taxi drivers and write the

18  amount paid in the daily sheet, correct?

19  A.  Yes.

20  Q.  And parts payout means they paid for parts with cash,

21  right?

22  A.  They purchased parts, yes.

23  Q.  If it said someone's name and it was usually an even number

24  amount, that meant it was payroll, right?

25  A.  Yes.

ICCHIss6                          Betancourt - Cross

1    Q.  Now, was it your responsibility also to take this data that
2    you see in the cash sheets and enter it into a spreadsheet
3    which you called a daily sales report?
4    A.  Yes.
5    Q.  You did this for the cash sheets for all the locations,
6    correct?
7    A.  Yes.
8    Q.  And you did it for every single day, correct?
9    A.  Every day.
10   Q.  And the DSR, I call it the DSR, the daily sales report,
11   wasn't just an accounting of the cash sheets, it was a lot
12   more, right?  There was multiple tabs on this spreadsheet,
13   right?
14   A.  Yes, yes.
15   Q.  One of the tabs was tied to the cash sheets, and the tab
16   showed the daily cash deposits, payments, sales, and --
17   correct?
18   A.  I'm sorry.  Can you repeat it.
19   Q.  One of the tabs of the DSR, the daily sales report --
20   A.  Uh-huh.
21   Q.  -- matched the data you received in the cash sheets, right?
22   A.  Yes.
23   Q.  So the cash was transferred onto a spreadsheet that was
24   used for a cash --
25   A.  Yes, from here, from this report was transferred to

ICCHIss6                        Betancourt - Cross

1    another -- same report, but on a spreadsheet totaling the total

2    amounts.

3    Q.  And on that cash -- on that DSR, there was areas where you

4    would write notes, right?

5    A.  Yes.

6    Q.  Those were generally in areas where you were unclear about

7    what the money -- what the amount was actually used for,

8    correct?

9    A.  Yes.

10   Q.  When you were unclear, you would call Mr. Issa or Daniela

11   to find out, right?

12   A.  That is correct, yeah.

13   Q.  Then whatever they said to you, you don't have to tell me

14   what they said, you would make a note of it on the DSR next to

15   the amount, right?

16   A.  Yes.

17   Q.  And then there was also a tab for the gas bank account,

18   right?

19   A.  Yes.

20   Q.  And that tab is the bank account that's used for the gas

21   payments, and it shows the details of the deposits and

22   payments, right?

23   A.  I'm sorry?

24   Q.  The tab for the gas bank account, that showed all the

25   details of the deposits and payments for the gas, right?

ICCHIss6                              Betancourt - Cross

1    A.   Yes.

2    Q.   Then there was an operating payroll bank account, right,

3    tab?

4    A.   Operating bank account, yes.

5    Q.   And that tab reflected the bank account used for all

6    operating and payroll payments that weren't in cash, correct?

7    A.   Yes.

8    Q.   So there's two separate accountings of payroll and

9    expenses, the ones that were paid in cash and then the ones

10   that were paid by check, right?

11   A.   Yes.

12   Q.   Then there were some other additional tabs, including a

13   payouts tab, an expenses tab, a profit and losses tab.  Do you

14   recall that?

15   A.   Yes.

16   Q.   And you put the data into all those companies each and

17   every day, right, for all those companies into each tab every

18   day?

19   A.   The banks daily, yes.

20   Q.   And this document, this spreadsheet called a DSR, it became

21   very large over time, correct?  Hundreds of pages, right?

22   A.   The DSR?

23   Q.   Yeah.  You know with multiple tabs in each -- with

24   different categories that you put in numbers for every single

25   day for multiple occasions, right?

1    A.  Yes.

2    Q.  So it was a lot of data?

3    A.  Yes.

4    Q.  And you always entered the data truly and accurately,

5    right?

6    A.  Yes.

7    Q.  You took care to make sure that every dollar was accounted

8    for, right?

9    A.  Yes.

10   Q.  Mr. Issa himself wasn't really involved in this process,

11   right?

12   A.  No.

13   Q.  He was at the time traveling a lot from location to

14   location or going out of town to seek new business, right?

15   A.  Yes.

16   Q.  Most of the notations that say Tony's name actually

17   happened while he was away, right, when it says Mr. Tony or

18   Tony?

19   A.  Yeah, it could -- yeah, it happened also when he was away.

20   Q.  It wasn't as if he was there?

21   A.  No.

22   Q.  Right.  And then sometime around 2013, did Daniela start

23   working full-time to help you run the office?

24   A.  Yes.

25   Q.  All right.  When Daniela started working, did First Star

ICCHIss6                         Betancourt - Cross

1   start putting more employees on the books, their payroll on the

2   books?

3   A.  Yes.

4   Q.  A lot of employees still wanted to get paid in cash, right?

5   A.  Yes.

6   Q.  And because of their resistance to go on the books, it took

7   a long time to actually get them on the books, right?

8   A.  Yes.

9   Q.  And Daniela, in your opinion, wanted to do everything by

10  the book, correct?

11  A.  Yes.

12  Q.  She wanted to stop all cash payments from the stations,

13  right?

14  A.  Yes.

15  Q.  And she wanted everything logged into, not the DSR anymore,

16  but into a QuickBooks accounting software, correct?

17              MR. WIRSHBA:  Objection.  Relevance.

18              THE COURT:  The objection's sustained.

19  Q.  Mr. Issa himself rarely worked from your office in Morris

20  Park, right?

21  A.  No, he never worked from the office.

22  Q.  Did Mr. Issa drive one car, to your knowledge?

23  A.  Yes.

24  Q.  It was that Mercedes?

25  A.  Yes.

ICCHIss6                          Betancourt - Cross

1    Q.   Did Mr. Issa and other employees use their cell phones for

2    business purposes?

3    A.   Yes.

4    Q.   Did Daniela work exclusively out of her and Mr. Issa's

5    apartment?

6    A.   Yes.

7    Q.   Oftentimes you had to send deliveries of documents and

8    various things from the office to the apartment because that's

9    where she worked, right?

10   A.   Yes.

11   Q.   You talked a little bit about the Gun Hill Road lawsuit on

12   direct examination, right?

13   A.   Yes.

14   Q.   Besides the numbers that you were asked to enter into the

15   spreadsheets that Mr. Wirshba showed you, did you have any idea

16   what the lawsuit was about?

17   A.   I do not know what the lawsuit was about.

18   Q.   Did you observe Mr. Issa socialize with his friends and

19   other employees of his companies?

20   A.   Yes.

21   Q.   Did you go out to lunches and dinners with Mr. Issa?

22   A.   Yes.

23   Q.   Did he always pick up the tab?

24   A.   Yes.

25   Q.   Did you observe Mr. Issa always working nonstop around the

1    clock?

2    A.   Yes.

3    Q.   You think of him as a workaholic?

4    A.   Yes.

5    Q.   Besides the nice car he drove, did he buy a lot of

6    expensive things?

7    A.   No.

8    Q.   Was it your opinion that he used all his effort and any

9    available money to just try and make these businesses work?

10             MR. WIRSHBA:  Objection.

11             THE COURT:  The objection's sustained.

12             MR. KIRSHNER:  Nothing further.

13             MR. WIRSHBA:  Very brief redirect, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. WIRSHBA:

16   Q.   You mentioned on direct that Mr. Issa brought cash to the

17   businesses, is that right?

18   A.   He brought cash to the business?

19   Q.   Yeah.  You remember saying that on cross, I'm sorry?

20   A.   Yes.

21   Q.   When he brought that cash to the business, you don't know

22   where that cash came from, right?

23   A.   No.

24   Q.   Did you include that cash -- was that cash included on

25   those daily sales reports?

ICCHIss6                      Betancourt - Redirect

1    A.  No.

2    Q.  All right.  You said that you were paid in cash for a

3    while, is that right?

4    A.  Yes.

5    Q.  Did Mr. Issa's company pay payroll tax?

6               MR. BRAFMAN:  Objection.  Objection, your Honor.

7               THE COURT:  Excuse me.  How is this a follow-on -- how

8    is this proper redirect?

9               MR. BRAFMAN:  It's irrelevant.

10              THE COURT:  How is this proper redirect?

11              MR. WIRSHBA:  Your Honor, I don't want to make a

12   proffer in front of the jury.  I'm happy to do so --

13              THE COURT:  I'm trying to figure out what question he

14   asked on cross this is relevant to.

15              MR. WIRSHBA:  Can we very briefly speak to you at

16   sidebar or would you like to just --

17              THE COURT:  No, just move on.

18              MR. WIRSHBA:  I'm sorry.  What was that, your Honor?

19              THE COURT:  Move on.

20              MR. WIRSHBA:  Your Honor, we have no additional

21   questions.

22              THE COURT:  Thank you.

23              You may step down, ma'am.  Thank you, Ms. Betancourt.

24              (Witness excused)

25              THE COURT:  So I'm going to try to get here by 9:30

ICCHIss6                          Betancourt - Redirect

1    tomorrow.  I'm certainly not going to take the subway.  It was

2    just one of those mornings.

3              So we will get started soon after -- ma'am, you may

4    leave -- as soon after 9:30 as we are all assembled.  We're

5    going to have a long break at lunch, 12:00 to 2:00.  We're

6    going to go 2:00 to 4:00, then I have to go to Judge Sullivan's

7    swearing in.  So that's the day tomorrow.

8              We are getting actually close to the end of the

9    government's case.  Don't discuss the case tonight.  Keep an

10   open mind.

11             (Jury excused)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

ICCHIss6                           Betancourt - Redirect

1             (Jury not present)

2             MR. SOLOWIEJCZYK:  Your Honor, could we raise one

3    issue briefly?

4             THE COURT:  Very briefly.  It's really a bad time,

5    so really fast.

6             MR. SOLOWIEJCZYK:  We can wait.  We can wait till

7    tomorrow morning.

8             THE COURT:  No, go ahead.

9             MR. SOLOWIEJCZYK:  Mr. Tsamutalis is going to testify

10   tomorrow, your Honor.  I think you remember he was the

11   accountant from the *Kovel* hearing.  We just wanted to get some

12   understanding, sort of get a better sense of the scope of cross

13   that's permissible with respect to any of those *Kovel* issues.

14   We don't think that going fully into all this stuff is actually

15   relevant to the issues for this jury.

16            THE COURT:  You know what?  I will rule on a

17   question-by-question basis, OK?

18            MR. SOLOWIEJCZYK:  Fair enough, your Honor.

19            THE COURT:  I just can't do scope things.  I will rule

20   on a question-by-question basis.

21            MR. SOLOWIEJCZYK:  Thank you, your Honor.

22            THE COURT:  All right.

23            MR. BRAFMAN:  I think your Honor indicated that you

24   would break on Friday at 2:30?

25            THE COURT:  Yes, I did, for religious reasons,

ICCHIss6                          Betancourt – Redirect

1    absolutely.

2              MR. BRAFMAN:   Thank you very much, your Honor.

3              (Adjourned to December 13, 2018, at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    INDEX OF EXAMINATION

2    Examination of:                              Page

3    JAMES NICHOLSON

4    Direct By Mr. Solowiejczyk . . . . . . . . . 855

5    Cross By Mr. Brafman . . . . . . . . . . . 863

6    JAMES NICHOLSON

7    Cross By Mr. Brafman . . . . . . . . . . . 946

8    CLAUDIA BETANCOURT

9    Direct By Mr. Wirshba . . . . . . . . . . 992

10   JAMES NICHOLSON

11   Redirect By Mr. Solowiejczyk . . . . . . . . 995

12   CHARLIE MELCHNER

13   Direct By Ms. Hanft  . . . . . . . . . . . .1002

14   Cross By Mr. Brafman . . . . . . . . . . . .1007

15   CLAUDIA BETANCOURT

16   Direct By Mr. Wirshba . . . . . . . . . . .1008

17   Cross By Mr. Kirshner . . . . . . . . . . .1066

18   Redirect By Mr. Wirshba  . . . . . . . . . .1083

19                    GOVERNMENT EXHIBITS

20   Exhibit No.                              Received

21    301E, 301F, 301E-T and 301F-T  . . . . . . . 854

22    601  . . . . . . . . . . . . . . . . . . .1007

23    614, 615, 702, 704A, 705A, 7 15(a), . . . .1019

24          715B, 716A, 717A, 718A, 719A,

25          7 23(a), 724A, 728A, 752A,

1                  753A, 754A, 771, 773, 775,

2                  801A, 801B, 801C, and 1001

3                  through 1053,

4     710  . . . . . . . . . . . . . . . . . .1025

5     715  . . . . . . . . . . . . . . . . . .1027

6     728  . . . . . . . . . . . . . . . . . .1038

7     716  . . . . . . . . . . . . . . . . . .1043

8     718  . . . . . . . . . . . . . . . . . .1052

9     754  . . . . . . . . . . . . . . . . . .1056

10    2073 through 2075, 2080 and 2102 and  . . . .1060

11              2090 through 2101 and 2103

12              through 2105 and 2076 through

13              2079

14    723  . . . . . . . . . . . . . . . . . .1060

15    777  . . . . . . . . . . . . . . . . . .1064

16                    DEFENDANT EXHIBITS

17    Exhibit No.                        Received

18    327  . . . . . . . . . . . . . . . . . 879

19    328  . . . . . . . . . . . . . . . . . 880

20    326  . . . . . . . . . . . . . . . . . 882

21    326B  . . . . . . . . . . . . . . . . . 883

22    326C  . . . . . . . . . . . . . . . . . 884

23    326A  . . . . . . . . . . . . . . . . . 885

24    316A  . . . . . . . . . . . . . . . . . 953

25    500 through 530  . . . . . . . . . . . .1075