ICHHIss1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                        17 Cr. 74 (CM)

IBRAHIM ISSA,

                                        Trial
              Defendant.

------------------------------x

                                 New York, N.Y.
                                 December 17, 2018
                                 9:55 a.m.

Before:

                     HON. COLLEEN MCMAHON,

                                   District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
NOAH SOLOWIEJCZYK
ELIZABETH HANFT
KYLE WIRSHBA
     Assistant United States Attorneys

BRAFMAN & ASSOCIATES, P.C.
     Attorneys for Defendant
BY:  BENJAMIN BRAFMAN
     JOSHUA D. KIRSHNER
     STUART GOLD

ALSO PRESENT:   ANTHONY DUBAR, Special agent USPS-OIG
                 GRACE SOTO, Special agent IRS
                 COLLEEN GEIER, Paralegal Specialist USAO
                 PRIYA KUARLALL, Paralegal

ICHHIss1

1                    (Trial resumed; jury not present)

2                    THE COURT:  OK.  I have your correspondence, so I'll

3       read it.

4                    Where's the witness?

5                    MR. KIRSHNER:  Judge, I'm going to be offering some

6       exhibits.  May I pass them up now?

7                    THE COURT:  Yes.

8                    Good morning, sir.

9                    (Pause)

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICHHIss1                          Berzansky - Cross

1            (Jury present)

2            THE COURT:  Good morning.  All right.  Sir, good

3    morning.  You're still under oath, and you're on

4    cross-examination.

5            MR. KIRSHNER:  Thank you, Judge.

6    RICHARD BERZANSKY, resumed.

7    CROSS-EXAMINATION CONTINUED

8    BY MR. KIRSHNER:

9    Q.  Good morning, Agent Berzansky.

10   A.  Good morning.

11   Q.  Did you get some rest this weekend?

12   A.  I did.  Thank you.

13   Q.  No more overnighters with Mr. Wirshba?

14   A.  Nothing with Mr. Wirshba.

15   Q.  And no more changes to the analysis at 3 a.m. this morning?

16   A.  No, sir.

17           THE COURT:  You should speak up.

18   Q.  Now, on Friday we began to discuss the subcontractor income

19   that flowed from First Star to other companies.  Do you recall

20   that?

21   A.  Yes.

22   Q.  And one of those companies was High Powered, right?

23   A.  That's correct.

24   Q.  And from High Powered, you had the bank statements?

25   A.  Yes.

ICHHIss1                          Berzansky - Cross

1   Q.  But you didn't analyze them, correct?

2   A.  Only to track the transfers from First Star into their

3   account in 2012.

4   Q.  So you did no reconstruction similar to what you did for

5   First Star, right?

6   A.  That's correct.

7   Q.  And you certainly didn't do an analysis of the cash sheets

8   for High Powered, right?

9   A.  No.

10  Q.  You weren't given them?

11  A.  No.

12  Q.  So you relied primarily in your testimony concerning High

13  Powered on the 2012 tax return, correct?

14  A.  In terms of just comparing the subcontracting expense

15  deducted by First Star?

16  Q.  Yes, that's right.

17  A.  Yes.

18  Q.  And you heard the testimony of the tax preparer George

19  Mousouris, correct?

20  A.  That's correct.

21  Q.  And he was the one who -- he testified about preparing the

22  2012 High Powered return, correct?

23  A.  That's correct.

24  Q.  When he was testifying -- Government Exhibit 203, show this

25  to the jury.

ICHHIss1                        Berzansky - Cross

1            MR. WIRSHBA:  Your Honor, this document is not in

2     evidence.

3            THE COURT:  Then take it off the screen.

4            MR. KIRSHNER:  Oh, I'm sorry.

5     Q.  Do you recall him testifying about a non-prosecution

6     agreement with the government?

7     A.  Yes.

8     Q.  The non-prosecution agreement, that was in connection with

9     his preparation of the High Powered return, correct?

10    A.  I believe so, yes.

11    Q.  So George Mousouris had to get a non-prosecution agreement

12    for the tax return that you relied on, correct?

13           MR. WIRSHBA:  Objection.

14           THE COURT:  I'm sorry.  I apologize.  I'm trying to do

15    too many things at once.  The question is -- the objection's

16    sustained.

17    Q.  You heard the testimony of George Mousouris when he

18    testified about the 2012 High Powered return, correct?

19    A.  That's correct.

20    Q.  You heard him testify about the non-prosecution agreement,

21    correct?

22    A.  That's correct.

23    Q.  He testified that the non-prosecution agreement was in

24    connection with the preparation of the return, correct?

25    A.  I thought the non-prosecution agreement was in connection

ICHHIss1                        Berzansky – Cross

1   with everything that was going on, not specifically that

2   return.

3   Q.  But yet you relied in your analysis on the tax return that

4   George Mousouris prepared, correct?

5               MR. WIRSHBA:  Objection.

6               THE COURT:  What's the ground for the objection?

7               MR. WIRSHBA:  Relevance.

8               THE COURT:  Overruled.

9   Q.  As part of your work in this case, you actually --

10              THE COURT:  Was there an answer to the question?  I

11  did overrule the objection.

12              MR. KIRSHNER:  I apologize.  I thought he said yes.

13  A.  Could you repeat it again.  I'm sorry.

14              (Record read)

15  A.  That's correct.

16  Q.  As part of your work in this case, you did analyze the bank

17  records for First Star Auto, correct?

18  A.  For 2012.

19  Q.  Now I'm going to show you, if you can take a look at,

20  Defendant's Exhibit 701.  See that there?

21  A.  Yes.

22  Q.  Is that part of the records of the bank, bank records of

23  First Star Auto?

24  A.  For 2013, yes, it is.

25              MR. KIRSHNER:  I offer Defendant's Exhibit 701.

ICHHIss1                      Berzansky - Cross

1           THE COURT:  Any objection?

2           MR. WIRSHBA:  No objection, your Honor.

3           THE COURT:  Admitted.

4           (Defendant's Exhibit 701 received in evidence)

5    BY MR. KIRSHNER:

6    Q.  If you could take a look at Defendant's Exhibit 702.  It's

7    a similar document.  It pertains to the 2013 First Star Auto

8    bank statement, correct?

9    A.  That's correct.

10          MR. KIRSHNER:  I offer Defendant's Exhibit 702.

11          MR. WIRSHBA:  No objection.

12          THE COURT:  Admitted.

13          (Defendant's Exhibit 702 received in evidence)

14   BY MR. KIRSHNER:

15   Q.  I'm going to show you, this is 702 -- I'm sorry, excuse me.

16   This is 701 now in evidence.  Turn to the second page of the

17   document.  Is that a check?

18   A.  It's a -- yes.

19   Q.  Who made out the check?  Where is the check drawn from?

20   A.  The Richard L. Rosen Law Firm PLLC escrow account.

21   Q.  What's the date of the check?

22   A.  October 25, 2013, it appears.

23   Q.  And in the memo section, what does it say?

24   A.  ExxonMobil settlement.

25   Q.  Who's it payable to?

ICHHIss1                          Berzansky - Cross

 1   A.   Tony Issa.

 2   Q.   And what's the amount?

 3   A.   $170,695 and I can't read the cents.  No cents.

 4   Q.   It's not payable to First Star Auto or any other entity.

 5   It's Tony Issa, correct?

 6   A.   That's correct.

 7   Q.   Now I'm going to show you Defendant's Exhibit 702 in

 8   evidence.  It's on the third page.  You see the date of that,

 9   the highlighted portion?

10   A.   Yes, I do.

11   Q.   What's the date?

12   A.   October 31, 2013.

13   Q.   And what's the amount?

14   A.   $170,695.

15   Q.   And what's the description of the transaction?

16   A.   Customer deposit.

17          MR. KIRSHNER:  Your Honor, I'm also going to offer --

18   Q.   You see there at the top, which account is this?

19   A.   First Star Auto Repair Inc.

20   Q.   Thank you.

21          JUROR:  We didn't see it.

22          MR. KIRSHNER:  Your Honor, at this time I'm going to

23   offer Defendant's Exhibit 703.

24          THE COURT:  Any objection?

25          MR. WIRSHBA:  No objection, your Honor.

ICHHIss1                          Berzansky - Cross

1                    THE COURT:  Admitted.

2                    (Defendant's Exhibit 703 received in evidence)

3    BY MR. KIRSHNER:

4    Q.   Showing you Defendant's Exhibit 703 now in evidence.  What

5    does this appear to be to you?

6    A.   This appears to be the first page of a lawsuit.

7    Q.   In the top section where it says "plaintiffs," is Ibrahim

8    Issa a named plaintiff?

9    A.   Yes.

10   Q.   It's not an entity or it's not First Star, it's not a

11   corporation, it's him personally, correct?

12   A.   There is an entity named, but he is named as well.

13   Q.   The 170,695, did you account for that anywhere in your

14   analysis?

15   A.   I considered that as part when I was considering the

16   ordering rules in relation to the taxability of the money

17   coming from First Star to or for, on the behalf of Mr. Issa.

18   Q.   But you didn't consider the deposit into First Star of

19   Mr. Issa's money in your analysis, correct?

20   A.   I did.

21   Q.   How did you consider the deposit of the money into -- from

22   Mr. Issa's personal account into First Star?

23   A.   I considered it a capital contribution.

24   Q.   What about all the money that the witnesses testified that

25   he brought in cash to the businesses?  Do you recall that

ICHHIss1                          Berzansky - Cross

1    testimony?

2    A.   Yep, yes, I do.

3    Q.   There's one witness who said $50,000 at one shot, right?

4    A.   I recall the testimony, yes.

5    Q.   There was another witness who said he brought in thousands

6    and thousands of dollars at various points, correct?

7    A.   Yes.

8    Q.   Did you consider that in your analysis?

9    A.   I was not able to see that going through the bank

10   statements.

11   Q.   Now, when we left off on Friday, we were discussing some of

12   the cash sheets.  But before we do that, when you analyzed

13   First Star Auto, you analyzed it based on the bank statements,

14   correct, primarily?

15   A.   Primarily, yes.

16   Q.   You didn't consider the cash sheets?

17   A.   Not initially, no.

18   Q.   From an income tax perspective, is there any difference

19   between a cash -- having a cash payroll and paying your staff

20   by check?

21   A.   Assuming that the proper tax returns are filed, no.

22   Q.   Again, just from an income tax perspective, there's nothing

23   wrong with paying other business expenses with cash, right?

24   A.   As long as they're properly accounted for, no.

25   Q.   Now, by way of example, if someone came to First Star Auto

ICHHIss1                          Berzansky – Cross

1    and paid, let's say, just for example, $100 for gas to First

2    Star Auto in cash, and then five minutes later a part was

3    needed for the auto repair section of First Star Auto and that

4    $100 was used to pay for the part, would that be reflected

5    anywhere in the bank statements?

6    A.  You're saying that the cash used to pay for that was pulled

7    out of the register?

8    Q.  Yes.

9    A.  Then no.

10   Q.  So you wouldn't see the deduction on the bank statement for

11   the expense being the part, correct?

12   A.  No.

13   Q.  You wouldn't see it, correct?

14   A.  Would not.

15   Q.  That's correct?

16   A.  You're correct.

17   Q.  OK.  Thank you.

18   A.  Sorry.

19   Q.  But if you did want to keep track of these deductions or

20   observe these deductions, you wouldn't look at the bank

21   statement, you would look at the cash sheets, correct?

22   A.  Yes.

23   Q.  So I'm going to show you Defendant's Exhibit 520, and this

24   is in evidence.  If you look at this, you see here that the

25   total cash in is about -- they record a total cash in, and it's

ICHHIss1                        Berzansky – Cross

1    about $2,200, right?

2    A.  Yes.

3    Q.  Then they also account for the credit card sales of 1,825,

4    right?

5    A.  That's correct.

6    Q.  Then they total it out at 4,000-something, correct?

7    A.  Correct.

8    Q.  And that seems to be money that's coming in, correct?

9    A.  Appears that way, yes.

10   Q.  Then we go to the middle here.  There's a column called

11   "Paid Out," right?

12   A.  Correct.

13   Q.  If we go down this column, we see various expenses.  A

14   taxi, correct?

15   A.  Correct.

16   Q.  Parts, correct?

17   A.  Correct.

18   Q.  New mechanic, correct?

19   A.  Correct.

20   Q.  It goes down and then it lists someone named Carlos,

21   correct?

22   A.  Yes.

23   Q.  And next to each one of those descriptions, pretty detailed

24   descriptions, there's an amount, correct?

25   A.  That's correct.

ICHHIss1                         Berzansky - Cross

1    Q.   Then you see at the bottom right there they total up the

2    amount that was paid out, correct?

3    A.   That's correct.

4    Q.   Does this appear to you to be an accounting of the daily

5    cash activity?

6    A.   Yes.

7    Q.   Does there appear to be legitimate business operating

8    expenses?

9    A.   Potentially, yes.

10   Q.   On the First Star amended return, did you see these expense

11   categories specifically listed in the deduction portion of the

12   tax return?

13   A.   I can't recall off the top of my head.  There were some

14   that said parts and cost of goods sold, but not all of them,

15   no.

16   Q.   Did you consider any of these to be deductions in your

17   analysis?

18   A.   Yes, I did.

19   Q.   Did you total them up?

20   A.   No, I did not.

21   Q.   So how did you consider them to be deductions if you didn't

22   add them up?

23   A.   When doing my analysis, I was able to determine the amount

24   of cash that was not deposited into the bank accounts to be

25   approximately $437,000.  When I gave my explanation, I used

ICHHIss1                          Berzansky - Cross

1    cash payroll because that's what the testimony was prior to me

2    being up here.  In essence, that 437,000 represents all of the

3    cash expenses that was paid out by First Star Auto Repair in

4    2012.  The missing cash must have been for the things that are

5    included on this cash sheet, not strictly cash payroll but all

6    items paid in cash.

7    Q.  But you didn't just total up the descriptions right here,

8    correct?

9    A.  That's correct.

10   Q.  And all this information was available to you for multiple

11   months of the year?

12   A.  For two months, yes.

13   Q.  I thought it was August through the end of --

14   A.  I'm sorry.  I thought you meant the time I had to add it

15   up.  You're correct, August through December.  I apologize.

16   Q.  And you just didn't add it up?

17   A.  Not every category, no.

18   Q.  Now I'm going to show you Defendant's Exhibit 521.  See

19   that?

20   A.  Yes.

21   Q.  It's similar to Exhibit 520, right?  It has the same

22   categories of information?

23   A.  Some of them, yes.

24   Q.  It lists parts and garbage and toll and diesel.  Do you see

25   those?

ICHHIss1                    Berzansky – Cross

1    A.  I do.

2    Q.  Again, you didn't tally these deductions up, correct?

3    A.  No, not individually, no.

4    Q.  But there is one thing you did account for, right?

5    A.  Yes.

6    Q.  And that's when it says "Tony, $300"?

7    A.  That's correct.

8    Q.  And whenever you saw that in any of these cash sheets which

9    you obviously reviewed, you counted that money towards his

10   personal expense, correct?

11   A.  That's correct.

12   Q.  When you added that all up between when it said "Tony" or

13   "Tony's friends," you had a number of $275,000, right?

14   A.  Across the three years or two and a half years, yes.

15   Q.  Now, when you first testified, you testified that even

16   though you're a government witness and you acknowledge that the

17   government had their theory of this case prior to you being

18   assigned, your analysis was not done simply to support their

19   theory, right?

20   A.  That's correct.

21   Q.  And the constant changing of your analysis right up until

22   Friday morning at 2:30 in the morning, you testified that

23   wasn't just to make the numbers kind of fit the government's

24   case, right?

25   A.  That's correct.

ICHHIss1                        Berzansky - Cross

1    Q.  And your decisions about which trial evidence to consider

2    and which trial evidence to ignore, that wasn't done to help

3    prove the government's case, right?

4    A.  No, it was not.

5    Q.  Do you think you were being fair and impartial?

6    A.  The analysis that I did at 2:30 in the morning that you

7    reference actually lowered the tax due and owing number by

8    $150,000.

9    Q.  The question was do you think in your analysis, from the

10   time you were assigned up until you testified, do you think you

11   were being fair and impartial?

12   A.  Yes, sir.

13   Q.  Agent, could you tell this jury that based on all the

14   evidence we heard, your decision to count all of the money next

15   to anything that said "Tony" or "Tony's friends" and use it as

16   a personal expense against Mr. Issa but at the same time and on

17   this very same sheet not consider a dime of the money for

18   payroll, parts, or taxis as a business expense, do you think

19   that's a fair and impartial analysis?

20          THE COURT:  The objection's sustained.  It's entirely

21   argumentative.

22   Q.  Do you think considering Tony's name and when it says

23   Tony's friend to be exclusively a personal expense, do you

24   think that's fair and impartial?

25   A.  Yes.

ICHHIss1                    Berzansky - Redirect

1    Q.  Do you think not counting up the payroll parts and taxis

2    and other business expenses that are listed on these cash

3    sheets and crediting them as deductions in your analysis to

4    First Star Auto, do you think that's fair and impartial?

5               MR. WIRSHBA:  Objection.  Asked and answered.

6               THE COURT:  Answer the question.  Were you being fair

7    and impartial or were you trying to put your thumb on the scale

8    so the government could make out its case?

9    A.  I was attempting to be fair and impartial.

10              THE COURT:  Thank you.

11              Let's move on, please.

12              MR. KIRSHNER:  No further questions.

13              THE COURT:  Redirect.

14              MR. WIRSHBA:  Yes, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. WIRSHBA:

17   Q.  Agent Berzansky, I'd like to start where Mr. Kirshner left

18   off, if we could start with the cash sheets.

19              Just before we broke just now, Mr. Kirshner was asking

20   you about whether you tallied all the information on the cash

21   sheets.  Do you remember that?

22   A.  Yes.

23   Q.  Did you have all the cash sheets for the period that you

24   were being asked about?

25   A.  No, I did not.

ICHHIss1                    Berzansky - Redirect

1   Q.   So would a tally of those cash sheets give you a full

2   picture of 2012?

3   A.   No, it would not.

4   Q.   What, if any, evidence would give you a full picture of

5   what happened with First Star Auto Repair in 2012?

6   A.   I had the complete bank statements for all three accounts

7   for First Star Auto Repair in 2012.

8   Q.   Did you analyze those bank statements?

9   A.   Yes, sir.

10  Q.   All right.  Mr. Kirshner also asked you about the entries

11  on those cash sheets for "Tony."  Do you remember that?

12  A.   Yes.

13  Q.   Why is it that you included those entries, "Tony," in Tony

14  Issa's personal expenses?

15  A.   Those entries were only considered for purposes of

16  calculating Mr. Issa's personal income tax liability.  Anything

17  that said "Tony" I was unable to determine was a business

18  expense.  That appeared, on the face of it, to be something

19  just for Mr. Issa.

20  Q.   As Mr. Kirshner pointed out, there were business expenses

21  listed on those cash sheets, right?

22  A.   That's correct.

23  Q.   As you say, they were taking a relatively detailed

24  accounting of what went out, right?

25  A.   That's correct.

ICHHIss1                        Berzansky - Redirect

1    Q.   Those entries, were they ever more detailed than just

2    saying "Tony"?

3    A.   No.

4    Q.   Were there other entries on those cash sheets that you also

5    considered to be a personal expense to Mr. Issa?

6    A.   I can't remember off the top of my head.  I don't think so,

7    though, no, only cash sheets Tony and cash sheets Tony family

8    and friends.

9    Q.   So were there entries labeled "Tony's father"?

10   A.   Yes.

11   Q.   What did you consider those expenses to be?

12   A.   Personal.

13   Q.   Why?

14   A.   Absent any further information, anything that was for

15   Mr. Issa's family appeared to be a personal expense and not for

16   the benefit of First Star Auto Repair Inc.

17   Q.   Tony's father wasn't the only one getting cash from First

18   Star and Optimum, right?  Weren't there other individuals in

19   Tony's family?

20   A.   That's correct.

21   Q.   Who else, if you remember?

22   A.   Tony's sister, I believe.  I think there was an entry that

23   referenced heat.  I believe there were other entries for

24   brother, some of Mr. Issa's children as well.

25           MR. WIRSHBA:  If we could bring up the ELMO,

ICHHIss1                          Berzansky - Redirect

1    Ms. Geier.

2    Q.  On cross, this is Government Exhibit 701, Mr. Kirshner

3    asked you about this check.  Do you remember that?

4    A.  Yes.

5    Q.  Are you familiar with this lawsuit?

6    A.  Not intimately, but I know what happened basically, yes.

7    Q.  Are you familiar with the financials from this lawsuit?

8    A.  Yes.

9    Q.  How is that?

10   A.  I was -- the information was included on the 2013 amended

11   return that was filed but never processed.

12   Q.  Are you aware of where, if anywhere, expenses from this

13   lawsuit were deducted from any tax return?

14   A.  Yes.

15   Q.  What tax return?

16   A.  The expenses were paid primarily from First Star Auto

17   Repair Inc.'s bank accounts.

18   Q.  Did you review records of First Star Auto Repair?

19   A.  Yes, I did.

20   Q.  In those records of First Star Auto Repair, did you see

21   those expenses included as business expenses?

22   A.  Yes.

23   Q.  And is that proper?

24   A.  No.

25   Q.  Why not?

ICHHIss1                          Berzansky - Redirect

1    A.  Because the lawsuit did not name --

2             MR. KIRSHNER:  Objection.

3             THE COURT:  The objection's overruled.

4    A.  Because the lawsuit did not name First Star Auto Repair

5    Inc. as a party.

6    Q.  All right.  Going back to those cash sheets for a moment,

7    you mentioned that you only reviewed the cash sheets in 2012

8    for what period?

9    A.  August through December.

10   Q.  But there was other evidence that you reviewed about cash

11   going out of First Star during 2012, right?

12   A.  From the bank statements I was able to see.

13   Q.  Let me ask you this:  Have you ever seen this email, Agent

14   Berzansky?  This is Government Exhibit 710.

15   A.  Give me one second, please.

16   Q.  Of course.

17   A.  Yes, I've seen this email.

18   Q.  Do you remember seeing this section while you were in court

19   during Ms. Betancourt's testimony?

20   A.  Yes.

21   Q.  All right.  I'm right that in this email, Ms. Silva, she

22   says in an email to Mr. Issa:  "You keep taking moneys from

23   First Star Auto and Optimum that are not accounted for.  If

24   they were not all personal, you should let the office know what

25   they are for, otherwise I will go personal.  See below how much

ICHHIss1                    Berzansky - Redirect

1    you took in these last three months."  And then there's a

2    table, right?

3    A.  That's correct.

4    Q.  And in that table, Ms. Silva, she accounts for the amount

5    of money that Mr. Issa has been pulling out of First Star and

6    Optimum.  Is that what this email says?

7    A.  That's what it appears to be saying, yes.

8    Q.  All right.  And it includes an amount paid to your family,

9    and that's $4,000 in July, $11,000 in August, and $5,000 in

10   September, is that what that table says?

11   A.  Yes, it is.

12   Q.  Below that it says the total expenses paid for each month

13   are very high numbers, and there's four months listed there, is

14   that right?

15   A.  That's correct.

16   Q.  Now, did you use this information in coming to your

17   determination of how much was paid to Mr. Issa's family?

18   A.  No, I did not.

19   Q.  Why not?

20   A.  This was not a business record that I considered to be

21   original.  I used the cash sheets exclusively.

22   Q.  So had you used this record, had you used this email, what

23   would have happened to Mr. Issa's tax liability?

24   A.  The diversions coming from First Star and Optimum would

25   have been --

ICHHIss1                     Berzansky - Redirect

1          MR. KIRSHNER:  Objection to the term "diversion."

2   Conclusion.

3          THE COURT:  The objection's overruled.

4   Q.  You may answer.

5   A.  The diversions from First Star and Optimum would have

6   resulted in a higher tax liability to Mr. Issa in 2012.

7   Q.  All right.  Agent Berzansky, do you remember being asked by

8   Mr. Kirshner on cross-examination about a company called High

9   Powered?

10  A.  Yes.

11  Q.  You were asked if you analyzed the High Powered bank

12  account, is that right?

13  A.  That's correct.

14  Q.  Did you do that?

15  A.  As I stated, only in relation to the transfers between the

16  accounts and -- no, just between the transfers for the accounts

17  in 2012.

18  Q.  So what did you use to determine High Powered's gross

19  receipts in 2012?

20  A.  I used the amount that High Powered chose to place on their

21  tax return and file with the IRS.

22  Q.  And was that important to your analysis?

23  A.  In terms of determining what the subcontractor expense

24  should be allowable for First Star in 2012, yes.

25  Q.  To the best of your knowledge, who controlled High Powered

ICHHIss1                          Berzansky - Redirect

1   Auto?

2   A.   Ibrahim Issa.

3   Q.   Is it possible that the gross receipts for 2012 for High

4   Powered were actually higher than what was reported?

5   A.   It's possible.

6   Q.   All right.  Mr. Kirshner asked you quite a bit about

7   staying up late to complete your analysis.  Do you remember

8   that?

9   A.   I do.

10   Q.   You adjusted your analysis in this case, is that right,

11   during the course of the trial?

12   A.   That's correct.

13   Q.   Why did you do that?

14   A.   I wanted to ensure that my analysis was as complete and

15   accurate as possible.

16   Q.   I'd like to talk about one analysis, one change in

17   particular.  Showing you Government Exhibit 5003, do you see

18   that?

19   A.   Yes.

20   Q.   What is this document?

21   A.   This is my summary of the total tax due and owing for First

22   Star Auto Repair in 2012.

23   Q.   When was this last column, this final column, added?

24   A.   This was added sometime on Thursday evening, Friday

25   morning.

ICHHIss1                      Berzansky - Redirect

1    Q.  All right.  Why did you add that column?

2    A.  Based upon the testimony that had been presented the prior

3    two days, I determined that there was -- the cash sheets

4    presented potential for deductible expenses by First Star.  The

5    $437,000 that I determined to be coming out as a result of my

6    gross receipts calculation were not deposited, excuse me, into

7    the bank accounts.  I determined that those could be used for

8    expenses.  Therefore, I gave credit to First Star for those

9    $437,000 as cash expenses paid.

10   Q.  So what's the difference between your analysis without

11   giving First Star the full deduction for the cash and giving

12   First Star the full deduction for the cash approximately?  I

13   understand you don't have a calculator in front of you.

14   A.  It's approximately $150,000 less.

15   Q.  In going back to the cash sheets for a moment, Mr. Kirshner

16   asked you whether there were things on those cash sheets,

17   including parts, am I right?

18   A.  That's correct.

19   Q.  What percentage of the missing cash did you count as a

20   deduction for First Star in this final column?

21   A.  100 percent.

22   Q.  So would it make a difference whether or not that expense

23   for, let's say, a part is counted as an expense for a part or

24   whether it's counted as an expense for payroll in determining

25   the tax due and owing?

ICHHIss1                    Berzansky - Recross

1   A.  No, the line items are still deductible no matter what

2   categorization you place them in.

3   Q.  Is it fair to say that with respect to First Star in 2012,

4   that in this last column of analysis, you gave First Star

5   deductible credit even for the line items that include Tony's

6   friends or Tony's family, is that right?

7   A.  And Tony as well, yes.

8   Q.  Had you not done that, would First Star Auto Repair's tax

9   due and owing be larger or would it be smaller?

10  A.  Had I not counted it as an expense, their tax due and owing

11  would be larger.

12  Q.  So it was in First Star's benefit, is that right?

13  A.  That's correct.

14          MR. WIRSHBA:  Nothing further, your Honor.

15          MR. KIRSHNER:  Your Honor, couple questions.

16          THE COURT:  Sure.

17  RECROSS EXAMINATION

18  BY MR. KIRSHNER:

19  Q.  Did you just testify that you determined that there was a

20  certain amount of missing cash based on the bank deposits?

21  A.  Based on my analysis of the bank statements.

22  Q.  When I cross-examined you five minutes ago, didn't we

23  figure out that a lot of cash may not have hit the bank?

24  A.  I said that that was a possibility, yes.

25  Q.  And now you testified that you didn't count up the cash

ICHHIss1                    Berzansky - Recross

1    sheets because you had less than a year, right?  You had less

2    than a full 2012 cash sheets to do that, right?

3    A.  Can you repeat that.  I'm sorry.

4    Q.  You didn't have the full 2012 everyday cash sheet to do a

5    thorough analysis in your opinion, right?

6    A.  That's correct.

7    Q.  That's because the government didn't give you the full

8    year, correct?

9    A.  I don't know why.  I wasn't provided with that information.

10   Q.  And the DSRs that were discussed by Ms. Betancourt, the

11   government didn't give you those either, did they?

12   A.  Not for the entire year, no.

13   Q.  The personal expenses, the email that you were just shown

14   that were discussed, arguably personal expenses, right?  Do you

15   remember seeing that?

16   A.  Yes.

17   Q.  You heard Claudia Betancourt testify that at the same time,

18   that was in 2012, at the same time tons and tons of cash was

19   going back into First Star from Mr. Issa's pocket, correct?

20   That was her testimony, right?

21   A.  I don't remember her saying "tons and tons."

22   Q.  OK.  Thousands and thousands of dollars?

23   A.  I remember her saying that Mr. Issa would come in with

24   money.  I don't know how she could possibly know where it came

25   from.  But, yes, I remember her saying that Mr. Issa did come

ICHHIss1                    Berzansky – Redirect

1    in with money.

2    Q.  And Mr. Butt, he testified to the same thing, $50,000?

3    A.  Yes.

4    Q.  Claudia Betancourt also testified that when it said "Tony,"

5    it didn't mean that Tony took the money; it was just that it

6    was authorized by Tony, correct?

7    A.  Correct.

8    Q.  And she would often call Mr. Issa, get that authorization,

9    and then note what it was actually for, correct?

10   A.  Correct.

11   Q.  And you didn't review those notes, did you?

12   A.  On the cash sheets?

13   Q.  On the DSRs where she said she put them, right?

14   A.  No.

15   Q.  Because you weren't given the DSRs, correct?

16   A.  Not for the entire year, no.

17   Q.  She also said that many of the things that said "Tony's

18   father" were loans, right?

19   A.  Yes.

20           MR. KIRSHNER:  Nothing further.

21           MR. WIRSHBA:  Very briefly, your Honor.

22   REDIRECT EXAMINATION

23   BY MR. WIRSHBA:

24   Q.  Agent Berzansky, Mr. Kirshner just asked you about

25   testimony that there was cash coming into the businesses from

ICHHIss1                         Berzansky - Recross

1    Mr. Issa.  Do you remember that?

2    A.  Yes.

3    Q.  He was referencing testimony of Ms. Claudia Betancourt,

4    right?

5    A.  Correct.

6    Q.  Did you examine the personal income tax returns of Tony

7    Issa for 2012, 2013, and 2014?

8    A.  Yes, I did.

9    Q.  Did you also take a look at the personal bank accounts for

10   Tony Issa during that time period?

11   A.  Yes, I did.

12   Q.  What, if anything, were you able -- where, if anywhere,

13   were you able to determine that there was funds available to

14   bring thousands and thousands and thousands of dollars into

15   First Star and Optimum?

16   A.  Nowhere in any of the evidence I was able to review.

17          MR. WIRSHBA:  Nothing further.

18   CROSS-EXAMINATION

19   BY MR. KIRSHNER:

20   Q.  Did you analyze the 2011, 2010, 2009 personal bank accounts

21   of Mr. Issa?

22   A.  No, I did not.

23   Q.  Did you hear testimony that he was going through a divorce

24   right up until the 2012 year?

25   A.  Yes, I did.

ICHHIss1                         Berzansky - Recross

1          MR. KIRSHNER:  Nothing further.

2          THE COURT:  I just have one question, which is in

3    doing the work that you've done, how would you account for an

4    indeterminate -- lots and lots is not a number.  How would you,

5    as you do your work, account for lots and lots of cash, if

6    you'd be able to?

7          THE WITNESS:  Well, that was as a result of my

8    analysis.  One of the things we do is indirect methods of

9    reconstructing gross receipts, and that's sort of what I did.

10   By imputing the cash gas based upon the debits from the bank

11   account, I was able to determine the amount of cash coming in,

12   and that's how I was able to determine the cash not deposited

13   in that year.

14         THE COURT:  OK.  I got it.  You did some extrapolation

15   to try to figure out what that amount was?

16         THE WITNESS:  I wouldn't call it extrapolation, but

17   yes, it was a calculation based upon what was known.

18         THE COURT:  But I'm talking about the cash that

19   they've just been talking about in these questions, the lots

20   and lots of cash that Mr. Issa brought in.

21         THE WITNESS:  If I were to do an audit, civil audit, I

22   would be able to speak with the individual I was auditing.  In

23   this case I was unable to do so.

24         THE COURT:  Thank you.

25         Anything else?

ICHHIss1                    Berzansky - Recross

1              Thank you.  You may step down.

2              (Witness excused)

3              MR. WIRSHBA:  Your Honor, we have a brief housekeeping

4   matter.

5              THE COURT:  Well, clean it up.

6              MR. WIRSHBA:  Yes, your Honor.  There were a few

7   stipulations that your Honor read into the record that we never

8   offered the stipulations themselves.  That's Government

9   Exhibits 4003, 4008, 4009.  The government offers those

10  exhibits at this time.

11             MR. BRAFMAN:  No objection.

12             THE COURT:  Admitted.

13             (Government's Exhibits 4003, 4008, 4009 received in

14  evidence)

15             MR. WIRSHBA:  If I may have one brief moment, your

16  Honor?

17             THE COURT:  As opposed to a long one?

18             MR. WIRSHBA:  Your Honor, the government rests.

19             THE COURT:  OK.  Ladies and gentlemen, "the government

20  rests" are magic words.  That means that the government has

21  introduced the evidence from which it intends to argue that it

22  has overcome the presumption of innocence and proven the

23  defendant, Mr. Issa, guilty of the crimes with which he's

24  charged beyond a reasonable doubt.  I remind you that at this

25  moment, the government having rested, Mr. Issa remains cloaked

ICHHIss1                         Berzansky - Recross

1    with the presumption of innocence, and he will remain cloaked

2    with that presumption until 12 jurors unanimously decide that

3    the government has met its burden of overcoming that

4    presumption beyond a reasonable doubt, OK?

5            So I am now required to excuse you for a few minutes.

6    I need to talk to the lawyers.  So don't discuss the case yet

7    and keep an open mind.

8            (Jury excused)

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICHHIss1                      Berzansky – Recross

1              (Jury not present)

2              THE COURT:  Let's have a seat.

3         Mr. Brafman.

4              MR. BRAFMAN:  Just waiting for the door to close.

5         The defendant has filed a motion, written motion

6    pursuant to Rule 29 of Federal Rules of Criminal Procedure.

7    I'm not certain whether the Court requires additional argument.

8              THE COURT:  No, because it's a very thorough, complete

9    letter with a reply letter that I got to see this morning after

10   I read the government's letter.

11             MR. BRAFMAN:  I just wanted the record to reflect that

12   we made the motion, that we filed the motion.

13             THE COURT:  Indeed you did.

14             MR. BRAFMAN:  I don't want to waste the Court's time

15   with argument.  I don't think you need it, unless you have

16   specific questions.

17             THE COURT:  I do not.  The defense Rule 29 request for

18   a judgment of acquittal as to the bribery count is denied.  To

19   the extent that the government misunderstood the original

20   motion, which I really don't think it did, you are certainly

21   free to argue that the government has failed to prove a quid

22   pro quo.  I expect that's what you will be arguing.  There is

23   certainly enough evidence of one to get the question to the

24   jury.

25             MR. BRAFMAN:  Your Honor, if I may?

ICHHIss1                    Berzansky - Recross

1          THE COURT:  Yes.

2          MR. BRAFMAN:  We wrote specifically on the bribery

3     count, but I want the record to reflect that I am also moving

4     under Rule 29 for an order of dismissal with respect to all of

5     the other counts as we believe, based on the evidence, no

6     reasonable juror could convict Mr. Issa on the evidence beyond

7     a reasonable doubt.

8          THE COURT:  Oh, I disagree with that, so I will deny

9     that motion too.

10          All right.  Is it still your intention to rest?

11          MR. BRAFMAN:  Yes, ma'am.

12          THE COURT:  OK.  Fine.

13          MR. BRAFMAN:  The record should reflect, your Honor,

14     that I have discussed this decision with Mr. Issa; that

15     Mr. Issa agrees with my position and has authorized me to say

16     that he will not testify to your Honor.

17          THE COURT:  Good.  I'm going to ask him the same

18     questions right now.

19          Mr. Issa, good morning, sir.

20          THE DEFENDANT:  Good morning.

21          THE COURT:  Mr. Issa, there are two decisions at a

22     criminal trial that a defendant -- in a criminal case that a

23     defendant ultimately and finally gets to make.  One of those

24     decisions is the decision to plead guilty or not guilty.  The

25     other is the decision whether or not to testify.  Everything

ICHHIss1                     Berzansky – Recross

1   else we remit to a lawyer who knows what he's doing, and the

2   lawyer gets to make those decisions, obviously, certainly the

3   lawyers that have appeared in this case working most

4   deciduously in the best interest of their client and zealously

5   representing him.  But, ultimately, the decision to get on the

6   stand or not to get on the stand is your decision.  I believe

7   that you have discussed this at great length with Mr. Brafman.

8   You haven't hired a superb lawyer for no reason, and I believe

9   that he has given you his best advice.

10          Are you satisfied that you've had ample opportunity to

11  talk about this issue with Mr. Brafman?

12          THE DEFENDANT:  Yes, I have, your Honor.

13          THE COURT:  OK.  And having listened to his advice but

14  knowing from me that it's your decision, is it, in fact, your

15  decision not to testify?

16          THE DEFENDANT:  Yes, it is, your Honor.

17          THE COURT:  Do you understand that at some time if the

18  worst happens and you get convicted, that you're not going to

19  be able to argue that you wanted to testify but we somehow kept

20  you from testifying or that Mr. Brafman didn't tell you you

21  could testify or that I didn't tell you you could testify?

22  You're waiving all those arguments.  Do you understand that?

23          THE DEFENDANT:  Yes, I do, your Honor.

24          THE COURT:  OK.  Thank you, sir.

25          MR. BRAFMAN:  Your Honor, can I ask on scheduling,

ICHHIss1                          Berzansky - Recross

1    just to figure out today?  Can I assume that after I rest, that

2    the Court will have a brief charging conference?

3              THE COURT:  No.  We're going to have it right now

4    because the jurors are out of the room.

5              MR. BRAFMAN:  Yes.

6              THE COURT:  That's why I wanted to know if you were

7    going to rest.

8              MR. BRAFMAN:  Thank you.

9              THE COURT:  So let's just do that.

10             I could use a copy of the charge, which I don't seem

11   to have in front of me.  This is the charge that was given to

12   them?

13             THE LAW CLERK:  Yes.

14             THE COURT:  With nothing added.  OK.

15             Jesus, take about a year and a half to give this

16   charge.

17             All right.  The government has sent a letter saying

18   that it has some small requests, but that it principally wants

19   the Court to add the language that I used in the *Annabi* case,

20   which was another public official bribery case, about dual

21   intent.  I will hear argument from the defense, though my

22   inclination is to add the language.

23             MR. SOLOWIEJCZYK:  Your Honor, could we just clarify

24   one thing?  In the letter it said this is the first time the

25   government's raising this.  We actually did request --

ICHHIss1                        Berzansky - Recross

1              THE COURT:  You did.  We overlooked it, OK?

2              MR. SOLOWIEJCZYK:  Just wanted to note that for the

3       record.

4              THE COURT:  Wouldn't matter if it were the first time.

5       You can raise it anytime up to the moment I stop charging, OK,

6       and there's no bias, no prejudice.  They can't say you've

7       waived it.  You've waived it when I stop charging and send them

8       back to deliberate, OK?  Fine.  You haven't waived it.

9              Mr. Brafman, are you going to argue this?  Is one of

10      your colleagues going to argue this?  Who's going to?

11             MR. BRAFMAN:  Well, I think we made note of it in our

12      letter to the Court.  I understand the law in terms of being

13      able to give the Court discussions.  I think, however, the

14      issue was made clear by me in my opening statement.  They refer

15      to that fact, and yet they waited until all of the

16      cross-examinations were complete to raise the issue with the

17      Court even though they submitted a request to charge.  I'm just

18      pointing that out.

19             THE COURT:  Fine.  All right.  So you'll get your

20      *Annabi* language.

21             MR. BRAFMAN:  I object to the charge.

22             THE COURT:  And you object.

23             MR. BRAFMAN:  So if it could be noted if we could just

24      have an understanding of what your Honor's going to say before

25      we actually start the summation.

ICHHIss1                    Berzansky - Recross

1           THE COURT:  Yes, more or less what's quoted in the

2    government's letter, but let's move on.  The government had

3    some other small issues.

4           MR. SOLOWIEJCZYK:  Yes, your Honor.  These are all

5    relatively minor.  At page 16, the accomplice testimony

6    section --

7           THE COURT:  I'm sorry.  Hang on.  Page 16, accomplice,

8    yes.

9           MR. SOLOWIEJCZYK:  So there's discussion here in the

10   plural regarding cooperating witnesses.  We would just ask that

11   it be made singular so it's clear there's actually only one

12   cooperating witness.

13          MR. BRAFMAN:  Are you on the same page 16 that I am?

14          THE COURT:  Find one that's headed "Accomplice

15   Testimony."

16          MR. BRAFMAN:  I have it, your Honor.  I also note that

17   there's Mr. Connelly and Mr. Black named in this.  I assume

18   that will come out.

19          THE COURT:  Yes.

20          THE LAW CLERK:  You're on page 16, though, right?

21          THE COURT:  Never try Mr. Connelly and Mr. Black

22   again.

23          Has anyone pleaded guilty in this case?  No.

24          MR. SOLOWIEJCZYK:  Yes.

25          THE COURT:  Who had a guilty plea?

1           MR. SOLOWIEJCZYK:  Mr. Velez did.

2           THE COURT:  Or Mr. Velez, OK.

3           So this is going to say:  Mr. Velez, the cooperating

4   witness in this case, pleaded guilty about the defendant --

5   from the fact that a prosecution witness pleaded guilty.

6           Mr. Issa -- I think Jim just threw this in because he

7   didn't know if we were going to include it or not, about

8   Mr. Issa's guilt.  It will say:  "Mr. Velez, the cooperating

9   witness in this case, pleaded guilty to charges arising out of

10  the same facts that are at issue in this case.  You may not

11  draw any conclusions or inferences of any kind about the guilt

12  of the defendant from the fact that a prosecution witness

13  pleaded guilty to similar charges.  The decision of any witness

14  to plead guilty was a personal decision he made about his own

15  guilt.  Nobody else's plea is evidence against Mr. Issa.  So

16  you may not consider or draw any conclusion about Mr. Issa's

17  guilt based on the fact that a cooperating witness pled

18  guilty."

19          All right.  So that's what page 16 will be.  All

20  right.  Next.

21          MR. SOLOWIEJCZYK:  On page 17, just to make life easy,

22  the two immunized witnesses are Sohail Butt and Claudia

23  Betancourt.

24          THE COURT:  I'm sorry?

25          MR. SOLOWIEJCZYK:  I can spell them.

1              THE COURT:  You heard testimony from two witnesses,

2        yes.

3              MR. SOLOWIEJCZYK:  Sohail Butt, S-o-h-a-i-l, last name

4        B-u-t-t, and Claudia.

5              THE COURT:  Betancourt.

6              MR. SOLOWIEJCZYK:  B-e-t-a-n --

7              THE COURT:  I know, B-e-t-a-n-c-o-u-r-t.  Got that.

8              MR. SOLOWIEJCZYK:  OK.

9              THE COURT:  OK.

10             MR. SOLOWIEJCZYK:  Your Honor, at page 68, which is

11       the description of the overt acts --

12             THE COURT:  Yes.

13             MR. SOLOWIEJCZYK:  -- right now it calls them Tax

14       Preparer 1, Issa Company 1, Issa Company 3.  They're all

15       anonymized.

16             THE COURT:  That's right, that's what it says in the

17       indictment.

18             MR. SOLOWIEJCZYK:  Is there any way the Court would

19       change it to the actual name?

20             MR. BRAFMAN:  I object to that.  It's not in the

21       indictment.

22             THE COURT:  It's not in the indictment.  It's in the

23       evidence.  I'm not going to change what's in the indictment.

24       We will add after reading this paragraph B of the indictment:

25       Issa Company 1 --

ICHHIss1                    Berzansky - Recross

1          MR. SOLOWIEJCZYK:  Is First Star Auto.

2          THE COURT:  -- is First Star Auto.  CC-1 is --

3          MR. SOLOWIEJCZYK:  Is Daniela Silva.

4          THE COURT:  -- Daniela Silva.

5          MR. SOLOWIEJCZYK:  Tax Preparer 1 is Chris Tsamutalis.

6          THE COURT:  Tax Preparer 1 is Chris Tsamutalis.  And

7    Tax Preparer 2 --

8          MR. SOLOWIEJCZYK:  Tax Preparer 2 is George Mousouris.

9          THE COURT:  Is George -- how do you spell his name?

10          MR. SOLOWIEJCZYK:  M-o-u-s-o-u-r-i-s, I believe.

11          THE COURT:  Yes.  And then Company 3, Issa Company 3,

12    is?

13          MR. SOLOWIEJCZYK:  We believe it's -- we're checking

14    right now.  We're pretty positive it's High Powered Auto, but

15    we're confirming that right now.  If for some reason that's

16    wrong, your Honor --

17          MR. BRAFMAN:  I sure hope you would know by now.

18          THE COURT:  I would certainly hope you would know by

19    now.  You've listed it.

20          MR. SOLOWIEJCZYK:  Mr. Issa has so many companies it's

21    hard to keep track of all the companies.  If that's wrong,

22    we'll let your Honor know ASAP, but it's High Powered Auto.

23          THE COURT:  You better.

24          MR. SOLOWIEJCZYK:  Give me one sec.

25          Oh, yes.  Your Honor, there's one more, and I'm

ICHHIss1                        Berzansky - Recross

1   actually going to turn it over to Mr. Wirshba because he

2   understands tax law way better than I do at this point.

3               THE COURT:  Really?

4               MR. SOLOWIEJCZYK:  If you couldn't tell.  So on

5   page 73, in describing the distribution -- I'm just going to

6   let Mr. Wirshba explain.  I'm going to bungle it.

7               MR. WIRSHBA:  Your Honor, my understanding is that

8   this last term on page 73 with respect to this proposed

9   instruction, it says "taxable dividend" --

10              THE COURT:  Look, what language do you want me to

11  change?

12              MR. WIRSHBA:  Of course.  "Taxable dividend" to

13  "capital gain."

14              THE COURT:  Where's the word, where on the page?

15              MR. WIRSHBA:  It's the last two words on page 73.

16              THE COURT:  You want "taxable dividend" to be changed

17  to "capital gain"?

18              MR. WIRSHBA:  Yes, ma'am.

19              THE COURT:  Fine.  It's the kind of question I would

20  ask my accountant.

21              MR. WIRSHBA:  As would I, your Honor.

22              MR. BRAFMAN:  Your Honor.

23              THE COURT:  Yes.  Is that it from the government?

24              MR. WIRSHBA:  Yes, your Honor, that's all from the

25  government.

ICHHIss1                    Berzansky - Recross

1              MR. BRAFMAN:  Just for the record, we object to that

2    change.  I don't think that's what the evidence is.  I think

3    you can argue it, but I don't think it's a matter of law that

4    that's what the evidence is.

5              MR. SOLOWIEJCZYK:  We can explain it, your Honor, why

6    the change.

7              THE COURT:  Well, I thought you were telling me what

8    the law is.  OK.  What's the law?

9              MR. WIRSHBA:  Your Honor, that is the law from

10   *Boulware* and that Second Circuit case that you referenced.

11   Your Honor, once the earnings.

12             THE COURT:  *Bok*.

13             MR. WIRSHBA:  *Bok*, yes, your Honor.  My understanding,

14   once the accumulated earnings and profits of a corporation have

15   been exhausted, it is no longer possible that a distribution

16   from that company can be considered a dividend because there

17   are no accumulated earnings and profits.  At that time, the

18   courts have said that a distribution from that company is

19   considered to be taxed like a long-term capital gain, and

20   that's why we're requesting --

21             MR. BRAFMAN:  Your Honor, that's a factual

22   determination.  We did not ask for this charge.  The testimony

23   is on both sides of that coin.  And if your Honor's making a

24   factual determination, it's essentially marshaling the

25   evidence.

ICHHIss1                        Berzansky - Recross

1          THE COURT:  It's not a factual determination.

2          MR. WIRSHBA:  Your Honor, we would consent to leaving

3     this charge out completely.

4          THE COURT:  Which one?  The whole Section 301(c)(2)?

5     You asked for it.

6          MR. WIRSHBA:  No, your Honor.  I don't believe we did

7     ask for that.

8          THE COURT:  Well, I can't very well leave it out.

9     It's the *Bok* charge.  Given the way this case has come in, I

10    can't very well leave it out, can I?

11         MR. BRAFMAN:  I think you can because no one is

12    requesting it.

13         THE COURT:  Fine.  You don't want it, your problem.

14         MR. BRAFMAN:  Thank you.  Thank you.

15         Your Honor, can I make one observation and ask?  I

16    have, other than the objections I previously noted on page 44,

17    your Honor --

18         THE COURT:  Yes.

19         MR. BRAFMAN:  -- in the middle of the page --

20         THE COURT:  Mr. O'Neill has changed some pages, so

21    what's the heading at the top of the --

22         MR. BRAFMAN:  There is no heading at the top.

23         THE COURT:  What are the words at the top of the page?

24         MR. BRAFMAN:  Inferences to be --

25         THE COURT:  To be drawn, it's actually 44, great.

ICHHIss1                    Berzansky - Recross

1              MR. BRAFMAN:  I thought it was.  The lower part of the

2    page, about two and a half paragraphs, you discuss the issue of

3    conscious avoidance.  I would object to a charge on conscious

4    avoidance.  I don't think the evidence in this case warrants

5    it.  This is an intentional crime that's been charged.  All of

6    the evidence suggests Mr. Issa either did this intentionally or

7    he did not, and I don't know that any witness testified that

8    Mr. Issa consciously avoided his obligations.

9              THE COURT:  I'm interested.  There's a conscious

10   avoidance charge both here and in the tax count.  I've never

11   not charged conscious avoidance in a tax case.  I'm curious why

12   the government thinks it's an appropriate charge for the

13   bribery counts.  What's the view of the evidence that would

14   warrant a conscious avoidance charge?

15             MR. SOLOWIEJCZYK:  Your Honor, I actually don't think

16   it's -- I think it's only in for the tax counts right now, and

17   we're not seeking it for bribery or theft of government funds.

18             THE COURT:  As long as it's in for the tax counts, it

19   stays in.  OK.  I thought it was in twice.

20             MR. BRAFMAN:  Your Honor, in terms of the order this

21   morning, I know the Court has given the government 90 minutes,

22   you've given defendant 90 minutes, and then government a

23   half-hour.  It is now almost 11 o'clock.  If we could ask, one,

24   if I could step out for a minute before we start?

25             THE COURT:  Yes.

ICHHIss1                    Berzansky - Recross

1          MR. BRAFMAN:  And, second, if the government starts

2      and goes 90 minutes, it would bring us right to a lunch break.

3          THE COURT:  Indeed, not only a lunch break, a lunch

4      break at which Chief Judge McMahon has to make an appearance at

5      two events, so you would start right after lunch.

6          MR. BRAFMAN:  Thank you.

7          THE COURT:  In fact, it looks to me that's exactly the

8      way it's going to break.

9          MR. BRAFMAN:  Thank you.

10          THE COURT:  OK.

11          MR. BRAFMAN:  Yes, yes, I'm sorry, Judge.  There was

12      one ask that we submitted in writing.  Mr. Gold just remind me

13      we had asked for a curative instruction that the defendant is

14      not charged with violating the post office regulations.

15          THE COURT:  I'm perfectly happy to put in that

16      language.

17          MR. BRAFMAN:  Thank you, your Honor.

18          MR. SOLOWIEJCZYK:  Your Honor, we object to that

19      language for a number of reasons, particularly as proposed by

20      the defense.  Just because there may be postal rules that are

21      coextensive with the bribery law doesn't mean that the postal

22      rules are somehow --

23          THE COURT:  You know what?  I'm perfectly capable of

24      crafting a charge that says he's not charged with violating

25      ethics rules or the post office rules.  He's charged with

ICHHIss1                        Berzansky - Recross

bribery.  It may be you may conclude that post office rules and
the bribery statute are coextensive, or overlapping, but please
understand it is the bribery statute that he's charged with
violating.  I can do that.  I'm quite capable of doing that.

            MR. BRAFMAN:  And your Honor --

            MR. SOLOWIEJCZYK:  Thank you, your Honor.

            MR. BRAFMAN:  One other ask in the same letter was
that the defendant is also not charged with any violations
relating to a withholding tax or cash payroll or any of those
things that might arise in a juror's mind as to why you didn't
do that.  Those are state charges, generally.  It's a
one-sentence ask, your Honor.

            THE COURT:  I'm trying to find the language you
wanted.  I had no difficulty.  I'll find a place to put it in,
OK?  I'd like five minutes to think.

            MR. SOLOWIEJCZYK:  Your Honor, is it your intention to
go straight to closing statements from here right now?

            THE COURT:  Well, they're going to rest, I'll charge,
you'll start.  Yes, absolutely.

            MR. SOLOWIEJCZYK:  OK.

            THE COURT:  The minute the jury comes in, he'll rest,
you won't have any redirect/rebuttal case because he's resting,
I'll give the jury their preliminary charges, and somebody
better be ready to close.

            MR. SOLOWIEJCZYK:  OK.  We'll be ready.

ICHHIss1                    Berzansky – Recross

1            MR. BRAFMAN:  Your Honor, the Court is denying our

2      application in our December 14 letter with respect to the

3      *Silver* issue and the prolific and perfunctory nature of the

4      work that's being done?

5            THE COURT:  Oh, yeah, that's the dumbest argument I

6      ever read.

7            MR. BRAFMAN:  I appreciate the Court's observation.  I

8      think it's a pretty good ask, but I understand, your Honor.

9            THE COURT:  It's a good ask.

10            (Lunch recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICH5iss2

1           THE COURT:  Case on trial continued, parties are

2    present, jury is not.  Just so you know, this is what I will

3    add at the very end of the substantive charge.

4           THE DEPUTY CLERK:  Jury?

5           THE COURT:  Please.

6           (Continued on next page)

ICH5iss2

1          (Jury present)

2          THE COURT:  Okay.  Have a seat, please.

3          Mr. Brafman, does the defendant wish to put on a case?

4          MR. BRAFMAN:  Defense rests, your Honor.

5          THE COURT:  Thank you.

6          Ladies and gentlemen, as I told you at the beginning,

7     the government has to put on a case.  The defense does not have

8     to put on a case because the defense has nothing to prove.

9     Even at this moment we are presuming that Mr. Issa is innocent

10    of the crimes with which he has been charged and Mr. Brafman

11    and his client have decided that they're going to argue to you

12    from the evidence that you have heard that the government has

13    failed in its burden, that it has failed to overcome the

14    presumption of innocence that the credible evidence is

15    insufficient to convict the defendant of any of these crimes

16    and so, we are going to turn to the arguments of the lawyers.

17         At this point, the lawyers are going to take the

18    evidence that you have heard and they're going to paint a

19    picture for you with that evidence, and it will come as no

20    surprise to you to learn that the two lawyers from the front

21    and the back tables will paint two very different pictures with

22    that evidence.  They're going to argue the case, they're going

23    to ask you to draw inferences or conclusions from the evidence

24    that you have heard.  If what a lawyer suggests to you seems

25    like a rational conclusion for you to draw from evidence that

ICH5iss2

you find to have been believable and persuasive, then you are

perfectly free to accept the lawyers' suggestion and draw that

conclusion.  If, however, you are not satisfied that the

conclusion you are asked to draw makes any sense to you, or if

it doesn't accord with the evidence that you, the members of

the jury, find to be believable and persuasive, then you will

just reject the lawyers' suggestion and you will draw your own

conclusion based on your reason and common sense and the

evidence that you find to be believable and persuasive.

        The arguments follow rules as does everything else in

a trial so there are rules for making summations.  And if a

lawyer is perceived by his or her opponent to run afoul of the

rules, then someone will jump up and say "objection" from the

other table.  I will rule on the objection.

        Please, I just take this opportunity to remind you, I

don't have a position in this matter.  My rulings on objections

are not intended to send you any kind of a semaphore signal

that I think this side or that side has the better of the

arguments in this case.  All right?  I am just being the ref

and enforcing the rules and we have rules for summations.  So,

if there are any objections during the summations, I will

enforce the rules.

        The lawyers will speak to you in colloquial English so

they'll probably say "I think" or "I believe."  At some point

during the course of the summations that's because we always

ICH5iss2

say that in the course of our every day speech.  What they mean
is I submit the following for your consideration because the
only people whose thoughts or beliefs we really care about are
your thoughts and beliefs at this stage of the case.  But, I
submit the following for your consideration is an awfully
cumbersome locution.  So, if the lawyers tell what you they
think or they believe they're not turning themselves into
witnesses, remember that.  Remember always that what the
lawyers say to you is not evidence.  So, if a lawyer makes an
argument based on something that you don't recall being in
evidence you are to ignore that argument because all of the
arguments must, of course, be grounded in the evidence.

Now, the party that bears the burden of proof gets the
opportunity to open first, to give its closing argument first,
so we will, this morning, hear from the government.  This
afternoon we will hear from the defense after lunch, and then
the government will get one last shot because it has the burden
of overcoming the presumption of innocence so it will be able
to make a brief rebuttal.  And the way everything has timed out
is beautiful because everybody can -- we will have government
summation first, you will have your lunch, we will have defense
summation, and the government's rebuttal.  I will charge in the
morning.  The reason being that the charge is sufficiently long
that I don't want to break it up.  I just want to take you to
law school one time.

1              Mr. Wirshba, are you ready?

2              MR. WIRSHBA:  Yes, your Honor.

3              THE COURT:  All right.  The government may close.

4              MR. WIRSHBA:  If you don't know how to hide, don't

5     steal.  This is the saying by which Tony Issa led his life.

6     This is his motto.  And he stole every chance he got.  He stole

7     through his bribes, he stole through his bogus bills, and he

8     stole through his taxes and, in every instance, Tony Issa

9     thought he hid his crimes.  But he was wrong.

10             In this courtroom over the last two weeks all of Tony

11    Issa's crimes have been laid before you.  Issa has been exposed

12    for the thief that he is.  Having seen the witnesses and the

13    evidence in this case you now know that Tony Issa bribed public

14    officials, that he stole public money, and that he cheated on

15    his taxes.  Tony Issa tried to cheat the system time and again

16    in any way that he could.  Now you must hold him accountable

17    for these crimes and find him guilty on all counts.

18             Ladies and gentlemen, this closing argument is the

19    government's opportunity to bring all of the evidence together

20    to show you why Tony Issa is guilty of bribing public officials

21    in exchange for lucrative postal service contracts and repair

22    work, why he is guilty of stealing government funds by padding

23    his bills with double charges and work that was never

24    authorized, and why he is guilty of lying on his corporate and

25    personal tax returns in order to avoid paying what he really

ICH5iss2                    Summation - Mr. Wirshba

owed.  In each instance, Mr. Issa tried to cheat the system and
in each case he got caught red-handed.  Let's start with the
bribery.

        Ladies and gentlemen, the government has proven beyond
a reasonable doubt that Tony Issa bribed three different
officials -- Jim Nicholson, Jeffrey Blight, and Ismael "Izzy"
Velez.  Each was a manager of his own VMF, his own vehicle
maintenance facility.  Each was in charge of his own set of
postal trucks that Tony Issa wanted desperately to get into his
shop, and each was a potential source of lucrative vehicle
repair work for Issa's companies.  So, what did Tony Issa do?
How did Tony Issa make sure that his companies got work from
these VMF managers?  Did he play by the rules?  No.  He cheated
the system.  He paid Nicholson, paid Blight, paid Velez in
meals, trips, gifts, and cash.  And in exchange he wanted and
expected work, as much of it as he could get.  You heard this
play out not once, not twice, but three times.  But before we
begin, let's start with the basics:  What is a bribe under the
law?

        Well, you should listen extremely carefully when Judge
McMahon instructs you on the law and whatever she says, that's
what should control.  That said, I expect that she will tell
you at the heart of bribery is a *quid pro quo*.  Now, you have
already heard that term quite a bit during this trial, mostly
from the defendant himself on the tapes, and it means exactly

ICH5iss2                         Summation - Mr. Wirshba

1    what Issa said it means.  This, for that.  You scratch my back,

2    I'll scratch yours.

3            So, let's start with something very basic but also

4    extremely important.  There is no dispute that Tony Issa

5    provided gifts, meals, trips, and cash to postal service VMF

6    managers.  In fact, Tony Issa had a playbook for situations

7    just like these.  You know this playbook because you saw it

8    over and over again.

9            So, what's the first step in the Tony Issa playbook?

10   The first step is caution.  It's to start a VMF manager with

11   something small.  For Nicholson, it was a meal at the Olive

12   Garden.  For Jeffrey Blight, some sushi.  And for Ismael Velez,

13   a burger at Jimbo's.  The first step, it is a test.  See if the

14   VMF manager insisted on paying, evaluate whether a prosperous

15   relationship was possible.

16           Step two, escalate to expensive dinner and drinks.

17   Nicholson, he got Smith & Wollensky's with endless crab, steak

18   and shrimp, and at the end of the Issa bought Nicholson even

19   more ordering items to go for Nicholson's wife.  You remember

20   that because you heard it on the tapes.  How much was that

21   meal?  You saw the evidence, Government Exhibit 3520, it came

22   to approximately $650.

23           What about Jeff Blight?  It escalated with him, too.

24   Jeff Blight, he got Roast Detroit, a restaurant near Blight's

25   home where Issa spent $527.32 on dinner for two, and you can

ICH5iss2                          Summation - Mr. Wirshba

1    see it in Government Exhibit 551B.

2              Velez, he also received meals and drinks at Frankie &

3    Johnnie's, a nice restaurant in the Bronx.

4              And if steps one and two of the Tony Issa playbook

5    went over without incident, that's when things really started

6    to get good because step three of the Tony Issa playbook is

7    when Issa started offering and providing free trips and gifts.

8    For Nicholson, it was additional meals, sure, and you have seen

9    those receipts at Wolfgang's and at Blackstone Steakhouse, but

10   it was also an offer of a fishing trip, also the gift of a

11   tablet computer, also tequila, scotch, and bottle after bottle

12   of wine.

13             Now, Blight and Velez, they were also treated to

14   trips.  For Blight, a trip to New York where he was wined and

15   dined by Issa and his staff.  For Velez, trips to Miami where

16   he and Issa relaxed and partied.  Issa and Velez went to

17   Tootsie's, that strip club that you have heard oh so much

18   about.

19             For all of these trips, Velez and Blight told you that

20   they paid for the trips themselves initially and that they

21   expected that Issa would reimburse them with cash -- a move

22   straight out of the Tony Issa playbook.  Also straight out of

23   the Tony Issa playbook, the payment of cash once the meals,

24   gifts, and trips were established.  For Velez it had been

25   happening before years long before Issa knew Nicholson and

ICH5iss2                       Summation - Mr. Wirshba

Blight.  You heard from Mr. Velez and he told you it started

with $200 tossed into a car, then $200 a week from one of

Mr. Issa's gas stations, followed by increasing amounts until

Velez was eventually being paid $1,500 a week.

For Blight, it happened at the end of his time in New

York when Tony Issa asked for the cost of the trip and in

return Blight received $2,000 cash, under the table, in a

napkin, nearly double what he had told Mr. Issa the trip cost.

No worries, Tony Issa said.  Everything is good.  $2,000

literally under the table.

Let's watch the video as it unfolds.

(Audiofile played).

MR. WIRSHBA:  What Nicholson, Blight, and Velez got

from Tony Issa the defense cannot reasonably dispute.  But

equally as clear is what Issa got from Nicholson, Blight, and

Velez.  In exchange for these meals, gifts, trips, and cash,

Tony Issa got millions of dollars in repair work.  He filled

his garages with postal trucks and with preventive maintenance

inspections, or PMIs.  Lots of PMIs.

Ladies and gentlemen, respectfully, that's no

coincidence.  The reason Tony Issa was giving away all this

free stuff, these free meals, straight up cash to these VMF

managers is exactly what your common sense tells you:  He

wanted work in return.  This was the quo in the *quid pro quo*.

This is what makes Issa's gifts bribery.

ICH5iss2                    Summation - Mr. Wirshba

1          Now, before I move on let me say one more thing about

2     Nicholson and Blight.  They each separately came forward, on

3     their own, to tell the postal service Office of Inspector

4     General -- what has been referred to in this trial as the

5     OIG -- about Tony Issa.  As you heard from Jim Nicholson, he

6     never heard of or met Jeff Blight.  Two separate postal service

7     VMF managers who each separately reported their concerns about

8     Tony Issa to OIG.  The fact that Issa raised red flags with two

9     different VMF managers in two entirely different parts of the

10    country, that's no coincidence, ladies and gentlemen.

11         Now, Issa's conduct with each of these three VMF

12    managers standing alone, each, is compelling proof of bribery.

13    All three in a position to decide whether Issa's companies

14    succeeded or failed, received things of value from Issa.  And,

15    when taken together, Issa's behavior with all three managers

16    leaves absolutely no doubt about what Issa was after.  How he

17    sought to get it and how he planned to conceal it.

18         Now, I expect that Judge McMahon will tell you that in

19    order to convict for bribery you will need to find beyond a

20    reasonable doubt that the defendant gave, promised, or offered

21    money or a thing of value with a corrupt intent to influence an

22    official act.  We have already gone through what Issa gave --

23    meals, trips, gifts, cash, and you know what he received in

24    return -- work, including those lucrative, lucrative PMIs.  But

25    you also know from the testimony and evidence presented here

ICH5iss2                      Summation - Mr. Wirshba

that Issa intended to obtain work in return for the things of
value that he was providing to his three VMF managers.  You
know it because when you use your common sense there is just no
other reasonable explanation.  When you look closely at the
evidence in this case, it's simply overwhelming.  When Issa
paid for VMF managers to eat, drink, and be merry, he wasn't
doing it to be a nice guy or out of the goodness of his heart.
No.  He was doing it because he expected work.  He expected the
VMF managers to fill his garages with vehicle repairs.

        Now, let's make one thing very clear.  Tony Issa, he
never came out and said, hey, VMF manager when I pay for your
steak I want you to exchange the steak for repair work.  Of
course he didn't.  Criminals, especially criminals who are
aware of the dangers of a *quid pro quo*, they don't announce
that they're doing something illegal.  Criminals carefully hide
their illegal activity and illegal intent any way that they
can.  Nonetheless, here, for Tony Issa, that intent is clear.
And, in addition, I expect that Judge McMahon will instruct
you, and of course her words, they always control, but I expect
that she will instruct you that as to bribery, you need not
find that the intent of the defendant was entirely corrupt.
The defendant, he could be found to have the requisite intent
even if he possessed a dual intent, that is, partly a corrupt
intent and partly an innocent one, a valid purpose like
friendship, I expect that Judge McMahon will instruct you but,

1    again, her words control.  A valid purpose like friendship that

2    partially motivates a payment does not insulate the defendant

3    if any part of his motivation was corrupt.  By the same token,

4    the government must prove beyond a reasonable doubt that some

5    part of the defendant's motive was corrupt but not all.

6            So, how do you know that Tony Issa intended to pay

7    bribes?  How do you know that he intended to get something in

8    return for his meals, gifts, and cash?  Three ways.  First, you

9    know that because you have heard Tony Issa explicitly ask for

10   work in exchange for meals.  Second, you know because Issa all

11   but admitted on tape that he knew what he was doing was wrong.

12   Third, you know because of how badly Tony Issa tried to hide

13   what he was doing with Nicholson, with Blight, and with Velez.

14           So, let's start with the first way you know that Tony

15   Issa intended to pay bribes.  You know because he said so.  In

16   this case you hardly have to guess at Mr. Issa's intentions

17   because you can listen to the words right out of his mouth and

18   those words, they tell you everything you need to know about

19   why he was giving money, meals, and gifts to VMF managers.

20           Let's start with Blight's July 11th, 2016 dinner at

21   Roast Detroit, you are going to find the transcript of that at

22   Government Exhibit 307C.  And, ladies and gentlemen, as I am

23   going through my presentation today you will notice that we

24   include the government exhibit sticker right there in case

25   later on, when you are deliberating, you want to go back and

ICH5iss2                    Summation - Mr. Wirshba

look.  I will do my best to also mention them when they're
there.

        Now, during this $500 meal in which Mr. Issa promises,
among other things, to bring Blight to New York on Mr. Issa's
dime, Issa says, *All I ask is that you got work to do?  We do
it for you.*

        Similarly, look at Issa's January 15th meal with
Nicholson at Wolfgang's at Government Exhibit 303.  During this
expensive and extravagant meal Issa repeatedly asked Nicholson
for PMI work.  Issa sells Nicholson:  *Let me help you with the
PMIs.*  He says it twice.  In practically two sentences further
offering that the money, it's coming out of the USPS, not out
of Nicholson's pocket.

        Now, this is hardly Tony Issa's only mention of PMIs.
Look here again, Government Exhibit 303I.  Here Issa again
asked for PMIs, look at how many times he asked.  He says it
himself:  *It's all he's looking for.*

        Now, giving something of value and in the next breath
asking for something in return, that's how a *quid pro quo*
works.  Basically, Tony Issa is saying, oh hey, here is this
thing of value, here is this Tablet computer.  It's not a bribe
but, hey, can I get that PMI work?  Can I get that PMI work?
Can I get that PMI work?  Over and over and over again.

        Now, most circumstances, the mere fact that an
individual is asking for a *quid pro quo* -- while he is asking

ICH5iss2                          Summation - Mr. Wirshba

1    for a quid, that is the thing that he wants during a quo.  Here

2    he is asking for work during a meal that was paid for by Issa.

3    In most circumstances that would be enough to infer intent.

4    But here, ladies and gentlemen, you have even more than that.

5    Here Issa tells you that he expects work in exchange for these

6    generosities.  Let's take a look at Government Exhibit 303D and

7    let's listen to Tony Issa's own words.

8               (Audiofile played)

9               MR. WIRSHBA:  Now, ladies and gentlemen, these

10   statements by Issa, they tell you everything you need to know.

11   Use your common sense.  What does Tony Issa mean when he says

12   it's a two-way street?  What did Tony Issa mean when he says we

13   help each other, just before saying, *You have to get those*

14   *trucks fixed anyway, right?*  Ask yourself when you are

15   deliberating how can Nicholson help Issa?  One way, and one way

16   only.  Nicholson can get more work for Issa's shops.  That's

17   the two-way street that Tony Issa is talking about.  This, for

18   that, an acknowledgment that what he is asking for is *quid pro*

19   *quo*, even if on this very clip he doesn't want to call it that.

20   And this isn't the only time that Tony Issa makes that *quid pro*

21   *quo* explicit even if he says it's not.

22               Taking a look at another clip from Government Exhibit

23   303, Tony Issa references the Mafia and discusses the

24   importance of trust.  He says we have a mutual relationship

25   that we can both benefit from, that's right, that we can both

ICH5iss2                    Summation - Mr. Wirshba

benefit from.  Ask yourself, what is the benefit to Jim
Nicholson?  Easy, it's the food, it's the booze, it's the
gifts.  And then ask yourself what is the benefit to Tony Issa?
Also easy.  It's work.  Tons and tons of U.S. Postal Service
work, PMIs and all.

Now, what's the second way that you know that Tony
Issa intended a *quid pro quo*?  The second way you know that
Tony Issa had an intent to bribe is that the evidence shows
that he knew that what he was doing was wrong.  Start with the
fact that you heard the tapes, you heard Nicholson repeatedly
telling Tony over and over again that he wasn't supposed to be
accepting meals for gifts.  Nicholson, he sounded like a broken
record.  Each time Tony Issa brushes him off because Nicholson
is telling Issa what he already knows, that Tony Issa is
proposing something that's illegal.  Tony Issa, he just doesn't
care.  How else do Tony Issa's words tell you that he knows
what he is doing is wrong?  Look at how many times Issa brings
up and insists that what he is doing is perfectly legal.  Look
at all these mentions of no *quid pro quo*.

Ladies and gentlemen, ask yourself who talks like
that?  Who continuously and repeatedly talks about how what
they are doing is on the right side of the law.  Use your
common sense, ladies and gentlemen.  People only talk about
being law-abiding and doing law-abiding things when what
they're actually doing is not law-abiding.

ICH5iss2                      Summation - Mr. Wirshba

 1              You know who talks about doing not law-abiding

 2       things -- or about doing law-abiding things constantly?  People

 3       like Tony Issa, people who are trying to convince the world

 4       that they're not doing something illegal.  But Tony Issa, he

 5       knows exactly what he is doing because he knows that even if he

 6       says no *quid pro quo*, he is asking for a two-way street.

 7              Now, what's the third way that you know that Tony Issa

 8       knew that what he was doing was wrong?  The third way is that

 9       you heard, time and again, that Tony Issa went to great lengths

10       to hide what he was doing with these VMF managers and that

11       tells you that Issa knew that he was paying bribes because when

12       people know that what they are doing is wrong, they try to hide

13       it, and that's exactly what the defendant did.  After all, to

14       use Tony Issa's words, if you don't know how to hide, don't get

15       in the game.

16              So, how did Tony Issa hide?  By insisting on secrecy

17       and by taking steps to conceal the truth.  Over and over again

18       in these tapes Tony Issa insisted on loyalty and silence.  Issa

19       repeatedly directed Nicholson that they must keep their

20       arrangement, the gifts and the meals a secret.  Here in

21       Government Exhibit 303H, Issa tells Nicholson it is their

22       little secret and he likens their relationship to two married

23       people having an affair.  In this next slide Issa tells

24       Nicholson he doesn't want to advertise what is happening

25       because, you know, of how it might look.  Consider what happens

ICH5iss2                    Summation - Mr. Wirshba

1    when Nicholson asks Issa if he had lunches with other U.S. Post
2    Office officials.  What did Issa say in response?  "Even if I
3    did, I would never tell you."  Followed by, "What happens
4    between us, stays between us."  This is both a reassurance and
5    a warning.  I will protect you but you better not talk about
6    our arrangement.
7             In addition to just talking about keeping the bribe
8    secret, Tony Issa took affirmative steps to ensure that his
9    bribes, that they would go undetected.  Remember Tony's motto.
10   If you don't know how to hide, don't steal.
11            Take the tablet computer.  What Mr. Brafman referred
12   to in his opening statement is akin to a pen at a bank.  I
13   don't know about you, ladies and gentlemen, but no one has ever
14   handed me a Dell tablet at a branch for free.  Now, you will
15   remember this tablet because Nicholson discussed it with Tony
16   Issa at length.  Issa first brought up the tablet at Smith &
17   Wollensky's.  In his opening, Mr. Brafman told you it was
18   Nicholson that suggested wiping the tablet but that's just not
19   what happened and now you, ladies and gentlemen, you have seen
20   the evidence.  Take a look at what really happened.
21            Government Exhibit 302G.  Issa said to Nicholson:  I
22   got that computer for you but the reason I didn't bring it
23   today is because it was designed to advertise, so when you open
24   it up every time it says Daimner, one of Mr. Issa's companies.
25   So, I still got to remove that.

ICH5iss2                    Summation - Mr. Wirshba

1          It was Issa who said he needed to remove his company's

2     name and it was Issa, after all, who knows how to hide and,

3     indeed, when Nicholson expressed concern about taking such an

4     expensive item, Tony Issa reassured him.  I already know you

5     got to be careful, that's why I don't want it to say Daimner.

6          Issa also sought to hide his payments to the VMF

7     managers in other ways.  Velez, for example, he put his trips

8     on his own credit card so that he could be reimbursed with

9     cash.  Similarly, before Bright's trip to New York, Issa told

10    him to book travel on his own credit card and that Issa would

11    later reimburse him.  Then, with Blight, you got to see that

12    reimbursement, straight out of the Tony Issa playbook.  That,

13    too, showed the length that Tony Issa would take to conceal his

14    illegal conduct.  Even far away from Detroit, at a random

15    restaurant in Chinatown, Tony Issa felt he had to wait for his

16    employee to leave the table and even then slipped the cash

17    under the table in a napkin, cash that, by the way, far

18    exceeded the supposed cost of Blight's trip.

19         Issa also told Velez as another example of how Tony

20    Issa tried to hide, to stop depositing the bribe money into his

21    bank account because, after all, it could be traced.  You have

22    heard Mr. Velez say that, ladies and gentlemen.  This

23    concealment, this constant concealment, it's clear evidence of

24    Tony Issa's consciousness of his own guilt.

25         Another way that you know that Tony Issa was aware

ICH5iss2                    Summation - Mr. Wirshba

1    that his bribes were illegal is that, at times, Issa's words

2    and actions, they appear to descend into paranoia.  Paranoia

3    that your common sense will tell you is a sign of Tony Issa's

4    knowledge that what he was doing was wrong.

5           Let's look at Government Exhibit 303H.  This is the

6    time that Tony Issa went to the bathroom while at dinner with

7    Nicholson.  And what does Issa say when he gets back to the

8    table?  He says he has been thinking about whether Nicholson is

9    going to rat him out by revealing their illegal arrangement.

10   What is he going to gain from effing you? Tony says out loud.

11   Or take the next example, Tony Issa's insistence that he

12   doesn't trust phones.  Never say a thing on the phone other

13   than legitimate business, Tony instructed.  Who says that?

14   Would a legitimate business person say that?  Or would a

15   legitimate business person never think to have a second phone

16   for illegitimate business?  And consider Tony Issa's obsession

17   with people wearing wires.

18          First, as you can see here from Mr. Blight's testimony

19   with Blight Tony Issa suggested that Blight could be a federal

20   agent and then Issa opened up his own shirt to prove that he

21   wasn't wired.  In addition, you heard about wires a second

22   time.  Shortly after Issa's arrest you heard that Tony Issa

23   went and confronted Ismael Velez in the freezer aisle of a

24   grocery store.  Once there, Issa checked Velez for a wire

25   before Velez did the same to him.  Ask yourself if you ever

ICH5iss2                    Summation - Mr. Wirshba

checked someone for a wire, if you've ever seen someone at a

restaurant check his legitimate business partner for a wire.

You haven't.  And during this trial you have heard about it

twice.

    And finally and relatedly, how do you know that Tony

Issa knew he was illegally bribing VMF managers?  Because he

felt the need to coach the VMF managers that he was bribing on

what to say if they were approached.  After his arrest, Tony

Issa tried to silence Velez, knowing how damaging it could be

if Velez' story got out.  When Issa met Velez in the freezer

aisle, Tony Issa said that Velez should tell authorities that

Velez didn't receive any money from Tony Issa and that

everything was legit and Issa was just doing the work.

    If, in Issa's mind, there was nothing wrong with the

bribes to Blight, Nicholson, and Velez, why would he keep

telling everyone to hide them?  The answer is simple, ladies

and gentlemen.  Issa knew he was giving illegal bribes.  All of

the evidence points to the same thing.  Issa knew that his

payments of meals, cash, gifts, and trips made in exchange for

work was wrong.

    Now let's talk for a moment about Ismael Velez.  First

of all, as you know with Velez, unlike the other two VMF

managers, there were no tapes but, frankly, there might well

have been because Issa's actions toward Velez, they follow the

Tony Issa playbook to a T.  In fact, Velez was getting cash

before, during, and after Issa's business with Blight and

Nicholson.  Yes, Velez did conceal the truth from the

government.  He broke his promise to disclose all of his crimes

and that is extremely serious but ask yourself when you are

considering Mr. Velez' testimony, what did he lie about?  What

did he conceal?  He told you that it was more bribes, bribes

from a different postal service vendor.

　　　　　Ladies and gentlemen, it should be no surprise that

someone willing to take bribes once was willing to take bribes

again, just as Tony Issa was willing to give bribes on multiple

occasions from multiple people.  And while Velez' concealment

is very serious and something you should carefully consider,

ask yourself if Velez was telling the truth when he got on the

stand.  First of all, Velez admitted that he accepted a bribe

when asked by Mr. Brafman that he had never told the government

about.  He also told the truth about what he received from the

government for his testimony and acknowledged that the benefits

he was supposed to receive, in exchange for his testimony,

could be at risk and, indeed, it could be.  But ask yourself

while you are evaluating Mr. Velez' testimony, what incentive

did develops develop have to make up the bribes from Tony Issa?

　　　　　Velez, he wasn't the reason that Tony Issa got

arrested.  You will recall that Tony Issa was arrested on

September 2nd of 2018.  It is in stipulation 4001.  And shortly

thereafter, you will remember the testimony that Tony Issa paid

ICH5iss2                    Summation - Mr. Wirshba

1    a visit to Velez to warn him not to talk, we just talked about.

2    The government did not use Velez to get to Tony Issa.  Instead,

3    the government approached Velez after Issa's arrest and asked

4    about Issa.  Velez, at that point, he came clean.  He knew he

5    had done something wrong and he turned himself into the

6    marshals and cooperated with the government.  He then pled

7    guilty to accepting Tony Issa bribes and is now facing up to 15

8    years in prison.

9            Velez, he hadn't committed some other crime for which

10   he was trying to get time off his sentence.  Velez didn't get

11   caught and then help catch some other guy to save his own skin.

12   Velez, from the start, told law enforcement that he had

13   accepted bribes from one person, Tony Issa.  Why would he make

14   that up?  Why would he say he accepted these bribes from Issa

15   if it wasn't true?  Ask yourself, what is the benefit to Ismael

16   Velez?  Nothing.

17           Now, in addition, there is plenty of testimony that

18   corroborates Ismael Velez.  Maybe most importantly is the

19   testimony of Sohail Butt.  You remember Sohail Butt.  He is a

20   loyal employee of Mr. Issa.  He still works for him.  And you

21   will remember that Sohail Butt said that on one occasion, Tony

22   Issa, he got very mad with me and he told me, Sohail, I'm too

23   far away to get the money for him -- referring to Ismael Velez.

24   And if I don't pay this guy, he shuts all my shops.  So, that's

25   what he mentioned at that time and he, meaning Tony Issa, was

ICH5iss2                        Summation - Mr. Wirshba

1    very angry.

2              Now, ladies and gentlemen, you don't need to like

3    Ismael Velez.  You don't need to like that he concealed things

4    from the government or that he demanded more money from Tony

5    Issa.  But look at how much of what he said was corroborated by

6    texts, by photos, and by the testimony of Sohail Butt.  Think

7    about why Velez would make up his testimony and what could be

8    gained by telling law enforcement that he was bribed when he

9    wasn't.

10             Ultimately, Ismael Velez, he will have his day of

11   reckoning.  He will be sentenced for the crimes that he has

12   committed and a Judge who sentences him will know not only

13   about those crimes but about everything else that he told you

14   during this trial.  But the fact that Velez' story lines up so

15   closely with the Issa playbook used with Nicholson and Blight

16   combined with Sohail Butt's corroborating testimony shows that

17   Velez' testimony is credible, and in the end this testimony

18   plus the testimony of Nicholson and Blight and the physical

19   evidence including transcripts, the tablet, the taped

20   conversations, they constitute overwhelming evidence of guilt.

21             So, what about what you have heard from Mr. Brafman

22   during this trial?  I will remind you, of course, that

23   Mr. Issa, he has absolutely no burden here.  The government

24   bears the entire burden of proof and we embrace that burden.

25   But, when the defense presents evidence to you and makes

ICH5iss2                        Summation - Mr. Wirshba

1    argument to you, you are entitled to and you should scrutinize

2    that evidence and those arguments the same way you would any

3    other evidence and arguments.  You should use your common sense

4    as well and when you do that, you will see that these

5    arguments, they either don't make sense or irrelevant.  Let's

6    start with Nicholson and Blight.

7         Mr. Brafman spent a lot of time in his opening and in

8    questioning focusing on the motivations of Nicholson and

9    Blight.  For Blight we spent a significant amount of time

10   reviewing whether or not his daughter went to Columbia, whether

11   his daughter had a scholarship, whether his mother had surgery

12   on a particular day that he mentioned to Tony Issa.  For

13   Nicholson, it was all about who was the fish.

14        First of all, ladies and gentlemen, you heard what

15   Mr. Brafman told you in opening.  He said that Nicholson would

16   be paranoid and mean-spirited.  He said that Blight would be a

17   whining, patronizing liar.  You saw these witnesses.  You saw

18   their demeanor, you saw that they testified truthfully about

19   what happened and that their testimony is supported by the

20   recordings and other evidence in this case but there is a far

21   more important point here.  The motivations of Nicholson and

22   Blight, they just don't matter.  The reason that Nicholson and

23   Blight made those tapes, they're simply irrelevant here.  What

24   is beyond dispute is what happened on those tapes, what Issa

25   said on those tapes.  Mr. Brafman, he doesn't want you to focus

ICH5iss2                    Summation - Mr. Wirshba

1    on that unless, I expect, that in his closing argument you will

2    hear quite a lot about Nicholson and Blight and what they were

3    doing.  Ladies and gentlemen, that is a distraction.

4           Nicholson and Blight, they aren't on trial.  Tony Issa

5    is on trial and it is your job to determine what Tony Issa's

6    intent was, not the intent of Nicholson and Blight.  In this

7    case, unlike many cases, we have tapes.  From those tapes you

8    can see exactly what Tony Issa's reactions were to the

9    statements made by Nicholson and Blight.  For example, when

10   Blight told Issa that he might need to come to Columbia

11   University, did it matter that his daughter didn't actually go

12   to Columbia?  No.  What mattered was that Tony Issa offered to

13   and did pay for that Blight.  And, what mattered that once

14   Blight got here, Issa paid him, in cash, more than his trip was

15   worth.

16          What matters is why Tony Issa did these things, not

17   what motivated Blight.  Blight's motivation, Nicholson's

18   motivation, these things are a distraction because if you

19   concentrate on what Tony Issa was doing and saying -- paying

20   for luxury goods and meals while asking for work -- you will

21   come to the conclusion that Tony Issa knew exactly what he was

22   doing -- bribing public officials in exchange for repair work.

23          Keep this in mind, too.  Jim Nicholson, Jeff Blight,

24   they never asked for a thing from Tony Issa.  To pay for

25   Blight's flight to come to New York City.  That was Issa's

ICH5iss2                    Summation - Mr. Wirshba

1   idea, not Blight.  Paying extra money to Blight above and

2   beyond what the trip cost, that was Issa's idea.  Giving

3   Nicholson a tablet, paying for food for his wife; Issa's idea.

4   Taking Nicholson to high-end steak houses?  Issa's idea.  It

5   was all Issa's idea.

6          So let's talk for a minute about a related argument

7   that Mr. Brafman raised in his opening, in his questioning of

8   the witnesses that every single thing of value that Tony Issa

9   gave to these VMF managers, every meal, every gift, every trip,

10  every dollar of cash, was motivated completely by generosity or

11  friendship.  And you will remember from that instruction that I

12  expect that you will hear later from Judge McMahon, that he

13  needs to prove that because if any portion of Tony Issa's

14  motivation was in order to get work from the U.S. Postal

15  service -- any portion -- he is guilty of bribery.

16         So, Mr. Brafman, he argued that these VMF managers are

17  sad, sad people and that Tony Issa was just trying to make

18  their lives better.  Use your common sense, ladies and

19  gentlemen.  Do these meals, these gifts, these trips, do they

20  feel like charity to you?  Do they feel like friendship?  Does

21  eating a $30 stone crab while lecturing about the importance of

22  trust and keeping everything on the hush-hush, does that seem

23  like charity or friendship?

24         Does passing cash in a napkin under the table, does

25  that feel like charity or friendship to you?

ICH5iss2                    Summation - Mr. Wirshba

1              Does paying a prostitute at Tootsie's feel like an act

2      of charity?

3              No.  Because it's not.  Nicholson and Blight, they

4      weren't Tony Issa's friends.  They barely knew him.  There is

5      only one reason that Tony Issa was paying these VMF managers

6      who had the ability to send him loads of vehicle maintenance

7      work.  That one reason:  Literally, millions of dollars.  You

8      heard that in the case of Ismael Velez.  Tony Issa was trying

9      to get work, period.

10             How else do you know that these weren't acts of

11     kindness?  Take a look at these portions of the transcript.

12     You heard over and over again that Tony Issa is a

13     self-proclaimed business man, a smart businessman.  Do

14     businessmen give away meals, booze, and an iPad for nothing?

15     Of course not.  Smart businessmen do business, they make deals,

16     they enter mutually beneficial arrangements where each side

17     gets something in exchange for something else, a two-way

18     street.  That's what Tony Issa said and that's exactly what

19     Tony Issa was doing.  He told you that over and over.  These

20     meals, these gifts, these trips, this cash?  It's business.

21     Illegal business.  A *quid pro quo*.

22             Keep this in mind, too.  You don't have to find that

23     every payment that Issa made was purely motivated by an intent

24     to bribe.  First, you need to find that only one of these

25     things of value that Issa gave was intended, in part, as a

ICH5iss2                        Summation - Mr. Wirshba

1    bribe to find him guilty.  So, even if you buy Mr. Brafman's

2    argument that here and there Mr. Issa, he was giving away

3    things because he felt story for the VMF managers, that just

4    isn't enough.  You need to believe that all of the things that

5    Mr. Issa provided -- all of them -- the cash, the trips, the

6    bottles, the meals -- all of it was out of the goodness of his

7    heart.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICHHIss3                    Summation - Mr. Wirshba

1              MR. WIRSHBA:  (Continued) This is simply not

2    believable.

3              Another argument that Mr. Brafman might make is that

4    Tony Issa didn't know that what he was doing was illegal.

5    Yeah, sure, he bribed people.  Yes, he paid for meals and booze

6    and trips in exchange for work, but he thought he was only

7    violating postal rules, not the law.

8              Well, ladies and gentlemen, if you hear that argument,

9    you can dismiss it for two reasons:  First, it's just not true.

10   You know it's not true from the tapes.  What was Tony Issa

11   constantly talking about?  What did Tony Issa make sure to say

12   over and over and over again?  No quid pro quo, no this for

13   that, again and again.  Well, ladies and gentlemen, take a look

14   at the contracts that Delores Waters asked you about -- that

15   Delores Waters talked about at the very beginning of this

16   trial, excuse me.  Take a look at the language of those

17   contracts that talk about gifts.  When you do that, you'll find

18   that quid pro quo is nowhere in these contracts.  That term,

19   that concept, it just isn't discussed.  So why is Tony Issa

20   obsessed with whether or not there was a quid pro quo?  Because

21   he knows when he gives things to VMF managers, the risk is to

22   him is not just a canceled contract, the risk is criminal

23   charges, because you know, as we discussed, you'll hear from

24   Judge McMahon, it's the bribery law that talks about a quid pro

25   quo.  So every time that Tony Issa mentions a quid pro quo,

ICHHIss3                    Summation - Mr. Wirshba

1    he's telling you he knows exactly what he's risking.  It's not

2    just a risk to his reputation or his companies; he's signaling

3    to you that he knows the law.  And when he insists upon a

4    two-way street, he's telling you that he intends to break that

5    law.  For Mr. Brafman to suggest otherwise would ignore every

6    time Mr. Issa discusses the quid pro quo.

7            In addition, as we already discussed, you know that

8    Tony Issa knows that a quid pro quo is illegal because he says

9    so on the tapes.  Here in Government Exhibit 303D, Tony Issa

10   defines a quid pro quo and tells Nicholson that if Nicholson

11   demanded something for giving Tony Issa work, that would be

12   illegal.  But then he agrees when Nicholson says if something

13   just came his way, that would be OK, because then, you know,

14   there's no quid pro quo.  It just came his way.

15           In addition to defining quid pro quo, Mr. Issa also is

16   constantly talking about how he would never bribe a VMF manager

17   to do anything illegal.  Why is Issa talking about illegality

18   if all he's concerned about is a canceled contract for his

19   company?  He's talking about illegality because he knows that

20   paying VMF managers to get work, it doesn't just run afoul of

21   some internal postal regulation.  It might do that, that's

22   true, but there's more.  It's a crime.  And even though you

23   know that it's not true that Tony Issa was worried about only

24   his contract, it.

25           Also wouldn't matter, because even if you found ladies

ICHHIss3                    Summation - Mr. Wirshba

1    and gentlemen, that Tony Issa thought his quid pro quos were

2    just violations of postal rules and you shouldn't, you know

3    much more than that, he's still guilty.  Why?  Because in order

4    to convict, as we've already discussed, I expect that Judge

5    McMahon will tell you that Tony Issa didn't need to know

6    exactly which specific law he was violating.  Instead, I

7    anticipate that Judge McMahon will instruct you that Tony Issa

8    only needed to act corruptly.

9         Listen extremely carefully when Judge McMahon

10   instructs you on what it means to act corruptly.  But I expect

11   that she will tell you that to act corruptly means having an

12   improper motive or purpose, conscious wrongdoing.  Having a bad

13   or evil state of mind.  Someone who makes a deal for an illegal

14   quid pro quo with a public official, therefore, doesn't need to

15   know exactly what law he's violating so long as he acts within

16   an improper motive.

17        Do you have any doubt in your mind that Tony Issa

18   acted with an improper motive?  With all the hiding, all the

19   talk of loyalty, all the scheming, all the reassurance that

20   everyone was doing it, Tony Issa knew that what he was doing

21   was wrong.  From the evidence there can be no doubt about it.

22        Now, Mr. Brafman might also argue that Issa's payments

23   and gifts to the VMF managers weren't bribes because Issa's

24   companies were doing good work, because Issa's companies were

25   the only ones open overnight, or because Issa's companies were

ICHHIss3                    Summation - Mr. Wirshba

1    the only ones under contract.  This too, ladies and gentlemen,

2    you know from the testimony and evidence is simply not true.

3    You heard each of the VMF managers say that it's in their

4    discretion or up to their subordinates whether to give work to

5    a third-party contractor, and it's up to them to decide which

6    contractor gets to do that work.  Delores Waters, she told you

7    the same thing at the beginning of the trial.  It's up to the

8    VMF manager and his staff.  Even if there was only one

9    contract, you heard Delores Waters say that nothing about the

10   existence of that contract, nothing about the existence of a

11   VMRA entitled the third-party contractor to work.  How else do

12   you know this is true?  Because Tony Issa was constantly

13   begging for work.  In the tapes he was constantly begging

14   Nicholson to give him PMIs.  And Velez, he told you Issa was

15   constantly asking for more repair work.  If Tony Issa was

16   entitled to work and it was going to come to him anyway, why

17   was he always begging for it?  Because Tony Issa wasn't getting

18   what he wanted, and so he bribed the people who could get it

19   for him.

20          But at bottom, ladies and gentlemen, it's just another

21   distraction because even if these VMF managers were going to

22   give Tony Issa the work, it wouldn't matter.  I expect that

23   Judge McMahon will instruct you that the government does not

24   have to prove that the public official ever intended to perform

25   the act sought.

ICHHIss3                    Summation - Mr. Wirshba

1          I anticipate that she will also say that a quid pro
2   quo is illegal even if the public official would have taken the
3   same official act without the bribe or even if the public
4   official did not take the official act sought in the end.   In
5   other words, even if the quo was never going to happen or
6   already was definitely going to happen, the payment of a quid
7   can still be a bribe.
8          Finally, I expect that Judge McMahon will instruct you
9   that an illegal quid pro quo would be illegal even if the
10  action taken by the public official was desirable or beneficial
11  to the public.  A bribe payment is unlawful even if the public
12  official would have and should have taken that action anyway in
13  the public interest.
14         What does this mean here, ladies and gentlemen?  It
15  means that even if Tony Issa struck a bargain to pay the VMF
16  managers for work that they already planned to give him, it
17  would still be illegal and he would still be guilty.  So this,
18  ladies and gentlemen, it's just a distraction.  It's not a
19  defense to the charge, period.
20         Finally, as you heard in Mr. Brafman's opening and
21  throughout his questioning, Mr. Brafman might try to distract
22  you with issues that have just absolutely nothing to do with
23  this trial.  You know what's at issue during this trial?  It's
24  whether or not the U.S -- it's whether or not Mr. Issa paid
25  bribes to U.S. postal officials.

1    You know what's not at issue in this trial, whether or

2    not the United States Postal Service needed new trucks.  This

3    fact has no bearing on whether or not Tony Issa gave bribes,

4    stole money, or cheated on his taxes.  What else isn't

5    relevant?  Whether or not Issa's garages were packed with

6    postal trucks.  He's charged with bribing people to ensure he

7    gets work.  It should be no surprise to anyone that he had post

8    office trucks in his garages.  Finally, whether or not the area

9    where Tony Issa's Detroit operation worked needed jobs or was

10   blighted, those issues have just nothing to do with this case.

11   Let's make one thing crystal clear a, ladies and

12   gentlemen.  The U.S. Postal Service is not on trial in this

13   courtroom.  Tony Issa is on trial.  The only thing that matters

14   is Tony Issa and his bribes, his lies, his theft, and his tax

15   fraud.

16   What is relevant to this bribery count, then?  It's

17   pretty simple, ladies and gentlemen, and the bottom line is

18   this:  When Tony Issa was giving all these things to VMF

19   managers, the cash under the table, the expensive lunches, the

20   trips to Miami, and the envelopes of cash week after week, you

21   know why he was doing it.  You know it from all the evidence.

22   It was a bribe.  He wanted and expected work in return for

23   providing these things, and ladies and gentlemen, that makes

24   him guilty of Count One.

25   The next count, Count Two, it charges Tony Issa with

ICHHIss3                    Summation - Mr. Wirshba

1    the theft of government funds.  What theft?  The continuous and

2    repeated double billing, billing for work not performed, and

3    billing for work not requested that you heard over and over and

4    over again from all three VMF managers.  You heard from each

5    VMF manager that they had problems.  You heard from these VMF

6    managers that they raised these issues with Tony Issa.  Jim

7    Nicholson, you heard him confront Tony Issa in the Olive Garden

8    about shoddy work.  Jeff Blight, he told you that while the

9    first couple of repairs were good, things after that, they got

10   pretty bad.  There was double billing, billing too much, and

11   even double billing on the same bill.

12          So let's take a look at some of these things.  Time

13   and time again, despite Issa having been informed of the issues

14   with the work and with the way that his companies were

15   invoicing, the problems continued.  Let's take very briefly to

16   talk about a few of these problems that you saw over and over

17   again.

18          The biggest one, it's the double billing.  Issa's

19   companies billed for PMI work, the preventive maintenance

20   inspection that you heard so much about, and then you know from

21   the testimony that they billed again.  They billed again for

22   itemized items that should have been covered by the PMI.  Now,

23   it would be one thing if this just happened once.  It would be

24   one thing if here and there the duplicate charges, they were

25   random, but you, ladies and gentlemen, know that that's not

ICHHIss3                        Summation - Mr. Wirshba

what the evidence showed.  Instead, what the evidence showed

was that the same charges kept being billed over and over

again, and not just one but many of Issa's locations.

        Take a look.  The road test charge right here, it was

clearly double billed, and not just at one company.  Look

again.  There's other companies.  This one's First Star, but

let's go to the next slide.  There's also double billing

another from First Star and, on the next slide, from Hybrid.

        You also heard from Nicholson about duplicate charges

related to batteries.  Let's look at that.  Here's one from

Delorean.  Let's look at the next slide.  First Star and

Delorean.  And on the next, Safeway in Detroit.  Yet another

set of double billing.  The common denominator between all of

this, between the Safeway in Michigan, Healey in Westchester,

and First Star and Hybrid, the common denominator is Tony Issa.

        The other thing that Issa's companies did that you

heard from both Nicholson and Velez is that they would bill for

work the USPS had not authorized.  Mr. Brafman may try to

portray this as trivial, but when you stop for a minute, you'll

realize it's anything but.  It's like going to a mechanic, and

when they found something new, instead of calling you to say:

Hey, there's a problem.  Do you want us to fix it? they just

bill you for it.  That's not fair, and it's exactly what Issa's

companies did.  They just went ahead and did extra work without

even asking.  And here, Issa's companies, they knew better.

ICHHIss3                    Summation - Mr. Wirshba

1    Tony Issa, he knew better.  Why?  Because unlike when you visit

2    your mechanic, Issa had a contract, and that contract required

3    him to seek the postal service's permission before taking any

4    additional work.  You heard that this happened often.

5         All right.  Taken together, it was Issa's companies

6    over and over again that did this double billing.  Year after

7    year Velez told Issa about these issues, and yet Tony Issa did

8    nothing.  He is the common denominator among all this billing.

9    Tony Issa is guilty of Count Two.

10         But Tony Issa, he wasn't just stealing money from the

11   postal service.  He was determined to cheat the system in any

12   way he could.  After all, he had already bribed, he had lied,

13   he had stolen to get extra money into his pocket.  Why give it

14   back to the government in taxes?  The tax laws, they were just

15   another system to cheat.

16         So what did Tony Issa do?  He lied, cheated, and stole

17   again.  He paid for personal expenses from his businesses and

18   then he hid the true nature of those expenses from the IRS.  He

19   took cash and he hid it from the government.  When he finally

20   got caught, when the IRS noticed that the numbers it was

21   getting, they just couldn't be right, what did Tony Issa do?

22   He lied again.  This time to accountants, so many accountants,

23   so that he didn't have to pay one more dime in taxes.  He

24   covered up his earlier lies with new lies, confident that the

25   law would never catch up to him.  Well, ladies and gentlemen,

ICHHIss3                          Summation - Mr. Wirshba

1    now it has, and now you can hold him accountable.

2          But before I go into the detail of the third set of

3    charges, the tax charges, I'll just say a brief bit about taxes

4    in general.  Ladies and gentlemen, no one likes to pay their

5    taxes, but everyone understands that it is necessary for the

6    functioning of our government.  In addition, in this country

7    the IRS relies on individuals and business owners to

8    self-report their earnings and expenses voluntarily to pay the

9    taxes owed.  Without this voluntary reporting, the system would

10   not work.  So Congress has made it a crime to purposely lie on

11   your tax forms or purposefully evade taxes.  The tax laws are

12   there for a reason, to make sure that every single person does

13   their part and does not purposefully fail to account to the IRS

14   for their fair share.

15         So how did Tony Issa cheat the tax system?  In the

16   broadest sense he cheated in two ways:  First, he lied to the

17   IRS about his personal income on his personal income tax

18   returns in 2012, 2013, and 2014; and, second, he lied to the

19   IRS about how much money First Star Auto Repair and other

20   companies that he controlled made in 2012.  Let's look at these

21   one at a time.  Let's start with Tony Issa's personal taxes.

22         The personal income tax crimes are charged in Count

23   Five through Eight, and I expect that Judge McMahon will

24   instruct you that on those counts that they allege that Tony

25   Issa signed his personal tax returns knowing that at least one

ICHHIss3                    Summation - Mr. Wirshba

1    item on the return was materially false or, in other words, was

2    essential to an accurate determination of the defendant's tax

3    liability.

4           Now, on these counts, as with all the others, the

5    government has met its burden.  Here it met its burden by

6    showing that Tony Issa underreported his income.  What were the

7    sources of that money that the government proved Tony Issa

8    failed to report on his personal income tax returns?  There

9    were two sources: personal expenses paid from Issa's businesses

10   and cash pulled from his cash stations.  Let's start with

11   personal expenses.

12          You heard that in 2012, 2013, and 2014, Tony Issa paid

13   a lot of personal expenses out of his businesses.  Some things,

14   normal living expenses, he paid for those throughout this

15   period, like his rent, his utilities, his cable, and his

16   parking.  But other things, they were one-time purchases, like

17   for his dentist, his boat, his Mercedes, a commercial kitchen,

18   and his vacation home in the Hamptons for the summer.  But in

19   each case you have no doubt, these expenses were personal to

20   Tony Issa.  You know that for two reasons:  First, you can use

21   your common sense.  Going to the dentist is not a business

22   expense for a vehicle repair shop; and, second, excuse me --

23   and second, excuse me for one moment.

24          Now, going to the dentist, as I said, it's not a

25   personal expense for a repair shop.  And according to

ICHHIss3                    Summation - Mr. Wirshba

1    Mr. Brafman in the opening, the government doesn't need to
2    prove that the boat or the apartment, that these were personal
3    expenses.  In fact, Mr. Brafman said that he wasn't going to
4    argue that the apartment was a completely OK deduction.  So
5    those are the two ways that you know that these aren't personal
6    expenses.  You're going to use your common sense, and you're
7    going listen to the arguments of the parties.  When Mr. Brafman
8    says that he knows that it wasn't a completely OK deduction,
9    you should pay attention.
10           Nevertheless, the government did prove that these were
11   personal expenses.  You heard from Agent Berzansky about how he
12   carefully examined the records of these companies and carefully
13   tallied the expenses, and that in his judgment that they were
14   personal because they were not ordinary and necessary to Issa's
15   business.  On this exhibit you can see all of the personal
16   expenses that are tallied on the left-hand side.  And in 2012,
17   it amounts to Tony Issa paying for over $90,000 in personal
18   expenses directly from First Star, Optimum, and Hybrid; in
19   2013, more than $250,000; and in 2014, more than $30,000 in
20   personal expenses directly from the bank accounts.
21           But that's not the only way that Tony Issa got money
22   that he didn't report on his personal income tax returns.  You
23   know he also took cash from his businesses.  You heard a lot
24   about it, and you saw the records.  You remember that these gas
25   stations, they're owned by the defendant, and you remember that

ICHHIss3                    Summation - Mr. Wirshba

1    they kept very detailed records of the cash going in and out.

2    You heard that from Sohail Butt, about how he manages several

3    gas stations and that they would keep track of the daily sales

4    report.  Similarly, you heard that from Claudia Betancourt who

5    told you that these reports would come to the main office and

6    that she would make sure that they were accurate.

7           What did Claudia and Sohail tell you was recorded on

8    these records?  Payouts.  We've had a lot of discussions about

9    payouts or payments that went straight from the cash register

10   to pay for someone or something.  This included things for the

11   business, sure, but it also included payments that had nothing

12   to do with the businesses and had everything to do with Tony

13   Issa personally, cash to Tony, cash to Tony's father, cash to

14   Tony's sister, and cash to Tony Issa's daughter.  And you heard

15   from Ms. Betancourt that each time she saw a payout that

16   referenced something connected to Mr. Issa, Ms. Betancourt

17   would call Issa and ask him about it, confirm that the payment

18   was good with him.

19          Now, Tony Issa, he only got some of this money

20   himself.  Much of it went to his father, his daughter, his

21   sister, as we just discussed.  But you know that despite his

22   best efforts, Tony Issa paying friends and family, it doesn't

23   change that these payouts, they ultimately are income to Issa.

24   You heard Agent Berzansky tell you about the concept of

25   constructive receipt.  When a corporation pays an unrelated

ICHHIss3                    Summation - Mr. Wirshba

third party at the direction of that corporation's owner, the
IRS, it treats that corporation's owner as first getting that
income and then passing that income on to the third party.  In
other words, an owner of a corporation can't avoid paying
income taxes just because he has his company pay his bills and
give gifts directly, but that's exactly what Tony Issa tried to
do.  And you heard that Agent Berzansky, he found that there
was quite a bit of money coming out to Tony and Tony's family
and friends, and you can see it on those lines that say "cash
sheets Tony" and "cash sheets Tony family/friends."

        Ladies and gentlemen, you know that this number, these
numbers from these cash sheets, that the number that's actually
missing that was taken by Tony Issa, it was actually much
higher in 2012.  Not by virtue just of the fact that Agent
Berzansky, he only had August through December, you also know
that the amount that Tony took was much higher because you saw
Daniela Silva's words to that effect.

        Here's Government Exhibit 710.  Here, Daniela wrote to
Tony on October 11, 2012:  "You keep taking moneys from First
Star and Optimum that are not accounted for.  If they are not
all personal, you should let the office know what they're for,
otherwise I will go for personal.  See below how much you took
in these last three months."  Then she includes a table.

        We just discussed this with Agent Berzansky, ladies
and gentlemen.  Look at these totals.  These are quite high.

ICHHIss3                    Summation - Mr. Wirshba

1  Despite that, however, despite the fact that Agent Berzansky

2  had access to this information, he didn't include this on his

3  tax calculation because this wasn't reflected in a proper

4  business record.  So you know that despite Agent Berzansky's

5  calculations, that number, that cash that Mr. Issa kept, it was

6  actually much higher.  Look at the last thing that Daniela

7  Silva says here.  She says:  Below are your total expenses paid

8  for each month.  Very high numbers.  June, $40,000;

9  July $41,000; August, $35,000; and September $25,000.

10         Now, I expect that Mr. Brafman, he may argue that Tony

11  Issa, he didn't realize that he was responsible for paying

12  taxes on these personal expenses.  Keeping in mind that the

13  government, it always bears the burden, never the defendant, if

14  Mr. Brafman argues that Tony Issa didn't know what he was

15  doing, you can dismiss this argument.  You know from the

16  testimony and evidence presented that Tony Issa knew exactly

17  what he was doing when he neglected to declare these personal

18  expenses and cash on his personal income tax returns.

19         How do you know?  Because you're going to use your

20  common sense.  When a business owner takes money from his own

21  register, is it stealing?  No.  But is it income?  Of course it

22  is.  You remember that in 2013 Tony Issa declared on his bank

23  return -- excuse me, on his tax return, only W-2 income, only

24  income that came directly into account, his account, from his

25  companies, not a dime more.  But you knew and Tony Issa knew

ICHHIss3                    Summation - Mr. Wirshba

that Issa got so much more than that.  He took money from the

registers, he gave money from the cash registers to his family,

and he paid for things like his car and his Hamptons summer

home with those company funds.  Every taxpayer knows that when

you get money from where you work, when your work pays for your

Mercedes and your vacation home in Southampton, that is income,

plain and simple.

        But you don't even just need to use your common sense

to know that Issa was avoiding taxes.  You know that he was

avoiding taxes because Tony Issa tried to conceal these

expenses; he tried to conceal this cash.  And you know that

when someone tries to conceal something, they're trying to hide

because they know that what they're doing is wrong.

        So how did Tony Issa try to conceal these things?

Well, he tried to do so in his corporate books.  Let's start

with the expenses.

        You remember that Claudia Betancourt told you that it

was her job to create the monthly expense reports, just like

this one for First Star Auto Repair.  To do that, she took

every expense that she found in the bank accounts and she found

a place for it in this form.  In 2012, those categories in

green, those reflected the legitimate business expenses, but

when Ms. Betancourt couldn't find a place for these other

expenses that she found, she put it on the bottom.

        So what did she put here on the bottom?  Tony's rent,

ICHHIss3                    Summation - Mr. Wirshba

1    Tony's parking, Tony's dentist, Tony's boat.  These were things

2    that weren't expenses, and Claudia Betancourt, she didn't

3    classify them as such.  But to Tony Issa and Daniela Silva, his

4    top employee and his wife, that just wouldn't do.  Sitting at

5    the bottom like that, those expenses, they were exposed.

6    Someone might find out what they were.  So Silva created new

7    categories and moved the expenses in so they could no longer be

8    identified.

9           Let's look at those.  This is 715 and 716A.  You

10   remember when Claudia compared the spreadsheet on the left with

11   the spreadsheet on the right, the one on the left is earlier,

12   it's from January, and the one on the right, it's from

13   February.  And you remember she told you that Tony's rent, it

14   becomes city office rent; Tony's parking, city office parking;

15   Tony's boat, entertainment; and Tony's dental, health

16   insurance.  Health insurance, ladies and gentlemen, that's a

17   clear attempt to hide.

18          Remember, this isn't the only way you know what

19   happened.  Daniela Silva, she sent out an email, Government

20   Exhibit 726, in which she made this into corporate policy for

21   First Star Auto Repair.  What does she say?  Instead of Solow

22   rent, which is Mr. Issa's apartment, write "city office rent."

23   You can see it here.  It's laid out.  There you have it.

24   Here's how we're going to hide and here's how we're going to do

25   it.  For a while this seemed to work.  By hiding it in the

ICHHIss3                        Summation – Mr. Wirshba

books and records of First Star Auto Repair, Tony Issa managed
to hide these personal expenses from anyone outside of First
Star.  It would be impossible for anyone just looking at these
books and records once they were finished to tell what these
things were other than that they were legitimate expenses of
the business, and that's exactly the point.  These personal
expenses are hidden, and the accountants, they wouldn't ask
questions.

          What's more, this scheme offered an even greater
benefit.  Not only did hiding the personal expenses as
corporate ones allow Tony Issa to skirt paying personal income
taxes, but in 2012 it also meant that he had more corporate
expenses to claim for First Star, further reducing First Star's
tax burden.  This was a win-win for Tony Issa, a double cheat
of the system.

          What about the cash?  How do you know that Tony Issa
sought to hide the cash?  Easy.  He kept it out of the bank.
You know that Tony Issa took or gave to his family and friends
some $26,000 in cash from First Star in 2012, and that's just
from August to December.  You heard from Claudia and Sohail
that the money that gets paid out, it never reaches the bank.
As long as that cash never reaches the bank, to anyone looking
at the bank accounts, looks like First Star never made that
money.

          But in early 2013, the story changes.  All of a sudden

ICHHIss3                    Summation - Mr. Wirshba

Tony Issa finds that maybe he wasn't as good as cheating the

tax system as he thought.  In March of 2013, Issa received a

notice from the IRS.  First Star, it says, IRS records show

your company got a whole lot more revenue than you reported, so

much more revenue that the IRS calculates that you owe us a

check of over $400,000.

     How did the IRS detect this revenue?  Well, as you

heard, the IRS receives 1099s, and when those 1099s show that

there's money from a third party that was paid to a business,

they can calculate that and determine whether that business

owes extra taxes.  Here, there was a 1099 from the U.S. Postal

Service that far exceeded what First Star Auto had declared as

income in 2012.  Issa's company, it hadn't told the IRS about

approximately $900,000 in funds that it received from the

postal service and other companies in the 2012 year.

     So faced with this reality, what does Tony Issa do?

Does Tony Issa say:  You got me.  I'll pay up?  Does he accept

that there are penalties and interest for his corporate tax

shenanigans but no additional consequences?  No.  Of course he

doesn't, because he's a cheater, and when you're a cheater, you

cheat no matter what the cost.

     So Issa and Silva, they had to scheme to ensure that

they don't pay any more taxes.  So long as they keep the 2012

internal First Star records private, they think that they can

convince some accountant to lie to the IRS on their behalf.  So

ICHHIss3                       Summation - Mr. Wirshba

1    what's their first stop?  What's the first thing Issa and Silva

2    do?  Well, on March 25 of 2014, shortly after receiving a

3    notice from the IRS, they go to George Mousouris, who had been

4    working for Ms. Silva for years.  In fact, Mousouris had

5    recently prepared the Hybrid 2012 tax return.  You remember

6    Hybrid.  It's the company that got $357,000 from First Star in

7    2012, but how much did it declare on its income tax returns?

8    About $30,000 in income for the calendar year 2012.

9           So Silva, she emails Mousouris in Government 501 about

10   the notice:  "Hi George, I have a question about Hybrid

11   Specialist.  This corporation was opened in 2011 but started

12   doing business in November 2013.  You filed the corporate taxes

13   for 2011 and 2012 but with no activity.  We are being audited

14   for 2012 corporate taxes for First Star.  How should we apply

15   that money to Hybrid?"

16          And you remember what Mousouris said.  Mousouris told

17   you that they spoke on the phone and he spoke with Ms. Silva.

18   He told them:  You didn't declare that money for Hybrid in

19   2012, so you have two options:  You could, on the one hand,

20   make those transfers from First Star to Hybrid a loan from

21   First Star or, on the other hand, you could say that those

22   transfers from First Star were an investment into Hybrid from

23   First Star.  In both circumstances, Mousouris explains, Hybrid

24   would need to declare any additional income from First Star.

25   The Hybrid return he filed, that Mousouris filed, it would be

ICHHIss3                    Summation - Mr. Wirshba

1   just fine.  But in both situations, First Star, it couldn't

2   claim the loan or investment as an expense.  The money would

3   need to be declared as income of First Star and Issa would have

4   to pay taxes on it.

5        Did that satisfy Tony Issa?  Most certainly not.  You

6   know that from Tony Issa's own words.  You remember that the

7   day after Daniela Silva emailed Mousouris, Silva emailed Tony

8   to report back.  Government Exhibit 752:  "I spoke to George

9   the accountant about First Star transfers and checks put into

10  Hybrid in 2012.  He says it's better to say that this money was

11  a loan, not to say that it was paid for services, because we

12  did not show that money into Hybrid for the 2012 corporation,

13  and they can come after Hybrid later.  The total amount is

14  close to $400,000.  Let me know what to do."

15       Issa responds two hours later:  "Ask him what if we're

16  showing it as a loan?  It might be taxable to First Star as

17  income.  What about putting it as an investment into Hybrid,

18  that way it's not taxable to First Star?"

19       Eight minutes later, Silva responds:  "I already asked

20  that question to George.  We cannot put it as investment to

21  Hybrid anymore because 2011-2012 taxes returned didn't show any

22  of this money.  At the time I wanted to show it, but you," Tony

23  Issa, "you said no."

24       This conversation continued.  Two minutes later Issa

25  asked again:  "Ask him if the loan is going to be taxable on

ICHHIss3                    Summation - Mr. Wirshba

First Star.  If it is, it's no good, then we need a different

solution."

          And after some back and forth, dissatisfied with the

answer that he was getting, Tony Issa, he found himself to be

upset.  He's used to cheating the tax system, and yet all of a

sudden, it looks like the system is catching up with him.  He

may actually have to pay taxes for First Star Auto Repair that

he owes to the IRS, and this frustration, it's apparent in his

response:  "There are 1,000 ways to earn the money and then put

it out without it being taxable to the corporation.  What is

the use of your stupid accountant to make a loan and then have

to pay hundreds of thousands in tax?  Tell him to call me

ASAP."

          Ladies and gentlemen, this email, Government

Exhibit 725, it's extremely important evidence that you should

study closely when you go back into the jury room to

deliberate.  This email shows you a lot about Issa's true

intentions.  First, it shows that Issa is not only in charge of

the companies, he's also in charge of the tax decisions.  Issa

may not write often, but when he does, you know who calls the

shots.  Silva asked him what he wants to do, and Issa, he gives

the orders.

          Second, this email shows Issa's knowledge of the tax

laws.  What about making an investment? he asks.  What about a

loan?  Issa says there are a million ways to put out this money

ICHHIss3                    Summation - Mr. Wirshba

1   without it being taxable.  Those aren't the words of a man

2   who's ignorant of how the movement of money affects tax

3   returns.  Those are the words of a tax cheat who's willing to

4   do anything to avoid paying the taxes that he rightfully owes

5   to the IRS.

6           So what happened from there?  Well, you know what

7   happened.  They didn't like the answers they were getting from

8   George Mousouris, and so what did they do?  They went on to the

9   next accountant.  They went on to Chris Tsamutalis and they

10  brought Chris Tsamutalis their problem.  They said:

11  Tsamutalis, look at this deficiency notice.  It says we owe

12  $400,000, but really, we don't owe any money.  Yes, we

13  understand First Star's income in 2012 had more income than we

14  reported, but it's only because we also underreported our

15  expenses.  In fact, they told Tsamutalis First Star

16  underreported its expenses and income almost precisely the same

17  amount, how convenient, so that the expenses that they had

18  suddenly found years after they filed the return, they just so

19  happened to match the increased income leading First Star to

20  owe practically no taxes.

21          This is no coincidence, ladies and gentlemen.  So

22  let's look at what they gave Chris Tsamutalis and let's look at

23  how they tried to convince him that this was the truth.

24          Ladies and gentlemen, there are two line items that

25  we've gone over in depth.  You've heard about it from

ICHHIss3                        Summation - Mr. Wirshba

1    Mr. Tsamutalis; you heard about it from Agent Berzansky.  It's
2    the cost of goods sold, and we're going to take them very
3    briefly one at a time.  Let's look at the -- there's two cost
4    of goods sold that make up the bulk of this expense, and I will
5    tell you, ladies and gentlemen, both of these numbers, both of
6    these figures, the explanations, we have proven beyond a
7    reasonable doubt that they are lies.

8         Let's start with subcontracting.  Ladies and
9    gentlemen, this is the accounting that Daniela Silva and Tony
10   Issa gave to Chris Tsamutalis to explain the subcontracting.
11   These moneys moving out, this was supposedly the subcontracting
12   work.  But you know that subcontracting, that explanation, it
13   was a lie.  You know that because Ms. Silva, she sent an email
14   to that effect.  It's Government Exhibit 801.  And in
15   Government Exhibit 801, Ms. Silva said that this money, it
16   wasn't subcontracting.  One of these businesses wasn't even in
17   business yet, and the others, they were just short.

18        So why would they tell Tsamutalis that this was
19   subcontracting?  Easy.  Because when something is
20   subcontracting, that means that it's deductible.  If these
21   other companies, if they actually did work on behalf of First
22   Star, well, then First Star, they could claim that these things
23   were deductions.  And you know that that's what Tony wanted to
24   do because you already saw that email.  He was concerned.  The
25   money will be taxable in First Star anyway.  First Star

ICHHIss3                    Summation – Mr. Wirshba

1  received it, not Hybrid.  That's what Daniela Silva told him,

2  and this was his reaction.

3        Now, Chris Tsamutalis, he buys it, he buys that these

4  things are subcontracting.  But Tsamutalis, he's also diligent.

5  He also realizes that if these things are subcontracting, that

6  means that these other companies, they need to also pick up

7  that income.  They need to declare as income the gross receipts

8  from these subcontracting costs.

9        So what does Tsamutalis do?  He talks to Issa and

10  Silva.  He told you about that conversation.  He told you that

11  he told them that these other companies, they needed to also

12  adjust their income tax returns, and that was backed up by the

13  emails:  "Hi Daniela.  Yes, we have to file amended returns for

14  the other companies."

15       So what did Tsamutalis do?  He did his job.  He

16  prepared an amended return for another company.  In particular,

17  he prepared the amended return for Hybrid.  You can see that.

18  It's Government Exhibit 809.  And you remember that Tsamutalis,

19  he took this prepared amended return, and he sent it to Tony

20  Issa, due date as soon as possible, along with a payment,

21  $141,000.  But you heard that this, it was never filed with the

22  IRS.

23       What did Issa and Silva do instead?  Instead, they did

24  what they always did when they didn't get an answer that they

25  liked from one accountant; they went to another.  So this time

ICHHIss3                        Summation - Mr. Wirshba

1   they went to George Mousouris, and George Mousouris, he

2   prepared the tax returns without asking any additional

3   questions.  Take a moment to take stock of that, ladies and

4   gentlemen.  Issa was told by an accountant:  Hey, you need to

5   do this.  You need to pick up this additional income.  In fact,

6   the accountant went so far as to prepare an amended return.

7   And what did Tony Issa do?  He ignored it.  That tells you

8   everything about Tony Issa's intent to evade taxes.

9           Let's talk about the other expense in addition to

10  subcontracting costs.  The other expense was gas for our

11  trucks.  Ladies and gentlemen, I'm running out of time, so I'm

12  moving quickly here.  But you remember this expense, gas used

13  to put -- cash used to put gas in our trucks.  That's what

14  First Star said, that's what Issa and Daniela Silva told

15  Tsamutalis, but you remember the testimony.  There were no

16  trucks.  No one could find any trucks in 2012.  They weren't

17  anywhere.  They weren't in the books and records of First Star.

18  They weren't on the tax returns.  They just were nowhere to be

19  found.

20          So this too was a lie.  This too was a lie that there

21  was trucks that they put gas in.  But Agent Berzansky, he

22  didn't completely view it that way.  He knew this was a lie,

23  and he said that he couldn't find anything to substantiate that

24  the cash was used to put gas in the trucks.  But nonetheless,

25  when Agent Berzansky, when he did his calculation of the tax

ICHHIss3                    Summation - Mr. Wirshba

loss, of the taxes due and owing from First Star in 2012, he

found that this was an expense.  He allowed it to be an

expense.  He allowed it to be an expense because he heard

testimony about cash payroll.

        Maybe, ladies and gentlemen, maybe that's why Issa and

Silva, maybe that's why they tried to cover it up with this

excuse of gas cash used to put gas in their trucks.  Maybe.

But that would only be part of an explanation because you know

that it wasn't just cash payroll that Issa and Silva were using

this cash for that went missing.  It wasn't just to pay their

employees.  It was also to pay Tony and Tony's friends and

Tony's family.  That money too came straight out of the cash

register.  While Agent Berzansky when he presented to you his

tax due and owing, he didn't include that, those figures, you

know from the evidence presented that those figures, they were

also money taken and that there was no reasonable expense for

that amount.

        Now, this is the final tax calculation that Agent

Berzansky showed you, and he told you that in this last column,

this represents his analysis of the amount due and owing,

including that entire expense, that entire expense for all of

the cash that was missing as an expense to First Star Auto

Repair.  Ladies and gentlemen, even when he did that, you can

see what happened.  Even when he did that, First Star still

owed $171,000.  But you know, ladies and gentlemen, that the

ICHHIss3                    Summation - Mr. Wirshba

1  figure is actually higher because you've seen all the evidence

2  and you can consider not just what Agent Berzansky did, but you

3  can consider things like Silva's emails and all of the money

4  coming out of the register.

5          So, ladies and gentlemen, before I leave you, I want

6  to just take one moment to remind you of where we began.  We

7  started with Tony Issa's words.  We started with Tony Issa's

8  motto:  If you don't know how to hide, don't steal.  Well, Tony

9  Issa, he thought he could hide, he thought he could steal, and

10 he thought he could bribe without consequence.  But there are

11 consequences to lying, to cheating, to stealing, and to

12 bribing.  Tell Tony Issa that he can no longer cheat the

13 system, no longer refuse to play by the rules that everyone

14 else must follow.  Return the only verdict that is consistent

15 with the law and the overwhelming evidence, as well as your

16 common sense.  Tony Issa is guilty on all counts.

17         Thank you.

18         THE COURT:  Thank you, Mr. Wirshba.

19         OK, ladies and gentlemen.  We've heard the

20 government's opening summation.  I think that the lunch that

21 we've ordered for you is here, and so we're going to hear from

22 Mr. Brafman after lunch.  That will be at 2 o'clock, OK.  So

23 have your lunch, stretch, move around a little, and we'll hear

24 from the defense after lunch.  Don't discuss the case and keep

25 an open mind.

ICHHIss3                    Summation – Mr. Wirshba

1            (Jury excused)

2            THE COURT:  I'll see you all.

3            Looking forward to it, Mr. Brafman.

4            Nicely, done, Mr. Wirshba.

5            MR. WIRSHBA:  Thank you, your Honor.

6            (Lunch recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICH5iss4

1            A F T E R N O O N   S E S S I O N

2                        2:05 p.m.

3            THE DEPUTY CLERK:  Case on trial continued.

4    Government and defense are present, jury is not.

5            THE COURT:  Are you ready?

6            MR. BRAFMAN:  Yes, ma'am.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Okay, Mr. Brafman.

3           MR. BRAFMAN:  Good afternoon, ladies and gentlemen.

4           THE JURY:  Good afternoon.

5           MR. BRAFMAN:  Don't be put off by the size of the

6   notebook, I write in large letters and I am not going to read

7   it but I have 90 minutes and like the news station, WINS, give

8   me 22 minutes we will give you the world.  Give me 90 minutes,

9   that's what I have, I will give you an acquittal, despite

10  everything you heard this morning in a wonderful, well-crafted

11  summation by Mr. Wirshba.  It was a good summation -- he left a

12  lot out but it was a good summation.

13          I have looked forward to this moment for a very long

14  time when I finally get to argue my case to you.  Now is the

15  time, and although I have looked forward to this moment for a

16  very long time, I'm somewhat awed by the responsibility that

17  attaches when you get up to speak on behalf of someone else,

18  someone else's life.  But I'm comforted by a couple of things.

19  One, you pay careful attention to the entire trial, not just

20  the part the government has asked you to focus on; and two, I

21  am comforted by the knowledge and belief that each of you

22  shares in the intensity of this moment when you are being asked

23  to Judge another human being, when you are being asked to

24  decide guilty or not guilty on someone you have never met

25  before.  This is government at its best.  This, trial by jury.

ICH5ISS4                    Summation - Mr. Brafman

1   We pick people who don't know anybody in the case and then we

2   ask you to use your common sense, to wait patiently, pay

3   attention, and you have, and for that I am grateful and it has

4   been a privilege to appear before you and a privilege to appear

5   before the Chief Judge of the Southern District.

6           Ladies and gentlemen, jurors are asked to keep an open

7   mind but that does not mean you should let your brains fall

8   out.  I want you to keep your mind and your brains and your

9   savvy and your good sense, everything that makes you get

10  through the day as a New Yorker because if you lose your street

11  sense or your savvy or your common sense, you could convict

12  someone who, under the facts of this case, I submit, is not

13  guilty of the crimes charged.  So, I'm going to appeal to your

14  intelligence in this discussion, I am going to appeal to your

15  common sense, and I am also going to appeal to your courtesy

16  and patience that you have extended to me throughout this

17  trial.

18          So, you know, other people will quote a legal scholar

19  or famous Judge and maybe I will do that before I sit down, but

20  first I'm going to quote one of the amazing sports heroes who

21  then got in trouble and led into a horrible life so I'm not

22  asking you to consider him a hero now, but Mike Tyson was one

23  of the best professional heavyweight champions the world had

24  ever seen and he won bouts against other heavyweights in under

25  a minute.  And once, after a fight, with I think Michael Spinks

1    that lasted 59 seconds they said, you know, Michael Spinks had

2    a great fight plan that we heard all about.  What happened

3    Mr. Tyson?  And Mike Tyson said everybody has a great plan

4    until you get punched in the face.  It's a great quote.  You

5    know why it is a great quote?  Because it is this case.

6            Tony Issa had a great plan, an honest plan, a diligent

7    plan, a real plan.  He was going to fill the need that the

8    United States Postal Service had and he was going to do it

9    honestly and legally.  And all of the plans that you saw and

10   that we will show you pictures of in a couple of minutes were

11   not built with bribery, were not built on thievery, and he went

12   out to Dearborn and built that plant that Mr. Blight discussed

13   and I will show you and he went to Kingsland, and he went to

14   Brentwood, and he went to Poughkeepsie, hydraulic lifts,

15   mechanics, warehouses, investments of millions of dollars and

16   they want to suggest that he only did it so that he could bribe

17   a couple of guys with meals.  And we will talk about

18   everything, I'm not skipping anything, I'm going to address all

19   of the points that Mr. Wirshba made and I'm going to address it

20   because it's very important but I want to tell you a story.

21   Before I do, I just want to reference something that Mr.  -- I

22   think I can get a tan in this summation -- I want to reference

23   a part of the summation that was used, a word that was used

24   over and over again -- distraction.

25            Distraction.  Mr. Brafman was a distraction.

ICH5ISS4                    Summation - Mr. Brafman

1   Mr. Brafman created the distraction.  Did you perceive me to be

2   a distraction in this trial or did I help clarify?  Did I bring

3   out material on cross-examination that you need to have before

4   you are asked to decide the fate of another person?  I was not

5   a distraction.  The only part of the government's summation

6   that I found offensive.  I had a vital role to play in this

7   case and I'm going to tell you a story.  It is a funny story

8   and you are allowed to laugh if you think it is funny story but

9   sometimes a story makes such a wonderful point.

10          So, you go back to old times when people were riding

11   around in horse-driven carriages and there is an intersection

12   and wagon comes through being pulled by a horse and there is a

13   driver on the wagon.  And the dog runs out in the street,

14   scares the horse, the horse rears up, falls on the dog, the

15   wagon falls on the horse and the driver is thrown out.

16          10 years later, there is a lawsuit in the courtroom

17   and the police officer is called by Mr. Wirshba and the police

18   officer said, tell me what the driver said when you walked up

19   to him on that day.  And he looks in his memo book and he takes

20   it out and says the driver said "I'm okay.  I'm okay,"

21   suggesting that there was nothing wrong with the driver and

22   that this is a false lawsuit.

23          So, then Ben Brafman gets up and says, officer, tell

24   me everything you did and everything you saw before my client

25   said "I'm okay, I'm okay."  Well, you know, it was a horrible

ICH5ISS4                    Summation - Mr. Brafman

1   scene and the dog had four broken legs and was screaming in

2   pain.  I took out my gun and I shot the dog to put him out of

3   his misery.  And the horse was whining and crying on the

4   ground, the wagon had broken his neck, and I took out my gun

5   and I shot the horse to put him out of his misery.  And I

6   turned to the driver and the driver said, "I'm okay.  I'm

7   okay."

8           Why is that important?  Because cross-examination has

9   always been and is in this case the engine of truth.  You did

10  not get the whole truth and nothing but the truth on direct

11  examination from any witness in this case.  Every single

12  witness, certainly the major three witnesses you were

13  enlightened by issues I raised on cross-examination.  So, let

14  me tell you what this case is not about and her Honor will tell

15  you that as well.

16          Would you please put up Exhibit 120?

17          This document was shown to you again and again and

18  again and again and again and again and it is, in my opinion, I

19  submit, worthless.  Meaningless.  That's what Mr. Issa did not

20  do.  The post office may terminate the contract for default, if

21  after notice and a hearing the Service Board of Contract

22  Appeals determines that the supplier or the supplier of agent

23  to other representative offered to give a gratuity or gift to

24  an officer or employee of the post office.

25          Ms. Waters, the lovely woman from Philadelphia who

ICH5ISS4                    Summation - Mr. Brafman

1   testified at this trial testified that that's in every

2   contract.  Every witness was shown that document.  Every

3   witness said oh, no, I can't take a gift because if I do, I

4   will lose my job and Mr. Issa will lose his contract.  That is

5   not what this case is about.

6         That's why on tape when Nicholson and Blight over and

7   over and over and over and over again tell me, you know, I'm

8   not supposed to do that.  Mr. Issa's understanding is he was

9   risking his contract and they were risking their job and when

10  he says I don't want to get you into trouble, that's what he

11  means.  There is no intent to bribe.  It's wrong to do this?

12  Good.  Take away my contract.  He has his contracts renewed

13  over and over and over again.  And they never took way his

14  contract and that's not what we are talking about.

15        I want to tell you what I found also inappropriate in

16  the government's summation.  They called my client a thief.

17  That's what he called him.  They said Tony Issa double bills.

18  Tony Issa double bills and if you double bill you're a thief if

19  you do it knowingly and intentionally but if they ignored

20  completely what you have heard and what you can have read back

21  is the testimony on cross-examination by Mr. Velez:

22        Mr. Velez, page 599:

23        Does it refresh your recollection from time to time

24  Mr. Issa or people in his company sent you e-mails to notify

25  you that they had received double payment for the same invoice

ICH5ISS4                    Summation - Mr. Brafman

1    from the post office?

2              This refreshes my recollection of Daniela Silva

3              His wife, correct?

4              Correct.  She's running the office.  I recall her

5    telling me about receiving double payments.  I don't recall

6    anybody else telling me that.

7              On behalf of Healey?  On behalf of Daniela getting the

8    money twice?  Its Duploy?

9              Correct.

10             And she is telling you they got double payment for

11   invoices?

12             Yes.

13             And your answer is, thank you for your honesty,

14   correct?

15             Yes.

16             And that's not the only time this has happened; is

17   that correct.

18             It's happened a bunch of times.  Daniela would make --

19   she would send e-mails and let me know that we got double paid.

20             By fixing it the post office would get the money back,

21   right?

22             Yes, would get a credit.

23             So it was Issa's company who brought these mistakes to

24   your attention.

25             That's not a thief.  No thief tells the post office

ICH5ISS4                    Summation - Mr. Brafman

1   you paid me twice.  Why?  If you are intent on stealing from

2   the government.  Listen to the instruction that her Honor gives

3   about what it means to steal.  It means to intentionally

4   deprive another of their money, not to take it and give it back

5   because they've made a mistake.  You can't ignore that

6   testimony if you even think about convicting Mr. Issa of theft

7   of government funds.  That's their witness.  This isn't a

8   trick.  They ask you to believe Mr. Velez but they asked are

9   did you not to believe him when they said they were paying back

10  double-billing.

11          On my opening statement one of the things Mr. Wirshba

12  didn't mention is I said to you welcome to post office crazy

13  land.  I said that in my opening statement.  Not the people who

14  slosh through, slog through the snow and rain and bring you

15  your mail every day.  Not those people.  Not the hard-working

16  good citizens but the post office bureaucracy is crazy.  There

17  is no method to the madness.  And all of the government

18  witnesses who testified in this case told you how bad things

19  are, not because they don't know how to fix it but because it's

20  bad.

21          Delores Waters, she was the first woman and I will

22  describe these people because it seems like a year ago since

23  they testified.  She was a middle-age woman, attractive, black,

24  African American lady who worked in Philadelphia and she was

25  involved in this process.  She testifies and what you get from

ICH5ISS4                    Summation - Mr. Brafman

1    all of the post office witnesses is that the cars, the trucks

2    that you see delivering the mail, the LLVs -- the long-life

3    vehicles -- have come to the end of their life.

4            Does anyone in this jury, I submit, have a car that's

5    25 or 30 years old that still works or is it up on cinder

6    blocks in somebody's back yard?  Nobody can drive a 25 or

7    30-year-old car.  And yet, all of their trucks are 25 or 30

8    years old, at least the trucks in this case.  And they break

9    down again and again and again and again and the post office

10   can't fix them.  And they can't fix them fast enough to get

11   them back in service.  So, she acknowledges that they contract

12   out for people like Mr. Issa to do the work.  And you saw the

13   contract renewal again and again and again and again.

14           Delores Waters said to you that there is a vetting

15   process, that you have to list references.  When you renew they

16   have to determine whether you are capable.  Do you think if

17   Tony Issa has a contract for six years that if he weren't

18   capable of doing this that he would get the contracts renewed

19   again and again and again?  You can't ignore that.  You just

20   can't ignore that.  You can't ignore that.

21           So, I want to talk to you about the bribery part of

22   the case.  I want to talk to you about the bribery part of the

23   case and I want you to understand that every single person in

24   this case, Velez, Nicholson, and Blight, comes to the table

25   with substantial baggage that should get you offended and get

ICH5ISS4                    Summation - Mr. Brafman

1    you not to agree to believe them beyond a reasonable doubt and

2    I will talk about each of them individually.

3           You know, Mr. Wirshba spoke about hiding, you have got

4    to hide, you have to hide, that's Mr. Issa's life.  No it's

5    not.  There was testimony by Mr. Nicholson when Nicole, from

6    his office, delivered bottles of liquor on Christmas.  She

7    walked in, in front of everybody, put down a card, put it on

8    the desk.  She didn't hide, she didn't slink it in the back

9    way.  And Nicholson is the one who complains to Issa.  Don't

10   let them see that.  It's not a corrupt gift, in Mr. Issa's

11   mind, he is giving him a Christmas present.  Everything in this

12   case is a bribe.  Every single thing that was done is a bribe

13   according to the government, and yet their own witnesses tell

14   you that it's not.

15          So, why is the conversation with Sohail, the man who

16   ran the convenience store, so important?  The conversation that

17   he had when Velez was coming in and demanding $1,500 and

18   Mr. Issa was out traveling and he called him and on the phone

19   Mr. Issa says if you don't give him the money, he will shut me

20   down.

21          Extortion is not bribery.  If you pay someone because

22   they're forcing you out of business and they've done nothing

23   wrong, that is not bribery.  And that's what you had with Velez

24   and I'm going to take Velez apart piece by piece even though

25   they gave him a literal pass because what happened in this

1    courtroom is nothing that you can dismiss so quickly.

2          So, they said to you well, every time Velez ate, it

3    was a bribe.  That's just a bad accusation and it is so not

4    true.  Look at Government Exhibit 412.  This is Mr. Velez and

5    Mr. Issa and several people he has testified who are employees.

6    Yes, Mr. Issa picked up the check.  This is a bribe to Velez?

7    You take a friend out to dinner with your employees and you, as

8    the owner of the business who they work for, you pick up the

9    check?  That's a bribe?  Here, this is a bribe.

10         409, please?

11         This is the lunch in Florida.  Who are these people?

12   They don't work for the post office.  Velez is out there

13   drinking and having a good time.  This is a bribe?  This is a

14   bribe, ladies and gentlemen?  You get convicted of bribery for

15   this lunch where they have some salads and some beers and these

16   people who are not anywhere near involved?  This is a group of

17   men, this is a road trip.

18         You can take that down.

19         And Mr. Velez, who was on there, he wasn't -- he

20   wasn't happy to testify and he left even unhappier but he was

21   Mr. Issa's friend and Mr. Issa saw him as a pathetic, needy guy

22   whose wife he told him had back surgery and who he needed new

23   teeth and those were not bribes.

24         Look at this picture, 414.  This is a picture of a

25   briber and a bribee?  This is a picture of two friends.  And

ICH5ISS4                    Summation - Mr. Brafman

1     when your friend has no teeth and you have money and you get

2     him teeth, do you think that was a bribe?  Or do you think that

3     was something nice?  Because I will get you to the testimony of

4     Velez where he says I think he was doing something nice for me

5     on cross-examination.  But, look at the picture.  It's not a

6     bribe, ladies and gentlemen.

7            Now I want to explain something to you because

8     Mr. Wirshba touched on it.  He said something to you which was

9     quite remarkable.  He said to you Mr. Velez didn't come into

10    the courtroom and lie.  Mr. Velez told the truth.  Even when

11    Mr. Brafman caught him with the car he told the truth.  That's

12    not what happened here.  I'm not using my imagination.  You

13    aren't either.  You remember.

14           First of all, we asked him:

15           Did Mr. Issa lend you $5,000 for your house?

16           No.

17           And then I probed and I showed him his bank statement

18    and then he said yes.  And I said:

19           Was it a bribe?

20           No.

21           So, what was it?

22           It was gift or it was a loan and I paid it back.

23           Now, what person who is getting bribed for years,

24    according to them, gets $5,000 from the man who is paying

25    bribes and pays it back.  And he doesn't pay it back.  What

1  happens, and it is only after I show him the check when he

2  changes his testimony, is he has his sister-in-law -- the

3  deposit goes into his account and the check comes from his

4  sister-in-law and on it it says "gift."  I brought that out.

5  He denied it.  He lied.

6          Then let's talk about something else because he is a

7  cooperating witness.  He figured out if the agents show up and

8  they say to you Mr. Velez we have $100,000 going into your bank

9  account, we want you to tell us about Tony Issa.  He knows he

10  is caught doing something wrong and they're interested in Issa.

11  He doesn't give them Arafat, he gives them Issa because they

12  have all of this money going into his account.  But let me tell

13  you what happens on trial here.  I said to him:

14          All of this money going into your account, 500, 500,

15  500, 500, 500.  Is that from my client?

16          No.

17          Who is it from?

18          My wife was taking money out of her accountant putting

19  it into my account in cash every week 500, then it went to 500,

20  and 1800 and 13 -- every week the same amount.

21          Nobody banks that way.  They ask you to use common

22  sense.  They complain if you don't use your common sense to

23  show something that's nefarious.  Nobody banks that way.  Velez

24  lied and let's talk about the car because those moments don't

25  really happen quite often.  Okay?

1              You sign an agreement with the government.  It's a

2     contract and the premise of the contract is I'm now going to

3     tell the truth.  And the government then puts you on the

4     witness stand with the understanding that if you lie, the deal

5     is off.  And if you lie, you don't get the benefit of your

6     cooperation.  So they say to you, Mr. Velez, what happens if

7     you lie?  Well, I could get 15 years.  And then he lied.  He

8     didn't lie to them, he lied to me and Mr. Wirshba had the

9     temerity to suggest that when confronted with the car,

10    Mr. Velez told the truth.  No, he didn't.  Ask for Velez'

11    cross-examination on the car back.  Here is how it went.  You

12    were here, you saw it.

13             Mr. Velez, didn't you get a bribe from Arafat?  Didn't

14    he give you a car?

15             I loaned his car.  I borrowed his car.  He loaned me

16    he his car.

17             No, he didn't.  Didn't you register it in Pennsylvania

18    with your wife's name?  And then I show him the registration.

19    And suddenly, yeah, I did, but it is a crappy car.

20             We didn't ask you if it was a good car or bad car.

21    You lied about the car and you lied about the car to the

22    government and you lied about the car to this jury and, as a

23    result, her Honor will tell you an interesting legal

24    instruction and you will hear it, and I'm not going to get in

25    trouble by trying to paraphrase it but the substance of it is,

ICH5ISS4                    Summation - Mr. Brafman

1    and if I'm different than what the Court says, like Mr. Wirshba

2    said to you, go by what her Honor says.  But what her Honor

3    will tell you is that if you see that a witness has lied about

4    any matter in this case of importance, you are have a right to

5    reject all of that witness' testimony or you can accept as much

6    of that testimony as you want to and then you can reject the

7    rest.  So, you now have a right, under the law, to reject all

8    of Velez' testimony if you think he is not trustworthy.  You

9    know why he is not trustworthy?  Look what he told you.  He

10   told you he lied about the house money, lied about the car, and

11   lied about the money going into his bank account, and he lied

12   about the money going into his bank account to protect the

13   people he was continuing to take bribes from after he signed

14   cooperation agreement.  Why does that not make sense?  You know

15   somebody is telling him.  He tells you the money is not

16   Mr. Issa's.  He tells you Mr. Issa's money is kept in the

17   basement in my electrical box so you have no proof whatsoever

18   to corroborate the testimony of Mr. Velez other than Sohail who

19   characterized Mr. Velez as a friend who came to the garage and

20   got cigarettes and gas and he got $200, and when he demanded

21   more and Mr. Issa yelled, what was the substance of that

22   conversation?  Pay him or he is going to shut me down.

23          That's what happened with Velez.  That's not a bribe,

24   ladies and gentlemen.  If it starts out nice and it is done out

25   of friendship and it turns into a shakedown, then Mr. Issa is

1    not attempting to corruptly influence Mr. Velez.

2           What did Velez tell you about Issa's operation, unlike

3    Nicholson, Velez did concede that Healey Motors was a real

4    company and that it was doing real work and that Mr. Issa

5    opened it in Poughkeepsie.  And here is Exhibit 286, Healey

6    Motors.  The inside, working on post office trucks with

7    hydraulic lifts and mechanics.

8           And here is 274.  Look at the size of this place.  Did

9    he get that for doing a free PMI?  Did he invest that in the

10   post office so that he could repair a horn that wasn't

11   authorized?  Are we nuts?  This is the hardest working man in

12   the history of the United States Postal Service who they gave

13   contracts to again and again and again and again, and the

14   government says he is just a bum who can't do work because

15   Nicholson said that.  And we will talk about Nicholson in a

16   minute and decide who is and who is not the bum here.

17          Now, let me read to you to show you why it is not a

18   bribe and Velez tells it to you under oath.  And if you get

19   this read back, you know, it is a very nice slide show you saw

20   before, little snippets -- one line, two lines, one line, two

21   lines.  That's not how a conversation works.  You have to

22   understand context.  If I come up to you and say two words you

23   have no word what I'm talking about but this is as clear as a

24   bell.  This is Velez on cross-examination, page 636:

25          Does your amount that you are alleging receiving,

ICH5ISS4                    Summation - Mr. Brafman

1    meanings bribes, have anything to do with the amount of work

2    that you were giving Mr. Issa?

3             No.

4             So there was no, I-give-you-this-you-give-me-that?

5             No.

6             This is not Mr. Issa on tape saying no *quid pro quo*.

7    This is their witness before you, under oath, telling you so

8    there is no I give you this, you give me that.

9             No.

10            It is their witness, he said it and you can't ignore

11   that and this is beyond a reasonable doubt on Velez.  Velez is

12   beyond a reasonable doubt because he lied in front of you and

13   you have a right to reject his testimony.  And we will go

14   through invoices in a minute but when Velez says there is no

15   this for that and he says it to you under oath in the

16   courtroom, should he be believed?  And if he is believed,

17   Mr. Issa is not guilty of bribing Velez.

18            Let's talk about Jeffrey Blight.  First I want to show

19   you the pictures which demonstrate what Mr. Issa did in Detroit

20   before he paid anything to Blight, before he bought him a meal.

21            Please, put up Exhibit 100.

22            This is Mr. Issa in front of the warehouse in Detroit

23   that Mr. Blight identified.  You can see it has a number of

24   entrances.  This is 101, it is a picture of the inside where

25   Blight identified a VMF supervisor from another station coming

ICH5ISS4                    Summation - Mr. Brafman

1   to teach them how to do PMIs and if you look down in the lower

2   right-hand corner, you can see the PMI form, the form that we

3   have had so much discussion about in this courtroom in this

4   case.  This is before Blight starts complaining about his life

5   and Mr. Issa feels sorry for him.

6            Now look at 104.

7            This is up and running in Detroit and it is a real

8   facility.  And look how many trucks are in the process of being

9   repaired.  These are all trucks, these are trucks that are 30

10  years old, 25 years old, they're all being repaired.  Who are

11  they being repaired by?  Not the post office.  By Mr. Issa.

12  How is he doing that?  Because he has contracts and because he

13  has employees and because he knows how to do it.  There were no

14  complaints here about this operation.

15           And look at 105.

16           These are pictures their witness identified.  This is

17  not magic.  These are trucks in the state of being repaired.

18           Look at 106.

19           More trucks up on hydraulic lifts.  No one has to tell

20  you how much this equipment costs.  You can use your common

21  sense as New Yorkers to understand that when you open a

22  facility like that it's going to cost you a fortune.  Why is he

23  doing that?  So he can pay for Blight's daughter's roommate

24  expenses?  It is crazy.  And they said to you what Mr. Blight

25  said doesn't matter and the circumstances under which what

ICH5ISS4                    Summation - Mr. Brafman

1    Blight said doesn't matter.  They're wrong.  That's not the

2    law.

3              If Mr. Issa is consumed by concern for someone who he

4    is starting to like, it matters.  It determines whether his

5    state of mind is corrupt or whether his state of mind is: *I'm*

6    *going to help this guy.*

7              So, I asked Mr. Blight and I got stopped a lot by the

8    Court, properly so perhaps because this is argument, but over

9    and over and over again what did he tell you?  What did he tell

10   you on tape?

11             I told Mr. Issa that I had a daughter who was

12   transferring to Columbia.

13             Did you have a daughter?

14             Yes.

15             Was she transferring to Columbia?

16             No.

17             Why did you make up that college?

18             Wanted to get Mr. Issa to New York.

19             That's why.  There is no other explanation because

20   they could have picked up University of Michigan, the guy lives

21   in Detroit.  They picked Columbia to get him to New York.  So,

22   that's a lie.

23             Did you daughter have a scholarship to Columbia?

24             No.

25             So, when you told Mr. Issa that you wanted to come to

1    New York because you wanted to meet with the college advisor,

2    that was a lie, right?

3              Yes.

4              Why?  Why do you have to lie again and again and again

5    and again and again so the man you are investigating -- and you

6    are wearing a recorder and he doesn't know you are wearing the

7    recorder.  I told you in my opening statement we welcome these

8    tapes because without those tapes they can wiggle out and with

9    those tapes they can't.

10             How many times Mr. Blight did you lie to my client?

11             I don't know.

12             More than 50?

13             It is hard for me to tell.

14             It is not hard to tell.  You have listened to only a

15   smidgen of the conversations with Blight.  Even on those

16   smidgens there are dozens of times when he lies.

17             Did you lie about her coming to New York?

18             Yes.

19             Did you lie about the stores in New York being

20   expensive and that your wife and daughter are coming?

21             Yes.

22             Your wife and daughter weren't coming, right?  That

23   was a lie.  And why did you tell Mr. Issa that the stores were

24   expensive with dollar signs on the text?  Were you trying to

25   maybe convince them that he could give you a handout because

ICH5ISS4                    Summation – Mr. Brafman

1    you're a poor jerk who has got all of these expenses?  Did he

2    tell him that for that reason?  There is no other explanation,

3    they haven't offered you any other explanation.

4              113.

5              Read this text.  It should make you angry.  Let me

6    read the last part.  Going on a cruise Father's Day.  I will

7    have Thursday and Friday free.  The girls plan on hanging out

8    with my wife's friend Thursday and shopping Friday.  She

9    scheduled dress fittings for my daughter at some kind of fancy

10   stores out there $$$.  She deserves it and is worth every

11   expensive penny I'm probably going to spend.

12             Why does he tell Mr. Issa this if not to incur

13   sympathy and charity and a handout?  Why would you tell a

14   stranger that and you are burdening yourself to Mr. Issa again

15   and again and again and again.

16             You know I'm right.  This should not sit well with

17   you.  This may be technically legal but if it is as offensive

18   to you as it sounds to me then you should reject it because it

19   impacts on why Mr. Issa ultimately, after five months of

20   begging and pleading and whining about his life, Mr. Issa

21   finally lets him come to New York and pays for it.  Yes, I told

22   you he paid for it but there is a story here and the story

23   isn't work.  The story is I'm dying, I can't pay for my

24   daughter.

25             And then you know how desperate Blight becomes and you

1   want to know why you should just write him off?  Because he

2   ultimately says I have to get back because my mother is having

3   a heart operation.  What kind of a person does that?  Well, I

4   needed to make up an excuse to go back to Detroit.  So tell him

5   you left your car at the airport.  Tell him someone is watching

6   your dog.  Tell him you have to go back to work.  Tell him

7   painters are coming to your house.  Who lies about their mother

8   needing an operation to a stranger when it is not true?  And

9   why are you lying to Mr. Issa?

10          You know there used to be a quiz show 60 years ago --

11   I'm dating myself -- people would come on and tell the sorriest

12   tales you ever heard.  And it was a terrible show because

13   people would come out and they would talk about all of their

14   problems.  And then the person who had the worse problems would

15   win a washing machine.  It was such an offensive show.  Today

16   couldn't do that, but then nobody cared about what was right or

17   wrong.  That's what you are watching here.  You are watching a

18   quiz show where you are trying to get my client to bleed for

19   you.

20          And you look at the stories and then -- then -- he

21   tells you when the story had played itself out and Tony wanted

22   to have dinner and Tony was going to have dinner with his wife

23   and our wives.  Oh my God, he is turning this into a couples

24   dinner and I want to turn it into a bribery case.  That's when

25   the mother dying comes in, to save him from that stupid excuse.

ICH5ISS4                    Summation - Mr. Brafman

1    And I asked him:

2              Are you trying to get Mr. Issa to like you?

3              Okay.

4              Did you make believe that you liked Mr. Issa?

5              In the beginning when we first started working in

6    Detroit, yes, I did.

7              Did you also, on these tapes, make it appear like you

8    liked him when you had these jovial three-hour meals where a

9    lot of personal stuff was exchanged about your families?

10             Yes.  I wanted Issa to like me.  I liked him, I wanted

11   him to think that I liked him.  I told him things to make him

12   feel story for me.

13             That's not how a bribe works.  It shouldn't be allowed

14   to work that way where you whine and whine and whine and beg

15   and beg and beg and then ultimately, when the generous man and

16   the kind man finally succumbs to this.  He didn't ask him for

17   money in Detroit.  You want to fix this case and finish it?

18   Hey, Tony.  I'm Jeff Blight.  You want to work here and build

19   these factories?  Pay me.  Then we have no argument.

20             This is offensive.  And just remember something else

21   that's offensive.  You talk about telling the truth, you talk

22   about me being a distraction.  When Mr. Blight was on the

23   witness stand he made it seem like there was a text that he got

24   from Mustafa, Mr. Issa's son, that said my father wanted to

25   talk to you about something personal and he didn't want you to

ICH5ISS4                        Summation - Mr. Brafman

1   talk about it in the post office.  Remember that?  That is what

2   he thought was so scary that he ran to OIG and he ran to OIG

3   because they had locked up a bunch of VMF people in Detroit and

4   he was afraid Mr. Issa was investigating him.  So when Mr. Issa

5   said I want to talk to you about something important and I

6   don't want to talk to you on the phone or in the post office

7   and we walked out to the garage and then he tells you what

8   Mr. Issa talked to him about, that wasn't true and eventually,

9   ultimately, conceded after much fighting and discussion, that

10  what Mr. Issa really wanted to talk to him out in the yard and

11  what he did talk to him about out in the yard is the fact that

12  one of the mechanics, Jeff, was making racial comments and he

13  didn't want to talk about it in the post office.  That's

14  understandable.  You are accusing someone who works there of

15  this kind of misconduct?

16          I brought that out, they didn't bring that out.  It

17  was their tape.  They didn't play that portion.  They get to

18  pick what portions they can play.  They did not play that

19  portion.  I showed him the transcript and refreshed his

20  recollection.

21          It is just not right, ladies and gentlemen.

22          Now the lie gets better.  My daughter is coming to New

23  York, I can't afford the room and board.  It is going to cost

24  me $20,000.

25          First of all, why are you telling me that when it is a

1    complete fabrication?  I want somebody to ask that question and

2    if you can answer that question other than in the way I'm going

3    to answer it, then I will stop.

4           Why are you telling Mr. Issa, a stranger that your

5    daughter's room and board is going to cost $20,000 a year when

6    it is a lie, when she doesn't have room and board in New York

7    and when, I submit, you are saying that because you want him to

8    feel bad for you and you want him to ultimately reach into his

9    pocket and give you something of value.  There is no other

10   reason.  No other reasons.  And then, listen to this when

11   Mr. Issa says it is stupid, there are apps for this, I will get

12   her four girls who want to share an apartment.  It will cost a

13   couple hundred dollars a month and she will share an apartment.

14   That's what people do.  Don't let her rent an apartment up at

15   Columbia alone for $20,000.  Get a roommates.  There are people

16   we know.  He says my family is doctors up at Columbia.  They

17   know the area.  And then the government turns that into part of

18   the bribe.  When I ask him and this is important, when I asked

19   him on cross:

20          He says to you that's crazy, you can get three or four

21   girls who are going to school and you could work as roommates

22   and they would all share the expenses.  didn't you say that?

23          Yes.

24          Did you think when he said that he was getting

25   sinister, being sinister, or was he being nice in your mind?

1          I don't know.

2          Well, if he told you his family had doctors up in

3     Columbia where she would be living and he would help you find a

4     place --

5          Correct.

6          -- you think he was getting a bribe or bribing you

7     with that information or trying to help you with your daughter?

8     The truth, as you sit here now.

9          I don't know how to answer.  I don't know if he was

10    trying to bribe me or not.  I don't know.

11         That's a reasonable doubt.  Ladies and gentlemen, at

12    page 307-308 of the transcript that ends the discussion with

13    Jeff Blight, I submit, even if he did give him money because in

14    his mind, even in his mind, he thinks Issa is trying to help

15    him because maybe he is a nice guy.  And, that's still not a

16    crime.  It is still not a crime in the United States to be

17    nice.

18         Page 367:

19         At some point you were concerned that by pushing the

20    Columbia story it was like getting a little bit absurd?

21         Well, absurd, and it wasn't working.

22         What do you mean it wasn't working?  You got him all

23    excited by helping your daughter.  What wasn't working about

24    the Columbia story that caused you to stop?

25         The whole thing for me was the fact that Mr. Issa

ICH5ISS4                         Summation - Mr. Brafman

1   wanted to meet with my wife and daughter, you know, and that

2   situation.

3          So he had a friendly dinner in mind and you had an

4   undercover investigation in mind and you stopped it, correct?

5          Correct.

6          Don't you see what happened, ladies and gentlemen?

7   They turned friendship into something corrupt and then when the

8   corruption became so stupid because it was a fabrication, he

9   pulled the plug.  Why did he tell the plug?  Because he had

10  lied so many times.

11         You know, from another generation, my mother's

12  generation, they used to say if you lie, you better have a good

13  memory.  If you tell the truth it always comes out the same.

14  Here he is, my mother, my father, my daughter is coming to New

15  York, my mother is having a heart operation, Columbia, a

16  scholarship, an interview.  It is all a lie.  And then when he

17  says my daughter and my wife want to have dinner in New York,

18  Issa says that's great; my wife and I will have dinner with

19  you.  And suddenly Blight is reporting to the agents, oh my

20  God, this guy thinks I really want to have a friendly dinner

21  when all I want to do is do an undercover sting.

22         Don't you see what happened, ladies and gentlemen?

23  I'm so happy that these conversations are recorded because the

24  contemptibility of what Blight is doing should jump off the

25  page for you.

ICH5ISS4                    Summation - Mr. Brafman

1          You know, if I take a pizza with a lot of toppings and

2     I throw it against that wall, the pizza is going to fall to the

3     ground but stuff is going is to stick on the wall, the wall is

4     going to be stained.  And whether it is anchovy or tomato sauce

5     or cheese, that wall is going to be stained but the pizza is

6     going to fall down.  Throw all of this stuff at the Issa, maybe

7     Brafman will be asleep at the switch, throw it at Columbia,

8     throw it at the wine at the restaurant.  Throw everything at

9     Issa because the jury will think whoa, whoa, whoa, whoa, whoa,

10    what's going on here?  And I submit to you, most respectfully,

11    that Blight playing the sympathy card again, and again, and

12    again, and again should end your discussion.  And let me tell

13    you a piece of testimony that should, as a practical matter end

14    the discussion as to Blight.  Page 311.

15         Why do you need all these money bells and whistles

16    for?  You thought it would help the conversation, right?  Isn't

17    that the honest truth?

18         Well, I mentioned that about the hardship, yes.  I

19    interjected that.

20         Because you thought it would help get Mr. Issa to help

21    or discuss helping you?

22         I would say yes.

23         And you are recording that, right?

24         Yes; for law enforcement.  Yes.

25         Let me read that again because I submit with great

ICH5ISS4                    Summation - Mr. Brafman

1    respect I am reading it again only because to me, when I wrote

2    this down, I wrote on the sticker "bingo" because I wanted to

3    remember this little piece to give you and you need to remember

4    it.  It is at page 311:

5          Why do you need all these money bells and whistles

6    for?  You thought it would help the conversation, right?  Isn't

7    that the honest truth?

8          When I mentioned that about the hardship, yes, I

9    interjected that.

10          Because you thought it would help get Mr. Issa to help

11    you or discuss helping you, right?

12          I would say yes.

13          So, when Mr. Issa is talking on tape about helping

14    Blight and he helps Blight, it is because he tried to get him

15    to help by talking about his hardship.  This isn't me, this is

16    him, it's their witness.  You can't excuse this, you can't

17    erase it, and if this isn't a reasonable doubt there is no

18    reason.  There is no reasonable doubt.  Her Honor will instruct

19    you that a reasonable doubt is a doubt for which you could give

20    a reason and it is a doubt that an intelligent, reasonable

21    person would use to pause before doing something of importance

22    in their life.  This is something that should make you pause

23    because it's Mr. Issa's life but you're the ones who are going

24    to be making a decision and they can't get around this.

25          You know, they get up for another half hour after I

1    sit down, it is a terrible rule but I have to live with it and

2    we all like to have the last word in the discussion.  They get

3    up after I sit down.  There is no answer.  And Mr. Wirshba

4    saying as many times as he can that what Mr. Blight said and

5    what Mr. Nicholson said and how they said it and why they said

6    it is completely irrelevant.  It is not irrelevant, it is the

7    heart of the case because her Honor will charge you that in

8    every crime that Mr. Issa is accused of, the most important

9    element for you to decide, I submit, is his state of mind, his

10   intent.  Did he have a corrupt intent?  Was he trying to get

11   generalized goodwill with this post office employee?  Because

12   if he is, I submit you have to find him not guilty.  Listen to

13   the Court's instructions, don't go by what I said but wait to

14   hear the phrase generalized goodwill.  This is generalized good

15   will.  And you know who told you that?  Blight.  He said he is

16   trying to help me, not get work, he is trying to help me help

17   my daughter.

18          You know what else is just terrible about what

19   happened in this trial?  People made up stuff.  They made up

20   stuff, that's what I think he meant when Mr. Issa said I wish

21   you could have a purposeful life, he said that meant pay for

22   play.  And I am sitting there listening to this and I am saying

23   to myself, that expression is never used in any of the

24   recordings.  So, I then challenged him on it.  I said:

25          Did Mr. Issa tell you the words pay for play?  Did he

1    use them?

2              Page 360.

3              What about the pronunciation of purposeful don't you

4    understand?

5              Purposeful, I understand.

6              Does it have to mean money?

7              No.

8              It could mean a genuine relationship, right?

9              It could, yes.

10             And depending on the purpose it could be very good and

11   legal and honest?

12             Yeah.  It could mean anything.

13             And the word prosperous could mean the same thing,

14   doesn't it?

15             It doesn't have to be a negative connotation, correct?

16             Yes.

17             And when he said purposeful you told the jury that you

18   meant it was pay for play; is that right?

19             I did say that, yes.

20             In your own mind you meant that, correct?

21             Yes.

22             You understood that?

23             Yes

24             But there is nowhere in any of the tapes does he use

25   that expression ever.

1           I don't recall.

2           You would recall if he used the words pay for play,

3   wouldn't you?

4           If he used the words, yes, I would.

5           He never did, did he?

6           No.

7           My client says purposeful and he says pay for play.

8           You know, we play these games with children you come

9   up with the word, they come up with the word.  If I said to you

10  have a purposeful life, would you ever in your wildest dreams

11  come up with the words pay for play?  Mr. Issa doesn't.  It

12  fits the narrative now, what could he possibly mean, possibly

13  mean if pay for play?  It is called feeding the tape.  I'm

14  wearing a tape, I know I'm wearing a tape.  I am trying to make

15  the conversations sound sinister even though they document me

16  whining and whining.

17          At various times in these conversations where you knew

18  it was being recorded Mr. Issa, in words or substance said he

19  would never do anything illegal to get you in trouble, correct?

20          That was said, yes.

21          And this was one of the places where, starting at line

22  17, I am devoting why a tape -- so I am telling you right now,

23  take this to your grave.  I would never ask you to complete

24  anything that's illegal.  That would be against your job.

25  Nothing, never, never.  You know why?  Because if I do, it's no

ICH5ISS4                    Summation - Mr. Brafman

1   good for me.

2          He loses his contract, ladies and gentlemen, and

3   Blight loses his job.  That's what the fear was, not a bribe.

4   These guys were feeding the tape.  Nicholson, when he said I

5   can't do this, I can't do this, I can't do this.  Tony, you

6   shouldn't do this.

7          You know what else bothers me?  I am just going to say

8   it and get rid of it so I have said it.

9          Expensive dinner $650.  Nicholson ate like he was

10  getting out of jail.  He didn't have to eat stone crabs and

11  crab cakes and sirloin steaks.  He could have had a salad.  He

12  knew the bill for the meal was going to be used by the

13  government as evidence of a bribe so make it as high as you

14  can.  And he is a little bit of a wise guy too and we will get

15  to it in a minute, but I don't want to lose this thought.

16         When Mr. Solowiejczyk put up on the screen the bottles

17  of wine do you remember that moment when Nicholson volunteered

18  on his own when nobody asked him a question "oh, the good

19  stuff."  That's when the Barolo wine was shown and Nicholson

20  said "oh, the good stuff."  He changed a little bit when he

21  started his cross-examination I think you will agree, but when

22  he was on direct examination he was a big shot, he was a wise

23  guy and we will get to him in a minute but Blight, Blight's

24  conversation is critical to whether or not you can convict.

25         This is Blight again, I just have to read you these:

ICH5ISS4                        Summation - Mr. Brafman

1          You know Mr. Blight, I'm almost done but I want to ask

2     you:  When you are talking to Mr. Issa sometimes in these

3     conversations like a friend who you are unburdening yourself

4     to?

5          Yes.

6          So, how does Mr. Issa know?

7          I am asking you, forget what he said.  How does

8     Mr. Issa know I'm talking to you as a friend then I put on my

9     undercover agent hat, now I'm talking to you as someone who is

10    getting bribed, now I'm talking to you as a friend, now I'm

11    putting on my hat.  That's not proof beyond a reasonable doubt.

12    That's not how a conversation is supposed to sound when you are

13    doing an undercover operation.  Why are you trying to be my

14    friend if you are trying to put me in prison?  Because I want

15    you to like me and I want you to think I like you so maybe you

16    will buy me dinner.  And if buying dinner is a crime, ladies

17    and gentlemen, then nobody would be walking around.  And, yes,

18    I know he is a public official so take away his contract.

19    That's what happens if you give a gratuity to a post office

20    person.  A gratuity is not a bribe.  Her Honor will tell you

21    the difference and it is a huge difference.

22         Everything that Mr. Issa said to him and all of these

23    conversations about willing to help his daughter and any

24    recommendation he had or any time he said anything like that,

25    it was just twisted and it was turned into something that was

ICH5ISS4                    Summation - Mr. Brafman

1    venal and corrupt and it was not.  I submit to you that it was

2    not, ladies and gentlemen.

3             Now I want to talk a little bit about the invoices and

4    then I'm going to spend a lot of my time on Mr. Nicholson and

5    then some time on the tax case and then it will be the last

6    time you hear from me again unless we run into each other in

7    the street years from now.  And, then you can say hello if that

8    should happen.  Millions of people in New York, the odds are

9    not great that that will happen.

10            But, let me tell you a little bit about the invoices.

11   So, we already covered the fact that Mrs. Daniela Issa --

12   Daniela Silva -- wrote to Velez on a couple of times about

13   double-billing.  And Mr. Velez' response on the witness stand

14   here was thank you for your honesty.

15            So, now they're telling you under this count, which

16   charges the defendant with stealing from the government, that

17   on a handful of invoices that they culled out of tens of

18   thousands because you heard about the millions of dollars of

19   work that Mr. Issa was getting from the post office and there

20   are only a few hundred dollars or a few thousand dollars a

21   piece so you have a right to assume that there are thousands

22   and thousands of invoices, they took a couple, a handful, and

23   now two years after they are submitting they are telling you,

24   oh, man, you were stealing from the post office and I want to

25   talk to you about it.

1    First, let's talk about the argument that there was

2 shoddy work.  There is no proof whatsoever that Mr. Issa got

3 under a truck and tried to fix it.  There is no proof

4 whatsoever as to who the mechanic was who did the work.  There

5 is no proof whatsoever for who the manager was that supervised

6 that work.  And, there is no proof whatsoever that Mr. Issa

7 knew that these invoices were being submitted at the time they

8 were submitted because it's not now two years later when you

9 say that invoice shows that you meant to steal.  They have to

10 show intent to take that money and keep it at the time the

11 invoice was submitted, not two years after the fact.  And let

12 me tell you the problems that they have.  Okay?  The problems

13 that they have are as follows.

14    First of all, we are working on a truck that's 25, 30

15 years old.  I don't want to belabor that, everybody has agreed

16 that that's an accurate statement.  I want you to think about

17 that for a second.

18    25-year-olds little truck that's driving through snow

19 and rain 24 hours a day, six days a week, nonstop, 25 years.

20 None of you has ever driven a car like that, I submit, unless a

21 friend let you borrow one of their cars that they're trying to

22 fix up and keep as a show piece.  So, that's not what we are

23 talking about.

24    And they break.  And the post office knows that so

25 that's why they require two Preventive Maintenance Inspections

ICH5ISS4                    Summation - Mr. Brafman

1     a year.  So, there are hundreds of thousands and they require

2     two a year and Ms. Waters told you that there are hundreds of

3     thousands of vehicles and they require different inspections

4     but the people who testified said it was twice a year.

5              So, right away you have probably half a million

6     inspections on trucks and that's not counting the breakdowns.

7     If it breaks down outside your house somebody has to tow it to

8     the shop, somebody has to fix it.  What are the charges?  What

9     is the requirement?  You have to fix it overnight so it can be

10    back on the road the next morning because we can't replace it.

11    If we don't have the truck, you don't get your mail and the

12    post office always delivers its mail.  So, the entire mainstay

13    of the post office delivery system is breaking apart as we

14    speak and Mr. Issa and others are charged with fixing it.

15             But, understand something, the post office has

16    acknowledged that they can't do it.  All of the people who

17    testified to you told you that the vehicle maintenance

18    facilities are understaffed and they don't have enough trained

19    people to do it so they rely on people.  So that was the plan.

20    Mr. Issa had a real plan.  You know what entrepreneurs do in

21    the United States when they want to be successful?  They find

22    something, a need that needs to be filled or they create an app

23    today or they create a business that nobody thought of before

24    and then they create the business, they invest in the business,

25    they run the business, they train people.

ICH5ISS4                    Summation - Mr. Brafman

1           How many people do you think Mr. Issa had to employ to

2     keep Poughkeepsie and Brentwood and Kingsland and Detroit and

3     all of those places running and in operation, the size of the

4     facilities that you saw?  How many people do you think he

5     needed to employ?  And who was paying those people?  And what

6     an operation?  First you have to find a mechanic and you have

7     to train the mechanic and you have to find a mechanic who is

8     willing to work in the middle of the night.  Not everybody

9     wants to work in the middle of the night so your work pool is

10    reduced.  And he found the people to do the work.  And, yes,

11    there was some problems with the invoices but, on balance, he

12    was getting them their trucks back.  And while Mr. Nicholson

13    and other people can pick apart some of his invoices, that's

14    not fair and let me tell you why it is not fair.

15          If we can put up Exhibit 2049B, please, the one with

16    the form?

17          This is one of the invoices that Mr. Nicholson

18    testified was a fraud.  This was Mr. Issa trying to steal and

19    he pointed to two things.  He pointed to $53 charge, we fixed

20    the horn.  We fixed the horn, he said, we weren't authorized to

21    fix the horn, it was $53.  That $53 is theft.  The invoice is

22    $3,600 so we had a $53 item on there that he didn't authorize.

23    Take it off.  Take it off.  He said no, I was operating under

24    the direction of OIG.  They don't want to help you fix the

25    invoice.  You go to a mechanic and he gives you a bill for

ICH5ISS4                    Summation - Mr. Brafman

1    $2,000.

2              What are you talking about?

3              I didn't want my mirror changed.

4              Well, it was broken.

5              I didn't authorize that.

6              Okay, don't pay for the mirror.

7              That's commerce in America.  In a dry cleaning store,

8    delivery service, in an air conditioning repair.  But, no, you

9    submit this invoice and you have a horn on there that we didn't

10   authorize you to fix, we are going to indict you for stealing

11   from the post office and you are going to go, possibly, to

12   prison.

13             And let me tell you something else that came out on my

14   cross-examination, not on direct.  I submit to you that on

15   direct examination nobody on the government's team pointed to

16   the names of the supervisors who are listed on the invoice and

17   Mr. Nicholson recognized that, that's André Noel.  He works for

18   him, and on redirect you know what the government pointed out?

19   Who puts that name down there?  Well, the vendor, meaning the

20   vendor can put down a name and he doesn't mean that he

21   supervised it.  Yes, it does.  Do you know why?  Because if the

22   supervisor's name is on there, the supervisor didn't authorize

23   this.  All Nicholson needs to do is walk over to the next bay

24   where Noel is working and say, André, did you authorize this

25   horn?  Because he told you that while the authorizations were

ICH5ISS4                    Summation - Mr. Brafman

1  supposed to be in writing, verbal authorizations were okay with

2  supervisors.

3          Every one of our invoices has a supervisor's name,

4  they work in Brooklyn across the bridge.  They have the burden

5  of proof.  They could bring Noel in, they could bring Willie

6  Weiss in, they could bring Andre Cox in and say did you guys

7  ever authorize this work?  No.  Well, I submit to you, ladies

8  and gentlemen, this is a reasonable doubt because they get this

9  two years ago, it is submitted in 2015, almost four years ago,

10 and they're sitting with this invoice and we are ready to

11 pounce?  You submitted a repair for a horn for $53 and instead

12 of taking it off, instead of doing what Daniela did when she

13 knew that they double-billed, just call them and say on invoice

14 9404 that was not authorized.  Do you think they would fight

15 with the post office over the $53 or they would say just pay

16 the $3,500?

17         It is just so unfair, ladies and gentlemen.  I just

18 want to do one other thing and then I'm going to leave this

19 alone but I was so stunned when this happened in the courtroom

20 and I know where -- a big deal was made on invoice after

21 invoice about the charge of $70 for exterior wash.  Do you

22 remember that?  And all of the witnesses said that that's

23 covered in the PMI and the PMI says clean car inside and out

24 and you can't charge if you wash the car.  And then what

25 happened?  What happened when Blight was on the witness stand?

ICH5ISS4                    Summation – Mr. Brafman

What happened?  What did I do?  I showed him the rule book.

         This is the post office rule book.  You need Exhibit 112A before you even think about convicting Mr. Issa on any charge of theft of services because every invoice, over and over again, he charged for a wash and a wash is covered by the PMI.  And then I put the rule book up and, lo and behold, Brafman found a rule that the post office ignored.  Estimated repair time shown on the back of form 4456B was calculated assuming the use of an automatic truck washer.  At 0.3 hours if the vehicle is hand washed, and 0.2 for cleaning windows and inside of vehicle.

         How is that proof beyond a reasonable doubt that I was trying to steal when I charged you for washing your truck when it is not covered by the PMI?  Because the rule book that tells you how to interpret that tells you, you have a right to charge another half hour almost if you have to do this by power wash, and even though the PMI says clean inside out, this provides that you can charge for a washing the windows.

         This isn't proof beyond a reasonable doubt.  This is sloppy.  Look at this, this is Government Exhibit 1060, you have seen it so many times I am sure you don't want to see it again.  Here is the "clean inside out," item 12.  It doesn't say wash.  Okay?  If you want to prove proof beyond a reasonable doubt say wash car, inside out.  This is the English language, it is not that hard.  So it doesn't say it.  All

ICH5ISS4                    Summation - Mr. Brafman

1   right?

2           So, let's assume that my client thinks that he is not

3   supposed to wash the car because under the PMI it is covered.

4   You have to assume that my client who is a mechanic also know

5   the post office rules that they should know that if you are

6   doing the wash, you can add extra time, and extra time is

7   labor.  And extra time is labor.  And what did he charge on

8   every one of these invoices?  He didn't make up a number, it is

9   the exact same charge on any invoice for a wash.  It's $70.

10          And when I asked him what happens if you have to drive

11  the truck to the car wash?  He said well, you know, it's time.

12          That's right.  Somebody is driving it, you are paying

13  them, that's labor costs.  That's how business works and we

14  didn't take advantage of it.  Again, all they had to do was say

15  I'm not paying for the wash and then Mr. Issa and his mechanic

16  could bring this rule book to Mr. Nicholson and say it's your

17  rule book.  We are following your guidance

18          Ladies and gentlemen, they're accusing my client of

19  stealing $70 on a $2,000 invoice when you are allowed to charge

20  labor.  If you look, they're referring you to this.  This is

21  estimated lime, ladies and gentlemen.  This is the standard

22  estimated time on the bottom of this exhibit, 1060.  This is

23  form 4546 that the rule book addresses.  Estimated repair time

24  to perform a PMI on a light delivery vehicle is 1.5 hours.  ERT

25  to perform PMI on a light delivery vehicle, if it is a CNF

ICH5ISS4                        Summation – Mr. Brafman

1    engine it is two hours, on a bigger car it is 3.5 hours.

2    They're telling you you can add more time.

3                    (Continued on next page)

1           MR. BRAFMAN:  (Continued) That is not a crime.  That

2    is not an intentional crime.  It is not proof of intentional

3    criminal conduct.  And you can't just decide to convict

4    Mr. Issa on this because it's easy, because the government

5    suggested or Mr. Nicholson suggested that his repair work was

6    shoddy.  Ladies and gentlemen, I don't have to prove anything.

7    I just proved that they don't have proof beyond a reasonable

8    doubt as to the washing of the car.

9           You know, I'm going to talk to you about taxes for a

10   minute and then I'm going to spend the rest of my time on

11   Mr. Nicholson.

12          You know, we're playing basketball, and they bring in

13   the revenue agent who spends his entire life just doing this,

14   analyzing, and they're bringing LeBron James to play with

15   Tsamutalis.  That's who we have.  We have Chris Tsamutalis and

16   Mousouris, and they bring in LeBron James.  They bring in a guy

17   who just does this and he does it perfectly and maybe he's the

18   greatest revenue agent in the history of America, but that's

19   not how this works.  We don't have to compete with him.

20          Look what he did.  He spent eight weeks after the fact

21   in a case that's four years old that he had nothing to do with

22   and now for eight weeks he's sitting in a room and he's

23   analyzing these returns, trying to find something wrong, and he

24   finds stuff that he doesn't agree with.  He didn't say it's a

25   fraud.  He didn't say Mr. Issa is guilty.  He's saying to you:

ICHHIss5                         Summation - Mr. Brafman

1    I don't agree with that. You know what? On some of the stuff

2    he is just flat-out wrong. He's just wrong. Even LeBron James

3    sometimes misses a free throw. He's wrong.

4           First of all, I submit that there's evidence in the

5    record that if I run my own business and I got to place in

6    Poughkeepsie and I got a place in Brentwood and I got a place

7    Brooklyn and I have a place in Manhattan and I got to go in

8    Queens, I got to go upstate and to Westchester, and all I'm

9    doing all day is driving to these places, with the evidence

10   suggests Mr. Issa is always at, that car is tax deductible. I

11   don't care how many revenue agents you bring in. They're wrong

12   on that. And the judge is not going to instruct you on what is

13   and what is not tax deductible. That's a business car and if

14   you have a business car and it's a legitimate business car, the

15   business can pay for it. The rules are different, and he's

16   wrong. And if you park a business car near your home so that

17   you can save time getting to work by having it there, the

18   garage is deductible.

19          Let me tell us something else that he's wrong on. If

20   I pay my dentist through my own company and I am the only

21   shareholder and it's my company, it's not a crime to use the

22   company check to pay him. Because if I'm putting 50,000 into

23   the business and I'm putting $170,000 into the business, no one

24   is giving me any credit for that. So if I have 100,000 in what

25   you call personal expenses and I put in hundreds of

ICHHIss5                          Summation - Mr. Brafman

1    thousands --

2                MS. HANFT:  Objection.

3                THE COURT:  The objection is sustained.

4                Ladies and gentlemen, you will recall something.

5    Mr. Brafman is not a witness in this case, and you will decide

6    the case on the basis of the evidence that came from witnesses

7    in the case and exhibits in the case and my instructions about

8    what is legal and what is not.

9                MR. BRAFMAN:  Thank you.

10               Ladies and gentlemen, from the witnesses in this case,

11   you heard testimony about the following:  On direct

12   examination, Mr. Berzansky, the revenue agent, said he treated

13   the $170,000 in one way and then on cross-examination by

14   Mr. Kirshner, he said he treated it a different way.  And you

15   saw the check.  It's in evidence.  It's made out to Tony Issa,

16   and he did not give Mr. Issa credit for that.

17               I submit that one of the things you need to understand

18   is what was Mr. Issa's state of mind at the time?  Did he

19   intentionally try and violate the law, or did he have a good

20   faith basis to believe that what he was doing was not a crime?

21   And one of the things that is absolutely clear, when Mr. Issa

22   and his wife get the tax deficiency from the IRS, he goes and

23   he hires a tax lawyer.  He doesn't run away to the Bahamas.  He

24   hires a tax lawyer.  The tax lawyer, God help us, hires Chris

25   Tsamutalis, and Tsamutalis said five times on his testimony

ICHHIss5                    Summation - Mr. Brafman

1    that he didn't get paid to do this; I was getting paid to do

2    that; I did only as little as I had to.  He was getting paid

3    $300 an hour.  That's what the contract says.  He was getting

4    paid $300 an hour, and he didn't do his job.  He didn't do his

5    job, ladies and gentlemen.

6           So I'm running a cash business and, according to the

7    government, my intent is to steal and my intent is to lie and

8    my intent is to cheat.  Why is Claudia Betancourt, who you saw

9    and met and I think you believe, the woman who worked at

10   Capital One, why is she keeping careful track of every dollar

11   in and every dollar out?  Why would you want to have that paper

12   trail if you're running a cash business and all you want to do

13   is shove the cash into your pockets?

14          How careless are they to say any money that says for

15   Tony goes on Mr. Issa's side of the ledger, and yet the

16   testimony and the evidence shows that when it says for Tony, it

17   could be for Tony or it could be at Tony's direction, it could

18   be for a part, it could be for a series of parts, it could be

19   for cash payroll.  And let's understand something.  You have

20   seen no evidence put in by the government as to the extent of

21   the payroll.  You don't know whether one person -- we know

22   Sohail worked there and we know Claudia works, but you didn't

23   see any evidence put in by the government, who has the burden

24   of proof, to show you what is the size of the cash payroll?

25   How many people are working in these garages and gas stations?

ICHHIss5                    Summation - Mr. Brafman

1    These trucks don't fix themselves.

2         You have a right to use your common sense.  When you

3    see a warehouse the size of Yankee Stadium with trucks inside

4    in different states of repair, somebody's doing the work.  So,

5    yes, under New York State law, which he's not charged with,

6    he's not supposed to use a cash payroll.  And to the extent

7    that people were getting cash payroll, you don't expect to see

8    them lining up wanting to be witnesses in a federal courtroom.

9         So the government has the burden of proof, but a

10   failure of proof is also a reasonable doubt.  A failure of

11   proof is on their side of the ledger.  And on these counts,

12   ladies and gentlemen, they don't make it out to be a crime.

13        I want to say something else which you can agree or

14   disagree with.  It's just my submission or surmise, and you can

15   reject it or you can accept it.  There's parts of the tax case

16   that were completely incomprehensible, I submit.  You can look

17   at those charts for the rest of your life.  There were parts of

18   their case on the tax part that were completely

19   incomprehensible.  And if you went in there and had to take a

20   quiz on those items, you'd say:  Oh, yeah, a lot of numbers, a

21   lot of charts.  I don't know whether Claudia's telling the

22   truth.  I don't know whether the revenue agent is telling the

23   truth.  I don't know whether Tsamutalis, Mousouris, Berzansky,

24   I don't know.  I don't know.  When you don't know, you vote not

25   guilty.  You don't vote guilty when you think that they've made

1   a case, and you don't vote guilty because you think Mr. Issa

2   owes taxes and since I pay my taxes, why should I let him go?

3   You don't convict someone because the nature of the crime to

4   you is personal because you pay taxes, and you don't convict

5   without proof beyond a reasonable doubt.  And the government

6   has to explain these counts to you and they have to prove them

7   to you beyond a reasonable doubt so that you can go in there

8   and have some degree of certainty that what you're doing is

9   right, and they did not do that.

10          What they did was they threw the pizza against the

11   wall again on the tax count.  They put a lot of numbers up and

12   put the dentist bills, boom, boom, boom.  We'll make the

13   assumption that the jury will see that he's paying personal

14   bills out of his own account; therefore, he must be guilty.

15   Nobody told you that.  The agent told you what he would allow

16   and what he wouldn't disallow, what he would allow, what he

17   didn't allow.  We got a notice from the government to come

18   down.  Of course there was a deficiency notice.  The deficiency

19   notice says in 2014 you owe this kind of money.  We want to

20   hear from you.  We're going to keep the interest running until

21   we hear from you.  He went to a tax lawyer.  Tax lawyer hired

22   Chris Tsamutalis.  They advised him not to go to tax court.

23   Their testimony is they advised him to file an amended return.

24   He filed an amended return.  They never heard from the IRS

25   again.  You heard the testimony.  There was no audit.  There

ICHHIss5                    Summation - Mr. Brafman

1    was no meet and greet:  Hey, we got your amended return.  We

2    think this is not right.  Next thing you know, he's indicted

3    for tax fraud.

4            You know, when your adversary is the government, even

5    when your adversary is, you know, relatively young, although

6    they did a great job, your adversary is the government, the

7    government.  They have unlimited resources.  They have

8    everything at their disposal, and the defendant doesn't.  The

9    defendant, even a successful defendant, can't match the

10   government pound for pound, and they don't have to because

11   that's why the burden of proof is on the government.

12           So let me talk to you about James Nicholson.  And

13   there's something really interesting about what happened in the

14   summation of the government.  They made believe that something

15   here didn't happen.  It did happen, and you need to understand

16   it.  Now, it's not my job to embarrass anyone, and I didn't.

17   The minute Nicholson broke down, I stopped questioning him.

18   They continued to question him.  But when he broke down and

19   began sobbing on cross-examination, I stopped.  We took a

20   break.  When we came back, I stopped cross-examining him.  The

21   point was made, I submit.

22           So what happened?  What happened?  This was the

23   strongest, most powerful, most solid witness in the history of

24   America, I submit, on direct examination.  Every question, yes,

25   no, never a hesitation, never fumbling for a document,

ICHHIss5                    Summation - Mr. Brafman

1   volunteering information when it wasn't asked for.  In your

2   face, big, tall, tough, strong guy.  Tony Issa is a bad guy and

3   me, James Nicholson, I'm going to get him.  And that's what

4   happened here, right?

5        In this case Nicholson thought he was going to be

6   phased out.  I'm going to read it to you in a minute.  That if

7   you let Tony Issa be successful, then you wouldn't need these

8   dinosaur VMFs who can't get the job done anyway.  So Nicholson

9   assumed, you know what?  If I'm being told to use Tony Issa, I

10  smell a rat.  So I'm going to go to OIG, and I'm going to tell

11  them:  I, Jim Nicholson, am going to wear a wire.  And I, Jim

12  Nicholson, I am going to be Mr. Undercover Agent, and I'm going

13  to get this guy.

14       You know what happened, ladies and gentlemen?  He was

15  a robot on cross-examination -- on direct examination.  I've

16  never seen or you should never -- you would never think you

17  could get somebody that well-prepared.  And then a couple hours

18  into cross-examination, when we were starting to pick away at

19  this veneer that was a fraud, it began to unravel.  And I

20  submit to you, you can make whatever decision you want to make

21  about his demeanor, but Her Honor will tell you that you have a

22  right to decide who to believe based on what they say, how they

23  say it, and their demeanor when on the witness stand.

24       And you, I submit, must have been stunned when,

25  relatively soon into the cross-examination, this guy who was

1    the tough guy of the case began to sob.  Why?  Let me tell you

2    why.  You hang around grandchildren long enough, you hear a lot

3    of stupid stuff.  I'm hanging around them and I hear a lot of

4    stupid stuff.  Every once in a while you also hear something

5    really cute.  I hear you can peel an orange or it can all come

6    off in one case if you're careful and you practice.  You can

7    peel an apple, and you can get the peel off in one piece.  You

8    try peeling a grape.  You can't peel a grape.  You have to peel

9    it piece by piece.  You peel a grape by taking away a piece,

10   taking away a piece, and when the grape is completely peeled,

11   you know what's left?  Mush.  Because the shell of the grape

12   protects the grape.  We were peeling that grape in front of

13   you.

14       I'm not trying to be an offensive.  This is the big

15   leagues.  You come into a public courtroom and you accuse my

16   client of crimes and then when you start your

17   cross-examination, you tap out.  You know, in the wrestling

18   ring, in the ultimate fighting ring, there's a rule that when a

19   fighter taps out, you stop.  You don't want to kill the guy.

20   You're supposed to win the fight.  He tapped out and he tapped

21   out just when the cross-examination was getting tenacious.  So

22   I may be a good cross-examiner, but not to make that happen.

23   Because all I asked him, remember:  When you got Mr. Issa to

24   agree to have lunch, what did you say to your OIG handler?  I

25   said, "Fish on."  Remember that?  That's what he said, "Fish

1    on."  Because all Mr. Issa had to agree to is lunch and he was

2    cooked, as far as Nicholson was concerned.  Didn't have to do

3    anything at lunch.  Issa was going to go to lunch, Nicholson

4    was going to eat, and Nicholson knew Issa would pay, and boom,

5    they got him.  When I said to him:  Well, you're a fisherman.

6    You talk about fishing on these tapes over and over again.

7    What did you mean when you said, "Fish on?"  You know what he

8    said?  I don't know.  I don't remember.

9           Now, I'm not a fisherman.  You don't have to be a

10   fisherman to understand that when a fisherman says to an

11   undercover agent who's his handler, "Fish on," the only two

12   words he uses, so I kept away at it until he finally said:

13   Yeah, I understand.  I understand.  And "fish on" means when

14   you finally get the hook into the fish and you can reel that

15   fish in, that the fish is going to end up dead.

16          That's why when Mr. Issa -- Mr. Nicholson got crazy a

17   few weeks before the trial, remember when I said to him:  Did

18   you scream at the OIG people and say, Why isn't this man in

19   prison yet?  Eight weeks ago.  Because I don't think he ever

20   thought that Mr. Issa would go to trial, and now that he's on

21   trial, he's not liking what's happening.  Well, you know why?

22   We have a trial first, and then if you convict him, if the

23   judge determines that's the appropriate sentence, that's when

24   you talk about prison.  You don't do it before the trial unless

25   you're Nicholson whose only objective was to get Tony Issa out

1    of business because then you don't have to worry about Tony

2    Issa doing such a good job they're going to replace the

3    Brooklyn VMF.

4            And how do we know that I'm right?  We know that I'm

5    right because Delores Waters told you I'm right.  How can that

6    happen, Mr. Brafman?  You making that up?  No, I'm not making

7    that up.  Let me show you.  I showed Mr. Nicholson a contract

8    that Mr. Issa got from the post office in which more money was

9    added to his contract because it was going to be extended to

10   cover the Triborough district, if you recall, Brooklyn,

11   Jamaica, and Staten Island.  Remember that the government put

12   it in evidence.  I don't think they even read their own

13   exhibits sometimes.  105H.  And what it is, is -- 105H is a

14   contract with First Star and Mr. Issa, and the new total amount

15   for this award $2,885,000.  The adjustment is almost a million

16   dollars more.

17           What does it cover?  It covers Triborough.  And what

18   does it cover it?  I showed Mr. Nicholson.  It covers the

19   Brooklyn VMF.  And remember he identified his finance number.

20   Now, this contract is signed in -- effective date is 2014.

21   2014, that's four years ago.  And he said to you under oath:

22   That's the first time I've seen that contract.  I had no idea

23   he had a contract over my facility.  He's lying.  You know how

24   I know he's lying?  Because Delores Waters testified to how you

25   get these contracts and what happens when they send out a

ICHHIss5                    Summation - Mr. Brafman

1    solicitation:  When you give somebody a contract that services

2    post office vehicles, it's important that you identify a

3    qualified supplier who can perform the work.  We have taken

4    into consideration your past performance, your capability, your

5    pricing to make a determination of who offers the best value to

6    the post office.  We also get information from the VMFs, from

7    the VMFs, as to the valuation of suppliers.

8            This is her testimony, page 54:

9    "Q.  You mentioned that you handle U.S. post office

10   contracting.  Who initiating the contracting process for

11   vehicle maintenance?

12   "A.  We receive requirements from what would be a vehicle

13   maintenance facility.  Before they shove this supplier down

14   your throat, they need to know that you need the work, the

15   help.

16   "Q.  All right.  Now in the circumstances where the postal

17   service decides to enter into a contract, how does your office

18   determine with whom to contract?"

19           Please listen carefully.  This is the end of

20   Nicholson's testimony.

21   "A.  Well, this process we go through when we talk about the

22   acquisition process, we would receive a requirement from a

23   facility."

24           That's the VMF.  In this case, it's Nicholson's VMF.

25

ICHHIss5                    Summation - Mr. Brafman

1          "We would solicit those requirements.  We would send

2     out a solicitation package to a source list of possible

3     sources."  Mr. Issa is one of the possible source.  "We would

4     get the proposals, we'd evaluate their proposal, and in concert

5     with the requesting office, we would make a best value

6     determination as to who should receive the contract award."

7          Ladies and gentlemen, we take into -- we take under

8     advisement the opinion of the requesting office.  Nicholson is

9     the requesting office.  Even if he denies it, that's what she

10    says.  This is an extension of a legal contract to cover the

11    VMF that Nicholson operates, and he tells you it's the first

12    time he ever saw it was in this courtroom.  He can't tell you

13    that he saw it before or the whole story falls apart.  His

14    whole obnoxious false story goes in the crapper if he tells you

15    the truth.

16         Mr. Nicholson told you he went to check out Mr. Issa's

17    facility, and on direct examination said:  Ahh, I didn't like

18    it.  There was no guard at the door.  Remember that?  And that

19    suggested to him this guy really doesn't have a company.

20         Can you put up 326C, please.

21         So this is the entrance to the facility, the long

22    driveway.

23         You can take it down.

24         This is 326A, and this is the facility.  Now, it's

25    big.  It's got a lot of truck bays.  And that's the facility he

1    looked at, OK, and that's the facility he said:  Ahh, I wasn't

2    impressed with the facility.

3          Then 326B actually shows post office trucks in there

4    in some state of repair.

5          So that's the facility at Kingsland that Nicholson

6    said was not up to snuff.  He didn't like it.  And then we

7    showed him Brentwood.  Brentwood is another facility by

8    Mr. Issa.  And Brentwood, he said, was a state-of-the-art

9    facility.  So this is Brentwood.  So that's the facilities of

10   Mr. Issa.

11         So here's Mr. Nicholson's vendor of choice, one of his

12   vendors of choice, Unico.  This is what he wants to see.  He

13   wants to see Unico, this guy with the garage that can fit one

14   truck, and if a truck's gone in, another truck has to come out.

15   That's what he wants.  We've got 80,000 square feet -- I'm

16   making up a number -- of truck bays and hydraulic lifts, and

17   that's not good.

18         Ladies and gentlemen, Nicholson said on Government

19   Exhibit 302P, Nicholson on page 134:  "No, I understand, but I

20   also like to keep the VMF viable.  If these guys in the station

21   can do that, they'll cut us out and throw us to the dogs";

22   meaning, if the independent contractors can do the work,

23   they're not going to need Nicholson and the people who he is

24   looking to protect.

25         Page 5 of the same transcript:  "I like to see what's

ICHHIss5                    Summation - Mr. Brafman

1    going out.  Don't want to turn it over to the station because,

2    all of a sudden, they'll phase me out of everything, you know

3    what I'm saying?"

4         Then he says to Tony:  "Tony, I'm enjoying all of

5    this.  I just don't want to go get into trouble."  He doesn't

6    want to take a meal because he could lose his job.

7         Mr. Issa tells him:  "All right.  There's no problem.

8    We're not looking to make trouble for you."

9         And when he says there's no quid pro quo, yes, normal

10   people don't talk like that, but if you want to make certain

11   that you're not committing a bribe and you say that, they say

12   that's evidence that you're guilty.  If I say I want to commit

13   a quid pro quo or I'm giving you a quid pro quo, then you're

14   also guilty.  So what does an honest person say when they want

15   to make certain that they're not committing a crime?  They

16   can't take it and twist it.

17        Nicholson's saying:  I'm enjoying all this.  It's all

18   very nice, it's all very nice, it's all very nice, and then --

19   let me go through a couple more.  I've got eight minutes left

20   and then I'll stop.

21        This is Mr. Issa, 303D, Mr. Issa:  You never asked me

22   to do anything illegal.  Never ask for any -- to jeopardize

23   your job, nothing.  All I ask is that you do your job, but try

24   and let me -- get me in there.  But never, for example, I'm

25   never going to ask you, for example -- God forbid, there's no

ICHHIss5                    Summation - Mr. Brafman

1  quid pro quo, and I said before, there's no if this, then that.
2  Meaning, I'm not buying you lunch to get the work.  Tony Issa
3  wants to be able to compete.  He has the contract for that VMF,
4  and they're standing in his way because they're protecting
5  their own turf.  And that is not bribery if all you're trying
6  to do is your job, I submit.
7        Then Nicholson says:  The post office, in their
8  infinite wisdom, you know, I shouldn't be at lunch with you.
9        And Issa says:  If it makes you feel any better, I
10  have lunch with all of the people.  And Issa says:  If you said
11  to me:  Hey, Tony, you want some of my trucks?  And I go, yeah,
12  I do.  OK.  Well, then do this for me, that's illegal.  That's
13  Mr. Issa saying that if it's giving you something in return for
14  something, that would be illegal, and I don't want to do that.
15        And Mr. Issa goes on:  If you say to me, if you want
16  to get this contract, you have to do this --
17        Nicholson:  Uh-huh.
18        Issa:  -- that's not allowed.
19        Nicholson:  OK.
20        Issa:  You got it?
21        Nicholson.  Got it.
22        Which means then you're using your power and your
23  influence to get something personal, and I don't want you to do
24  that.
25        How much more innocent can you sound when you don't

ICHHIss5                    Summation - Mr. Brafman

1   know you're being recorded by a man who is feeding the tape to

2   get you to incriminate yourself?  That's a reasonable doubt.

3   He has to intend to bribe him, and here when he doesn't know

4   that he's being listened to, he's telling him I don't want to

5   do this if it's illegal.

6           They tell me I'm stealing from the post office.

7           Mr. Issa:  Let me tell you, with the PMIs, let me help

8   you out.  I'll tell you something.  Anything you don't like, I

9   will not charge you.

10          Isn't that him saying tell me what's wrong with the

11  invoice, and I'll take it off?  Isn't that how mechanics deal

12  with customers in their normal life?  He's telling him, bring

13  it to my attention.  He's not doing the repairs.  Tell me and I

14  won't charge you.

15          And here I want to stop with this.  This is the last

16  transcript and then I'm just going to close because I have only

17  five minutes.  This should be the end of the case.

18          Mr. Issa says:  You think I'm taking you to lunch and

19  I expect anything from you?  Then don't give me anything.

20          I'm going to read it again:  You think I'm taking you

21  to lunch and I expect anything from you?  Then don't give me

22  anything.  I don't want to put any pressure.  All I'm saying to

23  you is this:  If I can help you with something, let me help

24  you.  That's fair.  It's not a bargain.  You don't have to give

25  me stuff.  If I can help you.  It's not a bribe if I can help

ICHHIss5                   Summation - Mr. Brafman

you.  I'm a legitimate contractor.  I have the contract.

          Ladies and gentlemen, we learned a lot of stuff in law
school and then 45 years later you forget a lot of stuff.  But
I learned something which I will never forget, and I hope you
don't either.  It's a simple statement.  "Maybe" does not cut
it in a criminal case.  The word "maybe" is not enough to reach
out and take someone else's life.  Maybe doesn't cut it in a
criminal case.  And maybe a few maybes -- maybe none of the
words mean anything.  Maybe they do and maybe he's not guilty.
Maybe all of the words mean something, and on balance, Mr. Issa
has more exculpatory statements on these tapes than inculpatory
statements.

          There are a lot of smoking gun innocent statements
that I just read to you, and they say, ignore them.  Maybe Jim
Nicholson broke down because he knew we had exposed him as a
liar, and he was embarrassed.  Maybe, I don't know, he was just
having a bad day.  He didn't have a bad day the day before.
And maybe Velez lied on the witness stand because he thought he
could get away with it, and he didn't.  Maybe Blight whined and
whined and whined to Mr. Issa so he could get him help, get him
help, get him to New York, help him, and then charge him with a
crime because it's not a help, it's a bribe.

          You know, the building down -- this building is named
after a very, very famous man and a very good man, Daniel
Patrick Moynihan.  It's the Moynihan Courthouse, I believe.  He

ICHHIss5                    Summation - Mr. Brafman

had a great quote once.  He said everyone is entitled to his

own opinion, his or her opinion, but not to their own facts.

The government is not entitled to develop facts out of whole

cloth and they are not entitled to ignore facts and they are

not entitled to ask a jury to convict someone based on surmise

and speculation.  And you remember when Mr. Mousouris, the

accountant who got a non-prosecution agreement, the accountant

should be in jail, but the accountant, remember what he said:

I had suspicion.  And I said:  Thank you.  We're talking about

reasonable doubt, not suspicion.  Maybe doesn't cut it.

Suspicion doesn't cut it.

        Listen, they go last.  It's a terrible rule, but it's

the rule because they have the burden of proof.  So when I sit

down, I think Ms. Hanft is going to address you for 30 minutes,

and I don't get up to say anything.  So you have to two do

things:  First of all, you have to listen, because you're

courteous people, but you also have to think, what would

Brafman say if he had another ten minutes, if he could get up

to respond?  They don't get the last word in this case.  You

do, the last two words, two words that are not guilty.

        Ladies and gentlemen, I want to say one other thing.

Regardless of your verdict, I want to thank you for serving.

Over the holidays when you see family and friends and they talk

to you, Where you been? and you're finished with the case and

you're allowed to talk about the case and the case is over,

ICHHIss5                    Summation - Mr. Brafman

1    you're allowed to talk about this, and someone says to you:

2    What, you served on a jury?  What's wrong with you? grab them,

3    don't fight, but just grab them and say:  You're wrong.  Jury

4    duty is important.  Jury duty is a very, very important civic

5    responsibility.  Don't you try and get out of jury duty.

6    Serve.  It's inconvenient.  Sometimes it's not fun, but it's

7    important to a democracy that says before the government can

8    reach out and take someone else, they got to convince 12

9    ordinary citizens, not lawyers, not judges, just people.

10          When you go into the jury room and you look at each

11   other and when you finally able tomorrow to talk about the

12   case, I would like you to look at each other, and you'll see

13   what I've seen for the last two weeks.  Just normal people.

14   You're all different.  There's no common denominator.  You've

15   got different backgrounds, different races, different

16   religions, I assume, different age groups.  You know what you

17   have in common?  You said you would be fair.  You would be

18   fair, that's all I'm asking, you to be fair, that you would

19   apply the law, that you would respect the presumption of

20   innocence that Her Honor has spoken to you about.

21          Finally, ladies and gentlemen, I'm going to ask you

22   something else, two things, and then I sit down.  Don't

23   compromise your verdict.  You cannot go in there and say:

24   Well, you know, the government spent a lot of time and money

25   and they brought this case; we'll give them a couple counts.

ICHHIss5                        Summation - Mr. Brafman

1    And Issa did a good job; we'll give him a couple counts.  No,

2    any count that you convict Mr. Issa of has substantial

3    potential consequences, and you shouldn't do it unless you

4    believe beyond a reasonable doubt that he is guilty.

5              And second, I'm going to say this which you may not

6    understand until the time comes.  It's very easy to convict

7    because the government is asking you to and he's been indicted

8    and you're in a courthouse and he's the accused and he's the

9    defendant.  Very easy.  Hey, everybody else said guilty.  Takes

10   a lot of courage to acquit.  You have that courage.  You have

11   that courage to come out and say not guilty, because it's the

12   right verdict under the facts of this case and under the law as

13   Her Honor will charge you.  And if it's the right verdict, it's

14   the right verdict.

15             Thank you very much.  Have a good holiday season.

16             THE COURT:  OK.  Let's take a ten-minute break,

17   stretch break, and then we will be back, and the government

18   will deliver its rebuttal closing under a rule that defense

19   counsel understandably chaff under, but it is manifestly not

20   unfair.

21             OK.  Do not discuss the case.  Keep an open mind.

22             (Jury excused)

23             (Recess)

24             THE COURT:  All right.  Are we ready?

25             MR. SOLOWIEJCZYK:  Yes, we fixed the issue, Judge.

1   Thank you.

2            THE LAW CLERK:  Jurors?

3            THE COURT:  Yes, please.

4            Remember, Ms. Hanft, less is more.

5            MS. HANFT:  Thank you, your Honor.

6            (Jury present)

7            THE COURT:  All right, ladies and gentlemen, the

8   government has the burden of proof, so the government gets to

9   be the last voice that you hear commenting on the evidence.

10           Ms. Hanft.

11           MS. HANFT:  Thank you, your Honor.

12           Well, ladies and gentlemen, you've just heard from

13  LeBron James.  Mr. Brafman mentioned LeBron James, and you've

14  just heard from him.  I think over the past couple of weeks

15  we've all seen Mr. Brafman is a very talented attorney, but

16  even LeBron James cannot escape the overwhelming evidence in

17  this case.  Even LeBron James can't talk his way out of this

18  one.

19           Let's talk about that overwhelming evidence.  Let's

20  talk about the things that Mr. Brafman stood here for 90

21  minutes talking and didn't mention.

22           Did you hear Mr. Brafman talk about the white

23  envelopes of cash that Tony Issa left for Ismael Velez week

24  after week after week?  Did you hear Mr. Brafman mention those

25  emails on which Tony Issa says:  What's the use of your stupid

ICHHIss5                          Rebuttal - Ms. Hanft

1   accountant if we can't avoid taxes?  Mr. Brafman accused the

2   government of leaving things out.  Well, Mr. Brafman left out

3   some of the most important evidence in this case, and so I just

4   want to take you back through some of that evidence.

5            First I want to point to a few of the things that

6   Mr. Brafman just said in his summation that were just plain

7   wrong.  I don't have time to go into everything, and I'm sure

8   you'll be thankful that I don't go into everything.  As Judge

9   McMahon has reminded you many times, it's your recollection

10  that controls.  It's the things that you heard and you saw in

11  this courtroom that control, and it's the evidence that

12  controls, not defense counsel's arguments and not my arguments,

13  not the screaming and the yelling.  So when you go back into

14  the jury room and start deliberating, don't be afraid to look

15  at the evidence, the facts.  That's all we're asking you to do.

16           Here are a few examples.  And again, there are more,

17  and you should go back and look at them.  Do you remember

18  Mr. Brafman just stood here and said:  Well, there were no

19  complaints about Mr. Issa's work before Mr. Blight started

20  going out to dinner with Mr. Issa?  That's not what happened

21  here.  Mr. Blight took the stand, and he testified that he

22  wasn't happy with Mr. Issa's work way back when he was at the

23  Detroit VMF.  He said he almost completely cut back Tony Issa's

24  work.  Look at the transcript.  You'll see that.

25           Another example.  Mr. Brafman talked about Nicholson.

1    Look how much Jim Nicholson was eating at these lavish meals.

2    Look at how much he was enjoying the food.  It wasn't

3    Mr. Issa's idea for Mr. Nicholson to take food home to his

4    wife.  Well, guess what?  It was.  Look back at the transcript

5    and you'll see.  You'll see who was pushing these lavish food

6    orders.  You'll see whose idea it was to get a meal to take

7    home to Mr. Nicholson's wife.

8            Mr. Brafman spent most of his summation just now

9    talking about the ulterior motives that the witnesses in this

10   case had.  Jim Nicholson didn't like Tony Issa and was worried

11   Tony Issa would put him and the VMF out of work, and Jeff

12   Blight lied to Tony Issa.  And I know Mr. Brafman said he

13   didn't like this word, but guess what?  These things are a

14   distraction.  Mr. Brafman is desperately trying to get you to

15   focus on everything and everyone else other than what his

16   client did and what his client said.  You heard those tapes and

17   you saw that video.  You know exactly what Tony Issa did and

18   said.  You saw and heard it with your own eyes.  So no matter

19   how hard Mr. Brafman tries to distract you by talking about

20   other people, let's talk about Tony Issa.  What did Tony Issa

21   say?

22           Let's look at the first slide, Mr. Concepcion.

23           Tony Issa said:  "I want to help you.  I got to help

24   you.  Listen, I'm the kind of person, it's a two-way street.

25   We help each other."

ICHHIss5                       Rebuttal - Ms. Hanft

1          What else did he say?  "Me, you and I, we have a

2     mutual relationship that we can both benefit from."  So those

3     are some of the things Tony Issa said, and you've heard a lot

4     more of them throughout this trial.

5          What are some of the things Tony Issa did?  Well, he

6     took Jim Nicholson to $600 lunches, asking him practically in

7     the same breath for work, for PMIs.  He paid Israel Velez

8     envelopes of cash, eventually thousands of dollars in each

9     envelope.  And I'll get back to Ismael Velez, but Mr. Brafman

10    didn't once talk about those envelopes of cash.  He talked

11    about trips and he talked about meals, but cold hard cash is

12    something different.

13         What else did Tony Issa do?  He paid Jeff Blight

14    $2,000 in cash, passing him surreptitiously a napkin filled

15    with cash under the table at a restaurant in Chinatown.  So

16    don't lose sight of these things when you go back in there,

17    into the jury room.  Mr. Brafman can't make the facts

18    disappear, and the facts are that Tony Issa paid people bribes,

19    people with no connection to one another, to get work from

20    them.  It's as simple as that.  Follow the facts.

21         So let's talk briefly about Jeff Blight because

22    Mr. Brafman did.  Well, one thing Mr. Brafman forgot to mention

23    is before Jeff Blight came to New York, he told Tony Issa that

24    his daughter was no longer going to Columbia.  Remember

25    Government Exhibit 258?  He told -- and you can look at that

back in the jury room.  Here we have Government Exhibit 258 on

the screen.  He told Tony Issa:  "Well, guess what?  My

daughter decided not to switch colleges.  It's a huge weight

off my shoulders, my checkbook.  I'm coming to New York alone."

And Tony Issa said:  "Great.  I'll get a free pass, and we can

go crazy."

　　　　How could Mr. Issa have given Mr. Blight $2,000 just

because he told him his daughter was going to Columbia when he

knew well before he passed him the money that his daughter

wasn't going to Columbia?  When defense counsel argues that

Blight tricked Issa into giving him the money because he told

him that his daughter was switching schools, don't forget about

that fact that Mr. Brafman conveniently left out.

　　　　Also don't forget about Mr. Tony Issa saying on tape

to Mr. Blight:  "You should come back to New York.  This trip

doesn't count.  Come for longer next time.  We'll go to

Broadway shows.  We'll enjoy the city more."  Again, how could

that invitation have anything to do with Mr. Blight's daughter

and her scholarship?

　　　　Finally, don't forget it was Issa who offered to pay

for the trip, not Jeff Blight.  Jeff Blight never asked Tony

Issa for a dime.  You can pore over the transcripts over and

over again, and you will not see Jeff Blight asking Tony Issa

for a dime.

　　　　Now, as to Nicholson, Jim Nicholson, Mr. Brafman took

ICHHIss5                          Rebuttal - Ms. Hanft

1   a long time to go after Mr. Nicholson.  Respectfully, your

2   common sense tells you Jim Nicholson was a postal employee who

3   came forward because he was concerned.  He didn't have a vested

4   interest in the case.  He agreed to record Tony Issa at the

5   direction of the OIG.  He was a man who had no reason to be

6   here, ladies and gentlemen.  He committed no crime.  He wasn't

7   being forced to testify.  There is no benefit to him to be part

8   of this investigation or to have to testify for days in this

9   courtroom.

10          But at the end of the day, it doesn't matter, because

11  he didn't make Tony Issa say the things he said.  He didn't

12  make him pay for the meals.  He didn't make Tony Issa give him

13  the tablet computer, the bottles of wine, and the alcohol.  So

14  again, Nicholson, Blight, their motives don't matter, but they

15  had no ulterior motives, and you know that based on your common

16  sense.  This is about Tony Issa's intent and what Tony Issa

17  intended when these gave these things, these gifts, these

18  meals, these trips, and this cash to the VMF managers.

19          You know, Mr. Brafman spent quite a long time talking

20  about Jim Nicholson, but he didn't mention everywhere on the

21  tapes where Tony Issa is plying Jim Nicholson for work, in the

22  same breath asking for work as when he's giving Nicholson

23  colossal stone crabs and steak and, of course, spinach which we

24  heard all too much about at this trial.

25          Now, Mr. Brafman talked about the things that Tony

ICHHIss5                        Rebuttal - Ms. Hanft

1    Issa said that -- you know, Tony Issa insisting over and over

2    again that he wasn't trying to do anything illegal.  Oh, he's

3    just talking about the postal regulations.  Well, guess what?

4    The word "illegal" has nothing to do with the postal

5    regulations, and Mr. Issa said that he wasn't doing something

6    illegal over and over again.

7         We've all heard that expression about protesting too

8    much, haven't we?  In other words, sometimes somebody says

9    something, denies something so strongly over and over again

10   that you know it's the truth.  They just say it too many times

11   for it to be believable.  That's what we have here.  How many

12   times does Tony Issa tell Jim Nicholson there's no quid pro

13   quo?  I'm not giving you meals in exchange for work.  Can I get

14   some work?  Can I get some work?  Can I get those PMIs?  Hey,

15   here's a free tablet computer.  Can I get those PMIs?  Don't

16   worry, as long as I just tell you over and over again, utter

17   the magic words "there's no quid pro quo," we'll be fine.

18   That's not how this works, ladies and gentlemen.  Saying the

19   magic words "no quid pro quo" doesn't mean you insulate

20   yourself from committing a crime.  You know that it wasn't

21   true, and you know there was a quid pro quo with each of these

22   VMF managers.

23        Mr. Brafman suggested you can't just ignore the

24   context of a conversation.  You can't just look at snippets.

25   And that's right, and if you look at the context of these

ICHHIss5                              Rebuttal - Ms. Hanft

1    conversations, you will see that Tony Issa intended to get work

2    with his bribes.

3            By the way, who talks over and over and over again

4    about not trying to do something illegal?  Somebody who's

5    committing a crime.  Somebody who knows the shit inside out, as

6    Tony Issa says.  Tony Issa knew he was doing something illegal.

7            By the way, does defense counsel want you to believe

8    that the fact that Velez gave millions of dollars' worth of

9    work to Tony Issa's company while Tony Issa just started giving

10   more and more and more money to Velez is just a coincidence?

11   He didn't mention that in his summation either.  It's not a

12   coincidence.  It's because the money was a bribe for the work,

13   and your common sense tells you that that's the only

14   explanation.

15           Mr. Wirshba went over this with you, and I just want

16   to briefly review.  There are many, many ways that you know

17   that Tony Issa knew he was doing something illegal.  I'm going

18   to focus on one of them.  Tony Issa tried to hide what he was

19   doing.  He tried to hide it over and over and over again.

20   There are countless examples you've heard about during this

21   trial.  If Tony Issa was just taking friends out to eat, giving

22   a friend some money to come to New York, giving a friend

23   envelopes of cash because he felt bad for him or because he was

24   extorted, why would he need to keep that a secret?  He

25   wouldn't.  You know that.

1      Let's review some of the ways he tried to hide his

2    tracks.  Well, he told Jeff Blight more than once:  You better

3    reserve the trip to New York in your own name so nobody would

4    know that Tony Issa was involved.  He even told him that when

5    he reimbursed Blight.  He said:  Don't go paying it all in one

6    shot.  That's too obvious.  Once Jeff Blight got to New York,

7    he said:  Good thing you reserved this in your own name.

8    Again, these are all in the tapes, and you can listen to them

9    when you go back in the jury room.  He handed Jeff Blight

10   $2,000 in cash under a table and after his employee got up to

11   go to the bathroom.

12      Remember Ismael Velez?  He told Ismael Velez not to

13   deposit the cash he was giving Velez in a bank account so the

14   money can't be traced.  And remember that visit Tony Issa made

15   to Velez after Issa had been arrested?  He told Velez not to

16   say anything about the money, to say that he'd never given

17   Velez any money if anyone asked.  If he wasn't doing anything

18   wrong or if Velez was just somehow extorting him, why would he

19   need to say that?

20      Finally, you've heard about the computer tablet that

21   Mr. Issa gave Nicholson.  He told Nicholson he removed the

22   Daimner name from the tablet he gave him and then he did that.

23      Also, who is constantly talking about federal agents

24   and about being wired?  Remember when Issa told Blight, I could

25   be a federal agent right now in the middle of dinner and showed

ICHHIss5                          Rebuttal - Ms. Hanft

1    Blight his chest to show him he wasn't?

2              If we could look at the second slide.  He patted Velez

3    down in the freezer aisle of the Giant supermarket to make sure

4    Velez wasn't wearing a wire.  Mr. Brafman didn't mention either

5    of these in his summation, and that's because these make it

6    obvious.  Only someone who's doing something illegal would be

7    constantly talking about federal agents.

8              (Continued on next page)

ICH5iss6                    Summation - Ms. Hanft

1          MS. HANFT:  Now, turning to Ismael Velez.

2          Mr. Brafman spent a lot of his summation attacking

3    Ismael Velez and we told you at the beginning of this case that

4    you should scrutinize his testimony carefully and we told you

5    he committed serious crimes, just like the defendant.  But

6    there were few things that Mr. Brafman conveniently ignored

7    when he was going after Ismael Velez in his summation.

8          First, you shouldn't forget that Mr. Velez was

9    approached well after Tony Issa's arrest.  You heard the

10   evidence months after Tony Issa was arrested Velez is

11   approached by OIG agents and he admits to having accepted

12   bribes from Tony Issa.  Tony Issa had already been charged.

13   Why would Velez make up that he was accepting bribes so that

14   he, too, could be charged, so that he could turn himself in to

15   the marshals, so that he could face time in prison?  He pleaded

16   guilty and he admitted to accepting bribes from Tony Issa.

17         People don't lie to get themselves into trouble.

18   People lie to get them self out of trouble.

19         Second, this is not a one-witness case and you know

20   Ismael Velez isn't lying because of all the other evidence, all

21   of that evidence supports what he said here on the stand, the

22   text messages, the photographs, the testimony of other

23   witnesses like Sohail Butt, the receipts.

24         I submit to you, ladies and gentlemen, that defense

25   counsel's attacks on Ismael Velez are another distraction.

ICH5iss6                    Summation - Ms. Hanft

1    This isn't United States v. Ismael Velez, this is United States

2    v. Tony Issa.

3           Mr. Brafman's best defense is to get you all focused

4    on Velez that you forget all of the damning evidence against

5    Tony Issa, all of it independent of anything Velez said.  What

6    is Mr. Brafman even staying that Mr. Velez lied about?  Did he

7    lie about the trips to Florida?

8           Government Exhibit 410, if we could pull that up?

9    There is evidence of the trip.

10          Government Exhibit 414, Mr. Brafman showed you that

11   too.

12          Government Exhibit 415?  Did he lie about the lavish

13   meals?

14          Let's look at Government Exhibit 406, Government

15   Exhibit 407, Government Exhibit 250P.

16          Did he lie about the envelopes of cash?  Well, let's

17   look at what Sohail Butt said.  Sohail Butt, an employee of

18   Tony Issa who had to be ordered to testify, Sohail Butt had no

19   reason to lie about this.  Pulling up the transcripts, lines 23

20   to this, from this very trial, what does Mr. Butt say?  He was

21   asked:

22          Why would you give cash to Izzy?

23          He said, because he came in with Tony and Tony

24   introduced me and I thought he was working with him from his

25   shop and I thought he was maybe a supervisor.  So, the first

ICH5iss6                         Summation - Ms. Hanft

1     time he asked me $200 to give to him.

2              Do you remember when Ismael Velez said that same

3     thing?  After that first trip when they were coming back from

4     Healey, he and Tony Issa, when Tony Issa threw the two $100

5     bills into his car, he said the next time he went to Tony

6     Issa's gas station and he met Ismael Velez and they were

7     talking in the back room -- and you can go look at this

8     transcript -- near Sohail Butt's office and Tony Issa said --

9     and you heard this from Ismael Velez and you heard this from

10    Sohail Butt -- give him $200 when he comes by.

11             Let's look at page 694 of the transcript.  Sohail Butt

12    again:

13             After that first time you just told us about, did Izzy

14    come to the station regularly to pick up cash?

15             Yes.

16             Approximately when did he start coming?

17             Normally he come every week.

18             In what year did he start coming?

19             I think May, May, June, I'm not sure.  But I think

20    May, June 2013.

21             When did he stop coming to pick up cash?

22             He stopped coming the last time I saw him on July 31st

23    or 30th on 2016.

24             Again, if you look back at Sohail Butt's testimony,

25    and you look back at Ismael Velez' testimony you will see they

1  track very closely.  You know what else Mr. Velez' testimony

2  tracks?  It tracks Tony Issa' playbook.  Tony Issa's playbook

3  that my colleague Mr. Wirshba spent some time talking to you

4  about this morning.  Everything about how Tony Issa bribed him

5  and started small and escalating it is all corroborated by what

6  you heard and saw with Nicholson and with Blight and with your

7  own eyes and ears.  Defense, again, is focusing on Ismael Velez

8  to try to get you to take your eye off the ball and forget

9  about all the other evidence showing that his client is guilty.

10         And, by the way, if Velez was just going to make up

11  some story from accepting bribes from Tony Issa wouldn't he

12  make up a better one?  Why would he tell a lie in which he

13  demanded more money?  That should suggest to you that Ismael

14  Velez was telling the truth.

15         As Mr. Wirshba said, Ismael Velez, he will have his

16  day of reckoning, he will be sentenced for the crimes he has

17  admitted to but it doesn't change what Tony Issa did.

18         Mr. Brafman talked about how Ismael Velez was

19  extorting Tony Issa.  He was forcing him to give him money in

20  exchange for work and as I have just said, Velez admitted to

21  you right here on the stand he sometimes asked Tony Issa for

22  more money because, guess what?  They both knew what was going

23  on.  I submit to you that that is proof that Tony Issa was

24  intending to get work when he bribed Ismael Velez.  It was a

25  bribe.  Tony Issa himself threatened to stop giving Velez money

ICH5iss6                    Summation - Ms. Hanft

1    if he didn't get more work.  That's at the transcript page 456,

2    lines 11 to 13.  Again, Tony Issa thought that Velez would shut

3    down his shop if he didn't give him money.  That just goes to

4    show that Tony Issa knew giving Velez money was about getting

5    work.  He was giving him money to get work.

6         And as you have heard so many times, you should listen

7    to Judge McMahon's instructions on the law but I expect you

8    won't hear that Ismael Velez' intent matters or Jim Nicholson's

9    intent matters or Jeff Blight's intent matters.  That's because

10   it is Tony Issa's intent that matters.  The question is whether

11   when Tony Issa was giving bribes to all of these people he was

12   doing it for work and the obvious answer is, the only answer

13   that makes any sense, is yes.

14        Is it good that Velez demanded more money?  Is it good

15   that he may have admitted to other bribes?  Of course not.

16   Just like it is not good that he committed a crime with Tony

17   Issa.  We are not telling you Velez is someone you should like

18   or whose life choices you should approve of.  Far from it.

19   But, we didn't choose Ismael Velez.  Tony Issa chose Ismael

20   Velez and Tony Issa chose someone who tried to benefit right

21   back from Tony Issa's bribes.  That's how a bribe works and

22   that doesn't make Tony Issa any less guilty.

23        Ladies and gentlemen, Mr. Brafman threw up all kinds

24   of things.  He told you about throwing a piece of pizza against

25   the wall and seeing what sticks.  Well, that's what he did in

ICH5iss6                        Summation - Ms. Hanft

his summation.  Everyone else is to blame.  Jeffrey Blight is
to blame, James Nicholson is to blame, Ismael Velez is to
blame.  You know the old saying, fool me once, shame on you,
fool me twice, shame on me?  What about fool me three times?
Because Tony Issa didn't just bribe one person, he didn't just
take one person out to fancy meals.  He didn't just describe
how great Tootsie's was with one person or Brazilian
steakhouses or fishing trips to Florida.  He didn't even give
cash to just one person.  He pulled the same thing, he played
the same tricks, and he played the same game with three
different VMF managers.

        Does Mr. Brafman want you to believe that this is all
one big coincidence after another?  He keeps meeting the wrong
people.  He keeps meeting people who play up his sympathy and
extort him.  Poor Tony Issa keeps getting tricked into feeling
bad for people and giving them money; Tony Issa, who over and
over and over again talks on the tape about what a smart
businessman he is.

        You know what is going on here.  What is going on is
Tony Issa had an MO.  He bribed and he bribed and he bribed and
you saw it play out on the tape and you heard it through the
testimony and you know it happened.

        Now, ladies and gentlemen, Mr. Brafman spent some time
talking about the tax case but not too much time and that's
because you know that Tony Issa has no defense in that case.

ICH5iss6                        Summation - Ms. Hanft

1   Mr. Brafman tries to get you to blame the accountant, blame

2   Chris Tsamutalis, but it was Tony Issa who was feeding lies to

3   his accountant.  What are the accountants supposed to do when

4   Tony Issa gives them false information?

5          And Agent Berzansky got up on the stand and he told

6   you, he told you on direct examination and he even told you on

7   cross-examination how he and his tax calculations gave Tony

8   Issa and his companies every benefit of the doubt.  That cash

9   payroll thing that Mr. Brafman mentioned?  Well, guess what.

10  Agent Berzansky considered that entire amount -- the entire

11  amount -- not deposited into the account the cash payroll he

12  gave Tony Issa the benefit of the doubt.  You know it is not

13  cash payroll.  You know, you saw the cash sheets.  You saw

14  Tony, Tony friend, Tony family.  You saw the e-mail from

15  Daniela Silva about all the personal money that Tony Issa had

16  taken out of his company but he did not even hold that against

17  Tony Issa.

18         Mr. Brafman spent some time talking about the contact

19  process and how the postal service is all a mess hearing the

20  term "postal crazy land."  He mentioned that Mr. Issa built a

21  great facility and fulfilled a need.  That does not mean that

22  Tony Issa didn't commit crimes.  You can't just build a great

23  facility and take advantage of the postal service and say, oh,

24  they renewed my contract so, guess what?  I get to keep

25  defrauding them, I get to keep bribing people.  That's not how

ICH5iss6                    Summation - Ms. Hanft

1    this works.

2              The fact that Jim Nicholson didn't know about the

3    contract?  Guess what, Waters water also testified and told you

4    those contracts, they're not entitlement to work, they just

5    mean that the vendor, the third-party contractor is approved

6    and you can use them.  And guess what?  Who helped Tony Issa

7    get some of those contracts?  Ismael Velez who was getting

8    paid, who was getting bribes.  You heard all about that.

9              Ladies and gentlemen, I just have a few more things to

10   tell you.  I want to talk briefly about reasonable doubt

11   because the defense, they want you to believe that reasonable

12   doubt is some impossible standard.  Judge McMahon will instruct

13   you about what reasonable doubt means.  You should listen to

14   and follow her instructions.  But keep in mind the standard

15   isn't beyond any doubt, it's beyond a reasonable doubt and

16   that's the same standard that is used in every courtroom in

17   every criminal case across the country.  It's a high standard

18   and we embrace that standard but it's not insurmountable.  If

19   it were, no one would ever be convicted of a crime?

20             MR. BRAFMAN:  Objection.

21             MS. HANFT:  And we have met --

22             THE COURT:  The objection is overruled.

23             MS. HANFT:  We have met that burden in this case.  The

24   mountain of evidence against Tony Issa shows that he is guilty

25   beyond a reasonable doubt.

ICH5iss6                    Summation - Ms. Hanft

1          I am just going to ask if we can pull up Government

2     Exhibit 809.  I referenced this earlier and I just want to make

3     sure we have all seen it.

4          Remember this?  If we can go back to the first page?

5     Mr. Brafman talks about Chris Tsamutalis, the accountant.

6     Chris Tsamutalis, the accountant and how he compared to Agent

7     Richard Berzansky as Lebron, he didn't know what he was doing.

8     Well, guess what?  Chris Tsamutalis, he told you I met with

9     Tony Issa, I talked to him about the subcontracting problem,

10    that if he gave all of this money and it went to subcontracting

11    we have to amend the return for Hybrid -- the company Hybrid

12    and do new tax returns for High Powered.  He sent out a tax

13    return to them.

14         So, when you hear that Tony Issa didn't know what was

15    going on and Tony Issa didn't have an intent to evade taxes,

16    keep in mind Government Exhibit 809.  It says, Dear Tony, and

17    told him to file as soon as possible.  Look.  Date due:  As

18    soon as possible.

19         Hybrid's amended tax return.  He never did that.

20         Let's briefly turn to Government Exhibit 725.

21    Remember this?  *What is the use?  Your stupid accountant to*

22    *make a loan and then have to pay hundreds of thousands in tax.*

23    *Tell him to call me ASAP.*  Is this someone who didn't know what

24    was going on?  Ladies and gentlemen, you have been very

25    attentive and we appreciate the time you have given to this

1    case and the attention you have given to the evidence and to

2    the witnesses during this trial.  I am going to sit down and I

3    ask that you listen to the Judge's instructions carefully on

4    the law and like we did at the beginning of the this trial, I

5    am going to ask you to use your common sense, decide this case

6    based on the evidence you have seen and heard.  If you do, you

7    will see that this is not a close case.

8            The evidence of Tony Issa's guilt, his bribery, his

9    stealing the government's money and his tax evasion, it is

10   overwhelming.  You have heard from multiple VMF managers, Tony

11   Issa's employees, accountants, and IRS revenue agent, you have

12   seen text messages, e-mails, photographs, bank?receipts, bank

13   statements and you have heard recordings, recordings of the

14   defendant bribing VMF managers in return for work and telling

15   them to keep it all a secret.  You have seen videos of cash

16   handoffs under a table.  If you consider all of that evidence

17   and use your common sense, you will reach the only verdict

18   consistent with the evidence in this case -- that Tony Issa is

19   guilty as charged.

20           Thank you.

21           THE COURT:  Okay.  Thank you Ms. Hanft.

22           So, we have now heard the lawyers' argument about how

23   you should view the evidence.  Obviously I gave them time

24   limits so they couldn't talk to you about absolutely everything

25   in the evidence, but I think you will agree it has been a most

iCH5iss6

1    interesting and enlightening day and it is time for this day to

2    be over.

3              Tomorrow morning, when you arrive, there will once

4    again be an order form for your lunch on the table.  Order your

5    lunch, Jim will make sure that you get it, and we will start

6    the day at about a quarter of 10:00 and I will deliver the

7    charge.  We will take a break in the middle of the charge

8    because it is a lot to absorb.  It's not nearly as engrossing

9    as what you heard today and it is kind of a longish charge,

10   probably longer than it should be, but that's partly because

11   there are a number of tax laws I have to advise you about.  So,

12   we will do that and then you will retire to deliberate and

13   render your verdict.

14             So, the hardest work is yet to come so get a good

15   night's rest.  Don't discuss the case tonight, keep an open

16   mind, and I will see you in the morning.

17             (Continued on next page)

18

19

20

21

22

23

24

25

iCH5iss6

1              (Jury not present)

2              THE COURT:  Okay.  Wonderful, everyone.  So, I will

3    see you in the morning.

4              MR. SOLOWIEJCZYK:  Your Honor, if we could briefly be

5    heard about the charge your Honor circulated on the USPS rules?

6    We have a very minor proposed tweak.

7              THE COURT:  I don't have it.

8              MR. SOLOWIEJCZYK:  We actually have --

9              THE COURT:  You will have to wait until Jim gets back.

10   Can you get me a copy of the charge?

11             THE DEPUTY CLERK:  Let me get it from the printer.

12             THE COURT:  They want to make a change.

13             MR. SOLOWIEJCZYK:  Your Honor, we have a piece of

14   paper with your charge and our proposed change.

15             THE COURT:  Okay.  Well, that's fine.

16             MR. SOLOWIEJCZYK:  Your Honor, I will let you read it

17   first.

18             THE COURT:  You couldn't just mark mine up?  It is so

19   much easier.

20             MR. SOLOWIEJCZYK:  I'm sorry.  We had limited time

21   this afternoon, as you might imagine, as you can tell from the

22   spelling mistake.

23             MR. BRAFMAN:  I can't find what you changed.

24             THE COURT:  The bottom of the second paragraph.  They

25   made it longer, that's what the government does.

iCH5iss6

1          MR. SOLOWIEJCZYK:  Do you have an objection?

2          MR. BRAFMAN:  No, no.  I don't understand why you

3    would ask for the change.

4          MR. SOLOWIEJCZYK:  The way the charge is currently

5    written it makes it seem as if there is no way any of this is

6    relevant and respectfully, yes, it is true that violating

7    postal rules alone is not a crime, everyone acknowledges that,

8    but that can be informative to them.

9          THE COURT:  You are right.  You are right about that.

10   So, just let me mess with this so that it doesn't take so many

11   words.  Okay?

12         MR. SOLOWIEJCZYK:  Thank you, your Honor.

13         MR. BRAFMAN:  I would object to this.

14         THE COURT:  That's okay.

15         MR. BRAFMAN:  Your Honor, I would object to this, your

16   Honor.  I think what they're saying -- you know what?  I don't

17   object.

18         THE COURT:  You don't.  You don't.

19         MR. BRAFMAN:  If that makes the difference then I will

20   accept it.

21         (Adjourned to Tuesday, December 18, 2018 at 9:45 a.m.)

22

23

24

25

INDEX OF EXAMINATION

Examination  of:                                    Page

RICHARD BERZANSKY

Cross By Mr. Kirshner  . . . . . . . . . . .1460

Redirect By Mr. Wirshba  . . . . . . . . . .1474

Recross By Mr. Kirshner  . . . . . . . . . .1483

Redirect By Mr. Wirshba  . . . . . . . . . .1485

Cross By Mr. Kirshner  . . . . . . . . . . .1486

GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 4003, 4008, 4009   . . . . . . . . . . . .1488

DEFENDANT EXHIBITS

Exhibit No.                                     Received

 701   . . . . . . . . . . . . . . . . . . .1464

 702   . . . . . . . . . . . . . . . . . . .1464

 703   . . . . . . . . . . . . . . . . . . .1466