ICE5iss1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                  v.                            17 Cr. 74 (CM)

5    IBRAHIM ISSA,

6                                                Trial
                   Defendant.
7    ------------------------------x

8                                                New York, N.Y.
9                                                December 14, 2018
                                                 9:55 a.m.
10

11   Before:

12                       HON. COLLEEN MCMAHON,

13                                              District Judge

14                            APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     NOAH SOLOWIEJCZYK
17   ELIZABETH HANFT
     KYLE WIRSHBA
18        Assistant United States Attorneys

19   BRAFMAN & ASSOCIATES, P.C.
          Attorneys for Defendant
20   BY:  BENJAMIN BRAFMAN
          JOSHUA D. KIRSHNER
21        STUART GOLD

22   ALSO PRESENT:    ANTHONY DUBAR, Special agent USPS-OIG
                      GRACE SOTO, Special agent IRS
23                    COLLEEN GEIER, Paralegal Specialist USAO
                      PRIYA KUARLALL, Paralegal
24

25

ICE5iss1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  Case on trial continued.  The parties are |
| 3 | present, the jurors are not present.  Mr. O'Neil is dealing |
| 4 | with my chair. |
| 5 | So, who is the next witness?  Can we get the witness |
| 6 | on the stand? |
| 7 | MR. WIRSHBA:  Your Honor.  The government calls George |
| 8 | Mousouris. |
| 9 | THE COURT:  Get the jury. |
| 10 | MR. WIRSHBA:  Of course. |
| 11 | THE COURT:  But if we can put him on the stand, that |
| 12 | can save some time. |
| 13 | MR. WIRSHBA:  We are, your Honor. |
| 14 | (Continued on next page) |

ICE5iss1                          Mousouris – direct

1            (Jury present)

2            THE DEPUTY CLERK:  Be seated.

3            THE COURT:  Good morning.

4            THE JURY:  Good morning.

5            THE COURT:  The government has two more witnesses.

6            Call your next witness.

7            MR. WIRSHBA:  Yes, your Honor.  The government calls

8    Mr. George Mousouris.

9     GEORGE MOUSOURIS,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12            MR. WIRSHBA:  May I proceed?

13            THE COURT:  You may.

14   DIRECT EXAMINATION

15   BY MR. WIRSHBA:

16   Q.  What is your current occupation, Mr. Mousouris?

17   A.  I'm an accountant.

18   Q.  What is your educational background?

19   A.  I have a bachelors degree in accounting, a masters degree

20   in tax, a masters degree in education.

21   Q.  Where do you currently work?

22   A.  In Astoria, Queens.

23   Q.  In what business?

24   A.  GJM Business Center.

25   Q.  What is GJM Business Center?

ICE5iss1                    Mousouris - direct

1   A.  It is an accounting office that I founded in 1999.  We have

2   been there pretty much ever since.

3   Q.  How many employees do you have at GJM?

4   A.  Five.

5   Q.  What kind of work do you do there?

6   A.  We specialize in small to mid-sized businesses, mostly tax

7   work; personal, as well as business.

8   Q.  And when you say -- when you say business tax work, does

9   that mean a preparing of form 1120s?

10  A.  Yes.  Corporate businesses, 1120s as well as sales tax,

11  payroll.  Any other kind of tax returns that they need to file

12  we would prepare them all.

13  Q.  I would like to focus in on 1120s for a moment.  When you

14  prepare an 1120, what do you request from the person asking you

15  to prepare it, in general?

16  A.  Usually I have them give me a writeup, year-end write up

17  from QuickBooks which is like a profit and loss statement, as

18  well as bank statements, and any other documents that they

19  feel -- that I feel that I will need or we will need to prepare

20  the return.  Usually it's bank statements and profit and loss

21  statements, so that what we usually ask for.

22  Q.  Why do you need these things?

23  A.  I have to verify numbers, I have to be able to check the

24  profit and loss statements and be able to verify those numbers

25  against the numbers that are on the bank statements.

ICE5iss1                     Mousouris - direct

1   Q.  When you are asked to prepare a form 1120, do clients

2   typically provide this information?

3   A.  Yes.

4   Q.  Did you prepare a form 1120 corporate tax return for, on

5   behalf of Mr. Ibrahim Issa?

6   A.  Yes.

7   Q.  Did you receive bank records for Mr. Issa before you

8   prepared those returns?

9   A.  No.

10  Q.  What did you receive?

11  A.  I received profit and loss statements.

12  Q.  Did you ask anyone for the backup for those records?

13  A.  I asked Daniela if she had bank statements to give me and

14  she said that all the numbers were taken from the bank

15  statements and they were correct so she only gave me the profit

16  and loss statements.

17  Q.  When you say Daniela, who are you talking about?

18  A.  Mr. Issa's wife.

19  Q.  Do you know her name?

20  A.  Daniela Zagnolli.

21  Q.  Did you file the returns even without the bank statements?

22  A.  Yes.

23  Q.  I would like to take a step back.  You mentioned Daniela

24  Zagnolli.  How did you meet Daniela Zagnolli?

25  A.  She was referred to me by -- I have a very large Brazilian

ICE5iss1                         Mousouris - direct

1   client base and somebody referred her to me, I believe, back in

2   2007 or so, and she was referred to me to come in and do tax

3   returns for a business that she had at the time.

4   Q.  And approximately when was that?

5   A.  2007, I believe.  End of 2007.

6   Q.  Are you familiar with an individual named Daniela Silva?

7   A.  Daniela Silva, yes, I believe I am.

8   Q.  And who is that?

9   A.  She has a business as well.  I think she -- she might have

10  been the one who actually referred her to me.  She has a

11  business also but there is a lot of Silvas in the Brazilian

12  community so I'm not quite sure which one it is but, yeah, she

13  was probably the one that referred her to me.

14  Q.  Let's go back to Daniela Zagnolli.

15          What type of work did Daniela Zagnolli do?

16  A.  She sold jewelry.

17  Q.  What was the name of that business?

18  A.  Duploy.

19  Q.  And for how long did you work for Duploy?

20  A.  I did work for Duploy from the beginning when she first

21  came to me in 2007 all the way to, I believe, like 2014, '15.

22  Something like that.

23  Q.  If we could publish just to the witness for a moment

24  Government Exhibit 903?

25          Mr. Mousouris, if you could look in your book for

ICE5iss1                          Mousouris - direct

1   Government Exhibit 903?  It is also up on your screen.  Do you

2   see who this e-mail is from?

3   A.  Yes.

4   Q.  Who is it from?

5   A.  It is from Daniela.

6   Q.  And what's Daniela's last name here?

7   A.  Ah, okay.

8   Q.  Does that refresh your recollection as to who Daniela Silva

9   is?

10  A.  Yes.

11  Q.  Who is that?

12  A.  That's Daniela Zagnolli.

13  Q.  So, those are one in the same person?

14  A.  Yes.

15  Q.  I'm sorry.  You were saying -- you can take that down.

16          You were saying how long did you work for

17  Ms. Silva/Ms. Zagnolli, working for Duploy?

18  A.  Probably from like 2007 to about 2015 -- '14, '15,

19  somewhere around there.

20  Q.  Did you file year end tax returns on behalf of Duploy?

21  A.  Yes.

22  Q.  Before you did so, what did you receive from Daniela?

23  A.  She would give me bank statements and profit and loss

24  statements.

25  Q.  Are there other things that you asked Daniela for that she

ICE5iss1                          Mousouris - direct

1    did not provide you?

2    A.   No.

3    Q.   Did there come a time when you met Daniela's husband?

4    A.   Yes.

5    Q.   What's his name?

6    A.   Ibrahim Issa.

7    Q.   Did you refer to him by any other names?

8    A.   Tony.

9    Q.   What led to your meeting with Mr. Issa?

10   A.   Daniela had asked me if -- she said she wasn't really happy

11   with the way the bookkeeping and accounting was being done for

12   his businesses so she basically asked me if I wouldn't mind

13   meeting with him and talking to him to see if maybe I could

14   help him with his businesses, with the accounting work for his

15   businesses.  So, I agreed.

16   Q.   When was your first meeting with Mr. Issa?

17   A.   I believe it was towards the end of 2012.

18   Q.   Where was that meeting held?

19   A.   At my office.

20   Q.   Who was there?

21   A.   Myself, Daniela, and Tony.

22   Q.   What do you remember Mr. Issa saying at this meeting?

23   A.   He was telling me that he was looking to grow his business,

24   he wanted to expand, he wanted to get more stores in upstate,

25   and he also wanted to have Daniela take over the bookkeeping

ICE5iss1                          Mousouris - direct

1   end of it and the management of the office and have it all

2   centralized, and he wanted her to do it all out of the Bronx

3   office so he wanted, basically, help with the consolidating

4   everything under one roof.

5   Q.  And who did most of the talking during this meeting?

6   A.  Tony.

7   Q.  What, if anything, did Daniela say during this meeting?

8   A.  Well, she told me that she was having a hard time finding

9   all the records, that there were a lot of records that were

10  missing, that there were things that she had to go back all the

11  way to the beginning to find and that she was in the process of

12  taking care of everything.  She had to go back and basically

13  start quick Books all the way from the beginning and she was in

14  the process of doing that.

15  Q.  What, if anything, did Daniela say about companies they had

16  that were not active?

17  A.  She also told me that she had a lot of -- they opened up a

18  lot of corporations in the past with the hopes of opening

19  stores but these stores hadn't been opened yet so they had the

20  corporation sitting idle, they had never done corporate returns

21  so she needed somebody to basically bring those corporations

22  up-to-date.

23  Q.  Was Mr. Issa present when Daniela was talking about the

24  books of these corporations?

25  A.  Yes.

ICE5iss1                         Mousouris - direct

1   Q.   And how did he respond to her comments?

2   A.   I mean, he basically agreed with her but he was also saying

3   that a lot of these corporations were going to be used in the

4   future so that he wanted these books and records to be brought

5   up to date as well.

6   Q.   How did you respond to the request to bring the books

7   up-to-date?

8   A.   I told her, I said if we are going to be bringing these

9   books and records up to date, then we have to get going because

10  there were some of them were like two or three years behind so

11  I would need her to provide me with the information as soon as

12  possible so I could do them.

13  Q.   How long did this meeting last, Mr. Mousouris?

14  A.   About an hour.

15  Q.   And at the conclusion of the meeting what was your

16  understanding of what would happen next?

17  A.   I was under the impression that Daniela would contact me or

18  my staff and basically send me the information that I needed,

19  as well as the names of the corporations that were needed to be

20  brought up to date, and then I would go ahead and do whatever I

21  needed to do to bring those corporations up to date.

22  Q.   After that meeting, did you begin performing tax work for

23  any of Mr. Issa's businesses?

24  A.   After that meeting, it took about I would say, somewhere

25  around four or five months before I actually started getting

ICE5iss1                              Mousouris - direct

1    e-mails from Daniela telling me that she wanted me to bring

2    certain corporations up-to-date.  She would send me copies of

3    the filing receipts, the certificates of incorporation, and

4    other various documents.

5    Q.  Was the first business that you worked on for Mr. Issa

6    Hybrid Specialist?

7    A.  Yes.

8    Q.  If we could put up Government Exhibit 509, Ms. Geier?  This

9    is in evidence.  Moving to the second page.

10           Do you recognize this, Mr. Mousouris?

11   A.  Yes.

12   Q.  What is this?

13   A.  It's the corporate tax return for Hybrid Specialist for

14   2011.

15   Q.  Looking at the third page, was this return filed?

16   A.  Yes.

17   Q.  And who was it filed by, prepared?

18   A.  It was prepared by my office.

19   Q.  Looking back at page 2, what's the total revenues from the

20   year March 1, 2011, to February 29th, 2012 for Hybrid?

21   A.  $14,542.

22   Q.  Do you know from whom you received the information to

23   prepare this return?

24   A.  I don't remember.  This return was the first one I

25   prepared.  I don't remember.  I don't think I had any -- I went

ICE5iss1                          Mousouris - direct

1    back to the files to check and I don't remember seeing

2    anything.

3    Q.  And what was the -- zooming back out, what was the total

4    taxable income here for this corporation?

5    A.  Minus 884.

6    Q.  That was the total taxable income.  So, how much did Hybrid

7    pay in tax in 2011?

8    A.  Zero.

9    Q.  Let's look at Government's exhibit 510, if we could?  Do

10   you recognize this?

11   A.  Yes.

12   Q.  What is it?

13   A.  It's the corporate tax return for Hybrid for 2012.

14   Q.  And, on this second page can you tell what --

15          MR. BRAFMAN:  Excuse me, your Honor.  Our machine is

16   out again.

17          THE COURT:  Oh, please.  Not again.

18          MR. BRAFMAN:  I am going to use the hard copy not to

19   delay the proceedings.

20   BY MR. WIRSHBA:

21   Q.  Mr. Mousouris, looking at the second page, what months does

22   this tax return cover?

23   A.  It covered March of '12, all the way to February of '13.

24   Q.  Looking at the next page if we could, Ms. Geier, who

25   prepared this return?

ICE5iss1                     Mousouris - direct

1    A.   My office did.

2    Q.   And going back to the prior page -- apologies for going

3    back and forth -- what's the total revenues for the year March

4    1st, 2012, to February 29, 2013, for Hybrid?

5    A.   $16,623.

6    Q.   Do you know from whom you received the information to

7    prepare this return?

8    A.   I am assuming it's Daniela but, again, I don't remember if

9    she sent me -- I'm sorry.  I don't remember.

10   Q.   Did you search your files to try to determine where you got

11   this number?

12   A.   Yes.

13   Q.   And what did you find when you searched your files?

14   A.   I didn't find anything.

15   Q.   What's the total taxable income on this tax return, if we

16   can back out and zoom in on the bottom section?

17   A.   Minus 166.

18   Q.   So, according to this return how much tax did Hybrid pay in

19   2012?

20   A.   Zero.

21   Q.   Can we keep that up?  I'm sorry.  I apologize.  Going back

22   to that third page, if we could, can you just tell me when this

23   return was filed, Mr. Mousouris?

24   A.   It was filed on November 5, 2013.

25   Q.   If you could take a look in your book, Mr. Mousouris, at

ICE5iss1                        Mousouris - direct

1    Government Exhibit 901?  Do you see 901?  Ms. Geier, can you

2    publish 901 just to the witness?

3    A.   It is not here.

4    Q.   What is this?  Will you look on the screen?

5    A.   It is an e-mail from Daniela to myself.

6              MR. WIRSHBA:  Your Honor, at this time the government

7    offers Government Exhibit --

8              THE COURT:  Excuse me.

9              MR. WIRSHBA:  I apologize.

10             THE COURT:  The government offers what?

11             MR. WIRSHBA:  Government Exhibit 901, your Honor.

12             THE COURT:  Any objection?

13             MR. BRAFMAN:  No, ma'am.

14             THE COURT:  Admitted.

15             (Government's Exhibit 901 received in evidence)

16   BY MR. WIRSHBA:

17   Q.  Mr. Mousouris, what are we looking at here, focusing on the

18   top?

19   A.   It's an e-mail talking about the corporate tax returns for

20   2011 and '12 for Hybrid.

21   Q.   Who is this e-mail from?

22   A.   Daniela.

23   Q.   Who is it to?

24   A.   To myself.

25   Q.   What's the subject?

ICE5iss1                         Mousouris - direct

1   A.  She is saying -- shall I read it?

2   Q.  Yes.  Read the subject line, if you could.

3   A.  As you know we have --

4   Q.  No, no.  I'm sorry, Mr. Mousouris; just the subject at the

5   very top.

6   A.  Okay.  I have a question about Hybrid Specialist.  The

7   corporation was opened in 2011 but started doing business in

8   November 2013.  You filed the corporate taxes for 2011 and 12

9   with no activity.

10  Q.  Keep reading, Mr. Mousouris.

11  A.  As you know, we have deposited money from First Star Auto

12  Repair prior to 2013 to open that business.  We are being

13  audited for 2012 corporate taxes for First Star where it shows

14  many checks transferred to Hybrid.  How should we apply that

15  money put into Hybrid?  When can I call to discuss this?

16  Q.  Focusing in for a moment on first paragraph that you read

17  it talks about corporate taxes.  You filed the corporate taxes

18  for 2011 and 2012 with no activity.  What corporate taxes did

19  you understand Daniela to be referring to here?

20  A.  The corporate taxes for Hybrid Specialist.

21  Q.  In the second paragraph it says:  As you know, we had

22  deposited money from First Star Auto Repair prior to 11/20/13

23  to open that business.

24         At the time you received this e-mail, did you know

25  anything about Hybrid receiving money from First Star?

ICE5iss1                           Mousouris - direct

1    A.   No.

2    Q.   Did you have a conversation with Ms. Silva by phone after

3    receiving this e-mail?

4    A.   Yes.

5    Q.   What did Ms. Silva say to you during this conversation?

6    A.   She asked me exactly what is on the e-mail.  She told me

7    that she was getting audited for 2012 for First Star and that

8    she wanted to know, they were asking her the deposits that were

9    being transferred from First Star to Hybrid, what should she

10   tell them they were.

11   Q.   What, if any advice, did you offer after she said that?

12   A.   I told her the only way that she could explain these

13   deposits, these transfers without having any tax consequences,

14   was either to show them as loans from First Star to Hybrid or

15   to show them as First Star giving money to Hybrid to buy a

16   portion of Hybrid.

17   Q.   And when you say without any tax consequences, you mean

18   without any tax consequences as to which company?

19   A.   Either or.  I mean, if we had shown anything else Hybrid

20   would have had to pick up income, and if we showed anything

21   else, First Star would have also had to explain where they got

22   the money to put -- give the money to Hybrid.  So, we had to,

23   you know, that was the only explanation that could basically

24   explain why money was being transferred from First Star to

25   Hybrid.

ICE5iss1                        Mousouris - direct

1    Q.  And have you already filed the tax returns for the year

2    2012 for Hybrid Specialist?

3    A.  Yes.

4    Q.  And on the Hybrid tax return that ended February 29, 2012,

5    did you include any income from First Star Auto Repair?

6    A.  No.

7    Q.  What about the Hybrid return that you filed that ended

8    February 29, 2013; did you include any income from First Star

9    on that return?

10   A.  No.

11   Q.  So, under the advice that you gave, would Hybrid need to

12   amend its returns?

13   A.  Would Hybrid need to amend?  No.

14   Q.  Under the advice that you gave, would First Star be able to

15   take an expense for those transfers to Hybrid?

16   A.  No.

17   Q.  Did you ever discuss this audit with Ms. Silva again?

18   A.  Yes.

19   Q.  What did you discuss?

20   A.  She called me a few times after that and I asked her how is

21   the audit going and she told me, well, we hired an attorney to

22   take care of it and it looks like the government wants us to

23   pay, they're assessing us about $1 million in taxes and we are

24   trying to amend the returns so we could give it to them and

25   show that we didn't really make the money that we are saying

ICE5iss1                         Mousouris - direct

1    that we made so they were in the process of amending the

2    returns for First Star.

3    Q.  Were you ever, again, asked about Hybrid Specialist?

4    A.  No.

5    Q.  Were you ever again asked about First Star Auto Repair?

6    A.  No.

7    Q.  Do you know what happened as a result of this audit?

8    A.  No.  They were in the process of amending the returns up

9    until the last time I spoke to her about it.  That's what they

10   were doing.  They never finished.

11   Q.  Ms. Geier, if we could put up just for the witness and for

12   the parties Government Exhibit 725?

13             MR. WIRSHBA:  Your Honor, the government offers

14   Government Exhibit 725.

15             MR. BRAFMAN:  No objection.

16             THE COURT:  Admitted.

17             (Government's Exhibit 725 received in evidence)

18   BY MR. WIRSHBA:

19   Q.  If we can go to the second page and focus in on the e-mail

20   at the bottom first, and if we can go to the next e-mail up the

21   chain which is an e-mail from Mr. Issa to Daniela Silva at the

22   top of the page?  Let's look at the next e-mail up the chain,

23   if we could, which was a response from Daniela to Tony, and if

24   we could go to the next e-mail up just from Mr. Issa?  And the

25   next e-mail from Ms. Zagnolli?  And the next e-mail on the

ICE5iss1                          Mousouris - direct

1  chain, Ms. Geier, if we could, from Mr. Issa?  And then if we

2  could focus in on the top two e-mails?  Okay, Ms. Geier, you

3  can take that down.  Thank you very much.

4          Mr. Mousouris --

5  A.  Yes, sir.

6  Q.  -- did there come a time when Daniela asked you to perform

7  tax preparation for other companies?

8  A.  Yes.

9  Q.  Can you take a look in your binder at Government Exhibit

10  902?  Or you could also look at it on the screen when Ms. Geier

11  publishes it to you.  Do you recognize that?

12  A.  Yes.

13  Q.  What is it, Mr. Mousouris?

14  A.  It is an e-mail from Daniela to myself.

15          MR. WIRSHBA:  Your Honor, the government offers

16  Government Exhibit 902 at this time.

17          MR. BRAFMAN:  No objection.

18          THE COURT:  Admitted.

19          (Government's Exhibit 902 received in evidence)

20  BY MR. WIRSHBA:

21  Q.  Mr. Mousouris, you said this was an e-mail from Daniela to

22  you.  I see that it's addressed:  "Hi Ashley."  Why is that?

23  A.  Ashley works for me.  She's my office manager and associate

24  so she handles a lot of my e-mails.

25  Q.  Is there anybody that reviews Ashley's work?

ICE5iss1                          Mousouris - direct

1    A.  I do.

2    Q.  Does Ashley prepare tax returns from time to time?

3    A.  Yes.

4    Q.  Can you quickly read this e-mail?

5    A.  *Hi Ashley, can you prepare the tax returns years 2012,*

6    *2013, 2014 for this corporation High Powered Auto, Inc., below,*

7    *please?  This is one of the corporations I spoke to you about*

8    *before that we never filed corporation taxes for it.  Sorry for*

9    *the delay.  I didn't have time to finish preparing the*

10   *paperwork before.*

11   Q.  Were there attachments to this e-mail?

12   A.  Yes.

13   Q.  Let's take a look at page 2 of this pdf if we could,

14   Ms. Geier.  What is this?

15   A.  It's a profit and loss statement.

16   Q.  Is this attached to the e-mail we were looking at?

17   A.  Yes.

18   Q.  Whose handwriting is that on this document?

19   A.  The handwriting or --

20   Q.  The handwriting.

21   A.  It is mine.

22   Q.  What is a profit and loss statement, Mr. Mousouris?

23   A.  It's basically a year-end statement that depicts the income

24   that the business had for a certain period of time and the

25   offsetting expenses for that period of time, and it gives you a

ICE5iss1                          Mousouris - direct

1   net income at the end.

2   Q.  And according to this profit and loss statement, what is

3   the total income for High Powered Auto in 2012?

4   A.  $3,333.

5   Q.  What's the gross profit, according to this profit and loss

6   statement?

7   A.  $1,398.

8   Q.  I see some categories at the bottom of this; what are those

9   categories?

10  A.  Those are the expenses directly related to the business.

11  Q.  Let's take a look at the next page of this document if we

12  could, Ms. Geier.

13          What were the total expenses, according to this profit

14  and loss statements?

15  A.  $160,331.

16  Q.  By the way, a profit and loss statement, is that sometimes

17  referred to as a P&L?

18  A.  Yes.

19  Q.  So, what was the net income for High Powered Auto Repair,

20  in 2012, according to this profit and loss statement?

21  A.  Minus $158,933.

22  Q.  So what, if anything, does this profit and loss statement

23  tell you about transfers to High Powered from First Star Auto

24  Repair, in 2012?

25  A.  I'm sorry.  Can you repeat that?

ICE5iss1                          Mousouris - direct

1    Q.  Does this profit and loss statement tell you anything about

2    transfers to this company from First Star Auto Repair in 2012?

3    A.  No.

4    Q.  What did you receive other than this profit and loss

5    statement to complete the 2012 tax return for High Powered?

6    A.  Nothing.

7    Q.  How does that compare to what you would generally receive

8    from Daniela to prepare tax returns for her company Duploy?

9    A.  She would give me the bank statements.

10   Q.  What, if any additional information, did you request about

11   High Powered for 2012?

12   A.  I asked her for bank statements and she told me that these

13   numbers came right from the bank statement, that the company

14   was idle, they didn't have much activity, and that these

15   expenses were accurate.

16   Q.  Did you have any additional discussions with Ms. Silva

17   about the profit and loss statement?

18   A.  I told her it is a profit and loss statement that is

19   questionable.  The expenses on this profit and loss statement

20   are huge compared to the income so I told her, I said if we are

21   going to continue doing work for this company we have to be a

22   little more careful about what we are doing as far as the

23   income and the expenses.  She was paying a huge amount of money

24   in rent for a company that only made $3,300 for the year so I

25   told her that's going to be a problem going forward.

ICE5iss1                          Mousouris - direct

1   Q.  Let's go to the prior page, if we could.

2              What was the company paying in rent, according to this

3   profit and loss statement?

4   A.  It was paying $102,632.

5   Q.  Why did you think that was problematic?

6   A.  That's a huge amount of rent for a company that is

7   basically closed.

8   Q.  Ultimately, what did you do with the information provided

9   in the profit and loss statement?

10  A.  I prepared the return.

11  Q.  Mr. Mousouris, are you testifying today pursuant to an

12  agreement with the government?

13  A.  Yes.

14  Q.  If you can take a look at what's been marked in your binder

15  as Government Exhibit 203, or we can ask Ms. Geier to put it up

16  on the screen just to review?  Do you recognize that?

17  A.  Yes.

18  Q.  If we can look at the last page of this agreement, did you

19  sign it?

20  A.  Yes.

21  Q.  Did you review this document before you signed it?

22  A.  Yes.

23  Q.  Who else signed this agreement?

24  A.  Myself, my attorney, and representatives of the government.

25  Q.  What's your understanding of what your obligations are

ICE5iss1                         Mousouris - direct

1   under this agreement?

2   A.   The agreement wants me to be -- states that I should be

3   truthful about what transpired during the period that I was

4   preparing personal as well as business tax returns for Tony as

5   well as Daniela from the period 2011 to 2015.

6   Q.   Are there any other obligations under this agreement?

7   A.   That I have to come to all the meetings that we were to

8   have with the government, that I was supposed to come and

9   testify truthfully during the trial, and that was it.

10  Q.   And if you don't do those things -- I'm sorry.

11             If you do those things, the things you just said, what

12  is your understanding of what the government's obligations are

13  under the agreement?

14  A.   The government promised not to prosecute me for anything

15  that had to do, that was related to the tax returns that I

16  prepared.

17  Q.   And are you testifying here today as part of that

18  agreement?

19  A.   Yes.

20  Q.   What's your understanding of what happens if you lie here

21  in court today?

22  A.   This agreement becomes null and void and the government can

23  prosecute me for anything they want.

24  Q.   And, does the outcome of this trial have any impact on this

25  agreement with the government?

ICE5iss1                          Mousouris - direct

1   A.  No.

2   Q.  Can you tell the jury in your own words what you did that

3   was wrong?

4   A.  What I did that was wrong, I didn't give enough emphasis on

5   trying to get additional information from Daniela as far as the

6   taxes.  I should have asked for bank statements and any

7   additional information that she had to verify the numbers that

8   were on the profit and loss statement.

9   Q.  You can take that down, Ms. Geier, and instead publish

10  Government Exhibit 513 in evidence, the second page, please?

11          Showing you what's been marked Government Exhibit 513,

12  Mr. Mousouris, what is this?

13  A.  It's the tax return for High Powered Auto, Inc. for 2012.

14  Q.  Who prepared this return?

15  A.  I did.

16  Q.  What's the gross receipts for High Powered in 2012?

17  A.  It's the $3,330.

18  Q.  Where did you get that figure?

19  A.  From the profit and loss statement.

20  Q.  Is that the same figure that you discussed with Daniela?

21  A.  Yes.

22  Q.  Why did you include it?

23  A.  That's the number that she gave me.  I mean, I had no other

24  numbers to use, that's the number that she gave me to use.

25  Q.  And zooming out for a bit, taking a look at total

ICE5iss1                        Mousouris - direct

1   deductions on line 27; do you see that?

2   A.  Yes.

3   Q.  What were the total deductions?

4   A.  $160,331.

5   Q.  Does that include the rent figure that we discussed earlier

6   that you discussed with Daniela?

7   A.  Yes.

8   Q.  Did you suspect that the information that she was giving

9   you is false with respect to this?

10          MR. BRAFMAN:  Objection.

11          THE COURT:  Objection is overruled.

12          THE WITNESS:  I'm sorry.  What was the question?

13  BY MR. WIRSHBA:

14  Q.  Did you suspect that the rent figure that she was giving

15  you was false that she put on the tax return?

16  A.  I didn't suspect that the rent figure was false, I

17  suspected that the gross income figure was false.

18  Q.  What was the taxable income for High Powered in 2012?  If

19  we can zoom out?

20  A.  You said gross income?

21  Q.  Taxable income.

22  A.  Negative $158,933.

23  Q.  So according to this return, how much did High Powered owe

24  in taxes in 2012?

25  A.  Zero.

ICE5iss1                    Mousouris - direct

1    Q.  Let's take a look at, if you could look -- actually,

2    Ms. Geier, if you can publish for the witness and the parties

3    Government Exhibit 903?  It will come up on your screen,

4    Mr. Mousouris.  What is this, sir?

5    A.  It's an e-mail from Daniela to my office again.

6              MR. WIRSHBA:  The government offers Government Exhibit

7    903.

8              MR. BRAFMAN:  No objection.

9              THE COURT:  Admitted.

10             (Government's Exhibit 903 received in evidence)

11   BY MR. WIRSHBA:

12   Q.  If we can publish that to the jury, Ms. Geier?

13             Focusing in on the top, what is the e-mail?

14   A.  It is an e-mail that -- should I read it?

15   Q.  Just tell me who it is from and who it is to.

16   A.  It is from Daniela and it is to Ashley.

17   Q.  Again, Ashley works for you?

18   A.  Yes.

19   Q.  But this is your e-mail address, right?

20   A.  Yes.

21   Q.  And this e-mail, the subject is Optimum Grocery 2011, 2012,

22   2013, and 2014 tax returns, right?

23   A.  Right.

24   Q.  So, zooming out, without having to read the e-mail, can you

25   tell me what is being asked of you here?

ICE5iss1                        Mousouris - direct

1    A.  She is asking us to prepare the tax returns for Optimum

2    Grocery for the years '11, '12, '13 and '14.

3    Q.  Let's look at the next page of the document, if we could.

4    Is this the attachment to that email, Mr. Mousouris?

5    A.  Yes.

6    Q.  Again, what is this?

7    A.  Profit and loss statement.

8    Q.  According to the profit and loss statement, what were

9    Optimum Grocery's gross receipts?

10   A.  $191,389.

11   Q.  Was Optimum Grocery profitable in 2012?

12   A.  No.

13   Q.  How do you know that?

14   A.  At the bottom it says P&L loss, $32,587.

15   Q.  Did you request any additional information other than this

16   profit and loss statement to complete 2012 tax returns for

17   Optimum Grocery?

18   A.  Again, I requested bank statements.

19   Q.  And did you speak with Daniela about this?

20   A.  Again, she told me the same thing; that these numbers were

21   taken before the bank statements and that they were accurate,

22   so.

23   Q.  What did you do with the information from this profit and

24   loss statement?

25   A.  I prepared the return.

ICE5iss1                         Mousouris - direct

1    Q.  Did you ultimately file that return?

2    A.  Yes.

3    Q.  Or send it along to be filed?

4    A.  Yes.

5    Q.  Let's take a look at Government Exhibit 904, if we could,

6    only for the parties and the Court.  Thank you, Ms. Geier.

7            What is this document, Mr. Mousouris?  If we can zoom

8    in?

9    A.  It is another e-mail from Daniela, again, to Ashley.

10           MR. WIRSHBA:  Your Honor, at this time the government

11   offers Government Exhibit 904.

12           MR. BRAFMAN:  No objection.

13           THE COURT:  Admitted.

14           (Government's Exhibit 904 received in evidence)

15   BY MR. WIRSHBA:

16   Q.  If we can publish this?  The subject of this e-mail is

17   Value Grocery Store returns 2011 to 2015; is that right,

18   Mr. Mousouris?

19   A.  Yes.

20   Q.  And what is this e-mail asking you to do?

21   A.  It's asking me to prepare tax returns for Value for the

22   period '11, '12, '13, '14, and '15.

23   Q.  Let's look at the next page of this e-mail, if we could,

24   and the following page, please.  What is this, Mr. Mousouris?

25   A.  It is also a profit and loss statement for 2012.

ICE5iss1                    Mousouris - direct

1    Q.  And for what company?

2    A.  For value Grocery.

3    Q.  Is this attached to that e-mail that we were just

4    reviewing?

5    A.  Yes.

6    Q.  According to this profit and loss statement, what were

7    Value's gross receipts in 2012?

8    A.  $121,109.

9    Q.  Was Value profitable in 2012?

10   A.  No.

11   Q.  How do you know that?

12   A.  On the P & L at the bottom of the page it says negative

13   $78,045.

14   Q.  Did you request any information other than this profit and

15   loss statement to complete the 2012 Value tax return?

16   A.  Again, I asked her for cancelled checks, bank statement.

17   Q.  Who is "her?"

18   A.  Daniela.

19   Q.  And what, if anything, did she say about that?

20   A.  She said the same thing; that these numbers were taken from

21   the statements and the statements were accurate.

22   Q.  And did that information compare to what you normally

23   received from Daniela to complete the Duploy returns?

24   A.  When I read the Duploy I was always getting bank statements

25   as well as P & Ls so I was always cross-referencing them.

ICE5iss1                         Mousouris - direct

1    Q.   What did you do with this profit and loss statement?

2    A.   I prepared the returns.

3    Q.   Let's take a look at Government Exhibit 502 if we could,

4    which is in evidence, Ms. Geier, the second page?

5             What is this?

6    A.   This is a personal tax return for Mr. Issa for 2013.

7    Q.   If we could take a look at page 5 of this pdf, Ms. Geier?

8    Can you tell who prepared this return?

9    A.   I did.  My office did.

10   Q.   And turning back to page 2, what's listed as wages here on

11   page 2?

12   A.   $29,000.

13   Q.   Do you know where you got that figure?

14   A.   Daniela sent me two W2s.

15   Q.   What did Mr. Issa or Daniela tell you about non-W2 income

16   for this year?

17   A.   Nothing.

18   Q.   What did Mr. Issa or Daniela tell you about Mr. Issa's

19   paying personal expenses from his business accounts in the year

20   2013?

21   A.   Nothing.

22   Q.   What did Mr. Issa or Ms. Silva tell but Mr. Issa's

23   receiving cash from his gas stations in 2013?

24   A.   Nothing.

25             MR. WIRSHBA:  Your Honor, we have no further

ICE5iss1                          Mousouris - cross

1      questions.

2                  MR. BRAFMAN:  I have some, your Honor.

3                  THE COURT:  Of course.

4      CROSS EXAMINATION

5      BY MR. BRAFMAN:

6      Q.  Good morning, Mr. Mousouris.

7      A.  Good morning.

8      Q.  You and I have never met, correct?

9      A.  Correct.

10     Q.  And you have testified on direct about having a meeting at

11     which both Mr. Issa and Daniela were present at your office,

12     correct?

13     A.  Yes.

14     Q.  And was that the one and only time that you ever met

15     Mr. Issa?

16     A.  Yes.

17     Q.  And after that, that's the only time you ever received

18     information from Mr. Issa, correct?

19     A.  Yes.

20     Q.  All of the information you received was from Daniela?

21     A.  Yes.

22     Q.  And Daniela had been your client for a number of years and

23     you knew her during those years to be very careful and

24     organized, correct?

25     A.  Yes.

ICE5iss1                          Mousouris – cross

1    Q.  And during the meeting did she tell you that she was

2    essentially marrying Mr. Issa, correct?

3    A.  Yes.

4    Q.  And that prior to that he had gone through an extended

5    divorce?

6    A.  Yes.

7    Q.  And that she was going to try her best to make sense out of

8    a business, that prior to 2011, had been essentially

9    disorganized.  Would that be a fair way to characterize it?

10   A.  Yes.

11   Q.  And during the period of time that you worked with Daniela

12   and you corresponded with Daniela, was she responsive to your

13   request insofar as getting back to you?

14   A.  Yes.

15   Q.  Did she send you information from time to time to try and

16   get these companies in order?

17   A.  Yes.

18   Q.  Now, as you sit here today you have an understanding with

19   the government that you are not going to be prosecuted but did

20   you ever intentionally violate the law in connection with any

21   of the things that you did with Daniela or Mr. Issa in

22   connection with their returns?

23   A.  Intentionally?

24   Q.  Yes.  Did you ever knowingly or intentionally violate the

25   law during any of the period of time that you worked with them

ICE5iss1                          Mousouris - cross

1    and in connection with the filing of their returns?

2    A.   No.

3    Q.   Yes or no?

4    A.   No.

5    Q.   No.  Okay.

6            And what you wanted was protection in case the

7    government thought that you had, right?

8    A.   In case the government thought that I wasn't diligent

9    enough to look at corresponding evidence for the returns.

10   Q.   Right.

11           Now, when you say whether you were diligent or not,

12   there are accounting standards and then there is criminal

13   standards, right?

14   A.   Yes.

15   Q.   And would it be a fair statement that perhaps you weren't

16   diligent enough as an accountant, correct?

17   A.   Yes.

18   Q.   But that does not, in your mind at least, translate into

19   intentional criminal conduct, correct?

20           MR. WIRSHBA:  Objection.

21           THE COURT:  The objection is sustained.

22           MR. BRAFMAN:  Thank you.

23   BY MR. BRAFMAN:

24   Q.   Mr. Mousouris, would it be a fair statement that you knew

25   not very much about the companies that you were preparing

ICE5iss1                              Mousouris - cross

1    returns for?

2    A.   Yes.

3    Q.   And, for example, when you work on behalf of a company, if

4    it's a new company that is starting up, is it possible that the

5    company could have substantial startup expenses that

6    substantially exceed its income at that time?

7    A.   Yes.

8    Q.   Now, if you are building a garage facility, for example,

9    you might have a million dollars in rent before you generate

10   any income, correct?

11   A.   Yes.

12   Q.   Now, do you know what any of these businesses did other

13   than what you see in the title?

14   A.   I knew that some of them were tow truck companies, some of

15   them were convenience stores, and some of them were auto repair

16   shops.

17   Q.   But would it be a fair statement that you never physically

18   visited any of these facilities?

19   A.   No.

20   Q.   You never did?

21   A.   No.

22   Q.   So you didn't know how big they were, how small they were?

23   A.   No.

24   Q.   Or how many people worked there?

25   A.   No.

ICE5iss1                        Mousouris - cross

1   Q.  Would it be a fair statement that during the period when

2   you were assisting Mr. Issa, Mr. Issa's companies and working

3   with Daniela, that you held yourself out to be a certified

4   public accountant?

5   A.  I held myself out -- I never held myself out to be a

6   certified public accountant.  I held myself out to be a tax

7   return preparer.

8   Q.  But you were a certified public accountant, correct?

9   A.  Yes.

10  Q.  And that certification has lapsed because you never did the

11  continuing legal education that accountants and other

12  professionals are required to do on a regular basis, right?

13  A.  Yes.

14  Q.  When you met with the government on several occasions

15  before you finally explained that, you told them that you were

16  a certified public accountant, correct?

17  A.  I don't think so.

18  Q.  We will get to that in a minute, but technically you were

19  trained to be a certified public accountant, right?

20  A.  Yes.

21  Q.  And you were certified as a public accountant, correct?

22  A.  Yes.

23  Q.  But then certified public accountants are required to

24  continue legal education to be kept up-to-date on rules and

25  regulations, correct?

ICE5iss1                          Mousouris - cross

1    A.  Yes.

2    Q.  And by not continuing that, you then lose your

3    certification, correct?

4    A.  Well, I gave it up voluntarily.

5    Q.  But you gave it up because you didn't qualify any more,

6    right?

7    A.  Yes.  Exactly.

8    Q.  Let me ask the government if they can put up Government

9    Exhibit 904 and we will work backwards a little bit and save

10   some time, it was placed in evidence.

11           Can you see that document, sir?

12   A.  Yes.

13   Q.  And is this a document that you read earlier just a few

14   minutes ago on direct and it is from Daniela to Ashley,

15   correct?

16   A.  Yes.

17   Q.  And Ashley is one of the people on your staff?

18   A.  Yes.

19   Q.  Is Ashley an accountant?

20   A.  Yes.

21   Q.  And does Ashley help you and work with clients?

22   A.  Yes.

23   Q.  And she was one of the people who assisted you in

24   connection with Daniela's and Mr. Issa's returns, correct?

25   A.  Right.  Yes.

ICE5iss1                    Mousouris - cross

1    Q.  Now, in this e-mail, I'm not going to read the whole thing,

2    if you would just highlight the first sentence?  This refers to

3    Value Grocery Store, correct?

4    A.  Yes.

5    Q.  And what she says to you is that this was -- this

6    corporation is not being used anymore.  The corporation taxes

7    were never filed and if you look down to the next sentence, if

8    you highlight that and make it a little bigger, please, it was

9    opened on 2/18/2011 and the president is Alya El Jamal.  Do you

10   know who that is?

11   A.  No.

12   Q.  Look at the attachments, if we can, that were sent to you

13   in connection with this return.  And the first page of P & L

14   for 2012 -- if you bring that up, please, I mean enlarge the

15   top portion and highlight it, the top portion of the chart --

16   do you see that is for Value Grocery for expenses 2012 and the

17   rent was $81,000?

18   A.  Yes.

19   Q.  And you have Worker's Compensation Insurance.  Do you see

20   that?

21   A.  Yes.

22   Q.  And if you could move this up further so we see more of it?

23   You can enlarge the whole chart on one page if you can.  Thank

24   you.

25           Do you see the total on bottom being $199,153.95?

ICE5iss1                          Mousouris - cross

1    A.  Yes.

2    Q.  Do you know whether that's a true number or a false number?

3    A.  No.

4    Q.  And, as you sit here today, what struck your mind was that

5    the rent seemed high, right?

6    A.  Not on this return.  On the other one.

7    Q.  Okay, but the rent here, does that seem high to you,

8    $81,000 a year?

9    A.  No, this wasn't abnormally high.  No.

10   Q.  If you can go to the next page, the rent pretty much stayed

11   in the $85,000, $86,000 range; is that right?

12   A.  Yes.

13   Q.  If can you make this a little larger, please?

14        And the total for this year more than doubled from the

15   previous year, correct?

16   A.  Yes.

17   Q.  Can you go to the next page?  The rent is still pretty much

18   in the same dollar range, correct?

19   A.  Yes.

20   Q.  And the total on the bottom increased again, correct?

21   A.  Yes.

22   Q.  Now, so with respect to Value Grocery Store, to save time,

23   you don't really know how many people worked there or how big

24   the store is, correct?

25   A.  No.

ICE5iss1                          Mousouris - cross

1   Q.  And you don't know whether it pays rent to a landlord or

2   whether it payed rent to a gas station operated by one of

3   Mr. Issa's companies?

4   A.  Right.  I don't know.

5   Q.  And if a gas station was a separate company and the

6   convenience store renting on there was a separate company, they

7   could both be owned by Mr. Issa under separate names and there

8   would be nothing, per se, illegal about that arrangement,

9   correct?

10              MR. WIRSHBA:  Objection.

11              THE COURT:  The objection is sustained.

12  BY MR. BRAFMAN:

13  Q.  Well, if we could move on to Exhibit 902?  That's an e-mail

14  from Daniela to Ashley and it references High Powered Auto.  Do

15  you see that?

16  A.  Yes.

17  Q.  And there are attachments, correct, sir, profit and loss

18  statements?

19  A.  Yes.

20  Q.  And in the e-mail she says to you -- can you make the

21  correspondence bigger, please -- in the second line:  *This is*

22  *one of the companies that I spoke to you about before that we*

23  *never filed the corporation taxes for before.  Sorry for the*

24  *delay, I didn't have time to finish the paperwork before.*

25              She is asking you to prepare tax returns for 2012,

ICE5iss1                          Mousouris - cross

1    2013, and 2014, correct?

2    A.  Yes.

3    Q.  And she gives you the federal tax I.D. number on the

4    bottom?

5    A.  Right.

6    Q.  And then there are a series of attachments, correct?

7    A.  Yes.

8    Q.  Now, this is a company that was a new company, if you know?

9    A.  She told me it was -- she wanted to do returns from 12 on

10   so I'm assuming it wasn't new.

11   Q.  But you don't know, right?

12   A.  No.

13   Q.  And if you turn to the next page, please, on the exhibit,

14   this was one of the items that you said the rent was

15   substantial, in your opinion, $102,000?

16   A.  Yes.

17   Q.  And again, you don't know what High Powered Auto was, do

18   you know?

19   A.  No.

20   Q.  Let's look at, and it had a -- next page, please -- it had

21   a net loss of $158,933, correct?

22   A.  Yes.

23   Q.  If a new company -- is it possible -- withdrawn.

24          As someone who prepares accounting returns or tax

25   returns for small companies, is it startling to you that a new

ICE5iss1                          Mousouris - cross

1   company might have a net operating negative cost after the

2   first year?

3   A.  No.

4   Q.  Now, if you look to the last page of this exhibit, in the

5   last page of this exhibit you have an entry vehicles purchased

6   $404,000, correct?

7   A.  Yes.

8   Q.  And do you know how many vehicles that involves?

9   A.  I believe there was an attachment that showed the vehicles

10  that were purchased.

11  Q.  And this was a repair shop, correct?

12  A.  I believe this was a towing company.

13  Q.  And tow trucks -- for a tow truck company you don't know

14  how much they cost, do you?

15  A.  But he had a schedule that showed me individually what he

16  purchased.

17  Q.  Did you have any problem with that schedule when it was

18  presented?

19  A.  No.

20  Q.  I would like to bring that down and go to Exhibit 513.

21  Now, this is the tax return that you prepared for High Powered

22  Auto for the first year, correct?

23  A.  Yes.

24  Q.  And for the first year it showed that it had very little

25  income if you go to the first page -- I'm sorry, the first page

ICE5iss1                          Mousouris - cross

1     of the return.  Mr. Wirshba has pointed you to the income line,

2     if you could blow that up and it's $3,333.  This is the first

3     return for this corporation.  Do you have an understanding of

4     why the income line was so low?

5     A.  No.  Daniela --

6     Q.  Can I?

7     A.  Go ahead.

8     Q.  If you look at the bottom of the page, the lower half --

9     I'm sorry, a little bit higher and keep that there too -- you

10    have the $160,000 that comes off the P&L, correct?

11    A.  Right.

12    Q.  And then you have line 28, with the net taxable income of

13    $158,933, correct?

14    A.  Yes.

15    Q.  If the total expenses were $160,000 -- I'm sorry.  If the

16    total deductions were $160,000 and then you have $3,300 in

17    income, it would be correct to list net operating taxable

18    income, correct?

19    A.  Yes.

20    Q.  And you, as you sit here now, you don't remember whether

21    that number is accurate or not?

22    A.  No.

23    Q.  If we can take that down, please?  If we can put up

24    Government Exhibit 725 and if we could start on the bottom?

25             Is there anything wrong with a business trying to

ICE5iss1                          Mousouris - cross

1    structure its return in a way so long as it's honest that

2    reflects as few tax consequences as possible?

3               MR. WIRSHBA:  Objection.

4               THE COURT:  The objection is overruled.

5    BY MR. BRAFMAN:

6    Q.  Thank you.

7               Do you understand the question?

8    A.  Yes.

9    Q.  And there is nothing wrong with the company so long as that

10   being accurate, structuring its operation in a way that gives

11   it the least taxes payable?

12   A.  No.

13   Q.  There is nothing wrong with that?

14   A.  No.

15   Q.  Look at this colloquy between yourself and Daniela and if

16   you look at the second page -- Ashley -- I'm sorry.  This is

17   between Mr. Issa and Daniela, correct?

18   A.  Yes.

19   Q.  So, you never saw this e-mail before today?

20   A.  No.

21   Q.  So, you just read it like all of us, correct?

22   A.  Yes.

23   Q.  So, look at the conversation at the beginning of the e-mail

24   and the first one on the bottom, it says:  I spoke to George

25   accountant -- that's you, right?

ICE5iss1                        Mousouris - cross

 1   A.  Yes.

 2   Q.  And you know that Daniela speaks English but her first

 3   language is not English, correct?

 4   A.  Yes.

 5   Q.  And sometimes when she types or writes there are

 6   grammatical errors but you understand her to mean you, George

 7   the accountant, correct?

 8   A.  Yes.

 9   Q.  It says:  *I spoke to George accountant about First Star*

10   *transfer and checks put into Hybrid for 2012.  He said is*

11   *better say that this money was a loan, not to say that they*

12   *were paid for services because we did not show that money into*

13   *Hybrid for 2012 and they can come after Hybrid later.   The*

14   *total amount is close to $400,000.*

15         Correct?

16   A.  Yes.

17   Q.  Were you discussing with her one of the different options

18   that she could use to explain this transfer?

19   A.  She sent me an e-mail -- previous e-mail that was asking me

20   about the transfers that went from First Star into Hybrid and I

21   told her that there were two ways you could show it, the

22   transfers without incurring any tax liability; one was the loan

23   and the other one was if one company was buying the other.

24   Q.  And it wasn't a loan, it is just not appropriate to do it,

25   right?

ICE5iss1                          Mousouris - cross

1   A.   Right.

2   Q.   Now, if you look at the conversation further up where

3   Mr. Issa is responding to you -- I'm sorry, to her about this

4   thing about a loan -- further up at the beginning of the page.

5   There is a characterization by it where he is essentially --

6   forget about the adjective but he said, what is the use, your

7   accountant -- your blank accountant -- to make a loan and then

8   have to pay hundreds of thousands in tax?  Is he essentially

9   saying that --

10          THE COURT:  The objection is sustained.

11          MR. BRAFMAN:  This is in evidence.

12          THE COURT:  But you can't ask him to interpret it.

13   You can't say "Is he essentially saying."  That is not a proper

14   question.  Move on.

15          MR. BRAFMAN:  Okay.

16   BY MR. BRAFMAN:

17   Q.   Let me ask you this.  If it wasn't a loan it shouldn't be

18   characterized as a loan, right?

19   A.   Right.

20   Q.   And if it is not a loan and it is characterized as a loan

21   there could be tax consequences that may not be appropriate,

22   right?

23   A.   Yes.

24   Q.   Thank you.  You can take it down.

25          If you put up 901, please, another e-mail the

ICE5iss1                          Mousouris - cross

1   government put into evidence.  Do you see that?  Can we enlarge

2   it so we can refer to it, please?  Again, this is the subject

3   Hybrid and it is an e-mail from Daniela to you; is that

4   correct, sir?

5   A.  Yes.

6   Q.  And it says:  *I have a question about Hybrid Specialist.*

7   *This corporation was open in 2011 but started doing business in*

8   *2013.  You filed the corporation taxes for 2011 and 2012 with*

9   *no activity.*  Let's stop there.

10          She is telling you it didn't start doing business

11  until 2013, so by filing the corporate taxes 2011 to 2012 with

12  no activity would be appropriate if it was first doing business

13  in 2013, correct?

14  A.  Yes.

15  Q.  *And as you know, we deposited money from First Star prior*

16  *to 2013 to open that business.*

17          Do you see that?

18  A.  Yes.

19  Q.  Do you know what the word "seed money" means?

20  A.  Yes.

21  Q.  And seed money is when you open a business and someone

22  invests money to be able to start the business, correct?

23  A.  Yes.

24  Q.  And she is telling you we deposited money from First Star

25  Auto Repair prior to 11/2013 to open that business.  Would you

ICE5iss1                          Mousouris - cross

1   understand her to be telling you that that was the money used

2   to open the business?

3   A.  She is not telling me that.  She is asking me what exactly

4   should I tell the --

5   Q.  No, but this sentence -- let me interrupt you just for a

6   minute.

7   A.  Yes.

8   Q.  This says she is telling you about the money deposited

9   into -- from First Star to open the business referring to

10  hybrid, correct?

11  A.  Oh, yes.  Yes.

12  Q.  Do you know, as you sit here today, whether that statement

13  is true or not from any of the records you have looked at?

14  A.  No.

15  Q.  And she then tells that you they are being audited for

16  2012, corporate taxes for First Star, where it shows many

17  checks transferred to Hybrid and she is asking you how should

18  we apply that money put into Hybrid?  When can I call you to

19  discuss this.

20          Correct?

21  A.  Yes.

22  Q.  Do you remember having a specific conversation with Daniela

23  about this?

24  A.  Yes.

25  Q.  And did you remember telling her that so long as the money

ICE5iss1                        Mousouris - cross

1   was in fact deposited that it's okay and you should refer to it

2   this way?

3   A.  I told her, again, I told her that we should either -- if

4   she didn't get it from either income or any kind of transaction

5   that she should tell them it was a loan from one company to the

6   other or it was money that was used from First Star to either

7   buy out Hybrid or to buy a portion of it or -- that would be

8   the only way no taxable income would be created.

9   Q.  Is if it was an investment, correct?

10  A.  Yes.

11  Q.  From one company into the other?

12  A.  Right.

13  Q.  Now, if you could go up further on the -- sorry.  If you go

14  now to Government Exhibit 510, please?

15      This is the 2012 return for Hybrid, correct?

16  A.  Yes.

17  Q.  And is that the first return that you prepared for Hybrid?

18  A.  Yes.

19  Q.  And you had just been told by Daniela that they didn't

20  start doing business until 2013, correct?

21  A.  Right.

22  Q.  So you prepared this return and it has -- if you go to the

23  next page, please, income of $16,623, if you would enlarge that

24  portion, please -- didn't your office make up that number?

25  A.  No.

ICE5iss1                              Mousouris - cross

1    Q.  Who gave that you number?

2    A.  Like I said, I went through my file.  I didn't see any

3    numbers or any kind of statement from it.

4    Q.  How did you put in $16,623?

5    A.  I don't remember, but my office doesn't make up numbers.

6    Q.  All right, I will give you that, but you were told in an

7    e-mail from Daniela that the company wasn't even open, it

8    wasn't operating, there was no business expense?

9    A.  But that e-mail came after we did the return.

10   Q.  Okay, so now you know, as we sit here, that it wasn't

11   operating until 2013.  Where did this number come from?

12   A.  Like I said, I don't remember.

13   Q.  Let's file --

14   A.  She might have told me over the he phone, she could have --

15   you know, I don't know.

16   Q.  You don't know.  Would that be the end of this discussion?

17   A.  Yes.  I don't know.

18   Q.  But this was filed by you?

19   A.  Yes.

20   Q.  And it was e-filed, right?  Whether it was filed, e-filed

21   or not it was filed by your office?

22   A.  It was filed, yes.

23   Q.  And if you look at the next page for the preparer it says

24   GJM Business Center; that's you, right?

25   A.  Yes.

ICE5iss1                        Mousouris - cross

1    Q.  Now, I should have done this before but here is Exhibit
2    509, if you can look at the front page, this is another tax
3    return for Hybrid; is that correct?
4    A.  Yes.
5    Q.  And if you look at the first page of the return itself
6    there is an income of $14,542.  Do you see that?
7    A.  Yes.
8    Q.  Would it be correct to say that, as you sit here today, you
9    have no idea where that number came from?
10   A.  I don't remember.
11   Q.  But it wasn't -- if the e-mail from Daniela telling you
12   that the first time it worked was 2013 it would have no income
13   during that period, correct?
14   A.  Again, the e-mail was sent after the fact.
15   Q.  I understand that, but this return is prepared by your
16   office, you gave your files to the U.S. Attorney's office,
17   right?
18   A.  Yes.
19   Q.  And, as you sit here today, you have no knowledge
20   whatsoever about where this number came from?
21   A.  I don't remember.
22   Q.  Okay.  If I may have just a minute, Judge?  I'm trying to
23   wrap up.
24           Now, do you remember filing the 2013 -- if you could
25   take that down, please -- do you remember when there was some

ICE5iss1                          Mousouris - cross

1    discussion between you and Daniela relating to the 2013

2    personal return that was supposed to be filed by your office

3    for Mr. Issa?

4    A.  Yes.

5    Q.  And do you remember -- if you don't remember I will go

6    through the documents, let me see if I can do it quickly.  Do

7    you remember that they came to you telling you that they were

8    being audited by the IRS?

9    A.  They didn't tell me, though.  They had come to me, she told

10   me over the phone.

11   Q.  And she told you that they had another accountant handling

12   that, correct?

13   A.  A lawyer.

14   Q.  And the lawyer was Paul Ambrose, if you know?

15   A.  I don't know.

16   Q.  Did you ever meet an accountant named Chris Tsamutalis?

17   A.  No.

18   Q.  She says to you that when they filed the amended return for

19   2013 for Mr. Issa's personal return, the IRS wrote back and

20   said we don't have the original return for 2013, correct?

21   A.  I don't remember her telling me that.

22   Q.  Let me show you what I have marked for identification only

23   as Exhibit no. 1100.  Please look at that, read it to yourself,

24   don't read it aloud.  Did you have a chance to read it?

25   A.  Yes.

ICE5iss1                          Mousouris - cross

1    Q.  It is correspondence -- without telling us what it said --

2    between Ashley and Daniela, correct?

3    A.  Yes.

4    Q.  The Ashley who works for you?

5    A.  Right.

6    Q.  Does it refresh your recollection that with respect to the

7    2013 personal income tax return that your office was supposed

8    to file on behalf of Mr. Issa, that it was never filed?

9    A.  Well, the return that we prepared was prepared late.

10   Q.  No, no, no.  Not the late one.  The original -- you

11   ultimately filed a return for 2013, correct?

12   A.  Right, but it was late.

13   Q.  But it was prepared two years late?

14   A.  Right.

15   Q.  And your office had been given the return for filing, in

16   2013, and the IRS had no record of ever receiving it.  Isn't

17   that correct?

18   A.  I didn't know it never received it.  I mean, I never heard

19   of it.

20   Q.  But you now -- I'm sorry.

21        You learned of it later, didn't you?

22   A.  Again, if she sent the letter, e-mail to Ashley, Ashley

23   might have taken care of it and I never knew about it.  I

24   mean --

25   Q.  But Ashley didn't take care of it because your office had

ICE5iss1                        Mousouris - cross

1    to file a second 2013 return two years later; isn't that right?

2              THE COURT:  Is there some reason why you are standing

3    up?

4              MR. WIRSHBA:  Objection, your Honor.  Asked and

5    answered.

6              THE COURT:  The objection is overruled.

7    BY MR. BRAFMAN:

8    Q.  Now, do you know what -- does the IRS sometimes correspond

9    directly with the taxpayer when they can't find the return?

10   A.  Yes.

11   Q.  You are familiar with those notices, right?

12   A.  Yes.

13   Q.  I want to show you Exhibit 1110 for identification, and you

14   tell me whether you recognize this document as one of the forms

15   the IRS would send to a taxpayer.

16   A.  Yes.

17              (Continued on next page)

18

19

20

21

22

23

24

25

ICEHIss2                          Mousouris - Cross

1   Q.  Does it refresh your recollection that there was a saga

2   going on between Daniela, your office, and the IRS about the

3   fact that his original 2013 had never been filed?

4          MR. WIRSHBA:  Objection, your Honor.  That wasn't the

5   witness' testimony.

6          THE COURT:  Guess what, you can't make that objection.

7          MR. WIRSHBA:  He's trying to refresh his recollection.

8          THE COURT:  Excuse me.

9   Q.  Do you recognize the form?

10  A.  Yes.  I could tell you one thing.  That we never e-file a

11  return unless the signature page is signed.  So if he never

12  came to my office to sign the signature page, the return, we

13  wouldn't have e-filed it.  I'm not saying that's what happened.

14  I don't remember.

15  Q.  Tell me what happened.

16  A.  I don't remember.  If we did the return and he never came

17  in to sign the signature page, we wouldn't have e-filed it.

18  We're not allowed.

19  Q.  But this indicates, does it not, that they have already

20  filed an amended return for 2013, correct?

21  A.  They did, yes, not me.

22  Q.  Yes.  No, with the new accountant?

23  A.  Right.

24  Q.  Now, when the IRS gets an amended return, it's standard

25  operating procedure that -- it's standard operating procedure

ICEHIss2                         Mousouris - Cross

1    that the IRS will not accept an amended return without

2    first looking at the original return?

3    A.  Yes.

4    Q.  Right?

5    A.  Yes.

6    Q.  Because the IRS, in order to determine whether an amended

7    return is accurate, they have to be able to look at the

8    original return, correct?

9    A.  Yes.

10   Q.  And you testified on direct examination that one of the

11   things Ms. Daniela wanted you to begin doing was not only

12   dealing with the lumber of these corporations but also with

13   respect to Mr. Issa's personal taxes, right?

14   A.  Yes.

15   Q.  During the period when the tax return for 2013 would have

16   been due, you were doing that work for Mr. Issa, correct?

17   A.  Yes.

18   Q.  Now, you said that on an e-file, the person has to come in

19   and sign, isn't that correct?

20   A.  Yes.

21   Q.  What?

22   A.  Yes.

23   Q.  But they sign an e-file permission form, right?  Right?

24   A.  You don't sign an e-file permission form.  What you do,

25   once the return is prepared, then there's a form that you have

ICEHIss2                          Mousouris - Cross

1    to sign that allows me to e-file the return.

2    Q.  Now, do you know whether in 2013 you filed for him on

3    e-file or whether you filed for him on paper?

4    A.  If it was a timely return and it was prepared before the

5    due date, it would have been e-filed.

6    Q.  Do you know whether his original return was ever filed by

7    your office, yes or no?

8    A.  No.

9    Q.  So as you sit here today, years later, you can't tell us

10   whether or not your office either forgot or just dropped the

11   ball, correct?

12   A.  I mean, the return was prepared.  You saw it on the -- but

13   I don't -- I can't tell you for sure whether Mr. Issa came in

14   and signed the form and I was able to e-file it or whether we

15   had it there and we were waiting for him to come in.  That, I

16   can't --

17   Q.  But it was prepared, right?

18   A.  Yes.

19   Q.  And on a timely basis?

20   A.  Yes.

21   Q.  What's the point of preparing your return on a timely basis

22   if you then don't file it for the taxpayer or verify that he or

23   she files it?

24            MR. WIRSHBA:  Objection.  Argumentative.

25            THE COURT:  The objection's overruled.

ICEHIss2                          Mousouris - Cross

1    Q.  Can you answer the question.

2    A.  I'm sorry.  Say again.

3    Q.  You prepare a return in a timely fashion, correct?

4    A.  Right.

5    Q.  Certain serious consequences if the return isn't filed,

6    correct?

7    A.  Correct.

8    Q.  So you told us you prepared the 2013 return for Mr. Issa,

9    correct?

10   A.  Right.

11   Q.  And then it's either he signs it or you e-file it or one of

12   the above, but you need to verify that the return is filed,

13   right?

14   A.  Yes.

15   Q.  As you sit here today, you know that that return was never

16   filed, isn't that true?

17   A.  I mean, yes, now that I know it wasn't filed, it wasn't

18   filed.

19   Q.  And the dialogue that then goes on for a period of time

20   between you and Daniela is trying to find out if the return was

21   filed or why is the IRS rejecting the amended return, correct?

22   A.  Yes.

23   Q.  Now, there are two reasons -- there are a couple of reasons

24   why the IRS rejects an amended return:  Either they don't think

25   it's complete or if doesn't have a return on file that it

ICEHIss2                          Mousouris - Cross

1   refers to, correct?

2   A.  Yes.

3   Q.  And if an amended return refers to an original return that

4   has never been filed, it's impossible to figure out whether the

5   amended return is correct, right?

6           MR. BRAFMAN:  May I have just one moment, your Honor?

7           THE COURT:  Yes.

8   Q.  I want you to look at -- I'm sorry.  I'm going to give you

9   1104 for identification.  Read it to yourself, sir, again --

10  not again.  Just read it to yourself.  Just read the first

11  page, sir.

12          Have you read it?

13  A.  Yes.

14  Q.  Do you recognize this as dialogue in June of 2015 between

15  Daniela and you?

16  A.  Between Daniela and Ashley.

17  Q.  Look at the top of the page.  Isn't that from you?

18  A.  It's from my office, but --

19  Q.  It says from George Mousouris.

20          MR. WIRSHBA:  Objection, your Honor.

21  Q.  I'm sorry.  It's from Ashley, you're right.

22          THE COURT:  Thank you.

23  Q.  She's writing on behalf of your office, correct?

24  A.  Yes.

25  Q.  You read it to yourself.  Ashley is telling Daniela, I'm

ICEHIss2                          Mousouris - Cross

1    not asking about -- I'm not asking about Daniela's

2    conversation, just Ashley's.

3              MR. WIRSHBA:  Your Honor, we still object on hearsay

4    grounds.

5              THE COURT:  The objection's sustained.

6    Q.  Well, does this indicate to you as to whether or not your

7    office was making certain representations about the --

8              THE COURT:  The objection's sustained.  You can use it

9    to refresh his recollection.  You can ask him a question as a

10   predicate to that, but not about the document.  The document is

11   hearsay.

12             MR. BRAFMAN:  Yes, ma'am.

13             THE COURT:  You can't read it to the jury.  You can't

14   tell the jury what is in it.  At the end of two weeks of trial,

15   it should be pretty clear how I'm going to rule on these

16   objections.

17             MR. BRAFMAN:  Yes, ma'am.

18   Q.  Mr. Mousouris, did you ever authorize Ashley to tell

19   Ms. Silva that the reason why the IRS is rejecting the amended

20   return was because they were still processing the taxes for

21   Mr. Issa?

22   A.  Again, I didn't know anything about being --

23   Q.  The question is did you --

24   A.  No.

25   Q.  -- ever authorize Ashley to tell Ms. Daniela that the

ICEHIss2                          Mousouris - Cross

1    status of the tax is that they were still processing the taxes,

2    and that's why the IRS rejected the amended return?

3    A.   No.

4    Q.   Have you ever spoken to Ashley about this issue since it

5    came up?

6    A.   I mean, no, but according to the email, she took care of

7    it.

8    Q.   How?

9    A.   It says:  Attached please find the acceptance from the IRS.

10   Q.   Excuse me?

11   A.   It says, "I apologize for the delay in getting this to you.

12   Attached please find the acceptance from the IRS for Ibrahim's

13   2013 personal taxes."

14   Q.   Would you show me where you have that acceptance.

15   A.   I don't have it with me.

16   Q.   No, did you ever see that they accepted the 2013 initial

17   return?

18   A.   I didn't -- I didn't follow up on this.  This wasn't

19   something that I would take care of in my office.  It's

20   something that the girls take care of.

21   Q.   And I want to show you, if I can -- did you ultimately

22   prepare the 2015 return?

23   A.   For Mr. Ibrahim, no.

24   Q.   The amended return --

25   A.   No.

ICEHIss2                          Mousouris - Cross

1    Q.  -- for the 2013?

2    A.  No.

3    Q.  Who did?  Do you know?

4    A.  I have no idea.

5           MR. BRAFMAN:  May I just have a minute, your Honor?

6           THE COURT:  Yes.

7    Q.  Do you have anything on a piece of paper or an email or

8    anything from the IRS showing that what Ashley was telling them

9    was correct?

10   A.  We might have it at the office.  I don't -- I personally

11   haven't seen it.

12   Q.  You went through your files knowing that you were going to

13   testify, right?

14   A.  This never came up.

15   Q.  You were talking to the government about the 2013 return?

16   A.  Right, but I never knew that it wasn't accepted.  I mean,

17   that wasn't a question that was never brought up.

18   Q.  They have never asked you that?

19   A.  No.

20   Q.  The first time anybody asked you about this is when I spoke

21   to you?

22   A.  Yeah.

23          MR. BRAFMAN:  I have nothing further, your Honor.

24          THE COURT:  Any redirect?

25          MR. WIRSHBA:  Briefly, your Honor.

1          Ms. Geier, if we could put up Government Exhibit 509,

2     page 2.

3     REDIRECT EXAMINATION

4     BY MR. WIRSHBA:

5     Q.  Mr. Mousouris, do you remember on cross-examination that

6     Mr. Brafman asked you about this particular Hybrid return?

7     A.  I don't have it.

8          MR. WIRSHBA:  Oh.  If we could publish it to the

9     witness, Ms. Geier.

10    Q.  It's not coming up?

11    A.  No.

12    Q.  Maybe you could take a look in your book for Government

13    Exhibit 509 while we see whether we can fix the technology

14    here.

15    A.  OK.  I have it.

16    Q.  Look at the second page.  Is it up now?

17    A.  Yeah.

18    Q.  Mr. Brafman asked you about the total income, $14,000,

19    right?

20    A.  Right.

21    Q.  And he asked you where you got that number?

22    A.  Right.

23    Q.  What do you remember about where you got that number?

24         MR. BRAFMAN:  Objection.  Asked and answered.  Doesn't

25    know.

ICEHIss2                          Mousouris – Redirect

1      THE COURT:  Really?  Well, you can't say what his

2  answer is either, asked and answered, no.  We're going to hear

3  it on redirect.  Objection's overruled.

4  A.  I'm sorry.  Can you ask me again.

5      THE COURT:  Ask him the question.

6      MR. WIRSHBA:  Of course.

7  Q.  Mr. Mousouris, what do you remember about where you

8  received that number from?

9  A.  I don't remember, but I mean, I wouldn't have just made up

10  a number.  It must have been given to me either over the phone

11  or maybe it was given to me by email, but I don't have it.  In

12  my files I didn't see them.  This I specifically looked for

13  because it was part of the preparation that we did, and I

14  couldn't find anything.

15  Q.  Why is it that you wouldn't just make up a number?

16  A.  Because I don't do that kind of accounting.  I mean, I

17  don't make up numbers for clients.

18  Q.  What would be the benefit to you of making up a number?

19  A.  Nothing.

20  Q.  All right.  Mr. Mousouris, do you keep your records in your

21  office for forever?

22  A.  No.  Three years.

23  Q.  All right.  Mr. Mousouris, Mr. Brafman asked you on direct

24  about your agreement with the government.  Do you remember

25  that?

ICEHIss2                         Mousouris - Redirect

1   A.  Yes.

2   Q.  Do you remember -- or on cross.

3            Do you remember stating on direct that the information

4   that you put in the 2012 Hybrid return may have been false?

5   Was that your testimony?

6   A.  May have been false?

7   Q.  For the 2012 High Powered return.

8   A.  I said that it might have been false?

9   Q.  Let's take a look at Government Exhibit 902.

10           In particular on the second page, please, Ms. Geier.

11           Do you remember stating on direct that you suspected

12  that the information that Ms. Silva was giving you may have

13  been false?

14  A.  I suspected that the income might have been.

15  Q.  Explain that.

16  A.  I mean, again, if you're looking at a business and the

17  person was opening up a business, you have to have some pretty

18  deep pockets in order to be able to carry a business for the

19  whole year while you're paying $102,000 a year in rent if

20  you're only making 3,333 in income.  So, I mean, it just seemed

21  to me that the numbers didn't jibe.  It was either that they

22  didn't show enough income or that the expenses they were

23  showing -- I mean, it could have been, you know, what they

24  said, which was that they were basically fixing the place and

25  they were -- and I know -- I mean, I've seen other returns

ICEHIss2                         Mousouris - Recross

1    where people do that, but at the same time, I just let her know

2    that if we're going to continue doing returns for this company,

3    we have to do something about the discrepancy in income and

4    expenses.

5    Q.  So although there may be explanations, at the time you

6    believed that it was possible that this information was false,

7    right?

8    A.  Yes.

9    Q.  Do you have an obligation to further look into information

10   that you believe to be false before putting it on an income tax

11   return?

12   A.  No.

13   Q.  If you believe the information to be false, do you have any

14   obligation?

15   A.  I basically make inquiries, and if they tell me that the

16   return is correct, that the P & L's correct, it's correct.

17   Unless I'm asked to audit the return, then that's a different

18   story.

19   Q.  So despite your suspicions, you filed this amended tax --

20   you filed this tax return, right?

21   A.  Yes.

22          MR. WIRSHBA:  Nothing further, your Honor.

23   RECROSS EXAMINATION

24   BY MR. BRAFMAN:

25   Q.  You're dealing with suspicion, correct?  We're talking

ICEHIss2                        Berzansky - Direct

1    about suspicion, correct?

2    A.   Yes.

3              MR. BRAFMAN:  Thank you.

4              THE COURT:  Thank you, sir.  You may step down.

5              Call your next witness, please.

6              (Witness excused)

7              MR. WIRSHBA:  Your Honor, the government calls

8    Agent Richard Berzansky.

9              Your Honor, would it be possible to take a short

10   bathroom break at this time?

11             THE COURT:  We can take like a three-minute break, and

12   anybody who absolutely needs to go to the bathroom, go.  But I

13   don't want to get everybody out of the room.  It'll take us 10

14   to 15 minutes to get back, and then I won't another break until

15   2:30.

16             MR. WIRSHBA:  Understood, your Honor, just very

17   briefly.

18             (Recess)

19             MR. WIRSHBA:  Your Honor, the government calls Richard

20   Berzansky.

21   RICHARD BERZANSKY,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MR. WIRSHBA:

ICEHIss2                           Berzansky - Direct

1    Q.  What's your occupation, Mr. Berzansky?

2    A.  I'm a revenue agent with the Internal Revenue Service.

3    Q.  How long have you been in that position?

4    A.  Approximately 13 and a half years.

5    Q.  What were you doing before you were a revenue agent?

6    A.  Directly out of college, I worked for KPMG, a large

7    accounting firm.

8    Q.  Agent Berzansky, if you can make sure the mic is in front

9    of your mouth so we can all hear you, that would be great.

10          What did you do after working for KPMG?

11   A.  After KPMG, I worked for the New York District Attorney as

12   a financial investigator.

13   Q.  Very briefly, what did you do there?

14   A.  I assisted the Assistant District Attorneys with

15   white-collar criminal investigations.

16   Q.  What did you do after you were with the Manhattan D.A.?

17   A.  I became a revenue agent.

18   Q.  What is it that revenue agents do for the Internal Revenue

19   Service?

20   A.  Revenue agents are responsible for conducting civil

21   examinations, more commonly known as audits, of taxpayers.

22   Q.  And did you do that work?

23   A.  I did.

24   Q.  For about how long?

25   A.  Approximately four and a half years.

ICEHIss2                        Berzansky - Direct

1   Q.   During that time, about how many audits did you participate
2   in?
3   A.   Between 100 and 200.
4   Q.   What's the breakdown between individuals and corporations
5   of those audits?
6   A.   I did approximately 75 percent of my examinations were of
7   individuals; 25 percent of those were for businesses,
8   partnerships, corporations, S corps.
9   Q.   What did you do after you were just a general revenue
10  agent?
11  A.   After four and a half years, I was promoted to a manager of
12  a general program revenue agent group.
13  Q.   What are your duties and responsibilities, briefly, as a
14  manager?
15  A.   As a manager, I had anywhere between six to 12 different
16  revenue agents in my employ.  I was responsible for the
17  day-to-day operations of the group, assignment of work,
18  overseeing of the work, administrative tasks associated with
19  payroll, things of that nature.
20  Q.   What are you doing now?
21  A.   I now work as a revenue agent again in the special
22  enforcement program.
23  Q.   What's the special enforcement program?
24  A.   The special enforcement program is the arm of the
25  examination division, the small business self-employed

ICEHIss2                          Berzansky - Direct

1  examination division charged with dealing with those

2  individuals or businesses that have a higher likelihood of

3  fraud.

4  Q.  And in your current role, do you perform what are known as

5  tax computations?

6  A.  I do.

7  Q.  What are tax computations, briefly?

8  A.  Tax computations are simply the determination of a proper

9  amount of income tax that should have been reported versus what

10 was actually reported.

11 Q.  Now, at some point did you become involved with an

12 investigation into an individual named Ibrahim Issa?

13 A.  Yes, I did.

14 Q.  How'd you become involved?

15 A.  When criminal investigation requests assistance from the

16 special enforcement program, they send a request down the line.

17 The request was passed forward to my manager, and my manager

18 assigned me to the case.

19 Q.  And that's IRS criminal investigations that you're talking

20 about, right?

21 A.  Excuse me, yes.

22 Q.  Were you asked to perform tax computations -- I'm sorry.

23         When was it that you were assigned?  Let me ask you

24 that.

25 A.  I was assigned in October of this year.

ICEHIss2                          Berzansky - Direct

1    Q.  Were you asked to perform tax computations of certain

2    individuals and entities as part of this assignment?

3    A.  Yes, I was.

4    Q.  What individuals and entities?

5    A.  I was asked to perform a tax computation regarding First

6    Star Auto Repair for the 2012 year, and I was asked to perform

7    tax computations for an individual named Mr. Ibrahim Issa for

8    the years 2012, 2013, and 2014.

9    Q.  Did you determine whether there was a tax due and owing for

10   First Star Auto Repair in 2012?

11   A.  Yes, I did.

12   Q.  And was there?

13   A.  Yes, there was.

14   Q.  What about for Mr. Issa's personal income tax returns?  Did

15   you determine whether there was a tax due and owing for

16   Mr. Issa on his personal tax returns in 2012, 2013, and 2014?

17   A.  Yes, in each year.

18   Q.  Was there a tax due and owing?

19   A.  Yes, in each year.

20   Q.  All right.  In performing your tax analysis, did you

21   analyze and review certain records and documents that were

22   admitted in this trial?

23   A.  Yes, I did.

24          MR. WIRSHBA:  All right.  Your Honor, at this time I

25   would ask that your Honor read a stipulation into the record.

ICEHIss2                        Berzansky - Direct

1    The stipulation is Government Exhibit 4009.  If I may hand it

2    up.

3              THE COURT:  You want me to read the whole thing?

4              MR. WIRSHBA:  No, your Honor, but several paragraphs.

5    If we could ask that the Court read paragraphs 2, 6, 7, 8, 10,

6    13, and 14.

7              THE COURT:  Well, excuse me.  My memory is not that

8    good.

9              MR. WIRSHBA:  Understood.

10             THE COURT:  Paragraph 2:  If called as a witness at

11   trial, the custodian of records from Bank of America would

12   testify that Government Exhibits 3503A through E and 31 --

13   3516A, including all parts and subdivisions thereof, meet all

14   the conditions for being business records.  OK.  All those

15   words, I'm not reading them again.  You know what they are.

16             Next paragraph.

17             MR. WIRSHBA:  Paragraph 6, your Honor.

18             THE COURT:  If called as a witness at trial, a

19   custodian of records from Consolidated Edison Company of New

20   York, Inc., would testify that Government Exhibits 630,

21   including all parts and subdivisions thereof, is a business

22   record of Con Ed.

23             Next.

24             MR. WIRSHBA:  Paragraph 7, your Honor.

25             THE COURT:  If called as a witness at trial, a

ICEHIss2                          Berzansky - Direct

1    custodian of records from Quick Park East 72 LLC would testify

2    that Government Exhibits 620 and 621, including all parts and

3    subdivisions thereof, are business records of Quick Park East

4    72 LLC.

5              Next.

6              MR. WIRSHBA:  No. 8, your Honor.

7              THE COURT:  If called as a witness at trial, a

8    custodian of records from the Solow, S-o-l-o-w, Management

9    Corporation, would testify that Government Exhibit 610 through

10   613, including all parts and subdivisions thereof, are business

11   records of Solow Management.

12             MR. WIRSHBA:  Paragraph 10, your Honor.

13             THE COURT:  If called as a witness at trial, a

14   custodian of records from Gasway Inc. and Getty Petroleum

15   Marketing would testify that Government Exhibit 645B, including

16   all parts and subdivisions thereof, are business records -- is

17   a business record of Getty Petroleum Marketing Inc.

18             MR. WIRSHBA:  Thirteen, your Honor.

19             THE COURT:  If called as a witness at trial, a

20   custodian of records from Beau, B-e-a-u, Hulse, H-u-l-s-e, Beau

21   Hulse Realty Group would testify that Government Exhibit 680,

22   including all parts and subdivisions thereof, is a business

23   record of Beau Hulse Realty Group.

24             MR. WIRSHBA:  Finally, your Honor, paragraph 14.

25             THE COURT:  If called as a witness at trial, a

ICEHIss2                    Berzansky - Direct

1    custodian of records from the Clerk of New York City would

2    testify that Government Exhibit 660, including all parts and

3    subdivisions thereof, are true and correct copies of marriage

4    records, and just to remind you of what a business record is,

5    that the original records were made at or near the time, by or

6    from information transmitted by a person with knowledge of the

7    matters set forth in the records; that they were kept in the

8    ordinary course of the Clerk of New York City conducted

9    business activity; and that it was the regular practice of that

10   business activity to make those records.

11           MR. WIRSHBA:  Your Honor, the government offers the

12   exhibits you read from paragraphs 2, 6, 7, 8, 10, 13, and 14.

13           MR. BRAFMAN:  No objection.

14           THE COURT:  Admitted.

15           (Government's Exhibits 3503A through 3503E, 3516A,

16   630, 620, 621, 610 through 613, 645B, 680, and 660 received in

17   evidence)

18   BY MR. WIRSHBA:

19   Q.  Agent Berzansky, in performing your tax analysis, did you

20   analyze and review certain records that were admitted during

21   this trial?

22   A.  Yes, I did.

23   Q.  Including the ones that were just admitted?

24   A.  Yes.

25   Q.  Were you asked to create charts summarizing that evidence?

ICEHIss2                      Berzansky - Direct

1   A.  Yes, I was.

2   Q.  On what records did you rely in creating those charts?

3   A.   In general, I relied on items such as tax returns, bank

4   statements, what I refer to as the daily cash sheets, amongst

5   other items that were submitted.

6   Q.  Do you see in front of you in your binder what's marked

7   Government Exhibit 503 through 521?  Have you reviewed those

8   before?

9   A.  I don't see 503.

10           MR. WIRSHBA:  If we could just put 503 up.

11           Oh, one moment, your Honor.  Your Honor, if I may

12   approach?

13   Q.  What I just handed you, Government Exhibits 503 through

14   521 --

15   A.  5003 through 5021.

16   Q.  Oh, 5003.  I apologize, 5003 to 5021.  My apologies.

17           THE COURT:  Is this on the screen?

18           MR. WIRSHBA:  No, your Honor, it's not.

19           THE COURT:  OK.  Thank you.

20   Q.  Do you see that, what I handed to you?

21   A.  Yes, I do.

22   Q.  What are those?

23   A.  These are the summary charts that I created as a result of

24   my analysis.

25   Q.  And taking a look at the disc in front of you, Government

ICEHIss2                      Berzansky – Direct

1    Exhibit 501, do you know what that is?

2    A.  5001?

3    Q.  Yes.

4    A.  Yes.

5    Q.  What is that?

6    A.  This is a CD that contains the supporting information for

7    the charts that I created.

8    Q.  Do you see Exhibit 5002?

9    A.  Yes, I do.

10   Q.  What is that?

11   A.  This is a summary schedule of documents that I reviewed in

12   order to complete my analysis and tax computation for First

13   Star Auto Repair Inc.'s 2012 tax return.

14   Q.  Is 5002 also a PowerPoint presentation?

15   A.  Yes.

16   Q.  Would that assist in your presenting your schedules to the

17   jury today?

18   A.  Yes, it would.

19   Q.  To the best of your knowledge, does the information

20   contains in Government Exhibits 5001 to 5021 accurately

21   summarize the information contained in the underlying records?

22   A.  Yes, it would.

23          MR. WIRSHBA:  Your Honor, at this time government

24   offers Government Exhibits 5001 through 5021.

25          MR. BRAFMAN:  No objection.

ICEHIss2                          Berzansky - Direct

 1              THE COURT:  Admitted.

 2              (Government's Exhibits 5001 through 5021 received in

 3     evidence)

 4              MR. WIRSHBA:  Let's take a look at 5002, which is the

 5     PowerPoint presentation, if we could, Ms. Geier.

 6     BY MR. WIRSHBA:

 7     Q.  All right.  So you mentioned that you were asked to look

 8     into First Star Auto Repair, is that right?

 9     A.  Yes.

10     Q.  Regarding First Star Auto Repair, what were you asked to

11     do?

12     A.  I was asked to review books and records related to First

13     Star for the 2012 tax year in order to determine the proper tax

14     liability for that corporation for that year.

15     Q.  All right.  Taking a look at this first slide we have here,

16     what is this?

17     A.  This is the summary schedule that I referenced earlier

18     regarding all the documents that I reviewed in order to prepare

19     my analysis and my schedules.

20     Q.  This Government Exhibit at the top, 5002, that refers to

21     the whole PowerPoint presentation, right?

22     A.  Yes, sir.

23     Q.  And the one at the bottom where it says 5020, what is that

24     referring to?

25     A.  That's the referring to the schedule itself.

ICEHIss2                          Berzansky - Direct

1    Q.  So where there's a government exhibit, on the page it

2    refers to the schedule that's in the document?

3    A.  Correct.

4    Q.  All right.  Where did you get this evidence that you

5    reviewed?

6    A.  I was provided with the evidence from the government.

7    Q.  Without going into the details of everything, what are the

8    types of evidence that you reviewed for First Star Auto Repair?

9    A.  I reviewed items such as their tax return, tax returns of

10   other corporations, bank records, daily cash sheets, and the

11   schedules, the summary schedules that First Star themselves

12   prepared.

13   Q.  When you say "daily cash sheets," what do you mean?

14   A.  That's the -- that's what I refer to as those daily sales

15   reports, those handwritten reports that were created at First

16   Star Auto Repair Inc.

17   Q.  Have you been present in the courtroom for testimony that

18   could impact your analysis?

19   A.  Yes, I have.

20   Q.  All right.  What was the first thing that you looked at

21   when undergoing our analysis?

22   A.  My first step in my analysis was looking at the tax returns

23   of First Star Auto Repair Inc. for 2012, both the original 1040

24   and the 1040X -- 1120 and 1120X, excuse me.

25   Q.  Let's go to the next slide.  Can you tell who signed this

ICEHIss2                          Berzansky - Direct

1    document?

2    A.  Yes, I can.

3    Q.  Let's go to the next slide.

4              What's that person's name?

5    A.  The person's name is Alya Jamal.

6    Q.  What is this document?

7    A.  This document is the original Form 1120 filed for First

8    Star Auto Repair Inc. in 2012.

9    Q.  Did you include the information from this original First

10   Star 1120 on your summary charts?

11   A.  I did.

12   Q.  Let's take a look at the next slide.

13             What's on the left there?

14   A.  On the left is the first page of that Form 1120 for First

15   Star Auto Repair Inc. for 2012.

16   Q.  And on the right, what is that?

17   A.  On the right is a -- is my summary of the amounts that were

18   reported from the original filed 1120.

19   Q.  Taking a look at your summary, what are those numbers on

20   the left side?

21   A.  The numbers on the left side refer back to the line numbers

22   on the Form 1120.

23   Q.  Now, we've reviewed many of these numbers before, but I see

24   you have here line 29a, a net operating loss deduction.  Do you

25   see that?

ICEHIss2                          Berzansky - Direct

1   A.   Yes, I do.

2   Q.   What is a net operating loss deduction?

3   A.   Much in the way that if a corporation shows income for a

4   year, if they show a loss for a year, they're entitled to that

5   loss.  They can't deduct it in that year because they have a

6   loss, so they're entitled to the benefit of that loss either by

7   carrying it back to prior years or carrying it forward to

8   future years.

9   Q.   What does it mean to carry something back or carry

10  something forward?

11  A.   When I say they carryback, I mean they're allowed to use

12  that deduction against taxable income for prior years or as a

13  deduction against taxable income in future years.  That's a

14  carryforward.

15  Q.   These figures from the original 1120, do you know if they

16  actually reflect all of the business activity for First Star

17  Auto Repair in 2012?

18  A.   No, they do not.

19  Q.   How do you know that?

20  A.   Because the IRS had information reported to them that

21  indicated that the gross receipts amount was higher than what

22  was reported.

23  Q.   Let's take a look at the next slide.

24       What's this?

25  A.   This is a notice, CP-2030.

ICEHIss2                         Berzansky - Direct

1    Q.   What's a CP-2030?

2    A.   This is an automated notice issued by the IRS when there's

3    a discrepancy on a tax return between amounts that were

4    reported to the IRS and the amounts that the corporation itself

5    reported to the IRS on their filed 1120.

6    Q.   Taking a look at this particular page, can you see the date

7    of this notice?

8    A.   Yes.

9    Q.   What is it?

10   A.   March 10, 2014.

11   Q.   Let's take a look at the next page.

12        What's blown up here?

13   A.   This is the top portion of another page in that notice.

14   Q.   That same notice that we were looking at?

15   A.   Yes.

16   Q.   What line item is the IRS saying needs to be adjusted

17   according to this notice?

18   A.   Gross receipts.

19   Q.   What does this notice say about what First Star reported in

20   2012?  What's that figure?

21   A.   This notice says 546,836 was reported on the original

22   return.

23   Q.   What was the gross receipts reported to the IRS?

24   A.   The IRS had information that indicated that gross receipts

25   were $1,495,243.

ICEHIss2                          Berzansky - Direct

1    Q.  And did that number come from 1099s; am I right about that?

2    A.  Yes.

3    Q.  All right.  So according to this notice, what does First

4    Star owe to the IRS in 2012?

5    A.  The amount owed to the IRS in relation to the 2012 year is

6    $406,295.

7    Q.  Did the IRS receive a payment in this amount?

8    A.  No, they did not.

9    Q.  What did the IRS receive?

10   A.  In response to this notice, the IRS received an amended

11   1120, or an 1120X.

12   Q.  Let's take a look at the next slide.

13        What's this?

14   A.  This is the Form 1120X that was sent in response to CP-2030

15   notice.

16   Q.  For what company does this 1120X prepared?

17   A.  The First Star Auto Repair Inc.

18   Q.  In what circumstances is a corporation permitted to file an

19   amended return?

20   A.  A corporation can file an amended return any time that

21   additional information comes up that necessitates a change to

22   their taxable income, whether it be change to their income or

23   change to their deductions.

24   Q.  This 1120X, the "X" indicates it's an amended return, is

25   that right?

ICEHIss2                          Berzansky – Direct

1    A.  That's correct.

2    Q.  All right.  Let's go to the next slide.

3            Who signed this 1120X on behalf of First Star Auto

4    Repair?

5    A.  This return is signed by Ibrahim Issa.

6    Q.  According to this 1120X, what was Mr. Issa's title?

7    A.  President.

8    Q.  Let's take a look at the next slide.

9            Can you see what's written above Mr. Issa's signature?

10   A.  Yes, I can.

11   Q.  Can you read it.

12   A.  "Under penalties of perjury, I declare that I filed an

13   original return and that I have examined this amended return,

14   including accompanying schedules and statements, and to the

15   best of my knowledge and belief this amended return is true,

16   correct, and complete.  Declaration of preparer other than

17   taxpayer is based on all information of which preparer has any

18   knowledge."

19   Q.  All right.  Let's take a look at the next slide.

20           What is the result of the adjustments reflected on the

21   Form 1120X?

22   A.  Based upon the amounts reported on the 1120X, First Star is

23   requesting a refund of $4.

24   Q.  Did the IRS pay the $4 refund to First Star Auto Repair?

25   A.  No, they did not.

ICEHIss2                          Berzansky - Direct

1   Q.  Did First Star Auto Repair send anything else that went

2   into greater detail about its income and expenses in 2012?

3   A.  Yes, they did.

4   Q.  What was that?

5   A.  They submitted an amended Form 1120 detailing the changes

6   that were -- that they proposed to their return.

7   Q.  Let's take a look at the next slide.

8        What is this?

9   A.  This is that amended Form 1120 that I just referenced.

10  Q.  Is it unusual for a company to file an amended 1120 when

11  also filing an 1120X?

12  A.  No.

13  Q.  All right.  Let's take a look at the next slide.

14       Who signed this document?

15  A.  This document is signed by Ibrahim Issa.

16  Q.  Take a look at the next slide.

17       Do you see there's another declaration on this form?

18  A.  Yes, I do.

19  Q.  Can you read this one.

20  A.  "Under penalties of perjury, I declare that I've examined

21  this return, including accompanying schedules and statements,

22  and to the best of my knowledge and belief, it is true,

23  correct, and complete.  Declaration of preparer other than

24  taxpayer is based on all information of which preparer has any

25  knowledge."

ICEHIss2                         Berzansky - Direct

1    Q.  Do all corporate tax returns have this declaration on them?

2    A.  Yes, they do.

3    Q.  What if a document is e-filed?

4    A.  The declaration is still present on the e-filed document.

5    Q.  Whose responsibility is it to file a tax return?

6    A.  It is the responsibility of the individual or business for

7    which that return relates to.

8    Q.  What if it's an e-filing?

9    A.  It's still the individual's responsibility.

10   Q.  What if there's a paid tax preparer involved?

11   A.  It's still the individual's responsibility to make sure

12   that this is filed.

13   Q.  All right.  Let's take a look at the next slide.

14       What's the portion of the amended 1120 that's blown up

15   here?

16   A.  This is the portion related to income of the corporation.

17   Q.  Do these figures differ from those in the original return?

18   A.  Yes, they do.

19   Q.  Approximately how much does the gross receipts figure

20   differ from that on the original 2012 return for First Star?

21   A.  This represents an increase of approximately $1.25 million

22   from what's on the original return.

23   Q.  Did the cost of goods sold figure also change?

24   A.  Yes, it did.

25   Q.  By approximately how much?

1    A.   By approximately the same $1.25 million.

2    Q.   Does this amended 1120 go into additional details about the

3    cost of goods sold?

4    A.   Yes, it does.

5    Q.   Let's take a look at the next slide.

6              What is this?

7    A.   This is a Form 1125-A.

8    Q.   What's that?

9    A.   This details the components of cost of goods sold.

10   Q.   And what's listed here for purchases?

11   A.   $42,377.

12   Q.   What's listed for other costs?

13   A.   $1,254,357.

14   Q.   Does this amended return further explain those other costs?

15   A.   Yes, it does.

16   Q.   Where does it do so?

17   A.   On statement two.

18   Q.   What's a statement?

19   A.   A statement is something that accompanies a tax return that

20   allows the person or individual corporation to tell the IRS a

21   bit more about what accompanies or what makes up that line item

22   amount.

23   Q.   All right.  Looking at the next slide, does this detail the

24   other cost component of the cost of goods sold?

25   A.   Yes, it does.

ICEHIss2                            Berzansky - Direct

1    Q.   What does it say?

2    A.   It states:  Fleet operating cost-fuel, $636,711, and

3    subcontractors, $617,646.

4    Q.   Based on your analysis of First Star Auto Repair, what

5    businesses did you understand First Star to be involved in?

6    A.   Based upon the evidence that I reviewed, I determined that

7    there were two sources of revenue for First Star Auto Repair

8    Inc. in the 2012 year.  The first -- I'm sorry.

9    Q.   I apologize.  No, please.

10   A.   The first source was amounts that are related to gas sales

11   on consignment, and the second being in relation to the repair

12   shop.

13   Q.   You mentioned gas sales on consignment.  Are either of

14   these costs of goods sold related to the gas sales on

15   consignment, if you know?

16   A.   No.

17   Q.   So why are there no cost of goods sold related to gas

18   sales?

19   A.   When you have a consignment relationship, and First Star

20   was an agent in that consignment relationship, they're not the

21   owner of the inventory.  Therefore, the income or the expense

22   related to the sale of that is not theirs to report.  The only

23   reportable amount related to that relationship is the

24   commission.

25   Q.   What does it mean to sell something on consignment?

ICEHIss2                        Berzansky - Direct

1  A.  It means that you're not the owner of it; that you're just

2  selling it on behalf of another.

3          THE COURT:  Can I ask you a question.  So if I have a

4  convenience store with gas pumps outside and the gas is Exxon

5  gas, I'm selling it on a consignment relationship with them,

6  and Exxon owns the gas?

7          THE WITNESS:  Yes, your Honor.

8  Q.  Could you give an example of how consignment sales work.

9  A.  Absolutely.  In a traditional consignment shop, if you were

10  to go in and, say, you wanted to sell a hat, you bring the hat

11  in, and the consignment store will put that on their shelves.

12  When someone finally purchases that hat, that money that they

13  receive is not theirs to keep; that money has to get remitted

14  back to the owner of the hat.  The only money that is received

15  by the store would be the amount of commission that's earned as

16  a result of selling it on behalf of the other individual.

17  Q.  Did First Star receive commissions for their sale of gas?

18  A.  Yes, they did.

19  Q.  Is it permissible for a company not to include consignment

20  sales on its income tax return?

21  A.  Yes.

22  Q.  Why?

23  A.  Because it's not their revenue to report.  They're not the

24  owner of what they are selling.

25  Q.  Is it also permissible for a company to include revenue and

ICEHIss2                         Berzansky - Direct

1   expenses from consignment sales on its income tax return?

2   A.  If they wish.

3   Q.  How would that work?

4   A.  The revenue and expenses should net to zero.  They'd both

5   be the same.

6   Q.  When you say "net," what do you mean?

7   A.  I mean the difference between the two would be zero.

8   Q.  Let's take a look at the next slide.

9              What's on the left?

10  A.  On the left is the first page, amended 1120 filed behind

11  the 1120X for First Star Auto Repair Inc. in 2012.

12  Q.  And what's on the right?

13  A.  On the right is a snapshot of my summary chart related to

14  the amounts reported on that amended 1120.

15  Q.  All right.  Earlier you told us that the first thing you

16  did in your analysis was to review the tax returns.  What was

17  the next step in your process?

18  A.  After reviewing the tax returns, I went to the bank

19  statements of the corporation in order to review those.

20  Q.  Why was that the next step in your process?

21  A.  Bank statements represent third-party records.  These are

22  not records that are kept by the business.  Therefore, we can

23  assign a certain amount of reliability to those records that we

24  couldn't assign to the reliability of the records kept by the

25  business themselves.

ICEHIss2                          Berzansky - Direct

1    Q.  How did you begin your analysis of the bank records?

2    A.  I took the electronic records format, they were given to me

3    in PDF format, and I ran those records through a program called

4    BankScan.

5    Q.  What's BankScan?

6    A.  BankScan is a program that was created by the FBI.

7    Essentially, it allows the changeover from an electronic

8    format, such as a PDF, into a more workable format, like an

9    Excel spreadsheet.

10   Q.  How do you know that it's accurate?

11   A.  There are fail-safes within BankScan to ensure that the

12   transmission is accurate.  In addition to that, I pored over

13   the information after it was transferred over into Excel to

14   ensure the accuracy of the information.

15   Q.  When you say "fail-safe," what do you mean by a fail-safe?

16   A.  BankScan, in order to complete your analysis through

17   BankScan, you have to perform a reconciliation of monthly

18   balances.  If there's ever a discrepancy, BankScan will give

19   you errors, and it won't let you move forward.

20   Q.  How many bank accounts did First Star Auto Repair have in

21   2012?

22   A.  I was provided with three bank accounts.

23   Q.  Did you ultimately split those transactions from those bank

24   accounts into debits and credits?

25   A.  Yes, I did.

ICEHIss2                              Berzansky – Direct

1   Q.   If you could remind us, on a bank account, what is a debit?

2   A.   When speaking about bank accounts, debits are what are more

3   commonly referred to as withdrawals.

4   Q.   And credits?

5   A.   Credits would be your deposits.

6   Q.   After you split the transactions into debits and credits,

7   what are the items on the amended return that you attempted to

8   verify?

9   A.   I attempted to verify gross receipts and cost of goods

10  sold.

11  Q.   Is that it?

12  A.   Yes.

13  Q.   Why?

14  A.   These are the only items that First Star Auto Repair Inc.

15  materially adjusted as a result of the filing of the 1120X, or

16  the amended 1120.

17  Q.   To verify gross receipts from the bank statement, are you

18  looking into debits or looking into credits?

19  A.   I was looking into the credits.

20  Q.   If we could take a look at the next slide.

21       When you looked at the credits, how did you further

22  subdivide them?

23  A.   These are broken into two categories: taxable deposits or

24  receipts, which is on the left-hand side, and nontaxable

25  deposits or receipts, which is on the right-hand side.

ICEHIss2                          Berzansky - Direct

1   Q.   What does the IRS use to determine whether a receipt is

2   taxable or nontaxable?

3   A.   The Internal Revenue Code defines that.

4   Q.   What are some examples of nontaxable receipts?

5   A.   Nontaxable receipts, the most common one that we would deal

6   with are loans.  For example, if someone were to take out a

7   mortgage.  When we get a mortgage, that money isn't taxable to

8   us because it's being repaid overtime.  Other items would

9   include inheritances, transfers, things of that nature.

10  Q.   What are some examples of taxable receipts?

11  A.   Taxable receipts, the most common ones that we deal with

12  are income from employment, the money that we get every two

13  weeks from our employer.

14  Q.   Now, it may seem obvious, but nontaxable items, those are

15  not included in gross receipts, right?

16  A.   That's correct.

17  Q.   All right.  Let's take a look at the next slide.

18          What's this?

19  A.   This is the detail of the total amount of nontaxable

20  receipts that I observed going into First Star's bank accounts

21  in 2012.

22  Q.   What did you find to be the total amount of nontaxable

23  receipts into the bank account?

24  A.   The total amount of nontaxable receipts were $1,291,993.90.

25  Q.   Let's take a look at some of these items.  So at the top I

ICEHIss2                     Berzansky - Direct

1    see that there are xfers.  What's an "xfer"?

2    A.  "Xfer" is what Capital One Bank, which is the bank that

3    held the bank accounts of First Star Auto Repair in 2012,

4    that's their shorthand for transfer.

5    Q.  Where'd you get this description?

6    A.  Directly from the bank statements.

7    Q.  What bank accounts were those transfers into or from?

8    A.  They were into or from the bank accounts ending in 6706,

9    0165, or 6084 in the name of First Star Auto Repair Inc.

10   Q.  Both the sender and the recipient of these transfers was

11   First Star Auto Repair, is that right?

12   A.  That's correct.

13   Q.  Why did the bank account numbers repeat here?

14   A.  Because they had three separate bank accounts, there were

15   times when there were transfers from, for example, account 6076

16   into account 0165 or into account 6084.

17   Q.  And why are transfers nontaxable?

18   A.  Transfers are nontaxable because it's money moving within

19   the same corporation.  It would be like moving money from your

20   savings account to your checking account.  That's not taxable.

21   Q.  So if these are just transfers between accounts for the

22   same company, why would you include them at all?

23   A.  Because they were part of the bank account records that I

24   reviewed, I wanted to ensure that my analysis was as complete

25   as possible.

ICEHIss2                          Berzansky - Direct

1   Q.  All right.  Let's look at the next slide.

2             What's this?

3   A.  This is the summary schedule of total taxable deposits that

4   I observed going into First Star's bank accounts in 2012.

5   Q.  How did you determine that these items were taxable?

6   A.  These items are taxable because they did not fall under any

7   of the categories of being nontaxable.  Additionally, some of

8   these specifically said for items for repair work or there was

9   1099s income included in there.

10  Q.  Did you see any evidence that these items were nontaxable?

11  A.  None whatsoever.

12  Q.  Why are there some highlighted figures here?

13  A.  These items relate to what I refer to later on as other

14  repair revenue.

15  Q.  OK.  We'll come back to that.

16            Let's look at some of the more substantial items.

17  Let's start with ACH deposits.  What does ACH stand for?

18  A.  ACH stands for automated clearinghouse.

19  Q.  What does that mean?

20  A.  It's banking speak for electronic movement of money.

21  Q.  According to your analysis, how much came into First Star

22  Auto Repair from the U.S. Postal Service in 2012?

23  A.  Based on my analysis, I was able to determine that there

24  was a total of $1,448,070.77 received from the United States

25  Postal Service into First Star bank accounts in 2012.

ICEHIss2                         Berzansky - Direct

1   Q.   What about Global Montello?

2   A.   $3,033.93.

3   Q.   What's Global Montello?

4   A.   Global Montello was the owner of the fuel that First Star

5   sold as an agent for them from the months of May through

6   December of 2012.

7   Q.   Did you determine what Gasway was?

8   A.   Yes, I did.

9   Q.   What was Gasway?

10  A.   Gasway was the owner of the fuel in the agent relationship

11  that First Star had for fuel sold between the months of January

12  and April of 2012.

13  Q.   What about customer deposits?  What are those?

14  A.   Customer deposits is a catchall category that Capital One

15  Bank uses for any deposit that's not defined elsewhere.

16  Q.   So according to your analysis -- I'm sorry.  We already

17  reviewed that.  Let's take a look at the next slide.

18          Does this chart show your calculation of gross

19  receipts for First Star in 2012?

20  A.   Yes, it does.

21  Q.   What are the different components of gross receipts for

22  First Star in 2012?

23  A.   Due to the fact that I determined from review of the

24  evidence that there were two separate revenue streams or types

25  of ways that First Star earned money in 2012, I broke my

1    analysis into two separate categories: cash gas sales and

2    repair revenue.

3    Q.  Let's start with gas sales.  Did your gross receipts

4    account for all of the gas sales made by First Star in 2012?

5    A.  No, it did not.

6    Q.  Why not?

7    A.  Because of that agent relationship for the gas sales on

8    consignment, any receipts that were -- any gas that was

9    purchased by a customer using a credit card, those funds were

10   remitted directly to the fuel company.  They never hit First

11   Star's bank account.  Therefore, it was not included in my

12   analysis.

13   Q.  What does your analysis of the gas sales include?

14   A.  My analysis includes only those amounts that were

15   attributable to cash gas sales.

16   Q.  What did you do to determine the total amount of cash gas

17   sales that was received by First Star in 2012?

18   A.  In order to determine the cash gas sales, I totaled the

19   amount of ACH debits from the gas companies in 2012.

20   Q.  What did you find that figure to be?

21   A.  That amount is $1,751,791.54.

22   Q.  This says that it's from ACH debits.  What does that mean?

23   A.  It means money that was electronically withdrawn from First

24   Star's bank accounts by these fuel companies.

25   Q.  Is that consistent with the testimony from the witness from

1    Global Montello that we heard earlier?

2    A.  Yes, it is.

3    Q.  All right.  What about revenue from auto repair?  Were

4    there multiple sources of revenue that you tied to auto repair

5    work?

6    A.  Yes, there is.

7    Q.  What was the first source that you tied to auto repair

8    work?

9    A.  The first source were amounts reported directly to the IRS

10   via Form 1099.

11   Q.  Were there two types of 1099s that you examined?

12   A.  There were two types of 1099s that I observed being

13   attributed to First Star for that year, yes.

14   Q.  Did you treat those two types differently?

15   A.  Yes.

16   Q.  All right.  Let's start with the first 1099.  What was the

17   first type of 1099?

18   A.  The first 1099 received was a 1099-MISC received from the

19   United States Postal Service.

20   Q.  How much of the moneys that were reported on that 1099-MISC

21   for the postal service were you able to tie into the bank

22   accounts of First Star in 2012?

23   A.  All of it.

24   Q.  So how much did you include in the gross receipts figure

25   that you calculated on this sheet?

ICEHIss2                          Berzansky - Direct

1   A.  $1,448,070.77.

2   Q.  And that's the full amount from the 1099?

3   A.  Yes, it is.

4   Q.  What's the second 1099-MISC that you observed?

5   A.  The second 1099-MISC received by First Star in 2012 was

6   from Remco Maintenance.

7   Q.  How much of the moneys reported on the 1099-MISC for Remco

8   Maintenance were you able to tie into the bank accounts of

9   First Star in 2012?

10  A.  I was able to determine deposits of $2,367.33 based upon

11  the details in the bank records given to me.

12  Q.  Is that the full amount of 1099s for Remco Maintenance?

13  A.  No, it's not.

14  Q.  How much did you include in the gross receipts calculation

15  that you conducted here?

16  A.  Only the amounts that I was able to directly tie into the

17  bank account deposits, the $2,367.33.

18  Q.  Why did you do that?

19  A.  If I wasn't able to see the source of the deposit, I did

20  not want to count it as being from that.  So those -- the

21  difference between the $13,038 1099 that was reported and the

22  $2,367 that I observed going into the account might not have

23  hit the bank account that year.  Checks could have been cashed.

24  They could have gone into different accounts.  I only included

25  the amounts that I actually observed being deposited into the

ICEHIss2                    Berzansky - Direct

1   account.

2   Q.  Now let's look at the 1099-Ks.  Remind the jury what a

3   1099-K is.

4   A.  A 1099-K represents funds received from credit card

5   processors in a year.

6   Q.  What are the two 1099-Ks listed here?

7   A.  The first is a 1099-K from American Express in the amount

8   of $19,487.  The second is a 1099-K from First Data Merchant

9   Services in the amount of $14,652.

10  Q.  How much of these 1099-Ks did you include in your

11  calculation of the amount of repair work done?

12  A.  All of it.

13  Q.  Why is that?

14  A.  Because of the gas sale on consignment relationship, the

15  agent relationship that First Star had with the owner of the

16  fuel in 2012, any credit card receipts related to those gas

17  sales were remitted directly back to the fuel companies.  So

18  these amounts received from credit card processors had to be

19  from another revenue source.  Since the only other revenue

20  source I was able to observe from First Star was the repair

21  shop revenue, I attributed the 1099-Ks to the repair shop

22  revenue.

23  Q.  You received a second source of revenue from repair work,

24  right?

25  A.  Yes.

1   Q.   What was that second source?

2   A.   It's a catchall category that I named "Other repair

3   deposits."

4   Q.   What were the other repair deposits?

5   A.   These were the amounts highlighted on the earlier sheet.

6   These were amounts that I could tell were from repair work but

7   weren't reported to the IRS on the 1099.

8   Q.   Can you give an example?

9   A.   Of course.  There was several checks from a gentleman named

10  Edwin Peck, and in the memo line it specifically said "repair."

11  Q.   What's the total amount of other repair deposits that you

12  found?

13  A.   Total amount of repair deposits were $156,693.05.

14  Q.   When you add that to what you found from the 1099s and

15  traced to the bank, what's the total amount of repair revenue

16  that you found in the bank accounts for First Star Auto Repair

17  in 2012?

18  A.   $1,641,270.15.

19  Q.   All right.  Using that figure, were you able to calculate

20  gross receipts?

21  A.   Yes, I was.

22  Q.   How?

23  A.   I simply added the repair revenue to the cash gas sale

24  revenue.

25  Q.   What did you find?

ICEHIss2                          Berzansky – Direct

1   A.   I found that total gross receipts for First Star in 2012

2   was $3,393,061.69.

3            THE COURT:  And that total gas revenue includes the

4   full amount of all the gas that was sold on consignment?

5            THE WITNESS:  No, your Honor.

6            THE COURT:  No?

7            THE WITNESS:  No.

8            THE COURT:  It's not?

9            THE WITNESS:  It's only the amount that was sold via

10  cash.  The credit card revenue was omitted from my analysis.

11  BY MR. WIRSHBA:

12  Q.   Why did you omit the credit card?

13           THE COURT:  But it's still gas sold on consignment?

14           THE WITNESS:  Yes.

15           THE COURT:  Thank you.

16  Q.   Why did you omit the credit card sales from your analysis?

17  A.   Because the credit card sales, those funds were remitted

18  directly back to the owners of the fuel, the fuel companies.

19  They never hit First Star's bank accounts.

20  Q.   All right.  Is that calculation reflected as this top

21  calculation in bold towards the bottom of the chart?

22  A.   Yes, it is.

23  Q.   The one that says, "First Star Auto Repair 201212 gross

24  receipts calculation"?

25  A.   Yes, it is.

ICEHIss2                          Berzansky – Direct

1    Q.  Let me just ask you, that number that's there, 201212, do

2    you see that?

3    A.  Yes, I do.

4    Q.  That's a couple places on your spreadsheets, right?

5    A.  Yes, it is.

6    Q.  What does that mean?

7    A.  That's IRS parlance for saying that this is the 2012 year.

8    The 12 represents the fact that their taxable year ends in

9    December.  If their taxable year were to end in June, it would

10   have said 201206.

11   Q.  So 201212 means you're looking at the calendar year ending

12   in 2012, which is also the tax year, right?

13   A.  Yes.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

ICE5iss3                        Berzansky – direct

1  BY MR. WIRSHBA:

2  Q.  Did you compare the calculated gross receipts with the

3  taxable deposits into First Star's bank accounts?

4  A.  Yes, I did.

5  Q.  Why did you do that?

6  A.  When you have a cash intensive business such as this one,

7  you want to ensure that all of the cash is deposited into the

8  bank account for the year.

9  Q.  What did that analysis reveal?

10 A.  It revealed that not all the cash was deposited, that the

11 gross receipts exceeded their taxable deposits.

12 Q.  How much cash was not deposited according to your analysis?

13 A.  $437,924.77.

14 Q.  Is this depicted on that box on the bottom of the screen?

15 A.  Yes, it is.

16 Q.  So, again, how did you come to that number of $437,000?

17 A.  I took my calculated gross receipts, I subtracted the

18 taxable deposits that I determined to go into First Star's bank

19 accounts for 2012.  The difference was the cash that was not

20 deposited was about $437,924.77.

21 Q.  So, having calculated gross receipts, what is the next line

22 item you sought to evaluate for tax computation for First Star

23 in 2012?

24 A.  Cost of goods sold.

25 Q.  Let's take a look at the next slide.

1    　　　　According to the amended 1120, what were the most

2    substantial components of First Star's cost of goods sold in

3    2012?

4    A.   These were reported as other costs under costs of goods

5    sold, and these were fleet operating costs, fuel, in the amount

6    of $636,711, and subcontractors in the amount of $617,646.

7    Q.   Ms. Geier, if we could take a look at the next exhibit or

8    the next page?  Thank you.

9    　　　　This spreadsheet, this is the spreadsheet provided to

10   Mr. Tsamutalis, right?

11   A.   Yes.

12   Q.   This is the one that he testified that he used to create

13   the amended return?

14   A.   Yes.

15   Q.   Do you see those figures that you just reviewed in this

16   COGS box in the middle of the page?

17   A.   Yes, I do.

18   Q.   COGS; is that a common abbreviation for the cost of goods

19   sold?

20   A.   Yes, it is.

21   Q.   According to this schedule here, what is the first item in

22   the COGS box?

23   A.   The first item listed there is fuel trucks.

24   Q.   Is that equivalent to what was put on the amended return as

25   fleet operating costs, fuel?

ICE5iss3                          Berzansky - direct

1   A.  Yes.  The amounts are equivalent, yes.

2   Q.  Do you see the box on the right side of the page that it

3   says "gas used to put gasoline into our trucks?"

4   A.  Yes.

5   Q.  Is that the same figure that was put for fuel trucks and on

6   the amended return?

7   A.  Yes.

8   Q.  Do you see anything else, did you see in the bank accounts

9   about First Star operating a fleet of vehicles in 2012?

10  A.  No, I did not.

11  Q.  Did you review other records of First Star Auto Repair?

12  A.  I did.

13  Q.  What other records of First Star did you review?

14  A.  I reviewed their tax returns, any other information that

15  was provided by the government, to me.

16  Q.  Did you review spreadsheets that were created by the

17  company itself?

18  A.  I did.

19  Q.  Did you review sales reports that were handwritten?

20  A.  I did.

21  Q.  Why did you review all those records?

22  A.  I wanted to make sure that my analysis was as complete and

23  accurate as possible.

24  Q.  Did you find anything in those records supporting the

25  existence of First Star's ownership of a fleet of vehicles in

ICE5iss3                         Berzansky - direct

1    2012?

2    A.   There was no evidence of that.

3    Q.   Now, can you tell, looking at this sheet and, Ms. Geier,

4    maybe we could zoom in on the bottom half of the page, can you

5    tell -- sorry, above that, that box that is just above what you

6    were about to zoom in.  Yes, thank you so much, Ms. Geier.

7              Can you tell from that sheet how that figure, the gas

8    cash for gasoline in our trucks, was calculated?

9    A.   Yes, I can.

10   Q.   How was it calculated?

11   A.   First Star took the amount that they reported that they

12   calculated for themselves as gasoline sold year of

13   $1,748,893.33, and they subtracted the amount that they

14   deposited attributable to gasoline of $1,112,182.10.  The

15   difference is the $636,711, as reported.

16   Q.   As you discussed in your analysis, you also found a

17   difference between the money deposited from gas sales and the

18   gas cash sold.  Am I right?

19   A.   Yes.

20   Q.   Other than in this spreadsheet and others sent to

21   Mr. Tsamutalis, where in First Star records from 2012 is it

22   supported that the cash not deposited into the bank accounts is

23   for a fleet of vehicles?

24   A.   I saw no evidence.

25   Q.   If we can go to the next slide, this is back to the amended

ICE5iss3                          Berzansky – direct

1    return, right?

2    A.  Yes, it is.

3    Q.  What's the other substantial cost of goods sold item that

4    we are looking at here?

5    A.  The other substantial item is subcontractors in the amount

6    of $617,646.

7    Q.  Did you investigate that aspect of the cost of goods sold?

8    A.  I did.

9    Q.  Can you go to the next slide, Ms. Geier?  I apologize, we

10   can go back a couple of slides?  There we go.

11              Do you see that figure in the cost of goods sold box?

12   A.  Yes, I do.

13   Q.  And what is that figure?

14   A.  The figure is $617,646.

15   Q.  And that's the same one that was from the amended return,

16   right?

17   A.  Yes.

18   Q.  Taking a look at this, this top box here, can you see where

19   that subcontracting figure came from in the top box?

20   A.  Yes, I can.

21   Q.  Where did it come from?

22   A.  If you can just get the totals of those columns up?

23              If you look on the far right column, the sum of the

24   monies out (subcontractors) column on the far right is the same

25   $617,646.

ICE5iss3                         Berzansky - direct

1    Q.   Now, other than on the spreadsheet sent to Mr. Tsamutalis,

2    where in the books and records of First Star is it supported

3    that these transfers out were for subcontractors?

4    A.   Nowhere.

5    Q.   On this chart, are there additional details of these

6    supposed subcontracting costs?

7    A.   Yes, there were.

8    Q.   Ms. Geier, if we can advance two slides?

9         Is this the second page of that same schedule that was

10   sent to Mr. Tsamutalis?

11   A.   Yes, it is.

12   Q.   In looking at the next slide, what is this?

13   A.   This is that far right column from page 1 of the monies out

14   subcontractors put up next to the applicable notes or the

15   detail behind those amounts from page 2.

16   Q.   What did you understand this detail to mean?

17   A.   I understood it to mean that the amounts on the right were

18   the explanation for the totals of the amounts reported on the

19   left.

20   Q.   So, just walk us through one line, let's take the first one

21   that says $ 45,000; what do those notes mean?

22   A.   Of course the notes say 30K HP/15K Value.  I took that to

23   mean there were $30,000 transferred from First Star to High

24   Powered auto and $15,000 transferred from First Star to Value

25   Grocery.

ICE5iss3                         Berzansky - direct

1   Q.   To state the obvious, 30 plus 15 equals 45, right?

2   A.   Yes.

3   Q.   Were you able to verify these transfers?

4   A.   Yes, I was.

5   Q.   How did you do that?

6   A.   Initially I went into First Star's bank accounts that I had

7   previously reviewed to find the withdrawals coming out of First

8   Star's accounts.  Then I went into the bank accounts of each of

9   these four corporations to verify that these amounts were

10  actually deposited into those corporation's bank accounts in

11  the months indicated.

12  Q.   And when you did that, what did you find?

13  A.   I found that this chart was accurate.

14  Q.   What company supposedly worked as subcontractors for First

15  Star in 2012, if you know?

16  A.   Based upon this chart, there were four companies that

17  worked as subcontractors High Powered Auto, Value Grocery,

18  Optimum Grocery, and Hybrid specialist.

19  Q.   Did you review the tax returns of those companies for 2012?

20  A.   Yes, I did.

21  Q.   Why did you do that?

22  A.   Since these -- all these corporations are closely held

23  corporations.  That means that they all have the same owner,

24  Mr. Issa.  As such, the amounts that were reported as

25  deductions on one corporation attributable to income earned by

ICE5iss3                          Berzansky – direct

1    the other should be equal.

2    Q.  Did you create a summary chart summarizing your findings?

3    A.  I did.

4    Q.  If we can look at the next slide, Ms. Geier?

5          What is this chart?

6    A.  This is that summary chart that you spoke of.

7    Q.  I would like to just walk through one line of this just to

8    explain, so let's start with High Powered as an example.  What

9    does this say was the transfer from First Star for High Powered

10   Auto?

11   A.  $129,276.

12   Q.  And what does it say was the reported gross receipts on the

13   transferring entity for 2012/12?

14   A.   In this case the treasury entity being High Powered Auto.

15   They reported $3,333 on their 2012 form 1120.

16   Q.  Let's take a look at the next slide.  What is this?  Can we

17   zoom in on the top, Ms. Geier?

18   A.  This is the first page of the form 1120 for High Powered

19   Auto in the 2012 year.

20   Q.  And what does it show for gross receipts, if we can back

21   out and focus on the income section of the return?

22   A.  Gross receipts is reported as $3,333.

23   Q.  So, if we could advance one slide?  Is that the figure that

24   you included here in the second column?

25   A.  Yes, it is.

ICE5iss3                          Berzansky – direct

1  Q.  And, how much money did you determine actually went to High

2  Powered from First Star for supposed subcontracting costs in

3  2012?

4  A.  Their supposed subcontracting costs reported in the amount

5  of $129,276 from First Star to High Powered in that year.

6  Q.  So, how did High Powered Auto's gross receipts compare to

7  the amount that First Star supposedly paid for subcontracting

8  in 2012?

9  A.  They were less.

10  Q.  And what did you do with this information?

11  A.  Because of the fact that there is a closely held

12  corporation, Mr. Issa was the owner of all these corporations,

13  the amount of the deduction, if I allowed the deduction to

14  First Star I would have to ensure that the income is picked up

15  by the entity that the money is going to.  In this case, since

16  High Powered Auto only picked up $3,333 of income on their end,

17  the deduction that was allowable was only the amount of the

18  income that was reported by High Powered Auto.

19  Q.  So, what portion of this $129,000 could be subcontracting

20  costs in that year?

21  A.  Only the $3,333.

22  Q.  And you said "picked up" just a moment ago.  What did you

23  mean by "picked up"?

24  A.  Apologies.  "Picked up" means that was included in their

25  books and records and reported on their tax return.

ICE5iss3                          Berzansky - direct

1   Q.  So, did you perform that same analysis for all these other

2   corporations?

3   A.  Yes, I did.

4   Q.  And what did you find for Optimum?

5   A.  I found that Optimum's reported gross receipts exceeded the

6   supposed subcontracting costs that was included on this chart.

7   Q.  So, what did you do?

8   A.  I allowed the deduction for the subcontracting cost in

9   full, to First Star.

10  Q.  What about for Value?

11  A.  The same; I allowed the deduction, in full.

12  Q.  And what about for Hybrid?

13  A.  Hybrid is a little bit more complex.

14  Q.  Why is that?

15  A.  Hybrid had two separate tax returns that covered the

16  calendar year of 2012, so I couldn't be sure exactly which

17  gross receipts were earned in calendar year 2012 by Hybrid.  As

18  such, I just allowed all the gross receipts -- I added all the

19  gross receipts reported on both returns from my analysis.

20  Q.  So, that gross receipts figure that is on this summary

21  chart, that covers actually a broader period than just 2012,

22  right?

23  A.  It covers a 24-month period that includes calendar year

24  2012; yes.

25  Q.  So, what was the total gross receipts to Hybrid on those

ICE5iss3                        Berzansky - direct

1    two returns that you included in this chart?

2    A.   The total gross receipts reported by Hybrid were -- on the

3    two returns were $31,165.

4    Q.   And what was transferred to Hybrid from First Star in 2012,

5    according to First Star's records?

6    A.   Per First Star's records there were $357,000 transferred to

7    Hybrid in that year.

8    Q.   And you also checked that with the bank accounts, right?

9    A.   Yes, I did.

10   Q.   So what did you conclude?

11   A.   I concluded that the only allowable deduction to First Star

12   as a result of the alleged subcontracting costs from Hybrid

13   were $31,165.

14   Q.   What was your ultimate conclusion of First Star's allowable

15   costs of goods sold for subcontracting in 2012?

16   A.   I determined that there was an allowable deduction for

17   subcontracting in the amount of $165,868.

18            MR. WIRSHBA:   If I could have just one moment, your

19   Honor?

20            THE COURT:   I had hoped that we would get through

21   First Star, then take a short break so that we could have a

22   snack or whatever.

23            MR. WIRSHBA:   Of course.

24            THE COURT:   How much more do we have to go on First

25   Star?

ICE5iss3                        Berzansky – direct

1              MR. WIRSHBA:  I would say approximately 20 minutes.

2              THE COURT:  In that case, we are going to take a break

3       right now.  Okay?

4              Folks, I would like you to be back here at 1:00 ready

5       to go.  Don't discuss the case.  Keep an open mind.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ICE5iss3

1              (Jury not present)

2              THE COURT:  I assume that the portion of the

3     examination of this witness dealing with Mr. Issa's personal

4     tax returns is considerably shorter?

5              MR. WIRSHBA:  It is, your Honor.

6              THE COURT:  Good.  I will see you at 1:00.

7              (Luncheon recess)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           A F T E R N O O N   S E S S I O N

2                       1:05 p.m.

3           (Jury present; witness resumes the stand)

4           THE COURT:  Have a seat, sir.  You are still under

5     oath.

6           THE WITNESS:  Yes, your Honor.

7      RICHARD BERZANSKY, resumed.

8           THE COURT:  Let's keep going.

9           MR. WIRSHBA:  Yes, your Honor.

10    DIRECT EXAMINATION (Cont'd)

11    BY MR. WIRSHBA:

12    Q.  Mr. Berzansky, before we broke we were looking at this

13    chart.  Am I right?

14    A.  Yes.

15    Q.  Can you just remind us, after the Corporations that are

16    listed in the first column, what does that second column

17    represent?

18    A.  That column represents the amounts that were transferred

19    from First Star Auto Repair, Inc., in 2012, to those

20    corporations listed on the left-hand side.

21    Q.  And you traced those from the bank accounts of First Star

22    Auto Repair into the bank accounts of these corporations?

23    A.  That's correct.

24    Q.  And this second column, what does that column represent?

25    A.  That column represents the total amount of reported gross

1    receipts on the entities listed on the left on their form 1120

2    for 2012.

3    Q.  This is from their tax returns; is that right, those

4    companies' tax returns?

5    A.  That's correct.

6    Q.  What about this third column, what is that?

7    A.  This column represents the amount that the cost of goods

8    sold deduction for subcontracting fees exceeded the gross

9    receipts.  If they did and it is a negative it means they

10   didn't exceed it.  If it is a positive that meant that the

11   transfer exceeded their gross receipts.

12   Q.  In the last column it says allowable COGS deduction.  What

13   is the significance of that column?

14   A.  Per my analysis, that's the amount that I included as a

15   deduction for cost of goods sold attributable to subcontracting

16   for First Star in 2012.

17   Q.  I think right before we broke we were talking about this

18   number, this Hybrid Specialist number in the second column,

19   this $31,000.  Do you remember that?

20   A.  Yes.

21   Q.  You said that that was the total for the two tax returns

22   for 2012 for Hybrid, right?

23   A.  Not the two tax returns for 2012.  The two tax returns that

24   incorporated the calendar year 2012 for Hybrid.

25   Q.  And why did you include those two tax returns?

ICE5Iss3                        Berzansky - Direct

1   A.  Because I couldn't be sure exactly when the money was

2   earned by Hybrid.  I had to include the entire portion, the

3   full 24-month period that was covered by those two tax returns

4   to ensure that the full calendar year was covered in my

5   analysis.

6   Q.  And would that benefit First Star Auto Repair including

7   both of those in your analysis?

8   A.  It allowed them an additional deduction.

9   Q.  When you say it allowed them, what do you mean?

10  A.  Meaning per my analysis, it made the costs of goods sold

11  deduction higher.

12  Q.  And if the deduction is higher, what does that mean for

13  their tax burden that year?

14  A.  It would reduce their taxable income.

15  Q.  What was your ultimate conclusion for the allowable costs

16  of goods sold for subcontracting in 2012 for First Star Auto

17  Repair?

18  A.  My total conclusion was that $165,868 would be cost of

19  goods sold deduction attributable to subcontracting for First

20  Star in that year.

21  Q.  Did you summarize your findings as to cost of goods sold

22  anywhere?

23  A.  Yes, I did.

24  Q.  Ms. Geier, if you can take a look at the next slide and the

25  next slide?  And the next slide.  Ms. Geier, I believe I gave

1   you the wrong starting slide, my apologies.

2        What is this?

3   A.  This is that summary of my calculation of cost of goods

4   sold for First Star in 2012.

5   Q.  These figures, why are they in parentheses?

6   A.  Cost of goods sold represents a reduction to taxable

7   income, it is offset against reported gross receipt so, in

8   accounting speak, the brackets mean negative.

9   Q.  And this first line item for reported cost of goods sold on

10  filed form 2012 for 201212, what is that figure?

11  A.  That amount is $44,091.

12  Q.  Where did you get that number?

13  A.  From the original filed form 1120 for First Star for 2012.

14  Q.  Was a similar figure on the amended form 1120?

15  A.  Similar figure, yes.

16  Q.  Was the one on the amended higher or lower?

17  A.  It was lower.

18  Q.  Why did you choose this higher number here?

19  A.  Because I did not validate that portion of the costs of

20  goods sold, I allowed First Star the higher deduction.

21  Q.  And a higher deduction, what does that mean for First

22  Star's tax obligations for this year?

23  A.  It would result in a lower taxable income.

24  Q.  So it is to the taxpayer benefit; is that right?

25  A.  It is to First Star's benefit.

ICE5Iss3                          Berzansky – Direct

1   Q.   What is the next component of the cost of goods sold here?

2   A.   The next component is the calculated cost of goods sold

3   related to cash gas sales on consignment for 2012.

4   Q.   And how did you calculate that figure?

5   A.   That amount was calculated based upon the ACH debits or

6   withdrawals from the gas companies through First Star's bank

7   accounts in 2012.

8   Q.   And is that the same amount that was included on your gross

9   receipts analysis for total cash gas sales?

10  A.   Yes, it was.

11  Q.   What's the third component here?

12  A.   The third component is the amount that we had just spoken

13  about, the amount of the allowable subcontracting expense under

14  cost of goods sold for First Star in 2012.

15  Q.   What's the total in bold and double underlining of these

16  three figures?

17  A.   Total allowable cost of goods sold deduction per my

18  analysis $1,961,750.54.

19  Q.   Let's take a look at the next slide, Ms. Geier.

20        So, what is this slide that we have up right now?

21  A.   This slide represents the total of my -- a total summary of

22  each of the different filings and analyses that were performed

23  on First Star's form 1120 in 2012.

24  Q.   We have already looked at a few of the columns.  The one on

25  left, these numbers, those are the same numbers that track the

ICE5Iss3                        Berzansky – Direct

1    tax return; is that right?

2    A.   They follow the form 1120, correct.

3    Q.   In this first column you just pulled those numbers from the

4    original 1120, right?

5    A.   That's correct.

6    Q.   The second one is from the amended 1120; is that right?

7    A.   That's correct.

8    Q.   Let's start with this third column.  What is that third

9    column?

10   A.   The third column is the results of the analysis that I

11   performed.

12   Q.   And the gross receipts figure at the top, line 1A, is that

13   the same figure that you calculated earlier that is reflected

14   on that other spreadsheet?

15   A.   Yes, it is.

16   Q.   What is that figure?

17   A.   $3,393,062.

18   Q.   What about the costs of goods sold here for your analysis?

19   What's that figure?

20   A.   $1,961,751.

21   Q.   Is that the same figure that we just showed that you

22   calculated earlier on the last slide?

23   A.   Yes, it is.

24   Q.   What about total deductions here, where did you get that

25   figure, the $400,681 figure?

ICE5Iss3                           Berzansky - Direct

1    A.   That amount is the amount that was reported on the amended

2    1120 that was filed with the IRS in response to the notice sent

3    by the IRS.

4    Q.   And did you examine the total deductions for First Star in

5    2012?

6    A.   No, I did not.

7    Q.   Why not?

8    A.   I only focused my analysis on the things that were changed

9    as a result from the filing of the original 1120 and the

10   amended 1120.  Or the 1120X.

11   Q.   And, did you also keep the net operating loss deduction?

12   A.   Yes, I did.

13   Q.   Why did you do that?

14   A.   Because it was not changed from the 1120 to the 1120X.

15   Q.   Did you verify that it was accurate?

16   A.   No, I did not.

17   Q.   Would it be to the benefit of a taxpayer to have a

18   deduction of that kind?

19   A.   Any deduction would be to the benefit of the taxpayer.

20   Q.   So, what did you determine was the total taxable income for

21   First Star in 2012?

22   A.   Total taxable income was calculated as $953,211.

23   Q.   What did you find was the total tax that should have been

24   reported?

25   A.   $324,091.

ICE5Iss3                          Berzansky – Direct

1   Q.   And the total tax due and owing?

2   A.   The total tax due and owing as a result of my analysis was

3   $320,116.

4   Q.   I see you have another column here, the fourth column.  Can

5   you explain what is going on in that column?

6   A.   Yes.

7        First Star reported their tax return net of gas sales.

8   The only amount attributable to gas sales that was reported on

9   First Star's returns were the amounts that they received as

10  commission.  I wanted to show my analysis in the same

11  convention that First Star used for their files.

12  Q.   So, when you reported your analysis net of gas sales, did

13  it have any effect on the taxable income that should have been

14  reported by First Star?

15  A.   No, it did not.

16  Q.   What about on total tax; was there any effect?

17  A.   No, none.

18  Q.   What about on the tax due and owing for that year?

19  A.   It is the same amount as my analysis that I just discussed.

20  Q.   Now, for the tax due and owing I see it is slightly lower

21  than the total tax.  Why is that?

22  A.   Well, First Star already reported tax of $3,975 on their

23  original return that was processed.  Therefore, the total tax

24  was the $324,091.  The difference between the two would be the

25  amount that is due and owing.

ICE5Iss3                          Berzansky - Direct

1    Q.  And finally, let's look at that last column.  What is that

2    last column?

3    A.  The last column represents my analysis with the assumption

4    that the cash that I determined to be missing in my gross

5    receipts calculation was for cash payroll.

6    Q.  And why did you include this column?

7    A.  Based upon the testimony that I have been privy to in the

8    courtroom, I determined that that was a reasonable assumption

9    so I wanted to allow First Star the deduction for that cash

10   payroll.

11   Q.  Do you know whether this missing cash was cash payroll?

12   A.  No, I do not.

13   Q.  Did you see anything in the books and records of First Star

14   that confirmed that it was cash payroll?

15   A.  No, I did not.

16   Q.  So why are you permitting a deduction for cash payroll for

17   that amount?

18   A.  They earned that money and it had to have been earned

19   somehow.  So, the argument was reasonable, I couldn't attribute

20   it to anything, so I allowed a deduction.

21   Q.  Was there anything else you saw in the books and records of

22   First Star other than the $400,000 that you attributed to cash

23   payroll that could have been cash payroll?

24   A.  Potentially.  Yes.

25   Q.  So, what was your ultimate conclusion as to the tax due and

1    owing?

2    A.  My final conclusion regarding total tax due and owing for

3    First Star Auto Repair, Inc., in 2012, was $171,222.

4    Q.  If we could move on to the next slide?

5           So, in addition to examining First Star's 2012 tax

6    return, did you conduct any analysis, tax computations with

7    respect to Mr. Issa's personal income tax returns?

8    A.  Yes, I did.

9    Q.  What tax computations had you performed?

10   A.  I performed tax computations upon Mr. Issa's 2012, 2013,

11   and 2014 form 1040s, personal income tax returns.

12   Q.  Looking at this first slide, what is it?

13   A.  This is a summary schedule of all of the items that I

14   reviewed in order to conduct my analysis.

15   Q.  Is this similar to the first summary schedule you looked at

16   with records on it?

17   A.  Yes.

18   Q.  What is the difference?

19   A.  The difference is that this is the documents reviewed

20   specifically for the tax computation for Mr. Issa's 1040.  The

21   other schedule was in relation strictly to the First Star

22   analysis for 2012.

23   Q.  And, in general, what are the sources that you examined as

24   part of your computation of Mr. Issa's personal income taxes?

25   A.  I reviewed items such as tax returns filed for Mr. Issa in

1    the three years noted, tax returns for his corporations Hybrid,

2    Optimum, and Value -- excuse me, First Star; bank statements,

3    and other records that were introduced into evidence.

4    Q.  How did you begin your analysis of Mr. Issa's personal

5    income tax returns for 2012, 2013, and 2014?

6    A.  At the same starting point I did for the 1120 analysis.  I

7    looked at the tax returns.

8    Q.  And which tax returns are those?

9    A.  Mr. Issa's form 1040 for the 2012 year, Mr. Issa's form

10   1040 for the 2013 year, his 1040X for the 2013 year, 1040 for

11   2014, and 1040X for 2014.

12   Q.  What did you do after reviewing those tax returns?

13   A.  Can you be more specific, please?

14   Q.  Did you eventually look at the bank records for these

15   companies and look at other records?

16   A.  Yes, I did.

17   Q.  Let's take a look at the next slide.  What is this?  Can

18   you tell if we can focus on the top of the left page,

19   Ms. Geier?

20   A.  This is the first page of the form 1040 for Ibrahim Issa

21   for 2012.

22   Q.  And, Ms. Geier, if we can focus in on the bottom of the

23   right-hand page, can you see who signed this?

24   A.  Yes, I can.

25   Q.  Is there a declaration here?

ICE5Iss3                    Berzansky – Direct

1    A.  Yes, there is.

2    Q.  Can you read it?

3    A.  Under penalties of perjury, I declare that I have examined

4    this return and accompanying schedules and statements, and to

5    the best of my knowledge and belief they are true, correct, and

6    complete.  Declaration of preparer other than tax payer is

7    based on all information of which preparer has any knowledge.

8    Q.  Is this on every form 1040?

9    A.  Yes, it is.

10   Q.  Let's look at the next slide and next one.

11            Look, what is this document?

12   A.  This document is the summary that I prepared of personal

13   expenses or diverted corporate funds from First Star Hybrid and

14   Optimum on behalf of Mr. Issa or to Mr. Issa, in 2012, 2013,

15   2014.

16   Q.  What do you mean by diverted corporate funds?

17   A.  I mean monies that were taken from the corporation that

18   were used to pay personal expenses of Mr. Issa or for the

19   benefit of Mr. Issa.

20   Q.  When the owner of a corporation diverts funds from his own

21   company, where would the owner need to account for that

22   diversion in his personal income tax returns?

23   A.  That depends.  There is a set of rules that govern the

24   nature of the taxability of those diverted funds.

25   Q.  Did these corporate diversions benefit only Mr. Issa?

ICE5Iss3                         Berzansky - Direct

1    A.   No.

2    Q.   So, why would payment to people other than Mr. Issa need to

3    be accounted for potentially as income on Mr. Issa's 1040?

4    A.   That goes to a concept called constructive receipt.

5    Q.   What is constructive receipt?

6    A.   Essentially, constructive receipt states that rather than

7    giving the money to Mr. Issa and then Mr. Issa giving the money

8    to someone else, the money was just transmitted directly to the

9    beneficial third-party at the direction of the owner of the

10   corporation.

11   Q.   In looking across the top here, just to understand how this

12   is organized, what is going on on the top?  What is this thing

13   across the top, the top half?

14   A.   The top header is the years 2012, 2013, and 2014.

15   Q.   And what is just under that?

16   A.   Just under that are the names of three of the Mr. Issa's

17   corporations; First Star Auto Repair, Hybrid Auto and Optimum

18   Grocery.

19   Q.   And what is down the side?

20   A.   The left side?

21   Q.   On the left side; yes, sir.

22   A.   Those are the types of diversions that I observed.

23   Q.   Let's go through those, let's start with AmEx payments.  I

24   assume that AmEx is American Express; is that right?

25   A.   That's correct.

ICE5Iss3                          Berzansky – Direct

1    Q.   Why does it say D. Silva here?

2    A.   That is the notation in the bank statements.

3    Q.   Why is that a personal expense, a diversion for Mr. Issa?

4    A.   It goes back to that concept of constructive receipt.  It

5    would have been the same whether these corporations paid

6    Ms. Silva's American Express card would have been the same if

7    Mr. Issa would have taken the money out of First Star, for

8    example, given it to Ms. Silva, and then Ms. Silva paid those

9    pills.

10   Q.   What about Con Ed, why is that a personal expense?

11   A.   The Con Ed expense is related to Mr. Issa's home, not the

12   business.

13   Q.   Taking a look at the next slide, were you able to determine

14   from examining records what Con Ed account these particular

15   funds related to?

16   A.   Yes, I was.

17   Q.   How were you able to do that?

18   A.   I was able to tie in the account number to this document

19   received from Con Ed.

20   Q.   Let's take a look at the next line.  The next item there is

21   apartment.  Do you see that?

22   A.   Yes, I do.

23   Q.   Why do you include apartment in the schedule?

24   A.   These are the amounts paid for the rent of Mr. Issa's

25   apartment 525 East 72nd Street, Apartment 20A, from these

ICE5Iss3                        Berzansky – Direct

1    corporations.

2    Q.  Did you verify from the bank accounts that Mr. Issa paid

3    for his apartment out of these companies in the years listed?

4    A.  Yes, I did.

5    Q.  Let's take a look at the next slide.  How did you know that

6    Mr. Issa was living in this apartment?

7    A.  I reviewed lease renewal forms that state that Mr. Issa was

8    the lessee and the address of the apartment.

9    Q.  Are these them?

10   A.  Yes, they are.

11   Q.  I think we heard testimony earlier about when a home could

12   be a personal expense.  What are the rules that govern that?

13   A.  There are rules that govern the business use of home as a

14   deductible expense.  Essentially, in general, it states that

15   the space must be regular and exclusive, meaning you use it on

16   a consistent basis and it must be only for business purposes.

17   So, it can't be for anything else.  So, if you have space in

18   your living room you can't have your couch there too to watch

19   TV.  It has to be only for business purposes, and it must be

20   for the benefit of the corporation, not for the convenience of

21   the employee.

22   Q.  Are there any other rules that are applicable to whether or

23   not there could be a personal expense taken for a personal

24   home?

25   A.  Off the top of my head I can't think of any at the moment.

ICE5Iss3                              Berzansky - Direct

1    Q.  What, if anything, is there about other types of available

2    office spaces?

3    A.  If there is available office space, then the business use

4    and home deduction would generally be disallowed because you

5    could do the administrative work of a business at your assigned

6    office space unless the corporation directs you that you

7    cannot.

8    Q.  And did these companies First Star, Optimum, and Hybrid --

9    if we could take a look at next slide, Ms. Geier -- did they

10   have other office spaces available to you, if you know?

11   A.  To Mr. Issa?

12   Q.  Yes.

13   A.  Yes.

14   Q.  How do you know that?

15   A.  Based upon the evidence and the testimony.

16   Q.  What about these four entries here that say GH.  Do you see

17   that?

18   A.  I do.

19   Q.  What are those?

20   A.  Those are expenses related to the Gun Hill Road lawsuit.

21   Q.  If we can take a look at the next slide, did you see the

22   money coming out of the corporate bank accounts for these

23   items?

24   A.  Yes, I did.

25   Q.  Are these some of the checks?

ICE5Iss3                         Berzansky - Direct

1    A.  Yes.  This is a sampling of the checks I observed.

2    Q.  Can we take a look at the next slide?  How do you know that

3    these expenses related to the Gun Hill Road service station

4    lawsuit?

5    A.  This is the accounting of all the expenses that related to

6    the Gun Hill Road lawsuit.  I was able to trace these checks to

7    disbursements from First Star.

8    Q.  Why did you include these in the personal expenses?

9    A.  Because they're not for the benefit of the business.  The

10   loss on the Gun Hill Road lawsuit was taken on Mr. Issa's

11   personal return, therefore these expenses are personal

12   expenses.

13   Q.  Let's take a look at the next slide.  The next item here is

14   Quik Park.  Do you see that?

15   A.  I do.

16   Q.  Why did you determine that that was a corporate diversion?

17   A.  Quik Park relates to a parking spot in or around Mr. Issa's

18   apartment on E 72nd Street in Manhattan.

19   Q.  Let's take a look at the next slide.  Were you able to

20   verify that this was the parking lot near Mr. Issa's apartment

21   in Manhattan?

22   A.  Based upon evidence, yes.

23   Q.  Is this the evidence that you examined in part?

24   A.  Yes, it was.

25   Q.  When was it appropriate for an owner of a corporation to

ICE5Iss3                          Berzansky - Direct

1    take an expense for parking a vehicle at his home?

2    A.  I find it hard to think of a situation where that would be

3    appropriate.

4    Q.  Why is that?

5    A.  Because it is for the benefit of, in this case Mr. Issa,

6    not for the benefit of the corporation.  It doesn't benefit

7    First Star to have Mr. Issa have a parking spot at his home.

8    Q.  Let's take a look at the next slide.  Next I see personal

9    income tax.  Why is personal income tax listed on this

10   schedule?

11   A.  Personal income tax is listed because that is paid on --

12   for Mr. Issa, these are not related to the income tax

13   liabilities for these three corporations.

14   Q.  How did you know that these were Mr. Issa's personal income

15   tax return payments?

16   A.  Specifically, the ACH debits in the bank statements state

17   that and I was also able to trace that directly to internal IRS

18   records showing the payments received.

19   Q.  The next charge says Dentist William Wolfson.  Why did you

20   consider this to be a personal expense?

21   A.  Because, as best I could determine, an auto repair shop, it

22   would be not be an ordinary or necessary expense of an auto

23   repair shop or gas station to have dental work performed.

24   Q.  You used the words "ordinary and necessary."  Why are you

25   using that term?

ICE5Iss3                        Berzansky – Direct

1    A.  I use that term because it relates back to the specific

2    language included in the Internal Revenue Code.

3    Q.  So, to take expense for dental work, for example, it would

4    have to be an ordinary and necessary expense of the

5    corporation; is that right?

6    A.  For any deduction it would have to be ordinary and

7    necessary; that's correct.

8    Q.  Let's take a look at the next slide.

9            Were you able to verify that these dental funds came

10   out of First Star?

11   A.  Yes, I was.

12   Q.  Is that what is shown here?

13   A.  Yes.  On April 5, the second item listed there.  And the

14   last one.

15   Q.  If we can take a look at the next slide?  Next I see you

16   have listed Ray Chung.  Were these funds paid directly to

17   Mr. Issa?

18   A.  No, they were not.

19   Q.  So, why did you include them?

20   A.  Again, this goes back to that concept of constructive

21   receipt.

22   Q.  So, in what manner were these funds paid, do you know?

23   A.  Via check.

24   Q.  Let's take a look at the next slide.  Is this one of the

25   checks that you observed?

ICE5Iss3                        Berzansky – Direct

1    A.  Yes, it was.

2    Q.  And why do you consider this payment from Ray Chung to be a

3    personal expense?

4    A.  If you look at the memo of the check it states 50 percent

5    payment for exhaust system and hood installation for commercial

6    kitchen.  Based on the evidence I reviewed there was no

7    commercial kitchen in First Star's shop.

8    Q.  Let's go to the next slide.  What is the next line item

9    after Ray Chung?

10   A.  Marina.

11   Q.  Why is that not a personal expense?

12   A.  Because the boat that was stored at the marina was owned by

13   Mr. Issa, not by the corporations.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Could we go to the next slide.

2           What does this say that this check is for?

3   A.  The memo states boat.

4   Q.  Why did you not consider this to be an entertainment

5   expense for the corporation?

6   A.  The Internal Revenue Code imposes strict requirements that

7   are necessary in order to deduct items as meals or

8   entertainment expense.  These include things such as nature of

9   the meeting, the participants at that meeting, what was

10  discussed, allocation between personal time versus business

11  time.  I was not able to see any of that documentation in the

12  things that I reviewed.

13  Q.  And that documentation would be required in order to take

14  it as an expense?

15  A.  Yes.

16  Q.  And would the business receive that entire amount as an

17  expense or only a portion?

18  A.  No, it would only be 50 percent at most.

19  Q.  All right.

20          The next, if we can go to the next slide, Ms. Geier.

21  Thank you.

22          The next two items are cash sheets.  Can you explain,

23  what are the cash sheets?

24  A.  "Cash sheets" is the colloquial term, the term that I used

25  when I started the review of the evidence, for those daily

ICEHIss4                          Berzansky – Direct

1    reports of the cash from First Star and Optimum.

2    Q.  If we could take a look at the next line.

3         Are these the cash sheets from First Star Auto Repair?

4    A.  Yes, they are.

5    Q.  And the next slide.

6         Are these some of the cash sheets from Optimum Grocery

7    Store?

8    A.  Yes.

9    Q.  Did you review all of the cash sheets from First Star and

10   Optimum from all of 2012 through 2014?

11   A.  No, I did not.

12   Q.  Why not?

13   A.  We only had information available from August of 2012

14   moving forward.

15   Q.  So because you only had part of 2012, did you estimate

16   going back the remainder of the year?

17   A.  No.

18   Q.  Why not?

19   A.  My analysis was based strictly upon my observations

20   regarding the evidence that was presented to me.

21   Q.  Had you included what you had estimated, would that make

22   the tax liability for Mr. Issa greater or lower?

23   A.  Had I estimated, his tax liability would have been higher

24   based upon my analysis.

25   Q.  All right.  Let's take a look at the next slide.

1    I see that there's two categories of cash sheets here

2    as I mentioned.  What are those?

3    A.  It says in the items I reviewed, in those things that I

4    called cash sheets, those daily sales reports, it stated Tony

5    as an item or Tony's friends or family.  So this is the sum

6    total of amounts that were paid directly to Mr. Issa under Tony

7    or stated that they were paid directly to Mr. Issa under Tony,

8    and then the entry for Tony family and friends were entries for

9    that amount, for those items.

10   Q.  Why did you consider these to be personal expenses?

11   A.  Because these amounts were for the benefit of Mr. Issa.

12   Q.  Next it says "Checks directly to Issa."  What are those?

13   A.  That was one check that I observed while reviewing the bank

14   account of Hybrid in 2013.  Initially, I included it in my

15   analysis because it was a disbursement directly to Mr. Issa

16   that I did not see reflected on his Form 1040 in 2013.  Upon

17   further review of the tax returns for Hybrid, I determined that

18   this was actually not a disbursement, that this was recorded in

19   the books of Hybrid, so it's not included in my analysis.

20   Q.  What was your ultimate treatment of this check?

21   A.  It's not included in the -- in my sum total on the bottom

22   there.  So I just included it to show that -- I included it

23   initially, so I didn't want to delete it; I wanted to address

24   it.

25   Q.  The next line item there is the Hamptons.  Do you see that?

ICEHIss4                          Berzansky – Direct

1    A.   Yes.

2    Q.   What's the Hamptons?

3    A.   Hamptons relates to a home that was leased by Mr. Issa and

4    Ms. Silva in 2013.

5    Q.   How much did you find was diverted from Hybrid in 2013 for

6    the Hamptons house?

7    A.   I found $26,400 to be diverted from Hybrid to pay for this

8    Hamptons house.

9    Q.   If we could look at the next slide.

10         How do you know this is a personal expense for

11   Mr. Issa?

12   A.   Because the lessees -- the tenants listed here related to

13   that are Anthony Issa, or Ibrahim Issa, and Daniela Silva.

14   Q.   And for the $20,000, what was the duration of this lease?

15   A.   The lease was from July 1 of 2013 through September 3,

16   2013.

17   Q.   All right.  Let's go to the next page.

18         What's this last one here, Mercedes payments?

19   A.   These were payments that were made from these corporations

20   to a third party named Michael Randazzo.

21   Q.   Why was this a personal expense?

22   A.   These relate to the payments for Mr. Issa's personal

23   Mercedes vehicle.

24   Q.   Let's go to the next slide.

25         Who did First Star pay for this Mercedes vehicle?

ICEHIss4                          Berzansky - Direct

1   A.  Michael Randazzo.

2   Q.  How do you know that these payments are for the Mercedes?

3   A.  If you look at the memo section, it specifically states

4   that.

5   Q.  Were there other payments made to Mr. Randazzo in the books

6   of First Star?

7   A.  Yes, there were.

8   Q.  Did you include all those payments as personal expenses?

9   A.  No.

10  Q.  Why did you not include those other payments?

11  A.  I was not sure what the nature of those payments were.  I

12  only included the payments that specifically stated

13  Mercedes-Benz lease as a personal expense.

14  Q.  Had you included those other checks to Michael Randazzo

15  that didn't have Mercedes-Benz in the memo line, would that

16  have been a benefit to Mr. Issa for his personal tax returns or

17  a detriment?

18  A.  If treated as an amount of diverted corporate funds, that

19  would have increased Mr. Issa's taxable income and resulted in

20  additional tax.

21  Q.  But you did not do that?

22  A.  I did not do that.

23  Q.  Let's look at the next slide.

24          Looking at this summary chart, what did you determine

25  was the total personal expenses paid for the benefit of

ICEHIss4                        Berzansky - Direct

1    Mr. Issa in 2012?

2    A.   $138,016.51.

3    Q.   And that's for all three companies, right?

4    A.   Yes.

5    Q.   What was the total for all three companies in 2013?

6    A.   $324,767.11.

7    Q.   And for 2014?

8    A.   $124,622.11.

9    Q.   Did Mr. Issa fully account for these personal expenses on

10   his personal income tax returns?

11   A.   No, he did not.

12   Q.   How did you determine the taxability of these corporate

13   diversions?

14   A.   I touched on it earlier.   It goes towards the ordering

15   rules that I spoke about.

16   Q.   Are these ordering rules on a per corporation basis?

17   A.   Yes, they are per corporation, per year.

18   Q.   So for every individual year and for every corporation, how

19   do you determine the taxability of a disbursement from a

20   company?

21   A.   First you have to look to the current earnings and profits

22   of that corporation.

23   Q.   What are earnings and profits of a corporation?

24   A.   Earnings and profits of a corporation are the corporation's

25   ability to pay a dividend to its shareholders.

ICEHIss4                          Berzansky - Direct

1    Q.   What's a dividend?

2    A.   A dividend is an approved corporate distribution from a

3    corporation to their owners or shareholders.

4    Q.   When you say "approved," approved by whom?

5    A.   The board of directors of the corporation.

6    Q.   Once you've determined current earnings and profits, what's

7    the next step?

8    A.   Once if -- once current earnings and profits are exhausted

9    or if there are none in the current year, you look towards

10   accumulated earnings and profits.

11   Q.   What are accumulated earnings and profits?

12   A.   Those represent the sum totals of all the earnings and

13   profits over the life of the corporation.

14   Q.   What happens once you determine whether there were

15   accumulated earnings and profits?

16   A.   Once accumulated earnings and profits are exhausted, the

17   distributions are treated as a return of capital or investment

18   and -- I'm sorry.

19   Q.   No, no.  What's a return of capital?

20   A.   Return of capital means that that's the amount of money

21   that was invested into the corporation by the shareholder.

22   Q.   What happens after that --

23         THE COURT:  Wait a minute.  Return of capital means

24   it's the amount that was invested?  I thought return of capital

25   meant you're taking out money that was invested.  Return.

ICEHIss4                          Berzansky - Direct

1    What's capital?

2              THE WITNESS:  Capital, in the context of this, capital

3    is the investment that the shareholder makes in the

4    corporation.

5    Q.  So the return of capital is what, Agent Berzansky?

6    A.  The return of capital would be the amounts that the

7    corporation is giving back to the shareholder.

8              THE COURT:  Out of the amount that was invested by the

9    shareholder?

10             THE WITNESS:  Yes, your Honor.

11   Q.  And what happens after that, Agent Berzansky?

12   A.  Once the full amount of the investment has been returned to

13   the shareholder, then the remainder is taxed as a capital gain.

14   Q.  What does it mean that it's taxed as a capital gain?

15   A.  Simply means that it's taxed at the same rate that the

16   dividends would be, but since there are no earnings or profits

17   remaining, the remainder is just taxed -- we call it a capital

18   gain because we can't call it a dividend because there's no

19   earnings or profits.

20   Q.  Is this taxed at the same rate as like W-2 earnings that

21   most people get?

22   A.  No, it's not.

23   Q.  Is it a better rate or a worse rate for the taxpayer?

24   A.  Generally speaking, it's a better rate because it's a flat

25   15 percent.  When you have ordinary income or wages, that's

1  when we speak about things like the tax brackets where the more

2  you make, the higher income you pay.  With capital,

3  specifically long-term capital gains rates, it's always

4  15 percent, no matter whether it's a dollar or a million

5  dollars.

6  Q.  Did you conduct this analysis for First Star Auto Repair,

7  Hybrid, and Optimum in 2012, '13, and '14 using these ordering

8  rules that you just described?

9  A.  Yes, I did.

10 Q.  Did you summarize that analysis in a few charts that we can

11 review?

12 A.  Yes, I did.

13 Q.  Let's look at the next slide.

14         So what is this?

15 A.  This is the summary chart related to my analysis of the

16 diverted corporate funds for First Star Auto Repair Inc. for

17 2012, 2013, and 2014.

18 Q.  When you conducted this analysis, what did you conclude?

19 A.  Based upon my analysis, I determined that there was

20 sufficient current earnings and profits or accumulated earnings

21 and profits in First Star Auto Repair Inc. in order to treat

22 all of the diversions as dividends on Mr. Issa's personal 1040

23 for those years.

24 Q.  What does that mean for Mr. Issa?

25 A.  It means that these diversions in each year were taxed as

ICEHIss4                        Berzansky - Direct

1   dividends.  They're included as ordinary dividends now on --

2   excuse me, qualified dividends on his personal tax form.

3          THE COURT:  You mean they're taxable income.  They're

4   not nontaxable distributions, is that what you're saying?

5          THE WITNESS:  Yes, your Honor.

6          THE COURT:  Thank you.

7   Q.  How did you come to this determination?

8   A.  Based on the ordering rules described.

9   Q.  All right.  Can we look at the next slide.

10          What's this for?

11  A.  This is my analysis of earnings and profits for Hybrid

12  Specialist Inc. for the corporate diversions for the years

13  2012, 2013, and 2014.

14  Q.  Did you undergo that exact same analysis based on the

15  ordering rules?

16  A.  Yes, I did.

17  Q.  What did you conclude?

18  A.  I determined that in 2012 there was no diversions to be

19  attributed to Mr. Issa's 1040 in that year.  For 2013, a

20  portion of the diversion was treated as a return of capital;

21  the remaining portion was treated as a capital gain or taxable

22  income on Mr. Issa's return.  And in 2014, since they had

23  current earnings and profits, a portion of the diversion was

24  treated as a dividend, and the remainder was treated as capital

25  income, gain income.

1   Q.  So here you didn't assess that there was any taxable income

2   for Mr. Issa in 2012 for Hybrid Specialist, right?

3   A.  Correct.

4   Q.  Did you find that there were diversions from Hybrid in

5   2012, for Hybrid Specialists?

6   A.  Can I see that summary chart again, please?

7   Q.  Of course.

8          Ms. Geier, can we go back a couple of slides.  That

9   was good.

10         Did you find that there were diversions in 2012 from

11  Hybrid?

12  A.  Yes.  However, because Hybrid is -- excuse me for one

13  second.

14  Q.  There are things you found that were personal expenses in

15  2012, right?

16  A.  Yes.  Because Hybrid is on a fiscal year, as we discussed,

17  the diversions are treated as being on the last day of the

18  taxable year.  Since Hybrid's last day of the taxable year

19  where these diversions were made was in February of 2013, the

20  distributions were considered to be done in 2013.

21  Q.  Let's go back to that summary chart for Hybrid Specialist.

22         What was your ultimate conclusion for Hybrid

23  Specialists?

24  A.  I determined that there was nothing -- no additional income

25  reportable for Mr. Issa in 2012.  In 2013, a portion was return

1    of capital; the remainder was taxable as capital gain.  In

2    2014, since there were current earnings and profits, a portion

3    of the amount of the distribution -- of the diversion was

4    treated as a dividend.  The remainder was treated as capital

5    gain.

6              MR. WIRSHBA:  If I may have a moment, your Honor?

7              THE COURT:  OK.

8    Q.  All right.  Let's look at the next slide.

9              What is this slide?

10   A.  This is my summary of earnings and profits for Optimum

11   Grocery for the years 2012, 2013, and 2014 related to the

12   diversion of corporate funds.

13   Q.  Looking at the beginning, accumulated earnings and profits

14   for each of those years, do you see that?

15   A.  Yes, I do.

16   Q.  Where did you find this information that you used?

17   A.  I determined the accumulated earnings and profits based

18   upon the balance sheets that were included as attachments to

19   the corporate tax returns for the entities in each year.

20   Q.  And then you used the ordering rules?

21   A.  At that point I used the ordering rules, yes.

22   Q.  What's shown on this slide?

23   A.  This slide shows that in 2012, the entire amount of the

24   corporate diversions from Optimum Grocery were treated as

25   return of capital, or not taxable to Mr. Issa.  In 2013, a

ICEHIss4                          Berzansky – Direct

1    portion of the amount was a return of capital; the remainder

2    was treated as capital gain, or taxable income to Mr. Issa.

3    And in 2014, the entire amount is attributable to a capital

4    gain, or taxable income to Mr. Issa.

5    Q.  Did you use those same ordering rules that you just

6    reviewed to come up with these calculations?

7    A.  Yes, I did.

8    Q.  All right.  Having evaluated earnings and profits, did you

9    conduct a computation for Mr. Issa in 2012, '13, and '14, a tax

10   computation?

11   A.  Yes, I did.

12   Q.  For his personal income, right?

13   A.  Yes, for his 1040 in each year.

14   Q.  All right.  Let's go to the next slide.

15          Does this chart summarize your tax computation in

16   2012?

17   A.  Yes, it does.

18   Q.  What are the columns in this spreadsheet?

19   A.  On the left-hand side, it states "Line item."  The numbers

20   there relate directly to the line of the Form 1040 for that

21   year.  The next column is "Per original 1040 filed with the

22   IRS."  That's from the original Form 1040 that Mr. Issa filed

23   for that year and submitted to the IRS.  The last column is the

24   results of my analysis.

25   Q.  What's the difference between your analysis and what was

ICEHIss4                         Berzansky – Direct

1    originally reported by the IRS?

2    A.   Based upon my analysis, I determined that there was $68,806

3    of taxable qualified dividends that should be added to

4    Mr. Issa's tax return in that year.

5    Q.   Where did you get that figure?

6    A.   That's based upon the ordering rules and my analysis that

7    we discussed earlier.

8    Q.   So am I right that you started with a corporate diversion,

9    and then you went through the ordering rules, and this is what

10   you ended up with?

11   A.   Correct.

12   Q.   What was your ultimate conclusion for tax year 2012?

13   A.   In 2012 I determined that there was total tax due and owing

14   for Mr. Issa of $6,709.

15   Q.   All right.  Let's take a look at the next slide.

16          What year does this cover?

17   A.   This is my analysis for the 2013 Form 1040 for Mr. Ibrahim

18   Issa.

19   Q.   What are the different columns in this spreadsheet?

20   A.   The first two columns are the same as I described on the

21   2012 year.  The third column represents an amended return that

22   was received by the Internal Revenue Service but never

23   processed for the 2013 year.  The final column is the results

24   of my analysis.

25   Q.   What does it mean that the amended return was filed but not

ICEHIss4                         Berzansky – Direct

1   processed?

2   A.  When I say "filed but not processed," it means that the IRS

3   received the return.  We have a record of receipt of the

4   return, but because this amended return was received prior to

5   the original return, you can't amend something that was never

6   filed.  So the amended return was not considered by the IRS as

7   a submission.

8   Q.  So what tax return did you base your tax analysis on?

9   A.  My tax analysis was based on the original 1040 that was

10  filed subsequent to the amended return.

11  Q.  And where did your analysis different from the original

12  1040?

13  A.  Based upon my analysis, I determined that Mr. Issa had

14  additional qualified dividends of $190,122 and an additional

15  capital loss of $1,500.

16  Q.  The qualified dividends, where do those come from?

17  A.  The qualified dividends amount is based upon the ordering

18  rules and analysis that we had discussed prior.

19  Q.  Am I right that it started from the total amount of

20  diverted funds and then it went through the ordering rules to

21  come up with that number for the qualified dividend, right?

22  A.  That's correct.

23  Q.  All right.  Why did you include a capital loss of $1,500?

24  A.  In the 2013 year, the IRS received a 1099—MISC for

25  $375,000, which were the proceeds of the Gun Hill Road lawsuit.

1    Based upon the evidence provided and the accounting done by

2    Mr. Issa himself, there was a loss related to that lawsuit in

3    total.  I allowed that capital loss beginning in the 2013 year.

4    Q.  Why is there a $3,000 capital loss on the amended return?

5    A.  For the amended return that was submitted, Mr. Issa's

6    filing status was head of household.  When you file head of

7    household, you're allowed up to a $3,000 capital loss.  Per my

8    analysis, he did not qualify for that filing status.  He was

9    actually married filing separate in that year.  When you have a

10   married filing separate filing status, your capital loss is

11   limited to only $1,500 each year.

12   Q.  Did you review records from which you concluded that he was

13   married in that year?

14   A.  Yes, I did.

15   Q.  All right.  Let's look at the next slide -- I'm sorry.

16   Before we can do that, Ms. Geier, I apologize.

17          What was your ultimate conclusion in tax year 2013 for

18   Mr. Issa's personal 1040?

19   A.  Based upon my analysis, I determined that there was total

20   tax due and owing for Mr. Issa 2013 Form 1040 $33,266.

21   Q.  All right.  Let's look at the next slide.

22          Is this your analysis for Mr. Issa's 2014 personal

23   income tax returns?

24   A.  Yes, it is.

25   Q.  After the line items in the original 1040 which we've

ICEHIss4                        Berzansky - Direct

1   already gone over and are the same in the spreadsheets, what

2   are the next few columns?

3   A.   The next column is based upon a notice that was sent to

4   Mr. Issa indicating that the IRS had information regarding

5   additional income that was reported to the IRS that was not

6   reported on the original Form 1040.  This was the -- these were

7   the amounts that the IRS increased or adjusted as a result of

8   that notice.

9   Q.   All right.  What's the next column?

10  A.   The next column is "Per amended return Form 1040X."  As a

11  result of that notice that was sent, Mr. Issa submitted an

12  amended Form 1040 for the 2014 year.  That's what these amounts

13  represent.

14  Q.   Did the IRS process that amended 1040, that submission?

15  A.   No, it did not.

16  Q.   Why not?

17  A.   Attached -- excuse me.

18        The submission related to a change in reported income

19  from an investment in an 1120S, an S corp., that Mr. Issa was

20  the sole shareholder for beginning in 2014.  When the original

21  return was filed, it reported income of approximately $66,000.

22  Mr. Issa filed an amended return stating that that was actually

23  incorrect and the amount that should have been reportable

24  taxable income from that entity was only $23.  However, since

25  that submission was attached to a submission for a 1040 and the

1    submission of the 1040X was not signed -- I'm sorry, for the

2    amended 1120S was not signed, the IRS could not process that

3    return.

4    Q.  I'd like to break that down a little bit.  So you mentioned

5    an 1120S.

6    A.  Sorry.

7    Q.  That's OK.  So let's talk about that.

8            The first step there was that there was a notice,

9    right?

10   A.  Yes.

11   Q.  And what was included in that notice?

12   A.  Included in that notice were three basic items of

13   adjustments to the return as it was filed.  There was

14   flow-through income from the 1120S that I referenced of

15   approximately $66,000.

16   Q.  All right.  Let's stop there.  What is flow-through income?

17   A.  When you have an entity that's reported on an 1120S or a

18   1065, these are what are commonly referred to as flow-through

19   entities.  What that means is that the tax is not paid at the

20   entity level.  The income is passed through to the

21   shareholders, and the shareholders pay the tax on their 1040.

22   Q.  Is that through, for example, an S corp.?

23   A.  Correct.  That's the 1120S that I referenced.

24   Q.  These corporations that we have been talking about, are

25   those S corps.?

ICEHIss4                              Berzansky - Direct

1    A.   No.   These are what we call C corps.

2    Q.   What's the difference between an S corp. and a C corp.?

3    A.   An S corp. is a creation of the IRS.   It's an election made

4    by that taxpayer to be taxed as a flow-through entity.

5    Q.   What happens with a C corp. that's different?

6    A.   A C corp. is taxed at the entity level; meaning that the

7    C corp. pays its taxes at the -- the business pays the taxed

8    liability.   For S corps., the individual shareholders are

9    responsible for the liability related to any sort of taxable

10   income for the year.

11   Q.   So the IRS in 2014 tried to tell Mr. Issa that he was

12   missing information from an S corp., is that right?

13   A.   That the return that he filed did not include that

14   information, yes.

15   Q.   So what did he do in response to that?

16   A.   He filed an amended 1040X.

17   Q.   What did that amended 1040X -- which is an amended tax

18   return, personal income tax return, right?

19   A.   Correct.

20   Q.   What did that say?

21   A.   It stated that the amount of income from the 1120S was

22   incorrect as the IRS was -- as was reported to the IRS.

23   Q.   He stated that it was -- it should have been lower than

24   what he thought was accurate, is that right?

25   A.   That's correct.   There was an amended 1120S attached to the

ICEHIss4                        Berzansky - Direct

1  1040 -- amended 1040 in order to explain the difference.

2  Q.  Why did the IRS not process that submission for Mr. Issa?

3  A.  That was not processed because the amended 1120S was not

4  signed.  We cannot process a tax return that is not signed.

5  Q.  What did you use to conduct your analysis in tax year 2014?

6  A.  I used the notice that was sent by the IRS.

7  Q.  If you had used the amended 1040X that was submitted by

8  Mr. Issa, that would have been a benefit to the taxpayer or a

9  detriment to the taxpayer?

10  A.  If I had used the amended 1040X, that would mean that, per

11  my analysis, there would be significantly higher tax due and

12  owing.

13  Q.  What was your analysis for 2014?

14  A.  My -- the results of my analysis?

15  Q.  Yes.

16  A.  The final result of my analysis indicated that there was

17  total tax due and owing for Mr. Issa in 2014 of $38,786.

18  Q.  By not using the amended 1040 and instead by using the

19  amounts on the notice, that's a benefit to Mr. Issa, is that

20  right?

21  A.  It means the total tax due and owing number is lower.  The

22  total tax number would have still been the amount that I did

23  per my analysis or that I determined per my analysis.

24          MR. WIRSHBA:  Nothing further, your Honor.

25          THE COURT:  Cross.

ICEHIss4                          Berzansky - Cross

1    CROSS-EXAMINATION

2    BY MR. KIRSHNER:

3    Q.   Good afternoon, Agent Berzansky.

4    A.   Good afternoon.

5    Q.   You were first assigned to this case in October of this

6    year, correct?

7    A.   Yes, that's correct.

8    Q.   When you were first assigned, you didn't know anything

9    about the case, right?

10   A.   That's correct.

11   Q.   But you were aware that Mr. Issa had been charged with

12   these tax offenses a long time before you were assigned, right?

13   A.   No.

14   Q.   You didn't know anything about whether he was charged?

15   A.   Not until I was assigned the case, no.

16   Q.   When you were assigned the case, you learned that he was

17   charged previous to your assignment?

18   A.   Yes.  Sorry.  I misunderstood, yes.

19   Q.   You're also aware that the tax deficiency notice that was

20   sent to First Star Auto, that was sent four years ago, correct?

21   A.   That was sent in March of 2014 if memory serves me correct.

22   Q.   And the amended return was filed in that same year, 2014,

23   right?

24   A.   Yes.

25   Q.   You're aware that Mr. Issa or First Star Auto was never

ICEHIss4                         Berzansky – Cross

1    audited for that amended return, correct?

2    A.   Correct.

3    Q.   And an audit is a situation in which a taxpayer, in this

4    case Mr. Issa, and his tax preparer can come in and explain the

5    amended tax return to the IRS, correct?

6    A.   If they wish.

7    Q.   And he was never offered that opportunity, correct?

8    A.   Not to my knowledge, no.

9    Q.   So when you're assigned in October, you do learn about the

10   charges, right?

11   A.   Yes.

12   Q.   Did the government give you the indictment?

13   A.   Yes.

14   Q.   Did you read it?

15   A.   Yes.

16   Q.   You were made aware of what the government is essentially

17   trying to prove in this case, right?

18   A.   Yes.

19   Q.   And you're assigned to do an analysis in order to assist

20   the government in proving their case, right?

21   A.   No.

22   Q.   Well, you're a government witness, right?

23   A.   Yes.

24   Q.   You've never spoken to me before, right?

25   A.   No.

ICEHIss4                          Berzansky - Cross

1    Q.  Ever speak with Mr. Wirshba before?

2    A.  Yes.

3    Q.  How many times?

4    A.  Many.

5    Q.  Too many to count?

6    A.  That's a good way of characterizing it, yes.

7    Q.  When was the last time you spoke to him prior to your

8    testimony?

9    A.  This morning.

10   Q.  Did you speak to him last night?

11   A.  Yes.

12   Q.  Were you working with him all night?

13   A.  All night.

14   Q.  How about the night before?

15   A.  Yes.

16   Q.  And the night before that?

17   A.  Yes.

18   Q.  And you were tweaking the case to have the numbers meet the

19   presentation that you just submitted to the jury?

20   A.  I adjusted my analysis to reflect the additional

21   information that was provided to me via testimony, yes.

22   Q.  How many times did you adjust your analysis?

23   A.  Many times.

24   Q.  Based on the testimony?

25   A.  And additional evidence that was provided to me.

ICEHIss4                          Berzansky - Cross

1    Q.  All of it?

2    A.  All of what?

3    Q.  All the testimony and evidence, or did you just choose some

4    to use and choose some not to use?

5    A.  I chose the evidence that was relevant to the tax

6    computations.

7    Q.  When you were first assigned to this case, it was the

8    government that provided you with some information to start

9    your analysis, right?

10   A.  They are the ones that provided me with the tax returns,

11   which is how I started my analysis, yes.

12   Q.  And they also provided you with the bank statements, right?

13   A.  That's correct.

14   Q.  And that's what you relied on -- prior to the start of this

15   trial, that's what you relied on principally to do the tax

16   reconstruction of First Star, right?

17   A.  That's correct.

18   Q.  You testified on direct examination that you're aware that

19   the auto repair business and the gas sale business is a

20   cash-intensive business, right?

21   A.  Yes.

22   Q.  So isn't reviewing the bank statements of a cash-intensive

23   business an indirect way of accounting?

24   A.  Accounting for what?

25   Q.  Well, if it's a cash business, a lot of the books and

ICEHIss4                        Berzansky - Cross

1    records -- I'm sorry.  Excuse me.

2              A lot of the transactions won't be recorded in the

3    bank statements, would they?

4    A.  Yes, they would.

5    Q.  They're all recorded -- cash is all recorded in a bank

6    statement?

7    A.  They should be.

8    Q.  For a cash-intensive business?

9    A.  If the cash is deposited, yes.

10   Q.  Isn't it a primary method of accounting for a corporation

11   to actually look at the books and records rather than the bank

12   statements when it's a cash business?

13   A.  Not primary, no.  Our first source of information is always

14   the bank statements when we do our analyses.

15   Q.  Even for a cash-intensive business?

16   A.  For all businesses.

17   Q.  Are you aware of the IRS audit technical guidance

18   instructions for gasoline service stations in which it says

19   that the service station has historically been the type of

20   business where most of the income and many of the expenses are

21   paid in cash?

22   A.  It's my understanding that the Audit Techniques Guides are

23   outdated, and we're not to use them.

24   Q.  So you freely ignored the fact that a cash business is

25   expected to make their expense payments in cash?

ICEHIss4                          Berzansky - Cross

1   A.  It states that they're expected to make their expense

2   payments.

3   Q.  Or it's historically been the type of business to have many

4   of their expenses paid in cash?

5   A.  That's true.

6   Q.  There are book and records in this case that are available

7   which demonstrate the cash expenses, correct?

8   A.  Yes.

9   Q.  You didn't rely on those, did you?

10  A.  No.

11  Q.  After you were sent that initial information from the

12  government, just the bank statements and the tax returns, did

13  you do any investigation of Mr. Issa or his companies?

14  A.  No, I did not.

15  Q.  You never spoke to Sohail Butt?

16  A.  No, I did not.

17  Q.  Did you ever interview Claudia Betancourt?

18  A.  No.

19  Q.  Any of Mr. Issa's employees?

20  A.  No.

21  Q.  You ever visit First Star Auto, the location?

22  A.  No.

23  Q.  Go to any of Mr. Issa's locations?

24  A.  None.

25  Q.  Did you check out the facility to get an idea of what type

ICEHIss4                          Berzansky - Cross

1    of business it was?

2    A.   No.

3    Q.   Whether it was a big business with a lot of employees or a

4    small business with no employees, few employees?

5    A.   No.

6    Q.   Did you go to Mr. Issa's apartment?

7    A.   No, I did not.

8    Q.   You ever see his car?

9    A.   Not personally, no.

10   Q.   So prior to the start of the trial, with the exception of

11   the information provided to you by the government, you knew

12   very little about Mr. Issa or his companies, right?

13   A.   That's correct.

14   Q.   And I'm sure the jury is aware, you were sitting back right

15   there for the bulk of this trial, correct?

16   A.   Yes, that's correct.

17   Q.   And you saw the testimony of the witnesses that I just

18   mentioned, Sohail Butt?

19   A.   Yes.

20   Q.   You heard the testimony, excuse me?

21   A.   Yes.

22   Q.   And you heard the testimony of Claudia Betancourt?

23   A.   Yes.

24   Q.   And you heard the testimony of the Global Montello witness?

25   A.   Yes.

ICEHIss4                         Berzansky - Cross

1   Q.   And you also heard the testimony of the two accountants,

2   Mr. Tsamutalis and Mr. Mousouris, correct?

3   A.   That's correct.

4   Q.   Now, you'd agree with me that the primary focus of your

5   assignment, or at least one of the two primary focuses, was the

6   calculation of the taxable income for First Star in the year

7   2012, right?

8   A.   Yes.

9   Q.   In order to -- the basics to establishing what amounts to a

10  taxable income is you take the gross receipts and you calculate

11  the gross receipts, you calculate the cost of goods sold, you

12  deduct, and then you have the taxable income.  Is that a fair

13  statement?

14  A.   Less the deductions as well, yes.

15  Q.   So let's talk about the gross receipts of First Star Auto.

16          Now, prior to the start of this trial when you were

17  relying solely on the information provided to you by the

18  government, you repeatedly included the money coming in from

19  gas sales into the gross receipts calculation, correct?

20  A.   That's correct.

21  Q.   You did that because it came into -- you saw the bank

22  records and you saw the cash and you didn't understand anything

23  about the business, so you just said it's part of the gross

24  receipts, right?

25  A.   Are you talking about the cash or the total gas revenue?

ICEHIss4                        Berzansky - Cross

1   Q.   The cash.  We know that the credit card goes straight to

2   the gas company, right?

3   A.   That's what I wanted to clarify.  Yes.

4   Q.   So that's not in the bank statements?

5   A.   Right.

6   Q.   So you're able to deduce, essentially, what the cash is

7   that is coming in based on the bank records, right?

8   A.   Correct.

9   Q.   But then prior to the start of this trial, you keep on

10  including it in the gross receipts calculation, right?

11  A.   Yes.

12  Q.   So when the witness from Global Montello came and

13  testified, she testified that that money nor their gas is --

14  nor the gas belongs to First Star at any time, right?

15  A.   That's correct.

16  Q.   And Defense Exhibit 600 which I read into the record is an

17  agreement between Global Montello and First Star Auto, and that

18  says -- in the agreement it says:  "Deposit by agent of any

19  daily deposit to a bank account in its own name shall not be

20  interpreted as nor constitute any agreement or acknowledgment

21  that daily deposits shall ever be deemed a property of the

22  agent.  It being expressly understood and agreed that said

23  funds remain at all times the sole and exclusive property of

24  Global," right?

25  A.   That's correct.

ICEHIss4                          Berzansky - Cross

1    Q.  Now, it was during the trial that you first learned of this

2    concept of consignment, correct?

3    A.  No, I learned of --

4    Q.  Well, you knew what it was.  It's the first time you

5    learned that First Star operated its gas station on a

6    consignment basis, right?

7    A.  No.

8    Q.  But throughout your meetings with Mr. Wirshba, you

9    repeatedly took the cash gas sales and applied it to the gross

10   receipts, correct?

11   A.  And the associated cost of goods sold, yes.

12          THE COURT:  So you applied it on both sides of the

13   ledger?

14          THE WITNESS:  Yes, your Honor.

15          THE COURT:  So that it zeroed out, as you described?

16          THE WITNESS:  Yes, your Honor.

17          THE COURT:  OK.

18   BY MR. KIRSHNER:

19   Q.  I'll show you, this is just one of the changes you made.

20   Although the net effect is basically zero, after hearing the

21   Global Montello witness, you made a change to your analysis;

22   you added a column?

23   A.  That's correct.

24   Q.  Right?

25          So this is Government Exhibit 5003.  When you started,

ICEHIss4                           Berzansky - Cross

1    you had, per your analysis, gross receipts of 3,993,060 --

2              MR. BRAFMAN:  Is this to the jury?

3              MR. KIRSHNER:  It's in evidence.

4              MR. BRAFMAN:  It's not on their screen.

5              MR. KIRSHNER:  Is it there?  OK.

6    Q.  Then after you heard the Global Montello witness testify,

7    you made this additional category right here and that, although

8    it netted out to the same thing, was a different analysis,

9    right?  You started with the gross receipts being a different

10   number, right?

11   A.  I didn't change the analysis.  All I did was back off the

12   amounts that were related to the cash gas sales.

13   Q.  But then it makes it more apparent that, if we look at the

14   gross receipts as stated in the amended return versus the way

15   you did -- you computed the gross receipts after the Global

16   Montello witness testified, the jury, we see, that the gross

17   receipts are actually higher in your analysis, putting First

18   Star Auto in a worse tax position as a starting point, correct?

19   A.  I'm sorry.  Can you clarify that?

20   Q.  The amended return that was filed by First Star has gross

21   receipts as a -- has more gross receipts listed than you have

22   in your analysis of the sales, right?

23   A.  That's correct.

24   Q.  So when you start off with a higher gross receipts, you're

25   starting off at a higher income level.  So, essentially, the

ICEHIss4                         Berzansky - Cross

1    tax burden is greater to First Star Auto than in your analysis,

2    right?

3    A.  I wouldn't call it a tax burden.  Their income is higher.

4    Q.  You'll agree with me that the gross receipts is not

5    misstated based on your analysis on the amended return, right?

6    A.  My analysis indicated a different amount of gross receipts.

7    Q.  It was higher, though, right?

8    A.  That's correct.

9    Q.  The amended return had a higher gross receipts, so it's not

10   a misstatement that gives First Star a tax benefit as a

11   starting point, right?

12   A.  Correct.

13   Q.  So for the First Star return, after we do gross receipts,

14   the next big subject area is cost of goods sold, right?

15   A.  That's correct.

16   Q.  And for that you focus on exhibit in evidence Government

17   506, statement two of the amended return, right?

18   A.  That's correct.

19   Q.  And we see two amounts there, right?  One is listed as

20   "fleet operating cost-fuel," and that's 636,711.  In the

21   description you see "fleet operating cost-fuel," correct?

22   A.  That's correct.

23   Q.  Then in the amount you see $636,711, right?

24   A.  That's correct.

25   Q.  Do you know who prepared this return?

ICEHIss4                         Berzansky - Cross

1    A.  I believe it was Mr. Tsamutalis, but I can't be sure.

2    Q.  Mr. Tsamutalis, he did prepare the return.  It's in

3    evidence.

4            Mr. Tsamutalis is the one who put "fleet operating

5    cost-fuel," correct, if he's the preparer?

6    A.  He could have got that description from somewhere else, but

7    his testimony said he was the one who put it down.

8    Q.  And that's a little bit of an imprecise term, right?

9    Standing alone, you read that, you don't know anything about

10   the company, you look at "fleet operating cost-fuel," you don't

11   know anything about it, right?

12   A.  That's correct.

13   Q.  That's the form that was submitted to the IRS, right?

14   A.  That's correct.

15   Q.  Not any of the forms that went back and forth between

16   Mr. Tsamutalis and someone else, right -- I'm sorry, the emails

17   that went back and forth?

18   A.  That's correct.

19   Q.  The only thing that was submitted was this form that says

20   "fleet operating costs-fuel."  That goes to the IRS.  That's

21   Mr. Tsamutalis' words, right?

22   A.  That's correct.

23   Q.  Now, is it fair to say that in your analysis you disregard

24   that label and you try and reconstruct the cost of goods sold

25   using the information you have available to you, right?

ICEHIss4                        Berzansky - Cross

1   A.   Yes.

2   Q.   That's bank statements primarily, right?

3   A.   Primarily, yes.

4   Q.   OK.  But then in another analysis, you allow for some of

5   the cash deposits -- I'm sorry, the cash expenses to be

6   deducted from the cost of goods sold, right?

7   A.   I allowed some of the cash expenses to be deducted from the

8   cost of goods sold.

9   Q.   Yeah.  In another analysis you reduced the cost of --

10  sorry.  You raised the cost of goods sold by assuming the cash

11  payroll, right?

12  A.   Yes, in my final analysis.

13  Q.   When was that final analysis made?

14  A.   Last night.

15  Q.   Wasn't this morning at 2:30?

16  A.   Last night, this morning, it's the same to me,

17  unfortunately.

18  Q.   So you tweaked it again, right?

19  A.   I adjusted my analysis based on the evidence provided.

20  Q.   And was that evidence the daily cash sheets?

21  A.   No.  Those were already -- I had already seen the daily

22  cash sheets at that point.  I just wasn't sure what all the

23  entries on those sheets were.  The testimony that I observed

24  over the last few days clarified what was on those daily cash

25  sheets.

ICEHIss4                          Berzansky - Cross

1    Q.  And what was on those daily cash sheets was expenses,

2    right?

3    A.  Correct.

4    Q.  Payroll was on there?

5    A.  That was the claim, yes.

6    Q.  And there was other expenses.  It was taxis, right?

7    A.  Yeah, I believe so.

8    Q.  And there were parts repeatedly listed on the cash sheets,

9    right?

10   A.  Yes.

11   Q.  Did you tally up all of these expenses?

12   A.  No.

13   Q.  No.  Why didn't you?

14   A.  Because my analysis was primarily based on the information

15   that was in the books and the records and -- the bank

16   statements, excuse me.  The books and records were supplemental

17   to that.  Those cash sheets, for me to tally that up would be

18   the re-creation of the tax return, and that's not my goal here.

19   My goal is to determine, based upon the evidence, what is a --

20   what the tax liability should be.

21   Q.  Your goal isn't to accurately re-create the tax return?

22   A.  Not from scratch.  It's from the evidence provided to me.

23   Q.  And the evidence provided to you is the daily cash sheets,

24   correct?

25   A.  Those cash sheets were provided to me, yes.

ICEHIss4                         Berzansky - Cross

1    Q.  You heard the testimony of Claudia Betancourt, right?

2    A.  That's correct.

3    Q.  You heard how she described the daily cash sheets as

4    something Mr. Issa's employees were required to keep meticulous

5    track of, right?

6    A.  Correct.

7    Q.  And they noted every single expense of cash going out,

8    right?

9    A.  Correct.

10   Q.  And they were required then not only to do that but to

11   submit the daily cash sheet into Claudia Betancourt at the main

12   office, right?

13   A.  That's the testimony, yes.

14   Q.  And then she took that information --

15           THE COURT:  Sir, can you keep your voice up, please.

16           Not you, him.

17           THE WITNESS:  Yes, your Honor.

18           THE COURT:  He just mumbled something.

19           THE WITNESS:  I apologize.

20   Q.  Then she told you, well, she told the jury, how the

21   information on those daily cash sheets, the data on that, was

22   put into something called a daily sales report, right?

23   A.  Correct.

24   Q.  And that daily sales report had a tab that calculated all

25   the daily cash expenses for all of the businesses on a daily

ICEHIss4                          Berzansky - Cross

1    basis, correct?

2    A.  Yes.

3    Q.  It also had a separate tab in which the expenses that came

4    from the businesses from checks or credit cards were

5    calculated, right?  She told you that?

6               MR. WIRSHBA:  Objection, your Honor.

7               THE COURT:  Ground?

8               MR. WIRSHBA:  Relevance of this line of questioning.

9               THE COURT:  OK.  The objection's sustained.

10   Q.  Did you ever see the daily sales reports?

11   A.  Yes.

12   Q.  In completion?

13   A.  No.

14   Q.  Did you ever ask to see the daily sales reports in

15   completion?

16   A.  I don't get to ask for what evidence is provided to me.

17   I'm provided with the evidence.

18   Q.  So you have no incentive to find out the accurate

19   accounting of First Star Auto in doing your analysis?

20   A.  Of course I do, but my analysis was only upon the

21   determination of the amounts that were changed from the

22   original return to the amended return.  All those expenses that

23   you had mentioned would have been included on the deductions

24   side of the tax return, which I just accepted as filed from

25   First Star.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

ICEHIss4                          Berzansky — Cross

1    Q.  Sir, you've heard the deduction side of the First Star Auto

2    return was significantly less than the $636,000 reported as

3    fleet operating costs-fuel, right?

4    A.  Correct.

5    Q.  So it must have become apparent to you that there was

6    something to account for the $636,000, right?

7    A.  Yes.

8    Q.  And when you couple that with the testimony given in this

9    court in which Claudia Betancourt told the jury that all these

10   expenses were paid in cash, that this was a 24/7 operation, and

11   that they needed to pay mechanics to work overnight, does it

12   become apparent that the cash that goes out on those cash

13   sheets actually constitutes the $636,000?

14              MR. WIRSHBA:  Objection.  Form.

15              THE COURT:  Answer the question.

16   A.  No.

17   Q.  OK.

18              THE COURT:  Next question.

19   Q.  Now, you stated on direct examination that you did review

20   the daily cash sheets for May through the end of the year in

21   First Star Auto, right?

22   A.  August through the end of the year.

23   Q.  August through the end of the year.

24              And do you know what extrapolation is?

25   A.  Yes, I do.

ICEHIss4                          Berzansky - Cross

1   Q.  Can you tell the jury.

2   A.  Extrapolation is taking the data that you're provided and

3   then making an assumption that it's equal over the course of a

4   time period.

5   Q.  And that's an accepted methodology of accounting, right?

6   A.  In what context?

7   Q.  The New York State tax authority, the IRS.  If there's

8   incomplete records, you're permitted to extrapolate?

9   A.  Not exactly, no.  If I have one month of bank statements

10  that says that there was a million dollars of receipts, I can't

11  just say that that corporation had $12 million of gross

12  receipts for the year.

13  Q.  But if you have four months of bank records with detailed

14  cash expenses on them, isn't it acceptable to then take that,

15  those amounts, and just multiply it by three?

16  A.  If there were bank records with detailed cash expenses?  I

17  don't know how bank records can have detailed cash expenses.

18  Q.  No, the books and records of the business.

19  A.  No, I thought you said bank records.

20          THE COURT:  You did say bank records.

21  Q.  I apologize.  I meant books and records.

22          THE COURT:  Because I had the same question in my

23  head.

24          MR. KIRSHNER:  It was a good question.

25  A.  If I have detailed information on the books and records,

ICEHIss4                          Berzansky - Cross

1   you're saying it's acceptable to just extrapolate that way.

2   No, it's not, not when you're talking about determining a tax

3   liability.

4   Q.  So if you couldn't extrapolate, couldn't you just ask to

5   see the full and complete records which are contained in the

6   DSRs?

7   A.  I was told that the information that was provided to me was

8   all the information that was available.

9   Q.  You were told by the government that they didn't have

10  access to the DSRs?

11  A.  I did not say that.  I said I was told that the information

12  given to me was the information that was -- that's all the

13  information that we had, that the government had.

14  Q.  All right.  Next I'd like to turn to the second area of

15  cost of goods sold on the statement two, subcontractors.  See

16  that?

17  A.  Yes.

18  Q.  And it's $617,646.  $617,646, right?

19  A.  That's correct.

20  Q.  And on direct testimony, you agreed that that was the

21  correct amount, that was an accurate amount of the flow of

22  money from First Star to other companies, right?

23  A.  I indicated that the amounts that were included on the

24  spreadsheet given to Mr. Tsamutalis was accurate.

25  Q.  Let me ask you by way of example.  If company A pays

ICEHIss4                        Berzansky – Cross

1    company B, say, $10 for subcontracting and company A takes that

2    deduction, but company B doesn't pick up the income, is there

3    any consequence for company A?

4    A.  Are company A and B owned by the same individual?

5    Q.  I just asked you a straightforward question.

6            THE COURT:  Well, he asked for a clarification.

7            THE WITNESS:  Yeah.

8            THE COURT:  Is the answer different if the company is

9    owned by an individual or -- if both companies are owned by the

10   same individual or if they are not?

11           THE WITNESS:  Yes, your Honor.

12           THE COURT:  Well, in that case tell us what the two

13   different answers are.

14           THE WITNESS:  Yes, ma'am.

15           THE COURT:  Assume first one owner, then assume

16   different owners.

17   A.  If they're both the same -- owned by the same individual,

18   then no, the other company would not be allowed the deduction

19   if the second company did not pick up the relevant income.  If

20   they're completely independent ownership, independent

21   corporations from each other, then it's not the responsibility

22   of company A to ensure that company B is properly keeping their

23   books and records or reporting the amount of income.

24   Q.  Even if they're C corporations?

25   A.  Even if they're C corporations.

ICEHIss4                          Berzansky – Cross

1   Q.  And is that the government's theory, or do we do an

2   analysis of each and every tax return based on the four corners

3   of that document?

4            MR. WIRSHBA:  Objection.  Form.

5            THE COURT:  The objection's sustained.

6   Q.  If you look at First Star's cost of goods sold, the

7   subcontractor's amount is accurate, correct?

8   A.  The number?

9   Q.  Yes.

10  A.  Yes.

11  Q.  So standing alone by itself, First Star's amended tax

12  return for 2012 contains no inaccuracies as to the amount that

13  it paid out to subcontractors, right?

14  A.  That's the amount that was transferred from First Star

15  accounts to Hybrid Optimum Value and High -- or High Powered, I

16  forget which one.  Sorry.

17  Q.  But we just agreed that the amount is accurate.  So the

18  First Star tax return by itself is an accurate document?

19  A.  No.  Just because an amount is accurate doesn't necessarily

20  mean that it's a deductible expense based upon the

21  classification.  I still saw no evidence that they were

22  subcontracting, going back and forth between First Star and the

23  other four corporations.

24  Q.  You saw no evidence of subcontracting?

25  A.  Correct.

ICEHIss4                          Berzansky - Cross

1        THE COURT:  That's what he said.  Please.

2   Q.  So let's talk about the companies that did the

3   subcontracting.

4        If we look at High Powered Auto, what you're saying,

5   what I believe you're saying here, and correct me if I'm wrong,

6   is that because the income or the amount transferred from First

7   Star to High Powered exceeded the income on High Powered's tax

8   return, that you disallowed the -- you disallowed the deduction

9   from First Star and therefore you disallowed -- and you added

10  the income to High Powered, right?

11  A.  No.  I simply disallowed the deduction to First Star.

12  Q.  OK.  But as we discussed earlier, this is a cash-intensive

13  business, right?

14  A.  That's correct.

15  Q.  And we learned from Claudia Betancourt that each and every

16  business had these things called cash sheets, right?

17  A.  Correct.

18  Q.  And so those cash expenses are coming out of all of

19  Mr. Issa's businesses, right?

20  A.  That was the testimony.

21  Q.  And so then isn't it fair to assume that had you done a

22  review of all the cash sheets and found all the deductions,

23  it's possible that the income was negated by the amount of

24  deductions that are on those cash sheets?

25  A.  I'm sorry.  I don't understand what you mean by "the income

ICEHIss4                              Berzansky - Cross

1    was negated."

2    Q.   Assume that High Powered should have taken the additional

3    income, correct?

4    A.   Sure, should have reported the additional income.

5    Q.   Yeah.  Had you done an analysis of High Powered based on

6    the cash sheets and all the evidence in this trial about the

7    cash sheets and the accuracy in which they're kept and you

8    realized that the deductions negated the income, there would be

9    no tax liability for High Powered, and it's a valid deduction

10   for First Star?

11              MR. WIRSHBA:  Objection.  Form.

12              THE COURT:  The objection's overruled.

13              If you understand the question, you can answer it.

14   A.   I don't understand the question.

15              THE COURT:  OK.

16   Q.   Look at --

17              THE COURT:  Can you break it up, please.

18              MR. KIRSHNER:  Yes.

19   Q.   The amount reported for High Powered on their return is

20   $3,333, right?

21   A.   That's correct.

22   Q.   Did you analyze High Powered?

23   A.   No, I did not.

24   Q.   So, as you sit here today, you have no idea if that amount

25   is accurate, if the amount of deductions taken from High

ICEHIss4                    Berzansky - Cross

1    Powered or the income is accurate, right?

2    A.  Correct.

3    Q.  So based on that, based on the information about this being

4    a cash business, can't we assume that there is additional

5    deductions that could potentially negate the income that flowed

6    from First Star to High Powered?

7    A.  Potentially, yes.

8    Q.  So, as you sit here today, you can't tell this jury that

9    that didn't occur?

10   A.  Correct.

11   Q.  Because you didn't do the analysis?

12   A.  Correct.

13   Q.  You didn't look at the books and records?

14   A.  Correct.

15   Q.  OK.

16   A.  Of High Powered, you mean?

17   Q.  Of High Powered.

18   A.  Correct.

19   Q.  You just did an assumption based on the tax return which

20   as, we heard earlier, was done by George Mousouris?

21   A.  None of my analysis was based on assumption.

22   Q.  Why don't you take a look at the personal expenses or the

23   charges that you disallowed because you deemed them personal

24   expenses.

25   A.  I'm sorry.  You said charges I disallowed?

ICEHIss4                     Berzansky - Cross

1   Q.  Or payments that you declared were personal expenses.  Do

2   you see that?

3   A.  Yes.

4   Q.  Now, you heard testimony that the apartment, that it was

5   Daniela's exclusive office, correct?

6   A.  I did not hear testimony that it was exclusive, no.

7   Q.  Claudia Betancourt didn't say that that's where she worked

8   exclusively?

9   A.  I remember her saying that she worked there most of the

10  time.  I could be incorrect, but that's what I remember.

11          THE COURT:  Ladies and gentlemen, obviously, it's your

12  memory of the testimony that controls.

13  Q.  And you still, despite that testimony, declared that the

14  entire apartment constitutes a personal expense, right?

15  A.  Correct.

16  Q.  You didn't disallow 10 percent -- or allow 10 percent to be

17  a deductible, correct?

18          THE COURT:  He didn't disallow anything.  We know

19  that.

20  Q.  100 percent for $71,067.35, correct?

21  A.  That entire amount was deemed to be a personal expense of

22  Mr. Issa.

23  Q.  And the ConEd bill for that same home office, 1,000 -- I'm

24  sorry, total of $3,730.05, correct?

25  A.  Correct.

ICEHIss4                              Berzansky - Cross

1    Q.  And you deemed that all to be personal?

2    A.  Correct.

3    Q.  You heard testimony about Mr. Issa and his car, right?

4    A.  Correct.

5    Q.  It was his only car, right?

6    A.  I don't know.

7    Q.  Well, that was the testimony you heard, right?

8    A.  From whom?

9    Q.  From Claudia Betancourt.

10   A.  I don't remember her saying that, no.

11   Q.  And you heard -- you did hear testimony that he used the

12   car to drive from location to location to location, right?

13   A.  That's correct.

14   Q.  And he also often traveled to other places to pick up new

15   business, right?

16   A.  Correct.

17   Q.  And he used that car?

18   A.  That was the testimony, yes.

19   Q.  And you still declared that the whole $26,875 was a

20   personal expense, right?

21   A.  Correct.

22   Q.  Now I want to talk about the cash sheets where it indicates

23   Tony and Tony family and friends, right?

24   A.  Correct.

25   Q.  Between the two of them, it's about $375,000?

ICEHIss4                          Berzansky – Cross

1   A.  No.

2   Q.  I'm sorry.  275,000?

3   A.  Yes.

4   Q.  You declared that to be a personal expense?

5   A.  Correct.

6   Q.  And that was based on the cash sheets, right?

7   A.  Correct.

8   Q.  You just assumed that it was a personal expense, right?

9   A.  The cash sheets stated "Tony" or "Tony's family and

10  friends."

11  Q.  Did you hear the testimony of Claudia Betancourt regarding

12  the cash sheets?

13  A.  Yes.

14  Q.  Did she say that when it said Tony or Tony family/friends,

15  it was often just authorized by Tony, it wasn't for Tony

16  himself?

17  A.  Yes, I did hear that testimony.

18  Q.  And she would call Tony or Daniela and make sure that the

19  authorization -- that she would get authorization that the

20  payment was permitted, right?

21  A.  Correct.

22  Q.  And then she would -- they would tell her what it was for,

23  right?

24  A.  Sometimes.

25  Q.  And she would write -- and sometimes it was for a business

ICEHIss4                          Berzansky - Cross

1  expense, right?

2  A.  Sometimes, yes.

3  Q.  And then after they told her it was for a business expense,

4  she would note that in the DSR, right?

5  A.  I don't know.

6  Q.  Well, is that what she testified to?

7  A.  I believe that's what she testified to, yes.

8  Q.  So you just assume that the entire amount should be

9  personal?

10 A.  When it says, "cash sheets Tony," that to me states that

11 the money was going to Tony.  So whether or not Ms. Betancourt

12 stated that she had authorization from Mr. Issa to pay

13 expenses, that is not proof of anything to me.

14 Q.  What about --

15         THE COURT:  It's not proof what?  Please don't mumble.

16         THE WITNESS:  I'm sorry.  That's not proof of an

17 expense to me.  I went over what the books and records said.

18 The books and records said "cash sheets Tony" and "cash sheets

19 Tony family and friends."

20 Q.  So when it worked to Mr. Issa's detriment, you relied on

21 the cash sheets, right?

22 A.  No.

23 Q.  Well, you just stated that $275,000 was personal expenses

24 based on the cash sheets, right?

25 A.  Correct.

ICEHIss4                          Berzansky - Cross

1    Q.  But you didn't use the cash sheets to calculate the

2    deductions from First Star Auto, right?

3    A.  I didn't validate the deductions at all for First Star

4    Auto.  All I did was validate cost of goods sold and cash

5    receipts.

6    Q.  But you used the cash sheets to Mr. Issa's detriments by

7    declaring everything on there that said Tony or Tony's friends

8    as personal expenses?

9    A.  Correct.

10   Q.  That's the only purpose you used them for, right?

11   A.  Correct -- not the only purpose I used them for.  Those

12   were the only amounts included in my analysis.

13   Q.  Let's look at a couple of them.

14            It's not pertinent to your analysis that expenses were

15   paid in cash to taxis, tolls, parts, parts, parts, towing,

16   parts, gas, parts, we have payroll to Mohammed?

17   A.  Can you put that back up, please.  I'm sorry.

18   Q.  We have a payment to Tony's father, right?

19   A.  Yes.

20   Q.  And you assumed that that was personal, right?

21   A.  Yes.

22   Q.  Didn't Ms. Betancourt testify that First Star lent -- was

23   lent money by Mr. Issa's family and friends?

24   A.  Yes.

25   Q.  So this could be payback of a loan, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

ICEHIss4                          Berzansky - Cross

1   A.  Potentially.

2   Q.  But you just assumed it was personal?

3   A.  There was nothing in there indicating a loan.  It just said

4   Tony's father.

5   Q.  But Ms. Betancourt testified that most of these payments

6   were actually for payments of loans, right?

7   A.  Right.  But no one -- it didn't say in the sheet that it

8   was a repayment of a loan.  I can't just assume that every

9   expense written there was not personal or was related to the

10  business.

11  Q.  But you --

12  A.  Parts were included as a component piece of cost of goods

13  sold, and that was included in and allowed on my analysis.

14  Q.  Did your analysis include all the money that Sohail Butt

15  told us that Tony, Mr. Issa, put into the businesses?

16  A.  Money that he brought to the business in the form of cash?

17  Q.  Yes.

18  A.  No.

19  Q.  Did your analysis include all the money that Claudia

20  Betancourt told that he brought to the businesses in cash?

21  A.  No.

22  Q.  Did your analysis include the -- withdrawn.

23          THE COURT:  We've reached the point in time when we

24  need to conclude for the day.  So, folks, we have some people

25  who have religious observance, and Shabbat starts early on the

ICEHIss4                         Berzansky – Cross

1   14th of December, so we're going to finish with this witness on

2   Monday.  Monday, Tuesday we're going to be bringing this thing

3   to a close and handing it off to you.

4           All right.  Don't discuss the case over the weekend.

5   Keep an open mind.  Please get a lot of rest this weekend

6   because I've got to tell you that you're going to do a whole

7   lot of work early next week, a lot of hard listening.

8           (Jury excused)

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  OK.

3              MR. BRAFMAN:  Your Honor.

4              THE COURT:  You're on cross.  You can't talk to them

5    over the weekend.

6              MR. BRAFMAN:  I'm not.

7              THE COURT:  Can we get rid of the witness?  He's the

8    agent.

9              MR. BRAFMAN:  Your Honor, he's been here the whole

10   trial.

11             THE COURT:  That's true.

12             MR. BRAFMAN:  Your Honor, I want to provide your Honor

13   and the government with a brief letter that we would ask your

14   Honor to consider so that when we do raise an issue on Monday

15   on Rule 29 argument when we rest, that your Honor at least has

16   the benefit of reading this before and not spring it on you.

17             THE COURT:  I thank you very, very much for doing

18   that.

19             MR. BRAFMAN:  Yes.  Also, Judge, when we have a

20   charging conference, there are a couple of minor changes that

21   we're going to ask your Honor to make and also two charges to

22   add, but we will bring that to your attention before Monday.

23             THE COURT:  That will be really nice too.

24             MR. BRAFMAN:  I'm trying to be a gentleman.

25             THE COURT:  I appreciate it.

ICEHIss4                        Berzansky – Cross

1           MR. BRAFMAN:  Thank you very much.  Thank you for

2     breaking early too.

3           Your Honor, you expect us to sum up on Monday?

4           THE COURT:  Oh, I do.  I expect we're going to go from

5     this to this to this to this.

6           MR. BRAFMAN:  That's fine.  Just checking, Judge.

7     Thank you.

8           THE COURT:  You'll have more time than the government

9     will to worry about what comes out of the charging conference

10     because the government has going to go first.  Yes, we are

11     going to move very fast, very fast.

12           (Adjourned to December 17, 2018, 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    INDEX OF EXAMINATION

 2   Examination  of:                        Page

 3    GEORGE MOUSOURIS

 4   Direct By Mr. Wirshba  . . . . . . . . . .1270

 5   Cross By Mr. Brafman . . . . . . . . . . .1299

 6   Redirect By Mr. Wirshba  . . . . . . . . .1330

 7   Recross By Mr. Brafman . . . . . . . . . .1333

 8   RICHARD BERZANSKY

 9   Direct By Mr. Wirshba  . . . . . . . . . .1334

10   Cross By Mr. Kirshner  . . . . . . . . . .1423

11                   GOVERNMENT EXHIBITS

12   Exhibit No.                           Received

13    901    . . . . . . . . . . . . . . . . .1281

14    725    . . . . . . . . . . . . . . . . .1285

15    902    . . . . . . . . . . . . . . . . .1286

16    903    . . . . . . . . . . . . . . . . .1294

17    904    . . . . . . . . . . . . . . . . .1296

18    3503A through 3503E, 3516A, 630, 620, . . . .1341

19            621, 610 through 613, 645B,

20            680, and 660

21    5001 through 5021  . . . . . . . . . . .1344

22

23

24

25
</pre>