UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                    v.                        17 CR 74 (CM)

IBRAHIM ISSA,

                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        November 15, 2018
                                        2:25 p.m.


Before:

                    HON. COLLEEN MCMAHON,

                                        District Judge


                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
DANIEL NESIM
     Assistant United States Attorney

BENJAMIN BRAFMAN
JOSHUA KIRSHNER
     Attorneys for Defendant

 1               (Case called)

 2               THE DEPUTY CLERK:  Appearances, please.

 3               MR. NESSIM:  Good afternoon, your Honor.  Daniel

 4    Nessim and Noah Solowiejczyk for the government.  Joining us at

 5    counsel table is a paralegal in our office, Jonathan

 6    Concepcion.

 7               MR. BRAFMAN:  Good afternoon, your Honor.  Benjamin

 8    Brafman and Josh Kirshner for Mr. Issa who is present in the

 9    courtroom.

10               THE COURT:  Good afternoon, folks.  I have developed a

11    neck problem.  I left my neck brace upstairs.  I'm hoping I'm

12    not going to need it, but that explains all this.

13               Sometimes I stand up, and sometimes I sit down, and

14    sometimes I try to do both at the same time.  They have me on

15    this chair that keeps sliding away from the bench.  So I'm

16    sorry about the optics.  I got through one trial on my feet.  I

17    will not do this trial on my feet.  I can only do one trial on

18    my feet.

19               Okay.  So Mr. O'Neill will be passing out a decision

20    on the in limine motions which are decided.  We have a

21    suppression hearing.  I don't understand the letter that I got

22    from Mr. Brafman.

23               This is a suppression hearing.  You give me the

24    documents you want suppressed, we figure out whether there is

25    some attorney-client privilege that protects them on a

1   document-by-document basis, and I suppress or I don't suppress.

2   That's what a suppression hearing is.

3          MR. BRAFMAN:  Your Honor, I'm sorry that the Court is

4   going through this personal agony, and we wish you well.

5          THE COURT:  Thank you.

6          MR. BRAFMAN:  You are the judge.  So please feel free

7   to move around as often as you need to.

8          THE COURT:  I will.  Trust me.

9          MR. BRAFMAN:  Your Honor, I did get the Court's order

10  memo this afternoon.  We briefly discussed it with the

11  government.  Herein lies the problem.  Given the fact that

12  Mr. Tsamutalis, the accountant, met with and spoke with the

13  government on several occasions ostensibly before he remembered

14  that he had a Kovel agreement, the determination as to what

15  becomes suppressed is much more complicated than your Honor

16  might --

17         THE COURT:  Then let's get started.

18         MR. BRAFMAN:  Well, I think what we first need to do

19  is determine whether or not the Court agrees with us that a

20  privilege existed.  If a privilege existed, your Honor --

21         THE COURT:  A privilege but not only a privilege but

22  as among whom, because unless your client individually has a

23  Kovel letter, ain't no privilege there.

24         MR. BRAFMAN:  Well, I think, your Honor, the defendant

25  does have a Kovel letter with that accountant because he

1    retained the lawyer who then retained the accountant.  That's

2    how it's always been done.

3           THE COURT:  That's how it's always been done except

4    the only purported Kovel letter that's been shown to me is not

5    between your client and anyone but between your client and some

6    corporation, one of a number of large corporations.  That

7    corporation can claim a privilege not anyone else can, not your

8    client, and not any other corporation.  That is my position.

9           MR. BRAFMAN:  Well, let me just try my best to

10   enlighten the Court.  The defendant was charged with various

11   counts of tax evasion --

12          THE COURT:  Yes.  He's a principal of all those

13   corporations.  So he should have been a lot more careful to get

14   Kovel agreements for everybody, including himself, shouldn't

15   he?

16          MR. BRAFMAN:  But the primary income that's at issue

17   in the indictment relates to his 2012 return.  That is

18   throughout the indictment.  That, your Honor, is determined by

19   the Kovel agreement between the accountant, Mr. Tsamutalis; the

20   lawyer; and my client who is relying on the amended return

21   filed on his behalf.

22          All of the income that he is charged with and the

23   fraudulent expenses relate to that company.  So if the

24   government chose not to charge him, we wouldn't be here.  But

25   they chose to charge him ostensibly because of what passes

1    through that company, and that company is my client, and it is

2    not a corporation --

3              THE COURT:  But your client, the corporation, is not

4    indicted.  Exactly one person is indicted, Mr. Issa.  He is the

5    only client in my courtroom.  I don't care who else you

6    represent outside of this courtroom, in front of the IRS, or

7    anyplace else.

8              MR. BRAFMAN:  Your Honor, I think if you were to allow

9    the hearing to begin --

10             THE COURT:  I'm allowing the hearing to begin.  You're

11   giving a speech, Mr. Brafman.  I'm sitting here waiting for the

12   hearing to begin.

13             MR. BRAFMAN:  Yes, your Honor.  May I call my first

14   witness?

15             THE COURT:  Sure.

16             MR. BRAFMAN:  Paul Ambrose.

17             THE COURT:  Where are the documents?  Hand me the

18   documents you want to suppress.

19             MR. BRAFMAN:  Your Honor, there is a room full of

20   documents that the government has.

21             THE COURT:  Hand me the documents you want to

22   suppress.  We are going through them one by one.  You are not

23   leaving to represent anybody else on any other matter until we

24   have gone through each and every one that you seek to suppress

25   and I make a ruling.

1          You have to identify, Mr. Brafman, individual

2    documents you seek to suppress.  You cannot say, I wish to

3    suppress every document in this room.  That doesn't work.  That

4    motion I can deny right now, and we can all go home.

5          MR. BRAFMAN:  Well, your Honor, most respectfully, if

6    we continue the hearing, the evidence will demonstrate that all

7    of the documents that the government --

8          THE COURT:  It's not going to work.  I don't care if

9    the evidence demonstrates it all, we are still going through

10   the one by one.  You are not hearing me.

11         MR. BRAFMAN:  I am hearing you.  I am not agreeing

12   with you, but I am hearing you.

13         THE COURT:  Well, good.  I win.  Any document that is

14   going to be suppressed in this case I will have looked at

15   eyeball to eyeball and an argument has been made with respect

16   to that particular document.  I will not do it any other way.

17         MR. BRAFMAN:  Neither the government nor counsel can

18   physically do that today.

19         THE COURT:  Well, then I'll deny your motion because I

20   said there was going to be a hearing today.

21         MR. BRAFMAN:  Yes, your Honor.

22         THE COURT:  And it was your job to get the evidence

23   into court, and if you have not done it, easily, I'm denying

24   your motion.  That's it.  Done.

25         MR. BRAFMAN:  Judge, let me just explain the

1   difficulty we've had.

2          THE COURT:  It's not difficult.

3          MR. BRAFMAN:  It is difficult.  The accountant who is

4   at the heart of the matter has refused to speak with us.  The

5   accountant who is at the heart of the matter has refused to

6   identify the documents that he has identified for the

7   government.

8          So it's impossible for us, without the hearing, to

9   understand specifically what part of the privilege was

10  violated.

11         MR. SOLOWIEJCZYK:  I don't think that's correct,

12  your Honor.  Documents were provided to the government pursuant

13  to a subpoena before we knew there was any supposed Kovel

14  letter, and they were all turned over in discovery.

15         If Mr. Brafman has another understanding, we're not on

16  the same page.  We gave them all the documents.  We

17  ourselves -- Judge, just to be clear, as soon as we realized

18  that there was a potential Kovel issue, we stopped reviewing

19  everything.

20         THE COURT:  I understand.  I thought that the TAINT

21  team was going to do this hearing.  It is the government's

22  position that all the documents have been turned over to you.

23  I will accept the government's representation.

24         Where from the documents that were turned over to you

25  have you identified the documents you wish to suppress?  Where

1    are they?  Give them to me.

2           MR. BRAFMAN:  Yes, your Honor.  If I could just read

3    the last paragraph of the Court's order scheduling this

4    hearing.  The Court's order of October 19 says:  The Court will

5    hold a hearing on November 15, 2015, where the burden will be

6    on the defendant to show that Accountant Tsamutalis was in fact

7    acting as Lawyer Ambrose's agent and to provide evidence

8    sufficient to establish the essential elements of the

9    privileged relationship."

10          THE COURT:  That's true, and you better have the

11   documents here because this is a suppression motion.  I'm so

12   sorry.  I have spoken, Mr. Brafman.  You have come here

13   unprepared.

14          What did you think?  I was going to waste my time this

15   afternoon?

16          MR. BRAFMAN:  No.  I thought we'd first establish

17   whether there was a privilege because if you denied the fact

18   that there was a privilege, you don't need to go to the next

19   step.

20          If you accept the fact that there was a privilege,

21   everything that was seized from Mr. Tsamutalis that relates to

22   what's in the indictment is tainted because he had no right to

23   speak to the agents about any of those documents because he

24   conveniently forgot that there was a Kovel agreement in place.

25   So I think we need to establish the privilege.

```
 1              THE COURT:  You called a witness.  I'll listen to his
 2    testimony.  But when I rule -- and I will rule orally.  I will
 3    not be writing an opinion -- I will expect to see the documents
 4    you wish to suppress if there is indeed a privilege.
 5              MR. BRAFMAN:  Yes, your Honor, but the government has
 6    never seen these documents.  The lawyers in the courtroom today
 7    have never seen these documents.
 8              THE COURT:  You have the burden.  You have the burden
 9    of producing to me the documents you want to suppress.  It's
10    your burden.
11              MR. BRAFMAN:  I have them in the courtroom,
12    your Honor.  The government has never seen them.
13              THE COURT:  That's fine.
14              MR. SOLOWIEJCZYK:  That's true.  To be clear,
15    Mr. Nessim is not going to be trying this case.
16              THE COURT:  Is he on the TAINT team?
17              MR. SOLOWIEJCZYK:  He could look at the documents.
18              THE COURT:  Is he on the TAINT team?
19              MR. SOLOWIEJCZYK:  No, your Honor.
20              THE COURT:  Why isn't the TAINT team here?  Do you
21    guys know how to practice law?
22              MR. SOLOWIEJCZYK:  We try our best, your Honor.
23              THE COURT:  I'm a busy person.
24              MR. SOLOWIEJCZYK:  We understand that.  If for some
25    reason we had specific documents that they don't want somebody
```

 1    on the trial team to see, Mr. Nessim could see them.

 2              THE COURT:  Swear the witness.

 3    PAUL N. AMBROSE,

 4         called as a witness by the Defense,

 5         having been duly sworn, testified as follows:

 6              THE DEPUTY CLERK:  Tell us your name.

 7              THE WITNESS:  Paul N. Ambrose, Jr.

 8              THE DEPUTY CLERK:  Spell it.

 9              THE WITNESS:  A-m-b-r-o-s-e.

10              MR. BRAFMAN:  Your Honor, we have provided the

11    witness, the government, and your Honor with a small white

12    notebook that has the exhibits that we will be referring to.

13              For the convenience of everyone, I have spoken to the

14    government.  I would assume that since this is a hearing, that

15    your Honor will permit me to lead the witness through the

16    document to show which area I want him to focus on.

17              THE COURT:  Would you mind asking him a question.

18    DIRECT EXAMINATION

19    BY MR. BRAFMAN:

20    Q.  How are you employed, Mr. Ambrose?

21    A.  I am a contract partner for Cullen & Dykman LLP located at

22    433 Hackensack Avenue, Hackensack, New Jersey.

23    Q.  Are you a lawyer?

24    A.  Yes, I am.

25              THE COURT:  Yes, he is.  He's a partner at Cullen &

```
 1   Dykman.

 2   BY MR. BRAFMAN:

 3   Q.  Are you admitted both in New York and New Jersey.

 4   A.  Yes, I am.

 5   Q.  Now, directing your attention to the spring of 2014, did

 6   you meet an individual named Ibrahim Issa?

 7   A.  Yes, I did.

 8   Q.  What brought him to your office?  If you can tell the Court

 9   briefly.

10   A.  Mr. Issa was recommended to meet with me based upon the

11   existing client because Mr. Issa had a tax issue.

12   Q.  What is your area of expertise?

13           THE COURT:  Based on an existing client?  Do you mean

14   he was referred to you by another client?

15           THE WITNESS:  Yes.

16           THE COURT:  A client who had anything to do with him

17   or his businesses?

18           THE WITNESS:  No.

19           THE COURT:  Thank you.

20   BY MR. BRAFMAN:

21   Q.  What is the nature of your practice?

22   A.  I deal with tax controversy, state litigation, corporate

23   work.

24   Q.  How long have you practiced as a tax lawyer?

25   A.  I was admitted in 1980 in the state of New Jersey, in 1988
```

1    in the state of New York.  I've been practicing law for about

2    35 years.

3    Q.  Directing your attention to what's in your notebook that's

4    marked as Exhibit 1, do you see that document?

5    A.  Yes, do I.

6    Q.  Can you tell the Court what that document is.

7    A.  This document is a notice that was addressed to First Star

8    Auto Repair, Inc. at 1982 Bronxdale Avenue, Bronx, New York,

9    which was a notice of deficiency for the tax year December 31,

10   2012, form 1120.

11   Q.  Is this what you and Mr. Issa discussed?

12   A.  Yes, it is.

13   Q.  Without violating the privilege, would it be fair to say

14   that he agreed to have you represent him in connection with

15   this matter?

16   A.  Yes, he did.

17   Q.  And if you look to the back of that document, did you

18   prepare and execute a power of attorney?

19   A.  Yes, I did.

20   Q.  And is that your signature on the last page?

21   A.  Yes, it is.

22   Q.  Does that allow you to then interface on his behalf with

23   the Internal Revenue Service?

24   A.  Yes, it does.

25   Q.  Was it also signed personally by Ibrahim Issa?

1    A.  Yes.

2    Q.  Now, subsequent to --

3              THE COURT:  Hang on.  That is Mr. Issa signing as

4    president of the corporate entity that we see on the notice of

5    deficiency; is that correct?  On page 2 of form 2848 at the top

6    of the page?

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  Thank you.

9    BY MR. BRAFMAN:

10   Q.  And directing your attention to Exhibit 2, did you

11   subsequently write to the IRS on behalf of First Star Auto?

12   A.  Yes, I did.

13   Q.  And was that at the request of Mr. Issa?

14   A.  Yes.

15   Q.  Was that you advising the IRS that you were going to be

16   representing First Star Auto in connection with this matter?

17   A.  Yes.

18   Q.  Now, if you look at the second paragraph, in pertinent

19   part, the paragraph provides that the taxpayer is in the

20   process of reviewing all of its documents to determine if there

21   was an error in reporting its income and expenses.  In

22   addition, the taxpayer is in the process of retaining a new

23   accountant and, due to tax season, will not be able to meet

24   with them until the first week of May 2014.

25              Did I read that correctly?

1    A.  Yes, you did.

2    Q.  In terms of the taxpayer, while you were representing First

3    Star Auto, was it Mr. Issa who personally appeared on behalf of

4    First Star Auto?

5    A.  Yes.

6    Q.  And when Mr. Issa met with you, without, again, violating

7    privilege, did he ask you to assist him in the preparation of

8    an amended return and also to help him resolve his other tax

9    issues, including his personal tax issues?

10   A.  Yes, he did.

11   Q.  Now, directing your attention to Exhibit 3, is this a copy

12   of a page from your office diary maintained in or about April

13   of 2014?

14   A.  Yes, it is.

15   Q.  And the entry as to Mr. Issa -- the entry on April 21,

16   references Tony Issa.

17          Is that the defendant in this case?

18   A.  Yes.

19   Q.  Did you meet with Mr. Issa on that date?

20   A.  Yes, I did.

21   Q.  And do you remember whether or not there was also an

22   accountant present?

23   A.  Yes.

24   Q.  Who was the accountant?

25   A.  Chris Tsamutalis.

 1              MR. BRAFMAN:  For the reporter's benefit, that's

 2   T-s-a-m-u-t-a-l-i-s.

 3   Q.  On that date --

 4              MR. BRAFMAN:  Your Honor, can I assume without

 5   formally offering these exhibits --

 6              THE COURT:  They're all in.

 7              MR. BRAFMAN:  Thank you.

 8   Q.  Mr. Ambrose, on or about April 24, 2014, did you enter into

 9   a formal written retainer agreement with Mr. Issa?

10   A.  Yes, I did.

11   Q.  As president of First Star Auto?

12   A.  Yes, I did.

13              THE COURT:  And that's with the firm of Schiffman,

14   Abraham, Kaufman & Ritter?

15              THE WITNESS:  Yes, your Honor.

16              THE COURT:  That was your firm at that time?

17              THE WITNESS:  Yes, your Honor.

18   BY MR. BRAFMAN:

19   Q.  Now I'm referring you to Exhibit 4.

20   A.  Yes.

21   Q.  Is that the formal retainer agreement that you gave to

22   Mr. Issa?

23   A.  Yes, it is.

24   Q.  In the first sentence of Exhibit 4, you say, it was a

25   pleasure to meet with you and your wife, Daniella, on Monday,

1   April 21, along with Chris Tsamutalis, CPA, regarding your tax

2   issues.

3            Do you see that?

4   A.  Yes.

5   Q.  When you said, "your tax issues," were you also discussing

6   with him and his wife their personal tax issues?

7   A.  Yes.

8   Q.  In connection with this retainer agreement, if you look at

9   the bottom of page 1 where you indicate under item B the legal

10  services you were going to render, it says, among other things,

11  investigation of facts and research of law.

12           Is that correct?

13  A.  Yes.

14  Q.  And if you turn over to the second page, paragraph D says

15  preparation and filing of all necessary documents, forms,

16  agreements, and instruments in connection with our services

17  with the IRS.

18           Do you see that?

19  A.  Yes.

20  Q.  Did you limit this retainer agreement to only filing forms

21  on behalf of First Star?

22  A.  No.  It was also dealing with his personal tax issues.

23  Q.  Now, if you look at page 3 --

24           THE COURT:  Where does it say that by the way?  Where

25  does it say your personal tax issues?

1          MR. BRAFMAN:  It says all tax issues.

2          THE COURT:  Excuse me, Mr. Brafman.  I would like this

3    lawyer who drafted this retainer letter to tell me where there

4    is any reference in haec verba to Mr. Issa's personal taxes.

5    It may well be there.

6          He knows the letter.  He drafted the letter.  He's

7    obviously a very experienced tax lawyer.  Since it's signed by

8    Mr. Issa in his capacity as the president of First Star Auto

9    and there is no personal signature, I'd just like to know

10   where.  So that I don't have to read it, he can show me where

11   it says and your and your wife's personal taxes.

12          Does it say that anywhere in the letter?

13          MR. BRAFMAN:  I'll stipulate that it does not.

14          THE COURT:  Thank you, Mr. Brafman.  We'll move on.

15   BY MR. BRAFMAN:

16   Q.  Paragraph D where you referenced the filing of all

17   necessary documents, forms, agreements, and instruments in

18   connection with our services with the IRS, was it your

19   understanding that you were also going to be filing --

20          THE COURT:  We know that subjective understandings are

21   not part of contract terms.

22          MR. BRAFMAN:  That's not the discussion, your Honor.

23          THE COURT:  Contract terms are what's on a page.  You

24   know that.  That's like the first year of law school.

25          MR. BRAFMAN:  Your Honor, in the first year of law

1   school, I also learned that conversations that are

2   contemporaneous with the execution of the document may have a

3   bearing on what was the understanding of the parties.

4           THE COURT:  Are you familiar with the parol evidence

5   rule?

6           MR. BRAFMAN:  Yes, I am.

7           THE COURT:  This looks like an integrated document to

8   me.

9           MR. BRAFMAN:  I think the purpose of the exercise is

10  not to stand on ceremony.  I think the purpose of the exercise

11  is to determine whether he understood and Mr. Issa understood

12  that he was going to be assisting him in the preparation of

13  personal tax returns.

14          THE COURT:  Oh, yes.  Right.  I think I want to know

15  what the contract says.  Let's move on.  Let's move on.

16  BY MR. BRAFMAN:

17  Q.  If you look at --

18          THE COURT:  Regardless of what the words say,

19  Mr. Ambrose, you had a subjective understanding that your

20  retention was broader than your retention by First Star Auto

21  Repair.  That was your understanding.

22          THE WITNESS:  If you look at the second sentence, your

23  Honor, it says, you have requested that I and the law firm of

24  Schiffman and Abraham represent you regarding tax planning and

25  issues arising out of the filing of amended returns --

 1           THE COURT:  Yes.  That's true.  But the problem is the
 2  letter is addressed to Ibrahim Issa, president of First Star
 3  Auto Repair, Inc.  And as we all, know corporations can only
 4  act through their officers and managers.  Let's move on.
 5  BY MR. BRAFMAN:
 6  Q.  The question the Court asked you was whether or not you had
 7  an understanding, a subjective understanding, that you were
 8  being retained to represent more than just First Star Auto; is
 9  that correct?
10  A.  Yes.
11  Q.  And did you discuss that with Mr. Issa and his wife?
12  A.  Yes, I did.
13  Q.  And was it your understanding and as expressed to you his
14  understanding that you were going to try and, if I can use the
15  phrase, straighten out his tax issues?
16  A.  Yes.
17  Q.  Now, if you look at the top of page 3 where it says expert
18  fees, I'm going to read that paragraph to you.  This indicates
19  that you're going to be authorized by Mr. Issa to hire experts.
20           Is that correct?
21  A.  Yes.
22  Q.  And specifically it says, the second sentence, the third
23  sentence, you are responsible for payment of such expert fees
24  directly to the expert.  You have agreed for me to the retainer
25  to the services of Chris Tsamutalis, CPA, as my accountant in

1  preparation of amended returns and addressing tax planning and

2  other potential tax issues with the IRS.

3          Did I read that correctly?

4  A.  Yes, you did.

5  Q.  Did you bring Chris Tsamutalis to this meeting so that you

6  could retain him as your accountant to assist you in the

7  representation of Mr. Issa?

8  A.  Yes.

9  Q.  And did you know whether Chris Tsamutalis had any

10  accounting relationship with Mr. Issa prior to this meeting?

11  A.  He did not.

12  Q.  He did not?

13  A.  Correct.

14  Q.  Did you recommend Chris Tsamutalis?

15  A.  Yes, I did.

16  Q.  Was he present at the meeting when the discussion was held

17  concerning the tax issues?

18  A.  Yes.

19          THE COURT:  Was one of the things he was supposed to

20  do prepare amended returns if that were to prove necessary?

21          THE WITNESS:  Yes.

22          THE COURT:  He's your accountant.  Thank you.  Let's

23  move on.

24  BY MR. BRAFMAN:

25  Q.  And any returns that had not yet been filed that he would

```
 1   deem necessary?

 2   A.  Correct.

 3   Q.  Both corporate and personal?

 4   A.  Yes.  Both federal and state.

 5   Q.  Thank you.

 6           Now, if you look at Exhibit 5, on that date at that

 7   meeting, did you prepare a retainer letter?

 8   A.  Yes, I did.

 9   Q.  And was that considered by you to be a Kovel agreement that

10   your firm used in matters of this kind?

11   A.  Yes.

12   Q.  Was this your draft or Mr. Issa's draft?

13   A.  My draft.

14   Q.  And it wasn't Mr. Tsamutalis' draft.  It was your draft; is

15   that correct?

16   A.  That's correct.

17   Q.  And it's on your letterhead.

18   A.  Correct.

19   Q.  And it's addressed to Chris Tsamutalis; is that correct?

20   A.  Yes.

21           THE COURT:  And for legal services rendered to First

22   Star Auto Repair, Inc.; right?  Identified as taxpayer.

23           THE WITNESS:  Yes.

24           THE COURT:  Thank you.

25   BY MR. BRAFMAN:
```

1  Q.  Did you in that letter -- in the third paragraph, does it

2  say in connection with this employment, all communications

3  between you and the taxpayer, as well as communications between

4  you and any attorney, agent, or employee acting on my client's

5  behalf shall be regarded as confidential and made solely for

6  the purpose of assisting counsel and giving legal advice to the

7  taxpayer?

8  A.  Yes.

9  Q.  And although this is addressed and regards First Star Auto,

10 who did you understand would be communicating with

11 Mr. Tsamutalis on behalf of the taxpayer?

12 A.  I would be communicating.

13 Q.  And who else besides you?

14 A.  The client.

15 Q.  And who was the client besides First Star?

16 A.  Tony Issa.

17 Q.  Who would be the human who would be communicating?

18 Mr. Issa?

19        THE COURT:  Mr. Issa was going to be an agent or

20 employee acting on the client's behalf; right?  Isn't that

21 correct?

22        THE WITNESS:  Yes.

23        THE COURT:  Right.  Of course, because corporations

24 can only act through individuals.

25 BY MR. BRAFMAN:

1    Q.  Now, I want to turn your attention to --

2            THE COURT:  I assume you're aware of all the law

3    around Kovel, and you know that this letter doesn't vary that

4    law and that many kinds of communications under Kovel letters

5    have been held not to be privileged.  You know that.

6            THE WITNESS:  Right.

7            THE COURT:  So your intention was to the extent that

8    there was any kind of privilege that could attach to a

9    communication, it would; right?

10           THE WITNESS:  Well, your Honor, let me just say that

11   this Kovel letter --

12           THE COURT:  Yes or no.  It's a yes or no question.

13   That was your intention?

14           THE WITNESS:  Yes.

15   BY MR. BRAFMAN:

16   Q.  What did you want to add to that answer?

17   A.  That the note from the IRS was addressed to First Star.

18   It was not addressed to Tony individually.  Had Tony Issa

19   received a notice personally, I would have done another Kovel

20   letter.  But in this case, First Star was the taxpayer on the

21   notice of deficiency.

22           THE COURT:  Understood.

23   BY MR. BRAFMAN:

24   Q.  Now, when you understood that you were retaining a Kovel

25   accountant to work on your behalf, did you intend for any work

1    that he did on your behalf on behalf of First Star to be

2    privileged?

3         THE COURT:  Yes, but you know as a matter of law,

4    Mr. Brafman, that if he performed pure accounting services,

5    it's not privileged.  So don't go down this road.  You know

6    that.  You know the law.  He can't vary the law by writing a

7    letter that says all our communications are privileged.

8         MR. BRAFMAN:  He's not varying the law, your Honor.

9    He's adhering to the law.

10   Q.  Now, if you look at the top of page 2, among the things you

11   were retaining Mr. Tsamutalis to do was to review all

12   documentation and spreadsheets provided by the taxpayer for the

13   years 2010 to 2014?  Is that correct?

14   A.  Yes.

15   Q.  Now, the notice from the IRS only related to 2012; is that

16   correct?

17   A.  Yes.

18   Q.  And why were you interested in seeing the stream of income

19   that relates from 2010 through 2014?

20   A.  Because I was concerned that there might have been an

21   audit.

22   Q.  Sorry?

23   A.  An audit by the IRS.

24        THE COURT:  You were concerned that the IRS might be

25   auditing your client.

```
 1                THE WITNESS:  Correct.

 2                THE COURT:  During that period at some point.

 3                THE WITNESS:  Correct.

 4   BY MR. BRAFMAN:

 5   Q.  Now, you asked them to also review schedules summarizing

 6   the financial accounting reflected in the documentation?

 7   A.  Yes.

 8   Q.  And number 3, meet with the taxpayer to discuss and review

 9   issues regarding tax planning and potential tax issues with the

10   IRS?

11   A.  Yes.

12   Q.  Did you understand among the tax issues that you needed

13   guidance on were personal tax issues involving Mr. Issa?

14   A.  Yes.

15   Q.  Now, as the president of a small corporation, if the

16   corporation is audited, can that have serious tax consequences

17   to the individual taxpayer who is acting on behalf of the

18   corporation?

19   A.  Yes.

20   Q.  And if the corporate return doesn't adequately reflect the

21   compensation that flows to the personal taxpayer, can he or she

22   have serious tax issues with the IRS?

23   A.  Yes.

24   Q.  And was this --

25                THE COURT:  So even though the IRS hasn't sent a
```

1    deficiency notice, you were fully aware, as an experienced tax

2    lawyer, that as the president of some small corporation,

3    Mr. Issa, might have personal tax exposure.

4    BY MR. BRAFMAN:

5    Q.  Is that correct?

6              THE COURT:  Is that correct?

7              THE WITNESS:  Yes.

8              THE COURT:  But nonetheless you did not do what you

9    said you would ordinarily do, which is prepare a second Kovel

10   letter for this individual who might have personal tax exposure

11   as a result of this IRS notice that had been issued to his

12   corporation.  Is that correct?

13             THE WITNESS:  Not at that time.

14             THE COURT:  Thank you.

15   BY MR. BRAFMAN:

16   Q.  Was it your understanding or belief that this Kovel letter

17   was going to cover whatever Mr. Tsamutalis learned from the

18   investigation and review, including what he learned about

19   Mr. Issa personally?

20   A.  Yes.

21   Q.  And did you understand that that information, when conveyed

22   to Mr. Tsamutalis, was going to be privileged?

23   A.  Yes.

24   Q.  And did that information eventually impact on whether the

25   taxpayer personally had tax exposure here?

1   A.  Yes.

2   Q.  And that was one of your concerns?

3   A.  Yes.

4   Q.  Despite the fact that you didn't put his personal name on

5   the tax return, you had discussions with Mr. Tsamutalis that

6   this was a personal issue, as well as a corporate issue.  Isn't

7   that correct?

8   A.  Yes.

9   Q.  Now, number 4 says that he would be authorized to meet with

10  the IRS agent and review issues that arise if the IRS audits

11  the amended tax returns.  Is that correct?

12  A.  Yes.

13  Q.  And if the IRS audited the amended tax returns, would that

14  have implications to Mr. Issa personally as well?

15  A.  Possibly.

16  Q.  And 5, assist our office as may be required in the event

17  further accounting services are required; is that correct?

18  A.  Yes.

19  Q.  You then go on to say on the same page that absent your

20  consent -- I'm summarizing, but if you read through the bottom,

21  it's all work papers are going to be your work papers because

22  he's being retained by you; is that correct?

23  A.  Yes.

24  Q.  Is that your understanding, that when a valid Kovel

25  agreement is prepared, that if the accountant is working with

1  you to assist you in giving legal guidance to the client that

2  the accountant's work papers become your work product?

3  A.  Yes.

4  Q.  Did you direct Mr. Tsamutalis that if there is a request by

5  anyone to examine, inspect, or copy such documents that you

6  should be advised?

7  A.  Yes, I did.

8  Q.  And if he receives any subpoena, that you should be

9  advised?  Is that correct?

10 A.  Yes.

11 Q.  And if Mr. Tsamutalis had spoken with you when he received

12 the subpoena from the IRS, would you have given him permission

13 to simply respond to the subpoena, or would you have interfaced

14 with the government at that time?

15 A.  I would have interfaced with the government.

16 Q.  And would you have raised the issue of privilege before he

17 simply provided these documents?

18 A.  Absolutely.

19 Q.  You now know, after the fact, that he didn't call you when

20 he was contacted by the government; is that correct?

21 A.  Yes.

22 Q.  Now, in the course of preparing these tax returns, did you

23 also from time to time communicate with not only Mr. Issa

24 personally but also with his wife, Daniella, and also one of

25 the people who worked for him, Ada Vasquez?

```
 1   A.  Yes, I did.

 2   Q.  Did you understand that they were communicating to you on

 3   behalf of Mr. Issa at various times?

 4   A.  Yes.

 5   Q.  And were you copied on some of the emails that they wrote

 6   to the accountant in connection with their review of these

 7   materials?

 8   A.  Yes.

 9   Q.  I want you to look at Exhibit Number 6.  This is an email

10   chain that starts at the bottom of the first page.  It's from

11   Ada Vasquez to you.  That's you as the person it's directed to.

12   Is that correct?

13   A.  Yes.

14   Q.  And it's copied to Daniella.  You know that to be

15   Mr. Issa's wife?

16   A.  Yes.

17   Q.  And it's an email that is to Paul and Chris.  Paul is you,

18   sir; is that correct?

19   A.  Yes.

20   Q.  And Chris do you know to be Chris Tsamutalis?

21   A.  Yes.

22   Q.  The accountant; right?

23   A.  Yes.

24          THE COURT:  That's cetcpa; right?  That's

25   Mr. Tsamutalis' email?
```

1          THE WITNESS:  Yes.

2    BY MR. BRAFMAN:

3    Q.  The email reads:  As per Mr. Issa's request, I'm attaching

4    the consolidated statements of tax liabilities under Mr. Issa's

5    name.  He needs to discuss with you as soon as possible.

6    Please call him at your earliest convenience."

7          Did it strike you as odd that they were sending you

8    information concerning Mr. Issa personally?

9    A.  No.

10   Q.  Did you understand that part of what you and Mr. Tsamutalis

11   were going to be reviewing was his personal tax liability,

12   regardless of whose name is directly referenced in the Kovel

13   letter?

14   A.  Yes.

15   Q.  Now there is then a letter from Mr. Tsamutalis back to Ada:

16   "I will discuss this with Paul and get back to you shortly.

17   The next two days, I will be out of the office.  Thank you.

18   CET."

19          You understand that to be how Chris Tsamutalis signs

20   these email correspondences; is that correct?

21   A.  Yes.

22          THE COURT:  And both of these emails the subject is

23   corporation taxes under Ibrahim Issa's name, not Mr. Issa's

24   personal income tax.  Right?

25          MR. BRAFMAN:  It doesn't say that, Judge, most

1   respectfully.

2          THE COURT:  Excuse me.  Does it say, subject,

3   corporation taxes under Ibrahim Issa's name on Ms. Vasquez's

4   email to you and to the accountant whose name I can't

5   pronounce?  The subject says corporation taxes under Ibrahim

6   Issa's name.  That's what the subject says?

7          MR. BRAFMAN:  On the Ada email at the top.

8          THE COURT:  On Ada's email.  Is that what it says?

9   Corporation taxes under Ibrahim Issa's name?

10          THE WITNESS:  It says that, and in the body --

11          THE COURT:  No.  I asked what the subject says.

12   That's what it says; right?

13          THE WITNESS:  Yes.

14          THE COURT:  And the accountant's email is re:

15   corporation taxes under Ibrahim Issa's name.

16          THE WITNESS:  Yes.

17          THE COURT:  Thank you.  Move on.

18          MR. BRAFMAN:  But the substance of the email is

19   consolidated statement of tax liability under Mr. Issa's name.

20   It doesn't say corporate tax liability under Mr. Issa's name.

21   Is that correct?

22          MR. NESSIM:  Objection, your Honor.  He's testifying.

23          THE COURT:  I know, plus individuals don't have

24   consolidated tax liability.  Only corporations do.

25   BY MR. BRAFMAN:

1    Q.  Does there come a time, sir, when the IRS provides Mr. Issa

2    or First Star Auto with a second letter?

3    A.  Yes.

4    Q.  Turn, if you will, sir, to Exhibit 7.

5            Do you see it?

6    A.  Yes.

7    Q.  Is that the second letter that Mr. Issa provides to you?

8    A.  Yes.

9    Q.  Do you see on the upper right side it says the date is

10   May 19, 2014; correct?

11   A.  Yes, it does.

12   Q.  On the upper right-hand box, there is a reference last date

13   to petition tax court, August 17, 2014; correct?

14   A.  Correct.

15   Q.  And did this letter alarm you in any way as Mr. Issa's or

16   First Star's attorney?

17   A.  Yes.

18   Q.  Why is that, sir?

19   A.  Well, in this second notice, there was -- if you turn to

20   the fifth page --

21           THE COURT:  What's at the top of the page?

22           THE WITNESS:  It says:  "The proposed changes to your

23   tax return is listed below."  I noticed that there was almost a

24   million dollars of income that was not reported according to

25   the IRS.  However, I also noticed that the IRS did not change

1    any of the deductions which were about $520,000.  But what was

2    more pertinent at this time was that now they provided 1099's

3    that were sent to the IRS.

4              THE COURT:  Do you mean that's what is attached?

5              THE WITNESS:  Yes.  The two pages which were not in

6    the first notice of March of 2014.

7              THE COURT:  Yes.

8              THE WITNESS:  The last one was -- I was concerned

9    because it showed a $1,448,070 --

10             THE COURT:  That's a big number.

11             THE WITNESS:  Right.  I believe -- but I could be

12   wrong -- but I thought that that was from the U.S. Post Office.

13   Again, I'm not sure.

14   BY MR. BRAFMAN:

15   Q.  When you see on the bottom of the last page where it says,

16   federal tax withheld, zero, do you see that?

17   A.  Yes.

18   Q.  That's the last page all the way on the bottom.

19   A.  Yes.

20   Q.  Then it says nonemployment commission or compensation.

21             What does that stand for?

22   A.  Well, that's a 1099 miscellaneous.

23   Q.  Now, if this configuration by the IRS was accurate, were

24   you concerned that this would have impact on whatever personal

25   return Mr. Issa filed for that year as well?

1    A.   Yes.

2    Q.   Why is that, sir?

3    A.   Because, as the Court pointed out, a corporation is

4    statutory, and it would flow to Mr. Issa as sole shareholder as

5    well as an officer and director of that closely held

6    corporation.

7    Q.   So he would have had personal tax liability if this wasn't

8    addressed properly; correct?

9    A.   Correct.

10   Q.   Now, did you ever learn after this letter whether or not

11   Mr. Issa or First Star was audited?

12   A.   No, it was not.

13   Q.   And the first thing you learned about the tax issues was

14   when Mr. Issa was arrested and under indictment which was

15   superseded with tax crimes.  Correct?

16   A.   Correct.

17   Q.   Have you seen that indictment?

18   A.   Yes, I have.

19   Q.   Does it pertain to the tax year of 2012 among other things?

20   A.   Are we talking about the second indictment?

21   Q.   Yes.

22   A.   Yes.

23   Q.   The one that added the tax charges.

24   A.   Yes.

25   Q.   Now, did you and Mr. Tsamutalis collectively decide whether

1   or not Mr. Issa should file an amended return?

2   A.   Well, I had directed Mr. Issa's spouse to prepare a

3   spreadsheet and to incorporate and review the 1099's, and she

4   had done that.  I believe we had met in June, and after

5   reviewing everything and Mr. Tsamutalis discussing with me the

6   intricacies of deductions, expenses, I had made a determination

7   and directed him to prepare an amended return.

8   Q.   When you say "him," directed Mr. Tsamutalis?

9   A.   Mr. Tsamutalis to prepare an amended return.

10  Q.   Now, you're an experienced tax lawyer.  You have a

11  background in business.

12          Do you do compliance work?

13  A.   I used to do compliance work in the early '80s.  I haven't

14  done any compliance work probably in 30 some odd years.

15  Q.   Tell us just briefly.  What's the difference between

16  compliance work and tax controversy work?

17  A.   Tax compliance is usually the review of the taxpayer's

18  income and deductions in order to prepare an accurate tax

19  return and any amendments thereto; whereas tax controversy

20  deals with audits and filing and doing litigation with the U.S.

21  government, the IRS.  And it's limited to that, as well as

22  preparing private letter rulings.

23  Q.   Was Mr. Tsamutalis directed by you to provide you with his

24  expertise in compliance work?

25  A.   Yes.

1   Q.  And that would mean Mr. Tsamutalis would be required to

2   meet with the taxpayer, the human face of the corporation or

3   his agent, and prepare spreadsheets, prepare bookkeeping

4   entries; is that correct?

5   A.  Yes.

6   Q.  Did you do that work, or did you rely on him?

7   A.  I relied on Mr. Tsamutalis.

8   Q.  Was his work done at your direction or just doing whatever

9   he wanted?

10  A.  Mr. Tsamutalis took direction from me and me alone.

11  Q.  When he responded to your direction, did the spreadsheets

12  and materials that he worked with -- did he then discuss them

13  with you?

14  A.  Yes.

15  Q.  And was the decision to file an amended tax return a

16  decision that you and Mr. Tsamutalis made together?

17  A.  Yes, but I directed it because I felt that at this point we

18  would file an amended return.  And if there was an audit, then

19  I would step in and handle the audit.  But at this point, we

20  felt it was best to show the IRS our amended returns and that

21  the amount owed was incorrect.

22  Q.  And was the amended return then prepared by Mr. Tsamutalis?

23  A.  Yes, it was.

24  Q.  Was it ultimately filed by the taxpayer?

25  A.  Yes, it was.

1   Q.  Was it signed, if you know, by Mr. Issa?

2   A.  Yes.

3   Q.  Now, I want to turn your attention to Exhibit 8.

4          Exhibit 8 is another email chain; is that correct?

5   A.  Yes.

6   Q.  And starting on the bottom, it's from Daniella who is

7   Mr. Issa's wife, dated May 28, 2014.  And it says important

8   letter from the IRS, First Star 2012.

9          Do you see that?

10  A.  Yes.

11  Q.  And that is sent by her to Mr. Issa; is that correct?

12  A.  Yes.

13  Q.  And then on the top of the page, there is an email dated

14  the same date, maybe ten minutes later, even less, from

15  Mr. Issa to you.  Is that correct?

16  A.  Yes.

17  Q.  And also to Accountant Chris Talis.

18          Is that the short name for Mr. Tsamutalis?

19  A.  Yes, it is.

20  Q.  And that is a letter from Mr. Issa jointly to you, and it

21  says:  "Paul, Chris, we received another letter about First

22  Star 2012.  Please.  We need to move a bit faster on this.

23  Daniella is capable of answering any questions you may have,

24  and then when we meet next week, we could move further ahead.

25  Please look at the documents we provided and see if you have

1   any questions before our meeting."

2          Is that what then prompts a meeting subsequently in

3   June?

4   A.   Yes.

5   Q.   Now I want you to look at Exhibit 9.  And we start, if we

6   can, at the back because it's an email chain.  On the last

7   page, there is an email to Daniella on April 21:  "Hi,

8   Daniella.  It was a pleasure meeting you and Tony today at Paul

9   Ambrose's office in Hackensack.  I would like to learn more

10  about the company's accounting system and how the various

11  transactions were being recorded by the company.  This will

12  help me while working with Paul attempts to handle IRS

13  inquiries currently outstanding.  Please let me know what would

14  be the best way to facilitate that," signed by Chris Talis.

15         Then if you go to the page before that, an email from

16  Daniella to Chris:  "I would like to send to you a website and

17  a list of documents you need from us today.  Would you be able

18  to come to our main office in the Bronx, tomorrow, Thursday?  I

19  think it would be easier for me to show and explain to you

20  everything."

21         Is that correct?

22  A.   Yes.

23  Q.   If you look at the first page, on Monday, June 2, it's a

24  letter from Daniella to Chris.  And you were copied; is that

25  correct?

1    A.  Yes, I am.

2    Q.  And the subject:  "Meeting.  Hi, Chris.  Do you have more

3    questions in regards to the spreadsheets I sent you for First

4    Star?  Tony wants me to make sure I answer to all your

5    questions before the meeting this Thursday.  Please let me

6    know.  Thank you."

7            And then if you turn to Exhibit 10, that's a copy of

8    your diary for June 8; is that correct?

9    A.  Yes.

10   Q.  I'm sorry.  For the week of June 8.

11           For the left-hand side under June 5, Thursday, at

12   approximately 1:00 p.m., there's a Tony Issa entry.

13           Is that your handwriting?

14   A.  Yes, it is.

15   Q.  Does that reflect the meeting that you had with Mr. Issa

16   and Chris and Daniella on that date?

17   A.  Yes, it is.

18   Q.  Was it to discuss the spreadsheet?

19   A.  Yes.

20   Q.  Did the spreadsheet contain various lists of expenses that

21   they were trying to explain to you?

22   A.  Yes.

23   Q.  And to Mr. Tsamutalis?

24   A.  Yes.

25   Q.  To determine what additional IRS concerns they might have?

1   A.  Correct.

2   Q.  Both corporate and personal?

3   A.  Yes.

4   Q.  Now, do you sometimes also confer with Mr. Tsamutalis by

5   phone?

6   A.  Yes, I do.

7   Q.  Do you sometimes confer with him by phone because you do

8   not generally provide privileged discussions in the body of an

9   email?

10  A.  Yes.

11  Q.  And did you deem your discussions with Mr. Tsamutalis about

12  anything related to Tony Issa's tax life at that time as being

13  privileged?

14  A.  Yes, I did.

15  Q.  Now, on Exhibit 11 is an entry on August 13, and it

16  indicates "Phone conference with Chris Talis."

17          Is that the accountant?

18  A.  Yes.

19  Q.  This request -- was that a conference that you had with him

20  concerning Issa?

21  A.  Yes, it was.

22  Q.  Was it before the amended tax returns were filed?

23  A.  I believe so.

24  Q.  And you would need to go into privileged conversations in

25  order to tell us precisely what was discussed; is that correct?

1    A.   Yes.

2    Q.   So without violating the privilege, would it be fair to say

3    that included in the subject matter was what ramifications the

4    filing of these returns are going to have on Tony Issa's

5    personal tax life?

6    A.   Yes.

7    Q.   Were you aware at the time Mr. Issa retained you from

8    discussions you had with him that he had gone through an

9    extended period of divorce before he married Daniella?

10   A.   Not really.

11   Q.   Did you ultimately learn about that?

12   A.   Yes, I did.

13   Q.   Did you learn that during the period of his divorce that he

14   was delinquent in the filing of various personal and corporate

15   tax returns?

16   A.   Yes, I did.

17   Q.   Did you learn that in connection with privileged

18   conversations?

19   A.   Yes, I did.

20   Q.   Was it your understanding that included among the

21   assignments that Mr. Tsamutalis was supposed to carry out were

22   these areas as well?

23   A.   Absolutely.

24   Q.   Now, I want to refer you, sir, to Exhibit 12.  I want you

25   to start from the next-to-the-last page.  There is discussion,

1   is there not, as to what bank statements you would need and

2   that they should be requested from the IRS in case they have

3   any questions?

4   A.  Yes.

5   Q.  Now, if you go to the front of the exhibit, there's an

6   email dated August 13, and it's an email from Chris Tsamutalis

7   to Daniella copying you and Mr. Issa, and the subject is

8   corporate tax returns.

9           Do you see that?

10  A.  Yes.

11  Q.  Is the subject heading on these emails simply copied

12  because it's the subject matter that goes through most of these

13  emails?

14          THE COURT:  Oh, come on, Mr. Brafman.

15          MR. BRAFMAN:  Your Honor, that's exactly what happened

16  here.

17          THE COURT:  That's argument for you.

18          MR. BRAFMAN:  It's common sense, Judge.  You don't

19  keep changing the subject matter if you're talking to the same

20  person over and over again.  We do it all the time.

21          THE COURT:  Okay.  That's your argument.  Let's move

22  on.

23  BY MR. BRAFMAN:

24  Q.  The exhibit on August 13 indicates it's from Chris, from

25  the accountant:  "Hi, Daniella.  I just spoke to Paul.  He

1    informed me that he received a response from the IRS and that

2    he does not have to file a petition in tax court.  The deadline

3    to file an amended return is March 15, '15.  I think you should

4    meet with Paul early next week to go over the amended return

5    that I should have completed by tomorrow.  I think it is

6    important that we go over the numbers all together prior to

7    filing."

8             Do you see that?

9    A.  Yes.

10   Q.  If you go back to Exhibit 11, that is the meeting that he

11   is referencing because that's the meeting that -- that's the

12   conference call that you talked about.

13            He's now confirming to Daniella that he spoke to you

14   about this; is that correct?

15   A.  Yes, it is.

16   Q.  And although the heading only says corporate tax return, he

17   does indicate that he is going to be -- that he discussed with

18   you a petition in tax court; is that correct?

19   A.  Yes.

20   Q.  And is that the choice you had to make, whether to file an

21   amended return or to go petition in tax court?

22   A.  Yes.

23   Q.  And the subject matter doesn't say, petition in tax court,

24   does it?  The subject matter heading.

25   A.  No, it does not.

1      THE COURT:  The entity that had been told that it had

2  to file a petition in tax court by a certain date was First

3  Star Auto; correct?  Because they got the notice of deficiency

4  from the IRS.

5      THE WITNESS:  Yes.

6      THE COURT:  That was the one that by September or

7  something like this -- that's your drop-dead date for filing a

8  petition in tax court; right?

9      THE WITNESS:  Yes.

10      THE COURT:  Mr. Issa never got such a notice; right?

11      MR. BRAFMAN:  Mr. Issa got indicted.

12      THE COURT:  I understand.  I am asking the witness

13  some questions.  I think I'm entitled to some answers.

14  BY MR. BRAFMAN:

15  Q.  On the judge's point, Mr. Ambrose --

16      THE COURT:  I'd like him to answer my questions before

17  you start rephrasing my questions.

18      THE WITNESS:  I'm sorry.

19      THE COURT:  The taxpayer who got a notice with a

20  drop-dead date for filing a petition was First Star Auto

21  Corporation; correct?

22      THE WITNESS:  That's correct.

23      THE COURT:  Did Tony Issa ever get such a notice with

24  a drop-dead date for filing such a petition?

25      THE WITNESS:  No.

1          THE COURT:  And you were referring in this email to a

2     petition for First Star Auto, were you not?

3          THE WITNESS:  Yes.

4          THE COURT:  Right.

5     BY MR. BRAFMAN:

6     Q.   The first notice, if you will, that Tony Issa personally

7     gets about the IRS is when he's indicted for tax fraud; is that

8     correct?

9     A.   Yes.

10    Q.   And when he's indicted for tax fraud, does it become

11    evident from the face of the indictment that among the things

12    the government is charging him with is the amended tax return

13    for 2012 as being false; is that correct?

14    A.   Yes.

15    Q.   And one of the things that you know from the work you did

16    is that the discussions with Chris Tsamutalis included the

17    concern that there not be a tax deficiency as to Tony Issa

18    personally; is that correct?

19    A.   Yes.

20         THE COURT:  Where is the privilege?  Waived.  Waived.

21    Waived.  Waived.  They were talking about what they talked

22    about.

23         MR. BRAFMAN:  Your Honor, we're talking about the

24    subject matter.  We're not talking about the details that the

25    government questioned Mr. Tsamutalis about, the numbers, how he

1   got the numbers, who he got the numbers from.  They didn't

2   indict Mr. Issa for tax fraud until after they debriefed

3   Mr. Tsamutalis.

4              THE COURT:  I get that.  Believe me.  I get that.

5   It's really unfortunate that Mr. Tsamutalis didn't take the

6   time to call Mr. Ambrose.  I agree.  He wouldn't be in this

7   pickle.

8              It's also really unfortunate that the government

9   decided to indict this man for tax fraud instead of what was

10  once a very straightforward bribery case that we had once upon

11  a time, but the government does tend to overcomplicate things.

12  I've gotten used to that over 20 years.

13             MR. BRAFMAN:  May I just have one moment, your Honor,

14  to save some time.

15             THE COURT:  Yes.

16             (Pause)

17  BY MR. BRAFMAN:

18  Q.  Mr. Ambrose, I'm going to skip ahead to save some time and

19  go to Exhibit 14 if we can.

20             THE COURT:  I'd actually like to look at Exhibit 13,

21  if you don't mind.  Would that be all right, Mr. Brafman?

22             MR. BRAFMAN:  Yes.  I'll question the witness about

23  it.

24             THE COURT:  I just have a question.  I note that the

25  first email at the end of the chain which is the one at the top

1    of the first page, it says, subject.  Re:  Resolving all

2    corporate sales, DOL, and withholding issues with the six

3    corporations.  It doesn't say re:  Corporate tax returns.  It

4    says re:  Resolving all corporate sales, DOL, and withholding

5    issues with the six corporations.

6            You were the author of this email; correct, sir?

7            THE WITNESS:  Yes.

8            MR. BRAFMAN:  That's why I wanted to go to the next

9    exhibit, because it explains this email, and then I will work

10   back.  Your Honor, if I may --

11           THE COURT:  You just told me that all emails have the

12   same heading because one just carries the heading forward and

13   forward and forward.  Forgive me if I noticed that email by

14   Mr. Ambrose.

15           MR. BRAFMAN:  One of the problems in this case is that

16   the taxpayer's tax profile was so complicated that this evolved

17   into a much more complicated process that Mr. Ambrose will

18   explain to you, if given an opportunity to do so, in a moment.

19   Q.  Did there come a time during your advising the taxpayer as

20   to what his potential exposure is that you came to learn that

21   he had other small corporations besides First Star Auto?

22   A.  Yes.

23   Q.  And did you also come to learn, without waiving the

24   privilege, that there were concerns that he may have income

25   from some of these corporations?

1  A.  Yes.

2  Q.  And I asked you to look at Exhibit 14.

3       Is this a memo that you prepared?

4  A.  Yes, I did.

5  Q.  And in addition to the federal issues that you needed to

6  advise Mr. Issa about, were there concerns about state tax

7  issues?

8  A.  Yes.

9  Q.  And is this a memo that you prepared once you had an

10  understanding, with the assistance of Mr. Tsamutalis, of just

11  how complicated the tax issues were that you needed to have

12  assistance in advising Mr. Issa?

13  A.  Absolutely.

14  Q.  And this three-page memo lists the names of a number of

15  different corporations, and it also lists Mr. Ibrahim Issa with

16  his personal Social Security number in the first paragraph or

17  second paragraph.  Is that correct?

18  A.  Yes.

19  Q.  Sir, is that correct?

20  A.  Yes.

21  Q.  I'm sorry.

22       And when you list the taxpayer's personal Social

23  Security number in connection with even a potential corporate

24  tax issue, could that reflect on the taxpayer's personal tax

25  exposure?

1  A.  Yes, it could.

2  Q.  Were there concerns on your part about that?

3  A.  Absolutely.

4  Q.  Now, were some of these corporations dormant?

5  A.  Yes.

6  Q.  And when a corporation is dormant, are there tax

7  obligations?

8          THE COURT:  It looks like all of them were dormant.

9          MR. BRAFMAN:  Yes, but, Judge, that doesn't avoid the

10 potential tax liability.

11         THE COURT:  Oh, I know.  Taxes never go away.

12         MR. BRAFMAN:  Right.

13 Q.  So even though these are apparently dormant, in the event

14 that there was tax liability that had not been resolved prior

15 to them entering the dormant stage, would that be the

16 responsibility of the person who ran the corporations?

17 A.  Yes.

18 Q.  And even if the corporation was a corporation, if the

19 taxpayer whose personal Social Security number is the

20 individual Ibrahim Issa obtained any income from these

21 corporations, would that be something you would want

22 Mr. Tsamutalis to help you with?

23 A.  Absolutely.  Especially there are sales and use tax which

24 are considered trust tax that flow to the individual

25 shareholder or responsible party, as well as the state of

1    New York and the IRS -- they take the last return filed, and

2    they use that as a basis for determining the taxes in the

3    future, even though there was no income.

4    Q.  Now, we've established that there was one Kovel letter and

5    one retainer letter; is that correct?

6    A.  Yes.

7    Q.  Did you feel that there was a legal obligation on your part

8    or an ethical obligation on your part to do another Kovel

9    letter every time you gave Mr. Issa advice that impacted on any

10   of these corporations and possibly impacted on him?

11   A.  No.

12   Q.  And when he was conferring with you as an attorney, did he

13   have an understanding, if you know --

14        THE COURT:  You can't testify about his understanding.

15   BY MR. BRAFMAN:

16   Q.  Was it your understanding, Mr. Ambrose, that your

17   conversations with Mr. Issa were privileged, regardless of

18   whether the subject matter changed as to different companies or

19   his personal issues?

20   A.  Absolutely.

21   Q.  And if you had received the subpoena, would you have been

22   able to just go in absent a waiver from Mr. Issa and testify as

23   to those issues?

24   A.  No.

25   Q.  Did you believe, when you retained Mr. Tsamutalis, that he

 1  was your Kovel accountant to assist you in advising this

 2  taxpayer, Mr. Ibrahim Issa?

 3  A.  Absolutely.

 4  Q.  Was it your understanding that the conversations between

 5  Mr. Tsamutalis and you were to remain privileged absent the

 6  waiver?

 7  A.  Yes.

 8  Q.  Is there anybody besides Mr. Issa who could have waived

 9  that privilege in your opinion?

10  A.  No.

11  Q.  Are you aware of whether Mr. Issa ever waived that

12  privilege?

13  A.  Not to my knowledge.

14  Q.  When you had Mr. Tsamutalis confer with Mr. Issa about

15  these issues, did you believe that he was doing that as your

16  agent?

17  A.  Absolutely.

18  Q.  And then subsequent to you preparing that memo, Exhibit 13,

19  which is the email that the Court focused on that I'm going to

20  admit now, even though you've already done number 14, because

21  the email discusses your memo.  Is that correct?

22  A.  Yes.

23  Q.  And the memo is Exhibit 14; is that correct?

24  A.  Yes.

25  Q.  And you also addressed this -- I'm sorry.  Apparently Chris

1   Talis is on this chain; is that correct?

2   A.  Yes.

3   Q.  And he says about the six corporations, those are among the

4   corporations that are in your memo; is that correct?

5   A.  Yes.

6           MR. BRAFMAN:  If I may just have a moment, your Honor.

7           THE COURT:  Of course, Mr. Brafman.

8   BY MR. BRAFMAN:

9   Q.  I'm referring you now, sir, to Exhibit 15, which is an

10  email from Daniella, who is Mrs. Issa, to Socrates Tsamutalis.

11          Is that what he called himself as times?  That's the

12  same Chris?

13  A.  Yes.

14  Q.  And the email says:  Subject.  Hybrid corporate taxes

15  amended 2013 and 2014.

16          Did you come to learn in your capacity as Mr. Issa's

17  lawyer that there was also a company called Hybrid?

18  A.  Yes.

19  Q.  That was closely associated with Mr. Issa?

20  A.  Yes.

21  Q.  And that he was the president and shareholder of?

22  A.  Yes.

23  Q.  Now, the email reads:  "Good morning, Chris.  I spoke to

24  Tony, and he told me that he will wait until March 2014 to

25  amend 2012 taxes and file 2013 and 2014 all together.  Did you

1    guys decide what to do with the Philomena property money?  He

2    didn't say anything about that."

3           The reference to "you guys" -- did you understand that

4    to be you and Chris?

5    A.  Yes.

6           MR. NESSIM:  Objection.

7           THE COURT:  I'm sorry.  The government is trying to

8    object.

9           MR. BRAFMAN:  I need a verbal sound, your Honor.

10          THE COURT:  I agree.  A verbal sound is usually

11   helpful.

12          MR. NESSIM:  Objection.  The witness is not on this

13   email as far as we can tell.

14          THE COURT:  That's correct.

15   BY MR. BRAFMAN:

16   Q.  Are you familiar with this email?

17   A.  Yes.

18   Q.  And it references you even though you're not on the email?

19   A.  Yes.

20   Q.  Have you seen this email prior to today?

21   A.  Yes.

22   Q.  And is it an email that you have reviewed prior to

23   testifying?

24   A.  Yes.

25          MR. BRAFMAN:  Your Honor, this is a hearing.

```
 1              THE COURT:  I know that, Mr. Brafman.  I just had to

 2    let him object.

 3              MR. BRAFMAN:  Okay.  Thank you.  The objection was

 4    overruled though; right?

 5              THE COURT:  The objection was definitely overruled.

 6              MR. BRAFMAN:  Thank you.

 7    Q.  I'm going to read it from where I left off.

 8              THE COURT:  You don't have to read it.  I can read it.

 9    I'm really good at reading.

10    BY MR. BRAFMAN:

11    Q.  The last sentence says:  "I would like to see if you could

12    start filing all of the returns for the old corporation to

13    clean Tony's name.  Paul sent us all the notes about what has

14    to be done."  Do you see that?

15    A.  Yes.

16    Q.  And it wasn't just to file the old corporations'.  It was

17    to clean Tony's name; is that correct?

18    A.  Yes.

19    Q.  Did you understand that Mr. Issa had expressed concern

20    about his potential personal tax liability?

21              THE COURT:  No.  No.  No.  He can't testify about what

22    Mr. Issa said.  Sorry.  Mr. Issa can if he wants to get on the

23    stand.  I'm sure he does not.

24    BY MR. BRAFMAN:

25    Q.  Was it your understanding that among the things you were
```

1   requesting Mr. Tsamutalis to do is to help clear Tony's name?

2   A.   That was my understanding.

3   Q.   And the Paul there -- is that you?

4   A.   Yes, it is.

5   Q.   When he says "sent us all the notes about what has to be

6   done," did you prepare notes in the course of this

7   representation?

8   A.   Yes, I did.

9   Q.   Did you share those notes with Mr. Tsamutalis?

10  A.   Yes.

11  Q.   As a privileged document?

12  A.   Yes, I did.

13  Q.   Now, I want to ask you -- do you have what's marked as

14  Government Exhibit 19?  Do you have that in front of you?  Let

15  me give you a copy.  The government has it.  It's theirs.  I'm

16  going to use it for a moment.

17        THE COURT:  You can use anybody's exhibit you want.

18  BY MR. BRAFMAN:

19  Q.   Government Exhibit 19 -- is this an email that you've seen?

20  A.   Yes.

21  Q.   And it's an email from Mr. Wirshba, who is an assistant

22  United States attorney, dated July 2, 2018.  Is that correct?

23  A.   Yes.

24  Q.   Does there come a time when Mr. Tsamutalis calls you and

25  tells you, in words or substance, that he just remembered that

1   he had a Kovel agreement?

2   A.  He had received numerous calls from the assistant U.S.

3   attorney, as well as I believe CI Agent Soto, and realized and

4   advised them that he had a Kovel letter.

5   Q.  Did there come a time when Mr. Tsamutalis asked you whether

6   he needed a lawyer?

7   A.  Yes.

8   Q.  Did you believe you could represent him?

9   A.  No, but he asked me to contact Kyle to tell him -- to

10  discontinue contacting him until Chris obtained an attorney.

11  Q.  Did you call this person Kyle who is an assistant

12  United States attorney identified as Kyle Wirshba?

13  A.  I called Ms. Soto, as well as Kyle.

14  Q.  Did you subsequently speak to Kyle?

15  A.  Yes, I did.

16  Q.  Did you discuss with him, as it indicates, that you were

17  Mr. Issa's lawyer?

18  A.  Yes.  I told Kyle that I was Mr. Issa's tax attorney.

19  Q.  Did you describe yourself as his old attorney?

20  A.  No, I did not.

21  Q.  Weren't you still his attorney at the time?

22  A.  Yes, and I'm still his attorney.

23  Q.  Did you ask Mr. Wirshba whether or not he had a view of

24  whether you had a conflict if you tried to represent

25  Mr. Tsamutalis?

1    A.  No.  What I told him was that Mr. Tsamutalis had contacted

2    me and asked me to call you, and I told him that there was a

3    conflict and that Mr. Tsamutalis would be retaining counsel.

4           And I said, don't you believe that's the case?  And

5    Tsamutalis said, yes.  That was really the end of the

6    discussion.

7    Q.  Well, there was another part of the discussion.

8           Was there a discussion as to whether or not they or

9    the government was aware of a Kovel letter?

10   A.  Chris had told me earlier that when he advised Kyle that

11   there was a Kovel letter, he didn't know what it was.

12   Q.  Who didn't know?

13   A.  Kyle.

14   Q.  Now, did you discuss the Kovel letter with Mr. Wirshba?

15   A.  Other than to say that there was a Kovel letter, that was

16   it.

17   Q.  And did you tell him that you never really -- it's quoted

18   there that you never really did anything other than retain

19   Tsamutalis to deal with the tax issue.

20   A.  I would have never said that.

21   Q.  Well, you've just testified for over an hour about all of

22   the things you've done in connection with this.

23          Have you been telling the Court the truth?

24   A.  Yes.

25   Q.  And we've been looking at documents that have been prepared

1    contemporaneously throughout the period of your representation;

2    is that correct?

3    A.  Yes.

4              MR. BRAFMAN:  Nothing further, your Honor.

5              THE COURT:  Thank you, Mr. Brafman.

6              Does the government have any cross for Mr. Ambrose?

7              MR. NESSIM:  Yes, your Honor.

8    CROSS-EXAMINATION

9    BY MR. NESSIM:

10   Q.  Good afternoon, Mr. Ambrose.

11   A.  Good afternoon.

12   Q.  In connection with briefing on this Kovel issue, Mr. Issa

13   filed a brief in support of his motion, and there was an

14   affirmation that you filed in support of that brief.  Is that

15   right?

16   A.  Yes.

17   Q.  This is an affirmation of Paul N. Ambrose, Jr.; right?

18   That's you?

19   A.  Yes.

20   Q.  And this is something you made.  You affirmed the

21   statements made to be true?

22              THE COURT:  It's a hearing.  Please.  I'm not a jury.

23   I don't need it.  I've read his affirmation.  We know what an

24   affirmation means.  Mr. Ambrose knows.  I know.  You know.

25   Everybody knows.  Let's just ask him a substantive question.

```
 1   BY MR. NESSIM:

 2   Q.  There is no mention in this affirmation of you doing

 3   anything with Mr. Issa's personal tax liability or personal tax

 4   returns; right?

 5   A.  There's no mention of it, but there was involvement that I

 6   represented him regarding his personal tax returns, as well as

 7   tax lien issues.

 8   Q.  I'll show you the affirmation.

 9   A.  I know what the affirmation says.

10   Q.  Take a look at it.

11           THE COURT:  He says that there wasn't anything in it

12   on that subject.  He did.  He was very forthright.

13   BY MR. NESSIM:

14   Q.  You only mentioned the corporate taxes; right?

15           MR. BRAFMAN:  Objection.

16           THE COURT:  It says what it says.

17           MR. NESSIM:  Mr. Concepcion, can we pull up Government

18   Exhibit 1, please.

19   Q.  This is the April 24 agreement with you and Ibrahim Issa as

20   president of First Star Auto; right?

21   A.  Yes.

22           MR. NESSIM:  Mr. Concepcion, could we pull up

23   Government Exhibit 2, please.

24   Q.  This is the April 24, 2014, agreement with Chris

25   Tsamutalis.  And this is your letter to him about First Star
```

1  Auto; right?

2  A.  Yes.

3  Q.  At the time you entered into this agreement, you already

4  anticipated that there would be the filing of an amended tax

5  return; right?

6  A.  Not really.  We needed to have the taxpayer's spouse

7  prepare a spreadsheet.  But it was one of the issues that had

8  to be addressed because prior to this -- subsequent to the

9  April 24 letter, the IRS sent a notice saying that a tax court

10  petition had to be filed I believe by August of 2014.

11         THE COURT:  So basically I think, if I understand what

12  you're saying, the possibility of an amended tax return was on

13  the table.  No final decision had been made.

14         THE WITNESS:  Yes.  Because, if I may speak.

15         THE COURT:  Yes.

16         THE WITNESS:  When you are dealing with a notice of

17  deficiency, if you disagree, unless there was an audit and what

18  we call a 90-day letter to file a tax court petition, the only

19  way to rectify the notice of deficiency, one of the ways, is to

20  file an amended return.

21  BY MR. NESSIM:

22  Q.  So you did anticipate that Mr. Tsamutalis would prepare and

23  file an amended tax return for First Star Auto Repair on

24  April 14; is that correct?

25  A.  No.  As I said, that was one of the options.

1    THE COURT:  And one option was to file a petition in

2    tax court?  What were the other options besides filing an

3    amended return?  Because I was never a tax lawyer.

4    THE WITNESS:  Well, at this point, we would probably

5    file an amended return.  And it wasn't until we had the May 19,

6    2014, letter that mentions a tax court petition.  I would not

7    have amended both my retainer agreement as well as Tsamutalis'

8    agreement to include a tax court petition.  I wouldn't have

9    done that.

10   First of all, Mr. Tsamutalis was not -- he again would

11   have --

12   THE COURT:  That's not the point because you never

13   filed a tax court petition; right?

14   THE WITNESS:  No, I didn't.

15   THE COURT:  So the government is asking.  At the

16   moment that you retained Mr. Tsamutalis, you had already

17   decided that an amended return was going to have to be filed.

18   Is that correct?

19   THE WITNESS:  Yes.

20   BY MR. NESSIM:

21   Q.  We'll turn to Defense Exhibit 13 which you discussed for a

22   moment.

23   In your memo that you prepared, it lists six

24   corporations.  Not one of those corporations is First Star Auto

25   Repair; is that correct?

1    A.  Yes.

2              THE COURT:  Those are the defunct corporations or

3    dormant corporations?

4              MR. NESSIM:  Yes.

5    Q.  The amended tax return was prepared by Mr. Tsamutalis for

6    First Star's tax year 2012 return; right?

7    A.  Yes.

8    Q.  And that was filed?

9    A.  Yes.

10   Q.  And Mr. Issa signed that return?

11   A.  Yes.

12   Q.  And Mr. Tsamutalis signed that return?

13   A.  I'm not sure.

14             MR. BRAFMAN:  I'll stipulate it was signed by both,

15   your Honor.

16             THE COURT:  It was signed by the tax preparer.  Of

17   course it was.

18             MR. NESSIM:  Thank you, your Honor.

19   Q.  Subsequent to your work or Mr. Tsamutalis' work on the

20   amended tax return, Mr. Tsamutalis and Mr. Issa entered into

21   subsequent separate agreements to engage in tax work; is that

22   right?

23             MR. BRAFMAN:  Objection.  Relevance.  It's post the

24   indictment.

25             THE COURT:  I don't know that fact.

1          MR. BRAFMAN:  I'll withdraw the objection, your Honor.

2          THE COURT:  Thank you.  All of this is new to me.

3   BY MR. NESSIM:

4   Q.  After the preparation of the First Star 2012 amended

5   return, Mr. Tsamutalis and Mr. Issa engaged in subsequent

6   agreements, and Mr. Tsamutalis worked on his taxes after this

7   agreement.  Is that right?

8   A.  To my knowledge, yes.

9   Q.  And those agreements -- you were not a party to those

10  agreements?

11  A.  No, I was not.

12  Q.  And Mr. Tsamutalis was paid directly by Mr. Issa for his

13  work on those personal and corporate tax returns; right?

14  A.  I have no knowledge of that.

15          MR. NESSIM:  May I have a moment, your Honor?

16          THE COURT:  You were going to show me these

17  agreements?

18          MR. NESSIM:  Yes, your Honor.  They were marked as

19  Government Exhibits 20, 21, and 22 I believe.

20          THE COURT:  So Exhibit 20 relates to Mr. Issa's 2013

21  return, 21 relates to First Star Auto's 2013 return, and 22

22  relates to First Star Auto's 2015 return.

23          Did I get that right?

24          MR. NESSIM:  Yes, your Honor.

25          THE COURT:  And none of them relates to the 2012

1    return.

2              MR. NESSIM:  Correct.

3    Q.  So you mentioned that you're not sure if Mr. Issa paid

4    Mr. Tsamutalis directly, but you were not paid for any of this

5    work; right?

6    A.  In terms of compliance, no.

7    Q.  The subsequent tax work.  You were never paid any fee for

8    any of that.

9    A.  To my knowledge, there was no IRS controversy.  There were

10   no audits.

11             MR. NESSIM:  No further questions, your Honor.

12             MR. BRAFMAN:  Can I just ask two or three brief

13   questions?

14             THE COURT:  Of course.

15             MR. BRAFMAN:  Thank you.

16   REDIRECT EXAMINATION

17   BY MR. BRAFMAN:

18   Q.  When you got the first tax notice, you were just asked

19   whether or not you had already decided whether an amended

20   return was going to be filed.  It was one of the options;

21   correct?

22             THE COURT:  That wasn't the question I asked him.  I

23   said at the time that he retained Mr. Tsamutalis, which was

24   April 24, 2014, I said had you decided at that point that there

25   was going to have to be an amended tax return, and he said yes.

1   So that was after the notice was received.

2   BY MR. BRAFMAN:

3   Q.  But you could have just advised him to pay the deficiency;

4   correct?

5   A.  Yes.

6   Q.  You didn't have to file an amended return; correct?

7   A.  Correct.

8   Q.  Whether you file an amended return or not would depend on

9   what Mr. Tsamutalis found out during his investigation on your

10  behalf; is that correct?

11  A.  Well, the second notice raised a red flag where at this

12  point we were going to make a decision whether to file an

13  amended return, but we needed --

14          THE COURT:  Here is the problem.  You already told me

15  that as of the 24th of April that you decided that there was

16  going to have to be an amended return.

17          THE WITNESS:  Well, that's because the IRS notice did

18  not have the 1099's attached.  The later notice was more

19  detailed, your Honor.  And that created another issue in my

20  mind that now I'm looking at over a million dollars of income

21  not reported by First Star.

22          THE COURT:  Got it.

23          THE WITNESS:  And I didn't know -- and that also

24  mentioned about the tax court petition.

25          THE COURT:  So you made a decision before you hired

1   Tsamutalis, but you had to revisit that decision after you got

2   the second notice because there was more information.

3          THE WITNESS:  Well, when I hired Tsamutalis, we were

4   dealing with the first notice that seemed to be filing an

5   amended return.  The second notice changed what we may file,

6   but that wasn't until our June meeting.

7          THE COURT:  So the second notice caused you to rethink

8   the decision that you had made.

9          THE WITNESS:  Correct, your Honor.

10         THE COURT:  Okay.

11  BY MR. BRAFMAN:

12  Q.  Even though we're referring to the 2012 return, that's not

13  filed until sometime in 2014, the amended return; is that

14  correct?

15  A.  Correct.

16  Q.  Now, you were referred to your affirmation that was

17  prepared in connection with this litigation.

18         And I know the Court has it.  And I know we can all

19  read it.

20         But I just want to refer you, if I can, to paragraph 3

21  of your affirmation which in pertinent part says that Mr. Issa

22  agreed for me to retain the services of Chris Tsamutalis, CPA,

23  as my accountant in preparation of amended returns and in

24  addressing tax planning and other potential tax issues with the

25  IRS.

1          Did I read that correctly?

2   A.  Yes, you did.

3   Q.  So it's not exclusively to work only on behalf of First

4   Star; is that correct?

5   A.  Yes.

6   Q.  And in paragraph 5 on the last page, again in pertinent

7   part, the last part of that paragraph, referring to

8   Mr. Tsamutalis, I retain Mr. Tsamutalis with the express

9   authority of Mr. Issa with the understanding that all

10  communications between Tsamutalis and Issa, as well as

11  communications between Tsamutalis and any attorney, agent, or

12  employee acting on Mr. Issa's behalf shall be regarded as

13  confidential and may, for the purpose of assisting in giving

14  legal and tax advice to Mr. Issa.  Correct?

15  A.  Yes.

16  Q.  It doesn't say to First Star.  It says to Mr. Issa.  Is

17  that correct?

18  A.  Correct.

19  Q.  Is that true?

20  A.  Yes.

21  Q.  Was that part of the process?

22  A.  Yes, it was.

23  Q.  And what advice you gave Mr. Issa would depend on what

24  Mr. Tsamutalis discovered when he did his investigation on your

25  behalf; correct, sir?

1    A.   Correct.

2              MR. BRAFMAN:  Nothing further.

3              THE WITNESS:  Thank you, your Honor.  I hope you feel

4    better.

5              MR. BRAFMAN:  Can we have a two-minute break, Judge.

6              THE COURT:  More like five.

7              (Witness excused)

8              (Recess)

9              MR. BRAFMAN:  I just wanted to bring something to the

10   Court's attention.

11             THE COURT:  Of course.

12             MR. BRAFMAN:  Judge, you know, you can look at an

13   indictment 50 times and notice something for the first time

14   when you're beaten up by the Court over it.

15             THE COURT:  You know it's happened to me.

16             MR. BRAFMAN:  Okay.  Well, I just noticed, your Honor,

17   that they didn't indict First Star.  They only indicted

18   Mr. Issa.  And they indicted Mr. Issa because of income

19   diverted from First Star.

20             So they can't have it both ways arguing that Mr. Issa

21   should face jail for corporate returns that were prepared

22   falsely because he's the guy who helped prepare them and then

23   at a Kovel letter say, wait a minute.  This information was

24   really only supposed to have been provided on behalf of First

25   Star.

1          I think they would have been wiser to have indicted

2     the corporation, as they often do, and Mr. Issa.  But they

3     chose not to do that.  When you read the conspiracy preamble to

4     the tax charges, Mr. Issa is conspiring with others, his wife,

5     among others, to prepare false returns on behalf of First Star.

6          So the fact is, Judge, that I think by establishing

7     what we've so far established I'm in the hunt -- I'm not saying

8     I'm there yet, but I think, given the way --

9          THE COURT:  Well, First Star had a Kovel letter.  No

10     question about it.  And I agree.  There is kind of an

11     interesting issue here.  Now, the Kovel letter, however,

12     doesn't cover everything that Chris did.

13          MR. BRAFMAN:  I'm not suggesting it does because

14     there's a cut-off date.

15          THE COURT:  That's why we have to do this document by

16     document you see.

17          MR. BRAFMAN:  If you look at the way the indictment

18     reads, it refers throughout only to the 2012 tax return.

19          THE COURT:  I don't understand the government to be --

20     it's been a while since I've read it, but I thought that it was

21     about -- Count Seven is an individual return for 2013, and

22     there is no Kovel letter on that because he has a separate

23     agreement on that.

24          MR. BRAFMAN:  Correct.

25          THE COURT:  Then Counts Six is a 2012 individual

1  return.  Count Five is aiding and abetting for false corporate

2  return which is obviously First Star.  That's the company one;

3  right?  First Star?

4          MR. SOLOWIEJCZYK:  Yes, your Honor.

5          THE COURT:  Count Four is sort of general tax evasion,

6  and then there is this stupid conspiracy count.

7          MR. BRAFMAN:  I just wanted to point that out for the

8  record and for your Honor because it wasn't obvious to me until

9  your Honor punched me in the face with those facts.

10         THE COURT:  Well, the government is at least going to

11 go forward on Count Seven.  That's clearly covered.

12         MR. BRAFMAN:  That's a very different indictment.

13         THE COURT:  Okay.  So what else do you have for me?

14         MR. BRAFMAN:  I have Mr. Tsamutalis who is here.

15 While he was subpoenaed by the government, I intend to call

16 him.

17         THE COURT:  Oh, this is getting fun.  All right.

18         MR. BRAFMAN:  This is his lawyer.

19         THE COURT:  Good afternoon, sir.  How are you?

20         MR. AGOSTINO:  Good afternoon.  I'm fine.  Thank you,

21 your Honor.

22         THE COURT:  Could you put your appearance on the

23 record for me.

24         MR. AGOSTINO:  Good afternoon.  My name is Frank

25 Agostino from Agostino and Associates, Hackensack, New Jersey.

```
 1    I represent Chris Tsamutalis.

 2              THE COURT:  Good afternoon.  And you are welcome.

 3              MR. AGOSTINO:  Thank you very much, your Honor.

 4              THE COURT:  Get your client.

 5              MR. BRAFMAN:  Would you ask him to come in, please,

 6    sir.

 7              THE COURT:  Hello, sir.

 8    CHRIS TSAMUTALIS,

 9         called as a witness by the Defense,

10         having been duly sworn, testified as follows:

11              THE DEPUTY CLERK:  Tell us your name and spell your

12    last name.

13              THE WITNESS:  Chris Tsamutalis.  It's

14    T-s-a-m-u-t-a-l-i-s.

15              THE COURT:  Okay.  Mr. Brafman, I believe you've

16    called the witness.

17              MR. BRAFMAN:  Yes, ma'am.  Your Honor, again, because

18    it's a hearing, I'm just going to proceed as if he was just a

19    witness.

20              THE COURT:  As if he what?

21              MR. BRAFMAN:  As if he was just a witness, not their

22    witness, not my witness.  I'm calling him to save a lot of

23    time.

24              THE COURT:  Great.

25              MR. BRAFMAN:  Thank you.
```

1    DIRECT EXAMINATION

2    BY MR. BRAFMAN:

3    Q.  Mr. Tsamutalis, prior to coming to court today, did you and

4    I ever meet?

5    A.  No.

6    Q.  Have you and I ever had any discussion other than me saying

7    hello to you before?

8    A.  No.

9    Q.  In the past several months, once we knew that there was a

10   Kovel agreement, would it be a fair statement that we've tried

11   to meet with you and speak with you?

12   A.  You never have.

13   Q.  I never asked your attorney to allow you to meet with us?

14   He never told you that?

15   A.  No.

16   Q.  Do you want to stipulate to that on the record?

17           THE COURT:  It's not going to make any difference to

18   me.  You haven't talked to him before.  Fine.

19           MR. BRAFMAN:  Fair enough.

20   Q.  Mr. Tsamutalis, before you open that book, can I ask you,

21   sir:  Are you a certified public accountant?

22   A.  Yes.

23   Q.  How long have you been a certified public accountant?

24   A.  Twenty-eight years.

25   Q.  Where are you licensed to practice?

```
 1   A.   New Jersey.

 2   Q.   Do you practice anywhere else?

 3   A.   Yes.

 4   Q.   Where?

 5   A.   In the New York metropolitan area.

 6   Q.   Did there come a time in April of 2014 when you came to

 7   meet a man named Ibrahim Issa?

 8   A.   Yes.

 9   Q.   How did you come to meet him?

10   A.   I got a call from Mr. Ambrose who asked that I meet with

11   him.

12   Q.   And Mr. Ambrose together?

13   A.   Yes.

14   Q.   And Mr. Ambrose is an attorney with whom you had worked

15   with in the past?

16   A.   Yes.

17   Q.   And did you understand that the purpose of the meeting was

18   for you to perhaps become retained as an accountant to work on

19   behalf of Mr. Ambrose and Mr. Issa?

20   A.   Well, I learned at the meeting, yes.

21   Q.   And at this meeting, did you meet personally with Mr. Issa

22   alone or with Mr. Issa and Mr. Ambrose together?

23   A.   With Mr. Ambrose together.

24   Q.   And was Mr. Issa there with his wife as well?

25   A.   Yes.
```

1    Q.  Daniella -- is that her name?

2    A.  Yes.

3    Q.  Directing your attention to the first exhibit that's in

4    that white book.  If you could open it and look at it.  Exhibit

5    Number 1.

6            Do you have it, sir?

7    A.  Yes.

8    Q.  Do you recognize that document?

9    A.  I do.

10   Q.  Would it be fair to say that the document is the subject

11   matter that was discussed at the first meeting with Mr. Issa

12   and Mr. Ambrose?

13   A.  Yes.

14   Q.  And did you come to learn at that meeting that Mr. Issa was

15   the president of First Star Auto?

16   A.  Yes.

17   Q.  And did you come to know at that meeting that there were

18   tax issues that Mr. Issa needed to address?

19   A.  Yes.  Based on this letter.  Yes.

20   Q.  But did you come to know whether or not he had additional

21   tax issues at that time?

22   A.  At that time, no.

23   Q.  But subsequently?

24   A.  Subsequently, yes.

25   Q.  And did Mr. Ambrose ultimately retain you?

 1    A.   Yes.

 2    Q.   Can you look at Exhibit 3.  I'm sorry.  It's Mr. Ambrose's

 3    diary, but is it April 21, to the best of your recollection,

 4    when you met him?

 5    A.   Yes.

 6    Q.   This was at Mr. Ambrose's office; is that correct?

 7    A.   Yes.  That's correct.

 8    Q.   Now, did there come a time when you were retained by

 9    Mr. Ambrose?

10    A.   Yes.

11    Q.   To assist First Star and Mr. Issa?

12    A.   I believe just First Star.

13    Q.   And that was on April 24, 2014?

14    A.   Yes.

15    Q.   And if you look at Exhibit 5, if you turn to the third

16    page, is that your signature, Chris Tsamutalis, dated April 24?

17    A.   Yes.

18    Q.   And you understand now that this is a Kovel letter?

19    A.   Yes.

20    Q.   And do you understand the significance of a Kovel letter as

21    you sit here today?

22    A.   Yes.

23    Q.   And the purpose of a Kovel letter is to have the accountant

24    become the agent of the attorney; is that correct?

25              MR. NESSIM:  Objection.

 1          THE COURT:  The objection is sustained.  I know what

 2   it is, and it will be what I say it is.

 3          MR. BRAFMAN:  He needs to know what it is.

 4          THE COURT:  I don't care.

 5          MR. BRAFMAN:  Can I have his understanding?

 6          THE COURT:  No.  Move on.

 7          MR. BRAFMAN:  It's very important, Judge.

 8          THE COURT:  Then ask him for his understanding.  Don't

 9   you tell him what you think his understanding is.

10          MR. BRAFMAN:  Yes, your Honor.

11   Q.  What's your understanding of a Kovel agreement when a

12   lawyer retains an accountant to assist him with a client?

13   A.  It's an agreement between the accountant and the attorney.

14   So I would be working under him with the attorney-client

15   privilege.

16   Q.  And that anything you did on behalf of the client at the

17   direction or in conjunction with the lawyer would remain

18   privileged as you were an agent of the attorney?

19   A.  Yes.

20   Q.  And any documents you prepared would be privileged as well?

21   A.  Yes.

22          THE COURT:  To the fullest extent of the law.  Okay.

23   BY MR. BRAFMAN:

24   Q.  Do you recognize this document?

25   A.  Yes.

1    Q.  And if you look at the third paragraph on that page, it

2    says that in connection with this employment, all

3    communications between you and the taxpayer, as well as

4    communications between you and any attorney, agent, or employee

5    acting on my client's behalf, shall be regarded as confidential

6    and made solely for the purpose of assisting counsel in giving

7    legal advice to the taxpayer.

8            Is that correct?

9    A.  Yes.

10   Q.  That was your understanding as to the conditions under

11   which you were retained on April 24; correct, sir?

12   A.  Yes.

13   Q.  Now, the taxpayer, in your mind at the time, was First Star

14   Auto?

15   A.  Yes.

16   Q.  And in terms of the communications on behalf of the

17   taxpayer, did you understand that any communications by you

18   with an agent or employee acting on the client's behalf was

19   also to be confidential?

20   A.  Yes.

21   Q.  And did you understand that Mr. Issa and his wife were

22   agents of the client?

23   A.  Well, they were owners of the company.  He was an owner of

24   the company.  That's how I knew him as.

25   Q.  But did you understand him to be one of the people who were

 1  going to be covered by this privilege?

 2  A.  No.

 3  Q.  Did you understand that your communications to him about

 4  tax issues involving First Star were going to be privileged?

 5  A.  Yes.

 6  Q.  And that those communications would be as if he made them

 7  to Mr. Ambrose; is that correct?

 8  A.  Yes.

 9  Q.  And you took some direction from Mr. Ambrose; is that

10  correct?

11  A.  That's correct.

12  Q.  And you gave Mr. Ambrose certain advice and your opinion as

13  to certain tax matters; is that correct?

14  A.  Yes.

15  Q.  And you did that with the understanding that this

16  information was being given by you to Mr. Ambrose as an agent

17  of Mr. Ambrose.  Correct?

18  A.  Correct.

19  Q.  Now, if you look at the second page, among the things you

20  were going to be doing was to review all documentations and

21  spreadsheets provided by the taxpayer and/or his former

22  accountant for the years 2010 to 2014; correct?

23  A.  Correct.

24  Q.  Was that to remain privileged?

25  A.  Yes.

1    Q.  And item 2, you were supposed to review schedules

2    summarizing the financial accounting reflected in the

3    documentation.  Correct?

4    A.  Yes.

5    Q.  And you were supposed to meet with the taxpayer to discuss

6    and review issues regarding tax planning and potential tax

7    issues with the IRS; correct?

8    A.  Yes.

9    Q.  And who was the person that you were going to be meeting

10   with if the taxpayer was a corporation?

11   A.  I would assume it's the president, Mr. Issa.

12   Q.  And did you have that understanding when you signed this

13   document?

14   A.  Yes.

15   Q.  And in terms of potential tax issues with the IRS, did you

16   know on that date precisely the whole universe of tax issues

17   that might come up in connection with your job?

18   A.  No.

19   Q.  You would first need to do your investigation, confer with

20   Mr. Ambrose, and then have an understanding as to which tax

21   issues arise; correct?

22   A.  Yes.

23   Q.  Now, whether they were corporate or personal tax issues, if

24   they ended up being personal tax issues, you would advise

25   Mr. Ambrose and Mr. Issa, but it would remain privileged; isn't

1   that correct?

2   A.  No.

3   Q.  If you came across them in connection with your work on

4   behalf of First Star and it reflected on personal tax issues,

5   you don't believe that would be privileged?

6           MR. NESSIM:  Objection, your Honor.  This is getting

7   into a legal conclusion.

8           THE COURT:  It does.  It gets into a legal conclusion.

9   He's already said he doesn't think they were privileged.  I get

10  to decide whether they were or not, and my decision is the only

11  one that matters.

12  BY MR. BRAFMAN:

13  Q.  Number 5 says you're going to assist our office, meaning

14  Mr. Ambrose, as may be required in the event further accounting

15  services are required.  Is that correct?

16  A.  Yes.

17  Q.  So at the time you agreed to this Kovel letter, you did not

18  know exactly what accounting services would be required?

19  A.  At the time we were dealing with that notice that was

20  presented.

21  Q.  And in order to respond to the notice, you would have to do

22  some investigation?

23  A.  Yes.

24  Q.  The notice had a substantial tax deficiency alleged;

25  correct?

1   A.   Correct.

2   Q.   So you would need to go through books and records to

3   determine whether it was accurate whether you had any legal tax

4   defenses; correct?

5   A.   Well, I was provided with Excel spreadsheets, and I worked

6   off the Excel spreadsheets.

7   Q.   And then you did your inquiry, and then you gave your

8   recommendation to Mr. Ambrose; correct?

9   A.   That's correct.

10  Q.   Now, you were billing for your time at $300 an hour; is

11  that correct?

12  A.   Correct.

13  Q.   And it was Mr. Ambrose's firm who you would be billing;

14  correct?  At this point.

15  A.   At this point, yes.

16  Q.   And there was a specific understanding that, if you look

17  further down that page, work papers prepared by you or under

18  your direction belonged to the law firm.  Is that correct?

19  A.   Correct.

20  Q.   And there was a specific understanding that if there was a

21  request by anyone to examine and inspect a copy of such

22  documents or records that you would first notify Mr. Ambrose;

23  correct?

24  A.   Correct.

25  Q.   Including any attempt to serve you with a court order or

1   subpoena.  You would immediately return the documents, records,

2   and work papers to Mr. Ambrose at his request.  Is that

3   correct?

4   A.  Correct.

5   Q.  Now, you signed this letter on April 24, 2014; correct,

6   sir?

7   A.  Yes.

8   Q.  Now, subsequently -- and I'm going to do this quickly

9   because I think they're in the record and the Court has read

10  them -- there were a series of emails between you and

11  Mr. Ambrose at times; is that correct?

12  A.  Yes.

13  Q.  And there were a series of emails where you were copied

14  between Daniella or Mr. Issa and you and Mr. Ambrose; correct?

15  A.  Correct.

16  Q.  And all that was done in connection with your work on

17  behalf of Mr. Ambrose.

18  A.  Correct.

19  Q.  Now, there comes a time, if you look at Exhibit 7 -- do you

20  recognize that document?

21  A.  That's the IRS notice.

22  Q.  That's the second notice, isn't it?

23  A.  Yes.

24  Q.  And the second notice, Exhibit 7, comes on May 19, 2014;

25  correct?

 1   A.  Correct.

 2   Q.  And the decision that you, in conjunction with Mr. Ambrose,

 3   had to make was whether to file an amended return or whether to

 4   petition the tax court; correct?

 5   A.  Correct.

 6   Q.  And your job was to do the compliance work; correct?

 7   A.  My job was if we were going to amend the return, I would

 8   amend the return.

 9   Q.  And you would figure out what amounts to put on the amended

10   return; correct?

11   A.  It was based on the schedules provided to me by Daniella

12   and Mr. Issa, yes.

13   Q.  And they provided them to you in your capacity as the Kovel

14   accountant for Mr. Ambrose; correct?

15   A.  Yes.

16            MR. NESSIM:  Objection.

17            THE COURT:  Go on.

18   BY MR. BRAFMAN:

19   Q.  And the second letter says, last day to petition tax court,

20   August 17, 2014.

21            Do you see that, sir?  On the top corner.

22   A.  Yes.

23   Q.  And subsequent to receiving this letter, did you confer

24   with Mr. Ambrose?

25   A.  Yes.

1   Q.  And without telling us what was said in this conversation,

2   which was to be privileged, did you ultimately decide what

3   course of action to recommend to the taxpayer?

4   A.  I believe we decided to file an amended return.

5   Q.  Was that a decision that you and Mr. Ambrose made together?

6   A.  Along with the taxpayer, yes.

7   Q.  But it was your professional opinion that that was a good

8   thing to do; correct?

9   A.  Well, Mr. Ambrose helped me make that decision, yes.

10  Q.  I'm not saddling you with exclusive responsibility.

11  A.  Okay.

12  Q.  But you, sir, were part of the mix of efforts.

13  A.  Yes.

14  Q.  Advising the taxpayer; correct?

15  A.  Correct.

16  Q.  And although the taxpayer was First Star Auto, you were

17  interfacing with Mr. Issa and his wife; correct?

18  A.  Yes.

19  Q.  Now, if you look at the back of this document, this

20  document now has 1099's attached to it; is that correct?

21  A.  Yes.

22  Q.  Those 1099's, if you look at the last page on the bottom

23  left, have a number of $1,448,070; correct?

24  A.  Yes.

25  Q.  That's a substantial deficiency; is that correct?

1   A.   Correct.

2   Q.   And ultimately, as a result of the amended return, do you

3   understand what happened?

4   A.   Yes.  Based on the schedule that was provided to me and the

5   explanation from Daniella, she explained to me how the income

6   and expense worked on that statement, and that's how we

7   prepared the amended return.

8   Q.   Subsequent to filing the amended return for that tax year,

9   are you aware whether or not Mr. Issa was ever audited in

10  response to the amended return?

11  A.   I'm not aware of any audit.

12  Q.   Did you see any further correspondence from the IRS with

13  respect to that tax return addressed either to Mr. Issa or

14  First Star?

15  A.   Other than those two letters?

16  Q.   Yes.

17  A.   No.

18  Q.   The next thing that you understand with respect to that tax

19  year is when Mr. Issa is arrested and charged and indicted for

20  tax fraud in connection with those years; is that correct?

21  A.   Can you say that again.

22  Q.   The next interaction, if you will, by the government in

23  connection with that amended return was when you learned that

24  Mr. Issa had been arrested --

25          THE COURT:   An "interaction by the government" cannot

1    be what he learned.  That doesn't make any sense at all.

2    BY MR. BRAFMAN:

3    Q.  Did you ever have any further interaction in connection

4    with the IRS with regard to the amended tax return for 2012?

5    A.  I received a subpoena.

6    Q.  That's what I'm getting to.  Thank you, sir.

7               If I may just have one minute, your Honor?

8               THE COURT:  Could I ask you when that happened, sir.

9               THE WITNESS:  When did I receive --

10              THE COURT:  When you got the subpoena.

11              THE WITNESS:  The subpoena was somewhere around the

12    middle of September of '16.

13              THE COURT:  The middle of September of 2016.

14              THE WITNESS:  I think it was the 13th.

15              THE COURT:  The middle of September of 2016.  That's

16    good enough for my purposes.

17              MR. BRAFMAN:  Let me just have a minute, Judge.

18              THE COURT:  Of course.

19    BY MR. BRAFMAN:

20    Q.  When you got the subpoena, did you call or email or in any

21    way advise Mr. Ambrose that you had received a subpoena at that

22    time?

23    A.  When I received it, no.  I notified him later.

24    Q.  No.  I'm not talking about later.  I'm talking about when

25    you got the subpoena.

1    A.  Yes.

2    Q.  Did you notify him at all?

3    A.  No.

4    Q.  Despite the clear instructions in the Kovel letter that you

5    were required to notify him, you did not; is that correct?

6    A.  That's correct.

7    Q.  And then there came a time when you actually met with

8    agents; is that correct?

9    A.  That's correct.

10   Q.  And when I say "agents," IRS agents or postal inspectors?

11   A.  No.  IRS agents came to my office.

12   Q.  When they came to your office and they gave you the

13   subpoena, they asked you for all of the records that you have

14   been working on with respect to Mr. Issa; correct?

15   A.  Correct.

16   Q.  Including the period covered by the Kovel letter.

17   A.  Correct.

18   Q.  And you gave it to them.

19   A.  I did.

20   Q.  And despite the instructions in the Kovel letter that

21   documents were not to be turned over.

22   A.  Yes.

23   Q.  Did you also discuss with the agents the work you did on

24   behalf of Mr. Issa?

25   A.  Not in any detail, no.

1    Q.  Not in any detail?  Well, let me ask you this --

2           THE COURT:  Did you answer the questions that they put

3    to you?

4           THE WITNESS:  As best as I could, yes.

5           MR. BRAFMAN:  You don't have the 3500 materials?

6           THE COURT:  No.

7           MR. BRAFMAN:  3546.

8           THE COURT:  There it is.  3546.  Sorry.

9    BY MR. BRAFMAN:

10   Q.  Now, I would assume that you don't know, as you sit here

11   now, the dates on when you met with the government; is that

12   correct?  Without looking at something to refresh your

13   recollection.

14   A.  It was right around that date, the middle of --

15   Q.  I'd ask you to look at the document which is 3546-01, a

16   report dated September 16, 2016.  If you could look at that in

17   the back of the binder, the black binder.

18          Can may I approach the witness and help him?

19          MR. SOLOWIEJCZYK:  Your Honor, the government

20   wonders --

21          MR. BRAFMAN:  It's to refresh his recollection.

22          MR. SOLOWIEJCZYK:  -- the relevance of this inquiry.

23   It all postdates the Kovel agreement.  If the point is that he

24   forgot a Kovel existed when he talked to the government, we'll

25   stipulate to that.

1          MR. BRAFMAN:  Yes, but the subjects he discussed with

2     the government is what this hearing is all about.

3          THE COURT:  What this hearing is all about will be me

4     saying and you're going to come back tomorrow, and you're going

5     to come back Monday, and we're going to go document by document

6     through every document that Mr. Brafman wants to suppress.

7          And I really do think this is comprehended within that

8     because the ultimate result of this hearing is going to be do I

9     grant his motion to suppress on a document-by-document basis.

10          We're going to start again at 12:30 tomorrow.  We're

11     going to go until 5:30 tomorrow night.  Then we'll start on

12     Monday morning at 10:00.  We will go from day to day until

13     we're done, and your calendar is of no relevance to me,

14     Mr. Brafman.

15          MR. BRAFMAN:  I'm not asking about my calendar.  I'm

16     asking if the Court has concluded that I've met my burden of

17     establishing a Kovel relationship.

18          THE COURT:  There is a Kovel agreement, and I have a

19     legal question that I want addressed.  We're still going to go

20     through the documents, even if you're withdrawing your motion

21     to suppress.

22          MR. BRAFMAN:  I'm not, but we don't need to go through

23     the documents --

24          THE COURT:  Yes, we do.

25          MR. BRAFMAN:  -- until the Court decides that there is

1    the existence of a Kovel agreement.

2          THE COURT:  Of course there's a Kovel agreement

3    between him and First Star, and I want to discuss the legality

4    of what it means that First Star was an S corporation.  That's

5    what I want to decide legally.

6          MR. SOLOWIEJCZYK:  The Government would like to be

7    heard as to whether they've met their burden before any

8    decision is made outside the presence of the witness.

9          THE COURT:  Do you want to go on?  I've overruled

10   their objection to your asking questions about the 3500

11   material.

12         MR. BRAFMAN:  Thank you, Judge.

13   Q.  Can I ask you, sir --

14         Can I show him the document to save some time, Judge?

15         THE COURT:  I'd love to save time.

16   BY MR. BRAFMAN:

17   Q.  This is 3546-01.  So that's the reference number that you

18   will be looking at.

19         Look at the heading of this document, does it refresh

20   your recollection that your first in-person meeting with the

21   agents when they served you with the subpoena was on

22   September 16, 2016?

23         THE COURT:  You had said the middle of September 2016.

24   Does this jog your memory that it was in fact September 16?

25         THE WITNESS:  Yes.

1   BY MR. BRAFMAN:

2   Q.  And on that date that's when you were served with a

3   subpoena; correct?

4   A.  Yes.

5   Q.  And that's the first in-person interaction you had with any

6   government agents from the IRS or the U.S. Attorney's Office on

7   behalf of Mr. Issa; correct?

8   A.  Yes.

9   Q.  And this was at your office; correct?

10  A.  Correct.

11  Q.  Did they take from you documents at that time or at a later

12  time?

13  A.  At a later time.

14  Q.  And did you, when they came to you and asked you for these

15  materials, remember that you had a Kovel agreement?

16  A.  No.

17  Q.  Did you call Mr. Ambrose or Mr. Issa to tell them that they

18  were there?

19  A.  No.

20  Q.  Did they ask you questions about only Mr. Issa's company,

21  or did they ask you questions about Mr. Issa as well?

22  A.  I don't recall.  I don't recall.

23          MR. BRAFMAN:  Give me one second, Judge.

24  Q.  If you look at the last paragraph on page 1, paragraph

25  number 3, did you tell the agents that you prepared corporate

1    and personal tax returns for Ibrahim Issa and his wife,

2    Daniella?

3    A.  Yes.

4    Q.  Now, did you also tell --

5          THE COURT:  For the past year or so.  Is that what you

6    said?

7          THE WITNESS:  Yes.

8    BY MR. BRAFMAN:

9    Q.  For the past year or so.  Is that correct?

10   A.  Yes.

11   Q.  Do you know when you started preparing personal returns for

12   Mr. Issa?

13   A.  The first return we prepared was an amended return for '13,

14   and I believe that was prepared -- I think that was around -- I

15   think it was December of '14.

16   Q.  Is it your understanding as an accountant, a certified

17   public accountant, that when you prepare a corporate return for

18   a client who is the president and only shareholder of a

19   corporation that what you put on the corporate return can have

20   an impact on what personal tax issues the taxpayer must deal

21   with?

22   A.  Generally, yes.  I believe this was a C corp. though.

23   Q.  So tell the Court what that means.

24   A.  That means that the company is paying its own tax.  It's

25   not being passed on --

1          THE COURT:  It's not a pass-through like an S.  It's

2    not an S?

3          THE WITNESS:  Correct.

4    BY MR. BRAFMAN:

5    Q.  Any compensation to the taxpayer from a C corp. would have

6    to be picked up on his or her personal return; correct?

7    A.  That's correct.

8    Q.  And it was one of those issues that you would have to

9    decide whether or not Mr. Issa had any personal tax liability

10   when you prepared the corporate return?

11   A.  No.

12   Q.  Did you discuss it with Mr. Ambrose?

13   A.  I don't recall.

14   Q.  Let's look at the next document which is 3546-02.

15          Did the agents meet with you again on that date at

16   your office on November 14, 2016?  Does that refresh your

17   recollection?

18   A.  Is this my office?

19   Q.  I don't know, sir.  It's your recollection.

20          THE COURT:  Is your office at 101 Cedar Lane?

21          THE WITNESS:  Yes.

22          THE COURT:  Did you get a second visit a few months

23   later from the IRS at your office?  Do you remember getting a

24   second visit from them.

25          THE WITNESS:  Honestly, I don't remember.

```
 1              THE COURT:  Okay.  Why don't you take a look at this
 2   document and see if it jogs your memory.  It might; it might
 3   not.
 4              MR. BRAFMAN:  Your Honor, where the meeting occurred
 5   really doesn't matter.
 6   Q.  Do you remember meeting with the agents again and talking
 7   to them about Mr. Issa?
 8   A.  For some reason, I just don't recall the second meeting.
 9   Q.  Look down at paragraph 4 of that to see if it refreshes
10   your recollection.
11              Did there come a time when you told the government
12   agents that the return in question was clearly false?  Did you
13   ever tell them that?
14   A.  No.
15   Q.  Look at the paragraph 4 and tell me whether it refreshes
16   your recollection as to whether or not you told the agents that
17   the gas receipts is what was left off of the return:
18   "Tsamutalis can see now that this was clearly false and it was
19   clearly U.S. Postal Service income that was left off the
20   return."
21   A.  No.  I did not say that.
22   Q.  You never said that?
23   A.  No.
24   Q.  Did you ever tell the agents that there were income issues
25   with respect to the failure to report income by Mr. Issa?
```

1    A.  Can I explain this?

2    Q.  Sure.

3    A.  The way Daniella explained it to me when we were analyzing

4    her spreadsheet was --

5         MR. BRAFMAN:  Your Honor, this is a privileged

6    conversation in the presence of the government.

7    A.  Then I'm not going to explain.  We'll go to the next

8    question.  Sorry.

9    BY MR. BRAFMAN:

10   Q.  Whatever you told the government agents came either from

11   Mr. Issa or from his wife, Daniella; correct?

12   A.  I'm sorry.  Say that again.

13   Q.  Whatever you told the government agents who were

14   interviewing you about this case, the information either came

15   from spreadsheets prepared by Mr. Issa or Daniella or from

16   conversations you had with them; correct?

17   A.  Right.

18   Q.  During the period you were under a Kovel agreement.

19   A.  Correct.

20   Q.  And if you had honored the Kovel agreement like you were

21   directed to and if you had remembered it --

22        MR. NESSIM:  Objection.

23        THE COURT:  Stop being argumentative.

24   BY MR. BRAFMAN:

25   Q.  -- you would not have had those conversations --

1          MR. NESSIM:  Objection.

2          THE COURT:  The objection is overruled.

3          If you would have remembered the agreement, would you

4    have called Mr. Ambrose before talking to the agents?

5          THE WITNESS:  Yes.

6          THE COURT:  Yes.  Of course.

7    BY MR. BRAFMAN:

8    Q.  Now, there comes a time, if you look at 3506-43 -- I'm

9    sorry.

10          Then there was a period when you also met with the

11    agents at the United States Attorney's Office; correct?

12    A.  Yes.

13    Q.  And you also met with an assistant United States attorney

14    named Kyle Wirshba?

15    A.  Yes.

16    Q.  During that meeting, if you look at 3546-06 on May 2, 2018,

17    did you meet other assistant United States attorneys on that

18    date?

19    A.  Yes.

20    Q.  Including Elizabeth Hanft; correct?

21          Do you recall?

22    A.  I don't recall.  She might have been there.  I don't

23    recall.

24    Q.  Do you remember Noah Solowiejczyk, the gentleman sitting at

25    the front table here?

1   A.  Yes.

2   Q.  And during that period, were you also still in the period

3   where you didn't recall that you had a Kovel agreement?

4   A.  Yes.

5   Q.  And you didn't tell them you had a Kovel agreement?

6   A.  Correct.

7   Q.  And you talked to them about the work you had done on

8   behalf of Mr. Issa and on behalf of his company; is that

9   correct?

10  A.  Yes.

11  Q.  And you talked about --

12          One moment, please.

13          You did tell them that Issa was referred to you by

14  Paul Ambrose; is that correct?

15  A.  Yes.

16  Q.  But you didn't tell them that he had retained you under a

17  Kovel agreement?

18  A.  No.

19  Q.  You didn't?

20  A.  No.

21  Q.  Did you tell the government that Issa -- I'm sorry -- that

22  you had told Mr. Issa that he had underreported his income?

23  A.  No.

24  Q.  You never told them that?

25  A.  If it's regarding that notice when it was originally

1    underreported, if it was specific to that, the answer would be

2    yes.

3    Q.  Now, did you go over with the government a spreadsheet that

4    was presented to you by the government?

5    A.  Not in detail because I needed to refresh my memory.

6    Q.  Look at paragraph 13 on the second page and answer the

7    Court whether or not a spreadsheet was provided to you at that

8    meeting in the Southern District and you discussed it with

9    them.

10   A.  It was, and it was discussed.  But it was a very general

11   discussion.

12   Q.  Well, among the things that were discussed, was it not,

13   under paragraph C, that it appeared that cash was being taken

14   and not being reported?

15   A.  No.

16   Q.  Would you look at paragraph C and see if that refreshes

17   your recollection.

18            THE COURT:  Refreshes his recollection that he said it

19   or refreshes his recollection that --

20            MR. BRAFMAN:  That it was discussed.

21            THE COURT:  That it was discussed generally?

22            MR. BRAFMAN:  That it was discussed.

23            THE COURT:  Do you recall what the government told you

24   about the spreadsheet?

25            THE WITNESS:  I don't recall if that was specifically

1   discussed.

2   BY MR. BRAFMAN:

3   Q.  In paragraph 21, did you tell the agents that you worked on

4   the 2012 First Star Auto Repair amended tax return and after

5   this Dana, a CPA on your staff, began working on Issa's tax

6   returns thereafter?

7   A.  Yes.

8   Q.  Is that Issa's personal tax returns?

9   A.  I'm sorry?

10  Q.  Issa's personal tax returns?

11  A.  We did an amended 2013 return, yes.

12  Q.  When was that?

13          THE COURT:  He already said.

14          THE WITNESS:  That was back in December of '14.

15  BY MR. BRAFMAN:

16  Q.  Now, when you used the numbers to put into that, did you

17  have to look at your worksheets that were prepared under the

18  Kovel letter?

19  A.  No.

20  Q.  This was separate and apart?

21  A.  Yes, because it was an amended return.  We made one

22  adjustment to the return that was originally filed.

23  Q.  And that was for the period 2012, for the '13 return?

24  A.  No.  '13.

25          THE COURT:  It has nothing to do with 2012.

BY MR. BRAFMAN:

Q.   Can you tell me, sir, when you ultimately remembered that
you had a Kovel agreement and when you notified the government
of that fact.

A.   What happened was after I left their meeting, they were
asking me to be a witness.  So I went back and started looking
at my papers.  That's when I first saw it.  That's when I knew.
It must have been a week or two or three.  I can't tell you the
time, but it was after that meeting.

Q.   And be a witness in what?

A.   In this case.

Q.   In the grand jury?

A.   I don't know if they were specific.  I don't recall that.

Q.   They gave you a grand jury subpoena; is that correct?

A.   I believe so.

Q.   And ultimately in response to the grand jury subpoena, did
you give them the books and records that you had received from
Mr. Issa and from his companies and from his wife?

A.   Yes.

Q.   Excuse me?

A.   Yes.

Q.   Did you give them the records that were examined by you
during the period when you were also a Kovel accountant?

A.   Yes.

Q.   So those materials were given to the government.

1          Do you have any way to segregate which was or which

2    was not covered by the Kovel agreement?

3    A.  I didn't recall.  So I didn't segregate.

4    Q.  So you gave them everything?

5    A.  Yes.

6    Q.  Yes?

7    A.  Yes.

8    Q.  You have to answer verbally and not shake your head.

9          THE COURT:  I heard him.

10         THE WITNESS:  I thought I said yes.

11   BY MR. BRAFMAN:

12   Q.  Did you also provide them with other documents, including

13   emails?

14   A.  Yes.

15   Q.  And communications between you and Mr. Issa and Daniella

16   and Ada who worked for Daniella?

17   A.  Yes.

18   Q.  And any emails that were between you and Mr. Ambrose and at

19   times Mr. Issa?

20   A.  Yes.

21   Q.  So you just gave them everything?

22   A.  Yes.

23   Q.  And you did no review to try and segregate anything?

24   A.  No.

25   Q.  And there was no blessing, if you will, by Mr. Ambrose that

```
 1   you could do this; correct?

 2   A.   Correct.

 3   Q.   Subsequently, you had a conversation with at least one

 4   assistant United States attorney in which you told them that

 5   you had a Kovel letter?

 6   A.   Yes.

 7   Q.   And who was that?

 8   A.   I think it was Mr. Wirshba.

 9   Q.   What did he say to you?

10   A.   He wasn't even familiar with what the letter was, and he

11   said he needed to look into it.  And that was it.  I never

12   heard anything again.

13   Q.   You never heard anything from them again?

14   A.   Not until very recently when they wanted to have a meeting

15   with me a couple weeks ago or so.

16            MR. BRAFMAN:  I have nothing further, your Honor.

17            THE COURT:  I take it you didn't testify in the grand

18   jury.

19            THE WITNESS:  No.

20            THE COURT:  Right.  Okay.

21            The government, I believe, wanted to call you.

22   CROSS-EXAMINATION

23   BY MR. NESSIM:

24   Q.   Mr. Tsamutalis, I believe the end of your last line of

25   questioning covered this, but you've never met me before this
```

1   hearing; right?

2   A.   What is your name, sir?

3   Q.   Daniel Nessim.   I'm an AUSA.

4   A.   No.

5   Q.   And we never had a chance to prepare or talk about your

6   testimony in advance?

7   A.   No.

8   Q.   You mentioned when you first got involved in this matter

9   you met with Mr. Issa and Mr. Ambrose; right?

10  A.   Yes.

11  Q.   And Mr. Ambrose referred you to Mr. Issa to help prepare an

12  amended tax return?

13  A.   Yes.

14          THE COURT:   I'm sorry?

15          THE WITNESS:   At the time I didn't know if it was

16  going to be an amended return or not.   It was a meeting at that

17  point.

18          MR. NESSIM:   Could we pull up Government Exhibit 1,

19  Mr. Concepcion.

20          It should be on the screen.

21          THE COURT:   It's on the screen.   Okay.

22          MR. NESSIM:   So we'll turn to Section 1.   This is an

23  agreement between Mr. Issa and Mr. Ambrose.   If we can blow

24  that up.   Undertake representation of your corporate entities

25  in connection with tax planning, filing amended corporate tax

1   returns, and addressing any potential issues with the IRS.

2   Q.  Right?

3   A.  Yes.

4   Q.  So filing an amended tax return was part of the reason why

5   you were being brought on?

6   A.  I'm sorry.  Say that again.

7   Q.  Was filing an amended tax return part of the reason you

8   were being brought on?

9   A.  Again at that time I didn't know it, but eventually, yes.

10  Q.  So there was a time where there was a decision to prepare

11  an amended tax return?

12  A.  Yes.

13  Q.  For the 2012 First Star tax return?

14  A.  Yes.

15          THE COURT:  When was that decision made?  That's what

16  they keep refusing to ask you.

17          When was that decision made?

18          THE WITNESS:  Let's see.  After we had the agreement

19  signed, we -- there were emails that went back and forth.  I

20  don't believe the return was filed --

21          THE COURT:  When was the decision made to file it?

22  Not when was it filed.  When was the decision made to file an

23  amended corporate tax return?

24          THE WITNESS:  I don't know the exact date, but I would

25  have to say it had to be sometime June to August.  I can't tell

1  you the date.

2          THE COURT:  Sometime like between June and

3  August 2014?

4          THE WITNESS:  There were many emails going back and

5  forth at that time.

6  BY MR. NESSIM:

7  Q.  We'll show you Government Exhibit 6.  This is an email from

8  Daniella Zagnoli which is Daniella Silva, Mr. Issa's wife;

9  right?

10  A.  Yes.

11  Q.  And it's to you, cetcpa?

12  A.  Yes.  So this is in May, May 27, of '14.

13  Q.  If you'll see, there are some attachments to this document.

14  It might be easier to book at them in the binder before you.

15  Government Exhibit 6.

16  A.  Yes.

17  Q.  A series of schedules and documents.

18  A.  Uh-huh.

19  Q.  What was the purpose of you receiving these documents?

20          THE COURT:  Why did she send you these documents if

21  you know?

22          THE WITNESS:  She sent them as supplements to the

23  summary schedule.

24          THE COURT:  The summary schedule was the spreadsheet

25  that you got originally?

1       THE WITNESS:  Yes.

2    BY MR. NESSIM:

3    Q.  What did you use these documents for?

4    A.  This summary schedule -- I had trouble understanding it,

5    and I remember Daniella coming to the office and explaining it

6    to me.  And it was from that that we agreed to prepare the

7    amended return.

8    Q.  So these documents were to assist you to prepare the

9    amended return?

10   A.  Yes.

11       THE COURT:  The question is:  Had the decision been

12   made as of May 27, 2014, to file an amended return?  Had that

13   decision been made?

14       THE WITNESS:  I don't know.  I don't recall.

15       THE COURT:  You don't recall.  Can I just ask you to

16   look at the original email, the front page of this exhibit.

17   I've actually put a circle around one of the sentences.  It

18   says:  "Time is passing, and we need to know what it will be

19   the best response for the 2012 First Star Auto's IRS notice

20   dated 3-10-14."

21       Do you know what that means?

22       THE WITNESS:  I guess they're concerned because there

23   was a notice.  They wanted to know when we would be responding

24   to that notice.

25       THE COURT:  Had a decision as to what response the

 1    notice was going to get been made at that point?

 2              THE WITNESS:  I don't think so.  Not at that point.

 3              THE COURT:  That's what it looks like to me from the

 4    language used in the email, that a decision hadn't yet been

 5    made.  They want to know how best to respond to this notice.

 6              THE WITNESS:  Correct.

 7    BY MR. NESSIM:

 8    Q.  Did you ultimately use these schedules to prepare the

 9    amended return?

10    A.  I basically worked off the summary schedule that was

11    explained to me, yes.

12              THE COURT:  Wait a minute.  The summary schedule is

13    the original spreadsheet that you got; right?  The one that you

14    didn't understand.

15              THE WITNESS:  I believe so.  There were a lot of

16    schedules going.  I think so, yes.

17    BY MR. NESSIM:

18    Q.  Let's turn to page 4 of this exhibit just as an example

19    where the tables begin.

20    A.  Okay.

21    Q.  Can you just explain sort of how.  There's a month January

22    here.  There's a table of expenses and dollar figures

23    associated with those expenses.

24    A.  Uh-huh.

25    Q.  How would you use this information in preparing a tax

1    return?

2              THE COURT:  Did you use this information to prepare a

3    tax return?

4              THE WITNESS:  I did not use this information.

5              THE COURT:  You did not use this information.

6              THE WITNESS:  Keep in mind it was an original return

7    that was filed, and we were trying to analyze what was wrong

8    with what was filed because clearly they underreported their

9    gross income.

10             So they were trying to show me the changes that had to

11   be made based on that schedule affected gross revenues and cost

12   of goods sold.  So we basically focused on the gross revenues

13   and the cost of goods sold based on that schedule.

14   BY MR. NESSIM:

15   Q.  This was the question to decide how to respond you're

16   saying?  To the IRS.

17   A.  No.  No.  I mean, it was us looking at the paperwork.  If

18   we're going to amend the return, this was what we were going to

19   use to amend it.

20   Q.  But you said you did not use this to amend the return;

21   right?

22   A.  No.  I used the summarized schedule because I wasn't

23   understanding the schedule.  So I needed them to explain it to

24   me, and it was explained in a meeting at my office.

25             THE COURT:  And then based on their explanation, you

1  used the original summarized schedule to prepare the amended

2  return?

3          THE WITNESS:  Yes.

4          THE COURT:  I at least understand what the man did.

5  BY MR. NESSIM:

6  Q.  Once a decision was made to prepare an amended return, did

7  you communicate directly with Mr. Issa to gather information

8  for that return?

9  A.  I think I spoke to -- it was probably Daniella.

10 Q.  You communicated with Mr. Issa, his wife, his employees to

11 gather information.  You did not communicate with Mr. Ambrose

12 primarily; is that right?

13 A.  At that time Mr. Ambrose was involved -- he was involved in

14 what was going on in the decision-making.  So the answer is he

15 was involved as well.

16 Q.  I was asking:  Was a decision made to file an amended

17 return?

18 A.  I can't be specific.  I don't recall.  I don't think so at

19 that point in time.

20         THE COURT:  There did come a time when such a decision

21 was made.

22         THE WITNESS:  Yes.  The time did come.

23 BY MR. NESSIM:

24 Q.  After that time, what sort of documents did you have to

25 collect to file the amended return?  Was it only the summary

1   schedule you mentioned, or were there additional materials?

2   A.   The summary schedule.

3   Q.   So specifically what did you do once the decision was made

4   to file an amended return to prepare that return?

5   A.   We prepared the return.

6   Q.   So can you explain what that means for a non accountant.

7   A.   After understanding -- after getting the explanation of the

8   numbers on the spreadsheet, we used those numbers to adjust

9   certain parts of the originally filed return so we could file

10  it to the IRS.

11        THE COURT:   And the certain portions had to do with

12  gross revenue and cost of goods sold; right?

13        THE WITNESS:   Correct.

14  BY MR. NESSIM:

15  Q.   Once that return was prepared, that return was filed with

16  the IRS?

17  A.   I believe it was filed -- I believe it was filed in August,

18  in August of '14.

19  Q.   And you as the accountant made the decision of what to

20  include on the amended return; right?

21  A.   Based on information provided to me.

22  Q.   Right.   But you were the one determining how to prepare

23  that amended return, preparing the amended return, and

24  compiling the necessary information to do so.   Right?

25  A.   Yes.   I knew the structure of how to prepare the return.   I

1  needed the information.  I took the information, and I prepared

2  the amended return.

3         THE COURT:  What role did Mr. Ambrose play in that

4  process?

5         THE WITNESS:  There was a point in time where

6  Mr. Ambrose was -- I think Daniella was told to review it with

7  him.  So she was told to review it with him prior to it being

8  submitted.  I think there's --

9         THE COURT:  In terms of the preparation, were you

10 having interchanges with Mr. Ambrose about that process, or

11 were you just doing your job and then Mr. Ambrose reviewed the

12 return?

13        THE WITNESS:  We were just doing our job at that

14 point.

15        THE COURT:  Okay.

16 BY MR. NESSIM:

17 Q.  And you mentioned that you filed that return in around

18 August?

19 A.  I believe so, yeah.

20 Q.  And after you filed the amended return, did you continue to

21 work for Mr. Issa personally and his companies?

22 A.  Slowly we began to do, as the years went on, more and more

23 work.  Yes.

24 Q.  You prepared Mr. Issa's personal tax returns?

25 A.  Yes.

1   Q.  And corporate tax returns?

2   A.  Yes.

3   Q.  And the same sort of work that you performed in preparing

4   the amended return?

5              THE COURT:  No, because I hate to tell you this.  I

6   don't know if you do your own taxes or not, but preparing an

7   amended return is a really different exercise than preparing an

8   original return.

9   BY MR. NESSIM:

10  Q.  You were acting as his CPA --

11  A.  We were his tax preparer.  We prepared the returns.  They

12  internally did all their bookkeeping and did all their work.

13  We prepared all the returns.

14  Q.  And Mr. Ambrose had no involvement in these later tax

15  returns?

16  A.  No.  As time moved on, no.

17  Q.  And you also signed separate agreements with Mr. Issa or

18  his companies to prepare these tax returns?

19  A.  Yes.

20  Q.  And Ambrose was not a party to those agreements?

21  A.  He might have been on a discussion or two, but no.

22             THE COURT:  I've seen them.  Why are you asking

23  questions?

24             MR. NESSIM:  I'll move on, your Honor.

25             THE COURT:  All that can happen is that he can give an

 1    answer that varies with what I've seen.  Never ask a question

 2    like that.

 3            MR. NESSIM:  I'll move on.  May I have one moment,

 4    your Honor?

 5            THE COURT:  Yes.

 6            (Counsel conferred)

 7            MR. NESSIM:  Nothing further, your Honor.

 8            MR. BRAFMAN:  Can I just ask two questions from here,

 9    your Honor?  I'll keep my voice up.

10    REDIRECT EXAMINATION

11    BY MR. BRAFMAN:

12    Q.  Mr. Tsamutalis, just focus on the 2012 amended return if

13    you can.  Okay?

14    A.  Sure.

15    Q.  There is no question in your mind that with respect to the

16    decision whether or not to file that amended return, Paul

17    Ambrose was directly involved in that decision?

18    A.  Yes.

19    Q.  And you shared with him the benefit of the work you did?

20    A.  Yes.

21    Q.  And when you shared the work you did, some of the work you

22    did came from Mr. Issa and Ms. Daniella; correct?

23    A.  Correct.

24    Q.  And those people were talking to you at that time under the

25    Kovel agreement that you had with Mr. Ambrose; correct?

1    A.  Yes.

2             MR. BRAFMAN:  Nothing further, your Honor.

3             THE COURT:  I think you can leave.

4             THE WITNESS:  Thank you, your Honor.

5             THE COURT:  You're welcome.

6             (Witness excused)

7             THE COURT:  Thank you, Mr. Agostino, very much.

8             MR. AGOSTINO:  Thank you, your Honor.

9             THE COURT:  Mr. Brafman, do you have more that you

10   wish to put on?

11            MR. BRAFMAN:  No, I don't.  And I don't have any

12   witnesses to call.  I'm not certain that the government does

13   either.

14            THE COURT:  Well, I don't know.  If you're resting,

15   I'm going to talk to the government for a moment.

16            MR. BRAFMAN:  I'm resting.  Yes, your Honor.

17            THE COURT:  Thank you, Mr. Brafman.

18            Does the government wish to put on a case?

19            MR. NESSIM:  No, your Honor.

20            THE COURT:  So it's time for argument sort of.

21            MR. BRAFMAN:  Can I go first?

22            THE COURT:  Yes, because it's your motion.  Why don't

23   I tell you kind of where I am, and then it might help you to

24   focus your argument.

25            MR. BRAFMAN:  Yes, your Honor.

1          THE COURT:   There is very little doubt in my mind that

2     there was a Kovel agreement between Mr. Ambrose and this nice

3     gentleman, Mr. Tsamutalis, on behalf of First Star Auto

4     covering the notice about its 2012 tax deficiency.

5          There is no doubt in my mind whatsoever that the

6     decision to file an amended return was made jointly by the

7     taxpayer represented by its president, his lawyer, and the

8     accountant who had been hired by his lawyer under the Kovel

9     agreement.

10         And there is no doubt in my mind that Daniella Silva

11    and Tony Issa and Ada whatever her name was who worked for them

12    were acting as agents and employees of First Star Auto when

13    they provided Mr. Tsamutalis with the information that he

14    analyzed and got explained to him and used along with

15    Mr. Ambrose to make the decision which was not made before the

16    27th of May of 2014 on how to respond to that notice that was

17    used in the actual preparation of the amended return, in which

18    process Mr. Ambrose played no role whatsoever.

19         And that was pure accountancy, the preparation of the

20    return, not the decision to file it, not the analysis that went

21    into the decision to file it, but the preparation of the return

22    itself, pure accountancy.

23         Now, I'm pretty clear about all of that.   At least

24    that's what seems credible to me.   And it is equally clear to

25    me from the text of the retainer letter between First Star Auto

1    by Tony Issa, president, and Mr. Ambrose, who is a real smart

2    man and knows how to write a retainer letter, that he was

3    retained for the purpose of doing work for corporate tax

4    returns, not personal tax returns at all.

5          Because these were C corporations or this was a C

6    corporation -- it wasn't a pass-through -- the work that was

7    done on behalf of First Star Auto was not automatically and

8    immediately attributable to Mr. Issa personally.

9          Government Exhibit 1, which is also Mr. Brafman's

10   Exhibit 5, which is the legal retainer letter, says the scope

11   of services based upon the facts disclosed.  You have asked us

12   to undertake representation of your corporate entities in

13   connection with tax planning, filing amended corporate tax

14   returns, and addressing any potential issues with the IRS.

15   That is the scope of services to be rendered.  It does not

16   involve any individual tax returns, tax planning, or anything

17   else at all.

18          I listened to Mr. Ambrose for the better part of an

19   hour.  He's a man who is quite capable of being very precise.

20   That said, Mr. Issa and Ms. Silva were acting as agents of the

21   corporation under the Kovel letter when they provided certain

22   information to Mr. Tsamutalis.  Now, what the impact of that is

23   on the 2012 count, the corporate tax count, I don't know.

24   Whether documents would have to be suppressed as a result, I

25   don't know.

1          It appears to me very clear that everything else that

2     happened has nothing to do with the Kovel letter.  So that's

3     kind of where I am right now after listening to this.  I just

4     wanted to put that on the table so that you could tell me where

5     I'm right, tell me where I'm wrong, Mr. Brafman.

6          MR. BRAFMAN:  I think you're partially very right, and

7     partially I think your Honor is taking a narrow view of the

8     testimony that's been elicited and the documents that have been

9     introduced.

10          THE COURT:  I'm not taking a narrow view.  I'm taking

11     an originalist view.  The words on the page mean what they say.

12     I heard what Mr. Ambrose said.  The words on the page mean what

13     they say.

14          MR. BRAFMAN:  But the words on the page also have some

15     loose words where any tax --

16          THE COURT:  No.  I'm sorry.  I believe that the scope

17     of services rendered paragraph defines the scope of services

18     for which Mr. Issa, as president, retained Mr. Ambrose and

19     Mr. Ambrose, in turn, retained Mr. Tsamutalis, representation

20     of your corporate entities in connection with tax planning,

21     filing amended corporate tax returns, and addressing any

22     potential issues with the IRS.  To the extent that Mr. Ambrose

23     testified otherwise, I do not find him a credible witness.

24          I don't like to say that about a lawyer.  I never like

25     to say that about a lawyer.  But to the extent that he

1    testified otherwise, I do not find him credible.  I do get to

2    make credibility findings.  It's one of the things they pay me

3    to do.

4              MR. BRAFMAN:  I think -- I don't want to belabor this

5    issue because I have a much more pressing issue that I know the

6    Court is not going to like but I think perhaps maybe the

7    government will even join me in.

8              I disagree with your Honor's assessment of

9    Mr. Ambrose.  I think Mr. Ambrose is a practitioner, and I

10   think when you look at the Kovel cases we have cited for the

11   Court, I think the rule is that the Court is supposed to use

12   common sense, and you have discretion.

13             And common sense will tell you that if you're dealing

14   with someone with limited education who hires a professional to

15   do a professional job who then hires another professional and

16   then you're instructed to talk to that person about your tax

17   issues and that it will be privileged and you're not to worry,

18   come honestly with them, and then that tax preparer

19   irresponsibly regurgitates everything you've told them to the

20   government --

21             THE COURT:  I think the government has a Kovel

22   problem.  I've told you that.  But it's a much more limited

23   Kovel problem than you think it is.

24             MR. BRAFMAN:  I don't think so, Judge, because I'm

25   looking at the indictment.  And this indictment, as I mentioned

1      earlier, does not charge First Star or any corporation.

2              THE COURT:  I understand that.

3              MR. BRAFMAN:  Yes, but what it does, throughout Count

4      Three, for example, the conspiracy charge -- that goes on page

5      after page using all of the documents that we would claim are

6      now under the Kovel in order to prove a crime against Tony Issa

7      for causing the filing of a fraudulent corporate tax return

8      being the 2012 corporate tax return.

9              THE COURT:  That's why we're going to go document by

10     document starting tomorrow at 12:30 through the documents you

11     want suppressed so we can see if there is anything left of the

12     government's case on that count.

13             MR. BRAFMAN:  I just want to make a suggestion.

14     Please let me finish it before you say no or yell at me because

15     I know you're not going to like it.  It's going to be made with

16     great respect.

17             There are thousands of documents that were turned over

18     by this accountant to the government.  We do not believe it is

19     humanly possible to do this document by document because what

20     we would like to do, what we'd like to do -- please, Judge.

21     Whatever people have accused me of, it's never been I'm shy

22     about showing up and doing my job.

23             THE COURT:  You're not shy, Mr. Brafman.  I know.

24     I've waited a long time to have you in my court.  Twenty-three

25     years I waited.

1           MR. BRAFMAN:  I would have done earlier if I knew it

2    meant that much to you, your Honor.  But I don't control

3    assignments here.

4           But you know, your Honor, we have spoken to the

5    government about this.  I don't know what their position is

6    about this now, but now that your Honor has found that there is

7    a Kovel agreement, I think if you give us a short adjournment

8    of the trial date -- let me just finish, please.

9           THE COURT:  How short?  I already gave you a short

10   adjournment of the trial date.

11          MR. BRAFMAN:  Your Honor, that short adjournment of

12   the trial date was so that the parties could properly tee up --

13          THE COURT:  You wanted this trial date.  You demanded

14   this trial date.  You told me in no uncertain terms that you

15   better not muck around with your calendar because you had free

16   time to do this trial.

17          MR. BRAFMAN:  Yes, and I promise you, Judge, that I

18   have no other trial in January.

19          THE COURT:  Yes, but I do, and in February and in

20   March.

21          MR. BRAFMAN:  That's why I'm asking you not to yell

22   until I'm finished.  I think, your Honor, that if we could

23   perhaps brief this issue for you --

24          THE COURT:  I don't need it briefed.

25          MR. BRAFMAN:  You do.  Let me explain why.  I don't

1    believe you have any understanding, respectfully, of what this

2    job entails because it is not that simple.

3              THE COURT:  What it entails is finding the documents

4    that were turned over with respect to the 2012 First Star tax

5    return, all of them, every single one of them, but not

6    Mr. Issa's personal tax return from 2013 or 2014 or any other

7    corporation's tax return or any First Star return from any year

8    other than 2012.  It's the only thing that's covered by the

9    Kovel letter.

10             So if you all can identify that universe of documents,

11   which is a fraction of what was turned over to the government

12   during this process.  It's a fraction.

13             MR. BRAFMAN:  He was debriefed by three assistants who

14   are trying this case who at the time didn't know there was a

15   Kovel agreement.  I'm not looking to disqualify them.  I am

16   looking to make the record clear as to what we can and cannot

17   do.  Mr. Wirshba is not here because he's the one who debriefed

18   him primarily.

19             MR. SOLOWIEJCZYK:  That's not why Mr. Wirshba is not

20   here.

21             THE COURT:  It doesn't make any difference to me.  The

22   issue is whether I'm going to suppress some evidence.  Clearly

23   I'm going to suppress some evidence that relates to the 2012

24   counts.  I will not be suppressing evidence that relates to the

25   2013 counts or '14 counts or any other tax counts.

1          Do you understand me?

2          MR. SOLOWIEJCZYK:  Your Honor, if we could be briefly

3   heard.  Even as to the 2012 return, our position is -- and we

4   think that the law supports this -- that at a minimum, once

5   he's acting as purely a tax preparer and they say, okay.  We're

6   going forward with preparing this amended return, we do not

7   believe that any privilege applies to that type of work.

8          THE COURT:  I agree that no privilege applies to that

9   type of work, but I don't know whether those documents that he

10  used were turned over in connection with the decision-making

11  process where the privilege would apply.  When I can't tell,

12  you lose because you're the government.

13         MR. SOLOWIEJCZYK:  But they have to identify the

14  documents.

15         MR. BRAFMAN:  No, we don't, Judge.  They have to

16  identify the documents they want to introduce.

17         MR. SOLOWIEJCZYK:  No.

18         MR. BRAFMAN:  Yes, Judge.  If you look at the way the

19  indictment is read, the indictment identifies documents.  If

20  they're telling me they're not going to use any of those

21  documents because you've concluded that there was a privilege,

22  it makes this a very simple process.

23         THE COURT:  You made a motion to suppress.

24         MR. BRAFMAN:  We just then ask you to give us until

25  Monday to cull through this and save you --

```
 1                THE COURT:  It would be great if you would do that.
 2      Yes.
 3                MR. BRAFMAN:  Can we begin this on Monday?
 4                THE COURT:  Yes.
 5                MR. BRAFMAN:  Perhaps we can come to an agreement on
 6      Friday.
 7                THE COURT:  I would hope.  I'm going to even hazard a
 8      guess that we may not be going forward on one or two counts.
 9      That's okay with me.  I thought this was a bribery case.  I was
10      looking forward to trying a bribery case.
11                MR. BRAFMAN:  So did I.
12                MR. SOLOWIEJCZYK:  It still is a bribery case too.
13                THE COURT:  So fine.  I'll see you Monday.
14                MR. BRAFMAN:  What time?
15                THE COURT:  I'm telling you if it's a close call as to
16      whether it was covered by the Kovel and the non-Kovel work for
17      2012, I'm going to say it falls within Kovel because that way I
18      don't get reversed.  So close calls do not go to the
19      government.
20                MR. SOLOWIEJCZYK:  We understand that, your Honor.
21      Respectfully, we would just also remind the Court the law is
22      that it is their burden obviously.
23                THE COURT:  I understand that the law is their burden.
24      That's why I keep saying, Mr. Brafman, you made a motion to
25      suppress.
```

1            MR. BRAFMAN:  I think I met the burden that was set

2   out by the Court.

3            THE COURT:  I haven't suppressed a single document

4   because I haven't been shown a single document that needs to be

5   suppressed.  You've certainly gone some part of the way toward

6   winning your motion.

7            MR. BRAFMAN:  I thought that was one of the objectives

8   of today, your Honor.

9            THE COURT:  I think that you've probably succeeded, at

10  least in part, on one of your objectives for today.

11           MR. BRAFMAN:  Thank you very much.

12           THE COURT:  So I'll see you on Monday morning.

13           MR. BRAFMAN:  Feel better, Judge.

14           MR. NESSIM:  Thank you, Judge.

15           THE COURT:  If anyone has any special insight into a C

16  corporation, I think it's an easier case when it's a C

17  corporation than when it's an S corporation.  If it were an S

18  corporation, the income of the corporation is really the income

19  of the owner, but that's not true of a C corporation.

20           (Adjourned)

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    PAUL N. AMBROSE

4    Direct By Mr. Brafman  . . . . . . . . . . . .10
     Cross By Mr. Nessim  . . . . . . . . . . . . .58
5    Redirect By Mr. Brafman  . . . . . . . . . . .64

6    CHRIS TSAMUTALIS

7    Direct By Mr. Brafman  . . . . . . . . . . . .72
     Cross By Mr. Nessim  . . . . . . . . . . . . 102
8    Redirect By Mr. Brafman  . . . . . . . . . . 113

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25