J6KVISSS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          17 CR 74 (CM)

5   IBRAHIM ISSA,

6              Defendant.                  SENTENCE

7   ------------------------------x

8                                          New York, N.Y.
                                           June 20, 2019
9                                          11:35 a.m.

10
    Before:
11
                        HON. COLLEEN MCMAHON,
12
                                          Chief District Judge
13

14                         APPEARANCES

15

    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  ELIZABETH A. HANFT
    KYLE A. WIRSHBA
18  NOAH D. SOLOWIEJCZYK
         Assistant United States Attorneys
19

    BENJAMIN BRAFMAN
20  JOSHUA D. KIRSHNER
    STUART GOLD
21       Attorneys for Defendant

22

    ALSO PRESENT:   Special Agent Anthony Dubar, Inspector General
23                  Special Agent Grace Soto, IRS
                    Paralegal Specialist Colleen Geier, USAO
24

25

J6KVISSS

1          (Case called)

2          MS. HANFT:  Good morning, your Honor.

3          Elizabeth Hanft, for the government.

4          Joined here at counsel table by my colleagues Kyle

5     Wirshba and Noah Solowiejczyk; and Special Agent Anthony Dubar,

6     and Special Agent Grace Soto; and Paralegal Specialist Colleen

7     Geier, from the U.S. Attorney's office.

8          THE COURT:  Good morning.

9          MS. HANFT:  Good morning.

10         MR. BRAFMAN:  Good morning, your Honor.

11         Benjamin Brafman, joined by Mr. Joshua Kirshner and

12    Stuart Gold.  And Mr. Issa is present and ready for sentencing.

13         THE COURT:  Good morning.  Have a seat, everyone.

14         This matter is on for sentencing under Docket No. 17

15    CR 74, *United States of America v. Ibrahim Issa*, Mr. Issa

16    having been found guilty by a jury of 12 of:

17         One count of bribing a public official, a Class C

18    felony, in violation of 18, United States Code, Section 201

19    (b)(1)(A).  This crime carries a statutory maximum penalty of

20    15 years' imprisonment, three years' supervised release, a fine

21    of $250,000, and a $100 special assessment.

22         One count of conspiracy to evade or defeat income tax,

23    a Class D felony, in violation of 18, United States Code,

24    Section 371.  This crime carries a statutory maximum penalty of

25    five years' imprisonment, three years' supervised release, a

J6KVISSS

1    $250,000 fine, and a $100 special assessment.

2              One count of tax evasion, a Class D felony, in

3    violation of 26, United States Code, Section 7201, which

4    carries a statutory maximum penalty of five years'

5    imprisonment, three years' supervised release, a fine of

6    $100,000, and a $100 special assessment.

7              One count of aiding and assisting in the preparation

8    and presentation of a false corporate income tax return, Class

9    E felony, in violation of 26, United States Code, Section 7206.

10   This crime carries a statutory maximum penalty of three years'

11   imprisonment, one year supervised release, a fine of up to

12   $100,000, and a $100 special assessment.

13             Three counts of subscribing to false individual tax

14   returns for the tax years 2012, '13, and '14, Class E felonies,

15   in violation of 26, United States Code, Section 7206, each

16   carrying a statutory maximum penalty of three years'

17   imprisonment, one year of supervised release, a fine of up to

18   $100,000, and a $100 special assessment.

19             In connection with today's proceedings, I have

20   received and reviewed the presentence investigation report

21   prepared by United States Probation Officer Specialist Colleen

22   Tyler, filed with the Court on April 9, 2019.  I have a

23   sentencing memorandum from the government filed on June 13,

24   2019.  I have a substantial number of submissions from

25   Mr. Brafman.  I have the original sentencing memorandum with a

J6KVISSS

|   |   |
|---|---|
| 1 | massive, massive appendix containing a number of letters in |
| 2 | support of Mr. Issa.  I have a second letter that was filed by |
| 3 | Mr. Brafman on June 6, 2019, and a third letter filed in |
| 4 | response to the government's sentencing memorandum which was |
| 5 | received yesterday on June 19, 2019. |
| 6 | Is there anything else I should have seen in writing |
| 7 | prior to today's proceedings from the government? |
| 8 | MS. HANFT:  No, your Honor. |
| 9 | THE COURT:  From the defendant? |
| 10 | MR. BRAFMAN:  No, your Honor. |
| 11 | THE COURT:  Has the government reviewed the |
| 12 | presentence report? |
| 13 | MS. HANFT:  Yes, your Honor. |
| 14 | THE COURT:  Any additions, deletions, or corrections |
| 15 | that you wish to make? |
| 16 | MS. HANFT:  Just two items, your Honor. |
| 17 | In paragraph 19, which is on page 8, I believe this |
| 18 | was an error, as the PSR in later paragraphs describes the |
| 19 | obstruction enhancement.  But, of course -- |
| 20 | THE COURT:  Well, paragraph 19 needs to be stricken. |
| 21 | But I'll just tell you right off the bat, this is like |
| 22 | no secret, probation hasn't recommended a guideline sentence; |
| 23 | the government doesn't appear to be seeking a guideline |
| 24 | sentence; and I'm not planning to impose a guideline sentence. |
| 25 | So rather than getting involved in do we have to have |

J6KVISSS

1     a *Fatico* hearing on obstruction, I'm just going to throw those

2     two points out, okay?  Instead of 151 to 181 months, it's going

3     to be 121 to 151 months.  I want you to know, I've now

4     considered the guideline, okay?  And I'm not going to follow

5     it.  And I'm not going to sentence proportionately to the

6     guidelines, so it doesn't really make any difference whether I

7     keep those two points in or not, Ms. Hanft.

8               MS. HANFT:  I understand, your Honor.

9               THE COURT:  I get your position.  I don't want to have

10    a hearing about it.  It's irrelevant.

11              MS. HANFT:  Understood, your Honor.

12              If the Court doesn't find obstruction, however, the

13    guidelines aren't 121 to 151.  Our position is with the

14    obstruction enhancement they are 121 to 151.

15              THE COURT:  Wait a minute.  I don't understand that.

16              I've got 151 to 181 from probation.

17              MS. HANFT:  Correct, your Honor.

18              As noted in our sentencing submission, though, defense

19    counsel came back to the government with certain costs that we

20    then agreed to deduct --

21              THE COURT:  Oh, you mean that hadn't been factored in

22    by probation?

23              MS. HANFT:  That had not, your Honor.

24              So just for the record, our view of the guidelines is

25    that they are 121 to 151 months.

J6KVISSS

1          THE COURT:  And without the two points for --

2          MS. HANFT:  Without two points for obstruction, it

3    would be two levels lower, so it would be 97 to 121.

4          THE COURT:  97 to 121.  Fine.

5          MS. HANFT:  And then the only other item, just to

6    correct in the PSR, your Honor, is paragraph 105.  It says that

7    the guidelines' fine range is 35,000 to 250,000.  That should

8    be 350,000.  Because even though the statutory maximum on one

9    of the counts is 250,000, there are, of course, several counts

10   of conviction in this case.

11         THE COURT:  Thank you, Ms. Hanft.

12         Now, with that said and having heard my ruling on the

13   obstruction, does the government wish to be heard on

14   sentencing?

15         MS. HANFT:  Yes, your Honor.

16         THE COURT:  Somehow I knew you did.

17         MS. HANFT:  So I am understanding that the Court does

18   not want to hear testimony from a witness, is that correct,

19   regarding obstruction?

20         THE COURT:  Regarding obstruction, I absolutely don't.

21   I'm simply not going to.  I don't need to jump down that rabbit

22   hole.

23         MS. HANFT:  Okay.  Thank you, your Honor.

24         As the Court knows, after sitting through

25   approximately two weeks of trial in this case, Mr. Issa

J6KVISSS

1     brazenly bribed postal VMF employees.  He showered them with

2     meals and gifts -- cash, in the case of Mr. Velez -- vacations.

3     And the Court heard recording after recording it being

4     demonstrated that Mr. Issa did not believe that the rules

5     applied to him; he believed that he could cheat the system to

6     get work and to avoid paying taxes.

7            In addition, Mr. Issa tried to conceal his bribes.  He

8     told multiple VMF managers to keep things quiet.  He told

9     Ismael Velez not to deposit the cash Issa was giving him into

10    bank accounts.  He told Jeffrey Blight to pay for his trip to

11    New York on his own credit cards, and that Issa would pay him

12    back in person so that there would be no records of it.  He

13    handed Mr. Blight $2,000 in cash under the table at a

14    restaurant in Chinatown.

15           So this is the conduct of a serial cheater and not a

16    momentary aberration, as defense counsel's submission suggests.

17           As to the history and characteristics of Mr. Issa,

18    despite the numerous talents that the letters he has submitted

19    extol, he committed these crimes.  He didn't play by the rules

20    and he didn't support his employees.  I would note that

21    Mr. Issa's employees, many of them have submitted letters on

22    his behalf.

23           But, in fact, as the Court also heard at trial,

24    Mr. Issa implicated his own employees in his crimes.  Your

25    Honor will remember the testimony of Sohail Butt, who Issa had

J6KVISSS

deliver cash payments to Velez or Claudia Betancourt, who was

instructed to change the categorization of certain expenses for

tax purposes.  These are selfish acts; they are not the acts of

the savior employer who always has his employees' best

interests at heart that the defendant submission touts.

So for these reasons, the nature and circumstances of

the offense, Mr. Issa's history and characteristics, the need

for deterrence, and for all the reasons stated in our

sentencing submission, the government respectfully submits that

a guidelines -- that a sentence within the range recommended by

probation of approximately 60 months or a sentence in or around

that, and a fine within the applicable guidelines range here,

are sufficient, but not greater than necessary, to achieve the

purposes of sentencing.

Unless the Court has any questions, we'll rest on our

submissions.

THE COURT:  Thank you very much, Ms. Hanft.

Mr. Brafman, have you -- Ms. Hanft, let me just ask a

question.  I take it it's the government's position that

paragraph 25 of the presentence report should be reduced from

18 to 16, is that where I make the correction?

MS. HANFT:  That's correct, your Honor.

THE COURT:  Okay.

Bringing the total offense level to 30.

Okay.  Mr. Brafman, have you reviewed the presentence

J6KVISSS

1    report and have you gone over it with Mr. Issa?

2              MR. BRAFMAN:  Yes, your Honor.

3              THE COURT:  Obviously I've made two changes to the

4    guideline calculation; one at the behest of the government, and

5    one at my own or at the behest of you.  Is there anything else

6    that you think I need to change or amend in the presentence

7    report?

8              MR. BRAFMAN:  Your Honor, I've listened carefully to

9    what the Court said about where you see the guideline play into

10   these facts.  I don't want to belabor it, but in our submission

11   we have suggested that Mr. Issa should be given credit under

12   the costs far more than the government --

13             THE COURT:  For a larger amount.  But I'm with the

14   government on this.

15             MR. BRAFMAN:  Okay.  Then I won't belabor the issue; I

16   think we've preserved the issue.

17             THE COURT:  You've preserved it.  You've definitely

18   preserved it.

19             MR. BRAFMAN:  Thank you, your Honor.

20             Your Honor, respectfully, I'm obviously not going to

21   repeat the substance of our submission; I know your Honor has

22   read it.  I've had other sentences before this Court, and I

23   know your Honor is meticulous in reading all of the letters.

24   And I think the letters in this case are rather compelling in

25   many ways.

J6KVISSS

1          And, you know, Judge, I've tried to figure out how

2     many times I've stood in the well of a federal court on

3     sentence, and I can't do it exactly, but it's north of 500

4     times.

5          THE COURT:  I'll bet.

6          MR. BRAFMAN:  And I will tell you, Judge, with great

7     respect, that this is the second time in more than 40 years

8     where I am pleased that despite his conviction, that a

9     defendant actually proceeded to trial.  And I think the

10    sentence that I hope your Honor will impose, after having sat

11    through this trial, I think would be lower, indeed, than

12    perhaps the sentence that the defendant would get had he pled

13    guilty.

14         Because I think one of the things this trial did,

15    besides obviously demonstrating the criminal culpability, is I

16    would hope that it in some ways humanized the defendant; and

17    that the Court has an appreciation of really who this man is

18    beyond the facts that get him to be convicted.

19         So I've sort of dreaded this day for a long time,

20    because, as I say in my letter, we've gotten to know Mr. Issa

21    over the past two years, despite the criminal conduct, which I

22    obviously do not condone.  I find him to be an extraordinary

23    individual in many ways.  He is obviously talented; he has

24    great entrepreneurial skills; and, having come with nothing, he

25    has built a fairly successful business model.

J6KVISSS

1          And I want to point out that which the government, I

2     think, in their submission ignores:  There is no evidence

3     whatsoever that Mr. Issa obtained the contracts from the postal

4     service based on fraud or criminality.  He spent years

5     negotiating contracts which he ended up getting.  And what was

6     ironic, as I point out in the letter, is having gotten the

7     contract, to be able to do the service at Mr. Nicholson's

8     maintenance facility, it wasn't until the trial when

9     Mr. Nicholson became aware of the fact that Mr. Issa had

10    actually been awarded the contract from Philadelphia Postal

11    Service to do the repair work at Mr. Nicholson's own repair

12    facility.

13          I also note that which I think the trial demonstrated

14    beyond question, is that the post office, if you will, was

15    overwhelmed with the need for repair work, they were

16    overwhelmed with the need for important repair work on a -- not

17    on a schedule basis, but needing it within 24 hours at times,

18    overnight, so that the trucks would not be taken out of service

19    and be able to deliver the mail.

20          And as I got into the facts of this case and tried to

21    start to understand the nature of the business, I was struck by

22    a couple of things, which I don't think the government refers

23    to at all, but which I hope your Honor focused on at least a

24    bit during the trial.

25          Doing what he did -- forget the meals for a minute and

J6KVISSS

1   forget the Blight bribe, which I know is why we are here

2   today -- building these facilities in Dearborn, Michigan,

3   building these facilities in Long Island and then Upstate New

4   York, took an extraordinary amount of investment, time, and

5   effort and somewhat genius, if you will, to get them up and

6   running, to find the mechanics, train them, and let them

7   service these cars.  And we have a decrepit vehicle -- decrepit

8   fleet of vehicles that are 25, 30 years old, breaking down

9   constantly.

10          And, you know, there were suggestions, Well, the work

11  was shoddy.  We didn't see any evidence of shoddy work.  We saw

12  evidence of bill after bill after bill of work that was

13  actually performed, sometimes overnight.

14          And while Mr. Nicholson said that, Oh, I didn't

15  authorize this repair of a horn on this $3300 bill on the

16  truck, the supervisors who ran these facilities were all listed

17  on the pieces of paper.  And obviously that was the count that

18  Mr. Issa was acquitted of.  And I think it's an important

19  acquittal.

20          Because what happens in a criminal case is you're

21  driven by, What did he do?  He's not a public official himself.

22  In many of the corruption cases that we refer to in our

23  sentence parody part of our memo are cases involving corrupt

24  officials who corrupted themselves and sought to sell out the

25  people they represented.

J6KVISSS

1    If anything, the evidence in this case demonstrated

2    that Mr. Issa, while somewhat flawed, obviously, which is why

3    we're here, is nevertheless a businessman who was doing, I

4    think, an important job.  And when I look at the evidence in

5    this case -- and I put Velez on the side for a minute and I'll

6    talk about that for a minute.

7    With respect to Mr. Nicholson, there's a part on one

8    of the conversations where they are in a restaurant and he's

9    wining and dining Mr. Nicholson, and there's lavish meals that

10   they are eating.  There's a reference by Mr. Issa, he says, Do

11   you see all of those tables around us?  Those are all

12   businesspeople buying dinner for other businesspeople.  And

13   that was a mindset that Mr. Issa had, that this was somewhat

14   business.

15   Now, it was illegal, and he's standing here, and I

16   think your Honor will ultimately sentence him, because it's

17   considered a serious crime and I understand that.  But I want

18   to place things in context.

19   With Mr. Nicholson, yes, there were lavish gifts and

20   there was wine and there was dinner.  There was never any

21   money; there was never any cash.  Yes, he got a gift at one

22   point which was an iPad that was given out by Mr. Issa's

23   company as a novelty.

24   The case of Blight -- and I don't want to revisit the

25   trial, but your Honor heard the tedious and, at times,

J6KVISSS

1    repetitive nature of the cross-examination of Blight, because

2    it's weeks and weeks and weeks of begging Mr. Issa for money

3    and lying to him about all of his financial hardship.

4              And one of the things you see from the letters that

5    have been presented to the Court -- and I'm going to refer to

6    just the quality of some of the letters in a minute -- I'm sure

7    your Honor has seen more than I have, but I've seen tens of

8    thousands of letters submitted on behalf of people about to be

9    sentenced.  And there are family letters, and there are friend

10   letters, and there are letters that say he's a good community

11   person, and there are letters that generally say that the

12   person works for a charity, gives money to a charity.

13             I haven't seen a lot of letters like some of the

14   letters in this case; letters from an employee named Mr. Rivera

15   who was a drug offender and repeatedly, you know, fell back

16   into the throes of addiction.  And Mr. Issa gave him a job

17   again and again and again and again, and made sure that he

18   sobered up and went for rehab, and paid him while he was in

19   rehab.  That speaks volumes about, I think, the man you're

20   about to sentence; not the crime you're about to sentence, but

21   the man you're about to sentence.

22             And the letter that we submitted yesterday with my

23   letter, which is Exhibit 6, I submitted it again because as I

24   read these letters again preparing for sentence for the second

25   time after I read them when we first got them, I was struck by

J6KVISSS

the letter that we submitted yesterday only because it

encapsulates the whole Detroit issue with respect to Mr. Issa

building a business, A, in a depressed area that no one else

would go into; B, he built a state-of-the-art facility; three,

he hired people from this depressed area who needed jobs and

paid them well.  He trained them.

          And the letter also indicates that when there would be

these employer pep talks, when Mr. Issa would come in and there

were 48 people who he would gather around, he said to them,

What you suffer from is learned helplessness.  You think you're

in a bad spot, you don't think you're ever going to get out of

the bad spot, so you're helpless.  And he taught them not to be

helpless.  He gave them a job.

          And one of the things I ask your Honor to consider

when deciding how long to sentence Mr. Issa to prison, if

you're going to impose a prison sentence, is a lot of people

depend on him.  Forget the family for a minute.  There are

employees out there today who are somewhat unemployable in

today's economy.  These people rely on him for their jobs.  He

gave jobs to unemployed single mothers who were abandoned by

their husbands or boyfriends, who had young children.  They

needed jobs, he gave them jobs; they needed time off for

childcare, he gave them time off.  He was a good man to these

people.  He did not corrupt his employees.

          I understand that, yes, Mr. Sohail handed envelopes to

J6KVISSS

1    Mr. Velez.  He had no idea he was bribing Velez, as he

2    testified to here.  They didn't involve him in criminal

3    conduct.  The people who worked in these gas stations, the

4    people who worked in these repair facilities, one after another

5    talk about the fact that they had a criminal record.  Mr. Issa

6    hired them.  He believed in giving people a second chance,

7    which is an interesting coin or phrase, term or phrase, when

8    I'm asking for a very lenient sentence on behalf of someone

9    who's obviously violated the law.

10          So let me tell you, with great respect, where I am

11    here.

12          I spoke this week at an alternative sentencing

13    symposium at Columbia University, sponsored by The Olive

14    Society.  And what they do is they formulate alternative --

15          THE COURT:  I know.  Unfortunately, I could not

16    attend; I was otherwise engaged.

17          MR. BRAFMAN:  But I spoke there and I read the

18    literature.  And I was, to be honest with you, intrigued.

19          We tried to formulate something to submit to the

20    Court; and we reached out to people who are in a position to

21    help train.  And their position uniformly is, We can't do this

22    in a vacuum; or we can't say, We're going to do this three

23    years from now or two years from now or after he finishes his

24    sentence.  If you come to me and you say, Here's the sentence.

25    We'll prepare a proposal.  And we'll prepare a proposal which

J6KVISSS

will allow Mr. Issa to perhaps train people who are involved in

drug treatment programs, or we will give Mr. Issa access

through The Fortune Society to people who come out of jail and

need employment.

So to the extent that once we know what the sentence

is, could we formulate a plan with these people?  I think the

answer is yes.

So here is the choice your Honor makes.  I've read the

government's submission.  And to be honest with you, I was

struck by one comment in the submission on page 15 where they

refer to our letters.  And they say while -- they talk about

him being generous and devoted.  And they say, This is a trait

to be commended in theory.  It's not a theory, it's a fact.

It's not an argument, it's a fact.  He's a generous employer.

He's a kind employer.  He's an important employer in an

industry where basically most of the people who work there are

blue-collar people.  So we could either warehouse him for a

significant period of time or a not significant period of time.

So I just want to touch upon two items which I think

we all should be focused on.

Under 3553, which, thank God, I've lived long enough

to appear before judges when the guidelines were no longer

mandatory, and you can be a judge and I can be an advocate, we

don't have to pigeonhole people.  And some of the cases cited

by the government are extraordinary family circumstances cases

J6KVISSS

1    which we don't need to go into here.  We're not arguing

2    extraordinary family circumstances and we don't need to ask for

3    a downward departure.  We need to ask for a variance.  And I

4    think we're all on the same page that there's going to be a

5    variance, the only question is how much is a variance.

6          So here are my arguments briefly, your Honor, on 3553:

7          It's clear that Mr. Issa is an intelligent man, and

8    it's clear that he's not going to benefit when incarcerated by

9    training or educational programs or anything that the Bureau of

10   Prisons has to offer.  He doesn't need medical treatment that

11   the Bureau of Prisons has to offer.  In terms of counseling

12   that the Bureau of Prisons -- God help us -- even if they have

13   that to offer, that's not what we're talking about.

14         So what we're talking about is is he a danger to the

15   community?  And I suggest that he's not.  There's no argument

16   from the government that society has to be protected from

17   Mr. Issa.

18         Is he going to be a recidivist?  And the information

19   we provided to your Honor, which the government, I don't think,

20   has focused on at all, is as people get older, the likelihood

21   of recidivism is substantially reduced.  And with someone in

22   Mr. Issa's range of being 57 years old, it's almost *de minimis*.

23   And a number of courts in this building have written on this,

24   and they've also cited to studies, and we've provided that

25   information to your Honor.  So I don't think you ever have to

J6KVISSS

be concerned that you'll see Mr. Issa again in a criminal case
in this building or in any other courtroom.

        This has been a devastating event in his life; it has
cost him everything; it has cost him his businesses; it has
humiliated him; and, as you see from the letters submitted by
family members, he has a very proud family that he is part of,
from parents that are elderly and not well, to nieces and
nephews, some stricken with cancer, who write about Mr. Issa as
the primary person in the family.

        And I cite one letter that I didn't staple to my
letter.  There's a letter from a concierge who works in the
building that Mr. Issa lives in.  And the man writes to the
fact that Mr. Issa saw him eating a sandwich on his dinner
break and said, That's not dinner.  Come up to my apartment and
I will make dinner for you.  And Mr. Issa cooked him dinner.
It's a simple gesture; but yet it speaks volumes of what we're
dealing with.  Are we dealing with a bad man or are we dealing
with a good man who has done something bad?  So in terms of
personal deterrence, Judge, I don't think you need to worry
about that at all.

        So then we come to the question of general deterrence.
And is Mr. Issa to be punished in part for the crime, but also
to send a message to somebody else.  And the literature we have
provided to the Court suggests that in a white-collar case, any
prison sentence is significant deterrence to people who would

J6KVISSS

1   not normally want to go to prison, even for a day, much less

2   for a year and a day or two years or more.

3          So the issue of general deterrence has always

4   intrigued me.  And about 30 years ago in the well of a

5   courtroom in the Eastern District, there was an argument by an

6   assistant to a judge.  And I'm not certain it's appropriate for

7   me to name the judge, but it's a judge I have enormous respect

8   for and is still on the bench and has been there for 40 years.

9          The judge looked at the assistant and, in substance,

10  said, You're asking me to send this man to prison for X number

11  of years so that someone else who you haven't identified, who

12  we don't know, may one day think before they commit a crime

13  that, Tony Issa got this much for that crime, therefore, I'm

14  not going to do that crime.

15         The judge basically says, I don't accept that as a

16  premise.

17         I understand the premise of general deterrence.  All

18  I'm suggesting to you, your Honor, is that at the end of the

19  day, he's not a public official; at the end of the day, I

20  understand his crimes are serious and we're not defending the

21  crime.  The jury has spoken.  But I'm asking you to consider,

22  with great respect, where he should be sentenced.  And the

23  government says 60 months.  And there's no rationale --

24         THE COURT:  Probation says 60 months.

25         MR. BRAFMAN:  But then the government says 60 months.

J6KVISSS

1          THE COURT:  The government says -- okay.

2          MR. BRAFMAN:  The government said 60 months.  They say

3    about 60 months, all right.

4          Judge, this is sort of a made-up number.  It has no

5    relationship to the guidelines.  And I commend probation for

6    recognizing that the guidelines sentences are draconian; and I

7    commend the government for not standing up, as is often the

8    case, and saying, We, you know, think there should be a

9    guideline sentence.

10          But 60 months that's being spoken of, that's not

11   magic.  There's no mathematical determination how that was

12   arrived at.  It's sort of like an arbitrary number.  And the

13   only person who will suffer if the Court imposes a higher

14   sentence than is necessary is not anybody outside of the well

15   of this courtroom, it's Mr. Issa, his family, and his

16   employees.

17          So here is my question:  We have given the Court a

18   graph.  And I know we've done some artful calculations with how

19   probation originally thought it was a level 34, they

20   recommended 60 months; now it's a level 32, which is a -- we

21   ask for a 20 percent reduction from that.

22          THE COURT:  But I don't do percentage reductions.

23          MR. BRAFMAN:  I know that.

24          THE COURT:  I have to tell you, I just want this to be

25   really clear, because I know you're going to take an appeal

J6KVISSS

1    from the conviction.  And I want the Second Circuit to

2    understand that if I calculate the guidelines wrong, I am not

3    going to derive Mr. Issa's sentence as a percentage of the

4    guidelines.

5                MR. BRAFMAN:  Good.

6                THE COURT:  So if I get it wrong, they shouldn't

7    remand it to me, because I would give him the same sentence,

8    whether the guidelines were 151 to 181, 121 to 151, or 97 to

9    121.  I want that to be more.  As you say, they should be even

10   lower than that.  I just want that to be really, really clear.

11               MR. BRAFMAN:  It is clear.  It is crystal clear to us.

12   And I wanted to be crystal clear on the record, I hear you loud

13   and clear.

14               So the answer is --

15               THE COURT:  You, of course, are not the person I'm

16   talking to, but --

17               MR. BRAFMAN:  I got it, Judge.  I'm fast on the

18   uptake.

19               THE COURT:  I know you are, Mr. Brafman.

20               MR. BRAFMAN:  Thank you.

21               And I actually have framed that piece of transcript

22   from the trial that I told you I would frame.

23               All right.  Judge, getting back to where we should

24   sentence -- obviously, you have such wide discretion here; it's

25   sort of like -- to me it's an awesome power that is imposed by

J6KVISSS

1    your Honor.  And I respect that.  And I ask you to consider a

2    sentence that is sufficient, but not greater than necessary, to

3    promote respect for the law.  And we have suggested in this

4    case that the Court should be in the 29-month range.  That's a

5    significant sentence for someone who's never been in prison

6    before.  It's years.  It's years of being without your family,

7    of being in a humiliating, condescending position where you're

8    told when you can eat and sleep.  People who've never been to a

9    prison and people who've never been in a room with people in

10   prison maybe don't get it.  I know your Honor gets it because

11   you sentence a lot of people.  I get it.

12           And I can tell you, Judge, that in the case of

13   Mr. Issa, if you were to sentence him below 60 months -- and I

14   submit substantially below 60 months -- I think you would be

15   doing something good, not something bad, and not something

16   inappropriate.  I think he's a good man.  I think he has earned

17   through his life consideration of who he is by the Court.  And

18   I ask your Honor to sentence the man and not the crime.

19           I have nothing else to say, unless your Honor has

20   specific questions.

21           THE COURT:  Mr. Brafman, as always, I thank you very

22   much.

23           MR. BRAFMAN:  Thank you, your Honor.

24           THE COURT:  Ms. Hanft, does the government wish to

25   respond?

J6KVISSS

1      MS. HANFT:  Your Honor, I would take issue with many

2  of the things --

3      THE COURT:  Much of what Mr. Brafman has said, I

4  understand that.  But do you want to respond?

5      MS. HANFT:  I'm not going to go into details; I know

6  the Court would prefer I not do that.

7      But I do want to point out that Mr. Brafman has

8  entirely ignored the tax offenses.  He's repeatedly referred to

9  the offense here, the conduct here, and has repeatedly, sort

10  of, attacked the conviction on the bribery count.

11      I would point out that Mr. Issa was convicted of a

12  number of tax fraud counts which further shows his flagrant

13  conduct, his flagrant violations of the law over a period of

14  time, and again detracts from the argument that he is a

15  generous person who freely gives money to those in need.

16      Certainly it is commendable -- and we have said in our

17  sentencing submission that Mr. Brafman has pointed out, that

18  it's commendable in theory.  And we've said "in theory" because

19  in this case, he's giving money to other people that is stolen

20  money.  And that certainly detracts from the generosity they

21  extol.  And that's all we intended to say in that portion of

22  our sentencing submission.  And it is certainly relevant to the

23  Court's decision as to what sentence is appropriate to impose.

24      Other than that, unless the Court has questions, I'll

25  sit down.

J6KVISSS

1          MR. BRAFMAN:  Can I briefly respond, Judge?

2          Very briefly.

3          THE COURT:  Then I'll have to let them do it again.

4          Mr. Brafman, go right ahead.

5          MR. BRAFMAN:  Your Honor, I didn't discuss the tax

6     charges because, as you know and as everyone here knows, the

7     sentence that you impose on the bribery count will be enough to

8     cover the tax count if your Honor sentences concurrently.

9          But let me tell you, your Honor, respectfully, what we

10    said in our letter.  And I'm glad Ms. Hanft raised this

11    because, you know, I want to just stress one thing.

12         The evidence in this case showed that Mr. Issa was

13    kind of reckless in how he proceeded in terms of his taxes.

14         THE COURT:  Kind of reckless?

15         MR. BRAFMAN:  But let me just say something.

16         The evidence in this case shows that the way the IRS

17    contacted him was to suggest that he needs to refile, and then

18    they were going to conduct an audit.  Two years later, on the

19    eve of this trial, when Mr. Issa did not plead, they added the

20    tax counts.  They had these tax counts for six years.  They

21    added it on the eve of trial when he decided to go to trial.

22         And I submit with great respect if he had pled guilty

23    a year before the trial, he would have pled guilty to the

24    bribery -- maybe to only the bribery, because he always denied

25    stealing from the government -- and the tax counts would have

J6KVISSS

1    been handled in civil fashion.  And you don't have to be inside

2    the IRS to understand that, and I'm not violating Rule 11.

3              But the timing of the indictment of the tax counts,

4    having had it for five years, suggests to me that this is not a

5    tax case.  He will have to deal with the tax issues.  There is

6    a restitution on the tax issues; he will have to pay the taxes

7    when he comes out, and he will have to refile and amend and

8    file new taxes.  And he has gone through a ten-year divorce

9    where much of the stuff involving his taxes was difficult for

10   him to deal with.

11             So, yes, he violated the tax laws.  But I think this

12   is a bribery case.  And I ask the Court to sentence Mr. Issa

13   one time and let everything else run concurrent.

14             Thank you, Judge.

15             THE COURT:  Ms. Hanft.

16             MS. HANFT:  I won't belabor the --

17             THE COURT:  Or Mr. Wirshba, he's the tax guy.

18             MR. WIRSHBA:  No, your Honor, nothing in response to

19   the timing of the tax counts.

20             THE COURT:  Mr. Issa, is there anything that you want

21   to say?

22             THE DEFENDANT:  I'm sorry?  Me?

23             THE COURT:  Yes, sir, you.

24             THE DEFENDANT:  Your Honor, thank you for giving me

25   the opportunity to speak.

J6KVISSS

1    I just want to say that I'm embarrassed to be here
2 today, so much so that I asked my family to stay home and not
3 even to come.

4    I know I did some wrong things; and I'm ready to
5 accept whatever sentencing your Honor finds appropriate.  I
6 just hope that you just take into consideration my whole life
7 and not just the conduct of this conviction.

8    Thank you, your Honor.

9    THE COURT:  Okay.  Well, we can get out of the way --
10 I think I've already gotten out of the way the notion of the
11 guidelines.  This is, to me, not a guidelines driven case.
12 There are numerous reasons, having considered the guidelines --
13 which I now calculate at 97 to 121 months.  There are numerous
14 reasons for me to conclude, notwithstanding what I saw and
15 heard at the trial, that eight to ten years' imprisonment is
16 probably not the right range for a 57-year-old defendant who,
17 despite the fact that his crimes took place over a period of
18 time such that one count on the bribery really encompassed a
19 number of encounters -- we're not talking about an individual
20 instance of walking into a bank -- and whose tax convictions
21 stand three years, which does matter to me, I still don't think
22 that eight to ten years is the appropriate sentencing range.

23    I'm very happy that we're no longer in the days when
24 the guidelines are a straitjacket or a handcuff; also because
25 that does allow me to be a judge and to think long and hard

J6KVISSS

1    about what the right sentence would be for the individual who's

2    in front of me.  And I'm actually not somebody who in my head

3    penalizes someone for going to trial.  It might be because I

4    was never a prosecutor, I don't know, but I don't, as a rule,

5    think to myself, All right.  This guy went to trial, so we're

6    going to -- I know the guidelines, but we're going to punish

7    him for electing to stand on his constitutional rights.  So

8    that doesn't play into my thinking at all.  I want to be very

9    clear about that.  It does not play into my thinking about

10   Mr. Issa at all.

11           But I operate from the premise that there is neither a

12   magical nor a mathematical way to fashion a sentence in almost

13   any case, but certainly not in a case like this.  The

14   guidelines are themselves driven by the Sentencing Commission's

15   mathematical ideas of how the fraud should be valued.  I've

16   never much agreed with the Sentencing Commission's fraud

17   guidelines.

18           I don't think there is anything either magical or

19   mathematical about sentencing.  I think that, in the end, it's

20   a gut reaction from a judge about given everything I know about

21   this person and this crime, these crimes -- there are seven of

22   them here -- what is an appropriate sentence.  And the always,

23   always most important consideration for me is to punish for

24   these crimes.

25           Mr. Brafman wants me to sentence the man and not the

J6KVISSS

```
1    crime.  Well, if I'm to sentence the man and not the crime,

2    then we certainly can't set aside everything I learned about

3    the man at the trial.  And the trial did not really redound to

4    Mr. Issa's benefit.

5            In terms of what I learned about Mr. Issa, let me

6    start with the tax counts, okay.  I don't care when they were

7    indicted.  I try very hard and in my family we try very hard to

8    pay our taxes.  And tax crimes have always kind of bothered me,

9    rank with me.  It's like you want the benefits of living in

10   this country and you're not willing to pay your share.  And the

11   burden then falls disproportionately on the rest of us.  So you

12   could even say that everybody else in this courtroom is a

13   victim of the tax crime.  And I take them very seriously.

14           And the evidence in this case about the tax evasion,

15   the hiring and firing, the misleading of outside accountants,

16   the complaining to Mr. Issa's wife about how the fact that the

17   accountant was trying to do the right thing was not helping

18   them because it was causing them to owe taxes and that wasn't

19   the goal, I'm sort of reminded of another case that I had a

20   long time ago when I had a defendant whose spiritual advisor

21   was in the courtroom and, at the end of the trial day, I

22   allowed a conference.

23           And I heard later that the defendant asked for a

24   blessing; and that the spiritual advisor said, May justice be

25   done.
```

J6KVISSS

1          The defendant said, Not that blessing.  I want the

2     let-me-go-home blessing.

3          And the tax evidence was so damning and, frankly, so

4     revelatory about who Mr. Issa was as a human being, as a man,

5     as a citizen; maybe not as an employer, maybe not as a husband

6     or as a father, maybe not as a friend, but as a man, it was

7     very revelatory.  And it was not to Mr. Issa's benefit that I

8     heard the things that he said and did during the three years

9     when he was engaged in the process of not paying his taxes.

10          I have to agree with Mr. Brafman, this is principally

11     a bribery case, even though there's only one count of

12     conviction on bribery and six counts of conviction on tax.  But

13     I must tell you, I saw much the same kind of behavior

14     perpetrated by Mr. Issa in connection with his dealings with

15     Mr. Velez and the other people who work for the postal service.

16          The rules are the rules.  And we have rules when we're

17     dealing with the public sector that don't exist when a business

18     transaction is purely in the private sector because we want to

19     hold our public officials and the people who do business with

20     them to a particularly high standard.

21          And Mr. Issa's wooing of individuals associated with

22     the postal service for the purpose of getting business is what

23     the jury found was unsavory.  His dealings with those people

24     were unsavory.  "Unsavory" is an adjective that I think

25     describes the man, the man I met and got to know during the

J6KVISSS

1    trial.  He's an unsavory businessman.

2         So Mr. Brafman is correct, Mr. Issa is not a public

3    official; the people who testified against him were the public

4    officials.  And I think Mr. Brafman guessed correctly that for

5    that reason, I don't see a lot of guidance in the *Sheldon*

6    *Silver* case or the *Norman Seabrook* case or the cases that

7    involve real public officials or, in Seabrook's case, a real

8    public union boss, who are the defendants.  I think those cases

9    might provide some guidance, assuming I agreed with the

10   sentences that were handed down in those cases, if Mr. Issa

11   were a public official.  He's not.  So I don't take much from

12   those cases.

13        But you've already intuited that I'm not going to

14   sentence him in the range of most of those sentences, which

15   were in the 80-month, 90-month, 100-month range.  I'm going to

16   sentence him to less than that.  And I'm going to do it to

17   punish him for what he did, and I'm going to do it to punish

18   him for how he did it, which is to say the man.

19        I want to say one more thing, which is that I'm well

20   aware of the statistics about older offenders being less likely

21   to recidivate.  I think there are a lot of reasons for that.

22   One of them is age, one of them -- I'm going to guess is that

23   many of the older offenders I see are people like Mr. Issa who

24   have gained a certain stature in the community, they have

25   education, they have businesses, they tend not to be poor kids

J6KVISSS

1    from the 'hood who have never had a break and have been selling

2    drugs since they were 12 years old.

3           So I'm aware of that.

4           And that's one of the reasons why I think the

5    guidelines sentence, whatever it may be -- and we're going with

6    97 to 121 -- is too much.  But that doesn't mean that I think

7    that probation's recommendation is too much.  Probation's

8    recommendation is the number I came to independently before I

9    looked at probation's recommendation based on what I knew of

10   the crimes and what I knew of the man.  It's a not

11   insignificant sentence.  It will certainly send a message to

12   Mr. Issa.  It may or may not send a message to anybody in the

13   community.  I tend to agree that the community doesn't pay much

14   attention to the sentences of people like Mr. Issa, certainly

15   not as much as they pay to people like, say, Mr. Silver.

16          But Mr. Issa needs to be punished for what he did.

17   And it seems to me that a 60-month sentence on the bribery

18   count cuts him a substantial break from the guidelines, which

19   is not being calculated in percentage terms.  And it is not

20   greater than necessary to account for what I believe is the

21   seriousness of this offense -- these offenses, I will say these

22   offenses.  And I really have given it a lot of thought.  I've

23   read the letters.

24          As in so many white-collar cases, it is clear that

25   Mr. Issa was one thing in his dealings with the postal service

J6KVISSS

1    and another thing altogether in his dealings with many of the

2    other people with whom he has come into contact in his life.

3    And that disconnect, which I see all the time and which I know

4    the government has, and I'm sure Mr. Brafman sees all the time,

5    makes it incredibly difficult for somebody like me to

6    understand why Mr. Issa would do what he did.  But in the end,

7    the fact that Mr. Issa has a Janus-faced personality does not

8    excuse what he did.  And I still think that what he did should

9    drive the punishment.

10          So I've reviewed the presentence report.  I accept and

11   adopt as my findings the description of the offense and the

12   offense conduct.  We're changing the guidelines calculation,

13   paragraph 25 -- first of all, paragraph 19 is simply being

14   eliminated.  Paragraph 25, the number 18 should be changed to

15   16.  And I think that's because the value of the benefit

16   received is 1.5 -- greater than 1.5 million, but less than 3.5

17   million I think is the right number.  But it's a two-point

18   reduction there.

19          Paragraph 28, I'm eliminating the two-point

20   enhancement for obstruction of justice.  And I'm quite honest

21   about the reason I'm doing it; there's really no need to go

22   through that exercise, since I've concluded that a guidelines

23   sentence would be inappropriate in this case even without it.

24   So there's no point in deciding whether it should be added to

25   the guidelines.  So we're going to get rid of that two points.

J6KVISSS

1    And that means that paragraphs 29 and 32 should be amended by

2    changing the number 34 to the number 30.  There are

3    corresponding changes that need to be made at the back end of

4    the presentence report.

5            The guidelines number, at a total offense level of 30

6    and a Criminal History Category of I -- and that's correct --

7    is 97 to 121 months.

8            I also accept and adopt as my findings the description

9    of Mr. Issa's offender characteristics, which are set forth

10   starting at paragraph 40 of the presentence report.

11           Do you happen to have those numbers, Ms. Hanft?  Is it

12   1.5 to 3.5?

13           MS. HANFT:  As to the value the defendant received?

14           THE COURT:  Yes.

15           MS. HANFT:  Yes, that's correct, your Honor.

16           THE COURT:  Thank you.

17           MS. HANFT:  With certain reduction for certain costs

18   supplied by --

19           THE COURT:  Okay.  Yes.  Thank you very much.

20           For the reasons I've already articulated, I am not

21   imposing a guideline sentence; I am imposing a variance

22   sentence.  The Court of Appeals should be aware that I have

23   considered the guidelines.

24           Okay.  Mr. Issa, will you please stand.

25           Under Docket 17 CR 74, total offense level is 30,

J6KVISSS

1    Criminal History Category I, I hereby sentence you, Ibrahim

2    Issa, to be remanded to the custody of the attorney of the

3    United States and the Bureau of Prisons on Count One for a term

4    of 60 months; and on each of Counts Three, Four, Five, Six,

5    Seven, and Eight, a term of 36 months, all to run concurrently.

6            I further sentence you to a term of supervised

7    release, upon your release from prison, of three years on each

8    of Counts One, Three, and Four, and one year on Counts Five,

9    Six, Seven, and Eight, to run concurrently.

10           You are going to be required to make restitution, but

11   I don't have a number yet, and that's to the government.

12           Do you have paperwork on that yet, Ms. Hanft?

13           MS. HANFT:  We can submit an order --

14           THE COURT:  I know you'll have it in 90 days; you get

15   90 days to do it, but --

16           MS. HANFT:  We have the number now.

17           THE COURT:  The number.  Good.  I'd like to articulate

18   the number on the record.

19           MS. HANFT:  It's $557,176.  And that's at page 18 of

20   the government's sentencing submission.

21           THE COURT:  Okay.

22           Required to make restitution to the United States in

23   the amount of $557,176; and to pay $700 in a special

24   assessment, which is due and payable immediately.

25           Mr. Issa, I recognize that a fine is recommended by

J6KVISSS

1   probation, but, frankly, Mr. Issa has a rather substantial tax

2   obligation that's due and owing to the United States, and I

3   really don't see the purpose of imposing a fine on top of that.

4   And so I'm not going to impose the fine.

5          Mr. Brafman, what recommendations, if any, would you

6   like me to make?

7          MR. BRAFMAN:  Your Honor, we would ask that the Court

8   recommend that Mr. Issa be permitted to serve his sentence in

9   Canaan, C-A-N-A-A-N.  It's a camp facility in Pennsylvania.

10  And we would also ask that he be permitted to voluntarily

11  surrender to that facility on September 5th.

12         THE COURT:  I will suggest Canaan.  Mr. Issa, it seems

13  to me, belongs in a very low-security type of facility.  I

14  think he would be a good candidate for camp.  And so we'll make

15  that clear.  If Canaan is unavailable, certainly in the

16  Northeastern United States, if such a facility is possible for

17  him, so that he will have access to his family, his family to

18  him.  And, yes, he will be permitted to self-surrender.

19         MR. BRAFMAN:  Thank you, your Honor.

20         On September 5th?  Can we just note that date?

21         THE COURT:  Is that a good date, Mr. O'Neill?

22         MR. BRAFMAN:  He would surrender to Canaan.  He

23  wouldn't surrender here.

24         THE COURT:  Well, he has to be designated.  We need at

25  least 90 days for BOP, and they've been slow recently.

J6KVISSS

1              MR. BRAFMAN:  Your Honor, let me make a suggestion,

2     because in a couple of cases that we've just had, they've

3     actually designated in six weeks.  So if he's not designated --

4              THE COURT:  You must have a magic wand, Mr. Brafman.

5              MR. BRAFMAN:  No, no.  It just happened recently in a

6     case before Judge Furman.  We got the designation.

7              THE COURT:  Look, I'm happy to make it September the

8     5th.  And the institution, Mr. Issa, will be told to

9     Mr. Brafman, and you'll surrender there by 2 o'clock on that

10    date.  But we may have to push it back -- just know that we may

11    have to push it back if we don't get a designation.

12             MR. BRAFMAN:  Yes, your Honor.

13             If he hasn't been designated by the end of August,

14    we'll let Mr. O'Neill know and ask for additional time.

15             THE COURT:  Thank you.

16             MR. BRAFMAN:  Thank you.

17             THE COURT:  So, Mr. Issa, much of what I say at

18    sentencing ends up focusing on the period after incarceration,

19    and it has to do with the period when you will be on supervised

20    release for three years after you're released.  You'll be under

21    the supervision of the United States Probation Officer.  And

22    during that period, you have to do everything that the

23    probation officer tells you to do; and you may not do anything

24    that the probation officer tells you that you cannot do.

25             You'll report within 72 hours of your release.

J6KVISSS

1          And let me briefly run through the conditions of

2     supervision.

3          You can't commit another crime.  You cannot unlawfully

4     possess a controlled substance.  You have to participate in an

5     outpatient treatment program approved by the United States

6     Probation Office, which program will include testing to

7     determine whether you've reverted to the use of drugs or

8     alcohol.  You must contribute to the cost of services rendered

9     based on your ability to pay or the availability of third-party

10    payment.

11         You must cooperate with the collection of DNA, genetic

12    identifying material, as directed by your probation officer.

13    You must comply with all of the standard conditions that have

14    been adopted by this Court, which I will go through briefly.

15    You must not knowingly leave the federal judicial district

16    where you're authorized to reside, which I believe is the

17    Southern District of New York?

18         MR. BRAFMAN:  Yes, your Honor.

19         THE COURT:  Without getting permission from the Court

20    or the probation officer.  You have to answer truthfully any

21    questions put by your probation officer.  You must live and you

22    must work at least 30 hours a week at a lawful type of

23    employment, both in locations approved by your probation

24    officer and if you are going to change anything about where you

25    live or who you live with or where you work or what you're

J6KVISSS

doing, you have to get the permission of the probation officer

in advance, ten days in advance, unless there's an emergency.

There's a fire, you have to vacate your house; and if that

happens, you have 72 hours to notify your probation officer.

You have to allow the probation officer to visit you

at any time at your home or elsewhere; and you permit the

probation officer to take any items that are prohibited by the

conditions of your supervision that are observed in plain view.

You must not communicate or interact with someone who

you know is engaged in criminal activity.  If you know someone

who has been convicted of a felony, you must not knowingly

communicate or interact with that person without first getting

the permission of the probation officer.  If you are arrested

or questioned by a law enforcement officer, you must notify

probation within 72 hours.

You must not own, possess, or have access to a

firearm, ammunition, destructive device, or dangerous weapon.

You must not act or make any agreement with law enforcement to

act as a confidential human source or an informant without

getting the permission of the Court.

You have to, as a special condition, provide the

probation officer with access to your financial information;

and you must not incur new credit charges or open additional

lines of credit without the approval of the probation officer

unless you are in compliance with the installment payment

J6KVISSS

1    schedule for your restitution.

2          Now, as for the restitution, the government will be

3    submitting an order of restitution some time in the next 90

4    days.  If while you're incarcerated you're engaged in what's

5    called a non-UNICOR work program at the Bureau of Prisons, you

6    have to pay $25 per calendar quarter toward that restitution,

7    and your $700 in court costs.  But the court costs are due and

8    payable immediately; they need to be paid.  $25 per calendar

9    quarter toward the criminal financial penalty of restitution.

10          If you're in a UNICOR Grade 1 through 4 program,

11   you'll pay 50 percent of your monthly UNICOR earnings toward

12   the restitution and, when you get out, 15 percent of your

13   gross, pre-tax -- and you will be paying your taxes -- monthly

14   income will go toward your restitution.  You make your

15   restitution payable to the Clerk of the United States District

16   Court for the Southern District of New York for distribution to

17   the U.S. Treasury.

18          Ibrahim Issa, you have the right to take an appeal of

19   the jury's verdict and from the judgment and sentence that had

20   been imposed upon you.  You have a right to counsel in

21   connection with any appeal you would choose to file.  And if

22   you elect to file a notice of appeal and you do not have the

23   funds to retain counsel, counsel will be appointed to represent

24   you without charge.  Do you understand?

25          THE DEFENDANT:  Yes.

J6KVISSS

1          THE COURT:  Mr. Brafman, I assume you'll be filing a

2     notice of appeal on behalf of your client?

3          MR. BRAFMAN:  We'll certainly make that decision

4     within the statutory time period.  Thank you, your Honor.

5          THE COURT:  Thank you, Mr. Brafman.

6          Is there anything else that I need to address today

7     from the government?

8          MS. HANFT:  The government moves to dismiss the

9     underlying indictment in this case, your Honor.

10          THE COURT:  Underlying indictments are dismissed.

11          Mr. Brafman, anything from you?

12          MR. BRAFMAN:  Nothing, your Honor.

13          THE COURT:  Thank you all very much.

14          These proceedings are closed.

15                         *    *    *

16

17

18

19

20

21

22

23

24

25